ARGUMENT NOT SCHEDULED

NO. 23-3228

IN THE UNITED STATES CIRCUIT COURT
FOR THE DISTRICT OF COLUMBIA
────────────────────────────

UNITED STATES OF AMERICA,
*Appellee,*

v.

DONALD J. TRUMP,
*Appellant.*

────────────────────────────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
────────────────────────────

*AMICI CURIAE* BRIEF OF FORMER OFFICIALS IN FIVE
REPUBLICAN ADMINISTRATIONS, *ET AL.,* SUPPORTING
APPELLEE AND AFFIRMANCE

December 12, 2023

Matthew W. Edwards
D.C. Bar No. 992036
1300 19th Street NW, Suite 300
Washington, DC 20006
(202) 530-3314
medwards@ainbanklaw.com

Richard D. Bernstein
D.C. Bar No. 416427
1875 K Street NW, Suite 100
Washington, DC 20006
(301) 775-2064
rbernsteinlaw@gmail.com

Nancy A. Temple
Katten & Temple, LLP
209 S. LaSalle Street, Suite 950
Chicago, IL 60604
(312) 663-0800
ntemple@kattentemple.com

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), *amici curiae* submit this certificate as to parties, rulings, and related cases.

### A. Parties and *Amici*

The parties are Donald Trump and the United States of America. The *amici* are set forth in Appendix A to this brief. Counsel is not aware of any other *amici* who, on the immunity issue, participated in the District Court or intend to participate in this Court.

### B. Rulings Under Review

References to the rulings at issue appear in this brief. The rulings by District Court Judge Chutkan under review are District Court Docket Numbers 171 and 172.

### C. Related Cases

D.C. Cir. Docket No. 23-3190 was an appeal from an earlier order of the District Court concerning extrajudicial statements. D. Ct. Dkt. 105.

December 12, 2023              */s/ Richard D. Bernstein*

i

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES.................................................................... i

TABLE OF CONTENTS.......................................................... ii

TABLE OF AUTHORITIES....................................................... iii

INTEREST OF AMICI CURIAE ............................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT................. 1

ARGUMENT...................................................................... 7

I.     A President Who Loses Re-Election But Makes Efforts To Stay Beyond His Term Is Attempting To Violate The Executive Vesting Clause........................................ 7

II.    Absolute Immunity Does Not Protect A President's Use Of Criminal Conduct To Alter Presidential Election Results.......................................................... 11

    A. Protecting The Presidency Designed By Article II Requires Rejecting Absolute Immunity For Criminal Efforts To Overturn Presidential Election Results..... 11

    B. Under Former President Trump's View Of Absolute Immunity, A Future President Could Disregard Current Criminal Restraints Against Using The Military To Alter Election Results........................... 19

    C. Rejecting Absolute Immunity Would Not Prevent Presidents From Vigorously Challenging Election Results................................................................ 26

CONCLUSION................................................. ................ 29

# TABLE OF AUTHORITIES

Page(s)

Cases

*Blassingame v. Trump,*
No. 22-5069, 2023 WL 8291481 (D.C. Cir. Dec. 1, 2023)
........................................................ 4, 9, 11, 13, 16, 18, 27, 28

*Carmell v. Texas,*
529 U.S. 513 (2000)................................................................4

*Chiafalo v. Washington,*
140 S. Ct. 2316 (2020)................................................... 17, 19

*Dahda v. United States,*
138 S. Ct. 1491 (2018).............................................................5

*Greenlaw v. United States,*
554 U.S. 237 (2008)............................................................5, 8

*Jenkins v. Washington Convention Center,*
236 F.3d 6 (D.C. Cir. 2001)...............................................5, 15

*Meza v. Renaud,*
9 F.4th 930 (D.C. Cir. 2021) ...............................................4

*Montgomery v. Louisiana,*
136 S. Ct. 718 (2016)...............................................................4

*Nixon v. Fitzgerald,*
457 U.S. 731 (1982)....................... 3, 4, 6, 12, 13, 14, 15, 19

*Schweitzer v. Hogan,*
457 U.S. 569 (1982)................................................................5

*Seila Law LLC v. Consumer Financial Protection Bureau,*
140 S. Ct. 2183 (2020)..........................................................17

*Texas v. Pennsylvania,*
141 S. Ct. 1230 (2020)..................................................... 20, 22

*Thigpen v. Roberts,*
468 U.S. 27 (1984).................................................................5

*Trump v. Vance,*
140 S. Ct. 2412 (2020)..................................................... 13, 14

*United States v. Burr,*
25 F. Cas. 30 (C.C.D. Va. 1807) .......................................9, 11

Statutes

3 U.S.C. § 1 .........................................................................21

3 U.S.C. § 7 ..................................................................... 22, 23

10 U.S.C. § 10106 ...........................................................................21
10 U.S.C. § 12405 ...........................................................................21
18 U.S.C. § 2(a) ..............................................................................20
18 U.S.C. § 2(b) ..............................................................................21
18 U.S.C. § 593 .........................................................................20, 21
18 U.S.C. § 1385 .............................................................................21

Rules

D.C. Cir. R. 32(e)(1) ......................................................................31
D.C. Cir. Rule 32(e)(2) ...................................................................31
Fed. R. App. P. 29(a)(5) .................................................................31
Fed. R. App. P. 32(a)(5) .................................................................31
Fed. R. App. P. 32(a)(6) .................................................................31
Fed. R. App. P. 32(a)(7)(B) ............................................................31
Fed. R. App. P. 32(f) ......................................................................31

Other Authorities

J. Alemany, J. Dawsey, and T. Hamburger, Talk of martial law,
    Insurrection Act draws notice of Jan. 6 Committee,
    Washington Post (Apr. 27, 2022)…………………………………………..25
John Danforth, et al., Lost, Not Stolen: The Conservative Case that
    Trump Lost and Biden Won the 2020 Presidential Election,
    (July 2022)…………………………………………………………………….28
J. Elliot ed., The Debates in the Several State Conventions
    (2d ed. 1888)……………………………………………………………………..8
M. Farrand ed., Records of the Federal Convention (1911)…………….7
Michael Flynn to Newsmax TV: Trump Has Options to Secure Integrity
    of 2020 Election (Dec. 17, 2020)
    https://www.newsmax.com/politics/trump-election-flynn-
    martiallaw/2020/12/17/id/1002139/.......................................24
D. Forte, Presidential Term, Article II, Section 1, Clause 1,
https://www.heritage.org/constitution/#!/articles/2/essays/77/presidentia
    l-term....................................................................................9-10
Gardner & H. Bailey, Ex-Trump allies detail effort to overturn election
    in Georgia plea videos, Washington Post (Nov. 13, 2023)……….. 10-11
Jonathan Karl, Tired of Winning, (2023)…………………………… 25
B. Swan, Read the emails showing Trump allies' connections to voting
    machine seizure push, Politico (Feb. 9, 2022)……………………… 23

U.S. Army Rejects Using 'Martial Law' on Election Fraud, Newsmax
    (Dec. 19, 2020), https://www.newsmax.com/newsfront/election-fraud-
    martial-law-army-no-role/2020/12/19/id/1002337/............................. 24
Washington's Farewell Address (1796)...................................... 12
Lin Wood to Newsmax TV: Trump Should Declare Martial Law
(Dec. 12, 2020),https://www.newsmax.com/newsmax-tv/
lin-wood-martial-law-georgia-bradraffensperger/2020/12/12/id/
1001228/.........................................................................23

## INTEREST OF *AMICI CURIAE*

*Amici* listed in Appendix A include former officials who have worked in five Republican administrations from Presidents Nixon to George W. Bush, served as elected Republican officials, are constitutional scholars, and others who support a strong Presidency.[1] Reflecting their experience, *amici* have an interest in a strong Presidency where each elected President serves only the term or terms to which he or she has been elected. *Amici* speak only for themselves personally, and not for any entity or other person.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Rejection of absolute immunity in this case is essential to protecting Article II's design of the Presidency itself. Former President Trump has argued that if absolute immunity does not protect his alleged criminal conduct in this case,[2] then necessarily every former President may be prosecuted for exercising supervisory and policy responsibilities, firing

---

[1]    *Amici* state that no counsel for any party authored this brief in whole or in part and that no entity, aside from *amici* and their counsel, made any monetary contribution toward the preparation or submission of this brief.

[2]    In this brief, "criminal conduct" refers to conduct that meets every required element of a federal criminal statute, including *mens rea.*

Cabinet members, allegedly lying in communications to Congress, or using lethal force abroad. *See* D. Ct. Dkt. No. 122, at 12-15. This is a vast overstatement for a number of reasons. These reasons include that federal criminal statutes require *mens rea* and particular acts.

This *amici* brief demonstrates another reason. One of the bases to affirm focuses on the specific category of crimes alleged against the former President here—engaging in criminal conduct in post-election efforts to subvert the presidential election results. None of the former President's hypotheticals about prosecutions in other contexts involves an outgoing President's criminal efforts to prevent what Article II mandates—the vesting of the authority and functions of the Presidency in the next, lawfully-elected President.

A core allegation of the Indictment is that Mr. Trump knew that it was false to say there had been "outcome-determinative voting fraud in the [2020] election," but nonetheless engaged in criminal lies and conspiracies "to overturn the legitimate results of the 2020 presidential election and retain power."[3] Under these allegations, former President

---

[3]      Indictment (D. Ct. Dkt. No. 1), ¶¶ 2, 4, 7-8; *see also, e.g., id.* at ¶¶ 10-13, 15, 19-20, 22, 25, 29-33, 35-37, 41, 45-46, 50, 52, 56, 64, 66-67, 70, 74, 77, 81, 83, 86, 90, 92, 99-100, 102, 104, 116, 118. *Amici* do not address

Trump's criminal conduct was directed to usurping the authority and functions of the Presidency for the current term to which President Biden was legitimately elected. That constitutes an alleged effort to violate Article II, Section 1, Clause 1, also called the Executive Vesting Clause. That is an attack on Article II's very design for the Presidency itself.

Former President Trump's alleged effort to usurp the Presidency presents an especially weak case for extending the doctrine of presidential immunity to a criminal case. The last thing presidential immunity should do is embolden Presidents who lose re-election to engage in criminal conduct, through official acts or otherwise, as part of efforts to prevent the vesting of executive power required by Article II in their lawfully-elected successors. The scope of immunity proposed by former President Trump would turn *Nixon v. Fitzgerald*, 457 U.S. 731 (1982), on its head by encouraging the greatest possible threat of "intrusion on the authority and functions of the Executive Branch," *id.* at 754 — a losing President's efforts to usurp the authority and functions of a duly-elected successor President.

---

any defense former President Trump has asserted or may assert, other than absolute immunity.

The District Court rejected former President Trump's argument that a President's absolute immunity from civil damages for official acts under *Nixon v. Fitzgerald,* 457 U.S. 731 (1982), also applies to federal criminal prosecution of a former President. D. Ct. Dkt. No. 171. *Amici* agree with this ruling. *Amici* also agree with *Blassingame v. Trump*, No. 22-5069, 2023 WL 8291481 (D.C. Cir. Dec. 1, 2023) ("*Blassingame*"), that President Trump "engaged in his campaign to win re-election – *including his post-election efforts to alter the declared results in his favor* – in his personal capacity as presidential candidate, not in his official capacity as sitting President." *E.g.*, *id.* at *2 (emphasis added).

One factor on which the District Court relied was that it "would betray the public interest" to give a former President "a categorical exemption from criminal liability" for allegedly "attempting to usurp the reins of government." D. Ct. Dkt. No. 171, at 24-25. This *amici* brief will demonstrate that this ground by itself provides one of the bases to affirm. *See Meza v. Renaud*, 9 F.4th 930, 933 (D.C. Cir. 2021) (on a "legal question . . . [,] we generally may affirm on any ground supported by the

record").[4] Under this basis, this Court should affirm regardless of whether there may be presidential immunity for official acts in some other criminal contexts and whether any of the alleged criminal conduct of former President Trump may be an official act.

Preservation of the Presidency designed by Article II requires rejection of immunity from prosecution for a President's use of criminal conduct in efforts to alter declared election results, whether that conduct consists of acts as a candidate, official acts, or both. Here, for example,

---

[4]    The District Court's reliance on attempted usurpation, the Indictment's allegations of attempted usurpation, and the government's arguments that there is no immunity from criminal prosecution for a former President generally or in this case all provide ample grounds to affirm on the basis that any immunity a former President may have from criminal prosecution does not apply to allegations that he or she engaged in criminal conduct in an attempt to usurp the Presidency. *See Dahda v. United States,* 138 S. Ct. 1491, 1498 (2018) (affirming conviction based "upon an argument that the Government did not make below"); *Greenlaw v. United States,* 554 U.S. 237, 250 & n.5 (2008) (Court may affirm based on a "novel" legal argument "presented for the first time in a brief *amicus* filed in this Court"); *Jenkins v. Washington Convention Center,* 236 F.3d 6, 8 n.3 (D.C. Cir. 2001) (this "court may affirm the district court on grounds different from those relied upon by the district court"); *see also Thigpen v. Roberts,* 468 U.S. 27, 29-30 (1984) (affirming based on legal argument that circuit court did not address); *Schweitzer v. Hogan,* 457 U.S. 569, 585 n.24 (1982) (sustaining district court's judgment based on a legal argument that was "not presented in the District Court").

the former President argues that he was acting officially when he allegedly conspired to commit criminal conduct by enlisting Department of Justice personnel to make false statements to state officials to support his efforts to overturn declared state election results. Indictment, ¶¶ 70, 75, 78-79, 84. If that conduct qualified for absolute immunity, this would improperly unleash a future President to disregard current criminal statutes and deploy the military in efforts to alter the results of a presidential election. *See* Part II.B., *infra.*

Instead, to deter future attempts to violate the Executive Vesting Clause, this Court should reject Mr. Trump's claim of an absolute immunity so broad that it would bar prosecution of a first-term President who employed criminal conduct to overturn election results. In this vital context, rejection of criminal immunity for both unofficial and official acts is necessary to protect the "public interest," *Nixon v. Fitzgerald*, 457 U.S. at 754 n.37, in government by the People that the Executive Vesting Clause guarantees.

The District Court also rejected the former President's additional argument that a former President is immune from criminal prosecution for conduct while in office unless that President was impeached by the

House and convicted by the Senate. *Amici* agree with that rejection but do not address it in this brief.

## ARGUMENT

### I.   A PRESIDENT WHO LOSES RE-ELECTION BUT MAKES EFFORTS TO STAY BEYOND HIS TERM IS ATTEMPTING TO VIOLATE THE EXECUTIVE VESTING CLAUSE.

Article II, Section 1, Clause 1 of the Constitution provides:

> The executive Power shall be vested in a President of the United States of America. He shall hold his Office *during the Term of four Years*, and, together with the Vice President, chosen for the same Term, *be elected*, as follows

(Emphases added). This Executive Vesting Clause creates the only Presidency we have under our Constitution.

The second sentence of the Clause requires a first-term President who loses re-election to leave office at the end of his term. This was an important selling point during ratification. The Constitutional Convention initially adopted provisions of a draft Constitution that would have elected a President for a single seven-year term and made each President ineligible for re-election. 1 M. Farrand ed., *Records of the Federal Convention,* 64, 68-69 (1911). The Convention later switched course and framed a Constitution that enabled a President to seek re-

7

election, but the Executive Vesting Clause limited every presidential term to four years.

This major change was explained by Edmund Randolph, who was a delegate at both the Constitutional Convention and the Virginia Ratifying Convention.[5] Randolph explained to the Virginia Ratifying Convention that, at the Constitutional Convention, his original position was "that the reeligibility of the President was improper." 3 J. Elliot ed., *The Debates in the Several State Conventions* 485 (2d ed. 1888). He "altered [his] opinion" and subsequently defended the Constitution's permission for re-election by relying on the mandates of the Executive Vesting Clause. *Id.* at 485-86. He stated that a sitting President "may [not] hold his office without being reelected. He cannot hold it over four years, unless he be reelected, any more than if he were prohibited [from running]." *Id.* at 486. Randolph stated that a President who loses re-election is "displaced at the end of the four years" by the Executive Vesting Clause. *Id.* at 486.

---

[5]     At both times, he was also Governor of Virginia. He would later be President George Washington's first Attorney General and second Secretary of State.

As Chief Justice Marshall put it, "the president . . . , on the expiration of the time for which he is elected, returns to the mass of the people again." *United States v. Burr*, 25 F. Cas. 30, 34 (C.C.D. Va. 1807) (Marshall, Circuit Justice) (quoted in *Blassingame*, at *12). As Section 1 of the subsequent Twentieth Amendment reiterated: "The terms of the President and the Vice-President *shall end* at noon on the 20th day of January . . .; and the terms of their successors *shall then begin*." (Emphases added).

Presidents from John Adams to George H.W. Bush who lost re-election obeyed the Executive Vesting Clause by peacefully transferring the powers of the Presidency to their elected successors. As was written in The Heritage Foundation's *Guide to the Constitution* before the 2020 election: "It should be noted that the four-year limitation is absolute, and every president (no matter how disputed the election results may have been) has always turned the office over to his successor on the appointed day . . . ." D. Forte, *Presidential Term,* Article II, Section 1, Clause 1, available                                                                at https://www.heritage.org/constitution/#!/articles/2/essays/77/presidential-term.

In contrast, any President who loses re-election, but engages in efforts to usurp the office of the Presidency beyond his four-year term, would be threatening to violate the Executive Vesting Clause in two inseparable ways. First, that President would be threatening to extend the four-year term – and *only* four years – in which executive power has been vested by election in that President. Second, that President would be threatening to prevent the vesting of the authority and functions of the Presidency in the *newly-elected* President. These are assaults upon the Presidency created by Article II.

The recent proffer in Georgia of Jenna Ellis, a lawyer for President Trump's 2020 campaign, describes a stark attempt to violate the Executive Vesting Clause. According to the proffer of Ms. Ellis, on December 19, 2020, she discussed the former President's numerous court losses with Dan Scavino, the Deputy White House Chief of Staff. A Gardner & H. Bailey, *Ex-Trump allies detail effort to overturn election in Georgia plea videos*, Washington Post (Nov. 13, 2023).[6] According to

---

[6]      *Available at* https://washingtonpost.com/national-security/2023/11/13/trump-georgia-case-videos-overturn-2020-election/ (linking to proffer video).

the proffer video, Mr. Scavino responded: "Well, we don't care, and we're not going to leave . . . . [T]he boss is not going to leave under any circumstances. We are just going to stay in power." *Id.*

Former President Trump's immunity appeal in effect argues that a former President who employed criminal conduct in efforts to retain power contrary to the Executive Vesting Clause nonetheless has absolute immunity. Part II of this brief demonstrates one basis why this is wrong.

## II.  ABSOLUTE IMMUNITY DOES NOT PROTECT A PRESIDENT'S USE OF CRIMINAL CONDUCT TO ALTER PRESIDENTIAL ELECTION RESULTS.

### A.  Protecting The Presidency Designed By Article II Requires Rejecting Absolute Immunity For Criminal Efforts To Overturn Presidential Election Results.

*Blassingame,* at \*1-2, 12-15, recognized that the presidential re-election context disfavors even civil immunity for a President. The presidential re-election context also presents the weakest case for creating any criminal immunity for a former President, including for official acts.

As the District Court stated, former President Trump is charged with criminal efforts to subvert his re-election loss and "usurp the reins of government." Docket No. 171, at 25. What kind of Constitution would

11

immunize and thereby embolden losing first-term Presidents to employ criminal conduct—through either official or unofficial acts—in efforts to usurp a second term? Not our Constitution with the Executive Vesting Clause's clear mandate: four years, you lose re-election, you get out, and the Presidency is vested in your successor. Indeed, George Washington's Farewell Address stated that it would "destroy[]" our constitutional system if "cunning, ambitious, and unprincipled men will be enabled to subvert the power of the people and usurp for themselves the reins of government." Washington's Farewell Address, at 14 (1796).[7] Nothing in our Constitution, or any case, supports former President Trump's dangerous argument for criminal immunity.

*Nixon v. Fitzgerald* addressed immunity from civil damages for firing a federal employee. The plaintiff did not and could not allege that his firing had anything to do with presidential election results. The reasoning of *Nixon v. Fitzgerald* was that the Court "must balance the constitutional weight of the interest to be served [by civil damages] against the dangers of intrusion on the authority and functions of the

---

[7]    *Available    at*    https://www.govinfo.gov/content/pkg/GPO-CDOC-106sdoc21/pdf/GPO-CDOC-106sdoc21.pdf.

Executive Branch." 457 U.S. at 754. The Court cautioned that "[i]n defining the scope of an official's absolute privilege, . . . the sphere of protected action must be related closely to the immunity's justifying purposes." *Id.* at 755.

*Nixon v. Fitzgerald* reserved deciding whether presidential absolute immunity applies at all in the criminal context, much less in which cases. So did *Blassingame. See* 2023 WL 8291481, at *2 (not addressing "whether and when a President might be immune from criminal prosecution"). *Nixon v. Fitzgerald* explained that this reservation was because at least one side of the requisite balancing would carry different weight: "[t]he Court has recognized . . . that there is a lesser public interest in actions for civil damages than, for example, in criminal prosecutions." *Nixon v. Fitzgerald,* 457 U.S. at 754 & n.37.

In *Trump v. Vance,* 140 S. Ct. 2412 (2020), then-sitting President Trump sought an immunity from a grand jury subpoena concerning conduct outside his official duties. Justice Kavanaugh's concurrence reiterated that a court must balance interests when a sitting or former President seeks an immunity in a new context. In that case, the Court had to "balance" the "interests of the criminal process and the Article II

13

interests of the Presidency." *Id.* at 2432. In *Vance,* as in *Nixon v. Fitzgerald,* "the Article II interests of the Presidency" were entirely on the side of the sitting or former President.

In marked contrast to those cases and the hypotheticals relied upon in the former President's briefs below, the current case involves a prosecution for a President's alleged criminal conduct that threatened the most serious "intrusion on the authority and functions of the Executive Branch." *Nixon v. Fitzgerald*, 457 U.S. at 754. That is, an outgoing President allegedly engaged in criminal efforts to usurp the functions and authority of a lawfully-elected successor President. In this new and different context, protecting Article II's Executive Vesting Clause is vital. Here, both the interests of the criminal process *and* protecting the Article II interests of the Presidency support legal accountability and oppose absolute immunity.

To be clear, *amici* are not advocating individual case-by-case balancing. This case presents an entirely different *category* that *Nixon v. Fitzgerald* did not and could not decide – immunity that would encourage a President to employ criminal conduct to usurp the Presidency itself.

*Nixon v. Fitzgerald* addressed only the category where a President allegedly injures "individuals" who sue for damages. *Id.* at 754 n.37.

There is a fundamental difference between the category of *Nixon v. Fitzgerald* and the category of this case as to which side has the support of the Article II interests of the Presidency. A village is not saved by destroying it. So too, the functions and authority of the elected Presidency would be imperiled—*not* preserved—by an immunity so boundless that it would encourage Presidents who lose as candidates for re-election to employ criminal conduct in efforts to prevent the Presidency's functions and authority from being vested in their lawfully-elected successors.

Even *assuming* presidential immunity might appropriately be applied to some categories of criminal prosecutions, immunity should not extend to the particular category at issue here. The Executive Vesting Clause uniquely protects the Presidency by specifying *who* is vested with executive powers. Under the "balance" of interests approach in *Nixon v. Fitzgerald* and *Vance*, *supra* at 13-14, the interests supporting a criminal prosecution of a former President could not be stronger than in the category of cases that protects Article II's assignment of "who" is vested with executive powers. Although *amici* believe that the balance of

interests also plainly opposes absolute immunity in a criminal category about "how" executive powers were executed, the Executive Vesting Clause provides an independent basis for denying immunity in the "who" category of criminal cases.

*First*, the "who" category protects the Presidency itself. Presidential immunity is designed to protect Article II interests, including enabling a decisive and even bold President in the execution of his or her powers. But with respect to the Executive Vesting Clause, there are powerful Article II interests against immunity. This is because Article II itself is deeply concerned with ensuring that "who" is President is the person elected pursuant to Article II, not the person self-servingly determined by a sitting President. "The *presidency itself* has no institutional interest in who will occupy the office next." *Blassingame,* at *13 (emphasis added). There is thus no constitutional value in encouraging bold and decisive official or unofficial acts by a President to seize control of the office beyond the term to which he or she has been elected.

*Second,* the "who" category protects Article II's design for presidential elections. To start, the Executive Vesting Clause ensures government by the People by mandating that a first-term President

16

leaves at the end of a four-year term when the People have elected someone else for the next term.[8] As the Supreme Court recently held, "[t]o justify and check" the President's "unique [authority] in our constitutional structure," Article II "render[s] the President directly accountable to the people through regular elections." *Seila Law LLC v. Consumer Financial Protection Bureau*, 140 S. Ct. 2183, 2203 (2020). The paramount public interest against executive tyranny is antithetical to creating an absolute immunity from criminal prosecution that is so broad that it would immunize a President who loses re-election but uses criminal conduct in efforts to overturn the presidential election results.

Moreover, part and parcel of Article II's design for the Presidency is specifying which officials determine the presidential election results. The Executive Vesting Clause requires the President "be elected, *as follows . . .* " (Emphasis added). Under the immediately following Clause 2 of Section 1 of Article II, state law officials determine which candidate won each state. Under Article II, Section 1, Clause 3, as reiterated by the

---

[8]    Every state has exercised its Article II powers to choose the popular vote as the manner to elect a President. *See Chiafalo v. Washington*, 140 S. Ct. 2316, 2321-22 (2020).

17

Twelfth Amendment, Congress and the Vice President have a narrow role concerning the counting of electoral votes.

It is logical to conclude that one key reason Article II did not assign even a ceremonial role to a President concerning presidential election results is that a President might try to avoid the ignominy of electoral defeat through dishonesty or intimidation. It would turn Article II on its head if absolute immunity were so broad that it encouraged a President to engage in criminal conduct by deceiving or intimidating the officials to whom, unlike the President, Article II assigns duties concerning presidential election results. As *Blassingame* concluded, under Article II, "'every practicable obstacle' was imposed to prevent 'cabal, intrigue and corruption' from giving an incumbent President a structural electoral advantage." *Blassingame, supra,* at *12 (quoting Federalist No. 68, at 459 (Alexander Hamilton) (Jacob E. Cooke ed., 1961)).

*Third*, because the "who" category protects Article II's design for the Presidency and presidential elections, it is not germane to this criminal case that "an effort by one branch to interfere in *another* branch's sphere" is an indicator of official conduct. *Blassingame*, *supra,* at *19 (emphasis added). It is to protect *the Presidency itself*—not another branch— that

there should be no immunity from prosecution for a President's criminal efforts to violate the Executive Vesting Clause, whether through official *or* unofficial acts. The "public interest," *Nixon v. Fitzgerald*, 457 U.S. at 754, could not be higher in criminal prosecutions that preserve and defend the provisions of Article II that design the Presidency itself and presidential elections. Enforcing those provisions is essential to fulfilling both Article II's design and "the trust of a Nation that here, We the People rule." *Chiafalo v. Washington*, 140 S. Ct. 2316, 2328 (2020).

*Fourth*, the "who" category involves the narrowest sliver of potential criminal cases. Thus, unlike in *Nixon v. Fitzgerald,* recognizing the inapplicability of presidential immunity here would not even arguably "subject the President to trial on virtually every allegation that an action was unlawful." 457 U.S. at 756.

> **B.    Under Former President Trump's View Of Absolute Immunity, A Future President Could Disregard Current Criminal Restraints Against Using The Military To Alter Election Results.**

The Indictment alleges that former President Trump "attempted to use the Justice Department to make knowingly false claims of election fraud to officials in the targeted states through a formal letter under the Acting Attorney General's signature" that urged "the targeted states to

replace legitimate Biden electors with the Defendant's." Indictment, ¶¶70, 75. *See also id.* ¶¶78-79, 84. The former President has argued these were official acts because an Attorney General "is appointed by and reports to the President." D. Ct. Dkt. No. 74, at 33. Under this reasoning, armed with absolute immunity, a future President would be incentivized to enlist the Secretary of Defense to deploy the military to support efforts to overturn that President's re-election loss. Just like the Attorney General, the Secretary of Defense is appointed by and reports to the President.

Absent absolute immunity, current criminal statutes deter a President's use of the military to alter presidential election results. In addition to the statutory provisions underlying the Indictment, 18 U.S.C. § 593, for example, makes it a crime when "an officer or member of the Armed Forces of the United States . . . imposes or attempts to impose any regulations for conducting any general or special election in a State, different from those prescribed by law, or . . . interferes in any manner with any election officer's discharge of his duties."[9] Pursuant to 18 U.S.C.

---

[9]    A presidential election is actually an election in each of the 50 states. *See Texas v. Pennsylvania,* 141 S. Ct. 1230 (2020) (one state has no "judicially cognizable interest in in the manner in which another State

§ 2(a), a President would commit a crime if that President "aids, abets, counsels, *commands*, induces, or procures" commission of an offense under 18 U.S.C. § 593 (emphasis added); *see also* 18 U.S.C. § 2(b) (criminalizing "[w]hoever willfully causes an act to be done which if directly performed by him *or another* would be an offense against the United States") (emphasis added)); § 371 (criminalizing conspiracy "to commit any offense against the United States"). In addition, 18 U.S.C. § 1385 makes it a crime when anyone "willfully uses any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force as a posse comitatus or otherwise to execute the laws" except "in cases and under circumstances expressly authorized by the Constitution or Act of Congress." [10]

---

conducts its elections"); 3 U.S.C. § 1 ("The electors of President and Vice President shall be appointed, in each State, on election day, in accordance with the laws of the State enacted prior to election day.").

[10]     Statutes like 18 U.S.C. §§ 593 and 1385 that govern the federal military services apply to "[m]embers of the National Guard called into Federal service." 10 U.S.C. § 12405; *see also, e.g.,* 10 U.S.C. § 10106 ("The Army National Guard while in the service of the United States is a component of the Army.").

Absolute immunity from criminal prosecution, however, would encourage a future President to disregard these criminal statutes and deploy the military—or armed agents of the Departments of Justice or Homeland Security—to prevent the counting of votes in an unfavorable county or of a certain type (such as mail-in ballots) by seizing ballots or voting machines. Such absolute immunity also would encourage that President to use the military or armed federal agents to bar physically his or her opponent's electors from casting their electoral votes on the day and in the place required by 3 U.S.C. § 7 and state law.

These terrifying possibilities are real, not remote. Indeed, after the Supreme Court refused to overturn the 2020 election results in *Texas v. Pennsylvania*, there was a drumbeat of calls from allies of President Trump for him to deploy the military to remain in power. The next day, on December 12, 2020, Lin Wood appeared on Newsmax and stated: "If the Supreme Court does not act, I think the president should declare some extent of Martial law, and he should hold off an[d] stay the electoral college . . . . [T]he electoral college does not need to meet and vote until we have resolved these [fraud and illegality] issues." Lin Wood to Newsmax TV: Trump Should Declare Martial Law (Dec. 12, 2020),

22

available at https://www.newsmax.com/newsmax-tv/lin-wood-martial-law-georgia-brad-raffensperger/2020/12/12/id/1001228/.

An executive order was drafted and dated December 16, 2020, under which President Trump would have "order[ed]" that "the Secretary of Defense shall seize" voting machines and records, including by using federalized National Guard units. B. Swan, *Read the never-issued Trump order that would have seized voting machines*, Politico (Jan. 21, 2022), *available at* https://www.politico.com/news/2022/01/21/read-the-never-issued-trump-order-that-would-have-seized-voting-machines-527572 (linking to draft order). According to *Politico,* the draft order was created by a lawyer assisting Rudy Guiliani in efforts to overturn the 2020 election results. B. Swan, *Read the emails showing Trump allies' connections to voting machine seizure push,* Politico (Feb. 9, 2022), available at https://www.politico.com/news/2022/02/09/trump-emails-voting-machines-election-00007449 (linking to December 16-17, 2020 emails).

On December 16, 2020, former General and National Security Advisor Michael Flynn and other allies of former President Trump reviewed the draft order. *Id.* The next day, Mr. Flynn criticized the

23

Supreme Court and simultaneously called for President Trump to seize voting machines and deploy "military capabilities" to "rerun an election in each of those [swing] states." Michael Flynn to Newsmax TV: Trump Has Options to Secure Integrity of 2020 Election (Dec. 17, 2020), available at https://www.newsmax.com/politics/trump-election-flynn-martiallaw/2020/12/17/id/1002139/ (linking to video).

In response, on December 18, 2020, the Army's Chief of Staff and Secretary issued a public statement that "[t]here is no role for the U.S. military in determining the outcome of an American election." U.S. Army Rejects Using 'Martial Law' on Election Fraud, Newsmax (Dec. 19, 2020), available at https://www.newsmax.com/newsfront/election-fraud-martial-law-army-no-role/2020/12/19/id/1002337/. President Trump, however, promptly dispatched the Director of the White House Presidential Personnel Office to inform the Acting Secretary of Defense that the public statement of these Army officials "was entirely unacceptable." Jonathan Karl, *Tired of Winning,* 131, 133-34 (2023). That evening, President Trump met with Flynn, Guiliani, and others for four hours. *Id.* at 134.

On January 3, 2021, co-conspirator 4, a Justice Department official, discussed potential use of military force purportedly under the Insurrection Act. Indictment, ¶ 81. On January 15, 2021, Mike Lindell carried notes into a meeting with President Trump that stated "Insurrection Act *now* . . . martial law if necessary." J. Alemany, J. Dawsey, and T. Hamburger, Talk of martial law, Insurrection Act draws notice of Jan. 6 Committee, Washington Post (Apr. 27, 2022) (emphasis in quoted notes), available at https://www.washingtonpost.com/politics/2022/04/27/talk-martial-law-insurrection-act-draws-notice-jan-6-committee/. As late as January 17, 2021, Representative Marjorie Taylor Greene texted White House Chief of Staff Mark Meadows that "several [members of the House] are saying the only way to save our Republic is for Trump to call for Marshall [sic] law." *Id.*

Even now, the real possibility that absolute immunity might embolden tyrannical conduct by a President logically follows from the discussion in former President Trump's reply brief below about how, during the dispute over the 1876 election, President Grant's "official actions [possibly] were criminal." D. Ct. Dkt. No. 122, at 11-12. The clear

25

import of that brief's discussion is that, in the future, absolute immunity for official conduct should bar prosecution of a former President who "trailed greatly in the electoral college" and "dispatched federal troops to states to ensure that" the electoral votes of those states were favorably awarded. *Id.* at 11-13.

If this Court adopts former President Trump's view of absolute immunity, future first-term Presidents would be encouraged repeatedly to engage in despotic criminal conduct after election day to remain in power illegitimately. In our divided nation, in the last eight presidential re-election campaigns, the incumbent lost four times (1976, 1980, 1992, and 2020), and won competitive races twice (2004 and 2012). No Court should create a presidential immunity from criminal prosecution, even for official acts, that is so vast that it endangers the peaceful transfer of executive power that is mandated by the Executive Vesting Clause.

### C.     Rejecting Absolute Immunity Would Not Prevent Presidents From Vigorously Challenging Election Results.

Like other presidential candidates, a sitting President's rights to challenge election results include both the First Amendment rights and access to the courts that candidates Al Gore and George W. Bush exercised in 2000. And, like any candidate, an incumbent President may

not be prosecuted for employing means that fall outside criminal statutes, including their *mens rea* elements. A President merely does not have an additional absolute immunity so over-reaching that it encourages criminal conduct employed in efforts to overturn presidential election results.

Take court challenges for example. Under *Blassingame*, at *2, not even civil presidential immunity extends to court filings by a sitting President as a candidate seeking to alter presidential election results. The Indictment's restrained treatment of former President Trump's many court filings contesting the 2020 election illustrates how, notwithstanding the lack of absolute immunity, many other safeguards—including First Amendment rights, access to the courts, and *actus reus* and *mens rea* elements—fully enable a sitting President to make vigorous challenges to election results.

The Indictment acknowledges, for example, that as a candidate, former President Trump was, among other efforts, "entitled to . . . fil[e] lawsuits challenging ballots and procedures." Indictment, ¶3. The former President and his allies brought 64 court cases concerning vote counting in Arizona, Georgia, Michigan, Nevada, Pennsylvania, and Wisconsin,

including challenging the counting of mail-in ballots, the counting of votes in counties Joe Biden was winning, voter eligibility, and campaign observer access. *See* John Danforth, *et al., Lost, Not Stolen: The Conservative Case that Trump Lost and Biden Won the 2020 Presidential Election,* at 3-5 (July 2022), available at www.lostnotstolen.org.[11] Even though myriad state and federal courts thoroughly rejected both factual allegations and legal assertions in these challenges, *see id.* at 14-15, 33-35, 44-46, 51-52, 59-63, 68-69 (citing cases), the Indictment does not even mention 62 of these court challenges as a basis for prosecution.[12]

---

[11]   Former Senator John Danforth's co-authors were former Senator Gordon H. Smith, former Judges Thomas B. Griffith, J. Michael Luttig, and Michael W. McConnell, and Benjamin Ginsberg, David Hoppe, and Theodore B. Olson.

[12]   The Indictment also does not mention two other failed court challenges by former President Trump. First, the former President moved to intervene in his personal capacity in an original proceeding in the Supreme Court challenging the election results in Georgia, Michigan, Pennsylvania, and Wisconsin. *See Blassingame,* at *2, 11-12. Second, former President Trump's campaign pursued an action in federal district court in New Mexico challenging that State's use of drop boxes for mail-in ballots. *See Donald J. Trump Campaign for President, Inc. v. Toulouse Oliver,* No. 1:20-cv-02189-MV-JHR (D.N.M.) (filed Dec. 14, 2020).

Only two paragraphs of the Indictment mention court filings. Both filings contained factual statements that allegedly were known by former President Trump to be false and allegedly were part of efforts to subvert Georgia's election results. On November 25, 2020, former President Trump retweeted about a lawsuit that contained false allegations of "massive election fraud" in voting machine software and hardware, even though former President Trump allegedly had conceded privately that these allegations were unsupported and "crazy." Indictment, ¶20. And on December 31, 2020, the former President signed a verification of a lawsuit's allegations after a co-conspirator allegedly had acknowledged that the former President was aware that some of the factual allegations were inaccurate. Indictment, ¶30. The Indictment thus confirms that rejecting absolute immunity does not expose to prosecution here even inaccurate and deeply flawed post-election day court challenges, except where those challenges contained factual statements that the former President allegedly knew were false and were employed as part of a larger scheme of criminal conduct.

## CONCLUSION

This Court should affirm.

December 12, 2023                    Respectfully submitted,

/s/ *Richard D. Bernstein*
Richard D. Bernstein
D.C. Bar No. 416427
1875 K Street NW, Suite 100
Washington, DC 20006
(301) 775-2064
rbernsteinlaw@gmail.com

Matthew W. Edwards
D.C. Bar No. 992036
1300 19th Street NW, Suite 300
Washington, DC 20036
(202) 530-3314
medwards@ainbanklaw.com

Nancy A. Temple
Katten & Temple, LLP
209 S. LaSalle Street, Suite 950
Chicago, IL 60604
(312) 663-0800
ntemple@kattentemple.com

*Counsel for Amici*

## CERTIFICATE OF COMPLIANCE WITH
## TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS,
## AND TYPE STYLE REQUIREMENTS

1.    Pursuant to Fed. R. App. P. 29(a)(5), this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and D.C. Cir. Rule 32(e)(2) because this brief contains 5,730 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and D.C. Cir. R. 32(e)(1).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 with 14-point Century font.

Respectfully submitted,

/s/ Richard D. Bernstein

## CERTIFICATE OF WHY SEPARATE BRIEF IS NECESSARY

Counsel is aware of no other person, individual or group who sought leave to file in the District Court an *amicus* brief supporting the government's opposition to absolute immunity. Counsel likewise is not aware of any other potential *amicus* brief supporting appellee and affirmance in this appeal. Accordingly, and in light of the expedited schedule for this appeal, it is not practicable for the *amici* on this brief to file a single brief with unknown other potential *amici.*

*/s/ Richard D. Bernstein*

## CERTIFICATE OF SERVICE

I, Richard D. Bernstein, hereby certify that on December 12, 2023, I caused a true and correct copy of the foregoing *Amici Curiae* Brief by Former Officials in Five Republican Administrations, *et al.*, in Support of Appellee and Affirmance to be served on counsel of record for the Government and the Defendant listed on the docket via the Court's ECF system and via electronic mail as follows:

J.P. Cooney
Molly Gulland Gaston
Thomas Windom
U.S. ATTORNEY'S OFFICE FOR THE DISTRICT OF COLUMBIA
555 Fourth Street, NW
Washington, DC 20530
joseph.cooney@usdoj.gov
Molly.gaston@usdoj.gov
Thomas.windom@usdoj.gov

James Pearce
U.S. DEPARTMENT OF JUSTICE
CRIMINAL DIVISION APPELLATE SECTION
Department of Justice, Criminal Division
950 Pennsylvania Ave NW, Suite 1250
Washington, DC 20530
james.pearce@usdoj.gov

Dean John Sauer
Michael E. Talent
James Otis Law Group

13321 N. Outer Forty Road, Suite 300
Chesterfield, MO 63017
John.sauer@james-otis.com
Michael.talent@james-otis.com


William Owen Scharf
will@willscharf.com

Todd Blanche
Emil Bove
BLANCHE LAW
99 Wall Street
New York, NY 10005
toddblanche@blanchelaw.com
emil.bove@blanchelaw.com

John F. Lauro
Filzah I. Pavalon
Gregory M. Singer
LAURO & SINGER
400 N. Tampa Street, 15th Floor
Tampa, FL 33602
jlauro@laurosinger.com
fpavalon@laurosinger.com
gsinger@laurosinger.com

/s/ Richard D. Bernstein

# APPENDIX A
## LIST OF AMICI CURIAE[1]

**Donald Ayer**, Deputy Attorney General, 1989-1990; Principal Deputy Solicitor General, 1986-1988; United States Attorney, Eastern District of California, 1982-1986; Assistant United States Attorney, Northern District of California, 1977-1979.

**John Bellinger III**, Legal Adviser to the Department of State, 2005-2009; Senior Associate Counsel to the President and Legal Adviser to the National Security Council, The White House, 2001-2005.

**Barbara Comstock**, Representative of the Tenth Congressional District of Virginia, United States House of Representatives, 2015-2019; Member of the Virginia House of Delegates, 2010-2014; Director of Public Affairs, United States Department of Justice, 2002-2003; Chief Investigative Counsel, Committee on Government Reform of the United States House of Representatives, 1995-1999.

**John Danforth,** United States Senator from Missouri, 1976-1995; United States Ambassador to the United Nations, 2004-2005; Attorney General of Missouri, 1969-1976.

**Mickey Edwards**, Representative of the Fifth Congressional District of Virginia, United States House of Representatives, 1977-1993; founding trustee of the Heritage Foundation and former national chairman of both the American Conservative Union and the Conservative Political Action Conference.

---

[1]     The views expressed are solely those of the individual *amici* and not any organization or employer. For each *amicus,* reference to prior and current position is solely for identification purposes.

**Charles Fried**, Solicitor General, 1985-1989; Associate Justice, Massachusetts Supreme Judicial Court, 1995-1999; currently, the Beneficial Professor of Law at Harvard Law School.

**Stuart M. Gerson**, Acting Attorney General, 1993; Assistant Attorney General for the Civil Division, 1989-1993; Assistant United States Attorney for the District of Columbia, 1972-1975.

**John Giraudo**, Attorney Advisor, Office of Legal Counsel, 1986-1988; Associate Deputy Secretary of Labor, December 1986-1988.

**Peter Keisler**, Acting Attorney General, 2007; Assistant Attorney General for the Civil Division, 2003-2007; Principal Deputy Associate Attorney General and Acting Associate Attorney General, 2002-2003; Assistant and Associate Counsel to the President, The White House, 1986-1988.

**Edward J. Larson**, Counsel, Office of Educational Research and Improvement, United States Department of Education, 1986-1987; Associate Minority Counsel, Committee on Education and Labor, United States House of Representatives, 1983-1986; formerly University of Georgia Law School Professor; currently Hugh & Hazel Darling Chair in Law at Pepperdine University.

**J. Michael Luttig,** Circuit Judge, United States Court of Appeals, 1991-2006; Assistant Attorney General, Office of Legal Counsel and Counselor to the Attorney General, 1990-1991; Assistant Counsel to the President, The White House, 1980-1981.

**Carter Phillips**, Assistant to the Solicitor General, 1981-1984.

**Alan Charles Raul**, Associate Counsel to the President, The White House, 1986-1988; General Counsel of the Office of Management and Budget, 1988-1989; General Counsel of the United States Department of Agriculture, 1989- 1993; Vice Chairman of the Privacy and Civil Liberties Oversight Board, 2006-2008.

**Paul Rosenzweig**, Deputy Assistant Secretary for Policy, Department of Homeland Security, 2005-2009; Office of Independent Counsel, 1998-1999; United States Department of Justice, 1986-1991; currently Professorial Lecturer in Law, The George Washington University Law School.

**Nicholas Rostow**, General Counsel and Senior Policy Adviser to the U.S. Permanent Representative to the United Nations, New York, 2001-2005; Special Assistant to the President for National Security Affairs and Legal Adviser to the National Security Council, 1987-1993; Special Assistant to the Legal Adviser, U.S. Department of State, 1985-1987; currently, Senior Research Scholar at Yale Law School.

**Robert Shanks**, Deputy Assistant Attorney General, Office of Legal Counsel, 1981-1984.

**Christopher Shays**, Representative of the Fourth Congressional District of Connecticut in the United States House of Representatives, 1987-2009.

**Michael Shepherd**, Deputy Assistant Attorney General, 1984-1986; Associate Counsel to the President, 1986-87.

**Larry Thompson**, Deputy Attorney General, 2001-2003; Independent Counsel to the Department of Justice, 1995-1998; United States Attorney for the Northern District of Georgia, 1982-1986; currently, John A. Sibley Chair of Corporate and Business Law at University of Georgia Law School.

**Stanley Twardy**, United States Attorney for the District of Connecticut,1985-1991.

**Christine Todd Whitman**, Administrator, Environmental ProtectionAgency, 2001-2003; Governor, New Jersey, 1994-2001.

**Wendell Willkie, II**, Associate Counsel to the President, 1984-1985; Acting Deputy Secretary, U.S. Department of Commerce, 1992-1993;

General Counsel, U.S. Department of Commerce, 1989-1993; General Counsel, U.S. Department of Education, 1985-1988; currently, adjunct Professor of Law at New York University and adjunct fellow at the American Enterprise Institute.

**Keith E. Whittington,** William Nelson Cromwell Professor of Politics, Princeton University, 2006-present; announced as forthcoming chaired Professor of Law, Yale Law School.

**Richard Bernstein**, Appointed by the United States Supreme Court to argue in *Carmell v. Texas*, 529 U.S. 513, 515 (2000); *Montgomery v. Louisiana*, 136 S. Ct. 718, 725 (2016).