ORAL ARGUMENT SET FOR JANUARY 9, 2024

No. 23-3228

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

UNITED STATES OF AMERICA,

*Appellee,*

v.

DONALD J. TRUMP,

*Defendant-Appellant.*

———————————

On Appeal from the United States District Court
for the District of Columbia

---

**OPENING BRIEF OF DEFENDANT-APPELLANT
PRESIDENT DONALD J. TRUMP**

---

LAURO & SINGER
John F. Lauro
Gregory M. Singer
400 N. Tampa St., 15th Floor
Tampa, FL 33602
(813) 222-8990
jlauro@laurosinger.com

BLANCHE LAW
Todd Blanche
Emil Bove
99 Wall St., Suite 4460
New York, NY 10005
(212) 716-1250
toddblanche@blanchelaw.com

JAMES OTIS LAW GROUP, LLC
D. John Sauer
William O. Scharf
Michael E. Talent
13321 N. Outer Forty Road, Suite 300
St. Louis, Missouri 63017
(314) 562-0031
John.Sauer@james-otis.com

*Attorneys for President Donald J. Trump*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**A.     PARTIES AND *AMICI CURIAE***

The parties in the district court include the United States of America and President Donald J. Trump.  The district court denied leave to file to proposed *amici curiae*.  The parties before this Court include the United States of America and President Donald J. Trump.

*Amici Curiae* before this Court include, for Appellee:

Donald B. Ayer; John B. Bellinger, III; Barbara Comstock; John C. Danforth; Mickey Edwards; Charles Fried; Stuart M. Gerson, Esquire; John Giraudo; Peter D. Keisler; Edward J. Larson; J. Michael Luttig; Carter G. Phillips; Alan Charles Raul, Attorney; Paul Rosenzweig; Nicholas Rostow; Robert B. Shanks; Christopher Shays; Michael Shepherd; Larry Thompson; Stanley Twardy; Christine Todd Whitman; Wendell Willkie, II; Keith E. Whittington; Richard Bernstein

**Disclosure Statement:** No Disclosure Statement under Federal Rule of Appellate Procedure 26.1 or under Circuit Rule 26.1 is necessary, as Defendant is not a corporation or similar entity.

**B.     RULINGS UNDER REVIEW**

The parties are before this Court on appeal from the December 1, 2023, Memorandum Opinion and Order of the district court issued by Hon. Tanya S.

i

Chutkan, D.Ct. Doc. Nos. 171, 172, in *United States v. Trump*, No. 1:23-cr-00257 (TSC), -- F. Supp. 3d --, 2023 WL 8359833 (D.D.C. Dec. 1, 2023), J.A.599, 647.

## C.    RELATED CASES

The following cases are related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C):

- *Blassingame v. Trump*, Nos. 22-5069, 22-7030, 22-7031 (consol.), -- F.4th--, 2023 WL 8291481 (D.C. Cir. Dec. 1, 2023) (appeal involving President Trump and the United States as *amicus curiae* addressing Presidential immunity for certain related alleged conduct in the civil context)

- *United States v. Trump*, No. 23-3190, -- F.4th --, 2023 WL 8517991 (D.C. Cir. Dec. 8, 2023) (interlocutory appeal in this case challenging the district court's entry of an unconstitutional gag order on President Trump's extrajudicial statements)

*/s/ D. John Sauer*

## **TABLE OF CONTENTS**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES.................i

TABLE OF CONTENTS ........................................................... iii

TABLE OF AUTHORITIES.........................................................v

GLOSSARY ........................................................................ xiii

INTRODUCTION .................................................................1

STATEMENT OF JURISDICTION .............................................2

STATEMENT OF THE ISSUES ................................................2

STATEMENT OF THE CASE...................................................3

    I.  Allegations in the Indictment. ..............................................3

    II. Trial Court Proceedings......................................................4

SUMMARY OF ARGUMENT..................................................5

STANDARD OF REVIEW .....................................................8

ARGUMENT ......................................................................9

    I.  The Prosecution of President Trump Is Barred by Presidential Immunity.......9

        A.  Presidential Immunity Includes Immunity from Criminal Prosecution for Official Acts..........................................................9

            1.  The separation of powers requires criminal immunity. ........................9

            2.  The Impeachment Judgment Clause presupposes immunity...............12

            3.  Early constitutional authorities confirm immunity.............................14

            4.  The common law supports criminal immunity...................................16

5.  Criminal immunity draws support from 234 years of history. ............17

6.  Analogous immunity doctrines support criminal immunity. ...............18

7.  Policy rooted in the separation of powers supports immunity. ...........21

B.  The District Court's Contrary Reasoning Is Not Convincing .................25

C.  The Conduct Alleged in the Indictment Falls Within the Scope of President Trump's Official Responsibilities. .............................................41

II. The Prosecution Is Barred by the Impeachment Judgment Clause and Principles of Double Jeopardy. .......................................................................46

CONCLUSION ...............................................................................................55

CERTIFICATE OF SERVICE ....................................................................56

CERTIFICATE OF COMPLIANCE .......................................................57

# TABLE OF AUTHORITIES

## Cases

*Abney v. United States*,
   431 U.S. 651 (1977)..........................................................................2

*Anderson v. Celebrezze*,
   460 U.S. 780 (1983)....................................................................37, 44

*Ball v. United States*,
   163 U.S. 662 (1896)........................................................................48

*Barr v. Matteo*,
   360 U.S. 564 (1959)........................................................9, 22, 23, 42

*Blassingame v. Trump*,
   87 F.4th 1 (D.C. Cir. 2023) ....................................................... 8, 41-43

*Bradley v. Fisher*,
   80 U.S. 335 (1871)..........................................................................42

*Burroughs v. United States*,
   290 U.S. 534 (1934)....................................................................44, 46

*Butz v. Economou*,
   438 U.S. 478 (1978)................................................................. 23, 39-40

*CAIR v. Ballenger*,
   444 F.3d 659 (D.C. Cir. 2006) ........................................................8

*Cheney v. U.S. Dist. Ct. for D.C.*,
   542 U.S. 367 (2004)........................................................................23

*Chi. & S. Air Lines v. Waterman S.S. Corp.*,
   333 U.S. 103 (1948)........................................................................12

*Clinton v. Jones*,
   520 U.S. 681 (1997)........................................... 13, 26, 28, 31, 51, 54

*Coffin v. Coffin*,
   4 Mass. 1, 27 (Mass. 1808) ...................................................................19

*Cohen v. Beneficial Indus. Loan Corp.*,
   337 U.S. 541 (1949) ..............................................................................2

*Coinbase, Inc. v. Bielski*,
   599 U.S. 736 (2023) .............................................................................17

*Cunningham v. Neagle*,
   135 U.S. 1 (1890) .........................................................................44, 46

*Dennis v. Sparks*,
   449 U.S. 24 (1980) ...............................................................................21

*Ex parte Virginia*,
   100 U.S. 339 (1879) .............................................................................20

*Ferri v. Ackerman*,
   444 U.S. 193 (1979) .............................................................................24

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) ..............................................................11, 12, 30, 38

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
   561 U.S. 477 (2010) .......................................................................18, 25

*Freeman v. Quicken Loans, Inc.*,
   566 U.S. 624 (2012) .............................................................................48

*Gravel v. United States*,
   408 U.S. 606 (1972) ....................................................................19, 38-39

*Gregoire v. Biddle*,
   177 F.2d 579 (2d Cir. 1949) ..............................................................22, 42

*Guzman–Rivera v. Rivera–Cruz*,
   55 F.3d 26 (1st Cir. 1995) ....................................................................46

*Harlow v. Fitzgerald*,
457 U.S. 800 (1982)............................................................................35

*Imbler v. Pachtman*,
424 U.S. 409 (1976).....................................................................22, 23

*In re Sealed Case*,
121 F.3d 729 (D.C. Cir. 1997) ........................................................44

*INS v. Chadha*,
462 U.S. 919 (1983)..........................................................................32

*Knight First Amend. Inst. at Columbia Univ. v. Trump*,
928 F.3d 226 (2d Cir. 2019) ...........................................................43

*Marbury v. Madison*,
5 U.S. (1 Cranch) 137 (1803) ....................................... 6, 10-11, 15, 51

*Martin v. Mott*,
25 U.S. (12 Wheat.) 19 (1827)................................................... 11, 35

*McDonnell v. United States*,
579 U.S. 550 (2016)..........................................................................33

*Mercy Hosp., Inc. v. Azar*,
891 F.3d 1062 (D.C. Cir. 2018) .......................................................47

*Morrison v. Olson*,
487 U.S. 654 (1988)..................................................................... 32-33

*Mississippi v. Johnson*,
71 U.S. 475 (1866).......................................................................11, 12

*Myers v. United States*,
272 U.S. 52 (1926)............................................................................43

*NFIB v. OSHA*,
595 U.S. 109 (2022).....................................................................18, 25

*Nixon v. Fitzgerald*,
  457 U.S. 731 (1982).. 2, 7-10, 12, 14, 16-17, 21-26, 28, 31, 35-36, 40-41, 44, 54

*O'Shea v. Littleton*,
  414 U.S. 488 (1974)................................................................................38

*Perrin v. United States*,
  444 U.S. 37 (1979)..................................................................................21

*Pierson v. Ray*,
  386 U.S. 547 (1967)..........................................................................24, 42

*Pleasant Grove City v. Summum*,
  555 U.S. 460 (2009)................................................................................42

*Ponzi v. Fessenden*,
  258 U.S. 254 (1922)................................................................................43

*Prince v. Hicks*,
  198 F.3d 607 (6th Cir. 1999)..................................................................46

*Printz v. United States*,
  521 U.S. 898 (1997)..........................................................................18, 25

*Seila Law, LLC v. CFPB*,
  140 S. Ct. 2183 (2020)...................................................................7, 18, 25

*Spalding v. Vilas*,
  161 U.S. 483 (1896)....................................................................7, 19, 23, 42

*Stump v. Sparkman*,
  435 U.S. 349 (1978)................................................................................41

*Tenney v. Brandhove*,
  341 U.S. 367 (1951)........................................................................11, 19, 35

*Trump v. Hawaii*,
  138 S. Ct. 2392 (2018)............................................................................42

*Trump v. Mazars USA, LLP*,
 140 S. Ct. 2019 (2020)........................................................................42

*Trump v. Vance*,
 140 S. Ct. 2412 (2020)........................................13, 15, 22, 23, 36

*United States v. Chaplin*,
 54 F. Supp. 926 (S.D. Cal. 1944) ....................................................20

*United States v. Curtiss-Wright Export Corp.*,
 299 U.S. 304 (1936)...........................................................................37

*United States v. Johnson*,
 383 U.S. 169 (1966)..................................................6, 7, 16, 19

*United States v. Lee*,
 106 U.S. 196 (1882)............................................................................39

*United States v. Nixon*,
 418 U.S. 683 (1974).............................................................................32

*Wuterich v. Murtha*,
 562 F.3d 375 (D.C. Cir. 2009) ..........................................................2

*Yates v. Lansing*,
 5 Johns. 282 (N.Y. 1810) ................................................................19

*Youngstown Sheet & Tube Co. v. Sawyer*,
 343 U.S. 579 (1952)....................................................................... 37-38

## U.S. Constitution

U.S. CONST. art. I, § 3, cl. 7 .............................3, 5-6, 8, 12, 27, 31, 46-48
U.S. CONST. art. I, § 7, cl. 2 ..................................................................45
U.S. CONST. art. I, § 7, cl. 3 ..................................................................45
U.S. CONST. art. II, § 1 ..................................................................10, 38
U.S. CONST. art. II, § 1, cl 2 ..................................................................46
U.S. CONST. art. II, § 2, cl. 2 ..................................................................43
U.S. CONST. art. II, § 3..................................................................43, 45

## Statutes and Regulations

18 U.S.C. § 241 ................................................................................43
18 U.S.C. § 242 ................................................................................43
18 U.S.C. § 611 ................................................................................43
18 U.S.C. § 911 ................................................................................43
18 U.S.C. § 1015(f) ..........................................................................43
18 U.S.C. § 3231 ................................................................................2
28 U.S.C. § 1291 ................................................................................2
52 U.S.C. § 10307(c) ........................................................................43
52 U.S.C. § 10307(e) ........................................................................43
52 U.S.C. § 20511(1) ........................................................................43
52 U.S.C. § 20511(2)(A) ..................................................................43
52 U.S.C. § 20511(2)(B) ..................................................................43
52 U.S.C. § 30120 ............................................................................43
52 U.S.C. § 30124 ............................................................................43
Exec. Order 14019, 86 Fed. Reg. 13623-27 ....................................44
H. Res. 24 (117th Cong. 1st Sess.), https://www.congress.gov/bill/117th-
congress/house-resolution/24/text ....................................................46
H.R. Rep. No. 81-3138 ......................................................................45

## Other Authorities

1 Annals of Congress 481 (1789).......................................................44

2 J. Elliot, Debates on the Federal Constitution 480 (2d ed. 1863)........14, 51

3 J. Story, Commentaries on the Constitution of the United States ch. 37, §
1563 (1833), https://lonang.com/library/reference/story-commentaries-us-
constitution/sto-337/..................................................................11, 48, 52

6 W. Holdsworth, A History of English Law 235-36 (2d ed. 1937)................20

28 Papers of Ulysses S. Grant 19-20, 75-78, 80–81 (ed. John Y. Simon 2005), *at*
https://scholarsjunction.msstate.edu/usg-volumes/27/ ............................45

*A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 U.S.
Op. Off. Legal Counsel 222, 2000 WL 33711291 (2000) ..........27-31, 34-35, 37, 49

*Amenability of the President, Vice President and other Civil Officers to Federal Criminal Prosecution while in Office* (1973)...........................................................27

ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 107 (2012) .................................................................13, 46

Brett M. Kavanaugh, *The President and the Independent Counsel*, 86 GEO. L.J. 2133 (1998) .................................................................14, 35, 50

Brief for United States as *Amicus Curiae* in *Blassingame v. Trump*, Nos. 22-5069, 22-7030, 22-7031 (D.C. Cir. filed March 2, 2023)........................................... 44-45

Clinton Rossiter, *The American Presidency* 108 (2d rev. ed. 1960)......................45

Gary L. Gregg II, *George W. Bush: Foreign Affairs*, UVA Miller Center, https://millercenter.org/president/-gwbush/foreign-affairs ......................................17

J. Randolph Block, *Stump v. Sparkman and the History of Judicial Immunity*, 1980 DUKE L.J. 879, 884.................................................................20

JEFFREY K. TULIS, THE RHETORICAL PRESIDENCY 4 (2017) ....................................42

Jessie Kratz, *The 1824 Presidential Election and the "Corrupt Bargain"*, National Archives (Oct. 22, 2020), at https://prologue.blogs.archives.gov/2020/10/22/the-1824-presidential-election-and-the-corrupt-bargain/................................................17

Letter from James Madison to Edmund Pendleton, 28 October 1787, https://founders.archives.gov/documents/Madison/01-10-02-0156 ........................50

Letter to James Madison from Edmund Pendleton, 8 October 1787, https://founders.archives.gov/documents/Madison/01-17-02-0352 ........................50

*Lobbying by Executive Branch Personnel*, U.S. Op. O.L.C. Supp. 240, 243-45 (1961) .................................................................45

*Office & Duties of Attorney General*, 6 U.S. Op. Atty. Gen. 326, 335 (1854)........43

*Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 U.S. Op. O.L.C. 101, 113 (1984)........43

R. Jackson, *The Federal Prosecutor, Address Delivered at the Second Annual Conference of United States Attorneys* (April 1, 1940) ...........................................33

Spencer Ackerman, *US Cited Controversial Law in Decision to Kill American Citizen by Drone*, The Guardian (June 23, 2014), https://www.theguardian.com/world/2014/jun/23/us-justification-drone-killing-american-citizen-awlaki ...........................................................................................17

THE FEDERALIST NO. 47 ............................................................. 33, 53-54

THE FEDERALIST NO. 65 ............................................................. 50, 52-53

THE FEDERALIST NO. 69 ....................................................13, 15, 26, 50

THE FEDERALIST NO. 77 ...........................................................13, 15, 50

*The Legal Aftermath: Citizen Nixon and the Law*, Time (Aug. 19, 1974), *at* https://content.time.com/time/subscriber/article/0,33009,942980-2,00.html....28, 41

U.S. Dep't of Justice, *Federal Prosecution of Election Offenses* (8th ed. 2017), https://www.justice.gov/criminal/file/1029066/download ......................................43

*Whether a Former President May Be Indicted and Tried for the Same Offenses for Which He Was Impeached by the House and Acquitted by the Senate*, 24 Op. O.L.C. 110, 114 (2000) ...................................................................................... 47-54

## **GLOSSARY**

criminal immunity…………………….absolute presidential immunity from
criminal prosecution for official acts

Double Jeopardy Memo………………*Whether a Former President May Be*
*Indicted and Tried for the Same Offenses for*
*Which He Was Impeached by the House and*
*Acquitted by the Senate*, 24 Op. O.L.C. 110,
114 (2000)

J.A.__...................................................Joint Appendix (page number[s])

OLC Memo…………………………….*A Sitting President's Amenability to*
*Indictment and Criminal Prosecution*, 24
U.S. Op. O.L.C. 222, 2000 WL 33711291
(2000)

President Trump……………………….Appellant President Donald J. Trump

the government………………………..Appellee United States of America

# INTRODUCTION

During the 234 years from 1789 to 2023, no current or former President had ever been criminally prosecuted for official acts.  That unbroken tradition died this year, and the historical fallout is tremendous.  The indictment of President Trump threatens to launch cycles of recrimination and politically motivated prosecution that will plague our Nation for many decades to come and stands likely to shatter the very bedrock of our Republic—the confidence of American citizens in an independent judicial system.

Under our system of separated powers, the Judicial Branch cannot sit in judgment over a President's official acts.  That doctrine is not controversial.  It was treated as self-evident and foundational from the dawn of the Republic, and it flows directly from the exclusive vesting clause of Article II.  In 1803, Chief Justice Marshall endorsed it, writing in *Marbury v. Madison* that a President's official acts "can never be examinable by the courts."

The structure of our government, the text of the Constitution and its early commentators, common-law immunity doctrines, our political history, the Supreme Court's analogous immunity doctrines, and the policy considerations rooted in the separation of powers all dictate that no President, current or former, may be criminally prosecuted for his *official acts* unless he is first impeached and convicted by the Senate.  Nor may a President face criminal prosecution based on conduct for

1

which he was *acquitted* by the U.S. Senate.  The indictment against President Trump is unlawful and unconstitutional.  It must be dismissed.

## STATEMENT OF JURISDICTION

The district court exercised subject-matter jurisdiction over the underlying federal criminal case under 18 U.S.C. § 3231.  The district court denied President Trump's claims of Presidential immunity and double jeopardy by opinion and order dated December 1, 2023.  J.A.599, 647.  President Trump filed a timely notice of appeal on December 7, 2023.  J.A.648.

The district court's decision constitutes a "final decision" under 28 U.S.C. § 1291 and the collateral-order doctrine.  *See Cohen v. Beneficial Indus. Loan Corp*., 337 U.S. 541, 546-47 (1949); *Nixon v. Fitzgerald*, 457 U.S. 731, 743 (1982).  The denial of presidential immunity "is an immediately appealable collateral order." *Wuterich v. Murtha*, 562 F.3d 375, 381–82 (D.C. Cir. 2009) (citing cases).  So is the denial of President Trump's double-jeopardy claim.  *Abney v. United States*, 431 U.S. 651, 659 (1977).

## STATEMENT OF THE ISSUES

I.    Whether the President has immunity from criminal prosecution for official acts, *i.e.*, those that fall within the "outer perimeter" of his official responsibilities;

2

II.     Whether the Impeachment Judgment Clause, U.S. CONST. art. I, § 3, cl. 7, and principles of Double Jeopardy prevent the prosecution of a President who has been impeached and acquitted by the Senate for the same or closely related conduct.

## STATEMENT OF THE CASE

### I.     Allegations in the Indictment.

On August 1, 2023, President Trump was indicted on four counts based on allegations regarding his efforts to dispute the outcome of the widely questioned 2020 presidential election.  J.A.24.  The indictment charges President Trump with acts of political speech and advocacy in disputing the election's outcome after the campaign ended, performed while President Trump was still in office.  *Id.*  The indictment alleges five types of conduct, all of which constitute quintessential Presidential acts:

First, it alleges that President Trump made a series of tweets and other public statements about the outcome of the 2020 federal election, contending that the election was tainted by fraud and irregularities.  J.A.24, 29-32, 34, 39-44, 59-62 (public statements); J.A.36-37, 43-44, 55-56, 58-59, 63 (tweets).

Second, the indictment alleges that President Trump communicated with the Acting Attorney General and officials at the U.S. Department of Justice about investigating election crimes and possibly appointing a new Acting Attorney General.  J.A.29, 37-38, 40, 43-44, 50-54.

Third, the indictment alleges that President Trump communicated with state officials about the administration of the federal election and urged them to exercise their official responsibilities in accordance with extensive information that the election was tainted by fraud and irregularities.  J.A.28, 33-43.

Fourth, the indictment alleges that President Trump communicated with the Vice President, in his legislative capacity as President of the Senate, and attempted to communicate with other members of Congress in order to urge them to exercise their official duties with respect to the certification of the federal election according to President Trump's view of the national interest.  J.A.29, 55-60, 63-65.

Fifth, the indictment alleges that other individuals organized slates of alternate electors from seven States to provide a justification for the Vice President to exercise his official duties in the manner urged by President Trump.  J.A.44-50.

## II.    Trial Court Proceedings.

On October 5, 2023, President Trump filed a motion to dismiss the indictment on grounds of Presidential immunity.  J.A.331.  He argued that presidential immunity extends to immunity from criminal prosecution for a President's official acts, *i.e.*, those performed within the "outer perimeter" of the President's official responsibility.  J.A.344-57.  He argued that all five classes of conduct alleged in the indictment fall within the outer perimeter of the President's official responsibility. J.A.357-81.

On October 23, 2023, President Trump filed a motion to dismiss on constitutional grounds. J.A.437. As relevant here, President Trump argued that the Impeachment Judgment Clause, U.S. CONST. art. I, § 3, cl.7, and principles of Double Jeopardy foreclose the prosecution because President Trump was impeached and acquitted for the same and closely related conduct. J.A.454-60.

On December 1, 2023, the district court issued its Memorandum Opinion and Order. J.A.599, 647. First, the district court wrongfully held that a former President has no immunity from prosecution for official acts performed while in office. J.A.604-29. The court did not address whether any of the conduct alleged in the indictment falls within the scope of the President's official duties. J.A.628. The district court also incorrectly held that "neither traditional double jeopardy principles nor the Impeachment Judgment Clause" prevent the prosecution of a President who has been impeached and acquitted by the Senate. J.A.636-42.

## SUMMARY OF ARGUMENT

I.    President Trump has absolute immunity from prosecution for his official acts as President. The indictment alleges only official acts, so it must be dismissed.

A.  Seven considerations mandate the recognition of presidential immunity from prosecution for official acts. First, criminal immunity has deep roots in the separation of powers. Under Article II, § 1, the President is vested with the Executive Power. The Judicial Branch may not sit in judgment, criminal or

5

otherwise, over his exercise of that power.  As Chief Justice Marshall wrote in *Marbury v. Madison*, the President's official acts "can never be examinable by the courts."  5 U.S. (1 Cranch) 137, 165-66 (1803).

Second, the text of the Constitution, through the Impeachment Judgment Clause, presupposes criminal immunity.  That Clause dictates that a President may be criminally charged only if he is the "Party convicted" in an impeachment trial.  U.S. CONST. art. I, § 3, cl. 7.  Alexander Hamilton reinforced this understanding by writing in The Federalist that the President may face criminal prosecution only "afterwards" or "subsequent" to impeachment and Senate conviction.  President Trump was acquitted, not convicted, by the Senate after an impeachment, so he retains immunity for his official acts.

Third, early commentators on the Constitution—including Chief Justice Marshall, George Washington's Attorney General Charles Lee, Alexander Hamilton, Justice Joseph Story, and others—confirm that a President's official acts are not examinable by the Judicial Branch.

Fourth, at common law, immunity from criminal prosecution was far more central to the concept of immunity than immunity from civil liability.  The prospect of senior officials facing "criminal charges" before a "possibly hostile judiciary" was the "chief fear" that official immunity was designed to prevent.  *United States v. Johnson*, 383 U.S. 169, 180-82 (1966).

6

Fifth, the 234-year tradition of *not* prosecuting Presidents for official acts—despite ample motive and opportunity to do so—provides powerful evidence that the power to do so does not exist.  "Perhaps the most telling indication of a severe constitutional problem" with this "wholly unprecedented" prosecution "is a lack of historical precedent to support it."  *Seila Law, LLC v. CFPB*, 140 S. Ct. 2183, 2201 (2020) (cleaned up).

Sixth, analogous immunity doctrines for legislators and judges, which are also rooted in the separation of powers, support criminal immunity for a President's official acts.  Legislative immunity "prevent[s]" legislative acts "from being made the basis of a criminal charge against a member of Congress."  *Johnson*, 383 U.S. at 180.  Excluding cases of bribery, which were long prosecutable at common law, judicial immunity shields a judge from "indictment for any act done … by him, sitting as judge."  *Spalding v. Vilas*, 161 U.S. 483, 494 (1896).  Presidents' official acts are equally, if not more so, immune.

Seventh, policy considerations rooted in the separation of powers support immunity.  The President handles "especially sensitive duties," *Fitzgerald*, 457 U.S. at 746.  The Presidency requires "bold and unhesitating action."  *Id.* at 745.  The threat of future prosecution risks "crippl[ing] the proper and effective administration of public affairs."  *Id.* at 745 (quoting *Spalding*, 161 U.S. at 498).  The President is most likely to be "harassed by vexatious actions."  *Spalding*, 161 U.S. at 495.  The

7

threat of indictment, conviction, and imprisonment by a politically motivated successor—or by hundreds of local prosecutors, many in enclaves of political hostility to the President—before a possibly hostile judiciary poses a far greater deterrent to bold, fearless Executive leadership than civil liability.

B.  Given the existence of criminal immunity, the scope of immunity should extend to the "'outer perimeter' of [the President's] official responsibility." *Fitzgerald*, 457 U.S. at 756.  Applying these principles, all five types of conduct alleged in the indictment fall within the outer perimeter of President Trump's official duties.

II.    In addition, the Impeachment Judgment Clause, U.S. CONST. art. I, § 3, cl. 7, mandates reversal because it incorporates a Double Jeopardy principle:  A President who is acquitted by the Senate cannot be prosecuted for the acquitted conduct.  The Clause's plain meaning, its historical context, and the decisive weight of authority from key commentators all confirm that a single unelected prosecutor lacks authority to second-guess the judgment of the U.S. Congress.

## **STANDARD OF REVIEW**

Both issues in this appeal present pure questions of law that are "subject to *de novo* review."  *CAIR v. Ballenger*, 444 F.3d 659, 664 (D.C. Cir. 2006); *see also Blassingame v. Trump*, 87 F.4th 1, 12 (D.C. Cir. 2023).

## ARGUMENT

I.    **The Prosecution of President Trump Is Barred by Presidential Immunity.**

    A.    **Presidential Immunity Includes Immunity from Criminal Prosecution for Official Acts.**

"In view of the special nature of the President's constitutional office and functions," a current or former President has "absolute Presidential immunity from [civil] damages liability for acts within the 'outer perimeter' of his official responsibility." *Fitzgerald*, 457 U.S. at 756 (quoting *Barr v. Matteo*, 360 U.S. 564, 575 (1959)).  In addressing whether this extends to immunity from *prosecution*, this Court should examine the Constitution's text, structure, and original meaning; the common law; historical practice; the Supreme Court's precedents and immunity doctrines; and considerations of public policy.  *See id.* at 747.  All these authorities point in the same direction—the President has absolute immunity from criminal prosecution "for acts within the 'outer perimeter' of his official responsibility." *Id.* at 756.

        1.    **The separation of powers requires criminal immunity.**

First, as emphasized in *Fitzgerald*, the doctrine of presidential immunity is "rooted in the separation of powers under the Constitution."  457 U.S. at 753.  "The President occupies a unique position in the constitutional scheme," and the President's "absolute immunity … predicated on his official acts" constitutes "a functionally mandated incident of the President's unique office, rooted in the

9

constitutional tradition of the separation of powers and supported by our history." *Id.* at 732, 749.

Under the doctrine of separated powers, neither a federal nor a state prosecutor, nor a state or federal court, may sit in judgment over a President's official acts, which are vested in the Presidency alone. U.S. CONST. art. II, § 1. "Article II, § 1, of the Constitution provides that '[t]he executive Power shall be vested in a President of the United States.' This grant of authority establishes the President as the chief constitutional officer of the Executive Branch, entrusted with supervisory and policy responsibilities of utmost discretion and sensitivity." *Fitzgerald*, 457 U.S. at 749-50 (alterations omitted). "The President's unique status under the Constitution distinguishes him from other executive officials." *Id.* at 750.

The immunity of the President's *official acts* from judicial second-guessing has been treated as self-evident and foundational from the dawn of the Republic. Chief Justice Marshall emphasized in *Marbury v. Madison* that "[b]y the constitution of the United States, the President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character, and to his own conscience." 5 U.S. (1 Cranch) at 165–66. "The acts of such an officer, as an officer, *can never be examinable by the courts*." *Id.* (emphasis added).

10

Justice Story agreed, citing *Marbury* for the proposition that the Judicial Branch lacks authority to sit in judgment over the President's official acts: "In the exercise of his political powers he is to use his own discretion, and is accountable only to his country, and to his own conscience.  His decision, in relation to these powers, is subject to no control; and his discretion, when exercised, is conclusive." 3 J. STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES ch. 37, § 1563 (1833), https://lonang.com/library/reference/story-commentaries-us-constitution/sto-337/.  "When the President exercises an authority confided to him by law," his official conduct cannot "be passed upon by a jury" or "upon the proofs submitted to a jury."  *Martin v. Mott*, 25 U.S. (12 Wheat.) 19, 32-33 (1827) (Story, J.); *cf. Tenney v. Brandhove*, 341 U.S. 367, 377 (1951).

Thus, the Judicial Branch cannot "require [the President] to exercise the 'executive Power' in a judicially prescribed fashion."  *Franklin v. Massachusetts*, 505 U.S. 788, 826 (1992) (Scalia, J., concurring in part and concurring in the judgment).  "An attempt on the part of the judicial department of the government to enforce the performance of such duties by the President might be justly characterized, in the language of Chief Justice Marshall, as 'an absurd and excessive extravagance.'"  *Mississippi v. Johnson*, 71 U.S. 475, 499 (1866) (quoting *Marbury*, 5 U.S. at 170); *Marbury*, 5 U.S. at 170 ("Questions … which are, by the constitution and laws, submitted to the executive, *can never be made in this court*.") (emphasis

11

added); *see also Chi. & S. Air Lines v. Waterman S.S. Corp*., 333 U.S. 103, 112 (1948) ("[W]hatever of this order emanates from the President is not susceptible of review by the Judicial Department.").  "The Congress is the legislative department of the government; the President is the executive department.  Neither can be restrained in its action by the judicial department." *Mississippi*, 71 U.S. at 500.  "[T]his court has no jurisdiction of a bill to enjoin the President in the performance of his official duties." *Id.*  "It is incompatible with his constitutional position that [the President] be compelled personally to defend his executive actions before a court." *Franklin*, 505 U.S. at 827 (Scalia, J., concurring in part and concurring in the judgment).  The same principles foreclose a criminal prosecution of a President "based upon his official acts." *Fitzgerald*, 457 U.S. at 744.

> ### 2.     The Impeachment Judgment Clause presupposes immunity.

Second, the text of the Constitution presupposes the President's criminal immunity.  The Impeachment Judgment Clause provides that "Judgment in Cases of Impeachment shall not extend further than to removal from Office … but *the Party convicted* shall nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law."  U.S. CONST. art. I, § 3, cl. 7 (emphasis added).  Because the Constitution specifies that only "the Party *convicted*" by trial in the Senate may be "liable and subject to Indictment, Trial, Judgment and Punishment," *id.*, it presupposes that a President who is *not* convicted may *not* be subject to

12

criminal prosecution. ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 107 (2012) ("When a car dealer promises a low financing rate to 'purchasers with good credit,' it is entirely clear that the rate is *not* available to purchasers with spotty credit.").

As Justice Alito recently noted, "[t]he plain implication" of this Clause "is that criminal prosecution, like removal from the Presidency and disqualification from other offices, is a consequence that can come about only after the Senate's judgment, not during or prior to the Senate trial." *Trump v. Vance*, 140 S. Ct. 2412, 2444 (2020) (Alito, J., dissenting). "This was how Hamilton explained the impeachment provisions in the Federalist Papers. He wrote that a President may 'be impeached, tried, and, upon conviction ... would afterwards be liable to prosecution and punishment in the ordinary course of law.'" *Id.* (quoting THE FEDERALIST No. 69 (C. Rossiter ed. 1961)); *see also* THE FEDERALIST No. 77 (Hamilton) (a President is "at all times liable to impeachment, trial, [and] dismission from office," but any other punishment must come only "by subsequent prosecution in the common course of law").

Thus, the Supreme Court has often stated that impeachment, not criminal prosecution, provides the principal check against a President for malfeasance in his official duties. "[T]he President … 'is amenable to [the laws] in his private character as a citizen, and in his public character by impeachment.'" *Clinton v. Jones*, 520

U.S. 681, 696 (1997) (quoting James Wilson in 2 J. ELLIOT, DEBATES ON THE FEDERAL CONSTITUTION 480 (2d ed. 1863)) (cleaned up). "With respect to acts taken in his 'public character'—that is, official acts—the President may be disciplined principally by impeachment … . But he is otherwise subject to the laws for his purely private acts." *Id.* "A rule of absolute immunity for the President will not leave the Nation without sufficient protection against misconduct on the part of the Chief Executive. There remains the constitutional remedy of impeachment." *Fitzgerald*, 457 U.S. at 757; *see also* Brett M. Kavanaugh, *The President and the Independent Counsel*, 86 GEO. L.J. 2133, 2158 (1998) ("The Framers thus appeared to anticipate that a President who commits serious wrongdoing should be impeached by the House and removed from office by the Senate—and then prosecuted thereafter.").

The district court disputed this interpretation of the Clause. J.A.606-11, 638-42. Those arguments are addressed in Part II, *infra*.

### 3.    Early constitutional authorities confirm immunity.

Early authorities confirm the doctrine of criminal immunity for official acts. Alexander Hamilton wrote that the criminal prosecution of a President for official acts may occur only after impeachment and conviction by the Senate: "The President of the United States would be liable to be impeached, tried, and, upon conviction of treason, bribery, or other high crimes or misdemeanors, removed from office; and would *afterwards* be liable to prosecution and punishment in the ordinary course of

14

law." THE FEDERALIST NO. 69; *see also* THE FEDERALIST NO. 77 (stating that the President is subject to "*subsequent* prosecution" after "impeachment, trial, [and] dismissal from office") (emphases added); *Vance*, 140 S. Ct. at 2444 (Alito, J., dissenting) ("This was how Hamilton explained the impeachment provisions in the Federalist Papers.").

Likewise, in *Marbury*, Attorney General Charles Lee "declare[d] … that the President is not amenable to any court of judicature for the exercise of his high functions, but is responsible only in the mode pointed out in the constitution," *i.e.*, impeachment. 5 U.S. at 149. Chief Justice Marshall agreed: "By the constitution of the United States, the President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character, and to his own conscience." *Id.* at 165–66. When the President "act[s] in cases in which the executive possesses a constitutional or legal discretion, nothing can be more perfectly clear than that [his] acts are only politically examinable." *Id.* at 166. "The acts of such an officer, as an officer, *can never be examinable by the courts*." *Id.* (emphasis added).

As noted above, Justice Story reinforced this conclusion, both in his Commentaries and in *Martin v. Mott*.

#### 4.    The common law supports criminal immunity.

*Fitzgerald* emphasized that the Court's "immunity decisions have been informed by the common law." 457 U.S. at 747. At common law, official immunity to secure the independence of senior officials meant, first and foremost, immunity from *criminal prosecution*. Immunity from civil liability was of secondary concern.

The Supreme Court's Speech and Debate cases make this clear. At common law, "the privilege" of legislative immunity "was not born primarily of a desire to avoid private suits …, but rather to prevent intimidation by the executive and accountability before a possibly hostile judiciary." *Johnson*, 383 U.S. at 180–81. Preventing "the instigation of *criminal charges* against critical or disfavored legislators" was the "chief fear" that led to the recognition of legislative immunity. *Id.* at 182 (emphasis added). *Johnson* emphasized that immunity was intended to protect the legislature from a potentially hostile executive and judiciary, and thus it transplanted naturally "in the context of the American system of separation of powers." *Id.* So also, protection of the Presidency from political factions and a potentially hostile judiciary is both reflected in the common law and "rooted in the constitutional tradition of the separation of powers." *Fitzgerald*, 457 U.S. at 749. For this reason, in regards of immunity doctrines rooted in separation of powers, civil immunity without criminal immunity is "like a lock without a key, a bat without

16

a ball, a computer without a keyboard—in other words, not especially sensible." *Coinbase, Inc. v. Bielski*, 599 U.S. 736, 743 (2023).

> **5.    Criminal immunity draws support from 234 years of history.**

*Fitzgerald* also consulted the "presuppositions of our political history." 457 U.S. at 745, 749. From 1789 to 2023, no President was ever prosecuted for his official acts, despite centuries of motive and opportunity to do so. The 234-year tradition of *not* prosecuting Presidents for official acts strongly supports the existence of immunity. American history abounds with examples of Presidents who were accused by political opponents of committing crimes through their official acts. These include, among many others, John Quincy Adams' alleged "corrupt bargain" in appointing Henry Clay as Secretary of State;[1] President George W. Bush's allegedly false claim to Congress that Saddam Hussein possessed stockpiles of "weapons of mass destruction," which led to war in which thousands were killed;[2] and President Obama's alleged authorization of a drone strike that targeted and killed a U.S. citizen abroad (and his teenage son, also a U.S. citizen).[3]

---

[1] *See, e.g.*, Jessie Kratz, *The 1824 Presidential Election and the "Corrupt Bargain"*, National Archives (Oct. 22, 2020), https://prologue.blogs.archives.gov/2020/10/22/the-1824-presidential-election-and-the-corrupt-bargain/.

[2] *See*, *e.g.,* Gary L. Gregg II, *George W. Bush: Foreign Affairs*, UVA Miller Center, https://millercenter.org/president/-gwbush/foreign-affairs.

[3] *See, e.g.*, Spencer Ackerman, *US Cited Controversial Law in Decision to Kill American Citizen by Drone*, The Guardian (June 23, 2014),

In each such case, the President's political opponents vehemently accused that President of criminal behavior in his official acts.  In each case, those outraged political opponents eventually came to power.  Yet no President was ever prosecuted, until this year.  The unbroken tradition of *not* exercising the supposed formidable power of criminally prosecuting a President for official acts—despite ample motive and opportunity to do so, over centuries—implies that the power does not exist.  *See, e.g., NFIB v. OSHA*, 595 U.S. 109, 119 (2022) (per curiam) ("This 'lack of historical precedent,' coupled with the breadth of authority that the [Special Counsel] now claims, is a 'telling indication'" that the authority does not exist) (citation omitted); *Seila Law*, 140 S. Ct. at 2201 (same); *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 505 (2010) (same).  "The constitutional practice ... tends to negate the existence of the … power asserted here." *Printz v. United States*, 521 U.S. 898, 918 (1997).

### 6.    Analogous immunity doctrines support criminal immunity.

Immunity doctrines rooted in the separation of powers also support a finding of criminal immunity here.

***Legislative immunity.***  Legislative immunity encompasses the "privilege … to be free from *arrest* or civil process" for legislative acts, *i.e.*, criminal

---

https://www.theguardian.com/world/2014/jun/23/us-justification-drone-killing-american-citizen-awlaki.

and civil proceedings alike.  *Tenney*, 341 U.S. at 372.  Such immunity enables officials "to execute the functions of their office without fear of prosecutions, civil or criminal."  *Id.* at 373–74 (quoting *Coffin v. Coffin*, 4 Mass. 1, 27 (Mass. 1808)).

Thus, legislative immunity "prevent[s]" legislative acts "from being made the basis of a criminal charge against a member of Congress."  *Johnson*, 383 U.S. at 180.  A legislative act "may not be made the basis for a civil *or criminal* judgment against a Member [of Congress] because that conduct is within the sphere of legitimate legislative activity."  *Gravel v. United States*, 408 U.S. 606, 624 (1972) (emphasis added).  Speech and Debate immunity "protects Members against prosecutions that directly impinge upon or threaten the legislative process."  *Id.* at 616.

**Judicial immunity.**  In *Spalding v. Vilas*, the Supreme Court stated that the doctrine of judicial immunity extends to both "civil suit" and "indictment": "'The doctrine which holds a judge exempt from a civil suit or *indictment* for any act done or omitted to be done by him, *sitting as judge*, has a deep root in the common law. It is to be found in the earliest judicial records, and it has been steadily maintained by an undisputed current of decisions in the English courts, amidst every change of policy, and through every revolution of their government.'"  161 U.S. at 494 (quoting *Yates v. Lansing*, 5 Johns. 282, 291 (N.Y. 1810) (Kent, C. J.)); *see also Ex parte*

*Virginia*, 100 U.S. 339, 348–49 (1879) (upholding the indictment of a judge on the ground that the actions charged were *not* "judicial acts").

Like legislative immunity, this doctrine is rooted in common law. "[I]t was held, certainly as early as Edward III.'s reign [1326-1377], that a litigant could not go behind the record, in order to make a judge civilly *or criminally* liable for an abuse of his jurisdiction." J. Randolph Block, *Stump v. Sparkman and the History of Judicial Immunity*, 1980 DUKE L.J. 879, 884 (emphasis added) (quoting 6 W. HOLDSWORTH, A HISTORY OF ENGLISH LAW 235-36 (2d ed. 1937)). Lord Coke rejected the "possible subjection" of judges "to criminal prosecution for judicial acts," opining that no judge may "be charged … before any other Judge at the suit of the King.'" *Id.* at 887 n.39 (quoting 77 Eng. Rep. at 1307) (emphasis added).

Cases where prosecutors have brought criminal charges against judges for *judicial acts* are thus exceedingly rare. In *United States v. Chaplin*, 54 F. Supp. 926 (S.D. Cal. 1944), involving federal charges against a state judge "acting in his judicial capacity and within his jurisdiction," *id.* at 928, the court upheld absolute immunity from prosecution for judicial acts:

> The immunity which has clothed judges for a century and a half in our country found its genesis in the English common law simultaneously with the independence of the judiciary. … To sustain the Government's contention would be to destroy the independence of the judiciary and mark the beginning of the end of an independent and fearless judiciary.

*Id.* at 933-34.

20

Citing *Dennis v. Sparks*, 449 U.S. 24, 31 (1980), the district court concluded that there is no judicial immunity from prosecution for judicial acts. J.A.626. This is incorrect. *Dennis* involved allegations of *bribery*, *i.e.*, that "an official act of the defendant judge was the product of a corrupt conspiracy involving bribery of the judge." *Dennis*, 449 U.S. at 28. But at common law, judicial *bribe-taking* (or bribe-extorting) was not treated as a judicial act and was prosecutable. *See Perrin v. United States*, 444 U.S. 37, 43 (1979) ("By the time of Blackstone, bribery was defined as an offense involving a judge or 'other person concerned in the administration of justice' and included the giver as well as *the receiver of the bribe*.") (emphasis added).

### 7.    Policy rooted in the separation of powers supports immunity.

In considering Presidential immunity, the Supreme Court "has weighed concerns of public policy, especially as illuminated by our history and the structure of our government." *Fitzgerald*, 457 U.S. at 747–48.

***Especially sensitive duties.*** First, the Supreme Court emphasizes the necessity of robust immunity for officials who have "especially sensitive duties," such as prosecutors and judges. *Fitzgerald*, 457 U.S. at 746. No one exercises more sensitive duties than the President: "Under the Constitution and laws of the United States the President has discretionary responsibilities in a broad variety of areas, many of them highly sensitive." *Id.* at 756.

21

***Bold and unhesitating action.***   Second, the Supreme Court reasons that immunity is most appropriate for officials from whom "bold and unhesitating action" is required.  *Id.* at 745; *see also Imbler v. Pachtman*, 424 U.S. 409, 423-24, 427-28 (1976).  "[T]o submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties," and subject them "to the constant dread of retaliation."  *Barr*, 360 U.S. at 571–72 (quoting *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949) (Hand, J.)).   *Fitzgerald* "conclud[ed] that a President … must 'deal fearlessly and impartially with the duties of his office'—not be made 'unduly cautious in the discharge of [those] duties' by the prospect of civil liability for official acts."  *Vance*, 140 S. Ct. at 2426 (citation omitted).  The threat of criminal prosecution poses a greater risk of deterring bold and unhesitating action.

***Crippling and deterring executive action.***   The Supreme Court emphasizes the concern that, "[i]n exercising the functions of his office, the head of an Executive Department, keeping within the limits of his authority, should not be under an apprehension that the motives that control his official conduct may, at any time, become the subject of inquiry in a civil suit for damages.  It would *seriously cripple the proper and effective administration of public affairs* as entrusted to the executive branch of the government, if he were subjected to any such restraint."  *Fitzgerald*,

22

457 U.S. at 745 (quoting *Spalding*, 161 U.S. at 498) (emphasis added); *see also Barr*, 360 U.S. at 573 (holding that official immunity is "designed to aid in the effective functioning of government"). "Frequently acting under serious constraints of time and even information," a President makes many important decisions, and "[d]efending these decisions, often years after they were made, could impose unique and intolerable burdens … ." *Imbler*, 424 U.S. at 425–26; *see also Barr*, 360 U.S. at 571. The President's "focus should not be blurred by even the subconscious knowledge" of the risk of future prosecution. *Imbler*, 424 U.S. at 427. And "[t]here is no question that a criminal prosecution holds far greater potential for distracting a President and diminishing his ability to carry out his responsibilities than does the average civil suit." *Vance*, 140 S. Ct. at 2452 (Alito, J., dissenting).

**Harassed by vexatious actions.**  Another key justification for immunity for officials is to "prevent them being harassed by vexatious actions." *Spalding*, 161 U.S. at 495 (quotation omitted). In *Imbler*, the Supreme Court held that the common-law immunity of prosecutors rests on the "concern that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust." 424 U.S. at 423; *see also Butz v. Economou*, 438 U.S. 478, 512 (1978). The President is most likely to draw politically motivated ire. *See Cheney v. U.S. Dist. Ct. for D.C.*, 542

U.S. 367, 369 (2004) (recognizing "the paramount necessity of protecting the Executive Branch from vexatious litigation that might distract it from the energetic performance of its constitutional duties.").

For each of these policy considerations, the case is even stronger when the President is faced with the prospect of *criminal prosecution*, which has a far greater deterrent effect on bold and fearless action than civil liability or a subpoena to produce documents.  "The President's unique status under the Constitution distinguishes him from other executive officials."  *Fitzgerald*, 457 U.S. at 750.  Thus, "the singular importance of the President's duties" entails that "diversion of his energies by concern with" criminal prosecution "would raise unique risks to the effective functioning of government."  *Id.* at 751.  "[A] President must concern himself with matters likely to 'arouse the most intense feelings.'"  *Id.* at 752 (quoting *Pierson v. Ray*, 386 U.S. 547, 554 (1967)).  "[I]t is in precisely such cases that there exists the greatest public interest in providing an official 'the maximum ability to deal fearlessly and impartially with' the duties of his office."  *Id.* (quoting *Ferri v. Ackerman*, 444 U.S. 193, 203 (1979)).  "This concern is compelling where the officeholder must make the most sensitive and far-reaching decisions entrusted to any official under our constitutional system."  *Id.*

"Nor can the sheer prominence of the President's office be ignored."  *Id.* at 752-53.  "In view of the visibility of his office and the effect of his actions on

24

countless people, the President would be an easily identifiable target for" criminal prosecution by a politically motivated successor, as well as hundreds of prosecutors across the country. *Id.* at 753. "Cognizance of this personal vulnerability frequently could distract a President from his public duties, to the detriment of not only the President and his office but also the Nation that the Presidency was designed to serve." *Id.*

### B.    The District Court's Contrary Reasoning Is Not Convincing.

The district court disagreed with this analysis, J.A.604-29, but its reasoning is not convincing. As noted above, the district court simply failed to address many of President Trump's principal arguments. Furthermore, its own analysis erred.

First, the district court emphasized that "[n]o court … has ever accepted" presidential immunity from criminal prosecution for official acts. J.A.604. But no court has ever addressed the question. As noted above, the 234-year tradition of *not* prosecuting Presidents for their official acts implies that the power does not exist. *NFIB*, 595 U.S. at 119; *Seila Law*, 140 S. Ct. at 2201; *Free Enter. Fund*, 561 U.S. at 505; *Printz*, 521 U.S. at 918.

The district court reasoned that the absence of an express provision in the Constitution granting the President official immunity implies that no such immunity exists. J.A.604-06. However, this reasoning would mean that the President has no immunity from *civil* suits as well, which contradicts strong Supreme Court

precedent. *Fitzgerald*, 457 U.S. at 747-49. *Fitzgerald* upheld absolute presidential immunity from civil liability for official acts "in the absence of explicit constitutional … guidance." *Id.* at 747. Moreover, the district court's logic would invalidate other well-established immunity doctrines not explicitly spelled out in the Constitution. *See id.* at 751-55.

Next, the district court cited Alexander Hamilton's statement in The Federalist No. 69 that there is a "total dissimilitude" between the President and the British monarch. J.A.605. However, the district court ignored the fact that, in the same essay, Hamilton wrote that a President could be prosecuted only *after* he was impeached and convicted by the U.S. Senate: "The President of the United States would be liable to be impeached, tried, and, upon conviction of treason, bribery, or other high crimes or misdemeanors, removed from office; and would *afterwards* be liable to prosecution and punishment in the ordinary course of law." THE FEDERALIST NO. 69 (emphasis added).

The district court held that original sources "universally affirmed the crucial distinction that the President would at some point be subject to criminal process." J.A.606. That observation—and those sources—are fully consistent with President Trump's position. A former President is "subject to criminal process" for his "*unofficial* conduct," *Clinton*, 520 U.S. at 694; and he is subject to criminal prosecution for official acts for which he has been impeached and convicted by the

26

Senate, U.S. CONST. art. I, § 3, cl. 7.  Both depart from the British monarch's exceptionless immunity.  The district court's suggestion that presidential immunity provides a "'get-out-of-jail-free' pass" and establishes the "divine right of kings" is historically and legally inaccurate.  J.A.604, 628.

The district court relies heavily on a 2000 OLC opinion, and the 1973 OLC Memo and SG Brief that it discusses in detail, addressing whether a *sitting* President enjoys complete immunity from indictment, prosecution, and imprisonment from *any* criminal charges—whether for private conduct or official acts—while he is still in office.  *A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 U.S. Op. Off. Legal Counsel 222, 2000 WL 33711291 (2000) ("OLC Memo") (cited in J.A.604-05, 608-10, 613, 620, 624).  The district court contends that the OLC Memo "expressly and repeatedly concluded that a former President may 'be subject to criminal process … after he leaves office or is removed therefrom through the impeachment process.'"  J.A.624 (quoting the OLC Memo, which cites and discusses in detail *Amenability of the President, Vice President and Other Civil Officers to Federal Criminal Prosecution While in Office* (1973)).

The district court misapprehends both the historical and legal context of those analyses.  In 1973 and 2000, questions arose about whether a sitting President might be criminally charged for acts that included *private* conduct—*i.e.*, President Nixon's

27

alleged involvement in a range of potentially criminal private conduct,[4] and President Clinton's alleged perjury and obstruction of justice in a private lawsuit based on "*unofficial* conduct." *Clinton*, 520 U.S. at 694. Relatedly, the legal issue addressed—as the memo's title proclaims—was whether a *sitting* President enjoys complete immunity from any kind of criminal indictment, prosecution, trial, or punishment, even for private crimes. 2000 WL 33711291, at *1. The question whether a *sitting* President has complete immunity from criminal process—even for private acts committed "before, during, and after" his time in office, *id.* at *12—is distinct from the question whether a current or former President enjoys absolute immunity from prosecution "based upon his *official acts*." *Fitzgerald*, 457 U.S. at 744 (emphasis added).

Given their historic and legal context, it is unsurprising that OLC's analyses conclude that the immunity for a "sitting" President terminates when he leaves office. "Recognizing *an immunity from prosecution for a sitting President* would not preclude such prosecution once the President's term is over or he is otherwise removed from office by resignation or impeachment." OLC Memo at *26; *see also id.* at *12 ("[T]he constitutional structure permits a sitting President to be subject to

---

[4] *See, e.g., The Legal Aftermath: Citizen Nixon and the Law*, Time (Aug. 19, 1974), *at* https://content.time.com/time/subscriber/article/0,33009,942980-2,00.html (noting that, upon leaving office, President Nixon faced possible criminal charges for "subornation of perjury, tax fraud, misprision of a felony, [and] misuse of Government funds for his private home") ("*Legal Aftermath*").

28

criminal process only after he leaves office or is removed therefrom through the impeachment process."). This statement is correct, provided there is no *other* bar to such prosecution—such as official-act immunity, which the OLC analyses do not address, and which applies here.

Thus, when the district court cites the OLC Memo to analyze the burdens on a *sitting* President from a criminal prosecution, it analyzes the wrong question. J.A.613 (citing OLC Memo, at *19). Naturally, the OLC Memo focuses on the burdens that apply to a *still-sitting* President, since it addresses "[a] *sitting* president's amenability" to criminal process. 2000 WL 33711291, at *19; *id.* at *1. And naturally, some of those unique burdens do not apply to a *former* President.

Moreover, to the extent that it addresses a related issue, the OLC Memo's reasoning strongly supports President Trump here. It emphasizes that impeachment, not criminal prosecution, provides the structural check on a President's alleged misfeasance in office. *Id.* at *6, 7, 8, 21. The Memo recognizes that "a criminal proceeding against the President is … necessarily political," and thus "it would be 'incongruous' for a 'jury of twelve' to undertake the 'unavoidably political' task of rendering judgment in a criminal proceeding against the President." *Id.* at *7. It emphasizes that immunity does not render "the President … above the law," because "the President occupies a unique position within our constitutional order." *Id.* at *12. The Memo supports the view that the threat of future criminal prosecution

29

imposes a far greater, not lesser, deterrent to a President's bold and fearless action while in office.  *See id.* at *22-23.

The district court argues that President Trump's reading of the Impeachment Judgment Clause "proves too much" because the Clause applies to lower-level officers who are generally subject to criminal prosecution before leaving office. J.A.610.  But the OLC Memo undercuts this view by emphasizing that the Founders envisioned that the President would be treated differently under the Clause because of the unique status of his office.  2000 WL 33711291, at *9 ("[T]he discussion of the Impeachment Judgment Clause in the convention focused almost exclusively on the Office of the President, and 'the Framers did not debate the question whether impeachment generally must precede indictment.'"); *id.* at *10 ("To the extent that the convention did debate the timing of impeachment relative to indictment … , the convention records show that *the Framers contemplated that this sequence should be mandatory only as to the President*.  Moreover, the remarks contained in those records 'strongly suggest an understanding that the President, as Chief Executive, would not be subject to the ordinary criminal process.'") (emphasis added) (quotations omitted).  Likewise, the Supreme Court has "long recognized that the scope of Presidential immunity from judicial process differs significantly from that of Cabinet or inferior officers."  *Franklin*, 505 U.S. at 826 (Scalia, J., concurring in part and concurring in the judgment) (citing cases).

30

The district court argues that criminal immunity would produce "implausibly perverse results" because it might allow some Presidents to escape punishment for official-act crimes in marginal cases. J.A.610-11. The OLC Memo addresses very similar concerns about potential underenforcement and concludes that those concerns do not outweigh the needs of the President's unique office and functions. OLC Memo, 2000 WL 33711291, at *26-27. The Constitution establishes a powerful structural check to prevent political factions from abusing the formidable threat of criminal prosecution to disable the President and attack their political enemies. Under the Constitution's balanced, structural approach, a President may be prosecuted, but only if he is first impeached, tried, and convicted by the U.S. Senate. U.S. CONST. art. I, § 3, cl. 7. The Constitution opens the door to such prosecutions, but requires a strong political consensus—*i.e.*, the participation of the political branches, including a supermajority of the U.S. Senate, the Republic's traditional "cooling saucer"—before such a drastic action can be taken. *See id.* Accordingly, the Supreme Court has repeatedly emphasized that impeachment, not prosecution, provides the principal check and deterrent to a President's malfeasance in his official acts. *Clinton*, 520 U.S. at 696; *Fitzgerald*, 457 U.S. at 757.

The mere possibility of under-enforcement in marginal cases does not "license a President's criminal impunity," J.A.611, nor cast doubt on this system of checks and balances. *Every* structural protection in the Constitution necessarily creates the

31

possibility of under-enforcement—that is a feature, not a bug, of the separation of powers. "While the separation of powers may prevent us from righting every wrong, it does so in order to ensure that we do not lose liberty." *Morrison v. Olson*, 487 U.S. 654, 710 (1988) (Scalia, J., dissenting); *see also INS v. Chadha*, 462 U.S. 919, 944 (1983) ("[T]he fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution.").

The district court reasoned that "the Supreme Court has largely rejected similar claims of a 'chilling effect' from the possibility of future criminal proceedings." J.A.614 (citing *United States v. Nixon*, 418 U.S. 683, 712 (1974)); *see also* J.A.618-19. But *Nixon* addressed a far less direct threat to the Presidency—*i.e.*, the threat that aides might be deterred from giving candid advice by the prospect that their communications might someday be subject to a criminal subpoena. *See* 418 U.S. at 686. That bears no resemblance to the threat of *personal* criminal indictment, prosecution, and imprisonment directly against the President himself for his official acts.

Next, the district court offered that criminal immunity is unnecessary because Presidents should just not commit federal crimes. J.A.615; *see* J.A.616 ("Every President will face difficult decisions; whether to intentionally commit a federal crime should not be one of them."). The Founders, by contrast, correctly anticipated

32

the risk of manipulation of vaguely defined "crimes" by political factions. James Madison, for example, explained the provision of a specific definition of "Treason" in Article III, § 3, clause 1, by stating that it was devised to prevent political factions from devising "*new fangled and artificial treasons*, [which] have been the great engines, by which violent factions, the natural offspring of free governments, have usually wreaked their alternate malignity on each other." THE FEDERALIST NO. 47 (Madison) (emphasis added). Then-Attorney General Robert Jackson expounded the same concern in 1940, emphasizing the sweeping breadth of federal criminal statutes, and describing therefore "the most dangerous power of the prosecutor" as the power to "pick[] the man and then search[] the law books … to pin some offense on him." R. Jackson, *The Federal Prosecutor, Address Delivered at the Second Annual Conference of United States Attorneys* (April 1, 1940) (quoted in *Morrison*, 487 U.S. at 728 (Scalia, J., dissenting)). The instant indictment of President Trump—which dramatically stretches the language of vague criminal statutes in novel interpretations in an attempt to criminalize core political speech and advocacy, J.A.443-454, 575-583—vividly illustrates these predictions. *See McDonnell v. United States*, 579 U.S. 550, 575 (2016).

The district court incorrectly discounted the risk of future prosecutions, stating that "[d]espite Defendant's doomsaying, he points to no evidence that his criminal liability in this case will open the gates to a waiting flood of future federal

prosecutions." J.A.617. Yet the recent history of presidential impeachment contradicts the district court. In the 209 years from 1789 to 1998, there was one impeachment of a President—Andrew Johnson in 1868. In the last 25 years, there have been three, with a fourth currently under consideration by the House of Representatives. In just over two decades, Presidential impeachment changed from virtually unthinkable to a fixture of interbranch politics. And impeachment faces formidable structural checks—it must be voted by a majority of the House, with a supermajority of the Senate required to convict. Criminal prosecution, by contrast, requires only a single enterprising prosecutor and a compliant grand jury drawn from a tiny sector of America.

The district court then pointed to the "robust procedural safeguards attendant to federal criminal prosecutions." J.A.617-18. Again, the OLC Memo contradicts this analysis, by emphasizing the inherent, highly politicized nature of any prosecution of a former President. It recognizes that "a criminal proceeding against the President is … necessarily political," and thus "it would be 'incongruous' for a 'jury of twelve' to undertake the 'unavoidably political' task of rendering judgment in a criminal proceeding against the President." 2000 WL 33711291 at *7. The district court emphasized that "the prosecutor, judge, and all twelve petit jurors [must] agree that the charges are legitimate and have been proven beyond a reasonable doubt." J.A.618. But the OLC Memo emphasizes the *inappropriateness*

34

of having a jury sit in judgment over a President.  2000 WL 33711291, at *7-8.  So, too, does the Supreme Court.  *Martin*, 25 U.S. at 32-33; *cf. Tenney*, 341 U.S. at 377; *see also* Kavanaugh, *supra*, at 2159 (arguing that the "repercussions" of criminal proceedings against a President "if they are to occur, should not result from the judgment of a single prosecutor—whether it be the Attorney General or special counsel—and a single jury").  "Prosecution or nonprosecution of a President is … inevitably and unavoidably a political act."  Kavanaugh, *supra*, at 2159.

The district court reasoned that criminal immunity is unnecessary because "the violations require criminal intent."  J.A.615.  The Supreme Court rejected this argument in *Fitzgerald*.  The dissent argued that civil immunity was unnecessary because, under *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), "the President, were he subject to civil liability, could be held liable only for an action that he knew, or as an objective matter should have known, was illegal and a clear abuse of his authority and power." 457 U.S. at 782 (White, J., dissenting).  The majority, however, rejected this argument and adopted the rule of absolute presidential immunity.

The district court emphasized the strong public interest in criminal proceedings.  J.A.618-19.  But when it comes to the prosecution of a President, the Constitution strikes a balance that gives "grave weight" to those interests.  *Id.*  It allows a President to be prosecuted for purely private acts, and even for official acts

35

for which he has been impeached and convicted by the Senate. The district court had no warrant to re-balance what the Constitution has already balanced.

The district court argues that "[d]espite their other vehement disagreements in *Fitzgerald*, all nine Justices unanimously endorsed" the denial of criminal immunity "with respect to former Presidents." J.A.619. Not so. The majority opinion in *Fitzgerald* merely noted that, in *United States v. Nixon*, "the exercise of jurisdiction [was] held warranted" over the President "to vindicate the public interest in an ongoing criminal prosecution," 457 U.S. at 754, and it "recognized … that there is a lesser public interest in actions for civil damages than, for example, in criminal prosecutions," *id.* at 754 n.37. It did not purport to decide whether absolute immunity extends to criminal prosecutions for official acts. *See id.* Chief Justice Burger's concurrence, likewise, merely recognized that the Court was not addressing or deciding whether absolute immunity extended beyond civil liability. *Id.* at 759. Moreover, Justice White's dissent contended that the majority's reasoning strongly supports criminal immunity—the same argument that President Trump makes here. *See id.* at 765, 780 (White, J., dissenting).

Regarding the prospect of criminal prosecutions from approximately 2,300 local prosecutors, the district court suggests that such prosecutions "*might* run afoul of the Supremacy Clause," and thus they could be defended on that ground on a case-by-case basis. J.A.616 (emphasis added) (citing *Vance*, 140 S. Ct. at 2428). This is

true, but insufficient.  The OLC Memo rejects similar reasoning: "[A] *categorical rule* against indictment or criminal prosecution is most consistent with the constitutional structure, rather than a doctrinal test that would require the court to assess whether a particular criminal proceeding is likely to impose serious burdens upon the President."  2000 WL 33711291 at *25 (emphasis added).

The district court emphasized the "distinctly communal character" of criminal law.  J.A.620.  This overlooks the *national* "communal character" of the Presidency.  The Presidency "implicate[s] a uniquely important national interest, because the President and the Vice President of the United States are the only elected officials who represent all the voters in the Nation."  *Anderson v. Celebrezze*, 460 U.S. 780, 794–95 (1983).  The President constitutes "a single head in whose choice the whole Nation has a part, making him the focus of public hopes and expectations."  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 653 (1952) (Jackson, J. concurring).  He is responsible for directing the entire Executive Branch and, in the field of foreign affairs, is "the sole organ of the federal government ... ."  *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936).  This *nationwide* interest in the Presidency makes it particularly inappropriate for a jury drawn from a *local* "commun[ity]," J.A.620, to sit in judgment over the President's official acts.

The district court argued that "Congress has spoken by criminalizing the conduct with which the Defendant is charged," and that this puts the President's

power "at its lowest ebb." J.A.621 (quoting *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring)). But *Youngstown* addressed the availability of injunctive relief against inferior executive officers—not prosecuting the President for official acts. *See Franklin*, 505 U.S. at 828 (Scalia, J., concurring in part and concurring in the judgment) (citing *Youngstown* for this point). When it comes to the far different—and more intrusive—prospect of Congress purporting to *criminalize* a President's official acts, and the Judicial Branch purporting to convict and imprison him for them, separation-of-powers principles weigh heavily in the opposite direction. "Unless the other branches are to be entirely subordinated to the Judiciary, we cannot direct the President to take a specified executive act or the Congress to perform particular legislative duties." *Id.* at 829. Nor can the Judicial Branch throw the President into prison for allegedly failing to do so. U.S. CONST. art. II, § 1.

The district court cited dicta in *O'Shea v. Littleton*, 414 U.S. 488, 503 (1974), to argue that no judge-created immunity doctrine can trump an act of Congress. J.A.621. Citing *Gravel*, 408 U.S. at 627, *O'Shea* stated that "we have never held that the performance of the duties of judicial, legislative, or executive officers, requires or contemplates" criminal immunity, and that "the judicially fashioned doctrine of official immunity does not reach 'so far as to immunize criminal conduct proscribed by an Act of Congress." *Id.* The district court interprets this statement as abolishing all official-immunity doctrines from federal criminal prosecution,

J.A.621, but so interpreted, this statement is incorrect.  As noted above, the Supreme

Court has recognized both legislative and judicial immunity from criminal

prosecution for *official acts*.  *Gravel* does not call these precedents into doubt—it

addressed the existence of a "nonconstitutional testimonial privilege" arising from

the Speech and Debate Clause, not the existence of criminal immunity.  408 U.S. at

627.  In any event, the dicta in both cases appear to make a much narrower claim—

*i.e.*, that some civil-rights statutes might uniquely abrogate absolute judicial

immunity.  No such claim is made here.

Citing *United States v. Lee*, 106 U.S. 196, 220 (1882), the district court likened

presidential immunity from criminal prosecution to the "divine right of kings," and

held that "'[n]o man in this country,' not even the former President, 'is so high that

he is above the law.'"  J.A.628; *see also* J.A.622.  But in *Butz*—also citing *Lee*—the

Court rejected the same reasoning and held that absolute immunity does not render

an official "above the law."  438 U.S. at 506.  Quoting *Lee*'s statement that "no man

… is above the law," *Butz* held that this principle is *consistent* with the recognition

of absolute immunity where, as here, history and public policy warrant immunity.

"In light of this principle," *Butz* held, "federal officials who seek absolute exemption

from personal liability for unconstitutional conduct must bear the burden of showing

that public policy requires an exemption of that scope."  *Id*.  *Butz* then stated that

absolute immunity applies in "those exceptional situations where it is demonstrated

39

that absolute immunity is essential for the conduct of the public business." *Id.* at 507. The Presidency, of course, presents the most "essential" of all cases. *Id.*; *see also Fitzgerald*, 457 U.S. at 750 (citing *Butz* and holding that "[t]he President's unique status under the Constitution distinguishes him from other executive officials"). Likewise, the district court's reasoning overlooks that, under the Impeachment Judgment Clause, a former President *is* subject to prosecution for official acts—provided that he is first impeached and convicted by the political branches.

Citing the OLC analyses, the district court argued that the Executive Branch has rejected the President's absolute immunity from prosecution. J.A.624-25. Not so. The OLC analyses address whether the President is immune from *any* criminal process—even for purely private crimes, committed at any time—while he is *still in office*. They do not analyze the President's criminal immunity "based upon his *official acts.*" *Fitzgerald*, 457 U.S. at 744 (emphasis added). The OLC memos' reasoning supports the recognition of such immunity. *See supra*.

The district court relied on President Ford's prophylactic pardon of President Nixon. J.A.625. The district court draws exactly the wrong conclusion. President Ford's issuance of a prophylactic pardon to *prevent* a potentially bitter, protracted, divisive prosecution of a former President, J.A.625, *reinforces* the political and constitutional tradition against prosecuting Presidents—it does not undermine it. In

40

any event, the allegations against President Nixon included alleged crimes in *private* conduct, *see Legal Aftermath*, *supra*, so the pardon provides no counterexample to *official-act* immunity.

### C.    The Conduct Alleged in the Indictment Falls Within the Scope of President Trump's Official Responsibilities.

Because the district court held that criminal immunity does not exist, it did not address whether the five types of conduct charged in the indictment fall within the outer perimeter of the President's official duties.  J.A.628-29.  After upholding criminal immunity, the Court should remand for the district court to consider these questions in the first instance.  *See Blassingame*, 87 F.4th at 29.  If the Court reaches these questions, to avoid duplicative briefing, President Trump incorporates by reference his briefing in the trial court, J.A.357-81; J.A.487-93.

Given the existence of criminal immunity, the *scope* of immunity should extend at least as far as civil immunity, *i.e.*, to the "'outer perimeter' of [the President's] official responsibility." *Fitzgerald*, 457 U.S. at 756; J.A.357-59.  The test is broad.  "When an appropriately objective, context-specific assessment yields no sufficiently clear answer in either direction, the President … should be afforded immunity." *Blassingame*, 87 F.4th at 21.

In assessing whether immunity applies to Presidential conduct, courts must look to the "nature of the act itself," *Stump v. Sparkman*, 435 U.S. 349, 362 (1978)— not to its allegedly unlawful manner or purpose.  *Fitzgerald*, 457 U.S. at 756;

41

*Bradley v. Fisher*, 80 U.S. 335, 354 (1871); *Spalding*, 161 U.S. at 494, 498; *Pierson*, 386 U.S. at 554; *Barr*, 360 U.S. at 575; *Gregoire*, 177 F.2d at 581 (Hand, J.); *Blassingame*, 87 F.4th at 20-21; *see also* J.A.359-62 (citing many cases).

Further, for a *President*'s official acts, "there is not always a clear line between his personal and official affairs," so many acts may have a dual character. *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2034 (2020); *see also Blassingame*, 87 F.4th at 20-21.

Under these standards, all five types of conduct alleged in the indictment constitute official acts. They all reflect President Trump's efforts and duties, squarely as Chief Executive of the United States, to advocate for and defend the integrity of the federal election, in accord with his view that it was tainted by fraud and irregularity.

First, President Trump's public statements and tweets about alleged fraud and irregularity in the federal election fall within the outer perimeter of Presidential duty, to which communicating with the public on matters of federal concern is absolutely central. *See Trump v. Hawaii*, 138 S. Ct. 2392, 2417-18 (2018); *Barr*, 360 U.S. at 568, 574-75; Jeffrey K. Tulis, The Rhetorical Presidency 4 (2017); *see also Pleasant Grove City v. Summum*, 555 U.S. 460, 467-68 (2009); J.A.364-69. This is especially apparent with respect to President Trump's tweets; his Twitter account has been held to be an official government channel of communication based on

42

"overwhelming" evidence. *Knight First Amend. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 236 (2d Cir. 2019), *judgment vacated as moot*, 141 S. Ct. 1220 (2021). President Trump's other public statements are also plainly official. *Cf. Blassingame*, 87 F.4th at 30 (directing further factfinding to determine whether some statements, also alleged in the indictment here, are official acts).

Second, President Trump's communications with the U.S. Department of Justice about investigating widespread reports of election fraud, and deliberating about replacing the Acting Attorney General, are quintessential Presidential acts. The President shall "take Care that the Laws be faithfully executed," U.S. CONST. art. II, § 3, which include the numerous prohibitions on federal election crime. *See*, *e.g.*, 18 U.S.C. §§ 241, 242, 611, 911, 1015(f); 52 U.S.C. §§ 10307(c), 10307(e), 20511(1), 20511(2)(A), 20511(2)(B), 30120, 30124; *see also* U.S. Dep't of Justice, *Federal Prosecution of Election Offenses* (8th ed. 2017), https://www.justice.gov/criminal/file/1029066/download. Directing the Attorney General to enforce these falls squarely within the Take Care power. *Office & Duties of Attorney General*, 6 U.S. Op. Atty. Gen. 326, 335 (1854); *Ponzi v. Fessenden*, 258 U.S. 254, 262 (1922). Deliberating about whether to replace a Cabinet-level officer is a core exercise of the appointment and removal power. U.S. CONST. art. II, § 2, cl. 2; *Myers v. United States*, 272 U.S. 52, 122 (1926); *see also Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim*

*of Executive Privilege*, 8 U.S. Op. O.L.C. 101, 113 (1984) (quoting 1 Annals of Congress 481 (1789)); *In re Sealed Case*, 121 F.3d 729, 752–53 (D.C. Cir. 1997) (deciding to remove the Secretary of Agriculture is a "quintessential and nondelegable Presidential power").

Third, communications with state officials about their exercise of official duties with respect to a federal election falls within a President's official duties. J.A.371-75. The President's Take Care duty "include[s] the rights, duties, and obligations growing out of the constitution itself … and all the protection implied by the nature of the government under the constitution." *Cunningham v. Neagle*, 135 U.S. 1, 64 (1890); *see also Fitzgerald*, 457 U.S. at 756 (adopting a broad view of the scope of immunity instead of parsing specific presidential "functions"). This includes taking steps to ensure the integrity of federal elections, such as communicating with state officials who play a critical role in administering those federal elections. Presidential electors "exercise federal functions under, and discharge duties in virtue of authority conferred by, the Constitution of the United States." *Burroughs v. United States*, 290 U.S. 534, 545 (1934); *see also Celebrezze*, 460 U.S. at 794-95; Exec. Order 14019, 86 Fed. Reg. 13623-27; Br. for U.S. as *Amicus Curiae* at 12, *Blassingame*, 87 F.4th at 1 (Nos. 22-5069, 22-7030, 22-7031) ("*Blassingame* Amicus Br.").

Fourth, communicating with Members of Congress, including the Vice President in his capacity as President of the Senate, about their exercise of their official duties lies at the core of Presidential responsibility.  J.A.375-78.  The President has intimate and extensive responsibility in the legislative process.  U.S. CONST. art. I, § 7, cl. 2-3.  Article II specifically provides that the President "recommend to [Congress's] Consideration such Measures as he shall judge necessary and expedient." U.S. CONST. art. II, § 3.  This includes the Executive Branch "mak[ing] its views known to Congress on all matters in which it has responsibilities, duties, and opinions."  *Lobbying by Executive Branch Personnel*, U.S. Op. O.L.C. Supp. 240, 243-45 (1961) (gathering sources); *see also id.* at 244 (quoting H.R. Rep. No. 81-3138, at 52); *see also* Clinton Rossiter, *The American Presidency* 108 (2d rev. ed. 1960); *Blassingame* Amicus Br. 11.  Historical precedent from President Grant's intervention in the disputed Hayes-Tilden election supports this conclusion.  *See* 28 PAPERS OF ULYSSES S. GRANT 19-20, 75-78, 80–81 (ed. John Y. Simon 2005), https://scholarsjunction.msstate.edu/usg-volumes/27/.

Fifth, organizing contingent slates of electors to support the President's advocacy to the Vice President and Congress is likewise an official act.  J.A.378-81.  The indictment itself alleges that these acts were intertwined with President Trump's attempts to lobby the Vice President and Members of Congress.  J.A.28-29, 44-45, 55-61.  Thus, they fall under the President's official duties both because those duties

45

extend to "the rights, duties, and obligations growing out of the constitution itself" and "all the protection implied by the nature of the government under the constitution," *Neagle*, 135 U.S. at 64; *see also* U.S. CONST. art. II, § 1, cl 2; *Burroughs*, 290 U.S. at 545, and because they are necessary and preparatory to, and thus intertwined with, the plainly official acts of communicating with Congress about the certification of the federal election, *see, e.g., Prince v. Hicks*, 198 F.3d 607, 612 (6th Cir. 1999); *Guzman–Rivera v. Rivera–Cruz*, 55 F.3d 26, 29 (1st Cir. 1995).

## II.    The Prosecution Is Barred by the Impeachment Judgment Clause and Principles of Double Jeopardy.

Here, President Trump was impeached and *acquitted* by the Senate for the same and closely related conduct to that alleged in the indictment. H. RES. 24 (117th Cong. 1st Sess.), https://www.congress.gov/bill/117th-congress/house-resolution/24/text. The Impeachment Judgment Clause, U.S. CONST. art. I, § 3, cl. 7, mandates reversal because it incorporates a Double Jeopardy principle: A President who is acquitted by the Senate cannot be prosecuted for the acquitted conduct.

That follows from the text of the Clause. It says that "the Party *convicted* shall nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law." *Id.* (emphasis added). By specifying that "the Party convicted" is subject to criminal prosecution, the clause "implies" that the Party who is not convicted is not subject to criminal prosecution. Scalia & Garner, *supra*, at 107.

46

This is a straightforward application of the canon *expressio unius est exclusio alterius*.

To be sure, "[f]inding the negative implication of a" legal writing "is a context-specific exercise." *Mercy Hosp., Inc. v. Azar*, 891 F.3d 1062, 1069 (D.C. Cir. 2018). But the context of the Impeachment Judgment Clause strongly supports the negative implication that a Senate-acquitted President may *not* be prosecuted. Indeed, even the OLC memo the district court relied on in discussing Double Jeopardy, concedes the argument "has some force." *Whether a Former President May Be Indicted and Tried for the Same Offenses for Which He Was Impeached by the House and Acquitted by the Senate*, 24 Op. O.L.C. 110, 114 (2000) ("Double Jeopardy Memo").

The concession is an understatement. In England, "the House of Lords could not only remove officials from office and disqualify them from holding office, but also impose a full range of criminal punishments on impeachment defendants." *Id.* at 126. The Impeachment Judgment Clause altered that by limiting the punishments the Senate could impose to just removal and disqualification and then creating an exception to Double Jeopardy by saying a *convicted* officer could be criminally prosecuted. *See id.* at 126–27; *see also* U.S. CONST., art. I, § 3, cl. 7. But nothing indicates it altered the criminal nature of the impeachment process. To the contrary,

47

the second proviso in the Clause is unnecessary if impeachment and conviction have *no* jeopardy implications.

That reading is to be avoided.  *See*, *e.g.*, *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 635 (2012) (surplusage canon).  Since the Clause references only "the Party Convicted," the usual rules of Double Jeopardy apply to acquittals—they "bar … a subsequent prosecution for the same offense."  *Ball v. United States*, 163 U.S. 662, 671 (1896).  Indeed, OLC admits this reading is reasonable.  *See* Double Jeopardy Memo, 24 Op. O.L.C. at 116–18.

Justice Story certainly found it persuasive.  In the section of the *Commentaries* cited by both the district court and OLC, *see* J.A.641; 24 Op. O.L.C., at 125–26, he notes that under the British system, where the House of Lords could "pronounce a full and complete sentence," an acquittal would bar further prosecution.  3 Story, *supra*, § 780.  But under the constitutional structure, where impeachment and conviction result in removal and disqualification, Story recognized "that provision should be made" authorizing additional prosecution, or else there would be "extreme doubt, whether ... a second trial for the same offence could be had, either after an acquittal, or a conviction … ."  *Id.*  The only provision for future criminal prosecution in the Impeachment Judgment Clause is for "the Party convicted … ."  U.S. CONST., art. I, § 3, cl. 7.  OLC, to be sure, said that Justice Story believed the Impeachment Judgment Clause "removed any doubt about a double jeopardy bar in

48

the case of Senate acquittals ... ."  Double Jeopardy Memo, 24 Op. O.L.C. at 126.

There is no analysis behind that statement, which makes sense because the assertion

is baseless.  The express reference to prosecution after *conviction* does not make

"provision"—to borrow from Justice Story—for prosecution after *acquittal*.  The

opposite is true.

The district court pointed to a 1973 OLC memorandum, J.A.607-08; but OLC

subsequently conceded that its 1973 memorandum missed the complexity of "the

relationship between [the Impeachment Judgment Clause] and double jeopardy

principles," OLC Memo, 24 Op. O.L.C. at 224 n.5.  To be sure, OLC adheres to the

1973 memo's decision, *see id.*, but its reasoning is unconvincing.  It rests on the

assumption that "the framers and ratifiers most heavily relied" on "formulations of"

Double Jeopardy that "restricted its reach to cases where the defendant's life was at

stake," 24 Op. O.L.C. at 127.

But if that is what the Founders believed, there was no reason to say a

convicted officer could be prosecuted; Double Jeopardy would be out of the picture.

It also assumes that the Founders departed from the British model *explicitly* in one

way (by limiting the punishments the Senate could impose) but *implicitly* in another

way (by not treating impeachments like a criminal proceeding).  That is highly

unlikely.  Indeed, OLC acknowledged that State constitutions typically say if they

intend an impeachment acquittal to result in further prosecution.  *Id.* at 115.  That

49

includes State constitutions at the time of the Founding. *See id.* at 116 (mentioning Pennsylvania's 1790 charter). And New York's constitution, which "contained language strikingly similar to that" in the U.S. Constitution, and "was amended [in 1846] to refer to 'the party impeached' rather than 'the party convicted' precisely because of a concern that the latter phrase might be understood to give immunity from criminal prosecution to those who had been impeached and acquitted." *Id.* at 116; *see id.* at 116 n.12.

Likewise, "[t]he Framers … appeared to anticipate that a President who commits serious wrongdoing should be impeached by the House and removed from office by the Senate—and then prosecuted thereafter." Kavanaugh, *supra*, at 2158.[5] Hamilton thrice said criminal prosecution can only *follow* impeachment *and*

---

[5] Many of the quotes the district court and OLC provide are unilluminating. The letter from Edmund Pendleton to James Madison is an example. *See* Double Jeopardy Memo, 24 Op. O.L.C. at 124–25; J.A.640. The statement is made in a paragraph providing general criticisms about impeachment; it involves other issues Pendleton had with the Senate; and the letter itself is a list of Pendleton's thoughts about the Constitution in private correspondence. *See* Letter to James Madison from Edmund Pendleton, 8 October 1787, https://founders.archives.gov/documents/Madison/01-17-02-0352. Madison's reply is similar. *See* JA.640. He does not address impeachment, instead focusing on other points Pendleton made; the most he says is that Pendleton's remarks are "in general extremely well founded." Letter from James Madison to Edmund Pendleton, 28 October 1787, https://founders.archives.gov/documents/Madison/01-10-02-0156. That is not a ringing endorsement of Pendleton's letter, much less an endorsement of any view on whether an acquitted officer can be prosecuted. The Double Jeopardy Memo references a commentary by St. George Tucker that speculated an acquittal would not bar further prosecution. 24 Op. O.L.C. at 125. That also has limited persuasive value, by a similar analysis.

*conviction*.   *See* FEDERALIST NO. 65; FEDERALIST NO. 69; FEDERALIST NO. 77. Indeed, in discussing impeachment in Federalist No. 65 he said, "The punishment which may be the consequence of *conviction* upon impeachment, is *not to terminate* the chastisement of the offender.   *After* having been sentenced to a perpetual ostracism from the esteem and confidence, and honors and emoluments of his country, he will still be liable to prosecution and punishment in the ordinary course of law."  (Emphases added).   The constant linkage of criminal punishment as following *conviction* but not impeachment *simpliciter* is compelling evidence that it did not follow impeachment acquittal.

Then there is James Wilson's statement that "the President … 'is amenable to [the laws] in his private character as a citizen, and in his public character by impeachment.'"   *Clinton*, 520 U.S. at 696 (quoting James Wilson in 2 J. ELLIOT, DEBATES ON THE FEDERAL CONSTITUTION 480 (2d ed. 1863)).   Other statements by Charles Lee, *see Marbury*, 5 U.S. at 149, and Chief Justice Marshall likewise point to impeachment as the primary means of addressing presidential malfeasance.   To the same effect is a Gouverneur Morris statement OLC discussed; he said that " '[t]he Executive ought therefore to be impeachable for treachery; Corrupting his electors, and incapacity … .   For the latter he should be punished not as a man, but as an officer, and punished only by degradation from office.'"   Double Jeopardy Memo, 24 Op. O.L.C. at 128.

Those statements affirm that punishing a President for alleged official malfeasance has two parts: impeachment and conviction in Congress, which may then be followed by criminal prosecution.[6]  It also highlights that the Founders adapted the British method of impeachment, *see*, *e.g.*, FEDERALIST NO. 65, but bifurcated it into a political part, which the Senate controls; and a criminal part, which belongs to the judiciary, *see* 3 Story, *Commentaries* § 784 (making the same observation).  The British impeachment process starts and ends with its legislative entities.  *Id.* § 742.  It stands to reason that the Framers would conclude that Congress should have the dominant role in impeachment and conviction—with criminal prosecutions taking a back seat.  That is consistent with the emphasis on the political process of impeachment as the primary form of checking the President, and also with the Senate's acquittal having binding effect on future criminal prosecutions.

The text, context, and history of the Impeachment Judgment Clause thus confirm that an acquittal bars prosecution for the same or closely related conduct.

---

[6] The district court notes Wilson said, during the Pennsylvania ratification convention, that Senators who are impeached but not convicted "may be tried by their country."  *See* J.A.640 (quotations omitted); *see also* Double Jeopardy Memo, 24 Op. O.L.C. at 124.  First, this statement is inconsistent with the more considered views of Hamilton.  Second, it was made in the context of discussing impeachment and conviction of Senators.  *See* Double Jeopardy Memo, 24 Op. O.L.C. 122 n.34.  The more relevant view is his discussion of how impeachment worked for Presidents, which is discussed here.

Similarly, the statement of Representative Dana referenced by the district court and OLC, *see id.* at 125; J.A.641, involved senatorial impeachment and, furthermore, were made over a decade after the Constitution's ratification.

That leaves the district court's policy disagreements with the Founders, disguised by the district court as "structural considerations." The district court pointed to two: that "impeachment and prosecution serve distinct goals within the separation of powers," and that the Senate "may acquit … even when it finds that an official committed the acts alleged." J.A.639-40.

The Double Jeopardy Memo said the first is "perhaps the most fundamental." 24 Op. O.L.C. at 130. But it and the district court, J.A.640, both missed what the Founders recognized: That punishment of the President *is* irreducibly political and so belongs primarily to the branch most politically accountable—Congress and, ultimately, the Senate. "The subjects of [impeachment] are those offenses which proceed from the misconduct of public men ... . They are of a nature which may with peculiar propriety be denominated POLITICAL, as they relate chiefly to injuries done immediately to the society itself." FEDERALIST NO. 65 (Hamilton). "[T]he Senate [is] the most fit depositary of this important trust." *Id.*

Madison underscores that point. He cautioned against "new fangled and artificial treasons," which "have been the great engines, by which violent factions, the natural offspring of free governments, have usually wreaked their alternate malignity on each other." FEDERALIST NO. 47. By requiring widespread political consensus within the U.S. Senate—the historical "cooling saucer" of the Republic— before a President can be criminally prosecuted, the Impeachment Judgment Clause

protects Presidents from "new fangled and artificial treasons." *Id.* And contrary to the district court, J.A.641-42, the Supreme Court has repeatedly affirmed the view that impeachment is political—and so is the principal, constitutionally prescribed method to address Presidential malfeasance. *See Clinton*, 520 U.S. at 696; *Fitzgerald*, 457 U.S. at 757.

The Impeachment Judgment Clause thus protects Presidents from harassing criminal prosecutions by requiring Congress first to make the political judgment that the President should be convicted. If, as here, the Senate acquits the President, the Senate has necessarily concluded that the President should remain in office and is not disqualified from service. For a prosecutor to conclude otherwise undermines that conclusion—indeed, a successful prosecution voids it—and arrogates to himself a judgment the Constitution reserves for Congress.

\*\*\*

Thus, President Trump's acquittal by the Senate bars prosecution for the conduct alleged in the indictment.[7] Further, the acquittal reinforces President Trump's immunity argument. Where, as here, the question is the amenability of the President to prosecution for an official act, the political concerns are at their apex.

---

[7] The district court's analysis of the Double Jeopardy Clause, J.A.636-38, misses the point. The preclusive effect here arises from the Impeachment Judgment Clause, which incorporates Double Jeopardy principles, but not Double Jeopardy tests wholesale. *Cf.* Double Jeopardy Memo, 24 Op. O.L.C. at 113–48 (separately analyzing the two).

54

Before any single prosecutor can ask a court to sit in judgment of the President's conduct, Congress must have approved of it by impeaching and convicting the President. That did not happen here, and so President Trump has absolute immunity.

## <u>CONCLUSION</u>

The district court's Memorandum Opinion and Order, J.A.599, 647, should be reversed and the case should be remanded with instructions to dismiss the indictment with prejudice. In the alternative, the Court should uphold criminal immunity and remand to the district court to apply the doctrine in the first instance. If the Court affirms the district court in any respect, President Trump respectfully requests that the Court stay the issuance of its mandate pending further review, including possible en banc proceedings and/or Supreme Court review.

Dated: December 23, 2023          Respectfully Submitted,

LAURO & SINGER                    JAMES OTIS LAW GROUP, LLC
John F. Lauro
Gregory M. Singer                 */s/ D. John Sauer*
400 N. Tampa St., 15th Floor      D. John Sauer
Tampa, FL 33602                   William O. Scharf
(813) 222-8990                    Michael E. Talent
jlauro@laurosinger.com            13321 N. Outer Forty Road, Suite 300
                                  St. Louis, Missouri 63017
BLANCHE LAW                       (314) 562-0031
Todd Blanche                      John.Sauer@james-otis.com
Emil Bove
99 Wall St., Suite 4460           *Attorneys for President Donald Trump*
New York, NY 10005
(212) 716-1250
toddblanche@blanchelaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on December 23, 2023, I caused a true and correct copy of the foregoing to be filed by the Court's electronic filing system, to be served by operation of the Court's electronic filing system on counsel for all parties who have entered in the case.

*/s/ D. John Sauer*

## <u>CERTIFICATE OF COMPLIANCE</u>

This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,900 words, excluding those portions pursuant to Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1), according to Microsoft Word.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it was prepared in a proportionally spaced typeface in Microsoft Word utilizing 14-point Times New Roman font.

*/s/ D. John Sauer*
D. John Sauer