ORAL ARGUMENT SET JANUARY 9, 2024

No. 23-3228

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

UNITED STATES OF AMERICA,

*Appellee,*

v.

DONALD J. TRUMP,

*Defendant-Appellant.*

_____

On Appeal from the United States District Court
for the District of Columbia

---

## JOINT APPENDIX

---

LAURO & SINGER
John F. Lauro
400 N. Tampa St., 15th Floor
Tampa, FL 33602
(813) 222-8990
jlauro@laurosinger.com

BLANCHE LAW
Todd Blanche
Emil Bove
99 Wall St., Suite 4460
New York, NY 10005
(212) 716-1250
toddblanche@blanchelaw.com

JAMES OTIS LAW GROUP, LLC
D. John Sauer
William O. Scharf
Michael E. Talent
13321 N. Outer Forty Road, Suite 300
St. Louis, Missouri 63017
(314) 562-0031
John.Sauer@james-otis.com

*Attorneys for President Donald J. Trump*

# TABLE OF CONTENTS

1. Docket Sheet ......................................................................................................1

2. Indictment (Aug. 1, 2023), Doc. 1 .................................................................24

3. Response in Opposition to Government's Proposed Trial Calendar
   (Aug. 17, 2023), Doc. 30 ...............................................................................69

   A. Ex. A – Aug. 11, 2023 Transcript of Hearing on Protective Order,
      Doc. 30-1 .................................................................................................85

   B. Ex. B – June 23, 2023 Declaration of Jay I. Bratt, with Exhibit B, and
      Proposed Order, United States District Court, Southern District of
      Florida, Case No. 23-80101, Doc. 30-2 ................................................159

   C. Ex. C – July 18, 2023 Transcript of Motion Hearing, United States
      District Court, Southern District of Florida, Case No. 23-80101,
      Doc. 30-3 ...............................................................................................167

   D. Ex. D – June 9, 2023 Order, Supreme Court of the State of New York,
      County of New York, Case No. 452564/2022, Doc. 30-4 .....................251

   E. Ex. E – June 15, 2023 Scheduling Order, United States District Court,
      Southern District of New York, Case No. 20-cv-7311, Doc. 30-5 .........254

   F. Ex. F – Aug. 16, 2023 Motion for Entry of Pretrial Scheduling Order,
      with Proposed Order, Superior Court of Fulton County, Georgia,
      Case No. 23SC188947, Doc. 30-6 ........................................................256

   G. Ex. G – July 21, 2023 Order Granting in Part Government's Motion to
      Continue Trial and Resetting Deadlines, United States District Court,
      Southern District of Florida, Case No. 23-80101, Doc. 30-7 ...............262

4. Transcript of Aug. 28, 2023 Status Hearing (Aug. 28, 2023), Doc. 38...........270

5. Motion to Dismiss Indictment Based on Presidential Immunity
   (Oct. 5, 2023), Doc. 74 ...................................................................................331

6.  Government's Response in Opposition to Defendant's Motion to Dismiss on Presidential Immunity Grounds (Oct. 19, 2023), Doc. 109..........383

7.  President Trump's Motion to Dismiss the Indictment Based on Constitutional Grounds and Memorandum in Support (Oct. 23, 2023), Doc. 113 .................437

8.  President Trump's Reply Brief in Support of His Motion to Dismiss the Indictment Based on Presidential Immunity (Oct. 26, 2023), Doc. 122 ..........468

9.  Government's Omnibus Opposition to Defendant's Motions to Dismiss the Indictment on Statutory and Constitutional Grounds (Nov. 6, 2023), Doc. 139 ...........................................................................................495

10. President Donald J. Trump's Reply in Support of Motion to Dismiss Based on Constitutional Grounds (Nov. 22, 2023), Doc. 162....................................574

11. Memorandum Opinion (Dec. 1, 2023), Doc. 171..............................................599

12. Order (Dec. 1, 2023), Doc. 172 ........................................................................647

13. Notice of Appeal (Dec 7, 2023), Doc. 177 .......................................................648

14. Opinion and Order (Dec. 13, 2023), Doc. 186 .................................................649

# U.S. District Court
## District of Columbia (Washington, DC)
## CRIMINAL DOCKET FOR CASE #: 1:23–cr–00257–TSC All Defendants

Case title: USA v. TRUMP                                    Date Filed: 08/01/2023

Assigned to: Judge Tanya S. Chutkan

Appeals court case numbers: 23–3190, 23–3228

**Defendant (1)**

| | | |
|---|---|---|
| **DONALD J. TRUMP** | represented by | **John F. Lauro** |

**John F. Lauro**
LAURO & SINGER
400 N. Tampa Street
15th Floor
Tampa, FL 33602
(813) 222–8990
Fax: (813) 222–8991
Email: jlauro@laurosinger.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Emil Bove**
BLANCHE LAW
99 Wall Street, Suite 4460
New York, NY 10005
212–716–1250
Email: emil.bove@blanchelaw.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Filzah I. Pavalon**
LAURO & SINGER
400 N. Tampa Street
15th Floor
Tampa, FL 33602
(813) 222–8990
Fax: (813) 222–8991
Email: fpavalon@laurosinger.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Todd Blanche**
BLANCHE LAW
99 Wall Street
New York, NY 10005
(212) 716–1250
Email: toddblanche@blanchelaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Pro Hac Vice*

**Pending Counts**                                    **Disposition**

18 U.S.C. 371; CONSPIRACY
TO DEFRAUD THE UNITED
STATES; Conspiracy to Defraud

1

the United States
(1)

18 U.S.C. 1512(k); TAMPERING
WITH WITNESS, VICTIM, OR
AN INFORMANT; Conspiracy
to Obstruct an Official
Proceeding
(2)

18 U.S.C. 1512(c)(2), 2;
TAMPERING WITH A
WITNESS, VICTIM OR
INFORMANT; Obstruction of,
and Attempt to Obstruct, an
Official Proceeding
(3)

18 U.S.C. 241; CONSPIRACY
AGAINST RIGHTS OF
CITIZENS; Conspiracy Against
Rights
(4)

**Highest Offense Level
(Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level
(Terminated)**

None

| **Complaints** | **Disposition** |
|---|---|
| None | |

---

**Plaintiff**

| **USA** | represented by | **J.P. Cooney** |
|---|---|---|

U.S. ATTORNEY'S OFFICE FOR THE
DISTRICT OF COLUMBIA
555 Fourth Street, NW
Washington, DC 20530
(202) 252–7281
Email: joseph.cooney@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant U.S. Attorney*

**James Pearce**
U.S. DEPARTMENT OF JUSTICE
CRIMINAL DIVISION APPELLATE
SECTION
Department of Justice, Criminal Division
950 Pennsylvania Ave NW
Suite 1250
Washington, DC 20530
(202) 532–4991
Fax: (202) 305–2121

Email: james.pearce@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant U.S. Attorney*

**Molly Gulland Gaston**
U.S. ATTORNEY'S OFFICE FOR THE
DISTRICT OF COLUMBIA
555 Fourth Street, NW
Washington, DC 20530
(202) 252–7803
Email: molly.gaston@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant U.S. Attorney*

**Thomas Windom**
555 Fourth Street NW
Washington, DC 20530
202–252–7846
Email: thomas.windom@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant U.S. Attorney*

**John M. Pellettieri**
Special Counsel's Office
950 Pennsylvania Avenue NW
Rm. B–206
Washington, DC 20530
202–714–3913
Email: john.pellettieri@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Assistant U.S. Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/01/2023 | 1 | INDICTMENT as to DONALD J. TRUMP (1) count(s) 1, 2, 3, 4. (zltp) (Entered: 08/01/2023) |
| 08/01/2023 | 3 | MOTION to Seal Case by USA as to DONALD J. TRUMP. (Attachments: # 1 Text of Proposed Order)(zltp) (Entered: 08/01/2023) |
| 08/01/2023 | 4 | ORDER granting 3 Motion to Seal Case as to DONALD J. TRUMP (1). Signed by Magistrate Judge Moxila A. Upadhyaya on 8/1/2023. (zltp) (Entered: 08/01/2023) |
| 08/01/2023 | | Case unsealed as to DONALD J. TRUMP (zltp) (Entered: 08/01/2023) |
| 08/03/2023 | 5 | NOTICE OF ATTORNEY APPEARANCE: John F. Lauro appearing for DONALD J. TRUMP (Lauro, John) (Entered: 08/03/2023) |
| 08/03/2023 | 7 | MOTION for Leave to Appear Pro Hac Vice Todd Blanche Filing fee $ 100, receipt number ADCDC–10252226. Fee Status: Fee Paid. by DONALD J. TRUMP. (Lauro, John) (Entered: 08/03/2023) |
| 08/03/2023 | 8 | Summons Returned Executed on 8/3/2023 as to DONALD J. TRUMP. (ztl) (Entered: 08/04/2023) |
| 08/03/2023 | | MINUTE ORDER as to Donald J. Trump: As required by Rule 5(f), the United States is ordered to produce all exculpatory evidence to the defendant pursuant to Brady v. Maryland and its progeny. Not doing so in a timely manner may result in sanctions, including exclusion of evidence, adverse jury instructions, dismissal of charges and contempt proceedings.Signed by Magistrate Judge Moxila A. Upadhyaya on 8/3/2023. (ztl) (Entered: 08/04/2023) |

| 08/03/2023 | | ORAL MOTION for Speedy Trial by USA as to DONALD J. TRUMP. (ztl) (Entered: 08/04/2023) |
|---|---|---|
| 08/03/2023 | | Minute Entry for proceedings held before Magistrate Judge Moxila A. Upadhyaya: Return on Summons/Initial Appearance/Arraignment as to Counts 1,2,3,4 held on 8/3/2023. Plea of Not Guilty entered as to all counts. The Court advised the Government of its due process obligation under Rule 5(f).Status Conference set for 8/28/2023 at 10:00 AM in Courtroom 9– In Person before Judge Tanya S. Chutkan. Bond Status of Defendant: Defendant Remain on Personal Recognizance; Court Reporter: Jeff Hook; Defense Attorney: John Lauro and Todd Blanche; US Attorney: Thomas Windom and Molly Gaston; Pretrial Officer: Takeysha Robinson. (ztl) (Entered: 08/04/2023) |
| 08/03/2023 | | MINUTE ORDER as to DONALD J. TRUMP: A status conference will be held in this matter on August 28, 2023 at 10:00 AM in Courtroom 9 before Judge Tanya S. Chutkan. The court waives the requirement for Defendant to appear at that conference. It is hereby ORDERED that Defendant shall file any motion for excluding the time until the next status conference from the Speedy Trial Act clock by August 8, 2023; and that the government shall file any opposition to that motion by August 13, 2023. It is FURTHER ORDERED that by August 10, 2023, the government shall file a brief proposing a trial date and providing an estimate of the time required to set forth the prosecution's case in chief during that trial; and that by August 17, 2023, Defendant shall file a response brief likewise proposing a trial date and estimating, to the extent possible, the time required to set forth the defense at trial. Signed by Judge Tanya S. Chutkan on 8/3/2023. (ztl) (Entered: 08/04/2023) |
| 08/03/2023 | 13 | ORDER Setting Conditions of Release as to DONALD J. TRUMP (1) Personal Recognizance. Signed by Magistrate Judge Moxila A. Upadhyaya on 8/3/2023. (Attachment: # 1 Appearance Bond) (znjb) (Entered: 08/07/2023) |
| 08/04/2023 | 9 | MOTION for Leave to Appear Pro Hac Vice Filzah I. Pavalon Filing fee $ 100, receipt number ADCDC–10255735. Fee Status: Fee Paid. by DONALD J. TRUMP. (Lauro, John) (Entered: 08/04/2023) |
| 08/04/2023 | 10 | MOTION for Protective Order by USA as to DONALD J. TRUMP. (Attachments: # 1 Text of Proposed Order)(Gaston, Molly) (Entered: 08/04/2023) |
| 08/05/2023 | | MINUTE ORDER as to DONALD J. TRUMP: It is hereby ORDERED that by 5:00 PM on August 7, 2023, Defendant shall file a response to the government's 10 Motion for Protective Order, stating Defendant's position on the Motion. If Defendant disagrees with any portion of the government's proposed Protective Order, ECF No. 10–1, his response shall include a revised version of that Protective Order with any modifications in redline. Signed by Judge Tanya S. Chutkan on 08/05/2023. (lcss) (Entered: 08/05/2023) |
| 08/05/2023 | | MINUTE ORDER as to DONALD J. TRUMP: Granting 9 Motion for Leave to Appear Pro Hac Vice. Filzah I. Pavalon is hereby admitted pro hac vice to appear in this matter on behalf of Defendant. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCrR 44.5(a).** Click for instructions. Signed by Judge Tanya S. Chutkan on 08/05/2023. (lcss) (Entered: 08/05/2023) |
| 08/05/2023 | 11 | MOTION for Extension of Time to File Response/Reply as to 10 MOTION for Protective Order , MOTION for Hearing by DONALD J. TRUMP. (Attachments: # 1 Text of Proposed Order)(Lauro, John) (Entered: 08/05/2023) |
| 08/05/2023 | 12 | RESPONSE by USA as to DONALD J. TRUMP re 11 MOTION for Extension of Time to File Response/Reply as to 10 MOTION for Protective Order MOTION for Hearing (Gaston, Molly) (Entered: 08/05/2023) |
| 08/05/2023 | | MINUTE ORDER as to DONALD J. TRUMP: Defendant's 11 Motion for Extension of Time is hereby DENIED. Defendant may continue to confer with the government regarding its proposed protective order before or after the August 7, 2023 5:00 PM deadline for his response. The court will determine whether to schedule a hearing to discuss the proposed protective order after reviewing Defendant's response and, if included, his revised proposed protective order with modifications in redline. Signed by Judge Tanya S. Chutkan on 08/05/2023. (lcss) (Entered: 08/05/2023) |

4

| 08/06/2023 | | Set/Reset Deadline as to DONALD J. TRUMP: Defendant shall file a response to the government's 10 Motion for Protective Order, stating Defendant's position on the Motion by 5:00 PM on August 7, 2023. If Defendant disagrees with any portion of the government's proposed Protective Order, (Dkt. #10–1), his response shall include a revised version of that Protective Order with any modifications in redline. (jth) (Entered: 08/06/2023) |
|---|---|---|
| 08/07/2023 | 14 | RESPONSE by DONALD J. TRUMP re 10 MOTION for Protective Order (Lauro, John) (Entered: 08/07/2023) |
| 08/07/2023 | 15 | REPLY in Support by USA as to DONALD J. TRUMP re 10 MOTION for Protective Order (Gaston, Molly) (Entered: 08/07/2023) |
| 08/07/2023 | | MINUTE ORDER as to DONALD J. TRUMP: Upon consideration of the government's 10 Motion for Protective Order and Defendant's 14 Response, as well as the government's 15 Reply, the court will schedule a hearing on the parties' respective proposals. The court will waive the requirement of Defendant's appearance. Accordingly, it is hereby ORDERED that no later than 3:00 PM on August 8, 2023, the parties shall meet and confer and file a joint notice of two dates and times on or before August 11, 2023 when both parties are available for a hearing. Signed by Judge Tanya S. Chutkan on 08/07/2023. (lcss) (Entered: 08/07/2023) |
| 08/08/2023 | | Set/Reset Deadline as to DONALD J. TRUMP: by 3:00 PM on 8/8/2023, the parties shall meet and confer and file a joint notice of two dates and times on or before 8/11/2023 when both parties are available for a hearing. (jth) (Entered: 08/08/2023) |
| 08/08/2023 | 16 | TRANSCRIPT OF RETURN ON SUMMONS/INITIAL APPEARANCE/ARRAIGNMENT in case as to DONALD J. TRUMP before Magistrate Judge Moxila A. Upadhyaya held on August 3, 2023. Page Numbers: 1 – 24. Date of Issuance: August 8, 2023. Court Reporter: Jeff Hook. Contact Information: 202–354–3373 \| jeff_hook@dcd.uscourts.gov. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 8/29/2023. Redacted Transcript Deadline set for 9/8/2023. Release of Transcript Restriction set for 11/6/2023.(Hook, Jeff) (Entered: 08/08/2023) |
| 08/08/2023 | 17 | NOTICE *by the Parties in Response to Court's August 7, 2023 Minute Order* by USA as to DONALD J. TRUMP re Order,, (Gaston, Molly) (Entered: 08/08/2023) |
| 08/08/2023 | | MINUTE ORDER as to DONALD J. TRUMP: The court hereby schedules a hearing on the parties' respective protective order proposals in this matter on August 11, 2023 at 10:00 AM in Courtroom 9. The requirement of Defendant's appearance is waived for this hearing. Signed by Judge Tanya S. Chutkan on 08/08/2023. (lcc) (Entered: 08/08/2023) |
| 08/08/2023 | 18 | MOTION to Exclude *Time Under Speedy Trial Act* by DONALD J. TRUMP. (Attachments: # 1 Text of Proposed Order Granting Motion)(Lauro, John) (Entered: 08/08/2023) |
| 08/09/2023 | | Set/Reset Hearing as to DONALD J. TRUMP: A Hearing on the Parties' Respective Protective Order Proposals is set for August 11, 2023, at 10:00 AM in Courtroom 9. before Judge Tanya S. Chutkan. The requirement of Defendant's appearance is waived for this hearing. (jth) (Entered: 08/09/2023) |

| 08/09/2023 | 19 | ENTERED IN ERROR.....NOTICE *Updated Certificate of Good Standing* by DONALD J. TRUMP re 7 MOTION for Leave to Appear Pro Hac Vice Todd Blanche Filing fee $ 100, receipt number ADCDC−10252226. Fee Status: Fee Paid. (Lauro, John) Modified on 8/9/2023 (zhsj). (Entered: 08/09/2023) |
|---|---|---|
| 08/09/2023 | | NOTICE OF ERROR as to DONALD J. TRUMP regarding 19 Notice (Other). The following error(s) need correction: Incorrect format (Letter)− correspondence is not permitted (LCrR 49(f)(4)). Please refile as a Notice of Filing attaching your Certificate of Good Standing to a Notice of Filing Document Containing the Caption of the Court. (zhsj) (Entered: 08/09/2023) |
| 08/09/2023 | 20 | NOTICE *of Filing* by DONALD J. TRUMP re 7 MOTION for Leave to Appear Pro Hac Vice Todd Blanche Filing fee $ 100, receipt number ADCDC−10252226. Fee Status: Fee Paid. (Lauro, John) (Entered: 08/09/2023) |
| 08/09/2023 | | MINUTE ORDER as to DONALD J. TRUMP: Granting 7 Motion for Leave to Appear Pro Hac Vice **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCrR 44.5(a).** Click for instructions as to DONALD J. TRUMP (1). Signed by Magistrate Judge Moxila A. Upadhyaya on 8/9/2023. (zcll) (Entered: 08/09/2023) |
| 08/09/2023 | 21 | NOTICE OF ATTORNEY APPEARANCE: Filzah Pavalon appearing for DONALD J. TRUMP (Pavalon, Filzah) (Entered: 08/09/2023) |
| 08/10/2023 | 22 | MOTION for Leave to Appear Pro Hac Vice Gregory M. Singer Filing fee $ 100, receipt number ADCDC−10266892. Fee Status: Fee Paid. by DONALD J. TRUMP. (Lauro, John) (Entered: 08/10/2023) |
| 08/10/2023 | 23 | RESPONSE TO ORDER OF THE COURT by USA as to DONALD J. TRUMP re Order,,,, Set Deadlines,,, *Government's Response to Court's August 3, 2023 Minute Order* (Gaston, Molly) (Entered: 08/10/2023) |
| 08/10/2023 | 25 | MOTION for Hearing *Pursuant to Classified Information Procedures Act* by USA as to DONALD J. TRUMP. (Attachments: # 1 Text of Proposed Order)(Windom, Thomas) (Entered: 08/10/2023) |
| 08/10/2023 | 26 | Memorandum in Opposition by USA as to DONALD J. TRUMP re Motion for Speedy Trial, 18 Motion to Exclude (Gaston, Molly) (Entered: 08/10/2023) |
| 08/10/2023 | | MINUTE ORDER as to DONALD J. TRUMP: Granting 22 Motion for Leave to Appear Pro Hac Vice. Gregory M. Singer is hereby admitted pro hac vice to appear in this matter on behalf of Defendant. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCrR 44.5(a).** Click for instructions. Signed by Judge Tanya S. Chutkan on 08/10/2023. (lcc) (Entered: 08/10/2023) |
| 08/10/2023 | 27 | NOTICE OF ATTORNEY APPEARANCE: Todd Blanche appearing for DONALD J. TRUMP (Blanche, Todd) (Entered: 08/10/2023) |
| 08/10/2023 | | MINUTE ORDER as to DONALD J. TRUMP: The government's 24 Sealed Motion for Leave to Submit Exhibit Ex Parte and Under Seal is hereby DENIED without prejudice. Signed by Judge Tanya S. Chutkan on 8/10/2023. (zjd) (Entered: 08/10/2023) |
| 08/11/2023 | | Minute Entry for proceedings held before Judge Tanya S. Chutkan: Hearing on the Parties' Respective Protective Order Proposals as to DONALD J. TRUMP held on 8/11/2023. The Court shall issue a protective order consistent with the rulings made on the record. Oral Order of the Court granting Government's 25 Motion for Pretrial Conference Pursuant to the Classified Information Procedures Act. This hearing shall proceed on August 28, 2023 at 10:00 AM in Courtroom 9 before Judge Tanya S. Chutkan. Bond Status of Defendant: remains on Personal Recognizance; Court Reporter: Bryan A. Wayne; Defense Attorneys: John F. Lauro, Gregory M. Singer, and Todd Blanche; US Attorneys: Thomas Windom and Molly G. Gaston. (zjd) (Entered: 08/11/2023) |
| 08/11/2023 | | MINUTE ORDER as to DONALD J. TRUMP: The government's 25 Motion for Hearing Pursuant to Classified Information Procedures Act (CIPA) is GRANTED. Defense counsel consented to the motion during the August 11, 2023 hearing. Accordingly, the court will hold a hearing pursuant to CIPA Section 2 during the status |

| | | |
|---|---|---|
| | | conference currently scheduled for August 28, 2023. Signed by Judge Tanya S. Chutkan on 8/11/2023. (zjd) (Entered: 08/11/2023) |
| 08/11/2023 | 28 | PROTECTIVE ORDER GOVERNING DISCOVERY AND AUTHORIZING DISCLOSURE OF GRAND JURY TESTIMONY as to DONALD J. TRUMP. Consistent with the rulings made on the record during the hearing on August 11, 2023, the Court grants in part and denies in part the Government's 10 Motion for Protective Order. Signed by Judge Tanya S. Chutkan on 8/11/2023. (zjd) (Entered: 08/11/2023) |
| 08/11/2023 | 29 | TRANSCRIPT OF HEARING ON PROTECTIVE ORDER in case as to DONALD J. TRUMP before Judge Tanya S. Chutkan held on August 11, 2023; Page Numbers: 1–73. Date of Issuance: 8/11/2023. Court Reporter: Bryan A. Wayne. Transcripts may be ordered by submitting the Transcript Order Form  For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.  **NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.  Redaction Request due 9/1/2023. Redacted Transcript Deadline set for 9/11/2023. Release of Transcript Restriction set for 11/9/2023.(Wayne, Bryan) (Main Document 29 replaced on 8/23/2023) (zhsj). (Entered: 08/11/2023) |
| 08/17/2023 | 30 | RESPONSE TO ORDER OF THE COURT by DONALD J. TRUMP re Order,,,, Set Deadlines,,, (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit)(Lauro, John) (Entered: 08/17/2023) |
| 08/21/2023 | 31 | MOTION for Leave to File *Reply Brief* by USA as to DONALD J. TRUMP. (Attachments: # 1 Text of Proposed Order Proposed Order)(Windom, Thomas) (Entered: 08/21/2023) |
| 08/21/2023 | | MINUTE ORDER as to DONALD J. TRUMP: The government's 31 Motion for Leave to File Reply is hereby GRANTED. The government may file a reply in support of its brief proposing a trial date by August 22, 2023. The reply brief shall be limited to six pages. Signed by Judge Tanya S. Chutkan on 8/21/2023. (zjd) (Entered: 08/21/2023) |
| 08/21/2023 | 32 | RESPONSE TO ORDER OF THE COURT by USA as to DONALD J. TRUMP re Order,,,, Set Deadlines,,, Order on Motion for Leave to File,, Set/Reset Deadlines, *(Reply Brief)* (Windom, Thomas) (Entered: 08/21/2023) |
| 08/21/2023 | 40 | LEAVE TO FILE DENIED–Motion of D.A. Feliciano for Leave to File Amicus Curiae Brief Supporting Neither Plaintiff Nor Defendant as to DONALD J. TRUMP. "This document is unavailable as the Court denied its filing. Although Courts have in rare instances exercised their discretion to permit third–party submissions in criminal cases, neither the Federal Rules of Criminal Procedures nor the Local Rules contemplate the filing of amicus curiae briefs. At this time, the court does not find it necessary to depart from the ordinary procedures course by permitting this filing". Signed by Judge Tanya S. Chutkan on 8/21/2023. (zhsj) (Entered: 08/29/2023) |
| 08/21/2023 | 41 | LEAVE TO FILE DENIED– Motion for Judicial Notice Affidavit of Victor Shorkin as to DONALD J. TRUMP. This document is unavailable as the Court denied its filing. "This document is unavailable as the Court denied its filing. Although Courts have in rare instances exercised their discretion to permit third–party submissions in criminal cases, neither the Federal Rules of Criminal Procedures nor the Local Rules contemplate the filing of amicus curiae briefs. At this time, the court does not find it necessary to depart from the ordinary procedures course by permitting this filing". Signed by Judge Tanya S. Chutkan on 8/21/2023. (zhsj) (Entered: 08/29/2023) |

| | | |
|---|---|---|
| 08/21/2023 | 42 | LEAVE TO FILE DENIED–Motion to Intervene as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "This document is unavailable as the Court denied its filing. Although Courts have in rare instances exercised their discretion to permit third–party submissions in criminal cases, neither the Federal Rules of Criminal Procedures nor the Local Rules contemplate the filing of amicus curiae briefs. At this time, the court does not find it necessary to depart from the ordinary procedures course by permitting this filing". Signed by Judge Tanya S. Chutkan on 8/21/2023. (zhsj) (Entered: 08/29/2023) |
| 08/21/2023 | 43 | LEAVE TO FILE DENIED–Petition for a Writ of Habeas Corpus as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "This document is unavailable as the Court denied its filing. Although Courts have in rare instances exercised their discretion to permit third–party submissions in criminal cases, neither the Federal Rules of Criminal Procedures nor the Local Rules contemplate the filing of amicus curiae briefs. At this time, the court does not find it necessary to depart from the ordinary procedures course by permitting this filing".. Signed by Judge Tanya S. Chutkan on 8/21/2023. (zhsj) (Entered: 08/29/2023) |
| 08/21/2023 | 44 | LEAVE TO FILE DENIED– Galaxy Bar Association as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "This document is unavailable as the Court denied its filing. Although Courts have in rare instances exercised their discretion to permit third–party submissions in criminal cases, neither the Federal Rules of Criminal Procedures nor the Local Rules contemplate the filing of amicus curiae briefs. At this time, the court does not find it necessary to depart from the ordinary procedures course by permitting this filing". Signed by Judge Tanya S. Chutkan on 8/21/2023. (zhsj) (Entered: 08/29/2023) |
| 08/21/2023 | 45 | LEAVE TO FILE DENIED– Amicus Curiae in Support of Donald Trump as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "This document is unavailable as the Court denied its filing. Although Courts have in rare instances exercised their discretion to permit third–party submissions in criminal cases, neither the Federal Rules of Criminal Procedures nor the Local Rules contemplate the filing of amicus curiae briefs. At this time, the court does not find it necessary to depart from the ordinary procedures course by permitting this filing". Signed by Judge Tanya S. Chutkan on 8/21/2023. (zhsj) (Entered: 08/29/2023) |
| 08/21/2023 | 46 | LEAVE TO FILE DENIED– Moton of Former Judges and Senior Legal Officials for Leave to File an Amicus Curiae Brief in Support of Government Proposed Trial Date and Schedule as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "This document is unavailable as the Court denied its filing. Although Courts have in rare instances exercised their discretion to permit third–party submissions in criminal cases, neither the Federal Rules of Criminal Procedures nor the Local Rules contemplate the filing of amicus curiae briefs. At this time, the court does not find it necessary to depart from the ordinary procedures course by permitting this filing". Signed by Judge Tanya S. Chutkan on 8/21/2023. (zhsj) (Entered: 08/29/2023) |
| 08/21/2023 | 81 | LEAVE TO FILE DENIED– MOTION TO INTERVENE THE OUTCOME OF CASE AFFECTS DAVID REGINALD HERON AFTER MOTION INTERVENE GRANTED [DAVID FILE SEPARATE MOTION – RULING TO HIRE ATTORNEY] as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "Even if construed as a motion for leave to file an amicus curiae brief, the court is not persuaded that filing thissubmission is warranted. Although courts have in rare instances exercised their discretion to permit third–party submissions in criminal cases, neither the Federal Rules of Criminal Procedure nor the Local Criminal Rulescontemplate the filing of amicus curiae briefs. At this time, the court does not find it necessary to depart from the ordinary procedural course by permitting this filing". Signed by Judge Tanya S. Chutkan on 8/21/2023. (zhsj) (Entered: 10/06/2023) |
| 08/22/2023 | 33 | Consent MOTION to Appoint a Classified Information Security Officer by USA as to DONALD J. TRUMP. (Attachments: # 1 Text of Proposed Order Proposed Order)(Windom, Thomas) (Entered: 08/22/2023) |
| 08/22/2023 | | MINUTE ORDER as to DONALD J. TRUMP: The government's 33 Consent Motion to Appoint a Classified Information Security Officer is hereby GRANTED. The court will issue a separate sealed order designating the Officer and any alternate Officers. Signed by Judge Tanya S. Chutkan on 8/22/2023. (zjd) (Entered: 08/22/2023) |

| 08/22/2023 | 35 | Unopposed MOTION for Protective Order *Pursuant to the Classified Information Procedures Act* by USA as to DONALD J. TRUMP. (Attachments: # 1 Text of Proposed Order Proposed CIPA Protective Order)(Windom, Thomas) (Entered: 08/22/2023) |
| --- | --- | --- |
| 08/22/2023 | 37 | ORDER as to DONALD J. TRUMP granting 35 Unopposed MOTION for Protective Order Pursuant to the Classified Information Procedures Act. Signed by Judge Tanya S. Chutkan on 8/22/2023. (zjd) (Entered: 08/22/2023) |
| 08/28/2023 | | Minute Entry for proceedings held before Judge Tanya S. Chutkan: Status Conference and Hearing Pursuant to Classified Information Procedures Act (CIPA) as to DONALD J. TRUMP held on 8/28/2023. In the interests of justice (XT), and for the reasons stated on the record, the Court grants Defendant's 18 Motion for Exclusion of Time Under Speedy Trial Act. The time from 8/3/2023 through and including 8/28/2023 shall be excluded in computing the date for speedy trial in this case. Jury Trial in this matter is set for March 4, 2024 at 9:30 AM in Courtroom 9 before Judge Tanya S. Chutkan. Bond Status of Defendant: appearance waived, remains on personal recognizance; Court Reporter: Bryan Wayne; Defense Attorneys: John F. Lauro and Todd Blanche; US Attorneys: Molly G. Gaston and Thomas Windom. (zjd) (Entered: 08/28/2023) |
| 08/28/2023 | 38 | TRANSCRIPT OF 8/28/23 STATUS HEARING in case as to DONALD J. TRUMP before Judge Tanya S. Chutkan held on August 28, 2023; Page Numbers: 1–61. Date of Issuance: 8/28/2023. Court Reporter: Bryan A. Wayne. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 9/18/2023. Redacted Transcript Deadline set for 9/28/2023. Release of Transcript Restriction set for 11/26/2023.(Wayne, Bryan) (Entered: 08/28/2023) |
| 08/28/2023 | 39 | STAYED PURSUANT TO 186 ORDER FILED 12/13/2023.....PRETRIAL ORDER as to DONALD J. TRUMP: Upon consideration of the parties' Proposed Briefing Schedules 23 30 32 , the court hereby sets the following pretrial schedule. All pre–trial motions, excluding motions in limine, due 10/9/23, oppositions due 10/23/23, and replies due 11/6/23. Motions in limine and Suppression Motions due 12/27/23, oppositions due 1/9/24, and replies due 1/22/24. Not later than 12/4/23, the government shall provide notice of evidence it intends to offer pursuant to Fed. R. Evid. 404(b). Parties shall exchange expert witnesses on 12/11/23. Parties shall exchange exhibit lists by 12/18/23 and file any objections to exhibits by 1/3/24; replies due 1/9/24. Proposed jury instructions and voir dire questions due 1/15/24. Parties shall exchange witness lists by 2/19/24. Trial will commence on 3/4/24 at 9:30 a.m. in Courtroom 9 unless otherwise specified. See Order for additional details and instructions. Signed by Judge Tanya S. Chutkan on 8/28/2023. (zjd) **Modified on 10/6/2023: See 82 Opinion and Order for amendments made to this order. Modified on 11/7/2023: See 146 Opinion and Order for further amendments to this order.** (zjd). (Entered: 08/28/2023) |
| 09/05/2023 | | VACATED PURSUANT TO MINUTE ORDER FILED 9/5/2023.....MINUTE ORDER as to DONALD J. TRUMP: The Government's 47 Motion for Leave to File Unredacted Motion Under Seal, and to File Redacted Motion on Public Docket is hereby GRANTED. The Clerk of the Court is directed to file under seal the unredacted copy of the Government's Motion (ECF No. 47–1), attaching Exhibit 1 to the Government's Motion (ECF No. 47–2). The Clerk of the Court is further directed to file on the public docket the redacted copy of the Government's Motion (ECF No. |

| | | |
|---|---|---|
| | | 47–3), attaching a placeholder sheet for Exhibit 1 to the Motion (ECF No. 47–4), and the two proposed orders referenced in the Motion (ECF Nos. 47–5 and 47–6). Signed by Judge Tanya S. Chutkan on 9/5/2023. (zjd) Modified on 9/5/2023 (zjd). (Entered: 09/05/2023) |
| 09/05/2023 | 48 | MOTION to Vacate by DONALD J. TRUMP. (Lauro, John) (Entered: 09/05/2023) |
| 09/05/2023 | 49 | Memorandum in Opposition by USA as to DONALD J. TRUMP re 48 Motion to Vacate (Gaston, Molly) (Entered: 09/05/2023) |
| 09/05/2023 | | MINUTE ORDER as to DONALD J. TRUMP: Defendant's 48 Motion to Vacate is hereby GRANTED. The court's previous Minute Order of September 5, 2023 is VACATED. Defendant shall respond to the government's 47 Motion for Leave to File by September 11, 2023; the government may file a Reply by September 13, 2023. Any opposition or reply may be filed under seal. Going forward, all motions, including motions for leave to file, must (1) indicate whether the movant has conferred with opposing counsel, and (2) state the nonmovant's position on the motion, if known. As it has done here, the court may require briefing on motions for leave to file under seal on a timeline shorter than the default periods provided for in the Local Criminal Rules. However, all such briefing may be filed under seal without further order of the court. Signed by Judge Tanya S. Chutkan on 9/5/2023. (zjd) (Entered: 09/05/2023) |
| 09/11/2023 | 50 | MOTION for Recusal by DONALD J. TRUMP. (Attachments: # 1 Exhibit Transcript Excerpt 1, # 2 Exhibit Transcript Excerpt 2)(Lauro, John) (Entered: 09/11/2023) |
| 09/11/2023 | | MINUTE ORDER as to DONALD J. TRUMP: Upon consideration of Defendant's 50 Motion for Recusal, it is hereby ORDERED that the government shall file any opposition no later than September 14, 2023, and the defense shall file any reply within three calendar days from the filing date of the government's opposition. All other deadlines set by the court remain in effect. Defense counsel is reminded of the requirement to confer with opposing counsel before filing any motion and to indicate whether the motion is opposed. See 09/05/2023 Second Minute Order. Future motions that fail to comply with that requirement may be denied without prejudice. Signed by Judge Tanya S. Chutkan on 9/11/2023. (zjd) (Entered: 09/11/2023) |
| 09/13/2023 | 77 | LEAVE TO FILE DENIED–Application for Relief in a Criminal Case by a Person not a Party–Applicant Charles E. Hill as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. Signed by Judge Tanya S. Chutkan on 9/13/2023. (zhsj) (Entered: 10/06/2023) |
| 09/13/2023 | 78 | LEAVE TO FILE DENIED–Application for Relief in a Criminal Case by a Person not a Party–Applicant Charles E. Hill as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "Even if construed as a motion for leave to file an amicus curiae brief, the court is not persuaded thatfiling this submission is warranted. Although courts have in rare instances exercised their discretionto permit third–party submissions in criminal cases, neither the Federal Rules of Criminal Procedurenor the Local Criminal Rules contemplate the filing of amicus curiae briefs. At this time, the courtdoes not find it necessary to depart from the ordinary procedural course by permitting this filing". Signed by Judge Tanya S. Chutkan on 9/13/2023. (zhsj) (Entered: 10/06/2023) |
| 09/13/2023 | 79 | LEAVE TO FILE DENIED– Petition for a Writ of Habeas Corpus Continued Application to Arrest Protective Order Dated: 8/11/23 as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "Even if construed as a motion for leave to file an amicus curiae brief, the court is not persuaded thatfiling this submission is warranted. Although courts have in rare instances exercised their discretion to permit third–party submissions in criminal cases, neither the Federal Rules of Criminal Procedure nor the Local Criminal Rules contemplate the filing of amicus curiae briefs. At this time,the court does not find it necessary to depart from the ordinary procedural course by permitting this filing". Signed by Judge Tanya S. Chutkan on 9/13/2023. (zhsj) (Entered: 10/06/2023) |
| 09/13/2023 | 80 | LEAVE TO FILE DENIED–Letter Regarding Defendant's Right to Attend Trial as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "Even if construed as a motion for leave to file an amicus curiae brief, the court is not persuaded that filing this submission is warranted. Although courthave in rare instances exercised their discretion to permit third–party submissions in criminal |

| | | |
|---|---|---|
| | | cases, neither the Federal Rules of Criminal Procedure nor the Local Criminal Rules contemplate the filing of amicus curiae briefs. At this time, the court does not find it necessary to depart from the ordinary procedural course by permitting this filing" Signed by Judge Tanya S. Chutkan on 9/13/2023. (zhsj) (Entered: 10/06/2023) |
| 09/13/2023 | 83 | LEAVE TO FILE DENIED–Motion to Decriminalize as to DONALD J. TRUMP. This document is unavailable as the Court denied its filing. Signed by Judge Tanya S. Chutkan on 9/13/2023. (zhsj) (Entered: 10/06/2023) |
| 09/13/2023 | 84 | LEAVE TO FILE DENIED– Petition for Intervention as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "Even if construed as a motion for leave to file an amicus curiae brief, the court is not persuaded that filing this submission is warranted. Although courts have in rare instances exercised their discretion to permit third–party submissions in criminal cases, neither the Federal Rules of Criminal Procedure nor the Local Criminal Rules contemplate the filing of amicus curiae briefs. At this time, the court does not find it necessary to depart from the ordinary procedural course by permitting this filing". Signed by Judge Tanya S. Chutkan on 9/13/2023. (zhsj) (Entered: 10/06/2023) |
| 09/14/2023 | 53 | MOTION FOR BRIEFING SCHEDULE as to DONALD J. TRUMP. (Lauro, John) Modified on 9/15/2023 (zhsj). (Entered: 09/14/2023) |
| 09/14/2023 | 54 | Memorandum in Opposition by USA as to DONALD J. TRUMP re 50 Motion for Recusal (Gaston, Molly) (Entered: 09/14/2023) |
| 09/15/2023 | 55 | Opinion and Order as to DONALD J. TRUMP granting the government's 47 Motion for Leave to File Unredacted Motion Under Seal, and to File Redacted Motion on Public Docket, and granting in part and denying in part Defendant's 53 Motion for Briefing Schedule. Defendant shall file any Opposition to the government's substantive Motion by September 25, 2023, and the government shall file any Reply by September 30, 2023. The Clerk of the Court is directed to file under seal the unredacted copy of the government's Motion (ECF No. 47–1), attaching Exhibit 1 to the that Motion (ECF No. 47–2) under seal as well. The Clerk of the Court is further directed to file on the public docket the redacted copy of the government's Motion (ECF No. 47–3), attaching a placeholder sheet for Exhibit 1 to the Motion (ECF No. 47–4), and attaching the two proposed orders referenced in the Motion (ECF Nos. 47–5 and 47–6). Finally, the Clerk of the Court is directed to unseal Defendant's motion, ECF No. 53. See Order for details. Signed by Judge Tanya S. Chutkan on 9/15/2023. (zjd) (Entered: 09/15/2023) |
| 09/15/2023 | 57 | MOTION to Ensure that Extrajudicial Statements Do Not Prejudice these Proceedings by USA as to DONALD J. TRUMP. (Attachments: # 1 Exhibit, # 2 Text of Proposed Order Exhibit 47–5, # 3 Text of Proposed Order Exhibit 47–6) (zhsj) (Attachment 2 replaced on 9/21/2023) (zhsj). (Entered: 09/15/2023) |
| 09/17/2023 | 58 | REPLY in Support by DONALD J. TRUMP re 50 MOTION for Recusal (Lauro, John) (Entered: 09/17/2023) |
| 09/25/2023 | 59 | NOTICE *of Filing* by USA as to DONALD J. TRUMP (Attachments: # 1 Cover Sheet)(Gaston, Molly) (Entered: 09/25/2023) |
| 09/25/2023 | 60 | Memorandum in Opposition by DONALD J. TRUMP re 57 Motion for Miscellaneous Relief, (Lauro, John) (Entered: 09/25/2023) |
| 09/27/2023 | 61 | MEMORANDUM OPINION and ORDER as to DONALD J. TRUMP denying 50 Defendant's Motion for Recusal of District Judge Pursuant to 28 U.S.C. § 455(a). See attached memorandum opinion and order for full details. Signed by Judge Tanya S. Chutkan on 9/27/2023. (zjd) (Entered: 09/27/2023) |
| 09/27/2023 | 62 | MOTION for Extension of Time to *File CIPA Sect. 5 and response to ex parte notice* by DONALD J. TRUMP. (Blanche, Todd) (Entered: 09/27/2023) |
| 09/27/2023 | 67 | LEAVE TO FILE DENIED– Petition for Writ of Error Corum Noblis and Memorandum of Law in Support Thereof as to DONALD J. TRUMP. This document is unavailable as the Court denied its filing. "Even if construed as a motion for leave to file an amicus curiae brief, the court is not persuaded that filing this submission is warranted. Although courts have in rare instances exercised their discretion to permit third–party submissions in criminal cases, neither the Federal Rules of Criminal |

| | | |
|---|---|---|
| | | Procedure nor the Local Criminal Rules contemplate the filing of amicus curiae briefs. At this time, the court does not find it necessary to depart from the ordinary procedural course by permitting this filing". Signed by Judge Tanya S. Chutkan on 9/27/2023. (zhsj) (Entered: 10/05/2023) |
| 09/27/2023 | 68 | LEAVE TO FILE DENIED–Motion to Intervene as to DONALD J. TRUMP. This document is unavailable as the Court denied its filing. "Even if construed as a motion for leave to file an amicus curiae brief, the court is not persuaded that filing this submission is warranted. Although courts have in rare instances exercised their discretion to permit third–party submissions in criminal cases,neither the Federal Rules of Criminal Procedure nor the Local Criminal Rules contemplate the filing of amicus curiae briefs. At this time, the court does notfind it necessary to depart from the ordinary procedural course by permitting this filing". Signed by Judge Tanya S. Chutkan on 9/27/2023. (zhsj) (Entered: 10/05/2023) |
| 09/27/2023 | 69 | LEAVE TO FILE DENIED– Application for Relief in a Criminal Case by a Person not a Party–Applicant Charles E. Hill as to DONALD J. TRUMP. This document is unavailable as the Court denied its filing. "Even if construed as a motion for leave to file an amicus curiae brief, the court is not persuaded that filing this submission is warranted. Although courts have in rare instances exercised their discretion to permit third–party submissions in criminal cases, neither the Federal Rules of Criminal Procedure nor the Local Criminal Rules contemplate the filing of amicus curiae briefs. At this time, the court does not find it necessary to depart from the ordinary procedural course by permitting this filing". Signed by Judge Tanya S. Chutkan on 9/27/2023. (zhsj) (Entered: 10/05/2023) |
| 09/27/2023 | 70 | LEAVE TO FILE DENIED–Motion for Reconsideration of Order Date 8/21/2023 as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "Even if construed as a motion for leave to file an amicus curiae brief, the court is not persuaded that filing this submission is warranted. Although courts have in rare instances exercised their discretion to permit third–partysubmissions in criminal cases, neither the Federal Rules of Criminal Procedure nor the Local Criminal Rules contemplate the filing of amicus curiae briefs. At this time, the court does not find it necessary to depart from the ordinary procedural course by permitting this filing". Signed by Judge Tanya S. Chutkan on 9/27/2023. (zhsj) (Entered: 10/05/2023) |
| 09/27/2023 | 71 | LEAVE TO FILE DENIED– Motion to Intervene as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "Even if construed as a motion for leave to file an amicus curiae brief, the court is not persuaded that filing this submission is warranted. Although courts have in rare instances exercised their discretion to permit third–party submissions in criminal cases, neither the Federal Rules of Criminal Procedure nor the Local Criminal Rulescontemplate the filing of amicus curiae briefs. At this time, the court does not find it necessary to depart from the ordinary procedural course by permitting this filing". Signed by Judge Tanya S. Chutkan on 9/27/2023. (zhsj) (Entered: 10/05/2023) |
| 09/27/2023 | 72 | LEAVE TO FILE DENIED– Motion of D.A. Feliciano for Leave to File Amicus Curiae Brief Supporting Neither Plaintiff Nor Defendant as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "Although courts have in rare instances exercised theirdiscretion to permit third–party submissions in criminalcases, neither the Federal Rules of Criminal Procedure northe Local Criminal Rules contemplate the filing of amicuscuriae briefs. At this time, the court does not find it necessaryto depart from the ordinary procedural course by permittingthis filing". Signed by Judge Tanya S. Chutkan on 9/27/2023. (zhsj) (Entered: 10/05/2023) |
| 09/27/2023 | 73 | LEAVE TO FILE DENIED– New Motion to Intervene–New Fresh Most Recent Evidence Relate 6/4/2009 &11/4/2008 as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "Even if construed as a motion for leave to file an amicus curiae brief, the court is not persuaded thatfiling this submission is warranted. Although courts have in rare instances exercised their discretion topermit third–party submissions in criminal cases, neither the Federal Rules of Criminal Procedure northe Local Criminal Rules contemplate the filing of amicus curiae briefs. At this time, the court does notfind it necessary to depart from the ordinary procedural course by permitting this filing".. Signed by Judge Tanya S. Chutkan on 9/27/2023. (zhsj) (Entered: 10/05/2023) |

| | | |
|---|---|---|
| 09/27/2023 | 86 | LEAVE TO FILE DENIED– Petition for Writ of Error Coram Nobis as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "Even if construed as a motion for leave to file an amicus curiae brief, the court is not persuaded that filing this submission is warranted. Although courts have in rare instances exercised their discretion to permit third–party submissions in criminal cases, neither the Federal Rules of Criminal Procedure nor the Local Criminal Rules contemplate the filing of amicus curiae briefs. At this time, the court does not find it necessary to depart from the ordinary procedural course by permitting this filing". Signed by Judge Tanya S. Chutkan on 9/27/2023. (zhsj) (Entered: 10/09/2023) |
| 09/27/2023 | 87 | LEAVE TO FILE DENIED– Motion to Intervene as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. Even if construed as a motion for leave to file anamicus curiae brief, the court is not persuaded thatfiling this submission is warranted. Although courtshave in rare instances exercised their discretion topermit third–party submissions in criminal cases,neither the Federal Rules of Criminal Procedure northe Local Criminal Rules contemplate the filing ofamicus curiae briefs. At this time, the court does notfind it necessary to depart from the ordinaryprocedural course by permitting this filing." Signed by Judge Tanya S. Chutkan on 9/27/2023. (zhsj) (Entered: 10/09/2023) |
| 09/27/2023 | 88 | LEAVE TO FILE DENIED– Proof of Service as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "Even if construed as a motion for leave to file an amicuscuriae brief, the court is not persuaded that filing thissubmission is warranted. Although courts have in rareinstances exercised their discretion to permit third–partysubmissions in criminal cases, neither the Federal Rulesof Criminal Procedure nor the Local Criminal Rulescontemplate the filing of amicus curiae briefs. At thistime, the court does not find it necessary to depart fromthe ordinary procedural course by permitting this filing".. Signed by Judge Tanya S. Chutkan on 9/27/2023. (zhsj) (Entered: 10/09/2023) |
| 09/27/2023 | 89 | LEAVE TO FILE DENIED– Motion for Reconsideration of Order Date 8/21/2023 as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "Even if construed as a motion for leave to file an amicuscuriae brief, the court is not persuaded that filing thissubmission is warranted. Although courts have in rareinstances exercised their discretion to permit third–partysubmissions in criminal cases, neither the Federal Rulesof Criminal Procedure nor the Local Criminal Rulescontemplate the filing of amicus curiae briefs. At thistime, the court does not find it necessary to depart fromthe ordinary procedural course by permitting this filing". Signed by Judge Tanya S. Chutkan on 9/27/2023. (zhsj) (Entered: 10/09/2023) |
| 09/27/2023 | 90 | LEAVE TO FILE DENIED– Motion to Intervene as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. Even if construed as a motion for leave to file anamicus curiae brief, the court is not persuaded thatfiling this submission is warranted. Although courtshave in rare instances exercised their discretion topermit third–party submissions in criminal cases,neither the Federal Rules of Criminal Procedure northe Local Criminal Rules contemplate the filing ofamicus curiae briefs. At this time, the court doesnot find it necessary to depart from the ordinaryprocedural course by permitting this filing." Signed by Judge Tanya S. Chutkan on 9/27/2023. (zhsj) (Entered: 10/09/2023) |
| 09/27/2023 | 91 | LEAVE TO FILE DENIED– Motion of D.A. Feliciano for Leave to File Amicus Curiae Brief Supporting Neither Plaintiff Nor Defendant as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "Although courts have in rare instances exercised theirdiscretion to permit third–party submissions in criminalcases, neither the Federal Rules of Criminal Procedure northe Local Criminal Rules contemplate the filing of amicuscuriae briefs. At this time, the court does not find it necessaryto depart from the ordinary procedural course by permittingthis filing." Signed by Judge Tanya S. Chutkan on 9/27/2023. (zhsj) (Entered: 10/09/2023) |
| 09/27/2023 | 92 | LEAVE TO FILE DENIED– New Motion to Intervene–New Fresh Most Recent Evidence Relate 6/4/2009 &11/4/2008 as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "Even if construed as a motion for leave to file an amicus curiae brief, the court is not persuaded thatfiling this submission is warranted. Although courts have in rare instances exercised their discretion topermit third–party submissions in criminal cases, neither the Federal Rules of Criminal Procedure northe Local Criminal Rules contemplate the filing of amicus curiae briefs. |

13

| | | |
|---|---|---|
| | | At this time, the court does not find it necessary to depart from the ordinary procedural course by permitting this filing". Signed by Judge Tanya S. Chutkan on 9/27/2023. (zhsj) (Entered: 10/09/2023) |
| 09/28/2023 | 63 | MOTION for Extension of Time to *File Pretrial Motions* by DONALD J. TRUMP. (Lauro, John) (Entered: 09/28/2023) |
| 09/28/2023 | | MINUTE ORDER as to DONALD J. TRUMP: It is hereby ORDERED that by October 3, 2023, the government shall file any opposition to both Defendant's 62 Motion for Access to CIPA § 4 Filing and an Adjournment of the CIPA § 5 Deadline and Defendant's 63 Motion for Extension of Time to File Pretrial Motions; and that the defense shall file any reply within three calendar days from the filing date of the government's opposition. Signed by Judge Tanya S. Chutkan on 9/28/2023. (zjd) (Entered: 09/28/2023) |
| 09/29/2023 | | MINUTE ORDER as to DONALD J. TRUMP: The court hereby schedules a hearing on the government's 57 Motion to Ensure that Extrajudicial Statements Do Not Prejudice These Proceedings on October 16, 2023 at 10:00 AM in Courtroom 9. The requirement of Defendant's appearance is waived for this hearing. Signed by Judge Tanya S. Chutkan on 9/29/2023. (zjd) (Entered: 09/29/2023) |
| 09/29/2023 | 64 | REPLY in Support by USA as to DONALD J. TRUMP re 57 MOTION to Ensure that Extrajudicial Statements Do Not Prejudice these Proceedings (Gaston, Molly) (Entered: 09/29/2023) |
| 10/02/2023 | 65 | Memorandum in Opposition by USA as to DONALD J. TRUMP re 62 Motion for Extension of Time to *File CIPA Section 5 and Response to Ex Parte Notice* (Windom, Thomas) (Entered: 10/02/2023) |
| 10/02/2023 | 66 | Memorandum in Opposition by USA as to DONALD J. TRUMP re 63 Motion for Extension of Time to *File Pretrial Motions* (Windom, Thomas) (Entered: 10/02/2023) |
| 10/03/2023 | | MINUTE ORDER as to DONALD J. TRUMP: By October 10, 2023, defense counsel John F. Lauro and Gregory M. Singer shall initiate and complete all security clearance tasks as directed by the Litigation Security Group of the U.S. Department of Justice, and thereafter file a Notice of Compliance by October 11, 2023. The Notice shall also state whether the defense anticipates that any other of its members, whose assistance is reasonably required, will need to obtain a security clearance. Signed by Judge Tanya S. Chutkan on 10/3/2023. (zjd) (Entered: 10/03/2023) |
| 10/03/2023 | | Set/Reset Deadlines as to DONALD J. TRUMP: Notice of Compliance due by 10/11/2023. (mac) (Entered: 10/03/2023) |
| 10/04/2023 | | MINUTE ORDER as to DONALD J. TRUMP: It is hereby ORDERED that court will hold an ex parte Classified Information Procedures Act hearing with the defense at a time and place arranged with defense counsel. Signed by Judge Tanya S. Chutkan on 10/4/2023. (zjd) (Entered: 10/04/2023) |
| 10/05/2023 | 74 | MOTION to Dismiss Case by DONALD J. TRUMP. (Lauro, John) (Entered: 10/05/2023) |
| 10/05/2023 | 75 | REPLY in Support by DONALD J. TRUMP re 63 MOTION for Extension of Time to *File Pretrial Motions* (Lauro, John) (Entered: 10/05/2023) |
| 10/05/2023 | 76 | REPLY in Support by DONALD J. TRUMP re 62 MOTION for Extension of Time to *File CIPA Sect. 5 and response to ex parte notice* (Lauro, John) (Entered: 10/05/2023) |
| 10/06/2023 | 82 | OPINION and ORDER as to DONALD J. TRUMP granting in part and denying in part Defendant's 62 Motion for Access to CIPA § 4 Filing and An Adjournment of the CIPA § 5 Deadline; granting in part and denying in part Defendant's 63 Motion for Extension of Time to File Pretrial Motions; and amending in part the court's 39 Pretrial Order. Defense objections to ex parte nature of government's CIPA § 4 submission due October 11, 2023; government response due October 18, 2023. Defense CIPA § 5 notice due on October 26, 2023, with supplemental notices due within 20 days of receiving access to additional classified discovery materials. Dispositive motions, including motions to dismiss, due October 23, 2023; oppositions due within 14 days of motion's filing; replies due within 10 days of opposition's filing. Rule 17(c) motions and motions to compel due November 9, 2023; oppositions due November 24, 2023; |

| | | |
|---|---|---|
| | | replies due December 1, 2023. See Opinion & Order for details. Signed by Judge Tanya S. Chutkan on 10/6/2023. (zjd) **Modified on 11/7/2023: See 146 Opinion and Order for amendments to the deadlines set in this opinion and order. (zjd). Modified on 12/13/2023 (zjd, ). (Entered: 10/06/2023)** |
| 10/06/2023 | 94 | LEAVE TO FILE DENIED– Notice of Appeal as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "Even assuming a third party could file a notice of appeal in a criminal case which the Federal Rules of Criminal Procedure and Local Criminal Rules do not contemplate, this filing does not comply with Rule 3(c) of the Circuit Rules of the U.S. Court of Appeals for the District of Columbia Circuit". Signed by Judge Tanya S. Chutkan on 10/6/2023. (zhsj) (Entered: 10/10/2023) |
| 10/06/2023 | 96 | LEAVE TO FILE DENIED– Petition for a Writ of Habeas Corpus, Continued Judge Chutkan Impermissibly Held First Amendment to be Unconstitutional as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. Even if construed as a motion for leave to file an amicus curiae brief, the court is not persuaded that filing this submission is warranted. Although courts have in rare instances exercised their discretion to permit third–party submissions in criminal cases, neither the Federal Rules of Criminal Procedure nor the Local Criminal Rules contemplate the filing of amicus curiae briefs. At this time, the court does not find it necessary to depart from the ordinary procedural course by permitting this filing". Signed by Judge Tanya S. Chutkan on 10/6/2023. (zhsj) (Entered: 10/10/2023) |
| 10/09/2023 | 85 | MOTION for Leave to Appear Pro Hac Vice Emil Bove Filing fee $ 100, receipt number ADCDC–10406576. Fee Status: Fee Paid. by DONALD J. TRUMP. (Lauro, John) (Entered: 10/09/2023) |
| 10/10/2023 | 93 | LEAVE TO FILE DENIED– Notice of Appeal as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "Even assuming a third party could file a notice of appeal in a criminal cases, which the Federal Rules of Criminal Procedure and and Local Criminal Rules do not contemplate, this filing does not comply with Rule 3(c) of the Circuit Rules of the U.S. Court of Appeals for the District of Columbia Circuit".. Signed by Judge Tanya S. Chutkan on 10/6/2023. (zhsj) (Entered: 10/10/2023) |
| 10/10/2023 | 95 | LEAVE TO FILE DENIED– Notice of Appeal as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "Even assuming a third party could file a notice of appeal in a criminal cases, which the Federal Rules of Criminal Procedure and and Local Criminal Rules do not contemplate, this filing does not comply with Rule 3(c) of the Circuit Rules of the U.S. Court of Appeals for the District of Columbia Circuit".. Signed by Judge Tanya S. Chutkan on 10/6/2023. (zhsj) (Entered: 10/10/2023) |
| 10/10/2023 | 97 | MOTION for Order for Fair and Protective Jury Procedures by USA as to DONALD J. TRUMP. (Gaston, Molly) (Entered: 10/10/2023) |
| 10/10/2023 | 98 | MOTION for Formal Pretrial Notice of the Defendant's Intent to Rely on Advice–of–Counsel Defense by USA as to DONALD J. TRUMP. (Attachments: # 1 Text of Proposed Order)(Windom, Thomas) (Entered: 10/10/2023) |
| 10/10/2023 | | MINUTE ORDER as to DONALD J. TRUMP: It is hereby ORDERED that by October 20, 2023, the defense shall file any opposition to the government's 97 Motion for Fair and Protective Jury Procedures and 98 Motion for Formal Pretrial Notice of the Defendant's Intent to Rely on Advice–of–Counsel Defense; and that the government shall file any reply in support of those motions by October 25, 2023. Signed by Judge Tanya S. Chutkan on 10/10/2023. (zjd) (Entered: 10/10/2023) |
| 10/11/2023 | | MINUTE ORDER as to DONALD J. TRUMP: Granting 85 Motion for Leave to Appear Pro Hac Vice. Emil Bove is hereby admitted pro hac vice to appear in this matter on behalf of Defendant. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCrR 44.5(a).** Click for instructions. Signed by Judge Tanya S. Chutkan on 10/11/2023. (zjd) (Entered: 10/11/2023) |
| 10/11/2023 | 99 | MOTION for Discovery *(PRE–TRIAL RULE 17(c) SUBPOENAS)* by DONALD J. TRUMP. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit)(Lauro, |

| | | John) (Entered: 10/11/2023) |
|---|---|---|
| 10/11/2023 | | MINUTE ORDER as to DONALD J. TRUMP: It is hereby ORDERED that by October 25, 2023, the government shall file any opposition to Defendant's 99 Motion for Pre–Trial Rule 17(c) Subpoenas; and the defense shall file any reply in support of its motion by November 1, 2023. Signed by Judge Tanya S. Chutkan on 10/11/2023. (zjd) (Entered: 10/11/2023) |
| 10/11/2023 | 100 | NOTICE *of Compliance* by DONALD J. TRUMP re Order,,, Set Deadlines,, (Lauro, John) (Entered: 10/11/2023) |
| 10/11/2023 | 101 | MOTION to Access *CIPA Section 4 Filing* by DONALD J. TRUMP. (Blanche, Todd) (Entered: 10/11/2023) |
| 10/13/2023 | 102 | NOTICE OF ATTORNEY APPEARANCE: Emil Bove appearing for DONALD J. TRUMP (Bove, Emil) (Entered: 10/13/2023) |
| 10/16/2023 | | Minute Entry for proceedings held before Judge Tanya S. Chutkan: Motion Hearing as to DONALD J. TRUMP held on 10/16/2023 re 57 Motion to Ensure that Extrajudicial Statements Do Not Prejudice These Proceedings. Order forthcoming. Bond Status of Defendant: appearance waived, remains on personal recognizance; Court Reporter: Bryan Wayne; Defense Attorneys: John F. Lauro and Todd Blanche; US Attorneys: Molly G. Gaston and Thomas Windom. (zjd) (Entered: 10/16/2023) |
| 10/16/2023 | 103 | TRANSCRIPT OF MOTION HEARING in case as to DONALD J. TRUMP before Judge Tanya S. Chutkan held on October 16, 2023; Page Numbers: 1–86. Date of Issuance: 10/16/2023. Court Reporter: Bryan A. Wayne. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 11/6/2023. Redacted Transcript Deadline set for 11/16/2023. Release of Transcript Restriction set for 1/14/2024.(Wayne, Bryan) (Entered: 10/16/2023) |
| 10/16/2023 | 104 | NOTICE OF ATTORNEY APPEARANCE James Pearce appearing for USA. (Pearce, James) (Main Document 104 replaced on 10/17/2023) (zhsj). (Entered: 10/16/2023) |
| 10/17/2023 | 105 | OPINION and ORDER as to DONALD J. TRUMP: Granting in part and denying in part the government's 57 Motion to Ensure that Extrajudicial Statements Do Not Prejudice These Proceedings; and denying as moot the government's sealed 56 Motion to Ensure that Extrajudicial Statements Do Not Prejudice These Proceedings. Signed by Judge Tanya S. Chutkan on 10/17/2023. (zjd) Modified on 10/20/2023: Opinion and Order administratively stayed pursuant to Minute Order filed 10/20/2023 (zjd). Modified on 10/29/2023: Administrative stay lifted pursuant to 124 Opinion and Order (zjd). (Entered: 10/17/2023) |
| 10/17/2023 | 106 | NOTICE OF APPEAL (Interlocutory) by DONALD J. TRUMP re 105 Memorandum Opinion,, Order,. Filing fee $ 505, receipt number ADCDC–10425241. Fee Status: Fee Paid. Parties have been notified. (Lauro, John) (Entered: 10/17/2023) |
| 10/18/2023 | 107 | Transmission of the Notice of Appeal, 105 Opinion and Order, and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid on 10/17/2023 as to DONALD J. TRUMP re 106 Notice of Appeal – Interlocutory. (zhsj) (Entered: 10/18/2023) |

| | | |
|---|---|---|
| 10/18/2023 | | USCA Case Number as to DONALD J. TRUMP 23–3190 for <u>106</u> Notice of Appeal – Interlocutory filed by DONALD J. TRUMP. (zhsj) (Entered: 10/18/2023) |
| 10/18/2023 | <u>108</u> | Memorandum in Opposition by USA as to DONALD J. TRUMP re <u>101</u> Motion to Access *CIPA Section 4 Filing* (Windom, Thomas) (Entered: 10/18/2023) |
| 10/19/2023 | <u>109</u> | Memorandum in Opposition by USA as to DONALD J. TRUMP re <u>74</u> Motion to Dismiss Case (Pearce, James) (Entered: 10/19/2023) |
| 10/20/2023 | <u>110</u> | MOTION to Stay *Pending Appeal, Request for Temporary Administrative Stay, and Memorandum in Support* by DONALD J. TRUMP. (Lauro, John) (Entered: 10/20/2023) |
| 10/20/2023 | | MINUTE ORDER as to DONALD J. TRUMP: Upon consideration of Defendant's opposed <u>110</u> Motion for Stay Pending Appeal, Request for Temporary Administrative Stay, and Memorandum in Support, it is hereby ORDERED that the court's <u>105</u> Opinion and Order is administratively STAYED to permit the parties' briefing and the court's consideration of Defendant's Motion. It is FURTHER ORDERED that the government shall file any opposition to Defendant's Motion by October 25, 2023, and that Defendant shall file any Reply by October 28, 2023. Signed by Judge Tanya S. Chutkan on 10/20/2023. (zjd) (Entered: 10/20/2023) |
| 10/20/2023 | <u>111</u> | RESPONSE by DONALD J. TRUMP re <u>97</u> MOTION for Order for Fair and Protective Jury Procedures (Lauro, John) (Entered: 10/20/2023) |
| 10/20/2023 | <u>112</u> | RESPONSE by DONALD J. TRUMP re <u>98</u> MOTION for Formal Pretrial Notice of the Defendant's Intent to Rely on Advice–of–Counsel Defense (Lauro, John) (Entered: 10/20/2023) |
| 10/23/2023 | <u>113</u> | MOTION to Dismiss Case *Based on Constitutional Grounds* by DONALD J. TRUMP. (Lauro, John) (Entered: 10/23/2023) |
| 10/23/2023 | <u>114</u> | MOTION to Dismiss Case *Based on Statutory Grounds* by DONALD J. TRUMP. (Lauro, John) (Entered: 10/23/2023) |
| 10/23/2023 | <u>115</u> | MOTION to Strike *Inflammatory Allegations From the Indictment* by DONALD J. TRUMP. (Lauro, John) (Entered: 10/23/2023) |
| 10/23/2023 | <u>116</u> | MOTION to Dismiss Case *for Selective and Vindictive Prosecution* by DONALD J. TRUMP. (Attachments: # <u>1</u> Exhibit Exhibit 1, # <u>2</u> Exhibit Exhibit 2, # <u>3</u> Exhibit Exhibit 3, # <u>4</u> Exhibit Exhibit 4)(Bove, Emil) (Entered: 10/23/2023) |
| 10/25/2023 | <u>117</u> | REPLY in Support by USA as to DONALD J. TRUMP re <u>97</u> MOTION for Order for Fair and Protective Jury Procedures (Attachments: # <u>1</u> Text of Proposed Order)(Gaston, Molly) (Entered: 10/25/2023) |
| 10/25/2023 | <u>118</u> | REPLY in Support by USA as to DONALD J. TRUMP re <u>98</u> MOTION for Formal Pretrial Notice of the Defendant's Intent to Rely on Advice–of–Counsel Defense (Windom, Thomas) (Entered: 10/25/2023) |
| 10/25/2023 | <u>119</u> | Memorandum in Opposition by USA as to DONALD J. TRUMP re <u>99</u> Motion for Discovery, (Windom, Thomas) (Entered: 10/25/2023) |
| 10/25/2023 | <u>120</u> | Memorandum in Opposition by USA as to DONALD J. TRUMP re <u>110</u> Motion to Stay (Gaston, Molly) (Entered: 10/25/2023) |
| 10/26/2023 | <u>121</u> | NOTICE *of CIPA § 5 Filing and Objection to Unauthorized Deletions of Classified Information* by DONALD J. TRUMP (Blanche, Todd) (Entered: 10/26/2023) |
| 10/26/2023 | <u>122</u> | REPLY in Support by DONALD J. TRUMP re <u>74</u> MOTION to Dismiss Case (Lauro, John) (Entered: 10/26/2023) |
| 10/27/2023 | | MINUTE ORDER as to DONALD J. TRUMP: Defendant's combined response, if any, to the <u>1</u> Media Coalition's Application for Audiovisual Access to Criminal Trial Proceedings, filed in Case No. 23–mc–99–TSC, and <u>1</u> Application of NBCUniversal Media, LLC to Permit Video and Audio of Trial in United States v. Donald Trump, filed in Case No. 23–mc–107–TSC, is due November 10, 2023. It is FURTHER ORDERED that any response shall be docketed in Case No. 23–mc–99–TSC. Signed by Judge Tanya S. Chutkan on 10/27/2023. (zjd) (Entered: 10/27/2023) |

| 10/28/2023 | 123 | REPLY in Support by DONALD J. TRUMP re 110 MOTION to Stay *Pending Appeal, Request for Temporary Administrative Stay, and Memorandum in Support* (Lauro, John) (Entered: 10/28/2023) |
|---|---|---|
| 10/29/2023 | 124 | OPINION and ORDER as to DONALD J. TRUMP: Denying Defendant's 110 Motion to Stay Pending Appeal, and lifting the administrative stay imposed by the court's October 20, 2023 Minute Order. Signed by Judge Tanya S. Chutkan on 10/29/2023. (zjd) (Entered: 10/29/2023) |
| 10/31/2023 | 125 | LEAVE TO FILE DENIED– Motion of the American Civil Liberties Union & the American Civil Liberties Union of the District of Columbia for Leave to File Brief Amici Curae in Aid of the Court's Re–Evaluation of its Gag Order as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "Although courts have in rare instances exercised their discretion to permit third–party submissions in criminal cases, neither the Federal Rules of Criminal Procedure nor the LocalCriminal Rules contemplate the filing of amicus curiae briefs. At this time,the court does not find it necessary to depart from the ordinary proceduralcourse by permitting this filing." Signed by Judge Tanya S. Chutkan on 10/31/2023. (zhsj) (Entered: 10/31/2023) |
| 10/31/2023 | 131 | LEAVE TO FILE DENIED– Amicus Declaration in Support of United States Opposition to Defendant's Motion to Dismiss Dkt 74 Due "Presidential Immunity" as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "Even if construed as a motion for leave to file an amicus curiae brief, the courtis not persuaded that filing this submission is warranted. Although courts havein rare instances exercised their discretion to permit third–party submissionsin criminal cases, neither the Federal Rules of Criminal Procedure nor theLocal Criminal Rules contemplate the filing of amicus curiae briefs. At thistime, the court does not find it necessary to depart from the ordinaryprocedural course by permitting this filing". Signed by Judge Tanya S. Chutkan on 10/31/2023. (zhsj) (Entered: 11/03/2023) |
| 10/31/2023 | 132 | LEAVE TO FILE DENIED– Plaintiff's Demand for Default Judgments in Third Party Joinder Under FRCP, Rule 18(a) and (b) as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "Even if construed as a motion for leave to file an amicus curiae brief, the court is not persuaded that filing this submission is warranted. Although courts have in rare instances exercised their discretion to permit third–party submissions in criminal cases,neither the Federal Rules of Criminal Procedure northe Local Criminal Rules contemplate the filing ofamicus curiae briefs. At this time, the court does notfind it necessary to depart from the ordinaryprocedural course by permitting this filing". Signed by Judge Tanya S. Chutkan on 10/31/2023. (zhsj) (Entered: 11/03/2023) |
| 10/31/2023 | 133 | LEAVE TO FILE DENIED– Motion to Withdraw New Motion to Intervene – New Fresh Most Recent Evidence Relate 6/4/2009 & 11/4/2008 Set June Date Kill Reddie as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "Even if construed as a motion for leaveto file an amicus curiae brief, the court isnot persuaded that filing this submissionis warranted. Although courts have inrare instances exercised their discretionto permit third–party submissions incriminal cases, neither the Federal Rulesof Criminal Procedure nor the LocalCriminal Rules contemplate the filing ofamicus curiae briefs. At this time, thecourt does not find it necessary to departfrom the ordinary procedural course bypermitting this filing". Signed by Judge Tanya S. Chutkan on 10/31/2023. (zhsj) (Entered: 11/03/2023) |
| 10/31/2023 | 134 | LEAVE TO FILE DENIED– Motion of Former Officials in Five Republican Administrations, Et Al for Leave to File an Amici Curiae Brief in Opposition to Defendant's Motion to Dismiss Indictment Based on Presidential Immunity as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "Although courts have in rare instancesexercised their discretion to permit third–partysubmissions in criminal cases, neither theFederal Rules of Criminal Procedure nor theLocal Criminal Rules contemplate the filing ofamicus curiae briefs. At this time, the courtdoes not find it necessary to depart from theordinary procedural course by permitting thisfiling". Signed by Judge Tanya S. Chutkan on 10/31/2023. (zhsj) (Entered: 11/03/2023) |
| 10/31/2023 | 135 | LEAVE TO FILE DENIED– Pro Se Amicus Curiae re: Defendant's Motion to Dismiss Indictment Based on Presidential Immunity as to DONALD J. TRUMP. This document is unavailable as the Court denied its filing. "Even if construed as a motion |

| | | |
|---|---|---|
| | | for leave to file an amicus curiae brief, the court is not persuaded that filing this submission is warranted. Although courts have in rare instances exercised their discretion to permit third partysubmissions in criminal cases, neither the Federal Rules of Criminal Procedure nor the Local CriminalRules contemplate the filing of amicus curiae briefs. At this time, the court does not find it necessary todepart from the ordinary procedural course by permitting this filing". Signed by Judge Tanya S. Chutkan on 10/31/2023. (zhsj) Modified on 11/3/2023 (zhsj). (Entered: 11/03/2023) |
| 11/01/2023 | 126 | OPINION and ORDER as to DONALD J. TRUMP: Granting the government's Classified Ex Parte, In Camera, and Under Seal Motion for a Protective Order Pursuant to Section 4 of the Classified Information Procedures Act and Rule 16(d)(1) of the Federal Rules of Criminal Procedure; and denying Defendant's Motion for Access to CIPA § 4 Filing, ECF No. 101. See Opinion and Order for details. Signed by Judge Tanya S. Chutkan on 11/1/2023. (zjd) (Entered: 11/01/2023) |
| 11/01/2023 | 127 | REPLY in Support by DONALD J. TRUMP re 99 MOTION for Discovery *(PRE−TRIAL RULE 17(c) SUBPOENAS)* (Lauro, John) (Entered: 11/01/2023) |
| 11/01/2023 | 128 | MOTION to Stay *Case Pending Immunity Determination* by DONALD J. TRUMP. (Lauro, John) (Entered: 11/01/2023) |
| 11/01/2023 | 129 | MOTION for Extension of Time to *File Motions for Rule 17(c) Subpoenas and Motions to Compel* by DONALD J. TRUMP. (Lauro, John) (Entered: 11/01/2023) |
| 11/02/2023 | | MINUTE ORDER as to DONALD J. TRUMP: It is hereby ORDERED that the government shall file any opposition to Defendant's 129 Motion for Extension of Time by November 4, 2023; and that Defendant shall file any reply in support of that Motion by November 6, 2023. Signed by Judge Tanya S. Chutkan on 11/2/2023. (zjd) (Entered: 11/02/2023) |
| 11/02/2023 | 130 | ORDER as to DONALD J. TRUMP: Granting the government's 97 Motion for Fair and Protective Jury Procedures. See Order for details. Signed by Judge Tanya S. Chutkan on 11/2/2023. (zjd) (Entered: 11/02/2023) |
| 11/03/2023 | 136 | MOTION for Leave to File *Oversized Brief* by USA as to DONALD J. TRUMP. (Windom, Thomas) (Entered: 11/03/2023) |
| 11/03/2023 | | MINUTE ORDER as to DONALD J. TRUMP: It is hereby ORDERED that Defendant shall file any opposition to the government's 136 Motion for Leave to File Oversized Brief by 7:00 PM on November 4, 2023. This will allow the court to rule on the Motion in advance of the November 6, 2023 deadline for the brief in question. Signed by Judge Tanya S. Chutkan on 11/3/2023. (zjd) (Entered: 11/03/2023) |
| 11/03/2023 | 137 | Memorandum in Opposition by USA as to DONALD J. TRUMP re 129 Motion for Extension of Time to *File Pretrial Motions Related to Discovery and Subpoenas* (Windom, Thomas) (Entered: 11/03/2023) |
| 11/04/2023 | 138 | RESPONSE by DONALD J. TRUMP re 136 MOTION for Leave to File *Oversized Brief* (Lauro, John) (Entered: 11/04/2023) |
| 11/05/2023 | | MINUTE ORDER as to DONALD J. TRUMP: The government's 136 Motion for Leave to File Oversized Brief is hereby GRANTED. The government may submit a combined opposition brief to Defendant's 113 Motion to Dismiss Based on Constitutional Grounds and 114 Motion to Dismiss Based on Statutory Grounds. The brief may not exceed 90 pages in total. The discussion of each Motion therein shall not exceed 45 pages. Signed by Judge Tanya S. Chutkan on 11/5/2023. (zjd) (Entered: 11/05/2023) |
| 11/06/2023 | 139 | Memorandum in Opposition by USA as to DONALD J. TRUMP re 113 Motion to Dismiss Case, 114 Motion to Dismiss Case (Pearce, James) (Entered: 11/06/2023) |
| 11/06/2023 | 140 | Memorandum in Opposition by USA as to DONALD J. TRUMP re 115 Motion to Strike (Gaston, Molly) (Entered: 11/06/2023) |
| 11/06/2023 | 141 | Memorandum in Opposition by USA as to DONALD J. TRUMP re 116 Motion to Dismiss Case *for Selective and Vindictive Prosecution* (Windom, Thomas) (Entered: 11/06/2023) |

| 11/06/2023 | 142 | Memorandum in Opposition by USA as to DONALD J. TRUMP re 128 Motion to Stay (Gaston, Molly) (Entered: 11/06/2023) |
| 11/06/2023 | 143 | NOTICE OF ATTORNEY APPEARANCE John M. Pellettieri appearing for USA. (Pellettieri, John) (Entered: 11/06/2023) |
| 11/06/2023 | 144 | REPLY in Support by DONALD J. TRUMP re 129 MOTION for Extension of Time to *File Motions for Rule 17(c) Subpoenas and Motions to Compel* (Lauro, John) (Entered: 11/06/2023) |
| 11/07/2023 | 146 | OPINION and ORDER as to DONALD J. TRUMP: granting in part and denying in part Defendant's 129 Motion for Extension of Time to File Pretrial Motions Related to Discovery and Subpoenas. Motions to compel due November 27, 2023; oppositions due December 11, 2023; replies due December 18, 2023. Rule 17(c) motions due December 13, 2023; oppositions due December 27, 2023; replies due January 3, 2024. See Opinion and Order for details. Signed by Judge Tanya S. Chutkan on 11/7/2023. (zjd) (Entered: 11/07/2023) |
| 11/08/2023 | 147 | OPINION and ORDER as to DONALD J. TRUMP: Granting in part and denying in part the government's Motion for Formal Pretrial Notice of the Defendant's Intent to Rely on Advice–of–Counsel Defense, ECF No. 98 . See Opinion and Order for details. Signed by Judge Tanya S. Chutkan on 11/8/2023. (zjd) (Entered: 11/08/2023) |
| 11/08/2023 | 148 | ORDER as to DONALD J. TRUMP: By November 22, 2023, the government shall submit a classified brief responding to the objection set forth in Defendant's classified CIPA § 5 submission. See Order for details. Signed by Judge Tanya S. Chutkan on 11/8/2023. (zjd) (Entered: 11/08/2023) |
| 11/09/2023 | 149 | NOTICE of Filing by USA as to DONALD J. TRUMP (Windom, Thomas) (Entered: 11/09/2023) |
| 11/09/2023 | 153 | LEAVE TO FILE DENIED–Motion for Leave to File Amicus as to DONALD J. TRUMP. This document is unavailable as the Court denied its filing. "Although courts have in rare instances exercised their discretion to permit third–party submissions in criminalcases, neither the Federal Rules of Criminal Procedure nor the Local Criminal Rules contemplate the filing ofamicus curiae briefs. At this time, the court does not find it necessary to depart from the ordinary proceduralcourse by permitting this filing". Signed by Judge Tanya S. Chutkan on 11/9/2023. (zhsj) (Entered: 11/14/2023) |
| 11/09/2023 | 154 | LEAVE TO FILE DENIED–Notice of Appeal as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "Even assuming a third party could file a notice of appeal in a criminal cases which the Federal Rules of Criminal Procedure and Local Criminal Rules do not contemplate, this filing does not comply with Rule 3(c) of the Circuit Rules of the U.S. Court of Appeals for the District of Columbia Circuit". Signed by Judge Tanya S. Chutkan on 11/9/2023. (zhsj) (Entered: 11/14/2023) |
| 11/09/2023 | 155 | LEAVE TO FILE DENIED–Proof of Service/Notice of Filing as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "Even if construed as a motion for leave to file an amicus curiae brief, the court is notpersuaded that filing this submission is warranted. Although courts have in rareinstances exercised their discretion to permit third–party submissions in criminalcases, neither the Federal Rules of Criminal Procedure nor the Local Criminal Rulescontemplate the filing of amicus curiae briefs. At this time, the court does not find itnecessary to depart from the ordinary procedural course by permitting this filing". Signed by Judge Tanya S. Chutkan on 9/11/2023. (zhsj) (Entered: 11/14/2023) |
| 11/12/2023 | 150 | MOTION for Extension of Time to File Response/Reply as to 116 MOTION to Dismiss Case *for Selective and Vindictive Prosecution*, 128 MOTION to Stay *Case Pending Immunity Determination*, 115 MOTION to Strike *Inflammatory Allegations From the Indictment*, 113 MOTION to Dismiss Case *Based on Constitutional Grounds*, 114 MOTION to Dismiss Case *Based on Statutory Grounds* by DONALD J. TRUMP. (Lauro, John) (Entered: 11/12/2023) |
| 11/13/2023 | 151 | Memorandum in Opposition by USA as to DONALD J. TRUMP re 150 Motion for Extension of Time to File Response/Reply, (Gaston, Molly) (Entered: 11/13/2023) |

| 11/13/2023 | 152 | ORDER as to DONALD J. TRUMP: Granting in part and denying in part Defendant's 150 Motion for Extension of Time to File Reply Briefs. Defendant may file any Reply in support of his motions to dismiss based on 113 constitutional, 114 statutory, and 116 selective prosecution grounds by November 22, 2023; and Defendant may file any Reply in support of his pending 115 Motion to Strike and 128 Motion to Stay by November 15, 2023. Signed by Judge Tanya S. Chutkan on 11/13/2023. (zjd) (Entered: 11/13/2023) |
|---|---|---|
| 11/15/2023 | 156 | REPLY in Support by DONALD J. TRUMP re 115 MOTION to Strike *Inflammatory Allegations From the Indictment* (Lauro, John) (Entered: 11/15/2023) |
| 11/15/2023 | 157 | REPLY in Support by DONALD J. TRUMP re 128 MOTION to Stay *Case Pending Immunity Determination* (Lauro, John) (Entered: 11/15/2023) |
| 11/17/2023 | 158 | OPINION and ORDER as to DONALD J. TRUMP: Denying Defendant's 115 Motion to Strike Inflammatory Allegations From the Indictment. See Opinion and Order for details. Signed by Judge Tanya S. Chutkan on 11/17/2023. (zjd) (Entered: 11/17/2023) |
| 11/21/2023 | 159 | Unopposed MOTION for Extension of Time to File Response/Reply *to the Special Counsel's Classified CIPA Sec. 5 Motion to Strike* by DONALD J. TRUMP. (Blanche, Todd) (Entered: 11/21/2023) |
| 11/21/2023 | | MINUTE ORDER as to DONALD J. TRUMP: Defendant's unopposed 159 Motion for Extension of Time to File Opposition to the Special Counsel's Classified CIPA Sec. 5 Motion to Strike is hereby GRANTED. Defendant may file any opposition to the government's Motion to Strike by November 27, 2023. Signed by Judge Tanya S. Chutkan on 11/21/2023. (zjd) (Entered: 11/21/2023) |
| 11/22/2023 | 160 | NOTICE of Filing by USA as to DONALD J. TRUMP (Windom, Thomas) (Entered: 11/22/2023) |
| 11/22/2023 | 161 | REPLY in Support by DONALD J. TRUMP re 116 MOTION to Dismiss Case *for Selective and Vindictive Prosecution* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Blanche, Todd) (Entered: 11/22/2023) |
| 11/22/2023 | 162 | REPLY in Support by DONALD J. TRUMP re 113 MOTION to Dismiss Case *Based on Constitutional Grounds* (Lauro, John) (Entered: 11/22/2023) |
| 11/22/2023 | 163 | REPLY in Support by DONALD J. TRUMP re 114 MOTION to Dismiss Case *Based on Statutory Grounds* (Lauro, John) (Entered: 11/22/2023) |
| 11/22/2023 | 164 | LEAVE TO FILE DENIED– Motion for Leave to File Amicus as to DONALD J. TRUMP This document is unavailable as the Court denied its filing. "Although courts have in rare instances exercised their discretion to permit third–party submissions in criminal cases, neither the Federal Rules of Criminal Procedure nor the Local Criminal Rules contemplate the filing of amicus curiae briefs. At this time, the court does not find it necessary to depart from the ordinary procedural course by permitting this filing". Signed by Judge Tanya S. Chutkan on 11/22/2023. (zhsj) Modified on 11/27/2023 (zhsj). (Entered: 11/27/2023) |
| 11/27/2023 | 165 | OPINION and ORDER as to DONALD J. TRUMP: Denying Defendant's 99 Motion for Pretrial Rule 17(c) Subpoenas. See Opinion and Order for details. Signed by Judge Tanya S. Chutkan on 11/27/2023. (zjd) (Entered: 11/27/2023) |
| 11/27/2023 | 166 | MOTION for Leave to File *Under Seal Unredacted Motion and Exhibits* by DONALD J. TRUMP. (Attachments: # 1 PRESIDENT DONALD J. TRUMPS MOTION FOR AN ORDER REGARDING THE SCOPE OF THE PROSECUTION TEAM (REDACTED), # 2 Exhibit A, # 3 Exhibit B (redacted), # 4 Exhibit C (redacted), # 5 Exhibit D, # 6 Exhibit E (redacted), # 7 Exhibit F (redacted), # 8 Exhibit G (redacted), # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K, # 13 Exhibit L, # 14 Exhibit M, # 15 Exhibit N, # 16 Exhibit O)(Blanche, Todd) (Entered: 11/27/2023) |
| 11/27/2023 | 167 | MOTION to Compel *Discovery* by DONALD J. TRUMP. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I)(Blanche, Todd) (Entered: 11/27/2023) |
| 11/28/2023 | | MINUTE ORDER as to DONALD J. TRUMP: Defendant's 166 Motion for Leave to File Under Seal is hereby GRANTED. The proposed filing contains Sensitive Materials, which the court has already determined warrant sealing. See Protective |

21

| | | |
|---|---|---|
| | | Order, ECF No. 28 . Defendant shall file under seal an unredacted copy of his Motion for an Order Regarding the Scope of the Prosecution Team, and shall publicly file a redacted copy of that Motion, by November 29, 2023. The court reminds Defendant that all motions must indicate whether they are opposed. Going forward, if any party seeks to make a filing under seal, the party shall file a sealed motion for leave to file under seal that attaches (1) an unredacted copy of the filing to be docketed under seal, and (2) a redacted copy of the filing that may be publicly docketed. If the court decides to grant such sealed motions for leave to file under seal, it will then direct the Clerk of the Court to docket those attached filings under seal and publicly, respectively. See, e.g., ECF No. 47 (Government's sealed motion for leave to file under seal); ECF No. 55 (court order granting motion and directing Clerk to docket filings appropriately); see also Protective Order at 4; Local R. Crim. P. 49(f)(6)(i). Filings that do not comply with those procedures may be stricken. It is further ORDERED that the Government shall file any opposition to Defendant's Motion for an Order Regarding the Scope of the Prosecution Team by December 9, 2023; and Defendant shall file any Reply in support of that Motion by December 14, 2023. In addition, the Government shall file any Opposition to Defendant's 167 Motion to Compel Discovery by December 11, 2023; and Defendant shall file any Reply in support of that Motion by December 18, 2023. Signed by Judge Tanya S. Chutkan on 11/28/2023. (zjd) (Entered: 11/28/2023) |
| 11/28/2023 | 168 | NOTICE *Pursuant to CIPA Section 5* by DONALD J. TRUMP (Blanche, Todd) (Entered: 11/28/2023) |
| 11/29/2023 | 169 | REDACTED DOCUMENT by DONALD J. TRUMP of Motion for an Order Regarding the Scope of the Prosecution Team (Attachments: # 1 Exhibit A, # 2 Exhibit B (redacted), # 3 Exhibit C (redacted), # 4 Exhibit D, # 5 Exhibit E (redacted), # 6 Exhibit F (redacted), # 7 Exhibit G (redacted), # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O)(Blanche, Todd) (Entered: 11/29/2023) |
| 12/01/2023 | 171 | MEMORANDUM OPINION as to DONALD J. TRUMP re: Defendant's 74 Motion to Dismiss Based on Presidential Immunity, and Defendant's 113 Motion to Dismiss Based on Constitutional Grounds. Signed by Judge Tanya S. Chutkan on 12/1/2023. (zjd) (Entered: 12/01/2023) |
| 12/01/2023 | 172 | ORDER as to DONALD J. TRUMP: Denying Defendant's 74 Motion to Dismiss Based on Presidential Immunity, and denying Defendant's 113 Motion to Dismiss Based on Constitutional Grounds. Signed by Judge Tanya S. Chutkan on 12/1/2023. (zjd) (Entered: 12/01/2023) |
| 12/01/2023 | | MINUTE ORDER as to DONALD J. TRUMP: In light of the court's 172 Order denying Defendant's 74 Motion to Dismiss Based on Presidential Immunity; Defendant's 128 Motion to Stay Case Pending Immunity Determination is hereby DENIED as moot. Signed by Judge Tanya S. Chutkan on 12/1/2023. (zjd) (Entered: 12/01/2023) |
| 12/04/2023 | 173 | NOTICE *of Filing* by USA as to DONALD J. TRUMP (Windom, Thomas) (Entered: 12/04/2023) |
| 12/05/2023 | | MINUTE ORDER as to DONALD J. TRUMP: The Government's unopposed 174 Sealed Motion for Leave to File Unredacted Notice Under Seal and for Entry of Redacted Notice on Public Docket is hereby GRANTED. The proposed filing contains Sensitive Materials, which the court has already determined warrant sealing. See Protective Order, ECF No. 28 . The Clerk of the Court is directed to file under seal the unredacted copy of the Government's Notice (ECF No. 174–1), and to file on the public docket the redacted copy of the Government's Notice (ECF No. 174–2). Signed by Judge Tanya S. Chutkan on 12/5/2023. (zjd) (Entered: 12/05/2023) |
| 12/05/2023 | 176 | NOTICE Pursuant to Federal Rule of Evidence 404(b) by USA as to DONALD J. TRUMP. (zhsj) (Entered: 12/05/2023) |
| 12/07/2023 | 177 | NOTICE OF APPEAL (Interlocutory) by DONALD J. TRUMP re 172 Order on Motion to Dismiss Case, 171 Memorandum Opinion. Filing fee $ 605, receipt number ADCDC–10543486. Fee Status: Fee Paid. Parties have been notified. (Lauro, John) (Entered: 12/07/2023) |

| 12/07/2023 | 178 | MOTION for Stay *Order Regarding Automatic Stay of Proceedings Pending Appeal* re 177 Notice of Appeal – Interlocutory by DONALD J. TRUMP. (Blanche, Todd) Modified event on 12/8/2023 (znmw). (Entered: 12/07/2023) |
| --- | --- | --- |
| 12/07/2023 | 179 | NOTICE OF APPEAL (Interlocutory) by DONALD J. TRUMP re 172 Order on Motion to Dismiss Case, 171 Memorandum Opinion. Filing fee $605, receipt number ADCDC–10543486. Fee Status: Fee Paid. Parties have been notified. (zhsj) (Entered: 12/07/2023) |
| 12/07/2023 | | MINUTE ORDER as to DONALD J. TRUMP: Upon consideration of Defendant's 178 Motion for Order Regarding Automatic Stay of Proceedings Pending Appeal, it is hereby ORDERED that the government shall file any opposition to Defendant's Motion by 5:00 p.m. on Sunday, December 10, 2023, and that Defendant shall file any Reply by 5:00 p.m. on Tuesday, December 12, 2023. Signed by Judge Tanya S. Chutkan on 12/7/2023. (zjd) (Entered: 12/07/2023) |
| 12/08/2023 | 180 | Transmission of the Notice of Appeal, Order Appealed, and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid ON 12/7/2023 as to DONALD J. TRUMP re 179 Notice of Appeal – Interlocutory. (zhsj) (Entered: 12/08/2023) |
| 12/08/2023 | | USCA Case Number as to DONALD J. TRUMP 23–3228 for 179 Notice of Appeal – Interlocutory filed by DONALD J. TRUMP. (zstd) (Entered: 12/18/2023) |
| 12/08/2023 | 187 | MANDATE of USCA as to DONALD J. TRUMP re 106 Notice of Appeal – Interlocutory. In accordance with the Judgment filed on December 8, 2023, it is Ordered and Adjudged that the District Court's Order be affirmed in part and vacated in part, in accordance with the opinion of the court filed herein this date. It is Further Ordered that this court's administrative stay entered on November 3, 2023, be dissolved. USCA Case Number 23–3190. (Attachments: # 1 USCA Judgment of 12/8/2023, # 2 USCA Opinion Argued 11/20/2023 and Decided on 12/8/2023)(zstd) (Entered: 12/18/2023) |
| 12/09/2023 | 181 | Memorandum in Opposition by USA as to DONALD J. TRUMP re 167 Motion to Compel *and in Opposition to ECF No. 166–1 (Motion for an Order Regarding the Scope of the Prosecution Team)* (Windom, Thomas) (Entered: 12/09/2023) |
| 12/10/2023 | 182 | Memorandum in Opposition by USA as to DONALD J. TRUMP re 178 Motion for Stay Order (Gaston, Molly) Modified text on 12/12/2023 (zstd). (Entered: 12/10/2023) |
| 12/11/2023 | 183 | NOTICE *of Summary of Anticipated Expert Testimony* by USA as to DONALD J. TRUMP (Gaston, Molly) (Entered: 12/11/2023) |
| 12/12/2023 | 184 | NOTICE *of Filing* by USA as to DONALD J. TRUMP (Windom, Thomas) (Entered: 12/12/2023) |
| 12/12/2023 | 185 | REPLY in Support by DONALD J. TRUMP re 178 MOTION for Order Regarding Automatic Stay of Proceedings Pending Appeal re 177 Notice of Appeal – Interlocutory (Blanche, Todd) (Entered: 12/12/2023) |
| 12/13/2023 | 186 | OPINION and ORDER as to DONALD J. TRUMP: Granting in part and denying in part Defendant's 178 Motion to Stay Proceedings Pending Appeal. See Opinion and Order for details. Signed by Judge Tanya S. Chutkan on 12/13/2023. (zjd) (Entered: 12/13/2023) |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | **CRIMINAL NO.** |
| | * | |
| v. | * | **GRAND JURY ORIGINAL** |
| | * | |
| DONALD J. TRUMP, | * | **VIOLATIONS:** |
| | * | |
| Defendant. | * | **Count 1: 18 U.S.C. § 371** |
| | * | **(Conspiracy to Defraud the United** |
| | * | **States)** |
| | * | |
| | * | **Count 2: 18 U.S.C. § 1512(k)** |
| | * | **(Conspiracy to Obstruct an Official** |
| | * | **Proceeding)** |
| | * | |
| | * | **Count 3: 18 U.S.C. §§ 1512(c)(2), 2** |
| | * | **(Obstruction of and Attempt to** |
| | * | **Obstruct an Official Proceeding)** |
| | * | |
| | * | **Count 4: 18 U.S.C. § 241** |
| | * | **(Conspiracy Against Rights)** |
| | * | |

## INDICTMENT

The Grand Jury charges that, at all times material to this Indictment, on or about the dates and at the approximate times stated below:

## INTRODUCTION

1.      The Defendant, **DONALD J. TRUMP,** was the forty-fifth President of the United States and a candidate for re-election in 2020. The Defendant lost the 2020 presidential election.

2.      Despite having lost, the Defendant was determined to remain in power. So for more than two months following election day on November 3, 2020, the Defendant spread lies that there had been outcome-determinative fraud in the election and that he had actually won. These claims were false, and the Defendant knew that they were false. But the Defendant repeated and widely

disseminated them anyway—to make his knowingly false claims appear legitimate, create an intense national atmosphere of mistrust and anger, and erode public faith in the administration of the election.

3.       The Defendant had a right, like every American, to speak publicly about the election and even to claim, falsely, that there had been outcome-determinative fraud during the election and that he had won. He was also entitled to formally challenge the results of the election through lawful and appropriate means, such as by seeking recounts or audits of the popular vote in states or filing lawsuits challenging ballots and procedures. Indeed, in many cases, the Defendant did pursue these methods of contesting the election results. His efforts to change the outcome in any state through recounts, audits, or legal challenges were uniformly unsuccessful.

4.       Shortly after election day, the Defendant also pursued unlawful means of discounting legitimate votes and subverting the election results. In so doing, the Defendant perpetrated three criminal conspiracies:

      a.     A conspiracy to defraud the United States by using dishonesty, fraud, and deceit to impair, obstruct, and defeat the lawful federal government function by which the results of the presidential election are collected, counted, and certified by the federal government, in violation of 18 U.S.C. § 371;

      b.     A conspiracy to corruptly obstruct and impede the January 6 congressional proceeding at which the collected results of the presidential election are counted and certified ("the certification proceeding"), in violation of 18 U.S.C. § 1512(k); and

      c.     A conspiracy against the right to vote and to have one's vote counted, in violation of 18 U.S.C. § 241.

Each of these conspiracies—which built on the widespread mistrust the Defendant was creating through pervasive and destabilizing lies about election fraud—targeted a bedrock function of the United States federal government: the nation's process of collecting, counting, and certifying the results of the presidential election ("the federal government function").

- 2 -

## COUNT ONE
### (Conspiracy to Defraud the United States—18 U.S.C. § 371)

5.      The allegations contained in paragraphs 1 through 4 of this Indictment are re-alleged and fully incorporated here by reference.

### The Conspiracy

6.      From on or about November 14, 2020, through on or about January 20, 2021, in the District of Columbia and elsewhere, the Defendant,

### DONALD J. TRUMP,

did knowingly combine, conspire, confederate, and agree with co-conspirators, known and unknown to the Grand Jury, to defraud the United States by using dishonesty, fraud, and deceit to impair, obstruct, and defeat the lawful federal government function by which the results of the presidential election are collected, counted, and certified by the federal government.

### Purpose of the Conspiracy

7.      The purpose of the conspiracy was to overturn the legitimate results of the 2020 presidential election by using knowingly false claims of election fraud to obstruct the federal government function by which those results are collected, counted, and certified.

### The Defendant's Co-Conspirators

8.      The Defendant enlisted co-conspirators to assist him in his criminal efforts to overturn the legitimate results of the 2020 presidential election and retain power. Among these were:

    a.      Co-Conspirator 1, an attorney who was willing to spread knowingly false claims and pursue strategies that the Defendant's 2020 re-election campaign attorneys would not.

    b.      Co-Conspirator 2, an attorney who devised and attempted to implement a strategy to leverage the Vice President's ceremonial role overseeing the

certification proceeding to obstruct the certification of the presidential election.

c. Co-Conspirator 3, an attorney whose unfounded claims of election fraud the Defendant privately acknowledged to others sounded "crazy." Nonetheless, the Defendant embraced and publicly amplified Co-Conspirator 3's disinformation.

d. Co-Conspirator 4, a Justice Department official who worked on civil matters and who, with the Defendant, attempted to use the Justice Department to open sham election crime investigations and influence state legislatures with knowingly false claims of election fraud.

e. Co-Conspirator 5, an attorney who assisted in devising and attempting to implement a plan to submit fraudulent slates of presidential electors to obstruct the certification proceeding.

f. Co-Conspirator 6, a political consultant who helped implement a plan to submit fraudulent slates of presidential electors to obstruct the certification proceeding.

## The Federal Government Function

9. The federal government function by which the results of the election for President of the United States are collected, counted, and certified was established through the Constitution and the Electoral Count Act (ECA), a federal law enacted in 1887. The Constitution provided that individuals called electors select the president, and that each state determine for itself how to appoint the electors apportioned to it. Through state laws, each of the fifty states and the District of Columbia chose to select their electors based on the popular vote in the state. After election day, the ECA required each state to formally determine—or "ascertain"—the electors who would represent the state's voters by casting electoral votes on behalf of the candidate who had won the popular vote, and required the executive of each state to certify to the federal government the identities of those electors. Then, on a date set by the ECA, each state's ascertained electors were required to meet and collect the results of the presidential election—that is, to cast electoral votes based on their state's popular vote, and to send their electoral votes, along with the state executive's

- 4 -

certification that they were the state's legitimate electors, to the United States Congress to be counted and certified in an official proceeding. Finally, the Constitution and ECA required that on the sixth of January following election day, the Congress meet in a Joint Session for a certification proceeding, presided over by the Vice President as President of the Senate, to count the electoral votes, resolve any objections, and announce the result—thus certifying the winner of the presidential election as president-elect. This federal government function—from the point of ascertainment to the certification—is foundational to the United States' democratic process, and until 2021, had operated in a peaceful and orderly manner for more than 130 years.

## **Manner and Means**

10.     The Defendant's conspiracy to impair, obstruct, and defeat the federal government function through dishonesty, fraud, and deceit included the following manner and means:

a.      The Defendant and co-conspirators used knowingly false claims of election fraud to get state legislators and election officials to subvert the legitimate election results and change electoral votes for the Defendant's opponent, Joseph R. Biden, Jr., to electoral votes for the Defendant. That is, on the pretext of baseless fraud claims, the Defendant pushed officials in certain states to ignore the popular vote; disenfranchise millions of voters; dismiss legitimate electors; and ultimately, cause the ascertainment of and voting by illegitimate electors in favor of the Defendant.

b.      The Defendant and co-conspirators organized fraudulent slates of electors in seven targeted states (Arizona, Georgia, Michigan, Nevada, New Mexico, Pennsylvania, and Wisconsin), attempting to mimic the procedures that the legitimate electors were supposed to follow under the Constitution and other federal and state laws. This included causing the fraudulent electors to meet on the day appointed by federal law on which legitimate electors were to gather and cast their votes; cast fraudulent votes for the Defendant; and sign certificates falsely representing that they were legitimate electors. Some fraudulent electors were tricked into participating based on the understanding that their votes would be used only if the Defendant succeeded in outcome-determinative lawsuits within their state, which the Defendant never did. The Defendant and co-conspirators then caused these fraudulent electors to transmit their false certificates to the

Vice President and other government officials to be counted at the
certification proceeding on January 6.

c.  The Defendant and co-conspirators attempted to use the power and
authority of the Justice Department to conduct sham election crime
investigations and to send a letter to the targeted states that falsely claimed
that the Justice Department had identified significant concerns that may
have impacted the election outcome; that sought to advance the Defendant's
fraudulent elector plan by using the Justice Department's authority to
falsely present the fraudulent electors as a valid alternative to the legitimate
electors; and that urged, on behalf of the Justice Department, the targeted
states' legislatures to convene to create the opportunity to choose the
fraudulent electors over the legitimate electors.

d.  The Defendant and co-conspirators attempted to enlist the Vice President to
use his ceremonial role at the January 6 certification proceeding to
fraudulently alter the election results.  First, using knowingly false claims
of election fraud, the Defendant and co-conspirators attempted to convince
the Vice President to use the Defendant's fraudulent electors, reject
legitimate electoral votes, or send legitimate electoral votes to state
legislatures for review rather than counting them.  When that failed, on the
morning of January 6, the Defendant and co-conspirators repeated
knowingly false claims of election fraud to gathered supporters, falsely told
them that the Vice President had the authority to and might alter the election
results, and directed them to the Capitol to obstruct the certification
proceeding and exert pressure on the Vice President to take the fraudulent
actions he had previously refused.

e.  After it became public on the afternoon of January 6 that the Vice President
would not fraudulently alter the election results, a large and angry crowd—
including many individuals whom the Defendant had deceived into
believing the Vice President could and might change the election results—
violently attacked the Capitol and halted the proceeding.  As violence
ensued, the Defendant and co-conspirators exploited the disruption by
redoubling efforts to levy false claims of election fraud and convince
Members of Congress to further delay the certification based on those
claims.

### The Defendant's Knowledge of the Falsity of His Election Fraud Claims

11.   The Defendant, his co-conspirators, and their agents made knowingly false claims

that there had been outcome-determinative fraud in the 2020 presidential election.  These prolific

- 6 -

lies about election fraud included dozens of specific claims that there had been substantial fraud

in certain states, such as that large numbers of dead, non-resident, non-citizen, or otherwise

ineligible voters had cast ballots, or that voting machines had changed votes for the Defendant to

votes for Biden. These claims were false, and the Defendant knew that they were false. In fact,

the Defendant was notified repeatedly that his claims were untrue—often by the people on whom

he relied for candid advice on important matters, and who were best positioned to know the facts—

and he deliberately disregarded the truth. For instance:

> a. The Defendant's Vice President—who personally stood to gain by remaining in office as part of the Defendant's ticket and whom the Defendant asked to study fraud allegations—told the Defendant that he had seen no evidence of outcome-determinative fraud.

> b. The senior leaders of the Justice Department—appointed by the Defendant and responsible for investigating credible allegations of election crimes— told the Defendant on multiple occasions that various allegations of fraud were unsupported.

> c. The Director of National Intelligence—the Defendant's principal advisor on intelligence matters related to national security—disabused the Defendant of the notion that the Intelligence Community's findings regarding foreign interference would change the outcome of the election.

> d. The Department of Homeland Security's Cybersecurity and Infrastructure Security Agency ("CISA")—whose existence the Defendant signed into law to protect the nation's cybersecurity infrastructure from attack—joined an official multi-agency statement that there was no evidence any voting system had been compromised and that declared the 2020 election "the most secure in American history." Days later, after the CISA Director—whom the Defendant had appointed—announced publicly that election security experts were in agreement that claims of computer-based election fraud were unsubstantiated, the Defendant fired him.

> e. Senior White House attorneys—selected by the Defendant to provide him candid advice—informed the Defendant that there was no evidence of outcome-determinative election fraud, and told him that his presidency would end on Inauguration Day in 2021.

       f.      Senior staffers on the Defendant's 2020 re-election campaign ("Defendant's Campaign" or "Campaign")—whose sole mission was the Defendant's re-election—told the Defendant on November 7, 2020, that he had only a five to ten percent chance of prevailing in the election, and that success was contingent on the Defendant winning ongoing vote counts or litigation in Arizona, Georgia, and Wisconsin. Within a week of that assessment, the Defendant lost in Arizona—meaning he had lost the election.

       g.     State legislators and officials—many of whom were the Defendant's political allies, had voted for him, and wanted him to be re-elected—repeatedly informed the Defendant that his claims of fraud in their states were unsubstantiated or false and resisted his pressure to act based upon them.

       h.     State and federal courts—the neutral arbiters responsible for ensuring the fair and even-handed administration of election laws—rejected every outcome-determinative post-election lawsuit filed by the Defendant, his co-conspirators, and allies, providing the Defendant real-time notice that his allegations were meritless.

    12.    The Defendant widely disseminated his false claims of election fraud for months, despite the fact that he knew, and in many cases had been informed directly, that they were not true. The Defendant's knowingly false statements were integral to his criminal plans to defeat the federal government function, obstruct the certification, and interfere with others' right to vote and have their votes counted. He made these knowingly false claims throughout the post-election time period, including those below that he made immediately before the attack on the Capitol on January 6:

       a.     The Defendant insinuated that more than ten thousand dead voters had voted in Georgia. Just four days earlier, Georgia's Secretary of State had explained to the Defendant that this was false.

       b.     The Defendant asserted that there had been 205,000 more votes than voters in Pennsylvania. The Defendant's Acting Attorney General and Acting Deputy Attorney General had explained to him that this was false.

       c.     The Defendant said that there had been a suspicious vote dump in Detroit, Michigan. The Defendant's Attorney General had explained to the Defendant that this was false, and the Defendant's allies in the Michigan

state legislature—the Speaker of the House of Representatives and Majority Leader of the Senate—had publicly announced that there was no evidence of substantial fraud in the state.

d.   The Defendant claimed that there had been tens of thousands of double votes and other fraud in Nevada. The Nevada Secretary of State had previously rebutted the Defendant's fraud claims by publicly posting a "Facts vs. Myths" document explaining that Nevada judges had reviewed and rejected them, and the Nevada Supreme Court had rendered a decision denying such claims.

e.   The Defendant said that more than 30,000 non-citizens had voted in Arizona. The Defendant's own Campaign Manager had explained to him that such claims were false, and the Speaker of the Arizona House of Representatives, who had supported the Defendant in the election, had issued a public statement that there was no evidence of substantial fraud in Arizona.

f.   The Defendant asserted that voting machines in various contested states had switched votes from the Defendant to Biden. The Defendant's Attorney General, Acting Attorney General, and Acting Deputy Attorney General all had explained to him that this was false, and numerous recounts and audits had confirmed the accuracy of voting machines.

### The Criminal Agreement and Acts to Effect the Object of the Conspiracy

#### The Defendant's Use of Deceit to Get State Officials to Subvert the Legitimate Election Results and Change Electoral Votes

13.   Shortly after election day—which fell on November 3, 2020—the Defendant launched his criminal scheme. On November 13, the Defendant's Campaign attorneys conceded in court that he had lost the vote count in the state of Arizona—meaning, based on the assessment the Defendant's Campaign advisors had given him just a week earlier, the Defendant had lost the election. So the next day, the Defendant turned to Co-Conspirator 1, whom he announced would spearhead his efforts going forward to challenge the election results. From that point on, the Defendant and his co-conspirators executed a strategy to use knowing deceit in the targeted states to impair, obstruct, and defeat the federal government function, including as described below.

- 9 -

*Arizona*

14.     On November 13, 2020, the Defendant had a conversation with his Campaign

Manager, who informed him that a claim that had been circulating, that a substantial number of

non-citizens had voted in Arizona, was false.

15.     On November 22, eight days before Arizona's Governor certified the ascertainment

of the state's legitimate electors based on the popular vote, the Defendant and Co-Conspirator 1

called the Speaker of the Arizona House of Representatives and made knowingly false claims of

election fraud aimed at interfering with the ascertainment of and voting by Arizona's electors, as

follows:

> a.     The Defendant and Co-Conspirator 1 falsely asserted, among other things,
> that a substantial number of non-citizens, non-residents, and dead people
> had voted fraudulently in Arizona. The Arizona House Speaker asked Co-
> Conspirator 1 for evidence of the claims, which Co-Conspirator 1 did not
> have, but claimed he would provide. Co-Conspirator 1 never did so.

> b.     The Defendant and Co-Conspirator 1 asked the Arizona House Speaker to
> call the legislature into session to hold a hearing based on their claims of
> election fraud. The Arizona House Speaker refused, stating that doing so
> would require a two-thirds vote of its members, and he would not allow it
> without actual evidence of fraud.

> c.     The Defendant and Co-Conspirator 1 asked the Arizona House Speaker to
> use the legislature to circumvent the process by which legitimate electors
> would be ascertained for Biden based on the popular vote, and replace those
> electors with a new slate for the Defendant. The Arizona House Speaker
> refused, responding that the suggestion was beyond anything he had ever
> heard or thought of as something within his authority.

16.     On December 1, Co-Conspirator 1 met with the Arizona House Speaker. When the

Arizona House Speaker again asked Co-Conspirator 1 for evidence of the outcome-determinative

election fraud he and the Defendant had been claiming, Co-Conspirator 1 responded with words

to the effect of, "We don't have the evidence, but we have lots of theories."

17.    On December 4, the Arizona House Speaker issued a public statement that said, in

part:

> No election is perfect, and if there were evidence of illegal votes or
> an improper count, then Arizona law provides a process to contest
> the election: a lawsuit under state law.  But the law does not
> authorize the Legislature to reverse the results of an election.
>
> As a conservative Republican, I don't like the results of the
> presidential election.  I voted for President Trump and worked hard
> to reelect him.  But I cannot and will not entertain a suggestion that
> we violate current law to change the outcome of a certified election.
>
> I and my fellow legislators swore an oath to support the U.S.
> Constitution and the constitution and laws of the state of Arizona.  It
> would violate that oath, the basic principles of republican
> government, and the rule of law if we attempted to nullify the
> people's vote based on unsupported theories of fraud.  Under the
> laws that we wrote and voted upon, Arizona voters choose who
> wins, and our system requires that their choice be respected.

18.    On the morning of January 4, 2021, Co-Conspirator 2 called the Arizona House

Speaker to urge him to use a majority of the legislature to decertify the state's legitimate electors.

Arizona's validly ascertained electors had voted three weeks earlier and sent their votes to

Congress, which was scheduled to count those votes in Biden's favor in just two days' time at the

January 6 certification proceeding.  When the Arizona House Speaker explained that state

investigations had uncovered no evidence of substantial fraud in the state, Co-Conspirator 2

conceded that he "[didn't] know enough about facts on the ground" in Arizona, but nonetheless

told the Arizona House Speaker to decertify and "let the courts sort it out."  The Arizona House

Speaker refused, stating that he would not "play with the oath" he had taken to uphold the United

States Constitution and Arizona law.

19.    On January 6, the Defendant publicly repeated the knowingly false claim that

36,000 non-citizens had voted in Arizona.

- 11 -

*Georgia*

20.     On November 16, 2020, on the Defendant's behalf, his executive assistant sent Co-Conspirator 3 and others a document containing bullet points critical of a certain voting machine company, writing, "See attached – Please include as is, or almost as is, in lawsuit." Co-Conspirator 3 responded nine minutes later, writing, "IT MUST GO IN ALL SUITS IN GA AND PA IMMEDIATELY WITH A FRAUD CLAIM THAT REQUIRES THE ENTIRE ELECTION TO BE SET ASIDE in those states and machines impounded for non-partisan professional inspection." On November 25, Co-Conspirator 3 filed a lawsuit against the Governor of Georgia falsely alleging "massive election fraud" accomplished through the voting machine company's election software and hardware. Before the lawsuit was even filed, the Defendant retweeted a post promoting it.     The Defendant did this despite the fact that when he had discussed Co-Conspirator 3's far-fetched public claims regarding the voting machine company in private with advisors, the Defendant had conceded that they were unsupported and that Co-Conspirator 3 sounded "crazy." Co-Conspirator 3's Georgia lawsuit was dismissed on December 7.

21.     On December 3, Co-Conspirator 1 orchestrated a presentation to a Judiciary Subcommittee of the Georgia State Senate, with the intention of misleading state senators into blocking the ascertainment of legitimate electors. During the presentation:

> a.     An agent of the Defendant and Co-Conspirator 1 falsely claimed that more than 10,000 dead people voted in Georgia. That afternoon, a Senior Advisor to the Defendant told the Defendant's Chief of Staff through text messages, "Just an FYI. [A Campaign lawyer] and his team verified that the 10k+ supposed dead people voting in GA is not accurate. . . . It was alleged in [Co-Conspirator 1's] hearing today." The Senior Advisor clarified that he believed that the actual number was 12.
>
> b.     Another agent of the Defendant and Co-Conspirator 1 played a misleading excerpt of a video recording of ballot-counting at State Farm Arena in Atlanta and insinuated that it showed election workers counting "suitcases" of illegal ballots.

- 12 -

        c.     Co-Conspirator 2 encouraged the legislators to decertify the state's legitimate electors based on false allegations of election fraud.

22.    Also on December 3, the Defendant issued a Tweet amplifying the knowingly false claims made in Co-Conspirator 1's presentation in Georgia: "Wow! Blockbuster testimony taking place right now in Georgia. Ballot stuffing by Dems when Republicans were forced to leave the large counting room. Plenty more coming, but this alone leads to an easy win of the State!"

23.    On December 4, the Georgia Secretary of State's Chief Operating Officer debunked the claims made at Co-Conspirator 1's presentation the previous day, issuing a Tweet stating, "The 90 second video of election workers at State Farm arena, purporting to show fraud was watched in its entirety (hours) by @GaSecofState investigators. Shows normal ballot processing. Here is the fact check on it." On December 7, he reiterated during a press conference that the claim that there had been misconduct at State Farm Arena was false.

24.    On December 8, the Defendant called the Georgia Attorney General to pressure him to support an election lawsuit filed in the Supreme Court by another state's attorney general. The Georgia Attorney General told the Defendant that officials had investigated various claims of election fraud in the state and were not seeing evidence to support them.

25.    Also on December 8, a Senior Campaign Advisor—who spoke with the Defendant on a daily basis and had informed him on multiple occasions that various fraud claims were untrue—expressed frustration that many of Co-Conspirator 1 and his legal team's claims could not be substantiated. As early as mid-November, for instance, the Senior Campaign Advisor had informed the Defendant that his claims of a large number of dead voters in Georgia were untrue. With respect to the persistent false claim regarding State Farm Arena, on December 8, the Senior Campaign Advisor wrote in an email, "When our research and campaign legal team can't back up any of the claims made by our Elite Strike Force Legal Team, you can see why we're 0-32 on our

- 13 -

cases. I'll obviously hustle to help on all fronts, but it's tough to own any of this when it's all just conspiracy shit beamed down from the mothership."

26.     On December 10, four days before Biden's validly ascertained electors were scheduled to cast votes and send them to Congress, Co-Conspirator 1 appeared at a hearing before the Georgia House of Representatives' Government Affairs Committee. Co-Conspirator 1 played the State Farm Arena video again, and falsely claimed that it showed "voter fraud right in front of people's eyes" and was "the tip of the iceberg." Then, he cited two election workers by name, baselessly accused them of "quite obviously surreptitiously passing around USB ports as if they are vials of heroin or cocaine," and suggested that they were criminals whose "places of work, their homes, should have been searched for evidence of ballots, for evidence of USB ports, for evidence of voter fraud." Thereafter, the two election workers received numerous death threats.

27.     On December 15, the Defendant summoned the incoming Acting Attorney General, the incoming Acting Deputy Attorney General, and others to the Oval Office to discuss allegations of election fraud. During the meeting, the Justice Department officials specifically refuted the Defendant's claims about State Farm Arena, explaining to him that the activity shown on the tape Co-Conspirator 1 had used was "benign."

28.     On December 23, a day after the Defendant's Chief of Staff personally observed the signature verification process at the Cobb County Civic Center and notified the Defendant that state election officials were "conducting themselves in an exemplary fashion" and would find fraud if it existed, the Defendant tweeted that the Georgia officials administering the signature verification process were trying to hide evidence of election fraud and were "[t]errible people!"

29.     In a phone call on December 27, the Defendant spoke with the Acting Attorney General and Acting Deputy Attorney General. During the call, the Defendant again pressed the

- 14 -

unfounded claims regarding State Farm Arena, and the two top Justice Department officials again rebutted the allegations, telling him that the Justice Department had reviewed videotape and interviewed witnesses, and had not identified any suspicious conduct.

30.    On December 31, the Defendant signed a verification affirming false election fraud allegations made on his behalf in a lawsuit filed in his name against the Georgia Governor.  In advance of the filing, Co-Conspirator 2—who was advising the Defendant on the lawsuit— acknowledged in an email that he and the Defendant had, since signing a previous verification, "been made aware that some of the allegations (and evidence proffered by the experts) has been inaccurate" and that signing a new affirmation "with that knowledge (and incorporation by reference) would not be accurate."  The Defendant and Co-Conspirator 2 caused the Defendant's signed verification to be filed nonetheless.

31.    On January 2, four days before Congress's certification proceeding, the Defendant and others called Georgia's Secretary of State.  During the call, the Defendant lied to the Georgia Secretary of State to induce him to alter Georgia's popular vote count and call into question the validity of the Biden electors' votes, which had been transmitted to Congress weeks before, including as follows:

    a.    The Defendant raised allegations regarding the State Farm Arena video and repeatedly disparaged one of the same election workers that Co-Conspirator 1 had maligned on December 10, using her name almost twenty times and falsely referring to her as "a professional vote scammer and hustler."  In response, the Georgia Secretary of State refuted this: "You're talking about the State Farm video.  And I think it's extremely unfortunate that [Co-Conspirator 1] or his people, they sliced and diced that video and took it out of context."  When the Georgia Secretary of State then offered a link to a video that would disprove Co-Conspirator 1's claims, the Defendant responded, "I don't care about a link, I don't need it. I have a much, [Georgia Secretary of State], I have a much better link."

b.  The Defendant asked about rumors that paper ballots cast in the election were being destroyed, and the Georgia Secretary of State's Counsel explained to him that the claim had been investigated and was not true.

c.  The Defendant claimed that 5,000 dead people voted in Georgia, causing the Georgia Secretary of State to respond, "Well, Mr. President, the challenge that you have is the data you have is wrong. . . . The actual number were two. Two. Two people that were dead that voted. And so [your information]'s wrong, that was two."

d.  The Defendant claimed that thousands of out-of-state voters had cast ballots in Georgia's election, which the Georgia Secretary of State's Counsel refuted, explaining, "We've been going through each of those as well, and those numbers that we got, that [Defendant's counsel] was just saying, they're not accurate. Every one we've been through are people that lived in Georgia, moved to a different state, but then moved back to Georgia legitimately . . . they moved back in years ago. This was not like something just before the election."

e.  In response to multiple other of the Defendant's allegations, the Georgia Secretary of State's Counsel told the Defendant that the Georgia Bureau of Investigation was examining all such claims and finding no merit to them.

f.  The Defendant said that he needed to "find" 11,780 votes, and insinuated that the Georgia Secretary of State and his Counsel could be subject to criminal prosecution if they failed to find election fraud as he demanded, stating, "And you are going to find that they are—which is totally illegal— it's, it's, it's more illegal for you than it is for them because you know what they did and you're not reporting it. That's a criminal, you know, that's a criminal offense. And you know, you can't let that happen. That's a big risk to you and to [the Georgia Secretary of State's Counsel], your lawyer."

32.  The next day, on January 3, the Defendant falsely claimed that the Georgia Secretary of State had not addressed the Defendant's allegations, publicly stating that the Georgia Secretary of State "was unwilling, or unable, to answer questions such as the 'ballots under table' scam, ballot destruction, out of state 'voters', dead voters, and more. He has no clue!"

33.  On January 6, the Defendant publicly repeated the knowingly false insinuation that more than 10,300 dead people had voted in Georgia.

*Michigan*

34.    On November 5, 2020, the Defendant claimed that there had been a suspicious dump of votes—purportedly illegitimate ballots—stating, "In Detroit, there were hours of unexplained delay in delivering many of the votes for counting. The final batch did not arrive until four in the morning and—even though the polls closed at eight o'clock. So they brought it in, and the batches came in, and nobody knew where they came from."

35.    On November 20, three days before Michigan's Governor signed a certificate of ascertainment notifying the federal government that, based on the popular vote, Biden's electors were to represent Michigan's voters, the Defendant held a meeting in the Oval Office with the Speaker of the Michigan House of Representatives and the Majority Leader of the Michigan Senate. In the meeting, the Defendant raised his false claim, among others, of an illegitimate vote dump in Detroit. In response, the Michigan Senate Majority Leader told the Defendant that he had lost Michigan not because of fraud, but because the Defendant had underperformed with certain voter populations in the state. Upon leaving their meeting, the Michigan House Speaker and Michigan Senate Majority Leader issued a statement reiterating this:

> The Senate and House Oversight Committees are actively engaged in a thorough review of Michigan's elections process and we have faith in the committee process to provide greater transparency and accountability to our citizens. We have not yet been made aware of any information that would change the outcome of the election in Michigan and as legislative leaders, we will follow the law and follow the normal process regarding Michigan's electors, just as we have said throughout this election.

36.    On December 1, the Defendant raised his Michigan vote dump claim with the Attorney General, who responded that what had occurred in Michigan had been the normal vote-counting process and that there was no indication of fraud in Detroit.

- 17 -

37. Despite this, the next day, the Defendant made a knowingly false statement that in Michigan, "[a]t 6:31 in the morning, a vote dump of 149,772 votes came in unexpectedly. We were winning by a lot. That batch was received in horror. Nobody knows anything about it. . . . It's corrupt. Detroit is corrupt. I have a lot of friends in Detroit. They know it. But Detroit is totally corrupt."

38. On December 4, Co-Conspirator 1 sent a text message to the Michigan House Speaker reiterating his unsupported claim of election fraud and attempting to get the Michigan House Speaker to assist in reversing the ascertainment of the legitimate Biden electors, stating, "Looks like Georgia may well hold some factual hearings and change the certification under ArtII sec 1 cl 2 of the Constitution. As [Co-Conspirator 2] explained they don't just have the right to do it but the obligation. . . . Help me get this done in Michigan."

39. Similarly, on December 7, despite still having established no fraud in Michigan, Co-Conspirator 1 sent a text intended for the Michigan Senate Majority Leader: "So I need you to pass a joint resolution from the Michigan legislature that states that, * the election is in dispute, * there's an ongoing investigation by the Legislature, and * the Electors sent by Governor Whitmer are not the official Electors of the State of Michigan and do not fall within the Safe Harbor deadline of Dec 8 under Michigan law."

40. On December 14—the day that electors in states across the country were required to vote and submit their votes to Congress—the Michigan House Speaker and Michigan Senate Majority Leader announced that, contrary to the Defendant's requests, they would not decertify the legitimate election results or electors in Michigan. The Michigan Senate Majority Leader's public statement included, "[W]e have not received evidence of fraud on a scale that would change

the outcome of the election in Michigan." The Michigan House Speaker's public statement read, in part:

> We've diligently examined these reports of fraud to the best of our ability. . . .
>
> . . . I fought hard for President Trump. Nobody wanted him to win more than me. I think he's done an incredible job. But I love our republic, too. I can't fathom risking our norms, traditions and institutions to pass a resolution retroactively changing the electors for Trump, simply because some think there may have been enough widespread fraud to give him the win. That's unprecedented for good reason. And that's why there is not enough support in the House to cast a new slate of electors. I fear we'd lose our country forever. This truly would bring mutually assured destruction for every future election in regards to the Electoral College. And I can't stand for that. I won't.

41.     On January 6, 2021, the Defendant publicly repeated his knowingly false claim regarding an illicit dump of more than a hundred thousand ballots in Detroit.

*Pennsylvania*

42.     On November 11, 2020, the Defendant publicly maligned a Philadelphia City Commissioner for stating on the news that there was no evidence of widespread fraud in Philadelphia. As a result, the Philadelphia City Commissioner and his family received death threats.

43.     On November 25, the day after Pennsylvania's Governor signed a certificate of ascertainment and thus certified to the federal government that Biden's electors were the legitimate electors for the state, Co-Conspirator 1 orchestrated an event at a hotel in Gettysburg attended by state legislators. Co-Conspirator 1 falsely claimed that Pennsylvania had issued 1.8 million absentee ballots and received 2.5 million in return. In the days thereafter, a Campaign staffer wrote internally that Co-Conspirator 1's allegation was "just wrong" and "[t]here's no way to defend it."

The Deputy Campaign Manager responded, "We have been saying this for a while. It's very frustrating."

44. On December 4, after four Republican leaders of the Pennsylvania legislature issued a public statement that the General Assembly lacked the authority to overturn the popular vote and appoint its own slate of electors, and that doing so would violate the state Election Code and Constitution, the Defendant re-tweeted a post labeling the legislators cowards.

45. On December 31 and January 3, the Defendant repeatedly raised with the Acting Attorney General and Acting Deputy Attorney General the allegation that in Pennsylvania, there had been 205,000 more votes than voters. Each time, the Justice Department officials informed the Defendant that his claim was false.

46. On January 6, 2021, the Defendant publicly repeated his knowingly false claim that there had been 205,000 more votes than voters in Pennsylvania.

*Wisconsin*

47. On November 29, 2020, a recount in Wisconsin that the Defendant's Campaign had petitioned and paid for did not change the election result, and in fact increased the Defendant's margin of defeat.

48. On December 14, the Wisconsin Supreme Court rejected an election challenge by the Campaign. One Justice wrote, "[N]othing in this case casts any legitimate doubt that the people of Wisconsin lawfully chose Vice President Biden and Senator Harris to be the next leaders of our great country."

49. On December 21, as a result of the state Supreme Court's decision, the Wisconsin Governor—who had signed a certificate of ascertainment on November 30 identifying Biden's electors as the state's legitimate electors—signed a certificate of final determination in which he

- 20 -

recognized that the state Supreme Court had resolved a controversy regarding the appointment of Biden's electors, and confirmed that Biden had received the highest number of votes in the state and that his electors were the state's legitimate electors.

50.     That same day, in response to the court decision that had prompted the Wisconsin Governor to sign a certificate of final determination, the Defendant issued a Tweet repeating his knowingly false claim of election fraud and demanding that the Wisconsin legislature overturn the election results that had led to the ascertainment of Biden's electors as the legitimate electors.

51.     On December 27, the Defendant raised with the Acting Attorney General and Acting Deputy Attorney General a specific fraud claim—that there had been more votes than voters in Wisconsin. The Acting Deputy Attorney General informed the Defendant that the claim was false.

52.     On January 6, 2021, the Defendant publicly repeated knowingly false claims that there had been tens of thousands of unlawful votes in Wisconsin.

The Defendant's Use of Dishonesty, Fraud, and Deceit to Organize Fraudulent Slates of Electors and Cause Them to Transmit False Certificates to Congress

53.     As the Defendant's attempts to obstruct the electoral vote through deceit of state officials met with repeated failure, beginning in early December 2020, he and co-conspirators developed a new plan: to marshal individuals who would have served as the Defendant's electors, had he won the popular vote, in seven targeted states—Arizona, Georgia, Michigan, Nevada, New Mexico, Pennsylvania, and Wisconsin—and cause those individuals to make and send to the Vice President and Congress false certifications that they were legitimate electors. Under the plan, the submission of these fraudulent slates would create a fake controversy at the certification proceeding and position the Vice President—presiding on January 6 as President of the Senate—

- 21 -

44

to supplant legitimate electors with the Defendant's fake electors and certify the Defendant as president.

54.     The plan capitalized on ideas presented in memoranda drafted by Co-Conspirator 5, an attorney who was assisting the Defendant's Campaign with legal efforts related to a recount in Wisconsin. The memoranda evolved over time from a legal strategy to preserve the Defendant's rights to a corrupt plan to subvert the federal government function by stopping Biden electors' votes from being counted and certified, as follows:

a.     The November 18 Memorandum ("Wisconsin Memo") advocated that, because of the ongoing recount in Wisconsin, the Defendant's electors there should meet and cast votes on December 14—the date the ECA required appointed electors to vote—to preserve the alternative of the Defendant's Wisconsin elector slate in the event the Defendant ultimately prevailed in the state.

b.     The December 6 Memorandum ("Fraudulent Elector Memo") marked a sharp departure from Co-Conspirator 5's Wisconsin Memo, advocating that the alternate electors originally conceived of to preserve rights in Wisconsin instead be used in a number of states as fraudulent electors to prevent Biden from receiving the 270 electoral votes necessary to secure the presidency on January 6. The Fraudulent Elector Memo suggested that the Defendant's electors in six purportedly "contested" states (Arizona, Georgia, Michigan, Nevada, Pennsylvania, and Wisconsin) should meet and mimic as best as possible the actions of the legitimate Biden electors, and that on January 6, the Vice President should open and count the fraudulent votes, setting up a fake controversy that would derail the proper certification of Biden as president-elect.

c.     The December 9 Memorandum ("Fraudulent Elector Instructions") consisted of Co-Conspirator 5's instructions on how fraudulent electors could mimic legitimate electors in Arizona, Georgia, Michigan, Nevada, Pennsylvania, and Wisconsin. Co-Conspirator 5 noted that in some states, it would be virtually impossible for the fraudulent electors to successfully take the same steps as the legitimate electors because state law required formal participation in the process by state officials, or access to official resources.

55.    The plan began in early December, and ultimately, the conspirators and the Defendant's Campaign took the Wisconsin Memo and expanded it to any state that the Defendant claimed was "contested"—even New Mexico, which the Defendant had lost by more than ten percent of the popular vote. This expansion was forecast by emails the Defendant's Chief of Staff sent on December 6, forwarding the Wisconsin Memo to Campaign staff and writing, "We just need to have someone coordinating the electors for states."

56.    On December 6, the Defendant and Co-Conspirator 2 called the Chairwoman of the Republican National Committee to ensure that the plan was in motion.  During the call, Co-Conspirator 2 told the Chairwoman that it was important for the RNC to help the Defendant's Campaign gather electors in targeted states, and falsely represented to her that such electors' votes would be used only if ongoing litigation in one of the states changed the results in the Defendant's favor.  After the RNC Chairwoman consulted the Campaign and heard that work on gathering electors was underway, she called and reported this information to the Defendant, who responded approvingly.

57.    On December 7, Co-Conspirator 1 received the Wisconsin Memo and the Fraudulent Elector Memo.  Co-Conspirator 1 spoke with Co-Conspirator 6 regarding attorneys who could assist in the fraudulent elector effort in the targeted states, and he received from Co-Conspirator 6 an email identifying attorneys in Arizona, Georgia, Michigan, Nevada, New Mexico, Pennsylvania, and Wisconsin.

58.    The next day, on December 8, Co-Conspirator 5 called the Arizona attorney on Co-Conspirator 6's list.  In an email after the call, the Arizona attorney recounted his conversation with Co-Conspirator 5 as follows:

> I just talked to the gentleman who did that memo, [Co-Conspirator 5]. His idea is basically that all of us (GA, WI, AZ, PA,

etc.) have our electors send in their votes (even though the votes aren't legal under federal law -- because they're not signed by the Governor); so that members of Congress can fight about whether they should be counted on January 6th. (They could potentially argue that they're not bound by federal law because they're Congress and make the law, etc.) Kind of wild/creative -- I'm happy to discuss. My comment to him was that I guess there's no harm in it, (legally at least) -- i.e. we would just be sending in "fake" electoral votes to Pence so that "someone" in Congress can make an objection when they start counting votes, and start arguing that the "fake" votes should be counted.

59.     At Co-Conspirator 1's direction, on December 10, Co-Conspirator 5 sent to points of contact in all targeted states except Wisconsin (which had already received his memos) and New Mexico a streamlined version of the Wisconsin Memo—which did not reveal the intended fraudulent use of the Defendant's electors—and the Fraudulent Elector Instructions, along with fraudulent elector certificates that he had drafted.

60.     The next day, on December 11, through Co-Conspirator 5, Co-Conspirator 1 suggested that the Arizona lawyer file a petition for certiorari in the Supreme Court as a pretext to claim that litigation was pending in the state, to provide cover for the convening and voting of the Defendant's fraudulent electors there.  Co-Conspirator 5 explained that Co-Conspirator 1 had heard from a state official and state provisional elector that "it could appear **treasonous** for the AZ electors to vote on Monday if there is no pending court proceeding . . . ."

61.     To manage the plan in Pennsylvania, on December 12, Co-Conspirator 1, Co-Conspirator 5, and Co-Conspirator 6 participated in a conference call organized by the Defendant's Campaign with the Defendant's electors in that state.  When the Defendant's electors expressed concern about signing certificates representing themselves as legitimate electors, Co-Conspirator 1 falsely assured them that their certificates would be used only if the Defendant succeeded in litigation.  Subsequently, Co-Conspirator 6 circulated proposed conditional language to that effect

for potential inclusion in the fraudulent elector certificates. A Campaign official cautioned not to offer the conditional language to other states because "[t]he other States are signing what he prepared – if it gets out we changed the language for PA it could snowball." In some cases, the Defendant's electors refused to participate in the plan.

62.     On December 13, Co-Conspirator 5 sent Co-Conspirator 1 an email memorandum that further confirmed that the conspirators' plan was not to use the fraudulent electors only in the circumstance that the Defendant's litigation was successful in one of the targeted states—instead, the plan was to falsely present the fraudulent slates as an alternative to the legitimate slates at Congress's certification proceeding.

63.     On December 13, the Defendant asked the Senior Campaign Advisor for an update on "what was going on" with the elector plan and directed him to "put out [a] statement on electors." As a result, Co-Conspirator 1 directed the Senior Campaign Advisor to join a conference call with him, Co-Conspirator 6, and others. When the Senior Campaign Advisor related these developments in text messages to the Deputy Campaign Manager, a Senior Advisor to the Defendant, and a Campaign staffer, the Deputy Campaign Manager responded, "Here's the thing the way this has morphed it's a crazy play so I don't know who wants to put their name on it." The Senior Advisor wrote, "Certifying illegal votes." In turn, the participants in the group text message refused to have a statement regarding electors attributed to their names because none of them could "stand by it."

64.     Also on December 13, at a Campaign staffer's request, Co-Conspirator 5 drafted and sent fraudulent elector certificates for the Defendant's electors in New Mexico, which had not previously been among the targeted states, and where there was no pending litigation on the Defendant's behalf. The next day, the Defendant's Campaign filed an election challenge suit in

New Mexico at 11:54 a.m., six minutes before the noon deadline for the electors' votes, as a pretext so that there was pending litigation there at the time the fraudulent electors voted.

65.     On December 14, the legitimate electors of all 50 states and the District of Columbia met in their respective jurisdictions to formally cast their votes for president, resulting in a total of 232 electoral votes for the Defendant and 306 for Biden. The legitimate electoral votes that Biden won in the states that the Defendant targeted, and the Defendant's margin of defeat, were as follows: Arizona (11 electoral votes; 10,457 votes), Georgia (16 electoral votes; 11,779 votes), Michigan (16 electoral votes; 154,188 votes), Nevada (6 electoral votes; 33,596 votes), New Mexico (5 electoral votes; 99,720 votes), Pennsylvania (20 electoral votes; 80,555 votes), and Wisconsin (10 electoral votes; 20,682 votes).

66.     On the same day, at the direction of the Defendant and Co-Conspirator 1, fraudulent electors convened sham proceedings in the seven targeted states to cast fraudulent electoral ballots in favor of the Defendant. In some states, in order to satisfy legal requirements set forth for legitimate electors under state law, state officials were enlisted to provide the fraudulent electors access to state capitol buildings so that they could gather and vote there. In many cases, however, as Co-Conspirator 5 had predicted in the Fraudulent Elector Instructions, the fraudulent electors were unable to satisfy the legal requirements.

67.     Nonetheless, as directed in the Fraudulent Elector Instructions, shortly after the fraudulent electors met on December 14, the targeted states' fraudulent elector certificates were mailed to the President of the Senate, the Archivist of the United States, and others. The Defendant and co-conspirators ultimately used the certificates of these fraudulent electors to deceitfully target the government function, and did so contrary to how fraudulent electors were told they would be used.

68. Unlike those of the fraudulent electors, consistent with the ECA, the legitimate electors' signed certificates were annexed to the state executives' certificates of ascertainment before being sent to the President of the Senate and others.

69. That evening, at 6:26 p.m., the RNC Chairwoman forwarded to the Defendant, through his executive assistant, an email titled, "Electors Recap – Final," which represented that in "Six Contested States"—Arizona, Georgia, Michigan, Nevada, Pennsylvania, and Wisconsin—the Defendant's electors had voted in parallel to Biden's electors. The Defendant's executive assistant responded, "It's in front of him!"

The Defendant's Attempt to Leverage the Justice Department to Use Deceit to Get
State Officials to Replace Legitimate Electors and Electoral Votes with the Defendant's

70. In late December 2020, the Defendant attempted to use the Justice Department to make knowingly false claims of election fraud to officials in the targeted states through a formal letter under the Acting Attorney General's signature, thus giving the Defendant's lies the backing of the federal government and attempting to improperly influence the targeted states to replace legitimate Biden electors with the Defendant's.

71. On December 22, the Defendant met with Co-Conspirator 4 at the White House. Co-Conspirator 4 had not informed his leadership at the Justice Department of the meeting, which was a violation of the Justice Department's written policy restricting contacts with the White House to guard against improper political influence.

72. On December 26, Co-Conspirator 4 spoke on the phone with the Acting Attorney General and lied about the circumstances of his meeting with the Defendant at the White House, falsely claiming that the meeting had been unplanned. The Acting Attorney General directed Co-Conspirator 4 not to have unauthorized contacts with the White House again, and Co-Conspirator 4 said he would not.

73. The next morning, on December 27, contrary to the Acting Attorney General's direction, Co-Conspirator 4 spoke with the Defendant on the Defendant's cell phone for nearly three minutes.

74. That afternoon, the Defendant called the Acting Attorney General and Acting Deputy Attorney General and said, among other things, "People tell me [Co-Conspirator 4] is great. I should put him in." The Defendant also raised multiple false claims of election fraud, which the Acting Attorney General and Acting Deputy Attorney General refuted. When the Acting Attorney General told the Defendant that the Justice Department could not and would not change the outcome of the election, the Defendant responded, "Just say that the election was corrupt and leave the rest to me and the Republican congressmen."

75. On December 28, Co-Conspirator 4 sent a draft letter to the Acting Attorney General and Acting Deputy Attorney General, which he proposed they all sign. The draft was addressed to state officials in Georgia, and Co-Conspirator 4 proposed sending versions of the letter to elected officials in other targeted states. The proposed letter contained numerous knowingly false claims about the election and the Justice Department, including that:

    a. The Justice Department had "identified significant concerns that may have impacted the outcome of the election in multiple States[.]"

    b. The Justice Department believed that in Georgia and other states, two valid slates of electors had gathered at the proper location on December 14, and that both sets of ballots had been transmitted to Congress. That is, Co-Conspirator 4's letter sought to advance the Defendant's fraudulent elector plan by using the authority of the Justice Department to falsely present the fraudulent electors as a valid alternative to the legitimate electors.

    c. The Justice Department urged that the state legislature convene a special legislative session to create the opportunity to, among other things, choose the fraudulent electors over the legitimate electors.

- 28 -

76.     The Acting Deputy Attorney General promptly responded to Co-Conspirator 4 by email and told him that his proposed letter was false, writing, "Despite dramatic claims to the contrary, we have not seen the type of fraud that calls into question the reported (and certified) results of the election." In a meeting shortly thereafter, the Acting Attorney General and Acting Deputy Attorney General again directed Co-Conspirator 4 not to have unauthorized contact with the White House.

77.     On December 31, the Defendant summoned to the Oval Office the Acting Attorney General, Acting Deputy Attorney General, and other advisors. In the meeting, the Defendant again raised claims about election fraud that Justice Department officials already had told him were not true—and that the senior Justice Department officials reiterated were false—and suggested he might change the leadership in the Justice Department.

78.     On January 2, 2021, just four days before Congress's certification proceeding, Co-Conspirator 4 tried to coerce the Acting Attorney General and Acting Deputy Attorney General to sign and send Co-Conspirator 4's draft letter, which contained false statements, to state officials. He told them that the Defendant was considering making Co-Conspirator 4 the new Acting Attorney General, but that Co-Conspirator 4 would decline the Defendant's offer if the Acting Attorney General and Acting Deputy Attorney General would agree to send the proposed letter to the targeted states. The Justice Department officials refused.

79.     The next morning, on January 3, despite having uncovered no additional evidence of election fraud, Co-Conspirator 4 sent to a Justice Department colleague an edited version of his draft letter to the states, which included a change from its previous claim that the Justice Department had "concerns" to a stronger false claim that "[a]s of today, there is evidence of

- 29 -

52

significant irregularities that may have impacted the outcome of the election in multiple
States . . . ."

80. Also on the morning of January 3, Co-Conspirator 4 met with the Defendant at the
White House—again without having informed senior Justice Department officials—and accepted
the Defendant's offer that he become Acting Attorney General.

81. On the afternoon of January 3, Co-Conspirator 4 spoke with a Deputy White House
Counsel. The previous month, the Deputy White House Counsel had informed the Defendant that
"there is no world, there is no option in which you do not leave the White House [o]n
January 20th." Now, the same Deputy White House Counsel tried to dissuade Co-Conspirator 4
from assuming the role of Acting Attorney General. The Deputy White House Counsel reiterated
to Co-Conspirator 4 that there had not been outcome-determinative fraud in the election and that
if the Defendant remained in office nonetheless, there would be "riots in every major city in the
United States." Co-Conspirator 4 responded, "Well, [Deputy White House Counsel], that's why
there's an Insurrection Act."

82. Also that afternoon, Co-Conspirator 4 met with the Acting Attorney General and
told him that the Defendant had decided to put Co-Conspirator 4 in charge of the Justice
Department. The Acting Attorney General responded that he would not accept being fired by a
subordinate and immediately scheduled a meeting with the Defendant for that evening.

83. On the evening of January 3, the Defendant met for a briefing on an overseas
national security issue with the Chairman of the Joint Chiefs of Staff and other senior national
security advisors. The Chairman briefed the Defendant on the issue—which had previously arisen
in December—as well as possible ways the Defendant could handle it. When the Chairman and
another advisor recommended that the Defendant take no action because Inauguration Day was

- 30 -

only seventeen days away and any course of action could trigger something unhelpful, the Defendant calmly agreed, stating, "Yeah, you're right, it's too late for us. We're going to give that to the next guy."

84. The Defendant moved immediately from this national security briefing to the meeting that the Acting Attorney General had requested earlier that day, which included Co-Conspirator 4, the Acting Attorney General, the Acting Deputy Attorney General, the Justice Department's Assistant Attorney General for the Office of Legal Counsel, the White House Counsel, a Deputy White House Counsel, and a Senior Advisor. At the meeting, the Defendant expressed frustration with the Acting Attorney General for failing to do anything to overturn the election results, and the group discussed Co-Conspirator 4's plans to investigate purported election fraud and to send his proposed letter to state officials—a copy of which was provided to the Defendant during the meeting. The Defendant relented in his plan to replace the Acting Attorney General with Co-Conspirator 4 only when he was told that it would result in mass resignations at the Justice Department and of his own White House Counsel.

85. At the meeting in the Oval Office on the night of January 3, Co-Conspirator 4 suggested that the Justice Department should opine that the Vice President could exceed his lawful authority during the certification proceeding and change the election outcome. When the Assistant Attorney General for the Office of Legal Counsel began to explain why the Justice Department should not do so, the Defendant said, "No one here should be talking to the Vice President. I'm talking to the Vice President," and ended the discussion.

The Defendant's Attempts to Enlist the Vice President to Fraudulently Alter the
Election Results at the January 6 Certification Proceeding

86.     As the January 6 congressional certification proceeding approached and other

efforts to impair, obstruct, and defeat the federal government function failed, the Defendant sought

to enlist the Vice President to use his ceremonial role at the certification to fraudulently alter the

election results.  The Defendant did this first by using knowingly false claims of election fraud to

convince the Vice President to accept the Defendant's fraudulent electors, reject legitimate

electoral votes, or send legitimate electoral votes to state legislatures for review rather than count

them. When that failed, the Defendant attempted to use a crowd of supporters that he had gathered

in Washington, D.C., to pressure the Vice President to fraudulently alter the election results.

87.     On December 19, 2020, after cultivating widespread anger and resentment for

weeks with his knowingly false claims of election fraud, the Defendant urged his supporters to

travel to Washington on the day of the certification proceeding, tweeting, "Big protest in D.C. on

January 6th.  Be there, will be wild!"  Throughout late December, he repeatedly urged his

supporters to come to Washington for January 6.

88.     On December 23, the Defendant re-tweeted a memo titled "Operation 'PENCE'

CARD," which falsely asserted that the Vice President could, among other things, unilaterally

disqualify legitimate electors from six targeted states.

89.     On the same day, Co-Conspirator 2 circulated a two-page memorandum outlining

a plan for the Vice President to unlawfully declare the Defendant the certified winner of the

presidential election.  In the memorandum, Co-Conspirator 2 claimed that seven states had

transmitted two slates of electors and proposed that the Vice President announce that "because of

the ongoing disputes in the 7 States, there are no electors that can be deemed validly appointed in

those States."  Next, Co-Conspirator 2 proposed steps that he acknowledged violated the ECA,

- 32 -

advocating that, in the end, "Pence then gavels President Trump as re-elected." Just two months

earlier, on October 11, Co-Conspirator 2 had taken the opposite position, writing that neither the

Constitution nor the ECA provided the Vice President discretion in the counting of electoral votes,

or permitted him to "make the determination on his own."

90.     On several private phone calls in late December and early January, the Defendant

repeated knowingly false claims of election fraud and directly pressured the Vice President to use

his ceremonial role at the certification proceeding on January 6 to fraudulently overturn the results

of the election, and the Vice President resisted, including:

> a.      On December 25, when the Vice President called the Defendant to wish him
> a Merry Christmas, the Defendant quickly turned the conversation to
> January 6 and his request that the Vice President reject electoral votes that
> day. The Vice President pushed back, telling the Defendant, as the Vice
> President already had in previous conversations, "You know I don't think I
> have the authority to change the outcome."

> b.      On December 29, as reflected in the Vice President's contemporaneous
> notes, the Defendant falsely told the Vice President that the "Justice Dept
> [was] finding major infractions."

> c.      On January 1, the Defendant called the Vice President and berated him
> because he had learned that the Vice President had opposed a lawsuit
> seeking a judicial decision that, at the certification, the Vice President had
> the authority to reject or return votes to the states under the Constitution.
> The Vice President responded that he thought there was no constitutional
> basis for such authority and that it was improper. In response, the Defendant
> told the Vice President, "You're too honest." Within hours of the
> conversation, the Defendant reminded his supporters to meet in Washington
> before the certification proceeding, tweeting, "The BIG Protest Rally in
> Washington, D.C., will take place at 11.00 A.M. on January 6th. Locational
> details to follow. StopTheSteal!"

> d.      On January 3, the Defendant again told the Vice President that at the
> certification proceeding, the Vice President had the absolute right to reject
> electoral votes and the ability to overturn the election. The Vice President
> responded that he had no such authority, and that a federal appeals court
> had rejected the lawsuit making that claim the previous day.

91.     On January 3, Co-Conspirator 2 circulated a second memorandum that included a new plan under which, contrary to the ECA, the Vice President would send the elector slates to the state legislatures to determine which slate to count.

92.     On January 4, the Defendant held a meeting with Co-Conspirator 2, the Vice President, the Vice President's Chief of Staff, and the Vice President's Counsel for the purpose of convincing the Vice President, based on the Defendant's knowingly false claims of election fraud, that the Vice President should reject or send to the states Biden's legitimate electoral votes, rather than count them. The Defendant deliberately excluded his White House Counsel from the meeting because the White House Counsel previously had pushed back on the Defendant's false claims of election fraud.

93.     During the meeting, as reflected in the Vice President's contemporaneous notes, the Defendant made knowingly false claims of election fraud, including, "Bottom line—won every state by 100,000s of votes" and "We won every state," and asked—regarding a claim his senior Justice Department officials previously had told him was false, including as recently as the night before—"What about 205,000 votes more in PA than voters?" The Defendant and Co-Conspirator 2 then asked the Vice President to either unilaterally reject the legitimate electors from the seven targeted states, or send the question of which slate was legitimate to the targeted states' legislatures. When the Vice President challenged Co-Conspirator 2 on whether the proposal to return the question to the states was defensible, Co-Conspirator 2 responded, "Well, nobody's tested it before." The Vice President then told the Defendant, "Did you hear that? Even your own counsel is not saying I have that authority." The Defendant responded, "That's okay, I prefer the other suggestion" of the Vice President rejecting the electors unilaterally.

- 34 -

94.     Also on January 4, when Co-Conspirator 2 acknowledged to the Defendant's Senior

Advisor that no court would support his proposal, the Senior Advisor told Co-Conspirator 2,

"[Y]ou're going to cause riots in the streets." Co-Conspirator 2 responded that there had

previously been points in the nation's history where violence was necessary to protect the republic.

After that conversation, the Senior Advisor notified the Defendant that Co-Conspirator 2 had

conceded that his plan was "not going to work."

95.     On the morning of January 5, at the Defendant's direction, the Vice President's

Chief of Staff and the Vice President's Counsel met again with Co-Conspirator 2.   Co-

Conspirator 2 now advocated that the Vice President do what the Defendant had said he preferred

the day before: unilaterally reject electors from the targeted states.  During this meeting, Co-

Conspirator 2 privately acknowledged to the Vice President's Counsel that he hoped to prevent

judicial review of his proposal because he understood that it would be unanimously rejected by

the Supreme Court. The Vice President's Counsel expressed to Co-Conspirator 2 that following

through with the proposal would result in a "disastrous situation" where the election might "have

to be decided in the streets."

96.     That same day, the Defendant encouraged supporters to travel to Washington on

January 6, and he set the false expectation that the Vice President had the authority to and might

use his ceremonial role at the certification proceeding to reverse the election outcome in the

Defendant's favor, including issuing the following Tweets:

     a.      At 11:06 a.m., "The Vice President has the power to reject fraudulently
                chosen electors." This was within 40 minutes of the Defendant's earlier
                reminder, "See you in D.C."

     b.      At 5:05 p.m., "Washington is being inundated with people who don't want
                to see an election victory stolen . . . . Our Country has had enough, they
                won't take it anymore!  We hear you (and love you) from the Oval Office."

- 35 -

        c.      At 5:43 p.m., "I will be speaking at the SAVE AMERICA RALLY tomorrow on the Ellipse at 11AM Eastern. Arrive early — doors open at 7AM Eastern. BIG CROWDS!"

97.     Also on January 5, the Defendant met alone with the Vice President. When the Vice President refused to agree to the Defendant's request that he obstruct the certification, the Defendant grew frustrated and told the Vice President that the Defendant would have to publicly criticize him. Upon learning of this, the Vice President's Chief of Staff was concerned for the Vice President's safety and alerted the head of the Vice President's Secret Service detail.

98.     As crowds began to gather in Washington and were audible from the Oval Office, the Defendant remarked to advisors that the crowd the following day on January 6 was going to be "angry."

99.     That night, the Defendant approved and caused the Defendant's Campaign to issue a public statement that the Defendant knew, from his meeting with the Vice President only hours earlier, was false: "The Vice President and I are in total agreement that the Vice President has the power to act."

100.    On January 6, starting in the early morning hours, the Defendant again turned to knowingly false statements aimed at pressuring the Vice President to fraudulently alter the election outcome, and raised publicly the false expectation that the Vice President might do so:

        a.      At 1:00 a.m., the Defendant issued a Tweet that falsely claimed, "If Vice President @Mike_Pence comes through for us, we will win the Presidency. Many States want to decertify the mistake they made in certifying incorrect & even fraudulent numbers in a process NOT approved by their State Legislatures (which it must be). Mike can send it back!"

        b.      At 8:17 a.m., the Defendant issued a Tweet that falsely stated, "States want to correct their votes, which they now know were based on irregularities and fraud, plus corrupt process never received legislative approval. All Mike Pence has to do is send them back to the States, AND WE WIN. Do it Mike, this is a time for extreme courage!"

- 36 -

101.   On the morning of January 6, an agent of the Defendant contacted a United States Senator to ask him to hand-deliver documents to the Vice President. The agent then facilitated the receipt by the Senator's staff of the fraudulent certificates signed by the Defendant's fraudulent electors in Michigan and Wisconsin, which were believed not to have been delivered to the Vice President or Archivist by mail. When one of the Senator's staffers contacted a staffer for the Vice President by text message to arrange for delivery of what the Senator's staffer had been told were "[a]lternate slate[s] of electors for MI and WI because archivist didn't receive them," the Vice President's staffer rejected them.

102.   At 11:15 a.m., the Defendant called the Vice President and again pressured him to fraudulently reject or return Biden's legitimate electoral votes. The Vice President again refused. Immediately after the call, the Defendant decided to single out the Vice President in public remarks he would make within the hour, reinserting language that he had personally drafted earlier that morning—falsely claiming that the Vice President had authority to send electoral votes to the states—but that advisors had previously successfully advocated be removed.

103.   Earlier that morning, the Defendant had selected Co-Conspirator 2 to join Co-Conspirator 1 in giving public remarks before his own. When they did so, based on knowingly false election fraud claims, Co-Conspirator 1 and Co-Conspirator 2 intensified pressure on the Vice President to fraudulently obstruct the certification proceeding:

> a.   Co-Conspirator 1 told the crowd that the Vice President could "cast [the ECA] aside" and unilaterally "decide on the validity of these crooked ballots[.]" He also lied when he claimed to "have letters from five legislatures begging us" to send elector slates to the legislatures for review, and called for "trial by combat."
>
> b.   Co-Conspirator 2 told the crowd, "[A]ll we are demanding of Vice President Pence is this afternoon at one o'clock he let the legislatures of the state look into this so we get to the bottom of it and the American people know whether we have control of the direction of our government or not. We no

- 37 -

longer live in a self-governing republic if we can't get the answer to this
question."

104.    Next, beginning at 11:56 a.m., the Defendant made multiple knowingly false
statements integral to his criminal plans to defeat the federal government function, obstruct the
certification, and interfere with others' right to vote and have their votes counted. The Defendant
repeated false claims of election fraud, gave false hope that the Vice President might change the
election outcome, and directed the crowd in front of him to go to the Capitol as a means to obstruct
the certification and pressure the Vice President to fraudulently obstruct the certification. The
Defendant's knowingly false statements for these purposes included:

    a.    The Defendant falsely claimed that, based on fraud, the Vice President
could alter the outcome of the election results, stating:

> I hope Mike is going to do the right thing. I hope so.
> I hope so.
>
> Because if Mike Pence does the right thing, we win
> the election. All he has to do—all, this is, this is from
> the number one, or certainly one of the top,
> Constitutional lawyers in our country—he has the
> absolute right to do it. We're supposed to protect our
> country, support our country, support our
> Constitution, and protect our Constitution.
>
> States want to revote. The states got defrauded.
> They were given false information. They voted on
> it. Now they want to recertify. They want it back.
> All Vice President Pence has to do is send it back to
> the states to recertify and we become president and
> you are the happiest people.

    b.    After the Defendant falsely stated that the Pennsylvania legislature wanted
"to recertify their votes. They want to recertify. But the only way that can
happen is if Mike Pence agrees to send it back," the crowd began to chant,
"Send it back."

- 38 -

      c.     The Defendant also said that regular rules no longer applied, stating, "And fraud breaks up everything, doesn't it? When you catch somebody in a fraud, you're allowed to go by very different rules."

      d.     Finally, after exhorting that "we fight. We fight like hell. And if you don't fight like hell, you're not going to have a country anymore," the Defendant directed the people in front of him to head to the Capitol, suggested he was going with them, and told them to give Members of Congress "the kind of pride and boldness that they need to take back our country."

105.     During and after the Defendant's remarks, thousands of people marched toward the Capitol.

### The Defendant's Exploitation of the Violence and Chaos at the Capitol

106.     Shortly before 1:00 p.m., the Vice President issued a public statement explaining that his role as President of the Senate at the certification proceeding that was about to begin did not include "unilateral authority to determine which electoral votes should be counted and which should not."

107.     Before the Defendant had finished speaking, a crowd began to gather at the Capitol. Thereafter, a mass of people—including individuals who had traveled to Washington and to the Capitol at the Defendant's direction—broke through barriers cordoning off the Capitol grounds and advanced on the building, including by violently attacking law enforcement officers trying to secure it.

108.     The Defendant, who had returned to the White House after concluding his remarks, watched events at the Capitol unfold on the television in the dining room next to the Oval Office.

109.     At 2:13 p.m., after more than an hour of steady, violent advancement, the crowd at the Capitol broke into the building.

110.     Upon receiving news that individuals had breached the Capitol, the Defendant's advisors told him that there was a riot there and that rioters had breached the building. When

- 39 -

advisors urged the Defendant to issue a calming message aimed at the rioters, the Defendant refused, instead repeatedly remarking that the people at the Capitol were angry because the election had been stolen.

111.    At 2:24 p.m., after advisors had left the Defendant alone in his dining room, the Defendant issued a Tweet intended to further delay and obstruct the certification: "Mike Pence didn't have the courage to do what should have been done to protect our Country and our Constitution, giving States a chance to certify a corrected set of facts, not the fraudulent or inaccurate ones which they were asked to previously certify. USA demands the truth!"

112.    One minute later, at 2:25 p.m., the United States Secret Service was forced to evacuate the Vice President to a secure location.

113.    At the Capitol, throughout the afternoon, members of the crowd chanted, "Hang Mike Pence!"; "Where is Pence?  Bring him out!"; and "Traitor Pence!"

114.    The Defendant repeatedly refused to approve a message directing rioters to leave the Capitol, as urged by his most senior advisors—including the White House Counsel, a Deputy White House Counsel, the Chief of Staff, a Deputy Chief of Staff, and a Senior Advisor.  Instead, the Defendant issued two Tweets that did not ask rioters to leave the Capitol but instead falsely suggested that the crowd at the Capitol was being peaceful, including:

> a.    At 2:38 p.m., "Please support our Capitol Police and Law Enforcement. They are truly on the side of our Country.  Stay peaceful!"
>
> b.    At 3:13 p.m., "I am asking for everyone at the U.S. Capitol to remain peaceful.  No violence!  Remember, WE are the Party of Law & Order – respect the Law and our great men and women in Blue.  Thank you!"

115.    At 3:00 p.m., the Defendant had a phone call with the Minority Leader of the United States House of Representatives.  The Defendant told the Minority Leader that the crowd at the Capitol was more upset about the election than the Minority Leader was.

116.    At 4:17 p.m., the Defendant released a video message on Twitter that he had just taped in the White House Rose Garden. In it, the Defendant repeated the knowingly false claim that "[w]e had an election that was stolen from us," and finally asked individuals to leave the Capitol, while telling them that they were "very special" and that "we love you."

117.    After the 4:17 p.m. Tweet, as the Defendant joined others in the outer Oval Office to watch the attack on the Capitol on television, the Defendant said, "See, this is what happens when they try to steal an election. These people are angry. These people are really angry about it. This is what happens."

118.    At 6:01 p.m., the Defendant tweeted, "These are the things and events that happen when a sacred landslide election victory is so unceremoniously & viciously stripped away from great patriots who have been badly & unfairly treated for so long. Go home with love & in peace. Remember this day forever!"

119.    On the evening of January 6, the Defendant and Co-Conspirator 1 attempted to exploit the violence and chaos at the Capitol by calling lawmakers to convince them, based on knowingly false claims of election fraud, to delay the certification, including:

        a.    The Defendant, through White House aides, attempted to reach two United States Senators at 6:00 p.m.

        b.    From 6:59 p.m. until 7:18 p.m., Co-Conspirator 1 placed calls to five United States Senators and one United States Representative.

        c.    Co-Conspirator 6 attempted to confirm phone numbers for six United States Senators whom the Defendant had directed Co-Conspirator 1 to call and attempt to enlist in further delaying the certification.

        d.    In one of the calls, Co-Conspirator 1 left a voicemail intended for a United States Senator that said, "We need you, our Republican friends, to try to just slow it down so we can get these legislatures to get more information to you. And I know they're reconvening at eight tonight but the only strategy we can follow is to object to numerous states and raise issues so that we get ourselves into tomorrow—ideally until the end of tomorrow."

e. In another message intended for another United States Senator, Co-Conspirator 1 repeated knowingly false allegations of election fraud, including that the vote counts certified by the states to Congress were incorrect and that the governors who had certified knew they were incorrect; that "illegal immigrants" had voted in substantial numbers in Arizona; and that "Georgia gave you a number in which 65,000 people who were underage voted." Co-Conspirator 1 also claimed that the Vice President's actions had been surprising and asked the Senator to "object to every state and kind of spread this out a little bit like a filibuster[.]"

120.  At 7:01 p.m., while Co-Conspirator 1 was calling United States Senators on behalf of the Defendant, the White House Counsel called the Defendant to ask him to withdraw any objections and allow the certification. The Defendant refused.

121.  The attack on the Capitol obstructed and delayed the certification for approximately six hours, until the Senate and House of Representatives came back into session separately at 8:06 p.m. and 9:02 p.m., respectively, and came together in a Joint Session at 11:35 p.m.

122.  At 11:44 p.m., Co-Conspirator 2 emailed the Vice President's Counsel advocating that the Vice President violate the law and seek further delay of the certification. Co-Conspirator 2 wrote, "I implore you to consider one more relatively minor violation [of the ECA] and adjourn for 10 days to allow the legislatures to finish their investigations, as well as to allow a full forensic audit of the massive amount of illegal activity that has occurred here."

123.  At 3:41 a.m. on January 7, as President of the Senate, the Vice President announced the certified results of the 2020 presidential election in favor of Biden.

124.  The Defendant and his co-conspirators committed one or more of the acts to effect the object of the conspiracy alleged above in Paragraphs 13, 15-16, 18-22, 24, 26, 28, 30-33, 35, 37-39, 41, 43-44, 46, 50, 52, 54, 56, 57-64, 67, 71-75, 78-82, 84, 85, 87-97, 99-100, 102-104, 111, 114, 116, 118-119, and 122.

(In violation of Title 18, United States Code, Section 371)

- 42 -

## COUNT TWO
### (Conspiracy to Obstruct an Official Proceeding—18 U.S.C. § 1512(k))

125.    The allegations contained in paragraphs 1 through 4 and 8 through 123 of this Indictment are re-alleged and fully incorporated here by reference.

126.    From on or about November 14, 2020, through on or about January 7, 2021, in the District of Columbia and elsewhere, the Defendant,

### DONALD J. TRUMP,

did knowingly combine, conspire, confederate, and agree with co-conspirators, known and unknown to the Grand Jury, to corruptly obstruct and impede an official proceeding, that is, the certification of the electoral vote, in violation of Title 18, United States Code, Section 1512(c)(2).

(In violation of Title 18, United States Code, Section 1512(k))

**COUNT THREE**
**(Obstruction of, and Attempt to Obstruct, an Official**
**Proceeding—18 U.S.C. §§ 1512(c)(2), 2)**

127.    The allegations contained in paragraphs 1 through 4 and 8 through 123 of this

Indictment are re-alleged and fully incorporated here by reference.

128.    From on or about November 14, 2020, through on or about January 7, 2021, in the

District of Columbia and elsewhere, the Defendant,

**DONALD J. TRUMP,**

attempted to, and did, corruptly obstruct and impede an official proceeding, that is, the certification

of the electoral vote.

(In violation of Title 18, United States Code, Sections 1512(c)(2), 2)

- 44 -

## COUNT FOUR
### (Conspiracy Against Rights—18 U.S.C. § 241)

129.    The allegations contained in paragraphs 1 through 4 and 8 through 123 of this Indictment are re-alleged and fully incorporated here by reference.

130.    From on or about November 14, 2020, through on or about January 20, 2021, in the District of Columbia and elsewhere, the Defendant,

### DONALD J. TRUMP,

did knowingly combine, conspire, confederate, and agree with co-conspirators, known and unknown to the Grand Jury, to injure, oppress, threaten, and intimidate one or more persons in the free exercise and enjoyment of a right and privilege secured to them by the Constitution and laws of the United States—that is, the right to vote, and to have one's vote counted.

(In violation of Title 18, United States Code, Section 241)

A TRUE BILL

FOREPERSON

_____

JACK SMITH
SPECIAL COUNSEL
UNITED STATES DEPARTMENT OF JUSTICE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| | : | |
| UNITED STATES OF AMERICA | : | |
| | : | No. 23-cr-257-TSC |
| | : | |
| v. | : | |
| | : | |
| DONALD J. TRUMP, | : | |
| | : | |
| Defendant. | : | |
| | : | |

## RESPONSE IN OPPOSITION TO
## GOVERNMENT'S PROPOSED TRIAL CALENDAR

President Donald J. Trump, through counsel, submits this response in opposition to the government's proposed trial calendar, Doc. 23, and respectfully requests the Court place this case on the April 2026 trial calendar. In support, President Trump states as follows:

### INTRODUCTION

"The prompt disposition of criminal cases is to be commended and encouraged. But in reaching that result a defendant, charged with a serious crime, must not be stripped of his right to have sufficient time to advise with counsel and prepare his defense. To do that is not to proceed promptly in the calm spirit of regulated justice but to go forward with the haste of the mob." *Powell v. State of Ala.*, 287 U.S. 45, 59 (1932).

This is an unprecedented case in American history. The incumbent administration has targeted its primary political opponent—and leading candidate in the upcoming presidential election—with criminal prosecution. The administration has devoted tens of millions of dollars to this effort, creating a special counsel's office with dozens of employees, many of whom are apparently assigned full-time to this case and this case alone.

1

Taking full advantage of the administration's blank check,[1] the government spent over two-and-a-half years investigating this matter. It, among other things, interviewed and subpoenaed hundreds of witnesses, executed over 40 search warrants, and compiled information from countless individual sources. The government included some, but not all, of these materials in a massive, 8.5-terabyte initial production, totaling over 11.5 million pages, together with native files, recordings, and other electronic data not amenable to pagination.

In this District, ordinary order when faced with such overwhelming discovery is to set a reasonable trial schedule, commensurate with the size and scope of discovery and complexity of the legal issues. The government rejects this sensible approach. Instead, it seeks a trial calendar more rapid than most no-document misdemeanors, requesting just four months from the beginning of discovery to jury selection. The government's objective is clear: to deny President Trump and his counsel a fair ability to prepare for trial. The Court should deny the government's request.

The public interest lies in justice and fair trial, not a rush to judgment. Moreover, if the rights to due process and counsel are to mean anything, a defendant must have adequate time to defend himself. The Speedy Trial Act embraces these considerations and so, too, should the Court.

Accordingly, President Trump respectfully requests the Court schedule this case to begin on the April 2026 trial calendar, with the following interim control dates:

- Week of December 4, 2023: Discovery Status Conference and Motions Hearing
- Week of April 15, 2024: Discovery Status Conference and Motions Hearing
- Week of August 5, 2024: Discovery Status Conference and Motions Hearing
- August 1, 2024: Rule 12 and Other Dispositive Motions Due
- August 22, 2024: Oppositions to Rule 12 and Other Dispositive Motions Due

---

[1] *See* U.S. Department of Justice, *Special Counsel's Office – Smith Statement of Expenditures November 18, 2022 through March 31, 2023*, (reporting approximately $5.4 million in direct expenditures and an additional $3.8 million "DOJ component expenses," through March 31, 2023 only, the majority of which relate to salaries and benefits).

2

- September 5, 2024: Replies in Support of Rule 12 and Other Dispositive Motions Due
- Week of December 2, 2024: Discovery Status Conference and Motions Hearing
- Week of April 7, 2025: Discovery Status Conference and Motions Hearing
- Week of August 4, 2025: Discovery Status Conference and Motions Hearing
- Week of December 1, 2025: Discovery Status Conference and Motions Hearing
- January 29, 2026: Motions *in Limine* Due
- February 12, 2026: Oppositions to Motions *in Limine* Due
- February 19, 2026: Replies in Support of Motions *in Limine* Due
- Week of March 2, 2026: Motions Hearing
- Week of March 23, 2026: Final Pretrial Conference
- April 2026: Jury Selection and Trial[2]

This more reasonable schedule—equal to the government's time spent investigating—will allow this case to proceed in an orderly fashion, with both parties having a fair opportunity to review all material information, advance appropriate motions, and apprise the Court of relevant legal issues. Additionally, President Trump's proposed schedule (the "Proposed Schedule") will: (1) avoid scheduling conflicts with other pending matters; (2) provide sufficient time to address the production of discovery under the Classified Information Procedures Act (CIPA); and (3) preserve President Trump's right to seek discovery from third parties, while also addressing significant gaps in the government's productions.

**<u>APPLICABLE LAW</u>**

In setting a trial date, the Court must allow the defendant and defense counsel "reasonable time to prepare," as "stripping away the opportunity to prepare for trial is tantamount to denying

---

[2] At this early stage, without having reviewed discovery, President Trump cannot estimate the time he will require to present his case at trial; however, for the present, and without any waiver of rights or arguments, President Trump will adopt the same calculation as the government—4 to 6 weeks for the defense case.

altogether the assistance of counsel for the defense." *United States v. Young-Bey*, No. CR 21-661 (CKK), 2023 WL 4706122, at *2 (D.D.C. July 24, 2023) (citation omitted).[3]

For that reason, the Speedy Trial Act directs the Court to consider the unusual or complex nature of a case, 18 U.S.C. § 3161(h)(7)(B)(ii), and the need to provide "counsel for the defendant . . . the reasonable time necessary for effective preparation, taking into account the exercise of due diligence," 18 U.S.C. § 3161(h)(7)(B)(iv).

Thus, "whether a delay is reasonable depends on all the surrounding facts and circumstances," including:

> the length of the requested delay; whether other continuances have been requested and granted; the balanced convenience or inconvenience to the litigants, witnesses, counsel, and the court; whether the requested delay is for legitimate reasons, or whether it is dilatory, purposeful, or contrived; whether the defendant contributed to the circumstance which gives rise to the request for a continuance; whether the defendant has other competent counsel prepared to try the case, including the consideration of whether the other counsel was retained as lead or associate counsel; whether denying the continuance will result in identifiable prejudice to defendant's case, and if so, whether this prejudice is of a material or substantial nature; [and] the complexity of the case.

*Young-Bey*, 2023 WL 4706122, at *2.

---

[3] *See also United States v. Verderame*, 51 F.3d 249, 252 (11th Cir. 1995) (quoting *Gideon v. Wainwright*, 372 U.S. 335, 343 (1963)):

> While we appreciate the heavy case loads under which the district courts are presently operating and understand their interest in expediting trials, we feel compelled to caution against the potential dangers of haste, and to reiterate that an insistence upon expeditiousness in some cases renders the right to defend with counsel an empty formality. In our system of justice, the Sixth Amendment's guarantee to assistance of counsel is paramount, insuring the fundamental human rights of life and liberty. "The Sixth Amendment stands as a constant admonition that if the constitutional safeguards it provides be lost, justice will not still be done."

## ARGUMENT

A.  The Enormity of Discovery Warrants the Proposed Schedule

11.5 million pages is a difficult number to comprehend. Ordinarily, a complex, document-intensive criminal case might have a million pages at issue. *See, e.g.*, *United States v. Scarfo*, 41 F.4th 136, 176 (3d Cir. 2022) (open-ended continuance and complex case designation under 18 U.S.C. § 3161(h)(7)(B)(ii) appropriate where discovery included "approximately 1,000,000 pages of information."). To have over ten times that many pages at issue, against a single defendant, is largely unheard of. Such cases are, instead, almost always sprawling civil battles between large companies, which regularly take years to litigate. *See, e.g., Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 118 (2d Cir. 2005) (seven years to litigate a case involving approximately 5 million pages of discovery).

To put 11.5 million pages in some perspective, we began downloading the government's initial production on August 13, 2023. Two days later, it was still downloading. We then requested the government send hard drives containing its initial production, which we received on August 16, 2023. Our technology vendor is now preparing to ingest the files into a document review database, but estimates such a large dataset will take several days to process.

Nonetheless, even assuming we could begin reviewing the documents today, we would need to proceed at a pace of 99,762 pages per day to finish the government's initial production by its proposed date for jury selection. That is the entirety of Tolstoy's *War and Peace*, cover to cover, 78 times a day, every day, from now until jury selection.[4] (Keeping in mind this is just to read the government's initial production a single time, to say nothing of trial counsel's need to analyze, organize, and integrate those materials into a cohesive defense presentation.)

---

[4] LEO TOLSTOY, WAR AND PEACE (Vintage Classics Ed., Dec. 2008).

Stated differently, if we were to print and stack 11.5 million pages of documents, with no gap between pages, at 200 pages per inch, the result would be a tower of paper stretching nearly 5,000 feet into the sky. That is taller than the Washington Monument, stacked on top of itself eight times, with nearly a million pages to spare:



6

Yet even this analogy belies the true scope of discovery: it includes only printed text, without considering native files, audio recordings, phone and electronic device image files, and other materials that will require substantial, labor-intensive review. *See, e.g.,* Ex. A at 38:1–3 (August 11, 2023, Hr'g Tr.) (government counsel describing "hundreds of recordings of witness interviews"); *id.* at 69:16–19 (describing "a hard drive with 2703(d) returns and extractions from other certain electronic facilities [that are] impossible to paginate or to identify by that").

Likewise, it does not consider the large number of additional documents that:

- the government has not, but still intends to produce. *See, e.g.,* Ex. A at 70:5–7 ([Government Counsel]: "We anticipate additional productions in the coming weeks and our goal is to have discovery substantially complete by August 28.");

- the government will obtain going forward. Doc. 23 at 5 (Government Response) ("The Government would then continue to produce to the defense on a prompt rolling basis any additional materials that are obtained going forward.");[5]

- President Trump may request from the government in discovery. *See* Fed. R. Crim. P. 16(a)(1)(E)(i) (requiring production of materials "within the government's possession, custody, or control" that are "material to preparing the defense"); *United States v. Libby*, 429 F. Supp. 2d 1, 7–8 (D.D.C. 2006) (defendant may make requests for 16(a)(1)(E)(i) material and that "the materiality standard is not a heavy burden." (citation and quotation marks omitted)); and

---

[5] The government's grand jury investigation appears to continue, suggesting the volume of additional materials will only grow. *See* Dan Mangan, CNBC, *D.C. grand jury that indicted Trump meets Tuesday as election probe continues*, (Aug. 8, 2023), https://www.cnbc.com/2023/08/08/trump-grand-jury-meets-again-as-election-probe-continues.html

- President Trump may request from third parties. Fed. R. Crim. P. 17(c) (permitting pretrial subpoenas with leave of court).[6]

For its part, the government suggests that it has "prepare[d] and organize[d] discovery in a manner that will assist the defendant in his review of produced materials." Doc. 23 at 2. Setting aside the dubious accuracy of this statement, prosecutorial organization of information cannot solve the defense's largest burden—reviewing the documents and preparing to use them at trial. That takes time—a lot of time in this instance—regardless of how the documents are labeled.

Similarly, the government claims it will "provide a compilation of certain key" documents and "identif[y] certain material within the discovery that is arguably favorable to the defendant." Doc. 23 at 5. This, again, is no answer. The government's view of importance surely differs substantially from the defense, and it goes without saying that a criminal defendant should not build his case on the word of his accusers.

Rather, President Trump has a right to review all material information, regardless of the government's view of the significance of such information to the defense. This is a critically important process, as identifying and presenting *Brady* material will be central to demonstrating President Trump's innocence. *Cf. Newman v. Hopkins*, 247 F.3d 848, 852 (8th Cir. 2001) ("[T]he right to present favorable evidence to a jury is clearly established by the [Supreme] Court's precedent."). [7]

---

[6] We anticipate seeking leave to issue multiple Rule 17(c) subpoenas. By way of just one example, we would request a subpoena directed to the House of Representatives for documents related to the investigation by the January 6th Select Committee. We will also need to address the reported destruction of documents by that committee, which could be potentially exonerative to President Trump.

[7] Even by its own terms, the government states only that it will identify "certain," but not all, documents it views as significant to its case or favorable to the defense. Doc. 23 at 5. Thus, whatever limited usefulness the government's key document folder might provide, it will not alter President Trump's need to fully review all discovery. Additionally, in cases such as this with

8

Simply put, the discovery in this case is enormous and growing. Although defense counsel will, of course, work diligently to review this material, the process will take time. For example, even under our Proposed Schedule, we would need to review approximately 12,000 pages per day to complete a first pass of the initial production by our proposed trial date. This is an exceedingly rapid pace, by any measure, and one that will only be manageable with intense diligence. The government's proposal, by contrast, is flatly impossible. No defendant can reasonably review nearly 100,000 pages of discovery per day.

Thus, "even exercising 'due diligence,'" the government's proposal would deny President Trump "reasonable time necessary for effective preparation," and, in so doing, violate his rights to due process and counsel.[8] *United States v. Taylor*, No. CR 18-198 (JEB), 2020 WL 7264070, at *7 (D.D.C. Dec. 10, 2020) (quoting 18 U.S.C. § 3161(h)(7)(B)(iv)); *see also United States v. Rice*, 746 F.3d 1074, 1079–80 (D.C. Cir. 2014) (affirming continuance based, in part, on complexity of the case and volume of discovery, and District Court's finding that "the defense itself is not going to be in a position to adequately provide the quality of representation the defendants are entitled to" without time to review pertinent discovery).[9]

---

substantial discovery, the Court may require the government to go beyond identifying "certain key" documents, and instead identify all "those items it intends to offer in its case-in-chief at trial." *United States v. Anderson*, 416 F. Supp. 2d 110, 116 (D.D.C. 2006).

[8] It stands as no small irony that the government seeks to deny President Trump his constitutional rights in a prosecution where the government wrongly alleges President Trump violated the rights of others.

[9] The government contends that President Trump has been "aware of . . . certain relevant information made public through hearings and the report written by the House Select Committee to Investigate the January 6th Attack on the United States Capitol" and therefore should not need to thoroughly review discovery. Doc. 23 at 6. However, the government simultaneously advises only "a relatively small percentage of discovery" is non-sensitive. Ex. A at 28:11–12. As only non-public material may be marked sensitive, Doc. 28 at 1, that means President Trump had no meaningful ability to review the government's discovery prior to production. (Nor would he have

Without doubt, the public has an interest in the prompt resolution of this case; however, as the Speedy Trial Act recognizes, that interest must yield to the public and the defendant's overriding interest in a just proceeding. The Proposed Schedule allows President Trump to defend himself fairly. The government's proposal does not. Accordingly, the Court should adopt the Proposed Schedule.[10]

B.      The Complexity of this Case Warrants the Proposed Schedule

The large volume of discovery in this matter is not happenstance, but reflects the reality that this is a complicated, unusual case. 18 U.S.C. § 3161(h)(7)(B)(ii) (permitting continuances for complex or unusual cases, or where the Court must address "novel questions of fact or law"). There are hundreds of potentially relevant witnesses spread across the country. Many are current or former government officials, including within the Department of Justice itself. Events alleged in the Indictment, and which are otherwise pertinent, likewise occurred throughout the country. Classified documents are at issue, as well as large quantities of search warrant materials that may be subject to suppression. As noted above, President Trump will seek Fed. R. Crim. P.

---

known what materials to review, as the government did give any pre-indictment explanation of its theory of the case, let alone identify any information it purports supports those charges.)

At the same time, the government has identified no good reason why it waited 31 months to seek an indictment. The notion that the government may, with all its vast resources, spend years investigating this case, only to turn and demand the defense be prepared for jury selection in just four months defies all notions of fairness.

[10] The government invokes the violence on January 6, 2021, as a reason to expedite the trial calendar, arguing it is "clearly a matter of public importance." Doc. 23 at 4. First, the Indictment does not charge President Trump with causing or participating in any violence. The fact that others have allegedly done so cannot factor into President Trump's trial date. Moreover, the widespread interest in these proceedings counsels a deliberate approach, protective of individual rights. The public's interest is in truth, fairness, and justice, not a rush to judgment.

10

16(a)(1)(E)(i) discovery from government departments and witnesses, as well as pretrial 17(c) subpoenas, which may raise a host of difficult issues for the Court to resolve.[11]

These factors alone suggest this case is complex under the meaning of the Speedy Trial Act and weigh in favor of a lengthier trial calendar. *See United States v. Raymond*, No. CR 21-380 (CKK), 2023 WL 2043147, at *4 (D.D.C. Feb. 16, 2023) (holding case as complex and granting government motion for continuance, over defendant's objection, based on, *inter alia*, dispersion of witnesses and classified information); *see also Barker v. Wingo*, 407 U.S. 514, 531 (1972) ("To take but one example, the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge.").

However, this case is not just complex or unusual. It is *terra incognita*. The protests at Capitol Hill aside, no person in the history of our country has ever been charged with conspiracies related to the Electoral Count Act. No president has ever been charged with a crime for conduct committed while in office. No major party presidential candidate has ever been charged while in the middle of a campaign—and certainly not by a Justice Department serving his opponent. These and numerous other issues will be questions of first impression, requiring significant time for the parties to consider and brief, and for the Court to resolve. The Proposed Schedule provides that time. The government's timeline does not. Consequently, the complexity and unusual nature of this case favors the Proposed Schedule.

---

[11] The government acknowledges that it considers materials obtained from a congressional committee and the United States Secret Service are material to this case. Doc. 23 at 5. Many other governmental agencies may have information favorable to the defense as well. The government cannot pick and choose what sources of information are important to the determination of this matter; justice requires that the defense be accorded the time to consider, request, and review all information material to the charges.

11

C.      The Proposed Schedule is Consistent with Ordinary Order

As the Court stated at our August 11 hearing, and as the government then agreed, this case should "proceed[] in the normal course that our criminal justice system prescribes." Ex. A at 71:3–5; Doc. 15 at 8 (Gov't Reply in Support of Motion for Protective Order) ("Normal order should prevail."). As explained above, the normal course for complex, document-intensive cases is not a rush to trial, but a measured schedule that preserves the defendant's rights to review discovery and raise appropriate motions with the Court.

Indeed, the median time from commencement to termination for a jury-tried § 371 charge is 29.4 months—many times longer than the government's proposal schedule.[12] (And this reflects only the median, meaning half of all such cases take more time based on individualized assessments of discovery volume, complexity, and similar concerns.)

Likewise, this Court regularly allows far more time than the government proposes, even in cases involving protests at the Capitol on January 6, 2021. *See, e.g.*, *United States v. Foy*, No. 21-cr-0108 (28 months from indictment to stipulated bench trial on 4-page indictment); *United States v. Nordean, et al*, No. 21-cr-0175 (TJK) (21 months); *United States v. Crowl, et al*, No. 21-cr-0028 (APM) (23 months); *United States v. Kuehne, et al*, Case No. 21-cr-160 (29 months); *United States v. Hostetter, et al*, Case No. 21-cr-0392 (RCL) (24 months).

---

[12] Administrative Office of the United States Courts, *Table D-10: U.S. District Courts–Median Time Intervals From Commencement to Termination for Criminal Defendants Disposed of, by Offense, During the 12-Month Period Ending September 30, 2022*, at 2, jb_d10_0930.2022.pdf (uscourts.gov).

Ordinary order, in other words, is adherence to the Constitution and the Speedy Trial Act, together with their assurances of fair and just criminal trials, regardless of the government's ill-placed desire to hurry this case to a conclusion.[13]

D.      The Government's Proposal is Unworkable Under CIPA

CIPA controls the disclosure of classified information in this matter. Doc. 23. As the government is aware, proceedings under CIPA are complicated, and "often lengthen the ordinary trajectory from indictment to trial." Ex. B at ¶ 7 (Decl. of Jay Bratt, June 23, 2023).

These delays can be extensive. As the Special Counsel's foremost expert on CIPA, Jay Bratt,[14] recently explained: the government is unaware of any case with classified discovery that went to trial in less than six months. Ex. C at 16:17–22 ([THE COURT]: "Can you point the Court to any other similar cases involving classified information that have gone to trial following production of discovery in less than six months?" [Mr. Bratt]: "So going to trial in less than six months, no.").

This case will be no different. The government acknowledges even uncomplicated CIPA cases involving "a very small number of documents with no substantive pretrial motions" take a minimum of eight months. *Id*. at 17:5–17. It is, therefore, puzzling that the government would propose a trial calendar the CIPA process cannot accommodate. Our Proposed Schedule, conversely, accounts for CIPA and will ensure any issues under that law are fully resolved by the time of trial.

---

[13] Another key factor in setting any trial date is the detention status of the defendant. That is not a factor here, and there is no reason that this Court should place the government's desire for a headline ahead of the interests of any detained defendant in this District who is awaiting trial.

[14] Mr. Bratt previously led the Department of Justice's Counterintelligence and Export Control Section and testified that he has "extensive experience with [CIPA]." Ex. B at ¶ 7.

E.     The Government's Proposal Conflicts with Other Cases

Finally, the government's proposal presents numerous conflicts with other pending matters, including:

- A civil case in New York state court, scheduled for a six-week trial beginning October 2, 2023. Ex. D (Scheduling Order);

- A civil case in the Southern District of New York, scheduled for a two-week trial beginning January 15, 2024. Ex. E (Scheduling Order);

- A criminal case in New York state court, scheduled for a 5-week trial beginning March 25, 2024 (trial date set by oral order);

- A criminal case in Georgia state court, for which the state has requested a March 4, 2024, trial. Ex. F (Proposed Pretrial Scheduling Order); and

- A criminal case in the Southern District of Florida, also prosecuted by the Special Counsel and scheduled for a 5-week trial beginning May 20, 2024. Ex. G (Order Resetting Deadlines).

President Trump must prepare for each of these trials in the coming months. All are independently complex and will require substantial work to defend. Several will likely require President Trump's presence at some or all trial proceedings. Moreover, beyond trial, these cases will include numerous pre-and-post trial hearings that will invariably conflict with the government's proposed trial calendar here. As one example, a pretrial hearing in the Special Counsel's Southern District of Florida prosecution of President Trump is scheduled for December 11, 2023—the same day the Special Counsel proposes jury selection begin in this matter. Ex. G.[15]

---

[15] Co-counsel in this matter, Todd Blanche, also represents President Trump in the Southern District of Florida and New York state court criminal matters.

Without question, President Trump's obligation to diligently prepare for this case does not end because of other pending matters. However, the Court may, and should, consider the practical effects these parallel prosecutions will have on President Trump's ability to meet the extraordinarily brief deadlines the government proposes. *See, e.g.*, *United States v. Schardar*, 850 F.2d 1457, 1459 (11th Cir. 1988) (noting "several continuances were granted because defense counsel was involved in other trials"); *United States v. Randall Everette Tennyson*, No. 2:21-CR-364-ECM, 2022 WL 686619, at *1 (M.D. Ala. Mar. 8, 2022) (granting continuance to provide additional preparation time in light of counsel's simultaneous preparation for state court trials).

Once again, the government's proposed schedule does nothing to address these significant concerns; our Proposed Schedule resolves them. Accordingly, the Court should adopt the Proposed Schedule.

## CONCLUSION

The Proposed Schedule appropriately balances President Trump's constitutional and statutory rights to counsel and a fair trial with the public's need for promptness. The Proposed Schedule is further consistent with ordinary order and resolves significant conflicts presented by CIPA and other pending prosecutions. Accordingly, the Court should determine that the ends of justice outweigh the interest of the public and the defendant in a speedy trial, adopt the Proposed Schedule, and exclude time through April 1, 2026.

Dated: August 17, 2023

Respectfully submitted,

Todd Blanche, Esq. (PHV)

/s/Gregory M. Singer

toddblanche@blanchelaw.com

John F. Lauro, Esq.

BLANCHE LAW

D.C. Bar No. 392830

99 Wall St., Suite 4460

jlauro@laurosinger.com

New York, NY 10005

Gregory M. Singer, Esq. (PHV)

(212) 716-1250

gsinger@laurosinger.com

Filzah I. Pavalon, Esq. (PHV)

fpavalon@laurosinger.com

LAURO & SINGER

400 N. Tampa St., 15th Floor

Tampa, FL 33602

(813) 222-8990

*Counsel for President Donald J. Trump*

16

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| _____ | : | |
| UNITED STATES OF AMERICA | : | |
| | : | No. 23-cr-257-TSC |
| | : | |
| v. | : | |
| | : | |
| DONALD J. TRUMP, | : | |
| | : | |
| Defendant. | : | |
| _____ | : | |

**RESPONSE IN OPPOSITION TO
<u>GOVERNMENT'S PROPOSED TRIAL CALENDAR</u>**

# Ex. A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,        .
                                 .
            Plaintiff,           .    CR No. 23-0257 (TSC)
                                 .
      v.                         .
                                 .
DONALD J. TRUMP                  .    Washington, D.C.
                                 .    Friday, August 11, 2023
            Defendant.           .    10:00 a.m.
. . . . . . . . . . . . . . .    .


HEARING ON PROTECTIVE ORDER
BEFORE THE HONORABLE TANYA S. CHUTKAN
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Government:          THOMAS WINDOM, ESQ.
                             MOLLY G. GASTON, ESQ.
                             U.S. Attorney's Office
                             601 D Street NW
                             Washington, DC 20530


For Defendant:               JOHN F. LAURO, ESQ.
                             GREGORY M. SINGER, ESQ.
                             Lauro & Singer
                             400 North Tampa Street
                             15th Floor
                             Tampa, FL 33602

                             TODD BLANCHE, ESQ.
                             Blanche Law
                             99 Wall Street
                             New York, NY 10005

Court Reporter:              BRYAN A. WAYNE, RPR, CRR
                             U.S. Courthouse, Room 4704-A
                             333 Constitution Avenue NW
                             Washington, DC 20001


Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

P R O C E E D I N G S

1

2          THE DEPUTY CLERK:  Good morning, Your Honor.  This is

3     Criminal Case No. 23-257, United States of America versus

4     Donald J. Trump.

5        Counsel, please approach the lectern and state your

6     appearances for the record.

7          MR. WINDOM:  Good morning, Your Honor.

8          THE COURT:  Good morning.

9          MR. WINDOM:  Thomas Windom and Molly Gaston for the

10    United States.  With us at counsel table is FBI Special Agent

11    Jamie Garman.

12         THE COURT:  Good morning.

13       Who will be speaking for the government this morning?

14         MR. WINDOM:  I will, Your Honor.

15         THE COURT:  All right.  Thank you.

16         MR. LAURO:  Good morning, Your Honor.  Nice to meet

17    you.

18         THE COURT:  Good morning.

19         MR. LAURO:  John Lauro on behalf of President Trump.

20    With me is Todd Blanche, my co-counsel, and also my partner,

21    Greg Singer.

22         THE COURT:  Good morning.

23       And who will be speaking for counsel this morning?

24         MR. LAURO:  I will.

25         THE COURT:  All right.  Just so you know, because we're

1    going to be working through this, you all are free to remain

2    at counsel table and seated if you want, just as long as you

3    speak into the microphone so my court reporter can hear you.

4    Even if I can hear you, if you're not on the microphone, he

5    cannot, and he's got to keep the record.  So you're welcome

6    to stay at counsel table rather than hop up and down.  It's

7    totally up to you.

8        All right.  We are here for a hearing regarding the

9    parties' proposed protective orders in this case.  The

10   government has moved for imposition of a protective order in

11   ECF No. 10, which is frequently used in criminal cases to

12   ensure that certain information that the government shares

13   with the defense is not disclosed to the public.

14       The defense has objected to the government's initial

15   proposed order, and the government then proposed a second

16   order to which the defense also has objections.  The parties

17   have been unable to so far resolve those objections and reach

18   agreement on their own, and so I decided to schedule this

19   hearing to work through those objections one by one.

20       And I want to thank the parties for making themselves

21   available on such short notice.  I know initially I said

22   I wasn't available on Friday, and then I became available.

23   So I really appreciate that because, as you all know, the

24   government can't turn over discovery until there's a protective

25   order in place, and so it's imperative that this be resolved

1     promptly so that discovery can be disclosed and the case can

2     move forward in the regular order.

3         So a brief word about briefing schedules.  Under Local

4     Criminal Rule 47(b), a party may oppose a motion within 14 days

5     of the date of service or at such other time as the Court may

6     direct.

7         Likewise, under rule 47(d), the default deadline for replies

8     in support of a motion is seven days after service of the

9     memorandum in opposition; however, I routinely depart from the

10    default 14- and 7-day time limits, as do many of my colleagues,

11    when it serves the interest of justice and efficiency.

12        With respect to the government's pending motion, for

13    instance, I determined that a shorter briefing schedule deadline

14    was appropriate given the relative brevity of the proposed

15    protective order and the need to proceed with discovery in this

16    case.  There may well be other instances and times in this case

17    where my briefing schedule is shorter or longer than the one

18    prescribed in our local rule.

19        And so now I intend to resolve the parties' objections by

20    going through defendant's redline to the government's proposed

21    order one by one as they're set forth in ECF No. 14, which is

22    Exhibit A.  There's a few minor differences between A and B, but

23    I thought A best...

24        So I am prepared to rule immediately on some of the

25    revisions.  For others, I will have some questions.  I will have

1     some questions of counsel before I make my decision, and after

2     this hearing it's my intention to issue a protective order

3     consistent with today's rulings as quickly as possible.

4        So Federal Rule of Criminal Procedure 16(d) provides that at

5     any time the court may, for good cause, deny, restrict, or defer

6     discovery or inspection or grant other appropriate relief.

7        Under binding D.C. Circuit precedent in *United States v.*

8     *Cordova*, 806 F.3d 1085, 1090, the burden of showing good cause

9     is on the party seeking the order, and among the considerations

10    to be taken into account by the court will be the safety of

11    witnesses and others, a particular danger of perjury or witness

12    intimidation, and the protection of information vital to

13    national security.

14       Relatedly, I must also comply with what the Supreme Court

15    has said is my affirmative constitutional duty to minimize the

16    effects of prejudicial pretrial publicity, and that's from

17    *Gannett Co. v. DePasquale*, 443 U.S. 368.  The Supreme Court

18    noted that after the commencement of the trial itself,

19    inadmissible prejudicial information about a defendant can be

20    kept from a jury by a variety of means.  When such information

21    is publicized before the trial, however, it may never be

22    altogether kept from potential jurors.

23       As a result, the Supreme Court stated in *Alderman v. United*

24    *States*, 394 U.S. 165, 185, that the trial court can and should,

25    where appropriate, place a defendant and his counsel under

1    enforceable orders against unwarranted disclosure of materials

2    which they may be entitled to inspect.

3        Mr. Trump, like every American, has the First Amendment right

4    to free speech, but that right is not absolute.  In a criminal

5    case such as this one, a defendant's free speech is subject to

6    the release conditions imposed at arraignment and must also

7    yield to the orderly administration of justice, especially with

8    respect to disclosure of materials obtained in discovery.

9        Without a protective order, a party could reveal information

10   that would taint the potential jury pool, result in the

11   harassment or intimidation of witnesses or parties in the case,

12   or otherwise prevent a fair trial.

13       Accordingly, I'm going to review each disputed portion of the

14   proposed orders today to ensure that they are consistent with

15   the defendant's rights and the integrity of the judicial process

16   — in other words, that there is good cause for the order that

17   I'll issue.

18       So I want to begin with what is perhaps the parties' biggest

19   disagreement:  the scope of the protective order.  The

20   government proposes that the order govern all discovery material

21   that it turns over to the defense.  The defense proposes that

22   the order govern only the materials that the government

23   designates as sensitive.  This disagreement is reflected

24   throughout Defendant's Exhibit A, but the most relevant

25   paragraphs are paragraphs 1 and 2.

 1      So here I have some questions for you, Mr. Windom.  In your

 2      motion, you stated that there was good cause shown -- excuse

 3      me -- that there was good cause for your proposal, and I quote,

 4      "because issuance of the government's proposed order would

 5      expedite the flow of discovery in this case, give the defendant

 6      prompt access to a large portion of the discovery he ultimately

 7      will receive, and protect the highly sensitive categories of

 8      material."

 9      But I don't see why those same goals wouldn't be served by

10      the defense proposal.  So can you explain why you think there is

11      good cause to cover all discovery materials rather than just

12      sensitive materials?  And I have a couple of follow-up.

13              MR. WINDOM:  Yes, Your Honor.  Thank you.

14      So that is the kind of larger philosophical difference

15      between the government's proposed order and the defendant's

16      proposed order.  The government wants the protective order

17      to cover all discovery.  The defense only wants it to cover

18      sensitive discovery.

19              THE COURT:  Right.

20              MR. WINDOM:  On this issue, in addition to the line

21      from our motion that you read, in the paragraph underneath

22      that it also talks about preventing the improper dissemination

23      or use of discovery materials including to the public.

24      So the larger basis here is that, under the government's

25      proposed order, it really follows three overlapping bases for

1    good cause.  The first one is to ensure that the purpose of

2    discovery is for the fair and efficient adjudication of the

3    court in the courtroom as opposed to in the public.

4        The second is that, consistent with the Advisory Committee

5    explanation for the purpose of the rule, it is to safeguard

6    witness security, to prevent intimidation of the witnesses, to

7    prevent harm to reputation or dignity of the witnesses, and to

8    prevent personal information from being released, in addition

9    to the third overlapping piece, which, as Your Honor noted, is

10   the Court's affirmative duty to prevent prejudicial pretrial

11   publicity.

12       Those are the overlapping three core objectives at which

13   our protective order is aimed and which is, in some respects,

14   different than what the defense has proposed.

15       The defendant's proposal specifically is tailored to permit

16   them to try this case in the media.  This is something that

17   Your Honor, in the Rule 57.7 hearing in the *Butina* case, noted

18   was an improper purpose, to try the case in the media.

19       Here, the defendant is asking for the Court's blessing to

20   be able to use criminal discovery for political purposes.

21   That is not a proper use of discovery.  And what is, I think,

22   telling is that the defendant's proposed order and the

23   defendant's arguments do not actually indicate any way in

24   which the government's proposed order hinders the defense's

25   use of discovery material in defense of this case in the

1    courtroom.

2          THE COURT:  I hate to interrupt you, Mr. Windom, but

3    all that may be so, but how is that explaining why all of this

4    material is both sensitive and nonsensitive?  So my question

5    really goes to what is the good cause shown for subjecting the

6    nonsensitive material to the order.

7          MR. WINDOM:  There is some sensitive material, a great

8    amount of sensitive material that we would designate, and

9    there's some nonsensitive as well.

10          THE COURT:  Right.  It's the nonsensitive I'm

11    interested in.

12          MR. WINDOM:  Yes, ma'am.

13       The nonsensitive falls within the exact same rubric that

14    I just laid out.  Even if it's nonsensitive, it still may be

15    inadmissible, it may still be irrelevant, but it may be

16    sensational.  It may be something that is used by the defense

17    or the defendant to pollute the jury pool, whether purposely

18    or not.

19       The information the defense has set forth, both in the

20    defendant's own posts and the defense counsel's statements on

21    the Sunday shows last weekend, the defendant has set forth an

22    intention to publicly disseminate any information that they

23    deem, quote, "informative" is what the defense counsel said.

24          THE COURT:  Well, defense has a First Amendment right

25    to -- within limits, to speak about the case.  What I'm

1    interested in is the Circuit says I have to enunciate good

2    cause for protecting information, and certainly there's no --

3    I don't see any problem with the sensitive information.

4        Well, let me ask you this:  What percentage of the

5    discovery, if you can just give me a rough estimate, is

6    nonsensitive?

7            MR. WINDOM:  Giving you an estimate, Your Honor?

8            THE COURT:  Yes.  You said a "small amount."

9            MR. WINDOM:  Yes, ma'am.  I would say that the vast

10    majority would be designated as sensitive within the

11    government's definition of "sensitivity."  Obviously, that's

12    an issue of dispute between the parties, but I would say the

13    vast majority.  It's hard to give a percentage, because some

14    of the discovery material may already be in the defendant's --

15    he may have the right to access that material otherwise.

16            THE COURT:  But that's the sensitive material.

17    Nonsensitive is what I'm focused on.

18            MR. WINDOM:  Yes, ma'am.

19        For the nonsensitive material that the government intends

20    to produce, there is some, obviously, nonsensitive material,

21    which is a fairly small amount.  Then there is another bucket

22    of material which may be up to a quarter of the government's

23    first production which we need to consult with defense counsel

24    on because the defendant may have the ability to actually

25    access that information other than us giving it to him.

1          THE COURT:  And would that be sensitive or nonsensitive

2      information under the definition as set forth in the protective

3      order?

4          MR. WINDOM:  Sure.  Under the definition, assuming that

5      the defense can affirm in writing that they otherwise are able

6      to access that information, we would not consider it

7      sensitive.  We're talking about information specifically from

8      the defendant's campaign entities or PAC entities.

9          THE COURT:  All right.  So if I understand what you're

10     saying, your position is it's even the nonsensitive information

11     could be used for witness intimidation or reputational damage

12     or -- I mean, if so, why wouldn't it be sensitive, I guess?

13         MR. WINDOM:  It would not be sensitive within the

14     definitions we have laid out, but it still could be produced

15     in discovery.  And then Your Honor mentioned the First

16     Amendment right.

17         As you know, and as you quoted from *Seattle Times*, there is

18     simply a different calculus when it is discovery that is used

19     in a judicial proceeding.  There is much less of a First

20     Amendment issue, and the only thing the court needs to look

21     for, as you've said, is the good cause standard.

22         So I would just go back to the three animating principles

23     they provide for protection for all of the discovery material

24     for the government, both sensitive and nonsensitive.  The main

25     thing is -- well, it's all important, but as Your Honor said,

1    there is the potential of damaging reputations of witnesses,

2    depending on what the nonsensitive information is.  It doesn't

3    simply need to include PII in or a witness's statement in

4    order to potentially damage the witness's reputation.

5        But secondly, the larger issue here is the defense has

6    broadcast their strategy; and that is not to try this case in

7    this courtroom, and the Court should address that with this

8    protective order.

9        THE COURT:  I intend to, but my task here is somewhat

10   narrower.

11       MR. WINDOM:  Sure.

12       THE COURT:  And it really focuses on how much -- you

13   know, I don't want this order to be overinclusive.

14       MR. WINDOM:  Yes, ma'am.

15       THE COURT:  In other words, I don't want to just

16   issue a blanket protective order over information that is

17   not sensitive.  But if you're talking about a small amount

18   relative to what's being turned over, or if you can enunciate

19   good cause, because that is what I have to find.

20       And, certainly, if I decide to have two categories and not

21   have the nonsensitive information subject to the protective

22   order, you can always go over the nonsensitive and consider if

23   you need to designate it as sensitive.  Isn't that right?

24       MR. WINDOM:  That is right.  I will put out an

25   additional implication for the fair and efficient

1       administration of this case and getting this case to trial,

2       which I think is an important consideration.

3              THE COURT:  Oh, I agree.

4              MR. WINDOM:  Should the Court -- the government has a

5       blanket approach.  The defense has the sensitivity designation

6       or not, or simply outside the protective order.  Should the

7       Court go with the defense's approach, I anticipate that there

8       will be never-ending battles over sensitivity designations,

9       and perhaps every week we might be before the Court in order

10      for the defense to raise an objection as to the government's

11      sensitivity designation.

12             THE COURT:  But if the amount of material you're

13      describing as nonsensitive is relatively small -- I mean,

14      I suspect we're going to be having disagreements about a lot

15      of things in this protective order, but if the nonsensitive

16      material you're describing is relatively small, that is a

17      limited amount of disagreement we could have, isn't it?

18             MR. WINDOM:  I think it's the flip, Your Honor.

19      Since the sensitive amount is so large, under the government's

20      order, if the government produces it in discovery, the defense

21      simply cannot use it on the weekend shows.  If the government --

22      if the Court goes to the defense's proposed order, then there

23      will be the squabbles over what is sensitive --

24             THE COURT:  Isn't that going to happen in any event?

25      If I go with your request and designate it all as sensitive,

1     can't the defense come to me through motion and say, we

2     believe this document is not sensitive?  Isn't that going to

3     be the case anyway?

4             MR. WINDOM:  The defense could do that, Your Honor, but

5     it would still be covered under the protective order and would

6     not be permitted to be publicly disseminated.

7             THE COURT:  Until I ruled otherwise.

8             MR. WINDOM:  Unless you ruled otherwise under paragraph

9     16 of our proposed protective order.

10            THE COURT:  Okay.

11            MR. WINDOM:  The other thing to consider here that the

12    government will attempt to lay out, this is a decision today

13    to address what the Court sees as good cause and the best

14    interest of this case and the fair administration of justice.

15    Should it prove unworkable for some reason, paragraph 13

16    permits a modification; paragraph 16 permits document-specific

17    adjudication by the Court.

18        So, for those reasons, the ones that we've set forth as our

19    animating principles for all discovery, sensitive or not, and

20    the potential for what the government believes to be endless

21    litigation over sensitivity designation — so it's whether it's

22    in or outside of a protective order — the government believes

23    that the Court should enter our proposed protective order.

24            THE COURT:  Thank you, Mr. Windom.

25        Mr. Lauro?

```
 1            MR. LAURO:  Yes, Your Honor.

 2        I think you hit the nail on the head.

 3            THE COURT:  That may be the last time you say this

 4        for a while.

 5        (Laughter)

 6            MR. LAURO:  I doubt it, Your Honor.

 7        But truly, this kind of blanket order is extraordinary.

 8        The government has the ability to separate out sensitive and

 9        nonsensitive information.  We have to face the fact that we

10        are in uncharted waters here, where we have a presidential

11        candidate running for office, and his opponent has the Justice

12        Department bringing criminal charges against him.  And in this

13        situation, certainly President Trump has the right to respond

14        and speak about these issues.

15        What we're asking for is for the government to show good

16        cause as Your Honor has designated those items under Rule 16

17        as well as the case law.  Extrajudicial speech, or public

18        speech, is not one of the good-cause factors Your Honor

19        described.

20            THE COURT:  It is a good-cause factor if that

21        extrajudicial speech causes witness intimidation or harassment

22        or interferes with -- I mean, it must always yield.  And so

23        what the defendant is currently doing -- you know, the fact

24        that he's running a political campaign currently has to yield

25        to the orderly administration of justice.  And if that means
```

1     that he can't say exactly what he wants to say about people

2     who may be witnesses in this case, that's how it's going to

3     have to be.

4              MR. LAURO:  And that's a different issue, though, than

5     a Rule 16 protective order, I believe, because --

6              THE COURT:  But isn't a protective order under Rule 16

7     designed to protect the harassment or intimidation of witnesses

8     or the dissemination of information that is sensitive?

9              MR. LAURO:  Sure.  It's directed if there is some

10    cognizable harm or identifiable harm to a particular witness

11    or an issue of perjury.  Here we don't have that.

12             THE COURT:  Well, Mr. Lauro, what about talking about

13    a potential witness to a nationwide, or potential worldwide,

14    audience and denigrating that witness?  Isn't that the kind

15    of -- isn't that the kind of situation that the protective

16    order is designed and Rule 16 is designed to prevent?

17             MR. LAURO:  Your Honor, you may have Mr. Pence in mind?

18    Is that your concern?

19             THE COURT:  Any witness.

20             MR. LAURO:  All right.  Well, obviously, on the

21    campaign trail, since the prosecutors decided to bring this

22    case in the middle of the campaign, President Trump has the

23    ability to respond fairly to political opponents, and that's

24    the problem with the way this order is structured.

25             THE COURT:  The defendant's desire to conduct a

1    campaign, to respond to political opponents has to yield.  Do

2    you disagree with that, that there are limits regardless of

3    what is going on in -- you know, I hate to say -- his day job?

4        I mean, this is a criminal case.  The need for this

5    criminal case to proceed in the normal order and protect

6    witnesses and the integrity of the process means that there

7    are going to be limits on the defendant's speech.

8        MR. LAURO:  I can assure you that my client will abide

9    by the integrity of the process, but he also can't be subject

10   to some kind of a contempt trap, which this really is.

11       THE COURT:  I think you're going -- I mean, nobody's

12   talked about contempt.  What we're talking about now are the

13   parameters of this order, and the parameters of the order that

14   we're all considering means that there are certain things, if

15   they have an impact on the administration of justice or on

16   witnesses, can't be said regardless of what endeavors the

17   defendant is currently engaged in.

18       MR. LAURO:  No one disagrees that any speech that

19   intimidates a witness would be covered by this order and

20   prohibited.  What we're talking about, though, is the fair use

21   of information.  For example, if my client has a memory of a

22   certain event that occurred and wants to speak publicly about

23   it in the course of a campaign, he's certainly entitled to do

24   that.

25       THE COURT:  Not if that memory ends up containing

1    information that would intimidate a witness.  It always has to

2    yield to the fact that there are pretrial release conditions

3    and a protective order will be in place.

4         MR. LAURO:  And he'll abide by that, obviously, and

5    has abided by it.  But my concern here is that the first

6    obligation is on the government, under Rule 16, to establish

7    what's sensitive and what's not sensitive.

8         THE COURT:  So let's go back to that, because we're

9    kind of painting with a very broad brush here.  Let's go back

10   to the designation.

11      Is it your position that with regard to the nonsensitive

12   information, that your client can say whatever he wants to say

13   about the nonsensitive information?

14        MR. LAURO:  No.  Subject to the limitations that

15   you've described, he has to abide by the rules of this court.

16   Certainly, he has First Amendment rights, but in no way am I

17   suggesting that any client could ever intimidate a witness or

18   use that information.  But we are in the middle of a campaign,

19   and the way this order is structured, it would provide an

20   enormous advantage to President Biden in the middle of a

21   campaign, and that's my concern.  It really --

22        THE COURT:  What the effects of my order are on a

23   political campaign are not before me and are not going to

24   influence my decision here.  This is a criminal trial.  This

25   is going to be a criminal trial brought at the time that the

1    government decided to bring the charges and they decided they

2    were ready to bring charges.  I don't have any control over

3    that.  But I cannot, and I will not, factor into my decisions

4    the effect it's going to have on a political campaign for

5    either side.

6         MR. LAURO:  Although, Your Honor, one of the good-cause

7    factors requires you to do the balancing that you described.

8         THE COURT:  Of course.

9         MR. LAURO:  And one of those is the impact on the

10   defendant when you enter this order, and I think, as a result

11   of that, the Court has to balance the factor and the impact on

12   a defendant --

13        THE COURT:  Mr. Lauro, your client has not seemed to

14   have had any trouble talking about the prosecution of this

15   case for some time and the investigation that he's been under

16   for some time, and the protective order, in many ways, would

17   not infringe on his right to talk about that.

18        MR. LAURO:  And then we have no problem, if he can

19   speak the way he's been speaking.

20        THE COURT:  So let's go back to the sensitive versus

21   nonsensitive designation.  What would be the burden on the

22   defense if I designated all materials, sensitive and

23   nonsensitive, as subject to the protective order, to the

24   defense simply moving to exempt certain documents?  I mean,

25   I suspect we're going to be dealing with discovery disputes

 1    occasionally.

 2         MR. LAURO:  It would be a massive burden, Your Honor.

 3         THE COURT:  Tell me how.

 4         MR. LAURO:  Especially when they can designate

 5    sensitive versus nonsensitive information.  We looked at all

 6    the Rule 16 orders that have been added on J6 cases.  We

 7    haven't seen a single one that resembles this type of order

 8    in terms of breadth.  I'll give you a practical example.

 9      They designate all examples of testimony or interviews or

10    videos as being sensitive, and they require us, as counsel, to

11    sit with our client in the same room while our client reviews

12    that material.

13         THE COURT:  I'm going to get to that.

14         MR. LAURO:  Okay.

15         THE COURT:  I'm going to get to that.

16         MR. LAURO:  But that's just one example of how

17    over-burdensome that is.  And the other issue is --

18         THE COURT:  But that material is already designated

19    as sensitive.  I'm not inclined -- I'm not hearing a request

20    to say that that material is not included in the sensitive

21    designation.  What I'm talking about is the nonsensitive.

22    In other words, are you saying that those witness interviews

23    should not be designated as sensitive?

24         MR. LAURO:  Absolutely they should not be designated --

25         THE COURT:  Okay.  I'm going to get to that.

1          MR. LAURO:  -- unless the government can come up with

2     good cause as to why.  But I think, as you've seen under Rule

3     16 in your experience and the orders that you've entered, the

4     burden should be on the government --

5          THE COURT:  It is.

6          MR. LAURO:  -- first to designate what's sensitive and

7     what's not sensitive.  The nonsensitive material is subject to

8     the regular rules of the Court that we all have to abide by in

9     terms of what we can say and what we can't say about it.

10         But that nonsensitive information should not restrict,

11    under the Sixth Amendment, our ability to represent our client

12    and our ability to have an opportunity to discuss these issues

13    with our client, but also not be required to sit in the same

14    room as we go over a massive amount of documents in this case.

15         THE COURT:  Well, again, I'll get to that.

16         MR. LAURO:  I know we'll get to that.  But, really,

17    the burden is on the government under Rule 16, and here

18    they're trying to switch it.  They're trying to say the burden

19    is on President Trump's team when it's not.  It really has to

20    be something that the government has to go through and provide

21    good cause.  These kinds of blanket orders really present an

22    enormous problem here as well because of the ambiguity in this

23    order.

24         The risk is that someone can say something in the course of

25    a heated debate or heated campaign, and they're going to throw

1     a flag and say, No, wait a minute, somewhere in the bowels

2     of discovery there was something that mentioned what you

3     just said, and therefore you're in violation of this order.

4     And then we're off to the political spectacle of President

5     Trump in violation of the order.  All of this, Your Honor,

6     unfortunately, has to be understood in context under the

7     microscope of how the government decided to proceed.

8          And I will say one other thing.  Everything that we do

9     here now is under a microscope -- a political microscope,

10    unfortunately -- because of the result of what the government

11    has done.  And I understand our requirement, and we will obey

12    Your Honor's direction 100 percent --

13            THE COURT:  I'm glad to hear that.

14            MR. LAURO:  -- and not ever deviate from what Your

15    Honor directs us to do.  But there has to be fair play here.

16    All we're asking for is fairness in terms of how we handle

17    this discovery.  We don't even know the magnitude of the

18    discovery yet.  They haven't even described it for us.  Is it

19    one terabyte?  Is it three terabytes?

20         But the bottom line is we need something that's workable,

21    that isn't ambiguous, that doesn't intrude on the attorney-

22    client privilege, that affords my client the due process

23    rights that he's entitled to in the context of a campaign.

24    We can't ignore the fact that it's a campaign.

25            THE COURT:  I intend to ensure your client is afforded

1    all the rights he's entitled to.  I reiterate that the

2    existence of a political campaign is not going to have any

3    bearing on my decision other than, you know, any other lawyer

4    coming before me saying that my client needs to be able to do

5    his job.  I will always, obviously, factor it in, but I intend

6    to keep politics out of this.

7        And, Mr. Windom, since you have the burden, I'm going to

8    let you to respond to Mr. Lauro.

9        Did I cut you off?

10           MR. LAURO:  No.  Absolutely not.

11       Your Honor, just in sum, the factors that are at issue

12   here is whether or not the government can show good cause

13   with respect to witness intimidation or perjury.  We'll put

14   national security aside because there's no question, no issue

15   there.  But they haven't done that yet.  They haven't done

16   that in terms of any cognizable or nonspeculative harm that

17   exists.

18           THE COURT:  As to the nonsensitive.

19           MR. LAURO:  Exactly.

20           THE COURT:  I keep trying to come back to the paragraph.

21           MR. LAURO:  I understand your difference.  And, Your

22   Honor, that's our difference.  That's why we wanted the order

23   to separate out sensitive from nonsensitive and put the burden

24   on the prosecutor to come up with what's sensitive at an

25   initial blush.

1           Now, if they put something in the sensitive bucket, we can

2      argue that it shouldn't be.  But in fairness, they should have

3      the first obligation to do that and not have this blanket

4      assertion.

5           And one other point that I need to make on paragraph 1

6      before I forget, if I may, Your Honor, it says, "The order

7      does not apply to records," and we should add "or information."

8      "Records or information."  Because that covers the *Seattle*

9      *Times* issue where a client who is subject to a protective

10     order may have some information from prior that's not

11     connected to the discovery process.

12           THE COURT:  Well, isn't that covered by another

13     paragraph?

14           MR. LAURO:  It's not, really, and we just wanted to

15     make that clear in paragraph 1.

16           THE COURT:  Okay.

17           MR. LAURO:  But I think Your Honor knows our concerns

18     in terms of a blanket order.  We think it's much more

19     practical and much more in accordance with the way that this

20     Court has handled these orders, is to have the burden on the

21     government at first issue.

22           THE COURT:  Well, they always bear the burden when they

23     move for the order.  So I'll hear from Mr. Windom in response,

24     and then I'll rule.

25           MR. LAURO:  Yes.

1          MR. WINDOM:  Thank you, Your Honor.

2      The government is happy to accept its mandates to bear

3      the burden for good cause here.  The defense counsel's made a

4      bunch of comments that are obviously political in nature here

5      in this courtroom.  I'm not going to address those.

6      What I will say is that it is emblematic of what the

7      defendant has done even more recently, since we filed a week

8      ago, in posting things about potential witnesses in the case.

9      Counsel also has made no secret about what his intention is.

10     The good cause here is in order to, among what I already have

11     said, to prevent pollution of the jury.

12         THE COURT:  I really want you to focus -- I mean, we're

13     just -- this is the first thing.  We have a number of things

14     to discuss, and I really want you to focus on the sensitive

15     versus nonsensitive difference and whether it should all be

16     subject to the order.

17         MR. WINDOM:  Yes, ma'am.  And the government's aim here

18     is to prevent the use of any material produced in discovery

19     for purposes of harming the jury pool, whether it's sensitive,

20     whether it's nonsensitive.  The aims control, the objectives

21     control, regardless of the designation.

22         THE COURT:  I agree.  But you still have to show good

23     cause for the nonsensitive.  That's really what I'm trying to

24     home in on.

25         MR. WINDOM:  Yes, ma'am.  And I cannot be more specific

1    than they have identified what they intend to do with it.

2    Even if it is nonsensitive material, it still has the

3    potential to pollute the jury pool.  It still has the

4    potential to intimidate witnesses, to damage witness

5    reputation.

6        And I would say that this is not -- the defense has said

7    this is some sort of extreme thing that the government's

8    reaching for here.  The defense agreed to these same

9    protections in the Southern District of Florida not two months

10   ago.  The Court has entered an order with the same broad brush

11   of covering all discovery in the *Butina* case in addition to

12   the handful of cases that the government mentioned here in its

13   brief.

14       THE COURT:  I think the differences with the *Butina*

15   case, which now seems so small and quiet, is that there was

16   no argument from the defense there that the defendant in that

17   case needed to speak, and we have a different situation.  As I

18   said to Mr. Lauro, the fact that there's a political campaign

19   going on is not going to influence my decision one way or the

20   other.  But I do have to weigh the defendant's -- all

21   limitations on a defendant's First Amendment rights.

22       And I would point out that even without the protective

23   order, the defendant is -- Mr. Trump is subject to pretrial

24   release conditions, which also prevent him from interfering

25   with the orderly administration of justice and engaging in

1      behavior that could harass or intimidate a witness, because

2      the release conditions are also there.

3          MR. WINDOM:  That's also correct.  What the protective

4      order does is to prevent -- is to limit the amount of

5      information and data that the defendant would be able to use

6      in the event he wants to go after a potential witness.

7          THE COURT:  And so the statement that you used where

8      the defendant posted something about the former vice

9      president, for example, that's not really -- that really

10     wouldn't be covered, right, because that's not really

11     information.  That's covered under his conditions of release.

12       Isn't that right?  I mean that's not from information that

13     would be turned over in discovery.  That's behavior that may

14     be affecting his conditions of release but not really

15     implicated on the protective order.

16         MR. WINDOM:  That's correct.  However, once the

17     defendant receives discovery, if he says something that

18     clearly he got from a transcript or from another document --

19         THE COURT:  Well, we'll get to it, but a transcript

20     may be designated as sensitive, so it's subject to the order.

21     I'm really trying to determine if I need to subject the

22     nonsensitive information to the order, and that's where I keep

23     getting a lot of broad arguments.  But I'm not --

24         MR. WINDOM:  Sure.  And it's a little hard to speak in

25     the abstract, which is why --

1          THE COURT:  I know.

2          MR. WINDOM:  In addition to the overriding principles

3     that the government has laid out, I guess I would say two

4     other things.

5          First, in paragraph 1 of the proposed protective order, the

6     government's order is appropriately limited.  It does exempt

7     information that is public.  It does exempt information that

8     the defendant or defense counsel come into possession of by

9     independent means unrelated to the discovery process.

10         So we are talking about -- in terms of the nonsensitive

11    versus sensitive, we're talking about a relatively small

12    percentage of discovery.  But nonetheless, the concern is that

13    the defendant will still use that in order to affect the fair

14    administration of justice to the extent that there is -- once

15    we get the ability to be more granular, once discovery is

16    produced, to the extent that there is an issue where there is

17    a strong defense reason to rebut the government's good cause

18    that we have set forth, the defense can come back to the Court.

19         THE COURT:  All right.  Thank you.

20         MR. WINDOM:  Thank you, Your Honor.

21         THE COURT:  It is close.  But as I said, there are

22    release conditions, and the government has an opportunity to,

23    before turning over discovery once the protective order is

24    issued, to go over its materials and add sensitive

25    designations.

1         So, at this point, I am not persuaded that the government

2    has shown good cause to subject to the protective order all

3    the information in this case, and therefore I will adopt the

4    defense'S revised scope.  The protective order will govern

5    only materials that the government designates as sensitive.

6    At this stage, as I said, I haven't -- I'm not persuaded.

7         I will tell you, Mr. Lauro, that as I just said to

8    Mr. Windom, the defendant is also covered by conditions of

9    release, and all his behavior and statements are governed by

10   those conditions of release.

11        So, regardless of whether statements are made that are

12   derived from the discovery or not, if they are made and they

13   have an effect on the administration of justice or have the

14   effect of intimidating or causing harassment to a witness, I

15   will be scrutinizing them very carefully.

16        All right.  The remainder of the disputes about the

17   protective order are largely confined to the defense's

18   discrete edits in the particular paragraphs.  So, as I said,

19   I'm going to go through them in sequence as they appear in

20   Exhibit A to defendant's opposition brief in ECF No. 14,

21   beginning with paragraph 1.

22        I cannot accept the defense's edit that would exempt from

23   the protective order any records that -- and I guess you

24   would -- that would exempt from the protective order any

25   records that, in quotes, "become publicly available."

1        Discovery materials could become publicly available through

2   any number of ways, some improper.  I am not willing to

3   automatically allow the parties to disclose or confirm any

4   materials just because, for instance, someone else manages to

5   access and disseminate that information.  So I'm not going to

6   go for that edit, and the government language will stay.

7        Instead, I will retain the government's proposed language

8   which exempts only records that are publicly available

9   independent of the government's production.  If certain

10  records that are not publicly available now become so during

11  the course of these proceedings, the defense may move to

12  modify the protective order to exempt them.

13       Next we move to paragraph -- we're still in paragraph 1.

14  I also cannot agree to the defense's other proposed edit to

15  paragraph 1 which would exempt records which the defense came

16  into possession by means other than government production.

17       As the government points out in its reply, that would allow

18  the defense to subpoena sensitive information learned through

19  discovery and then disseminate those materials, and I don't

20  want that to happen.  So I will therefore retain the

21  government's proposed language which exempts only records that

22  the defense obtains by independent means unrelated to the

23  discovery process.  I move now to paragraph 3.

24            MR. LAURO:  Your Honor, if I may?

25            THE COURT:  Yes.

 1          MR. LAURO:  I don't mean to interrupt.

 2      Will the Court adopt our request that it should be "records

 3      or information" to cover the *Seattle Times* issue?

 4          THE COURT:  In paragraph 1?

 5          MR. LAURO:  In paragraph 1, yes.

 6          THE COURT:  Mr. Windom?

 7          MR. WINDOM:  The government has no objection to that,

 8      Your Honor.

 9          THE COURT:  I will.

10          MR. LAURO:  Thank you, Your Honor.

11          THE COURT:  Okay.  Paragraph 3.  The defense proposes

12      broadening the definition of authorized persons who can view

13      the protected materials to include not only persons employed

14      to assist the defense, but also to any persons assisting the

15      defense in any capacity, and I quote, "including any attorneys,

16      investigators, paralegals, support staff, consultants, or expert

17      witnesses who are advising or assisting defense counsel."

18      I am not comfortable with that broad a definition which

19      could include just about anyone and would significantly

20      heighten the risk of unauthorized disclosure.  So I'm not

21      going to alter that definition.  I do note, however, that the

22      parties' briefing suggested that the defense might be amenable

23      to drafting a narrower definition to which the parties could

24      agree.

25      Did you have a proposed alternative, Mr. Lauro?

1          MR. LAURO:  We could submit one, Your Honor.  Yes.

2          THE COURT:  And, obviously, submit it to the government

3     first because, to the extent that there's anything that is

4     unopposed, I'm going to treat it much more quickly than I

5     would if it's opposed.  So I would appreciate it if you would

6     do that.

7          MR. LAURO:  Your Honor, may I speak to that issue,

8     though?

9          THE COURT:  Yes.

10         MR. LAURO:  I'm assuming and want to represent to the

11    Court that anyone on our team who has access to any discovery

12    will be given a copy of this order, and we will require them

13    to abide.

14         THE COURT:  Actually, I'm going to get to it, but I'm

15    going to add a provision that neither party had mentioned,

16    that they sign a document.

17         MR. LAURO:  Yes.  And we understand that.

18       But one thing we want to be able to do, obviously, is as we

19    build our team with this incredibly large case, to be able to

20    have, you know, consultants and others who are working under

21    our direction or with us, including in some instances people

22    who volunteered to be volunteer lawyers and volunteer

23    paralegals to assist us.  They'll all be subject to this rule

24    and subject to Your Honor's order.

25       This is a massive case, and it's impossible to get ready

1    under the terms that the government is seeking, which is

2    in early January, without the kind of staff -- the special

3    counsel, as I understand it, has over 60 lawyers and

4    investigators working on this.  We have a relatively small

5    group here.

6              THE COURT:  I understand.

7              MR. LAURO:  And it's an impossible task unless we're

8    able to enlist the help of people who are willing to abide by

9    Your Honor's ruling, abide by this order, abide by the rules

10   of the court, but who want to provide assistance.  In order

11   for us to defend this case, we have to have more help and more

12   manpower beyond just the lawyers working on it.

13             THE COURT:  I understand that.  And no one is more

14   aware than I that you and your team are defending Mr. Trump

15   in more than one jurisdiction at the same time.  I'm aware

16   of that.  Notwithstanding that fact, and the need for you

17   to obtain assistance, there's a process.  I cannot accept a

18   definition that would basically let anyone, including, I might

19   note, individuals who may be unindicted co-conspirators, to

20   assist and to have access to this material without leave of

21   court.

22       If there is a lawyer or legal personnel, you know, a

23   paralegal or lawyer or consultant that you want to have assist

24   you, then that person needs to fit the definition and be

25   subject to the protective order, and the definition you have

1    currently is simply too broad.  It allows just about anybody --

2    you know.  I live in Washington.  Everyone is a consultant.

3        (Laughter)

4        MR. LAURO:  That may be, Your Honor, but not anyone

5    would be operating under the direction of counsel and subject

6    to the order.  And if the government would like, they can give

7    us a list of co-conspirators.  Obviously, we would --

8        THE COURT:  I'm sure you would like that, but I don't

9    think they're ready for that yet.

10       MR. LAURO:  Yeah, we can exclude those.  But to

11   basically disable us from having consultants or volunteer

12   lawyers working on the case would hamstring us in an

13   incredible way.  In every large case I've had, and I'm sure

14   Your Honor has had, there have been consultants, trial

15   consultants, third parties that assist in the accumulation

16   and processing of documents --

17       THE COURT:  But those people are usually employed by

18   the defense.  They are people who are subject to, you know,

19   all -- they're officers of the court.  They are people who are

20   subject not only to your supervision, but they must abide by

21   the rules of this case.

22     But volunteers?  I mean, you're asking for such a broad

23   definition that it makes me very concerned, and I just cannot

24   have it this open-ended and this broad a definition.

25       MR. LAURO:  These outside consultants are often

1      employed by the client, or paid by the client.  They're under

2      my supervision, but I don't pay all the consultants.

3          THE COURT:  The payment is less troubling to me than

4      the broadness of the definition.  I mean, I hear you and I

5      understand your need to have assistance, but that -- I think

6      allowing your definition would basically allow almost anyone

7      to just sort of come in, and it would increase the chance and

8      the possibility that information subject to the protective

9      order would be improperly disseminated.  But I'll hear

10     Mr. Windom on this.

11         MR. LAURO:  And, Your Honor, if we could submit,

12     perhaps, alternative language.  But I just want to make clear

13     that anybody who sees any discovery in this case, it will be

14     at my direction and co-counsel's direction.  It will not be

15     done in a haphazard --

16         THE COURT:  Anybody who sees any discovery in this case

17     has to sign a document indicating that they understand and are

18     bound by the protective order.

19         MR. LAURO:  We're fine with that, Your Honor.

20         THE COURT:  Okay.  Well, I'm not going to accept the

21     language as you proposed.  As with this order, it is subject

22     to modification.  If there's alternative language that you

23     want to meet and confer with the government about, I'll hear

24     you further down.  But as it stands right now, I am not going

25     to -- I'm going to leave the government language in.  I'm not

1     going to change it to the language that you propose, at least

2     in your motion.  Mr. Windom?

3             MR. WINDOM:  I don't need to be heard, Your Honor.

4             THE COURT:  Sometimes it's good to just -- yeah, move

5     on.  All right.

6         Paragraph 4, which is the exception for generalized mental

7     impressions.  The government does not object to the defense's

8     proposed exception to paragraph 4 for generalized mental

9     impression, so I will accept it.

10        With regard to paragraph 5, agreement in writing, I will

11    make one minor edit, as I said, that has not been requested by

12    either side, which paragraph 5 provides, that all authorized

13    persons must be provided with a copy of the protective order

14    and agree to abide by it.  And I am going to add that such

15    agreement must be in writing.

16        Paragraph 6, exception for work products, etc.  The

17    government does not object to the defense-proposed exception

18    to paragraph 6 for work product, notes, or other documents

19    reflecting the content of protected materials.  And I agree

20    that that edit is appropriate, so I will accept it.

21        In paragraph 7, the defense proposes a similar exemption

22    from the protective order for any records that become publicly

23    available.  For the reasons I discussed earlier, I will not

24    add that language here.  So that I will not add that edit, and

25    that is for the reasons that I discussed in the information

1    that may become publicly available.

2       So next paragraph, 8(e).  The defense proposes two changes

3    to the definition of sensitive materials in paragraph 8.

4    In paragraph 8(e), they replace "recordings, transcripts,

5    interview reports, and related exhibits of witness interviews"

6    with "information regarding the government's confidential

7    sources or which may jeopardize witness security."

8       The government states that the defense definition would allow

9    disclosure of discovery transcripts and audio recordings of

10   witness interviews conducted outside of the grand jury process.

11      Let me ask you, Mr. Windom, the transcripts and audio

12   recordings that you're concerned about that are not from

13   confidential sources -- well, are the transcripts and audio

14   recordings that you're concerned about not from confidential

15   sources?  Because if they are, wouldn't they be covered by

16   the defense's proposed language?

17          MR. WINDOM:  They would be covered by the defendant's

18   proposed language, but let me give you a sense as to what

19   we're talking about.

20          THE COURT:  Okay.

21          MR. WINDOM:  During the course of this investigation,

22   it was the government's general practice to audio record

23   witness interviews conducted outside of the grand jury.  Those

24   fall into interviews that occurred in preparation for grand

25   jury.  They fall into separate interviews conducted outside of

1    the local area.  They fall into interviews that occurred at

2    our office.  There are hundreds of recordings of witness

3    interviews.

4         What is or is not a confidential source, it's hard to say

5    when you're simply talking about a percipient fact witness,

6    for example, to the defendant's criminal conduct.  Our

7    approach is much cleaner.

8         It will prevent -- it is the functional equivalent of a

9    grand jury transcript taken outside of a grand jury setting,

10   and what it will prevent is what defense has forecast it's

11   going to do.  It will prevent the defendant from putting a

12   post out and attaching a three-second snippet of an audio

13   recording.  It will prevent the defendant from putting out a

14   Metro billboard with a quote or sending out a mass mailer

15   targeted to the D.C. jury pool.  It will prevent the defense

16   from systematically and scientifically generating the grounds

17   for a Rule 26 motion for change of venue.  It will prevent the

18   pollution of the jury pool.

19        That is the import of the government's proposed order with

20   respect to that subparagraph.

21        THE COURT:  Are there other materials you're concerned

22   that the defense's proposed language would exclude?

23        MR. WINDOM:  So the government's proposed language

24   covers all of the transcripts and recordings.  The defendant's

25   proposed language, we would construe it broadly.  We would

1   have to designate all of those transcripts should the Court

2   decide to go with the defense here.  But I anticipate that

3   it would result in protracted weekly litigation over which

4   sentence of which transcript that the defendant finds

5   favorable that it wants to put out, you know, on the Sunday

6   shows or put through a surrogate.  Ours is much cleaner and

7   straightforward and more efficient for this court.

8          THE COURT:  Okay.  Mr. Lauro?

9          MR. LAURO:  Yes, Your Honor.  Once again, it's too

10   broad of a brush.  For example, let's assume the government

11   has obtained information, a transcript that came about during

12   the J6 committee -- assuming that they haven't destroyed it --

13   and in the course of that, the government has that discovery.

14   It's a transcript.  It was never intended to be confidential.

15   For whatever reason, the J6 committee did not decide to

16   release it, but there never was any degree of confidentiality

17   attached to it.

18     That clearly should not be designated as sensitive

19   information, particularly if it contains *Brady* or *Giglio*

20   material that would be very important to President Trump in

21   terms of his defense and in terms of the -- you know, the

22   wider scope of what he has to do to defend himself publicly.

23          THE COURT:  But, again, you're sort of conflating what

24   your client needs to do to defend himself and what your client

25   wants to do politically, and your client's defense is supposed

1    to happen in this courtroom, not, you know, on the internet.

2            MR. LAURO:  Well, and here's --

3            THE COURT:  And to the extent your client wants to,

4    you know, make statements on the internet, they have to always

5    yield to witness security, witness safety.  And that's what

6    I'm concerned about.  The subcommittee may not have designated

7    those transcripts as confidential, but you start releasing

8    snippets of witness interview transcripts, what do you think

9    is going to happen to those witnesses?

10           MR. LAURO:  The problem is, Your Honor, the way that

11   this is drafted, if President Trump talks about something

12   relating to that witness and it happens to be in a transcript,

13   then they throw the red flag and they say there's been a

14   violation.

15           THE COURT:  Well, I'm finding it very difficult to

16   envision the former president of the United States engaged in

17   a political campaign talking about potential witnesses who may

18   not have, you know, the kinds of protection that he has.  I

19   mean, I could see the possibility for a lot of problems here.

20       I'm not sure what right -- I mean, your client retains, as

21   I said in the beginning, a First Amendment right.  But I can

22   see how, in advance of trial, making public statements about

23   potential witnesses is going to, in and of itself, affect the

24   orderly administration of justice and, Mr. Lauro, could run

25   afoul of his release conditions.  So the example you're giving

1    me is not helping.  It's actually causing me some concern.

2         MR. LAURO:  And I understand your concern, Your Honor.

3    And President Trump will scrupulously abide by his conditions

4    of release, and we will do everything to ensure that that

5    happens, and it will happen.  But let's take one example.

6         Vice President Pence is a political opponent now in a

7    campaign, and there's going to be an exchange between the

8    two of them.  There's going to be arguments back and forth.

9    And if, in one of President Trump's statements, it happens to

10   overlap with something that's in discovery that's included in

11   this definition, we suddenly have a problem.

12        And the other thing, Your Honor, respectfully, is President

13   Trump, in the middle of a campaign, should not have that chill

14   over him in terms of the way that he campaigns and advocates

15   for his position.

16        THE COURT:  He is a criminal defendant.  He's going to

17   have restrictions like every single other defendant.  This

18   case is proceeding in the normal order.  I know there are

19   obviously security concerns, and there are many, many concerns

20   that we all have because of the unusual nature of this case,

21   but the fact that the defendant is engaged in a political

22   campaign is not going to allow him any greater or lesser

23   latitude than any defendant in a criminal case.

24        MR. LAURO:  We understand that, absolutely.  But the

25   problem is, the way that this order is written by the

1    government, it paints too broadly.  All we're asking for

2    is more specificity, particularly with respect to sensitive

3    information that the government can designate with some

4    particularity and have a reason for.

5        Simply saying a transcript is sensitive, that's not enough

6    under Your Honor's original determination, because there's no

7    good cause to identify that particular transcript as

8    sensitive.  Once again, we have to go back to the government

9    showing good cause why it's sensitive and why it should be

10   protected.  That's all we're asking for.

11       THE COURT:  Well, what I did in the beginning was

12   agree with you that the government has to show good cause here

13   for why certain materials should be covered by the protective

14   order and shouldn't, and I agreed with you that, as to the

15   nonsensitive information, it would not be covered.

16       But now we're talking about what can be designated as

17   sensitive, and I have to tell you, so far I'm not being

18   persuaded by your argument that witness transcripts or

19   recordings of witness interviews shouldn't be sensitive for

20   the reasons I have concern, and the examples you're giving me

21   are not comforting.  But I'll hear from Mr. Windom on this.

22       MR. LAURO:  If I may say one last thing, Your Honor,

23   respectfully.

24       THE COURT:  Yes.

25       MR. LAURO:  I think the government can easily identify

1    what they believe are sensitive transcripts, videos and so

2    forth, and have some basis for making that argument based on

3    Your Honor's order here.  That's something that they're

4    capable of doing.  Rather than having this broad category, all

5    we're asking is that the government have to be put to its

6    burden to identify what's sensitive.

7              THE COURT:  All right.  Mr. Windom?

8              MR. WINDOM:  Thank you, Your Honor.

9        The government's proposed order is much more specific

10   than the defendant's proposed order.  The defendant's proposed

11   order is subjective and nebulous as to what is a confidential

12   source or what could jeopardize safety.  Ours is demarcated by

13   the type of document it is.

14       The defense just said that the government should have to

15   identify which transcripts or audio recordings are sensitive

16   and which are not.  Every single one of those people we

17   interviewed is a potential trial witness.  All of them are

18   sensitive.

19       I guess the next argument from the defense would be,

20   well, the government has to go through each one and designate

21   specific paragraphs, designate specific pages.  That is

22   antithetical to the smooth and orderly discovery process

23   that this court should impose here for the fair and efficient

24   administration of justice.

25             THE COURT:  All right.  I am going to retain the

1    government's proposed language.  The definition of "sensitive

2    materials" will include all recordings, transcripts, interview

3    reports, and related exhibits of witness interviews.  Disclosure

4    of any of those materials creates too great a risk that witnesses

5    may be intimidated or that prejudicial information reaches the

6    jury pool.

7        Mr. Trump is already bound by his conditions of release to,

8    and I quote, "not communicate about the facts of the case with

9    any individual known to him to be a witness, except through

10   counsel or in the presence of counsel."  That's ECF No. 13 at 3.

11       But I am concerned that members of the public -- I mean, in

12   addition to the concerns I've already talked about with regard

13   to witness security, I'm concerned that members of the public

14   who are not bound by the release conditions and by these terms

15   might use sensitive witness information in ways that intimidate

16   witnesses or otherwise threaten the integrity of the proceedings,

17   so I am going to go with the government's definition of

18   sensitive materials.

19       Again, the order provides that either side may seek

20   modification.

21       Moving on to paragraph 8(f), which concerns materials

22   obtained from other governmental entities, the defense also

23   proposes to change the definition of sensitive materials in

24   paragraph 8(f).  Specifically, they seek to exclude the

25   category of materials obtained from other governmental

1    entities.  Mr. Windom, I'm not sure I understand exactly what

2    would fall into this category.  Can you give me an example?

3         MR. WINDOM:  Yes, ma'am.  So paragraph 8(e) really

4    was targeted at the SCO, the Special Counsel's interviews.

5    Paragraph 8(f) is mainly dealing with a few things.  The first

6    bucket is the material that we've obtained -- or that we did

7    obtain from the House Select Committee.  There are nonpublic

8    items that the House Select Committee provided to the

9    government including transcripts of witness interviews that we

10   do not believe are public.

11        THE COURT:  But those will be covered by the previous

12   paragraph, right?

13        MR. WINDOM:  And perhaps this is poor wording on our

14   part.  The intention was for 8(e) really to be focused on what

15   the -- the government's own interviews and for 8(f) to

16   encompass the Select Committee's interviews.  I see that it

17   could be covered by both.  So that is one category.

18      The second category is there's a large volume of material

19   obtained from the Secret Service including internal emails

20   which have, you know, the names of individuals, various things

21   that the defendant may or may not have known in his time as

22   president that deal with any number of issues that should be

23   nonpublic.

24      Again, the blanket designation, the government believes,

25   is appropriate for the reasons of not polluting the jury pool,

1    not intimidating witnesses, not naming people who are within

2    the Service or within other governmental agencies.  Should

3    there be a specific document, we're happy to discuss that with

4    the defendant under the paragraph 16 of the proposed order

5    after discovery is released.

6             THE COURT:  All right.

7             MR. LAURO:  And, Your Honor, that clearly can be

8    something they designate as sensitive.

9             THE COURT:  I'm sorry?

10            MR. LAURO:  I'm sorry.  It clearly could be something

11   they designate as sensitive if it's a Secret Service or other

12   matter.  But to just have it as this broad category,

13   automatically sensitive, kind of --

14            THE COURT:  Well, it fits the definition -- and

15   wouldn't you agree, or do you agree, that some of this

16   material under 8(f) would already be covered under 8(e),

17   such as the transcripts of witness interviews?

18            MR. LAURO:  Yeah, it could.

19            THE COURT:  What about the material that Mr. Windom

20   just referenced, for example, Secret Service emails?  That

21   would fit the definition of 8(f), materials from other

22   governmental entities, and that is very sensitive.

23            MR. LAURO:  Right.  And it should be designated as

24   sensitive, and they can do that.  But what I'm concerned about

25   is nonsensitive information that is swallowed in this broad

1      language of "anything that's obtained."  You know, it just --

2      it makes it impossible to comply.  That's our problem.

3            THE COURT:  Well, I may one day regret saying this, but

4      the parties are always free to seek modifications under the

5      terms of the agreement.  But I think, given the examples and

6      given the good-cause argument that I've heard from the

7      government, I am going to retain the government's proposed

8      language.  The definition of "sensitive materials" will

9      include "materials obtained from other governmental entities."

10           I am persuaded that disclosure could compromise --

11     especially given the example that Mr. Windom has given me, and

12     I can think of others, could compromise the confidentiality of

13     those entities' own proceedings.  And so I'm going to leave

14     the language in as the government has stated.  I'm not going

15     to adopt the defense edit.

16           Now, if you want to propose language that narrows this,

17     you're free to meet and confer with Mr. Windom about it.

18           MR. LAURO:  I may have to, Your Honor, because it

19     literally would include -- all of the J6 materials that the

20     government obtained would be subsumed in this provision,

21     again, assuming that J6 didn't destroy any documents.

22           THE COURT:  Wouldn't some of that material already be

23     publicly available?

24           MR. LAURO:  Not necessarily, because --

25           THE COURT:  But some of it would.  So you said "all,"

1    and that's not actually correct.  Right?  So some of that

2    material has been broadcast.

3         MR. LAURO:  You know, talk about pretrial publicity,

4    they had big TV screens going on.  But the problem is that we

5    don't know what's there and what's not there.  For example, if

6    there's something that was not publicly disclosed that came

7    within J6, then it's all going to be considered sensitive even

8    though there's not a good-cause showing.  That's my concern.

9         THE COURT:  I think the government has established good

10   cause for materials that are defined in that paragraph, and,

11   as I said, this order has to be read as a whole.  And so there

12   may be some of those materials that are just not sensitive

13   because they are publicly available.  And with regard to the

14   subcommittee materials, there may be quite a bit of that that

15   is publicly available given the public proceedings.  So, at

16   this point, I'm not going to adopt the defense language.

17        Now, paragraph 8, the final edit the defense proposes --

18   not the final.  The final edit to paragraph 8 would require

19   the government to conspicuously mark all sensitive materials.

20        Now, Mr. Windom, my understanding is -- well, tell me if

21   I'm wrong.  Do you intend to, when you produce the materials,

22   segregate all sensitive materials from nonsensitive materials?

23   Correct?  And your reply brief suggests that it would be --

24   you said "logistically unworkable to mark all sensitive

25   materials."

1          Can you explain why?  Obviously, if you have to go through

2     and stamp every single page "sensitive," that's really quite

3     burdensome.  But what about an interim measure, like stamp on

4     the first page or -- I don't know.  Aren't there some ways

5     that could make sure that the defense doesn't inadvertently

6     produce something that's sensitive that they could argue to

7     me, well, we just didn't know; it wasn't clear that that was

8     sensitive?

9          MR. WINDOM:  So this is actually a -- it may not seem

10    on its face, it's a very important point for the speed of

11    getting discovery out.

12          THE COURT:  And I'm -- you know, I'm all for that.

13          MR. WINDOM:  Yes, ma'am.  So what the government wants

14    to do is in the -- whether it's in the cover letter or in the

15    source logs -- and I have an example where the source logs

16    have the exact production, by very organized title and

17    description, the Bates number, and whether it is sensitive or

18    nonsensitive.

19          THE COURT:  Okay.

20          MR. WINDOM:  That is the fastest and most efficient way

21    to accomplish this.  The defense has asked for a page-by-page

22    stamping of them.  If the Court went with that --

23          THE COURT:  I'm not going with that.

24          MR. WINDOM:  Thank you, Your Honor.

25        I will say that this approach also was adopted in a

1     protective order in a case in which Mr. Lauro was counsel

2     in Florida about two years ago, with this language being

3     permissible to include it not just on the face of the

4     document, but also in cover letter or in transmittal

5     information.

6          THE COURT:  And the organization and designation that

7     you describe in cover letter and transmittal would include a

8     Bates range.  Is that correct?

9          MR. WINDOM:  Yes, ma'am.  It is the source, the

10    beginning Bates, the end Bates, the designation.

11         THE COURT:  All right.

12       Mr. Lauro, I'll hear you if you want.

13         MR. LAURO:  They're going to do what they're going to do.

14         THE COURT:  Well, no.  I mean, you enunciate a

15    reasonable concern, which is you don't want to be in front of

16    me saying, we released sensitive information, but we didn't

17    know.  And I want to make sure that you're not in a position

18    where you may do that and that the production is designed so

19    to ensure that there's no confusion.

20       The procedure that Mr. Windom has described sounds like it

21    would make clear by Bates range and source and in every other

22    way that, you know, what is sensitive and what is not.  I do

23    think that stamping every page would be not only unworkable

24    but would delay this considerably for a reason that's not

25    really a problem.  I don't mind taking the time to ensure that

1      things are done right, but it seems like a solution in search

2      of a problem.

3           MR. LAURO:  Your Honor, based on the explanation

4      that counsel gave, we're fine with it as long as we have

5      identifiable sensitive information that we know exists.

6           THE COURT:  Okay.

7           MR. LAURO:  I just resent the fact that counsel has

8      been searching for prior orders in cases that I had no idea

9      about.  So I just need to put that on the record.

10          THE COURT:  Well -- you know.  I hear you.  I feel

11     your pain.  All right.  Based on the parties' submissions and

12     the arguments, I will retain the government's proposed

13     language.  I will not require the government to mark every

14     record it designates as sensitive, and I'm willing to accept

15     their representation that individually marking the documents

16     would be too burdensome and unnecessary, frankly, in light of

17     the government's representations as to how they will produce

18     and segregate and designate the documents.

19          Now paragraph 9, which goes to assisting the defense, and

20     that goes back to our discussion that I had, Mr. Lauro, with

21     persons who are subject to the order.

22          In paragraph 9, the defense edits reiterate the expanded

23     definition of "authorized persons" that I discussed earlier in

24     relation to paragraph 3, and for the same reasons as my ruling

25     on paragraph 3, I will not accept those edits and am going to

1          leave in place the government's definition of "authorized

2          persons."

3               Also in paragraph 9, the defense's other edit extends

4          permission to share sensitive materials to the counsel of

5          persons to whom the materials solely and directly pertain.

6          That edit and revision is unopposed, and I will enter it.

7               Paragraph 10, counsel review of defendant's notes.  The

8          defense edit to paragraph 10 would remove defense counsel's

9          obligation to review Mr. Trump's notes regarding sensitive

10         materials and ensure that they do not include any personal

11         identifying information under Federal Rule of Criminal

12         Procedure 49.1.

13              I am inclined to reject that edit.  That obligation

14         is imperative, as I mentioned earlier, to prevent witness

15         intimidation and other potentially prejudicial consequences.

16         With regard to paragraph 11 --

17              MR. LAURO:  Your Honor, I have one question about

18         paragraph 10, and this really does raise an important issue.

19         If there are transcripts or documents of prior witness

20         testimony, for example, I want to be able to allow my client

21         to read those in private and have the ability to examine them

22         without counsel present or without counsel being in the same

23         room.  And I think we have to have some degree of assurance

24         that we don't have to literally sit next to our client while

25         he reviews transcripts and otherwise sensitive information.

1          THE COURT:  Well -- and I'll hear from Mr. Windom in a

2     minute, but -- hold on.

3          (Court reviewing document.)

4       Wouldn't your client be able to review -- and Mr. Windom

5     can correct me if my reading is incorrect.  But he would be

6     able to review those materials in private, but afterwards

7     you would have to check his notes to make sure that personal

8     identifying information wasn't included in those notes.  It's

9     not how he reviews the notes.

10      Am I wrong, Mr. Windom?  I mean, Mr. Lauro's concern is

11    that his client be allowed to review the notes in private.

12         MR. WINDOM:  Just to make sure we're talking about the

13    same thing, the notes or the sensitive discovery materials?

14         THE COURT:  Mr. Lauro, as I understand it, wants his

15    client to be able to review the sensitive material without him

16    having to be there.  Is that -- let's break it down.  Is that

17    agreeable to the government?

18         MR. WINDOM:  So the -- I guess I would first note that

19    Mr. Lauro did not object to that language in paragraph 10 in

20    this proposal here.  What it sounds like he's asking for is

21    that he need not sit next to his client the entire time.

22         THE COURT:  Right.

23         MR. WINDOM:  I think as long as it is a person employed

24    to assist with the defense to be with him when the sensitive

25    materials are present and then to collect the material after

1    the defendant is done reviewing the sensitive material.

2            THE COURT:  Hold on a second.

3        (Court reviewing document.)

4        So your objection, Mr. Lauro, is to the language that says

5    "but defense counsel may not provide a copy of sensitive

6    material to the defendant"?

7            MR. LAURO:  Exactly, Your Honor.  And we're not --

8    in terms of personal identifying information or that nature,

9    we're fine with it.  I mean, we can sit with the client.

10   But in terms of -- and other orders, by the way, have done

11   sensitive and highly sensitive differentiations.

12       What I'm saying is, if there's a transcript of a witness or

13   if there's a video, I want to be able to share it with my client

14   without having to sit in the room or having somebody from the

15   defense team sitting in the room with him.  That becomes

16   impractical under the circumstances, and it really does impinge

17   on Sixth Amendment rights.

18       We have a lot to do in this case, with a relatively small

19   staff, and for us to have our folks sitting with a client as

20   he reads through a transcript, maybe hours, really is an

21   intolerable burden on us.  At least allow us to have the client

22   read transcripts, read information that could be relevant to

23   the case, and then coordinate with us and communicate with us.

24       We can put in procedures to get that information back

25   immediately, but we have to have a situation where the client

1    is allowed to review materials on his own, outside the presence

2    of counsel.

3         THE COURT:  You didn't object to that part.  In your

4    motion, you addressed the notes issue.  You didn't address the

5    reviewing on your own issue.

6         MR. LAURO:  Well, that's correct, Your Honor.  But in

7    light of the fact of how sensitive information is now defined

8    under this order, which will include these transcripts and

9    interviews and so forth, the issue does come to the forefront,

10   unfortunately, in terms of dealing with that issue.

11        THE COURT:  Okay.  Mr. Windom, Mr. Lauro has a point,

12   which is -- tell me what it is you're worried about.  So I'm

13   already inclined to have the order require that the defense

14   inspect any notes.  So that would apply whether or not

15   Mr. Trump is accompanied by counsel or other legal staff while

16   he's reviewing the material or not.  They're still going to

17   have to check all notes that he makes.

18        So tell me the harm or the prejudice that you see arising

19   from him being able to read the materials, which he's allowed

20   to see, by himself, in another room, as opposed to having one

21   of his lawyers or paralegals or legal staff be there with him.

22        MR. WINDOM:  Yes, Your Honor.  Three things on that.

23        First, defense counsel has a certain level of trust in the

24   defendant that the government does not.

25        Second, the defense counsel agreed to an extraordinarily

1    similar position in Florida.  It is defendant shall only have

2    access to discovery materials under the direct supervision of

3    defense counsel or member of defense counsel's team.

4        THE COURT:  But that involves some very -- some

5    classified and national security-implicated information,

6    doesn't it?

7        MR. WINDOM:  No, ma'am.  This particular order that

8    I'm reading from is the nonclassified protective order.

9    There's a separate CIPA Section 3 classified protective order.

10       Third, publicly, the defense counsel and the defendant have

11   had a divergence of views on the protective order, whether

12   there should be one at all or not.  The defendant says there

13   should not be.

14       Second, the defendant has made claims in the press that his

15   counsel has not adopted with respect to motions that should

16   have already been filed or will soon will be filed.  There's a

17   delta that I'm concerned about.

18       THE COURT:  But how would -- and I hate to interrupt

19   you, but I'm going to.  Because how -- and I share your -- but

20   sometimes -- you know.  I was a defense attorney.  Sometimes

21   there is a divergence.

22       But how would the procedure that you're talking about

23   address that?  In other words, whether Mr. Lauro or one of

24   his legal staff is in the room or out of the room isn't

25   necessarily going to solve that problem.  Can you tell me how

1      it would?

2              MR. WINDOM:  It would ensure that the defendant doesn't

3      have unfettered access to sensitive materials to do with it as

4      he wants.

5              THE COURT:  But even if Mr. Lauro -- okay.  Say I

6      go with your provision and I require Mr. Lauro, one of his

7      co-counsel or legal staff to be present.  If the defendant is

8      going to do something, he can still do it whether they were

9      there or not there.  I mean, the safety is the notes, right?

10     Making sure that any notes that he takes are reviewed by

11     defense counsel to make sure they don't include identifying

12     information.

13             MR. WINDOM:  Two things, Your Honor.  First of all, the

14     point of the protective order is to limit risk.  It will limit

15     risk in order to have a defense counsel or an employee --

16             THE COURT:  How, though?

17             MR. WINDOM:  Because of this:  The defendant, when he

18     only has the materials to himself, could elect to photocopy

19     or otherwise reproduce, take a picture of, the sensitive

20     materials.  That risk is much lower when in the presence of a

21     member --

22             THE COURT:  You mean like live tweeting something?

23             MR. WINDOM:  I mean literally just photocopying or

24     taking a picture of something, having it in order to do

25     whatever he wants with it.  He has shown a tendency to desire

1    to hold onto material to which he should not have.

2            THE COURT:  Well, you know --

3        I'll hear you, Mr. Lauro.

4        I'm still having a hard time figuring out how having

5    somebody right there with him is going to -- and I hear you

6    about the photocopy or photograph.  I guess that's a

7    possibility.  But I'll hear your response on that, Mr. Lauro.

8            MR. LAURO:  Yes, Your Honor.  I'm quite surprised that

9    counsel would say that, because it suggests that really what

10   they want to do is just bog us down and bog President Trump

11   down in the middle of a campaign, and maybe that's what they

12   want to do.  But the reality is, to have a lawyer physically

13   with a client all the time --

14           THE COURT:  Let me stop you.

15       Actually, Mr. Windom, would the government be willing to

16   allow the defendant to review the material, provided that the

17   defendant didn't review the material with a phone or -- I

18   mean, just without access to those -- to the extent that

19   that's a possibility, without access to those?  Because

20   Mr. Lauro does have a point.  It's a lot of material, and they

21   are stretched.  And absent some real danger of what you're

22   saying happens, I think it would be burdensome for the defense

23   to require legal staff there all the time.

24           MR. WINDOM:  The issue really is a custody or control

25   one.  I think Your Honor has identified some mitigating

1      measures.  Should the defendant not be permitted to have

2      electronic devices, not be permitted to have a replicating

3      machine --

4           THE COURT:  While he is reviewing the material.

5           MR. WINDOM:  Yes, ma'am.  And then also the other

6      catch to that is, even though a defense counsel or member of

7      the team wouldn't be sitting there, they would have to be

8      immediately available to collect the material if the defendant

9      goes to lunch, if the defendant --

10          THE COURT:  Absolutely.  That's sensitive material.

11     That can't be left lying around.

12          MR. WINDOM:  So if somebody is going to be there

13     anyway outside the room, I'm not sure why they couldn't be in

14     the room.  That said, I understand Your Honor's mitigation

15     measures.

16       I have yet to hear -- there has not yet been a motion to

17     amend the specific language already employed in Florida, so

18     I'm not sure what the actual aspect of the hypothetical harm

19     here is.

20          THE COURT:  That I forgot to ask you about, Mr. Lauro.

21     You did agree to it in Florida.  What's the problem now?  And

22     that case involves, as far as I know -- I don't know any

23     details -- a lot of materials as well.

24          MR. LAURO:  It does, Your Honor.  And I'm not involved

25     in the case in Florida.  I'm not counsel.

1          THE COURT:  Oh.

2          MR. LAURO:  But the bottom line here is that we have to

3     have a workable system that allows President Trump to review

4     these materials without counsel either sitting in the room or

5     outside the room.  We are stretched incredibly thin in this

6     case.

7          THE COURT:  Well, what about Mr. Windom's point, which

8     is -- I intend to retain the provision that says the notes

9     have to be reviewed, so --

10         MR. LAURO:  We can direct the client not to make any

11    notes, obviously.  I mean, this kind of intrusion --

12         THE COURT:  But Mr. Windom's point, which is even

13    if the defendant is reviewing notes alone, in a room where he

14    doesn't have access to electronic devices that could reproduce

15    those materials, somebody still has to be present to collect

16    it, safeguard it.  I mean, it's still going to require time.

17    What about that?

18         MR. LAURO:  The problem is, Your Honor -- respectfully,

19    is the government has not shown good cause for that kind of

20    intrusion into the attorney-client relationship.

21         THE COURT:  But I'm saying, even if he's allowed to

22    review it by himself, it's still going to require staffing to

23    make sure that the conditions of the order are complied with.

24    The materials can't be -- you know, they have to be

25    safeguarded, and they have to be collected.  Right?

1          MR. LAURO:  That's the problem with the order as

2     it stands now.

3          THE COURT:  Oh, that's not going to change.

4          MR. LAURO:  No, no.  But I'm just saying the

5     practicality of a case like this, of this magnitude, with the

6     number of documents involved, based on what the folks here are

7     requesting, would put President Trump and his defense team at

8     an incredible disadvantage at a time when not only is he

9     facing other prosecutions brought by this administration, but

10    also other litigation.

11        He's in the middle of a campaign against this

12    administration, and to have this kind of burden on us is

13    enormous.  And in 40 years of practice, I've never seen a

14    situation in a white-collar case where counsel has to sit next

15    to a client and literally sort of babysit what goes on in

16    terms of what they review and what notes they take.

17        What Your Honor has in this order already are protections

18    that if President Trump made any statements in violation of

19    the order, then that's a problem.  But having all of these

20    oppressive kinds of conditions which they know will interfere

21    with the campaign, that's the goal.  They know that --

22         THE COURT:  I'm not going to accept that premise, and

23    again, I -- I'm not going into that.

24         MR. LAURO:  But the practicality of it --

25         THE COURT:  And I will tell you, I think the more

1    reasonable and what I see is -- I see a desire to move this

2    case along.  I haven't seen any evidence that this is

3    politically motivated.  I understand you have a different

4    view, but it might be -- it might be more persuasive to me if

5    the former president had not entered into this agreement in

6    the Florida case.  It certainly undercuts some of the strength

7    of your arguments, that they're already agreeing to do it in

8    Florida.

9        And I'm willing to consider a modification to that, but I

10    am not willing to consider anything that's going to result in

11    information that's sensitive being disseminated to the public.

12    And I have concerns about that.

13        MR. LAURO:  And, obviously, we will abide by your

14    order, and we understand Your Honor's position.  But there

15    has to be some practical way of carrying this out so that it

16    doesn't burden the defense.  And as a defense lawyer, it's not

17    easy to sit with a client for hours and hours while they read

18    a document.  It just doesn't work, Your Honor.

19        THE COURT:  Okay.  I agree with you, and therefore I

20    am going to compromise here.  I will allow the defendant to

21    review the sensitive material without being accompanied,

22    without having a member of the legal team sit next to him,

23    but I am going to retain the provision that requires counsel,

24    members of the legal team, to review any notes.  And if you're

25    saying you're going to instruct him not to take notes, so much

1    the better, but to ensure that there's no notes taken and no

2    personal identifying information that is kept.  And if the

3    defendant's going to review those materials alone, the

4    defendant cannot have access, during that review, to an

5    electronic device, photocopier machine, or anything that could

6    reproduce or copy those materials.

7        Mr. Windom?

8        MR. WINDOM:  Your Honor, the issue remains about

9    keeping custody or control on breaks or lunches and things

10   like that.

11       THE COURT:  Oh, yes.  Those materials must be

12   safeguarded.  They cannot be left alone.  Should the defendant

13   need to leave the room for any reason, someone has to

14   safeguard those materials, and certainly he can't carry them

15   around with him.

16       Okay.  Paragraph 11.  The defense-proposed edits would

17   permit the parties to include sensitive materials in any

18   public filing without leave of court if all sensitive

19   information is redacted.  This doesn't materially alter the

20   government's proposed approach, which likewise contemplates

21   filing without leave redacted sensitive materials.

22       I will allow the parties to include in their public filings

23   redacted sensitive materials without leave of court only if

24   they have conferred and both sides agree to the redactions.

25   I realize that exception may swallow up my ruling, but if the

1    parties disagree about the redactions, leave of court must be

2    sought before the filing.

3        Again, with paragraph 11, filing sensitive materials under

4    seal without leave, the defense similarly proposes an edit

5    that would permit the parties to file unredacted copies of

6    sensitive materials under seal without leave of court, I'm not

7    going to accept.  This edit is in violation of our local

8    rules.  Local Criminal Rule 49(f)(6)(I)(1) provides that no

9    document may be sealed without an order from the Court.

10        In accordance with that rule, I will require the parties to

11    follow the regular procedure for seeking leave to file a

12    document under seal each time they wish to do so for sensitive

13    materials.

14        I will also require that any motion for leave to file

15    sensitive materials under seal shall attach a redacted copy of

16    those sensitive materials so that the Clerk of the Court can

17    file the redacted copy on the public record if I grant the

18    motion.  And I've consulted, and the Clerk of the Court is

19    prepared and able to do that.

20        Paragraph 12, introducing sensitive materials under seal

21    without leave.  So the defense's edits propose, essentially,

22    the same approach for handling sensitive materials at

23    hearings as they do for filings; that is, the parties may

24    (1) introduce redacted sensitive materials without leave, and

25    (2) go under seal to introduce or discuss unredacted sensitive

1   materials.

2       My approach to those procedures and hearings will be the

3   same as it is for filings.  The parties may introduce redacted

4   sensitive materials during hearings without leave of court so

5   long as both sides agree to the redactions.  However, they may

6   not go under seal or introduce unredacted sensitive materials

7   during hearings without first seeking leave of court.  And

8   that's unredacted.

9       Paragraph 12, handling sensitive materials at trial.  The

10  defense proposes an edit stating that the Court will determine

11  the appropriate handling of sensitive materials at trial in a

12  future order.  And I'm not going to add this language at this

13  juncture, but as we get closer to trial, the parties can move

14  for modifications to the protective order that will change or

15  specify different provisions for trial.

16      So are there any proposed or disputed edits from the

17  defense, Mr. Lauro, that I haven't covered?

18          MR. LAURO:  I don't believe so, Your Honor.

19          THE COURT:  All right.

20      Mr. Windom, is there anything else?

21          MR. WINDOM:  No, ma'am.  Thank you.

22          THE COURT:  All right.  I will issue a protective

23  order consistent with my decisions in short order, but for now

24  I just have a couple more items of business.

25      First, as reflected on the docket, last night I denied a

1    motion from the government for leave to file a document under

2    seal and ex parte.  I intend for this case to proceed in the

3    public record as much as possible, and the motion did not

4    persuade me that there was a need to file the document ex

5    parte.  Accordingly, neither that motion nor its attached

6    document had any bearing on my decision today, and that's why

7    I denied it without prejudice.

8         Going forward, I want to underscore that any motions to

9    file under seal, especially ex parte motions, must articulate

10   the need for those designations, and I will carefully weigh

11   the relevant factors to ensure that there's sufficient reason

12   for keeping any material off the public record.

13        Second, yesterday the government moved to schedule a

14   conference under the Classified Information Procedures Act,

15   CIPA, to discuss what they said was a small amount of

16   classified information that may be subject to discovery in

17   this case.  That's ECF No. 25.  The government proposes that

18   we hold that conference on August 28, which is the same day we

19   have our next status conference in the case.

20        Mr. Lauro, are you available to do that?  It makes sense to

21   me.  We could do it in the afternoon or, you know, right after

22   the status.

23             MR. LAURO:  I think, since we'll see you on the 28th,

24   it might be a good time to discuss that as well, Your Honor.

25             THE COURT:  Excellent.  Then we'll do it then.

1       Okay.  So I will schedule that conference.  Actually, it'll

2   just be part of our status conference on the 28th.  I don't

3   think I need to schedule another conference.

4       This is a good time to mention that, in the interest of

5   efficiency and in keeping with my standard practice, I expect

6   the parties to confer before filing any nondispositive motions

7   and indicate in the caption whether it is opposed or not, and

8   that way I can move speedily with regard to unopposed motions.

9       So just say, you know, defense opposed, defense unopposed

10  motion, or say in a paragraph that the government opposes it,

11  and then I'll know to give time and have a briefing schedule.

12      All right.  Any other matters related to discovery or

13  pretrial motions that we need to address, Mr. Lauro?

14          MR. LAURO:  Yes, Your Honor.  If I may approach?

15          THE COURT:  Yes.

16          MR. LAURO:  Your Honor, we've asked the government

17  not to hide the ball and tell us how much discovery there is.

18  They won't do that.  We don't know if it's terabytes, you

19  know, multiple terabytes, how many boxes, how they're

20  organized.  It's a humongous task, and Your Honor has been

21  there, as defense counsel, and knows what it's like dealing

22  with something like this.

23      We would like a Rule 16 conference with the government as

24  soon as possible, no later than Monday at five o'clock, where

25  we can discuss these issues because we have to respond to Your

1    Honor in terms of trial schedules, and we need to know how

2    much discovery there is.

3            THE COURT:  Well, so here's the thing.  It seems to

4    me -- and Mr. Windom can correct me if I'm wrong -- that the

5    government is prepared to give you that information as soon as

6    I enter a protective order.  Is that correct?

7            MR. WINDOM:  With respect to the --

8            THE COURT:  The amount and -- well, tell me.

9    You tell me.

10           MR. WINDOM:  Thank you.  If I may?

11           MR. LAURO:  And if I may ask, how much is it?

12           THE COURT:  Well, you may find out, as I said,

13    immediately after I issue the order.

14           MR. WINDOM:  The government has actively been trying

15    to get the defendant discovery for some time now.  We are

16    producing, presumably today if the Court enters the protective

17    order soon, the first production.  There's an extraordinarily

18    detailed, extensive source log in the same manner the defense

19    is familiar with from the Southern District of Florida case,

20    lays out exact Bates numbers, the exact organization of the

21    discovery.  So that information will be provided in that

22    source log.

23        There is, in addition to that, a hard drive that we'll go

24    over when the defense lets us know which address to send it

25    to.  That is the first discovery production.

1          THE COURT:  And let me stop you.

2       Is there any reason why you can't tell Mr. Lauro how many

3    documents?  What are we talking about?

4          MR. WINDOM:  Sure.  And he'll have it in a letter, you

5    know, by the end of the day --

6          THE COURT:  Okay.

7          MR. WINDOM:  -- in the first production.  If Your Honor

8    would like to hear it on record, I'm happy to provide the

9    information.  He's going to have it in a letter within 24 hours.

10         THE COURT:  I'm just saying, is there any reason why we

11   can't go on the record now?

12         MR. WINDOM:  No, ma'am.

13         THE COURT:  Well, go ahead.

14         MR. WINDOM:  So, for the first discovery production,

15   the volume of it is roughly 11.6 million pages, or files,

16   which are load ready, available at length.  There's also a

17   hard drive with 2703(d) returns and extractions from other

18   certain electronic facilities.  Those are impossible to

19   paginate or to identify by that.

20      I cannot go into the details because of various Rule 6

21   or sealing concerns.  In general, I will say the material is

22   extraordinarily well organized.  Roughly a quarter of it comes

23   from entities associated with the defendant already, and it

24   may be that the defendant has access to that material already.

25      Some of the material is open-source.  Some of it is also

1    necessarily duplicative just from an organizational

2    standpoint, just to make sure that the defense knows precisely

3    which documents came from where.  As I, said this is the same

4    format and the same process that is used in the Southern

5    District of Florida.  We anticipate additional productions

6    in the coming weeks, and our goal is to have discovery

7    substantially complete by August 28.

8         THE COURT:  You heard Mr. Windom, Mr. Lauro.  I can

9    just imagine your motion for a trial date now.

10        MR. LAURO:  I'm waiting for the deluge, Your Honor.

11   It's going to come.

12      One small point, though.  I think Your Honor mentioned

13   that, with respect to filing under seal, we would have to

14   justify under the normal rules.  I assume that the government

15   will also have to establish a reason for filing anything under

16   seal in terms of...

17        THE COURT:  Rules apply to both sides.

18        MR. LAURO:  Thank you.

19        THE COURT:  I mean, I assume, if it's sensitive

20   material, they have to file it under seal.  They don't have to

21   give additional reasons if it's sensitive material as defined

22   under the order.

23        MR. LAURO:  All right.

24        THE COURT:  Okay.

25      All right.  Thank you, all of you, for your preparation and

1    attention today.  Before we conclude, I just want to make two

2    points about this case going forward.

3        First, as I have said before, I am committed to ensuring

4    that this case proceeds in the normal course that our criminal

5    justice system prescribes.  The protective order that I will

6    issue is just one example of that.  Courts across the country

7    and in this district routinely issue similar orders in criminal

8    cases for many of the same reasons that I've discussed today.

9        The defense has reiterated at length Mr. Trump's First

10    Amendment right to speak about this case and the evidence in

11    it.  While I intend to ensure that Mr. Trump is afforded all

12    the rights that any citizen would have, I also take seriously

13    my obligation to prevent what the Supreme Court called in

14    *Sheppard v. Maxwell* "a carnival atmosphere of unchecked

15    publicity and trial by media rather than our constitutionally

16    established system of trial by impartial jury."

17        "It is a bedrock principle of judicial process in this

18    country," as the Supreme Court said in *Bridges v. California,*

19    "that legal trials are not like elections, to be won through

20    the use of the meeting hall, the radio, and the newspaper."

21    Obviously, in *Bridges*, the internet hadn't been invented yet.

22    This case is no exception.

23        Second, and relatedly, both parties' briefing on the

24    protective order referred to certain public statements that

25    Mr. Trump has made in recent days.  There are no motions based

1    on these statements, nor does the government claim they

2    violated the defendant's conditions of release.  So I will not

3    address them specifically, but I do want to issue a general

4    word of caution.

5        As I have stressed at several points during this hearing,

6    I intend to ensure the orderly administration of justice in

7    this case as I would with any other case; and even arguably

8    ambiguous statements from parties or their counsel, if they

9    could reasonably be interpreted to intimidate witnesses or to

10   prejudice potential jurors, can threaten the process.

11       In addition, the more a party makes inflammatory statements

12   about this case which could taint the jury pool or intimidate

13   potential witnesses, the greater the urgency will be that we

14   proceed to trial quickly to ensure a jury pool from which we

15   can select an impartial jury.

16       I caution all of you and your client, therefore, to take

17   special care in your public statements about this case.  I

18   will take whatever measures are necessary to safeguard the

19   integrity of these proceedings.

20       I'll see you all on August 28.  We are adjourned.

21        (Proceedings adjourned at 11:39 a.m.)

22

23

24

25

*   *   *   *   *   *

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify
that the foregoing pages are a correct transcript from the
record of proceedings in the above-entitled matter.


*/s/ Bryan A. Wayne*
Bryan A. Wayne

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| _____ | : | |
| UNITED STATES OF AMERICA | : | |
| | : | No. 23-cr-257-TSC |
| | : | |
| v. | : | |
| | : | |
| DONALD J. TRUMP, | : | |
| | : | |
| Defendant. | : | |
| _____ | : | |

**RESPONSE IN OPPOSITION TO
<u>GOVERNMENT'S PROPOSED TRIAL CALENDAR</u>**

# Ex. B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 23-80101-CR-CANNON

UNITED STATES OF AMERICA,

    Plaintiff,

v.

DONALD J. TRUMP and
WALTINE NAUTA,

    Defendants.

_____/

## DECLARATION OF JAY I. BRATT

Pursuant to 28 U.S.C. § 1746, I, Jay I. Bratt, declare as follows:

1.    I am employed as a Counselor to the Special Counsel in the Office of Special Counsel Jack Smith.   I am one of the prosecutors involved in the above-captioned case and am familiar with it.   The statements in this declaration are based on my personal knowledge and my conversations with other prosecutors and staff of the Special Counsel's Office, as well as the Litigation Security Group ("LSG").

2.    Among the discovery to be produced by the government in this case are certain materials that are classified (the "classified materials").   The level of classification varies across the classified materials, but a security clearance is required to lawfully view any of them. According to counsel for defendant Trump and defendant Nauta, no defense counsel currently possesses a security clearance.   As a result, they will need to obtain one to lawfully view the classified materials.

3.    LSG has committed to significantly expediting the issuance of security clearances

in this case.

4.      To be granted an interim security clearance, defense counsel must submit a

Standard Form 86 – Questionnaire for National Security ("SF-86") and supporting

documentation.   To date, not all of the defense counsel have submitted their SF-86s.   Once an

SF-86 and supporting documentation are submitted, absent complicating circumstances, an

interim clearance may be granted within a matter of days.   In this case, LSG has committed to

reaching an eligibility determination within 24-48 hours of the completed submission.   Once

defense counsel are granted interim security clearances, the government will be able to provide

the vast majority of classified discovery, consisting of documents marked CONFIDENTIAL,

SECRET, and TOP SECRET, including documents within the following Sensitive

Compartmented Information Compartments:   SI, SI-G, and TK.

5.      However, interim security clearances are not sufficient for the government to

provide in classified discovery a small number of documents—including some documents whose

unauthorized retention is charged in the indictment—that contain restricted compartments for

which a final security clearance and additional read-ins are required.   LSG estimates that final

clearances may be granted within 45 to 60 days of submission of the SF-86 and related

documentation, depending upon the content of the applicant's SF-86.   The additional read-ins

can be conducted promptly upon access approval.

6.      On June 21, 2023, the government began producing unclassified discovery to the

defense.   The production includes documents obtained via subpoena, evidence obtained via

warrants, transcripts of grand jury testimony, memorialization of witness interviews, a

reproduction of key documents that in the government's view are pertinent to the case, and

copies of closed-circuit television footage the government has obtained during its investigation.

7.     I have extensive experience with the Classified Information Procedures Act, Pub.

L. 96–456, 94 Stat. 2025, 18 U.S.C. App. 3 §§ 1–16, and from that experience I am aware that

the procedures provided for under that statute often lengthen the ordinary trajectory from

indictment to trial.    The additional procedures that may be required in this case are discussed in

the government's Motion for a Pretrial Conference Pursuant to the Classified Information

Procedures Act, which is being filed contemporaneously with this motion.    These procedures

address potential resolution of issues related to classified discovery and the use and admissibility

of classified information at trial.

I declare under penalty of perjury that the foregoing is true and correct.

Jay I. Bratt

Dated:   June 23, 2023

**EXHIBIT B**

The government proposes the below schedule for CIPA litigation in this case:

| Date | Event |
|------|-------|
| No later than July 10, 2023 (assuming timely interim clearance of defense counsel) | Government's initial production of classified discovery |
| August 14, 2023 | Deadline for filing of government's first CIPA Section 4 Motion, if necessary |
| September 5, 2023 | Deadline for all defense discovery requests |
| September 12, 2023 | Deadline for any notice under CIPA Section 5 |
| September 19, 2023, or seven days after defendant's initial CIPA Section 5 Motion, whichever is later | Deadline for government's initial Rule 16 expert disclosures and CIPA Section 10 notice |
| October 3, 2023, or 21 days after defendant's initial CIPA Section 5 Motion, whichever is later | Deadline for government to file initial CIPA Section 6(a) Motion<br><br>Defense Rule 16 expert disclosures due |
| October 17, 2023, or fourteen days after government's initial CIPA Section 6(a) Motion, whichever is later | Deadline for defense to file response to government's CIPA Section 6(a) Motion<br><br>Government's supplemental Rule 16 expert disclosures due |
| October 24, 2023, or seven days after defendant's response to government's initial CIPA Section 6(a) Motion, whichever is later | Deadline for government to file reply on its CIPA Section 6(a) Motion |
| October 31, 2023, or within seven days after government's reply on its CIPA Section 6(a) Motion, whichever is later | CIPA Section 6(a) Hearing |

1

| November 14, 2023, or fourteen days from filing of a final written Order on government's initial CIPA Section 6(a) Motion, whichever is later | Deadline for any government CIPA Section 6(c) Motion, if necessary |
|---|---|
| November 21, 2023, or seven days from filing of government's CIPA Section 6(c) Motion, whichever is later | Deadline for defendant's response to government's CIPA Section 6(c) Motion, if necessary |
| November 28, 2023, or seven days from filing of defendant's response to government's CIPA Section 6(c) Motion, whichever is later | Deadline for government's reply in support of its CIPA Section 6(c) Motion, if necessary |
| December 5, 2023, or seven days after the government's reply on any CIPA Section 6(c) Motion, whichever is later | Hearing to address any remaining CIPA issues, including CIPA Section 6(c), if necessary |
| December 11, 2023 | Trial (jury selection begins) |

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 23-80101-CR-CANNON

UNITED STATES OF AMERICA,

      Plaintiff,

v.

DONALD J. TRUMP and
WALTINE NAUTA,

      Defendants.

_____/

## PROPOSED ORDER

The Court has received the government's Motion for Continuance and Proposed Revised Scheduling Order (ECF No. __), as well as the accompanying Declaration of Jay I. Bratt. Having reviewed the Motion, the accompanying Declaration, and all other relevant submissions of the parties, it is hereby

ORDERED that trial in this matter is continued until December 11, 2023, on which date jury selection will begin; and it is further

ORDERED that the delay resulting from the continuance of trial is excluded from the speedy trial calculation in this case, because the ends of justice served by continuing the trial date outweigh the best interests of the public and the defendants in a speedy trial; and it is further

ORDERED that Calendar Call for trial is continued until December 5, 2023; and it is further

ORDERED that any pretrial motions to be filed under Federal Rule of Criminal Procedure 12(b)(3) must be filed no later than July 31, 2023; and it is further

1

**ORDERED** that all other pretrial motions and motions *in limine* must be filed no later than November 20, 2023; and it is further

**ORDERED** that all provisions of this Court's Omnibus Order Setting Trial Date and Establishing Pretrial Instructions and Sentencing Procedures (ECF No. 28) that are not modified by this Order remain in full force and effect.

**DONE AND ORDERED** in Chambers in Fort Pierce, Florida, this _____ day of _____, 2023.

_____
**AILEEN M. CANNON**
**UNITED STATES DISTRICT JUDGE**

2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

|                          |   |                       |
|--------------------------|---|-----------------------|
| UNITED STATES OF AMERICA | : |                       |
|                          | : | No. 23-cr-257-TSC     |
|                          | : |                       |
| v.                       | : |                       |
|                          | : |                       |
| DONALD J. TRUMP,         | : |                       |
|                          | : |                       |
|            Defendant.    | : |                       |

---

**RESPONSE IN OPPOSITION TO
<u>GOVERNMENT'S PROPOSED TRIAL CALENDAR</u>**

# Ex. C

1          UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF FLORIDA

3             FORT PIERCE DIVISION

4

5       CASE NO. 23-80101-CRIMINAL-CANNON

6

7  UNITED STATES OF AMERICA,

8

          Plaintiff,              FORT PIERCE, FLORIDA
9
     vs.
10                                JULY 18, 2023
   DONALD J. TRUMP and
11  WALTINA NAUTA,                 PAGES 1 - 83

12          Defendants.
   _____/

13

14

15

16       TRANSCRIPT OF MOTION HEARING

17    BEFORE THE HONORABLE AILEEN M. CANNON

18       UNITED STATES DISTRICT JUDGE

19

20

21

22

23

24

25

<u>APPEARANCES:</u>

FOR THE PLAINTIFF:      JAY BRATT, ESQ.
                        DAVID HARBACH, ESQ.
                        JULIE EDELSTEIN, ESQ.
                        U.S. Department of Justice
                        Office of Special Counsel
                        950 Pennsylvania Avenue NW
                        Washington, D.C.  20530


FOR DEFT. TRUMP:        CHRISTOPHER KISE, ESQ.
                        Continental PLLC
                        101 North Montroe Street
                        Suite 750
                        Tallahassee, FL  32301

                        TODD BLANCHE, ESQ.
                        Blanche Law
                        99 Wall Street
                        Suite 4460
                        New York, NY  10005


FOR DEFT. NAUTA:        STANLEY  WOODWARD, ESQ.
                        Brand Woodward Law
                        400 Fifth Street Northwest
                        Suite 300
                        Washington, D.C.  20001

                        SASHA DADAN, ESQ.
                        Dadan Law Firm, PLLC
                        201 S. 2nd Street
                        Suite 202
                        Fort Pierce, FL  34950


REPORTED BY:            DIANE M. MILLER, RMR, CRR, CRC
                        Official Court Reporter
                        diane_miller@flsd.uscourts.gov

1               P-R-O-C-E-E-D-I-N-G-S

2          THE COURT:  Thank you.  You may be seated.

3          Is it necessary to have this screen up, Ms. Casissi,

4     or can I bring it down?

5          THE COURTROOM DEPUTY:  You can bring it down, Your

6     Honor.

7          THE COURT:  All right.  Good afternoon, everybody.

8     I'll call the case.

9          This is case number 23-CR-80101, United States of

10    America vs. Donald J. Trump and Waltine Nauta.

11         Let's have appearances of counsel, starting with the

12    Government.

13         MR. BRATT:  Good afternoon, Your Honor; Jay Bratt,

14    David Harbach, and Julie Edelstein from the special counsel's

15    office on behalf of the United States.

16         THE COURT:  Good afternoon.

17         MR. BLANCHE:  Good afternoon, Your Honor; Todd

18    Blanche for President Trump.

19         THE COURT:  Good afternoon.

20         MR. KISE:  Good afternoon, Your Honor; Christopher

21    Kise for President Trump.

22         MR. WOODWARD:  Good afternoon, Your Honor; Stanley

23    Woodward and Sasha Dadan for Mr. Nauta, who's also present

24    today.

25         THE COURT:  Good afternoon to you both.

1          And good afternoon to you, Mr. Nauta.

2          DEFENDANT NAUTA:  Good afternoon, Your Honor.

3          THE COURT:  All right.  Before we get started, some

4    preliminary remarks about decorum and compliance.

5          Of course, there is no permitted possession of cell

6    phones or other electronic equipment in the courthouse.  There

7    shall be no broadcasting, video recording, photographing, or

8    filming of any kind either in this courtroom or anywhere in the

9    courthouse.  And, of course, no circumvention of that rule

10   either by folks here in the courtroom or in the overflow room.

11         For those who are seated in the courtroom, I ask that

12   you remain seated during the duration of the proceeding to

13   avoid disruption and distraction.

14         This is, as everybody is aware, a pretrial conference

15   pursuant to Section 2 of the Classified Information Procedures

16   Act, or CIPA for short.  Classified information won't be

17   discussed at this hearing except at a very high level, as

18   already referenced in public filings.

19         The purpose of this hearing is to establish a

20   schedule in accordance with the procedures of CIPA and more

21   broadly to establish at least a partial pretrial schedule for

22   deadlines in this case, based on the interests of the parties

23   and the actual needs of the litigation.

24         At this point -- can everybody hear me okay?

25         UNIDENTIFIED SPEAKER:  Your Honor, if I may, the

1    audio and the screen in the overflow room has been cut off.

2            THE COURT:  Perhaps that's because I -- okay.

3            There might be a need to restart this?

4            THE COURTROOM DEPUTY:  One moment, Your Honor.

5            UNIDENTIFIED SPEAKER:  Your Honor, is it okay if I

6    may approach for IT?

7            THE COURT:  Yes, that's fine.  Thank you.

8            I think we might have to rejoin the meeting.

9            UNIDENTIFIED SPEAKER:  Yes.

10           *(Brief pause in proceeding)*

11           THE COURT:  All right.  Okay.  I will repeat those

12   preliminary remarks because the audio, I understand, was not

13   transmitting to the overflow room.

14           There shall be no recording of this hearing in any

15   form.  No broadcasting, photographing, audio recording, or

16   filming of any kind in this courtroom or anywhere in the

17   courthouse, including in the media overflow room.  And no

18   attempt to circumvent those rules.

19           This is a pretrial conference pursuant to Section 2

20   of CIPA.  The purpose of today's hearing is to establish a

21   schedule in accordance with that statute along with a broader

22   schedule to advance this case with due regard to the interests

23   of all parties and the particular circumstances of the case.

24           Pending before the Court now are two motions.  The

25   first is the Government's motion to continue the current trial

 1    date.  The current trial date is mid August of this year with

 2    pretrial motions due in about six days, I believe.  The

 3    Government seeks to continue that trial date to December 11th

 4    of this year.  I've reviewed the motion along with all related

 5    filings.  I'm prepared to hear argument on that motion both

 6    specific to CIPA and the benchmarks in CIPA as well as more

 7    broadly.  I'd also note that there's a separate pending motion

 8    filed by the Government.  This was filed yesterday.  It seeks a

 9    protective order under Section 3 of CIPA.  That motion is not

10    yet ripe, and it doesn't appear that it has been the subject of

11    meaningful conferral.  I understand there are objections to

12    certain provisions of that protective order.

13          So with that very brief background, let me turn it

14    over first to Mr. Bratt.  What I'd like to start off with,

15    Mr. Bratt, is an overall view of the discovery that has been

16    provided thus far.  I understand there have been two

17    productions, the first on the 21st of June, I think it is, and

18    one yesterday with specifics in terms of volume as well as any

19    anticipated production.

20          MR. BRATT:  Yes, Your Honor.  Do you want me to speak

21    from here or from the podium?

22          THE COURT:  Whatever you prefer.

23          MR. BRATT:  I'll go up to the podium.

24          Good afternoon again, Your Honor.

25          THE COURT:  Good afternoon.

1              MR. BRATT:  So we have now made two productions of

2    discovery to the Defense.  The first was on June 21st to

3    President Trump's counsel, and then last week, July 6, to

4    Mr. Nauta's counsel.  The first production consists of about

5    800,000 pages, although as we note in our reply to the motion

6    for continuance, a significant portion of that is noncontent

7    from headers and footers of emails that were received pursuant

8    to 2703(d) orders.

9              In producing the discovery --

10             THE COURT:  I'm sorry, what do you mean by

11   "noncontent"?

12             MR. BRATT:  Just showing the "to/from" on emails.

13             THE COURT:  Okay.

14             MR. BRATT:  So nothing as to what is in the body of

15   the emails themselves.

16             When we produced the discovery to both counsel, we

17   also gave them a discovery log showing the sources of all the

18   information we are providing.  We identified what we believed

19   to be key documents in the case, which is a subset of about

20   4500 pages.  The contents of what we provided included all

21   search warrants and corresponding applications for search

22   warrants; the evidence, the scoped evidence that we obtained

23   from the search warrants and subpoenas; all witness statements

24   through May 2nd of this year; all grand jury testimony

25   transcripts from both the D.C. grand jury and the Southern

1    District of Florida grand jury; all of the CCTV footage was

2    obtained through the date of the indictment.  And we also

3    produced, in another separate folder subfile and on a hard

4    drive, what we believe again to be key footage for the Defense.

5           The second production that we sent out yesterday is

6    about 300,000 pages.  It provides the relevant content from

7    three devices that were provided to us voluntarily, all witness

8    statements between May 2nd and June 23rd, a number of FBI

9    forms, and a number of materials, primarily emails, that we

10   obtained from the Secret Service.

11          What is left, we have two devices for Mr. Nauta.  We

12   were able to search those devices in one form, but we were not

13   able to search it sort of more forensically.  We now have the

14   ability to do that.  It is undergoing filtering and then

15   scoping.  And once we are done with that process, we will be

16   providing to the Defense that content as well.

17          In addition, there is some CCTV footage that was

18   obtained post-indictment and then, of course, there's certain

19   *Jencks* materials that we have yet to gather together.

20          In sum, we produced about 1.1 million pages, we

21   identified key documents, and we've given the relevant content

22   from all devices we acquired during the course of the

23   investigation, except some subset of Mr. Nauta's devices.

24          So that is the status of unclassified discovery.

25          THE COURT:  So what's the projected timeline for the

1    production of any additional nonclassified material?

2          MR. BRATT:  So I would think the Nauta materials

3    should be producible in the next couple weeks, we hope.  And

4    certainly in a case like this, we do talk to witnesses from

5    time to time, so those would generate new witness reports.

6    Those types of things we'll provide on a rolling basis as they

7    occur.  But once we provide the Nauta device -- the Nauta

8    devices, I should say, the remaining content, that is in the

9    main the Government's discovery.

10          THE COURT:  All right.  So I've heard about I think

11   you said 1.1 million pages, did you say?

12          MR. BRATT:  Correct.

13          THE COURT:  Okay.  And in terms of the footage, how

14   many months does that run through?

15          MR. BRATT:  So it covers a nine-month period, but not

16   all the cameras were -- but it is not all the cameras at

17   Mar-a-Lago or Bedminster; not all the cameras were always

18   running.  And the retention period that the Trump organization

19   had varied from camera to camera, so it is not a solid

20   nine months of video footage.

21          THE COURT:  Do you have a sense for just straight up

22   viewing time?

23          MR. BRATT:  Let me confer with my colleagues.

24          *(Off record discussion amongst Governmental Counsel)*

25          MR. BRATT:  We don't know, Your Honor.  And these are

1    motion-activated cameras, so there can be long periods of time

2    when they're just not active and then something happens.

3              THE COURT:  Okay.

4              Okay.  Now, as far as the classified discovery, I

5    know that has not yet begun.  It appears to be contingent upon

6    finalization of the Section 3 protective order, is that

7    correct?

8              MR. BRATT:  That is correct.

9              THE COURT:  Okay.  And that could itself spawn

10   additional litigation depending on what's contested?

11             MR. BRATT:  In terms of the Section 3 protective

12   order?

13             THE COURT:  Correct.

14             MR. BRATT:  As things currently stand, Your Honor, we

15   filed our motion.  We've been advised by the Defense that they

16   have some objections.  We've asked that the time limit for

17   responding be shortened.  We're obviously open to hearing what

18   their concerns are; and to the extent we can address them,

19   we'll try to address them.  But at the same time, it may be

20   that the Court has to resolve those differences.  But I would

21   think that presumably some time in the next of couple weeks,

22   that will have been resolved and we'll be in a position to

23   produce the first tranche of classified discovery.

24             THE COURT:  Now, when I was reading the Section 3

25   protective order as proposed by the Government -- is it the

1    Government's intention to withhold certain portions of

2    classified discovery from the defendants themselves?

3              MR. BRATT:  Not at this point, Your Honor.  So that

4    would be the subject of a Section 4 motion that we would bring

5    to the Court, if we feel that there is any potentially

6    discoverable classified materials that we think either needs to

7    be deleted or needs to be provided in the form of a summary or

8    stipulation.  But in terms of what we have to produce, we are

9    producing all of it, as proposed in the -- in both our motion

10   and in the protective order.

11             THE COURT:  I thought there was a provision in the

12   proposed Section 3 protective order that did contemplate

13   potentially withholding certain documents from Defendants

14   themselves as distinct from Defense Counsel.

15             MR. BRATT:  Yes, sorry, Your Honor.  Yes, yes, I'm

16   sorry, I misunderstood.

17             Yes, in terms of once Defense Counsel have access to

18   it, there are times when the clients, the defendants, will seek

19   to see it, and we have provisions in the protective order that

20   addresses those situations when the defendants are seeking

21   access.  And I can just tell you, at least with respect to the

22   former president that we likely, upon request, would agree

23   to -- in order for him to assist his counsel, for him, since

24   he's already seen the documents, to be able to review them with

25   his counsel.

1          THE COURT:  All right.  Okay.  It wasn't clear to me

2    to what extent the Government was going to be seeking to

3    withhold any information from either former president Trump or

4    Mr. Nauta; but it does appear, at least on the text of the

5    proposed order, that that could happen based on the proposed

6    language.

7          MR. BRATT:  That's correct.

8          So I mean, we have, particularly with respect to

9    Mr. Nauta, somebody who no longer has a clearance, the former

10   president never had a clearance, so they're different from

11   their counsel in that respect.  And again, it can happen in

12   these types of matters that there are instances when counsel

13   want to share something with their client or the client wants

14   to see something and discuss it with counsel, and that's what

15   that portion of the protective order is meant to address.

16         THE COURT:  Okay.  Well, I haven't seen what the

17   objections are to that.  Was there meaningful conferral on the

18   Section 3?  I wasn't sure why it was filed without meaningful

19   conferral pursuant to the rules.

20         MR. BRATT:  So we tried.  We reached out to them.

21         THE COURT:  When did you try?

22         MR. BRATT:  So we had an email exchange on Friday --

23   trying to set up a call on Friday, and we were advised by

24   Counsel that they were tied up.  I suggested that we could make

25   some time over the weekend to talk, if that was possible.  We

1    did not hear a response from them.

2           THE COURT:  All right.  So you tried to confer on a

3    Friday before filing on a Monday something that is presumably

4    quite important.  That seems a bit rushed.

5           All right.

6           MR. BRATT:  And we're still happy to talk to them.

7           THE COURT:  Certainly, and I think that's going to be

8    necessary so that the Court has a more crystalized view of

9    what's actually contested, if anything.  Perhaps there are no

10   disagreements and that would streamline things, but I'm not

11   sure, at this point, given the lack of conferral.

12          All right.  Now, as far as I think you said Section 4

13   litigation, you don't anticipate any Section 4 litigation?  Did

14   I hear correctly?

15          MR. BRATT:  So no, we don't anticipate extensive

16   Section 4 litigation.  It may be very little.  We are in the

17   process of reviewing things that are potentially discoverable,

18   but that would be something that we think, at least in terms of

19   our initial Section 4, would be fairly minimal.

20          THE COURT:  Okay.

21          MR. BRATT:  It is possible, as sometimes happens in

22   these cases, that the defense will make discovery requests and

23   some of those discovery requests may hit on things that could

24   cause us to, as part of our response to them, seek to either

25   delete discovery or provide the information in the form of a

1    summary or stipulation.  So there could be sort of follow on

2    Section 4 litigation; but in terms of what we're looking at for

3    our initial filing, we don't anticipate it to be very

4    extensive.

5              THE COURT:  Okay.

6              Now, in terms of the classified discovery, just big

7    picture in terms of volume, can you provide any guidance?

8              MR. BRATT:  I can tell you what is currently ready to

9    be produced, once the protective order is in place and a

10   location is identified for us to provide it to the Defense.

11   There are 1,545 pages of classified material.  And what Counsel

12   will be getting access to is what their interim clearances will

13   permit them to see.  So they'll be seeing -- getting access to

14   about 80 percent of the documents that went from the White

15   House to Mar-a-Lago.  And for purposes of kind of dividing them

16   up, that consists of documents that were returned to NARA in

17   January of 2022, some of the documents of the 38 that were

18   provided in response to our May 11th grand jury subpoena, and

19   then documents that were seized on August 8th of 2022.

20             In addition, there are classified 302s and interview

21   notes and some transcripts of classified interviews.  There are

22   about 375 pages related to the interviews and about 250 pages

23   of some interview transcripts.  There are some additional

24   documents we received from NARA, and they will be receiving the

25   unredacted photograph that is pictured in paragraph 31 of the

1    indictment.

2            They will not see any of what I'll call Mar-a-Lago

3    documents that are classified at a higher level than what their

4    interim clearances permit.  And there are some of the 302

5    interview transcripts that also have information at a higher

6    level than that.

7            THE COURT:  All right.  Okay.

8            In terms of any pretrial motions anticipated by the

9    Government, does your team anticipate any pretrial motions from

10   your side?

11           MR. BRATT:  The only things that I think we would

12   do -- and we read Your Honor's omnibus order -- is we would

13   have some form of omnibus motion in limine relating to

14   evidentiary and issues relating to proper argument and

15   defenses.

16           THE COURT:  All right.

17           MR. BRATT:  But otherwise, we don't anticipate filing

18   any affirmative motions on our own.

19           THE COURT:  So in terms of looking at the proposed

20   schedule you offered, I think at docket entry 34-2, we're

21   already I guess behind according to that proposal because that

22   would have contemplated an initial production of classified

23   discovery as of July 10th.

24           MR. BRATT:  That is correct.

25           THE COURT:  Okay.

1          MR. BRATT:  We've looked at this, Your Honor, and we

2   do think that if we move the dates two weeks forward -- and the

3   assumption on that is that it will take the full period of time

4   for the final clearances, the 60 days, so my understanding as

5   of last Thursday, the 13th, all of the forms were submitted,

6   and some of the interim clearances have been approved, that --

7   assuming that it takes another 60 days for the final

8   clearances, and hopefully it will be less than that, that even

9   assuming that period of time, and on September 12th, the

10  Defense gets access to the remaining classified discovery, that

11  if we move the dates two weeks forward that we could still

12  finish the CIPA process before the December 11th -- before the

13  December 11th date that we propose to begin jury selection.

14          THE COURT:  I guess, but nowhere in this proposal do

15  I see any allowance for nonclassified Rule 12(b) motions, for

16  example, or any Court review or any hearings, and so which

17  leads me to my next question.  Can you point the Court to any

18  other similar cases involving classified information that have

19  gone to trial following production of discovery in less than

20  six months?

21          MR. BRATT:  So going to trial in less than

22  six months, no.  I think we gave the Court two examples from

23  the Eastern District of Virginia where -- and particularly the

24  one case out of Norfolk, where in about eight months, they went

25  from the beginning of the case to verdict.

1              THE COURT:  Yeah, I think I took -- let me go and see

2     that case.  Hold on.

3              MR. BRATT:  It's *United States vs. Hoffman*, Your

4     Honor.

5              THE COURT:  Uh-huh.

6              Yes, I saw that case.  I think it was a four-count

7     case, if I'm not mistaken, involving a very small number of

8     documents with no substantive pretrial motions, at least that I

9     could tell, which really is the nature of my question.

10             In your experience, I know you provided a declaration

11    and you're familiar with CIPA litigation, these matters often

12    require more time simply given the classified nature of some of

13    the materials.

14             Do you have any other I guess authority for the Court

15    on such a compressed timetable?

16             MR. BRATT:  So I would say not beyond what we

17    presented the Court.  My observation, Your Honor, is that we

18    acknowledge we have presented an aggressive schedule.  This

19    case is unique in a number of different ways.  We are committed

20    to doing the work that is necessary to achieve the schedule.

21    At the same time, we recognize that there could be some things

22    that come up that throw the schedule off.  There could be

23    things that -- there could be a Defense discovery demand that

24    reveals something that is more complicated and understandably

25    that would throw the schedule off.

1           And Mr. Harbach will address in more detail the

2    motion to continue, but we feel it's very important to have a

3    trial date to work from understanding that that trial date may

4    not be set in stone.

5           THE COURT:  All right.  Thank you.

6           Let's see if I have any other questions at this time.

7           All right.  I'll get back to your team, Mr. Bratt

8    unless --

9           Mr. Harbach, do you have particular observations with

10   respect to the motion to continue that you'd like to offer now,

11   before I turn to the defense attorneys?

12          MR. HARBACH:  I'd be happy to, Your Honor, if it

13   suits the Court.

14          THE COURT:  All right, so I guess any additional

15   argument you wish to offer on your motion to continue.  Like I

16   said, I've read the papers.

17          MR. HARBACH:  Yes, Your Honor.

18          Just a few points that I'd like to make, Your Honor.

19   One is a framing issue.  As Your Honor may have seen from the

20   response the defendants filed to our motion to continue, they

21   have repeatedly framed this as the Government seeking an

22   expedited trial, and in our view, they have inverted the

23   analysis.  I won't belabor this since it's adequately addressed

24   in our papers, but the simple point is that it is not a speedy

25   trial that has to be justified, it's deviation from a speedy

1    trial that has to be justified.  We think the statute provides

2    a framework for that analysis and that none of the framework

3    that is in place as a result of the statute or interpretive

4    case law requires the Government to substantiate a need to move

5    expeditiously, is what the framework contemplates.  So that's

6    the first point.

7         The second thing I'd like to address briefly is

8    something that is plainly intentioned here, and that is the

9    Defense's view that Mr. Trump in particular should be treated

10   differently in light of the circumstances, whether it's the

11   fact that he's a former president or the fact that he's running

12   for president or what have you.  In our view, he should be

13   treated like anybody else, and so we see that plainly as

14   attention here; but our view we think is supported by the

15   Constitution, the United States Court of Appeals for the

16   Eleventh Circuit, not to mention a fundamental tenet of the

17   republic.  In short, Mr. Trump is not the president.  He is a

18   private citizen who has been indicted by a lawfully empaneled

19   grand jury in this district, and his case should be governed by

20   the Constitution, the United States Code, and the Federal Rules

21   of Criminal Procedure, just like anyone else's.

22        Third thing, the fact that he's running for

23   president, how should the Court take that into account?  We

24   think there are two possibilities, neither of which would

25   justify this Court doing so.  The first is Mr. Trump's own

1    interests in running for president.  In short, it would be

2    unfair to force him to go to trial because his schedule will

3    not allow him to do it.  He has too much to do.  At that level

4    alone, our position is that he is no different from any other

5    busy important person who has been indicted.

6            The second possibility is a putative public interest

7    in his candidacy or his running for president and the effects

8    that putting him to trial might have on that public interest,

9    and our -- the point we would like to emphasize on this, Your

10   Honor, is that it is important that the Court and nobody else

11   conflate the public interest, as they might argue it here, with

12   the public interest formulation that is in the Speedy Trial

13   Act.  We think it's important to keep those distinct, because

14   the latter isn't just the public interest writ large.

15   According to the Speedy Trial Act, it is the ends of justice

16   finding that Your Honor, this Court, will have to make if

17   excluding time as a result of the continuance, it references

18   the best interests of the public and the defendant or

19   defendants in a speedy trial.

20           So it is abundantly clear, as I know the Court knows,

21   Your Honor has a whole lot of discretion in setting a trial

22   date and deciding whether to grant a continuance.  The case law

23   is very clear on that.  However, in light of the relief that

24   the Defense has sought here, namely indefinite deferral of even

25   discussion of setting a trial date because the Defendant is

1    running for office would be unwise, and so we would urge the

2    Court not to indulge the relief that Defendants seek for those

3    reasons.

4         THE COURT:  On the speedy trial issue specifically

5    and the designation of this case as complex, I take it the

6    Government objects to designation of this case as complex?

7         MR. HARBACH:  Yes, Your Honor, and it's because we

8    don't think it meets any of the requirements for that

9    designation in the statute.  The number of defendants is two.

10   The novelty or complexity of the legal issues that are

11   involved, we don't believe obtains in this case for the reasons

12   we set out in our pleading.  And I'll make a brief side point

13   here that the observation of Counsel for the Defense that they

14   think they may have a couple of potentially dispositive motions

15   that might, might, were the Court to rule in their favor,

16   obviate the need for a trial is no reason not to set a trial

17   date in the first instance.

18        THE COURT:  I'm not so sure it's the merit of the

19   potential motion as it is the extensive motion practice which

20   nonetheless would have to be conducted.  Of course, the Court

21   would need adequate time to review, so focusing just on that

22   coupled with the very voluminous discovery plus the classified

23   information aspect of the case.  I looked around so see if the

24   government had ever objected to a complex designation in a CIPA

25   case, I wasn't able to find any such objection, and so that's

1    the reason for my question.

2          Precisely why don't you think it would fall within

3    that complex designation under the act?

4          MR. HARBACH:  Can I have just a moment to grab the

5    statute, Judge?

6          THE COURT:  Yes.

7          MR. HARBACH:  Okay.  So I'm going to answer Your

8    Honor's questions by reference to the statute.

9          So the pertinent portion there -- and I know Your

10   Honor is familiar with it -- says whether the case is so

11   unusual or so complex due to -- and then there's a litany of

12   things.  The first one is the number of defendants which we've

13   already talked about and does not merit designation in this

14   case.  The second is the nature of the prosecution, which I'll

15   come back to in a moment.  The third is the existence of novel

16   questions of fact or law.  And in any of those instances such

17   that it's unreasonable to expect adequate preparation for trial

18   within the time limits.  So that's the framework.

19          To the point Your Honor was just raising a moment ago

20   about the potentially dispositive pretrial motions -- and Your

21   Honor is right, it's not just a question of the merits, of

22   course not, but it is -- according to the statute, it is -- the

23   Court should take into account to some degree the novelty of

24   the type of relief that's being sought.  This is something that

25   we address in our brief.  The two subjects that are noted by

 1  the Defense as, in their view, filling the bill here are,

 2  number one, an attack on the special counsel's ability to

 3  maintain this action in the first instance as a matter of

 4  jurisdiction and power without regard to anything else.  And as

 5  we point out in our brief, that, while an important legal

 6  issue, please don't misunderstand me, is not something that is

 7  being writ on an entirely blank slate.  It has been litigated

 8  extensively both in the Supreme Court of the United States and

 9  in the Court of Appeals for the D.C. Circuit.

10       Now, I'll readily acknowledge that in the Southern

11  District of Florida and perhaps even in the Eleventh Circuit,

12  there's a degree to which this is a new topic; but my point is

13  that it's not tabula rasa.  And so on the ultimately pertinent

14  question of, well, gosh, can we possibly get to trial while

15  still briefing this issue, we think the answer is yes.

16       And the other important point we make -- and I'll get

17  to their second motion in just a second.  The other point we

18  make is that neither the discovery schedule nor anything

19  related to classified information being produced or the

20  timeliness of CIPA proceedings should impact the Defense's

21  ability to make that motion.  Whether the special counsel has

22  authority to bring this action is a motion they could have been

23  working on since they got the indictment over a month ago.  So

24  when evaluating whether their need or their desire to file this

25  motion necessarily has to impact the trial schedule, we just

 1   ask Your Honor to keep that in mind, first of all.

 2           So the other motion that they mentioned was a --

 3           THE COURT:  I think at the intersection of the --

 4           MR. HARBACH:  Thank you.  The intersection of the

 5   Presidential Records Act and the statute.

 6           Now, we took a potshot in our brief at their legal

 7   theory and, in our view, that was justified because we don't --

 8   on the face of it, we genuinely don't believe that there is any

 9   reasonable argument to be made that the Presidential Records

10   Act could either, A, form a basis for dismissal of the

11   indictment; or B, justify the relief that they're seeking,

12   namely an indefinite deferral of consideration of the trial

13   date.  Now, that one, there's a degree to which it's new, I

14   suppose, which is one might say that the argument has never

15   been made in precisely that way before.  I mean, I'm shooting

16   in the dark a little bit because I don't know the full contours

17   of their theory, but I do know that to some extent, the

18   intersection of the Presidential Records Act with Mr. Trump's

19   ability to retain the materials in question has been the

20   subject of some litigation before this Court and some briefing

21   by this -- before this Court, including by Mr. Kise, one of

22   President Trump's counsel.

23           And so why do I mention that?  I mention that only as

24   another factor for the Court to consider in deciding whether

25   these are really the types of pretrial motion issues that

1   necessitate putting off trial indefinitely or by a number of

2   months in the way that the statute contemplates.

3          So I apologize for that detour about their pretrial

4   motions, but I want to circle back to the first factor that's

5   listed in the statute, which is the nature of the prosecution.

6          Obviously, circumstantially this is an unusual case

7   because of the identity of the defendants and the conduct

8   that's at issue.  What's not unusual about it is the theories

9   of liability.  They're pretty straightforward.  Whether it's

10  793 or any of the variations on obstruction that the indictment

11  alleges Defendants engaged in, that part is not complicated.

12  So in our view, the nature of the case is not -- it's pretty

13  standard fair as those types of cases go.  So it's a

14  long-winded way of hopefully answering your question which was

15  why doesn't the Government agree this case should be designated

16  as complex, and so those are the reasons.

17         I need to sit down, but the one last point, with Your

18  Honor's indulgence, I'd like to make is about a point that

19  Defendants have made about the difficulty -- or the potential

20  difficulty in selecting a jury here.  And the reason I think

21  it's worth emphasizing is because it's not an overstatement to

22  say -- and they have said it in their brief that in their view,

23  they would not be able to get a fair trial during a

24  presidential election cycle because essentially it would be

25  impossible for this Court to a select a jury.  There is

1    doctrine on this subject, but the cases they point to in their

2    brief involving heinous acts of violence and so forth don't

3    help them for the reasons we lay out in our brief, and I'm not

4    going to reiterate them here.  Suffice it to say, this isn't

5    the type of issue that would ordinarily justify continuance on

6    these facts.

7            The division of opinion in our country over Mr. Trump

8    I think it's fair to say long predated his indictment and will

9    long post date the election, however it turns out.  As with the

10   trial of any public figure, whether it is a politician or a

11   movie star or a corporate executive, whatever, there will be

12   surely be a need for more thorough and careful voir dire.

13   There's no question about that.  But in the Government's view,

14   none of that means that the Court should just throw up its

15   hands and say, "Well, I guess we can't have a trial until after

16   the election."  We think that's -- would be far too rash of a

17   reaction, and that's especially so -- it's especially so when

18   there's no reason to believe that the situation, vis-a-vis

19   public differences about Mr. Trump, is going to be any better

20   after the election than it is right now.

21           So the real question here in our view is whether this

22   Court can rely on the mechanisms that judges have used in this

23   country for generations to select fair and impartial juries.

24   That's the first thing.  And then the second thing the Court

25   will have to rely on, as it does in any case, is the honesty

1   and fairness of ordinary citizens who take an oath to judge the

2   case based only on the evidence that's presented to them and

3   instructions on the law from the Court.  And if the question is

4   whether those two things are adequate enough to rely on to

5   ensure a fair jury trial in this case, the Government's view is

6   that the answer has to be yes.

7            I know you said you read our pleadings, Your Honor,

8   so those are all the remarks I'd like to make at this point.

9            THE COURT:  Thank you.  If I have further questions,

10  I'll turn back to you.

11           Let me turn now to the Defense attorneys starting

12  with Mr. Blanche.  I'm not sure if there's a division of labor

13  here contemplated.

14           MR. BLANCHE:  Thank you, Your Honor.

15           Your Honor, just starting with a question you asked

16  Mr. Bratt a while ago about just one part of the discovery,

17  which is the CCTV footage, which is extraordinarily significant

18  to this case, not only as what's obvious from the indictment,

19  but it also in part gave rise to the search warrant, the

20  affidavit, and the probable cause to search Mar-a-Lago.  As of

21  this morning, there's 1,186 days of footage that we have

22  uploaded so far, and our vendor is not finished uploading it.

23  And again, I'm not questioning Mr. Bratt's position about the

24  time period, but there's multiple cameras that were subpoenaed

25  and that have been produced to us as Rule 16 discovery; and as

 1    of today, it's over three years' worth of video.

 2            Now, I'm not suggesting to the Court that we're going

 3    to sit for three years and watch three years' worth of video,

 4    but it's a tremendous amount of data and information, and we're

 5    just -- I'm just talking right now about the CCTV footage.

 6    While the Government is correct that they have pointed us to

 7    the few days that they believe are the most significant to them

 8    as it relates to the charges in the indictment and presumably

 9    the search warrant, they're not the most significant to us.  I

10    mean, the movement of boxes and where boxes were on given days

11    is extraordinarily significant not only to the justification

12    for the search warrant of the President's residence but also to

13    the defense of the case.  And so the CCTV footage alone, over

14    1,186 days, makes the schedule the Government proposed pretty

15    disingenuous, Your Honor.

16            Secondly, there's over 400 -- including yesterday's

17    production, Your Honor, over 450 gigabytes of data.  And I

18    accept the representation of the Government that a chunk of

19    those emails are going to be blank pages that just say to/from,

20    but that doesn't change the fact that I have an obligation, as

21    does the rest of my colleagues, to make sure that that's right.

22    And the fact that the Government has identified the material

23    that they believe is the most significant to them and to the

24    indictment is significant and helpful, and the discovery is

25    relatively organized.  But not the question that we believe the

1    Court needs to address or answer when considering the volume of

2    discovery, and the amount of discovery, and the manner in which

3    it was produced, and the timing of which it's produced.  We

4    received -- we have over 190,000 emails.  And it doesn't

5    matter, Your Honor, that many or even most of those emails are

6    not going to be significantly relevant to the defense of this

7    case.  It doesn't excuse our obligation to view them and to

8    look at them or to at least have a process in place to

9    understand who they're from, what they are.  There's nearly 100

10   custodians, Your Honor, that we've received so far from the

11   Government; and, again, we're talking about as recently as

12   yesterday.  So the sheer volume of discovery that has been

13   provided to us just in the past couple of weeks is very, very

14   significant.  And putting aside -- and I think I'm stating the

15   obvious, but this is an unusual case.

16        This isn't a case that's like many of the cases in

17   federal courtrooms around this country.  The fact that

18   President Trump was indicted and the reason why he was indicted

19   for possession of classified -- purportedly classified

20   documents in a series of boxes in his residence, many of which

21   were moved, we believe, before President Trump even left

22   office.  Some of them were maybe there afterwards, we don't

23   know, that's something that we're looking at in discovery.

24        This is not a normal case.  This is not a usual case.

25   And the fact that the Government stands in front of the Court

 1   today and put in their papers that the schedule they suggested,

 2   which is that motions should be due in two weeks, and that we

 3   don't have clearances -- I found out today that I have an

 4   interim clearance, but we haven't looked at any of the

 5   classified discovery which I'll get to in a moment, but the

 6   fact that we're supposed to consider and review all of the

 7   evidence that they have provided to us over the past two weeks

 8   and be prepared to file substantive motions in two weeks is

 9   disingenuous, Your Honor.

10          THE COURT:  And I can appreciate that more time is

11   necessary, but we need to set a schedule, and so I guess my

12   question for you would be:  What can you offer the Court in

13   terms of concrete specific projected timelines that actually

14   suit the needs of the case and the defendants' interests in

15   reviewing this discovery?  Because at least some deadlines, I

16   think, clearly can be established now.  And your motion at this

17   point, although it speaks to some of these concerns in fairly

18   general terms, really doesn't provide the Court with any

19   specific road map.  So I think it is incumbent upon the defense

20   team to offer more in the form of particulars so the Court can

21   establish an appropriate schedule that adequately takes into

22   account all parties' needs, along with the Court's obligation

23   to review any motions filed appropriately.

24          MR. BLANCHE:  Of course, and completely understood,

25   Your Honor.

1              This is in our opposition paperwork, but just to

2    briefly address it now, just talking about Counsel's schedule

3    which isn't the only primary concern but should be an

4    appropriate concern given the circumstances of this case.

5    There is no -- and I'm happy for Mr. Kise and Mr. Woodward to

6    address their own schedules, but there's no meaningful way that

7    the Defense can prepare and file motions on either CIPA

8    Section 5 motions or as it relates to the 12(b) substantive

9    motions in this case until at least December.  And let me step

10   back for a moment and explain why I say that date as even being

11   the potentially first date.

12             The number of -- and the amount of discovery that I

13   just laid forth doesn't get into the actual nature of the

14   discovery which, to be honest, we obviously haven't gotten our

15   way through yet, but we've gotten through some of it.  There

16   are meaningful substantive motions beyond the two that

17   Mr. Harbach mentions, although we very strongly believe that

18   both of those motions are something that the Court will need

19   time to consider, and we don't believe that they're in any way

20   frivolous and we think --

21             THE COURT:  Do those motions depend on sort of

22   detailed granular review of discovery?  Are there some that are

23   just more discrete legal issues that could be filed now or

24   close to now?

25             MR. BLANCHE:  I mean certainly there are potentially

 1   some motions that are separate and apart from the discovery

 2   produced, absolutely, Your Honor, of course; but it's a little

 3   bit -- you know, to the extent that we're writing substantive

 4   motions that don't require our review and consideration of the

 5   materials provided by the Government, that's time that we're

 6   not reviewing -- we very strongly believe that it's much more

 7   efficient, not only for the Defense but also for the Court, to

 8   do those motions at one time.

 9            Just by way of one example, as the Court knows from

10   the indictment, one of the Government's main witnesses in this

11   case is President Trump's lawyer, and the Government was

12   investigating this -- the grand jury, initially in this case,

13   was in D.C., and everything regarding the grand jury and what

14   happened there was in D.C.  There's a U.S. Attorney manual

15   provision that states very clearly that a case should not be

16   presented to a grand jury in the district unless venue for the

17   offense lies in that district.  There's no scenario under which

18   most of the statutes charged against President Trump that would

19   have ever lied in the District of Columbia; but that being

20   said, that's where this case was presented, and it still

21   continues to be, at least in part, presented there based on our

22   understanding.  That's a significant issue, but it requires

23   review of the discovery.

24            It requires us to read the briefing and the grand

25   jury transcript and what happened that led to that very

 1   significant issue that talk about something that this Court

 2   doesn't see very often and indeed none of us see very often,

 3   the President's personal lawyer is required to testify about

 4   conversations, privileged communications that he had with the

 5   President.  That's a significant issue that requires our review

 6   of discovery.

 7        Similarly, the search warrant that Your Honor is

 8   somewhat familiar with of Mar-a-Lago, but there were multiple

 9   search warrants executed in this matter mostly for cell phones

10   and computers.  And the affidavits that gave rise and that gave

11   probable cause purportedly for those search warrants are all in

12   some way similar but in some ways very different, we need to be

13   able to review those, and not only review the warrants and the

14   affidavits but also the material that was collected from many

15   of the witnesses or for -- fair enough, for some of the

16   witnesses that involved a team of lawyers at the Department of

17   Justice that were -- that could taint team because there were

18   privileged materials.  That's all something that we have to

19   look at as well.  But we can't make a motion based upon any

20   potentially improper conduct as it relates to that until we

21   review those materials and until we've had a chance to think

22   about that.

23        And I'm not trying to lay it on too thick, Your

24   Honor.  That's just two -- two, three motions that we're

25   talking about.  That's not actually talking about the actual

1    evidence in this case which is purportedly -- while the

2    indictment speaks to over 100 documents that had classified

3    markings on them, 30 documents that were interspersed between

4    multiple boxes at various locations at Mar-a-Lago that we need

5    to understand.  And this gets a little bit into the CIPA

6    litigation, Your Honor, but that we need to understand the

7    circumstances under which they were found, which box they were

8    found in, where in the residence they were found.  That

9    matters, and that's something that also goes to -- will

10   ultimately go to potentially a pretrial motion but also just

11   our understanding of the evidence in this case.

12           Beyond that, Your Honor, I just -- I'd very much

13   disagree with the Government, very much so, that they expect

14   and they ask the Court to treat President Trump like any other

15   defendant that walks in here.  I do not think it's appropriate

16   for the Court or for the Government to ignore the fact that he

17   is running for president and that the next year is a

18   presidential election year which, right now, he's -- you know,

19   we don't know what's going to happen in the primaries, of

20   course; but right now, he's the leading candidate and if all

21   things go as we expect, the person he is running against, his

22   administration is prosecuting him.  And so the idea that the

23   Government is putting forward that the Court should just ignore

24   that and say, "well, you're like any other defendant," I very

25   much disagree with that, Your Honor.

1           And I appreciate that there's tension and that Your

2    Honor has a tremendous amount of discretion in how to address

3    that issue, but it's, in my view, intellectually dishonest to

4    stand up in front of this Court and say that this case is just

5    like any other case, Your Honor.  It is not.

6           And the reality is, as we saw from earlier today,

7    there appears to be even more charges coming against

8    President Trump from the special counsel.  He has already been

9    indicted and has a trial scheduled in March in New York.  As we

10   put in our letter, but Mr. Kise can certainly address more

11   substantively, he has been charged civilly by the New York

12   attorney general.  There are depositions that Mr. Kise is

13   attending next several weeks and then motion practice and a

14   two-month trial that starts in October of this year of

15   Mr. Trump and his companies.

16          In the middle of all that, President Trump, he is

17   running for reelection.  And I do need to spend time with him

18   preparing him for this case and understanding the evidence, and

19   understanding what the evidence can mean as it relates to a

20   criminal trial in this courtroom.  And so the fact that we're

21   talking about the volume of discovery, the schedules that we

22   have, and the schedule of President Trump, we're not asking for

23   special treatment.  That's the reality.  That's not something

24   that -- I'm not making that schedule up, I'm not making up any

25   facts here, Your Honor.

1          And so when we asked in our papers -- we didn't ask

2     for an indefinite date.  We didn't just say put it off until

3     never, never land.  At the time that we wrote our opposition

4     brief, we hadn't processed most of the discovery.  We now have

5     more discovery.  We still don't know the nature of the

6     classified documents.  We now understand there's over a

7     thousand pages, but we don't understand, you know, what that

8     means or what they are.  And so what we asked is to return to

9     the Court at a date when we can speak intelligently about

10    what --

11         THE COURT:  So how much time would you need to do

12    sort of at least an initial triage of the discovery?

13         MR. BLANCHE:  So we will be prepared to file motions

14    in December, Your Honor, and that will give us time to --

15         THE COURT:  That's not my question.  My question is:

16    How much time do you need to do an initial triage of the

17    discovery so that you can formulate a more refined proposal in

18    terms of schedule?

19         MR. BLANCHE:  Understood; sorry, Your Honor, for not

20    answering.

21         Given what was represented today, Your Honor, and

22    given -- and I'll let Mr. Woodward speak to his schedule for

23    Mr. Nauta; but Mr. Kise's schedule, at least until early

24    November, Your Honor, to review -- and this includes the

25    classified information as well, Your Honor -- and come back at

 1   talk about what we've seen.

 2          On the classified information, this is -- and you

 3   asked Mr. Bratt about this, there's no case like this.  I mean,

 4   the President has original declassification authority.  He's

 5   one of a few people in this country that possess that as

 6   President.  Whether that's part of the review of classified

 7   materials, we don't know yet.  And Your Honor is right, the

 8   proposed protective order right now doesn't allow us to discuss

 9   anything with our client as it relates to any of the materials

10   that we see that are classified, without getting permission

11   from the Government.  And so there are complicated Section 5

12   motion practice for things that will take place that we can't

13   speak intelligently about yet because we haven't seen the

14   documents.  But it's not like a typical case when somebody has

15   classification authority, illegally possesses documents and

16   then is arrested for it.  That's not just what this case is.

17          THE COURT:  All right.  So in terms of security

18   clearances, there has been I think a good amount of progress on

19   that front, and I want to thank the litigation security group

20   for all that it's done to move those along expeditiously.

21          Does the Defense anticipate any additional members of

22   the defense team working on this case such -- what I don't want

23   to run into is a scenario where three months from now, all of a

24   sudden there are five new people, and we're now delayed on

25   account of additional clearance processing.

1           MR. BLANCHE:  Your Honor, possibly, but I can

2    represent to the Court that we will not seek a delay, given

3    what I've said today in connection with the timing that we've

4    requested if new people are added meaning we will not come back

5    to this Court and say, oh, geez, we just added a new lawyer,

6    reset deadlines.  We're here, and we may add members to our

7    team, but we will work with the Department of Justice and the

8    security folks to do that quickly, and we have one potential

9    new member who already has security clearance and so that will

10   be very efficient.  But I commit to the Court that that will

11   absolutely not happen.

12           THE COURT:  In terms of that March 2024 trial in

13   New York, do you know if that's a firm trial date?  Has that

14   that previously been continued?  Do you have any information

15   about scheduling as far as that case is concerned?

16           MR. BLANCHE:  You mean as far as like how long it

17   will last and whatnot?

18           THE COURT:  Yes, and whether it's really going to go

19   in March.

20           MR. BLANCHE:  Yes, Your Honor, our understanding from

21   the judge is that -- from the state judge is that he has

22   instructed all lawyers to -- and President Trump to clear the

23   schedule and to be prepared to go to trial on that date.  And

24   we do not anticipate that date moving.  We believe, based upon

25   the people of New York, the people's representations, that it's

 1    approximately a three-week trial with some potential give, of

 2    course.  That -- sorry to jump around.  That's the other thing

 3    about this case, Your Honor.  It's potentially a six- or

 4    seven-week trial.

 5            The Government indicated when filing the indictment

 6    that their case is 21 days.  When you work in jury selection --

 7    and I have no idea, if any, what Defense case there would be,

 8    but let's assume it's a couple days to a week, you're talking

 9    about a very significant amount of time for the Court that

10    should also be considered, especially as it relates to

11    President Trump and his ongoing campaign for president.

12            THE COURT:  All right, thank you.

13            Let me hear from Mr. Woodward, unless Mr. Kise has

14    particular commentary with respect to Mr. Trump.

15            MR. KISE:  Thank you, Judge.  Good afternoon.  Good

16    to see you, albeit under the circumstances.

17            I'm going to be brief, and I'll try not to cover

18    things that Mr. Blanche covered.  Just a couple points that

19    Mr. Harbach raised that are also raised in their reply that I

20    think are worth the Court's at least consideration a little bit

21    in this context.

22            The Government in its reply brushes away the *Sheppard*

23    and *Coleman* cases that we cite, and they focus really more on

24    the crime that was at issue.  But really, the focus of those

25    cases is the actual publicity, it's not really what's causing

1    the publicity.  The Court's focus is on the publicity and the

2    impact of that publicity on a fair trial.  And the press

3    coverage in both *Sheppard* and *Coleman* was indeed significant,

4    as they lay out in those cases, but it really doesn't compare

5    to this case.  I don't think anything does, and I'm going to

6    get to that just briefly in a second.

7         But the *Sheppard* court made something very clear, and

8    that is that where there's a reasonable likelihood that

9    prejudicial news will prevent or impede a fair trial, then the

10   Court should continue the trial until the threat abates.  It

11   doesn't say that it should continue it until it goes away

12   completely, but it does say that it should continue it or at

13   least consider continuing until it abates.

14        Here, you have what can easily be described, I think

15   fairly, as extraordinary and unrelenting press coverage.  As

16   Mr. Blanche pointed out, you have essentially the two right now

17   leading candidates for the presidency of the United States

18   squaring off against each other in the courtroom, at least

19   that's how the public views it.  That's certainly how the media

20   views it, and there's really no way right now to contain this.

21        I had some basic research done of what's called

22   Brandwatch data which helps reveal a little bit of the extent

23   of this coverage.  The federal indictment alone, just from the

24   38 days from June 8 until July 16th, generated 88,306 news

25   stories, that's over 2300 stories a day; 2,070,111 social media

1   posts, that's almost 55,000 social media posts per day.  Every

2   motion, every hearing, everything generates a story.

3        I filed a motion for pro hac vice admission for

4   Mr. Blanche's partner, Mr. Weiss, the other day, that generated

5   a news story.  I've never in my career seen a pro hac vice

6   motion generate a news story, but it generated a news story.

7   So there's no way to escape this.  And as Mr. Blanche pointed

8   out, what the Government is trying to ask this Court to do --

9   and I appreciate the Court is in a challenging position here,

10  but I think these factors should respectfully be considered and

11  weighed carefully and not in a hurry.

12        We have to recognize the reality of where we are, and

13  they certainly have this sort of Oz-like approach that they

14  just want to compartmentalize this.  And so every word that's

15  spoken in this courtroom is going to generate hundreds if not

16  thousands of stories.  There's going to be pundits and experts

17  during the course of the election, where we are at the peak,

18  the zenith of interest, focused on this, and it will be just

19  like in the *Sheppard* case, very difficult to separate the facts

20  that are going to be developed in the courtroom from the facts

21  that are going to be developed outside on the courthouse steps

22  in the media.  You see it already now.  There is pundit after

23  pundit after pundit, expert after expert after expert on TV

24  24/7 talking about -- they're going to do it today.  They're

25  going to talk about the arguments the Government made, they're

1    going to talk about the arguments that we made; and there's

2    going to be all of this subjective commentary that is going to

3    find its way into the jury pool.

4              THE COURT:  But won't that just continue?  I mean --

5              MR. KISE:  Respectfully, I think it will abate

6    somewhat post-election, I do.  And if you'd like us to develop

7    that argument further, then perhaps we can.  But I think it

8    will simply because the interest is at its peak, and it will

9    remain at its peak as long as these two individuals are squared

10   off directly against each other.  It will never go away.

11             THE COURT:  So your position is that there can be no

12   trial until it's after the election.

13             MR. KISE:  I certainly think that's the best course

14   of action for a fair trial for this defendant because this

15   defendant, like the defendant in *Sheppard* and like the

16   defendant in *Coleman*, deserves to have the evidence in the

17   courtroom and only the courtroom dictate the outcome.  And so

18   that's a very difficult thing in this context, and so I would

19   ask the Court to carefully consider this and let's think about

20   this before we make any final decision.  But as the *Sheppard*

21   court made clear, where there is a reasonable likelihood that

22   the prejudicial news will prevent or impede a fair trial, the

23   Court really should continue the trial until that abates.

24             THE COURT:  I think, at least it seems to me, that we

25   should be focused on the volume of discovery, the legal issues

1   that are expected to be presented, the extent of motion

2   practice, the complexity of the classified information, if it

3   is complex, and those sorts of CIPA procedures.  I think that

4   framework guides the Court's continuance inquiry in a more

5   concrete way, and one that I think is more suitable to the

6   Speedy Trial Act.

7          Anything further, Mr. Kise?

8          MR. KISE:  I want to talk about the schedule conflict

9   to your points, Your Honor.  And the schedule conflict -- they

10  cite two cases in their papers, the *Hanhardt* case and the

11  *DeCastro-Font* case, and I just want to point out that there's a

12  different context here as well.  We're not talking about

13  schedule conflicts, at least not with respect to me and with

14  former President Trump.  We're talking about schedule conflicts

15  that involve the same client.  So it's not that I have a case

16  for Client X or Client Y that is precluding me from being here.

17  I think that's a very relevant consideration and a real one,

18  but I think it's even more focused with respect to

19  President Trump.

20         The trial that I have beginning in October involves

21  him and his companies.  There is another trial scheduled with

22  him and his companies in January in the Southern District of

23  New York.  There is the trial that you know about in March of

24  2024 with Mr. Blanche.  So these are the same lawyers dealing

25  with the same client trying to prepare for the same sort of

1    exercises, and so I think that's highly relevant.

2         The *Hanhardt* case involved different clients.  It

3    involved a commercial arbitration versus a criminal trial, and

4    the conflict there between the two was really very different

5    than the context here.

6         The *DeCastro-Font* case also involved a conflict

7    between two different trial schedules for two different

8    clients, and the complexity and the volume of discovery there,

9    to Your Honor's point, is nowhere near comparable.  There,

10   there were 20,000 pages of documents and 10,000 emails.  We

11   have 1.1 million pages of documents and counting, 190,000

12   emails.  None of this is present here, so I would say that the

13   only cases cited by the Government are simply inapposite, and I

14   think that's very relevant for Your Honor's consideration.

15        In terms of the schedule here and my own schedule for

16   this same client, we are involved as of today, in fact.  I

17   mean, I'm missing the depositions.  We have expert depositions

18   every single day this month until the end of the month, until

19   July 28th.  Summary judgment motions are due on August 4th, and

20   they will be comprehensive.  The oppositions are due several

21   weeks later, on September 1st.  The witness and exhibit list is

22   due November 8th.  The summary judgment reply is

23   September 15th.  The summary judgment hearing is

24   September 22nd, that is the same day that we will have to file

25   all of our pretrial motions, including *Daubert* motions.  The

1    final pretrial conference is only five days later, on

2    September 27th; and the trial begins on October 2nd.  It is an

3    extraordinarily compacted schedule.

4            The trial itself involves well more than 20 fact

5    witnesses and 18 experts.  My experience in the New York State

6    Supreme Court leads me to conclude that we're going to have

7    roughly six hours of trial per day.  So this is why we

8    anticipate the trial to go at least through mid November to

9    Thanksgiving.  All of that is by way of saying that it would be

10   extraordinarily difficult to prepare effectively to participate

11   in this proceeding, even as to the Presidential Records Act

12   issues Mr. Harbach mentioned.  I think we need time to

13   understand the documents at issue; I certainly do.  Yes, those

14   arguments were touched upon when we were last before Your

15   Honor, but the real issue was that since we never knew what the

16   documents were, it was very difficult to frame those arguments

17   in sort of the esoteric environment that we were operating in.

18   I'm going to need to understand -- Defense Counsel is going to

19   need to understand exactly which documents are at issue and how

20   those relate to the charges in order to advance the argument.

21   So it is a legal argument, but that legal argument is dependent

22   upon the facts that don't become clear until at least we see

23   what it is that we're talking about.  So we need time to do

24   that.

25            I would also say that, as Mr. Blanche mentioned, the

1   target letter that has become public today, there are other

2   proceedings that we're going to be involved in.  We don't know,

3   because the investigation is ongoing, even in this particular

4   context, whether the Government plans on any superseding

5   indictment.  They haven't said so, but certainly the fact that

6   they're continuing to subpoena individuals and send out target

7   letters might lead you to conclude that that's a possibility.

8          And lastly, I would just reiterate again, Your Honor,

9   that the novel questions that we have here --

10          THE COURT:  Can you articulate more precisely what

11   those novel questions are from your perspective?

12          MR. KISE:  I can, Your Honor.

13          The Presidential Records Act is a novel question,

14   despite the dismissive nature with which the Government

15   presents it.  There is a structure in place for presidents --

16   unfortunately, there is -- while there is some guidance under

17   the Presidential Records Act, what is lacking with respect to

18   classified information or purportedly classified information

19   that's at issue here, what is lacking for all chief executives

20   of the United States and has been lacking since the

21   Presidential Records Act was adopted is what happens after the

22   fact.  What happens to these classified records?

23          There's actually no -- that's what's going to get

24   developed in this trial -- there's no real guidance.  This is

25   why you see Vice President Pence, President Biden,

1    President Obama, President Bush -- I mean every president that

2    has had to wrestle with these issues because there really

3    actually is no direction and guidance.  For all of the care and

4    concern that the Government brings to this courtroom and says

5    that they protect this information, when a chief executive

6    leaves office, there isn't a whole lot of direction.

7              What is governing --

8              THE COURT:  So what's the novel question?

9              MR. KISE:  The novel question is, is which takes

10   priority?  The novel question is:  Does the Presidential

11   Records Act govern how the president makes decisions about his

12   documents or her documents, as the case might be, or do these

13   other laws intersect and govern?

14             We are going to maintain the position that the

15   Presidential Records Act governs because that is what governs

16   how the president manages and disposes of information in his

17   possession during his term of office.  And once he makes

18   decisions about that information, whether it be classification

19   decisions, whether it be presidential records versus personal

20   records, those decisions are not assailable except under the

21   Presidential Records Act.

22             I mean that's the sum and substance of it.

23             THE COURT:  All right.  Thank you.

24             This is my last question, then I'd like to hear from

25   Mr. Woodward.

1          MR. KISE:  Yes, Your Honor.

2          THE COURT:  There's a reference in your opposition to

3     a careful and complete review being necessary of the, quote,

4     procedures that led to this indictment.  Can you put any more

5     meat on the bones to that?

6          MR. KISE:  Your Honor, I think that's what

7     Mr. Blanche was referencing, sort of the search warrant and

8     those procedures, the grand jury procedure that he mentioned,

9     Washington versus South Florida, and all of the issues

10    surrounding Mr. Corcoran's testimony and the appropriateness or

11    not of that testimony.

12         And lastly, Your Honor, respectfully, I would urge

13    the Court still to please do consider the publicity aspects of

14    this and perhaps maybe not postpone it until post-election, but

15    I think that they are permissible for consideration under 3116.

16         Thank you, Your Honor.

17         THE COURT:  Thank you.

18         All right.  Mr. Woodward.

19         MR. WOODWARD:  Thank you, Your Honor.

20         Just picking up where Mr. Kise left off, I have

21    serious questions about how an investigation that had been

22    pending for months and months and months in the District of

23    Columbia ended up here, in the Southern District.  You know, as

24    the Court is aware, I was personally involved in a fair amount

25    of litigation in the District of Columbia, and so I'm

1    especially curious, as we see discovery, to know what was done

2    in D.C. and then what was done in Miami and whether there's a

3    motion for abuse of grand jury process in this case.  Those are

4    rare, I understand that; but this is a new case, and we can't

5    bring such a motion before Your Honor without understanding

6    whether there's any merit there, and the only way for us to

7    understand whether there's merit is to review the discovery.

8          And so, you know, to state the obvious, my client is

9    not running for election, and so I'm not going to stand before

10   you and talk about why a trial of my client couldn't happen

11   until after the election.  Instead, I agree with the Court that

12   we can talk today about the practicalities of a trial.  I don't

13   know how much it's worth our time discussing a December trial

14   because the Government stood before you just a short while ago

15   and told you that they have not provided us with my client's

16   cell phones.

17         They seized my client's cell phones pursuant to a

18   search warrant in November, and they're telling you today that

19   they can't make forensic copies of my client's cell phones

20   available to us.  Why did they indict a case that they don't

21   have the cell phones to produce in discovery the minute that

22   this indictment is returned?  And the Government --

23         THE COURT:  Mr. Bratt made some comments about

24   potentially not being able to fully access the phone until a

25   later date which might explain why it has taken longer for them

1    to produce or to try to at least process.

2          MR. WOODWARD:  Well, that's the first I'm hearing of

3    that, and it leads to a broader issue in this case.  I mean,

4    they seized my client's cell phones despite knowing that he was

5    represented by counsel and counsel that was engaged in frequent

6    discussions with the Government.  Now, that's their prerogative

7    if they decide that they want to seize cell phones regardless

8    of whether they could have gotten a grand jury subpoena, I

9    understood that; but those are the types of questions that

10   we're going to ask this Court to take a close look and to

11   scrutinize.

12          With respect to --

13          THE COURT:  So from your perspective, the pretrial

14   motions that you envision, do they match up with the types of

15   pretrial motions that have already been discussed or are there

16   additional motions that you see in the future?

17          MR. WOODWARD:  There's one very important motion that

18   is going to be unique to Mr. Nauta, and that's whether he moves

19   to sever, and he cannot make an informed decision and I cannot

20   advise him on how to make that decision until we've seen the

21   discovery and, in particular, until we've seen the classified

22   discovery because there are 32, I think, counts involving

23   classified discovery as against former President Trump that do

24   not relate to Mr. Nauta.

25          And so the idea that the Government would rush ahead

1    to having motions being filed -- and, again, I don't know how

2    much it's worth our time to talk about a deadline in two weeks

3    or in six days, as the Court's current order is, but how can I

4    advise my client?  How can I provide him effective counsel

5    under the Sixth Amendment when I don't know what the discovery

6    is that's going to be admitted as against his codefendant?

7            I'm not suggesting we will be filing the motion

8    because I don't know, and that's what I think the theme of this

9    hearing is today.  There's so much that we don't know and --

10   you know, so respectfully, I think our ask is that we'll come

11   back as often as the Court would like, whether that's in 30,

12   45 days to just check in and let the Government tell us where

13   we are in discovery.  And Your Honor, I have no doubt, is going

14   to ask me where I am in my review of discovery; and if I come

15   before you in 45 days and say, Your Honor, you know, I've made

16   no progress, I don't think you're going to allow that.  You

17   know, I don't think you're going to allow an indefinite

18   continuance of a trial in this case.  I think you're going to

19   want us to provide you with real practicalities.

20           Your Honor, I want to comment on the video in this

21   case, as well, because that is a critical element of discovery,

22   and I didn't know before my co-defense counsel shared with me

23   that there's a thousand days of video.  And I actually take

24   issue with the suggestion that I won't be reviewing it all.

25   Now, maybe I personally won't be reviewing it all, but this

1    case is about what was happening on that video.

2        It's curious to me to learn that the Government

3    doesn't have all of the video because their allegation that my

4    client was moving boxes and that that is the sum and substance

5    of the obstruction count, well, we need to see what was on that

6    video in order to understand what they allege my client to have

7    done or not to have done.

8        As Your Honor is well aware -- and I want to thank

9    the Court for understanding my schedule last week, I was in

10   trial in a case involving video last week.  In that case, Your

11   Honor, my client was alleged to have been captured on video for

12   less than a total of two hours, and that client was arrested in

13   March of 2021 and, for almost three years, this United States

14   Department of Justice came before a federal court and said that

15   that case was complex because of video.  And so for them to

16   come today and say that this case isn't complex because 500,000

17   documents and a million pages of discovery and a thousand days

18   worth of video isn't a lie, we have a hard time reconciling

19   that.

20       Now, yes, I have a busy schedule; and, yes, I

21   understand the Government has cited a 20-year-old case and a

22   15-year-old case that suggests that that's not reason enough

23   for the Court to push off a trial, but the Court doesn't have

24   to rely simply on my busy schedule.  The Court can rely on the

25   fact that we have a lot of discovery issues left unresolved.

1    It may take them time to get access to Mr. Nauta's phones, but

2    for us to come to you and commit to a briefing day when we

3    don't know when we're going to get the phones, I think

4    that's --

5            THE COURT:  I think what I heard was a couple of

6    weeks hopefully on the phones, but Mr. Bratt I'm sure will

7    clarify that if I'm mistaken.

8            As far as the complexity under the Speedy Trial Act,

9    this opposition, I don't have a separate motion to declare this

10   case complex.  So my question for you, Mr. Woodward and

11   potentially for your colleagues, is whether that's built in or

12   subsumed within this opposition?

13           MR. WOODWARD:  Yes, Your Honor, I believe it is.  I

14   believe that under 3161, when the Court is considering the

15   interests of justice, complex is one of the factors that the

16   Court is to conclude.  And so if Your Honor is asking whether

17   we're prepared to toll under the Speedy Trial Act based on the

18   complexity of the case, the answer is yes.

19           Now, I would also observe that tolling is happening

20   right now.  The Government yesterday filed a motion and that

21   automatically tolls time under the Speedy Trial Act.

22           THE COURT:  Are you aware of any other CIPA case with

23   voluminous discovery that hasn't been deemed unusually complex?

24           MR. WOODWARD:  I'm not, Your Honor.

25           And the CIPA issues I think are issues that we need

1  to resolve for the reasons I've already said.  You know, I

2  appreciate that the Government is working -- all aspects of the

3  Government are working studiously dealing with the security

4  clearance issues, but I think it's premature for any of us to

5  assume that there won't be extensive CIPA briefing because I

6  don't know what I don't know.

7        I'm told today that I have an interim security

8  clearance; but, as the Court is aware, I have concerns about

9  where that goes next.  You know, we'll discuss with the

10  Government the proposed protective order, but I have serious

11  concerns about, as Mr. Nauta's counsel, consenting to a

12  protective order that doesn't give him access to the discovery.

13  I feel like as a defense counsel, we have a role not to make

14  such a concession.  Now, if the Court orders it --

15        THE COURT:  I think the Section 3 needs to be

16  conferred upon by the parties, and if there are any lingering

17  disputes, that would be potentially the subject of additional

18  litigation.  But at this point, I have an unripe motion that

19  wasn't truly conferred upon.

20        All right.  Anything further, Mr. Woodward?

21        MR. WOODWARD:  No, Your Honor.  Thank you.

22        THE COURT:  Okay.

23        All right.  Let me hear from the Government with any

24  rebuttal.

25        MR. HARBACH:  Thank you.  You predicted my question.

1          Thank you, Your Honor.

2          I'm going to address a number of things that were

3    mentioned by our counterparts, but to the extent the Court

4    might have any questions in particular on specific subjects, my

5    colleague, Mr. Bratt, is going to handle questions or issues

6    that were raised related to classified production, the volume

7    of video footage, and those sorts of things.

8          I would like to make a few comments starting with

9    where Mr. Blanche started.  Actually, I should rephrase that --

10   where the Court started.

11         The Court's first question to Mr. Blanche was a

12   request for a more concrete road map and some more particulars

13   about the type of delay that they're requesting here and the

14   reasons for it.  And what Your Honor got in response to that

15   was, at first at least December, although it wasn't clear what

16   the "at least December" deadline was.  And then later,

17   Mr. Blanche said at least early November to file motions; and

18   it occurred to me, as we were hearing the colloquy about

19   motions that need to be filed, that it might be worth a brief

20   detour to potentially bifurcate the types of motions we're

21   talking about.

22         When I said earlier that the majority of the pretrial

23   motions that they've -- they had mentioned in their written

24   papers up to this point were not the types of motions that

25   necessitated a thorough review of discovery, it's also the case

 1   that if you look at Rule 12, it's Rule 12(b)(3), the motions

 2   that must be made before trial.  There is a list there, and

 3   almost none of them require a fulsome review of discovery.  The

 4   one potential exception to that is a motion for suppression of

 5   evidence; and as Defense Counsel have acknowledged, we've

 6   provided all of the search warrants, search warrant

 7   applications, and the fruits of stuff that were seized.

 8            So my point of mentioning that is that to the extent

 9   the Court is considering setting interim deadlines for pretrial

10   motions writ large, one option that the Court might consider is

11   setting a deadline for motions that in the Court's view do not

12   require extensive review of discovery and set purely legal

13   motions, motions about the sufficiency of the indictment,

14   severance motions, the catalog of -- I don't know how quite to

15   put an umbrella over them, but some abuse of process

16   allegations that they've been talking about.  Those types of

17   things don't require extensive review of discovery, and there's

18   no reason to hold them up, certainly no reason to hold them up

19   until November at the earliest in the Government's view.

20            I further take issue with Mr. Blanche's suggestion to

21   the Court that it would be more efficient to do all of them at

22   one time.  I'm not sure quite what the rationale is there, but

23   for the reasons I just stated, we think there are plenty of

24   motions that could be handled sooner rather than later.

25            The Government more broadly does not take issue with

1    the notion that discovery has to be reviewed and has to be

2    reviewed thoroughly by Defense Counsel in order to discharge

3    their duties, of course.  But let's not forget, part of the

4    reason we're here is that it is the Government that sought a

5    four-month continuance from Your Honor's currently operative

6    trial date in part for that very reason, in order to

7    accommodate both parties having enough time to review

8    discovery, not to mention the CIPA procedures.

9        I reiterate that only to let Your Honor know that we

10   are sensitive to that issue, and that factored into our own

11   determination about a date to recommend to the Court that

12   attempted to take into account those issues while still moving

13   things along.

14       Briefly, I would like to address Mr. Blanche's claim

15   that it was intellectually dishonest for the Court to -- or for

16   the Government -- excuse me -- to suggest to the Court that

17   Mr. Trump is like any other defendant.  I've already made my

18   point about that; but, suffice it to say that this is not just

19   a philosophical musing about his station.  This is an important

20   principle that, as I said earlier, we think the Constitution,

21   the Eleventh Circuit, and all associated case law made quite

22   clear about how a private citizen who has been indicted should

23   be treated by the rules, by this Court, and by the United

24   States Code.  So I don't think there's anything intellectually

25   dishonest about it because the bedrocks that we stand on are

1   the ones that I mentioned earlier.

2          Both Mr. Blanche and Mr. Kise made reference to the

3   fact that this case is being maintained by one political

4   opponent as squaring off against another political opponent.

5   Mr. Kise went so far as to say that the media has latched on to

6   that and, in his view, is propounding that narrative.

7          For the Court's benefit, the Defendants, and to the

8   extent that any of the media are in here today, the Government

9   says that the claim is flat out false.  That is not the case.

10          The Attorney General appointed the special counsel to

11   remove this investigation from political influence, and there

12   has been none, none.

13          It is worth pointing out that all of us who are

14   sitting at the table today and all of our teammates are career

15   prosecutors.  No one on the team is or has been a political

16   appointee, and none of us would be here working on this case if

17   we thought we were just doing somebody's political bidding.

18          There has been lots of rhetoric about this in all of

19   the media outlets that Mr. Kise mentioned, in social media and

20   so forth, but that is all intended perhaps for the court of

21   public opinion.  In a court of law, that rhetoric has no legal

22   construct.  There's nothing for it to latch on to.

23          We are here because a grand jury of citizens in this

24   district returned an indictment against these defendants, and

25   the law requires a trial.  If they want to make a motion about

1    some sort of abuse of process because that's what they think is

2    going on, they can make a motion, and we can respond

3    accordingly.  But for present purposes, this argument, this

4    claim is nothing more than that.  It doesn't even purport to be

5    more than that.  It is just a naked argument.  It is false --

6        THE COURT:  I think it's an argument about publicity

7    and how that would impact jury selection.

8        MR. HARBACH:  Yes.

9        THE COURT:  So I don't know if we need to get ahead

10   of ourselves here.  I'd like to stay focused again on the

11   issues related to the continuance, the pretrial schedule, the

12   demands of this case in particular.  I think that's really what

13   needs to guide the Court's inquiry.

14       Anything further on those subjects?

15       MR. HARBACH:  Yes, Your Honor, and thank you for the

16   nudge.  I just wanted to put on the record that the claim is

17   false.

18       You're absolutely right that Mr. Kise also talked

19   about the degree of publicity about the case in general and the

20   extent the Court should take that into account.  He made a

21   point of attempting to distinguish the -- excuse me -- of

22   attempting to dismiss our distinguishing of the two cases they

23   put in their brief.  As I mentioned earlier, our view is those

24   cases are distinguishable because of the crimes that were at

25   issue.  And yes, the cases aren't necessarily restricted to

 1   cases involving violence or heinous crimes or that sort of

 2   thing, but the familiar principle that is common in case law

 3   typically tends to emanate from cases like that.

 4           More to the point, the publicity surrounding

 5   President Trump is chronic and almost permanent.  There is no

 6   reason to think that it's going to get any better.  Perhaps to

 7   the contrary, depending on the result of the election.  Who

 8   knows what's going to happen?  And all we're saying is, the

 9   fact that there is publicity is something that courts routinely

10   deal with not only in selecting juries but also in conducting

11   trials.  It is commonplace to issue instructions to a jury

12   saying "don't pay attention to social media, don't pay

13   attention to what's in the news, don't pay attention to this

14   and that."  And if we're in a world where we can't trust juries

15   to abide by courts' instructions along those lines, then we

16   would never be able to pick a jury with any party of any public

17   notoriety at all.

18           And so although, as I said earlier, we fully

19   acknowledge the importance of voir dire here, and perhaps the

20   need for some creative additional procedures to make sure both

21   sides and the Court are satisfied that there's an impartial

22   jury, we're not denying any of that.  All we're saying is that

23   is not enough of a reason to continue the case indefinitely or

24   even for any significant period of time.

25           The last thing I would like to say before I turn it

 1    over to my colleague is -- I would like to briefly touch on the

 2    other obligations of Counsel and how the Court should take that

 3    into consideration.

 4          It is -- the cases that we have cited to Your

 5    Honor -- Mr. Kise has pointed them out -- both of those cases

 6    and the standards that were involved there were, in fact, cases

 7    where lawyers had -- I was about to call it an actual conflict,

 8    but I don't mean it in the ethical sense, I mean it in terms of

 9    their calendar, where they were -- you know, they had two

10    trials scheduled on the same day, or something like that, and

11    were physically unable to be at both.  And even in those

12    circumstances, the courts concluded that the defendant's

13    limited Sixth Amendment right to counsel of choice had to give

14    way.  So we cited those courts just for that proposition -- we

15    cited those opinions just for that proposition.

16          I should point out that there is a Fifth Circuit

17    case, a presplit Fifth Circuit case called *Gandy vs. Alabama*

18    that is mentioned essentially by extension in the *Hanhardt* case

19    because *Hanhardt* cites another case called *Hughey* which is

20    another Fifth Circuit case that in turn cites *Gandy*.  I mention

21    that citation to the Court only to the extent it might inform

22    the Court because it also includes some of the factors that

23    courts consider in deciding whether to grant a continuance when

24    there is a situation of an actual conflict.  And to the extent

25    the Court finds those factors informative here, it might be

1  useful for Your Honor.  That citation is 569 F.2d 1318, and

2  it's Fifth Circuit, 1978.

3      Now, Mr. Woodward chided us for the age of some of

4  the cases we cited, and I have an Eleventh Circuit case from

5  2000 that cites *Gandy*.  It's called *United States vs. Bowe*,

6  B-O-W-E, 221 F.3d 1183.  Suffice it to say that some of the

7  most well-established principles in the law are actually quite

8  old.

9      I'm just checking my notes, Your Honor.  Can I please

10  have one moment?

11      THE COURT:  You may.

12      *(Brief pause in proceedings)*

13      MR. HARBACH:  Unless Your Honor has any questions,

14  I'll turn it over to my colleague.

15      THE COURT:  Thank you.

16      MR. BRATT:  Thank you, Your Honor.  I'll try to be

17  brief.  We've been here for a while.

18      First, one response that I actually should have given

19  to you when I was up here previously about other cases that

20  have gone to trial this quickly, and it was really something

21  that should have been obvious to me that I should have pointed

22  out which is one way in which this case is different is I can't

23  think of any other case that we've done where essentially from

24  day one, we've had all the discovery and been able to produce

25  it and to have the case ready from our perspective to go to

1   trial.

2            Just to turn to the *Mallory* case by contrast which

3   went to trial again within a year and that's a case I'm very

4   familiar with.  In *Mallory*, some of the most inculpatory

5   evidence that was used in that case was acquired in the search

6   warrant that was executed on the day that he was arrested.  And

7   things had to be processed on the basis of searches of his

8   house, of his devices that were recovered in his house.  That

9   was not the situation here.  We were able to -- our key search

10  we did now almost a year ago, we were able to compile all the

11  evidence and have it ready to be produced right at the outset

12  of the case.  So that does make it different from our other

13  cases.

14           THE COURT:  But even there, you're talking about

15  11 months and no substantive pretrial motions.  Were there in

16  *Mallory*?

17           MR. BRATT:  There was motions.  There was extensive

18  CIPA hearings in that case.

19           THE COURT:  Other than CIPA specific motions.

20           MR. BRATT:  I would have to go back and look, Your

21  Honor.  Like it is rare for -- and federal public defenders

22  were representing Mr. Mallory, it's rare for them not to file

23  any substantive motions; but I can go back and check.

24           Just to touch briefly on Mr. Nauta's phone, we had

25  the phone, we searched it thoroughly.  We provided the scope

1   results of those searches to Defense Counsel.  Evidence from

2   that phone is in the indictment.  The picture I referred to in

3   paragraph 31 of the indictment, that is from Mr. Nauta's phone.

4   Text messages that are in the indictment are from Mr. Nauta's

5   phone.

6            THE COURT:  When is that material going to be turned

7   over?

8            MR. BRATT:  It already has been turned over.

9            THE COURT:  Okay.

10           Any other device productions that you anticipate and

11   when?

12           MR. BRATT:  Just to sort of explain what occurred is

13   that we did a search of Mr. Nauta's devices, also searched his

14   iCloud and had those results and already produced them.  There

15   came a point in time when certain software was necessary to

16   continue the searches.  It took -- for reasons that I don't

17   understand, it took a few months to get that software.  We got

18   the software right around the time of the indictment which has

19   enabled us to do an even more thorough search of the phone, and

20   that is what is occurring now, and that is what should be

21   producible within the next couple of weeks.  But they have

22   received extensive evidence from Mr. Nauta's phone already, and

23   we offered defense counsel for Mr. Nauta a forensic copy.  On

24   July 6th, we offered them a hard drive that had a forensic copy

25   of the phones and said, "Where can we send them?"  We still

 1   have not heard from them where they want us to send the

 2   forensic images.  But they have a considerable amount of

 3   evidence from Mr. Nauta's phones.

 4          With respect to the closed circuit television and the

 5   movement of boxes, I would just note that the movement of boxes

 6   occurred between May 24th and June 2nd.  So it's not years'

 7   worth of video with respect to the movement of boxes.

 8          With respect to the classified information, I know

 9   Mr. Blanche --

10          THE COURT -- the Defense would have to review all of

11   the footage to be properly informed about the scope of the

12   footage.  I mean, it's not the case that they're going to zoom

13   in on whatever period of time the Government isolates as

14   critical.

15          MR. BRATT:  Of course, but a lot of what they're

16   going to be doing is having -- not themselves, having somebody

17   run through the video and seeing essentially nothing happening

18   or, you know, seeing somebody walk across a particular area and

19   being filmed, none of the people who have any relevance to this

20   case.  But, yes, that takes time, but it's also -- it's not --

21   you know, it's not like reading documents.  It is, you know,

22   it's viewing something.

23          With respect to the classified materials that the

24   Defense will see, understand it's their right to not concede

25   that they are classified.  They refer to them -- Mr. Blanche

1    referred to them as "purportedly classified."  I would just

2    advise the Court and Defense Counsel that all the documents

3    have now, at this point, gone through a classification review.

4    They are classified.  In the course of our investigation, we

5    saw no evidence from NARA or other records that any of these

6    documents ever were declassified.  We do have evidence that

7    they have or will see about declassification, some of it in

8    unclassified discovery they already have, some of it in the

9    classified discovery they'll be receiving.  And, yes, there

10   were things that were declassified, and there was a process for

11   it; not these particular documents.

12           And then finally, just to touch briefly on the PRA,

13   and we'll obviously have another forum to brief that to the

14   Court, but the PRA is very clear.  In fact, I believe it's the

15   initial provision in the PRA which is that, at the end of a

16   president's term, the presidential records belong to NARA,

17   belong to the U.S. Government.  Prior counsel for

18   President Trump have made statements both in pleadings and

19   publicly that there's a two-year period to review, that there's

20   a period for negotiation with NARA.  None of that is correct.

21   All presidential records belong to the U.S. government at the

22   end of a president's term.

23           Unless the Court has other questions.

24           THE COURT:  No.  Thank you very much.

25           All right.  Unless the Defense attorneys have focused

```
 1   and brief rebuttal...

 2             MR. BLANCHE:  Very brief, Your Honor.

 3             THE COURT:  Okay, very briefly.

 4             MR. BLANCHE:  Very quickly, just to be clear, we do

 5   believe this should be a complex case given our briefing on

 6   behalf of President Trump.

 7             And to the extent there was confusion about our ask,

 8   as Mr. Harbach just alluded to, our ask is that we come back at

 9   some point around November, having had a chance to do a

10   preliminary review of the CIPA classified discovery and the

11   discovery -- Rule 16 discovery and talk about a schedule then.

12             The Court then asked me about when we could file

13   motions.  I asked for December.  We do not think a trial date

14   should be scheduled today or at this time.  If the Court wants

15   to and believes a trial date does need to be scheduled at this

16   point, we ask for it to be at some point in mid November or

17   later of next year.

18             THE COURT:  All right.

19             MR. BLANCHE:  Thank you, Your Honor.

20             THE COURT:  All right.  Mr. Woodward, anything

21   further?

22             MR. WOODWARD:  Not unless the Court has questions.

23   And we're happy to come back whenever you'll have us.  So if we

24   come back in 30 or 45 days and we check on the status of

25   discovery, that's acceptable to us, and we can set motions
```

1   deadlines then; or, if the Court wanted to set motions

2   deadlines and bring us back in November, that's okay.  We're

3   not going to ask the Court to -- we'll come back whenever

4   you'll have us, Your Honor.

5              MR. BRATT:  Your Honor, I'm sorry.

6              THE COURT:  Yes.

7              I'd like to wrap this up.

8              MR. BRATT:  My colleagues just advised me that I

9   misstated something about what we offered Mr. Woodward last

10  week.  It was a hard drive with the CCTV, but we gave them the

11  contact information for the filter attorney who currently has

12  the forensic image of the phone.  I just wanted to correct that

13  for the record.

14             And one other thing I also neglected to mention,

15  while I was sitting there, Your Honor, when I was first up, had

16  said, are there any motions that the Government intends to

17  file?  And actually, we don't expect this will be a

18  significantly complex proceeding, but there are some *Garcia*

19  issues that we're going to have to bring to the Court's

20  attention.

21             THE COURT:  All right.  Okay.

22             Okay.  Well, thank you all for that overview of the

23  scheduling concerns.  It will assist me in thinking about and

24  reviewing what an appropriate schedule in this case will look

25  like.  I will issue an order promptly following this hearing.

1          As far as the pending motion for protective order is

2    concerned, because of the lack of meaningful conferral and

3    because I think it would help the parties to sit down and go

4    through those provisions carefully rather than file a motion

5    without that careful conferral, I'm going to deny that motion

6    without prejudice to be refiled following meaningful conferral

7    pursuant to the local rules.

8          Any questions before we adjourn, Mr. Bratt?

9          MR. BRATT:  Not for the Government, Your Honor.

10         THE COURT:  Any from the Defendants?

11         MR. BLANCHE:  No, Your Honor.  Thank you.

12         THE COURT:  Okay.

13         MR. WOODWARD:  No, Your Honor.

14         THE COURT:  All right.  Thank you all for being here.

15   Safe travels back home.  The Court is in recess.

16         *(PROCEEDINGS ADJOURNED AT 3:43 P.M.)*

17

18

19

20

21

22

23

24

25

1               <u>**C-E-R-T-I-F-I-C-A-T-E**</u>

2          I hereby certify that the foregoing is

3      an accurate transcription and proceedings in the

4      above-entitled matter.

5
       <u>**7/10/2023**</u>                    **/s/DIANE MILLER**
6        DATE                       DIANE MILLER, RMR, CRR, CRC
                                    Official Court Reporter
7                                   United States District Court
                                    101 South U.S. Highway 1
8                                   Fort Pierce, FL  34950
                                    772-467-2337
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 71

Case 1:23-cr-00257-TSC   Document 30-3   Filed 08/17/23   Page 72 of 84

FAMILY FIRST LLC vs. DAVID RUTSTEIN, et al.

USCA Case #23-3228   Document #2037501   Filed 12/23/2023   Page 238 of 2557

**DEFENDANT**
**NAUTA: [1]**  4/2
**MR. BLANCHE:**
**[13]**  3/17 27/14
30/24 31/25 36/13
36/19 38/1 38/16
38/20 67/2 67/4
67/19 69/11
**MR. BRATT: [39]**
3/13 6/20 6/23 7/1
7/12 7/14 9/2 9/12
9/15 9/23 9/25
10/8 10/11 10/14
11/3 11/15 12/7
12/20 12/22 13/6
13/15 13/21 14/8
15/11 15/17 15/24
16/1 16/21 17/3
17/16 62/16 63/17
63/20 64/8 64/12
65/15 68/5 68/8
69/9
**MR. HARBACH:**
**[10]**  18/12 18/17
21/7 22/4 22/7
24/4 54/25 59/8
59/15 62/13
**MR. KISE: [9]**
3/20 39/15 42/5
42/13 43/8 46/12
47/9 48/1 48/6
**MR.**
**WOODWARD: [9]**
3/22 48/19 50/2
50/17 53/13 53/24
54/21 67/22 69/13
**THE COURT: [82]**

**THE**
**COURTROOM**
**DEPUTY: [2]**  3/5
5/4
**UNIDENTIFIED**
**SPEAKER: [3]**
4/25 5/5 5/9

**/**

**/s/DIANE [1]**  70/5

**1**

**1,186 days [2]**
27/21 28/14

**1,545 [1]**  14/11
**1.1 million [3]**
8/20 9/11 44/11
**10,000 [1]**  44/10
**100 [2]**  29/9 34/2
**10005 [1]**  2/12
**101 [2]**  2/8 70/7
**10th [1]**  15/23
**11 months [1]**
63/15
**1183 [1]**  62/6
**11th [4]**  6/3 14/18
16/12 16/13
**12 [4]**  16/15 31/8
56/1 56/1
**12th [1]**  16/9
**1318 [1]**  62/1
**13th [1]**  16/5
**15-year-old [1]**
52/22
**15th [1]**  44/23
**16 [2]**  27/25 67/11
**16th [1]**  40/24
**18 [2]**  1/10 45/5
**190,000 [2]**  29/4
44/11
**1978 [1]**  62/2
**1st [1]**  44/21

**2**

**2,070,111 [1]**
40/25
**20 [1]**  45/4
**20,000 [1]**  44/10
**20-year-old [1]**
52/21
**2000 [1]**  62/5
**20001 [1]**  2/15
**201 [1]**  2/17
**202 [1]**  2/18
**2021 [1]**  52/13
**2022 [2]**  14/17
14/19
**2023 [2]**  1/10 70/5
**2024 [2]**  38/12
43/24
**20530 [1]**  2/5
**21 days [1]**  39/6
**21st [2]**  6/17 7/2
**221 F.3d 1183 [1]**
62/6
**22nd [1]**  44/24
**23-80101-CRIMIN**
**AL-CANNON [1]**

**23-CR-80101 [1]**
3/9
**2300 [1]**  40/25
**2337 [1]**  70/8
**23rd [1]**  8/8
**24/7 [1]**  41/24
**24th [1]**  65/6
**250 [1]**  14/22
**2703 [1]**  7/8
**27th [1]**  45/2
**28th [1]**  44/19
**2nd [5]**  2/17 7/24
8/8 45/2 65/6

**3**

**30 [3]**  34/3 51/11
67/24
**300 [1]**  2/15
**300,000 [1]**  8/6
**302 [1]**  15/4
**302s [1]**  14/20
**31 [2]**  14/25 64/3
**3116 [1]**  48/15
**3161 [1]**  53/14
**32 [1]**  50/22
**32301 [1]**  2/9
**34950 [2]**  2/18
70/8
**375 [1]**  14/22
**38 [1]**  14/17
**38 days [1]**  40/24
**3:43 [1]**  69/16

**4**

**400 [2]**  2/14 28/16
**4460 [1]**  2/11
**45 days [3]**  51/12
51/15 67/24
**450 [1]**  28/17
**4500 [1]**  7/20
**4th [1]**  44/19

**5**

**500,000 [1]**  52/16
**55,000 [1]**  41/1
**569 F.2d 1318 [1]**
62/1

**6**

**60 days [2]**  16/4
16/7
**6th [1]**  64/24

**7/10/2023 [1]**  70/5
**750 [1]**  2/8
**772-467-2337 [1]**
70/8
**793 [1]**  25/10

**8**

**80 percent [1]**
14/14
**800,000 [1]**  7/5
**80101 [1]**  3/9
**83 [1]**  1/11
**88,306 [1]**  40/24
**8th [2]**  14/19
44/22

**9**

**950 [1]**  2/4
**99 [1]**  2/11

**A**

**abate [1]**  42/5
**abates [3]**  40/10
40/13 42/23
**abide [1]**  60/15
**ability [4]**  8/14
23/2 23/21 24/19
**above [1]**  70/4
**above-entitled [1]**
70/4
**absolutely [3]**
32/2 38/11 59/18
**abundantly [1]**
20/20
**abuse [3]**  49/3
56/15 59/1
**accept [1]**  28/18
**acceptable [1]**
67/25
**access [8]**  11/17
11/21 14/12 14/13
16/10 49/24 53/1
54/12
**accommodate [1]**
57/7
**accordance [2]**
4/20 5/21
**according [3]**
15/21 20/15 22/22
**accordingly [1]**
59/3
**account [6]**  19/23

**57/12 59/20**
**achieve [1]**  17/20
**acknowledge [3]**
17/18 23/10 60/19
**acknowledged [1]**
56/5
**acquired [2]**  8/22
63/5
**across [1]**  65/18
**act [18]**  4/16
20/13 20/15 22/3
24/5 24/10 24/18
43/6 45/11 46/13
46/17 46/21 47/11
47/15 47/21 53/8
53/17 53/21
**action [3]**  23/3
23/22 42/14
**activated [1]**  10/1
**acts [1]**  26/2
**add [1]**  38/6
**added [2]**  38/4
38/5
**addition [2]**  8/17
14/20
**address [13]**
10/18 10/19 12/15
18/1 19/7 22/25
29/1 31/2 31/6
35/2 35/10 55/2
57/14
**addresses [1]**
11/20
**adequate [3]**
21/21 22/17 27/4
**adequately [2]**
18/23 30/21
**adjourn [1]**  69/8
**ADJOURNED [1]**
69/16
**administration [1]**
34/22
**admission [1]**
41/3
**admitted [1]**  51/6
**adopted [1]**  46/21
**advance [2]**  5/22
45/20
**affidavit [1]**  27/20
**affidavits [2]**
33/10 33/14
**affirmative [1]**

Page 72

FAMILY FIRST LLC vs. DAVID RUTSTEIN, et al.

Case 1:23-cr-00257-TSC   Document 30-3   Filed 08/17/23   Page 73 of 84

USCA Case #23-3225   Document #2046334   Filed: 12/16/23   Page 41 of 366

**affirmative... [1]**
15/18

**afternoon [13]**
3/7 3/13 3/16 3/17
3/19 3/20 3/22
3/25 4/1 4/2 6/24
6/25 39/15

**afterwards [1]**
29/22

**age [1]** 62/3

**aggressive [1]**
17/18

**AILEEN [1]** 1/17

**Alabama [1]**
61/17

**albeit [1]** 39/16

**allegation [1]**
52/3

**allegations [1]**
56/16

**allege [1]** 52/6

**alleged [1]** 52/11

**alleges [1]** 25/11

**allow [4]** 20/3
37/8 51/16 51/17

**allowance [1]**
16/15

**alluded [1]** 67/8

**almost [5]** 41/1
52/13 56/3 60/5
63/10

**alone [3]** 20/4
28/13 40/23

**although [5]** 7/5
30/17 31/17 55/15
60/18

**Amendment [2]**
51/5 61/13

**AMERICA [2]** 1/7
3/10

**America vs [1]**
3/10

**amongst [1]** 9/24

**amount [8]** 28/4
29/2 31/12 35/2
37/18 39/9 48/24
65/2

**analysis [2]** 18/23
19/2

**answer [5]** 22/7
23/15 27/6 29/1

**anticipate [9]**
13/13 13/15 14/3
15/9 15/17 37/21
38/24 45/8 64/10

**anticipated [2]**
6/19 15/8

**apologize [1]**
25/3

**Appeals [2]** 19/15
23/9

**appearances [2]**
2/1 3/11

**applications [2]**
7/21 56/7

**appointed [1]**
58/10

**appointee [1]**
58/16

**appreciate [4]**
30/10 35/1 41/9
54/2

**approach [2]** 5/6
41/13

**appropriately [1]**
30/23

**appropriateness
[1]** 48/10

**approved [1]** 16/6

**arbitration [1]**
44/3

**area [1]** 65/18

**aren't [1]** 59/25

**argue [1]** 20/11

**argument [12]**
6/5 15/14 18/15
24/9 24/14 42/7
45/20 45/21 45/21
59/3 59/5 59/6

**arguments [4]**
41/25 42/1 45/14
45/16

**arrested [3]** 37/16
52/12 63/6

**articulate [1]**
46/10

**aspect [1]** 21/23

**aspects [2]** 48/13
54/2

**assailable [1]**
47/20

**assist [2]** 11/23
68/23

**associated [1]**
57/21

**assume [2]** 39/8
54/5

**assuming [2]**
16/7 16/9

**assumption [1]**
16/3

**attack [1]** 23/2

**attempt [1]** 5/18

**attempted [1]**
57/12

**attempting [2]**
59/21 59/22

**attending [1]**
35/13

**attorney [4]** 32/14
35/12 58/10 68/11

**attorneys [2]**
18/11 27/11 66/25

**audio [3]** 5/1 5/12
5/15

**August 4th [1]**
44/19

**August 8th [1]**
14/19

**authority [4]**
17/14 23/22 37/4
37/15

**automatically [1]**
53/21

**Avenue [1]** 2/4

**avoid [1]** 4/13

**B**

**B-O-W-E [1]** 62/6

**background [1]**
6/13

**basic [1]** 40/21

**basis [3]** 9/6
24/10 63/7

**Bedminster [1]**
9/17

**bedrocks [1]**
57/25

**behind [1]** 15/21

**belabor [1]** 18/23

**belong [3]** 66/16
66/17 66/21

**benchmarks [1]**
6/6

**benefit [1]** 58/7

**beyond [3]** 17/16

**bidding [1]** 58/17

**Biden [1]** 46/25

**bifurcate [1]**
55/20

**bill [1]** 23/1

**BLANCHE [16]**
2/10 2/10 3/18
27/12 39/18 40/16
41/7 43/24 45/25
48/7 55/9 55/11
55/17 58/2 65/9
65/25

**Blanche's [3]**
41/4 56/20 57/14

**blank [2]** 23/7
28/19

**body [1]** 7/14

**bones [1]** 48/5

**Bowe [1]** 62/5

**box [1]** 34/7

**boxes [8]** 28/10
28/10 29/20 34/4
52/4 65/5 65/5
65/7

**Brand [1]** 2/14

**Brandwatch [1]**
40/22

**BRATT [11]** 2/2
3/13 6/14 6/15
18/7 27/16 37/3
49/23 53/6 55/5
69/8

**Bratt's [1]** 27/23

**brief [18]** 5/10
6/13 21/12 22/25
23/5 24/6 25/22
26/2 26/3 36/4
39/17 55/19 59/23
62/12 62/17 66/13
67/1 67/2

**brief that [1]**
25/22

**briefing [6]** 23/15
24/20 32/24 53/2
54/5 67/5

**broadcasting [2]**
4/7 5/15

**broader [2]** 5/21
50/3

**broadly [3]** 4/21
6/7 56/25

**brushes [1]** 39/22

**Bush [1]** 47/1

**busy [3]** 20/5
52/20 52/24

**C**

**C-E-R-T-I-F-I-C-A-
T-E [1]** 69/17

**calendar [1]** 61/9

**camera [2]** 9/19
9/19

**cameras [5]** 9/16
9/16 9/17 10/1
27/24

**campaign [1]**
39/11

**candidacy [1]**
20/7

**candidate [1]**
34/20

**candidates [1]**
40/17

**CANNON [1]** 1/5
1/17

**captured [1]**
52/11

**career [2]** 41/5
58/14

**careful [3]** 26/12
48/3 69/5

**carefully [3]**
41/11 42/19 69/4

**case such [1]**
37/22

**Casissi [1]** 3/3

**catalog [1]** 56/14

**CCTV [6]** 8/1 8/17
27/17 28/5 28/13
68/10

**cell [8]** 4/5 33/9
49/16 49/17 49/19
49/21 50/4 50/7

**certify [1]** 70/2

**challenging [1]**
41/9

**chance [2]** 33/21
67/9

**charged [2]** 32/18
35/11

**charges [3]** 28/8
35/7 45/20

**chided [1]** 62/3

**chief [2]** 46/19

Page 73

FAMILY FIRST LLC vs. DAVID RUTSTEIN, et al.

USCA Case #23-3228 16/10 16/18 17/12 20/1 Document 30-3 Filed 08/17/23 Page 74 of 84

USCA Case #23-3228 16/10 16/18 17/12 20/1 Document #2033204 Filed: 05/23/2023 Page 14 of 16 20/20

chief... [1]  47/5
choice [1]  61/13
CHRISTOPHER
 [2]  2/7 3/20
chronic [1]  60/5
chunk [1]  28/18
CIPA [20]  4/16
 4/20 5/20 6/6 6/6
 6/9 16/12 17/11
 21/24 23/20 31/7
 34/5 43/3 53/22
 53/25 54/5 57/8
 63/18 63/19 67/10
circle [1]  25/4
circuit [10]  19/16
 23/9 23/11 57/21
 61/16 61/17 61/20
 62/2 62/4 65/4
circumstances [6]
 5/23 19/10 31/4
 34/7 39/16 61/12
circumstantially
 [1]  25/6
circumvent [1]
 5/18
circumvention [1]
 4/9
citation [2]  61/21
 62/1
cite [2]  39/23
 43/10
cited [6]  44/13
 52/21 61/4 61/14
 61/15 62/4
cites [3]  61/19
 61/20 62/5
citizen [2]  19/18
 57/22
citizens [2]  27/1
 58/23
civilly [1]  35/11
claim [4]  57/14
 58/9 59/4 59/16
clarify [1]  53/7
classification [3]
 37/15 47/18 66/3
classified [40]
 4/15 4/16 10/4
 10/23 11/2 11/6
 14/6 14/11 14/20
 14/21 15/3 15/22

21/22 23/19 29/19
 29/19 30/5 34/2
 36/6 36/25 37/2
 37/6 37/10 43/2
 46/18 46/18 46/22
 50/21 50/23 55/6
 65/8 65/23 65/25
 66/1 66/4 66/9
 67/10
clear [11]  12/1
 20/20 20/23 38/22
 40/7 42/21 45/22
 55/15 57/22 66/14
 67/4
clearance [7]
 12/9 12/10 30/4
 37/25 38/9 54/4
 54/8
clearances [7]
 14/12 15/4 16/4
 16/6 16/8 30/3
 37/18
client [15]  12/13
 12/13 37/9 43/15
 43/16 43/16 43/25
 44/16 49/8 49/10
 51/4 52/4 52/6
 52/11 52/12
Client X [1]  43/16
Client Y [1]  43/16
client's [4]  49/15
 49/17 49/19 50/4
clients [3]  11/18
 44/2 44/8
close [2]  31/24
 50/10
closed [1]  65/4
co [1]  51/22
co-defense [1]
 51/22
Code [2]  19/20
 57/24
codefendant [1]
 51/6
Coleman [3]
 39/23 40/3 42/16
colleague [3]
 55/5 61/1 62/14
colleagues [4]
 9/23 28/21 53/11
 68/8
collected [1]

colloquy [1]
 55/18
Columbia [3]
 32/19 48/23 48/25
comment [1]
 51/20
commentary [2]
 39/14 42/2
comments [2]
 49/23 55/8
commercial [1]
 44/3
commit [2]  38/10
 53/2
committed [1]
 17/19
common [1]  60/2
commonplace [1]
 60/11
communications
 [1]  33/4
compacted [1]
 45/3
companies [3]
 35/15 43/21 43/22
comparable [1]
 44/9
compare [1]  40/4
compartmentalize
 [1]  41/14
compile [1]  63/10
complete [1]  48/3
complex [14]
 21/5 21/6 21/24
 22/3 22/11 25/16
 43/3 52/15 52/16
 53/10 53/15 53/23
 67/5 68/18
complexity [5]
 21/10 43/2 44/8
 53/8 53/18
compliance [1]
 4/4
complicated [3]
 17/24 25/11 37/11
comprehensive
 [1]  44/20
compressed [1]
 17/15
computers [1]
 33/10
concede [1]

concern [2]  31/3
 31/4 47/4
concerns [5]
 10/18 30/17 54/8
 54/11 68/23
concession [1]
 54/14
conclude [3]  45/6
 46/7 53/16
concluded [1]
 61/12
concrete [3]
 30/13 43/5 55/12
conduct [2]  25/7
 33/20
conducted [1]
 21/20
conducting [1]
 60/10
confer [2]  9/23
 13/2
conference [3]
 4/14 5/19 45/1
conferral [7]  6/11
 12/17 12/19 13/11
 69/2 69/5 69/6
conferred [2]
 54/16 54/19
conflate [1]  20/11
conflict [6]  43/8
 43/9 44/4 44/6
 61/7 61/24
conflicts [2]
 43/13 43/14
confusion [1]
 67/7
connection [1]
 38/3
consenting [1]
 54/11
considerable [1]
 65/2
consideration [7]
 24/12 32/4 39/20
 43/17 44/2 48/15
 61/3
consists [2]  7/4
 14/16
Constitution [3]
 19/15 19/20 57/20
construct [1]
 58/22

contemplate [1]
 11/12
contemplated [2]
 15/22 27/13
contemplates [2]
 19/5 25/2
content [4]  8/6
 8/16 8/21 9/8
contents [1]  7/20
contested [2]
 10/10 13/9
context [5]  39/21
 42/18 43/12 44/5
 46/4
Continental [1]
 2/7
contingent [1]
 10/5
continuance [9]
 7/6 20/17 20/22
 26/5 43/4 51/18
 57/5 59/11 61/23
continued [1]
 38/14
continuing [2]
 40/13 46/6
contours [1]
 24/16
contrary [1]  60/7
contrast [1]  63/2
Corcoran's [1]
 48/10
corporate [1]
 26/11
corresponding [1]
 7/21
counsel's [3]
 3/14 23/2 31/2
count [2]  17/6
 52/5
counterparts [1]
 55/3
country [4]  26/7
 26/23 29/17 37/5
counts [1]  50/22
court [102]
Court's [10]
 30/22 39/20 40/1
 43/4 51/3 55/11
 56/11 58/7 59/13
 68/19
courthouse [4]

Page 74

FAMILY FIRST LLC vs. DAVID RUTSTEIN, et al.

USCA Case #23-3228 1:23-cr-00257-TSC Document 30-3 Filed 08/17/23 Page 75 of 84 Document #2015386 Filed: 04/13/2023 Page 244 of 656

courthouse... [4] 4/6 4/9 5/17 41/21
courtroom [11] 4/8 4/10 4/11 5/16 35/20 40/18 41/15 41/20 42/17 42/17 47/4
courtrooms [1] 29/17
courts [4] 60/9 61/12 61/14 61/23
courts' [1] 60/15
cover [1] 39/17
coverage [3] 40/3 40/15 40/23
covered [1] 39/18
covers [1] 9/15
CR [1] 3/9
CRC [2] 2/24 70/6
creative [1] 60/20
crime [1] 39/24
crimes [2] 59/24 60/1
criminal [4] 1/5 19/21 35/20 44/3
critical [2] 51/21 65/14
CRR [2] 2/24 70/6
crystalized [1] 13/8
curious [2] 49/1 52/2
custodians [1] 29/10
cut [1] 5/1
cycle [1] 25/24

D

D.C [7] 2/5 2/15 7/25 23/9 32/13 32/14 49/2
DADAN [3] 2/16 2/17 3/23
dark [1] 24/16
data [3] 28/4 28/17 40/22
Daubert [1] 44/25
DAVID [2] 2/2 3/14
deadline [3] 51/2 55/16 56/11
deadlines [6]

56/9 68/1 68/2
DeCastro [2] 43/11 44/6
DeCastro-Font [2] 43/11 44/6
December 11th [3] 6/3 16/12 16/13
decide [1] 50/7
decision [3] 42/20 50/19 50/20
decisions [4] 47/11 47/18 47/19 47/20
declaration [1] 17/10
declare [1] 53/9
declassification [2] 37/4 66/7
declassified [2] 66/6 66/10
decorum [1] 4/4
deemed [1] 53/23
defendant [9] 20/18 20/25 34/15 34/24 42/14 42/15 42/15 42/16 57/17
defendant's [1] 61/12
defendants [16] 1/12 11/2 11/13 11/18 11/20 18/20 20/19 21/2 21/9 22/12 25/7 25/11 25/19 58/7 58/24 69/10
defendants' [1] 30/14
defenders [1] 63/21
defense [34] 7/2 8/4 8/16 10/15 11/14 11/17 13/22 14/10 16/10 17/23 18/11 20/24 21/13 23/1 27/11 28/13 29/6 30/19 31/7 32/7 37/21 37/22 39/7 45/18 51/22 54/13 56/5 57/2 64/1 64/23 65/10 65/24 66/2 66/25

Defense's [2] 19/9 23/20
defenses [1] 15/15
deferral [2] 20/24 24/12
DEFT [2] 2/7 2/13
delay [2] 38/2 55/13
delayed [1] 37/24
delete [1] 13/25
deleted [1] 11/7
demand [1] 17/23
demands [1] 59/12
deny [1] 69/5
denying [1] 60/22
Department [4] 2/3 33/16 38/7 52/14
depend [1] 31/21
dependent [1] 45/21
depending [2] 10/10 60/7
depositions [3] 35/12 44/17 44/17
deserves [1] 42/16
designated [1] 25/15
designation [6] 21/5 21/6 21/9 21/24 22/3 22/13
desire [1] 23/24
despite [2] 46/14 50/4
detail [1] 18/1
detailed [1] 31/22
determination [1] 57/11
detour [2] 25/3 55/20
develop [1] 42/6
developed [3] 41/20 41/21 46/24
deviation [1] 18/25
device [2] 9/7 64/10
devices [8] 8/7 8/11 8/12 8/22 8/23 9/8 63/8

diane [4] 2/24 2/25 70/5 70/6
dictate [1] 42/17
differences [2] 10/20 26/19
difficult [4] 41/19 42/18 45/10 45/16
difficulty [2] 25/19 25/20
dire [2] 26/12 60/19
direction [2] 47/3 47/6
disagree [2] 34/13 34/25
disagreements [1] 13/10
discharge [1] 57/2
discoverable [2] 11/6 13/17
discovery [69] 6/15 7/2 7/9 7/16 7/17 8/24 9/9 10/4 10/23 11/2 13/22 13/23 13/25 14/6 15/23 16/10 16/19 17/23 21/22 23/18 27/16 27/25 28/24 29/2 29/2 29/12 29/23 30/5 30/15 31/12 31/14 31/22 32/1 32/23 33/6 35/21 36/4 36/5 36/12 36/17 42/25 44/8 49/1 49/7 49/21 50/21 50/22 50/23 51/5 51/13 51/14 51/21 52/17 52/25 53/23 54/12 55/25 56/3 56/12 56/17 57/1 57/8 62/24 66/8 66/9 67/10 67/11 67/11 67/25
discrete [1] 31/23
discretion [2] 20/21 35/2
discussion [2] 9/24 20/25
discussions [1] 50/6

is honest [3] 35/3 57/15 57/25
disingenuous [2] 28/15 30/9
dismiss [1] 59/22
dismissal [1] 24/10
dismissive [1] 46/14
disposes [1] 47/16
dispositive [2] 21/14 22/20
disputes [1] 54/17
disruption [1] 4/13
distinct [2] 11/14 20/13
distinguish [1] 59/21
distinguishable [1] 59/24
distinguishing [1] 59/22
distraction [1] 4/13
district [16] 1/1 1/2 1/18 8/1 16/23 19/19 23/11 32/16 32/17 32/19 43/22 48/22 48/23 48/25 58/24 70/7
dividing [1] 14/15
division [3] 1/3 26/7 27/12
docket [1] 15/20
doctrine [1] 26/1
documents [29] 7/19 8/21 11/13 11/24 14/14 14/16 14/17 14/19 14/24 15/3 17/8 29/20 34/2 34/3 36/6 37/14 37/15 44/10 44/11 45/13 45/16 45/19 47/12 47/12 52/17 65/21 66/2 66/6 66/11
DONALD [2] 1/10 3/10
doubt [1] 51/13
duration [1] 4/12

FAMILY FIRST LLC vs. DAVID RUTSTEIN, et al.
Case 1:23-cr-00257-TSC   Document 30-3   Filed 08/17/23   Page 76 of 84
USCA Case #23-3228   Document #2033822   Filed: 11/13/23   Page 66 of 202

duties [1] 57/3

**E**

earliest [1] 56/19
early [2] 36/23
55/17
easily [1] 40/14
Eastern [1] 16/23
EDELSTEIN [2]
2/3 3/14
effective [1] 51/4
effectively [1]
45/10
effects [1] 20/7
efficient [3] 32/7
38/10 56/21
eight [1] 16/24
eight months [1]
16/24
election [12]
25/24 26/9 26/16
26/20 34/18 41/17
42/6 42/12 48/14
49/9 49/11 60/7
electronic [1] 4/6
element [1] 51/21
Eleventh [4]
19/16 23/11 57/21
62/4
else's [1] 19/21
email [1] 12/22
emails [9] 7/7
7/12 7/15 8/9
28/19 29/4 29/5
44/10 44/12
emanate [1] 60/3
empaneled [1]
19/18
emphasize [1]
20/9
emphasizing [1]
25/21
enabled [1] 64/19
engaged [2]
25/11 50/5
ensure [1] 27/5
entirely [1] 23/7
entitled [1] 70/4
entry [1] 15/20
entry 34-2 [1]
15/20
environment [1]

envision [1]
50/14
equipment [1] 4/6
escape [1] 41/7
esoteric [1] 45/17
especially [4]
26/17 26/17 39/10
49/1
ESQ [7] 2/2 2/2
2/3 2/7 2/10 2/13
2/16
essentially [5]
25/24 40/16 61/18
62/23 65/17
establish [4] 4/19
4/21 5/20 30/21
established [2]
30/16 62/7
ethical [1] 61/8
evaluating [1]
23/24
everybody [3] 3/7
4/14 4/24
evidence [17]
7/22 7/22 27/2
30/7 34/1 34/11
35/18 35/19 42/16
56/5 63/5 63/11
64/1 64/22 65/3
66/5 66/6
evidentiary [1]
15/14
examples [1]
16/22
exception [1]
56/4
exchange [1]
12/22
excluding [1]
20/17
excuse [3] 29/7
57/16 59/21
executed [2] 33/9
63/6
executive [2]
26/11 47/5
executives [1]
46/19
exercises [1] 44/1
existence [1]
22/15
expedited [1]

expeditiously [2]
19/5 37/20
experience [2]
17/10 45/5
expert [4] 41/23
41/23 41/23 44/17
experts [2] 41/16
45/5
extension [1]
61/18
extensive [8]
13/15 14/4 21/19
54/5 56/12 56/17
63/17 64/22
extensively [1]
23/8
extent [13] 10/18
12/2 24/17 32/3
40/22 43/1 55/3
56/8 58/8 59/20
61/21 61/24 67/7
extraordinarily [4]
27/17 28/11 45/3
45/10
extraordinary [1]
40/15

**F**

F.2d [1] 62/1
F.3d [1] 62/6
face [1] 24/8
fact [20] 19/11
19/11 19/22 22/16
28/20 28/22 29/17
29/25 30/6 34/16
35/20 44/16 45/4
46/5 46/22 52/25
58/3 60/9 61/6
66/14
factor [2] 24/24
25/4
factored [1] 57/10
factors [4] 41/10
53/15 61/22 61/25
facts [5] 26/6
35/25 41/19 41/20
45/22
fairness [1] 27/1
fall [1] 22/2
false [3] 58/9 59/5
59/17
favor [1] 21/15

federal [5] 19/20
29/17 40/23 52/14
63/21
Fifth [5] 2/14
61/16 61/17 61/20
62/2
figure [1] 26/10
file [10] 23/24
30/8 31/7 36/13
44/24 55/17 63/22
67/12 68/17 69/4
filings [2] 4/18
6/5
filling [1] 23/1
filmed [1] 65/19
filming [2] 4/8
5/16
filter [1] 68/11
filtering [1] 8/14
final [4] 16/4 16/7
42/20 45/1
finalization [1]
10/6
finally [1] 66/12
finish [1] 16/12
finished [1] 27/22
five days [1] 45/1
FL [3] 2/9 2/18
70/8
flat [1] 58/9
FLORIDA [5] 1/2
1/8 8/1 23/11 48/9
flsd.uscourts.gov
[1] 2/25
focus [3] 39/23
39/24 40/1
focused [5] 41/18
42/25 43/18 59/10
66/25
focusing [1]
21/21
folder [1] 8/3
folks [2] 4/10
38/8
Font [2] 43/11
44/6
footage [12] 8/1
8/4 8/17 9/13 9/20
27/17 27/21 28/5
28/13 55/7 65/11
65/12
footers [1] 7/7

foregoing [1]
70/2
forensic [5] 49/19
64/23 64/24 65/2
68/12
forensically [1]
8/13
forget [1] 57/3
form [7] 5/15 8/12
11/7 13/25 15/13
24/10 30/20
former [6] 11/22
12/3 12/9 19/11
43/14 50/23
forms [2] 8/9 16/5
formulate [1]
36/17
formulation [1]
20/12
FORT [4] 1/3 1/8
2/18 70/8
forum [1] 66/13
four-count [1]
17/6
four-month [1]
57/5
frame [1] 45/16
framework [5]
19/2 19/12 19/5
22/18 43/4
frequent [1] 50/5
Friday [3] 12/22
12/23 13/3
frivolous [1]
31/20
front [3] 29/25
35/4 37/19
fruits [1] 56/7
fulsome [1] 56/3
fundamental [1]
19/16

**G**

Gandy [3] 61/17
61/20 62/5
Gandy vs [1]
61/17
Garcia [1] 68/18
gather [1] 8/19
geez [1] 38/5
general [4] 30/18
35/12 58/10 59/19

Page 76

FAMILY FIRST LLC vs. DAVID RUTSTEIN, et al.

Case 1:23-cr-00257-TSC   Document 30-3   Filed 08/17/23   Page 77 of 84

USCA Case #23-3228   Document #2041414   Filed: 11/14/18   Page 76 of 84

**generate [3]**  9/5
41/6 41/15

**generated [3]**
40/24 41/4 41/6

**generates [1]**
41/2

**generations [1]**
26/23

**genuinely [1]**
24/8

**gets [2]**  16/10
34/5

**gigabytes [1]**
28/17

**gosh [1]**  23/14

**gotten [3]**  31/14
31/15 50/8

**govern [2]**  47/11
47/13

**governed [1]**
19/19

**governing [1]**
47/7

**government [52]**
3/12 6/3 6/8 10/25
12/2 15/9 18/21
19/4 21/6 21/24
25/15 28/6 28/14
28/18 28/22 29/11
29/25 32/5 32/11
34/13 34/16 34/23
37/11 39/5 39/22
41/8 41/25 44/13
46/4 46/14 47/4
49/14 49/22 50/6
50/25 51/12 52/2
52/21 53/20 54/2
54/3 54/10 54/23
56/25 57/4 57/16
58/8 65/13 66/17
66/21 68/16 69/19

**Government's [7]**
5/25 9/9 11/1
26/13 27/5 32/10
56/19

**Governmental [1]**
9/24

**governs [2]**  47/15
47/15

**grab [1]**  22/4

**grand [13]**  7/24

19/19 32/12 32/13
32/16 32/24 48/8
49/3 50/8 58/23

**grant [2]**  20/22
61/23

**granular [1]**
31/22

**group [1]**  37/19

**guidance [4]**  14/7
46/16 46/24 47/3

**guide [1]**  59/13

**guides [1]**  43/4

**H**

**hac [2]**  41/3 41/5

**handle [1]**  55/5

**handled [1]**  56/24

**Hanhardt [4]**
43/10 44/2 61/18
61/19

**happy [4]**  13/6
18/12 31/5 67/23

**HARBACH [8]**  2/2
3/14 18/1 18/9
31/17 39/19 45/12
67/8

**headers [1]**  7/7

**hearing [12]**  1/16
4/17 4/19 5/14
5/20 10/17 41/2
44/23 50/2 51/9
55/18 68/25

**hearings [2]**
16/16 63/18

**heinous [2]**  26/2
60/1

**helpful [1]**  28/24

**hereby [1]**  70/2

**higher [2]**  15/3
15/5

**highly [1]**  44/1

**Highway [1]**  70/7

**hit [1]**  13/23

**Hoffman [1]**  17/3

**hold [3]**  17/2
56/18 56/18

**home [1]**  69/15

**honest [1]**  31/14

**honesty [1]**  26/25

**Honor [94]**

**Honor's [6]**  15/12
22/8 25/18 44/9

**HONORABLE [1]**
1/17

**hope [1]**  9/3

**hopefully [3]**  16/8
25/14 53/6

**hours [2]**  45/7
52/12

**house [3]**  14/15
63/8 63/8

**Hughey [1]**  61/19

**huh [1]**  17/5

**hundreds [1]**
41/15

**hurry [1]**  41/11

**I**

**iCloud [1]**  64/14

**identity [1]**  25/7

**ignore [2]**  34/16
34/23

**illegally [1]**  37/15

**image [1]**  68/12

**images [1]**  65/2

**impact [4]**  23/20
23/25 40/2 59/7

**impartial [2]**
26/23 60/21

**impede [2]**  40/9
42/22

**importance [1]**
60/19

**impossible [1]**
25/25

**improper [1]**
33/20

**inapposite [1]**
44/13

**inculpatory [1]**
63/4

**incumbent [1]**
30/19

**indeed [2]**  33/2
40/3

**indefinite [4]**
20/24 24/12 36/2
51/17

**indefinitely [2]**
25/1 60/23

**indict [1]**  49/20

**indicted [6]**  19/18
20/5 29/18 29/18
35/9 57/22

8/2 8/18 15/1
23/23 24/11 25/10
26/8 27/18 28/8
28/24 32/10 34/2
39/5 40/23 46/5
48/4 49/22 56/13
58/24 64/2 64/3
64/4 64/18

**individuals [2]**
42/9 46/6

**indulge [1]**  21/2

**indulgence [1]**
25/18

**influence [1]**
58/11

**information [21]**
4/15 4/16 7/18
12/3 13/25 15/5
16/18 21/23 23/19
28/4 36/25 37/2
38/14 43/2 46/18
46/18 47/5 47/16
47/18 65/8 68/11

**informative [1]**
61/25

**informed [2]**
50/19 65/11

**initial [6]**  13/19
14/3 15/22 36/12
36/16 66/15

**initially [1]**  32/12

**inquiry [2]**  43/4
59/13

**instance [2]**
21/17 23/3

**instances [2]**
12/12 22/16

**Instead [1]**  49/11

**instructed [1]**
38/22

**instructions [3]**
27/3 60/11 60/15

**intellectually [3]**
35/3 57/15 57/24

**intelligently [2]**
36/9 37/13

**intended [1]**
58/20

**intends [1]**  68/16

**intention [1]**  11/1

**intentioned [1]**
19/8

**indictment [23]**
20/8 20/11 20/12
20/14 41/18 42/8

**interests [6]**  4/22
5/22 20/1 20/18
30/14 53/15

**interim [1]**  14/12
15/4 16/6 30/4
54/7 56/9

**interpretive [1]**
19/3

**intersect [1]**
47/13

**intersection [3]**
24/3 24/4 24/18

**interspersed [1]**
34/3

**interview [3]**
14/20 14/23 15/5

**interviews [2]**
14/21 14/22

**inverted [1]**  18/22

**investigating [1]**
32/12

**investigation [5]**
8/23 46/3 48/21
58/11 66/4

**isolates [1]**  65/13

**issue [23]**  18/19
21/4 23/6 23/15
25/8 26/5 32/22
33/1 33/5 35/3
39/24 45/13 45/15
45/19 46/19 50/3
51/24 56/20 56/25
57/10 59/25 60/11
68/25

**issues [16]**  15/14
21/10 24/25 31/23
42/25 45/12 47/2
48/9 52/25 53/25
53/25 54/4 55/5
57/12 59/11 68/19

**J**

**JAY [2]**  2/2 3/13

**Jencks [1]**  8/19

**judge [6]**  1/18
22/5 27/1 38/21
38/21 39/15

**judges [1]**  26/22

**judgment [3]**
44/19 44/22 44/23

Page 77

FAMILY FIRST LLC vs. DAVID RUTSTEIN, et al.
Case 1:23-cr-00257-TSC   Document 30-3   Filed 08/17/23   Page 78 of 84
USCA Case #23-3228   Document #2060462   Filed 05/31/024   Page 48/2248/2548/22

**JULIE [2]**  2/3 3/14
3/14
**July 10th [1]**
15/23
**July 16th [1]**
40/24
**July 28th [1]**
44/19
**July 6 [1]**  7/3
**July 6th [1]** 64/24
**jump [1]**  39/2
**June 21st [1]**  7/2
**June 23rd [1]**  8/8
**June 2nd [1]** 65/6
**June 8 [1]** 40/24
**juries [3]**  26/23
60/10 60/14
**jurisdiction [1]**
23/4
**jury [23]**  7/24
7/25 8/1 14/18
16/13 19/19 25/20
25/25 27/5 32/12
32/13 32/16 32/25
39/6 42/3 48/8
49/3 50/8 58/23
59/7 60/11 60/16
60/22
**justice [6]**  2/3
20/15 33/17 38/7
52/14 53/15
**justification [1]**
28/11
**justified [3]** 18/25
19/1 24/7
**justify [3]**  19/25
24/11 26/5

**K**

**key [4]**  7/19 8/4
8/21 63/9
**KISE [14]**  2/7
3/21 24/21 31/5
35/10 35/12 39/13
43/7 48/20 58/2
58/5 58/19 59/18
61/5
**Kise's [1]**  36/23
**knowing [1]**  50/4
**knows [3]**  20/20
32/9 60/8

**labor [1]**  27/12
**lack [2]**  13/11
69/2
**lacking [3]**  46/17
46/19 46/20
**Lago [6]**  9/17
14/15 15/2 27/20
33/8 34/4
**laid [1]**  31/13
**land [1]**  36/3
**language [1]**  12/6
**large [2]**  20/14
56/10
**lastly [2]**  46/8
48/12
**latch [1]**  58/22
**latched [1]**  58/5
**latter [1]**  20/14
**law [12]**  2/10 2/14
2/17 19/4 20/22
22/16 27/3 57/21
58/21 58/25 60/2
62/7
**lawfully [1]**  19/18
**laws [1]**  47/13
**lay [3]**  26/3 33/23
40/4
**lead [1]**  46/7
**leading [2]**  34/20
40/17
**leads [3]**  16/17
45/6 50/3
**learn [1]**  52/2
**led [2]**  32/25 48/4
**legal [9]**  21/10
23/5 24/6 31/23
42/25 45/21 45/21
56/12 58/21
**letter [2]**  35/10
46/1
**letters [1]**  46/7
**liability [1]**  25/9
**lied [1]**  32/19
**light [2]**  19/10
20/23
**likelihood [2]**
40/8 42/21
**limine [1]**  15/13
**limit [1]**  10/16
**limited [1]**  61/13
**limits [1]**  22/18

**lines [1]**  60/15
**lingering [1]**
54/16
**list [2]**  44/21 56/2
**litany [1]**  22/11
**litigated [1]**  23/7
**litigation [12]**
4/23 10/10 13/13
13/13 13/16 14/2
17/11 24/20 34/6
37/19 48/25 54/18
**local [1]**  69/7
**location [1]**  14/10
**locations [1]**  34/4
**log [1]**  7/17
**long-winded [1]**
25/14

**M**

**main [2]**  9/9
32/10
**maintain [2]**  23/3
47/14
**maintained [1]**
58/3
**majority [1]**  55/22
**Mallory [4]**  63/2
63/4 63/16 63/22
**manages [1]**
47/16
**manner [1]**  29/2
**manual [1]**  32/14
**map [2]**  30/19
55/12
**Mar [6]**  9/17 14/15
15/2 27/20 33/8
34/4
**March 2024 [1]**
38/12
**markings [1]**  34/3
**match [1]**  50/14
**material [5]**  9/1
14/11 28/22 33/14
64/6
**materials [12]**  8/9
8/19 9/2 11/6
17/13 24/19 32/5
33/18 33/21 37/7
37/9 65/23
**matter [4]**  23/3
29/5 33/9 70/4
**matters [3]**  12/12
17/11 34/9

**May [1]**  60/15
14/18
**May 24th [1]**  65/6
**May 2nd [2]**  7/24
8/8
**meaningful [7]**
6/11 12/17 12/18
31/6 31/16 69/2
69/6
**meat [1]**  48/5
**mechanisms [1]**
26/22
**media [10]**  5/17
40/19 40/25 41/1
41/22 58/5 58/8
58/19 58/19 60/12
**meeting [1]**  5/8
**member [1]**  38/9
**members [2]**
37/21 38/6
**merit [4]**  21/18
22/13 49/6 49/7
**merits [1]**  22/21
**messages [1]**
64/4
**Miami [1]**  49/2
**mid [3]**  6/1 45/8
67/16
**middle [1]**  35/16
**miller [4]**  2/24
2/25 70/5 70/6
**million [4]**  8/20
9/11 44/11 52/17
**minimal [1]**  13/19
**missing [1]**  44/17
**misstated [1]**
68/9
**mistaken [2]**  17/7
53/7
**misunderstand
[1]**  23/6
**misunderstood
[1]**  11/16
**moment [7]**  5/4
22/4 22/15 22/19
30/5 31/10 62/10
**Monday [1]**  13/3
**month [6]**  9/15
23/23 35/14 44/18
44/18 57/5
**months [12]**  9/14
9/20 16/20 16/22
16/24 25/2 37/23

**May 3rd [1]** 48/22
63/15 64/17
**Montroe [1]**  2/8
**mostly [1]**  33/9
**motion [46]**  1/16
5/25 6/4 6/5 6/7
6/9 7/5 10/1 10/15
11/4 11/9 15/13
18/2 18/10 18/15
18/20 21/19 21/19
23/17 23/21 23/22
23/25 24/2 24/25
30/16 33/19 34/10
35/13 37/12 41/2
41/3 41/6 43/1
49/3 49/5 50/17
51/7 53/9 53/20
54/18 56/4 58/25
59/2 69/1 69/4
69/5
**motion-activated
[1]**  10/1
**motions [51]**  5/24
6/2 15/8 15/9
15/18 16/15 17/8
21/14 22/20 25/4
30/2 30/8 30/23
31/7 31/8 31/9
31/16 31/18 31/21
32/1 32/4 32/8
33/24 36/13 44/19
44/25 44/25 50/14
50/15 50/16 51/1
55/17 55/19 55/20
55/23 55/24 56/1
56/10 56/11 56/13
56/13 56/14 56/24
63/15 63/17 63/19
63/23 67/13 67/25
68/1 68/16
**movement [4]**
28/10 65/5 65/5
65/7
**movie [1]**  26/11
**Mr. [86]**
**Mr. Blanche [13]**
27/12 39/18 40/16
41/7 43/24 45/25
48/7 55/9 55/11
55/17 58/2 65/9
65/25
**Mr. Blanche's [3]**
41/4 56/20 57/14

Page 78

FAMILY FIRST LLC vs. DAVID RUTSTEIN, et al.

Case 1:23-cr-00257-TSC   Document 30-3   Filed 08/17/23   Page 79 of 84

USMA Case #23-3228 24/12 Document #20 Norfolk [1]   16/24 October 22nd [1]   Page 80 of 11 63/11

**Mr. Bratt [9]** 6/14
6/15 18/7 27/16
37/3 49/23 53/6
55/5 69/8
**Mr. Bratt's [1]**
27/23
**Mr. Corcoran's [1]**
48/10
**Mr. Harbach [6]**
18/1 18/9 31/17
39/19 45/12 67/8
**Mr. Kise [12]**
24/21 31/5 35/10
35/12 39/13 43/7
48/20 58/2 58/5
58/19 59/18 61/5
**Mr. Kise's [1]**
36/23
**Mr. Mallory [1]**
63/22
**Mr. Nauta [9]**
3/23 4/1 8/11 12/4
12/9 36/23 50/18
50/24 64/23
**Mr. Nauta's [10]**
7/4 8/23 53/1
54/11 63/24 64/3
64/4 64/13 64/22
65/3
**Mr. Trump [7]**
19/9 19/17 26/7
26/19 35/15 39/14
57/17
**Mr. Trump's [2]**
19/25 24/18
**Mr. Weiss [1]**
41/4
**Mr. Woodward
[10]** 31/5 36/22
39/13 47/25 48/18
53/10 54/20 62/3
67/20 68/9
**Ms. [1]** 3/3
**Ms. Casissi [1]**
3/3
**multiple [3]** 27/24
33/8 34/4
**musing [1]** 57/19

**N**

**naked [1]** 59/5
**namely [2]** 20/24

**NARA [5]** 14/16
14/24 66/5 66/16
66/20
**narrative [1]** 58/6
**nature [8]** 17/9
17/12 22/14 25/5
25/12 31/13 36/5
46/14
**NAUTA [15]** 1/11
2/13 3/10 3/23 4/1
8/11 9/2 9/7 9/7
12/4 12/9 36/23
50/18 50/24 64/23
**Nauta's [10]** 7/4
8/23 53/1 54/11
63/24 64/3 64/4
64/13 64/22 65/3
**near [1]** 44/9
**nearly [1]** 29/9
**necessary [6]** 3/3
13/8 17/20 30/11
48/3 64/15
**necessitate [1]**
25/1
**necessitated [1]**
55/25
**neglected [1]**
68/14
**negotiation [1]**
66/20
**neither [2]** 19/24
23/18
**New York [6]**
35/9 35/11 38/13
38/25 43/23 45/5
**news [7]** 40/9
40/24 41/5 41/6
41/6 42/22 60/13
**nine [2]** 9/15 9/20
**nine months [1]**
9/20
**nine-month [1]**
9/15
**nobody [1]** 20/10
**nonclassified [2]**
9/1 16/15
**noncontent [2]**
7/6 7/11
**none [10]** 19/2
26/14 33/2 44/12
56/3 58/12 58/12
58/16 65/19 66/20

**Norfolk [1]** 16/24
**North [1]** 2/8
**Northwest [1]**
2/14
**notion [1]** 57/1
**notoriety [1]**
60/17
**novel [7]** 22/15
46/9 46/11 46/13
47/8 47/9 47/10
**novelty [2]** 21/10
22/23
**November 8th [1]**
44/22
**nowhere [2]**
16/14 44/9
**nudge [1]** 59/16
**number [11]** 3/9
8/8 8/9 17/7 17/19
21/9 22/12 23/2
25/1 31/12 55/2
**number one [1]**
23/2
**NW [1]** 2/4
**NY [1]** 2/12

**O**

**oath [1]** 27/1
**Obama [1]** 47/1
**objected [1]**
21/24
**objection [1]**
21/25
**objections [3]**
6/11 10/16 12/17
**objects [1]** 21/6
**obligation [3]**
28/20 29/7 30/22
**obligations [1]**
61/2
**observation [2]**
17/17 21/13
**observations [1]**
18/9
**observe [1]** 53/19
**obstruction [2]**
25/10 52/5
**obtained [4]** 7/22
8/2 8/10 8/18
**obtains [1]** 21/11
**obviate [1]** 21/16
**obvious [4]** 27/18
29/15 49/8 62/21

**October 22nd [1]**
45/2
**offense [2]** 32/17
**offer [4]** 18/10
18/15 30/12 30/20
**office [6]** 2/4 3/15
21/1 29/22 47/6
47/17
**Official [2]** 2/25
70/6
**oh [1]** 38/5
**omnibus [2]**
15/12 15/13
**ongoing [2]** 39/11
46/3
**open [1]** 10/17
**operating [1]**
45/17
**operative [1]** 57/5
**opinion [2]** 26/7
58/21
**opinions [1]**
61/15
**opponent [2]**
58/4 58/4
**opposition [5]**
31/1 36/3 48/2
53/9 53/12
**oppositions [1]**
44/20
**option [1]** 56/10
**order [23]** 6/9
6/12 10/6 10/12
10/25 11/10 11/12
11/19 11/23 12/5
12/15 14/9 15/12
37/8 45/20 51/3
52/6 54/10 54/12
57/2 57/6 68/25
69/1
**orders [2]** 7/8
54/14
**ordinarily [1]**
26/5
**ordinary [1]** 27/1
**organization [1]**
9/18
**organized [1]**
28/25
**original [1]** 37/4
**outcome [1]**
42/17
**outlets [1]** 58/19

**overall [1]** 6/15
**overflow [4]** 4/10
5/1 5/13 5/17
**overstatement [1]**
25/21
**overview [1]**
68/22
**Oz [1]** 41/13
**Oz-like [1]** 41/13

**P**

**P-R-O-C-E-E-D-I-
N-G-S [1]** 3/1
**P.M [1]** 69/16
**pages [14]** 1/11
7/5 7/20 8/6 8/20
9/11 14/11 14/22
14/22 28/19 36/7
44/10 44/11 52/17
**papers [6]** 18/16
18/24 30/1 36/1
43/10 55/24
**paperwork [1]**
31/1
**paragraph [2]**
14/25 64/3
**paragraph 31 [2]**
14/25 64/3
**part [8]** 13/24
25/11 27/16 27/19
32/21 37/6 57/3
57/6
**partial [1]** 4/21
**participate [1]**
45/10
**particulars [2]**
30/20 55/12
**parties [5]** 4/22
5/23 54/16 57/7
69/3
**parties' [1]** 30/22
**partner [1]** 41/4
**party [1]** 60/16
**pause [2]** 5/10
62/12
**pay [3]** 60/12
60/12 60/13
**peak [3]** 41/17
42/8 42/9
**Pence [1]** 46/25
**pending [4]** 5/24
6/7 48/22 69/1

Page 79

FAMILY FIRST LLC vs. DAVID RUTSTEIN, et al.

Case 1:23-cr-00257-TSC   Document 30-3   Filed 08/17/23   Page 80 of 84

USPCA Case #23-32286 4/2 Document #20cost[4] 8/18 26/9] president[141 Page 15/155/2556/9

**Pennsylvania [1]**
2/4

**people [5]** 37/5
37/24 38/4 38/25
65/19

**people's [1]**
38/25

**perhaps [8]** 5/2
13/9 23/11 42/7
48/14 58/20 60/6
60/19

**period [9]** 9/15
9/18 16/3 16/9
27/24 60/24 65/13
66/19 66/20

**periods [1]** 10/1

**permanent [1]**
60/5

**permissible [1]**
48/15

**permission [1]**
37/10

**permit [2]** 14/13
15/4

**permitted [1]** 4/5

**person [2]** 20/5
34/21

**personal [2]** 33/3
47/19

**perspective [3]**
46/11 50/13 62/25

**pertinent [2]** 22/9
23/13

**philosophical [1]**
57/19

**phone [9]** 49/24
63/24 63/25 64/2
64/3 64/5 64/19
64/22 68/12

**phones [13]** 4/6
33/9 49/16 49/17
49/19 49/21 50/4
50/7 53/1 53/3
53/6 64/25 65/3

**photograph [1]**
14/25

**photographing
[2]** 4/7 5/15

**pick [1]** 60/16

**picking [1]** 48/20

**picture [2]** 14/7

**pictured [1]** 14/25

**PIERCE [4]** 1/3
1/8 2/18 70/8

**place [5]** 14/9
19/3 29/8 37/12
46/15

**plainly [2]** 19/8
19/13

**Plaintiff [2]** 1/8
2/2

**plans [1]** 46/4

**pleading [1]**
21/12

**pleadings [2]**
27/7 66/18

**plenty [1]** 56/23

**PLLC [2]** 2/7 2/17

**plus [1]** 21/22

**podium [2]** 6/21
6/23

**point [32]** 4/24
11/3 13/11 16/17
18/24 19/6 20/9
21/12 22/19 23/5
23/12 23/16 23/17
25/17 25/18 26/1
27/8 30/17 43/11
44/9 54/18 55/24
56/8 57/18 59/21
60/4 61/16 64/15
66/3 67/9 67/16
67/16

**points [3]** 18/18
39/18 43/9

**political [5]** 58/3
58/4 58/11 58/15
58/17

**politician [1]**
26/10

**pool [1]** 42/3

**position [6]** 10/22
20/4 27/23 41/9
42/11 47/14

**possess [1]** 37/5

**possesses [1]**
37/15

**possession [3]**
4/5 29/19 47/17

**possibilities [1]**
19/24

**possibility [2]**
20/6 46/7

**pictured [1]** 14/25
42/6 48/14

**post-election [2]**
42/6 48/14

**post-indictment
[1]** 8/18

**postpone [1]**
48/14

**posts [2]** 41/1
41/1

**potential [5]**
21/19 25/19 38/8
39/1 56/4

**potentially [14]**
11/5 11/13 13/17
21/14 22/20 31/11
31/25 33/20 34/10
39/3 49/24 53/11
54/17 55/20

**potshot [1]** 24/6

**power [1]** 23/4

**PRA [3]** 66/12
66/14 66/15

**practicalities [2]**
49/12 51/19

**practice [4]** 21/19
35/13 37/12 43/2

**precisely [3]** 22/2
24/15 46/10

**precluding [1]**
43/16

**predated [1]** 26/8

**predicted [1]**
54/25

**prefer [1]** 6/22

**prejudice [1]** 69/6

**prejudicial [2]**
40/9 42/22

**preliminary [3]**
4/4 5/12 67/10

**premature [1]**
54/4

**preparation [1]**
22/17

**prepared [5]** 6/5
30/8 36/13 38/23
53/17

**prerogative [1]**
50/6

**present [3]** 3/23
44/12 59/3

**presidency [1]**
40/17

**president[14]**
3/18 3/21 7/3
11/22 12/3 12/10
19/11 19/12 19/17
19/23 20/1 20/7
24/22 29/18 29/21
32/11 32/18 33/5
34/14 34/17 35/8
35/16 35/22 37/4
37/6 38/22 39/11
39/11 43/14 43/19
46/25 46/25 47/1
47/1 47/1 47/11
47/21 50/23 60/5
66/18 67/6

**President Biden
[1]** 46/25

**President Bush
[1]** 47/1

**President Obama
[1]** 47/1

**President Pence
[1]** 46/25

**president Trump
[18]** 3/18 3/21
12/3 29/18 29/21
32/18 34/14 35/8
35/16 35/22 38/22
39/11 43/14 43/19
50/23 60/5 66/18
67/6

**President
Trump's [3]** 7/3
24/22 32/11

**president's [4]**
28/12 33/3 66/16
66/22

**presidential [15]**
24/5 24/9 24/18
25/24 34/18 45/11
46/13 46/17 46/21
47/10 47/15 47/19
47/21 66/16 66/21

**presidents [1]**
46/15

**presplit [1]** 61/17

**press [2]** 40/2
40/15

**pretrial [19]** 4/14
4/21 5/19 6/2 15/8
15/9 17/8 22/20
24/25 25/3 34/10
44/25 45/1 50/13

**prevent [2]** 40/9
42/22

**primaries [1]**
34/19

**primarily [1]** 8/9

**primary [1]** 31/3

**principle [2]**
57/20 60/2

**principles [1]**
62/7

**priority [1]** 47/10

**private [2]** 19/18
57/22

**privileged [2]**
33/4 33/18

**pro [2]** 41/3 41/5

**probable [2]**
27/20 33/11

**procedure [2]**
19/21 48/8

**procedures [7]**
4/15 4/20 43/3
48/4 48/8 57/8
60/20

**proceeding [4]**
4/12 5/10 45/11
68/18

**proceedings [5]**
23/20 46/2 62/12
69/16 70/3

**process [9]** 8/15
13/17 16/12 29/8
49/3 50/1 56/15
59/1 66/10

**processed [2]**
36/4 63/7

**processing [1]**
37/25

**produce [5]** 10/23
11/8 49/21 50/1
62/24

**producible [2]**
9/3 64/21

**producing [2]** 7/9
11/9

**production [8]**
6/19 7/4 8/5 9/1
15/22 16/19 28/17
55/6

**productions [3]**
6/17 7/1 64/10

Page 80

FAMILY FIRST LLC vs. DAVID RUTSTEIN, et al.

USCA Case #23-3228   Document #2011666   Filed 08/17/23   Page 81 of 84

Case 1:23-cr-00257-TSC   Document 30-3   Filed 08/17/23   Page 81 of 84

**progress [2]**
37/18 51/16
**projected [2]** 8/25
30/13
**promptly [1]**
68/25
**proper [1]** 15/14
**properly [1]** 65/11
**proposal [3]**
15/21 16/14 36/17
**proposed [9]**
10/25 11/9 11/12
12/5 12/5 15/19
28/14 37/8 54/10
**proposition [2]**
61/14 61/15
**propounding [1]**
58/6
**prosecuting [1]**
34/22
**prosecution [2]**
22/14 25/5
**prosecutors [1]**
58/15
**protect [1]** 47/5
**protective [14]**
6/9 6/12 10/6
10/11 10/25 11/10
11/12 11/19 12/15
14/9 37/8 54/10
54/12 69/1
**provision [3]**
11/11 32/15 66/15
**provisions [3]**
6/12 11/19 69/4
**public [14]** 4/18
20/6 20/8 20/11
20/12 20/14 20/18
26/10 26/19 40/19
46/1 58/21 60/16
63/21
**publicity [9]**
39/25 40/1 40/1
40/2 48/13 59/6
59/19 60/4 60/9
**publicly [1]** 66/19
**pundit [3]** 41/22
41/23 41/23
**pundits [1]** 41/16
**purely [1]** 56/12
**purport [1]** 59/4

**purportedly [5]** 20/25
29/19 33/11 34/1
46/18 66/1
**purposes [2]**
14/15 59/3
**pursuant [6]** 4/15
5/19 7/7 12/19
49/17 69/7
**push [1]** 52/23
**putative [1]** 20/6

**Q**

**question [23]**
16/17 17/9 22/1
22/21 23/14 24/19
25/14 26/13 26/21
27/3 27/15 28/25
30/12 36/15 36/15
46/13 47/8 47/9
47/10 47/24 53/10
54/25 55/11
**questioning [1]**
27/23
**questions [14]**
18/6 22/8 22/16
27/9 46/9 46/11
48/21 50/9 55/4
55/5 62/13 66/23
67/22 69/8
**quickly [3]** 38/8
62/20 67/4
**quote [1]** 48/3

**R**

**raised [3]** 39/19
39/19 55/6
**raising [1]** 22/19
**rare [3]** 49/4
63/21 63/22
**rasa [1]** 23/13
**rash [1]** 26/16
**rationale [1]**
56/22
**reached [1]** 12/20
**reaction [1]** 26/17
**readily [1]** 23/10
**ready [3]** 14/8
62/25 63/11
**reality [1]** 35/6
35/23 41/12
**rebuttal [2]** 54/24
67/1
**recently [1]** 29/11

**recess [1]** 69/15
**recognize [2]**
17/21 41/12
**recommend [1]**
57/11
**reconciling [1]**
52/18
**record [3]** 9/24
59/16 68/13
**recording [3]** 4/7
5/14 5/15
**records [16]** 24/5
24/9 24/18 45/11
46/13 46/17 46/21
46/22 47/11 47/15
47/19 47/20 47/21
66/5 66/16 66/21
**recovered [1]**
63/8
**reelection [1]**
35/17
**reference [3]** 22/8
48/2 58/2
**referenced [1]**
4/18
**references [1]**
20/17
**referencing [1]**
48/7
**refiled [1]** 69/6
**refined [1]** 36/17
**reiterate [3]** 26/4
46/8 57/9
**rejoin [1]** 5/8
**relatively [1]**
28/25
**relevance [1]**
65/19
**relief [4]** 20/23
21/2 22/24 24/11
**rely [5]** 26/22
26/25 27/4 52/24
52/24
**remain [2]** 4/12
42/9
**remaining [2]** 9/8
16/10
**remarks [3]** 4/4
5/12 27/8
**remove [1]** 58/11
**rephrase [1]** 55/9
**reply [4]** 7/5
39/19 39/22 44/22

**Reporter [2]** 2/25
70/6
**reports [1]** 9/5
**representation [1]**
28/18
**representations**
**[1]** 38/25
**republic [1]** 19/17
**request [2]** 11/22
55/12
**requested [1]**
38/4
**requests [2]**
13/22 13/23
**required [1]** 33/3
**requirements [1]**
21/8
**research [1]**
40/21
**reset [1]** 38/6
**residence [3]**
28/12 29/20 34/8
**resolve [2]** 10/20
54/1
**resolved [1]**
10/22
**respectfully [4]**
41/10 42/5 48/12
51/10
**response [6]** 13/1
13/24 14/18 18/20
55/14 62/18
**rest [1]** 28/21
**restart [1]** 5/3
**restricted [1]**
59/25
**result [3]** 19/3
20/17 60/7
**results [2]** 64/1
64/14
**retain [1]** 24/19
**retention [1]** 9/18
**return [1]** 36/8
**reveal [1]** 40/22
**reveals [1]** 17/24
**review [26]** 11/24
16/16 21/21 30/6
30/23 31/22 32/4
32/23 33/5 33/13
33/13 33/21 36/24
37/6 48/3 49/7
51/14 55/25 56/3
56/12 56/17 57/7

65/10 66/3 66/19
67/10
**rhetoric [2]** 58/18
58/21
**ripe [1]** 6/10
**rise [2]** 27/19
33/10
**RMR [2]** 2/24 70/6
**road [2]** 30/19
55/12
**role [1]** 54/13
**rolling [1]** 9/6
**room [4]** 4/10 5/1
5/13 5/17
**routinely [1]** 60/9
**rule [7]** 4/9 16/15
21/15 27/25 56/1
56/1 67/11
**Rule 12 [2]** 16/15
56/1
**Rule 16 [2]** 27/25
67/11
**rules [5]** 5/18
12/19 19/20 57/23
69/7
**rush [1]** 50/22
**rushed [1]** 13/4

**S**

**Safe [1]** 69/15
**SASHA [2]** 2/16
3/23
**satisfied [1]**
60/21
**scenario [2]**
32/17 37/23
**schedule [36]**
4/20 4/21 5/21
5/22 15/20 17/18
17/20 17/22 17/25
20/2 23/18 23/25
28/14 30/1 30/11
30/21 31/2 35/22
35/24 36/18 36/22
36/23 38/23 43/8
43/9 43/13 43/14
44/15 44/15 45/3
52/9 52/20 52/24
59/11 67/11 68/24
**scheduled [5]**
35/9 43/21 61/10
67/14 67/15
**schedules [3]**

Page 81

FAMILY FIRST LLC vs. DAVID RUTSTEIN, et al.

Case 1:23-cr-00257-TSC   Document 30-3   Filed 08/17/23   Page 82 of 84

USCA Case #23-3228   Document #2083593   Filed: 12/21/24   Page 46 of 151

schedules... [3] 31/6 35/21 44/7
scheduling [2] 38/15 68/23
scope [2] 63/25 65/11
scoped [1] 7/22
scoping [1] 8/15
screen [2] 3/3 5/1
scrutinize [1] 50/11
search [20] 7/21 7/21 7/23 8/12 8/13 27/19 27/20 28/9 28/12 33/7 33/9 33/11 48/7 49/18 56/6 56/6 63/5 63/9 64/13 64/19
searched [2] 63/25 64/13
searches [3] 63/7 64/1 64/16
second [8] 8/5 19/7 20/6 22/14 23/17 23/17 26/24 40/6
Secret [1] 8/10
Section [17] 4/15 5/19 6/9 10/6 10/11 10/24 11/4 11/12 12/18 13/12 13/13 13/16 13/19 14/2 31/8 37/11 54/15
Section 2 [2] 4/15 5/19
Section 3 [7] 6/9 10/6 10/11 10/24 11/12 12/18 54/15
Section 4 [6] 11/4 13/12 13/13 13/16 13/19 14/2
Section 5 [2] 31/8 37/11
security [6] 37/17 37/19 38/8 38/9 54/3 54/7
seek [4] 11/18 13/24 21/2 38/2
seeking [4] 11/20

seeks [2] 6/3 6/8
seize [1] 50/7
seized [4] 14/19 49/17 50/4 56/7
select [2] 25/25 26/23
selecting [2] 25/20 60/10
selection [3] 16/13 39/6 59/7
sense [2] 9/21 61/8
sensitive [1] 57/10
September 12th [1] 16/9
September 15th [1] 44/23
September 1st [1] 44/21
September 22nd [1] 44/24
September 27th [1] 45/2
series [1] 29/20
serious [2] 48/21 54/10
Service [1] 8/10
setting [4] 20/21 20/25 56/9 56/11
seven [1] 39/4
seven-week [1] 39/4
sever [1] 50/19
severance [1] 56/14
shall [2] 4/7 5/14
share [1] 12/13
shared [1] 51/22
sheer [1] 29/12
Sheppard [6] 39/22 40/3 40/7 41/19 42/15 42/20
shooting [1] 24/15
short [4] 4/16 19/17 20/1 49/14
shortened [1] 10/17
side [2] 15/10 21/12
sides [1] 60/21

single [1] 44/18
situation [3] 26/18 61/24 63/9
situations [1] 11/20
six days [2] 6/2 51/3
six hours [1] 45/7
six months [2] 16/20 16/22
Sixth [2] 51/5 61/13
slate [1] 23/7
small [1] 17/7
social [4] 40/25 41/1 58/19 60/12
software [3] 64/15 64/17 64/18
solid [1] 9/19
somebody's [1] 58/17
sooner [1] 56/24
sorts [2] 43/3 55/7
sought [3] 20/24 22/24 57/4
sources [1] 7/17
South [2] 48/9 70/7
South Florida [1] 48/9
SOUTHERN [5] 1/2 7/25 23/10 43/22 48/23
spawn [1] 10/9
special [7] 2/4 3/14 23/2 23/21 35/8 35/23 58/10
specific [5] 6/6 30/13 30/19 55/4 63/19
specifics [1] 6/18
speedy [10] 18/24 18/25 20/12 20/15 20/19 21/4 43/6 53/8 53/17 53/21
spend [1] 35/17
spoken [1] 41/15
squared [1] 42/9
squaring [2] 40/18 58/4
stand [4] 10/14

standard [1] 25/13
standards [1] 61/6
stands [1] 29/25
STANLEY [2] 2/13 3/22
star [1] 26/11
starting [4] 3/11 27/11 27/15 55/8
starts [1] 35/14
state [3] 38/21 45/5 49/8
stated [1] 56/23
statements [3] 7/23 8/8 66/18
states [16] 1/1 1/7 1/18 3/9 3/15 17/3 19/15 19/20 23/8 32/15 40/17 46/20 52/13 57/24 62/5 70/7
States vs [1] 62/5
station [1] 57/19
status [2] 8/24 67/24
statute [10] 5/21 19/1 19/3 21/9 22/5 22/8 22/22 24/5 25/2 25/5
statutes [1] 32/18
stay [1] 59/10
step [1] 31/9
steps [1] 41/21
stipulation [2] 11/8 14/1
stone [1] 18/4
stood [1] 49/14
stories [3] 40/25 40/25 41/16
story [4] 41/2 41/5 41/6 41/6
straight [1] 9/21
straightforward [1] 25/9
streamline [1] 13/10
Street [4] 2/8 2/11 2/14 2/17
strongly [2] 31/17 32/6
structure [1]

studiously [1] 54/3
subfile [1] 8/3
subjective [1] 42/2
submitted [1] 16/5
subpoena [3] 14/18 46/6 50/8
subpoenaed [1] 27/24
subpoenas [1] 7/23
subset [2] 7/19 8/23
substance [2] 47/22 52/4
substantiate [1] 19/4
substantive [7] 17/8 30/8 31/8 31/16 32/3 63/15 63/23
substantively [1] 35/11
subsumed [1] 53/12
sudden [1] 37/24
suffice [3] 26/4 57/18 62/6
sufficiency [1] 56/13
suggest [1] 57/16
suggested [2] 12/24 30/1
suggesting [2] 28/2 51/7
suggestion [2] 51/24 56/20
suggests [1] 52/22
suit [1] 30/14
suitable [1] 43/5
Suite [4] 2/8 2/11 2/15 2/18
suits [1] 18/13
sum [3] 8/20 47/22 52/4
summary [5] 11/7 14/1 44/19 44/22 44/23
superseding [1]

Page 82

FAMILY FIRST LLC vs. DAVID RUTSTEIN, et al.

Case 1:23-cr-00257-TSC   Document 30-3   Filed 08/17/23   Page 83 of 84

USCA Case #23-3228   Thanksgiving [1]  Document [1]   Filed 06/26/2024   Page 252 of 656

**superseding... [1]**
46/4

**supported [1]**
19/14

**suppression [1]**
56/4

**Supreme [2]**  23/8
45/6

**surely [1]**  26/12

**surrounding [2]**
48/10 60/4

**T**

**table [1]**  58/14

**tabula [1]**  23/13

**taint [1]**  33/17

**Tallahassee [1]**
2/9

**target [2]**  46/1
46/6

**team [8]**  15/9
18/7 30/20 33/16
33/17 37/22 38/7
58/15

**teammates [1]**
58/14

**television [1]**
65/4

**tends [1]**  60/3

**tenet [1]**  19/16

**tension [1]**  35/1

**term [3]**  47/17
66/16 66/22

**terms [18]**  6/18
9/13 10/11 11/8
11/17 13/18 14/2
14/6 14/7 15/8
15/19 30/13 30/18
36/18 37/17 38/12
44/15 61/8

**testimony [3]**
7/24 48/10 48/11

**text [2]**  12/4 64/4

**thank [25]**  3/2 5/7
18/5 24/4 27/9
27/14 37/19 39/12
39/15 47/23 48/16
48/17 48/19 52/8
54/21 54/25 55/1
59/15 62/15 62/16
66/24 67/19 68/22
69/11 69/14

45/9

**theme [1]**  51/8

**theories [1]**  25/8

**theory [2]**  24/7
24/17

**thick [1]**  33/23

**thinking [1]**  68/23

**thorough [3]**
26/12 55/25 64/19

**thoroughly [2]**
57/2 63/25

**thought [2]**  11/11
58/17

**thousand [3]**  36/7
51/23 52/17

**thousands [1]**
41/16

**threat [1]**  40/10

**three months [1]**
37/23

**three years [2]**
28/3 52/13

**three years' [2]**
28/1 28/3

**three-week [1]**
39/1

**throw [3]**  17/22
17/25 26/14

**Thursday [1]**  16/5

**thus [1]**  6/16

**tied [1]**  12/24

**time [42]**  9/5 9/5
9/22 10/1 10/16
10/19 10/21 12/25
16/3 16/9 17/12
17/21 18/6 20/17
21/21 22/18 27/24
30/10 31/19 32/5
32/8 35/17 36/3
36/11 36/14 36/16
39/9 45/12 45/23
49/13 51/2 52/18
53/1 53/21 56/22
57/7 60/24 64/15
64/18 65/13 65/20
67/14

**timeline [1]**  8/25

**timelines [1]**
30/13

**timeliness [1]**
23/20

**times [1]**  11/18

17/15

**timing [2]**  29/3
38/3

**today's [1]**  5/20

**TODD [2]**  2/10
3/17

**toll [1]**  53/17

**tolling [1]**  53/19

**tolls [1]**  53/17

**topic [1]**  23/12

**total [1]**  52/12

**touch [3]**  61/1
63/24 66/12

**touched [1]**  45/14

**tranche [1]**  10/23

**transcript [2]**
1/16 32/25

**transcription [1]**
70/3

**transcripts [4]**
7/25 14/21 14/23
15/5

**transmitting [1]**
5/13

**travels [1]**  69/15

**treat [1]**  34/14

**treated [3]**  19/9
19/13 57/23

**treatment [1]**
35/23

**tremendous [2]**
28/4 35/2

**triage [2]**  36/12
36/16

**trial [72]**

**trials [2]**  60/11
61/10

**TRUMP [29]**  1/10
2/7 3/10 3/18 3/21
9/18 12/3 19/9
19/17 26/7 26/19
29/18 29/21 32/18
34/14 35/8 35/15
35/16 35/22 38/22
39/11 39/14 43/14
43/19 50/23 57/17
60/5 66/18 67/6

**Trump's [5]**  7/3
19/25 24/18 24/22
32/11

**trust [1]**  60/14

**TV [1]**  41/23

52/12

**two weeks [6]**
16/2 16/11 30/2
30/7 30/8 51/2

**two-month [1]**
35/14

**two-year [1]**
66/19

**typical [1]**  37/14

**typically [1]**  60/3

**U**

**U.S [2]**  2/3 70/7

**U.S. [3]**  32/14
66/17 66/21

**U.S. Attorney [1]**
32/14

**U.S. Government
[2]**  66/17 66/21

**Uh [1]**  17/5

**Uh-huh [2]**  17/5

**ultimately [2]**
23/13 34/10

**umbrella [1]**
56/15

**unable [1]**  61/11

**unclassified [2]**
8/24 66/8

**undergoing [1]**
8/14

**understandably
[1]**  17/24

**understand [1]**
50/9

**understanding [9]**
16/4 18/3 32/22
34/11 35/18 35/19
38/20 49/5 52/9

**unfair [1]**  20/2

**unfortunately [1]**
46/16

**unique [2]**  17/19
50/18

**UNITED [15]**  1/1
1/7 1/18 3/9 3/15
17/3 19/15 19/20
23/8 40/17 46/20
52/13 57/23 62/5
70/7

**unless [7]**  18/8
32/16 39/13 62/13
66/23 66/25 67/22

22/17

**unredacted [1]**
14/25

**unrelenting [1]**
40/15

**unresolved [1]**
52/25

**unripe [1]**  54/18

**unusual [4]**  22/11
25/6 25/8 29/15

**unusually [1]**
53/23

**unwise [1]**  21/1

**uploaded [1]**
27/22

**uploading [1]**
27/22

**urge [2]**  21/1
48/12

**us [29]**  8/7 13/24
14/10 27/25 28/6
28/9 29/13 30/7
32/24 33/2 36/14
37/8 42/6 49/6
49/15 49/20 51/12
51/19 53/2 54/4
58/13 58/16 62/3
64/19 65/1 67/23
67/25 68/2 68/4

**useful [1]**  62/1

**usual [1]**  29/24

**V**

**variations [1]**
25/10

**varied [1]**  9/19

**vendor [1]**  27/22

**venue [1]**  32/16

**verdict [1]**  16/25

**versus [3]**  44/3
47/19 48/9

**vice [3]**  41/3 41/5
46/25

**video [16]**  4/7
9/20 28/1 28/3
51/20 51/23 52/1
52/3 52/6 52/10
52/11 52/15 52/18
55/7 65/16 65/17

**violence [2]**  26/2
60/1

**Virginia [1]**  16/23

Page 83

FAMILY FIRST LLC vs. DAVID RUTSTEIN, et al
Case 1:23-cr-00257-TSC   Document 30-3   Filed 08/17/23   Page 84 of 84
USCA Case #23-3228   31/5 36/22 39/13   Document #2033201   Filed: 12/23/2023   Page 253 of 656

vis [2]  26/18
26/18
voir [2]  26/12
60/19
volume [8]  6/18
14/7 29/1 29/12
35/21 42/25 44/8
55/6
voluminous [2]
21/22 53/23
voluntarily [1]  8/7
vs [5]  1/9 3/10
17/3 61/17 62/5

# W

walk [1]  65/18
walks [1]  34/15
Wall [1]  2/11
WALTINA [1]
1/11
Waltine [1]  3/10
warrant [8]  27/19
28/9 28/12 33/7
48/7 49/18 56/6
63/6
warrants [7]  7/21
7/22 7/23 33/9
33/11 33/13 56/6
Washington [3]
2/5 2/15 48/9
watch [1]  28/3
weekend [1]
12/25
weighed [1]
41/11
Weiss [1]  41/4
well-established
[1]  62/7
whenever [2]
67/23 68/3
White [1]  14/14
who's [1]  3/23
winded [1]  25/14
wish [1]  18/15
withhold [2]  11/1
12/3
withholding [1]
11/13
witnesses [5]  9/4
32/10 33/15 33/16
45/5
WOODWARD [13]
2/13 2/14 3/23

47/25 48/18 53/10
54/20 62/3 67/20
68/9
world [1]  60/14
worth [10]  25/21
28/1 28/3 39/20
49/13 51/2 52/18
55/19 58/13 65/7
wrap [1]  68/7
wrestle [1]  47/2
writ [3]  20/14
23/7 56/10

# Y

years' [3]  28/1
28/3 65/6
yesterday's [1]
28/16
York [7]  2/12 35/9
35/11 38/13 38/25
43/23 45/5
you'd [2]  18/10
42/6

# Z

zenith [1]  41/18
zoom [1]  65/12

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| _____ | : | |
| UNITED STATES OF AMERICA | : | |
| | : | No. 23-cr-257-TSC |
| | : | |
| v. | : | |
| | : | |
| DONALD J. TRUMP, | : | |
| | : | |
|         Defendant. | : | |
| _____ | : | |

**RESPONSE IN OPPOSITION TO**
**GOVERNMENT'S PROPOSED TRIAL CALENDAR**

# Ex. D

FILED: NEW YORK COUNTY CLERK 06/09/2023 04:13 PM
INDEX NO. 452564/2022

NYSCEF DOC. NO. 636
RECEIVED NYSCEF: 06/09/2023

Case 1:23-cr-00257-TSC    Document 30-4    Filed 08/17/23    Page 2 of 3

USCA Case #23-3228    Document #2033201    Filed: 12/23/2023    Page 255 of 656

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| PEOPLE OF THE STATE OF NEW YORK, by LETITIA JAMES, Attorney General of the State of New York, | Index No. 452564/2022 |
| Plaintiff, | **ORDER** |
| -against- | |
| DONALD J. TRUMP, *et al.*, | |
| Defendants. | |

It is hereby ORDERED that the Preliminary Conference Order, entered on November 22, 2022 (NYSCEF Doc. No. 228), as modified by the Orders dated March 24, 2023 (NYSCEF Doc. No. 598) and May 1, 2023 (NYSCEF Doc. No 628), is further modified as follows:

1.   All parties shall identify any rebuttal experts on or before June 19, 2023;

2.   All parties shall produce their rebuttal expert reports on or before June 30, 2023;

3.   Depositions of expert witnesses (which may be taken at any point after the opening report is served) shall be completed on or before July 28, 2023. Parties are presumptively limited to one deposition of each expert identified by another party.

4.   Expert discovery shall close on July 28, 2023.

5.   Trial depositions for all non-party witnesses who are unavailable for trial as provided for in CPLR § 3117 shall be held by July 28, 2023.

6.   **End Date for All Disclosure:** July 28, 2023.

7.   **Note of Issue:** Plaintiff shall file a Notice of Issue and Certificate of Readiness on or before July 31, 2023;

8.   **Dispositive Motions:** Any dispositive motions shall be made on or before August 4, 2023. Any opposition brief shall be filed on or before September 1, 2023. Any

reply brief shall be filed on or before <u>September 15, 2023</u>. Oral argument on any dispositive motions shall be heard on <u>September 22, 2023</u>;

9. **Additional Directives:**

   a. Final witness lists, final exhibit lists, deposition designations, and proposed facts to be proven at trial shall be filed on or before <u>September 8, 2023</u>;

   b. Pre-trial motions shall be filed on or before <u>September 22, 2023</u>;

   c. Final pre-trial conference is scheduled for <u>September 27, 2023</u>; and

   d. Trial shall begin on <u>October 2, 2023</u>.

Dated: New York, New York
     June 9, 2023

_____
Hon. Arthur Engoron, J.S.C.
HON. ARTHUR F. ENGORON J.S.C.

2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| _____ | : | |
| UNITED STATES OF AMERICA | : | |
| | : | No. 23-cr-257-TSC |
| | : | |
| v. | : | |
| | : | |
| DONALD J. TRUMP, | : | |
| | : | |
| Defendant. | : | |
| _____ | : | |

**RESPONSE IN OPPOSITION TO**
**GOVERNMENT'S PROPOSED TRIAL CALENDAR**

# Ex. E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

E. JEAN CARROLL,

                  Plaintiff,

       -against-                         20-cv-7311 (LAK)

DONALD J. TRUMP, in his personal capacity,

                  Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**SCHEDULING ORDER**

LEWIS A. KAPLAN, *District Judge.*

      Unless this case previously has been entirely disposed of, trial of this action shall commence on January 15, 2024 absent contrary order of the Court.

      SO ORDERED.

Dated:     June 15, 2023

                                            Lewis A. Kaplan
                                United States District Judge

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 6/15/23

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | No. 23-cr-257-TSC |
| v. | : | |
| DONALD J. TRUMP, | : | |
| Defendant. | : | |

**RESPONSE IN OPPOSITION TO**
**<u>GOVERNMENT'S PROPOSED TRIAL CALENDAR</u>**

# Ex. F

Case 1:23-cr-00257-TSC   Document 30-6   Filed 08/17/23   Page 1 of 6

USCA Case #23-3228   Document #2033201   Filed: 12/23/2023   Page 260 of 656

Fulton County Superior Court
***EFILED***NY
Date: 8/16/2023 12:49 PM
Che Alexander, Clerk

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

| | | |
|---|---|---|
| STATE OF GEORGIA | \| | CASE NO. |
| v. | \| | |
| | \| | 23SC188947 |
| DONALD JOHN TRUMP, | \| | |
| RUDOLPH WILLIAM LOUIS GIULIANI, | \| | |
| JOHN CHARLES EASTMAN, | \| | |
| MARK RANDALL MEADOWS, | \| | |
| KENNETH JOHN CHESEBRO, | \| | |
| JEFFREY BOSSERT CLARK, | \| | |
| JENNA LYNN ELLIS, | \| | |
| RAY STALLINGS SMITH III, | \| | |
| ROBERT DAVID CHEELEY, | \| | |
| MICHAEL A. ROMAN, | \| | |
| DAVID JAMES SHAFER, | \| | |
| SHAWN MICAH TRESHER STILL, | \| | |
| STEPHEN CLIFFGARD LEE, | \| | |
| HARRISON WILLIAM PRESCOTT FLOYD, | \| | |
| TREVIAN C. KUTTI, | \| | |
| SIDNEY KATHERINE POWELL, | \| | |
| CATHLEEN ALSTON LATHAM, | \| | |
| SCOTT GRAHAM HALL, | \| | |
| MISTY HAMPTON a/k/a EMILY MISTY HAYES | \| | |
| Defendants. | \| | |

## **MOTION FOR ENTRY OF PRETRIAL SCHEDULING ORDER**

COMES NOW, the State of Georgia, by and through Fulton County District Attorney Fani T. Willis, and requests this Honorable Court enter a pretrial scheduling order governing the deadlines for 23SC188947, State of Georgia v. Donald John Trump et al.

In light of Defendant Donald John Trump's other criminal and civil matters pending in the courts of our sister sovereigns[1], the State of Georgia proposes certain deadlines that do not conflict with these other courts' already-scheduled hearings and trial dates. Further, the proposed

---

[1] United States of America v. Donald J. Trump, 1:23-CR-00257-TSC (D. D.C.); United States of America v. Donald J. Trump et al., 9:23-CR-80101-AMC (S.D. Fl.); People of the State of New York v. Donald J. Trump, 71543-23 (S. Ct. N.Y. Cty., N.Y.); People of the State of New York v. Donald J. Trump et al., 451685/2020 (S. Ct. N.Y. Cty., N.Y.).

dates are requested so as to allow the Defendants' needs to review discovery and prepare for trial

but also to protect the State of Georgia's and the public's interest in a prompt resolution of the

charges for which the Defendants have been indicted. The State attaches to this Motion a

proposed Pretrial Scheduling Order for the Court's consideration containing the State's proposed

deadlines and other relevant dates.

Respectfully submitted this 16th day of August, 2023.

FANI T. WILLIS
District Attorney
Atlanta Judicial Circuit

By:
/s/Nathan J. Wade
Nathan J. Wade
Georgia Bar No. 390947
Special Prosecutor
Fulton County District Attorney's Office
136 Pryor Street SW
3rd Floor
Atlanta, GA 30303

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

| | |
|---|---|
| STATE OF GEORGIA | |
| | CASE NO. |
| v. | |
| | 23SC188947 |
| DONALD JOHN TRUMP, | |
| RUDOLPH WILLIAM LOUIS GIULIANI, | |
| JOHN CHARLES EASTMAN, | |
| MARK RANDALL MEADOWS, | |
| KENNETH JOHN CHESEBRO, | |
| JEFFREY BOSSERT CLARK, | |
| JENNA LYNN ELLIS, | |
| RAY STALLINGS SMITH III, | |
| ROBERT DAVID CHEELEY, | |
| MICHAEL A. ROMAN, | |
| DAVID JAMES SHAFER, | |
| SHAWN MICAH TRESHER STILL, | |
| STEPHEN CLIFFGARD LEE, | |
| HARRISON WILLIAM PRESCOTT FLOYD, | |
| TREVIAN C. KUTTI, | |
| SIDNEY KATHERINE POWELL, | |
| CATHLEEN ALSTON LATHAM, | |
| SCOTT GRAHAM HALL, | |
| MISTY HAMPTON a/k/a EMILY MISTY HAYES | |
|     Defendants. | |

## [PROPOSED] PRETRIAL SCHEDULING ORDER

The following proposed Order shall govern this criminal case. Absent express permission from the Court, no exceptions, extensions, or waivers to the requirements set forth herein are allowed. The term "Defendant" refers to each of the named defendants individually.

### A. ARRAIGNMENT:

    1.  Arraignment for the various Defendants shall take place the week of September 5, 2023.

2. The Clerk of Fulton County Superior Court shall mail to each Defendant and his/her counsel, if applicable, notice of this date at least five days prior to this date, pursuant to Georgia law.

## B. DISCOVERY:

1. Defendant has until 10 days after arraignment to opt into reciprocal discovery as set forth in O.C.G.A. § 17-16-1 *et. seq*.

2. If Defendant elects to participate in reciprocal discovery pursuant to O.C.G.A. § 17-16-1 *et. seq*, all parties shall serve discovery materials then in its possession upon opposing counsel no later than September 29, 2023. Any additional discovery shall be provided to opposing counsel on a rolling basis and as soon as practicable once available within the time frames as set forth in O.C.G.A. § 17-16-4. If Defendant procures new counsel, it shall be the duty of the original attorney for the Defendant to provide all discovery served upon him/her to the new attorney.

## C. MOTIONS HEARINGS:

1. All demurrers and claims of immunity are to be filed within ten (10) days of arraignment in accordance with O.C.G.A § 17-7-110.

2. All particularized motions and notices, including but not limited to (a) motions to suppress and (b) notices of evidence of other crimes, wrongs, or acts (including, but not limited to, 404(b) notices) shall be filed on or before October 31, 2023.

3. Hearings for motions filed by October 31 shall commence on December 11, 2023 and continue until completion.

4. Generalized and omnibus motions will not be considered by the Court. All motions shall specify, with particularity, the item, statement, and/or event at issue. Thus, for

example, a motion to suppress any and all statements is insufficient: the motion must identify the specific statement the movant is seeking to suppress, as well as the theory of suppression.

5. All motions in limine shall be filed at least five (5) days prior to the call of the trial.

**D. FINAL PRETRIAL CONFERENCE AND TRIAL DATES:**

1. The final pretrial conference shall be held on February 20, 2024.

2. The trial shall commence on March 4, 2024.

**EXTENSIONS OF DEADLINES MAY BE GRANTED WHEN REQUESTED IN WRITING AND GOOD CAUSE IS SHOWN.**

**SO ORDERED**, this _____ day of _____, 2023.

_____
**SCOTT MCAFEE**
Fulton County Superior Court
Atlanta Judicial Circuit

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                    :
UNITED STATES OF AMERICA          :
                                                    :        No. 23-cr-257-TSC
                                                    :
v.                                                  :
                                                    :
DONALD J. TRUMP,                       :
                                                    :
                    Defendant.               :
_____:

**RESPONSE IN OPPOSITION TO**
**GOVERNMENT'S PROPOSED TRIAL CALENDAR**

# Ex. G

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO. 23-80101-CR-CANNON**

**UNITED STATES OF AMERICA**,

      Plaintiff,

**v.**

**DONALD J. TRUMP** and
**WALTINE NAUTA**,

      Defendants.

_____/

**ORDER GRANTING IN PART GOVERNMENT'S MOTION**
**TO CONTINUE TRIAL AND RESETTING DEADLINES**

    **THIS MATTER** comes before the Court upon the Government's Motion to Continue Trial and Request for Revised Scheduling Order [ECF No. 34]. The Court has reviewed the Motion, Defendants' Response in Opposition [ECF No. 66], the Government's Reply to Defendants' Response [ECF No. 76], and the full record. The Court also held a Pretrial Conference Pursuant to Section 2 of the Classified Information Procedures Act (CIPA), Pub. L. 96–456, 94 Stat. 2025, 18 U.S.C. App. III §§ 1–16 (1980), on July 18, 2023 [ECF No. 82].

    Following review, it is **ORDERED AND ADJUDGED** as follows. The Government's Motion to Continue Trial and Revised Proposed Schedule [ECF No. 34] is **GRANTED IN PART** for the reasons stated below. The Court finds that the interests of justice served by this continuance outweigh the best interest of the public and Defendants in a speedy trial. 18 U.S.C. § 3161(h)(7)(A). The Court has considered the factors in 18 U.S.C. § 3161(h)(7)(B) in reaching this determination. Having done so, the Court finds that the period of delay resulting from this

continuance—i.e., from the date the Motion was filed, June 23, 2023, to the date trial

commences—is excludable time under the Speedy Trial Act.  *See* 18 U.S.C. § 3161.

## DISCUSSION

This case is currently set for trial commencing on August 14, 2023, with a deadline to file

pretrial motions on or before July 24, 2023 [ECF Nos. 28, 55].  All parties agree that a continuance

of the current trial date is warranted.  The Court concurs; proceeding to trial on August 14, 2023,

"would deny counsel for the defendant[s] or the attorney[s] for the Government the reasonable

time necessary for effective preparation" [ECF No. 34 (quoting 18 U.S.C. § 3161(h)(7)(B)(iv))].

The parties disagree as to the length of the continuance and to the appropriateness of setting

a schedule at this time.  As a preliminary matter, the Court rejects Defendants' request to withhold

setting of a schedule now; the Court deems it necessary to manage this proceeding through

important stages of discovery, CIPA briefing, motion practice, and trial, and does not see a

sufficient basis on this record to postpone entry of a scheduling order.  Nevertheless, the

Government's proposed schedule is atypically accelerated and inconsistent with ensuring a fair

trial.  As it stands, the Government's timeline spans less than six months from the first discovery

production (June 21, 2023) to trial in a CIPA case involving, at the very least, more than 1.1 million

pages of non-classified discovery produced thus far (some unknown quantity of which is described

by the Government as "non-content"), at least nine months of camera footage (with disputes about

pertinent footage), at least 1,545 pages of classified discovery ready to be produced (with more to

follow), plus additional content from electronic devices and other sources yet to be turned over.

By conservative estimates, the amount of discovery in this case is voluminous and likely to

increase in the normal course as trial approaches.  And, while the Government has taken steps to

organize and filter the extensive discovery, no one disagrees that Defendants need adequate time

to review and evaluate it on their own accord.  To add further complication, a material portion of the discovery in this case is subject to the procedures in CIPA—procedures that all agree often lengthen the ordinary trajectory from indictment to trial [*see* ECF No. 34-1 p. 3].  That is no less the case here, where the matter involves a substantial quantity of classified discovery that has yet to be produced pending Court resolution of a forthcoming (and so far contested) protective order under Section 3 of CIPA, security-clearance briefings, processing of final security clearances for certain portions of the classified discovery, and additional logistics for the review of such materials, including expedited preparations for an accredited facility in the Northern Division of this District.  Then there is the matter of extensive pre-trial motion practice as described by Defendants in the Response and at the Section 2 Hearing, the bare minimum of which will require considerable time for Court review, independent of the ultimate merits of any such motions.

Defendants, for their part, characterize the Government's approach to this case as unusually expedited and cursory, request additional time to conduct an initial review of the voluminous discovery (including yet-to-be produced discovery), and describe the case as falling squarely within the "unusual or complex" designation in 18 U.S.C. § 3161(h)(7)(B)(ii) [ECF No. 66].[1] Defendants maintain that this proceeding raises various "novel, complex, and unique legal issues," citing the interplay between the Presidential Records Act and the various criminal statutes at issue; constitutional and statutory challenges to the authority of the Special Counsel to maintain this action; disputes about the classification status of subject documents; challenges to the grand jury process that led to the indictment (including questions of attorney-client privilege); requests for

---

[1] 18 U.S.C.A. § 3161(h)(7)(B)(ii) (directing a court to consider, in determining whether to grant a continuance, "[w]hether the case is so unusual or so complex, due to the number of defendants, the nature of the prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by this section").

3

defense discovery; and other pre-trial motions, including possible motions to suppress and a motion to sever [ECF No. 66; *see* ECF No. 82]. As a final category, Defendants identify various additional factors the Court deems unnecessary to resolution of the Government's motion at this juncture, most principally the likelihood of insurmountable prejudice in jury selection stemming from publicity about the 2024 Presidential Election [ECF No. 66 p. 9].

Upon review of the parties' competing arguments, it is clear to the Court that a continuance is warranted and in accordance with the requirements of the Speedy Trial Act. First, as the record reveals, discovery in this case is exceedingly voluminous and will require substantial time to review and digest in accordance with Defendants' right to a fair trial. Second, this is a CIPA case, which although on its own may not be a fact warranting designation of this case as complex under the Speedy Trial Act, *see* 18 U.S.C. § 3161(h)(7)(B)(ii), strongly counsels in that direction here given the substantial quantities of classified discovery, anticipated CIPA briefing [*see* ECF No. 34-2], and the need for Defendants and the Court to adequately review the classified discovery under appropriate safeguards and following resolution of pending logistics. Third, even accepting the Government's contested submission that nothing in this case presents a "novel question[] of fact or law" [ECF No. 34 p. 2], the fact remains that the Court will be faced with extensive pre-trial motion practice on a diverse number of legal and factual issues, all in connection with a 38-count indictment. These factors are sufficient to designate this case complex under 18 U.S.C. § 3161(h)(7)(B)(ii), and the Court is unaware of any searchable case in which a court has refused a complex designation under comparable circumstances.

For all of these reasons, taking due account of the public's interest in a speedy trial and the rights of the parties, the Court hereby sets the following pre-trial and trial schedule.

CASE NO. 23-80101-CR-CANNON

**SCHEDULE**

Calendar call in this matter will be held on **Tuesday, May 14, 2024, at 1:45 p.m**. in the

Fort Pierce Division.  The case is set for Jury Trial in the Fort Pierce Division during the two-week

trial period commencing on **May 20, 2024**.  The parties shall adhere to the following pre-trial and

trial deadlines and are reminded to comply with the Local Rules in all respects and the instructions

in the Court's Orders Setting Trial [ECF Nos. 28, 55] except as superseded by this Order:[2]

| | |
|---|---|
| **Defense Review of Unclassified Discovery** | Ongoing |
| **Renewed Section 3 Motion for Protective Order** | July 27, 2023 |
| **Any Opposition to Renewed Section 3 Motion** | August 9, 2023 |
| **Government's Reply to Renewed Section 3 Motion** | August 14, 2023 |
| **Hearing on Section 3 Motion (if necessary)** | August 25, 2023 |
| **Initial Production of Classified Discovery**[3] | September 7, 2023 |
| **Joint Discovery Status Report** | September 14, 2023 |
| **Government's CIPA Section 10 Notice** | September 14, 2023 |
| **Government's CIPA Section 4 Motion (Ex Parte)** | October 10, 2023 |
| **Any Defense Challenge to Section 4 (Ex Parte) Filing** | October 10, 2023 |

---

[2] All hearings will begin at 9:30 a.m. except as modified by separate Order.  As circumstances
demand, hearings may be held in camera for classified information purposes.

[3] This review will take place at a temporary location until sufficient security measures have been
implemented on an expedited basis for placement at a final location.

CASE NO. 23-80101-CR-CANNON

| | |
|---|---|
| **Hearing on Section 4 Motion (if necessary)** | October 17, 2023 |
| **Deadline for the Filing of Any Defense Motion to Compel Discovery or Any Discovery-Related Request** | October 20, 2023 |
| **Deadline for the Filing of Any Pretrial Motions** | November 3, 2023 |
| **Government's Rule 16 Expert Disclosures** | November 8, 2023 |
| **Defense Rule 16 Expert Disclosures** | November 15, 2023 |
| **Any Defense CIPA Section 5 Notice** | November 17, 2023 |
| **Government Discovery Status Report** | November 21, 2023 |
| **Status Conference** | November 28, 2023 |
| **Hearing on Pretrial Motions (Evidentiary and/or Non-Evidentiary)** | December 11, 2023 |
| **Government's CIPA Section 6(a) Motion** | December 15, 2023 |
| **Defense Response to CIPA Section 6(a) Motion** | January 4, 2024 |
| **Government's Supplemental Rule 16 Expert Disclosures** | January 4, 2024 |
| **Government's Reply to CIPA Section 6(a) Motion** | January 8, 2024 |
| **CIPA Section 6(a) Hearing** | January 16, 2024 |
| **Defense Reciprocal Discovery Under Fed. R. Crim P. 16(b)(1)(A)** | February 5, 2024 |
| **Joint Discovery Status Report** | February 12, 2024 |
| **Hearing on Any Remaining Pretrial Motions (Evidentiary and/or Non-Evidentiary)** | February 26, 2024 |

| | |
|---|---|
| **Deadline for the Filing of Any Motions in Limine** | March 20, 2024 |
| **Deadline for the Filing of Any Motion to Introduce Evidence Under Fed. R. Evid. 404(b)** | March 20, 2024 |
| **Government's CIPA Section 6(c) Motion (if necessary)** | April 11, 2024 |
| **Hearing on Motions in Limine** | April 17, 2024 |
| **Defense Response to CIPA Section 6(c) Motion** | April 25, 2024 |
| **Government's Reply to CIPA Section 6(c) Motion** | May 2, 2024 |
| **Hearing on Remaining CIPA Issues/Calendar Call** | May 14, 2024 |
| **Jury Trial[4]** | May 20, 2024 |

**DONE AND ORDERED** in Chambers at Fort Pierce, Florida, this 21st day of July 2023.

**AILEEN M. CANNON**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record

---

[4] Jury selection procedures will be the subject of additional briefing/argument, to be set by separate Order.

7

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,       .
                                .
            Plaintiff,          .  CR No. 23-0257 (TSC)
                                .
        v.                      .
                                .
DONALD J. TRUMP                 .  Washington, D.C.
                                .  Monday, August 28, 2023
            Defendant.          .  10:00 a.m.
. . . . . . . . . . . . . . . .


TRANSCRIPT OF STATUS HEARING
BEFORE THE HONORABLE TANYA S. CHUTKAN
UNITED STATES DISTRICT JUDGE


<u>APPEARANCES</u>:

For the Government:        THOMAS WINDOM, ESQ.
                           MOLLY G. GASTON, ESQ.
                           U.S. Attorney's Office
                           601 D Street NW
                           Washington, DC 20530


For Defendant:             JOHN F. LAURO, ESQ.
                           GREGORY M. SINGER, ESQ.
                           Lauro & Singer
                           400 North Tampa Street
                           15th Floor
                           Tampa, FL 33602

                           TODD BLANCHE, ESQ.
                           Blanche Law
                           99 Wall Street
                           New York, NY 10005

Court Reporter:            BRYAN A. WAYNE, RPR, CRR
                           U.S. Courthouse, Room 4704-A
                           333 Constitution Avenue NW
                           Washington, DC 20001


Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

1                         P R O C E E D I N G S

2              THE DEPUTY CLERK:  Good morning, Your Honor.  This is

3        Criminal Case No. 23-257, United States of America versus

4        Donald J. Trump.  Counsel, please approach the lectern and

5        state your appearances for the record.

6              MS. GASTON:  Good morning, Your Honor.  Molly Gaston

7        for the United States along with Thomas Windom, and with us

8        at counsel table is Special Agent Jamie Garman.

9              THE COURT:  Good morning.

10             MR. LAURO:  Good morning, Your Honor.  John Lauro on

11       behalf of President Trump.  With me is my partner, Greg Singer,

12       and Todd Blanche, who has noticed an appearance as well, as

13       co-counsel for President Trump.

14             THE COURT:  And is Filzah Pavalon here?  Is that person

15       appearing or they're not appearing in this case?

16             MR. LAURO:  She's with my firm but not here presently.

17             THE COURT:  All right.  So pro hac entered.  Good

18       morning, everyone.

19          We are here for a hearing regarding the parties' proposed

20       trial dates.  But before we discuss the proposed schedules, I

21       want to address the defense's motion to exclude time under the

22       Speedy Trial Act, which is ECF No. 18.

23          The defense has moved to exclude the 25 days between

24       Mr. Trump's initial appearance on August 3, 2023, and today's

25       status conference from the Speedy Trial Act calculation.  The

1   government has opposed that motion but acknowledged in their

2   filing that the exclusion of time between the August 3rd

3   initial appearance and August 28th scheduled hearing already

4   will occur under the operation of other provisions of the act

5   such as those provisions that automatically exclude time

6   delays resulting from the filing of motions.

7       As the Supreme Court noted in *Bloate v. United States*, 559

8   U.S. 196 at 203, the Speedy Trial Act requires that a criminal

9   defendant's trial commence within 70 days of a defendant's

10  initial appearance or indictment, but excludes from the 70-day

11  period days lost to certain types of delay.  Section

12  3161(h)(7) of the Speedy Trial Act permits the Court to

13  exclude time from the calculation based on findings that the

14  ends of justice served by taking such action outweigh the best

15  interests of the public and the defendant in a speedy trial.

16      Taking into account the reasonable time necessary for

17  effective preparation, the numerous motions filed between

18  defendant's arraignment and this hearing, as well as the fact

19  that the motion has been filed by the defense, I do find that

20  the ends of justice outweigh the defendant and the public's

21  interest in a speedy trial, and therefore I will grant the

22  motion.  Accordingly, the 25 days between Mr. Trump's initial

23  appearance on August 3, 2023, and today's status conference

24  will be excluded.

25      Now let's move on to the proposed schedule.  In my August

1    3, 2023, minute order I asked the government to submit a

2    proposed trial date with an estimate of the time that would

3    be needed to set forth the prosecution's case-in-chief during

4    trial.  I also asked the defense to respond with their

5    proposed trial date and estimate to the extent possible of

6    the time that they believe they would need to put on a defense

7    case.

8        So the government in its proposed pretrial schedule, which

9    is ECF No. 23, proposes that trial begin on January 2, 2024,

10   and estimates that its case-in-chief will take no longer than

11   four to six weeks, and actually the government also proposed

12   that voir dire jury selection begin before that date.

13       The defense in their proposed trial schedule, which is ECF

14   No. 30, proposes that trial begin in April 2026, and states

15   that it cannot yet estimate how long the defense will take but

16   for now adopts, and I quote, the same calculation as the

17   government, four to six weeks.

18       These proposals are obviously very far apart.  And for

19   reasons I will discuss shortly, neither of them is acceptable.

20   So with regard to the Speedy Trial Act, the right to a speedy

21   trial is guaranteed by the Sixth Amendment and the Speedy

22   Trial Act comprehensively regulates the time within which a

23   criminal trial must begin.  And that's from *Zedner v.*

24   *United States*, 547 U.S. 489 at 500.

25       The act, which is codified at 18 U.S.C. § 3161(a), provides

1    that the appropriate judicial officer at the earliest

2    practicable time shall, after consultation with the counsel

3    for the defendant and the attorney for the government, set the

4    case for trial on a day certain so as to assure a speedy

5    trial.

6         The earliest practicable time depends in part on factors

7    which can exclude time from the act's calculation; that is, to

8    stop the speedy trial clock.  These factors include whether

9    the case is so unusual or so complex due to the number of

10   defendants, the nature of the prosecution, or the existence of

11   novel questions of fact or law, that it is unreasonable to

12   expect adequate preparation for pretrial proceedings or for

13   the trial itself before the trial date.  That's from section

14   (h)(7)(B)(ii).

15        Another factor is whether the trial date would deny the

16   defendant reasonable time to obtain counsel, would

17   unreasonably deny the defendant or the government continuity

18   of counsel, or would deny counsel for the defendant or the

19   attorney for the government the reasonable time necessary for

20   effective preparation, taking into account the exercise of due

21   diligence.  And that's from (h)(7)(B)(iv).

22        Now, I want to note here that setting a trial date does

23   not depend and should not depend on a defendant's personal and

24   professional obligations.  Mr. Trump, like any defendant, will

25   have to make the trial date work regardless of his schedule.

1    If this case, for example, involved a professional athlete, it

2    would be inappropriate for me to schedule a trial date to

3    accommodate her schedule.  The same is true here.

4         Moreover, although the Speedy Trial Act primarily

5    safeguards the defendant's rights, as the Supreme Court noted

6    in *Barker v. Wingo*, 407 U.S. 514 at 519, there is a societal

7    interest in providing a speedy trial which exists separate

8    from and at times in opposition to the interests of the

9    accused.  The Supreme Court in *Zedner* observed that if the act

10   were designed solely to protect a defendant's right to a

11   speedy trial, it would make sense to allow a defendant to

12   waive the application of the act.  But the act was designed

13   with the public interest firmly in mind.

14        Among other things, the public has an interest in the fair

15   and timely administration of justice, as well as reducing

16   defendant's opportunity -- reducing a defendant's opportunity

17   to commit crimes while on pretrial release, and preventing

18   extended pretrial delay from impairing the deterrent effort --

19   deterrent effect of punishment.  And I'm quoting from *Zedner*

20   at 501.

21        The Supreme Court's decision in *Barker* further highlights

22   that delay may prejudice the prosecution and public interest.

23   It noted:  Delay is not an uncommon defense tactic.  As the

24   time between the commission of the crime and the trial

25   lengthens, witnesses may become unavailable or their memories

1    may fade.  If the witnesses support the prosecution, its case

2    will be weakened, sometimes seriously so, and it is the

3    prosecution which carries the burden of proof in this case, as

4    in every case.  And that's from *Barker* at 521.

5        Relatedly, the Sixth Amendment also guarantees a defendant's

6    right to effective assistance of counsel, which in turn depends

7    on counsel having adequate time to prepare for trial.  But as

8    the D.C. Circuit noted in *United States v. Burton*, 584 F.2d

9    485 at 489, note 10, counsel is not entitled to unlimited

10   preparation time.  Instead, counsel is entitled to reasonable

11   preparation time.

12       And in *United States v. Cronic*, 466 U.S. 648 at 663, the

13   Supreme Court held that neither the period of time that the

14   government spent investigating the case nor the number of

15   documents that its agents reviewed during that investigation

16   is necessarily relevant to the question of whether a competent

17   lawyer could prepare to defend the case.

18       I am aware that Mr. Trump faces charges in other state and

19   federal criminal cases.  Given that Federal Rule of Criminal

20   Procedure 43 requires his presence at trial unless waived, the

21   Court has considered the currently set trial schedules in

22   those cases, as well as the competing demands of his counsel

23   in this and other cases.  Although I believe Mr. Lauro, who is

24   lead counsel in this case, does not represent the defendant in

25   any of the other matters -- is that right, Mr. Lauro?

1    MR. LAURO:  That's correct, Your Honor, although my

2    co-counsel, Mr. Blanche, does represent President Trump in the

3    New York proceeding as well as in the Florida proceeding, and

4    we will be trying this case together.  Given the magnitude of

5    the documents, over 250 witnesses, the complexity of the

6    issues, it really is a team effort.  So both of us are co-lead

7    counsel in this matter.

8    THE COURT:  All right.  Thank you.

9    All right.  I'm going to have some questions for each side,

10   but I'm going to start by addressing the defense argument

11   regarding the timing of other cases.  So the defense contends

12   that the median time from commencement to termination for a

13   jury demandable case involving 18 U.S.C. § 371, which is

14   conspiracy to defraud the United States, is 29.4 months, and

15   that the court regularly allows far more time than the

16   government proposes in other January 6 cases.

17   As an initial matter, and as the government correctly

18   points out, that 29.4 months cited by the defense was the

19   time from commencement to sentencing, not to trial.  And

20   sentencing, in this court at any rate, in the last few years

21   usually takes place about 90 days or more from verdict.  So

22   that statistic is a bit misleading.  And one of the cases that

23   the defense cites, *United States v. Foy*, 21-CR-108, is my

24   case.

25   In that case, there have been multiple continuances due to

1     the COVID-19 pandemic, litigation over -- considerable

2     litigation over pretrial detention, a superseding indictment,

3     and plea negotiations.  So, given that all the other cases the

4     defense cites were brought in 2021, I expect and suspect that

5     the pandemic had an impact on the time it took to resolve

6     those as well.

7         In addition, as the government notes, the other January 6

8     cases cited by the defense all involve between six and 17

9     codefendants.  There are no codefendants in this case.  And

10    from my review, the defense has not identified any case in

11    this district where the defendant was given over two years

12    between indictment and trial in which there were no

13    codefendants and no ongoing pandemic.

14        And the government hasn't identified any cases in this

15    district where the length of time between indictment and trial

16    was roughly five months, although they did point to the

17    *Manafort* case in the Eastern District of Virginia, which went

18    to trial roughly five months after the superseding indictment.

19        The other factor I wanted to focus on is the preparation

20    that's needed for trial.  And I think I will have some

21    questions in that area.  The defense advocates for a trial

22    schedule equal to the government's time spent investigating.

23    But as I've already noted, the Supreme Court found in *Cronic*

24    that there is no necessary correlation between the period of

25    time that the government spent investigating the case and the

1    defendant's task in preparing to deny or rebut a criminal

2    charge.

3        *Cronic* was a mail fraud case in which the government took

4    over four and a half years to investigate and included

5    extensive document review.  The Court found that the time

6    devoted by the government to the assembly, organization, and

7    summarization of the thousands of written records

8    unquestionably simplified the work of the defense counsel in

9    identifying and understanding the basic character of the

10   defendant's scheme.  That's at 664 of *Cronic*.

11       The defense here argues that they need years to review

12   the over 11.5 million pages of discovery, declaring they would

13   need to review nearly a hundred thousand pages per day to

14   finish the government's initial production by its proposed

15   date for jury selection.  The government responds that

16   characterization of the discovery review burden is misleading.

17   It contends that 65 percent of its initial production consists

18   of materials to which the defendant has functionally had

19   access, are duplicative, or do not constitute Rule 16

20   discovery.  25 percent come from entities associated with

21   Mr. Trump.  And hundreds of thousands of pages come from the

22   National Archives and House Select Committee to investigate

23   the January 6 attack.

24       The government further states that it has made a small

25   second discovery production consisting of 615,000 pages or

1    files, 20 percent of which were generated by records from an

2    entity associated with Mr. Trump.  The government also

3    represents that in the first production it provided defense

4    counsel with a set of key documents that it views as some of

5    the most pertinent to its case-in-chief.  Now, I realize the

6    defense may have a different view of that, but nonetheless

7    it's been provided.

8       So who will be arguing at this point?  Will it be you,

9    Ms. Gaston?

10          MS. GASTON:  Yes, Your Honor.

11          THE COURT:  So regarding the discovery that's been

12   turned over to the defense so far, you said in your motion

13   that about 65 percent of the first production is either

14   duplicative, is material that Mr. Trump has already had access

15   to, or is not Rule 16 discovery.

16      How much of the discovery did Mr. Trump already have access

17   to such as documents from the archives that his counsel would

18   have reviewed for privilege?

19          MS. GASTON:  Yes, Your Honor.  And let me begin by

20   saying that at this point discovery is now substantially

21   complete.

22          THE COURT:  Okay.

23          MS. GASTON:  We made a fifth production last night.

24          THE COURT:  Oh, a fifth.

25          MS. GASTON:  A fifth.

1          THE COURT:  Okay.  So I had two in the last -- so

2     there's been three more.  Okay.

3          MS. GASTON:  Correct, Your Honor.  So at this point

4     the discovery is at approximately 12.8 million pages.  That

5     is generally the number of pages that we are at.  But as we

6     described in our reply, number of pages is not the best metric

7     for measuring such things.

8          So of those 12.8 million pages, approximately 25 percent,

9     or more than 3 million, are pages associated with the

10    defendant's campaign or political action committees.  More

11    than 3 million, as we stated in our reply, came from the

12    United States Secret Service.  That's approximately 24

13    percent.  There are hundreds of thousands of pages from

14    publicly available litigation, 172,000 pages from the National

15    Archives.  And so --

16         THE COURT:  And those are documents that were -- would

17    have been reviewed for privilege by Mr. Trump's counsel before

18    they were turned over.

19         MS. GASTON:  Yes, Your Honor.  So approximately 61

20    percent of what we have provided so far, or 7.8 million pages,

21    are pages that came from entities associated with the

22    defendant, either in political action committees or the

23    campaign, from the National Archives, from publicly available

24    litigation documents, open-source materials like tweets,

25    materials from the House Select Committee, the vast majority

1    of which were already publicly available, and then some data

2    associated with a consultant to the defendant in some of the

3    election litigation.

4       So what is in the other 5 million pages, which is what

5    we're really talking about, is things like every grand jury

6    transcript in this case up to indictment and the accompanying

7    exhibits.  The defendant has all of those already.

8              THE COURT:  And those exhibits -- excuse me.  If an

9    exhibit was produced but shown to a witness during the grand

10   jury testimony, then it's been duplicated.  Is that correct?

11             MS. GASTON:  Yes, Your Honor.

12             THE COURT:  It's listed twice.

13             MS. GASTON:  Exactly.  So for instance, if a witness

14   in this case received a grand jury subpoena and produced

15   documents to the government, and the government went though

16   the documents, and then that person testified in the grand

17   jury and the government used documents from the document

18   production, those documents would be reproduced to the

19   defendant both in terms of the grand jury production and as --

20   the subpoena production, and the testimony and the documents

21   shown to the witness in the grand jury.

22      The same thing is true of all of our witness interviews in

23   the course of the investigation.

24             THE COURT:  That's what I was going to ask you next.

25   How much of the discovery could be categorized as witness

1    statements and notes?

2         MS. GASTON:  One moment, Your Honor.

3         Your Honor, approximately 58,000 pages are from witness

4    interview folders.  That includes the transcripts of those

5    interviews.  Most of them were audio recorded.  So the defense

6    has been provided audio recordings as well as transcripts

7    created for convenience of review.  And then all of the

8    exhibits that were used in the course of those interviews, and

9    those were provided in an organized fashion.

10        So, basically, there's a folder or a Bates range associated

11   with each witness.  It includes the transcript of either the

12   grand jury testimony or of the interview, the agent notes if

13   it was an interview, and then the exhibits associated or any

14   interview report of the interview.

15        THE COURT:  Do you have an idea of how much of the

16   discovery is material that Mr. Trump actually created, such as

17   tweets or other...

18        MS. GASTON:  The open-source material, Your Honor,

19   would include things like the publicly available litigation.

20   So I'm not sure I have a breakdown exactly of his tweets, but

21   I could get that for you.

22        THE COURT:  All right.  That's fine.

23        Now, you also said, at least in your response, that more

24   than 3 million pages, or 25 percent of the first production,

25   and 20 percent of the second production, came from, in quotes,

1     entities associated with Mr. Trump.  And you mentioned a PAC,

2     a political action committee.  Are there other -- what do you

3     mean by that?

4          MS. GASTON:  There's the defendant's campaign,

5     Your Honor, and then a few different political action

6     committees.

7          THE COURT:  Okay.

8          MS. GASTON:  And let me correct myself, Your Honor.  In

9     terms of the open-source material that includes campaign

10    statements, tweets, Truth Social posts, that's about 27,000

11    pages.

12         THE COURT:  Okay.  Now, in your key documents list, do

13    you have an approximation of how many documents are included

14    in that list?

15         MS. GASTON:  Yes, Your Honor.  One moment, please.

16      The key documents are approximately 47,000 pages.  And let

17    me take a moment just to describe what the key documents are.

18         THE COURT:  Yes.

19         MS. GASTON:  So it includes all of our case agent's

20    summary testimony as well as any exhibits introduced through

21    her to the grand jury.  And so that includes things like

22    transcripts of witness testimony or testimony before the House

23    Select Committee.  It also includes a file that is essentially

24    an annotation of the indictment.  It is almost 3 00 different

25    documents that are labeled and named according to the

1    paragraph of the indictment that they support.  So it is

2    essentially a road map to our case, Your Honor.  And it

3    includes other key documents that the government believes that

4    it may use at trial as well.

5        The other thing that we did through case agent testimony,

6    and have pointed the defense to in our cover letter and

7    through that case agent testimony, is we identified material

8    that we believe is arguably favorable to the defendant.  Of

9    course, that is simply the government's guess at what the

10   defense might find favorable, and it is of course a duty for

11   the defense to also identify potentially exculpatory material

12   in materials --

13       THE COURT:  But your *Brady* obligations are

14   constitutional and ongoing and that's what -- that's the

15   material you're talking about.

16       MS. GASTON:  Yes, Your Honor.

17       THE COURT:  And as you know, I think we take a --

18   if there's a doubt, the government's encouraged to take an

19   overinclusive position on that.

20       MS. GASTON:  Yes, Your Honor.  And, in addition,

21   the defense has spoken in interviews and such about various

22   defenses that they may raise in this case.  And all of the

23   materials that we have provided, the grand jury subpoena

24   returns, the search warrant returns, it is all searchable in

25   their electronic database for purposes of identifying that

1     material as well.

2          THE COURT:  Okay.  Thank you for answering a couple

3     of my questions, including how the information is organized.

4     And so -- and it's substantially complete.

5        All right.  And that key documents list, was that just for

6     the first production or has that been supplemented for the

7     entire production?

8          MS. GASTON:  The key documents list was an entirely

9     duplicative collection of material in the very first

10    production so that we could say to the defense in our very

11    first production, here's what we view as the most important

12    evidence in this case.  Here it is, it's all in one place for

13    you in a very organized fashion.

14          THE COURT:  Okay.  Thank you.

15        Well -- thanks.

16          MS. GASTON:  Thank you, Your Honor.

17          THE COURT:  I'll note that many years ago when I was

18    trying murder and conspiracy cases across the street in

19    Superior Court, we got witness names on the day of trial and

20    witness statements and grand jury testimony before the witness

21    testified and sometimes after the witness testified.  And

22    while the discovery rules here in federal court provide for

23    far more disclosure in advance, the manner in which the

24    discovery in this case has been organized indicates that the

25    government has made a considerable effort to expedite review,

1    certainly beyond their normal discovery obligations.

2        In cases involving large amounts of document discovery,

3    initial review is usually done by electronic searches.  The

4    government represents that it has produced the discovery in

5    load ready files so that the defense can review them quickly,

6    in the same manner as the government did, through targeted

7    keyword searches and electronic sorting.

8        So, Mr. Lauro, why won't that significantly speed up the

9    review process?

10        MR. LAURO:  Because Mr. Trump, President Trump, is

11    entitled to a fair trial.

12        THE COURT:  Absolutely.

13        MR. LAURO:  He is entitled to an opportunity to have a

14    defense lawyer who is reasonably prepared.  This is a request

15    for a show trial, not a speedy trial.

16        Your Honor, I respectfully and strongly disagree with the

17    prosecution's presentation here.  The concept that we would

18    have access to materials in the archives, in Secret Service,

19    in other government agencies, that that would somehow enable

20    us to prepare for trial because we should have already been

21    reading that material for the last two and a half years, is

22    absurd and ridiculous.

23        We have to do our job as defense lawyers to represent a

24    client.  This is a solemn obligation of every defense lawyer,

25    no matter if you're representing someone who's in a street buy

1    on a corner or a former president of the United States.

2    I have a special obligation to make sure that my client is

3    adequately represented.  And I'm sorry, Your Honor, to

4    suggest -- for a federal prosecutor to suggest that we could

5    go to trial in four months is not only absurd but it's a

6    violation of the oath to do justice.  And let me just go

7    through this organized material --

8         THE COURT:  Okay.  Let's take the temperature down for

9    a moment here.

10        MR. LAURO:  I take my obligation seriously as a defense

11   lawyer.  I've been doing this for 40 years.  I know Your Honor

12   has done it as well.  It's a sacred obligation to represent a

13   defendant.  And it's not easy when you have the entire

14   government amassed against you.  But we need adequate time to

15   prepare.  President Trump stands before Your Honor as an

16   innocent man right now.  He's entitled to his Sixth Amendment

17   protection.  He's entitled not only to counsel, but under

18   *Gideon*, the promise of *Gideon*, he's entitled to counsel that

19   can prepare adequately.

20        What this case means, we're talking about 9 terabytes of

21   information.  I have to go through that information.  I have

22   to sort it by witnesses, over 250 witnesses.  I have to

23   organize it in a way that's reasonable.  I have to look at all

24   the information in terms of these key witnesses.  I have to

25   cross-reference against other witnesses that may have said

1        something about a particular witness.  I need to think about

2        impeachment material.  I need to think about corroborative

3        material.  I need to think about my own Rule 17 subpoenas as

4        well.

5            For the government to suggest that I can do that in four

6        months is an outrage to justice, that not once have they

7        talked about justice in this case, not once.  So this is what

8        I have to do.

9            Now, they can give me key documents.  That's very nice of

10       them.  That's very kind of them.  I'd like to know one defense

11       lawyer in the United States that's going to rely on a

12       government's proposal of key documents.

13           THE COURT:  Mr. Lauro, as I said, let's take the

14       temperature down.  I understand you have a sacred obligation.

15       I understand Mr. Trump is presumed innocent, as is every

16       defendant.  But let's not overlook the fact that Mr. Trump has

17       considerable resources that every defendant -- criminal

18       defendant does not usually have.

19           And what I want -- my question to you is, given how the

20       discovery in this case has been produced, in an electronic

21       searchable form, and given the fact that a substantial portion

22       of the discovery has already been reviewed by Mr. Trump's

23       counsel as part of documents produced by archives -- hold

24       on -- why won't that speed it up?

25           I mean, we're not talking -- discovery in 2023 is not

1    sitting in a warehouse with boxes of paper looking at every

2    page at the first cut.  You and I both know that that is not

3    how the first cut of discovery in a complex case is reviewed;

4    it's reviewed by electronic searches.  So why won't the manner

5    in which this discovery has been turned over speed up your

6    review process?

7          MR. LAURO:  For a number of reasons.  First of all,

8    we've not had access as criminal defense counsel to what's in

9    the archives, what's in the Secret Service, what's in DOJ,

10   what's in political action committees.  We have not had that

11   access.  We as criminal defense lawyers now, for the first

12   time looking at these charges, have to assess these charges in

13   terms of what the actual relevance is.

14     They have given us what they represent is Rule 16 material

15   that's relevant to the defense.  We are now the defense and

16   we're looking at all the material they've given us.

17         THE COURT:  All right.  But some of that material is

18   not new to you --

19         MR. LAURO:  It is new to me, Your Honor.

20         THE COURT:  Whether or not you're looking at it through

21   the eyes of a criminal defense lawyer, certainly it was

22   reviewed by Mr. Trump's counsel before, before this case came

23   in.

24         MR. LAURO:  Who were not criminal defense lawyers.  How

25   is that new to me, Your Honor?  I just have to work through --

1          THE COURT:  In other words, this is not brand-new

2     information.  Some of it are statements, some of it are

3     materials of your client's own creation.  In other words, none

4     of this -- you're not seeing this for the -- you personally

5     may be, this may be new to you, but this is material that has

6     been reviewed, at least for privilege -- some of this material

7     are statements of your client and materials created by your

8     client or entities associated with him.  Why -- that's not

9     brand-new information, is it?

10          MR. LAURO:  Of course it is.  Of course.  To a criminal

11     defense lawyer, it's brand-new information.  That's like

12     saying if a CEO of a public company was before Your Honor and

13     had responsibility for running a company, oh, they've seen all

14     the information that the company has, why do they need time to

15     prepare?  They've already had it for years.

16          THE COURT:  No, that's a different point.  Because it's

17     information from the company doesn't mean that the defendant

18     had seen it.  But a lot of this material is material your

19     client created or material that your client's lawyers, maybe

20     not you specifically, saw and reviewed and had possession of

21     before this case.

22          MR. LAURO:  Your Honor, the statements of my client are

23     minuscule compared to the avalanche of information here.

24     Minuscule.  And by the way, I need to look at all the

25     statements, Mr. Blanche needs to look at all the statements

1    as a criminal defense lawyer, not from a client's perspective.

2    That's the teaching of *Gideon*.  It would be a miscarriage of

3    justice if a lawyer were expected to absorb all the

4    information that a client already knew and not look at it anew

5    and not look at it from the perspective of a criminal defense?

6         THE COURT:  Absolutely.  And certainly you have to look

7    at your client's statements, you have to look at -- there's a

8    lot that you may personally have to eyeball.  But you don't

9    need to look at -- you personally, at least at the first cut,

10   are not going to review all 12 million pages, right?  Some of

11   those documents are going to be reviewed electronically.  Am I

12   correct?

13        MR. LAURO:  No documents get reviewed electronically.

14   They get assembled electronically, and we can do searches for

15   documents, but, Your Honor, all I can tell you is I've worked

16   these large cases.  Maybe -- I don't know what the prosecution

17   has done in a former life, but these cases are enormously

18   complex and they go something like this.  As you know,

19   Your Honor, I'm not telling you anything; you've been through

20   it.  You have to do searches, maybe with key terms.

21        THE COURT:  Right.

22        MR. LAURO:  You have to organize those documents

23   typically by witnesses and issues.  You have to cross-

24   reference them with respect to what other people say and

25   what other people have mentioned.  Then you have to organize

1    a narrative.  I like to do witness outlines.  Some lawyers are

2    different.  I like to be prepared for trial.  I have an

3    obligation to a client.

4        Then, in addition, you have to look for evidence that

5    corroborates witnesses that are favorable to you.  You have

6    to look for impeachment evidence with respect to witnesses

7    that say something bad about you.

8        In this case we have not only documents we're searching

9    for, we have videos and recordings that can't be searched

10   electronically.

11           THE COURT:  But you have --

12           MR. LAURO:  This is a massive undertaking.

13           THE COURT:  But you have the transcripts of those

14   recordings.

15           MR. LAURO:  I don't think in all respects we do, and

16   not certainly with respect to every single video I don't think

17   we do.  This is over 12 million pages, 9 terabytes of

18   information.  This is an overwhelming task.  Never in the

19   history of the United States have we seen a case of this

20   magnitude go to trial in four months, let alone a year, let

21   alone less than two years.

22       If we were big corporations in America, where the only

23   thing was money at stake, no one would blink an eye at a

24   two-and-a-half or three-year trial schedule.  But this man's

25   liberty and life is at stake and he deserves an adequate

1    representation, as every American does.  He's no different

2    than any American.

3         THE COURT:  Mr. Lauro.

4         MR. LAURO:  I'm sorry, Your Honor.  For a defense

5    lawyer to hear these arguments from a prosecutor who took an

6    oath to do justice, I'm sorry, it has to be spoken.  Every

7    single person in this courtroom, every single person in the

8    United States deserves a fair and adequate defense.

9         And I'm telling you, as an experienced trial lawyer, an

10   experienced defense lawyer, we cannot do this in the time

11   frame that the government has outlined, and we cannot do this

12   in the time frame that would be suggested by anything less

13   than what we have.  We need this time to prepare.

14        THE COURT:  I understand, Mr. Lauro, but I can tell

15   you, you are not going to get two more years.  This case is

16   not going to trial in 2026.  It's not going to trial in --

17        MR. LAURO:  Your Honor, I can only give you my best

18   estimate based on the fact that, you know, we're looking at

19   this discovery right now.  We just got a discovery at three

20   o'clock in the morning today.

21        THE COURT:  I understand.  But Mr. Lauro, for one

22   thing -- okay.  You suggest that the defense needs a

23   substantial amount of time to investigate, for example.

24   The existence of the grand jury investigating in this case has

25   been known for -- since September 2022, almost a year, has been

1        public knowledge.  The identity of many of the witnesses who

2        have testified in the grand jury, and potential trial witnesses,

3        have been a matter of public record.  And given that Mr. Trump

4        likely knows most of the witnesses the government -- or many of

5        the witnesses the government would call, several of whom,

6        according to at least page 7 of the indictment, may be staff and

7        associates.  So why would the defense need two years to

8        investigate?

9              MR. LAURO:  Because there's no obligation for any

10       American citizen to start conducting their own defense during

11       a grand jury investigation and prepare for a trial when we

12       don't even know what the issues are, what the charges are.

13             THE COURT:  There may not be an obligation, but

14       certainly a defense attorney, a good defense attorney, knowing

15       that their client was under investigation by a grand jury,

16       knowing who the witnesses -- some of the witnesses were in the

17       grand jury, would already start.  Right?  Isn't that what a

18       good defense attorney would do?

19             MR. LAURO:  Your Honor, I was not hired during that

20       period of time.  The government never communicated, as far as

21       I know, to President Trump's counsel regarding the theories of

22       investigation, the matters under investigation, the statutes

23       at issue, the witnesses.  None of that was ever provided.

24       They could have done that.  They could have said, yes, here's

25       what we're doing --

1          THE COURT:  I'm not sure if they could commensurate

2     with --

3          MR. LAURO:  -- the fact that they didn't puts us at a

4     disadvantage because how can we go into a dark room and figure

5     out what they are investigating?  That would be absurd.  We

6     can't be charged and hindered because we didn't do an

7     investigation during the grand jury period when they wouldn't

8     tell us what that investigation was about.

9        I mean, this case, Your Honor, looking at it from a defense

10    lawyer's perspective, is an enormous, an enormous factual

11    issue.  We haven't even talked about the novel issues of law

12    we're going --

13         THE COURT:  I'm coming to those.

14         MR. LAURO:  -- to have to address.  And I know you're

15    going to get to that.  But this is an enormous, overwhelming

16    task.  We have two law firms, two small law firms here working

17    around the clock, and you see how diligent we are in

18    responding to Your Honor.  Whenever anything is asked, we

19    respond right away.  Even if the rules are shortened for

20    President Trump, we're making sure we're responding

21    immediately, we're doing everything that a diligent defense

22    lawyer can do.

23       But Mr. Trump is entitled, entitled to a defense that's

24    reasonably prepared.  It would be a miscarriage of justice if

25    that truth is not sustained in this court, and every single

1    court.  Whether it's Mr. Trump or anyone else deserves that

2    kind of defense.

3            THE COURT:  And they're going to get it.  The point I'm

4    asking you is about the review necessary for this case.  And

5    Mr. Lauro, I'm well acquainted with *Gideon*.  I'm well

6    acquainted with the defendant's Sixth Amendment rights, his

7    right to a fair trial, and I intend to ensure he gets it.  But

8    I'm not going to give -- as I said, this trial is not -- this

9    case isn't going to trial in 2026.

10        And I want to know, despite the rhetoric in your response

11    to the government's proposed trial date, realistically, why

12    you think that you need this time when, although there are 12

13    million pages of discovery, you and I both know and the

14    government knows that that's not -- again, nobody's sitting

15    there going through page by page.  A significant amount of

16    this discovery is duplicative.  A significant amount of it you

17    already have in your possession or know about.  And whether or

18    not you, the defense lawyer, are seeing it for the first time,

19    Mr. Trump has been ably represented by experienced counsel

20    during the whole pendency of this investigation.

21        This is not -- you know, it's not an unveiling -- a

22    surprise he's been indicted.  You've known this was coming.

23    Mr. Trump's counsel has known this was coming for some time.

24    And I'm sure any able, diligent, zealous defense counsel would

25    not have been sitting on their hands waiting for an

1    indictment.  Certainly -- yes, an indictment signifies the

2    beginning of a case, and you're looking at the indictment and

3    you're looking at what you need to prepare.  But a lot of this

4    material was in the hands of Mr. Trump and his counsel for a

5    significant period of time before the grand jury was convened.

6    And that's what I'm asking you about.

7         You can keep talking about 12 million pages and his right

8    to a fair trial.  He has a right to a fair trial, but what is

9    a fair amount of time to prepare?  And the 12 million pages we

10   talk about here are not truly indicative of how much time he

11   needs to prepare because a lot of that is simply a belt and

12   suspenders approach by the government, for example, in

13   releasing duplicative documents, exhibits that were referred

14   to in witness testimony and grand jury testimony that are also

15   disclosed to you in production.

16        So a lot of this is duplicative, a lot of this may not even

17   be relevant, and I realize there has to be some searches to

18   categorize that, but that does not, in this court's estimation,

19   need to take two years.

20        All right.  Let me ask you this --

21             MR. LAURO:  Your Honor, may I respond to that?

22             THE COURT:  Yes.

23             MR. LAURO:  And respectfully, what I'm saying is not

24   rhetoric, it's in defense of the Constitution and my client

25   and with respect to trying to explain to Your Honor what's

1    necessary to defend somebody under these circumstances.

2         I doubt, I doubt that -- you can't push a button these days

3    and get documents sorted.  You have to go through those

4    documents.  No person who is charged with a crime should be in

5    some way disadvantaged because they didn't do or anticipated

6    what that crime would be in connection with a grand jury

7    proceeding, and they didn't do or whether or not they did do

8    any kind of research or examination or defense prior to the

9    charge.

10        We start at the time of the charge.  It would be highly

11   prejudicial if Your Honor took into account any time before

12   the charge was entered and suggest that the defense had some

13   obligation to conduct investigation prior to the time the

14   charges were brought.

15        THE COURT:  I'm not suggesting you had an obligation.

16   I'm simply suggesting you had an opportunity.

17        MR. LAURO:  I didn't.  I was hired, you know, a month

18   and a half ago, Your Honor, and I'm going to be trial counsel

19   along with Mr. Blanche.  Not only do we have to review this

20   material, we have to absorb it.  You know what it's like as a

21   trial lawyer.  Sure, you know, a firm can help, paralegals can

22   help, they can read documents, they can look at documents.

23   But at the end of the day, Your Honor, we stand before the

24   jury and we have to make our case before a jury.  We have to

25   know the facts.  Mr. Blanche and I have to absorb a gargantuan

1    amount of facts in this case in order to adequately represent

2    a client.

3        Cross-examining a witness is not an easy task.  You have to

4    make sure that you understand all the documents that might be

5    related.  This is a question of whether or not -- and I'm

6    pleading with Your Honor as an experienced defense lawyer,

7    having done this over 40 years -- this is a question of

8    whether or not one man, one United States citizen, gets a fair

9    trial or not.  And I am telling you, Your Honor, based on what

10   I've seen so far, it is a gargantuan task.

11       I understand we have modern search tools.  Years ago maybe

12   there would be 50 boxes, right, in a room, and we'd look

13   through the boxes one by one.  Now there's 12 million pages.

14   Sure, we sort them in some way by computerized searches, but

15   at the end of the day I have to read the grand jury

16   transcripts, I have to read the FBI 302s, I have to go through

17   all of the text messages.

18       THE COURT:  That's a much smaller universe of

19   documents, Mr. Lauro.

20       MR. LAURO:  I don't think so, Your Honor.

21       THE COURT:  You and I both know that.

22       MR. LAURO:  250 witnesses in this case, and counting,

23   that might be witnesses in this case so far is the estimate we

24   have.  And that's to say nothing of our opportunity to file

25   and seek Rule 17 subpoenas, to do our own witness interviews,

1    to conduct our own investigation.  All of that will be

2    eviscerated.  All of that will be eviscerated.

3        And if the goal here is to truly do justice, truly do

4    justice, then every American citizen is entitled to counsel

5    with a reasonable time to prepare.  No one, no one, is

6    suggesting that we're not being diligent.  No one is

7    suggesting that we're not taking these obligations seriously,

8    because we are, Your Honor.  We have an enormous

9    responsibility here, not just to one client but to the system,

10   and to ensure that the system works for every American.

11       Mr. Trump is not above the law but he's not below the law.

12   He should not be treated any differently than any other person

13   who appears before Your Honor and asks and pleads for justice.

14   And I am saying, without question, that we cannot be ready

15   under the circumstances of this case until we have a

16   reasonable amount of time, consistent with justice, so we can

17   prepare and we can also present.

18       Your Honor, candidly, the jury is entitled to an organized

19   defense.  The jury is entitled to a presentation that makes

20   sense, a defense narrative that shows that counsel is

21   prepared.  The worst thing for a jury to see is a lawyer that

22   gets up there are starts asking questions, they don't even

23   know what they're talking about because they haven't been

24   prepared.  And we've been there, we've seen that, and none of

25   us here in this courtroom would do that, and I'm certainly

1    not.

2         THE COURT:  Thank you, Mr. Lauro.  And I will say that

3    I don't doubt for a minute that you're working diligently, but

4    I will say that you and I have a very, very different estimate

5    of the time that's needed to prepare for this case.  But as

6    you have mentioned several times, Mr. Trump will be treated

7    exactly, with no more or less deference, than any other

8    defendant would be treated.

9         All right.  With regard to the complexity of the case, the

10   defense says this is a complicated, unusual case that might

11   require the Court to address novel questions of fact or law,

12   but you don't explicitly state what those novel questions are.

13   I mean, some of the January 6 cases, all of which have been

14   brought in this court, have involved conspiracies related to

15   the Electoral Count Act.

16        Now, a former president being charged for crimes while in

17   office, or the prosecution of a presidential candidate may be

18   points of historic note about this case, but they aren't legal

19   issues.  This case involves one defendant and four counts.

20   The charges are not multijurisdictional.  The alleged conduct

21   occurred over the period of a few months.  Why is this case

22   complex, other than the historic aspect of it?

23        MR. LAURO:  We've outlined the factual complexity to

24   some extent.  The legal complexity, number one, is we have a

25   very initial issue of executive immunity which we're going to

1    raise with the Court likely this week or early next week,

2    which is a very complex and sophisticated motion regarding

3    whether or not this court would even have jurisdiction over

4    this case in light of the fact that, as the indictment

5    essentially indicts President Trump for being President Trump

6    and faithfully executing the laws and executing on his take

7    care obligations, so we're going to have a very, very unique

8    and extensive motion that deals with executive immunity.

9        We also anticipate a selective prosecution motion, given

10   the fact that this prosecution provides an advantage to these

11   prosecutors' boss, who is running a political campaign against

12   President Trump, which everybody knows about, and this

13   selective prosecution motion will go directly to the core of

14   criticisms that Mr. Trump made historically against President

15   Biden and his son and whether or not this is a retaliatory

16   action as a result of that.  So we expect that there's going

17   to be a selective prosecution motion as well.

18       We also have core First Amendment issues that are going to

19   be litigated in this case.  We also have a number of Rule 17

20   subpoenas that we anticipate serving.  There might be some

21   litigation about that.

22       So there's going to be an enormity of unique legal issues.

23   None of these have been decided yet.  To say nothing of the

24   core question of whether or not 18 U.S.C. 371 should be used

25   in a political context.  That's going to be a novel issue

1    because historically it's not been used against a political

2    opponent.  This is the first time where the Biden

3    administration has used that statute against a political

4    opponent.  We're going to be dealing with whether or not the

5    obstruction statute should be applied under the circumstances

6    of this case.

7        So all of those are novel issues, Your Honor, and I will

8    say that this court -- I know Your Honor is going to look at

9    all those issues seriously, but they're going to be briefed

10   completely and fully by the defense.  And not only are we

11   going to be dealing with a host of very significant factual

12   issues, but I'm afraid, Your Honor, we're going to be back

13   many, many times arguing some of these complex motions.  And

14   I --

15           THE COURT:  Can't wait.

16           MR. LAURO:  I see you smiling, Your Honor, that you're

17   looking to enjoy these novel issues, but they've never been

18   decided.  And certainly the question of executive immunity is

19   a very important one.  It's not been decided in the criminal

20   context by the Supreme Court.  It has with respect to civil

21   litigation, but everything in the indictment, it's a speaking

22   indictment, 45 pages of essentially a prosecutorial theory.

23       All of that really embraces executive action or items

24   within the penumbra of executive action, within the outer

25   perimeter, as the legal definition is, of what President Trump

1    was required to do as president.  That's going to present an

2    incredibly important *ab initio* legal issue for Your Honor to

3    decide.

4        So we're going to be busy with very, very complex, novel

5    issues without question in this case.  This is one of the most

6    unique cases from a legal perspective ever brought in the

7    history of the United States.  Ever.  And we're going to have

8    to deal with those issues.  And we will.

9        But we're already starting that at the same time that we

10   have this massive factual investigation under way.  So it's a

11   dual issue.  And that's why I'm so adamant about the time to

12   prepare.  It's not just looking through 18 million pages of

13   documents, it's also looking through legal theories and legal

14   issues that will be presented, and some of these have never

15   touched a court before, and Your Honor's time and effort are

16   going to have to be devoted to that as well.

17       So all of this presents a clear reason to handle this as if

18   President Trump were any other person coming before Your Honor

19   and needing the time necessary to prepare adequately both on

20   the legal side and on the factual side.

21           THE COURT:  All right.

22       Ms. Gaston.  Could you respond to Mr. Lauro's discussion

23   of the time needed to review the documents in this case.

24           MS. GASTON:  Yes, Your Honor.  I think there is a

25   reason why Mr. Lauro resisted answering your specific question

1    about what the exact time would be needed to review the

2    materials in this case, and it's because he doesn't want to

3    admit that through electronic searches and through the

4    reasonable due diligence used in modern criminal trials, it

5    is possible to be ready much sooner than April of 2026.

6        Let me first address a few of Mr. Lauro's points that

7    suggest that the defense is starting fresh at indictment.

8    So, first, in advance of indictment in this case, the Select

9    Committee made public a large amount of the evidence in this

10   case, and the defendant himself published video and written

11   defenses in response, which demonstrate that the defendant was

12   observing the Select Committee's investigation and work, and

13   defending himself against it.

14       In fact, in an interview the night the indictment was

15   unsealed in this case, Mr. Lauro called the indictment "a

16   regurgitation of the J6 committee report."

17       In terms of pre-indictment litigation, the government and the

18   defendant engaged in extensive pre-indictment litigation

19   regarding executive privilege.  It took place in five sealed

20   proceedings starting in August 2022 and lasting through March of

21   2023.  And it concerned the scope of grand jury testimony for 14

22   witnesses.  And I'll just note that we asked for and received

23   permission from the chief judge to provide that information to

24   you today.

25       In terms of witnesses, a number of people on our potential

1    witness list are not a surprise to the defense either.  The

2    defendant's political action committee paid attorneys' fees for

3    more than a dozen witnesses during the course of our

4    investigation.  And since indictment, Mr. Lauro has a team of

5    experienced attorneys working for him.  There are four counsel

6    of record, two additional attorneys who attended the

7    arraignment, one of whom was intimately involved in the

8    pre-indictment litigation that I just mentioned, another at the

9    last hearing.

10       And when Mr. Lauro appeared on multiple news programs and

11    podcasts following the indictment, he described a number of the

12    defenses he plans to raise, motions he plans to file, and he

13    stated that he had read Vice President Pence's book twice and

14    was already planning his cross-examination.

15       Just a week or so ago, the defendant claimed publicly to have

16    created a robust report on the stolen presidential election of

17    2020 that contained irrefutable and overwhelming evidence of

18    election fraud that his attorneys would use in service of a

19    motion to dismiss.  We are not starting fresh at indictment in

20    this case.

21       Other things that Mr. Lauro mentioned are not a reason not to

22    proceed promptly to trial.  With respect to Rule 17 subpoenas,

23    as the Court knows, those are not intended as a discovery tool,

24    and the defense has to meet exacting standards of relevancy,

25    admissibility, and specificity.  And the best way to find out if

1    the defense can meet those standards is to set a schedule based

2    off of a trial date and move forward with them.

3        The same goes, Your Honor, with respect to the complexity

4    that Mr. Lauro just mentioned.  So, first of all, Mr. Lauro

5    mentioned that they are prepared to file a motion regarding

6    executive immunity this week.  Let's have that motion.  The

7    government will respond to that motion and the Court can

8    consider it.  But let's set a trial date and set a schedule.

9        Other things that Mr. Lauro mentioned are not novel

10   questions.  Selective prosecution motions are common in this

11   district.  I'm sure that Your Honor receives them all the time.

12   Similarly, Rule 17 subpoenas, there's a lot of case law on

13   those.  And First Amendment issues in the context of fraud is

14   not a new legal issue and that won't be complex either.  And

15   §371 has been challenged in a number of ways in the course of

16   more than a decade, and that is not a complex legal issue

17   either.

18       But I think the thing that all of this shows is the

19   importance of setting a trial date and working backwards with a

20   schedule.  I think all of us, Your Honor, Mr. Lauro, we know

21   that a trial date really sort of focuses the mind and enables

22   everybody to work towards a common date.

23       And so the question before the Court today is, under the

24   Speedy Trial Act, what is the balance of the defendant's right

25   and need to prepare for a fair trial and, on the other hand,

1  the public's exceedingly and unprecedentedly strong interest in
2  a speedy trial here.  The defendant, formerly the senior-most
3  official in our federal government, is accused of historic
4  crimes: attempting to overturn the presidential election,
5  disenfranchise millions of Americans, and obstruct the peaceful
6  transfer of power.

7  There is an incredibly strong public interest in a jury's
8  prompt and full consideration of those claims in open court.
9  And there's also a strong public interest in a fair trial, which
10  means that we need to proceed to trial as soon as the defense
11  can be ready, reasonably, because on a near daily basis the
12  defendant posts on social media about this case.  He has
13  publicly disparaged witnesses, he has attacked the integrity of
14  the courts and of the citizens of the District of Columbia who
15  make up our jury pool, and this potentially prejudices the jury
16  pool.

17  So under the Speedy Trial Act, Your Honor, we need to find a
18  time for trial when -- as soon as the defense can reasonably be
19  ready.  The government's trial date estimate was an estimate of
20  when, based on our knowledge of the discovery, the public nature
21  of the evidence in this case, the pre-indictment litigation,
22  Mr. Lauro's experience and ability to prepare, and the
23  organization of the discovery, that was our estimate.  But the
24  government urges the Court to set the soonest possible trial
25  date when the Court believes that the defense can reasonably

1    be ready.

2            THE COURT:  Okay.  Thank you.

3        So I'm going to digress for a moment and talk about CIPA.

4    The parties agreed to hold a conference today on the

5    Classified Information Procedures Act, CIPA, to discuss the

6    small amount of classified information that may be subject to

7    discovery in this case.  Because such procedures might affect

8    the trial date and the parties' readiness, I think it might

9    make sense to discuss CIPA now, or we can wait till the end of

10   the hearing.  What's your preference?  Mr. Windom?

11           MR. WINDOM:  I think now makes sense, Your Honor.

12           THE COURT:  Mr. Lauro?

13           MR. LAURO:  Yes, Your Honor.  Mr. Blanche will take

14   care of that.

15           THE COURT:  All right.

16       So, as I understand it, CIPA does not create any additional

17   rights to discovery or disclosure but rather establishes

18   procedures for how and when certain procedures relating to

19   classified information will be handled during the discovery

20   process and the lead-up to trial.

21       The government filed a consent motion in what may be our

22   last joint unopposed filing -- such a nice beginning to the

23   case.  The government filed a consent motion to appoint a

24   classified information security officer pursuant to CIPA

25   Section 2, which was ECF No. 33, and an unopposed motion for a

1  protective order regarding classified materials pursuant to

2  CIPA Section 3, which was ECF No. 35.  I granted both motions

3  on August 22 and entered a sealed order designating the

4  classified information security officer, and that was ECF Nos.

5  36 and 37.

6      Now, CIPA Section 4 provides that the Court upon a

7  sufficient showing may authorize the United States to delete

8  specified items of classified information from documents to

9  be made available to the defendant through discovery under the

10  Federal Rules of Criminal Procedure, to substitute a summary

11  of the information for such classified documents, or to

12  substitute a statement admitting the relevant facts that

13  classified information would tend to prove.

14      Pursuant to the discovery process under Section 4, there

15  are three steps governing the handling of classified

16  information under Sections 5 and 6 of CIPA.

17      First, under Section 5, the defense must file a pretrial

18  notice precisely identifying the classified information they

19  want to use at trial; second, upon motion of the government,

20  the Court shall hold a hearing pursuant to Section 6(a) to

21  determine the use, relevance, and admissibility of the

22  proposed evidence; and third, following the Section 6(a)

23  hearing and formal findings of admissibility by the Court, the

24  government may move to substitute redacted versions of

25  classified documents for the originals or to prepare an

1      admission of certain relevant facts or summaries for

2      classified information that the Court has ruled admissible.

3          So, Mr. Windom, are you handling this?

4              MR. WINDOM:  Yes, Your Honor.

5              THE COURT:  The government has noted that it does not

6      anticipate introducing classified documents in its

7      case-in-chief.  Is this still the case?

8              MR. WINDOM:  Yes, ma'am.

9              THE COURT:  I realize this is dependent on the trial

10     date, but does the government have an estimated schedule for

11     producing classified information to the defense and/or moving

12     for deletion or substitution under Section 4?

13             MR. WINDOM:  Yes, ma'am.

14             THE COURT:  How much material are we talking about

15     here?

16             MR. WINDOM:  Sure.  So top line, whatever happens with

17     CIPA we don't anticipate will affect any trial date Your Honor

18     sets, whatever the date may be.

19         There are two things to talk about here.  First, there

20     is the limited amount of classified information that the

21     government is going to make available to the defense.  And

22     second is the CIPA Section 4 process.

23         With respect to the information that is going to be made

24     available to the defense, the universe of what we're talking

25     about is five to ten nonduplicative classified documents

1    totaling less than a hundred pages of material.  Those are the

2    documents.

3        There's also a transcript.  The transcript will be about

4    125 pages long.  It's a transcript of a witness interview.  We

5    have already provided the relevant part of the transcript in a

6    nonclassified form.  In fairness, we are going to provide the

7    rest of the transcript as well.  That is in classification

8    review.  That will be provided to the defense as well.

9        So in total, between the documents and the transcript,

10   we're talking about 225, 250 pages total.

11           THE COURT:  Okay.

12           MR. WINDOM:  This is information that the defense can

13   review as soon as it gets its final security clearance.

14   Mr. Blanche currently has an interim top secret clearance.  He

15   is allowed to review only a small part of the material at this

16   point.  We anticipate Mr. Blanche may have a better

17   understanding of when he'll get his final security clearance,

18   but we anticipate that will be fairly soon.  Within the next

19   few weeks is our best estimate.  That's not something we

20   control.

21       As I said at the beginning, we do not anticipate introducing

22   classified information in our case-in-chief.  To the extent

23   that the defense reviews the material and wants to give notice

24   under CIPA Section 5 that they intend to use the material,

25   first of all, based on my knowledge and information, I don't

1    think they will do that.  If they do do that, we would

2    recommend a date for that CIPA 5 notice, a deadline for the

3    CIPA 5 notice of 30 days after Mr. Blanche gets his final

4    security clearance.  That would give him time to review the

5    material.

6         Mr. Lauro, my understanding, he does not have a security

7    clearance at this point, but there are ways -- to the extent

8    that Mr. Blanche needs to discuss the material with Mr. Lauro,

9    the government believes that there are ways to do that either

10   in a unclassified form or in a classified form available to

11   Mr. Lauro should he get an interim security clearance, which

12   is a much faster process than a final security clearance.

13        If the defense does move under Section 5 of CIPA, which

14   again we recommend 30 days after Mr. Blanche gets his final

15   clearance, the government would then be in a position to move

16   very quickly for a CIPA 6 hearing.

17           THE COURT:  I was going to ask you, how long do you

18   estimate you'd need for the Section 6(a) hearing?

19           MR. WINDOM:  I'll say top line two weeks to make the

20   motion.  It's somewhat dependent on which documents, if any,

21   which would then implicate which equity holders would be

22   involved that the defense wants notice.  That said, there's a

23   universe in which the government doesn't move for a CIPA 6

24   hearing.

25           THE COURT:  You said does not?

1          MR. WINDOM:  Correct.  There's a universe in which that

2     happens, in which the government does not move for a CIPA 6

3     hearing.

4          THE COURT:  Okay.

5          MR. WINDOM:  But I think, in fairness, you can set a

6     date two weeks after the CIPA 5 notice deadline for the

7     government to move under CIPA 6.

8          THE COURT:  And I assume that after the 6(a) hearing,

9     if there is one, the government will not need much time -- or

10    how much time will the government need to prepare redacted

11    versions?  Substitute redacted versions.

12         MR. WINDOM:  Sure.  Again, with the variable that it's

13    highly dependent on what the document is, we believe that that

14    can be accomplished very quickly, in a matter of weeks, and I

15    think it's fine if you want to put a two-week deadline on that

16    given the nature of the documents.

17         THE COURT:  All right.

18         MR. WINDOM:  That's with respect -- so that's the first

19    bucket of the information that the defense will be getting in

20    classified discovery.  CIPA 4 is separate.  The government

21    anticipates filing a motion under CIPA Section 4 which we will

22    request that the Court hear on an ex parte basis.  It involves

23    a limited amount of information for the Court to review on a

24    discrete issue.  And we anticipate, if Your Honor would like

25    to set a deadline for that, September 25, which is four weeks

1    away, is more than enough time.  If you want it to be sooner,

2    that will be --

3              THE COURT:  September 25 is fine.

4              MR. WINDOM:  Thank you, Your Honor.  And thereafter,

5    once we file that, then Your Honor can consider that in

6    whatever due course Your Honor believes appropriate.

7              THE COURT:  All right.  Mr. Blanche.  Good morning.

8              MR. BLANCHE:  Good morning, Your Honor.

9              THE COURT:  All right.  I realize, again, this is

10   dependent on the trial date.  But does the defense have an

11   estimated time -- obviously, you don't have your final

12   clearance yet, so it would depend on that -- by which it plans

13   to file its notice identifying the classified information it

14   plans to use?

15             MR. BLANCHE:  So, Your Honor, just as far as my

16   security clearance is concerned and also my counsel who is

17   here today, the process is ongoing, and I do not believe that

18   there's a lot of time left in the process, but it's completely

19   out of my control.

20      In the case in the Southern District of Florida, there's

21   a tremendous amount of key events in September and October

22   around the CIPA discovery in that case.  So I anticipate

23   spending a fair amount of time between whenever I get a

24   security clearance and into October with the CIPA discovery in

25   that case.  My understanding from the government is that the

1        number of documents in this case is small.

2               THE COURT:  It's relatively small.

3               MR. BLANCHE:  The issue I have is -- about when we will

4        make Section 5 motions, if we make Section 5 motions at all,

5        is I would certainly have to speak about that with my counsel

6        who I don't believe has even interim clearance yet.

7               THE COURT:  Well, remember, at least according to

8        Mr. Windom, the government isn't even planning on using any

9        classified documents in its case-in-chief.  So this would sort

10       of be dependent on whether you wanted to introduce that

11       information.

12               MR. BLANCHE:  And even beyond that, there's other

13       potential litigation -- beyond just whether the government

14       chooses to use anything in their case-in-chief, there's

15       litigation that the defense can initiate under CIPA depending

16       on what the documents show, whether it's requests for

17       additional documents or for the government to do additional

18       searches for additional documents.  I don't know.  There may

19       not be any of that litigation, but I won't know that until I

20       review the documents.

21          So the only contention or issue I have with the schedule

22       proposed by the government is I think the triggering date for

23       a Section 5 filing should be 30 days after co-counsel gets

24       security clearance, not me.

25               THE COURT:  But why does that have anything to do with

1    you?  It's an ex parte filing they're proposing giving to me

2    by September 25.  Are we talking about the same thing?

3              MR. BLANCHE:  No, that's Section 4.

4              THE COURT:  Okay.

5              MR. BLANCHE:  That's the government, and that's fine.

6    The proposed date by the government for our motions was 30

7    days after --

8              THE COURT:  That's based on their proposed trial date,

9    though.  Right?

10             MR. BLANCHE:  I don't know what it's based on.  It's

11   just what they suggested.  My request would be that any

12   motions we need to file under CIPA, to the extent it's

13   triggered, it's triggered off of the date that Mr. Lauro and

14   his team receive security clearances.  It's not supposed to

15   take that long.  For example, I believe I started the process

16   in the Southern District of Florida about 45 days ago, and so

17   it's nearly complete.  My understanding, not from anybody

18   sitting at this table --

19             THE COURT:  Excuse me.  When did you get your interim

20   clearance?

21             MR. BLANCHE:  Oh, that's within a day or two.  It's

22   very quick.  However, Your Honor, my understanding is there's

23   not -- well, I don't want to speak to the documents.  But my

24   understanding is that the special counsel's office was able to

25   accelerate the process in the Florida case, and I'm assuming

1   they can do the same here.

2        THE COURT:  Oh, I'm sure they will try.

3        MR. BLANCHE:  They apparently have the ability.  So I

4   would just respectfully request, Your Honor -- I can certainly

5   look at the documents as soon as I have clearance, and I

6   appreciate the government making them available as soon as I

7   do have clearance, but that doesn't help my strategy and

8   whether we need to file Section 5 motions without counsel

9   being able to look at them.

10       So that would be my only adjustment.  The other proposed

11  dates for the Section 4 filing, I don't have an objection to

12  that.

13       THE COURT:  Okay.  Thank you.

14       All right.  Mr. Lauro, you've already touched on -- do

15  you want to respond, Mr. Windom?

16       MR. WINDOM:  Just briefly, Your Honor.

17       THE COURT:  Yes.

18       MR. WINDOM:  What I would propose is that the Court

19  keep that deadline for the CIPA 5 notice of 30 days after

20  Mr. Blanche gets his final clearance.  Based on what I believe

21  to be able to happen, if Mr. Blanche is able to review that

22  material, he may be able to make determinations on his own

23  with respect to notice, or he may be able to actually speak to

24  Mr. Lauro with an interim clearance regarding the nature of

25  the documents such that they can make a determination soon.

1    What I don't want to happen is for us to key things off of

2    a date which we cannot know as to when Mr. Lauro will get a

3    final clearance.  Maybe we're lucky, maybe that's only two

4    months, but then we're talking about three months from now is

5    when a CIPA 5 notice would be filed.

6         THE COURT:  I'm inclined to keep the schedule, and if

7    there's a delay in the clearance process, I'll adjust it on

8    motion of the parties.

9         MR. WINDOM:  Thank you, Your Honor.

10        THE COURT:  Now, motions schedule.  Mr. Lauro, you've

11   already talked about some of the motions you might file.  And

12   again, I won't hold you to this, but can you give me a sense

13   of what if any dispositive motions or motions requiring

14   significant briefing you intend to file?  You've mentioned the

15   executive immunity, you've mentioned selective prosecution.

16   What else are we talking about here?

17        MR. LAURO:  Thank you, Your Honor.  We'll have motions

18   addressed to each conspiracy that's alleged in the indictment

19   as well.

20        THE COURT:  What kind of motions are you talking about?

21        MR. LAURO:  Motions to dismiss based on the flawed

22   legal theory, and the fact that in our view this is a

23   political prosecution.  And as a result we're going to have to

24   raise that issue squarely with Your Honor and do it justice.

25   So we anticipate those motions to be filed.

 1          My understanding is that the selective prosecution motion

 2     may involve a request for an evidentiary hearing as well, and

 3     I anticipate that the executive immunity argument will also

 4     come with a motion to stay as well which we may be entitled to

 5     under existing law.

 6          So all of those are motions that we anticipate filing as

 7     quickly as possible.  Needless to say, it's a significant

 8     task.  We want to make sure we get all the issues before Your

 9     Honor in a way that does justice to these important motions.

10          THE COURT:  All right.  Thank you.

11          Ms. Gaston, I'm assuming there may be in limine motions

12     from both sides, but does the government plan on filing any

13     other motions that will require a significant briefing

14     schedule?

15          MS. GASTON:  No, Your Honor.  We're thinking in limine

16     motions and then depending on Rule 17 subpoenas and such,

17     responding.

18          THE COURT:  All right.  I am going to take a very brief

19     recess, a few minutes, five or 10 minutes, and we'll reconvene

20     for the trial date.

21          (Recess from 11:14 a.m. to 11:20 a.m.)

22          THE COURT:  All right.  I understand all too well

23     the need for counsel to have enough time to investigate and

24     prepare for trial.  That need is even more compelling in a

25     case such as this where the defendant faces serious charges

1  carrying significant penalties, and where the government has

2  had ample time and resources to investigate and bring these

3  charges.

4      I take seriously the defense's request that Mr. Trump be

5  treated like any other defendant appearing before this court,

6  and I intend to do so.  But I also want to point out that most

7  defendants do not receive this level of assembled, organized

8  and summarized discovery, as well as other concessions made

9  because of the historic nature of the case.

10      Nonetheless, the government's requested date of January 2,

11  2024, does not in my opinion give the defense enough time to

12  get ready for trial.  Even with the considerable resources at

13  his disposal, Mr. Trump, who faces trial in several other

14  matters, needs more than five months to prepare.

15      On the other hand, the defense's proposed date of April

16  2026 is far beyond what is necessary.  The offense giving rise

17  to this case occurred at the end of 2020 and the beginning of

18  2021.  To propose trying this case over five years later risks

19  the real danger that witnesses may become unavailable or their

20  memories may fade.  And while Mr. Trump has a right to time to

21  prepare, the public has a right to a prompt and efficient

22  resolution of this matter.

23      The defense cites to *Powell v. State of Alabama*, 287 U.S.

24  45 at 49, for the proposition that while prompt disposition of

25  criminal cases is to be commended and encouraged, a defendant

1    charged with a serious crime must not be stripped of his right

2    to have sufficient time to advise with counsel and prepare his

3    defense.

4        Quoting the case, the defense argues that scheduling a too

5    speedy trial is not to proceed promptly in the calm spirit of

6    regulated justice but to go forward with the haste of the mob.

7    In that landmark decision in *Powell*, which is also known as

8    the Scottsboro Boys case, the Supreme Court reversed the

9    convictions of several young black men for allegedly raping

10   two white women.

11       The court noted that after their arrest the defendants

12   were met at Scottsboro by a large crowd and that the attitude

13   of the community was one of great hostility.  That's at 51.

14   The defendants' trials began six days after indictment.  The

15   Supreme Court found that there was a clear denial of due

16   process because the trial court failed to give the defendants

17   reasonable time and opportunity to secure counsel and the

18   defendants were incapable of adequately making their own

19   defense.  That's at 71.

20       This case, for any number of reasons, is profoundly

21   different from *Powell*.  Mr. Trump is represented by a team of

22   zealous, experienced attorneys and has the resources necessary

23   to efficiently review the discovery and investigate, and, as

24   the government points out, a great deal of the discovery

25   provided has already been available to the defense or is

1    duplicative.

2         The grand jury investigating the events in this case was

3    convened in September of 2022, meaning that Mr. Trump has

4    known about the government's investigation for nearly a year.

5         I have seen many cases unduly delayed because a defendant

6    lacks adequate representation or cannot properly review

7    discovery because they are detained.  That is not the case

8    here.

9         Consequently, after considering the parties' briefs and

10   arguments, I find that a trial beginning on March 4, 2024,

11   would give the defense adequate time to prepare for trial

12   and ensure the public's interest in seeing this case resolved

13   in a timely manner.

14        I realize that Mr. Trump's criminal case in New York is

15   scheduled for trial on March 25.  I did speak briefly with

16   Judge Merchan to let him know that I was considering a date

17   that might overlap with his trial.

18        A trial start date of March 4, 2024, gives Mr. Trump

19   seven months between indictment and trial, which I believe

20   is sufficient time to advise with counsel and prepare his

21   defense.  Indeed, I have considered all of the relevant

22   factors under the Speedy Trial Act, many of which I've already

23   discussed.  This timeline does not move the case forward with

24   the haste of the mob.  The trial will start three years, one

25   month, and 27 days after the events of January 6, 2021.

1        The trial involving the Boston Marathon bombing began less

2    than two years after the events.  The trial involving Zacarias

3    Moussaoui for his role in the September 11 attacks was set to

4    begin one year after the attacks; but due to continuances,

5    appeals, and voluminous discovery, it began roughly four years

6    later.

7        My primary concern here, as it is in every case, is the

8    interest of justice, and that I balance the defendant's

9    right to adequately prepare with my responsibility to move

10   this case along in the normal order.  Accordingly, trial will

11   commence on March 4, 2024, meaning jury selection will begin

12   then.  I will issue an order with a schedule for pretrial

13   matters, including motions deadlines, status hearing, a

14   pretrial conference, and other interim deadlines.

15       If the parties have conflicts or other issues with the

16   schedule other than the trial date, you may file a motion to

17   alter those dates after consulting with opposing counsel

18   regarding alternative dates.

19       Do the parties have a proposed date for our next status

20   hearing?  Ms. Gaston, Mr. Lauro?

21            MR. LAURO:  I don't, Your Honor.

22            THE COURT:  Ms. Gaston?

23            MS. GASTON:  No, Your Honor.

24            MR. LAURO:  Your Honor, I do need to put on the record.

25            THE COURT:  Yes.  Go ahead.

1          MR. LAURO:  On behalf of President Trump, we will

2     certainly abide by Your Honor's ruling as we must, but we will

3     not be able to provide adequate representation to a client who

4     has been charged with serious offenses as a result of that

5     trial date.  The trial date will deny President Trump the

6     opportunity to have effective assistance of counsel in light

7     of the enormity of this case.

8          I feel I need to put that on the record so there's no doubt

9     that in our judgment that trial date is inconsistent with

10    President Trump's right to due process and his right to

11    effective assistance of counsel under the Sixth Amendment.

12          THE COURT:  I understand, and your objection is noted

13    for the record.

14          Does it make sense for us to have a status hearing -- to

15    set a date for a status hearing now, or why don't I issue a

16    minute order with a proposed pretrial schedule and then maybe

17    the parties can meet and confer and propose a status date.  Is

18    that agreeable to you, Mr. Lauro?

19          MR. LAURO:  I don't see any need for a status hearing.

20          THE COURT:  All right.  I'm sure we'll be back.  Okay.

21    I'll issue a minute order with the pretrial schedule.

22    Ms. Gaston?

23          MS. GASTON:  Your Honor, very briefly, one last matter.

24    In -- the government knows that in some cases in this district

25    attorneys have sent out polls to the general public in advance

1       of trial to gather material for change of venue motions.  I

2       believe Mr. Lauro has suggested in interviews both that the

3       defense might file such a motion and that they might conduct

4       some polling.

5              THE COURT:  By file such a motion, you mean a change of

6       venue motion?

7              MS. GASTON:  Yes, Your Honor.  Based on the wording of

8       the questions, the government has some concern about whether a

9       polling could affect the jury pool in the District, and so we

10      would just request that before either party does any such

11      polling, that the parties be allowed to brief the issue.

12             THE COURT:  Mr. Lauro?

13             MR. LAURO:  I'm not quite sure why that's necessary,

14      Your Honor, in light of fact that that is a core defense

15      function.

16             THE COURT:  Well, here's the problem I see.  The

17      District of Columbia is the site of the events at issue.

18      The citizens of the District of Columbia have a right -- an

19      interest in seeing that this matter is -- moves forward in a

20      fair manner.

21        I don't know whether you intend to file a motion to transfer

22      or what the grounds for such a motion to transfer would be, but

23      certainly based on statements that have been made outside of

24      this courtroom regarding the defense's view of the ability of

25      the citizens of the District of Columbia to provide a fair jury

1    pool, I'm watching carefully for any -- anything that might

2    affect that jury pool or poison that jury pool or in any way

3    affect the ability of the parties to select a fair jury in this

4    case.

5        So I guess I am concerned about what -- you know, if you file

6    a motion to transfer -- and you haven't, on one hand -- but are

7    doing polling on the other, that might affect the same jury pool

8    you're claiming is not fair, there's a problem.  And so I can't

9    tell you what pretrial -- you know -- what investigation you can

10   do or what information you can gather, but I am concerned that,

11   in terms of gauging the views of the venire, of the jury pool,

12   you may actually affect their ability to render a fair verdict

13   by virtue of the kinds of questions you're asking, because

14   questions can be phrased in all kinds of ways.

15       That's what I'm concerned about.  So I would ask -- well, are

16   you intending to conduct that kind of polling, first of all?

17           MR. LAURO:  We intended to address this issue as we get

18   closer to trial, and now in terms of the expedited trial

19   schedule, we'll likely need to do it sooner rather than later.

20   Those motions are typically done with the assistance of some

21   sort of public assessment of views and positions among a jury

22   pool generally.  I've never seen a court deny the opportunity

23   for defense counsel to do that in order to obtain a fair

24   trial.

25           THE COURT:  I'm not planning to restrict your ability

1        to do that.  But I do think it's fair to find out, for you to

2        let the Court know whether you're going to do that.

3              MR. LAURO:  Well, perhaps we could submit something *in*

4        *camera* to Your Honor if that issue does come up.  But I'm

5        certainly not going to share it with the United States

6        government in terms of what we're doing or the questions we're

7        asking.  I don't think that would be appropriate.

8              THE COURT:  I'm going to ask that if you intend to do

9        that kind of polling, that you notify the Court ex parte,

10       should you decide to do that, and then I'll consider it.

11       Ms. Gaston?

12             MS. GASTON:  Yes, Your Honor.  Our request was simply

13       that that polling not begin before we have an opportunity to

14       brief the issue.

15             THE COURT:  Well, there may not be an issue to brief.

16       It's going to be -- if there's a motion to change venue and

17       polling, those two things may be interconnected.  So let's not

18       get ahead of ourselves and find more motions and more briefing

19       that we need to do.  But I'll ask Mr. Lauro to notify the

20       Court, and it can be done ex parte, if and when the defense

21       decides to undertake such activities.

22             MS. GASTON:  Thank you, Your Honor.

23             THE COURT:  All right.  Thank you all.

24             (Proceedings adjourned at 11:32 a.m.)

25

```
                    *   *   *   *   *   *
```

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify
that the foregoing pages are a correct transcript from the
record of proceedings in the above-entitled matter.


*/s/ Bryan A. Wayne*
Bryan A. Wayne

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA

  v.

DONALD J. TRUMP,

    *Defendant*.

Case No. 1:23-cr-00257-TSC

**MOTION TO DISMISS INDICTMENT
<u>BASED ON PRESIDENTIAL IMMUNITY</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... iv

President Trump moves to dismiss the indictment in this matter, with prejudice, based on
Presential immunity. In support, President Trump states as follows. ............................................. 1

INTRODUCTION ............................................................................................. 1

LEGAL STANDARD ........................................................................................ 2

ALLEGATIONS IN THE INDICTMENT ............................................................ 2

   A.   Public Statements and Tweets About the Federal Election and Certification. .................... 3

   B.   Communications with the U.S. Department of Justice About Investigating Election
Crimes and Possibly Appointing a New Acting Attorney General .......................................... 4

   C.   Communications with State Officials About the Federal Election and the Exercise of
Their Official Duties with Respect to the Election. ................................................................. 6

   D.   Communications with the Vice President and Members of Congress About the Exercise of
Their Official Duties in the Election-Certification Proceedings. .............................................. 6

   E.   Organizing Slates of Electors as Part of the Attempt to Convince Legislators Not to
Certify the Election Against Defendant. ................................................................................... 7

ARGUMENT ................................................................................................... 8

   I.   The President Has Absolute Immunity from Criminal Prosecution for Actions Performed
Within the "Outer Perimeter" of His Official Responsibility. .................................................. 8

     A.   The Doctrine of Separation of Powers and the President's Unique Role in Our
Constitutional Structure Require Immunity from Criminal Prosecution. ............................... 8

     B.   Impeachment and Conviction by the Senate Provide the Exclusive Method of
Proceeding Against a President for Crimes in Office. ........................................................... 11

     C.   Early Authorities Support Presidential Immunity from Criminal Prosecution. ............. 13

     D.   Two Hundred Thirty-Four Years of History and Tradition Support Presidential
Immunity from Criminal Prosecution. ................................................................................... 15

     E.   Analogous Immunity Doctrines Support Presidential Immunity from Criminal
Prosecution. ......................................................................................................................... 16

     F.   Concerns of Public Policy Favor the President's Immunity from Prosecution. ............. 18

   II.   The Indictment Alleges Only Acts Committed Within the Outer Perimeter of the
President's Official Responsibilities, Which Are Shielded by Absolute Immunity. ................. 21

     A.   The Scope of Criminal Immunity Includes All Actions That Fall Within the "Outer
Perimeter" of the President's Official Duties. ....................................................................... 21

B.   The Nature of the Act, Not the Manner in Which It Is Conducted or Its Alleged
Purpose, Determines Whether It Falls Within the Scope of Immunity. ............................... 23

D.   Every Act Alleged in the Indictment Falls Within the Outer Perimeter of the President's
Official Duties and Is Immune from Criminal Prosecution. ................................................. 27

CONCLUSION ....................................................................................................................... 45

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) ................................................................ 36

*Barr v. Matteo*, 360 U.S. 564 (1959) .......................................... 1, 8, 19, 20, 23, 24, 28, 33

*Barrett v. Harrington*, 130 F.3d 246 (6th Cir.1997) ........................................................ 23

*Bernard v. Cnty. of Suffolk*, 356 F.3d 495 (2d Cir. 2004) ............................................... 23

*Buckley v. Valeo*, 424 U.S. 1 (1976) ................................................................................. 32

*Burroughs v. United States*, 290 U.S. 534 (1934) ..................................................... 36, 43

*Butz v. Economou*, 438 U.S. 478 (1978) ..................................................................... 16, 20

*Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367 (2004) .................................................. 20

*Clinton v. Jones*, 520 U.S. 681 (1997) ...................................................... 12, 22, 23, 28, 37

*Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541 (1949) ................................... 8

*Cunningham v. Neagle*, 135 U.S. 1 (1890) ................................................. 35, 36, 38, 43

*Dorman v. Higgins*, 821 F.2d 133 (2d Cir. 1987) ........................................................... 25

*Ferri v. Ackerman*, 444 U.S. 193 (1979) ......................................................................... 9

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010) .............. 16, 22, 37

*Gregoire v. Biddle*, 177 F.2d 579 (2d Cir. 1949) ....................................................... 19, 24

*Guzman–Rivera v. Rivera–Cruz*, 55 F.3d 26 (1st Cir. 1995) .......................................... 44

*In re Global Crossing, Ltd. Sec. Litig.*, 314 F. Supp. 2d 172 (S.D.N.Y. 2003) .............. 24

*In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997) .......................................................... 34

*Ireland v. Tunis*, 113 F.3d 1435 (6th Cir. 1997) ............................................................. 44

*Klayman v. Obama*, 125 F. Supp. 3d 67 (D.D.C. 2015) ............................................ 23, 33

*Knight First Amend. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226 (2d Cir. 2019) ................. 30

*Lynch v. President of the U.S.*, 2009 WL 2949776 (N.D. Tex. Sept. 14, 2009) .......................... 30

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803) .................................................. 13, 14

*Martin v. Mott*, 25 U.S. (12 Wheat.) 19 (1827) .............................................................. 15

*Matal v. Tam*, 582 U.S. 218 (2017) ................................................................................. 30

*Michigan Welfare Rts. Org. v. Trump*, No. CV 20-3388 (EGS), 2022 WL 17249218 (D.D.C.
   Nov. 28, 2022) ................................................................................................................ 31

*Midland Asphalt Corp. v. United States*, 489 U.S. 794 (1989) ......................................... 2

*Moore v. Trump*, No. 22-CV-00010 (APM), 2022 WL 3904320 (D.D.C. Aug. 2, 2022) ........... 31

*Morrison v. Olson*, 487 U.S. 654 (1988) ......................................................................... 11

*Myers v. United States*, 272 U.S. 52 (1926) .................................................................... 34

*NFIB v. OSHA*, 142 S. Ct. 661 (2022) ............................................................................. 15

*Nixon v. Fitzgerald*, 457 U.S. 731 (1982) 1, 8, 9, 10, 13, 15, 16, 17, 18, 19, 21, 22, 24, 25, 26, 33,
   44

*Novoselsky v. Brown*, 822 F.3d 342 (7th Cir. 2016) ....................................................... 24

*Pfeiffer v. Hartford Fire Ins. Co.*, 929 F.2d 1484 (10th Cir. 1991) ............................... 45

*Pierson v. Ray*, 386 U.S. 547 (1967) .......................................................... 9, 17, 24, 33

*Pleasant Grove City v. Summum*, 555 U.S. 460 (2009) ................................................... 30

*Ponzi v. Fessenden*, 258 U.S. 254 (1922) ....................................................................... 34

*Prince v. Hicks*, 198 F.3d 607 (6th Cir. 1999) ................................................................ 44
*Printz v. United States*, 521 U.S. 898 (1997) ................................................................ 16
*Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020) ........................................................ 16
*Snell v. Tunnell*, 920 F.2d 673 (10th Cir. 1990) ......................................................... 45
*Spalding v. Vilas*, 161 U.S. 483 (1896) .......................................... 17, 19, 20, 24, 33
*Stump v. Sparkman*, 435 U.S. 349 (1978) ............................................................ 18, 25
*Tenney v. Brandhove*, 341 U.S. 367 (1951) .................................... 15, 16, 25, 33
*Thompson v. Trump*, 590 F. Supp. 3d 46 (D.D.C. 2022) .................. 28, 30, 31, 32, 34, 38, 39
*Trump v. Hawaii*, 138 S. Ct. 2392 (2018) ................................................................. 28
*Trump v. Vance*, 140 S. Ct. 2412 (2020) .............................. 12, 19, 20, 21, 22
U.S. CONST. art. II, § 3 ...................................................... 1, 22, 33, 40
*United States v. Chaplin*, 54 F. Supp. 926 (S.D. Cal. 1944) .................................. 17
*United States v. Chrestman*, 525 F. Supp. 3d 14 (D.D.C. 2021) ......................... 31
*United States v. Nixon*, 418 U.S. 683 (1974) ...................................... 10, 11
*United States v. Saylor*, 322 U.S. 385 (1944) ....................................................... 36
*United States v. Sunia*, 643 F. Supp. 2d 51 (D.D.C. 2009) ................................... 2
*United States v. Weeks*, 636 F. Supp. 3d 117 (D.D.C. 2022) ................................ 2
*Yates v. Lansing*, 5 Johns. 282 (N.Y. 1810) ............................................................. 17

## Statutes

18 U.S.C. § 1015 ........................................................................................................ 33
18 U.S.C. § 241 .......................................................................................................... 33
18 U.S.C. § 242 .......................................................................................................... 33
18 U.S.C. § 611 .......................................................................................................... 33
18 U.S.C. § 911 .......................................................................................................... 33
52 U.S.C. § 10307 ...................................................................................................... 33
52 U.S.C. § 20511 ...................................................................................................... 33
52 U.S.C. § 30120 ...................................................................................................... 33
52 U.S.C. § 30124 ...................................................................................................... 33

## Other Authorities

1 ANNALS OF CONGRESS 481 (1789) ......................................................................... 34
2 J. ELLIOT, DEBATES ON THE FEDERAL CONSTITUTION 480 (2d ed. 1863) ................. 12
28 THE PAPERS OF ULYSSES S. GRANT (ed. John Y. Simon 2005) ............................ 42
3 J. STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES ch. 37, § 1563 (1833)
......................................................................................................................... 14
6 W. HOLDSWORTH, A HISTORY OF ENGLISH LAW (2d ed. 1937) ............................. 17
77 Eng. Rep. 1307 ...................................................................................................... 17
Clinton Rossiter, *The American Presidency* (2d rev. ed. 1960) ................................ 41
H. RES. 24 (117th Cong. 1st Sess.) ........................................................................... 13
H.R. Rep. No. 81-3138 ............................................................................................... 41
J. Randolph Block, *Stump v. Sparkman and the History of Judicial Immunity*, 1980 DUKE L.J.
879 ................................................................................................................... 17

Lawrence H. Chamberlain, *The President, Congress and Legislation* (1946) ............................ 41

*Legislative Activities of Executive Agencies: Hearings Before the H. Select Comm. on Lobbying Activities*, 81st Cong., pt. 10 (1950) .............................................................................................. 40

*Lobbying by Executive Branch Personnel*, U.S. Op. O.L.C. Supp. 240 (1961) .................... 40, 41

*Office & Duties of Attorney General*, 6 U.S. Op. Atty. Gen. 326 (1854) .................................... 34

*Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 U.S. Op. O.L.C. 101 (1984) .................................................... 34

SCALIA & GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS, § 10 (2012) .......... 12

THE FEDERALIST No. 43 (J. Madison) .......................................................................................... 12

THE FEDERALIST No. 65 (A. Hamilton) ........................................................................................ 12

THE FEDERALIST No. 69 (C. Rossiter ed. 1961) ............................................................................ 12

THE FEDERALIST No. 77 (A. Hamilton) ........................................................................................ 12

Thomas J. Norton, *The Constitution of the United States: Its Sources and Its Application* (special ed. 1940, 8th printing 1943) ...................................................................................................... 41

U.S. Dep't of Justice, *Election Crimes Branch* ...................................................................... 33, 37

U.S. Dep't of Justice, *Federal Prosecution of Election Offenses* (8th ed. 2017) ........................ 33

**Constitutional Provisions**

U.S. CONST. art. I, § 3, cl. 7 ............................................................................................... 11, 12, 13

U.S. CONST. art. II, § 1 ............................................................................................................... 9, 22

U.S. CONST. art. II, § 2, cl. 2 ........................................................................................................ 34

U.S. CONST. art. II, §1, cl. 2 .......................................................................................................... 43

President Trump moves to dismiss the indictment in this matter, with prejudice, based on Presidential immunity. In support, President Trump states as follows.

## INTRODUCTION

The President of the United States sits at the heart of our system of government. He is our Nation's leader, our head of state, and our head of government. As such, the founders tasked the President—and the President alone—with the sacred obligation of "tak[ing] Care that the Laws be faithfully executed." U.S. CONST. art. II, § 3.

To ensure the President may serve unhesitatingly, without fear that his political opponents may one day prosecute him for decisions they dislike, the law provides absolute immunity "for acts within the 'outer perimeter' of [the President's] official responsibility." *Nixon v. Fitzgerald* 457 U.S. 731, 756 (1982) (quoting *Barr v. Matteo*, 360 U.S. 564, 575 (1959) (plurality opinion)).

Breaking 234 years of precedent, the incumbent administration has charged President Trump for acts that lie not just within the "outer perimeter," but at the heart of his official responsibilities as President. In doing so, the prosecution does not, and cannot, argue that President Trump's efforts to ensure election integrity, and to advocate for the same, were outside the scope of his duties. Instead, the prosecution falsely claims that President Trump's motives were impure— that he purportedly "knew" that the widespread reports of fraud and election irregularities were untrue but sought to address them anyway. But as the Constitution, the Supreme Court, and hundreds of years of history and tradition all make clear, the President's motivations are not for the prosecution or this Court to decide. Rather, where, as here, the President's actions are within the ambit of his office, he is absolutely immune from prosecution. *Spalding v. Vilas*, 161 U.S. 483, 494, 949 (1896) ("The 'allegation of malicious or corrupt motives' does not affect a public official's immunity and "[t]he motive that impelled [the official] to do that of which the plaintiff

1

complains is … wholly immaterial."). Therefore, the Court should dismiss the indictment, with prejudice. *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 801 (1989) ("Dismissal of the indictment is the proper sanction when a defendant has been granted immunity from prosecution…") (citation omitted).

## LEGAL STANDARD

"In ruling on a motion to dismiss for failure to state an offense, a district court is" typically "limited to reviewing the face of the indictment and, more specifically, the language used to charge the crimes." *United States v. Sunia*, 643 F. Supp. 2d 51, 60 (D.D.C. 2009) (emphasis omitted). "When considering a motion to dismiss, the court must review the face of the indictment," and "the indictment must be viewed as a whole and the allegations must be accepted as true at this stage of the proceedings." *United States v. Weeks*, 636 F. Supp. 3d 117, 120 (D.D.C. 2022).

## ALLEGATIONS IN THE INDICTMENT

President Trump (the incumbent administration's leading opponent in the upcoming Presidential election) emphatically denies the truth of any allegations in the indictment. Rather, this memorandum sets forth the facts alleged in the indictment so that their legal sufficiency may be assessed for a motion to dismiss. *Id.* Moreover, the Supreme Court has "repeatedly … stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Davis v. Scherer*, 468 U.S. 183, 195 (1984); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985); *Malley v. Briggs*, 475 U.S. 335, 341 (1986); *Anderson v. Creighton*, 483 U.S. 635, 646, n.6 (1987)); and *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). Accordingly, this motion addresses only the question of Presidential immunity. Other fatal deficiencies in the indictment will be addressed in future motion(s) and proceeding(s).

The indictment alleges that President Trump took a series of actions that form the basis of its charges. These acts fall into five basic categories. The indictment alleges that President Trump, while he was still President: (1) made public statements about the administration of the federal election, and posted Tweets about the administration of the federal election; (2) communicated with senior Department of Justice ("DOJ") officials about investigating election fraud and about choosing the leadership of DOJ; (3) communicated with state officials about the administration of the federal election and their exercise of official duties with respect to it; (4) communicated with the Vice President, in his legislative capacity as President of the Senate, and with other Members of Congress about the exercise of their official duties regarding the election certification; and (5) authorized or directed others to organize contingent slates of electors in furtherance of his attempts to convince the Vice President to exercise his official authority in a manner advocated for by President Trump.[1]

## A.    Public Statements and Tweets About the Federal Election and Certification.

First, the indictment alleges that President Trump, while he was still President, made public statements about the administration of the 2020 federal election. *See* Doc. 1, ¶ 2 (alleging public statements claiming fraud in the administration of the federal election); *id.* ¶¶ 11-12 (alleging a series of public statements claiming fraud in the federal election); *id.* ¶ 19 (public statement about election fraud in Arizona); *id.* ¶ 32 (public statement regarding Georgia's election administration); *id.* ¶ 33 (public statement about fraudulent voting in Georgia); *id.* ¶ 34 (public statement suggesting fraudulent voting in Detroit); *id.* ¶ 37 (public statement about suspected election fraud in Michigan); *id.* ¶ 41 (public statement about election fraud in Michigan); *id.* ¶ 42 (public statement

---

[1] In certain cases, the indictment does not specify whether President Trump had direct involvement in many of these actions or even knew they were occurring; but even assuming that he did, the acts alleged are all still of a public character.

disputing a Pennsylvania local official's public statement about the absence of fraud in Philadelphia); *id.* ¶ 46 (public statement claiming election fraud in Pennsylvania); *id.* ¶ 52 (public statement about election fraud in Wisconsin); *id.* ¶ 99 (public statement about the scope of the Vice President's authority on January 6); *id.* ¶ 102 (public statement in speech about the scope of the Vice President's authority on January 6); *id.* ¶ 104 (statements in public speech on January 6 about election fraud, the scope of the Vice President's authority, the authority of state officials, and the certification proceedings).

Closely related to the allegations of public statements, the indictment alleges that President Trump posted a series of Tweets about the administration of the federal election and its certification. *Id.* ¶¶ 22, 28 (Tweet addressing evidence of election fraud in Georgia); *id.* ¶ 44 (Tweet criticizing Pennsylvania legislators' claim about slates of electors); *id.* ¶ 50 (Tweet addressing election fraud in Wisconsin); *id.* ¶¶ 87, 90(c) (Tweets urging Americans to protest fraud in the federal election); *id.* ¶ 88 (Tweet regarding the Vice President's authority regarding election-certification proceedings); *id.* ¶ 96(a)-(b) (Tweets regarding the Vice President's election-certification authority and encouraging Americans to protest election fraud); *id.* ¶ 96(c) (Tweet announcing public speech about the election); *id.* ¶ 100(a)-(b) (Tweets about the Vice President's authority); *id.* ¶ 111 (Tweet about the scope of the Vice President's authority); *id.* ¶114 (Tweets urging protestors to "Stay peaceful!" and "to remain peaceful. No violence!"); *id.* ¶ 116 (Tweet of a video claiming fraud in the federal election); *id.* ¶ 118 (Tweet claiming fraud in the election).

### B.    Communications with the U.S. Department of Justice About Investigating Election Crimes and Possibly Appointing a New Acting Attorney General.

The indictment alleges that President Trump attempted to "use the power and authority of the Justice Department to conduct … election crime investigations," and "to send a letter to the targeted states" from the Justice Department that "claimed that the Justice Department had

identified significant concerns that may have impacted the election outcome." Doc. 1, ¶ 10(c). The

indictment alleges a series of meetings and communications between President Trump and others,

including senior officials in the U.S. Department of Justice, relating to the investigation of federal

election fraud and possibly appointing a new Acting Attorney General of the United States (which,

as the indictment states, President Trump ultimately did not do). *Id.* ¶ 27 (alleging a meeting with

the incoming Acting Attorney General and Acting Deputy Attorney General "to discuss allegations

of election fraud"); *id.* ¶ 29 (phone call with Acting Attorney General and Acting Deputy Attorney

General to urge them to investigate election fraud); *id.* ¶ 36 (communication with the Attorney

General about election fraud in Michigan); *id.* ¶ 45 (two communications with the Acting Attorney

General and Acting Deputy Attorney General to urge them to investigate fraud in Pennsylvania);

*id.* ¶ 51 (communication urging the Acting Attorney General and Acting Deputy Attorney General

to investigate fraud in Wisconsin); *id.* ¶¶ 70-85 (meetings and communications with Department

of Justice officials about investigating election fraud and/or selecting an Acting Attorney General

who was willing to investigate election fraud); *id.* ¶ 70 (attempt to convince the Department of

Justice to send a letter to state officials expressing concerns about election fraud); *id.* ¶¶ 71-73

(communications with a DOJ official about election fraud); *id.* ¶ 74 (phone call with the Acting

Attorney General and Acting Deputy Attorney General about changing the leadership at the

Department of Justice); *id.* ¶ 77 (Oval Office meeting with the Acting Attorney General, the Acting

Deputy Attorney General, and "other advisors" about election fraud and possibly changing the

leadership of DOJ); *id.* ¶ 80 (meeting with DOJ official at the White House and allegedly offering

him the role of Acting Attorney General); *id.* ¶ 84 (meeting with the Acting Attorney General, the

Acting Deputy Attorney General, the Assistant Attorney General for the Office of Legal Counsel,

the White House Counsel, the Deputy White House Counsel, and a Senior Advisor about changing the leadership of the Department of Justice, which the President decided not to do).

### C.   Communications with State Officials About the Federal Election and the Exercise of Their Official Duties with Respect to the Election.

The indictment alleges a series of communications—some by President Trump, and some by other unnamed individuals—with state officials about the administration of the federal election and the exercise of their official duties with respect to the federal election. Doc. 1, ¶ 10(a); *id.* ¶¶ 15-18 (communications with the Speaker of Arizona House of Representatives about certifying Arizona's Presidential electors); *id.* ¶¶ 21 (communications with Members of the Georgia Senate about certifying Georgia's Presidential electors); ¶ 24 (phone call with the Georgia Attorney General); ¶ 26 (communications with members of the Georgia House of Representatives); ¶ 31 (phone call with the Georgia Secretary of State regarding the validity of Georgia's Presidential electors); ¶ 35 (meeting with the Speaker of the Michigan House of Representatives and the Majority Leader of the Michigan Senate about the administration of the election in Michigan); ¶¶ 38-39 (communications with Michigan legislative leaders urging them to take legislative action recognizing that the election results are in dispute); ¶ 43 (meeting with Pennsylvania state legislators about the administration of the federal election in Pennsylvania).

### D.   Communications with the Vice President and Members of Congress About the Exercise of Their Official Duties in the Election-Certification Proceedings.

The indictment charges that President Trump attempted to "enlist the Vice President to use his ceremonial role at the January 6 certification proceeding to … alter the election results," by "attempt[ing] to convince the Vice President" to rely on contingent slates of electors submitted by the President's alleged allies. Doc. 1, ¶ 10(d). Here, the indictment alleges that President Trump and others on his official staff made a series of communications with the Vice President—in his

legislative capacity as President of the Senate—about the exercise of his official duties in the January 6 election-certification proceedings. *Id.* ¶¶ 86-95; *id.* ¶ 90(a)-(d) (alleging "several private phone calls" in December 2020 and January 2021 between the Defendant and the Vice President, in which the Defendant allegedly urged the Vice President "to use his ceremonial role at the certification proceeding on January 6 to … overturn the results of the election"); *id.* ¶¶ 92-93 (meeting with the Vice President, the Vice President's Chief of Staff, and the Vice President's Counsel regarding the Vice President's exercise of his authority as President of the Senate); *id.* ¶ 95 (meeting with the Vice President's Chief of Staff and the Vice President's Counsel on the same topic); *id.* ¶ 97 (alleging a private meeting with the Vice President on the same topic); *id.* ¶ 101 (communication asking a United States Senator to hand-deliver documents to the Vice President regarding the contingent slates of electors); *id.* ¶ 102 (phone call with the Vice President urging him to exercise his authority as President of the Senate in the President's favor); *id.* ¶ 122 (urging Vice President to exercise his official duties with respect to the certification).

In addition to communications with the Vice President, the indictment alleges a handful of communications and attempted communications with Members of Congress regarding their official authority in Congress with respect to the election-certification proceedings. *Id.* ¶ 115 (phone call with the Minority Leader of the U.S. House of Representatives); *id.* ¶ 119(a) (attempts to communicate with two U.S. Senators regarding the certification); *id.* ¶ 119(b) (calls with five U.S. Senators and one U.S. Representative about the certification); ¶ 119(c)-(e) (attempts to contact six U.S. Senators about the certification).

### E.   Organizing Slates of Electors as Part of the Attempt to Convince Legislators Not to Certify the Election Against Defendant.

Closely related to these communications with the Vice President and Members of Congress, the indictment alleges that other individuals organized slates of contingent electors from

several States to provide a justification for the Vice President to exercise his official duties in the manner favored by President Trump. Doc. 1, ¶¶ 53-69. According to the indictment, these contingent slates of electors allowed President Trump, in his communications with the Vice President, to justify the exercise of the Vice President's authority to certify the election in President Trump's favor or delay its certification. *Id.* ¶¶ 10(b), 53. The indictment alleges that President Trump knew of these actions organizing the slates of electors and directed them to continue, but it does not allege that President Trump took any particular action in organizing them. *Id.* ¶¶ 54, 56.

## ARGUMENT

**I.   The President Has Absolute Immunity from Criminal Prosecution for Actions Performed Within the "Outer Perimeter" of His Official Responsibility.**

"In view of the special nature of the President's constitutional office and functions," a current or former President has "absolute Presidential immunity from [civil] damages liability for acts within the 'outer perimeter' of his official responsibility." *Fitzgerald*, 457 U.S. at 756 (quoting *Barr*, 360 U.S. at 575). No court has addressed whether such Presidential immunity includes immunity from criminal prosecution for the President's official act. The question remains a "'serious and unsettled question' of law." *See id.* at 743 (citation omitted) (holding "[i]n light of the special solicitude due to claims alleging a threatened breach of essential Presidential prerogatives under the separation of powers," issues of Presidential immunity were "serious and unsettled"). In addressing this question, the Court should consider the Constitution's text, structure, and original meaning, historical practice, the Court's precedents and immunity doctrines, and considerations of public policy. *See id.* at 747.

**A.   The Doctrine of Separation of Powers and the President's Unique Role in Our Constitutional Structure Require Immunity from Criminal Prosecution.**

"The President occupies a unique position in the constitutional scheme." *Fitzgerald*, 457 U.S. at 749. "Article II, § 1, of the Constitution provides that '[t]he executive Power shall be vested

8

in a President of the United States....' This grant of authority establishes the President as the chief constitutional officer of the Executive Branch, entrusted with supervisory and policy responsibilities of utmost discretion and sensitivity." *Id*. at 749-50.

Due to this "unique status" in our constitutional structure of separated powers, which "distinguishes him from other executive officials," the Supreme Court held in *Fitzgerald* that the President is, and must be, "absolute[ly] immun[e] from damages liability predicated on his official acts." *Id*. 749–50 ("We consider this immunity a functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers and supported by our history."); *see also id*. at 748 (the "policies and principles [mandating immunity] may be considered implicit in the nature of the President's office in a system structured to achieve effective government under a constitutionally mandated separation of powers").

In reaching this conclusion, the Supreme Court held that subjecting a President to personal liability for his official actions would improperly "diver[t] [the President's] energies" and "raise unique risks to the effective functioning of government," especially given "the singular importance of the President's duties." *Id.* at 751.

Chief among these risks is the chilling effect personal liability would have on the President's decision-making, particularly in "matters likely to 'arouse the most intense feelings.'" *Id.* at 752 (quoting *Pierson v. Ray*, 386 U.S. 547, 554 (1967)). "[I]t is in precisely such cases that there exists the greatest public interest in providing an official 'the maximum ability to deal fearlessly and impartially with' the duties of his office." *Id.* (quoting *Ferri v. Ackerman*, 444 U.S. 193, 203 (1979)). "This concern is compelling where the officeholder must make the most sensitive and far-reaching decisions entrusted to any official under our constitutional system." *Id.*

"Nor can the sheer prominence of the President's office be ignored." *Id.* at 752-53. "In view of the visibility of his office and the effect of his actions on countless people, the President would be an easily identifiable target for" prosecution in countless federal, state, and local jurisdictions across the country. *Id.* at 753. "Cognizance of this personal vulnerability frequently could distract a President from his public duties, to the detriment of not only the President and his office but also the Nation that the Presidency was designed to serve." *Id.*

Although *Fitzgerald* concerned civil liability, the exact same, if not more elevated, concerns apply to potential criminal prosecutions, mandating the same absolute immunity. Vertical and horizontal separation of powers simply cannot permit local, state, or subsequent federal officials to constrain the President's exercise of executive judgment through threats of criminal prosecution. To hold otherwise would be to allow the President's political opponents to usurp his or her constitutional role, fundamentally impairing our system of government. For this very reason, *Fitzgerald* recognized that Presidential immunity is not just a creature of common law but also "rooted in the separation of powers under the Constitution." *Id.* at 753 (quoting *United States v. Nixon*, 418 U.S. 683, 708 (1974)). [2]

---

[2] To be sure, *Fitzgerald* did not decide whether Presidential immunity extends to criminal prosecution, and it acknowledged that "there is a lesser public interest in actions for civil damages than … in criminal prosecutions." 457 U.S. at 754 n.37. But the fact that the doctrine of Presidential immunity is rooted in the separation of powers dictates that immunity must extend to criminal prosecution as well as civil liability. While the "public interest … in criminal prosecutions" may be important, *id.*, it is not important enough to justify abrogating the separation of powers, the most fundamental structural feature of our constitutional system. Further, exposure to criminal prosecution poses a far greater threat than the prospect of civil lawsuits to the President's "maximum ability to deal fearlessly and impartially with the duties of his office," and thus it raises even greater "risks to the effective functioning of government." *Fitzgerald*, 457 U.S. at 753 (citation and quotation marks omitted). *Fitzgerald*'s reasoning, therefore, entails that Presidential immunity include immunity from both civil suit and criminal prosecution.

10

"Nothing is so politically effective as the ability to charge that one's opponent and his associates are not merely wrongheaded, naive, ineffective, but, in all probability, 'crooks.' And nothing so effectively gives an appearance of validity to such charges as a Justice Department investigation and, even better, prosecution." *Morrison v. Olson*, 487 U.S. 654, 713 (1988) (Scalia, J., dissenting). "The present [indictment] provides ample means for that sort of attack, assuring that massive and lengthy investigations" and prosecutions "will occur," bedeviling every future Presidential administration and ushering in a new era of political recrimination and division. *Id.*

(Analogically, the executive privilege protecting Presidential communications is also designed to protect the President's ability to function in his role to the maximum extent, and "is fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." *Nixon*, 418 U.S. at 708.)

### B.  Impeachment and Conviction by the Senate Provide the Exclusive Method of Proceeding Against a President for Crimes in Office.

Presidential immunity from criminal prosecution for official acts is also rooted in the text of the Constitution. The Impeachment Clauses provide that the President may be charged by indictment only in cases where the President has been impeached and convicted by trial in the Senate. Here, President Trump was *acquitted* by the Senate for the same course of conduct.

The Impeachment Clause of Article I provides that "Judgment in Cases of Impeachment shall not extend further than to removal from Office … but *the Party convicted* shall nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law." U.S. CONST. art. I, § 3, cl. 7 (emphasis added). Because the Constitution specifies that only "the Party *convicted*" by trial in the Senate may be "liable and subject to Indictment, Trial, Judgment and Punishment," *id.*, it presupposes that a President who is *not* convicted may *not* be subject to criminal prosecution. As Justice Alito recently noted, "[t]he plain implication" of this Clause "is

11

that criminal prosecution, like removal from the Presidency and disqualification from other offices, is a consequence that can come about only after the Senate's judgment, not during or prior to the Senate trial." *Trump v. Vance*, 140 S. Ct. 2412, 2444 (2020) (Alito, J., dissenting). "This was how Hamilton explained the impeachment provisions in the Federalist Papers. He wrote that a President may 'be impeached, tried, and, upon conviction ... would afterwards be liable to prosecution and punishment in the ordinary course of law.'" *Id.* (quoting THE FEDERALIST No. 69, p. 416 (C. Rossiter ed. 1961)); *see also* THE FEDERALIST No. 77, p. 464 (A. Hamilton) (a President is "at all times liable to impeachment, trial, [and] dismission from office," but any other punishment must come only "by subsequent prosecution in the common course of law"). *See also* SCALIA & GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS, § 10, at 107 (2012) ("When a car dealer promises a low financing rate to 'purchasers with good credit,' it is entirely clear that the rate is *not* available to purchasers with spotty credit.").

"James Wilson—who had participated in the Philadelphia Convention at which the document was drafted—explained that … the President … 'is amenable to [the laws] in his private character as a citizen, and in his public character by impeachment.'" *Clinton v. Jones*, 520 U.S. 681, 696 (1997) (quoting 2 J. ELLIOT, DEBATES ON THE FEDERAL CONSTITUTION 480 (2d ed. 1863)) (cleaned up). "With respect to acts taken in his 'public character'—that is, official acts—the President may be disciplined principally by impeachment, not by private lawsuits for damages. But he is otherwise subject to the laws for his purely private acts." *Id.*; *see also* THE FEDERALIST No. 43 (J. Madison); THE FEDERALIST No. 65 (A. Hamilton).

*Fitzgerald* reinforced this conclusion:

> A rule of absolute immunity for the President will not leave the Nation without sufficient protection against misconduct on the part of the Chief Executive. There remains the constitutional remedy of impeachment. In addition, there are formal and informal checks on

> Presidential action…. The President is subjected to constant scrutiny
> by the press. Vigilant oversight by Congress also may serve to deter
> Presidential abuses of office, as well as to make credible the threat
> of impeachment. Other incentives to avoid misconduct may include
> a desire to earn reelection, the need to maintain prestige as an
> element of Presidential influence, and a President's traditional
> concern for his historical stature.

*Fitzgerald*, 457 U.S. at 757. Notably absent from *Fitzgerald*'s list of "formal and informal checks"

on the President for "abuses of office," *id.*, is any mention of criminal prosecution.

Here, President Trump is not a "Party convicted" in an impeachment trial by the Senate.

U.S. CONST. art. I, § 3, cl. 7. In January 2021, he was impeached on charges arising from the same

course of conduct at issue in the indictment. H. RES. 24 (117th Cong. 1st Sess.), *available at*

https://www.congress.gov/bill/117th-congress/house-resolution/24/text.  President Trump was

acquitted of these charges after trial in the Senate, and he thus remains immune from prosecution.

The Special Counsel cannot second-guess the judgment of the duly elected United States Senate.

### C.   Early Authorities Support Presidential Immunity from Criminal Prosecution.

In *Marbury v. Madison*, Charles Lee—Attorney General of the United States under

Presidents George Washington and John Adams—"declare[d] it to be my opinion, grounded on a

comprehensive view of the subject, that the President is not amenable to *any court of judicature*

*for the exercise of his high functions*, but is responsible only in the mode pointed out in the

constitution." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 149 (1803) (emphasis added). In his

opinion for the Court, Chief Justice Marshall endorsed this view: "[b]y the constitution of the

United States, the President is invested with certain important political powers, in the exercise of

which he is to use his own discretion, and is accountable only to his country in his political

character, and to his own conscience." *Id.* at 165–66. In cases involving the President's official

duties, "whatever opinion may be entertained of the manner in which executive discretion may be

used, still there exists, and can exist, no power to control that discretion. The subjects are political. They respect the nation, not individual rights, and being entrusted to the executive, the decision of the executive is conclusive." *Id.* at 166. "The acts of such an officer, as an officer, *can never be examinable by the courts.*" *Id.* (emphasis added). When the President "act[s] in cases in which the executive possesses a constitutional or legal discretion, nothing can be more perfectly clear than that their acts are only politically examinable." *Id.* If the President "acts in a case, in which executive discretion is to be exercised … any application to a court to control, in any respect, his conduct, would be rejected without hesitation." *Id.* at 170–71.

Justice Story cited *Marbury v. Madison* for this point in his oft-cited 1833 treatise:

> There are other incidental powers, belonging to the executive department, which are necessarily implied from the nature of the functions, which are confided to it. Among these, must necessarily be included the power to perform them, without any obstruction or impediment whatsoever. The president cannot, therefore, be liable to arrest, imprisonment, or detention, while he is in the discharge of the duties of his office; and for this purpose his person must be deemed, in civil cases at least, to possess an official inviolability. *In the exercise of his political powers he is to use his own discretion, and is accountable only to his country, and to his own conscience. His decision, in relation to these powers, is subject to no control; and his discretion, when exercised, is conclusive.*

3 J. STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES ch. 37, § 1563 (1833), *available at* https://lonang.com/library/reference/story-commentaries-us-constitution/sto-337/ (visited August 14, 2023) (emphasis added).

Likewise, *Martin v. Mott* held that, "[w]hen the President exercises an authority confided to him by law," his conduct cannot be second-guessed by a jury: "If the fact of the existence of the exigency were averred, it would be traversable, and of course might be passed upon by a jury; and thus the legality of the orders of the President would depend, not on his own judgment of the facts, but upon the finding of those facts upon the proofs submitted to a jury." 25 U.S. (12 Wheat.) 19,

14

32-33 (1827); *see also Tenney v. Brandhove*, 341 U.S. 367, 377 (1951) (holding that the immunity of Members of Congress "would be of little value if they could be subjected to … the hazard of a judgment against them based upon a jury's speculation as to motives").

> **D.   Two Hundred Thirty-Four Years of History and Tradition Support Presidential Immunity from Criminal Prosecution.**

In *Nixon v. Fitzgerald*, the Supreme Court emphasized that "the presuppositions of our political history," including "tradition[s] so well grounded in history and reason," help to define the scope of Presidential immunity. 457 U.S. at 745 (citation and quotation marks omitted); *see also Tenney*, 341 U.S. at 372.

Here, 234 years of unbroken historical practice—from 1789 until 2023—provide compelling evidence that the power to indict a former President for his official acts does not exist. No prosecutor, whether state, local, or federal, has this authority; and none has sought to exercise it until now. American history teems with situations where the opposing party passionately *contended* that the President and his closest advisors were guilty of criminal behavior in carrying out their official duties—John Quincy Adams' "corrupt bargain" with Henry Clay provides a notable example. In every such case, the outraged opposing party eventually took power, yet none ever brought criminal charges against the former President based on his exercise of official duties. Nor did *any* state or local prosecutor of the thousands of such officials throughout the history and tradition of United States attempt a similar maneuver.

A strong historical practice of *not* exercising a supposed power—especially when there has been ample incentive and opportunity to do so—undercuts the sudden discovery of the newly minted power. *See, e.g., NFIB v. OSHA*, 595 U.S. 109, 119 (2022) (per curiam) ("It is telling that OSHA, in its half century of existence, has never before adopted a broad public health regulation of this kind…. [t]his 'lack of historical precedent' … is a 'telling indication' that the mandate

extends beyond the agency's legitimate reach.") (citation omitted); *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2201 (2020) (same); *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 505 (2010) (same); *Printz v. United States*, 521 U.S. 898, 916 (1997) ("To complete the historical record, we must note that there is not only an absence of executive-commandeering statutes in the early Congresses, but there is an absence of them in our later history as well, at least until very recent years."). "The constitutional practice . . . tends to negate the existence of the…power asserted here." *Printz*, 521 U.S. at 918.

### E.   Analogous Immunity Doctrines Support Presidential Immunity from Criminal Prosecution.

Analogous immunity doctrines strongly favor the conclusion that absolute Presidential immunity extends to immunity from criminal prosecution.

#### 1.   Presidential immunity from civil suits.

First, *Nixon v. Fitzgerald* holds the President is absolutely immune from personal liability for conduct within the "outer perimeter" of his official duties. 457 U.S. at 756. The inference that such immunity should include both civil and criminal liability is compelling.

In their common law origins, immunity doctrines extended to both civil and criminal liability, because "[t]he immunity of federal executive officials began as a means of protecting them in the execution of their federal statutory duties from criminal or civil actions based on state law." *Butz v. Economou*, 438 U.S. 478, 489 (1978). Common-law immunity doctrines, therefore, encompass the "privilege … to be free from arrest or civil process," *i.e.*, criminal, and civil proceedings alike. *Tenney*, 341 U.S. at 372. In fact, immunity from criminal prosecution is *more* fundamental to the concept of official immunity than immunity from mere suits for civil damages, as such doctrines arose primarily to avoid potential retribution via criminal charges brought by government officials. *See Butz v. Economou*, 438 U.S. at 489.

16

2.      **Absolute judicial immunity.**

Like absolute executive immunity, absolute judicial immunity protects state and federal judges from criminal prosecution, as well as civil suits, based on their official judicial acts. In *Spalding v. Vilas*, the Supreme Court noted that the doctrine of judicial immunity extends to both "civil suit" and "indictment." 161 U.S. 483, 494 (1896) (quoting *Yates v. Lansing*, 5 Johns. 282, 291 (N.Y. 1810) (Kent, C.J.)). In *Pierson*, likewise, the Supreme Court held that "[t]his immunity applies even when the judge is accused of acting maliciously and corruptly." *Pierson*, 386 U.S. at 554; *see also Fitzgerald*, 457 U.S. at 745-46.

At common law, judicial immunity included immunity from criminal prosecution. "In the case of courts of record … it was held, certainly as early as [the 14th century], that a litigant could not go behind the record, in order to make a judge civilly *or criminally* liable for an abuse of his jurisdiction." J. Randolph Block, *Stump v. Sparkman and the History of Judicial Immunity*, 1980 DUKE L.J. 879, 884 (emphasis added) (quoting 6 W. HOLDSWORTH, A HISTORY OF ENGLISH LAW 235-36 (2d ed. 1937)); *see also id.* at 887 n.39 (quoting 77 Eng. Rep. at 1307).

In accordance with this long common law tradition, our courts have universally rejected criminal charges against judges for their judicial acts. In *United States v. Chaplin*, for instance, the Court held that judicial immunity barred the criminal prosecution of a judge who was "acting in his judicial capacity and within his jurisdiction in imposing sentence and probation upon a person charged with an offense in his court to which the defendant ha[d] pleaded guilty." 54 F. Supp. 926, 928 (S.D. Cal. 1944). In reaching this conclusion, the *Chaplin* Court extensively reviewed historic authorities and, like those authorities, determined criminal prosecution of judges for judicial acts "would … destroy the independence of the judiciary and mark the beginning of the end of an independent and fearless judiciary." *Id*. at 934; *see also id*. ("The rich tradition, the long line of

17

decisions, the confidence of our people in the state and federal judiciary, the experience of over a century and a half expressed in our legal lore, co-extensive with our national existence, cannot be ignored in deciding this issue."). The same reasoning applies to the President here.

### F.   Concerns of Public Policy Favor the President's Immunity from Prosecution.

In considering Presidential immunity, the Supreme Court "has weighed concerns of public policy, especially as illuminated by our history and the structure of our government." *Fitzgerald*, 457 U.S. at 747–48. Here, public policy overwhelmingly supports the finding of immunity.

#### 1.   The Presidency involves "especially sensitive duties."

First, the Supreme Court emphasizes the necessity of robust immunity for officials who have "especially sensitive duties," such as prosecutors and judges. *Fitzgerald*, 457 U.S. at 746 (citing *Imbler*, 424 U.S. 409 and *Stump v. Sparkman*, 435 U.S. 349 (1978)). No one exercises more sensitive duties than the President: "Under the Constitution and laws of the United States the President has discretionary responsibilities in a broad variety of areas, many of them highly sensitive." *Id.* at 756. As the government recently explained, "immunity reaches all of the President's conduct within the vast ambit of his Office, including its 'innumerable' constitutional, statutory, and historical dimensions. . . . In all contexts, questions of Presidential immunity must be approached with the greatest sensitivity to the unremitting demands of the Presidency." Brief for United States as Amicus Curiae *in Blassingame v. Trump*, Nos. 22-5069, 22-7030, 22-7031, at 1–2 (D.C. Cir. filed March 2, 2023) (hereafter "*Blassingame* Amicus Br.," attached as Exhibit A) (citing *Fitzgerald*, 457 U.S. at 750, 756).

#### 2.   The Presidency requires "bold and unhesitating action."

Second, the Supreme Court reasons that immunity is most appropriate for officials from whom "bold and unhesitating action" is required. *Id.* at 745; *see also Imbler*, 424 U.S. at 423-24,

427-28 (holding that prosecutors must enjoy absolute immunity to ensure "the vigorous and fearless performance of the prosecutor's duty that is essential to the proper functioning of the criminal justice system").

   "[T]o submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties," and subject them "to the constant dread of retaliation." *Barr*, 360 U.S. at 571–72 (quoting *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949) (Hand, J.)). In *Vance*, the Supreme Court noted this concern was central to its adoption of absolute immunity for the President, holding that *Fitzgerald* "conclud[ed] that a President … must 'deal fearlessly and impartially with the duties of his office'—not be made 'unduly cautious in the discharge of [those] duties' by the prospect of civil liability for official acts.'" *Vance*, 140 S. Ct. at 2426; *accord Blassingame* Amicus Br. at 9 ("[A]s the Supreme Court has emphasized, it is precisely in such circumstances that there is "the greatest public interest in providing" the President with "the maximum ability to deal fearlessly and impartially with the duties of his office." (quoting *Fitzgerald* 457 U.S. at 752–53)).

   For that reason, the Supreme Court emphasizes that, "[i]n exercising the functions of his office, the head of an Executive Department, keeping within the limits of his authority, should not be under an apprehension that the motives that control his official conduct may, at any time, become the subject of inquiry in a civil suit for damages. It would *seriously cripple the proper and effective administration of public affairs* as entrusted to the executive branch of the government, if he were subjected to any such restraint." *Fitzgerald*, 457 U.S. at 745 (quoting *Spalding*, 161 U.S. at 498) (emphasis added); *see also Barr*, 360 U.S. at 573 (holding that official immunity is "designed to aid in the effective functioning of government").

19

"Frequently acting under serious constraints of time and even information," a President inevitably makes many important decisions, and "[d]efending these decisions, often years after they were made, could impose unique and intolerable burdens…." *Imbler*, 424 U.S. at 425–26; *see also Barr*, 360 U.S. at 571 (expressing concern that suits would "inhibit the fearless, vigorous, and effective administration of policies of government").

The President's "focus should not be blurred by even the subconscious knowledge" of the risk of future prosecution. *Imbler*, 424 U.S. at 427. The threat of criminal prosecution poses a greater risk of deterring bold and unhesitating action than the threat of civil suit, and, therefore, requires at least the same immunity to ensure the President maintains the "maximum ability to deal fearlessly and impartially with the duties of his office." *Fitzgerald*, 457 U.S. at 751 (citation and quotation marks omitted)*; see also Vance*, 140 S. Ct. at 2452 (Alito, J., dissenting) ("There is no question that a criminal prosecution holds far greater potential for distracting a President and diminishing his ability to carry out his responsibilities than does the average civil suit.").

### 3.   Without Immunity the President would be "harassed by vexatious actions."

Another key purpose of immunity for officials is to "prevent them being harassed by vexatious actions." *Spalding*, 161 U.S. at 495 (quotation omitted). In *Imbler*, the Supreme Court held that the common-law immunity of prosecutors rests on the "concern that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust." 424 U.S. at 423; *see also Butz*, 438 U.S. at 512. The President, as the most high-profile government official in the country, is most likely to draw politically motivated ire, and most likely to be targeted for harassment by vexatious actions. *See Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 369 (2004) ("[R]ecognizing the paramount

20

necessity of protecting the Executive Branch from vexatious litigation that might distract it from the energetic performance of its constitutional duties.").[3]

## II.   The Indictment Alleges Only Acts Committed Within the Core of the President's Official Responsibilities, Which Are Shielded by Absolute Immunity.

The indictment is based entirely on alleged actions within the heartland of President Trump's official duties, or at the very least, within the "outer perimeter" of his official duties. As President Trump is absolutely immune from criminal prosecution for such acts, the Court should dismiss the indictment.

### A.   The Scope of Criminal Immunity Includes All Actions That Fall Within the "Outer Perimeter" of the President's Official Duties.

The Supreme Court adopted the expansive "outer perimeter" test for immunity precisely because any "functional" test would be inconsistent with the broad scope of Presidential duties. *Id.* at 756; *accord Blasingame* Amicus Br. at 9 ("This immunity, the Supreme Court has explained, may not be curtailed by attempting to parse discrete Presidential 'functions,' or through allegations that official acts were taken with improper motives. Because the President has 'discretionary responsibilities in a broad variety of areas, . . . [i]n many cases it would be difficult to determine which of the President's innumerable 'functions' encompassed a particular action.'" (quoting *Fitzgerald*, 457 U.S. at 756)).

In other words, the "outer perimeter" of Presidential duties—and thus the scope of Presidential immunity—encircles a vast swath of territory, because the scope of the President's

---

[3] *Vance* held that the need to avoid vexatious litigation was not, standing alone, sufficient to shield the President from a criminal subpoena for private records, 140 S. Ct. at 2426. However, criminal prosecutions for official acts raise numerous additional practical and prudential concerns that do not apply in the subpoena context. It is these additional factors, *in combination with the risk of vexatious litigation*, that compels executive immunity—as *Fitzgerald*, *Spalding*, *Butz*, *Imbler*, and similar cases held.

21

duty and authority in our constitutional system is uniquely and extraordinarily broad. "Article II

'makes a single President responsible for the actions of the Executive Branch,'" *Free Enter. Fund*,

561 U.S. at 496-97 (quoting *Clinton*, 520 U.S. at 712-13 (Breyer, J., concurring in judgment)), and

the President is "the only person who alone composes a branch of government," *Trump v. Mazars*

*USA, LLP*, 140 S. Ct. 2019, 2034 (2020).

Among these Article II duties, perhaps the most fundamental are the framers' dual

mandates that he hold "the executive Power," and with it, the duty to "take Care that the Laws be

faithfully executed." U.S. CONST. art. II, §§ 1, 3. To this end, the President must assume

"supervisory and policy responsibilities of utmost discretion and sensitivity," which "include[s]

the enforcement of federal law." *Fitzgerald*, 457 U.S. at 750; *see also Vance*, 140 S. Ct. at 2425

(The President's "duties, which range from faithfully executing the laws to commanding the

Armed Forces, are of unrivaled gravity and breadth," and "[q]uite appropriately, those duties come

with protections that safeguard the President's ability to perform his vital functions.").

Additionally, "[t]he public looks to the President, as the leader of the Nation, for guidance

and reassurance even on matters over which the Executive Branch—or the federal government as

a whole—has no direct control. From the actions of Congress and the Judiciary, to the policies of

state and local governments, to the conduct of private corporations and individuals, the President

can and must engage with the public on matters of public concern." *Blassingame* Amicus Br. at

12. Thus, even where a President's actions are "directed toward the constitutional responsibilities

of another Branch of government," or concern "matters for which the President himself bears" no

direct constitutional or statutory responsibility, *id*. at 11–12, his actions are often still within the

"outer perimeter" of his official duties, *see Fitzgerald* 457 U.S. at 756.

Without question, the President "occupies a unique office with powers and responsibilities so vast and important that the public interest demands that he devote his undivided time and attention to his public duties." *Clinton*, 520 U.S. at 697.

As the Supreme Court held, "the higher the post, the broader the range of responsibilities and duties, and the wider the scope of discretion, it entails." *Barr*, 360 U.S. at 573. As the highest of all posts, the Presidency warrants the broadest possible immunity, *id.*, and acts must fall within its "outer perimeter" unless clearly established as beyond his duties. *See Klayman v. Obama*, 125 F. Supp. 3d 67, 86 (D.D.C. 2015) ("Absolute immunity is extended to few officers, and it is denied only if the officer acts '*without any colorable claim of authority*.'" (quoting *Bernard v. Cnty. of Suffolk*, 356 F.3d 495, 504 (2d Cir. 2004) (emphasis added)).

**B.     The Nature of the Act, Not the Manner in Which It Is Conducted or Its Alleged Purpose, Determines Whether It Falls Within the Scope of Immunity.**

In deciding what conduct falls within the scope of official duties, courts apply an objective test based on the *nature of the act*—not the manner in which it was conducted, or any allegedly malicious purpose.

Thus, "[i]mmunity is not overcome by 'allegations of bad faith or malice.' Nor is immunity defeated by an allegation that the President acted illegally." *Klayman*, 125 F. Supp. 3d at 86 (citations omitted) (quoting *Barrett v. Harrington*, 130 F.3d 246, 254–55 (6th Cir.1997)); *accord Blassingame* Amicus Br. at 9–10 ("[A]n inquiry into the President's motives" to determine whether a particular action was done in furtherance of a legitimate function or for nefarious reasons would "be highly intrusive" and would impermissibly "subject the President to trial on virtually every allegation that an action was unlawful, or was taken for a forbidden purpose." (quoting *Fitzgerald*, 457 U.S. at 756)).

23

The Supreme Court has repeatedly emphasized this point. *See, e.g., Fitzgerald*, 457 U.S. at 745‑46; *Fisher*, 80 U.S. at 354 ("The allegation of malicious or corrupt motives could always be made, and if the motives could be inquired into judges would be subjected to the same vexatious litigation upon such allegations, whether the motives had or had not any real existence."); *Spalding*, 161 U.S. at 494, 498; *Pierson*, 386 U.S. at 554; *Barr*, 360 U.S. at 575 (holding that immunity applied "despite the allegations of malice in the complaint").

As Judge Learned Hand's often-cited analysis of this question states:

> The [immunity] decisions have, indeed, always imposed as a limitation upon the immunity that the official's act must have been within the scope of his powers; and it can be argued that official powers, since they exist only for the public good, never cover occasions where the public good is not their aim, and hence that to exercise a power dishonestly is necessarily to overstep its bounds. *A moment's reflection shows, however, that that cannot be the meaning of the limitation without defeating the whole doctrine*. What is meant by saying that the officer must be acting within his power cannot be more than that the occasion must be such as would have justified the act, if he had been using his power for any of the purposes on whose account it was vested in him.

*Gregoire*, 177 F.2d at 581 (Hand, J.) (emphasis added); *see also, e.g., Novoselsky v. Brown*, 822 F.3d 342, 351–52 (7th Cir. 2016) ("An 'unworthy purpose' behind the communication 'does not destroy the privilege,' for immunity would be of little use if it could be defeated by 'a jury's speculation as to motives.'") (quoting *Barr*, 360 U.S. at 575); *In re Global Crossing, Ltd. Sec. Litig.*, 314 F. Supp. 2d 172, 174-75 (S.D.N.Y. 2003) ("The 'outer perimeter' of the President's 'official responsibility' would shrink to nothing if a plaintiff, merely by reciting that official acts were part of an unlawful conspiracy, could have them treated by the courts as 'unofficial conduct.'") (citation omitted).

Nor does a mere allegation that an act was unlawful or otherwise inconsistent with a particular statutory scheme place it beyond the "outer perimeter" of the President's official

responsibility. For example, in *Fitzgerald*, the plaintiff, a federal employee working for the Air Force, argued that President Nixon exceeded his official responsibilities in unlawfully causing the plaintiff's dismissal without adherence to certain statutory processes and protections: "[b]ecause Congress has granted this legislative protection . . . no federal official could, within the outer perimeter of his duties of office, cause Fitzgerald to be dismissed without satisfying this standard in prescribed statutory proceedings." 457 U.S. at 756.

The Supreme Court rejected this argument, holding President Nixon's general constitutional and statutory authority to oversee the Air Force placed the nature of his acts comfortably within the "outer perimeter" of his official conduct, and therefore entitled to absolute immunity, even if allegedly unlawful. *Id.* at 756–57 To hold otherwise, the Supreme Court determined, "would subject the President to trial on virtually every allegation that an action was unlawful, or was taken for a forbidden purpose" and therefore "deprive absolute immunity of its intended effect." *Id.*; *see also Stump v. Sparkman*, 435 U.S. at 362 ("[T]he factors determining whether an act by a judge is a 'judicial' one relate to *the nature of the act itself*, *i.e.*, whether it is a function normally performed by a judge....") (emphasis added); *Tenney*, 341 U.S. at 378.

For the same reasons, alleging that immune acts were part of a conspiracy does not defeat immunity: "since absolute immunity spares the official any scrutiny of his motives, an allegation that an act was done pursuant to a conspiracy has no greater effect than an allegation that it was done in bad faith or with malice, neither of which defeats a claim of absolute immunity." *Dorman v. Higgins*, 821 F.2d 133, 139 (2d Cir. 1987) (collecting cases).[4]

---

[4] *See also Ashelman v. Pope*, 793 F.2d 1072, 1078 (9th Cir. 1986) (en banc). "[A]llegations that a conspiracy produced a certain decision should no more pierce the actor's immunity than allegations of bad faith, personal interest or outright malevolence." *Holloway v. Walker*, 765 F.2d 517, 522 (5th Cir. 1985) ("It is a well established rule that where a judge's absolute immunity

25

Importantly, this recognition of absolute immunity, regardless of internal motivation, does "not place the President 'above the law,'" but instead simply clarifies that the remedy for alleged official misconduct lies, as the Constitution requires, with Congress through impeachment, and through other informal means. *Fitzgerald,* 457 U.S. at 757.

### C.    Presidential Conduct With Both Official and Private Character Is Immune.

Because of the unique nature of the Presidency, the President's exercise of his official responsibilities may have personal ramifications, and vice versa. Indeed, as the Supreme Court has recognized, it is commonplace for a President's speech and conduct to have dual roles—both an official and personal character. "The President is the only person who alone composes a branch of government. As a result, there is not always a clear line between his personal and official affairs." *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2034 (2020). Thus, "for any President the line between official and personal can be both elusive and difficult to discern." *In re Lindsey*, 158 F.3d 1263, 1286 (D.C. Cir. 1998) (Tatel, J., concurring in part and dissenting in part). "Because the Presidency is tied so tightly to the persona of its occupant, … official matters … often have personal implications for a President." *Id.*

The government recently agreed with this point before the D.C. Circuit: "a 'first-term President is, in a sense, always a candidate for office,' and it is 'not the least bit unusual for first-term Presidents to comment on public policy or foreign affairs at campaign events, or, in this day, to announce policy changes by tweet during an election year.'" *Blassingame* Amicus Br. at 13 (citation omitted).

---

would protect him from liability for the performance of particular acts, mere allegations that he performed those acts pursuant to a … conspiracy will not be sufficient to avoid the immunity.").

26

For example, "The announcement of a Presidential policy decision at a political rally, or remarks on foreign policy delivered at a campaign event, cannot categorically be excluded from the scope of the President's Office merely because of the context in which they are made." *Id.* at 13-14. "And other statements at such events may be understood by members of the public and domestic and foreign leaders as reflecting the official views of the President, not just the remarks of a political candidate." *Id.* at 14.

For this very reason, it is not "appropriate to frame the immunity question … in terms of whether the challenged conduct of the President was undertaken with a purpose 'to secure or perpetuate incumbency.'" *Id.* (citation omitted). "The Supreme Court in *Nixon* [*v. Fitzgerald*] emphatically rejected an argument that otherwise-official acts lose immunity if they are motivated by an impermissible purpose. That logic applies with even greater force to the suggestion that the President should be subject to suit for his official acts whenever those acts are—or are plausibly alleged to have been—motivated by electoral or political considerations." *Id.* at 14-15 (citation omitted).

Thus, even if the President's speech or conduct appears to have a dual character—*i.e.*, both official and personal (including campaign-related) at the same time—that conduct still lies within the "outer perimeter" of his official responsibilities and is immune from prosecution.

### D. Every Act Alleged in the Indictment Falls Within the Outer Perimeter of the President's Official Duties and Is Immune from Criminal Prosecution.

Applying this objective test, every action of the Defendant alleged in the indictment falls within the "outer perimeter" of President Trump's official duties. As an initial matter, every action of the Defendant charged in the indictment occurred while he was still in office as President of the United States, and, according to the prosecution, all concerned a federal government function. Doc. 1. Given the all-consuming nature of the Presidency, these facts alone strongly support the

27

notion that the indictment is based solely on President Trump's official acts. *See Clinton*, 520 U.S.

at 697 (recognizing that the Presidency carries "powers and responsibilities so vast and important"

that they demand "undivided time and attention to … public duties").

> 1. **Making public statements, including Tweets, about matters of national concern is an official action that lies at the heart of Presidential duties.**

First, making public statements on matters of public concern—especially where they relate

to a core federal function such as the administration of a federal election—unquestionably falls

within the scope of the President's official duties. "The President of the United States possesses

an extraordinary power to speak to his fellow citizens and on their behalf." *Trump v. Hawaii*, 138

S. Ct. 2392, 2417-18 (2018). "[S]peech is unquestionably a critical function of the presidency."

*Thompson v. Trump*, 590 F. Supp. 3d 46, 79 (D.D.C. 2022). As one scholar of the Presidency has

explained, "Presidents have a duty constantly to defend themselves publicly, to promote policy

initiatives nationwide, and to inspirit the population. And for many, this Presidential 'function' is

not one duty among many, but rather the heart of the presidency—its essential task." JEFFREY K.

TULIS, THE RHETORICAL PRESIDENCY 4 (2017).

In *Barr*, the Supreme Court held that communicating with the public about matters of

public interest is standard government practice and well within the scope of official duties:

> The issuance of press releases was standard agency practice, as it has become with many governmental agencies in these times. We think that under these circumstances a publicly expressed statement of the position of the agency head … was an appropriate exercise of the discretion which an officer of that rank must possess if the public service is to function effectively. It would be an unduly restrictive view of the scope of the duties of a policy-making executive official to hold that a public statement of agency policy in respect to matters of wide public interest and concern is not action in the line of duty.

*Barr*, 360 U.S. at 574-75. Notably, immunity lies even if the official's public statements are false

and "actuated by malice," which, of course, President Trump denies. *Id.* at 568.

This conclusion applies even more strongly to the President. The tradition of Presidents making public statements on matters of national concern arose in the first days of the Presidency and encompasses some of the most historic Presidential actions in American History, including George Washington's Farewell Address and Abraham Lincoln's Gettysburg Address. President Theodore Roosevelt described the Presidency as a "bully pulpit" for advancing policy views on matters of public concern. When a President speaks to the public on matters of public concern—especially issues of uniquely *federal* concern, like federal elections—those statements fall in the heartland of his or her official duties.

Still today, the government recognizes the statements from the bully pulpit as a fundamentally Presidential act, entitled to the immunity recognized in *Fitzgerald*: "The traditional 'bully pulpit' of the Presidency … is not limited to speech concerning matters for which the President bears constitutional or statutory responsibility," but includes "matters over which the Executive Branch—or the federal government as a whole—has no direct control." *Id.* at 12. "Such speech is an important traditional function of the Presidency, and it would offend the constitutional separation-of-powers principles recognized in *Nixon* [*v. Fitzgerald*] for courts to superintend the President's speech to his constituents and to other officeholders…." *Id.* The government has taken the same position in other matters as well. *See, e.g.,* Government's Application for Stay of Injunction, *Murthy v. Missouri*, No. 23A243 (U.S.) (filed Sept. 14, 2023) (U.S. Solicitor General arguing that "[a] central dimension of Presidential power is the use of the Office's bully pulpit to seek to persuade Americans . . . to act in ways that the President believes would advance the public interest" and "[o]ne of the central duties and prerogatives of the President … is to speak to the public on matters of public concern, and [he] must have the latitude to do so forcefully at times").

29

Moreover, the Supreme Court emphasizes that "[a] government entity has the right to speak for itself. It is entitled to say what it wishes, and to select the views that it wants to express." *Pleasant Grove City v. Summum*, 555 U.S. 460, 467-68 (2009) (alterations, citations, and quotation omitted) (citing numerous cases). "[T]he First Amendment does not say that Congress and other government entities must abridge their own ability to speak freely." *Matal v. Tam*, 582 U.S. 218, 234 (2017); *see also, e.g., Lynch v. President of the U.S.*, 2009 WL 2949776, at *1 (N.D. Tex. Sept. 14, 2009) ("Televised publication of the President's views on various topical items is within the outer perimeter of his official duties."). This doctrine applies all the more to the Presidency.

For the same reasons, posting Tweets on matters of public concern that relate to the administration of a federal election falls within the heartland of the President's official duties. A Tweet is a public statement in a different (and more accessible) forum. The fact that President Trump most often communicated with the public through Twitter, rather than press releases or public speeches, is merely a difference of medium, not of function.[5]

Although, addressing a different set of allegations, this Court recently concluded that some of President Trump's Tweets and public statements relating to the January 6 certification process did not fall within the outer perimeter of his official duties. *Thompson*, 590 F. Supp. 3d at 79-84.

---

[5] In fact, the Second Circuit recently held that President Trump's Twitter account during his Presidency was a government-run public forum for speech, and that "the factors pointing to the public, non–private nature of the Account and its interactive features are overwhelming." *Knight First Amend. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 236 (2d Cir. 2019*), cert. granted, judgment vacated as moot sub nom. Biden v. Knight First Amend. Inst. At Columbia Univ.*, 141 S. Ct. 1220 (2021). The Second Circuit stated that President Trump "has stipulated that he … uses the Account frequently 'to announce, describe, and defend his policies; to promote his Administration's legislative agenda; to announce official decisions; to engage with foreign political leaders; to publicize state visits; [and] to challenge media organizations whose coverage of his Administration he believes to be unfair.' In June 2017, then–White House Press Secretary Sean Spicer stated at a press conference that President Trump's tweets should be considered 'official statements by the President of the United States.'" *Id.* at 231. The Second Circuit "conclude[d] that the evidence of the official nature of the Account is overwhelming." *Id.* at 234.

However, *Thompson* addressed a different set of allegations, and is therefore distinguishable from this case. Regardless, *Thompson*'s analysis is non-binding and unpersuasive.[6] First, *Thompson* acknowledged that President Trump's "pre-January 6th Tweets and the January 6 Rally Speech addressed matters of public concern: the outcome of the 2020 Presidential Election and election integrity. Whatever one thinks of the President's views on those subjects, they plainly were matters of public concern." *Id.* at 79.

The analysis should have ended there, as speaking to the public on matters of public concern—especially uniquely *federal* concerns, like a federal election—is not only a straightforward and long-established Presidential function, but *itself* "a critical function of the Presidency." *Id.* at 79. Yet the Court, puzzlingly, went on to analyze whether those Tweets "were spoken in furtherance" of another, entirely separate, Presidential function. *Id.* at 81.

*Thompson*'s artificially cramped formulation of the President's authority to speak contradicts the much broader historic tradition of Presidential communications on all matters that affect the Nation. Adopting *Thompson*'s analysis, for example, would place President Biden's recent criticism of the Supreme Court's opinion in *Dobbs*, or his regular criticism of Congress and certain state governments, outside the "outer perimeter" of official duties. This cannot be the case.

Second, *Thompson* misapplied its own "furtherance of a Presidential function" test. *Thompson* acknowledged that the investigation and enforcement of fraud in federal elections is a core Executive function. Conceding that "enforcing election laws through litigation strikes at the

---

[6] Other recent district court decisions coming to similar conclusions in the context of President Trump's claims of civil immunity are largely consistent with *Thompson*. *See Moore v. Trump*, No. 22-CV-00010 (APM), 2022 WL 3904320, at *1 (D.D.C. Aug. 2, 2022); *Michigan Welfare Rts. Org. v. Trump*, No. CV 20-3388 (EGS), 2022 WL 17249218, at *4–5 (D.D.C. Nov. 28, 2022); *United States v. Chrestman*, 525 F. Supp. 3d 14, 33 (D.D.C. 2021). For ease of reference, this memorandum discusses *Thompson*, but its analysis applies to those other decisions as well.

core of the executive branch's duty to faithfully execute the law," *Thompson* held that "[t]he President can enforce election laws through litigation initiated by the Department of Justice or the Federal Election Commission, agencies over which he has appointment authority." *Id.* at 78. "A lawsuit is the ultimate remedy for a breach of the law, and it is to the President, and not to the Congress, that the Constitution entrusts the responsibility to 'take Care that the Laws be faithfully executed.'" *Id.* (quoting *Buckley v. Valeo*, 424 U.S. 1, 138 (1976) (per curiam)).

Here, President Trump's alleged Tweets and public statements about fraud in the election and the role of the Vice President in the certification process were directly related to his contentions that: (1) the Presidential election's outcome was tainted by fraud and other procedural irregularities, and (2) the U.S. Department of Justice and certain state governments had failed to adequately investigate and prosecute fraud and irregularities in the election. By *Thompson*'s own logic, therefore, President Trump's Tweets and public statements *were* "in furtherance of [a] Presidential function" under the Take Care Clause—namely, assuring adequate investigation and enforcement of federal election laws and protecting the integrity of federal elections.

In reaching its conclusion, *Thompson* repeatedly and erroneously focused on what it deemed the "purpose" of President Trump's public statements. *Id.* at 83. *Thompon* stated, for instance, that President Trump's Tweets were "*directed at* securing incumbency," that this was "the *purpose* of the January 6 Rally," that "[t]he clear *purpose*" of his public statements was "to help him 'win,'" and that the January 6 speech "reflect[s] an electoral *purpose*...." *Id.* at 82-83 (emphases added).

But, as explained above, separate from the fact that the allegations regarding intent are untrue, an allegedly improper *purpose* for an official act does not rob the act of its official character—indeed, there is hardly an immunity case without such an allegation. "The claim of an

unworthy *purpose* does not destroy the privilege." *Tenney*, 341 U.S. at 377 (emphasis added). "The motive that impelled him to do that of which the plaintiff complains is therefore wholly immaterial." *Spalding*, 161 U.S. at 499; *see also, e.g., Fitzgerald*, 457 U.S. at 745-46; *Fisher*, 80 U.S. at 350-51; *Pierson*, 386 U.S. at 554; *Barr*, 360 U.S. at 575; *Klayman*, 125 F. Supp. 3d at 87.

### 2. Communicating with the U.S. Department of Justice about the investigation of election fraud and considering replacing the Acting Attorney General lie at the heart of the President's official duties.

The President's alleged meetings and communications with officials at the U.S. Department of Justice also lie at the heart of his constitutional duties. Article II provides that the President shall "take Care that the Laws be faithfully executed." U.S. CONST. art. II, § 3. The laws of the United States include prohibitions against election fraud and other election crimes, which the Attorney General of the United States—who is appointed by and reports to the President—is charged with enforcing. *See, e.g.,* 18 U.S.C. §§ 241, 242, 611, 911, 1015(f); 52 U.S.C. §§ 10307(c), 10307(e), 20511(1), 20511(2)(A), 20511(2)(B), 30120, 30124. The Department of Justice publishes a lengthy manual on the prosecution of federal election crimes, U.S. Dep't of Justice, *Federal    Prosecution    of    Election    Offenses* (8th    ed.    2017),    *at* https://www.justice.gov/criminal/file/1029066/download (visited August 21, 2023), which provides that "[f]ederal jurisdiction over election fraud is easily established in elections when a federal candidate is on the ballot." *Id.* at 6. The Department of Justice has an entire "Election Crimes Branch" within the Public Integrity Section that was created in 1980 "to oversee the Justice Department's nationwide response to election crimes." U.S. Dep't of Justice, *Election Crimes Branch*, *at* https://www.justice.gov/criminal-pin/election-crimes-branch (visited August 21, 2023). The Election Crimes Branch also "consult[s] and support[s] … [state and local] prosecutors and investigators around the nation." *Id.*

33

In short, it is indisputable that "[t]he President can enforce election laws through litigation initiated by the Department of Justice or the Federal Election Commission, agencies over which he has appointment authority." *Thompson*, 590 F. Supp. 3d at 78.

Urging his own Department of Justice to do more to enforce the laws that it is charged with enforcing is unquestionably an official act of the President. "[T]he President may undoubtedly, in the performance of his constitutional duty, instruct the Attorney General to give his direct personal attention to legal concerns of the United States elsewhere, when the interests of the Government seem to the President to require this." *Office & Duties of Attorney General*, 6 U.S. Op. Atty. Gen. 326, 335 (1854). "The Attorney General … is the hand of the President in taking care that the laws of the United States in protection of the interests of the United States in legal proceedings and in the prosecution of offenses be faithfully executed." *Ponzi v. Fessenden*, 258 U.S. 254, 262 (1922).

Deliberating about whether to replace the Acting Attorney General of the United States is also a core Presidential function. The Appointments Clause of Article II provides that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States…." U.S. CONST. art. II, § 2, cl. 2. This clause also encompasses the removal power. *Myers v. United States*, 272 U.S. 52, 122 (1926).

"During the first Congress, James Madison stated that 'if any power whatsoever is in its nature executive, it is the power of appointing, overseeing, and controlling those who execute the laws.'" *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 U.S. Op. O.L.C. 101, 113 (1984) (quoting 1 ANNALS OF CONGRESS 481 (1789)); *see also In re Sealed Case*, 121 F.3d 729, 752–53 (D.C. Cir. 1997) (holding Presidential deliberations about replacing the head of the Department of Agriculture

34

constituted a core Presidential function: "In this case the documents in question were generated in the course of advising the President in the exercise of his appointment and removal power, a quintessential and nondelegable Presidential power. . . . "the President himself must directly exercise the Presidential power of appointment or removal.").

Although, mirroring *Fitzgerald*, the prosecution incorrectly alleges that an improper purpose motivated President Trump's thinking regarding the Department of Justice's staffing, and its approach to election fraud and irregularities, a President's purpose or motive is once again irrelevant to whether his acts fall within the "outer perimeter" of his responsibilities. *Fitzgerald*, 457 U.S. at 756.

> **3.     Meeting with state officials about the administration of a federal election lies at the heart of the President's official duties.**

Next, meeting with state officials about the administration of a federal election in their States, and urging them to exercise their official duties with respect to the federal election in a certain way, constitutes another core exercise of Presidential responsibility.

The Supreme Court long ago rejected the notion that the President's Take Care duty is "limited to the enforcement of acts of congress or of treaties of the United States according to their express terms," and held that this duty "include[s] the rights, duties, and obligations growing out of the constitution itself, our international relations, and all the protection implied by the nature of the government under the constitution." *Cunningham v. Neagle*, 135 U.S. 1, 64 (1890).

Ensuring the integrity of federal elections and urging state officials to take steps to ensure the fairness and integrity of federal elections fall within "the rights, duties, and obligations growing out of the constitution itself … and all the protection implied by the nature of the government under the constitution." *Id. Fitzgerald*, likewise, rejected the notion that the "outer perimeter" of the President's official responsibilities should be identified by parsing specific "functions" of the

Presidency, holding that "[i]n many cases it would be difficult to determine which of the President's innumerable 'functions' encompassed a particular action," and that the "functional" approach "could be highly intrusive." 457 U.S. at 756.

Ensuring the integrity of federal elections falls within the President's official duty. "While Presidential electors are not officers or agents of the federal government, they exercise federal functions under, and discharge duties in virtue of authority conferred by, the Constitution of the United States." *Burroughs v. United States*, 290 U.S. 534, 545 (1934); *see also Anderson v. Celebrezze*, 460 U.S. 780, 794-95 (1983) (discussing the "uniquely important national interest" in Presidential elections). Recognizing the strong federal interest in elections, the current Administration has issued a sweeping executive order directing all federal agencies to interface with state and local officials to promote election integrity and ballot access.  Exec. Order 14019, *Promoting Access to Voting*, 86 Fed. Reg. 13623-27.

Similarly, taking steps to ensure that fraud and other irregularities do not vitiate the outcome of a federal election also falls within the President's responsibility. For example, federal election law criminalizes preparing "false ballots, plac[ing] them in the box, and return[ing] them" because that prevents "an honest count ... of the votes lawfully cast." *United States v. Saylor*, 322 U.S. 385, 389 (1944). The Constitution also guarantees equal treatment of voters in federal elections and protects them from arbitrary interference with their voting rights. *Bush v. Gore*, 531 U.S. 98, 104–05 (2000). Communicating with state officials to ensure "an honest count … of the votes lawfully cast" in a federal election, *Saylor*, 322 U.S. at 389, thus effectuates federal rights and flows directly from the President's Take Care power, *see Neagle*, 135 U.S. at 59.

Further, the indictment alleges that the President communicated with state officials, argued that election fraud occurred, urged them to conduct their own investigations of election fraud and

irregularities, and to take steps to address those issues. Those are just the sorts of communications that one would expect the Department of Justice to make if it had investigated and concluded that there was election fraud in the relevant States. As noted above, the Election Crimes Branch of DOJ "consult[s] and support[s] … prosecutors and investigators around the nation." U.S. Dep't of Justice, *Election Crimes Branch*, *supra*. DOJ's authority is not greater than the President's here; Article II "makes a single President responsible for the actions of the Executive Branch." *Free Enter. Fund*, 561 U.S. at 496-97 (quoting *Clinton*, 520 U.S. at 712-13 (Breyer, J., concurring in judgment)). The President thus has the authority and obligation to communicate his concerns about alleged fraud in federal elections to the relevant state authorities—a function at the heart of the President's constitutional role.

Again, the Department of Justice has recently come to the same conclusion—concluding that communicating with state officials about their exercise of official duties with respect to a federal election falls within the scope of the President's official duties: "Such speech is an important traditional function of the Presidency, and it would offend the constitutional separation-of-powers principles recognized in *Nixon* [*v. Fitzgerald*] for courts to superintend the President's speech to his constituents and *to other officeholders* … merely because it concerns the conduct of a coordinate Branch *or an entity outside the federal government*." *Blassingame* Amicus Br. 12 (citing *Council on Am. Islamic Relations v. Ballenger*, 444 F.3d 659, 665 (D.C. Cir. 2006)) (emphases added).

Aware that, as a general matter, a President may communicate with federal election officials regarding election integrity concerns, the prosecution here attempts to side-step the issue by falsely alleging President Trump did not really *believe* there were outcome-determinative issues with the election. However, probing President Trump's internal beliefs, again, are questions of

37

motive or purpose that cannot defeat immunity, elsewise the President would be "subject . . . to trial on virtually every allegation that an action was unlawful, or was taken for a forbidden purpose." *Fitzgerald*, 457 U.S. at 756.

Last, although *Thompson* came to a different conclusion about the scope of the Take Care responsibility, 590 F. Supp. 3d at 77-78, its analysis is unpersuasive. *Thompson* reasoned that "a sitting President has no expressly identified duty to faithfully execute the laws surrounding the Certification of the Electoral College." 590 F. Supp. 3d at 78. This is wrong for several reasons. First, by requiring the President to show an "*expressly* identified duty," *id.* (emphasis added), *Thompson* adopted the very standard that the Supreme Court rejected in *Neagle*, *i.e.*, as "limited to the enforcement of acts of congress or of treaties of the United States according to their *express* terms." 135 U.S. at 64 (emphasis added).

On the contrary, the President's Take Care role "include[s] the rights, duties, and obligations growing out of the constitution itself … and all the protection implied by the nature of the government under the constitution." *Id.* This includes taking steps to prevent the certification of a federal election tainted by fraud—even if those steps are limited to encouraging other state and federal officials to exercise their responsibilities a certain way where the President allegedly has no direct role. *Thompson* likewise contravened the Supreme Court's guidance in *Fitzgerald* that the scope of Presidential immunity should not be determined by parsing the specific "functions" of the President and demanding that immunity be closely linked to a specific function.

Second, even if the Take Care duty were limited to the "express terms" of federal statutes, *Thompson* overlooked the direct connection between the President's duty to enforce federal statutes that safeguard the integrity of federal elections, and his communications with state officials about that very issue. If the President or DOJ concludes that significant fraud occurred in the

administration of a federal election, the Take Care Clause does not require them to keep that information to themselves. Rather, it authorizes them to report that conclusion to state (and other federal) officials and to urge them to act accordingly. *Thompson* concluded that "merely exhorting non-Executive Branch officials to act in a certain way" is not "a responsibility within the scope of the Take Care Clause." 590 F. Supp. 3d at 78. That is wrong. But even if that were so, when "exhorting non-Executive Branch officials to act in a certain way" addresses core federal interests and effectuates and protects rights conferred by federal statutes, it falls within the President's responsibilities.

Third, *Thompson*'s conclusion that "[t]he President's Take Care Clause duty … does *not* extend to government officials over whom he has no power or control," *id.* at 78, proves far too much. That formulation entails that the President's urging the Supreme Court to rule a certain way in a case to which the United States is not a party—for example, in an amicus brief filed by the Solicitor General—is a purely private action outside the "outer perimeter" of Executive responsibility, simply because the President has "no power or control" over Article III judges. *Id.* That is illogical. Rather, the Take Care duty must extend to exhorting other officials to exercise their responsibilities in a manner consistent with the President's view of the public good— *especially* when the issue affects the civil rights of millions of federal voters and addresses a "bedrock function of the United States federal government." Doc. 1, at 2.

> **4.    Communicating with the President of the Senate and other Members of Congress about the exercise of their official duties regarding federal election certification lies at the heart of the President's official duties.**

President Trump's communications with the Vice President in his legislative role as President of the Senate and with other Members of Congress about the exercise of their official duties with respect to the election certification also fall at the heart of the President's official

responsibility. Presidents routinely communicate with Congress to provide information and urge

them to act, and this conduct is among the most deeply rooted traditions of Presidential authority.

First, President Trump's direct communications with the Vice President—in his legislative

role as "President of the Senate," Doc. 1, ¶¶ 9, 53—were central to his official responsibilities.

The Constitution assigns the President extensive roles in the legislative process. Article I, § 7,

clause 2 confers on the President the veto power over bills. Clause 3 of the same section confers

on the President the veto power over joint resolutions. Article II provides that the President "shall

from time to time give to the Congress Information of the State of the Union, and *recommend to*

*their Consideration such Measures as he shall judge necessary and expedient*." U.S. CONST. art.

II, § 3 (emphasis added). Article II, § 3 also provides that the President "may, on extraordinary

Occasions, convene both Houses, or either of them, and in Case of Disagreement between them,

with Respect to the Time of Adjournment, he may adjourn them to such Time as he shall think

proper…." *Id.*

Particularly relevant here, the President's authority to "recommend to [Congress's]

Consideration such Measures as he shall judge necessary and expedient," *id.*, encompasses the

President's authority to provide information to legislators and urge them to take specific actions:

> It is equally necessary for the executive branch of Government to be
> able to make its views known to Congress on all matters in which it
> has responsibilities, duties, and opinions. The executive agencies
> have a definite requirement to express views to Congress, to make
> suggestions, to request needed legislation, to draft proposed bills or
> amendments, and so on…. [E]xecutive agencies have the right and
> responsibility to seek to 'influence, encourage, promote or retard
> legislation' in many clear and proper—and often extremely
> effective—respects….

*Legislative Activities of Executive Agencies: Hearings Before the H. Select Comm. On Lobbying*

*Activities*, 81st Cong., pt. 10, at 2 (1950), *quoted in Lobbying by Executive Branch Personnel*, U.S.

40

Op. O.L.C. Supp. 240, 243-44 (1961), *at* https://www.justice.gov/d9/olc/opinions/1961/10/31/op-olc-supp-v001-p0240_0.pdf (visited August 22, 2023) ("1961 O.L.C. Op."). "[I]n furtherance of basic responsibilities[,] the executive branch and particularly the Chief Executive and his official family of departmental and agency heads" are authorized to "inform and consult with the Congress on legislative considerations, draft bills and urge in messages, speeches, reports, committee testimony and by direct contact the passage or defeat of various measures." H.R. Rep. No. 81-3138, at 52 (quoted in 1961 O.L.C. Op. at 244).

The Executive Branch endorsed these statements in 1961: "the participation of the President in the legislative function is based on the Constitution." 1961 O.L.C. Op. at 245. "It was the intention of the Fathers of the Republic that the President should be an active power in legislation .... He is made by the Constitution an important part of the legislative mechanism of our government." *Id.* (square brackets omitted) (quoting Thomas J. Norton, *The Constitution of the United States: Its Sources and Its Application* 123 (special ed. 1940, 8th printing 1943)).

"The President's right, even duty, to propose detailed legislation to Congress touching every problem of American society, and then to speed its passage down the legislative transmission belt, is now an accepted usage of our constitutional system." *Id.* (quoting Clinton Rossiter, *The American Presidency* 108 (2d rev. ed. 1960)). "This constitutionally established role in the legislative process has become so vital through the years that the President has been aptly termed the Chief Legislator." *Id.* (citing, *inter alia*, Lawrence H. Chamberlain, *The President, Congress and Legislation* 14 (1946)).

Here, the indictment alleges that President Trump urged both the Vice President—in his legislative capacity as President of the Senate—and Members of Congress to exercise their authority in the election-certification proceedings consistent with what President Trump urged was

the public good. This conduct is manifestly part of the President's responsibilities in our constitutional tradition, and the question whether the President has a formal role in the election-certification process makes no difference. As the Department of Justice recently put it, "a President acts within the scope of his office when he urges Members of Congress to act in a particular way with respect to a given legislative matter—even a matter, such as a congressional investigation, *in which the President has no constitutional role*." *Blassingame* Amicus Br. 11 (emphasis added).

In fact, there is direct historical precedent for a sitting President communicating with Members of Congress about alleged election fraud relating to the certification of a disputed election involving rival slates of electors. In the wake of the 1876 election, President Grant discussed the electoral count and claims of fraud with a member of the U.S. House. See 28 THE PAPERS OF ULYSSES S. GRANT 80–81 (ed. John Y. Simon 2005), *at* https://scholarsjunction.msstate.edu/usg-volumes/27/ (visited August 22, 2023). Likewise, President Grant transmitted to Congress a letter he received from an observer (a U.S. Senator) whom he had requested to go to New Orleans and witness the counting of votes. *Id.* at 75-78. President Grant also dispatched federal troops to Louisiana and Florida to prevent violence while Republican-controlled election boards counted votes, and he instructed the federal troops to report fraud in the election. *See id.* at 19-20. These acts, just like President Trump's, were Presidential.

### 5.   Allegedly organizing contingent slates of electors falls within the President's official duties.

The indictment alleges that President Trump directed or approved other individuals to organize contingent slates of electors in disputed States. Doc. 1, ¶¶ 53-69. The indictment clearly alleges that these actions were part and parcel of President Trump's alleged attempts to convince the Vice President and Members of Congress to exercise their official authority in his favor on January 6. *Id.* ¶ 10(b) (alleging that the contingent electors were "to transmit their false certificates

to the Vice President and other government officials to be counted at the certification proceeding on January 6"); *id.* ¶ 53 (alleging that "the submission of these fraudulent slates [of electors] would create a fake controversy at the certification proceeding and position the Vice President—presiding on January 6 as the President of the Senate—to supplant legitimate electors with the Defendant's fake electors and certify the Defendant as President"). The contingent electors' role, the indictment alleges, was to allow President Trump to convince the Vice President and other Members of Congress to reject or delay the certification of certain electoral votes. *See id.* ¶ 86 (alleging that President Trump attempted "to convince the Vice President to accept the Defendant's [supposedly] fraudulent electors, reject legitimate electoral votes, or send legitimate electoral votes to state legislatures for review rather than count them"); *see also id.* ¶¶ 88, 89, 90, 91, 92, 93, 95, 101, 103 (repeatedly alleging that the slates of electors were used to attempt to convince the Vice President to reject or delay the certification).

These actions fall within the President's official responsibilities for at least two reasons. First, as noted above, the "outer perimeter" of the President's official responsibilities "include[s] the rights, duties, and obligations growing out of the constitution itself … and all the protection implied by the nature of the government under the constitution." *Neagle*, 135 U.S. at 64. The Constitution explicitly provides for Presidential electors and delineates their role. U.S. CONST. art. II, §1, cl. 2. "While Presidential electors are not officers or agents of the federal government, they exercise federal functions under, and discharge duties in virtue of authority conferred by, the Constitution of the United States." *Burroughs*, 290 U.S. at 545. Indeed, the indictment itself describes the selection of Presidential electors as an integral part of "a bedrock function of the United States federal government: the nation's process of collecting, counting, and certifying the results of the Presidential election." Doc. 1, ¶ 4 (indictment); *see also id.* ¶ 9.

43

Organizing slates of electors, therefore, relates directly to "the rights, duties, and obligations growing out of the constitution itself," *Neagle*, 135 U.S. at 64, and thus to the President's responsibilities. Without contingent slates of electors, there would be no alternative option for the Vice President to certify, rendering futile the President's entirely legitimate efforts to urge Congress and the states to reconsider evidence of fraud and irregularities. Organization of the slates of electors, in other words, advances two core Presidential functions—protecting the integrity of federal elections, and urging Members of Congress to act in a manner consistent with the President's view of the public good. Thus, these actions clearly lie within the "outer perimeter" of the President's "official responsibilities." *Fitzgerald*, 457 U.S. at 756.[7]

Second, as the indictment itself emphasizes, the actions of organizing slates of electors were ancillary and preparatory to the acts of communicating with the Vice President and other Members of Congress and urging them to exercise their official responsibilities a certain way— which are themselves core exercises of Presidential responsibility.

Acts that are intertwined with immune actions are themselves immune from liability. For example, it is widely accepted that "[a]bsolute prosecutorial immunity will … attach to administrative or investigative acts necessary for a prosecutor to initiate or maintain the criminal prosecution." *Prince v. Hicks*, 198 F.3d 607, 612 (6th Cir. 1999) (quoting *Ireland v. Tunis*, 113 F.3d 1435, 1447 (6th Cir. 1997)); *see also, e.g., Guzman–Rivera v. Rivera–Cruz*, 55 F.3d 26, 29 (1st Cir. 1995) ("[A]bsolute immunity may attach even to ... administrative or investigative

---

[7] Nor were such actions unprecedented. Quite the opposite, at the time of the alleged conduct, the Electoral Count Act did not prohibit organizing contingent slates of electors, and such electors had been organized previously in the disputed elections of 1876 and 1960—including, in the former case, with the support of the sitting President. This was thus not a situation where "the President takes measures incompatible with the express or implied will of Congress," but a situation where the President was acting in an area of "independent Presidential responsibility." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

44

activities when these functions are necessary so that a prosecutor may fulfill his function as an officer of the court.") (quoting *Pfeiffer v. Hartford Fire Ins. Co.*, 929 F.2d 1484, 1490 (10th Cir. 1991)). "[T]he Supreme Court has recognized that some duties prior to the initiation of a prosecution are also protected. Preparing to initiate a prosecution may necessitate obtaining, reviewing and evaluating evidence; absolute immunity may attach when these functions are necessary so that a prosecutor may fulfill his function as an officer of the court." *Snell v. Tunnell*, 920 F.2d 673, 693 (10th Cir. 1990) (citing *Imbler*, 424 U.S. at 431 n.33). Thus, a prosecutor "who performs functions within the continuum of initiating and presenting a criminal case … ordinarily will be entitled to absolute immunity." *Id.* So too here. President Trump's alleged acts regarding the contingent slates of electors "perform[ed] within the continuum" of his other immune acts, *id.*, such as communicating with Congress, are also immune.

* * *

For these reasons, the acts alleged in the indictment lie firmly within the "outer perimeter" of the President's official responsibility. Therefore, they cannot form the basis of criminal charges against President Trump.[8]

## CONCLUSION

The Court should dismiss the indictment, with prejudice, on grounds of Presidential immunity.

---

[8] The indictment also alleges that President Trump filed lawsuits challenging the election outcome. Doc. 1, ¶¶ 20, 30. Yet the indictment proclaims that it is not directly relying on such actions. Doc. 1, ¶ 3 (admitting that President Trump "was also entitled to formally challenge the results of the election through lawful and appropriate means, such as by seeking recounts or audits of the popular vote in states or *filing lawsuits challenging ballots and procedures*") (emphasis added). Accordingly, these are included only as acts in furtherance of the supposed conspiracy, which are immune from prosecution for the reasons just stated, regardless of whether such lawsuits were filed in a personal or official capacity. Moreover, the act of filing lawsuits alone, without more, is manifestly insufficient to support any charge in the indictment.

45

Dated: October 5, 2023                    Respectfully submitted,


Todd Blanche, Esq. (PHV)                  /s/John F. Lauro
toddblanche@blanchelaw.com                John F. Lauro, Esq.
BLANCHE LAW                               D.C. Bar No. 392830
99 Wall St., Suite 4460                   jlauro@laurosinger.com
New York, NY 10005                        Gregory M. Singer, Esq. (PHV)
(212) 716-1250                            gsinger@laurosinger.com
                                          Filzah I. Pavalon, Esq. (PHV)
                                          fpavalon@laurosinger.com
                                          LAURO & SINGER
                                          400 N. Tampa St., 15th Floor
                                          Tampa, FL 33602
                                          (813) 222-8990
                                          *Counsel for President Trump*


## CERTIFICATE OF CONFERRAL

Counsel for President Trump conferred with counsel for the prosecution, who advise the government opposes the relief requested herein.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| v. | * | **CRIMINAL NO. 23-cr-257 (TSC)** |
| | * | |
| **DONALD J. TRUMP,** | * | |
| | * | |
| Defendant. | * | |
| | * | |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO
DISMISS ON PRESIDENTIAL IMMUNITY GROUNDS**

# TABLE OF CONTENTS

I.   Introduction ................................................................................................. 1

II.  Factual and Procedural Background .......................................................... 1

III. Argument ..................................................................................................... 3

    A.   Legal Background ................................................................................ 5

    B.   A Former President Has No Immunity from Federal Criminal
        Prosecution ........................................................................................... 7

        1.   No constitutional provision or historical practice supports
            conferring absolute immunity from criminal prosecution on a
            former president. ........................................................................... 8

            a.   The Constitution does not support absolute immunity
                from criminal prosecution for a former president for
                conduct while in office. ....................................................... 9

            b.   Historical practice does not support absolute immunity
                from criminal prosecution for a former president for
                conduct while in office. ..................................................... 15

        2.   The immunity from civil liability for a former president's official
            conduct recognized in *Fitzgerald* does not extend to criminal
            liability. ....................................................................................... 19

            a.   Applying *Fitzgerald* in the criminal context would place
                a former president above the law. ....................................... 19

            b.   *Fitzgerald*'s reasoning does not apply in the criminal
                context. ................................................................................ 21

            c.   *Fitzgerald*'s analogy to judges and prosecutors—who are
                not immune from criminal prosecution—applies here. ...... 23

            d.   Adequate safeguards protect the unique role of the
                presidency without immunizing a former president from
                criminal prosecution. ........................................................ 28

    C.   Creating a Novel Immunity from Criminal Prosecution for a Former
        President Would Pose Significant Challenges, But at a Minimum Any
        Such Immunity Should Be Narrower Than Immunity from Civil Liability
        and Would Be Inapplicable Here. ..................................................... 34

1.    The scope of any immunity in this context would have to account
      for the substantially greater public interest in federal criminal
      prosecutions and other relevant differences from private civil
      suits.. ..................................................................................... 34

2.    The defendant cannot establish that he would be entitled to
      dismissal of the indictment under any plausible view of a former
      president's immunity from criminal prosecution..................................... 36

D.    Even If a Former President Were Entitled to Immunity from Criminal
      Prosecution Comparable to His Immunity from Civil Liability,
      Dismissal Is Not Warranted Here. ....................................................... 40

IV.  Conclusion.................................................................................................... 43

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. United States,*
    417 U.S. 211 (1974) ........................................................................... 32

*Arthur Andersen LLP v. United States,*
    544 U.S. 696 (2005) ........................................................................... 32

*Banneker Ventures, LLC v. Graham,*
    798 F.3d 1119 (D.C. Cir. 2015) ....................................................... 39

*Barr v. Matteo,*
    360 U.S. 564 (1959) ........................................................................... 35

*Berger v. United States,*
    295 U.S. 78 (1935) ............................................................................. 23

*Blockburger v. United States,*
    284 U.S. 299 (1932) ........................................................................... 13

*Butz v. Economou,*
    438 U.S. 478 (1978) ............................................................. 17, 34, 37

*Cheney v. U.S. Dist. Court for Dist. of Columbia,*
    542 U.S. 367 (2004) ............................................................. 22, 23, 34

*Clinton v. Jones,*
    520 U.S. 681 (1997) ............................................................... 6, 10, 23

*Dennis v. Sparks,*
    449 U.S. 24 (1980) ................................................................. 1, 24, 26

*Ex Parte Commonwealth of Virginia,*
    100 U.S. 339 (1879) ........................................................................... 26

*Expeditions Unlimited Aquatic Enterprises, Inc. v. Smithsonian Inst.,*
    566 F.2d 289 (D.C. Cir. 1977) ......................................................... 22

*Forrester v. White,*
    484 U.S. 219 (1988) ........................................................................... 34

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) ........................................................................... 32

*Gravel v. United States,*
    408 U.S. 606 (1972) ..................................................................... 23, 35

*Hammerschmidt v. United States*,
   265 U.S. 182 (1924) .................................................................... 31

*Harlow v. Fitzgerald*,
   457 U.S. 800 (1982) ............................................................. 28, 34

*Hastings v. United States Senate*,
   716 F. Supp. 38 (D.D.C. 1989) ........................................... 11, 14

*Imbler v. Pachtman*,
   424 U.S. 409 (1976) ............................................................. 24, 25

*In re Lindsey*,
   158 F.3d 1263 (D.C. Cir. 1998) .................................................. 36

*In re Neagle*,
   135 U.S. 1 (1890) ........................................................................ 40

*In re Sealed Case*,
   121 F.3d 729 (D.C. Cir. 1997) .................................................... 32

*Logan v. United States*,
   144 U.S. 263 (1892) .................................................................... 40

*Lucia v. SEC*,
   138 S. Ct. 2044 (2018) ............................................................... 40

*Marbury v. Madison*,
   5 U.S. 137 (1803) ....................................................................... 17

*Martin v. Mott*,
   25 U.S. 19 (1827) ....................................................................... 17

*Mireles v. Waco*,
   502 U.S. 9 (1991) ................................................................. 25, 26

*Missouri v. Hunter*,
   459 U.S. 359 (1983) .................................................................... 13

*Nixon v. Adm'r of Gen. Servs.*,
   433 U.S. 425 (1977) .................................................................... 35

*Nixon v. Fitzgerald*,
   457 U.S. 731 (1982) ............................................................. passim

*Nixon v. Sirica*,
   487 F.2d 700 (D.C. Cir. 1973) (en banc) ................................... 16

*Nixon v. United States,*
   506 U.S. 224 (1993) ........................................................................ 11

*O'Shea v. Littleton,*
   414 U.S. 488 (1974) ................................................................. 23, 35

*Screws v. United States,*
   325 U.S. 91 (1945) ........................................................................ 32

*Tennessee v. Davis,*
   100 U.S. 257 (1879) ...................................................................... 31

*Tenney v. Brandhove,*
   341 U.S. 367 (1951) ........................................................................ 9

*Thompson v. Trump,*
   590 F. Supp. 3d 46 (D.D.C. 2022) ............................................. 14

*Trump v. Mazars USA, LLP,*
   140 S. Ct. 2019 (2019) ................................................................. 36

*Trump v. Thompson,*
   20 F.4th 10 (D.C. Cir. 2021) ...................................................... 16

*Trump v. Thompson,*
   573 F. Supp. 3d 1 (D.D.C. 2021) ................................................. 8

*Trump v. Vance,*
   140 S. Ct. 2412 (2020) ........................................................ passim

*Turkiye Halk Bankasi A.S. v. United States,*
   598 U.S. 264 (2023) ...................................................................... 22

*United States ex rel. Epton v. Nenna,*
   446 F.2d 363 (2d Cir. 1971) ........................................................ 38

*United States v. Armstrong,*
   517 U.S. 456 (1996) ...................................................................... 30

*United States v. Brewster,*
   408 U.S. 501 (1972) ...................................................................... 36

*United States v. Burr,*
   25 F. Cas. 187 (C.C.D. Va. 1807) .............................................. 16

*United States v. Burr,*
   25 F. Cas. 30 (C.C.D. Va. 1807) ............................................ 3, 16

*United States v. Chaplin*,
   54 F. Supp. 926 (S.D. Cal. 1944) ........................................................................... 27

*United States v. Chemical Foundation, Inc.*,
   272 U.S. 1 (1926) ................................................................................................ 30

*United States v. Claiborne*,
   727 F.2d 842 (9th Cir. 1984) .............................................................. 13, 23, 25, 26

*United States v. Collins*,
   972 F.2d 1385 (5th Cir. 1992) ............................................................................. 26

*United States v. Donner*,
   497 F.2d 184 (7th Cir. 1974) .............................................................................. 38

*United States v. Gillock*,
   445 U.S. 360 (1980) ...................................................................................... 21, 25

*United States v. Hastings*,
   681 F.2d 706 (11th Cir. 1982) ............................................................ 23, 25, 26, 31

*United States v. Isaacs*,
   493 F.2d 1124 (7th Cir. 1974) ............................................................ 14, 23, 25, 26

*United States v. Klein*,
   80 U.S. (13 Wall.) 128 (1872) ............................................................................. 36

*United States v. Lanier*,
   920 F.2d 887 (11th Cir. 1991) ............................................................................. 38

*United States v. Lee*,
   106 U.S. 196 (1882) ................................................................................... 1, 8, 17

*United States v. Manton*,
   107 F.2d 834 (2d Cir. 1939) ............................................................................... 27

*United States v. Morrison*,
   98 F.3d 619 (D.C. Cir. 1996) .............................................................................. 32

*United States v. Nixon*,
   418 U.S. 683 (1974) .................................................................................... passim

*United States v. Nixon*,
   816 F.2d 1022 (5th Cir. 1987) ............................................................................. 27

*United States v. North*,
   910 F.2d 843 (D.C. Cir. 1990), *opinion withdrawn and superseded in part on
   reh'g*, 920 F.2d 940 (D.C. Cir. 1990) .................................................................. 32

*United States v. R. Enterprises, Inc.*,
    498 U.S. 292 (1991) ................................................................ 31

*United States v. Rhodes*,
    610 F. Supp. 3d 29 (D.D.C. 2022) .......................................... 31

*United States v. Vascular Sols., Inc.*,
    181 F. Supp. 3d 342 (W.D. Tex. 2016) .................................. 38

*United States v. Weeks*,
    636 F. Supp. 3d 117 (D.D.C. 2022) ................................... 1, 37

*Wisconsin v. Mitchell*,
    508 U.S. 476 (1993) ................................................................ 38

*Youngstown Sheet & Tube v. Sawyer*,
    343 U.S. 579 (1952) ........................................................ 35, 40

*Zivotofsky v. Kerry*,
    576 U.S. 1 (2015) ................................................................... 35

**Constitutional Provisions**

U.S. Const. amend. V ...................................................................... 12

U.S. Const. art. I, § 3, cl. 7 ................................................... passim

U.S. Const. art. I, § 5, cl. 3 ........................................................... 41

U.S. Const. art. I, § 6, cl. 1 ................................................. 5, 9, 36

U.S. Const. art. II, § 1, cl. 1 .......................................................... 40

U.S. Const. art. II, § 2, cl. 2 .......................................................... 40

U.S. Const. art. II, § 2, cl. 3 .......................................................... 35

U.S. Const. art. II, § 3 ............................................................ 36, 40

U.S. Const. art. II, § 4 .............................................................. 5, 10

U.S. Const. art. III, § 2, cl. 1 ........................................................ 41

U.S. Const. art. VI, cl. 2 ............................................................... 30

**Statutes and Rules**

2 U.S.C. § 192 ................................................................................ 33

18 U.S.C. § 201 ........................................................................ 34, 36

18 U.S.C. § 208 ............................................................................................. 33

18 U.S.C. § 371 ............................................................................................... 2

18 U.S.C. § 1512 .............................................................................................. 2

18 U.S.C. § 1913 ........................................................................................... 33

28 U.S.C. 1442 ............................................................................................. 31

28 U.S.C. § 364 ............................................................................................. 26

**Office of Legal Counsel Opinions**

Laurence H. Silberman, *Conflict of Interest Problems Arising out of the President's Nomination of Nelson A. Rockefeller to be Vice President under the Twenty-Fifth Amendment to the Constitution* (Aug. 28, 1974) ................................... 33

Randolph D. Moss, *A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. 222 (Oct. 16, 2000) ...................................... 7, 29, 31

Randolph D. Moss, *Whether a Former President May Be Indicted and Tried for the Same Offenses for Which He Was Impeached by the House and Acquitted by the Senate*, 24 Op. O.L.C. 110 (Aug. 18, 2000) ........................................... 13

Robert G. Dixon, Jr., *Amenability of the President, Vice President and other Civil Officers to Federal Criminal Prosecution while in Office* (Sept. 24, 1973)........................6

Theodore B. Olson, *Payment of Expenses Associated with Travel by the President and Vice President*, 6 O.L.C. Op. 214 (Mar. 24, 1982) ............................... 35

Theodore B. Olson, *Prosecution for Contempt of Congress of an Executive Branch Officer Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C 101 (May 30, 1984) ..................................................................................... 33

Walter Dellinger, *Application of 28 U.S.C. § 458 to Presidential Appointments of Federal Judges*, 19 Op. O.L.C. 350 (Dec. 18, 1995) ............................... 33

Walter Dellinger, *The Constitutional Separation of Powers Between the President and Congress*, 20 Op. O.L.C. 124 (May 7, 1996)..................................... 33

William Barr, *Constraints Imposed by 18 U.S.C. § 1913 on Lobbying Efforts*, 13 Op. O.L.C. 300 (Sept. 28, 1989)...................................................... 33

**Law Review Articles**

Akhil Reed Amar & Brian C. Kalt, *The Presidential Privilege Against Prosecution*, 2 Nexus 11 (1997)........................................................................... 8

Brett M. Kavanaugh, *Separation of Powers During the Forty-Fourth Presidency and Beyond*, 93 Minn. L. Rev. 1454 (2009) ................................................................. 29

Brian C. Kalt, *Criminal Immunity and Schrödinger's President: A Response to Prosecuting and Punishing Our Presidents*, 100 Tex. L. Rev. Online 79 (2021)...................... 9

Claire O. Finkelstein & Richard W. Painter, *Presidential Accountability and the Rule of Law: Can the President Claim Immunity If He Shoots Someone on Fifth Avenue?*, 24 U. Pa. J. Const. L. 93 (2022) ......................................................... 8, 30

J. Randolph Block, *Stump v. Sparkman and the History of Judicial Immunity*, 1980 Duke L.J. 879 (1980) ............................................................................. 26

Keith King, *Indicting the President: Can a Sitting President Be Criminally Indicted?*, 30 Sw. U. L. Rev. 417 (2001) ..................................................................... 9

Saikrishna Bangalore Prakash, *Prosecuting and Punishing Our Presidents*, 100 Tex. L. Rev. 55 (2021) ........................................................................... 8, 9, 18

Timothy M. Stengel, *Absolute Judicial Immunity Makes Absolutely No Sense: An Argument for an Exception to Judicial Immunity*, 84 Temp. L. Rev. 1071 (2012) ............... 27

**Other Authorities**

1 Samuel Johnson, *A Dictionary of the English Language* (1755)................................. 39

167 Cong. Rec. S601 (daily ed. Feb. 9, 2021) ........................................................ 4, 12

167 Cong. Rec. S607 (daily ed. Feb. 9, 2021) ................................................... 4, 12, 31

167 Cong. Rec. S736 (daily ed. Feb. 13, 2021) ........................................................ 14

2 Joseph Story, *Commentaries on the Constitution of the United States* (1833)........ 10, 11, 12, 13

3 Joseph Story, *Commentaries on the Constitution of the United States* (1833)......................... 18

4 Debates on the Constitution 109 (J. Elliot ed. 1891) ................................................ 16

46 Am. Jur. 2d Judges § 77 (2023) ....................................................................... 26

*Ballentine's Law Dictionary* (3d ed. 1969)................................................................. 32

Gerald Ford, Presidential Statement (Sept. 8, 1974) .................................................. 18

H.R. Res. 24, 117th Cong. at 3 (Jan. 11, 2021) ........................................................ 13

*In re Impeachment of Former President Donald J. Trump*, Trial Memorandum of Donald J. Trump, S. Doc. 117-2 (Feb. 8, 2021) ....................................................... 14

John F. Harris & Bill Miller, *In a Deal, Clinton Avoids Indictment*, Washington Post
(Jan. 20, 2001) ............................................................................................................. 19

Richard Nixon, Statement by Former President Richard Nixon (Sept. 8, 1974) ......................... 18

Sen. Mike Crapo, Crapo Statement on Impeachment Trial (Feb. 13, 2021) ............................... 15

Sen. Thom Tillis, Tillis Statement on Impeachment Trial (Feb. 13, 2021) .................................. 15

*The Federalist No. 65* (Clinton Rossiter ed., 1999) .................................................... 10, 15

*The Federalist No. 69* (Clinton Rossiter ed., 1999) ...................................................... 8, 15

*The Federalist No. 77* (Clinton Rossiter ed., 1999) ........................................................ 15

## I.      Introduction

Defendant Donald J. Trump moves to dismiss the indictment, asking the Court to afford him absolute immunity from criminal prosecution for what he expansively claims was official conduct during his presidency.  ECF No. 74 ("Mot.").  That novel approach to immunity would contravene the fundamental principle that "[n]o man in this country is so high that he is above the law." *United States v. Lee*, 106 U.S. 196, 220 (1882).  The defendant is not above the law.  He is subject to the federal criminal laws like more than 330 million other Americans, including Members of Congress, federal judges, and everyday citizens.  None of the sources the defendant points to in his motion—the Constitution's text and structure, history and tradition, or Supreme Court precedent—supports the absolute immunity he asks the Court to create for him.  In staking his claim, he purports (Mot. 29) to draw a parallel between his fraudulent efforts to overturn the results of an election that he lost and the likes of Abraham Lincoln's Gettysburg Address and George Washington's Farewell Address.  These things are not alike.  The more apt parallel the defendant identifies (Mot. 17-18) is to judges, who, like a former president, enjoy absolute immunity from civil damages liability for certain conduct but who are "subject to criminal prosecutions as are other citizens." *Dennis v. Sparks*, 449 U.S. 24, 31 (1980).  The same is true for the defendant.  For the reasons set forth below, the defendant's motion to dismiss the indictment based upon presidential immunity should be denied.

## II.     Factual and Procedural Background

A grand jury charged the defendant in a four-count indictment.  ECF No. 1.  The defendant moved to dismiss the indictment on the ground that he "is absolutely immune from prosecution." Mot. 1.  When considering a motion to dismiss, the Court must view the indictment "as a whole[,] and the allegations must be accepted as true." *United States v. Weeks*, 636 F. Supp. 3d 117, 120 (D.D.C. 2022) (internal quotation marks omitted).

Count One, which charges a conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, alleges that the defendant, then a candidate seeking re-election to the presidency, conspired with, among others, several individuals outside the Executive Branch to "overturn the legitimate results of the 2020 presidential election by using knowingly false claims of election fraud to obstruct the federal government function by which those results are collected, counted, and certified." ECF No. 1 at ¶¶ 1, 7, 8. The indictment further alleges that the defendant aimed at accomplishing the conspiracy's objectives in five ways: using deceit toward state officials to subvert the legitimate election results in those states, *id.* at ¶¶ 13-52; using deceit to organize fraudulent slates of electors in seven targeted states, and cause them to send false certificates to Congress, *id.* at ¶¶ 53-69; leveraging the Department of Justice to use deceit to get state officials to replace the legitimate electoral slate with electors who would cast their votes for the defendant, *id.* at ¶¶ 70-85; attempting to enlist the Vice President to fraudulently alter the election results during the certification proceeding on January 6, 2021, and directing supporters to the Capitol to obstruct the proceeding, *id.* at ¶¶ 86-105; and exploiting the violence and chaos that transpired at the United States Capitol on January 6, 2021, *id.* at ¶¶ 106-124. Counts Two and Three, which incorporate allegations from Count One, charge conspiracy and substantive violations of 18 U.S.C. § 1512(c)(2) for corruptly obstructing the certification of the presidential election results on January 6, 2021. *Id.* at ¶¶ 125-28. Count Four, which likewise incorporates the allegations from Count One, alleges that the defendant conspired to violate one or more person's constitutional right to vote and have one's vote counted. *Id.* at ¶¶ 129-30.

The defendant recognizes (Mot. 2) but fails to adhere to the legal standard applicable to a motion under Rule 12 of the Federal Rules of Criminal Procedure requiring that the indictment's allegations "be accepted as true." Instead, the defendant inaccurately reframes the allegations in the indictment to suggest that his criminal conduct consisted solely of "public statements and

tweets about the federal election and certification," "communications with the U.S. Department of Justice about investigating elections crimes and possibly appointing a new Acting Attorney General," "communications with state officials about the federal election and the exercise of their official duties with respect to the election," "communications with the Vice President and Members of Congress about the exercise of their official duties in the election-certification proceedings," and "organizing slates of electors as part of the attempt to convince legislators not to certify the election against defendant." *Id.* at 3-8 (capitalization altered). Those characterizations are not consistent with the indictment.

## III.   Argument

An individual who has served as President of the United States but is no longer in office may face investigation, indictment, trial, and, if convicted, punishment for conduct committed during the presidency. No court has ever alluded to the existence of absolute criminal immunity for former presidents, and legal principles, historical evidence, and policy rationales demonstrate that once out of office, a former president is subject to federal criminal prosecution like other citizens. *See United States v. Burr*, 25 F. Cas. 30, 34 (C.C.D. Va. 1807) ("[T]he president is elected from the mass of the people, and, on the expiration of the time for which he is elected, returns to the mass of the people again."). Indeed, a contrary rule would violate the fundamental principle that no one in this country, not even the president, is above the law.

The defendant's novel request for absolute immunity directly conflicts with the Constitution's Impeachment Judgment Clause, U.S. Const. art. I, § 3, cl. 7, which expressly contemplates the criminal prosecution of a former president for acts committed during—and ultimately resulting in the president's removal from—the presidency. That provision ensures, among other things, that an officer who has been removed through impeachment cannot seek refuge in principles of double jeopardy to avoid criminal prosecution. The defendant, however,

would turn the Impeachment Judgment Clause on its head and have the Court read it as a sweeping grant of immunity that forbids criminal prosecution in the absence of a Senate conviction—which, among other things, would effectively preclude any form of accountability for a president who commits crimes at the end of his term of office.  The defendant dismissed this very approach to the Impeachment Judgment Clause as "nonsense" and "a complete canard" during his second impeachment trial, *see* 167 Cong. Rec. S601, S607 (daily ed. Feb. 9, 2021), and the Court should do the same here.  A president already enjoys two forms of immunity designed to afford protections to the discharge of his wide-ranging duties.  But neither the temporary immunity from criminal liability that an incumbent president enjoys while in office nor the absolute immunity that current and former presidents enjoy from civil liability for their official conduct as president, *see Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982), suggests the existence of an unprecedented form of absolute immunity from criminal liability.  To the contrary, the existence of both immunities is premised on the availability of criminal liability once a former president is out of office.  The defendant's motion to dismiss should be denied on the ground that a former president cannot claim any immunity from federal criminal prosecution.[1]

Even if the defendant had satisfied his burden to establish that a former president could claim some heretofore unrecognized and novel immunity from criminal prosecution for certain acts committed during his presidency, denial of the defendant's motion is nonetheless warranted. Recognizing immunity from federal criminal prosecution for a former president would pose substantial challenges regarding its scope and application, and the defendant provides no suggestion or support for how to navigate such challenges.  At a minimum, any such criminal immunity would, consistent with the reasoning in *Fitzgerald* and the balancing in *United States v.*

---

[1] This brief addresses only a former President's immunity from *federal* criminal prosecution.

*Nixon*, 418 U.S. 683 (1974), be narrower than the outer-perimeter immunity applicable in the civil context and would have to reflect a consideration of *mens rea*, since otherwise even clear cases like bribery would be excluded.  The defendant has not shown that the conduct alleged in the indictment would fall within the boundaries of any plausible understanding of such a novel immunity from federal criminal prosecution.  And even if he could claim immunity from criminal prosecution for official conduct while in office comparable to the broad immunity from civil liability recognized in *Fitzgerald*, dismissal is inappropriate because the defendant cannot plausibly claim that every allegation in the indictment involves acts within the outer perimeter of a president's official responsibility.

## A.    Legal Background

Unlike the express immunity conferred to legislators in the Speech or Debate Clause, *see* U.S. Const. art. I, § 6, cl. 1, no provision in the Constitution explicitly grants immunity to a sitting or former President of the United States.  The Constitution provides for a president's removal through "impeachment for, and conviction of, treason, bribery, or other high crimes and misdemeanors."  U.S. Const. art. II, § 4 (capitalization altered).  The Constitution's Impeachment Judgment Clause further provides that although the sole punishment the Senate may impose on a president (or other federal officer) impeached and convicted is removal from office and disqualification "to hold and enjoy any Office of honor, Trust or Profit under the United States," the impeached and convicted officer "shall nevertheless be liable to Indictment, Trial, Judgment and Punishment, according to Law."  U.S. Const. art. I, § 3, cl. 7.

The Supreme Court has not addressed a sitting or former president's claim of immunity from criminal liability, but it has addressed the issue in the civil context.  In *Fitzgerald*, 457 U.S. 731, the Court considered whether the plaintiff could seek damages in an employment discrimination suit against former President Nixon based on a reduction in force that Nixon had

undertaken in his "official capacity during his tenure in office." *Id.* at 733. In light of the President's unique constitutional responsibilities and the "singular importance of the President's duties," *id.* at 750-51, as well as the risk that private damages actions could "diver[t]" the President's "energies" and diminish his "'ability to deal fearlessly and impartially with' the duties of his office," *id.* at 751-52, the Court held that the President "is entitled to absolute immunity from damages liability predicated on his official acts," *id.* at 749. That "absolute Presidential immunity" encompassed "acts within the 'outer perimeter' of [the President's] official responsibility," which included the force reduction. *Id.* at 756-57. In recognizing this immunity, the Court specifically noted that "there is a lesser public interest in actions for civil damages than, for example, in criminal prosecutions." *Id.* at 754 n.37. Fifteen years later, the Supreme Court in *Clinton v. Jones*, 520 U.S. 681 (1997), rejected President Clinton's argument that the absolute presidential immunity recognized in *Fitzgerald* afforded him, while president, temporary immunity from civil claims arising from his time as the Governor of Arkansas because the immunity doctrine's "principal rationale"—allowing officials "to perform their designated functions effectively without fear that a particular decision may give rise to personal liability" and enabling them to "deal fearlessly and impartially with the public at large"—did not apply to unofficial conduct. *Id.* at 692-93 (internal quotation marks omitted).

Drawing support in part from the Supreme Court's decisions in *Fitzgerald* and *Clinton*, the Department of Justice's Office of Legal Counsel ("OLC") in 2000 reaffirmed its earlier conclusion[2] that the Constitution does not permit the indictment or criminal prosecution of a sitting president. *See* Randolph D. Moss, *A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. 222, 244 (Oct. 16, 2000). The reasoning employed by the OLC

---

[2] *See* Robert G. Dixon, Jr., *Amenability of the President, Vice President and other Civil Officers to Federal Criminal Prosecution while in Office* (Sept. 24, 1973).

strongly supports the conclusion that a former president may be prosecuted.  The OLC identified three burdens—a prison term, the "public stigma and opprobrium" resulting from an indictment, and the distraction of defending against the charges—that militated against prosecution of a sitting president given how those burdens might "severely hamper the President's performance of his official duties."  *Id.* at 246.  At the same time, the OLC observed that the President is not "'above the law,'" and that "[r]ecognizing an immunity from prosecution for a sitting President would not preclude such prosecution once the President's term is over or he is otherwise removed from office by resignation or impeachment."  *Id.* at 255, 257.

## B.   A Former President Has No Immunity from Federal Criminal Prosecution.

No legal principle, case, or historical practice supports the conclusion that a former president is immune from federal criminal prosecution for conduct undertaken during his presidency.  Although the defendant suggests (Mot. 15-16) that the absence of any supporting materials stems from the lack of prior indictments of former presidents, the truth is that presidential amenability to criminal prosecution has been the subject of extensive debate ever since the founding.  And while some have disagreed with the Department of Justice's longstanding view that a *sitting* president may not be indicted, tried, convicted, and punished, there has been universal agreement that a *former* president may be subject to federal criminal prosecution—a principle recognized in the Constitution and rooted in historical practice.  Moreover, the justifications that caused the Supreme Court to recognize a former president's absolute immunity from *civil* liability in *Fitzgerald*, 457 U.S. 731, do not similarly require absolute immunity from federal *criminal* liability.  Extending absolute immunity from civil liability to encompass the criminal prosecution of a former president would be inconsistent with the reasoning and policy considerations identified in that case.

1.      **No constitutional provision or historical practice supports conferring absolute immunity from criminal prosecution on a former president.**

The defendant claims (Mot. 8-21) that his status as a former President of the United States entitles him to absolute immunity from criminal prosecution for any conduct undertaken while he was in office.  If accepted, that claim would undermine the bedrock principle that "[n]o man in this country is so high that he is above the law." *United States v. Lee*, 106 U.S. 196, 220 (1882). That principle extends to "[a]ll the officers of the government, from the highest to the lowest," and requires that "every man who by accepting office participates in its functions is only the more strongly bound to submit to that supremacy." *Id.*  And the principle that no one is above the law "applies, of course, to a President." *Trump v. Vance*, 140 S. Ct. 2412, 2432 (2020) (Kavanaugh, J., concurring).  In choosing to break from the British monarchy headed by a "sacred" and "inviolable" King not "amenable" to any "constitutional tribunal" and not subject to any punishment, the founders instead created a "President of the United States" who could be removed through impeachment and would be "liable to prosecution and punishment in the ordinary course of law." *The Federalist No. 69*, at 384 (Alexander Hamilton) (Clinton Rossiter ed., 1999); *see Trump v. Thompson*, 573 F. Supp. 3d 1, 16 (D.D.C. 2021) ("Presidents are not kings[.]").

The principle that no one is above the law underlies the universal consensus that a president may be subject to criminal prosecution at some point.  The United States has long taken the position that the Constitution affords a sitting president temporary immunity from criminal prosecution until the conclusion of his presidential term, though some have disagreed.[3]  But the defendant can

---

[3] *Compare, e.g.*, Saikrishna Bangalore Prakash, *Prosecuting and Punishing Our Presidents*, 100 Tex. L. Rev. 55, 60 (2021) (arguing that a sitting president "may be arrested, indicted, prosecuted, and punished"); Claire O. Finkelstein & Richard W. Painter, *Presidential Accountability and the Rule of Law: Can the President Claim Immunity If He Shoots Someone on Fifth Avenue?*, 24 U. Pa. J. Const. L. 93, 97 (2022) (same), *with* Akhil Reed Amar & Brian C. Kalt, *The Presidential Privilege Against Prosecution*, 2 Nexus 11, 11 (1997) ("[W]e believe that

identify no support for his broad claim that he is forever entitled to absolute immunity for any conduct while he served as president. In fact, "both sides in the immunity debate agree that presidents are unregally subject to criminal prosecution" and disagree only on "timing." Brian C. Kalt, *Criminal Immunity and Schrödinger's President: A Response to* Prosecuting and Punishing Our Presidents, 100 Tex. L. Rev. Online 79, 83 (2021). That a president may face criminal prosecution for conduct during his presidency when no longer in office draws support from the Constitution and historical practice.

> ### a. The Constitution does not support absolute immunity from criminal prosecution for a former president for conduct while in office.

Two constitutional provisions support the conclusion that a former president does not possess absolute immunity from criminal prosecution. First, unlike the explicit textual immunity conferred to legislators under the Speech or Debate Clause, U.S. Const. art. I, § 6, cl. 1, which provides that "for any Speech or Debate in either House," members of Congress "shall not be questioned in any other Place," the Constitution does not expressly provide such protection for the President or any executive branch officials.[4] To be sure, the Constitution's "silence . . . on this score is not dispositive," *Nixon*, 418 U.S. at 705 n.16, "in light of the 'presuppositions of our political history,'" *Fitzgerald*, 457 U.S. at 745 (quoting *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951)). But that silence is telling when placed against the Constitution's Impeachment Judgment Clause, which expressly contemplates criminal prosecution following impeachment and

---

the best view of constitutional text, history, structure, and precedent supports the conclusion that Justice Story reached: Sitting Presidents cannot be prosecuted."); Keith King, *Indicting the President: Can a Sitting President Be Criminally Indicted?*, 30 Sw. U. L. Rev. 417, 418 (2001) (same).

[4] By contrast, some state constitutions operative at the time of the founding did grant express criminal immunity to the state's chief executive officer. *See* Prakash, *supra*, at 69-70 (discussing the 1776 Virginia Constitution and the 1776 Delaware Constitution).

conviction.  *See* U.S. Const. art. I, § 3, cl. 7.  Where a president—or any federal officer—has been impeached by the House and convicted at an impeachment trial in the Senate, the Impeachment Judgment Clause provides that the punishment for such impeachment and conviction "shall not extend further than to removal from Office, and disqualification to hold and enjoy any Office of honor, Trust or Profit under the United States: but the Party convicted shall nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law."  *Id.*  It would be incongruous to conclude that the Constitution or common law shields a former president from criminal prosecution when the Constitution expressly states that a former president may be subject to criminal prosecution after impeachment by the House and conviction by the Senate.

It would be all the more strained to reach that conclusion in light of the constitutional impeachment system.  Under the Constitution, a president is subject to impeachment and Senate conviction for, among other things, "high crimes and misdemeanors."  U.S. Const. art. II, § 4 (capitalization altered).  When the Constitution was ratified, the phrase "high crimes and misdemeanors" was aimed at the "misconduct of public men," including the "abuse or violation of some public trust."  *The Federalist No. 65*, at 364 (Hamilton).  In that respect, "high crimes and misdemeanors" were offenses that "may with peculiar propriety be denominated POLITICAL, as they relate chiefly to injuries done immediately to the society itself."  *Id.*; *accord* 2 Joseph Story, *Commentaries on the Constitution of the United States* § 783 (1833) (noting that the "offences, to which the remedy of impeachment has been, and will continue to be principally applied, are of a political nature").  The conduct that impeachment targets includes "acts taken in [the president's] 'public character'—that is, official acts[.]"  *Clinton*, 520 U.S. at 696.  As noted above, the Constitution's Impeachment Judgment Clause expressly contemplates the criminal prosecution of an impeached and convicted federal officer, including a president.  *See* U.S. Const. art. I, § 3, cl. 7.  In other words, given that the Constitution permits the impeachment and Senate conviction of

a president for official conduct taken in his public role and likewise explicitly provides for an impeached and Senate-convicted president's criminal prosecution for the same conduct, it would be implausible to posit that the Constitution also simultaneously (and implicitly) immunizes a former president from criminal prosecution for official acts.

The defendant's argument (Mot. 11-13) that impeachment is the "[e]xclusive [m]ethod" by which to hold a former president responsible for "[c]rimes in [o]ffice" is incorrect. As noted, the Impeachment Judgment Clause envisions both impeachment *and* criminal prosecution of a president who has been removed from office through impeachment. *See* U.S. Const. art. I, § 3, cl. 7; *see Nixon v. United States*, 506 U.S. 224, 234 (1993) ("[T]he Framers recognized that most likely there would be two sets of proceedings for individuals who commit impeachable offenses— the impeachment trial and a separate criminal trial."). The Impeachment Judgment Clause thus reflects the "separate and different roles for the executive's power of prosecution and the legislature's impeachment powers." *Hastings v. United States Senate*, 716 F. Supp. 38, 42 (D.D.C. 1989). It follows that neither branch can block the other from acting, and each has "different roles to play" when an officer subject to impeachment and criminal prosecution—such as a president— "engages in criminal behavior." *Id.*; *cf. Nixon*, 506 U.S. at 226-27 (federal judge convicted for making false statements after which Congress instituted impeachment proceedings).

Moreover, if the defendant's theory that criminal prosecution is available only when preceded by House impeachment and Senate conviction were correct, it would either completely shield a former president from criminal prosecution for crimes committed while in office but discovered afterwards or require that Congress initiate impeachment proceedings against a former president. But the Impeachment Judgment Clause does not empower Congress to control the core executive act of prosecution through the political impeachment process. *See* 2 Story, *supra*, at § 801 (explaining that even if an impeached party was no longer in office and therefore could no

longer be removed, "his offence was still liable to be tried and punished in the ordinary tribunals of justice").

The defendant's argument also flatly contradicts his claim during his second impeachment proceedings. At his impeachment trial in the Senate, the defendant aptly described the theory that he is now advocating as a "complete canard" because "[c]learly, a former civil officer who is not impeached is subject to" criminal prosecution as described in the Impeachment Judgment Clause. *See* 167 Cong. Rec. S607 (daily ed. Feb. 9, 2021). The defendant further contended that the "idea of a January amnesty [was] nonsense" because if he "committed a criminal offense" then "[a]fter he is out of office, you go and arrest him," adding, "[t]he Department of Justice does know what to do with such people." *Id.* at S601. In short, at his impeachment trial, the defendant argued that he could not be convicted by the Senate because he was no longer in office but that he was subject to post-presidency prosecution, and he now—when facing such a prosecution—argues that he cannot be prosecuted for criminal offenses concerning conduct while he was in office because he was not convicted by the Senate for that conduct. The Constitution does not countenance, let alone require, such a perverse outcome.

To the extent that the defendant separately grounds (Mot. 13) his immunity claim in the fact of a Senate *acquittal*, as distinct from the mere absence of a conviction, that argument fares no better. Neither the Impeachment Judgment Clause, U.S. Const. art. I, § 3, cl. 7, nor the Double Jeopardy Clause, U.S. Const. amend. V, supports that cursory claim. Indeed, Justice Story— whose ambiguous comment about presidential civil immunity the defendant otherwise relies on, *see infra* 17-18—explained that the Constitution wisely separated an impeachment trial (with its exclusive remedies of removal and disqualification) from a trial "in the common tribunals of justice" to ensure that "a second trial for the same offence could be had, either after an acquittal, or a conviction in the court of impeachments." 2 Story, *supra*, §§ 780-81. Otherwise, "if no such

- 12 -
405

second trial could be had, then the grossest official offenders might escape without any substantial punishment, even for crimes, which would subject their fellow citizens to capital punishment." *Id.* Impeachment and removal thus do not constitute "jeopardy" in a criminal sense, *see* Randolph D. Moss, *Whether a Former President May Be Indicted and Tried for the Same Offenses for Which He Was Impeached by the House and Acquitted by the Senate*, 24 Op. O.L.C. 110, 119-34 (Aug. 18, 2000), but even if they did, acquittal in the Senate would not preclude criminal prosecution based on the express constitutional text.[5]

The defendant's reliance (Mot. 11-12) on an asserted negative implication—that the phrase "Party convicted" in the Impeachment Judgment Clause requires that an officer be both impeached *and* convicted before that officer may face criminal prosecution—is therefore misplaced. The prior portion of the Clause specifies the permissible consequences for a party convicted by the Senate. The portion of the Clause on which the defendant relies then makes clear that such a party is subject to criminal prosecution. The best reading of the text thus is that it does not speak to acquittal at all. Moreover, the asserted negative implication cannot overcome historical evidence and structural considerations indicating that the Impeachment Judgment Clause was intended to limit congressional sanctions for impeachment to removal and disqualification from office, not to preclude the prosecution of an impeached but not convicted officer. *See United States v. Claiborne*, 727 F.2d 842, 846 (9th Cir. 1984) (per curiam) (Impeachment Judgment Clause "was

---

[5] And even if the Double Jeopardy Clause applied, it would not preclude this prosecution. The Clause protects against multiple punishments for the same offense, *see Missouri v. Hunter*, 459 U.S. 359, 365-66 (1983), and requires ascertaining whether each requires proof of an element that the other does not, *Blockburger v. United States*, 284 U.S. 299, 304 (1932). The offenses charged in this case are not the same as the "incitement of insurrection" article of impeachment at issue in the defendant's impeachment trial. *See* H.R. Res. 24, 117th Cong. at 3 (Jan. 11, 2021) (Single article of impeachment for high crimes and misdemeanors alleging that the defendant violated his "constitutional oath faithfully to execute the office of President of the United States . . . by inciting violence against the Government of the United States").

intended 'to assure that after impeachment a trial on criminal charges is not foreclosed by the principle of double jeopardy'") (quoting *United States v. Isaacs*, 493 F.2d 1124, 1142 (7th Cir. 1974) (per curiam)); *Thompson v. Trump*, 590 F. Supp. 3d 46, 86-87 (D.D.C. 2022).

Finally, the defendant's suggestion (Mot. 13) that a criminal prosecution "cannot second-guess" the Senate misstates the relationship between these two separate and distinct proceedings, *see Hastings*, 716 F. Supp. at 42, as emphasized by the reasons several Senators gave for their not-guilty votes in the defendant's own impeachment trial.  In that proceeding, the defendant argued that, because he was no longer in office, the Senate lacked jurisdiction to convict him.  *In re Impeachment of Former President Donald J. Trump*, Trial Memorandum of Donald J. Trump, S. Doc. 117-2 at 13-37 (Feb. 8, 2021).  At least 31 of the 43 Senators who voted to acquit explained that their decision to do so rested in whole or in part on their agreement with the defendant's jurisdictional argument,[6] underscoring that the defendant's claimed immunity from prosecution would create a yawning impunity gap: a president who leaves office before the House and Senate can consider impeachment would escape accountability altogether.  Further, some Senators explicitly referred to the availability of criminal prosecution as an alternative means of providing accountability.  *See, e.g.*, 167 Cong. Rec. S736 (daily ed. Feb. 13, 2021) (Sen. McConnell) (explaining that his vote was based on the view that the Senate lacked jurisdiction and stating that the defendant "is still liable for everything he did while he was in office, as an ordinary citizen" and that, "We have a criminal justice system in this country. We have civil litigation, and former presidents are not immune from being held accountable by either one."); Sen. Thom Tillis, Tillis

---

[6] *See* statements on February 13, 2021, from Senators Barrasso, Blunt, Boozman, Braun, Cornyn, Cramer, Crapo, Daines, Ernst, Fisher, Grassley, Hoeven, Hyde-Smith, Inhofe, Kennedy, Lankford, Lee, Lummis, McConnell, Moore, Moran, Portman, Risch, Rounds, Rubio, Shelby, Sullivan, Thune, Tillis, Tuberville, and Wicker.

Statement on Impeachment Trial (Feb. 13, 2021)[7] ("An impeachment trial is not the best or only way to hold a former elected official accountable for their actions. The ultimate accountability is through our criminal justice system where political passions are checked and due process is constitutionally mandated. No president is above the law or immune from criminal prosecution, and that includes former President Trump."); Sen. Mike Crapo, Crapo Statement on Impeachment Trial (Feb. 13, 2021)[8] ("Both by text and by precedent, the Constitution does not allow impeaching private citizens—even those who formerly occupied federal office.  Private citizens are subject to accountability for their actions under our legal justice system. . . . The violent, despicable acts of January 6th have shaken our republic to its core and must not go unpunished.").

> **b.      Historical practice does not support absolute immunity from criminal prosecution for a former president for conduct while in office.**

Historical evidence from the time of the founding likewise confirms that a president was subject to prosecution when no longer in office.  Writing as Publius in support of the Constitution's adoption, Alexander Hamilton explained that an impeachment would not "terminate the chastisement of the offender" because "[a]fter having been sentenced to a perpetual ostracism from the esteem and confidence, and honors and emoluments of his country, he will still be liable to prosecution and punishment in the ordinary course of law."  *The Federalist No. 65*, at 365; *see id.* at *No. 69*, at 384 (Hamilton); *id.* at *No. 77* (Hamilton), at 432 (noting that the president is "at all times liable to impeachment, trial, [and] dismission from office" as well as "forfeiture of life and estate by subsequent prosecution in the common course of law").  Speaking at the North Carolina ratifying convention, James Iredell—who would go on to become a Supreme Court Justice—noted

---

[7] https://www.tillis.senate.gov/2021/2/tillis-statement-on-impeachment trial.

[8] https://www.crapo.senate.gov/media/newsreleases/crapo-statement-on-impeach-trial.

that "[i]f [the President] commits any crime, he is punishable by the laws of his country."  4

Debates on the Constitution 109 (J. Elliot ed. 1891); *see Trump*, 140 S. Ct. at 2435 (Thomas, J.,

dissenting) (discussing Iredell).

The reasoning in decisions declining to recognize absolute immunity for a sitting president

with respect to subpoenas issued during the course of criminal proceedings bolsters this founding-

era evidence.  More than 200 years ago, Chief Justice John Marshall concluded that because a

sitting president does not "stand exempt from the general provisions of the constitution," a

subpoena duces tecum could be issued to the president.  *See Burr*, 25 F. Cas. at 33-34.  Marshall

refused to recognize for the sitting president the common-law immunity from criminal process

recognized in "the case of king," and observed that "it is not known ever to have been doubted"

that a chief executive could be served with a subpoena.  *Id.*; *see Nixon v. Sirica*, 487 F.2d 700, 709

(D.C. Cir. 1973) (en banc) (per curiam) (observing that in *Burr*, Chief Justice Marshall "squarely

ruled that a subpoena may be directed to the President").[9]  In *Nixon*, 418 U.S. 683, the sitting

president sought to quash the Special Prosecutor's trial subpoena seeking tape recordings of Oval

Office meetings.  Although the Supreme Court recognized a qualified presidential communications

privilege to "safeguard[] the public interest in candid, confidential deliberations within the

Executive Branch," *Trump v. Thompson*, 20 F.4th 10, 26 (D.C. Cir. 2021) (internal quotation

marks omitted), neither the separation of powers nor the need for confidentiality could "sustain an

absolute, unqualified Presidential privilege of immunity from judicial process under all

circumstances," *Nixon*, 418 U.S. at 706.  And in *Trump*, 140 S. Ct. 2412, the Court rejected the

---

[9] To be sure, Chief Justice Marshall in a subsequent opinion stated that "[i]n no case of this kind would a court be required to proceed against the president as against an ordinary individual." *United States v. Burr*, 25 F. Cas. 187, 192 (C.C.D. Va. 1807).  But as the Supreme Court later observed, Marshall's recognition in *Burr* that a sitting president differs from an "'ordinary individual'" "cannot be read to mean in any sense that a President is above the law." *Nixon*, 418 U.S. at 715.

sitting president's "*categorical* argument" that burdens associated with "diversion, stigma, and harassment" warranted immunity from responding to a state criminal subpoena, *id*. at 2425, instead concluding that under the reasoning in *Burr* and *Nixon*, "not even the President[] is categorically above the common duty to produce evidence when called upon in a criminal proceeding." *Id.* at 2431. In so holding, the Supreme Court reaffirmed the principle from *Nixon* that "the public interest in fair and accurate judicial proceedings is at its height in the criminal setting." *Id.* at 2424. These cases thus recognize a heightened "commitment to justice" in the face of criminal law enforcement. *Id.*

Largely ignoring these cases and the history on which they draw, the defendant advances two unpersuasive contentions (Mot. 13-16) that historical practice in fact supports a rule of absolute presidential immunity from criminal prosecution. First, in adverting to (Mot. 13) "[e]arly [a]uthorities," the defendant extracts broad language expounding upon a president's powers from two civil cases, *Marbury v. Madison*, 5 U.S. 137 (1803) (Marshall, C.J.), and *Martin v. Mott*, 25 U.S. 19 (1827) (Story, J.), that do not address presidential immunity, let alone immunity from criminal prosecution. The defendant's invocation of Chief Justice Marshall's opinion in *Marbury* fails to account for Marshall's opinion subjecting President Jefferson to a subpoena duces tecum in a criminal proceeding four years later in *Burr* and the Supreme Court's view—expressed in a case rejecting a claim of absolute civil immunity for certain federal officers—that *Marbury* stands for the propositions that "all individuals, whatever their position in government, are subject to federal law" and that "'[n]o man in this country is so high that he is above the law.'" *Butz v. Economou*, 438 U.S. 478, 506 (1978) (citing *Marbury* and *Lee*, 106 U.S. at 220). Moreover, the relevant language in the passage the defendant quotes (Mot. 14) from Justice Story's treatise—that "[t]he president cannot, therefore, be liable to arrest, imprisonment, or detention, while he is in the discharge of the duties of his office; and for this purpose his person must be deemed, in civil cases

at least, to possess an official inviolability," 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1563 (1833)—by its terms applies to sitting presidents "while . . . in the discharge of the duties of [their] office." *Id.* The passage thus does not illuminate (let alone govern) whether a *former* president is entitled to immunity from criminal prosecution for conduct during his presidency. Even construed broadly, it at best supports principles that are not at issue in this case. *See supra* 6-7 (a sitting president may not be criminally prosecuted); *infra* 19-34 (noting that a former president has absolute immunity from civil liability for official conduct but explaining why comparable immunity does not apply in the criminal context).

Second, that no former president has been criminally prosecuted (*see* Mot. 15-16) reflects not a history and tradition implying the existence of criminal immunity but instead the fact that "most presidents have done nothing criminal, making it difficult to draw inferences from the absence of arrests or prosecutions." Saikrishna Bangalore Prakash, *Prosecuting and Punishing Our Presidents*, 100 Tex. L. Rev. 55, 82 (2021). In any event, the history is not as uniform as the defendant suggests. President Ford's pardon of former President Nixon covering acts during the latter's presidency rested on the assumption that no post-presidential immunity from criminal prosecution existed. *See* Gerald Ford, Presidential Statement at 7-8 (Sept. 8, 1974) (granting former President Nixon a "full, free, and absolute pardon . . . for all offenses against the United States which he, Richard Nixon, has committed or may have committed or taken part in during" his presidency)[10]; Richard Nixon, Statement by Former President Richard Nixon at 1 (Sept. 8, 1974) (former president accepting "full and absolute pardon for any charges which might be brought against me for actions taken during the time I was President of the United States").[11] The

---

[10] https://www.fordlibrarymuseum.gov/library/document/0067/1563096.pdf.

[11] https://www.fordlibrarymuseum.gov/library/document/0019/4520706.pdf.

same is true for President Clinton's "forthright admission that he gave false testimony under oath" about matters occurring during his presidency in order to avoid indictment after his presidency. *See* John F. Harris & Bill Miller, *In a Deal, Clinton Avoids Indictment*, Washington Post (Jan. 20, 2001).[12]

### 2.   The immunity from civil liability for a former president's official conduct recognized in *Fitzgerald* does not extend to criminal liability.

In *Fitzgerald*, the Supreme Court concluded that a former President has absolute immunity from civil damages liability for "acts within the 'outer perimeter' of his official responsibility." 457 U.S. at 756.  The Court considered such civil immunity a "functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers and supported by our history." *Id.* at 749.  The defendant seeks to transplant *Fitzgerald*'s civil-damages-based immunity, for the first time, into the realm of criminal immunity.  Not only would applying the absolute immunity from civil damages liability recognized in *Fitzgerald* functionally place a former president above the law, it would also be inconsistent with *Fitzgerald*'s reasoning and its analogy to judges and prosecutors, whose absolute immunity from civil suit is carefully balanced with liability to criminal prosecution to ensure accountability.  Further, the "concerns of public policy, especially as illuminated by our history and the structure of our government," *id.* at 747-48, that supported absolute immunity in civil suits do not support such immunity in the criminal prosecution of a former president for his conduct while in office.

### a.   Applying *Fitzgerald* in the criminal context would place a former president above the law.

Offering no more than a cursory footnote (Mot. 10 n.2) for the claim that the absolute civil immunity recognized in *Fitzgerald* should grant a former president comparable immunity from

---

[12] https://www.washingtonpost.com/archive/politics/2001/01/20/in-a-deal-clinton-avoids-indictment/bb80cc4c-e72c-40c1-bb72-55b2b81c3065/.

criminal prosecution, the defendant contends (*id.* at 27-45) that he is permanently immune from criminal liability for any conduct that falls within the outer perimeter of his official presidential duties—which, he maintains, should be assessed at a high level of abstraction and generality. Thus, in the defendant's view, a court should treat a president's conduct as absolutely immune from criminal prosecution as long as it takes the form of a statement on a matter of public concern, or a meeting with a member of the executive branch, or correspondence with a state official about a matter in which there is a federal interest. Moreover, even where the conduct at issue does not fit within the outer perimeter of the functions of his office, he is still immune, in the defendant's telling, so long as his conduct was "intertwined" with some conduct that does fit within that perimeter. *Id.* at 44-45. Once immunity attaches, he further claims (*id.* at 23-26), it is absolute, and no evidence of criminal purpose can overcome it or even be considered in evaluating its application.

The implications of the defendant's unbounded immunity theory are startling. It would grant absolute immunity from criminal prosecution to a president who accepts a bribe in exchange for a lucrative government contract for a family member; a president who instructs his FBI Director to plant incriminating evidence on a political enemy; a president who orders the National Guard to murder his most prominent critics; or a president who sells nuclear secrets to a foreign adversary. After all, in each of these scenarios, the president could assert that he was simply executing the laws; or communicating with the Department of Justice; or discharging his powers as commander-in-chief; or engaging in foreign diplomacy—and his felonious purposes and motives, as the defendant repeatedly insists, would be completely irrelevant and could never even be aired at trial. In addition to the profoundly troubling implications for the rule of law and the inconsistency with the fundamental principle that no man is above the law, that novel approach to immunity in the criminal context, as explained above, has no basis in law or history.

           **b.**    ***Fitzgerald*'s reasoning does not apply in the criminal context.**

The defendant's contention (Mot. 10 n.2) that the immunity recognized in *Fitzgerald* must "extend to" the criminal context does not withstand scrutiny.  Multiple opinions in *Fitzgerald* clarified that neither the case's holding nor its reasoning supported the conclusion that a former president could claim a comparable immunity from criminal prosecution.[13]  The five-Justice majority observed that the separation-of-powers rationale that often counsels judicial restraint toward a president applied with less force where the Court acts "to vindicate the public interest in an ongoing criminal prosecution" as it did in *United States v. Nixon*.  457 U.S. at 754.  By contrast, a "merely private suit for damages based on a President's official acts" did not implicate the "broad public interests" supporting "judicial action."  *Id.*  In a footnote, the majority also noted that the Court's prior decisions had recognized "a lesser public interest in actions for civil damages than, for example, in criminal prosecutions."  *Id.* at 754 n.37.  In addition to relying on *United States v. Nixon*, the majority cited *United States v. Gillock*, 445 U.S. 360 (1980), where the Court had declined to recognize absolute immunity from criminal prosecution for a state legislator prosecuted in federal court because "principles of comity" yielded "where important federal interests are at stake, as in the enforcement of federal criminal statutes."  *Id.* at 373.

The concurrence and principal dissent in *Fitzgerald* likewise understood the decision not to extend a former president's immunity from suit to the criminal context.  Chief Justice Burger rejected any implication that the majority opinion "recognize[d] sweeping immunity for a

---

[13] When discussing *Fitzgerald*, the defendant repeatedly relies on (Mot. 18, 19, 22, 23, 26, 37, 42) an amicus brief filed by the United States in a recent civil case, but that reliance is misplaced because that brief addressed "only a President's liability in a private suit for damages" and "d[id] not express any view regarding the potential criminal liability of any person for the events of January 6, 2021, or acts connected with those events."  Brief for the United States as Amicus Curiae, *Blassingame v. Trump*, Nos. 22-5069, 22-7030, 22-7031, at 3 n.1 (D.C. Cir.) (filed Mar. 2, 2023) (internal quotation marks omitted).

President for all acts"; instead, the former president's immunity recognized in that case was "limited to civil damages claims." *Fitzgerald*, 457 U.S. at 759 (Burger, C.J., concurring). Writing for three other Justices in dissent, Justice White observed that no party had contended that a former president "is immune from criminal prosecution in the courts under the criminal laws enacted by Congress or by the States," and any claim to that effect would not be "credible." *Id.* at 780 (White, J., dissenting). In sum, though the Supreme Court fractured over whether absolute presidential immunity from civil damages for a former president's official acts in office was appropriate, it was unanimous in recognizing that the broad public interest in the enforcement of criminal law militated against granting a former president absolute immunity from federal criminal prosecution.

Contrary to the defendant's passing suggestion (Mot. 10 n.2), the distinction noted in *Fitzgerald* between the civil and criminal context "is not just a matter of formalism." *Cheney v. U.S. Dist. Court for Dist. of Columbia*, 542 U.S. 367, 384 (2004). The absolute immunity of certain government officials from civil actions for damages finds no analogue under criminal law. *See Expeditions Unlimited Aquatic Enterprises, Inc. v. Smithsonian Inst.*, 566 F.2d 289, 305 (D.C. Cir. 1977) (Wilkey, J., concurring dubitante) (noting absolute civil immunity "does not foreclose any possible criminal prosecutions of government officials who violate the law"); *cf. Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 272 (2023) (holding that the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1330, 1602 *et seq.*, "does not grant immunity to foreign states or their instrumentalities in criminal proceedings"). Although the interests at stake in civil litigation are "far from negligible," *Cheney*, 542 U.S. at 384, the courts' "primary constitutional duty" is "to do justice in criminal prosecutions," *Nixon*, 418 U.S. at 707. The Supreme Court in *Nixon* emphasized that "our historic[al] commitment to the rule of law . . . is nowhere more profoundly manifest than in our view that 'the twofold aim [of criminal justice] is that guilt shall not escape or innocence suffer.'" *Id.* at 708-09 (quoting *Berger v. United States*, 295 U.S. 78, 88

(1935)).  Extending immunity recognized for a former president in civil cases to the "much weightier" criminal context, *Cheney*, 542 U.S. at 384, would undermine that bedrock commitment to the rule of law.

Relatedly, the distinction for purposes of civil immunity analysis between "official" and "unofficial" conduct, *see Clinton*, 520 U.S. at 694, does not translate into the federal criminal context.  Stated concisely, "[c]riminal conduct is not"—and can never be—"part of the necessary functions performed by public officials."  *Isaacs*, 493 F.2d at 1144.  To hold otherwise would be to "carry a judicially fashioned privilege so far as to immunize criminal conduct proscribed by an Act of Congress."  *Gravel v. United States*, 408 U.S. 606, 627 (1972); *see O'Shea v. Littleton*, 414 U.S. 488, 503 (1974) ("[T]he judicially fashioned doctrine of official immunity does not reach 'so far as to immunize criminal conduct proscribed by an Act of Congress.'") (quoting *Gravel*, 408 U.S. at 627).  Consistent with that principle, courts of appeals have rejected arguments by federal judges seeking immunity from federal criminal prosecution even where the conduct in question implicated their official responsibilities as judges.  *See, e.g.*, *Claiborne*, 727 F.2d at 845; *United States v. Hastings*, 681 F.2d 706, 710-11 (11th Cir. 1982); *Isaacs*, 493 F.2d at 1143-44.

### c. *Fitzgerald*'s analogy to judges and prosecutors—who are not immune from criminal prosecution—applies here.

The defendant correctly notes (Mot. 17-18) that the immunity granted to presidents is in some respects analogous to the immunity granted to judges and prosecutors.  But his claim that such immunity also protects judges and prosecutors—and by extension, former presidents—from criminal liability overlooks binding precedent and settled historical practice.

Throughout the majority opinion in *Fitzgerald*, the Court likened the absolute civil immunity for a former president to common-law immunity accorded judges and prosecutors.  *See* 457 U.S. at 746-48 (discussing prior cases holding that "the especially sensitive duties of certain

officials—notably judges and prosecutors—required the continued recognition of absolute immunity" and after "[a]pplying the principles of our cases to claims of this kind," holding "that petitioner, as a former President of the United States, is entitled to absolute immunity from damages liability predicated on his official acts"); *id.* at 751-52 ("As is the case with prosecutors and judges—for whom absolute immunity now is established—a President must concern himself with matters likely to 'arouse the most intense feelings.'"); *id.* at 758 ("For the President, as for judges and prosecutors, absolute immunity merely precludes a particular private remedy for alleged misconduct in order to advance compelling public ends."); *see also id.* at 763-64 (Burger, C.J., concurring) ("Far from placing a President above the law, the Court's holding places a President on essentially the same footing with judges and other officials whose absolute immunity we have recognized."). And when subsequently describing *Fitzgerald*, the Court recognized the parallel between presidential immunity from civil damages liability and comparable immunity for prosecutors and judges. *See Trump*, 140 S. Ct. at 2426 ("But *Fitzgerald* did not hold that distraction was sufficient to confer absolute immunity. We instead drew a careful analogy to the common law absolute immunity of judges and prosecutors, concluding that a President, like those officials, must 'deal fearlessly and impartially with the duties of his office'—not be made 'unduly cautious in the discharge of [those] duties' by the prospect of civil liability for official acts.").

That parallel is instructive because the Supreme Court has reasoned that, notwithstanding their absolute immunity from civil liability, prosecutors and judges are "subject to criminal prosecutions as are other citizens." *Dennis v. Sparks*, 449 U.S. 24, 31 (1980) (discussing judges); *see Imbler v. Pachtman*, 424 U.S. 409, 429 (1976) (observing, in a case holding that prosecutors are absolutely immune from civil damages liability, that the Supreme Court had "never suggested that the policy considerations which compel civil immunity for certain governmental officials also place them beyond the reach of the criminal law"); *see also Mireles v. Waco*, 502 U.S. 9, 9, 10 n.1

(1991) (per curiam) (noting that while "[a] long line of this Court's precedents acknowledges that, generally, a judge is immune from a suit for money damages," the Court has also "recognized that a judge is not absolutely immune from criminal liability").  Accordingly, courts have declined to recognize immunity in cases of federal judges criminally prosecuted for violations of federal law, even when the charges involved official, rather than private, conduct.  *See, e.g.*, *Claiborne*, 727 F.2d at 845; *Hastings*, 681 F.2d at 710-11; *Isaacs*, 493 F.2d at 1143-44.  Just as an active judge "no less than any other man is subject to the processes of the criminal law," *Hastings*, 681 F.2d at 711, so too is a former president.

Indeed, courts recognizing immunity from civil liability for certain officials, such as judges and prosecutors, have operated from the premise that civil immunity did not erect an absolute shield for misconduct precisely because those officials were subject to criminal prosecution.  *See Imbler*, 424 U.S. at 428-29 ("We emphasize that the immunity of prosecutors from liability in suits under § 1983 does not leave the public powerless to deter misconduct or to punish that which occurs."); *Gillock*, 445 U.S. at 372-73 ("[T]he cases in this Court which have recognized an immunity from civil suit for state officials have presumed the existence of federal criminal liability as a restraining factor on the conduct of state officials."); *see also Fitzgerald*, 457 U.S. at 757 n.38 ("The presence of alternative remedies has played an important role in our previous decisions in the area of official immunity.").[14]  In holding that a federal judge's civil immunity did not also insulate him from federal prosecution, the Eleventh Circuit reasoned that the "miniscule increment in judicial independence that might be derived" from a rule of absolute judicial immunity "would

---

[14] The defendant suggests (Mot. 13) that the omission of criminal prosecution from *Fitzgerald*'s list of alternative remedies is "[n]otabl[e]."  But as explained above, *Fitzgerald* acknowledged a different—and greater—public interest in criminal prosecution.  *See* 457 U.S. at 754 n.37.  Moreover, the Court's discussion of alternative remedies included impeachment, *id.* at 757 & n.38, which, as the Impeachment Judgment Clause makes evident, does not foreclose and in fact expressly contemplates criminal prosecution.

be outweighed by the tremendous harm that the rule would cause to another treasured value of our constitutional system," namely that no man is above the law.  *See Hastings*, 681 F.2d at 711; *accord id.* at 711 n.17 ("The rule of absolute immunity from criminal prosecution of active federal judges for acts committed in their official capacities poses too great a threat to the public interest in the rule of law.").

The defendant is therefore correct (Mot. 17) that judicial immunity is an appropriate analogue here but wrong to conclude (Mot. 17-18) that judges are immunized against criminal prosecution.  Whatever the English common-law approach to judicial immunity in the criminal context, *compare* J. Randolph Block, *Stump v. Sparkman and the History of Judicial Immunity*, 1980 Duke L.J. 879, 884 (1980) (suggesting that a "litigant" could not "make a judge civilly or criminally liable for an abuse of his jurisdiction") (internal quotation marks omitted), *with id.* at 888 (noting that justices of the peace had civil immunity but could "be punished *criminally*") (internal quotation marks omitted), the Supreme Court and federal courts of appeals have uniformly rejected any claim or suggestion of judicial immunity from criminal prosecution.  *See Dennis*, 449 U.S. at 31; *Mireles*, 502 U.S. at 10 n.1; *Ex Parte Commonwealth of Virginia*, 100 U.S. 339, 348 (1879); *Claiborne*, 727 F.2d at 845; *Hastings*, 681 F.2d at 710-11; *Isaacs*, 493 F.2d at 1143-44; 46 Am. Jur. 2d Judges § 77 (2023) ("The doctrine of judicial immunity is applicable only to civil actions for judicial acts and does not render judges immune to criminal proceedings in the event they are charged with the commission of a crime.  Judges are subject to criminal prosecutions as are other citizens and may be held responsible for the violation of a criminal statute to the same extent.") (footnotes omitted); *see also* 28 U.S.C. § 364 (statute addressing the effect of a federal judge's felony conviction).  As noted above, judges have regularly faced criminal prosecution.  *See also United States v. Collins*, 972 F.2d 1385, 1392-94, 1415 (5th Cir. 1992) (affirming criminal conviction of federal judge who accepted bribes in exchange for agreeing to impose a lenient

sentence); *United States v. Nixon*, 816 F.2d 1022, 1031 (5th Cir. 1987) (affirming criminal conviction of federal judge); *United States v. Manton*, 107 F.2d 834, 838, 850 (2d Cir. 1939) (same for federal judge who "would accept sums of money in return for corrupt judicial action by him favorable to the interests of those who paid").

The defendant's reliance on *United States v. Chaplin*, 54 F. Supp. 926 (S.D. Cal. 1944), to support the claim (Mot. 17) that courts have "universally rejected criminal charges against judges for their judicial acts" is misleading and disingenuous. *Chaplin*—an out-of-circuit district court decision from nearly 80 years ago whose reasoning is opaque—is apparently the sole case that conferred immunity on a judge facing criminal prosecution. *See* 54 F. Supp. at 934-35. But even in reaching that one-of-a-kind result, the district court in *Chaplin* recognized that "[t]here is no judge, from the judge of the Supreme Court of the United States at Washington, to a justice of the peace in the smallest township of the state, who, acting on any judicial matter from corruption or from malice, but becomes amenable to the criminal law the same as any other man." *Id.* at 930; *accord id.* at 933 ("[W]here a judge violates a criminal statute, he is held to the same responsibility as any citizen."). *Chaplin*'s analysis—which none of the courts affirming criminal convictions cited above has followed—does not survive the Supreme Court's more recent pronouncements on judicial immunity in the criminal context, *see* Timothy M. Stengel, *Absolute Judicial Immunity Makes Absolutely No Sense: An Argument for an Exception to Judicial Immunity*, 84 Temp. L. Rev. 1071, 1085 (2012) (arguing that the Supreme Court would not "adopt the reasoning of the *Chaplin* court" because the Court has expressly recognized that the civil-rights law charged in *Chaplin* can "be used to prosecute judges"), but even if it did, this Court should not extend its outlier reasoning to the context of presidential immunity.

> **d.**    **Adequate safeguards protect the unique role of the presidency without immunizing a former president from criminal prosecution.**

The defendant's attempt (Mot. 18-21) to transplant the policy rationales that *Fitzgerald* identified as supporting absolute immunity from civil liability into the criminal context lacks merit. For one, the defendant's suggestion that an incumbent president would be inhibited by the prospect of future federal criminal prosecution lacks any historical or empirical support; indeed, it is at least equally plausible that the prospect of future criminal prosecution would have a salutary, not a chilling, effect. *See Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982) ("Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate."). Throughout American history, there have been federal criminal prosecutions of high-ranking officials from all three branches of the federal government— including the Vice President, members of the Cabinet, Senators, Representatives, and judges—as well as of governors, mayors, sheriffs, and more. Far from chilling public officials in the exercise of their duties, these prosecutions have helped ensure that officials and citizens alike know that ours is a system based on the rule of law, applicable without fear or favor to even the most powerful public officials.

Furthermore, the Impeachment Judgment Clause entirely undermines the defendant's claim (Mot. 10) that a former president's immunity from criminal prosecution should be "absolute"—as the defendant ultimately acknowledges (Mot. 11)—because a former president who has been impeached and convicted will be liable to criminal prosecution. It follows that at least two of the speculative concerns the defendant identifies (Mot. 18-20)—that a president will be constrained with respect to his "especially sensitive duties" and his need to take "bold and unhesitating action" (internal quotation marks omitted) if he fears prosecution—would remain even under the defendant's view because a former president would still be subject to criminal

- 28 -

prosecution following impeachment.  Thus, even on his own terms the defendant is unable to establish that "absolute immunity" is necessary or that meaningful functional benefits of such immunity for the presidency could justify its significant costs in terms of potential impunity, perverse incentives, and the undermining of the rule of law.

Indeed, no sound policy supports granting a former president blanket immunity from criminal prosecution for the time that he or she served as president.  The OLC recognized three burdens that counsel against permitting the criminal prosecution of a sitting president:  (1) imposition of a prison term, which "would make it physically impossible for the President to carry out his duties"; (2) the "public stigma and opprobrium occasioned by the initiation of criminal proceedings, which could compromise the President's ability to fulfill his constitutionally contemplated leadership role with respect to foreign and domestic affairs"; and (3) the "mental and physical burdens of assisting in the preparation of a defense for the various stages of the criminal proceedings, which might severely hamper the President's performance of his official duties."  *A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. at 246.  None applies to a former president, who no longer has "duties" or a "leadership role" with which a criminal prosecution would interfere.  The argument that a president "is almost inevitably going to do a worse job as President" if concerned about "an ongoing criminal investigation," Brett M. Kavanaugh, *Separation of Powers During the Forty-Fourth Presidency and Beyond*, 93 Minn. L. Rev. 1454, 1461 (2009), is immaterial in the case of a former president.  It follows, as the OLC has observed, that "[r]ecognizing an immunity from prosecution for a sitting President would not preclude such prosecution once the President's term is over or he is otherwise removed from office by resignation or impeachment."  *A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. at 255; *see also id.* at 257 (noting that unlike the "immunities claimed"

in *Nixon* and *Fitzgerald*, "the immunity from indictment and criminal prosecution for a sitting President would generally result in the delay, but not the forbearance, of any criminal trial").

Bestowing blanket immunity from criminal prosecution on a former president would also create troubling incentives. A president wholly immune from criminal prosecution for any conduct undertaken while in office—particularly one in a second term who would not face voters in another presidential election—could commit crimes with impunity that benefit himself, endanger the republic, or both. *See* Claire O. Finkelstein & Richard W. Painter, *Presidential Accountability and the Rule of Law: Can the President Claim Immunity If He Shoots Someone on Fifth Avenue?*, 24 U. Pa. J. Const. L. 93, 193 (2022) ("A President who is immune from criminal prosecution thus poses a very real danger that he will commit crimes that will secure not only his continuation in office, but also thereby allow him to protect himself against impeachment during his (next) term and immunize himself against prosecution once he is no longer in office."). Immunity from criminal prosecution would be particularly inappropriate where, as here, the former president is alleged to have engaged in criminal conduct aimed at overturning the results of a presidential election in order to remain in office.

Further, the Supreme Court's concern in *Fitzgerald* that a former president subject to civil suit could become "an easily identifiable target" for "highly intrusive" private lawsuits from "countless people," 457 U.S. at 753, 756, or "vexatious" civil actions (Mot. 20-21) does not translate to the criminal context. Courts generally apply a strong presumption of prosecutorial regularity in the criminal context precisely because prosecutors adhere to a strict code that prohibits vexatious or abusive prosecutions. *See United States v. Armstrong*, 517 U.S. 456, 464 (1996) (absent "clear evidence to the contrary, courts presume that [prosecutors] have properly discharged their official duties.") (quoting *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14-15

(1926)).[15]  Further, former presidents "enjoy the same protection as do all citizens from vindictive [or selective] prosecution."  *Hastings*, 681 F.2d at 711; *see also* 167 Cong. Rec. S607 (daily ed. Feb. 9, 2021) (the defendant arguing at his impeachment trial that criminal investigation and prosecution would be more "appropriate" than impeachment, because trial in the Senate "does not and cannot offer the safeguards of the judicial system").  Additionally, unlike a civil lawsuit, a federal felony prosecution of a former president may be brought only on the basis of an indictment by a grand jury, which is "prohibited from engaging in 'arbitrary fishing expeditions' and initiating investigations 'out of malice or an intent to harass.'"  *Trump*, 140 S. Ct. at 2428 (quoting *United States v. R. Enterprises, Inc.*, 498 U.S. 292, 299 (1991)); *see A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. at 250 (noting that a criminal indictment "is a public rather than private allegation of wrongdoing reflecting the official judgment of a grand jury acting under the general supervision of the District Court").

Complementing those procedural protections are demanding *mens rea* standards required to prove criminal offenses and evidentiary limitations that would come into play with respect to any prosecution of a former president.  The offenses in this case, for example, require the Government to prove beyond a reasonable doubt that the defendant undertook the charged conduct with criminal intent.  *See Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924) (defraud-clause violation of Section 371 requires proof that the defendant agreed with others to obstruct a lawful governmental function through deceitful and dishonest means); *United States v. North*, 910 F.2d 843, 881-82 (D.C. Cir. 1990) (per curiam) (obstruction of an official proceeding requires

---

[15] In addition, the Supremacy Clause, U.S. Const. art. VI, cl. 2, prevents state prosecutors "from interfering with a President's official duties."  *Trump*, 140 S. Ct. at 2428 (internal quotation marks omitted); *see Tennessee v. Davis*, 100 U.S. 257, 263 (1879) (a state government may not "obstruct [the] authorized officers" of the federal government).  To the extent a federal officer faces prosecution in state court, that officer may remove the case to federal court where the prosecution is "for or relating to any act under color of [federal] office."  28 U.S.C. § 1442(a)(1).

proof that the defendant acted with corrupt purpose by seeking an unlawful or improper benefit or advantage) (citing *Ballentine's Law Dictionary* 276 (3d ed. 1969)), *opinion withdrawn and superseded in part on reh'g*, 920 F.2d 940 (D.C. Cir. 1990) (per curiam); *id.* at 943 (Silberman, J., concurring in part and dissenting in part) (corrupt purpose can be shown through intending the use of unlawful means); *Arthur Andersen LLP v. United States,* 544 U.S. 696, 706-07 (2005) (corrupt purpose can be shown through dishonesty); *United States v. Morrison*, 98 F.3d 619, 630 (D.C. Cir. 1996) (corrupt purpose exists where defendant violated a legal duty); *Screws v. United States*, 325 U.S. 91, 105 (1945) (violation of Section 241 requires proof that the defendant acted willfully, which means to "act in open defiance or in reckless disregard of a constitutional requirement which has been made specific and definite"); *Anderson v. United States*, 417 U.S. 211, 223 (1974) (under Section 241, "the prosecution must show that the offender acted with a specific intent to interfere with the federal rights in question").  And the very process of obtaining evidence to establish whether a former president had a culpable *mens rea* would often require a showing of sufficient need to overcome any claim of executive privilege.  *See Nixon*, 418 U.S. at 712; *In re Sealed Case*, 121 F.3d 729, 754 (D.C. Cir. 1997).  These formidable safeguards counsel strongly against the need to extend a former president's civil immunity to the criminal context.

Nor would declining to recognize a novel immunity from criminal prosecution tantamount to the civil immunity conferred in *Fitzgerald* undermine other substantive protections available to a former president.  Courts construe statutes applied to a president for conduct during the presidency narrowly "[o]ut of respect for the separation of powers and the unique constitutional position of the President."  *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992).  That approach reflects two principles: statutes should be interpreted to avoid serious constitutional questions, and Congress should not be assumed to have altered the constitutional allocation of powers between branches without clear assurance that it intended the result.  *See* Walter Dellinger,

*The Constitutional Separation of Powers Between the President and Congress*, 20 Op. O.L.C. 124, 178 (May 7, 1996).  Relying on those principles, for example, the Department of Justice has concluded that three criminal statutes could not be applied against the president (or, in two cases, other Executive Branch officials).  *See* Laurence H. Silberman, *Conflict of Interest Problems Arising out of the President's Nomination of Nelson A. Rockefeller to be Vice President under the Twenty-Fifth Amendment to the Constitution*, at 5 (Aug. 28, 1974) (criminal conflict-of-interest statute, 18 U.S.C. § 208); Theodore B. Olson, *Prosecution for Contempt of Congress of an Executive Branch Officer Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C 101, 102, 140 (May 30, 1984) (the criminal contempt-of-Congress prohibition, 2 U.S.C. § 192); William Barr, *Constraints Imposed by 18 U.S.C. § 1913 on Lobbying Efforts*, 13 Op. O.L.C. 300, 305 (Sept. 28, 1989) (the Anti-Lobbying Act, 18 U.S.C. § 1913).

At the same time, just as application of the federal bribery statute "raises no separation of powers question, let alone a serious one," because "[t]he Constitution confers no power in the President to receive bribes," so too here the charged statutes raise no separation-of-powers issues because the Constitution grants a president no power to engage in a criminal conspiracy to defeat a federal government function through deceit, corruptly obstruct a congressional proceeding, or violate others' constitutional right to vote.[16]  Walter Dellinger, *Application of 28 U.S.C. § 458 to Presidential Appointments of Federal Judges*, 19 Op. O.L.C. 350, 357 n.11 (Dec. 18, 1995); *see also Conflict of Interest Problems Arising out of the President's Nomination of Nelson A. Rockefeller to be Vice President under the Twenty-Fifth Amendment to the Constitution*, at 5

---

[16] That is particularly true where, as here, the defendant offers no plausible argument that the federal government function and official proceeding that he is charged with obstructing envision a role for the president.  *See United States v. Rhodes*, 610 F. Supp. 3d 29, 41 (D.D.C. 2022) (Vice President in role as President of the Senate and Congress execute the "laws governing the transfer of power").

(concluding that separation-of-powers doctrine would not preclude criminal prosecution of the president under the federal bribery statute, 18 U.S.C. § 201, because given the "nature of the offense charged, no one, however exalted his position, should safely feel that he is above the law").

**C.   Creating a Novel Immunity from Criminal Prosecution for a Former President Would Pose Significant Challenges, But at a Minimum Any Such Immunity Should Be Narrower Than Immunity from Civil Liability and Would Be Inapplicable Here.**

For all the reasons explained above, no immunity should shield the defendant from federal prosecution for criminal conduct undertaken while he served as president.  An additional basis not to recognize an unprecedented immunity from criminal prosecution for a former president's—or any federal official's—conduct while in office are the significant definitional, substantive, and procedural challenges that any such novel immunity would pose.  The defendant bears the burden of "showing that public policy requires an exemption of that scope," *Butz*, 438 U.S. at 506; *Forrester v. White*, 484 U.S. 219, 224 (1988), and he would not be able to carry that burden here.

**1.   The scope of any immunity in this context would have to account for the substantially greater public interest in federal criminal prosecutions and other relevant differences from private civil suits.**

If the Court were to adopt a heretofore unrecognized immunity from criminal prosecution for former presidents, that immunity should balance interests differently than in the civil context at issue in *Fitzgerald*, operating in a manner that "maintain[s] the[] proper balance" of the separation of powers and "vindicate[s] the public interest in an ongoing criminal prosecution," *Fitzgerald*, 457 U.S. at 754; *see Harlow*, 457 U.S. at 810 (emphasizing the "'functional' approach to immunity law").  Although the "lesser public interest" at issue in a "merely private suit for damages," *Fitzgerald*, 457 U.S. at 754 & n.37, does not justify subjecting a president to civil liability, immunity doctrine in the "much weightier" criminal context, *Cheney*, 542 U.S. at 384, if it exists at all, must weigh the strong public interest in the rule of law and reflect the courts'

"primary constitutional duty . . . to do justice in criminal prosecutions," *Nixon*, 418 U.S. at 707,

particularly, where, as here, a "judicially fashioned doctrine of official immunity" would risk

"reach[ing] 'so far as to immunize criminal conduct proscribed by an Act of Congress.'"  *O'Shea*,

414 U.S. at 503 (quoting *Gravel*, 408 U.S. at 627).

Any such immunity might assess the asserted presidential authority to act, if any.  Where

the criminal statute in question directly impinged on, or a generally applicable criminal statute was

applied to, an area of responsibility where the president's power is "both 'exclusive' and

'conclusive' on the issue," *Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015) (citing *Youngstown Sheet &

Tube v. Sawyer*, 343 U.S. 579, 637-38 (1952) (Jackson, J., concurring)), such as the president's

authority to recognize foreign nations, *id.* at 9, 28, or to make a recess appointment, U.S. Const.

art. II, § 2, cl. 3, or where application of a criminal statute would "prevent[] the Executive Branch

from accomplishing its constitutionally assigned functions," *Nixon v. Adm'r of Gen. Servs.*, 433

U.S. 425, 443 (1977), that fact could weigh in favor of a finding of immunity in limited

circumstances.  But where the asserted presidential authority lay further from the president's core

"line of duty," *Barr v. Matteo*, 360 U.S. 564, 575 (1959) (plurality opinion), or his power was "at

its lowest ebb," *Youngstown Sheet & Tube*, 343 U.S. at 637 (Jackson, J., concurring), the

justification for immunity would be more attenuated.  For example, where a president was carrying

out predominantly partisan electioneering activities that related only incidentally to his official

activities as president, *see* Theodore B. Olson, *Payment of Expenses Associated with Travel by the

President and Vice President*, 6 O.L.C. Op. 214, 215 (Mar. 24, 1982), no immunity from criminal

prosecution should presumptively attach.

Another consideration should be the intent or motive animating the conduct in question.

Although absolute civil immunity generally precludes judicial inquiry into whether a defendant

acting within the scope of his duties acted "for a forbidden purpose," *Fitzgerald*, 457 U.S. at 756,

immunity in the criminal context should not preclude such an inquiry.  For example, where a statute prohibits engaging in certain conduct for a corrupt purpose, the statute's *mens rea* requirement tends to align, rather than conflict, with the president's Article II duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, which would weigh heavily against the need for immunity.  To illustrate, although the president's power to grant pardons is exclusive and not subject to congressional regulation, *see United States v. Klein*, 80 U.S. (13 Wall.) 128, 147-48 (1872), criminal immunity should not shield the corrupt use of a presidential pardon—which plainly constitutes "anything of value" for purposes of the federal bribery statute, *see* 18 U.S.C. § 201(b)(3)—to induce another person to testify falsely or not to testify at all in a judicial, congressional, or agency proceeding.  Just as the Speech or Debate Clause, U.S. Const. art. I, § 6, cl. 1, absolutely protects legislative acts, but not a legislator's "taking or agreeing to take money for a promise to act in a certain way . . . for it is taking the bribe, not performance of the illicit compact, that is a criminal act," *United States v. Brewster*, 408 U.S. 501, 526 (1972), the promise of a pardon to corruptly influence testimony would not be a constitutionally immunized act. Similarly, in those instances where the "line" between a president's "personal and official affairs" is "clear," *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2034 (2019), not "elusive and difficult to discern," *In re Lindsey*, 158 F.3d 1263, 1286 (D.C. Cir. 1998) (per curiam) (Tatel, J., concurring in part and dissenting in part), and it is plain that the president is acting corruptly to further his own personal benefit without regard to the best interests of the nation, no immunity from criminal prosecution should apply.

> **2.**   **The defendant cannot establish that he would be entitled to dismissal of the indictment under any plausible view of a former president's immunity from criminal prosecution.**

Incorporating these considerations into a workable test would present line-drawing and administrability challenges.  These complications, as well as the existing protections described

above, *see supra* 30-33, counsel against creating "some [new] form of immunity" from criminal prosecution, *Fitzgerald*, 457 U.S. at 744.  At a minimum, the defendant has not carried his burden of showing that this is the sort of "exceptional situation[]" in which the recognition of an immunity from criminal prosecution is "essential for the conduct of the public business."  *Butz*, 438 U.S. at 507.

The indictment alleges a conspiracy to overturn the presidential election results, ECF No. 1 at ¶ 7, through targeting state officials, *id.* at ¶¶ 13-52; creating fraudulent slates of electors in seven states, *id.* at ¶¶ 53-69; leveraging the Department of Justice in the effort to target state officials through deceit and substitute the fraudulent elector slates for the legitimate ones, *id.* at ¶¶ 70-85; attempting to enlist the Vice President to fraudulently alter the election results during the certification proceeding on January 6, 2021, and directing supporters to the Capitol to obstruct the proceeding, *id.* at ¶¶ 86-105; and exploiting the violence and chaos that transpired at the United States Capitol on January 6, 2021, *id.* at ¶¶ 106-124.  Allowing a former President to face criminal prosecution for that alleged conduct would not encroach on an Article II power, let alone a core presidential responsibility.  Instead, the allegations focus principally on the defendant's actions as a candidate for elective office.  Furthermore, the indictment alleges that the defendant acted deceitfully or corruptly to secure a personal benefit to himself as a presidential candidate, not to carry out constitutional obligations entrusted to the presidency.  Immunity should not foreclose the Government from shouldering the burden to prove those demanding standards, *see supra* 31-32, beyond a reasonable doubt at trial.  The defendant's contrary arguments are unpersuasive.

First, the defendant's counterarguments (Mot. 27-45) rest on misrepresentations of the indictment's allegations.   Although the defendant acknowledges that the indictment "must be accepted as true at this stage of the proceedings," Mot. 2 (quoting *United States v. Weeks*, 636 F. Supp. 3d 117, 120 (D.D.C. 2022)), his ensuing discussion consistently misstates the allegations in

a manner designed to fit his capacious theory of presidential authority. For example, the defendant identifies (Mot. 3-4, 28-33) one of the "five basic categories" of allegations as his "public statements about the administration of the federal election" and "Tweets about the administration of the federal election." *Id.* at 3. That description mischaracterizes the indictment, as described in the preceding paragraph. Moreover, the fact that the defendant's public statements and tweets furthered the alleged conspiracy is uncontroversial because courts have long recognized that "constitutionally protected speech may nevertheless be an overt act in a conspiracy charge." *United States v. Donner*, 497 F.2d 184, 192 (7th Cir. 1974); *United States ex rel. Epton v. Nenna*, 446 F.2d 363, 368 (2d Cir. 1971); *United States v. Lanier*, 920 F.2d 887, 893 n.48 (11th Cir. 1991); *see also United States v. Vascular Sols., Inc.*, 181 F. Supp. 3d 342, 345 (W.D. Tex. 2016) (Lamberth, J.) (sitting by designation) (finding "ample support" to reject defendants' contention that "truthful speech" cannot be "an act taken to effect the object of the conspiracy") (internal quotation marks omitted); *see also Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993) ("[A] defendant's previous declarations or statements [are] commonly admitted in criminal trials subject to evidentiary rules dealing with relevancy, reliability, and the like.").

Similarly, the defendant's conclusory assertions (Mot. 3, 6, 28, 33, 35, 37, 39, 42) that the allegations involve his "official duties" rely entirely on his recasting of what the indictment in fact alleges. In his view, for example, the indictment encompasses merely "[m]eeting with state officials about the administration of a federal election," Mot. 35, when the actual allegations detail "knowingly false claims of election fraud aimed at interfering with the ascertainment of and voting by" electors made by the defendant and his coconspirators in several targeted states. ECF No. 1 at ¶ 15; *see id.* at ¶¶ 14-19 (Arizona); *id.* at ¶¶ 20-33 (Georgia); *id.* at ¶¶ 34-41 (Michigan); *id.* at ¶¶ 42-46 (Pennsylvania); *id.* at ¶¶ 47-52 (Wisconsin). The defendant further posits (Mot. 39) that the indictment encompasses his communications with the Vice President and other legislators

"about the exercise of their official duties regarding federal election certification." That is a gross mischaracterization. The indictment in fact alleges that the defendant and his conspirators sought to "enlist the Vice President to use his ceremonial role at the certification to fraudulently alter the election results," ECF No. 1 at ¶ 86; *see also id.* at ¶¶ 86-105, and then sought to "exploit the violence and chaos at the Capitol by calling lawmakers to convince them, based on knowingly false claims of election fraud, to delay the certification," *id.* at ¶ 119. Additionally, the defendant's claim to have been carrying out his "official duties" entirely ignores that, as a "candidate for re-election," ECF No. 1 at ¶ 1, he is alleged to have conspired to "overturn the legitimate results of" a "presidential election," *id.* at ¶ 7, and to have done so with at least five others who had absolutely no role in the federal government, including private attorneys and a political consultant, *id.* at ¶ 8(a), (b), (c), (e), (f). While the defendant is certainly entitled to challenge those allegations at trial, he is not permitted to reframe them in a dismissal motion into a version that more conveniently supports his legal arguments.

The defendant's arguments likewise fail because they describe presidential duties at a stratospheric level of generality. *See Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1141 (D.C. Cir. 2015) (warning that "[a]t a high enough level of generality, almost any act that has any relationship to an overarching duty . . . will be immunized"). Take, for example, the defendant's repeated contention (Mot. 22, 32-34, 38) that his conduct between the election and January 6 broadly fell within his Article II "take-Care" power. The Constitution vests in the president "[t]he executive Power" and directs, among other things, that the president "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 1, cl. 1; U.S. Const. art. II, § 3; *see also id.* at art. II, § 2, cl. 2 (empowering the president to appoint all officers with the advice and consent of the Senate); *see Lucia v. SEC*, 138 S. Ct. 2044, 2051 n.3 (2018). The concept of "faithful execution" connotes the use of power in the interest of the public, not in the office holder's personal interests. *See* 1

Samuel Johnson, *A Dictionary of the English Language* 763 (1755) ("faithfully" def. 3: "[w]ith strict adherence to duty and allegiance").  The principal case on which the defendant relies (Mot. 35-36, 38, 43-44) for his expansive conception of the Take Care Clause, *In re Neagle*, 135 U.S. 1 (1890), cannot bear the weight of his arguments.  In *Neagle*, the Supreme Court held that the Take Care Clause authorized the appointment of a deputy marshal to protect a Supreme Court Justice while traveling on circuit even in the absence of congressional authorization.  *Id.* at 67-68; *see Logan v. United States*, 144 U.S. 263, 294 (1892) (describing *Neagle*'s holding); *Youngstown Sheet & Tube*, 343 U.S. at 661 n.3 (Clark, J., concurring) (same).  Before reaching that conclusion, the Court in *Neagle* posed as a rhetorical question—which the defendant cites several times (Mot. 35, 38, 43, 44)—whether the president's duty under the Take Care Clause is "limited to the enforcement of acts of congress or of treaties of the United States according to their express terms; or does it include the rights, duties, and obligations growing out of the constitution itself, our international relations, and all the protection implied by the nature of the government under the constitution?"  135 U.S. at 64.  From the undisputed proposition that the president's powers under Article II are not limited only to laws and treaties, it does not follow, as the defendant seems to imply, that every "right, duty, or obligation[]" under the Constitution is necessarily coterminous with the president's powers under the Take Care Clause.  Under that theory, for example, the president could superintend Congress's constitutional obligation to keep a journal of its proceedings, U.S. Const. art. I, § 5, cl. 3, or the judiciary's duty to adjudicate cases and controversies, U.S. Const. art. III, § 2, cl. 1.

**D.   Even If a Former President Were Entitled to Immunity from Criminal Prosecution Comparable to His Immunity from Civil Liability, Dismissal Is Not Warranted Here.**

Dismissal is at a minimum unwarranted because the defendant has no remotely viable claim that *all* of the indictment's allegations involve acts "within the 'outer perimeter' of his official

responsibility." *Fitzgerald*, 457 U.S. at 756.  For example, allegations that the defendant "acted purely in his capacity as a candidate for office" by, among other things, "directing his campaign staff" to further his efforts to overturn the election results do not fall within the outer perimeter of the presidency.  *See* Brief for the United States as Amicus Curiae, *Blassingame v. Trump*, Nos. 22-5069, 22-7030, 22-7031, at 22 (D.C. Cir.) (filed Mar. 2, 2023).  That is particularly true with respect to allegations that the defendant conspired with and directed individuals outside the government to facilitate his effort to turn the election in his favor as a candidate.  *See, e.g.*, ECF No. 1 at ¶¶ 8(a), 13 (alleging that the defendant "turned to Co-Conspirator 1," a private attorney who "was willing to spread knowingly false claims and pursue strategies that the Defendant's 2020 re-election campaign attorneys would not," to "spearhead his efforts going forward to challenge the election results"); *id.* at ¶¶ 8(b), 30 (alleging that the defendant and Co-Conspirator 2, a private attorney who "devised and attempted to implement a strategy to leverage the Vice President's ceremonial role overseeing the certification proceeding to obstruct the certification of the presidential election," caused the filing in a federal court of a "verification" signed by the defendant "affirming false election fraud allegations made on his behalf in a lawsuit filed in his name against the Georgia Governor"); *id.* at ¶¶ 8(e), 8(f), 61 (alleging that Co-Conspirator 1, Co-Conspirator 5, a private attorney "who assisted in devising and attempting to implement a plan to submit fraudulent slates of presidential electors to obstruct the certification proceeding," and Co-Conspirator 6, a "political consultant who helped implement a plan to submit fraudulent slates of presidential electors to obstruct the certification proceeding," participated in a call with the defendant's electors in Pennsylvania, during which Co-Conspirator 1 "falsely assured" the electors that the electoral certificates "would only be used if the Defendant succeeded in litigation").

The same is true for the allegations describing the conspirators' efforts to organize fraudulent electoral slates and cause them to transmit false certificates to Congress in anticipation

of the certification proceeding on January 6, 2021.  *See* ECF No. 1 at ¶¶ 53-69.  Again, those acts were carried out by and on behalf of the defendant in his capacity as a candidate, and the extensive involvement of private attorneys and campaign staff in procuring the fraudulent slates as alleged in the indictment underscores that those activities were not within the outer perimeter of the office of the presidency.  In response, the defendant suggests (Mot. 44) essentially that because both the presidency and presidential electors are defined in the Constitution, the former necessarily bears responsibility for "protecti[on]" of the latter.  But the defendant cites no legal principle or case that would extend the president's constitutional duties—or the scope of his office—to the preparation and submission of slates of electors supporting his candidacy for reelection.  Second, the defendant argues (*id.*) that organizing the fraudulent slates was "ancillary and preparatory" to "communicating with the Vice President and other Members of Congress."  But the defendant fails to explain how communications related to the preparation and submission of slates of electors on behalf of a candidate for office fall within the outer perimeter of a president's duties.  And because the indictment includes allegations that fall outside the outer perimeter of the president's powers even under the broadest understanding of that term, the remedy of dismissal is inappropriate.

## IV.    Conclusion

For the foregoing reasons, the Court should deny the defendant's motion to dismiss the

indictment on the ground that a former president is immune from criminal prosecution.

Respectfully submitted,

JACK SMITH
Special Counsel

By:    /s/ James I. Pearce
       James I. Pearce
       Assistant Special Counsel
       Molly Gaston
       Thomas P. Windom
       Senior Assistant Special Counsels
       950 Pennsylvania Avenue NW
       Room B-206
       Washington, D.C. 20530

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA

   v.

DONALD J. TRUMP,

       *Defendant*.

Case No. 1:23-cr-00257-TSC

**PRESIDENT TRUMP'S MOTION TO DISMISS THE INDICTMENT BASED ON
CONSTITUTIONAL GROUNDS AND MEMORANDUM IN SUPPORT**

## INTRODUCTION

The prosecution opens its indictment by stating that President Trump "had a right, like every American, to speak publicly about the election," including his deeply held view that there had been fraud and other irregularities "during the election and that he had won." Doc. 1 at ¶ 3 (Indictment). These points are not in dispute. Nonetheless, in an astonishing display of doublethink, the prosecution simultaneously claims that President Trump—simply by speaking his mind and petitioning for a redress of grievances—also somehow conspired to "defraud the United States," "oppress rights," and "obstruct an official proceeding." *Id*. at ¶ 5–6, 125–130. Attempting to explain this obvious contradiction, the prosecution argues that there was no "outcome-determinative fraud in the election" (whatever that means), *id*. at ¶ 2, and that President Trump supposedly knew this because some government officials "notified" him "that his claims were untrue," ¶ 11.

If there is any constant in our democratic system of governance, it is that the marketplace of ideas—not the mandates of government functionaries or partisan prosecutors—determines the scope of public debate. Countless millions believe, as President Trump consistently has and currently does, that fraud and irregularities pervaded the 2020 Presidential Election. As the indictment itself alleges, President Trump gave voice to these concerns and demanded that politicians in a position to restore integrity to our elections not just talk about the problem, but investigate and resolve it. *See id*. at ¶ 10(a) (state legislators and election officials act); ¶ 10(b) (Vice President and other government officials); ¶ 10(c) (state officials); ¶ 10(d) (vice president); ¶ 10(e) (members of Congress).

The First Amendment embraces and encourages exactly this kind of behavior, and therefore states in the clearest of terms that "Congress shall make no law . . . abridging the freedom

of speech, . . . or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I. The indictment, taken as true, violates this core principle as to each count. Accordingly, the Court should dismiss the indictment in its entirety.

Additionally, as the United States Senate has previously tried and acquitted President Trump for charges arising from the same course of conduct alleged in the indictment, the impeachment and double jeopardy clauses both bar retrial before this Court and require dismissal.

Finally, because of our country's longstanding tradition of forceful political advocacy regarding perceived fraud and irregularities in numerous Presidential elections, President Trump lacked fair notice that his advocacy in this instance could be criminalized. Thus, the Court should dismiss the indictment under the Due Process clause as well.

## ARGUMENT

"In ruling on a motion to dismiss for failure to state an offense, a district court is" typically "limited to reviewing the face of the indictment and, more specifically, the language used to charge the crimes." *United States v. Sunia*, 643 F. Supp. 2d 51, 60 (D.D.C. 2009). "When considering a motion to dismiss, the court must review the face of the indictment," and "the indictment must be viewed as a whole and the allegations must be accepted as true at this stage of the proceedings." *United States v. Weeks*, 636 F. Supp. 3d 117, 120 (D.D.C. 2022).

President Trump fully denies the allegations in the indictment which are referenced in this motion and memorandum. Rather, this memorandum sets forth the facts alleged in the indictment so that their legal sufficiency may be assessed for a motion to dismiss. *Id.*

I.     **The Indictment Should Be Dismissed Because It Seeks to Criminalize Core Political Speech and Advocacy Protected by the First Amendment.**

First and foremost, the indictment must be dismissed because it seeks to criminalize core political speech and advocacy that lies at the heart of the First Amendment.[1]

A.     **The Government May Not Prohibit Core Political Speech on Matters of Public Concern, Regardless of Its Supposed Truth or Falsity.**

In *United States v. Alvarez*, the Supreme Court reaffirmed the broad scope of the First Amendment, holding that it protects even the verifiably false claim that the speaker had been awarded the Congressional Medal of Honor. 567 U.S. 709, 729 (2012) (plurality opinion of Kennedy, J.); *id.* at 739 (Breyer, J., concurring in the judgment).

*Alvarez* produced multiple opinions, *see id.*, but on one key point, all nine Justices were unanimous: Under the First Amendment, the Government may not prohibit or criminalize speech on disputed social, political, and historical issues simply because the Government determines that some views are "true" and others are "false." *See id.* "Our constitutional tradition stands against the idea that we need Oceania's Ministry of Truth." *Id.* at 723 (citing GEORGE ORWELL, NINETEEN EIGHTY–FOUR (1949) (Centennial ed. 2003)).

The four-Justice plurality opinion of Justice Kennedy was emphatic on this point, rejecting the notion that the "government [may] decree this speech [about receiving medals] to be a criminal offense, whether shouted from the rooftops or made in a barely audible whisper," as such an approach "would endorse government authority to compile a list of subjects about which false

---

[1] As explained in President Trump's Motion to Dismiss Based on Presidential Immunity, all acts charged in the indictment were performed within the "outer perimeter" of his official duties as President. Doc. 74, at 21-45. As explained in that Motion, and conceded in the Government's *Blassingame* amicus brief, the fact that President Trump's alleged actions were conducted within his official duties is fully consistent with those actions also involving the exercise of his First Amendment rights. *See, e.g., id.* at 26-27 ("[I]t is commonplace for a President's speech to have dual roles—both an official and personal character.").

statements are punishable. That governmental power has no clear limiting principle." *Id.* at 723.

Thus, disavowing "Oceania's Ministry of Truth," *id.*, Justice Kennedy rejected any rule that would

"give government a broad censorial power unprecedent in this Court's cases or in our

constitutional tradition. The mere potential for the exercise of that power casts a chill, a chill the

First Amendment cannot permit if free speech, thought, and discourse are likely to remain a

foundation of our freedom." *Id.* Instead,

> [t]he remedy for speech that is false is speech that is true. This is the ordinary course
> in a free society. The response to the unreasoned is the rational; to the uninformed,
> the enlightened; to the straightout lie, the simple truth.… The theory of our
> Constitution is "that the best test of truth is the power of the thought to get itself
> accepted in the competition of the market."… Freedom of speech and thought flows
> not from the beneficence of the state but from the inalienable rights of the person.
> And suppression of speech by the government can make exposure of falsity more
> difficult, not less so…. These ends are not well served when the government seeks
> to orchestrate public discussion through content-based mandates.

*Id.* at 727-28 (quoting *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting)).

"Only a weak society needs government protection or intervention before it pursues its resolve to

preserve the truth. Truth needs neither handcuffs nor a badge for its vindication." *Id.* at 729.

Justice Breyer's two-Justice concurrence in *Alvarez* likewise endorsed this same point,

quoting Justice Alito for the proposition that "there are broad areas in which any attempt by the

state to penalize purportedly false speech would present a grave and unacceptable danger of

suppressing truthful speech," which include "[l]aws restricting false statements about philosophy,

religion, history, the social sciences, the arts, and the like." *See id.* at 731-32 (Breyer, J., concurring

in the judgment). These topics—which are often the subject of vigorous public debate—rarely

have clear or verifiable answers (hence, the controversy), and therefore citizens must be given

"breathing room" to speak their minds without fear of, as here, being criminally prosecuted by

government officials that do not like what they have to say. *See id.* at 733.

Indeed, Justice Breyer concluded that "the threat of criminal prosecution for making a false statement can inhibit the speaker from making true statements, thereby 'chilling' a kind of speech that lies at the First Amendment's heart." *Id.* at 733. Justice Breyer further emphasized that criminalizing supposedly "false" statements on such not "easily verifiable," politically controversial topics "provides a weapon to a government broadly empowered to prosecute falsity without more. And those who are unpopular may fear that the government will use that weapon selectively…." *Id.* at 734; *see also id.* at 736 (emphasizing that "in political contexts, … the risk of censorious selectivity by prosecutors is … high"); *id.* at 738 ("In the political arena … criminal prosecution is particularly dangerous … and consequently can more easily result in censorship of speakers and their ideas.").[2]

Justice Alito's three-Justice dissent in *Alvarez*—the opinion *least* protective of speech in that case—endorsed the same conclusion. As noted above, Justice Alito's dissent recognized that

> there are broad areas in which *any attempt by the state to penalize purportedly false speech would present a grave and unacceptable danger of suppressing truthful speech.* Laws restricting false statements about *philosophy, religion, history, the social sciences, the arts, and other matters of public concern* would present such a threat. The point is not that there is no such thing as truth or falsity in these areas or that the truth is always impossible to ascertain, but rather that *it is perilous to permit the state to be the arbiter of truth.*

*United States v. Alvarez*, 567 U.S. 709, 751–52 (2012) (Alito, J., dissenting) (emphasis added). "Even where there is a wide scholarly consensus concerning a particular matter, the truth is served by allowing that consensus to be challenged without fear of reprisal. Today's accepted wisdom sometimes turns out to be mistaken." *Id.* at 752. "And in these contexts, 'even a false statement

---

[2] Although Justice Breyer suggested false statements concerning "easily verifiable facts" might be afforded less First Amendment protection, as discussed *infra*, questions of election integrity are by no means "easily verifiable," and are certainly unlike the statements in *Alvarez* regarding receipt of the Medal of Honor, which Justice Breyer nonetheless concluded were protected by the First Amendment.

may be deemed to make a valuable contribution to public debate, since it brings about 'the clearer perception and livelier impression of truth, produced by its collision with error.'" *Id.* (quoting *New York Times v. Sullivan*, 376 U.S. at 279 n.19 (quoting JOHN STUART MILL, ON LIBERTY 15 (R. McCallum ed. 1947))).

In addition, "[a]llowing the state to proscribe false statements in these areas also opens the door for the state to use its power for political ends," *id.*—a concern that is maximal in this case, where a sitting President's Administration is prosecuting his chief political opponent for supposedly making "false" claims challenging the validity of the sitting President's election. "If some false statements about historical events may be banned, how certain must it be that a statement is false before the ban may be upheld? And who should make that calculation?" *Id.* "While our cases prohibiting viewpoint discrimination would fetter the state's power to some degree, *the potential for abuse of power in these areas is simply too great*." *Id.* (emphasis added).

Thus, *Alvarez* reflects the Supreme Court's unanimous consensus that claims about widely disputed social, political, and historical questions—*i.e.*, "matters of public concern," *id.* at 752— are protected by the First Amendment, regardless of the Government's view on supposed "truth" or "falsity." In fact, as Justice Alito's discussion demonstrates, such claims are protected by the First Amendment *especially* when the Government deems them "false." *See id.* Thus, claims about the integrity of the 2020 Presidential election—including claims that the election was "rigged," "stolen," and/or tainted by outcome-determinative fraud—are fully protected by the First Amendment, regardless of the Government's view of their truth or falsity. Indeed, in such areas, "it is perilous to permit the state to be the arbiter of truth." *Id.* at 752 (Alito, J., dissenting).

This conclusion that the First Amendment fully protects opinions and claims on widely disputed political and historical issues—such as the integrity of the 2020 Presidential election—

draws further support from the most basic principles of the Supreme Court's First Amendment jurisprudence. Such claims constitute (1) core political speech, on (2) matters of enormous public concern, where suppressing the speech constitutes (3) forbidden viewpoint discrimination.

**Speech on matters of public concern.** "Speech on matters of public concern is at the heart of the First Amendment's protection. That is because speech concerning public affairs is more than self-expression; it is the essence of self-government. Accordingly, speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011) (cleaned up; citations omitted) (citing numerous cases). "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Id.* at 452-53. And Justice Alito's dissent in *Alvarez* explicitly stated that the areas where the First Amendment does not permit the criminalization of supposedly "false" statements can be summarized as those involving "matters of public concern." 567 U.S. at 751–52 (Alito, J., dissenting). Speech disputing the outcome of the 2020 election unquestionably constitutes speech on "matters of public concern." *See id.*

**Core political speech.** Indeed, such speech constitutes core political speech, and First Amendment protection is "at its zenith" when the government attempts to restrict "core political speech." *Buckley v. Am. Const. Law Found., Inc.*, 525 U.S. 182, 186–87 (1999); *see also Meyer v. Grant*, 486 U.S. 414, 425 (1988) (speech that "at the core of our electoral process and of the First Amendment freedoms—an area … where protection of robust discussion is at its zenith") (citations and quotations omitted). Such "core political speech" encompasses any "advocacy of a politically controversial viewpoint." *McIntyre v. Ohio Elec. Comm'n*, 514 U.S. 334, 347 (1995). "No form

of speech is entitled to greater constitutional protection than" core political speech. *Id.* This is especially true of speech relating to *elections*, since the First Amendment's "constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014) (quoting *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971)).

**Viewpoint discrimination.** Further, attempts to prohibit or criminalize claims on political disputes—such as the integrity and outcome of the 2020 Presidential election—inevitably target speech on the basis of viewpoint, which is the least tolerable of First Amendment violations. "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 828 (1995). "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Id.* at 829. "Viewpoint discrimination is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.*

The fact that the indictment alleges that the speech at issue was supposedly, according to the prosecution, "false" makes no difference. Under the First Amendment, each individual American participating in a free marketplace of ideas—*not* the federal Government—decides for him or herself what is true and false on great disputed social and political questions. As noted above, "[o]ur constitutional tradition stands against the idea that we need Oceania's Ministry of Truth." *Alvarez*, 567 U.S. at 723. "Permitting the government to decree this [false] speech to be a criminal offense … would endorse government authority to compile a list of subjects about which false statements are punishable. That governmental power has no clear limiting principle." *Id.*

Thus, "falsity alone may not suffice to bring the speech outside the First Amendment." *Id.* at 719.

"Absent from those few categories where the law allows content-based regulation of speech is any general exception to the First Amendment for false statements. This comports with the common understanding that some false statements are inevitable if there is to be an open and vigorous expression of views in public and private conversation, expression the First Amendment seeks to guarantee." *Id.* at 718. "The erroneous statement is inevitable in free debate." *Id.* (quoting *New York Times v. Sullivan*, 376 U.S. 254, 271 (1964)).

***

The indictment therefore attempts to criminalize core political speech and political advocacy, which is categorically impermissible under the First Amendment. As the Supreme Court held in *Texas v. Johnson*, "[i]f there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989) (citing 14 cases for this proposition). "[I]t is a central tenet of the First Amendment that the government must remain neutral in the marketplace of ideas." *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 56 (1988) (quoting *FCC v. Pacifica Foundation*, 438 U.S. 726, 745-46 (1978)). "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 95 (1972).

The indictment here does not merely criminalize conduct with an incidental impact on protected speech; instead, it directly targets core protected speech and activity. For this reason, it is categorically invalid under the First Amendment. "Clearly, government has no power to restrict

such activity because of its message." *Grayned v. City of Rockford*, 408 U.S. 104, 115 (1972). That is precisely what the indictment attempts to do here.

For similar reasons, the indictment is invalid under any level of scrutiny. As noted above, the indictment imposes viewpoint-based restrictions on core political speech on matters of the highest public concern with extremely severe penalties, and thus if any scrutiny applies, it is the strictest form of scrutiny. Yet regardless, the prosecution cannot show any interest (let alone a compelling or substantial one) in punishing such First Amendment-protected activity. The prosecution has no valid interest in silencing disfavored viewpoints or preventing people from advocating such disfavored viewpoints to government officials. *See, e.g., United States v. Eichman*, 731 F. Supp. 1123, 1131 (D.D.C.), *aff'd*, 496 U.S. 310 (1990) ("However compelling the government may see its interests, they cannot justify restrictions on speech which shake the very cornerstone of the First Amendment."). Furthermore, no amount of tailoring can save such a restriction, because its entire impact is focused on punishing the exercise of core political speech. *See* Doc. 1; *see also, e.g., United States v. Popa*, 187 F.3d 672, 677 (D.C. Cir. 1999) ("Punishment of those who use the telephone to communicate a political message is obviously not 'essential to the furtherance of that [government] interest.'"). The indictment is precisely tailored to *violate* free-speech rights, not narrowly tailored to *avoid* violating them. *See id.* This is the antithesis of narrow tailoring.

Finally, if the indictment validly applies the language of the statute, that renders the statute both unconstitutional as applied and unconstitutional on its face, under the First Amendment overbreadth doctrine. Under the prosecution's interpretation, the statute sweeps in the criminalization of large amounts of "pure speech," and thus it suffers from "overbreadth" that is "not only … real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973).

**B.      The First Amendment Protection for Opinions on Politically Charged Disputes Extends to Statements Advocating the Government to Act.**

Because the First Amendment confers absolute protection on public statements about hotly disputed social, political, and historical topics and other matters of public concern, including those which are supposedly "false," it confers the same protection on the same statements made in advocating for government officials to *act* on one's views. The First Amendment protects the right "to petition the Government for a redress of grievances" in the same clause as "the freedom of speech." U.S. CONST. amend. I. When it comes to what speech is protected, the right to petition is coextensive with the right to speak—a claim protected under the Amendment's right to "freedom of speech" is equally protected when the same claim is made while "petition[ing] the Government." *Id.* As the Supreme Court stated, "[t]he right to petition is cut from the same cloth as the other guarantees of that Amendment, and is an assurance of a particular freedom of expression." *McDonald v. Smith*, 472 U.S. 479, 482 (1985).

For this reason, in *McDonald*, the Supreme Court consulted the right to freedom of speech to determine what statements are protected when exercising the right to petition the government. *McDonald* concerned a libel lawsuit brought against a man who sent letters to President Reagan making allegedly libelous claims about a potential political appointee. 472 U.S. at 480-81. The libel defendant claimed that he had absolute immunity from libel suit because the allegedly libelous statements were made in the course of petitioning the Government. *Id.* at 481-82. The Supreme Court rejected this claim, holding instead that the scope of First Amendment protection for claims made while petitioning government officials is *coextensive* with the scope of First Amendment protection for public statements under the Free Speech Clause. *Id.* at 484-85. Because libel falls within a well-established First Amendment exception, libel made in statements to government officials is likewise unprotected under the Petition Clause of the First Amendment.

*Id.* at 485. In so holding, the Supreme Court made clear that the Free Speech Clause and the

Petition Clause are on identical footing, establishing the same levels of protection for speech:

> To accept petitioner's claim of absolute immunity would elevate the Petition Clause to special First Amendment status. The Petition Clause, however, was inspired by the same ideals of liberty and democracy that gave us the freedoms to speak, publish, and assemble. *These First Amendment rights are inseparable, and there is no sound basis for granting greater constitutional protection to statements made in a petition to the President than other First Amendment expressions*.

Id. at 485 (citations omitted) (emphasis added). The same logic applies here. Just as there is "no

sound basis for granting *greater* protection to statements made in a petition … than other First

Amendment expressions," *id.*, so also there is no sound basis for granting *lesser* constitutional

protection to the same statements. After all, the Petition Clause reflects "the same ideals of liberty

and democracy that gave us the freedoms to speak, publish, and assemble." *Id.* Thus, speech that

is protected by the Free Speech Clause when made in a public forum retains its full protection

when it is made to Government officials in the course of petitioning them to action. *See id.*

This conclusion draws further support from *McDonnell v. United States*, 579 U.S. 550

(2016). In *McDonnell*, the Government prosecuted the Governor of Virginia using an

interpretation of the phrase "official act" in 18 U.S.C. § 201 that would have criminalized a broad

range of ordinary political lobbying of public officials: "Section 201 prohibits *quid pro quo*

corruption—the exchange of a thing of value for an 'official act.' In the Government's view, nearly

anything a public official accepts—from a campaign contribution to lunch—counts as a *quid*; and

nearly anything a public official does—from arranging a meeting to inviting a guest to an event—

counts as a *quo*." *Id.* at 575. The Supreme Court unanimously held that "[i]n addition to being

inconsistent with both text and precedent, the Government's expansive interpretation of 'official

act' would raise significant constitutional concerns," *id.* at 574, precisely because it threatened to

criminalize a broad range of ordinary political activity done in furtherance of petitioning the Government under the First Amendment:

> [C]onscientious public officials arrange meetings for constituents, contact other officials on their behalf, and include them in events all the time. The basic compact underlying representative government *assumes* that public officials will hear from their constituents and act appropriately on their concerns…. The Government's position could cast a pall of potential prosecution over these relationships….. Officials might wonder whether they could respond to even the most commonplace requests for assistance, and *citizens with legitimate concerns might shrink from participating in democratic discourse*.

*Id.* at 575 (second emphasis added). So also here, permitting the prosecution to criminalize First Amendment-protected statements simply because they were made to government officials would violate "[t]he basic compact of representative government" and cause "citizens with legitimate concerns" to "shrink from participating in democratic discourse." *Id.* Consider any number of disfavored claims on a host of controversial topics, all deemed to be demonstrably "false" and "disinformation" by the Government at various times—such as claiming that masks do not stop the transmission of COVID-19, that vaccines do not stop the transmission of COVID-19, that COVID-19 originated from a lab in Wuhan, China, and that the 2020 Presidential election was stolen. Can the Government prosecute a citizen for attempting to "defraud the United States" by making supposedly "false" statements to government officials for (1) opposing mask mandates by telling legislators that they don't stop transmission, (2) opposing vaccine mandates by telling legislators that they don't stop transmission, and/or (3) urging the investigation of China by telling government officials that COVID-19 leaked from a lab? Under the First Amendment, the answer is "no"—and that absolutely applies to claims that the 2020 Presidential election was stolen as well.

C.      **The First Amendment Does Not Permit the Government to Prosecute a Citizen for Claiming That the 2020 Presidential Election Was Stolen.**

Thus, under the First Amendment, the prosecution cannot criminalize claims that the 2020 Presidential election was stolen; and it cannot, by prosecution, seek to impose its view on a disputed political question like the integrity of the 2020 Presidential election. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). "At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 641 (1994). Neither the federal Executive Branch nor the Judicial Branch, both of which are bound by the First Amendment, may dictate that such claims are criminally "false."

Claims about the integrity of the 2020 Presidential election—including claims that the election was "rigged" and/or "stolen," or that fraud and irregularities tainted the outcome in certain States or across the Nation—implicate all the fundamental First Amendment principles discussed above. They constitute (1) core political speech (2) expressing a specific disfavored viewpoint (3) on matters of enormous public concern (4) that relate to a widely disputed historical, social, and political question (5) that is not readily verifiable or falsifiable. Thus, they lie at the heartland of the First Amendment's protection, and the federal government may not dictate whether such claims are true or false—nor prosecute the purveyors of the allegedly "false" views.

This is especially true because claims that the 2020 Presidential election was "rigged" or tainted by fraud and irregularity—unlike the libel claims at issue in *McDonald*, *see supra*—do not involve "easily verifiable facts." *Alvarez*, 567 U.S. at 732 (Breyer, J., concurring in the judgment). Such claims require the assessment of mountains of information from which each person will draw

competing inferences based on facts as well as their personal, deep-seated political views and presuppositions. They are not readily verifiable or falsifiable, they relate to politically charged issues, and people's assessment of them is deeply linked to their political predispositions and their trust in institutions, including governmental institutions. This is why Americans' opinions on these issues are profoundly divided, very much to this day. The First Amendment does not permit the prosecution to dictate what is "true" and what is "false" on such broad, vigorously disputed, politically charged questions—*especially* not in the context of a criminal prosecution that effectively seeks to criminalize a political *viewpoint* shared by over 100 million Americans.[3]

Many millions of reasonable people believe that the 2020 Presidential election was unfairly rigged against President Trump, and that fraud and other irregularities tainted the election results. There is abundant public evidence providing a reasonable basis for these opinions. What is critical is that how one interprets this evidence depends on one's deep-seated political views, including one's trust in government institutions and government officials, among others. Different people will draw different inferences from such public evidence based on their deep-seated political views—and that is exactly what the First Amendment permits—even celebrates.[4]

---

[3] Almost 40 percent of Americans, including almost 70 percent of Republicans, believe that the 2020 Presidential election was tainted by fraud or irregularity—a number that is increasing and has increased since 2020. *See, e.g.,* Jennifer Agiesta, et al*., CNN Poll: Percentage of Republicans Who Think Biden's 2020 Win Was Illegitimate Ticks Back Up Near 70%*, CNN (Aug. 3, 2023), at https://www.cnn.com/2023/08/03/politics/cnn-poll-republicans-think-2020-election-illegitimate/index.html. "The share of Republicans and Republican-leaning independents who believe that President Joe Biden's 2020 election win was not legitimate has ticked back up, according to a new CNN poll fielded throughout July. … 69% of Republicans and Republican-leaners say Biden's win was not legitimate, up from 63% earlier this year and through last fall…. Overall, 61% of Americans say Biden did legitimately win enough votes to the presidency, and 38% believe that he did not. Among registered voters who say they cast a ballot for Trump in 2020, 75% say they have doubts about Biden's legitimacy." *Id.*

[4] *Compare, e.g.,* Mollie Hemingway, *Rigged: How the Media, Big Tech, and the Democrats Seized Our Elections* (Regnery 2021) (423-page book discussing changes to election procedures, flooding the system with absentee ballots, use of mail-in ballots without signature verification or other

This unconstitutional dynamic appears on the face of the indictment itself. The indictment repeatedly alleges that President Trump made "*knowingly* false claims of election fraud." Doc. 1, ¶ 7 (emphasis added). But in every case, the indictment's basis for the allegation that President Trump's claims were "knowingly" false is that *a member of the political establishment assured President Trump that they were false. See, e.g., id.* ¶¶ 11(a)-(h) (alleging that a series of government officials assured President Trump that his concerns about the election's integrity were unwarranted). Under the First Amendment, President Trump and his supporters are entitled to mistrust the word of such establishment-based government officials and draw their own inferences from the facts. And neither the federal Executive Branch (through the prosecution) nor the Judicial Branch (through this Court) may dictate what President Trump and others are required to believe, or *say*, about this hotly disputed political question.

The prosecution, of course, may come to its own conclusions about such matters. It may hold hearings and conduct investigations to try to establish its own view and convince others of them. It may insist that the opinions of others—including President Trump—are wrong, baseless, stupid—even false and malicious. But it may not require Americans to subscribe to its views or punish them for expressing and advocating for different views. To do so violates the First Amendment. Under the First Amendment, the question of whether the 2020 Presidential election

---

safeguards against fraud, widespread ballot harvesting, censorship by social-media platforms, private funding of election administration concentrated in Democratic precincts, exclusion of observers from vote-counting processes, and other developments to argue that the 2020 election was "rigged" against President Trump), *with* Molly Ball, *The Secret History of the Shadow Campaign That Saved the 2020 Election*, TIME (Feb. 4, 2021), at https://time.com/5936036/secret-2020-election-campaign/ (feature-length article discussing many of the same developments as Hemingway's book; describing "an extraordinary shadow effort" to influence the election against President Trump, made up of "a well-funded cabal of powerful people … working together behind the scenes to influence perceptions, change rules and laws, steer media coverage and control the flow of information"; and concluding that this "shadow effort" and "cabal" provide evidence that the 2020 election was one of the fairest in modern history).

was stolen from President Trump must be decided in "the free marketplace of ideas," not in criminal prosecutions. *Barr v. Am. Ass'n of Political Consultants, Inc*., 140 S. Ct. 2335, 2358 (2020) (Breyer, J., concurring in the judgment with respect to severability and dissenting in part).

For the foregoing reasons, the indictment violates the First Amendment *in toto*. It should be dismissed with prejudice.

## II.   President Trump's Acquittal by the U.S. Senate Bars Criminal Prosecution for Offenses Arising from the Same Course of Conduct.

The indictment must be dismissed because President Trump was impeached, tried by the Senate, and *acquitted* on articles of impeachment that arise from the same course of conduct as the criminal indictment. Under our system of separated powers, the Executive Branch lacks authority to second-guess the decision of the Legislative Branch on an issue that lies within the Legislative Branch's exclusive purview. The Constitution's plain text, structural principles of separation of powers, our history and tradition, and principles of Double Jeopardy bar the Executive Branch from seeking to re-charge and re-try a President who has already been impeached and acquitted in a trial before the U.S. Senate.

### A.   The text of the Constitution bars the prosecution of a President who has been tried and *acquitted* by the Senate.

The text of the Constitution straightforwardly provides that only a "Party *convicted*" by the Senate may be charged by "Indictment, Trial, Judgment and Punishment"—not a party *acquitted*. As the Senate acquitted President Trump, the prosecution may not re-try him in this Court.

To be removed from office, the President must be convicted by trial in the Senate, which has exclusive authority under the Constitution for such trials: "The Senate shall have the sole Power to try all Impeachments. … And no Person shall be convicted without the Concurrence of two thirds of the Members present." U.S. CONST. art. I, § 3, cl. 6. "Judgment in Cases of

Impeachment shall not extend further than to removal from Office, and disqualification to hold and enjoy any Office of honor, Trust or Profit under the United States: but *the Party convicted* shall nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law." U.S. CONST. art. I, § 3, cl. 7 (emphasis added).

Because the Constitution specifies that only "the Party *convicted*" by trial in the Senate may be "liable and subject to Indictment, Trial, Judgment and Punishment," *id.*, it presupposes that a President who is *not* convicted may *not* be subject to criminal prosecution. *Id.* As Justice Alito notes, "[t]he plain implication" of the phrase "the Party convicted" in this Clause "is that criminal prosecution, like removal from the Presidency and disqualification from other offices, is a consequence *that can come about only after the Senate's judgment*, not during or prior to the Senate trial." *Trump v. Vance*, 140 S. Ct. 2412, 2444 (2020) (Alito, J., dissenting) (emphasis added). "This was how Hamilton explained the impeachment provisions in the Federalist Papers. He wrote that a President may 'be impeached, tried, and, upon conviction ... would *afterwards* be liable to prosecution and punishment in the ordinary course of law.'" *Id.* (quoting THE FEDERALIST No. 69, p. 416 (C. Rossiter ed. 1961) (emphasis added)); *see also* THE FEDERALIST No. 77, at 464 (A. Hamilton) (a President is "at all times liable to impeachment, trial, [and] dismission from office," but any other punishment must come only "by *subsequent* prosecution in the common course of law") (emphasis added).

Justice Alito's interpretation of the Clause is well-founded. The longstanding canon of interpretation *expressio unius est exclusio alterius* (or the "negative-inference canon") reflects "the principle that specification of the one implies exclusion of the other validly describes how people express themselves and understand verbal expression." SCALIA & GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS, § 10, p. 107 (2012). "When a car dealer promises a low

financing rate to 'purchasers with good credit,' it is entirely clear that the rate is *not* available to purchasers with spotty credit." *Id.* So also here, when the Constitution provides that "the Party convicted" in the Senate may be subject to criminal prosecution, "it is entirely clear that" the Party *acquitted* in a Senate trial "is *not*" subject to criminal prosecution for official acts. *Id.* This is true because the phrase "the Party convicted" "can reasonably be thought to be an expression of *all* that shares in the grant or prohibition involved." *Id.* Because there are only two possible outcomes from a Senate trial—conviction or acquittal—specifying the implications of only *one* outcome clearly means that those implications do *not* apply to the other outcome. *See id.*

This interpretation reflects the original public meaning of the impeachment clauses. "James Wilson—who had participated in the Philadelphia Convention at which the document was drafted—explained that, although the President … is amenable to [the laws] in his private character as a citizen, and *in his public character by impeachment*.'" *Clinton v. Jones*, 520 U.S. 681, 696 (1997) (emphasis added) (quoting 2 J. Elliot, Debates on the Federal Constitution 480 (2d ed. 1863) (cleaned up). "With respect to acts taken in his 'public character'—that is, official acts—the President may be disciplined principally by impeachment…." *Id.*

In addition, in Federalist No. 43, James Madison indicated that concerns about politically motivated prosecutions led to the adoption of the definition of "treason" in Article III, Section 3, Clause 1 of the Constitution:

> As treason may be committed against the United States, the authority of the United States ought to be enabled to punish it; but as *new fangled and artificial treasons, have been the great engines, by which violent factions, the natural offspring of free governments, have usually wreaked their alternate malignity on each other*, the [Constitutional] convention have with great judgment opposed a barrier to this peculiar danger, by inserting a constitutional definition of the crime, fixing the proof necessary for conviction of it, and restraining the congress, even in punishing it, from extending the consequences of guilt beyond the person of its author.

THE FEDERALIST No. 47 (Madison) (emphasis added). In Federalist No. 65, Alexander Hamilton explained that the Constitution entrusted impeachment trials to the Senate because the risk of politically motivated criminal trials, which would inevitably be tainted by factionalism and partisanship, was too great in the courts, including even the Supreme Court:

> A well constituted court for the trial of impeachments, is an object not more to be desired than difficult to be obtained in a government wholly elective. The subjects of its jurisdiction are those offenses which proceed from the misconduct of public men, or in other words from the abuse or violation of some public trust. They are of a nature which may with peculiar propriety be denominated POLITICAL, as they relate chiefly to injuries done immediately to the society itself. *The prosecution of them, for this reason, will seldom fail to agitate the passions of the whole community, and to divide it into parties, more or less friendly or inimical, to the accused.* In many cases, it will connect itself with the pre-existing factions, and will inlist all their animosities, partialities, influence and interest on one side, or on the other; and in such cases there will always be the greatest danger, that the decision will be regulated more by the compar[a]tive strength of parties than by the real demonstrations of innocence or guilt.

THE FEDERALIST No. 65 (Hamilton) (emphasis added). Hamilton went on to argue that even the Supreme Court should not handle prosecutions of major political figures: "The awful discretion, which a court of impeachments must necessarily have, to doom to honor or to infamy the most confidential and the most distinguished characters of the community, *forbids the commitment of the trust to a small number of persons*. These considerations seem alone sufficient to authorise a conclusion, that the Supreme Court would have been an improper substitute for the Senate, as a court of impeachments." *Id.* (emphasis added).

In addition, treating impeachment as the exclusive remedy for alleged crimes committed in office is consistent with the Supreme Court's immunity decisions as to other sensitive officials, such as federal judges. The Supreme Court has held that judges are absolutely immune from civil liability and criminal prosecution for their official acts, and that the sole remedy is impeachment: "But for malice or corruption in their action whilst exercising their judicial functions within the general scope of their jurisdiction, *the judges of these courts can only be reached by public*

*prosecution in the form of impeachment*, or in such other form as may be specially prescribed."

*Bradley v. Fisher*, 80 U.S. 335, 354 (1871) (emphasis added).

In *Nixon v. Fitzgerald*, the Supreme Court reinforced this conclusion by emphasizing that the proper remedy against a President for official misfeasance is "the threat of impeachment," not criminal prosecution:

> A rule of absolute immunity for the President will not leave the Nation without sufficient protection against misconduct on the part of the Chief Executive. There remains the constitutional remedy of impeachment. In addition, there are formal and informal checks on Presidential action…. The President is subjected to constant scrutiny by the press. Vigilant oversight by Congress also may serve to deter Presidential abuses of office, as well as to make credible the threat of impeachment. Other incentives to avoid misconduct may include a desire to earn reelection, the need to maintain prestige as an element of Presidential influence, and a President's traditional concern for his historical stature.

*Nixon v. Fitzgerald*, 457 U.S. 731, 757 (1982). *See also, e.g., Bradley v. Fisher*, 80 U.S. 335, 354 (1871) ("But for malice or corruption in their action whilst exercising their judicial functions within the general scope of their jurisdiction, the judges of these courts [i.e., Article III courts] can only be reached by public prosecution in the form of impeachment, or in such other form as may be specially prescribed.").

Here, President Trump is not a "Party convicted" in an impeachment trial by the Senate. U.S. CONST. art. I, § 3, cl. 7. In January 2021, he was impeached by the House on articles arising from the same course of conduct at issue in the indictment. H. RES. 24 (117th Cong. 1st Sess.), *at* https://www.congress.gov/bill/117th-congress/house-resolution/24/text. Among other things, the articles of impeachment charged that President Trump "repeatedly issued false statements asserting that the Presidential election results were the product of widespread fraud and should not be accepted by the American people or certified by State or Federal officials;" made "false claims" in a speech on January 6; engaged in "prior efforts to subvert and obstruct the certification of the results of the 2020 Presidential election," including through a phone call to the Georgia secretary

of state; and "threatened the integrity of the democratic system." *Id.* The indictment here rests on the very same alleged facts. President Trump was acquitted of these charges after trial in the Senate. He is thus not a "Party convicted" under Article I, Section 3, Clause 7, and he is not subject to "Indictment, Trial, Judgment and Punishment" for the same course of conduct. U.S. CONST. art. I, § 3, cl. 7.

In sum, under the Constitution, the Executive Branch—including the prosecution—lacks authority to second-guess the determination of acquittal made by the United States Senate, the body to which the Constitution explicitly entrusts this authority. To do so violates the Impeachment Clause and the principles of separation of powers, by unlawfully encroaching on authority exclusively vested in Congress. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585-89 (1952). "The Founders of this Nation entrusted the [impeachment] power to the Congress alone in both good and bad times." *Id.* at 589.

**B.      The Prosecution Is Barred by Principles of Double Jeopardy.**

Applying principles of double jeopardy leads to the same conclusion. The Fifth Amendment states, "nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb." U.S. CONST. amend. V. The Clause prevents the same sovereign from subjecting a defendant to multiple, sequential charges based on the same operative facts or the same course of conduct. *See, e.g., United States v. Coughlin*, 610 F.3d 89, 95 (D.C. Cir. 2010) (holding that "a prong of double jeopardy analysis known as 'issue preclusion' … bars the government from prosecuting a defendant on a charge that depends on facts that a previous acquittal on a different charge necessarily decided in the defendant's favor"). Under those principles, the prosecution cannot proceed against President Trump for conduct of which he was acquitted by the Senate.

The fact that different branches of the federal government are at issue makes no difference. "In applying the dual sovereignty doctrine, then, the crucial determination is whether the two entities that seek successively to prosecute a defendant for the same course of conduct can be termed separate sovereigns. This determination turns on whether the two entities draw their authority to punish the offender from distinct sources of power." *Heath v. Alabama*, 474 U.S. 82, 88 (1985). With respect to the federal government and the States, there are distinct sovereignties: "The States are no less sovereign with respect to each other than they are with respect to the Federal Government. Their powers to undertake criminal prosecutions derive from separate and independent sources of power and authority originally belonging to them before admission to the Union and preserved to them by the Tenth Amendment." *Id.* at 89. The same is not true, however, with respect to different branches of the federal government, all of which derive their power from the same source—the U.S. Constitution. *See id.* Thus, the Executive and Judicial Branches cannot seek to place President Trump in jeopardy for conduct of which the Legislative Branch has absolved him—all three Branches are co-equal parts of the same "sovereign" deriving their "power and authority" from the same "source[]." *Id.*

The government—through Congress—already put President Trump on trial once, placing him in jeopardy for an alleged criminal offense arising from the same course of conduct alleged in the indictment.[5] Having failed to obtain a conviction, President Trump's acquittal in the United States Senate must stand, and the prosecution may not seek a retrial in this forum.

---

[5] *See* U.S. CONST. art. III, § 2, cl. 3 (referring to impeachment trials as trials for crimes – "[t]he Trial of all Crimes, except in Cases of Impeachment, shall be by Jury. . .").

III.     **The Indictment Violates the Fair Notice Doctrine of the Due Process Clause.**

The indictment charges President Trump with crimes arising from his political advocacy on matters of public concern made in the middle of a disputed Presidential campaign and election. President Trump's actions were inspired by and fully consistent with examples from many similar contested election disputes in our Nation's history. There is a long history in our Nation—dating back to 1800 and encompassing elections in 1800, 1824, 1876, 1960, 2000, 2004, and 2016, among many others—of disputing the outcome of close Presidential elections, publicly claiming that election results were tainted by fraud, filing legal actions to challenge election results, lobbying Congress to certify disputed election results in one side's favor or the other, and organizing alternate, contingent slates of electors to assist in such efforts. In other words, all the chief alleged acts charged in the indictment have a long historical pedigree in American electoral history, and they have long been decided in the political arena. President Trump is the first person to face criminal charges for such core political behavior as disputing the outcome of an election. He is charged, moreover, under statutes that facially have nothing to do with his alleged conduct, and whose language the Special Prosecutor stretches beyond recognition. *See* President Trump's Motion to Dismiss Based on Statutory Grounds (filed separately) ("Statutory Mot."). As a result, President Trump could not possibly have received fair notice that his conduct was supposedly criminal when he performed it. The indictment should be dismissed with prejudice for violation of the fair notice requirement of the Due Process Clause.

"[A] criminal statute must give fair warning of the conduct it makes a crime." *Bouie v. City of Columbia*, 378 U.S. 347, 350–51 (1964). "The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *United States v. Harriss*, 347 U.S. 612, 617 (1954). The Supreme Court has compared the "fair

warning" standard to the "clearly established" standard applied to civil cases under § 1983 or *Bivens* cases. *United States v. Lanier*, 520 U.S. 259, 271–72 (1997). To be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

The fair-notice requirement cannot be satisfied by post-conduct judicial interpretation of the statutes at issue. "If the Fourteenth Amendment is violated when a person is required 'to speculate as to the meaning of penal statutes,' … or to 'guess at (the statute's) meaning and differ as to its application,' … the violation is that much greater when, because the uncertainty as to the statute's meaning is itself not revealed until the court's decision, a person is not even afforded an opportunity to engage in such speculation before committing the act in question." *Bouie*, 378 U.S. at 352 (citations omitted). "There can be no doubt that a deprivation of the right of fair warning can result not only from vague statutory language but also from an unforeseeable and retroactive judicial expansion of narrow and precise statutory language." *Id.*; *see also Rogers v. Tennessee*, 532 U.S. 451, 457 (2001) ("Deprivation of the right to fair warning … can result both from vague statutory language and from an unforeseeable and retroactive judicial expansion of statutory language that appears narrow and precise on its face."); *Karem v. Trump*, 960 F.3d 656, 666 (D.C. Cir. 2020) ("Although courts routinely 'clarify the law and apply that clarification to past behavior,' 'the principle of fair warning requires that novel standards announced in adjudications must not be given retroactive effect ... where they are unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue[.]'") (alterations and citations omitted).

This principle of fair notice has special force here, where the lack of fair notice directly implicates First Amendment rights. *See supra* Part I. "The general test of vagueness applies with

particular force in review of laws dealing with speech. Stricter standards of permissible statutory vagueness may be applied to a statute having a potentially inhibiting effect on speech….” *Hynes v. Mayor & Council of Borough of Oradell*, 425 U.S. 610, 620 (1976)) (modifications omitted); *see also, e.g., Buckley v. Valeo*, 424 U.S. 1, 77 (1976) (“Due process requires that a criminal statute provide adequate notice to a person of ordinary intelligence that his contemplated conduct is illegal…. Where First Amendment rights are involved, an even ‘greater degree of specificity’ is required.”); *NAACP v. Button*, 371 U.S. 415, 432 (1963) (“[S]tandards of permissible statutory vagueness are strict in the area of free expression.”); *Nebraska Press Ass’n v. Stuart*, 427 U.S. 539, 568 (1976).

Here, President Trump’s alleged conduct—publicly and politically disputing the outcome of the election, attempting to convince Congress to act, and allegedly organizing alternate slates of electors—falls outside the plain language of the charged statutes, as discussed in President Trump’s Motion to Dismiss Based on Statutory Grounds, filed separately. *See* Statutory Mot. No court has ever applied these statutes to similar conduct. And the statutes’ meaning cannot be expanded by judicial re-interpretation after the fact without violating the Due Process Clause’s fair-notice requirement.

The extensive history of disputing elections in our Nation further demonstrates that none of these statutes provide fair notice that the alleged conduct is criminal. As for public statements and claims that the Presidential election was rigged and fraudulent, such claims have been a staple of American political discourse for decades. As one commentator has quipped, “If questioning the results of a presidential election were a crime, as many have asserted in the wake of the controversial 2020 election and its aftermath, then much of the Democratic Party and media establishment should have been indicted for their behavior following the 2016 election. In fact, the

last time Democrats fully accepted the legitimacy of a presidential election they lost was in 1988."

Hemingway, *supra*, at vii.[6] Democratic members of Congress have voted to refuse to certify

electors after the elections of 2004 and 2016, and there have been extensive attempts to submit

alternate electors and dispute the outcome of Republican Presidential victories in recent decades.[7]

---

[6] *See, e.g.,* Ari Berman, *Hillary Clinton on Trump's Election: "There Are Lots of Questions about Its Legitimacy"*, Mother Jones (Nov. 17, 2017), *at* https://www.motherjones.com/politics/2017/11/hillary-clinton-on-trumps-election-there-are-lots-of-questions-about-its-legitimacy/ ("A year after her defeat by Donald Trump in the 2016 presidential election, Hillary Clinton says 'there are lots of questions about its legitimacy'…"); *"I Would Be Your President": Clinton Blames Russia, FBI Chief for 2016 Election Loss*, National Post (May 2, 2017), *at* https://nationalpost.com/news/world/i-would-be-your-president-clinton-blames-russia-fbi-chief-for-2016-election-loss (noting Clinton "declaring herself 'part of the resistance' to Donald Trump's presidency" as an "activist citizen"); Dan Mangan, *Democratic Party Files Suit Alleging Russia, the Trump Campaign, and WikiLeaks Conspired to Disrupt the 2016 Election*, CNBC (Apr. 20, 2018), *at* https://www.cnbc.com/2018/04/20/democratic-party-files-suit-alleging-russia-the-trump-campaign-and-wikileaks-conspired-to-disrupt-the-2016-election-report.html ("The Democratic Party on Friday sued President Donald Trump's presidential campaign, the Russian government and the Wikileaks group, claiming a broad illegal conspiracy to help Trump win the 2016 election."); Rachael Revesz, *Computer Scientists Say They Have Strong Evidence Election Was Rigged against Clinton in Three Key States*, Independent (Nov. 23, 2016), *at* https://www.independent.co.uk/news/world/americas/wisconsin-michigan-pennsylvania-election-hillary-clinton-hacked-manipulated-donald-trump-swing-states-scientists-lawyers-a7433091.html ("A group of renowned computer scientists and lawyers have urged Hillary Clinton to challenge the election results in three key states after they gathered 'evidence' to suggest the election results were potentially manipulated."); *see also* Dan Merica, *Clinton Opens Door to Questioning Legitimacy of 2016 Election*, CNN.com (Sept. 18, 2017), *at* https://www.cnn.com/2017/09/18/politics/hillary-clinton-russia-2016-election/index.html; Sean Davis, *Nearly Half of Democrats Think the 2016 Election Was "Rigged"*, The Federalist (Nov. 18, 2016), *at* https://thefederalist.com/2016/11/18/nearly-half-democrats-think-election-rigged/.

[7] Bob Franken, *Democrats Challenge Certification of Florida Bush-Gore Election Results*, CNN.com (Nov. 16, 2000), *at* http://www.cnn.com/2000/LAW/11/16/certification.update.02.pol/index.html (noting "Florida Democrats and Al Gore presidential campaign…challenging the certification of election results in the contested state); Jill Zuckman, et al., *Black Caucus Can't Block the Final Tally*, Chicago Tribune (Jan. 7, 2001), *at* https://www.chicagotribune.com/news/ct-xpm-2001-01-07-0101070449-story.html ("members of the Congressional Black Caucus on Saturday tried to stop the formal recording of the Electoral College tally during a joint session of Congress… lawmakers who objected [Democrat Al Gore] for president objected vociferously to the proceedings. One after another, the representatives rose to prevent the electoral votes from Florida from being counted."); Ted Barrett, *Democrats Challenge Ohio Electoral Votes*, CNN.com (Jan. 6, 2005), *at* https://www.cnn.com/2005/ALLPOLITICS/01/06/electoral.vote.1718/ ("Alleging widespread

Additional historic precedent in close and contested elections supports the lawfulness of the actions alleged in the indictment. For example, in the disputed elections of both 1876 and 1960, competing slates of electors were sent to Congress. William Josephson & Beverly J. Ross, *Repairing the Electoral College*, 22 J. LEGIS. 145, 156-57, 166 (1996); *see also* 146 CONG. REC. E2180 (daily ed. Dec. 13, 2000) (statement of Rep. Mink) ("Based on the earlier certified results [in Hawaii in 1960], the Republican electors met and cast their three votes for Nixon. The Democratic electors also met and cast their votes for Kennedy *even though they did not have a certificate of election from the State*.") (emphasis added). In 1800, Vice President Jefferson unilaterally made the decision to accept questionable electoral votes from Georgia that favored him. Bruce Ackerman and David Fontana, *How Jefferson Counted Himself In*, THE ATLANTIC (Mar. 2004), *at* https://www.theatlantic.com/magazine/archive/2004/03/how-jefferson-counted-himself-in/302888/. In 1824, when his disputed election with Andrew Jackson was decided in the House of Representatives, President John Quincy Adams successfully lobbied the House to decide the election in his favor—even though Jackson far exceeded his totals in both the popular vote and electoral college—so successfully, in fact, that Jackson's supporters accused him of striking a

---

'irregularities' on Election Day, a group of Democrats in Congress objected Thursday to the counting of Ohio's 20 electoral votes, delaying the official certification of the 2004 presidential election results."); Brenna Williams, *11 Times VP Biden Was Interrupted during Trump's Electoral Vote Certification*, CNN.com (Jan. 6, 2017), *at* https://www.cnn.com/2017/01/06/politics/electoral-college-vote-count-objections/index.html ("During the course of the certification, House Democrats tried to object to electoral votes from multiples states" claiming, *inter alia*, "electors were not lawfully certified"); Rachael Revesz, *Computer Scientists Say They Have Strong Evidence Election Was Rigged against Clinton in Three Key States*, Independent (Nov. 23, 2016), *at* https://www.independent.co.uk/news/world/americas/wisconsin-michigan-pennsylvania-election-hillary-clinton-hacked-manipulated-donald-trump-swing-states-scientists-lawyers-a7433091.html ("So far, six electoral college voters said they would not vote for Mr Trump. Meanwhile more than 4.5 million people have signed a petition for more electoral college delegates to defy the instructions given to them in their state.").

"corrupt bargain" with House Speaker Henry Clay, whom Adams soon appointed Secretary of State. And in 1960, Vice President Nixon—himself a candidate—decided which competing slate of electors to accept from Hawaii. Herb Jackson, *What Happens When a State Can't Decide on its Electors*, ROLL CALL (Oct. 26, 2020), *at* https://rollcall.com/2020/10/26/we-the-people-what-happens-when-a-state-cant-decide-on-its-electors/; *see also* 146 CONG. REC. E2180 (daily ed. Dec. 13, 2000) (statement of Rep. Mink) ("Vice President Nixon, sitting as the presiding officer of the joint convention of the two Houses, suggested that the electors named in the certificate of the Governor dated January 4, 1961 be considered the lawful electors from Hawaii. There was no objection to the Vice President's suggestion . . ."). In the 2000 election contest, three Supreme Court justices pointed to the Hawaii situation in 1960 to emphasize that competing slates of electors could be submitted to Congress and that Congress could make the decision on which slate to accept:

> But, as I have already noted, those provisions [of the Electoral Count Act] merely provide rules of decision *for Congress to follow when selecting among conflicting slates of electors*. They do not prohibit a State from counting what the majority concedes to be legal votes until a bona fide winner is determined. Indeed, in 1960, *Hawaii appointed two slates of electors and Congress chose to count* the one appointed on January 4, 1961, well after the Title 3 deadlines.

*Bush*, 531 U.S. 98, 127 (2000) (Stevens, J., dissenting) (internal citations omitted) (emphasis added). In addition, the actions charged in the indictment against President Trump were consistent with the provisions of the then-current version of the Electoral Count Act, as it then provided before its recent revisions. 3 U.S.C. § 15 (2020). Indeed, the very fact that Congress decided to amend the Electoral Count Act at all demonstrates that it did not prohibit (let alone criminalize) mechanisms such as alternate electors or lobbying the Vice President, all of which further proves that this criminal prosecution violates the fair notice provisions of the Due Process Clause.

At the time of the allegations in the indictment, the only relevant judicial precedent, from 2000, treated post-election challenges as lawful and included a dissent arguing that competing elector slates could be submitted to Congress for Congress to decide which to accept. Furthermore, the actions listed in the Indictment had been performed in 1800, 1824, 1876, and 1960, among others, without any suggestion they were criminal. Scores of people have been involved in similar conduct over the years of American history, and none has faced criminal prosecution. On these facts, at best, "men of common intelligence must necessarily guess" if President Trump's conduct violated the statute, and the charges thus violate the Due Process Clause. *Hynes*, 425 U.S. at 620 (quoting *Connally v. General Constr. Co.,* 269 U.S. 385, 391 (1926)).

## **CONCLUSION**

The Court should dismiss the indictment with prejudice.

Dated: October 23, 2023

Respectfully submitted,

Todd Blanche, Esq. (PHV)
toddblanche@blanchelaw.com
Emil Bove, Esq. (PHV)
Emil.Bove@blanchelaw.com
BLANCHE LAW
99 Wall St., Suite 4460
New York, NY 10005
(212) 716-1250

*/s/John F. Lauro*
John F. Lauro, Esq.
D.C. Bar No. 392830
jlauro@laurosinger.com
Gregory M. Singer, Esq. (PHV)
gsinger@laurosinger.com
Filzah I. Pavalon, Esq. (PHV)
fpavalon@laurosinger.com
LAURO & SINGER
400 N. Tampa St., 15th Floor
Tampa, FL 33602
(813) 222-8990
*Counsel for President Trump*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA

v.

DONALD J. TRUMP,

*Defendant*.

Case No. 1:23-cr-00257-TSC

**PRESIDENT TRUMP'S REPLY BRIEF IN SUPPORT OF HIS MOTION TO DISMISS**
**THE INDICTMENT BASED ON PRESIDENTIAL IMMUNITY**

## INTRODUCTION

The question of presidential criminal immunity is a weighty one, intertwined with fundamental issues regarding our Constitution's structure, our history and traditions, and the President's unique role as the leader of our country. Although not yet resolved by the Supreme Court or any Circuit—because all prosecutors until now have respected Presidential immunity—the legal underpinnings and need for such protections are manifest. As the Supreme Court held in *Nixon* v. *Fitzgerald*, the President must have the ability to make decisive—and often unpopular—decisions regarding matters of public concern. 457 U.S. 731 (1982). Just as he cannot be constrained by fear of civil lawsuits, so too should he be protected from the much more potent specter of criminal prosecution. To hold otherwise would require the President to hesitate at every turn, conscious of the very real threat that one of many hundreds of prosecutors around the country may one day question his motives and seek to imprison him for his actions as President.

Nor would recognizing criminal immunity place the President above the law, as the prosecution contends. Rather, it would return us to the sensible process envisioned by the founders, where the People's representatives in Congress—not an unelected prosecutor—first decide whether a President's official actions are worthy of sanction and potential criminal liability. That has not occurred, and, in fact, the Senate acquitted President Trump of charges formed on the same basis as the indictment. Accordingly, the Court should hold that President Trump is immune from criminal prosecution for the acts described in the indictment and dismiss this case, with prejudice.

## ARGUMENT

### I.     Presidential Immunity Bars Criminal Prosecution of a President for Official Acts.

The prosecution argues that Presidential immunity does not extend to criminal prosecution of a President for his official acts. Response, at 7-34 ("Response"). The prosecution is wrong.

1

**A.      Presidential Immunity Does Not Place the President "Above the Law."**

First, the prosecution argues that recognizing immunity from criminal prosecution would place the President "above the law." Response, at 1 (quoting *United States v. Lee*, 106 U.S. 196, 220 (1882)); *see also id.* at 1, 3, 7, 8, 15, 16 n.9, 17, 19, 20, 24, 26, 34.[1] Not so. As the prosecution recognizes, a President is subject to criminal prosecution for (1) "unofficial conduct" or purely private acts, Response, at 6; and (2) conduct within the scope of his official responsibilities, provided that he is first impeached by the House of Representatives and convicted by the Senate for such conduct, *id.* at 3-4. The Impeachment Judgment Clause states that, after a trial in the Senate, "*the Party convicted* shall nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law." U.S. CONST. art. I, § 3, cl. 7 (emphasis added). The Clause authorizes the prosecution of a President for conduct committed while in office, provided that the President is first "convicted" of such conduct by the United States Senate. *Id.*

The historical authorities cited by the prosecution contemplate this same sequencing. For example, the prosecution quotes Hamilton's Federalist No. 65, which states that "*[a]fter* having been sentenced to a perpetual ostracism from the esteem and confidence, and honors and emoluments of his country [through impeachment and conviction by the Senate], he will still be liable to prosecution and punishment in the ordinary course of law." THE FEDERALIST NO. 65, at 365 (emphasis added); *see also infra* at 4, 8–9 (discussing additional authorities).

Recognizing Presidential immunity from criminal prosecution, therefore, does not place a President "above the law," or mean that he may never be prosecuted for official acts. Instead, it

---

[1] The case that the Government cites for this argument, *United States v. Lee*, 106 U.S. 196, 220 (1882), was a property dispute between the federal government and Robert E. Lee's heirs over the lands that became Arlington National Cemetery; it has little or no application to the dispute here.

affirms the careful safeguards that the framers erected around the Presidency for the sake of the public good, and ensures that only Congress, as the People's representatives, may decide when and whether the President shall be "liable and subject to Indictment, Trial, Judgment and Punishment, according to Law." U.S. CONST. art. I, § 3, cl. 7.

**B.      The Text of the Constitution Requires Presidential Immunity to Prosecution.**

The prosecution next argues that immunity cannot lie because "no provision in the Constitution explicitly grants immunity to a sitting or former President of the United States." Response, at 5; *see also id.* at 9.  This is, again, incorrect. *See* Doc. 74, at 11-13. As an initial matter, even absent specific textual support, the Supreme Court has repeatedly recognized broad immunity doctrines, including both judicial immunity and the President's absolute civil immunity. *Fitzgerald*, 457 U.S. at 750 n.31 ("[A] specific textual basis has not been considered a prerequisite to the recognition of immunity. No provision expressly confers judicial immunity. Yet the immunity of judges is well settled."). Likewise, "the temporary immunity from criminal liability that an incumbent president enjoys while in office," Response, at 11, also lacks explicit support in the Constitution, but certainly exists, as the prosecution acknowledges here. Thus, the absence of a specific "Presidential Immunity Clause," is not determinative. Rather, the Court must look to the text of the constitution in conjunction with the "policies and principles that may be considered implicit in the nature of the President's office in a system structured to achieve effective government under a Constitutionally mandated separation of powers," *Fitzgerald,* 457 U.S. at 748. Likewise, the Court must consider the "history," the "common law," "public policy," and "our history and the structure of our government," *id.* at 747-48; Doc. 74, at 8-21.

Regardless, the text of the Constitution—namely the Impeachment Judgment Clause—straightforwardly supports Presidential immunity from criminal prosecution absent conviction in the Senate, *see* U.S. CONST. art. I, § 3, cl. 7. The Clause provides that "the Party *convicted* shall

3

nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law." U.S. CONST. art. I, § 3, cl. 7. The most natural interpretation is that this statement means exactly what it says—that a convicted party is liable to criminal prosecution. Thus, a President who is *not* "convicted" is *not* liable. *See* SCALIA & GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 107 (2012) (discussing the "negative-implication canon" as "the principle that specification of the one implies exclusion of the other validly describes how people express themselves and understand verbal expression."); *Trump v. Vance*, 140 S. Ct. 2412, 2444 (2020) (Alito, J., dissenting) ("The plain implication [of the Impeachment Judgment Clause] is that criminal prosecution … is a consequence that can come about only after the Senate's judgment, not during or prior to the Senate trial.").

The prosecution attempts to evade this clear language by arguing that the Clause, in referencing criminal prosecution after conviction in the Senate, somehow *strips* the President of criminal immunity, regardless of the Senate's decision. Response, at 9-10. But this argument flips the plain text of the Clause on its head. Indeed, if the prosecution were correct, the phrase "Party convicted" would be rendered a nullity, as the President would be chargeable under any circumstances. This is clearly incorrect. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 174 (1803) (an interpretation under which "[a]ffirmative words" would "have no operation at all" should be rejected). Historical authorities—including those cited by the prosecution—likewise support the interpretation that a Senate conviction is a prerequisite for criminal prosecution. For example, Alexander Hamilton's comments in The Federalist No. 69, which the prosecution cites (Response, at 8), states in full: "The President of the United States would be liable to be impeached, tried, and, upon conviction of treason, bribery, or other high crimes or misdemeanors, removed

from office; and would *afterwards* be liable to prosecution and punishment in the ordinary course of law." THE FEDERALIST NO. 69 (emphasis added).

The word "afterwards," which the prosecution selectively omits from its brief, Response, at 8, forecloses any contention that a President may be criminally prosecuted regardless of the outcome of his impeachment trial (or even if never impeached). Instead, as Hamilton understood it, impeachment and conviction must come first, and only "afterwards" would criminal prosecution be possible. *Id.* Moreover, Hamilton's comments should be considered against the background of English common law, under which the criminal prosecution of the Chief Executive was virtually unthinkable. 3 BLACKSTONE'S COMMENTARIES ON THE LAWS OF ENGLAND ch. 17, pp. 254-55; *see also Marbury*, 5 U.S. (1 Cranch) at 164-65. As Hamilton emphasizes, the Impeachment Judgment Clause makes an important *exception* to that centuries-old rule—ensuring that the President would not be a "king," but instead responsible to the People's representatives, and subject to criminal prosecution upon impeachment and conviction.

For its part, the prosecution argues that it would be "incongruous" and "strained" for the Constitution to endorse Presidential immunity, but make an exception for Presidents who are convicted by the Senate. Response, at 10. On the contrary, the requirement of impeachment and conviction by the Senate assures that a President can be held criminally responsible for his actions in office, but only if there is a broad political consensus in Congress for doing so. To this end, the Constitution requires action by both Houses of Congress, including a supermajority of the Senators, providing the President with a critical structural protection from politically motivated prosecutions and those "new fangled and artificial treasons," which historically "have been the great engines, by which violent factions … have usually wreaked their alternate malignity on each other." THE FEDERALIST No. 47 (Madison).

5

However, once the charges against the President have been tested through this structural process, and found meritorious by the Senate, then it makes perfect sense to treat the former President on the same footing as other citizens subject to criminal prosecution. *See* U.S. CONST. art. I, § 3, cl. 7. Consistent with this, the Supreme Court has repeatedly emphasized that the primary check on the President for wrongdoing in official conduct is impeachment and trial by the Senate— including in *Fitzgerald* itself: "A rule of absolute immunity for the President will not leave the Nation without sufficient protection against misconduct on the part of the Chief Executive. There remains the constitutional remedy of impeachment." 457 U.S. at 757.

Therefore, the fact that some Presidents remain immune from prosecution for official acts because they are never impeached is not a "yawning impunity gap," Response, at 14, but a deliberate feature of the structural protections inherent in the separation of powers. "While the separation of powers may prevent us from righting every wrong, it does so in order to ensure that we do not lose liberty." *Morrison v. Olson*, 487 U.S. 654, 710 (1988) (Scalia, J., dissenting).

The prosecution next argues that there is not a perfect fit between the "high crimes and misdemeanors" for which impeachment is authorized under Article II, § 4, and the complete universe of crimes for which a citizen might be prosecuted. Response, at 10-11. But the "high crimes and misdemeanors" for which a President can be impeached include alleged crimes of a "political nature" and other serious abuses of the President's official responsibilities, as the prosecution concedes. *See id.* ("When the Constitution was ratified, the phrase 'high crimes and misdemeanors' was aimed at the 'misconduct of public men,' including the 'abuse or violation of some public trust.' . . . The conduct that impeachment targets includes 'acts taken in [the president's] 'public character'—that is, official acts[.]" (quoting THE FEDERALIST No. 65 (Hamilton), 2 Joseph Story, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 783 (1833), and *Clinton v. Jones*, 520 U.S. 681, 696 (1997)). Thus, the political offenses for which a President might be impeached

6

match the scope of his immunity, while still ensuring the President "is otherwise subject to the laws for his purely private acts." *Clinton*, 520 U.S. at 696.[2]

Finally, the prosecution speculates that the Impeachment Judgment Clause's "Party convicted" provision "was intended 'to assure that after impeachment a trial on criminal charges is not foreclosed by the principle of double jeopardy.'" Response, at 13-14 (quoting *United States v. Claiborne*, 727 F.2d 842, 846 (9th Cir. 1984)). But this inference directly contradicts the prosecution's own argument, made on the previous page, that Double Jeopardy does not attach to impeachment proceedings because their consequences are limited to removal from office and disqualification from future office. *Id.* at 12-13 (citing 2 Story, COMMENTARIES §§ 780-81). If impeachment does not, in fact, result in jeopardy (as the prosecution contends, *see id.*), there would be no need for the Impeachment Judgment Clause to specify that subsequent prosecutions are

---

[2] Straining to find an argument outside the text of the Constitution, the prosecution claims that President Trump's argument here "flatly contradicts his claim during his second impeachment proceedings." Response, at 12 (citing 167 Cong. Rec. S607 (Feb. 9, 2021)). This, too, is incorrect. The prosecution thoroughly misrepresents the arguments made by President Trump's impeachment counsel. The topic under dispute was whether a President can be impeached after he leaves office, not the scope of Presidential immunity. *See* 167 Cong. Rec. at S607. What impeachment counsel described as a "complete canard" was the argument that "any official who betrayed the public trust and was impeached could avoid accountability simply by resigning one minute before the Senate's final conviction vote." *Id.* Counsel then referred to the "judicial process in this country" and the "investigative process in this country to which no former officeholder is immune," and emphasized that those processes include "the safeguards of the judicial system." *Id.* Counsel never addressed whether former Presidents have absolute immunity from prosecution for official acts, and the "safeguards of the judicial system," *id.*, plainly include the right to assert Presidential immunity as a defense in a future prosecution.

Relatedly, the prosecution argues that "some Senators explicitly referred to the availability of criminal prosecution as an alternative means of providing accountability." Doc. 109, at 14. But it cites statements from only three Senators—a bloc whose votes were not necessary to reach acquittal. *Id.* at 14-15. The views of three Senators do not reflect the views of the whole body, but each "represent[s] at most the views of a single Senator." *Hamdan v. Rumsfeld*, 548 U.S. 557, 666 (2006) (Scalia, J., dissenting). In any event, in the context of this criminal case, it is "emphatically the province and duty of the judicial department," not the Senate, "to state what the law is." *Marbury*, 5 U.S. (1 Cranch) at 177.

permitted for convictions, as prosecution would be permitted in all cases (conviction or acquittal). Again, this leaves the "Party convicted" phrase a nullity, which cannot be the correct reading.

In total, the prosecution wishes to re-write the Impeachment Judgment Clause to say "[*all parties*] shall nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law." U.S. CONST. art. I, § 3, cl. 7. The prosecution may not do so. The clause states "*the party convicted*" *id*. The Court must, therefore, give effect to those words and recognize the President's immunity from criminal prosecution for official acts absent conviction by the Senate.

### C.    Historical Evidence Strongly Supports Criminal Immunity.

The prosecution argues that "[h]istorical evidence from the time of the founding … confirms that a president was subject to prosecution when no longer in office." Response, at 15. On the contrary, the prosecution's cited sources indicate that a President is "subject to prosecution when no longer in office," *id.*, only if he has been impeached and convicted by the Senate.

First, the prosecution cites several statements from Alexander Hamilton in The Federalist Nos. 65, 69, and 77, all of which support President Trump's interpretation. As noted above, Hamilton's statements in Federalist Nos. 65 and 69 both contemplate criminal liability only after a Senate conviction. Likewise, in Federalist No. 77, Hamilton wrote that the President is "at all times liable to impeachment, trial, dismission from office, incapacity to serve in any other, and to forfeiture of life and estate by *subsequent* prosecution in the common course of law." THE FEDERALIST NO. 77 (emphasis added). In each case, Hamilton makes clear that prosecution of the President would occur only "after[]" or "subsequent" to Senate conviction. Next, the prosecution cites James Iredell's comments at the North Carolina ratifying convention. Response, at 15-16. As with Hamilton, Iredell's comments strongly imply that criminal prosecution would *follow* conviction upon impeachment: "If [the President] commits any misdemeanor in office, he is

impeachable, removable from office, and incapacitated to hold any office of honor, trust, or profit. If he commits any crime, he is punishable by the laws of this country….” 4 DEBATES ON THE CONSTITUTION 109 (J. Elliot ed. 1891). The prosecution cites Justice Thomas's opinion in *Vance* discussing these comments, Response, at 16, but Justice Thomas cited them in arguing that the President may be immune even from the enforcement of a state criminal subpoena—hardly a position that supports the Government here. *Vance*, 140 S. Ct. at 2435 (Thomas, J., dissenting).

The prosecution also relies on the fact that Chief Justice Marshall's holding in the trial of Aaron Burr that "a subpoena duces tecum could be issued to" President Jefferson. Response, at 16 (citing *United States v. Burr*, 25 F. Cas. at 33-34). But the amenability of a President to respond to criminal subpoenas bears no resemblance to a President's exposure to be personally tried, convicted, and imprisoned for *official acts*, which would create a debilitating chill on a President's ability to fearlessly perform his duties. Further, in *Marbury v. Madison*, the same author, Chief Justice Marshall, emphasized that the courts could never sit in judgment on the President's official acts: "The acts of such an officer [*i.e.*, the President], as an officer, can never be examinable by the courts." *Marbury*, 5 U.S. (1 Cranch) at 166.

Cognizant of this clear statement, the prosecution seeks to distinguish *Marbury*, but its attempts fail. Doc. 105, at 17. Here is what Chief Justice Marshall wrote in *Marbury*:

> By the constitution of the United States, the President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and *is accountable only to his country in his political character, and to his own conscience*. To aid him in the performance of these duties, he is authorized to appoint certain officers, who act by his authority and in conformity with his orders.
>
> In such cases, their acts are his acts; and whatever opinion may be entertained of the manner in which executive discretion may be used, still there exists, and can exist, *no power to control that discretion*. The subjects are political. They respect the nation, not individual rights, and being intrusted to the executive, *the decision of the executive is conclusive*. The application of this remark will be perceived by adverting to the act of congress for establishing the department of foreign affairs.

9

> This officer, as his duties were prescribed by that act, is to conform precisely to the will of the President. He is the mere organ by whom that will is communicated. *The acts of such an officer, as an officer, can never be examinable by the courts*.

*Marbury*, 5 U.S. (1 Cranch) at 165–66 (emphases added). Thus, Chief Justice Marshall asserts that a President's official acts "can never be examinable by the courts." *Id.* A criminal prosecution of a President for his official acts is, of course, the most extreme method of "examin[ation] by the courts." *Id.* Justice Story's opinion in *Martin v. Mott*, 25 U.S. 19 (1827), reinforced this holding of *Marbury*, and further emphasized that it would be particularly inappropriate to allow a *jury* to sit in judgment on a President's official acts. *Id.* at 33 (rejecting the notion that "the legality of the orders of the President would depend, not on his own judgment of the facts, but upon the finding of those facts upon the proofs submitted to a jury").[3]

Finally, the Government relies on *Butz v. Economou*, 438 U.S. 478 (1978), for the proposition that "no man in this country is so high that he is above the law." Response, at 17 (quoting *Lee*, 106 U.S. at 220). But *Butz* immediately went on to acknowledge that this principle is perfectly consistent with the recognition of absolute immunity, when history and public policy warrant. "In light of this principle," *Butz* held, "federal officials who seek absolute exemption from personal liability for unconstitutional conduct must bear the burden of showing that public policy requires an exemption of that scope." *Butz*, 438 U.S. at 506. The Court then added, "This is not to

---

[3] The Government dismisses § 1563 of Justice Story's Commentaries as supposedly addressing only a *sitting* President's immunity from prosecution. Response, at 17-18. But in that section (quoted in full at Doc. 74, at 28), Justice Story wrote *both* that a sitting President "cannot … be liable to arrest, imprisonment, or detention, while he is in the discharge of the duties of his office," *and* that "[i]n the exercise of his political powers he is to use his own discretion, and is accountable only to his country, and to his own conscience. His decision, in relation to these powers, is subject to no control; and his discretion, when exercised, is conclusive." 3 J. Story, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES ch. 37, § 1563 (1833). Justice Story's Commentaries, therefore, come to the very same conclusion as *Marbury* and *Martin v. Mott*—that a President's discretion in the exercise of official acts is "conclusive," *id.*, and official acts are generally not "examinable by the courts." *Marbury*, 5 U.S. at 165-66.

say that considerations of public policy fail to support a limited immunity for federal executive officials." *Id.* The Court then explicitly stated that absolute immunity applies in "those exceptional situations where it is demonstrated that absolute immunity is essential for the conduct of the public business." *Id.* at 507. The Presidency, of course, presents the most "essential" of all possible cases. *Id.*; *see also Fitzgerald*, 457 U.S. at 750 (citing *Butz* and holding that "[t]he President's unique status under the Constitution distinguishes him from other executive officials"). And, as explained above, recognizing such immunity does not place the President "above the law," but instead embraces the Constitution's design that it is for the People, through Congress, to decide whether the President should be criminally liable for his actions.

### D.    Prosecuting President Trump Breaches Centuries of Unbroken Tradition.

The Government argues that the fact "that no former president has been criminally prosecuted … reflects not a history and tradition implying the existence of criminal immunity but instead the fact that 'most presidents have done nothing criminal, making it difficult to draw inferences from the absence of arrests and prosecutions.'" Response, at 18 (citation omitted). On the contrary, American history teems with situations where the opposing party vigorously contended that a sitting President acted criminally in the exercise of his official responsibilities. Yet, when the opposing party took power, none of these Presidents was ever prosecuted, until 2023.

For example, in the 1824 election, Andrew Jackson's supporters accused President John Quincy Adams of effecting a "corrupt bargain" with Henry Clay by appointing him Secretary of State in exchange for using his influence as Speaker of the House to deliver the election to Adams.[4] In the 1876 election, President Grant dispatched federal troops to disputed States to ensure that

---

[4] *See, e.g.,* Jessie Kratz, *The 1824 Presidential Election and the "Corrupt Bargain"*, National Archives (Oct. 22, 2020), at https://prologue.blogs.archives.gov/2020/10/22/the-1824-presidential-election-and-the-corrupt-bargain/.

Republican-controlled canvassing committees could organize just enough pro-Republican slates of electors to elect Rutherford B. Hayes, after Hayes lost the popular vote to Tilden and trailed greatly in the electoral college.[5] President Nixon was widely accused of criminal obstruction of justice for the exercise of his official duties in the so-called "Saturday Night Massacre," when he ordered three subsequent Attorneys General to fire the Watergate Special Prosecutor.[6] President George W. Bush's critics widely accused him of lying to Congress to induce the Iraq War on false allegedly pretenses by claiming that Saddam Hussein's regime in Iraq was hoarding stockpiles of "weapons of mass destruction," which turned out to be non-existent.[7] President Obama was criticized for personally authorizing the extrajudicial killing of a U.S. citizen located abroad through a CIA "kill list" and a drone strike that killed both the citizen and his 16 year-old son, also a U.S. citizen.[8] American history provides many further examples. Though many at the time believed these official actions were criminal, and their political opponents eventually took power in every case, none of these Presidents were ever charged with any crime for official acts. Our history thus reflects a strong tradition *against* prosecuting Presidents for their official acts.[9]

---

[5] *See, e.g.,* Lina Mann, *The Election of 1876*, The White House Historical Association (Apr. 22, 2021), at https://www.whitehousehistory.org/the-election-of-1876.

[6] *See, e.g.,* Carroll Kilpatrick, *Nixon Forces Firing of Cox; Richardson, Ruckelshaus Quit*, Washington Post (Oct. 21, 1973), at https://www.washingtonpost.com/wp-srv/national/longterm/watergate/articles/102173-2.htm.

[7] *See, e.g.,* Gary L. Gregg II, *George W. Bush: Foreign Affairs*, UVA Miller Center, at https://millercenter.org/president/gwbush/foreign-affairs.

[8] *See, e.g.,* Spencer Ackerman, *US Cited Controversial Law in Decision to Kill American Citizen by Drone*, The Guardian (June 23, 2014), at https://www.theguardian.com/world/2014/jun/23/us-justification-drone-killing-american-citizen-awlaki.

[9] The Government relies on President Ford's pardon of President Nixon, arguing that it presupposes that Nixon could have been prosecuted for acts he committed as President. Doc. 109, at 18. Not so. The fact that Nixon was never prosecuted—despite widespread public outrage and compelling evidence of wrongdoing—provides compelling evidence of the *strength* of the historical tradition against prosecuting former Presidents for their official acts, not its weakness. Moreover, this argument overlooks that much of the conduct at issue in the Watergate scandal—

Conversely, and as the prosecution recognizes, "[t]hroughout American history, there have been federal criminal prosecutions of high-ranking officials from all three branches of the federal government—including the Vice President, members of the Cabinet, Senators, Representatives, and judges—as well as of governors, mayors, sheriffs, and more." Doc. 109, at 28. The Presidency's absence from this list, despite ample opportunity, proves the point that the President is immune until and unless the Senate strips the President of that immunity.[10]

The prosecution next argues that it is "startling" that a President's "purposes and motives … would be completely irrelevant" to the immunity determination. Response, at 20. On the contrary, the principle that an official's allegedly unlawful motive or purpose is irrelevant to the immunity determination has been black-letter law for over a century, and repeatedly reaffirmed.

---

such as ordering the burglary of the Democratic National Committee headquarters—may well have been purely private acts, not shielded by immunity at all, thus necessitating a pardon. (Both of these points apply equally to President Clinton's admitted perjury in the Paula Jones litigation, for which he was never prosecuted. Response, at 19.)

Next, even if the acts were within the outer perimeter of President Nixon's official responsibilities (which is entirely unclear), immunity once again would not have provided a permanent shield against all criminal prosecution. Rather, Congress, through impeachment and conviction, could have stripped President Nixon's immunity, leaving him susceptible to potential criminal prosecution and providing logical cause for a pardon.

Finally, President Ford's decision—which may have been motivated by numerous factors beyond protecting President Nixon from prosecution, such as attempting to heal political divides or move forward from Nixon's presidency—does not and cannot control whether presidential immunity from criminal prosecution does or should exist. Rather, the Judiciary must make that determination. *Marbury*, 5 U.S. (1 Cranch) at 177.

[10] Ignoring actual lessons from history, the Government provides a list of lurid hypotheticals that have never happened—including treason and murder. Response, at 20 (speculating that a President might "murder his most prominent critics" or "sell[] nuclear secrets to a foreign adversary"). Some or all of these hypotheticals, depending on the facts, would likely involve purely private conduct, rendering them irrelevant here. *See id.* Yet even if such examples somehow were within the outer perimeter of a President's duties, it is overwhelmingly likely the House impeach and the Senate would convict, and the offending President would then be subject to "Indictment, Trial, Judgment and Punishment" by criminal prosecution. U.S. CONST. art. I, § 3, cl. 7. That is the process the Constitution provides, and the prosecution may not ignore it here.

13

*See, e.g., Fitgerald*, 457 U.S. at 745-46, 756; *see also United States v. Johnson*, 383 U.S. 169, 180 (1966) ("The claim of an unworthy purpose does not destroy the privilege."); *Spalding v. Vilas*, 161 U.S. 483, 498 (1896) (holding that an officer "cannot be held liable to a civil suit for damages … by reason of any personal motive that might be alleged to have prompted his action, for personal motives cannot be imputed to duly-authorized official conduct"); *Pierson v. Ray*, 386 U.S. 547, 554 (1967) ("This immunity applies even when the judge is accused of acting maliciously and corruptly….") (quotation omitted); *Barr v. Matteo*, 360 U.S. 564, 575 (1959) (holding that immunity applied "despite the allegations of malice in the complaint"); *Bradley v. Fisher*, 80 U.S. 335, 346–48 (1871) (the "exemption of the judges from civil liability [cannot] be affected by the motives with which their judicial acts are performed. The purity of their motives cannot in this way be the subject of judicial inquiry").

Thus, far from "startling," ignoring motive in deciding *whether immunity applies in the first instance* is simply the process working as the Constitution provides. To wit—we start from the presumption that all acts within the outer perimeter acts are immunized. Evidence of bad faith or unlawful motive is then presented to Congress, which decides through impeachment and removal proceedings, whether the conduct was egregious to warrant criminal liability. If so, the President may be charged. If not, as here, the prosecution must accept the People's judgment.

### E.   *Fitzgerald*'s Reasoning Strongly Supports Criminal Immunity.

The prosecution argues that *Fitzgerald* "clarified that neither the case's holding nor its reasoning supported the conclusion that a former president could claim a comparable immunity from criminal prosecution." Response, at 21. This is incorrect. The majority opinion in *Fitzgerald* merely stated, quite correctly, that it was not deciding the question of immunity from criminal prosecution, because it was not presented in that case. *See* 457 U.S. at 754 & n.37. Although the

14

Court commented in a footnote that "[t]he Court has recognized before that there is a lesser public interest in actions for civil damages than, for example, in criminal prosecutions," *id.* at 754 n.37, it did not suggest that the greater "public interest" in criminal prosecutions warrants stripping the Presidency of criminal immunity. *See id.* On the contrary, in the same footnote, the Court went on to state that "[i]t never has been denied that absolute immunity may impose a regrettable cost on individuals whose rights have been violated." *Id.* Emphasizing that "it is not true that our jurisprudence ordinarily provides a remedy in civil damages for every legal wrong," the Court further noted that "*victims of statutory crimes* ordinarily may not sue in federal court in the absence of expressed congressional intent to provide a damages remedy." *Id.* (emphasis added).

The reasoning of *Fitzgerald* strongly supports the finding of criminal immunity here. Virtually every consideration cited in that case applies with equal or greater force in the criminal context. *Fitzgerald* rested on "policies and principles that may be considered implicit in the nature of the President's office in a system structured to achieve effective government under a constitutionally mandated separation of powers," *id*. at 748; these "policies and principles" are the same regardless of whether the President is prosecuted civilly or criminally. *Fitzgerald* emphasized that "[t]he President occupies a unique position in the constitutional scheme," *id.*, which is true in both civil and criminal cases. *Fitzgerald* also considered that the President is "entrusted with supervisory and policy responsibilities of utmost discretion and sensitivity," and civil suits "would raise unique risks to the effective functioning of government." *Id.* at 750-51. These concerns are even greater when the President is threatened with criminal prosecution.

*Fitzgerald* noted that "a President must concern himself with matters likely to 'arouse the most intense feelings.'" *Id.* at 752 (quoting *Pierson*, 386 U.S. at 554). These "intense feelings" make him at least as great a target of politically motivated prosecution as civil lawsuit. "[I]t is in

precisely such cases that there exists the greatest public interest in providing an official 'the maximum ability to deal fearlessly and impartially with' the duties of his office." *Id.* at 752 (quoting *Ferri v. Ackerman*, 444 U.S. 193, 203 (1979)). The threat of criminal prosecution is far more likely to inspire such "fear[]" than civil lawsuit. "This concern is compelling where the officeholder must make the most sensitive and far-reaching decisions entrusted to any official under our constitutional system." *Id.* The President's duties are just as "sensitive and far-reaching" when he is threatened with imprisonment for his exercise of them. "Nor can the sheer prominence of the President's office be ignored." *Id.* at 752-53. "In view of the visibility of his office and the effect of his actions on countless people, the President would be an easily identifiable target for suits for civil damages," *id.* at 753—and for political prosecutions as well. "Cognizance of this personal vulnerability frequently could distract a President from his public duties, to the detriment of not only the President and his office but also the Nation that the Presidency was designed to serve." *Id.* Again, this concern applies with greater force to criminal liability.

### F.     Analogous Immunity Doctrines Support Criminal Immunity for the President.

The prosecution contends that analogous immunity doctrines undermine the claim of Presidential immunity from criminal prosecution. Response, at 22-27. For example, the prosecution argues that judicial immunity does not extend to criminal prosecution for judicial acts. Response, at 24-28. The Supreme Court disagrees. In *Spalding v. Vilas*, the Supreme Court recognized that "[t]he doctrine which holds a judge exempt from a civil suit *or indictment* for any act done or omitted to be done by him, *sitting as judge*, has a deep root in the common law." 161 U.S. at 494 (emphasis added); *see also Ex parte Virginia*, 100 U.S. 339, 348–49 (1879) (upholding the indictment of a judge on the ground that the actions charged were *not* "judicial acts"); *In re Kendall*, 712 F.3d 814, 835 (3d Cir. 2013) (Roth, J., concurring) ("Exposing judges to criminal

16

484

liability for judicial acts performed within their jurisdiction poses the same type of threat to judicial independence as does exposing them to civil suit for money damages.").

At common law, a judge could not be made "criminally liable for an abuse of his jurisdiction," and Coke's commentary foreclosed "criminal prosecution for judicial acts." J. Randolph Block, *Stump v. Sparkman and the History of Judicial Immunity*, 1980 DUKE L.J. 879, 884, 887 n.39 (emphasis added) (quoting 6 W. Holdsworth, A HISTORY OF ENGLISH LAW 235-36 (2d ed. 1937)). The prosecution contends that American courts have departed from this tradition, but *all* the cases it cites involved classic bribery of judges and solicitation of bribes by judges.[11] Bribery of judges is a unique case that could be prosecuted under common law. *See Perrin v. United States*, 444 U.S. 37, 43 (1979) ("At early common law, the crime of bribery extended only to the corruption of judges. By the time of Blackstone, bribery was defined as an offense involving a judge or 'other person concerned in the administration of justice' and included the giver as well as *the receiver of the bribe*.") (emphasis added).

Although the *purpose* of the bribe may be to induce some judicial act, in no circumstances are judges criminally prosecuted for making the wrong decisions. Accordingly, while judicial bribery prosecutions are entirely unsurprising, each time an overzealous prosecutor has attempted to charge a judge for purely *judicial* acts, those acts have been held immune. *See United States v. Chaplin*, 54 F. Supp. 926 (S.D. Cal. 1944).[12]

---

[11] *See Claiborne*, 727 F.2d at 843; *United States v. Hastings*, 681 F.2d 706, 707 (11th Cir. 1982); *United States v. Isaacs*, 493 F.2d 1124, 1131 (7th Cir. 1974); *United States v. Collins*, 972 F.2d 1385, 1388–95 (5th Cir. 1992); *United States v. Nixon*, 816 F.2d 1022, 1024 (5th Cir. 1987); *United States v. Manton*, 107 F.2d 834, 838, 850 (2d Cir. 1939).

[12] The prosecution cites a footnote in *Mireles v. Waco*, for the statement that "a judge is not absolutely immune from criminal liability." 502 U.S. 9, 10 n.1 (1991). But this statement, if it had any relevance outside of bribery or other non-judicial acts (which is unclear), was plain dicta: the question whether judicial immunity attaches in criminal proceedings had no bearing on the resolution of the case and was not briefed or argued. *See Tyler v. Cain*, 533 U.S. 656, 663 n.4

17

### G.     Constitutional Structures Provide Immunity as an "Adequate Safeguard."

The prosecution contends that the Presidency has "[a]dequate safeguards" without immunity from criminal prosecution for official acts. Response, at 28-34. The Supreme Court anticipated and rejected this argument in *Fitzgerald*:

> A rule of absolute immunity for the President will not leave the Nation without sufficient protection against misconduct on the part of the Chief Executive. There remains the constitutional remedy of impeachment. In addition, there are formal and informal checks on Presidential action that do not apply with equal force to other executive officials. The President is subjected to constant scrutiny by the press. Vigilant oversight by Congress also may serve to deter Presidential abuses of office, as well as to make credible the threat of impeachment. Other incentives to avoid misconduct may include a desire to earn reelection, the need to maintain prestige as an element of Presidential influence, and a President's traditional concern for his historical stature.

*Fitzgerald,* 457 U.S. at 757. Those are the "adequate safeguards" that the Constitution provides. Foremost on this list of safeguards is "the constitutional remedy of impeachment," *id.*, which, if it results in a Senate conviction, authorizes the criminal prosecution of a former President. U.S. CONST. art. I, § 3, cl. 7. Absent from the list is any other criminal prosecution.

The prosecution next argues that the various protections of the criminal process—*i.e.*, those available to ordinary citizens—suffice to protect the President from politically motivated prosecutions. Response, at 30-32. As *Fitzgerald* notes, this argument ignores "[t]he President's unique status under the Constitution," 457 U.S. at 750. Further, the prosecution's claim that the threat of facing criminal charges upon leaving office will be "immaterial in the case of former President," Response, at 29. That argument is nonsensical at best. "[A] President who is concerned about an ongoing criminal investigation is almost inevitably going to do a worse job as President," Brett M. Kavanaugh, *Separation of Powers During the Forty-Fourth Presidency and Beyond*, 93

---

(2001) (explaining that binding precedent includes only the final disposition of a case and the determinations "necessary to that result").

MINN. L. REV. 1454, 1461 (2009)—and so is a President who anticipates facing charges after he leaves office. "[I]t is unrealistic to think that the prospect of possible criminal prosecution will not interfere with the performance of the duties of the office." *Id.* at 2447. "There is no question that a criminal prosecution holds far greater potential for distracting a President and diminishing his ability to carry out his responsibilities than does the average civil suit." *Id.* at 2452.

## II.    The "Outer Perimeter" Test Provides the Appropriate and Workable Standard.

The prosecution argues that any standard for criminal immunity should be lesser than civil immunity. On the contrary, the "outer perimeter" test that the Supreme Court adopted in *Fitzgerald* provides the obvious, appropriate, and workable standard. As an initial matter, the prosecution's proposal of a lesser standard of immunity for criminal cases has no support in law. As noted above, the scope of immunity for both civil and criminal cases is historically the same. *See, e.g., Spalding*, 161 U.S. at 494 (describing the "doctrine which holds a judge exempt from *a civil suit or indictment* for any act done … by him, sitting as a judge") (emphasis added, quotation omitted); *see also Gravel v. United States*, 408 U.S. 606, 616–18 (1972); *Johnson*, 383 U.S. at 180–82. *Johnson* adopted criminal immunity for legislators for the very same conduct that civil immunity protects, *i.e.*, the "legislative acts" of members of Congress. 383 U.S. at 185; *see also* Response, at 36 (prosecution admitting that legislative immunity "absolutely protects legislative acts"). The Government's two-standard approach would be novel and unprecedented.

The "outer perimeter" test of *Fitzgerald*, moreover, makes perfect sense in this context. It is the test that the Supreme Court has already adopted for the closely related doctrine of civil Presidential immunity. And it is also closely akin to the "clear absence of all jurisdiction" test for judicial immunity, which distinguishes judicial acts from purely private acts. *Stump v. Sparkman*,

435 U.S. 349, 356-57 (1978). Both tests grant a scope of immunity that focuses on the outer reaches of the immune official's authority. *See id.*; *Bradley*, 80 U.S. at 351.

As the Supreme Court necessarily determined in adopting it, the "outer perimeter" test is reasonable and workable. *See Fitzgerald*, 457 U.S. at 756. The test was not invented in *Fitzgerald* but drawn from prior cases addressing lower-level executive officials. *See Barr*, 360 U.S. at 575 ("The fact that the action here taken was within the outer perimeter of petitioner's line of duty is enough to render the privilege applicable….") (quoted in *Fitzgerald*, 457 U.S. at 755). Moreover, in adopting the test, *Fitzgerald* observed that "the Court also has refused to draw functional lines finer than history and reason would support." 457 U.S. at 755. Finally, the scope of immunity for the President should not be narrower than for other officials, such as the Director of the Office of Rent Stabilization, for whom the "outer perimeter" test was adopted in *Barr*.[13]

By contrast, the prosecution offers no plausible alternative standard—as it ultimately admits. Among other things, the prosecution proposes that its never-defined standard would consider "the asserted presidential authority to act," on an apparent sliding scale, Response, at 35; "the intent or motive animating the conduct in question," *id.* at 35-36; the relevant criminal "statute's *mens rea* requirement," *id.* at 36; and/or whether the conduct occurs in an area where "the 'line' between a president's 'personal and official affairs' is 'clear,' not 'elusive and difficult to discern,'" *id.* at 36 (citations omitted). Needless to say, this elusive "test" is indeterminate, multi-factored, sliding-scaled, and irreducibly subjective in its application—the very opposite of what an immunity doctrine should be. This approach, the prosecution concedes, is unworkable:

---

[13] The Government contends that there is a greater public interest in criminal prosecutions than in civil suits. Response, at 34. But this concern is more than offset by the potential for greater chilling effect and interference from criminal prosecutions than from civil suits. *See supra* Part I.E.

"Incorporating these considerations into a workable test would present line-drawing and administrability problems." *Id.*

More significantly, the prosecution insists that, among other factors, the reviewing court should consider "the intent or motive animating the conduct in question." Response, at 35. The Supreme Court has rejected this argument in every other immunity context, for the obvious reason that it would completely defeat the concept of immunity. *See, e.g., Fitzgerald*, 457 U.S. at 745 ("In exercising the functions of his office, the head of an Executive Department … should not be under an apprehension that the motives that control his official conduct may, at any time, become the subject of inquiry in a civil suit for damages."); *id.* at 756 (rejecting the notion that "an inquiry into the President's motives," which "could be highly intrusive," could be conducted in a civil suit); *Johnson*, 383 U.S. at 180 ("The claim of an unworthy purpose does not destroy the privilege."); *Tenney v. Brandhove*, 341 U.S. at 367, 377 (1951) (same); *Pierson*, 386 U.S. at 554 ("This immunity applies even when the judge is accused of acting maliciously and corruptly….") *Spalding*, 161 U.S. at 498 ("[P]ersonal motives cannot be imputed to duly-authorized official conduct"); *Bradley*, 80 U.S. at 346–48 ("The purity of [judge's] motives cannot in this way be the subject of judicial inquiry."); *see also supra* Part I.D. This is yet another fatal flaw in the prosecution's alternative. The primary purpose of immunity is to ensure a President may act *without fear* of his motives being later questioned by prosecutors who disagree with his decisions. Allowing such prosecutors to circumvent such immunity (which necessarily attaches pretrial) merely by making allegations of bad faith would render the doctrine meaningless.

## III.     The Acts Alleged in the Indictment Are Immune Under the Outer Perimeter Test.

Unable to deny that the vast majority of President Trump's alleged conduct was within the "outer perimeter" of his duties, the prosecution does not try. Instead, it devotes the bulk of its brief

21

to arguing Presidential criminal immunity does not exist, or should apply with less force than *Fitzgerald* and the Impeachment Judgment Clause provide. Indeed, the prosecution presents no argument at all regarding most of its allegations, apparently conceding they would meet the *Fitzgerald* test, consistent with the appropriately broad view of Presidential duties the Government advanced in *Blassingame v. Trump*, Nos. 22-5069, 22-7030, 22-7031 (D.C. Cir.) (amicus brief filed March 2, 2023). The few remaining arguments that the prosecution does make on the test's application are meritless.

### A.     President Trump Characterizes the Indictment's Allegations Properly.

The prosecution argues that President Trump "misrepresent[s] … the indictment's allegations," by characterizing them "at a stratospheric level of generality." Response, at 37-39. On the contrary, President Trump's descriptions closely follow the Supreme Court's guidance in *Fitzgerald*, which rejected the plaintiff's loaded, narrowly specific description of President Nixon's conduct—*i.e.*, "ordering the discharge of an employee who was lawfully entitled to retain his job." *Fitzgerald*, 457 U.S. at 756. In doing so, the Supreme Court held that the plaintiff could not remove conduct from the "outer perimeter" simply by casting it in nefarious terms, as such a "construction would subject the President to trial on virtually every allegation that an action was unlawful, or was taken for a forbidden purpose" and thereby "deprive absolute immunity of its intended effect." *Id.* Instead, the Supreme Court considered the President's action in far more general terms, holding that a personnel decision, regardless of motive, was the President "prescrib[ing] the manner in which the Secretary will conduct the business of the Air Force." *Id.* at 757. The fact that President Nixon was alleged to have acted in an unlawful manner, and for an unlawful purpose, was excluded from the Supreme Court's description of President Nixon's conduct because those concerns are irrelevant to the question whether immunity applies. *See id.*;

22

*see also Stump*, 435 U.S. at 362 ("[T]he factors determining whether an act by a judge is a 'judicial' one relate to the nature of the act itself").

Under *Fitzgerald*'s guidance, President Trump's description of the *objective* conduct alleged in the indictment is clearly proper. Doc. 74, at 2-8. The prosecution, by contrast, seeks to subvert *Fitzgerald* by describing President Trump's conduct *solely* in terms of the allegations of unlawful purpose and manner—the exact opposite of what *Fitzgerald* prescribes. The prosecution repeatedly alleges that President Trump acted in an unlawful *manner* and for an unlawful *motive or purpose. See* Response, at 37 (characterizing the alleged conduct in specific detail with specific reference to allegedly unlawful motives); *id.* (describing President Trump's conduct as supposedly "acting deceitfully or corruptly to secure a personal benefit for himself"); *id.* at 38 (claiming that President Trump engaged in "knowingly false claims of election fraud aimed at interfering with" a federal function); *id.* at 39 (further descriptions of acting in a supposedly unlawful manner for a supposedly unlawful purpose); *see also id.* at 33 ("[T]he Constitution grants a president no power to engage in a criminal conspiracy to defeat a federal government function through deceit, corruptly obstruct a congressional proceeding, or violate others' constitutional right to vote.").

Thus, the prosecution adopts *exactly* the kind of loaded, gerrymandered description of alleged conduct that the Supreme Court rejected in *Fitzgerald*. 457 U.S. at 756. So too, here, the prosecution's loaded descriptions "would subject the President to trial on virtually every allegation that an action was unlawful, or was taken for a forbidden purpose," which would "deprive absolute immunity of its intended effect." *Id.*[14]

---

[14] The prosecution's related contention that President Trump's actions fall outside the "Take Care" power, Response, at 39-40, likewise illustrates this deficiency. The prosecution is incapable of articulating its argument on this point without referring to President Trump's alleged *motives*: "The concept of 'faithful execution' connotes the use of power in the interest of the public, *not in the office holder's personal interests*." Response, at 39 (emphasis added). But the question whether

### B.     Allegedly Organizing Alternate Slates of Electors Is Immune Conduct.

Finally, the prosecution argues that complete dismissal is unwarranted under the "outer perimeter" test because at least *some* of President Trump's conduct is supposedly purely private. Response, at 40-42. As noted above, the prosecution makes no specific argument to contend that the vast majority of President Trump's alleged conduct—including alleged public statements, meetings with DOJ, meetings with state officials, and communications with the Vice President and members of Congress—falls outside the outer perimeter of President Trump's official duties. Instead, the prosecution focuses exclusively on the alleged organization of alternate slates of electors and coordination with non-government personnel in those efforts. Response, at 40-42.

These arguments fail because organizing alternate slates of electors is both immune Presidential conduct in itself, and preparatory to the immune Presidential conduct of communicating with Congress about the election-certification proceedings. First, organizing slates of electors in attempt, as the indictment alleges, to persuade Congressional officials to act is part of "the rights, duties, and obligations growing out of the constitution itself … and all the protection implied by the nature of the government under the constitution." *Cunningham v. Neagle*, 135 U.S. 1, 64 (1890). History confirms that organizing alternate slates of electors falls within the outer perimeter of Presidential duty, because President Grant was directly involved in and supported the organization of slates of Republican electors in the disputed Hayes-Tilden election of 1876. *See* Doc. 74, at 42. In that election, both sides claimed fraud and both sides organized alternate slates of electors in the key disputed States of Louisiana, Florida, South Carolina, and Oregon. Though Tilden had large leads in the popular vote and electoral college after Election Day, President Grant

---

President Trump's actions were supposedly motivated by his "personal interests," *id.*, is irrelevant to the question whether immunity applies. That question turns on the objective nature of his acts, not their alleged purpose or supposed manner. *Fitzgerald*, 475 U.S. at 756.

24

directly supported the Republicans' efforts to organize alternate slates of electors by deploying federal troops to Louisiana and Florida to protect the efforts of Republican-controlled committees in those States to certify pro-Hayes slates of electors, and he also directed federal troops to observe and report fraud. *See* 28 THE PAPERS OF ULYSSES S. GRANT 19-20 (John Y. Simon ed. 2005), *at* https://scholarsjunction.msstate.edu/cgi/viewcontent.cgi?article=1026-&context=usg-volumes. These were Presidential acts, not purely private deeds, and they reflected President Grant's direct involvement in organizing the disputed Republican slates of electors, to avoid the certification of an election tainted by what he viewed as fraud.

Further, as the indictment claims, the alleged organization of slates of electors was ancillary and preparatory to the plainly immune conduct of advocating to the Vice President and members of Congress that they exercise their official duties in a certain way. Such ancillary and preparatory acts are equivalent to the "administrative and investigative acts necessary for a prosecutor to initiate or maintain the criminal prosecution," and thus they share in the latter's absolute immunity. *Prince v. Hicks*, 198 F.3d 607, 612 (6th Cir. 1999) (quoting *Ireland v. Tunis*, 113 F.3d 1435, 1447 (6th Cir. 1997)); *see also, e.g., Guzman–Rivera v. Rivera–Cruz*, 55 F.3d 26, 29 (1st Cir.1995) ("[A]bsolute immunity may attach even to ... administrative or investigative activities when these functions are *necessary* so that a prosecutor may fulfill his function as an officer of the court." (emphasis in original)). Duties involved in "[p]reparing to initiate a prosecution" such as "obtaining, reviewing and evaluating evidence," share in the immunity that attaches to the prosecution itself. *Snell v. Tunnell*, 920 F.2d 673, 693 (10th Cir. 1990). So also here.

## **CONCLUSION**

The indictment should be dismissed with prejudice based on the doctrine of Presidential immunity.

Dated: October 26, 2023

Respectfully submitted,

Todd Blanche, Esq. (PHV)
toddblanche@blanchelaw.com
Emil Bove, Esq. (PHV)
Emil.Bove@blanchelaw.com
BLANCHE LAW
99 Wall St., Suite 4460
New York, NY 10005
(212) 716-1250

/s/John F. Lauro
John F. Lauro, Esq.
D.C. Bar No. 392830
jlauro@laurosinger.com
Gregory M. Singer, Esq. (PHV)
gsinger@laurosinger.com
Filzah I. Pavalon, Esq. (PHV)
fpavalon@laurosinger.com
LAURO & SINGER
400 N. Tampa St., 15th Floor
Tampa, FL 33602
(813) 222-8990
*Counsel for President Trump*

26

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. 23-cr-257 (TSC)** |
| | * | |
| **DONALD J. TRUMP,** | * | |
| | * | |
| **Defendant.** | * | |

**GOVERNMENT'S OMNIBUS OPPOSITION TO DEFENDANT'S MOTIONS TO
<u>DISMISS THE INDICTMENT ON STATUTORY AND CONSTITUTIONAL GROUNDS</u>**

# TABLE OF CONTENTS

I.    Introduction ................................................................................................. 1

II.   Background .................................................................................................. 1

III.  Legal Standard ............................................................................................ 2

IV.  Argument .................................................................................................... 3

     A.     The Defendant's Statutory Challenges Lack Merit. ............................. 4

          1.     The indictment adequately alleges a violation of 18 U.S.C. § 371 ............ 4

              a.     The indictment alleges deceit, trickery, or dishonest means. ......... 5

                  i.     The defendant unsuccessfully attempts to recharacterize his false statements as permissible advocacy or expression of opinion to public officials. ....... 7

                  ii.    The indictment alleges deceit in connection with the fraudulent electors. ............................................................. 11

                  iii.   The defendant made false statements to the Vice President. ........................................................................ 13

              b.     The indictment alleges obstruction, not political advocacy. ......... 14

              c.     The defendant's invocation of interpretative canons does not support dismissal. ................................................................ 14

          2.     The indictment adequately alleges violations of 18 U.S.C. §§ 1512(k) and (c)(2). ............................................................. 17

              a.     The indictment alleges the defendant conspired to, attempted to, and did obstruct and impede the certification proceeding. ...... 17

              b.     The indictment alleges the defendant acted corruptly. ................. 21

          3.     The indictment adequately alleges a violation of 18 U.S.C. § 241 ........... 22

              a.     The indictment alleges a criminal agreement. ............................. 23

              b.     The indictment alleges the requisite *mens rea*. ............................. 23

     B.     The Defendant's Constitutional Challenges Lack Merit. ..................... 25

496

1. The First Amendment does not protect the defendant's criminal conduct. ................................................................ 26

 a. The charges in the indictment do not criminalize protected speech. ............................................................... 26

 b. *Alvarez* confirms that the charges in the indictment do not offend the First Amendment. ..................................... 30

 c. The indictment does not improperly restrict political speech or discriminate based on viewpoint. ............................. 32

2. The fair notice doctrine does not provide a basis for dismissal. .............. 35

 a. The defendant had fair notice that the charged conduct was unlawful. ............................................................ 35

 b. The defendant's historical examples do not raise fair notice concerns. ............................................................ 40

3. Neither the Impeachment Judgment Clause nor the Double Jeopardy Clause precludes criminal prosecution here. ........................... 47

 a. Background ................................................................. 48

 b. The Impeachment Judgment Clause does not preclude prosecution here. ........................................................ 49

  i. The Impeachment Judgment Clause's text and history support criminal prosecution of an officer who has been impeached by the House but acquitted by the Senate. ....................................................... 50

  ii. Structural considerations support that textual and historical conclusion. ......................................... 52

  iii. The defendant's counterarguments lack merit. ............... 55

 c. The Double Jeopardy Clause does not preclude prosecution here. ....................................................................... 57

  i. The Double Jeopardy Clause does not apply because the penalty for congressional impeachment and conviction is civil, not criminal. ..................................... 58

ii.    The Double Jeopardy Clause would not bar
       prosecution here because the defendant's
       impeachment proceeding and criminal prosecution do
       not involve the same offense................................................ 60

iii.   The defendant's double-jeopardy claim is frivolous. ....... 62

V.    Conclusion ...................................................................................... 64

# TABLE OF AUTHORITIES

**Cases**

*Abney v. United States,*
   431 U.S. 651 (1977) ............................................................................................ 62

*Arthur Andersen LLP v. United States,*
   544 U.S. 696 (2005) ............................................................................................ 22

*Blockburger v. United States,*
   284 U.S. 299 (1932) ............................................................................................ 61

*Bolling v. Sharpe,*
   347 U.S. 497 (1954) ............................................................................................ 38

*Bouie v. City of Columbia,*
   378 U.S. 347 (1964) ..................................................................................... 36, 37

*Bradley v. Fisher,*
   80 U.S. 335 (1871) .............................................................................................. 57

*Brandenburg v. Ohio,*
   395 U.S. 444 (1969) ............................................................................................ 61

*Bush v. Gore,*
   531 U.S. 98 (2000) ......................................................................... 25, 38, 43, 45

*Dennis v. Sparks,*
   449 U.S. 24 (1980) ....................................................................................... 56, 57

*Dennis v. United States,*
   384 U.S. 855 (1966) ................................................................................. 4, 10, 15

*Ex Parte Commonwealth of Virginia,*
   100 U.S. 339 (1879) ............................................................................................ 57

*Giboney v. Empire Storage & Ice Co.,*
   336 U.S. 490 (1949) ..................................................................................... 27, 28

*Glasser v. United States,*
   315 U.S. 60 (1942) ......................................................................................... 4, 37

*Haas v. Henkel,*
   216 U.S. 462 (1910) .............................................................................................. 4

*Hammerschmidt v. United States,*
   265 U.S. 182 (1924) ................................................................................... 4, 5, 15

*Hastings v. United States Senate*,
 716 F. Supp. 38 (D.D.C. 1989) ................................................. 52, 53, 57

*Hudson v. United States*,
 522 U.S. 93 (1997) ................................................................. 58, 59, 60

*Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*,
 538 U.S. 600 (2003) ............................................................................ 29

*Johnson v. Arteaga-Martinez*,
 142 S. Ct. 1827 (2022) ........................................................................ 16

*Johnson v. Quander*,
 440 F.3d 489 (D.C. Cir. 2006) ..................................................... 58, 59

*Kelly v. United States*,
 140 S. Ct. 1565 (2020) ........................................................................ 15

*Kennedy v. Mendoza-Martinez*,
 372 U.S. 144 (1965) ............................................................................ 59

*Marinello v. United States*,
 138 S. Ct. 1101 (2018) ........................................................................ 17

*McDonald v. Smith*,
 472 U.S. 479 (1985) ............................................................................ 34

*McDonnell v. United States*,
 579 U.S. 550 (2016) ............................................................................ 34

*Mireles v. Waco*,
 502 U.S. 9 (1991) ................................................................................ 57

*Missouri v. Hunter*,
 459 U.S. 359 (1983) ............................................................................ 60

*Muscarello v. United States*,
 524 U.S. 125 (1998) ............................................................................ 16

*NAACP v. Claiborne Hardware Co.*,
 458 U.S. 886 (1982) ............................................................................ 61

*Nat'l Org. for Women v. Operation Rescue*,
 37 F.3d 646 (D.C. Cir. 1994) .............................................................. 27

*Neder v. United States*,
 527 U.S. 1 (1999) .......................................................... 8, 9, 13, 15

*Nixon v. United States,*
  506 U.S. 224 (1993) .................................................................... 56

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund,*
  575 U.S. 175 (2015) .................................................................... 32

*Pasquantino v. United States,*
  544 U.S. 349 (2005) ............................................................... 8, 17

*Rice v. Paladin Enterprises, Inc.,*
  128 F.3d 233 (4th Cir. 1997) ..................................................... 28

*Richardson v. United States,*
  468 U.S. 317 (1984) .................................................................... 62

*Rogers v. Tennessee,*
  532 U.S. 451 (2001) .............................................................. 36, 37

*Spalding v. Vilas,*
  161 U.S. 483 (1896) .................................................................... 57

*Tanner v. United States,*
  483 U.S. 107 (1987) ..................................................... 4, 5, 13, 15

*Thompson v. Trump,*
  590 F. Supp. 3d 46 (D.D.C. 2022) ....................................... 55, 61

*Trump v. Vance,*
  140 S. Ct. 2412 (2020) ......................................................... 55, 56

*United States ex rel. Schutte v. SuperValu Inc.,*
  598 U.S. 739 (2023) .................................................................... 13

*United States v. Abboud,*
  273 F.3d 763 (8th Cir. 2001) ..................................................... 63

*United States v. Alvarez,*
  567 U.S. 709 (2012) .......................................................... 30, 31, 32

*United States v. Amawi,*
  695 F.3d 457 (6th Cir. 2012) ..................................................... 33

*United States v. Amrep Corp.,*
  560 F.2d 539 (2d Cir. 1977) ....................................................... 32

*United States v. Arif,*
  897 F.3d 1 (1st Cir. 2018) ......................................................... 10

*United States v. Atilla*,
   966 F.3d 118 (2d Cir. 2020) ........................................................ 4

*United States v. Ballestas*,
   795 F.3d 138 (D.C. Cir. 2015) ............................................... 2, 22

*United States v. Bathgate*,
   246 U.S. 220 (1918) ............................................................... 40

*United States v. Black*,
   759 F.2d 71 (D.C. Cir. 1985) ................................................. 63

*United States v. Bowdoin*,
   770 F. Supp. 2d 142 (D.D.C. 2011) ........................................ 3

*United States v. Bozell*,
   No. 21-cr-216, 2022 WL 474144 (D.D.C. Feb. 16, 2022) .................... 29

*United States v. Bradberry*,
   517 F.2d 498 (7th Cir. 1975) ................................................. 40

*United States v. Brock*,
   628 F.3d 85 (D.D.C. 2022) ..................................................... 22

*United States v. Bronstein*,
   849 F.3d 1101 (D.C. Cir. 2017) .............................................. 16

*United States v. Caldwell*,
   989 F.2d 1056 (9th Cir. 1993), *overruled on other grounds by*
   *Neder v. United States*, 527 U.S. 1 (1999) ................................ 15

*United States v. Chavis*,
   461 F.3d 1201 (10th Cir. 2006) .............................................. 10

*United States v. Claiborne*,
   727 F.2d 842 (9th Cir. 1984) ................................................. 55

*United States v. Classic*,
   313 U.S. 299 (1941) ................................................. 25, 37, 38, 39

*United States v. Collins*,
   972 F.2d 1385 (5th Cir. 1992) ............................................... 57

*United States v. Colton*,
   231 F.3d 890 (4th Cir. 2000) ................................................... 7

*United States v. Concord Mgmt. & Consulting LLC*,
   347 F. Supp. 3d 38 (D.D.C. 2018) ............................... 5, 31, 33, 36

*United States v. Dixon,*
    509 U.S. 688 (1996) ............................................................... 60, 62

*United States v. Dunbar,*
    611 F.2d 985 (5th Cir. 1980) (en banc) ........................................ 62

*United States v. Ehrlichman,*
    546 F.2d 910 (D.C. Cir. 1976) ...................................................... 24

*United States v. Feola,*
    420 U.S. 671 (1975) ........................................................................ 8

*United States v. Ferguson,*
    676 F.3d 260 (2d Cir. 2011) ........................................................ 10

*United States v. Fischer,*
    64 F.4th 329 (D.C. Cir. 2023) ....................................... 17, 19, 20, 22

*United States v. Freeman,*
    761 F.2d 549 (9th Cir. 1985) ........................................................ 33

*United States v. Gaudin,*
    515 U.S. 506 (1995) ........................................................................ 9

*United States v. Goldberg,*
    105 F.3d 770 (1st Cir. 1997) ........................................................ 15

*United States v. Guest,*
    383 U.S. 745 (1966) ...................................................................... 25

*United States v. Haldeman,*
    559 F.2d 31 (D.C. Cir. 1976) (en banc) ...................................... 10

*United States v. Hansen,*
    599 U.S. 762 (2023) .................................................................. 28, 30

*United States v. Hassan,*
    742 F.3d 104 (4th Cir. 2014) ........................................................ 33

*United States v. Hillie,*
    227 F. Supp. 3d 57 (D.D.C. 2017) ................................................ 3

*United States v. Hines,*
    689 F.2d 934 (10th Cir. 1982) ...................................................... 62

*United States v. Isaacs,*
    493 F.2d 1124 (7th Cir. 1974) ...................................................... 55

*United States v. Jacobsen*,
    466 U.S. 109 (1984) ........................................................................ 24

*United States v. Jimenez Recio*,
    537 U.S. 270 (2003) .......................................................................... 8

*United States v. Johnson*,
    383 U.S. 169 (1966) ........................................................................ 10

*United States v. Kennedy*,
    714 F.3d 951 (6th Cir. 2013) ......................................................... 10

*United States v. Kurlemann*,
    736 F.3d 439 (6th Cir. 2013) ........................................................... 7

*United States v. Lanier*,
    520 U.S. 259 (1997) .......................................................... 35, 37, 38, 40

*United States v. Leppo*,
    634 F.2d 101 (3d Cir. 1980) ........................................................... 62

*United States v. Mackey*,
    --- F. Supp. 3d ----, 2023 WL 363595 (E.D.N.Y. Jan. 23, 2023) ............... 38, 39, 40

*United States v. Manton*,
    107 F.2d 834 (2d Cir. 1939) ........................................................... 57

*United States v. McHugh*,
    583 F. Supp. 3d 1 (D.D.C. 2022) ................................................... 36

*United States v. Montgomery*,
    578 F. Supp. 3d 54 (D.D.C. 2021) ................................................. 17

*United States v. Mosley*,
    238 U.S. 383 (1915) ........................................................................ 39

*United States v. Nixon*,
    816 F.2d 1022 (5th Cir. 1987) ....................................................... 57

*United States v. O'Hagan*,
    521 U.S. 642 (1997) .......................................................................... 7

*United States v. Olinger*,
    759 F.2d 1293 (7th Cir. 1985) ....................................................... 25

*United States v. Paulus*,
    894 F.3d 267 (6th Cir. 2018) ......................................................... 32

*United States v. Philip Morris USA Inc.*,
    566 F.3d 1095 (D.C. Cir. 2009) ........................................ 29

*United States v. Pleva*,
    66 F.2d 529 (2d Cir. 1933) ........................................ 39

*United States v. Price*,
    383 U.S. 787 (1966) ........................................ 36

*United States v. Purvis*,
    580 F.2d 853 (5th Cir. 1978) ........................................ 23, 24

*United States v. Rahman*,
    189 F.3d 88 (2d Cir. 1999) ........................................ 27, 33

*United States v. Reid*,
    533 F.2d 1255 (D.C. Cir. 1976) ........................................ 7

*United States v. Resendiz-Ponce*,
    549 U.S. 102 (2007) ........................................ 3, 22

*United States v. Robertson*,
    --- F.4th ----, 2023 WL 6932346 (D.C. Cir. Oct. 20, 2023) ........................................ 20, 21, 22

*United States v. Robertson*,
    588 F. Supp. 3d 114 (D.D.C. 2022) ........................................ 29

*United States v. Rowlee*,
    899 F.2d 1275 (2d Cir. 1990) ........................................ 28

*United States v. Sayer*,
    748 F.3d 425 (1st Cir. 2014) ........................................ 27

*United States v. Saylor*,
    322 U.S. 385 (1944) ........................................ 39, 40

*United States v. Serrano*,
    856 F.3d 210 (2d Cir. 2017) ........................................ 63

*United States v. Shelby*,
    604 F.3d 881 (5th Cir. 2010) ........................................ 63

*United States v. Shotts*,
    145 F.3d 1289 (11th Cir. 1998) ........................................ 29

*United States v. Skurla*,
    126 F. Supp. 713 (W.D. Pa. 1954) ........................................ 39

*United States v. Stevens*,
     559 U.S. 460 (2010) ............................................................. 27

*United States v. Thompson*,
     275 F. Supp. 3d 107 (D.D.C. 2017) ..................................... 8

*United States v. Thompson*,
     76 F.3d 442 (2d Cir. 1996) ................................................... 29

*United States v. Tobin*,
     No. 04-cr-216, 2005 WL 3199672 (D.N.H. Nov. 30, 2005) .............. 38

*United States v. Townsley*,
     843 F.2d 1070 (8th Cir. 1988) ............................................. 39

*United States v. Turner*,
     720 F.3d 411 (2d Cir. 2013) ................................................. 33

*United States v. Ward*,
     448 U.S. 242 (1980) ...................................................... 58, 59

*United States v. Weeks*,
     636 F. Supp. 3d 117 (D.D.C. 2022) .................................. 3, 19

*United States v. Whitney*,
     229 F.3d 1296 (10th Cir. 2000) ........................................... 23

*United States v. Williams*,
     553 U.S. 285 (2008) ............................................................ 28

*United States v. Williamson*,
     903 F.3d 124 (D.C. Cir. 2018) ..................................... 3, 21, 22

*United States v. Winstead*,
     74 F.3d 1313 (D.C. Cir. 1996) .............................................. 7

*Whitaker v. Thompson*,
     353 F.3d 947 (D.C. Cir. 2004) ............................................ 29

*Wilkins v. United States*,
     376 F.2d 552 (5th Cir. 1967) ............................................... 23

*Wisconsin v. Mitchell*,
     508 U.S. 476 (1993) ............................................................ 29

*Yates v. Lansing*,
     5 Johns. 282 (N.Y. Sup. Ct. 1810), *aff'd*, 9 Johns. 395 (N.Y. 1811) .............. 57

*Yates v. United States*,
  354 U.S. 298 (1957), *overruled on other grounds by*
  *Burks v. United States*, 437 U.S. 1 (1978) ............................................................. 15

**Statutes, Rules, and Constitutional Provisions**

U.S. Const. amend. I .......................................................................................... 34

U.S. Const. amend. V ................................................................................... 48, 59

U.S. Const. amend. XII ...................................................................................... 42

U.S. Const. art. I, § 3, cl. 6 ............................................................................... 49

U.S. Const. art. I, § 3, cl. 7 ...................................................................... 49, 50, 51

U.S. Const. art. II, § 4 ...................................................................................... 50

3 U.S.C. § 15 ..................................................................................................... 21

3 U.S.C. § 16 ..................................................................................................... 21

18 U.S.C. § 241 ................................................................................... 3, 22, 27, 61

18 U.S.C. § 242 ................................................................................................. 37

18 U.S.C. § 371 ........................................................................................... passim

18 U.S.C. § 1001 ............................................................................................... 16

18 U.S.C. § 1512 ......................................................................................... passim

18 U.S.C. § 2383 ......................................................................................... 49, 61

Fed. R. Crim. P. 12 ............................................................................................. 3

Fed. R. Crim. P. 7 ............................................................................................... 2

**Congressional Materials**

18 Cong. Rec. 30 (Dec. 7, 1886) ........................................................................ 43

107 Cong. Rec. 289-90 (Jan. 6, 1961) ................................................................. 44

146 Cong. Rec. E2179-80 (daily ed. Dec. 13, 2000) ............................................. 45

147 Cong. Rec. 104-06 (Jan. 6, 2001) ................................................................. 45

151 Cong. Rec. 199 (Jan. 6, 2005) ................................................................ 45, 46, 47

163 Cong. Rec. H186-H189 (daily ed. Jan. 6, 2017) .......................................... 46

167 Cong. Rec. H191-92 (daily ed. Jan. 13, 2021) .......................................... 48

167 Cong. Rec. S733-36 (daily ed. Feb. 13, 2021) .................................... 49, 63

H.R. Res. 24, 117th Cong. (Jan. 11, 2021) ............................................... 48, 61

*In re Impeachment of Former President Donald J. Trump*, Trial Memorandum of Donald
   J. Trump, S. Doc. 117-2 at 122-39 (Feb. 8, 2021) ...................................... 49

Sen. Thom Tillis, Tillis Statement on Impeachment Trial (Feb. 13, 2021) ................................. 54

**Other Authorities**

2 Joseph Story, *Commentaries on the Constitution of the United States* (1833) .......................... 52

2 The Documentary History of the Ratification of the Constitution (Merrill Jensen et al.,
   eds. 1976) .................................................................................... 51

9 Annals of Congress (1798) ................................................................. 52

Bruce Ackerman & David Fontana, *How Jefferson Counted Himself In*, The Atlantic
   (Mar. 2004) .................................................................................. 41

CNN, Transcript of CNN's Town Hall with Former President Donald Trump (May 11,
   2023) ......................................................................................... 9

*Democrats Challenge Ohio Electoral Votes*, CNN.com (Jan. 6, 2005) ...................................... 46

John Copeland Nagle, *How Not to Count Votes*,
   104 Colum. L. Rev. 1732 (2004) .............................................................. 43

L. Kinvin Wroth, *Election Contests and the Electoral Vote*,
   65 Dick. L. Rev. 321 (1961) ................................................................. 44

Nathan L. Colvin & Edward B. Foley, *Lost Opportunity: Learning the Wrong Lessons
   from the Hayes-Tilden Dispute*, 79 Fordham L. Rev. 1043 (2010) ......................... 43

Rami Fakhouri, *The Most Dangerous Blot in Our Constitution: Retiring the Flawed
   Electoral College 'Contingent Procedure'*, 104 Nw. U. L. Rev. 705 (2010) .......................... 42

Randolph D. Moss, *A Sitting President's Amenability to Indictment and Criminal
   Prosecution*, 24 Op. O.L.C. 222 (Oct. 16, 2000) ................................................ 56

Randolph D. Moss, *Whether a Former President May Be Indicted and Tried for the
   Same Offenses for Which He Was Impeached by the House and Acquitted by the
   Senate*, 24 Op. O.L.C. 110 (Aug. 18, 2000) ...............................................51-54, 59-60

Restatement (Second) of Torts (1977) ........................................................................ 13

Robert G. Dixon, Jr., *Amenability of the President, Vice President and other Civil Officers to Federal Criminal Prosecution while in Office* (Sept. 24, 1973) ........................... 56

*The Federalist No. 65* (Alexander Hamilton) (Clinton Rossiter ed., 1999) ........................... 53, 54

*The Federalist No. 69* (Alexander Hamilton) (Clinton Rossiter ed., 1999) ................................ 51

Theodore B. Olson, *The Supreme Court & the Presidency*, 9 Green Bag 2d 139 (2006) ....................................................................................... 43

## I.   Introduction

The indictment in this case charges the defendant, then the president, with perpetrating an unprecedented campaign of deceit to attack the very functioning of the federal government to collect, count, and certify votes; to obstruct the January 6 congressional proceeding at which the election results are certified; and to disenfranchise millions of voters—all in a concerted criminal effort to overturn the presidential election results and prevent the lawful transfer of power to his successor.  Because the defendant cannot mount meritorious challenges to the charges against him, his motions to dismiss the indictment on constitutional (ECF No. 113) and statutory (ECF No. 114) grounds rely instead on distortions and misrepresentations.  The defendant attempts to rewrite the indictment, claiming that it charges him with wholly innocuous, perhaps even admirable conduct—sharing his opinions about election fraud and seeking election integrity—when in fact it clearly describes the defendant's fraudulent use of knowingly false statements as weapons in furtherance of his criminal plans.  The defendant's motions cite cases that, upon examination, undermine his arguments rather than support them, and he improperly challenges the Government's anticipated trial evidence at this stage.  The defendant also claims that he could not have known his actions were criminal because, in the past, others who have questioned, challenged, or protested election results were not prosecuted.  But the defendant stands alone in American history for his alleged crimes.  No other president has engaged in conspiracy and obstruction to overturn valid election results and illegitimately retain power.  The indictment squarely charges the defendant for this conduct, and the defendant's constitutional and statutory challenges to it are meritless.  The defendant's motions (ECF Nos. 113 and 114) should be denied.

## II.   Background

A grand jury charged the defendant in a four-count indictment.  ECF No. 1.  Count One, which charges a conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, alleges

that the defendant, then a candidate seeking re-election to the presidency, conspired with, among others, several individuals outside the Executive Branch to "overturn the legitimate results of the 2020 presidential election by using knowingly false claims of election fraud to obstruct the federal government function by which those results are collected, counted, and certified."  ECF No. 1 at ¶¶ 1, 7, 8.   The indictment further alleges that the defendant aimed at accomplishing the conspiracy's objectives in five ways: using deceit toward state officials to subvert the legitimate election results in those states, *id.* ¶¶ 13-52; using deceit to organize fraudulent slates of electors in seven targeted states, and cause them to send false certificates to Congress, *id.* ¶¶ 53-69; leveraging the Department of Justice to use deceit to get state officials to replace the legitimate electoral slate with electors who would cast their votes for the defendant, *id.* ¶¶ 70-85; attempting to enlist the Vice President to fraudulently alter the election results during the certification proceeding on January 6, 2021, and directing supporters to the Capitol to obstruct the proceeding, *id.* ¶¶ 86-105; and exploiting the violence and chaos that transpired at the United States Capitol on January 6, 2021, *id.* ¶¶ 106-124.  Counts Two and Three, which incorporate allegations from Count One, charge conspiracy and substantive violations of 18 U.S.C. § 1512(c)(2) for corruptly obstructing the certification of the presidential election results on January 6, 2021.  *Id.* ¶¶ 125-28. Count Four, which likewise incorporates the allegations from Count One, alleges that the defendant conspired to violate one or more person's constitutional right to vote and have one's vote counted.  *Id.* ¶¶ 129-30.

## III.   Legal Standard

An indictment's main purpose is to inform the defendant of the nature of the accusation.  *United States v. Ballestas*, 795 F.3d 138, 148-49 (D.C. Cir. 2015).  Thus, an indictment need "only contain 'a plain, concise, and definite written statement of the essential facts constituting the offense charged.'"  *Id.* at 149 (quoting Fed. R. Crim. P. 7(c)).  "[P]arroting the

language of a federal criminal statute is often sufficient." *United States v. Williamson*, 903 F.3d 124, 130 (D.C. Cir. 2018) (quoting *United States v. Resendiz-Ponce*, 549 U.S. 102, 109 (2007)). A defendant may move before trial to dismiss an indictment, or a count thereof, for "failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(v). "When testing the sufficiency of the charges in an indictment, 'the indictment must be viewed as a whole and the allegations [therein] must be accepted as true.'" *United States v. Hillie*, 227 F. Supp. 3d 57, 71 (D.D.C. 2017) (quoting *United States v. Bowdoin*, 770 F. Supp. 2d 142, 145 (D.D.C. 2011)); *United States v. Weeks*, 636 F. Supp. 3d 117, 120 (D.D.C. 2022).

## IV.   Argument

Rather than challenging the indictment on its merits, the defendant's motions (ECF Nos. 113 and 114) attack the indictment by mischaracterizing its allegations, raising inapposite hypotheticals, and advancing arguments that are long on rhetoric but short on law. Stripped of those distractions, the defendant's statutory and constitutional claims are entirely meritless. The detailed allegations in the 45-page indictment are more than adequate to charge that the defendant conspired to defeat a federal government function through deceit and dishonest means, in violation of 18 U.S.C. § 371; corruptly conspired to, attempted to, and did obstruct an official proceeding, in violation of 18 U.S.C. §§ 1512(c)(2) and (k); and conspired to violate others' constitutional rights to vote and have their vote counted, in violation of 18 U.S.C. § 241. The allegations that the defendant sought to overturn the results of the 2020 presidential election by resorting to fraud, deceit, and corruption place his conduct well outside the protections afforded by the First Amendment and likewise put him fully on notice that his conduct was criminal and thus subject to prosecution. Finally, the defendant's prior acquittal in a Senate trial following his impeachment in the House does not foreclose this criminal prosecution, and his particular reliance on the Double Jeopardy Clause is frivolous. The Court should deny the defendant's motions.

A.    **The Defendant's Statutory Challenges Lack Merit.**

1.    **The indictment adequately alleges a violation of 18 U.S.C. § 371.**

The defendant argues (ECF No. 114 at 3-21) that the indictment fails to allege a conspiracy

to defraud the United States, in violation of 18 U.S.C. § 371, which makes it unlawful to conspire

to obstruct a government function of the United States through deceit.  The government function

alleged in the indictment—the process, grounded in the Twelfth Amendment and the Electoral

Count Act, for collecting, counting, and certifying the results of the presidential election—plainly

constitutes a federal government function protected against a conspiracy to defraud.  Indeed, the

defendant does not dispute that this process is a federal government function for purposes of

Section 371.  *Cf.* ECF No. 114 at 14-15 (arguing that the indictment fails to allege obstruction or

interference, but not contesting that it alleges a federal government function).  Instead, the

defendant argues that the indictment fails to allege that he intended to use deceit to obstruct that

uncontested function.  He is wrong.

The general conspiracy statute makes it a crime "[i]f two or more persons conspire either

to commit any offense against the United States, *or to defraud the United States, or any agency*

*thereof in any manner or for any purpose*, and one or more of such persons do any act to effect the

object of the conspiracy." 18 U.S.C. § 371 (emphasis added).  The italicized clause is known as

the "defraud clause."  *See, e.g.*, *United States v. Atilla*, 966 F.3d 118, 130 (2d Cir. 2020). The

Supreme Court has interpreted and upheld use of the defraud clause, either under Section 371 or a

predecessor statute, for more than a century.  *See Tanner v. United States*, 483 U.S. 107, 128

(1987); *Dennis v. United States*, 384 U.S. 855, 861 (1966); *Glasser v. United States*, 315 U.S. 60,

66 (1942); *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924); *Haas v. Henkel*, 216 U.S.

462, 479 (1910).  Those cases establish that the defraud clause makes it a crime to conspire to

"interfere with or obstruct" a "lawful governmental function[]" of the United States "by deceit,

craft or trickery, or at least by means that are dishonest." *Hammerschmidt*, 265 U.S. at 188.[1]  The

Supreme Court has "stated repeatedly that the fraud covered by the statute reaches any conspiracy

for the purpose of impairing, obstructing or defeating" a lawful governmental function of the

United States.  *Tanner*, 483 U.S. at 128 (quotation marks omitted).  Although courts have divided

the elements differently, all agree that to establish an unlawful conspiracy under the defraud clause

the government must prove (1) the defendant "entered into an agreement, (2) to obstruct a lawful

function of the government or an agency of the government, (3) by deceitful or dishonest means,

and (4) at least one overt act was taken in furtherance of that conspiracy." *United States v. Concord*

*Mgmt. & Consulting LLC*, 347 F. Supp. 3d 38, 46 (D.D.C. 2018) (quotation marks omitted).

### a.    The indictment alleges deceit, trickery, or dishonest means.

The indictment's allegations of deceit, trickery, or dishonest means[2] are numerous and

clear.  As alleged in the indictment, the defendant "spread lies that there had been outcome-

determinative fraud in the election," these statements "were false," and the defendant "knew that

they were false."  ECF No. 1 at ¶ 2.  Similar allegations continue throughout the rest of the

indictment.

To start, tracking the established elements of a defraud-clause conspiracy, the indictment

alleges that the defendant did "knowingly combine, conspire, confederate, and agree with co-

conspirators . . . to defraud the United States by using dishonesty, fraud, and deceit to impair,

obstruct, and defeat the lawful federal government function by which the results of the presidential

---

[1] The defraud clause also makes it a crime to conspire to "cheat the government out of property or money." *Hammerschmidt*, 265 U.S. at 188.  The indictment does not charge property fraud.

[2] For purposes of brevity, this brief hereafter uses the term "deceit" to refer collectively to deceit, trickery, and dishonest means.

election are collected, counted, and certified by the federal government."  ECF No. 1 at ¶ 6.  The indictment explains that "[t]he purpose of the conspiracy was to overturn the legitimate results of the 2020 presidential election by using knowingly false claims of election fraud to obstruct the federal government function by which those results are collected, counted, and certified."  *Id.* ¶ 7.

The indictment goes on to describe the false statements that undergirded the conspiracy, alleging that the defendant, his co-conspirators, and their agents "made knowingly false claims that there had been outcome-determinative fraud in the 2020 presidential election," including "dozens of specific claims that there had been substantial fraud in certain states, such as that large numbers of dead, non-resident, non-citizen, or otherwise ineligible voters had cast ballots, or that voting machines had changed votes for the Defendant to votes for Biden."  *Id.* ¶ 11.  "These claims were false," the indictment alleges, "and the Defendant knew that they were false."  *Id.*  The indictment provides examples of these false claims, *see id.* ¶ 12, including the defendant's statements that "36,000 non-citizens had voted in Arizona," *id.* ¶ 19; that "more than 10,300 dead people had voted in Georgia," *id.* ¶ 33; that there had been "an illicit dump of more than a hundred thousand ballots in Detroit," *id.* ¶ 41; that "there had been 205,000 more votes than voters in Pennsylvania," *id.* ¶ 46; that "there had been tens of thousands of unlawful votes in Wisconsin," *id.* ¶ 52; and that voting machines in various contested states had switched votes from the defendant to Biden, *id.* ¶ 12(f).  The indictment identifies five ways in which the defendant and his co-conspirators used these lies to obstruct the federal government function by which the results of the presidential election were collected, counted, and certified.  *Id.* ¶ 10; *see id.* ¶¶ 13-124.

These extensive allegations of knowingly false statements are more than sufficient to charge that the defendant used and intended to use deceit to obstruct the lawful federal government function that was the target of his conspiracy to defraud.  The general principles regarding what

constitutes fraud are well established.  The touchstone of fraud is "deception," *United States v. O'Hagan*, 521 U.S. 642, 653 (1997), and "[f]raud has long been understood to include a broad[] range of deceptive conduct," *United States v. Kurlemann*, 736 F.3d 439, 446 (6th Cir. 2013); *accord United States v. Colton*, 231 F.3d 890, 897 (4th Cir. 2000).  Fraud "is as old as falsehood and as versable as human ingenuity." *United States v. Reid*, 533 F.2d 1255, 1264 (D.C. Cir. 1976) (quotation marks omitted).  The quintessential method of committing fraud is through knowingly false statements, as charged in the indictment. *See id.* at 1265 ("Of course, a material false statement contained in a document sent through the mails clearly constitutes a fraudulent misrepresentation and violation of the [mail fraud] statute."); *see, e.g.*, *United States v. Winstead*, 74 F.3d 1313, 1320 (D.C. Cir. 1996) (mail fraud based on false statements).  The indictment plainly alleges the use of deceit, and the Court need not look further than that to deny the defendant's motion to dismiss.

The defendant offers an array of arguments to avoid the clear allegations in the indictment. None withstands scrutiny.

### i. The defendant unsuccessfully attempts to recharacterize his false statements as permissible advocacy or expression of opinion to public officials.

The defendant claims (ECF No. 114 at 5-6) that he is charged because he merely "expressed opinions" about fraud in the 2020 presidential election and engaged in "pure advocacy."  That claim mischaracterizes the allegations in the indictment, which describe the defendant's use of fraudulent, knowingly false election-fraud claims.  Knowing lies are neither opinions nor "pure advocacy," and in any event, the defendant could not use so-called advocacy as a cover for his scheme to obstruct a governmental function through deceit.  Knowing deceit aimed at defeating a lawful government function constitutes a violation of the defraud clause, notwithstanding his attempts to sanitize his conduct.

The defendant also contends (ECF No. 114 at 5-6) that the indictment fails to allege deceit because his false statements would not have fooled the public officials at whom he aimed the statements. According to the defendant (*id.*), he was "one voice among countless millions," everyone had access to largely the same information, and the public officials he targeted were "some of the most informed politicians on the planet" and could come to their own conclusions. To the extent that the defendant argues that he cannot be held responsible because no one would have relied on his assertions of fraud, he is wrong; lack of success provides no defense to a charge of conspiracy to defraud, much less any basis to dismiss the charge. "The law of conspiracy identifies the agreement to engage in a criminal venture as an event of sufficient threat to social order to permit the imposition of criminal sanctions for the agreement alone, plus an overt act in pursuit of it," *United States v. Feola*, 420 U.S. 671, 694 (1975), regardless of whether "the object of the conspiracy be achieved," *United States v. Thompson*, 275 F. Supp. 3d 107, 111 (D.D.C. 2017). Were it otherwise, defendants captured en route to a bank robbery could not be charged with conspiracy because their crime did not succeed. Indeed, a conspiracy can be committed even if the object of the conspiracy is unattainable. *See United States v. Jimenez Recio*, 537 U.S. 270, 275 (2003). The federal fraud statutes similarly punish "the scheme, not its success," *Pasquantino v. United States*, 544 U.S. 349, 371 (2005) (quotation marks omitted), and the "common-law requirement[] of 'justifiable reliance' . . . [has] no place in the federal fraud statutes," *Neder v. United States*, 527 U.S. 1, 24-25 (1999). A defraud-clause conspiracy, like any conspiracy, is complete regardless of whether it succeeds or is likely to succeed in achieving its objective. Here, of course, as the indictment charges and history reflects, the defendant's scheme did obstruct the government function, and came dangerously close to overturning the valid results of the

presidential election.  In short, the indictment alleges a defraud-clause conspiracy, and the Court

need not look further.

Alternatively, if the defendant's argument is that his false claims were not material—

because his voice was just one "among countless millions" (ECF No. 114 at 5-6), and thus, he

suggests, his statements did not have "a natural tendency to influence" and were not "capable of

influencing[] the decisions of" the public officials to whom they were addressed, *Neder*, 527 U.S.

at 16 (quotation marks omitted)—he cannot raise it now.  Materiality is an issue of fact to be

addressed at trial, not on a motion to dismiss.  *United States v. Gaudin*, 515 U.S. 506, 522-23

(1995).  Moreover, any such defense will fail at trial.  As the sitting president, the defendant had

access to far more information than others in the country—he had the benefit of the full resources

of the federal government, including the top federal law enforcement officials at the Department

of Justice, the Director of National Intelligence, and experts on election security (ECF No. 1 at

¶ 11), all of whom were informing him that his claims of outcome determinative fraud were false—

and as a result of his role and access to this information his voice carried more weight, as indicated

by his boasts about the impact of his words.[3]  In any event, this is not a matter to be resolved in a

motion to dismiss.

The defendant also asserts that his statements were not deceptive because he genuinely

believed that "the election was stolen."  ECF No. 114 at 7.   But this, too, raises a matter for trial,

not a motion to dismiss.  Moreover, even if the defendant could supply admissible evidence of his

own personal belief that the election was "rigged" or "stolen," it would not license him to deploy

fraud and deceit to remedy what he perceived to be a wrong, and it would not provide a defense to

the charge.  Even where a defendant uses deceit to obstruct government functions that he thought

---

[3] *See* CNN, Transcript of CNN's Town Hall with Former President Donald Trump (May 11, 2023), https://www.cnn.com/2023/05/11/politics/transcript-cnn-town-hall-trump/index.html.

were unconstitutional, the Supreme Court has made clear that "a claim of unconstitutionality will not be heard to excuse a voluntary, deliberate and calculated course of fraud and deceit." *Dennis*, 384 U.S. at 867.  "One who elects such a course as a means of self-help may not escape the consequences by urging that his conduct be excused because the statute which he sought to evade is unconstitutional." *Id.*  There are "appropriate and inappropriate ways to challenge" perceived illegalities. *Id.*  Just as the president of a company may be guilty of fraud for using knowingly false statements of facts to defraud investors, even if he subjectively believes that his company will eventually succeed, *see, e.g.*, *United States v. Arif*, 897 F.3d 1, 9-10 & n.9 (1st Cir. 2018); *United States v. Kennedy*, 714 F.3d 951, 958 (6th Cir. 2013); *United States v. Ferguson*, 676 F.3d 260, 280 (2d Cir. 2011); *United States v. Chavis*, 461 F.3d 1201, 1209 (10th Cir. 2006), the defendant may be guilty of using deceit to obstruct the government function by which the results of the presidential election are collected, counted, and certified, even if he provides evidence that he subjectively believed that the election was "rigged."

Finally, the hypotheticals posed by the defendant (ECF No. 114 at 7-8) do not call into question Section 371's scope or its application here.  A defraud-clause violation, as honed by years of judicial application, requires an agreement, identification of a specific function of the federal government, the intent to obstruct that function through deceit, and an overt act, and does not reach lobbying or other societally beneficial political behavior.  *See, e.g.*, *United States v. Haldeman*, 559 F.2d 31, 120-21 (D.C. Cir. 1976) (en banc) (per curiam) (conspiracy to obstruct the lawful function of the CIA by deceptively causing it to provide financial assistance to those involved in the Watergate break-in and to falsely dissuade the FBI from investigating); *United States v. Johnson*, 383 U.S. 169, 172, 184-85 (1966) (in exchange for "campaign contributions" and "legal fees," congressman conspired to defeat the lawful functions of the Department of Justice by urging

dismissal of pending indictments).  Absent additional information about the conduct and mental state of the individuals in the defendant's hypothetical scenarios, they could not be prosecuted for violating Section 371.  None of the defendant's proffered hypotheticals, for example, involve individuals acting with the demanding criminal intent that Section 371 (or the other statutes with which the defendant is charged) requires.  Stated otherwise, the detailed allegations in the indictment, which establish that the defendant used false statements to conspire, defraud, and obstruct, are not comparable to the defendant's vague hypotheticals.[4]

> ii.      The indictment alleges deceit in connection with the fraudulent electors.

The defendant contends (ECF No. 114 at 9-13) that the indictment fails to allege deceit in connection with the fraudulent electors because the defendant and co-conspirators did not attempt to present the fraudulent electors as the electoral slates certified by the states.  This argument, too, rests on recasting the actual allegations in the indictment, which make clear that this part of the conspiracy was, indeed, deceitful.  First, five of the slates of fraudulent elector certificates were false on their face: they asserted that the electors were duly elected when they were not, and the conspirators resisted the addition of language that would water down that facial (and false) claim of validity.  ECF No. 1 at ¶ 61.  Beyond the fraud on the face of the documents, the indictment contains ample allegations of deceit in the scheme to create and use the fraudulent elector slates. *See, e.g.*, *id.* at ¶ 58 ("fake" votes); ¶ 62 ("fraudulent slates" used to supplant "legitimate slates"); ¶ 63 ("Certifying illegal votes"); and ¶ 64 (elector scheme propped up by litigation that was a "pretext").  Moreover, as the defendant has acknowledged elsewhere, "[t]he indictment clearly alleges that these actions were part and parcel of [the defendant's] alleged attempts to convince

---

[4] The three hypotheticals the defendant conjures up in his constitutional dismissal motion (*see* ECF No. 113 at 14) fail for the same reasons.

the Vice President and Members of Congress" to act in his favor.  ECF No. 74 at 42.  It was only by presenting these fake ballots that the defendant could try to make it appear, falsely, that there was a bona fide dispute about which electors should be counted.  ECF No. 1 at ¶¶ 53, 54(b).

And while the absence of any accompanying certificate of ascertainment might have alerted some that the false elector slates did not represent the official elector slates approved by the states, it does not follow, as the defendant suggests, that the use of the fake electoral slates was lacking in deceit.  From start to finish, false claims of election fraud provided the rationale for the fraudulent electors, making the fraudulent electors a vehicle for those false claims.  Co-conspirators lied to some of the fraudulent electors, falsely telling them that their votes would be used only if ongoing litigation changed the results in the defendant's favor.  ECF No. 1 at ¶¶ 56, 61, 62.  The defendant later tried to use the Department of Justice to send a letter to state officials falsely stating that the Department had found problems that may have changed the outcome of the election and urging state legislatures to convene in special sessions to choose the fraudulent electors over the legitimate electors.  *Id.* ¶¶ 70-75.  And using the false claims of voter fraud, the defendant and co-conspirators tried to convince the Vice President to accept the fraudulent electors and reject the legitimate electoral votes.  *Id.* ¶¶ 86, 90.  The defendant's contention (ECF No. 114 at 11) that he merely tried to "*persuade* officials to consider alternate slates" overlooks that the bases for this so-called persuasion were the knowingly false statements of voter fraud and that he was not engaged in persuasion but instead, as the indictment alleges, in making false statements that he repeatedly deployed.

The defendant also argues (ECF No. 114 at 12-13) that the lies to fraudulent electors to induce some of them to participate in the sham process do not establish deceit for purposes of alleging a violation of the defraud clause.  But under the defraud clause, the deceitful or dishonest

conduct may be directed at a third party, so long as the defendant is merely using the "third party to reach" the government function that is ultimately "the target of the fraud." *Tanner*, 483 U.S. at 129. Here, the lies to fraudulent electors were yet another form of deceit aimed at obstructing the government function of collecting, counting, and certifying the results of the election.

### iii.  The defendant made false statements to the Vice President.

The defendant contends (ECF No. 114 at 8-9) that his statements to the Vice President about the Vice President's authority at the certification proceeding in Congress cannot establish his intent to deceive for purposes of the defraud clause because misrepresentations of law cannot constitute fraud. The defendant is correct that "many courts appear to have stated—as a general rule—that misrepresentations of law are not actionable at common law," *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 756 (2023), but that general rule does not apply or provide a defense to the charges here. Even if accepted as governing law in federal fraud cases, *see Neder*, 527 U.S. at 24-25 (suggesting otherwise), "the rule has significant limits on its own terms," *Schutte*, 598 U.S. at 756. For instance, "statements involving some legal analysis remain actionable if they 'carry with [them] by implication' an assertion about 'facts that justify' the speaker's statement." *Id.* (quoting Restatement (Second) of Torts § 545, cmt. c (1977)). Thus, even assuming some of the defendant's statements about the Vice President's authority could qualify as misrepresentations of law, such statements—for example, his statement that the Vice President had the "power to reject fraudulently chosen electors" from certain states, ECF No. 1 at ¶ 96(a)—were undergirded by specific factual lies, *e.g.*, that the Vice President could and should do so because outcome-determinative voter fraud took place in those states and there was a bona fide dispute about which slate of electors should be counted. Thus, even if the common-law rule on misrepresentations of law applied, the defendant's statements about and to the Vice President

are powerful evidence of fraud.  *See, e.g., id.* ¶ 90 ("[I]n late December and early January, the Defendant repeated knowingly false claims of election fraud and directly pressured the Vice President to use his ceremonial role at the certification proceeding on January 6 to fraudulently overturn the results of the election[.]").

###### b.      The indictment alleges obstruction, not political advocacy.

The defendant argues (ECF No. 114 at 14-15) that the allegations in the indictment consist solely of "political advocacy," not obstruction of a government function.  That argument fails because the indictment alleges not lobbying or political advocacy, but instead that the defendant engaged in a multifaceted conspiracy aimed at overturning the results of the presidential election by targeting deceit at the federal government function (which included the certification proceeding on January 6) by which votes are collected, counted, and certified.

###### c.      The defendant's invocation of interpretative canons does not support dismissal.

The defendant's invocation (ECF No. 114 at 15-21) of "[s]everal principles of statutory interpretation" to justify his assertion that "the conduct alleged in the indictment does not fall within § 371 as a matter of law" is disingenuous.  Other than to ask that Section 371 be "narrowly" construed to ensure that it does not criminalize "vast swaths of ordinary political activity and First Amendment-protected speech," *id.* at 15 (capitalization altered), he does not focus on any statutory term and attempt to explain why it is vague or ambiguous, or offer any interpretation of what the statute should mean.  Indeed, the defendant agrees (*id.* at 3) regarding the essential elements of an offense under the defraud clause.

Those elements limit the scope of the defraud clause and ensure that it does not reach the sort of innocent conduct posited by the defendant, and thus no novel narrowing construction is necessary.  "The conspiracies criminalized by § 371 are defined not only by the nature of the injury

intended by the conspiracy, and the method used to effectuate the conspiracy, but also—and most importantly—by the *target* of the conspiracy." *Tanner*, 483 U.S. at 130. Because a defraud-clause conspiracy must be targeted at the United States or any agency thereof, it does not reach the vast array of private fraud potentially criminalized by other federal fraud statutes, or permit "federal prosecutors" to "set[] standards of disclosure and good government for local and state officials." *Kelly v. United States*, 140 S. Ct. 1565, 1571 (2020) (quotation marks omitted). Moreover, obstruction of the government function must be "a *purpose* or *object* of the conspiracy, and not merely a foreseeable consequence of the conspiratorial scheme." *United States v. Goldberg*, 105 F.3d 770, 773 (1st Cir. 1997) (citing *Dennis*, 384 U.S. at 861). Further, the defraud clause "is limited only to wrongs done 'by deceit, craft or trickery, or at least by means that are dishonest,'" and does not reach "[o]bstructing government functions in other ways—for example, by violence, robbery or advocacy of illegal action." *United States v. Caldwell*, 989 F.2d 1056, 1059 (9th Cir. 1993) (quoting *Hammerschmidt*, 265 U.S. at 188), *overruled on other grounds by Neder*, 527 U.S. at 8-9. The requirement of deceit, craft, trickery, or dishonest conduct—which flows from the statutory term "defraud"—also brings with it the fraud-related doctrine of materiality. *See Neder*, 527 U.S. at 20-25. Finally, the overt-act requirement provides another limitation, the function of which is "to manifest that the conspiracy is at work, and is neither a project still resting solely in the minds of the conspirators nor a fully completed operation no longer in existence." *Yates v. United States*, 354 U.S. 298, 334 (1957) (citation and quotation marks omitted), *overruled on other grounds by Burks v. United States*, 437 U.S. 1 (1978).

These requirements, taken together, confirm that Section 371 does not reach the sort of good-faith advocacy and lobbying that the defendant says should fall outside its scope. As such, there is no need to adopt some unspecified narrowing construction to avoid problems of "potential

overbreadth" (ECF No. 114 at 15-16) or "fatal vagueness" (*id.* at 17-18).  *See infra* p. 29 n.11 (discussing overbreadth); *United States v. Bronstein*, 849 F.3d 1101, 1106 (D.C. Cir. 2017) ("[The vagueness] doctrine spurns attempts to save a statute from unconstitutional vagueness based on speculative tests detached from statutory elements that do not craft a principled and objective standard." (quotation marks omitted)).  Nor do the rules of lenity (ECF No. 114 at 18-19) or constitutional avoidance (*id.* at 16-17) have any relevance here.  *See Muscarello v. United States*, 524 U.S. 125, 138-39 (1998) ("The rule of lenity applies only if, after seizing everything from which aid can be derived, we can make no more than a guess as to what Congress intended," such that "there is a grievous ambiguity or uncertainty in the statute." (ellipsis and quotation marks omitted)); *Johnson v. Arteaga-Martinez*, 142 S. Ct. 1827, 1833 (2022) ("[T]he canon of constitutional avoidance is only applicable where a statute has more than one plausible construction." (quotation marks omitted)).

Finally, the defendant offers a strained argument (ECF No. 114 at 19-21) that he was not and cannot be charged under the general false-statement statute, 18 U.S.C. § 1001, for his deceit aimed at a congressional proceeding, and therefore that he cannot be charged with any crime at all.  The argument fails on at least two grounds.  First, in a matter "within the jurisdiction of the legislative branch," Section 1001 does, in fact, apply to "a document required by law, rule, or regulation to be submitted to the Congress or any office or officer within the legislative branch." 18 U.S.C. § 1001(c)(1).  But more fundamentally, the applicability or inapplicability of one statute (based on law or facts) does not govern the applicability of another well-established statute with entirely different language, scope, and elements.  "The Federal Criminal Code is replete with provisions that criminalize overlapping conduct," and [t]he mere fact that two federal criminal

statutes criminalize similar conduct says little about the scope of either." *Pasquantino*, 544 U.S. at 359.

### 2. The indictment adequately alleges violations of 18 U.S.C. §§ 1512(k) and (c)(2).

The indictment charges that the defendant corruptly obstructed and impeded an official proceeding, namely, Congress's certification of the presidential election, and conspired to do so. ECF No. 1 at ¶¶ 125-28. The defendant argues (ECF No. 114 at 21-27) that the indictment fails to allege that he engaged in any conduct that obstructed or impeded the certification proceeding or that he acted "corruptly." He is wrong again.

### a. The indictment alleges the defendant conspired to, attempted to, and did obstruct and impede the certification proceeding.

Section 1512(c)(2) prohibits "all forms of corrupt obstruction of an official proceeding" other than the document destruction and evidence tampering "that is already covered" in Section 1512(c)(1). *United States v. Fischer*, 64 F.4th 329, 336 (D.C. Cir. 2023). Section 1512(c)(2) thus "encompasses all forms of obstructive conduct, including . . . efforts to stop Congress from certifying the results of the 2020 presidential election." *Id.* at 335. As the defendant acknowledges (ECF No. 114 at 22), the verbs Congress selected in Section 1512(c)(2) are "noncontroversial." *United States v. Montgomery*, 578 F. Supp. 3d 54, 70 (D.D.C. 2021). The words "'obstruct'" and "'impede'" naturally "refer to anything that 'blocks,' 'makes difficult,' or 'hinders.'" *Marinello v. United States*, 138 S. Ct. 1101, 1106 (2018) (brackets omitted) (citing dictionaries). In *Fischer*, the court concluded that indictments that, in addition to charging three defendants with other crimes, alleged that each defendant "attempted to, and did, corruptly obstruct, influence, and impede an official proceeding," and defining that proceeding as the certification of the electoral college vote, 64 F.4th at 333, sufficiently stated violations of Section 1512(c)(2) even in the absence of specific allegations describing each defendant's conduct, *id.* at 350.

The indictment here unmistakably alleges the *actus reus* element for a violation of Section 1512(c)(2). Consistent with *Fischer*, the indictment tracks Section 1512(c)(2)'s statutory language and identifies the specific congressional proceeding—the certification of the electoral college vote—that the defendant is alleged to have obstructed. *See* ECF No. 1 at ¶¶ 126, 128. Moreover, the indictment is replete with allegations that the defendant conspired to obstruct, attempted to obstruct, and in fact obstructed the certification proceeding on January 6, 2021. For example, the indictment describes the defendant's efforts to devise a plan to "marshal individuals" to serve as fraudulent slates of electors in several targeted states who would "make and send to the Vice President and Congress false certifications that they were legitimate electors." *Id.* ¶ 53; *see id.* at ¶¶ 53-69 (describing plan in detail). The defendant also sought to deceive state officials into undertaking efforts to derail the January 6 certification proceeding through direct overtures from him and his co-conspirators working outside the Executive Branch. *See, e.g.*, *id.* ¶ 15 (defendant and Co-Conspirator 1 "made knowingly false claims of election fraud" to the Speaker of the Arizona House of Representatives designed to "interfer[e] with the ascertainment of and voting by Arizona's electors"); ¶¶ 31, 31(f) (defendant in a phone call "lied to" the Georgia Secretary of State and "insinuated that the Georgia Secretary of State and his Counsel could be subject to criminal prosecution" if they failed to "find election fraud" as the defendant "demanded" in service of the defendant's effort to "induce" the Secretary of State "to alter Georgia's popular vote count and call into question the validity of the Biden electors' votes, which had been transmitted to Congress weeks before"); ¶ 38 (Co-Conspirator 1 "reiterat[ed]" an "unsupported claim of election fraud" in a text message to the Michigan House Speaker in an effort to get the Speaker "to assist in reversing the ascertainment of the legitimate Biden electors"). He sought the same result through a letter that was proposed by a co-conspirator within the Executive Branch that "contained

numerous knowingly false claims about the election and the Justice Department." *Id.* ¶ 75.  The defendant additionally used knowing false claims of election fraud to pressure and target the former Vice President to induce the Vice President to fraudulently alter the election results during the January 6 certification proceeding. *See id.* ¶¶ 86-104.  And on January 6, the defendant directed a large crowd of supporters, whom he knew to be "angry" based on his election fraud lies, to go to the Capitol and obstruct the proceeding. *See id.* ¶¶ 10(d), 98, 104.  The defendant likewise sought to exploit the violence that overtook the Capitol and caused the suspension of the certification proceeding on January 6, including by publicly attacking the Vice President 11 minutes after rioters had broken into the Capitol building; the Vice President had to be evacuated from the building one minute later, and rioters called the Vice President a "Traitor" and for him to be hanged. *See id.* ¶¶ 109-113.  Those allegations readily establish that the defendant conspired to, attempted to, and did obstruct and impede the certification proceeding.

The defendant's principal counterargument (ECF No. 114 at 23) mischaracterizes the indictment—thereby failing to accept the allegations as true, s*ee Weeks*, 636 F. Supp. 3d at 120—as focused solely on "lobbying" of state officials and Members of Congress.  That is flawed in at least three respects.  First, as the preceding paragraph makes evident, the indictment alleges not "lobbying" but instead a concerted effort to target knowingly false and fraudulent claims at government officials, and then seeking to exploit actions by a violent and chaotic mob, in order to defeat the certification proceeding.  Second, just as with Section 371, Section 1512(c)(2)'s *mens rea* requirement—that a defendant act "corruptly" when engaging in his obstructive conduct— prevents the statute "from sweeping up a great deal of conduct that has nothing to do with obstruction," including "lobbyists who know they advocate for morally wrongful causes." *Fischer*, 64 F.4th at 339.  Finally, any "concerns about constraining lobbying and advocacy are

not implicated in January 6 cases because the electoral-vote certification by Congress is not a policymaking exercise open to 'political jousting,'" but instead a "constitutionally scripted transition of presidential power, with an outcome determined by the results of a presidential election." *United States v. Robertson*, --- F.4th ---, 2023 WL 6932346, at *12 (D.C. Cir. Oct. 20, 2023) (quotation omitted).[5]  Relatedly, the defendant's ill-conceived hypothetical (ECF No. 114 at 23-24)—that advocacy efforts by an "activist" who "oppose[d] COVID vaccine mandates" (but does not appear to have acted with criminal intent) would amount to felony obstruction—has no relationship to the allegations in this case.   It is common ground between the parties that "the legitimate efforts of lobbyists and protestors to influence policymaking or to express political views," *Robertson*, 2023 WL 6932346, at * 12, would not violate Section 1512(c)(2).[6]

The indictment would likewise suffice under a narrower conception of Section 1512(c)(2)'s *actus reus* element—which *Fischer* rejected—that focused on tampering with records.  *See* ECF No. 114 at 21.  The certification proceeding that the defendant and his co-conspirators are alleged to have obstructed is required under the Electoral Count Act, which specifies procedures that rely on specific core records: certificates of votes from each State.  The President of the Senate opens the certificates "in the alphabetical order of the States," and calls for objections, which must be in

---

[5] The defendant's cursory suggestion (ECF No. 114 at 23) that several interpretative canons militate in favor of his cramped reading of Section 1512(c)(2) lacks merit.  Not only did *Fischer* reject the reading he advocates; it also explained how statutory canons, including those on which he relies, do not support that reading.  *See* 64 F.4th at 345-46 (discussing *ejusdem generis* and *noscitur a sociis* canons); *id.* at 348-50 (discussing anti-surplusage and mousehole canons); *id.* at 350 (discussing lenity and restraint).

[6] Indeed, as the defendant correctly notes (ECF No. 114 at 22 n.4), by foregoing any prosecution theory based on "influence," the indictment undoubtedly does not reach lobbying efforts.

- 20 -

writing.  3 U.S.C. § 15.[7]  After the two Houses resolve any objections, the votes are counted with

the aid of four tellers.  *Id.*  Congress may not recess until "the count of electoral votes" is

"completed" and the "result declared."  *Id.* § 16.  When the count is completed and the winner

declared, a record of the votes is entered on the "Journals of the two Houses."  *Id.* § 15.  Preventing

the Members of Congress from validating the state certificates constitutes evidence-focused

obstruction and thus would violate Section 1512(c)(2) even on a narrower view of the statute's

scope.  That is particularly true where, as here, the criminal conduct included falsifying electoral

certificates and transmitting them to Congress.  *See* ECF No. 1 at ¶¶ 53-69.

### b.    The indictment alleges the defendant acted corruptly.

The defendant's claim that the indictment fails to allege that he acted corruptly (ECF No.

114 at 24-27) is patently incorrect.  The indictment charges that the defendant conspired "to

*corruptly* obstruct and impede," ECF No. 1 at ¶ 126 (emphasis added), and that he "attempted to,

and did, *corruptly* obstruct and impede," the certification proceeding, *id.* ¶ 128 (emphasis added).

Alleging a violation of Section 1512(c)(2)'s *mens rea* element by tracking the statutory language

disposes of the defendant's claim that the indictment failed to allege that he acted with corrupt

intent.  *See United States v. Williamson*, 903 F.3d 124, 130 (D.C. Cir. 2018).

The defendant's additional challenges to the "corruptly" element are both premature and

flawed.  The defendant discusses the D.C. Circuit's recent decision in *Robertson* at length, but that

decision reviewed the evidence after a trial and concluded that ample evidence established the

defendant acted "corruptly."  2023 WL 6932346, at *9 ("The evidence presented at Robertson's

trial was undoubtedly sufficient to prove that he acted 'corruptly.'").  *Robertson* does not alter the

---

[7] Citations to the Electoral Count Act are to the provisions operative between November 2020 and January 2021.

long-standing rule that, in order to inform the defendant of the nature of the accusation as required under Rule 7 of the Federal Rules of Criminal Procedure, *see Ballestas*, 795 F.3d at 148-49, "parroting the language of a federal criminal statute is often sufficient," *Williamson*, 903 F.3d at 130 (quoting *United States v. Resendiz-Ponce*, 549 U.S. 102, 109 (2007)); *cf. United States v. Brock*, 628 F.3d 85, 93 (D.D.C. 2022) (noting that a defendant is not entitled through an indictment or a bill of particulars to a "preview" of the "government's evidence or theory of the case") (quotation marks omitted).  Thus, while relevant to jury instructions, *Robertson*'s interpretation of "corruptly" is not relevant to the defendant's dismissal motion.

Moreover, *Robertson* demonstrates that "there are multiple ways to prove" that the defendant "acted 'corruptly.'" 2023 WL 6932346, at *8.   The alternatives include "using independently unlawful, felonious means," *id.* at *9, and acting with a "corrupt purpose," *id.* at *11, which includes acting "with an intent to procure an unlawful benefit," *Fischer*, 64 F.4th at 352 (Walker, J., concurring) (quotation marks omitted), such as "secur[ing] . . . the presidency," *id.* at 356 n.5, and acting dishonestly, *Arthur Andersen LLP v. United States,* 544 U.S. 696, 706-07 (2005); *see Robertson*, 2023 WL 6932346, at *12 (noting that "dishonesty" or "seeking a benefit for oneself or another" is not necessary but "may be sufficient to prove corrupt intent"). The proof at trial will establish corrupt intent under the definitions in *Robertson*.   Contrary to the defendant's speculation about prosecutions that might reach political advocacy and lobbying (ECF No. 114 at 26-27), proceeding on a corrupt means or corrupt purpose theory will "ensure[] that [Section] 1512(c)(2) does not penalize innocent efforts to obstruct an official proceeding, including by engaging in constitutionally protected expression." *Robertson*, 2023 WL 6932346, at *17.

### 3.   The indictment adequately alleges a violation of 18 U.S.C. § 241.

Count Four of the indictment charges a conspiracy to deprive one or more persons of their right to vote and to have their votes counted, in violation of 18 U.S.C. § 241.  As relevant here, the

defendant advances two claims.  First, he claims that the indictment does not allege an agreement to commit an unlawful act.  Second, he argues that the indictment fails to charge the necessary specific intent.  Each argument fails.[8]

### a. The indictment alleges a criminal agreement.

The defendant first contends (ECF No. 114 at 28) that the indictment contains "[n]o agreement to commit an unlawful act."  That claim is flatly contradicted by the indictment, which alleges in Count Four a conspiracy to violate the rights and privileges secured by the Constitution and laws of the United States of one or more persons, that is, the right to vote and to have one's vote counted.  ECF No. 1 at ¶ 130.  The count incorporates dozens of factual allegations laying out how the defendant and his co-conspirators carried out their criminal agreement, including that they "pursued unlawful means of discounting legitimate votes and subverting the election results."  *Id.* ¶¶ 4, 129.  The indictment is more than sufficient to inform the defendant of the nature of the charge.[9]

### b. The indictment alleges the requisite *mens rea*.

The defendant next claims (ECF No. 114 at 32) that Count Four "fail[s] to allege" that the defendant acted with "specific intent" and "acted to accomplish a governmental purpose."  He relies exclusively on a fifty-year-old case from the Fifth Circuit, *Wilkins v. United States,* 376 F.2d 552, 562 (5th Cir. 1967), but fails to recognize that a subsequent Fifth Circuit case, *United States v. Purvis*, 580 F.2d 853, 856 (5th Cir. 1978), clarified *Wilkins* and directly contradicts his argument.  While the Government must prove at trial that the defendant had the specific intent to

---

[8] The defendant's fair notice challenge to Section 241 is addressed *infra* pp. 37-40.

[9]  The defendant's suggestion (ECF No. 114 at 28) that a violation of Section 241 requires proof of an overt act is incorrect.  *See United States v. Whitney*, 229 F.3d 1296, 1301 (10th Cir. 2000).  In any event, the indictment is replete with overt acts.

deprive one or more persons of a constitutional right, there is no requirement that the indictment contain these particular words. *See Purvis*, 580 F.2d at 857 ("the law does not compel a ritual of words"). It is sufficient if the indictment tracks the statutory language and identifies the constitutional right at issue, *id.* at 857-88, as the allegation of a conspiracy itself "incorporates willfulness and specific intent," *id.* at 859. Here, the indictment tracks the language of the statute and provides a detailed factual predicate for the charge. *See id*. at 857. Additionally, the indictment directly identifies the rights at issue—"the right to vote or to have one's vote counted"—rights the defendant has conceded are fundamental. ECF No. 114 at 29. That is more than sufficient for purposes of pleading a violation of Section 241.

Further, relying on *United States v. Ehrlichman*, 546 F.2d 910 (D.C. Cir. 1976), the defendant contends that the Government must prove that the defendant "acted to accomplish a governmental purpose." ECF No. 114 at 32. Putting aside that he is again raising a trial issue, the defendant's reliance on *Ehrlichman* is misplaced. *Ehrlichman* does not rest on a distinction between government and private purposes of the conspirators, as the defendant suggests. The defendant in that case was convicted under Section 241 of conspiring to break into a psychiatrist's office. 546 F.2d at 914. The right infringed by the conspiracy was the psychiatrist's Fourth Amendment rights, *id*. at 928 (Leventhal, J., concurring), and the passage the defendant focuses on stands for the unremarkable proposition that the Fourth Amendment protects only against unreasonable searches and seizures undertaken by the government. *Id.* ("It is a civil rights conspiracy in violation of [§ 241] . . . if they enter his office in their capacity as government agents without proper authorization to secure information for an ostensible government purpose."); *see also United States v. Jacobsen*, 466 U.S. 109, 113 (1984) ("This Court has also consistently construed this [Fourth Amendment] protection as proscribing only governmental action[.]").

However, because the right to vote in a presidential election is directly protected under the Constitution, *see Bush v. Gore*, 531 U.S. 98, 104 (2000) (per curiam); *see also infra* pp. 38-40, a Section 241 charge of conspiring to interfere in the free exercise of that right requires no proof of government involvement.  *See United States v. Classic*, 313 U.S. 299, 321 (1941) ("the right to vote in a congressional election is a right secured by the Constitution, and that a conspiracy to prevent the citizen from voting or to prevent the official count of his ballot when cast, is a conspiracy to injure and oppress the citizen in the free exercise of a right secured by the Constitution within the meaning of [Section 241's predecessor]").  Count Four is therefore sufficiently pleaded.[10]

## B.   The Defendant's Constitutional Challenges Lack Merit.

Repeating much of what he advances in his statutory challenges (*see* ECF No. 114), the defendant separately contends (ECF No. 113 at 4-18, 25-31) that dismissal is appropriate because the indictment violates the First Amendment and constitutional principles of fair notice.  And repeating much of what he advanced in his motion to dismiss on presidential immunity grounds

---

[10] Even if the right alleged to have been infringed is viewed as a violation of the Equal Protection and Due Process Clauses, the defendant, as president, was indisputably at times a government actor, even if he was also acting at times in his capacity as a candidate.  *See Classic,* 313 U.S. at 326 ("Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law.").  Moreover, it is well established that when the object of a Section 241 conspiracy is to violate a right that protects against action by the government, whether it is the Fourth Amendment or the Equal Protection Clause of the Fourteenth Amendment, not all co-conspirators need be government actors.  *United States v. Olinger*, 759 F.2d 1293, 1304 (7th Cir. 1985) ("Nor is it essential that the state official be a party defendant; it is sufficient if the proof involves 'a charge of active connivance by agents of the State' in the wrongful acts done in furtherance of the conspiracy; that will meet the test of state action, as required under the rule enunciated in [*United States v. Guest,* 383 U.S. 745 (1966)]").  In *Guest*, the Court denied defendants' motion to dismiss a Section 241 indictment alleging an Equal Protection violation, finding that because the indictment alleged state involvement, how the government would prove the violation was a matter for trial.  383 U.S. at 756.  The same analysis applies here.

(ECF No. 74 at 11-13, 16-17), the defendant contends (ECF No. 113 at 18-25) that his acquittal in the United States Senate following his impeachment in the United States House of Representatives precludes his criminal prosecution in this case, including on double-jeopardy grounds. Those contentions fail.

### 1. The First Amendment does not protect the defendant's criminal conduct.

The defendant argues (ECF No. 113 at 4-18) that the First Amendment requires dismissal of the indictment. The First Amendment does not protect fraudulent speech or speech otherwise integral to criminal conduct, particularly crimes that attack the integrity and proper function of government processes. The defendant's arguments are based on an inaccurate and self-serving characterization of the charges, and his motion should be denied.

### a. The charges in the indictment do not criminalize protected speech.

As the indictment recognizes, the defendant "had a right, like every American, to speak publicly about the [2020 presidential] election and even to claim, falsely, that there had been outcome-determinative fraud during the election and that he had won." ECF No. 1 at ¶ 3. Had the defendant done no more, his statements pertaining to political matters of public importance would have remained protected under the First Amendment, even if false.

But the defendant did not stop there. He instead made dozens of "specific claims that there had been substantial fraud in certain states, such as that large numbers of dead, non-resident, non-citizen, or otherwise ineligible voters had cast ballots, or that voting machines had changed votes for the Defendant to votes for Biden." ECF No. 1 at ¶ 11. He falsely stated, for example, that "more than 10,300 dead people had voted in Georgia." *Id.* ¶ 33. Those were factual claims that were verifiably false, and the defendant "knew that they were false." *Id.* ¶ 2. The defendant then used those lies as the instruments of his four criminal offenses: conspiring to fraudulently obstruct

the federal function for collecting, counting, and certifying the results of the presidential election, in violation of 18 U.S.C. § 371 (Count 1); corruptly obstructing and conspiring to obstruct Congress's certification of the election results, in violation of 18 U.S.C. §§ 1512(c)(2) and (k) (Counts 2 and 3); and conspiring to deprive citizens of their constitutional right to have their votes counted, in violation of 18 U.S.C. § 241 (Count 4). The defendant's "knowingly false statements were integral to his criminal plans to defeat the federal government function, obstruct the certification, and interfere with others' right to vote and have their votes counted." *Id.* ¶ 12.

Because the defendant used those knowingly false statements regarding specific facts to commit the crimes charged in the indictment, they were not protected by the First Amendment. Speech used to commit "fraud" and speech that is otherwise "integral to criminal conduct" is not protected under the First Amendment. *United States v. Stevens*, 559 U.S. 460, 468-69 (2010) (listing categories of speech that are unprotected, including "speech integral to criminal conduct."). For that reason, the First Amendment has never been thought to foreclose the prosecution of long-established crimes—such as conspiracy, fraud, bribery, extortion, blackmail, or aiding and abetting—that are committed wholly or in part through speech. *See, e.g.*, *Nat'l Org. for Women v. Operation Rescue*, 37 F.3d 646, 656 (D.C. Cir. 1994) ("That 'aiding and abetting' of an illegal act may be carried out through speech is no bar to its illegality."); *United States v. Sayer*, 748 F.3d 425, 434 (1st Cir. 2014) (listing perjury, bribery, extortion and threats, and conspiracy as examples of offenses where speech itself is the vehicle of the crime); *United States v. Rahman*, 189 F.3d 88, 117 (2d Cir. 1999) (per curiam) ("Numerous crimes under the federal criminal code are, or can be, committed by speech alone."). "[T]he constitutional freedom for speech" does not "extend[] its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute." *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949). It "has never been

deemed an abridgment of freedom of speech . . . to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Id.* at 502.  Put simply, using speech as a means to commit a crime does not shield that crime from prosecution.  *See, e.g.*, *Rice v. Paladin Enterprises, Inc.*, 128 F.3d 233, 244 (4th Cir. 1997) (explaining that the First Amendment does not foreclose the government from proscribing "countless" crimes, including extortion, blackmail, threats, perjury, solicitation, and conspiracy).  The defendant's comments about the virtues of the First Amendment, over which there is no dispute, do nothing to unsettle this line of unbroken precedent.

Any speech that the defendant used to carry out the conspiracy, fraud, and obstruction crimes charged in the indictment is categorically excluded from the protections of the First Amendment.  The "long established criminal proscription[] . . . against conspiracy. . . criminalize[s] speech" that is "undeserving of First Amendment protection." *United States v. Williams*, 553 U.S. 285, 298 (2008).  Speech used to carry out "agreements and conspiracies deemed injurious to society" is quintessential speech integral to criminal conduct. *Giboney*, 336 U.S. at 502.  "Speech intended to bring about a particular unlawful act has no social value; therefore, it is unprotected." *United States v. Hansen*, 599 U.S. 762, 783 (2023); *see id.* (concluding that if a proscription against solicitation or aiding-and-abetting "reaches *any* speech, it stretches no further than speech integral to unlawful conduct").  Accordingly, insofar as the defendant used speech to commit the charged conspiracies aimed at defrauding the United States, corruptly obstructing official proceedings, and unlawfully depriving citizens of their constitutional rights, that speech was unprotected under the First Amendment.  A conspiracy is "not protected by the First Amendment merely because, in part, it may have involved the use of language." *United States v. Rowlee*, 899 F.2d 1275, 1278 (2d Cir. 1990) (conspiracy to defraud the United

States, in violation of 18 U.S.C. § 371).  Were it otherwise, the prosecution would be unable to

prove that a defendant in a robbery case told the victim to "give me all your money" or that a drug

trafficker told his buyer what the price would be.  That is clearly not the law.  Moreover, speech

used to commit a conspiracy to defraud the United States is further unprotected because "the First

Amendment does not shield fraud."  *Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538

U.S. 600, 612 (2003); *see United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1123-24 (D.C.

Cir. 2009) (per curiam) ("Of course, it is well settled that the First Amendment does not protect

fraud.").  And the prohibition on corruptly obstructing an official proceeding likewise does not

proscribe protected speech.  *United States v. Bozell*, No. 21-cr-216, 2022 WL 474144, at *7

(D.D.C. Feb. 16, 2022) (opinion in January 6 case citing similar decisions by "several other

judges"); *see United States v. Shotts*, 145 F.3d 1289, 1300 (11th Cir. 1998); *United States v.

Thompson*, 76 F.3d 442, 452 (2d Cir. 1996).

Finally, not only does the First Amendment not limit or foreclose the conspiracy, fraud,

and obstruction charges in the indictment; it does not limit the evidence at trial.  The defendant's

speech may serve as evidence "to establish the elements of a crime or to prove motive or intent."

*Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993).  The First Amendment allows the "use of speech

to infer intent, which in turn renders an otherwise permissible act unlawful."  *Whitaker v.

Thompson*, 353 F.3d 947, 953 (D.C. Cir. 2004); *see United States v. Robertson*, 588 F. Supp. 3d

114, 124 (D.D.C. 2022) (finding no "First Amendment concerns in the government's use of [the

defendant's] statements to show intent").[11]

---

[11] The defendant argues in passing (ECF No. 113 at 11) that "the statute" is unconstitutionally overbroad and therefore facially invalid.  "[I]nvalidation for overbreadth is strong medicine that is not to be casually employed," and "[t]o justify facial invalidation, a law's unconstitutional applications must be realistic, not fanciful, and their number must be substantially

    **b.**   *Alvarez* **confirms that the charges in the indictment do not offend the First Amendment.**

The defendant devotes many pages (ECF No. 113 at 4-10, 15) to discussing the Supreme Court's decision in *United States v. Alvarez*, 567 U.S. 709 (2012), but *Alvarez* undermines the defendant's argument and confirms that the conspiracy, fraud, and obstruction charges in the indictment are entirely permissible under the First Amendment.

*Alvarez* held that the Stolen Valor Act, which made it a crime for anyone to falsely represent that he or she had been awarded a military medal or decoration, was facially invalid under the First Amendment.  567 U.S. at 715-16; *see id.* at 730 (Breyer, J., concurring).  In a plurality opinion, Justice Kennedy contrasted the Stolen Valor Act, which "target[ed] falsity and nothing more," with laws that "implicate fraud or speech integral to criminal conduct," which prohibit false statements in connection with some "other legally cognizable harm."  567 U.S. at 719-21.  In language that has direct application to the charges here, the plurality opinion specifically identified as permissible under the First Amendment laws that "protect the integrity of Government processes, quite apart from merely restricting false speech," such as perjury, prohibitions on false statements to government officials, and prohibitions on falsely representing that one is speaking on behalf of the government.  *Id.* at 720-21.  The plurality opinion further confirmed that "[w]here false claims are made to effect a fraud," the government "may restrict speech without affronting the First Amendment."  *Id.* at 723.  Justice Breyer's concurrence similarly contrasted statutes like the Stolen Valor Act that "simply prohibit without limitation the

---

disproportionate to the statute's lawful sweep."  *Hansen*, 599 U.S. at 770 (quotation marks omitted).  The defendant does not attempt to make this showing; he does not even cite the relevant statutes, let alone evaluate what they "cover[]," a necessary component of overbreadth analysis. *Id.*  In any event, the defendant could not demonstrate overbreadth even if he tried.  The statutes charged in the indictment have been on the books for decades and repeatedly enforced without questions as to the validity of the prosecutions under the First Amendment.

telling of a lie" with narrower, valid statutes that apply to "a subset of lies where specific harm is more likely to occur." *Id.* at 736; *see id.* at 734-36. As an example of one of these narrower, valid statutes, Justice Breyer specifically mentioned fraud statutes, which "typically require proof of a misrepresentation that is material," and statutes "forbidding lying to a government official," which "are typically limited to circumstances where a lie is likely to work particular and specific harm by interfering with the functioning of a government department." *Id.* at 734-35. In other words, the government may protect its processes and functions against fraud and corruption carried out through lies.

The statutes charged in the indictment are precisely the sorts of laws that the plurality and concurring opinions in *Alvarez* identified as permissible restrictions on false speech, in contrast to the invalid Stolen Valor Act. The conspiracy, fraud, and obstruction offenses charged in the indictment "implicate fraud or speech integral to criminal conduct," and they "protect the integrity of Government processes, quite apart from merely restricting false speech." 567 U.S. at 721 (plurality opinion). *Alvarez* thus forecloses a First Amendment challenge to the indictment. *See, e.g.*, *Concord Mgmt. & Consulting LLC*, 347 F. Supp. 3d at 56 (denying motion to dismiss Section 371 charges after *Alvarez*).

The defendant nonetheless erroneously contends that *Alvarez* supports dismissal. He relies (ECF No. 113 at 4, 7) on statements in the concurring and dissenting opinions that hypothetical laws "restricting false statements about philosophy, religion, history, the social sciences, the arts, and other matters of public concern would present" a "grave and unacceptable danger of suppressing truthful speech." 567 U.S. at 751 (Alito, J., dissenting); *see id.* at 731-32 (Breyer, J., concurring). But the statutes charged in this case do not impose restrictions anything like the hypothetical laws mentioned in *Alvarez*. Nonetheless, the defendant suggests (ECF No. 113 at 7-

8, 12, 15-17) that his statements about the 2020 election are like those hypothesized in *Alvarez* because he gave his "opinion" about what he describes as a "widely disputed historical, social, and political question." *Id.* at 15.[12]  The indictment belies that assertion, showing that the defendant's lies concerned not "philosophy, religion, history, the social sciences, the arts," and the like, 567 U.S. at 751 (Alito, J., dissenting), but instead concrete, specific statements that he knew were false, *see, e.g.*, ECF No. 1 at ¶ 19 ("36,000 non-citizens had voted in Arizona"), ¶ 33 ("more than 10,300 dead people had voted in Georgia"), ¶ 41 ("an illicit dump of more than a hundred thousand ballots in Detroit"), ¶ 46 ("there had been 205,000 more votes than voters in Pennsylvania"); ¶ 52 ("there had been tens of thousands of unlawful votes in Wisconsin").  Moreover, those false statements, unlike the hypothetical false statements mentioned in the *Alvarez* dissent and concurrence, were used to conspire, defraud, and obstruct.  Nor is there any basis for the defendant's suggestion (ECF No. 113 at 17) that proving he committed fraud through false statements would be akin to "dictat[ing]" what he is "required to believe."

> **c.   The indictment does not improperly restrict political speech or discriminate based on viewpoint.**

Starting from the faulty premise that he made only statements about political matters of public concern entitled to "absolute protection" (ECF No. 113 at 12), the defendant contends (*id.*

---

[12] Although the defendant is not charged with merely expressing his opinion on matters of public concern, he is wrong to suggest that statements of opinion may never be false.  "The expression of an opinion not honestly entertained is a factual misrepresentation."  *United States v. Amrep Corp.*, 560 F.2d 539, 543-44 (2d Cir. 1977).  Statements of opinion "may trigger liability for fraud when they are not honestly held by their maker, or when the speaker knows of facts that are fundamentally incompatible with his opinion."  *United States v. Paulus*, 894 F.3d 267, 275 (6th Cir. 2018).  "[T]he expression of an opinion may carry with it an implied assertion, not only that the speaker knows no facts which would preclude such an opinion, but that he does know facts which justify it."  *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 191 (2015) (quotation marks omitted).

at 7-11, 15-16) that the indictment should be dismissed as impermissible viewpoint discrimination. That argument is without merit.

The First Amendment's prohibition of viewpoint discrimination does not foreclose the Government from charging the defendant, or any other defendant, for committing crimes through false statements. Falsity is not a viewpoint. If it were, any statute that prohibits fraud, false statements, or the like would be invalid on its face. Nor does the indictment discriminate against the defendant based on viewpoint merely because he is charged with committing fraud using false statements about the 2020 election.

That many of the defendant's statements about the 2020 election were related to political matters of public concern does not insulate his false and fraudulent statements from the application of the criminal law. It has long been established that "[w]ords alone may constitute a criminal offense, even if they spring from the anterior motive to effect political or social change." *United States v. Freeman*, 761 F.2d 549, 551 (9th Cir. 1985). "Notwithstanding that political speech and religious exercise are among the activities most jealously guarded by the First Amendment, one is not immunized from prosecution for . . . speech-based offenses merely because one commits them through the medium of political speech or religious preaching." *Rahman*, 189 F.3d at 116-17; *see United States v. Turner*, 720 F.3d 411, 420-21 (2d Cir. 2013) (true threat unprotected speech even though it pertained to political matters); *United States v. Amawi*, 695 F.3d 457, 482 (6th Cir. 2012) ("Forming an agreement to engage in criminal activities—in contrast with simply talking about religious or political beliefs—is not protected speech."); *United States v. Hassan*, 742 F.3d 104, 127-28 (4th Cir. 2014) (same); *Concord Mgmt. & Consulting LLC*, 347 F. Supp. 3d at 56 (rejecting claim that charge of conspiracy to defraud the United States infringed on free-speech rights because the defendant engaged in political speech).

The defendant invokes (ECF No. 113 at 12-13) the Supreme Court's decision in *McDonald v. Smith*, 472 U.S. 479 (1985), to argue that his conversations with government officials were protected under the Petition Clause of the First Amendment,[13] but that case in fact confirms that speech is not immune from the application of criminal law simply because it concerns a matter of public importance. The petitioner in *McDonald* had sent a letter to multiple federal officials, including President Ronald Reagan, that allegedly contained false allegations of illegal and unethical conduct by the respondent, who at the time was under consideration for a position as a United States Attorney. *Id.* at 480-81. Rejecting the petitioner's claim of absolute immunity under the Petition Clause, the Court held that the Petition Clause afforded the petitioner the same amount of protection as the Speech Clause and therefore he could be held liable for defamation, which lacks First Amendment protection. *Id.* at 482-85. It made no difference that the letters addressed "matters of public importance," namely the "qualifications of a candidate for United States Attorney." *Id.* at 486 (Brennan, J., concurring). Likewise, there is no basis here to treat fraudulent statements or statements integral to criminal conduct any differently simply because the statements pertain to matters of public importance.[14]

---

[13] The Petition Clause provides a constitutional right to "petition the Government for a redress of grievances." U.S. Const. amend. I.

[14] Although the defendant cites and briefly discusses (ECF No. 113 at 13-14) *McDonnell v. United States*, 579 U.S. 550 (2016), that case lends no support to his First Amendment (or any other) claim. In that case, the Supreme Court defined the statutory term "official act" as used in federal bribery statutes applicable to public officials, with which the defendant is not charged. The Court adopted a narrow construction in part to avoid constitutional problems, identifying a substantial concern that a broader interpretation would "cast a pall of potential prosecution over" the normal relationships between officials and constituents that are an important part of our form of representative government. *Id.* at 574-75. The Court did not mention the First Amendment in its opinion, and the opinion provides no support for the defendant's claim that the First Amendment provides him with a right to commit fraud.

### 2.   The fair notice doctrine does not provide a basis for dismissal.

The defendant contends (ECF No. 113 at 25-31) that the indictment should be dismissed "for violation of the fair notice requirement of the Due Process Clause."  In doing so, he asserts that there is "a long history in our Nation" of presidential elections involving facts purportedly similar to the 2020 presidential election, specifically invoking (*id.* at 25) the elections of "1800, 1824, 1876, 1960, 2000, 2004, and 2016."  He then asserts (*id.*) that his conduct was "fully consistent with" and "inspired by" those examples, adding that because none of those events resulted in criminal prosecutions it would violate his due process rights to convict him here.  The defendant's fraudulent and corrupt conduct as charged in the indictment stands in sharp contrast with the historical examples he cites, and neither history nor law provide a basis to dismiss the charges on fair-notice grounds.

The umbrella term "fair notice" (also sometimes called "fair warning") is embodied in "three related manifestations": (1) "the vagueness doctrine"; (2) "the rule of lenity";[15] and (3) the rule that when a court applies "a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope," that novel construction may not be applied retroactively.  *United States v. Lanier*, 520 U.S. 259, 266 (1997). "In each of these guises, the touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal."  *Id.* at 267.  None of these manifestations of "fair notice" undermines the charges in the indictment.

### a.   The defendant had fair notice that the charged conduct was unlawful.

Although the defendant briefly gestures at vagueness concerns (ECF No. 113 at 26-27), he

---

[15] The rule of lenity has no application here, *see supra* p. 16, and the defendant advances no separate lenity challenge as part of his fair notice claim.

does not actually contend that any of the statutes charged here are void for vagueness.  Nor could he.  *See, e.g.*, *Concord Mgmt. & Consulting LLC*, 347 F. Supp. 3d at 59-60 ("[C]ourts have repeatedly rejected vagueness challenges to § 371 as applied to conspiracies, like this one, to impair lawful government functions."); *United States v. McHugh*, 583 F. Supp. 3d 1, 20-21 (D.D.C. 2022) (rejecting various vagueness challenges to § 1512(c)(2)); *United States v. Price*, 383 U.S. 787, 806 n.20 (1966) ("This Court has rejected the argument that the constitutionality of [§] 241 may be affected by undue vagueness of coverage.").

Moreover, nothing in this case implicates the manifestation of fair-notice that bars retroactive application of a novel judicial construction of a statute.  The defendant suggests (ECF No. 113 at 25-27) that if the Court were to find that the conduct alleged in the indictment fits within the charged offenses, such a finding would be tantamount to "an unforeseeable and retroactive judicial expansion of statutory language that appears narrow and precise on its face," *Rogers v. Tennessee*, 532 U.S. 451, 457 (2001), analogous to the prosecutions at issue in *Bouie v. City of Columbia*, 378 U.S. 347, 354 (1964).  There, South Carolina courts had upheld the convictions of civil rights demonstrators engaged in lunch-counter sit-ins, who were found guilty of criminal trespass under a statute that—on its face and throughout nearly a century of judicial interpretation—applied only to those who illegally entered land after receiving notice of prohibition from the owner, and not to those who, like the defendants, remained somewhere after being asked to leave.  *Bouie*, 378 U.S. at 355-57.  The Supreme Court reversed, explaining that the state courts' expansion of the statute was so "unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue" that Due Process precluded it from having "retroactive effect."  *Id.* at 354 (quotation marks omitted); *see Rogers*, 532 U.S. at 457.

That principle has no bearing on this case.  Nothing about the face of the charged statutes

or their prior judicial constructions suggests that the defendant's conduct fell outside their scope. To the contrary, the statutes plainly prohibit conspiring to defeat a government function through deceit, trickery, or dishonest means, *see Glasser*, 315 U.S. at 66; conspiring and attempting to corruptly obstruct an official proceeding, *see* 18 U.S.C. § 1512(c)(2); and conspiring to violate the right of voters to have their votes lawfully counted, *see Classic*, 313 U.S. at 314, and the conduct alleged in the indictment here falls within the plain language of the charged offenses, *see supra* pp. 4-17 (Count One); pp. 17-22 (Counts Two and Three); pp. 22-25 (Count Four).  Simply applying the facts alleged in the indictment to the well-established statutory elements would not require any sort of novel judicial construction, much less one that would be "unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue." *Rogers*, 532 U.S. at 457 (quoting *Bouie*, 378 U.S. at 354).  Rather, each of the statutes, "either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal."  *Lanier*, 520 U.S. at 267.

The defendant's more targeted attack (ECF No. 114 at 28-31) on Section 241 fares no better.  He relies principally on *Lanier* but misapplies the test for fair notice set out in that case. The defendant in *Lanier* was convicted under 18 U.S.C. § 242, which criminalizes violations of constitutional rights under color of law, for sexually assaulting five women while serving as a state judge.  520 U.S. at 261.  The court of appeals vacated the conviction on the ground that the defendant lacked fair notice that his conduct violated a constitutional right because no Supreme Court decision with "fundamentally similar" facts existed.  *Id*.  The Supreme Court reversed, concluding both that fair notice could be provided by decisions from all federal courts, and that the proper fair-notice inquiry asked whether the "[t]he contours of the right [violated are] sufficiently clear that a reasonable official would understand that what he is doing violates that

right." *Id*. at 268-70 (quotation marks omitted).  Under *Lanier*, therefore, a defendant needs to have fair notice that the constitutional right exists, not that the precise conduct he pursues violates that right.

Prior cases readily supply such fair notice here.  Following *Lanier,* courts confronted with fair notice challenges in Section 241 cases involving voting rights have reviewed prior court decisions not in a search of a fact pattern that matches what the defendant is alleged to have done, but instead to assess whether the right is sufficiently defined such that the defendant has fair notice that interfering with the right falls within the statute.  *See United States v. Mackey*, --- F. Supp. 3d ---, 2023 WL 363595, at *11 (E.D.N.Y. Jan. 23, 2023) (providing extensive analysis of Section 241 notice challenge to a charge of interfering with a presidential election and finding that "§ 241's fair warning doctrine focuses most centrally on the *right* that has been violated—in this case, the right to vote.") (emphasis in original); *United States v. Tobin*, No. 04-cr-216, 2005 WL 3199672, at *2 (D.N.H. Nov. 30, 2005) ("Here, the constitutional right at issue is fundamental—the right to vote.").  Although the defendant quotes only a portion of the relevant language, he acknowledges, as he must, that voting in a presidential election is a fundamental right under the Constitution.  ECF No. 114 at 29 (citing *Bush*, 531 U.S. at 104); *see also Classic*, 313 U.S. at 314 (when state makes primary "an integral part of the procedure for the popular choice of Congressman," it becomes "a right established and guaranteed by the Constitution.").  The states have chosen statewide election as the means to select their presidential electors, and therefore the Constitution protects the right to vote in a presidential election, both directly and under the Equal Protection Clause of the Fourteenth Amendment, including as incorporated into the Due Process Clause of the Fifth Amendment.  *Bolling v. Sharpe,* 347 U.S. 497, 498 (1954).  Section 241 prohibits conspiracies to injure that uncontested right.

Moreover, a long line of prosecutions for interfering with voting rights provided fair notice to the defendant that his conduct, as alleged in the indictment, falls squarely within the heartland of that statute.[16]  The indictment alleges various ways that the defendant and his co-conspirators sought, through fraud and deceit, to violate the rights of voters by setting aside the legitimate outcome of the state's election and discarding legitimate voter and electoral ballots.  As set forth in detail in *Mackey,* 2023 WL 363595, at *11-14, for over a century Section 241 cases have involved efforts to suppress legitimate ballots or change the outcome of elections.  *See, e.g., United States v. Mosley*, 238 U.S. 383, 385 (1915) (election board officials charged with conspiring to discard legitimate ballots); *United States v. Pleva*, 66 F.2d 529, 530 (2d Cir. 1933) (board of elections inspectors charged with falsely tabulating ballots to favor certain candidates; convictions reversed on separate jury grounds); *Classic*, 313 U.S. at 321 ("a conspiracy to prevent the citizen from voting or to prevent the official count of his ballot when cast, is a conspiracy to injure and oppress the citizen in the free exercise of a right secured by the Constitution within the meaning of [the predecessor statute to § 241]"); *United States v. Saylor*, 322 U.S. 385, 386 (1944) (election officers charged with interfering with ballots); *United States v. Skurla*, 126 F. Supp. 713, 715 (W.D. Pa. 1954) (defendants charged with various acts of interference with ballots); *United States v. Townsley*, 843 F.2d 1070, 1073-75 (8th Cir. 1988) (scheme to discard certain absentee ballots). These cases—as well as other voting rights prosecutions—demonstrate that while interference with voting rights can take any number of forms, it is well established that acts to interfere with ballots or to attempt to alter vote outcomes through fraud and deceit fall squarely within Section

---

[16] While the defendant concedes that the right to vote is clearly established, he describes (ECF No. 114 at 29) his conduct as "contesting an election through lawful means, including by public statements, court challenges, or alternate slates of electors."  That description mischaracterizes the indictment.

241, providing the defendant with fair notice.

The defendant's misplaced reliance on *United States v. Bathgate*, 246 U.S. 220 (1918), and *United States v. Bradberry*, 517 F.2d 498 (7th Cir. 1975), does not undercut this conclusion. As explained in *Mackey*, 2023 WL 363595, at *12 & n.10, *Bathgate* held that Section 241 did not extend to bribing voters, because Congress had repealed a nearby statutory provision that addressed bribery, and protected only the personal right to vote, which the voters in *Bathgate* had exercised. 246 U.S. at 226-27. But the relevant part of *Bathgate* was abrogated by *Saylor*, 322 U.S. at 389, and *Bradberry* is likewise inapposite, as it held not that there was a problem with the charge in the case, but rather with the proof at trial: while the Government charged a conspiracy to interfere in a federal election, it proved only vote fraud in a state and local election. 517 F.2d at 500 ("The offense charged in the indictment was not proved."). In sum, the defendant had fair notice that his conduct, as alleged in the indictment, was a violation of Section 241.

> **b.    The defendant's historical examples do not raise fair notice concerns.**

The defendant's attempt (ECF No. 113 at 25) to avoid this conclusion by pointing to "a long history" of purportedly similar conduct in past elections, claiming that the absence of prosecutions stemming from these elections somehow precludes him from having "fair notice" of the charges here, fails in at least two respects. First, the absence of prior prosecutions is not equivalent to a line of judicial precedent treating the conduct at issue as non-criminal, and the concept of "fair notice" does not require "the extreme level of factual specificity," *Lanier*, 520 U.S. at 268, that the defendant envisions. Second, the defendant's invocation of history fails on its own terms.[17] As set forth below, even a brief review of the seven elections the defendant cites

---

[17] At this stage of the proceedings, what might have "inspired" (ECF No. 113 at 25) the defendant's actions is irrelevant. The issue of the defendant's intent is a matter for trial, and

demonstrates just how dissimilar, and historically aberrant, the defendant's conduct was in this case.

The 1800 Election.  In the election of 1800 (*see* ECF No. 113 at 25, 29, 31; ECF No. 114 at 30, 31), Thomas Jefferson—the sitting vice-president and a presidential candidate—was presiding over the joint session when he observed that Georgia's envelope contained only a single sheet of paper, which was a technically defective electoral ballot "written on the back of the certificate of ascertainment."  *See* Bruce Ackerman & David Fontana, *How Jefferson Counted Himself In*, The Atlantic (Mar. 2004).  Despite these technical defects, Jefferson counted the votes, which were four each for himself and Aaron Burr.  *Id.*  By all accounts, Jefferson's decision furthered the will of the voters and the actions of the electors: newspaper articles "had consistently placed Georgia in the Republican—that is, Jeffersonian—column in their reports of election results"; the "members of Georgia's congressional delegation—two of whom were Federalists—were present" and raised no objection, as they surely would have done had "they believed their state's votes had been placed in the wrong column"; and more recent investigation has confirmed "that the defects in the state's ballot were merely the result of frontier lawyering," leaving "no doubt that the electors intended to vote for the Republican ticket."  *Id.*  Jefferson's decision to count the ballot despite its technical defects was also consistent with his conviction, expressed to James Madison in 1796, that ignoring the "choice of the people substantially expressed" would risk "the phaenomenon of a Pseudo-president."  *Id.*  That the Vice President, in an age before mass communication, had to rely on news reports and the absence of objections to ensure that he was accurately counting the votes from the duly appointed electors does not remotely suggest that the

whether his intent was informed by any historical examples would require, at the very least, evidence that the defendant was aware of them.

Vice President has unilateral authority to reject the votes from the duly appointed electors and accept fraudulent electoral votes that, as the defendant acknowledges elsewhere (ECF No. 114 at 9-10), plainly lacked any state backing.  Such a course would have resulted in electing what Jefferson referred to as a "Pseudo-president."

The 1824 Election.  In the election of 1824 (*see* ECF No. 113 at 25, 29-30, 31), four presidential candidates received electoral votes, with Andrew Jackson receiving 99 votes; John Quincy Adams receiving 84 votes; William H. Crawford receiving 41 votes; and Henry Clay receiving 37 votes.  Because no candidate received "a majority of the whole number of Electors appointed," the election was sent to the House to choose the president from among the top three candidates.  U.S. Const. amend. XII.  Clay, who was disqualified from consideration based on his fourth-place finish, eventually supported Adams, who was elected.  *See* Rami Fakhouri, *The Most Dangerous Blot in Our Constitution: Retiring the Flawed Electoral College 'Contingent Procedure'*, 104 Nw. U. L. Rev. 705, 719-20 (2010).  Adams later appointed Clay as Secretary of State.  *Id.*  And while Clay "vehemently denied" the rumor that he had bargained away his support in exchange for the appointment, Jackson described the rumored Adams-Clay agreement as a "corrupt bargain."  *Id.*  Although the defendant claims that both the election of 1824 and 2020 involved "lobb[ying]" by one of the presidential candidates (ECF No. 113 at 29-30), that generalized and superficial similarity masks crucial distinctions, including that the 1824 election genuinely failed to produce an electoral college winner, resulting in a constitutionally mandated resolution by the House.  No evidence suggests that any candidate engaged in corrupt and fraudulent conduct to obstruct an accurate count of the electoral votes.

The 1876 Election.  In the election of 1876 (*see* ECF No. 113 at 25, 29, 31; ECF No. 114 at 30), three Reconstruction-era southern states sent competing slates of electors to Congress, with

Oregon also sending competing slates for one of its votes. *See Bush*, 531 U.S. at 155 (Breyer, J., dissenting); Nathan L. Colvin & Edward B. Foley, *Lost Opportunity: Learning the Wrong Lessons from the Hayes-Tilden Dispute*, 79 Fordham L. Rev. 1043, 1045-46 (2010). In Florida, for example, the "state canvassing board declared" that Rutherford B. Hayes had "won the state by 924 votes"—but the electors for Samuel Tilden quickly filed suit and "'obtained a ruling from a state trial court that they'" were in fact the rightful electors. *See* John Copeland Nagle, *How Not to Count Votes*, 104 Colum. L. Rev. 1732, 1741-42 (2004). In all, 20 electoral votes were in dispute, enough to sway the outcome. *Id.* To resolve the dispute, Congress established an Electoral Commission composed of five senators, five representatives, and five Supreme Court justices. *Id.* at 1743-44. The Commission ultimately voted 8-7 to award all 20 disputed electoral votes to Hayes, making him the victor. *Id.* at 1747. The Electoral Count Act was enacted ten years later "for the explicit purpose . . . of preventing a repetition of 'the year of disgrace, 1876,' in which a 'cabal had determined to debauch the Electoral College.'" Theodore B. Olson, *The Supreme Court & the Presidency*, 9 Green Bag 2d 139, 145 (2006) (quoting 18 Cong. Rec. 30 (Dec. 7, 1886) (remarks of Rep. Caldwell)) (internal punctuation omitted). That a Reconstruction-era election produced a dispute over which electors were duly appointed—triggering "a true crisis," Colvin & Foley, *supra*, at 1046, that prompted enactment of the Electoral Count Act—does not remotely imply that, under the Electoral Count Act, a candidate can rely on a slate of fraudulent electors lacking any state imprimatur to discount the votes of the duly appointed electors and generate the illusion of a crisis.

The 1960 Election. In the election of 1960 (*see* ECF No. 113 at 25, 29, 31; ECF No. 114 at 30, 31), which was Hawaii's first election as a state, the initial vote count there indicated that Richard Nixon had narrowly defeated John F. Kennedy "by a mere 141 votes out of some 184,000

cast."  L. Kinvin Wroth, *Election Contests and the Electoral Vote*, 65 Dick. L. Rev. 321, 341 (1961).  While a court-ordered recount was underway, and with the outcome still hanging in the balance, slates of electors for both candidates met, voted, and sent their ballots to Congress, with the acting governor's certificate of ascertainment accompanying the ballot of the Nixon electors, in accordance with the then-controlling official count. *Id.*; *see* 107 Cong. Rec. 289 (Jan. 6, 1961) (noting first certificate of ascertainment, dated Nov. 28, 1960, reflecting 141-vote lead for Nixon).  On December 30, 1960, the court overseeing the recount formally found that Kennedy "had prevailed by 115 votes."  Wroth, *supra*, at 341.  On January 4, 1961, the acting governor "forwarded to the Administrator of General Services a copy of the court decree and his revised certificate, validating" the Kennedy electors as the ones who were duly appointed. *Id.*; *see* 107 Cong. Rec. 289 (Jan. 6, 1961) (noting court judgment and second certificate of ascertainment, dated Jan. 4, 1961, reflecting 115-vote victory for Kennedy).  After considering these documents, Vice President Nixon, presiding over the joint session, found that the second certificate of ascertainment, "properly and legally portrays the facts with respect to the electors chosen by the people of Hawaii at the election for President and Vice President held on November 8, 1960." 107 Cong. Rec. 290 (Jan. 6, 1961).  Without objection, he therefore "instruct[ed] the tellers . . . to count the votes" in the acting governor's second certificate of ascertainment, awarding Hawaii's votes to Kennedy.  *Id.*  The fact that the 1960 election involved a state revising its certificate of ascertainment to reflect the outcome of a court-supervised recount in no way implies that a candidate may corruptly submit a fraudulent slate of electors and endeavor to have the Vice President treat it as valid when it lacks any state-backed legitimacy and all legal challenges to the election have been rejected in court.

The 2000 Election.  In the election of 2000 (*see* ECF No. 113 at 25, 30, 31; ECF No. 114

at 29, 31), the initial vote count showed that George W. Bush won Florida by a margin of 1,784 over Al Gore. *See Bush*, 531 U.S. at 100-01. That narrow margin triggered an "automatic machine recount, . . . the results of which showed Governor Bush still winning the race but by a diminished margin." *Id.* at 101. Gore "then sought manual recounts" in several counties, which the Supreme Court eventually halted, finding that "the use of standardless manual recounts" violated the Equal Protection Clause. *Id.* at 101-03. On December 13, 2000, the day after *Bush v. Gore* was decided, Rep. Patsy T. Mink, from Hawaii, described the ruling as "most unfortunate" and argued, unsuccessfully, that "[t]he precedent" of Hawaii's 1960 electoral votes established a better approach for completing a court-supervised recount and certifying the results before the joint session. 146 Cong. Rec. E2179-80 (daily ed. Dec. 13, 2000). When the electoral votes from Florida were counted on January 6, 2001, several representatives sought to object, but Vice President Gore, presiding over the joint session, overruled each objection. 147 Cong. Rec. 104-06 (Jan. 6, 2001). The defendant contends that, because the Supreme Court, in *Bush v. Gore*, "indicated that the parties had taken an appropriate route to resolve the dispute," ECF No. 114 at 29, it follows that his chosen route was somehow also appropriate. But the candidates in the 2000 election litigated their disputes in court and then abided by the results, in accordance with the rule of law. By contrast, after courts rejected the defendant's efforts to change the outcome of the election, he persisted in his efforts to fraudulently and corruptly obstruct the certification of the duly elected winner.

The 2004 Election. Following the election of 2004 (*see* ECF No. 113 at 25, 28), Rep. Stephanie Tubbs Jones of Ohio raised an objection, signed by Sen. Barbara Boxer, to the counting of Ohio's electoral votes at the joint session. 151 Cong. Rec. 199 (Jan. 6, 2005).[18] When Congress

---

[18] As the sources cited by the defendant note (ECF No. 113 at 28 n.7), "Sen. John Kerry,

went to separate session, Rep. Jones explained, "This objection does not have at its root the hope or even the hint of overturning the victory of the President; but it is a necessary, timely, and appropriate opportunity to review and remedy the most precious process in our democracy," the right to vote. *Id.* After the separate sessions ended, Ohio's elector votes were counted for President Bush. This self-styled protest vote by a member of Congress was not remotely analogous to an attempt from outside Congress to corruptly obstruct the certification process through fraud.

The 2016 Election. Following the election of 2016 (*see* ECF No. 113 at 25, 27, 28), several representatives attempted to object to the counting of electoral votes for the defendant at the joint session. 163 Cong. Rec. H186-H189 (daily ed. Jan. 6, 2017). Each time, Vice President Biden, who was presiding over the joint session, refused to entertain the objection. *E.g.*, *id.* at H186 ("The VICE PRESIDENT: There is no debate. There is no debate. . . . It is over."). Again, nothing about those unsuccessful protest votes by members of Congress is analogous to an attempt from outside Congress to corruptly obstruct the certification process through fraud.

Taken together, these historical examples stand for several unremarkable propositions, none of which support the defendant's motion to dismiss. There have been times, as in 1800, 1876, and 1960, when genuine questions have arisen over which slate of electors from a particular state has been duly appointed. On one occasion, Thomas Jefferson accurately concluded that Georgia's electoral ballot (which included a certificate of ascertainment) was genuine; on another occasion, Richard Nixon accurately concluded that Hawaii's second certificate of ascertainment—issued after the recount was completed, but prior to the joint session—correctly reflected the state's lawful

---

the Democratic nominee for president, released a letter Wednesday saying he would not take part in the protest. 'Our legal teams on the ground have found no evidence that would change the outcome of the election,' Kerry said." *See Democrats Challenge Ohio Electoral Votes*, CNN.com (Jan. 6, 2005), at https://www.cnn.com/2005/ALLPOLITICS/01/06/electoral.vote.1718/.

final allocation of electoral votes; and on one occasion, in 1876, Congress resorted to an independent commission (whose failure spawned the Electoral Count Act) when faced with competing state-backed electoral slates.  There have also been times, as in 1824, when the failure of any candidate to obtain a majority of electoral votes has thrown the election to the House of Representatives.  And there have been times, as in 2000, 2004, and 2016, when those dissatisfied with the results have sought to raise objections to the electoral vote count, resulting in either the objections being overruled or, in one case, a brief adjournment designed as an Ohio-focused protest vote without "the hope or even the hint of overturning the victory of the President."  151 Cong. Rec. 199 (Jan. 6, 2005).  Notably absent from any of these historical episodes, however, is any attempt by any person to use fraud and deceit to obstruct or defeat the governmental function that would result in the certification of the lawful winner of a presidential election.  The existence throughout history of legitimate electoral disputes does not validate the defendant's corrupt and dishonest actions any more than the existence of legitimate investment offers validates the creation of a criminal Ponzi scheme.  The Court should reject the defendant's claim that these fundamentally dissimilar historical examples somehow robbed him of "fair notice" that his scheme could be criminal.

> **3.**     **Neither the Impeachment Judgment Clause nor the Double Jeopardy Clause precludes criminal prosecution here.**

The defendant argues (ECF No. 113 at 18-24) that the Impeachment Judgement Clause and the Double Jeopardy Clause foreclose his criminal prosecution in this case because of his impeachment by the House followed by his acquittal by the Senate.  Those arguments are entirely meritless.

The text and history of the Impeachment Judgment Clause demonstrate that it was intended to limit congressional sanction for impeachment to removal and disqualification from office, not

to create a double-jeopardy prohibition that protected an impeached but not convicted officer from criminal prosecution. Structural considerations—including the special function of impeachment within the constitutional separation of powers and the distinction between impeachment verdicts and criminal verdicts—reinforce the conclusion that the Impeachment Judgment Clause permits prosecution of a former president impeached by the House but acquitted by the Senate.

Nor is the prosecution here barred by the Double Jeopardy Clause, which states that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. Because the only remedies available in the impeachment proceedings were removal and disqualification, the defendant was never previously placed in jeopardy of life or limb, so the Double Jeopardy Clause is entirely inapplicable. And even if the Clause did apply, the criminal prosecution in this case does not charge the same offense as was at issue in the defendant's impeachment trial in February 2021. The defendant's double-jeopardy claim is frivolous, and the Court should so find in denying the defendant's motion.

### a.  Background

Five days after the attack on the United States Capitol on January 6, 2021, the United States House of Representatives adopted a single-article resolution to impeach the defendant for high crimes and misdemeanors. H.R. Res. 24, 117th Cong. (Jan. 11, 2021) ("Impeachment Resolution"). Specifically, the Impeachment Resolution alleged that the defendant violated his "constitutional oath faithfully to execute the office of President of the United States . . . by inciting violence against the Government of the United States." *Id.* at 3. Two days after adopting the Impeachment Resolution, the House voted to impeach the defendant. 167 Cong. Rec. H191-92 (daily ed. Jan. 13, 2021).

The Impeachment Resolution moved to an impeachment trial in the Senate after the defendant's term in office had ended, with the Chief Justice presiding. *See* U.S. Const. art. I, § 3,

cl. 6.  The only two possible remedies available in that proceeding were "removal from Office, and disqualification to hold and enjoy any Office of honor, Trust or Profit under the United States," U.S. Const. art. I, § 3, cl. 7—not imprisonment, supervised release, or a fine.  In his trial memorandum in the Senate, the defendant advanced two principal arguments.  First, he contended that the Senate lacked jurisdiction to conduct an impeachment trial for a former president.  *See In re Impeachment of Former President Donald J. Trump*, Trial Memorandum of Donald J. Trump, S. Doc. 117-2 at 122-39 (Feb. 8, 2021) ("Impeachment Trial Memorandum").  Second, the defendant argued that the First Amendment protected his speech at the Ellipse on January 6.  *Id.* at 146-75.  On February 13, 2021, 57 Senators voted to convict, and 43 Senators voted to acquit, 167 Cong. Rec. S733 (daily ed. Feb. 13, 2021), which resulted in an acquittal in light of the constitutional requirement of a two-thirds majority to convict at a Senate impeachment trial, *see* U.S. Const. art. I, § 3, cl. 6.

On August 1, 2023, a grand jury charged the defendant with the four offenses described above.  Each offense includes a potential term of imprisonment, supervised release, and a fine.  The indictment did not charge the defendant with an incitement offense.  *See, e.g.*, 18 U.S.C. § 2383 (criminal prohibition for inciting, assisting, or engaging in any "rebellion or insurrection against the authority of the United States").

> **b.    The Impeachment Judgment Clause does not preclude prosecution here.**

The Impeachment Judgment Clause's text and history demonstrate that its two-fold aim was to limit the potential punishments that Congress could impose following impeachment and conviction while also ensuring that a former federal officer does not escape accountability for criminal wrongdoing.  Understood within the Constitution's structure, the Impeachment Judgment

Clause permits criminal prosecution where, as here, a defendant has been impeached by the House but not convicted by the Senate.

>i.     **The Impeachment Judgment Clause's text and history support criminal prosecution of an officer who has been impeached by the House but acquitted by the Senate.**

The defendant first contends (ECF No. 113 at 18-23) that constitutional text bars his criminal prosecution following his impeachment by the House of Representatives and acquittal at a Senate trial.  That contention misreads the constitutional text and misapprehends the relevant history.

The Constitution provides for a president's removal through "impeachment for, and conviction of, treason, bribery, or other high crimes and misdemeanors."  U.S. Const. art. II, § 4 (capitalization altered).  The Constitution's Impeachment Judgment Clause specifies limitations on the consequences that the Senate may impose after a conviction, and makes clear that criminal prosecution—indictment, trial, and sentencing—may follow such a conviction by the Senate:

> Judgment in Cases of Impeachment shall not extend further than to removal from Office, and disqualification to hold and enjoy any Office of honor, Trust or Profit under the United States: but the Party convicted shall nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law.

U.S. Const. art. I, § 3, cl. 7.

The Impeachment Judgment Clause's two parts reflect its related objectives.  The first clause—which limits "Judgment in Cases of Impeachment" to removal and disqualification, U.S. Const. art. I, § 3, cl. 7—empowers Congress to impose a political sanction for removal without enabling the Legislative Branch to exact criminal punishment.[19]   The second clause—which

---

[19] Clarifying that Congress could not exact criminal penalties following impeachment distinguished the American approach from Britain, where Parliament could impose "a wide array of criminal penalties, including fines, imprisonment, and even execution."  Randolph D. Moss,

"nevertheless" subjects the officer in question to "Indictment, Trial, Judgment and Punishment, according to Law," U.S. Const. art. I, § 3, cl. 7—clarifies that, although Congress may not criminally prosecute, the officer in question, including a former president, is "liable to prosecution and punishment in the ordinary course of law." *The Federalist No. 69*, at 384 (Alexander Hamilton) (Clinton Rossiter ed., 1999). Read together, those two clauses constrain the range of potential sanctions available to Congress following impeachment but place no corresponding limits beyond those prescribed "according to Law" on post-impeachment criminal prosecution.

That straightforward textual reading of the Impeachment Judgment Clause finds ample historical support. For example, James Wilson, a participant at the Constitutional convention and later a Supreme Court Justice, responded in the 1787 Pennsylvania ratifying convention to the argument that the Senate would be unlikely to impeach and remove through Senate conviction fellow Senators by observing that, "Though they may not be convicted on impeachment before the Senate, they may be tried by their country; and if their criminality is established, the law will punish." 2 *The Documentary History of the Ratification of the Constitution* 492 (Merrill Jensen et al., eds. 1976). Similarly, Edward Pendleton, who served as President of the Virginia Supreme Court and the Virginia ratifying convention, observed in a letter to James Madison that the impeachment power "is in the hands of the House of Representatives, who will not use it in the case Supposed, or if they do, and meet the obstruction, may yet resort to the courts of Justice, as an Acquital [sic] would not bar that remedy." *See id.* at 1773 (Letter from Edmund Pendleton to James Madison, Oct. 8, 1787). And that view was likewise shared by Representative Samuel

---

*Whether a Former President May Be Indicted and Tried for the Same Offenses for Which He Was Impeached by the House and Acquitted by the Senate*, 24 Op. O.L.C. 110, 120 (Aug. 18, 2000); *see id.* at 117 ("Breaking with English practice, in which the House of Lords could impose regular criminal punishments up to death, the framers provided that the Senate could do no more than remove an offender from office and disqualify him from future federal officeholding.").

Dana, a participant in the first federal impeachment trial—of Senator William Blount of Tennessee in 1798—who observed that an impeachment conviction "has no connexion with punishment or crime, as, whether a person tried under an impeachment be found guilty or acquitted, he is still liable to a prosecution at common law." 9 Annals of Congress 2475 (1798). Finally, Justice Joseph Story in his canonical treatise on the Constitution explained that the Constitution separated an impeachment trial (with its exclusive remedies of removal and disqualification) from a trial "in the common tribunals of justice" to ensure that "a second trial for the same offence could be had, either after an acquittal, or a conviction in the court of impeachments." 2 Joseph Story, *Commentaries on the Constitution of the United States* §§ 780-81 (1833). Otherwise, "if no such second trial could be had, then the grossest official offenders might escape without any substantial punishment, even for crimes, which would subject their fellow citizens to capital punishment." *Id.* at § 781.

> **ii.** **Structural considerations support that textual and historical conclusion.**

Three structural considerations bolster the textual and historical evidence demonstrating that the Impeachment Judgment Clause does not bar the criminal prosecution of a former president acquitted at a Senate trial. *See* Randolph D. Moss, *Whether a Former President May Be Indicted and Tried for the Same Offenses for Which He Was Impeached by the House and Acquitted by the Senate*, 24 Op. O.L.C. 110, 130-34 (Aug. 18, 2000) ("OLC Op.").

First, "[i]mpeachment and criminal prosecution serve entirely distinct goals." *Id.* at 130; *see Hastings v. United States Senate*, 716 F. Supp. 38, 42 (D.D.C. 1989) (Impeachment Judgment Clause reflects the "separate and different roles for the executive's power of prosecution and the legislature's impeachment powers"). Impeachment provides Congress with a political check on the Executive Branch to address through removal the "misconduct of public men" for "injuries

done immediately to the society itself." *The Federalist No. 65*, at 364.  The Constitution's limitation of Congress's sanction to removal and disqualification reflects the view that "the national legislature is not to be trusted with dispensing criminal punishments, sanctions aimed not at protecting the integrity of the government's operations but at penalizing individuals by taking away their life, liberty, or property."  OLC Op. at 130.  By contrast, the Executive Branch is constitutionally entrusted with the "power of prosecution," *Hastings*, 716 F. Supp. at 42, to enforce the violation of congressionally passed penal statutes.  Neither branch's independent action, however, can "effectively prevent," *id.*, the other branch from acting.

Second, acquittal in a Senate impeachment trial may reflect a technical or procedural determination rather than a factual conclusion that the official in question did not commit the alleged acts.  OLC Op. at 131.  That is true of the defendant's impeachment proceedings.  As the Government has noted elsewhere (ECF No. 109 at 14-15), at least 31 of the 43 Senators who voted to acquit the defendant explained that their decision to do so rested in whole or in part on their agreement with the defendant's argument that the Senate lacked jurisdiction to try him because he was no longer in office.[20]  Several Senators who voted against conviction on jurisdictional grounds emphasized the defendant's criminal responsibility for the events of January 6.  *See, e.g.*, 167 Cong. Rec. S736 (daily ed. Feb. 13, 2021) (Sen. McConnell) (explaining that his vote was based on the view that the Senate lacked jurisdiction and stating that the defendant "is still liable for everything he did while he was in office, "as an ordinary citizen" and that, "We have a criminal justice system in this country. We have civil litigation, and former presidents are not immune from

---

[20] *See* Statements on February 13, 2021, from Senators Barrasso, Blunt, Boozman, Braun, Cornyn, Cramer, Crapo, Daines, Ernst, Fisher, Grassley, Hoeven, Hyde-Smith, Inhofe, Kennedy, Lankford, Lee, Lummis, McConnell, Moore, Moran, Portman, Risch, Rounds, Rubio, Shelby, Sullivan, Thune, Tillis, Tuberville, and Wicker.

being held accountable by either one."); Sen. Thom Tillis, Tillis Statement on Impeachment Trial
(Feb. 13, 2021)[21] ("An impeachment trial is not the best or only way to hold a former elected
official accountable for their actions. The ultimate accountability is through our criminal justice
system where political passions are checked and due process is constitutionally mandated. No
president is above the law or immune from criminal prosecution, and that includes former
President Trump.").  Those votes and statements make clear that Senators were not adjudicating
the defendant's factual guilt, but rather relying on a technical judgment about the scope of the
Senate's jurisdiction and a "political judgment" about what constitutes "high crimes and
misdemeanors" and whether removal and disqualification best serve the country "at a particular
moment in our nation's history."  OLC Op. at 132-33.  The defendant's criminal prosecution thus
does not "second-guess" (ECF No. 113 at 23) the Senate on a question of criminal liability.

Third, allowing a Senate acquittal to bar future criminal prosecution would undermine the
framers' endeavor to address the "concern that partisan loyalties or popular sentiment might
influence the Senate's decision to convict or acquit."  OLC Op. at 133.  As the defendant observes,
impeachment proceedings may "agitate the passions of the whole community" and "divide it into
parties, more or less friendly or inimical" (ECF No. 113 at 21 (quoting *The Federalist No. 65*, at
365) (emphasis omitted)).  Because the framers recognized that "partisanship and transitory
political passions" could induce the Senate to convict or to acquit, OLC Op. at 134, they decoupled
the judgment at an impeachment trial from criminal prosecution to prevent those passions from
dictating any subsequent criminal proceedings.  *See id.* ("Just as the possibility of partisan
convictions helps explain the limitation on impeachment punishments and the lifting of the double

---

[21] https://www.tillis.senate.gov/2021/2/tillis-statement-on-impeachment trial.

- 54 -

jeopardy bar for Senate convictions, so the possibility of partisan acquittals supports the lifting of the double jeopardy bar for Senate acquittals.").

### iii.        The defendant's counterarguments lack merit.

The defendant's counterarguments fail.  First, as noted in the Government's response to the defendant's motion to dismiss on presidential immunity grounds, ECF No. 109 at 13-14, the defendant's reliance (ECF No. 113 at 19-20) on an asserted negative implication—that the phrase "Party convicted" in the Impeachment Judgment Clause requires that an officer be both impeached and convicted before that officer may face criminal prosecution—is misplaced.  The prior portion of the Clause specifies the permissible consequences for a party convicted by the Senate.  The portion of the Clause on which the defendant relies then makes clear that such a party is subject to criminal prosecution.  The text does not speak to acquittal at all.  Moreover, the asserted negative implication cannot overcome the historical evidence and structural considerations indicating that the Impeachment Judgment Clause was intended to limit congressional sanctions for impeachment to removal and disqualification from office, not to preclude the prosecution of an impeached but not convicted officer.  *See United States v. Claiborne*, 727 F.2d 842, 846 (9th Cir. 1984) (per curiam) (Impeachment Judgment Clause "was intended 'to assure that after impeachment a trial on criminal charges is not foreclosed by the principle of double jeopardy'") (quoting *United States v. Isaacs*, 493 F.2d 1124, 1142 (7th Cir. 1974) (per curiam)); *Thompson v. Trump*, 590 F. Supp. 3d 46, 86-87 (D.D.C. 2022).

Likewise misplaced is the defendant's reliance (ECF No. 113 at 19) on Justice Alito's dissenting opinion in *Trump v. Vance*, 140 S. Ct. 2412 (2020), because even taking that dissenting view on its own terms, it lends no support to the defendant's argument.  As Justice Alito noted, *Vance* concerned "whether the Constitution imposes restrictions on a State's deployment of its criminal law enforcement powers"—and specifically, the issuance of a subpoena—"against a

sitting President." *Id.* at 2439-40 (Alito, J., dissenting). In setting out his view that a state should have to satisfy a higher standard to justify a criminal subpoena to a sitting president, Justice Alito emphasized that the impeachment provisions suggest that a sitting president "may not be prosecuted while in office," *id.* at 2444, a position long accepted by the Department of Justice, *see generally* Randolph D. Moss, *A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. 222 (Oct. 16, 2000); Robert G. Dixon, Jr., *Amenability of the President, Vice President and other Civil Officers to Federal Criminal Prosecution while in Office* (Sept. 24, 1973). When referring to the Impeachment Judgment Clause, therefore, Justice Alito was making the point—not in dispute in this case—that a sitting president may not face prosecution "during or prior to the Senate [impeachment] trial." *Vance*, 140 S. Ct. at 2444 (Alito, J., dissenting). Understood in that context, Justice Alito's observation that criminal prosecution of a president "is a consequence that can come about only after the Senate's judgment," *id.*, simply reflects his (and the Government's) view that a sitting president is not subject to criminal prosecution.

Finally, the defendant's invocation (ECF No. 113 at 21-22) of judicial immunity repeats the same misstatement of the law that he advanced when seeking dismissal on presidential immunity grounds. *See* ECF No. 74 at 17-18*; see also* ECF No. 109 at 23-27 (addressing the defendant's argument). Although judges, like former presidents, are absolutely immune from civil damages for official conduct while in office, they are "subject to criminal prosecutions as are other citizens." *Dennis v. Sparks*, 449 U.S. 24, 31 (1980); *see* ECF No. 109 at 23-27 (explaining the parallel between judges, who have absolute civil immunity for official conduct but are subject to criminal prosecution, and former presidents). Judges have thus faced criminal prosecution before impeachment, *see Nixon v. United States*, 506 U.S. 224, 226-27 (1993) (federal judge convicted

for making false statements after which Congress instituted impeachment proceedings, which then resulted in his impeachment); *United States v. Nixon*, 816 F.2d 1022, 1031 (5th Cir. 1987) (affirming perjury conviction of same federal judge); *Hastings*, 716 F. Supp. at 41 (rejecting judge-defendant's argument that his acquittal at a criminal trial precluded his impeachment), and in the absence of impeachment proceedings, *see United States v. Collins*, 972 F.2d 1385, 1392-94, 1415 (5th Cir. 1992) (affirming bribery, obstruction of justice, and conspiracy convictions of federal judge who accepted bribes in exchange for agreeing to impose a lenient sentence and resigned before impeachment proceedings began); *United States v. Manton*, 107 F.2d 834, 838, 850 (2d Cir. 1939) (conviction after resignation in the absence of impeachment).  The single line in the Supreme Court's decision in *Bradley v. Fisher*, 80 U.S. 335, 354 (1871), a civil case that the defendant twice cites (ECF No. 113 at 21-22), suggesting that a judge may "only be reached by public prosecution in the form of impeachment, or in such other form as may be specially prescribed," does not—given the express mention of other forms, such as criminal laws, that may be prescribed—imply that judges are immune from criminal prosecution, as subsequent Supreme Court decisions have confirmed.  *See Dennis*, 449 U.S. at 31; *Mireles v. Waco*, 502 U.S. 9, 9, 10 n.1 (1991) (per curiam); *Ex Parte Commonwealth of Virginia*, 100 U.S. 339, 348 (1879).[22]  The same is true for the defendant.

### c.   The Double Jeopardy Clause does not preclude prosecution here.

The defendant separately argues (ECF No. 113 at 23-24) that the Double Jeopardy Clause precludes his criminal prosecution in light of the acquittal at his Senate impeachment trial because

---

[22] Nor does the reference in *Spalding v. Vilas*, 161 U.S. 483, 494 (1896), to "indictment" aid the defendant's argument.  *Spalding* was a civil case, and that portion of that decision was citing a state case from 1810.  *See Yates v. Lansing*, 5 Johns. 282 (N.Y. Sup. Ct. 1810), *aff'd,* 9 Johns. 395 (N.Y. 1811).

both Congress and the Executive Branch are part of the same sovereign, and Congress has already "absolved him" (*id.* at 24) of any criminal conduct.  That argument fails for at least two reasons.  First, the defendant does not explain how removal and disqualification from office amounts to a criminal sanction so as to put him jeopardy.  Second, even assuming that Congress and the Executive Branch are the same sovereign, given that the article of impeachment alleged incitement, the defendant offers no plausible argument that he was acquitted in the Senate of the same offenses charged in the indictment.  The Court should reject the defendant's double-jeopardy claim and find expressly that it is frivolous.

i.      **The Double Jeopardy Clause does not apply because the penalty for congressional impeachment and conviction is civil, not criminal.**

The defendant's double-jeopardy claim fails because the penalty following impeachment—removal and disqualification from office—is not criminal.  The Double Jeopardy Clause does not preclude the imposition of any penalty "that could, in common parlance, be described as punishment"; instead, it guards only against "imposition of multiple *criminal* punishments for the same offense."  *Hudson v. United States*, 522 U.S. 93, 99 (1997) (quotation marks omitted).  To determine whether a penalty—typically as set out in a law enacted by a legislature—is criminal or civil proceeds in two steps.  First, courts assess whether the legislature, "in establishing the penalizing mechanism, indicated either expressly or impliedly a preference" for labelling the penalty as civil or criminal.  *United States v. Ward*, 448 U.S. 242, 248 (1980); *cf. Johnson v. Quander*, 440 F.3d 489, 501 (D.C. Cir. 2006) (assessing whether the purpose of a District of Columbia law directing the collection of DNA was "punitive").  Second, even where the legislature intended to enact a civil penalty, courts must determine whether that penalty is nonetheless "so punitive either in purpose or effect . . . as to transform what was clearly intended as a civil remedy into a criminal penalty."  *Hudson*, 522 U.S. at 99 (brackets and quotation marks

omitted).  The Supreme Court in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1965), set out

seven factors as "useful guideposts," *Hudson*, 522 U.S. at 99, to determine whether a nominally

civil penalty is criminal: (1) "[w]hether the sanction involves an affirmative disability or restraint";

(2) "whether it has historically been regarded as a punishment"; (3) "whether it comes into play

only on a finding of *scienter*"; (4) "whether its operation will promote the traditional aims of

punishment—retribution and deterrence"; (5) "whether the behavior to which it applies is already

a crime"; (6) "whether an alternative purpose to which it may rationally be connected is assignable

for it"; and (7) "whether it appears excessive in relation to the alternative purpose assigned."  372

U.S. at 168-69; *see Johnson*, 440 F.3d at 502-03 (applying *Mendoza-Martinez* factors and

concluding that DNA collection statute was punitive in "neither purpose nor effect").  "'[O]nly the

clearest proof' will suffice to override legislative intent and transform what has been denominated

a civil remedy into a criminal penalty."  *Hudson*, 522 U.S. at 100 (quoting *Ward*, 448 U.S. at 249).

The defendant cannot come close to showing that removal and disqualification from office

is a criminal penalty.  First, the historical evidence above showing that the framers intended that

Congress could not impose the type of criminal sanctions following impeachment that the British

Parliament could exact, *see supra* p. 50 n.19, indicates that the framers did not intend to create a

criminal sanction.  Indeed, the framers initially considered adopting language in the Constitution

that provided that "No person shall be subject, except in cases of impeachment, to more than one

punishment or one trial for the same offence."  U.S. Const. amend. V; *see* OLC Op. at 134.  But

the framers deleted the reference to impeachment when they added the phrase "life or limb,"

suggesting that they found it superfluous because impeachment clearly risked neither life nor limb.

*See id.* at 134-35.  That history underscores the common-sense intuition that being terminated

from, or prevented from obtaining, a job is qualitatively different than facing a prison term or execution.

Second, even if that were not so, the *Mendoza-Martinez* factors overwhelmingly support a finding that removal and disqualification from office does not constitute a criminal penalty. *See* OLC Op. at 139-48 (applying *Mendoza-Martinez* factors to removal and disqualification following impeachment).   Removal and disqualification from office impose no disability or restraint on liberty, *see id.* at 139-42; they are not treated as punishment, but instead as "remedial goals," *id.* at 143; the framers' rejection of language that would have permitted impeachment for "'maladministration'" tends to show that "scienter is a necessary element for an impeachable offense," *id.* at 145; the mere fact that impeachment presents a deterrent effect "is insufficient to render" it criminal because deterrence "serve[s] civil as well as criminal goals," *Hudson*, 522 U.S. at 105 (quotation marks omitted); sanctions that the Senate may impose are not "already" criminal; and the sixth and seventh factors, which concern "the ultimate question of legislative (or drafters' and ratifiers') purpose," OLC Op. at 146, indicate that removal and disqualification were not excessive, but instead "deftly tailored" not to "reach beyond the exact sphere of the misconduct and thus the threat: federal office." *Id.* at 147

> ii.     **The Double Jeopardy Clause would not bar prosecution here because the defendant's impeachment proceeding and criminal prosecution do not involve the same offense.**

Even if the Double Jeopardy Clause applied, it would not bar the defendant's prosecution. The Clause protects against multiple punishments for the same offense. *See Missouri v. Hunter*, 459 U.S. 359, 365-66 (1983).  But the Double Jeopardy Clause "is not implicated simply because a criminal charge involves 'essentially the same conduct' for which a defendant has previously been punished." *Hudson*, 522 U.S. at 107 (Stevens, J., concurring) (citing *United States v. Dixon*, 509 U.S. 688, 696, 704 (1996)).  Instead, whether two offenses are the same for double-jeopardy

purposes requires ascertaining whether each requires proof of an element that the other does not. *See Blockburger v. United States*, 284 U.S. 299, 304 (1932).  It is not enough that there may be some overlap between the conduct charged in each case.

Any double-jeopardy claim here—which, notably, the defendant entirely fails to spell out—would founder in light of these principles.  The single article of impeachment alleged a violation of "Incitement of Insurrection," Impeachment Resolution at 2 (capitalization altered), and charged that the defendant had "incit[ed] violence against the Government of the United States," *id.* at 3.  The most analogous federal statute is 18 U.S.C. § 2383, which prohibits "incit[ing] . . . any rebellion or insurrection against the authority of the United States or the laws thereof."  A violation of Section 2383 would require proof that the violence at the Capitol on January 6, 2021, constituted an "insurrection against the authority of the United States or the laws thereof" and that the defendant incited that insurrection.  Incitement, in turn, requires proof that the speaker's words were both directed to "producing imminent lawless action" and "likely to incite or produce such action."  *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (per curiam); *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 927-28 (1982); *see also Thompson*, 590 F. Supp. 3d at 112 (incitement includes three elements: "that '(1) the speaker subjectively intended incitement; (2) in context, the words used were likely to produce imminent, lawless action; and (3) the words used by the speaker objectively encouraged and urged and provoked imminent action'") (emphasis omitted).  None of the offenses charged here—18 U.S.C. § 371, 18 U.S.C. §§ 1512(c)(2) and (k), and 18 U.S.C. § 241—has as an element any of the required elements for an incitement offense.  And the elements of the charged offenses—*e.g.*, defeating a federal government function through deceit under Section 371, obstruction of an "official proceeding" under Section 1512, and deprivation of rights under Section 241—are nowhere to be found in the elements of a violation

of Section 2383 or any other potential incitement offense.  Moreover, the mere fact that some of the conduct on which the Impeachment Resolution relied is related to conduct alleged in the indictment does not implicate the Double Jeopardy Clause.  *See Dixon*, 509 U.S. at 696.

### iii.        The defendant's double-jeopardy claim is frivolous.

The denial of a motion to dismiss on double-jeopardy grounds is typically subject to interlocutory appeal.  *See Abney v. United States*, 431 U.S. 651, 662 (1977).  At the same time, the Supreme Court recognized that because such an approach "may encourage some defendants to engage in dilatory appeals," courts of appeals could "establish summary procedures and calendars to weed out frivolous claims of former jeopardy."  *Id.* at 662 n.8; *see Richardson v. United States*, 468 U.S. 317, 322 (1984) (indicating that "the appealability of a double jeopardy claim depends upon its being at least 'colorable,' . . . and that 'frivolous claims of former jeopardy' may be weeded out by summary procedures"); *id.* at 326 & n.6 (noting that a "colorable claim . . . presupposes that there is some possible validity").  Following the Supreme Court's decision in *Abney*, courts of appeals developed procedures for identifying and disposing of frivolous double-jeopardy claims without divesting the trial court of jurisdiction and delaying proceedings.  *See, e.g.*, *United States v. Dunbar*, 611 F.2d 985, 988 (5th Cir. 1980) (en banc) ("Henceforth, the district courts, in any denial of a double jeopardy motion, should make written findings determining whether the motion is frivolous or nonfrivolous.  If the claim is found to be frivolous, the filing of a notice of appeal by the defendant shall not divest the district court of jurisdiction over the case. If nonfrivolous, of course, the trial cannot proceed until a determination is made of the merits of an appeal."); *accord United States v. Leppo*, 634 F.2d 101, 105 (3d Cir. 1980); *United States v. Hines*, 689 F.2d 934, 937 (10th Cir. 1982).  Thus, courts have concluded that double-jeopardy claims are frivolous or not sufficiently colorable to confer jurisdiction for an interlocutory appeal where a defendant's conviction from a first trial was "set aside for reasons unrelated to the

sufficiency of the evidence against him," namely, because the district court had granted a new trial

based on instructional error, *United States v. Serrano*, 856 F.3d 210, 214 (2d Cir. 2017); where a

defendant's argument was squarely foreclosed by existing precedent and the defendant failed to

"cite any intervening change or correction in the law," *United States v. Shelby*, 604 F.3d 881, 887

(5th Cir. 2010) (per curiam); or where defendants were "sentenced within the statutorily authorized

range for their previous convictions and the totality of the circumstances do not suggest that there

has been only a single conspiracy or that jeopardy previously attached," *United States v. Abboud*,

273 F.3d 763, 769 (8th Cir. 2001).  In *United States v. Black*, 759 F.2d 71 (D.C. Cir. 1985) (per

curiam), the D.C. Circuit alluded to the procedure for weeding out frivolous double-jeopardy

claims when it acknowledged that it "must grant a stay unless appellant's claim of violation of the

double jeopardy clause is 'wholly lacking in merit.'"  *Id.* at 73.  Because the movant there had

made "no adequate response to the district court's comprehensive opinion" and the D.C. Circuit

found "the reasoning in that opinion entirely persuasive," the court denied the stay.  *Id.*

Consistent with the procedure described above, the Court should conclude in written

findings that the defendant's double-jeopardy claim is wholly without merit.  The defendant does

not even argue that removal and disqualification constitute criminal penalties sufficient to

implicate the Double Jeopardy Clause.  *See Abboud*, 273 F.3d at 766 ("A colorable claim requires

a showing of previous jeopardy and the threat of repeated jeopardy.").  He also offers no remotely

viable claim that the incitement allegation that formed the basis of the Impeachment Resolution

constitutes the same offense as any of the offenses charged in this case.  The defendant's wholly

meritless double-jeopardy claim should not, therefore, divest this Court of jurisdiction in a manner

that risks delaying the trial.

**V.      Conclusion**

The defendant's motions to dismiss on statutory and constitutional grounds should be denied.

Respectfully submitted,

JACK SMITH
Special Counsel

By:      /s/ James I. Pearce
         James I. Pearce
         John M. Pellettieri
         Assistant Special Counsels
         Molly Gaston
         Thomas P. Windom
         Senior Assistant Special Counsels
         950 Pennsylvania Avenue NW
         Room B-206
         Washington, D.C. 20530

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 1:23-cr-00257-TSC |
| DONALD J. TRUMP, | |
| *Defendant*. | |

**PRESIDENT DONALD J. TRUMP'S REPLY IN SUPPORT OF MOTION TO
<u>DISMISS BASED ON CONSTITUTIONAL GROUNDS</u>**

## INTRODUCTION

Election advocacy, including petitions to elected officials for the redress of election-related grievances, is a fundamental, time-honored tradition of our country. The First Amendment guarantees that the President—just like every other individual—may speak out on this subject and call Congress to action. Others are just as free to disagree and urge Congress to take a different course. That is how our country works, and why the Constitution prohibits the state from acting as "the arbiter of truth" on matters of public concern. *United States v. Alvarez*, 567 U.S. 709, 751-52 (2012) (Alito, J., dissenting). Yet that is exactly what the prosecution seeks. Rather than conceding, as it must, that election advocacy is one of the "broad areas in which any attempt by the state to penalize purportedly false speech would present a grave and unacceptable danger," *id*. at 751, the prosecution seeks to install itself as America's censor, with roving authority to criminally prosecute all who speak out against its approved narratives. The prosecution has no such mandate. Accordingly, the indictment is unconstitutional on its face and must be dismissed.

Additionally, even if the First Amendment permitted charges on this basis—which it emphatically does not—President Trump's acquittal before the United States Senate forecloses retrial before this Court, as do the Constitution's guarantees of due process and fair notice.

I.    **The First Amendment Bars the Prosecution in its Entirety**

A.    **All Charges in the Indictment Rest Solely on Allegations of Core Political Speech and Advocacy.**

Handwaving the First Amendment, the prosecution states that President Trump "had a right, like every American, to speak publicly about the [2020 presidential] election and even to claim, falsely, that there had been outcome-determinative fraud during the election and that he had won," but claims President Trump violated the law because he allegedly "did not stop there." Doc. 139 at 26 (quoting Doc. 1, ¶ 3).

1

Thus, the prosecution premises its entire case on the notion that President Trump did *more* than make supposedly "false[]" claims about the election's outcome. *See id.* But what "more" did President Trump do, according to the prosecution? He made *more* supposedly "false" claims about the outcome of the election—*i.e.*, "dozens of 'specific claims that there had been substantial fraud in certain states," and that "dead people had voted in Georgia." *Id.* (quoting Doc. 1, ¶¶ 11, 33). The prosecution generally asserts that "[t]he defendant … used those lies as the instruments of his four criminal offenses," and "the defendant used those knowingly false statements regarding specific facts to commit the crimes charged in the indictment." *Id.* at 26-27. But the prosecution does not identify any *conduct* involved in those crimes other than making, in their view, supposedly false statements about the election's outcome. *See id.* Thus, the indictment does not allege that the Defendant "used … lies" to commit crimes, *id.*—it alleges that he told (supposed) "lies" and those lies *are* the crimes. *See id.* Thus, the indictment does not charge speech in furtherance of a crime—it charges pure Speech Crimes.

The reason the prosecution does not identify any *non-speech* or *non-advocacy* conduct charged in the indictment is that there is none. Every charge in the indictment rests on core acts of political speech and advocacy that lie at the heart of the First Amendment. Likewise, all the factual allegations in the indictment pivot on the indictment's core theory—that President Trump allegedly engaged in "fraud" and "obstruction" by repeatedly contending, in public and to government officials, that the outcome of the 2020 Presidential election was tainted by fraud.

A comprehensive review of the indictment reveals that every operative allegation charges President Trump with engaging in acts of public speech and political advocacy about the election's outcome. First, the indictment alleges that President Trump made a long series of public statements about matters of enormous public concern—criticizing the administration of the 2020 federal

2

election, claiming that fraud and other irregularities tainted the outcome of the election in particular States, and making claims about the scope of the Vice President's constitutional authority in certifying the election. Doc. 1, ¶¶ 1, 11-12, 32-34, 37, 41-42, 46, 52, 99, 102, 104. These public statements include numerous postings on Twitter about these topics. *Id.* ¶¶ 22, 28, 44, 50, 87-88, 90(c), 96(a)-(c), 100(a)-(b), 111, 114, 116, 118. All these allegations center on the prosecution's core theory: that President Trump supposedly "spread lies that there had been outcome-determinative fraud in the election and that he had actually won." *Id.* ¶ 2.

Second, the indictment alleges that President Trump made statements to DOJ officials claiming that fraud and irregularities tainted the outcome of the election and urging them to act accordingly. *Id.* ¶¶ 10(c), 27, 29, 36, 45, 51, 70-74, 77, 80, 84. Again, every such allegation contends that President Trump, supposedly falsely, urged to such federal officials that there had been significant fraud or irregularities in the 2020 Presidential election. *See id.*

Third, the indictment alleges a series of communications to state officials claiming that fraud and/or irregularities had tainted the election outcomes in their states and urging them to act accordingly. Doc. 1, ¶¶ 10(a), 15-18, 21, 24, 26, 31, 35, 38-39, 43. As above, all these allegations center on the claim that President Trump stated, supposedly falsely, to these state officials that there had been significant fraud in the administration of the election in their states. *See id.*

Fourth, the indictment alleges a series of communications with the Vice President in his legislative capacity as President of the Senate, claiming that fraud and irregularities tainted the election's outcome and urging him to certify the election accordingly. Doc. 1, ¶¶ 10(d), 86-95, 90(a)-(d), 92-93, 95, 97, 101-102, 122. The indictment alleges attempts to make similar communications to other Members of Congress as well. *Id.* ¶¶ 115, 119(a)-(e). As with the DOJ and state officials, the indictment alleges that these statements by President Trump asserted that

3

there had been outcome-determinative fraud or irregularity in the election, and that was the basis on which he urged those officials to act.

Fifth, the indictment alleges that President Trump was involved in efforts to organize and submit contingent slates of alternate electors from states where the outcome of the election was disputed. *Id.* ¶¶ 10(b), 53-69. According to the indictment, these contingent slates of electors were designed to allow the President, in his communications with the Vice President, to justify the exercise of the Vice President's authority to certify the election in Defendant's favor or delay its certification. *Id.* ¶¶ 10(b), 53. Once again, the basis for organizing what the indictment calls "fraudulent electors" was the asserted view that the actual electors were invalid because the election in their States had been tainted by fraud or irregularity.

Thus, every allegation in the indictment, including all counts charged, centers on the prosecution's theory that President Trump committed "fraud" or "obstruction" by repeatedly contending that there had been fraud in the election.

In short, despite acknowledging "[t]he Defendant had a right, like every American, to speak publicly about the election and even to claim, falsely, that there had been outcome-determinative fraud during the election and that he had won," Doc. 1, ¶ 3, the prosecution presents such statements as the only material acts of alleged wrongdoing. Thus, this case is not about what President Trump did, but what he said. *See, e.g.,* Doc. 1, ¶ 4 (alleging that all counts charge "conspiracies" that are "built on the widespread mistrust the Defendant was creating *through pervasive and destabilizing lies about election fraud*"); ¶ 7 (alleging that "[t]he purpose of the conspiracy was to overturn the legitimate results of the 2020 presidential election by *using knowingly false claims of election fraud* to obstruct the federal government function by which those results are collected, counted, and certified") (emphases added); *see also, e.g., id.* ¶¶ 1, 10(a),

4

11-12, 15-18, 21-22, 24, 26, 28, 31-35, 37-39, 41-43, 44, 46, 50 52, 87-88, 90(c), 96(a)-(c), 99, 100(a)-(b), 102, 104, 111, 114, 116, 118 (alleging supposedly "false" claims of election fraud as central to the supposed "conspiracy" involving President Trump).

### B.     Claims of Fraud in the 2020 Presidential Election Are Protected Speech.

President Trump's motion explained in detail that *United States v. Alvarez*, 567 U.S. 709 (2012), reflects the Supreme Court's unanimous consensus that the government may not criminalize supposedly "false statements about philosophy, religion, history, the social sciences, the arts, and *other matters of public concern*." *Id.* at 751 (Alito, J., dissenting) (emphasis added); *see also id.* at 731-32 (Breyer, J., concurring in the judgment) (same). In these areas, "it is perilous to permit the state to be the arbiter of truth," for "the potential for abuse of power in these areas is simply too great." *Id.* at 752 (Alito, J., dissenting). "In the political arena," when disputes arise about politically charged topics—which typically involve claims that are not "easily verifiable"— the threat of "criminal prosecution is particularly dangerous … and consequently can more easily result in censorship of speakers and their ideas." *Id.* at 732, 738 (Breyer, J., concurring in the judgment). "Our constitutional tradition stands against the idea that we need Oceania's Ministry of Truth." *Id.* at 723 (plurality op. of Kennedy, J.) (citing George Orwell, NINETEEN EIGHTY-FOUR (1949) (Centennial ed. 2003)).

The prosecution does not meaningfully dispute this point. Instead, the prosecution contends that President Trump made not just general assertions, but "concrete, specific statements" about specific acts of fraud in individual states, and that these suffice to render his speech criminal. Doc. 139 at 32. The prosecution cites no authority for this supposed "specificity exemption" to *Alvarez*, and none exists. Claims about "philosophy, religion, history, the social sciences, the arts, and *other matters of public concern*," *id.* at 751 (Alito, J., dissenting) (emphasis added)—the prosecution

conveniently omits the italicized phrase—can be either general or specific, but they are all protected by the First Amendment.

The prosecution's attempt to carve out a "specificity exception" to the core political speech doctrine also runs afoul of *McDonnell v. United States*, 579 U.S. 550 (2016). As in *McDonnell*, "[i]n addition to being inconsistent with both text and precedent, the Government's expansive interpretation" of the charged statutes "would raise significant constitutional concerns." 579 U.S. at 574. Under the prosecution's view, any interaction between an elected official and his or her constituent where the constituent makes disputed claims on politically charged issues is the potential basis for a federal investigation and prosecution, provided that the government concludes that the claim was knowingly "false." The over-criminalization that would result from this interpretation is astonishing, and it is just what the Supreme Court rejected in *McDonnell*:

> But conscientious public officials arrange meetings for constituents, contact other officials on their behalf, and include them in events all the time. The basic compact underlying representative government *assumes* that public officials will hear from their constituents and act appropriately on their concerns…. The Government's position could cast a pall of potential prosecution over these relationships …. Officials might wonder whether they could respond to even the most commonplace requests for assistance, and citizens with legitimate concerns might shrink from participating in democratic discourse.

*Id.* at 575 (emphasis in original). The same reasoning applies here. "[T]he Government's legal interpretation is not confined to cases involving" the facts alleged here, "and we cannot construe a criminal statute on the assumption that the Government will 'use it responsibly.'" *Id.* at 576 (quoting *United States v. Stevens*, 559 U.S. 460, 480 (2010)). The courts cannot "rely on the Government's discretion to protect against overzealous prosecutions," and thus "a statute in this field that can linguistically be interpreted to be either a meat axe or a scalpel should reasonably be taken to be the latter." *Id.* (citations and quotation marks omitted).

## C.   The "Speech Integral to Criminal Conduct" Exception Does Not Apply.

The prosecution invokes the well-established First Amendment exception providing that "speech integral to criminal conduct" is not protected by the First Amendment. *Alvarez*, 567 U.S. at 717 (citing *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949)). But that exception does not apply here, where *all* the charged conduct constitutes First Amendment-protected speech. To fall within this exception, the speech in question must be "integral to" some criminal "conduct" that *is not itself a form of First Amendment-protected speech or expression*. *See Giboney*, 336 U.S. at 498 (holding that speech that was integral to organizing an unlawful picket designed to implement a restraint on trade was not protected by the First Amendment). Protected speech that is "integral to" other protected speech, or other protected activities like lobbying Members of Congress based on government-disfavored viewpoints, remains protected speech. *See, e.g., United States v. Petrovic*, 701 F.3d 849, 856 (8th Cir. 2012) (upholding the federal cyberstalking statute on the ground that it "is directed toward 'courses of conduct,' not speech, and the conduct it proscribes is not 'necessarily associated with speech'"); *United States v. Ackell*, No. 15-CR-123-01-JL, 2017 WL 2913452, at *10 (D.N.H. July 7, 2017), *aff'd*, 907 F.3d 67 (1st Cir. 2018) (recognizing that a "course of conduct" that was "comprised purely of protected speech" would be protected by the First Amendment). Otherwise, the exception would swallow the rule entirely.

For example, in *Afro-American Police League v. Fraternal Order of Police*, the court considered a civil rights conspiracy claim where the acts underlying the conspiracy—such as acts of pamphleteering by one union against another union—were plainly protected under the First Amendment. 553 F. Supp. 664, 674 (N.D. Ill. 1982). The latter union "attempt[ed] to attach culpability to [the first union's] act of pamphleteering" by arguing—just as the prosecution does here—that "any act in furtherance of the object of the conspiracy, even if that act is not unlawful,

7

is actionable." *Id.* The court rejected this argument because the entire alleged "conspiracy" rested on acts protected by the First Amendment:

> [N]o act has been committed by AAPL which would take their conduct outside the protection of the First Amendment…. The act of pamphleteering is one of the few modes of mass communication economically available to minority groups, and the activity is clearly protected by the First Amendment. A "conspiracy to exercise free speech" is an obvious oxymoron.

*Id.* The same logic applies here. "No act has been committed by [President Trump] which would take [his] conduct outside the protection of the First Amendment," *id.*, so the entire "conspiracy" charge is unconstitutional. In short, the indictment charges a "conspiracy to exercise free speech," which "is an obvious oxymoron." *Id.*

Contrary to the prosecution's argument, Doc. 139 at 30, *Alvarez* strongly supports President Trump on this very point. The prosecution argues that *Alvarez*'s plurality stated that "laws that 'protect the integrity of Government processes, quite apart from restricting false speech'" remain valid. *Id.* (quoting *Alvarez*, 567 U.S. at 721 (plurality op.)). In fact, *Alvarez* was referring to three specific kinds of "laws," *i.e.*, "[s]tatutes that prohibit falsely representing that one is speaking on behalf of the Government," "that prohibit impersonating a Government officer," and perjury. *Id.* Needless to say, the conduct alleged in the indictment bears no resemblance to those actions, precisely because they involve trickery and deceit, not ordinary political advocacy. Moreover, *Alvarez* emphasized that such conduct can be prohibited because those prohibitions "protect the integrity of Government processes, *quite apart from merely restricting false speech*." *Id.* (emphasis added). Thus, the indictment does not seek to punish President Trump's conduct "quite apart from merely restricting false speech," *id.*; it does the exact opposite. It punishes *only* First Amendment protected speech, including both public speech and protected advocacy to public officials. This is impermissible under the reasoning of *Alvarez* as well.

The prosecution further emphasizes this point when it contends that "[f]alsity is not a viewpoint." Doc. 139 at 33. Whatever the merits of this claim in other contexts, this statement is inapplicable to the widespread and unsettled disputes about the outcome of the 2020 Presidential election, which have no easily verifiable answer. *Alvarez*, 567 U.S. at 732, 738. Moreover, a law that criminalized speech questioning the outcome of the election, while permitting speech defending the outcome of that election, would involve obvious, and blatantly unconstitutional, viewpoint discrimination. *See, e.g., Matal v. Tam*, 582 U.S. 218, 243-44 (2017).

The prosecution's attempt to distinguish *McDonald v. Smith*, 472 U.S. 479 (1985), *see* Doc. 139 at 34, fails as well. *McDonald* held that claims about a judicial nominee's fitness made in a letter of advocacy to public officials were subject to the exact same standards of First Amendment protection that apply to the same statements made in a public forum. 472 U.S. at 485. The right to speak and the right to petition the government "are inseparable, and there is no sound basis for granting greater," or lesser, "constitutional protection to statements made in a petition to" a government official "than other First Amendment expression." *Id.* Because the claim that the 2020 election was stolen is protected by the First Amendment when it is made in a public speech, it is equally protected by the First Amendment when it is made to government officials in an act of petitioning or advocacy. *Id.*

### D.   On the Government's Interpretation, the Underlying Criminal Statutes Are Facially Invalid and Unconstitutionally Overbroad.

The First Amendment problems with the prosecution's novel and unprecedented theory of criminal liability extend, not just to the indictment, but to the underlying criminal statutes charged therein. If the prosecution is correct and those statutes criminalize acts of core political speech and advocacy, as charged in this case, those statutes are facially unconstitutional under the First Amendment. Any statute that criminalizes core political speech is invalid, at least as applied, where

the criminalization of protected speech is "not only ... real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973). As discussed above, the prosecution's interpretation of these statutes entails that they criminalize a wide range of perfectly ordinary acts of public speech and petitioning the government. *See id.* The prosecution, therefore, renders its own statutes invalid by seeking to extend them to President Trump's speech.

## II.      The Impeachment Judgment Clause and Principles of Double Jeopardy Bar the Prosecution of President Trump After His Acquittal by the Senate.

Both the Impeachment Judgment Clause and related principles of double jeopardy foreclose the criminal prosecution of a President who has been tried and acquitted by the Senate.

### A.      Impeachment Judgment Clause.

#### 1.      The plain meaning of the Impeachment Judgment Clause governs.

The prosecution claims that "[t]he Impeachment Judgment Clause's text and history support criminal prosecution here," Doc. 139 at 50, but it provides no analysis of the text. *See id.* Instead, the prosecution merely block-quotes the text of the Clause and then asserts, without further analysis, that the Clause merely "makes clear that criminal prosecution ... may follow such a conviction by the Senate." *Id.* On the prosecution's view, therefore, the phrase "the Party *convicted*" actually means that *both* the "Party convicted" *and* the "Party acquitted"—*and*, for that matter, the "Party who was never impeached at all." As a matter of plain meaning, the prosecution's interpretation makes no sense. Obviously, an *acquittal* by the Senate is more likely than a Senate conviction to foreclose future prosecution. Thus, if the Framers had wished to clarify that impeachment and trial in the Senate would have no impact on future prosecution *regardless of the trial's outcome*, one would expect them to state that the "Party *impeached* shall nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to law." But they did

10

not. Instead, the Constitution specifies that only the "Party *convicted* shall nevertheless be liable and subject to" criminal prosecution. U.S. Const. art. I, § 3, cl. 7 (emphasis added).

Proving this point, if the Framers wished to specify that *only* the "Party convicted" could be prosecuted, and *not* the "Party acquitted," the actual phrasing of the Clause is the most ordinary and natural way to do so. The longstanding canon of interpretation *expressio unius est exclusio alterius* (or the "negative-inference canon") reflects "the principle that specification of the one implies exclusion of the other *validly describes how people express themselves and understand verbal expression*." Scalia & Garner, Reading Law: The Interpretation of Legal Texts, § 10, p. 107 (2012) (emphasis added). "When a car dealer promises a low financing rate to 'purchasers with good credit,' it is entirely clear that the rate is *not* available to purchasers with spotty credit." *Id.* (emphasis added). So also here, when the Constitution provides that "the Party convicted" in the Senate may be subject to criminal prosecution, "it is entirely clear that" the Party acquitted in a Senate trial "is *not*" subject to criminal prosecution for official acts. *Id.* This is true because the phrase "the Party convicted" "can reasonably be thought to be an expression of *all* that shares in the grant or prohibition involved." *Id.* (emphasis added). Because there are only two possible outcomes from a Senate trial—conviction or acquittal—specifying the implications of only *one* outcome strongly implies that those implications do *not* apply to the other outcome. *See id.*

For these reasons, the "plain implication" of the phrase "Party convicted" "is that criminal prosecution … is a consequence that can come about only after the Senate's judgment…." *Trump v. Vance*, 140 S. Ct. 2412, 2444 (2020) (Alito, J., dissenting).[1]

---

[1] The prosecution attempts to dismiss Justice Alito's observation by arguing that he was addressing the amenability of a sitting President to prosecution. Doc. 139, at 56. But the logic of his argument is that prosecution may only come *after* Senate conviction, which applies equally to sitting and former Presidents. Moreover, Justice Alito's observation also reflects the plain text of the Constitution, which draws no distinction between current and former officeholders on this point.

11

**2.      Historical sources reinforce the Clause's plain meaning.**

Because the Clause's meaning is clear, there is no need to consult historical sources to resolve any ambiguity. But even if there were, the most authoritative and persuasive historical sources confirm the Clause's plain meaning.

Take, for instance, Hamilton's comments in Federalist No. 69. The prosecution cites this source, Doc. 139 at 51, but selectively omits language that contradicts its argument. Federalist No. 69 states: "The President of the United States would be liable to be impeached, tried, and, upon conviction of treason, bribery, or other high crimes or misdemeanors, removed from office; and would *afterwards* be liable to prosecution and punishment in the ordinary course of law." THE FEDERALIST NO. 69 (emphasis added), https://avalon.law.yale.edu/18th_century/fed69.asp. Thus, Hamilton asserted that impeachment and conviction were necessary prerequisites to criminal prosecution, which would come only "afterwards." *Id.*

Second, the prosecution cites Federalist No. 65, Doc. 139 at 53, 54, but once again, In Federalist No. 65, Hamilton wrote: "The punishment which may be the consequence of conviction upon impeachment, is not to terminate the chastisement of the offender. *After* having been sentenced to a perpetual ostracism from the esteem and confidence, and honors and emoluments of his country, he will still be liable to prosecution and punishment in the ordinary course of law." THE FEDERALIST NO. 65 (emphasis added), *at* https://avalon.law.yale.edu/18th_century/fed65.asp. Again, as in Federalist No. 69, Hamilton emphasizes the criminal prosecution of the President is something that occurs only "[a]fter" conviction by the Senate. *Id.*

Hamilton further reinforced this point in Federalist No. 77, which the prosecution ignores. In Federalist No. 77, Hamilton wrote that the President is "at all times liable to impeachment, trial, dismission from office, incapacity to serve in any other, and to forfeiture of life and estate by

*subsequent* prosecution in the common course of law." THE FEDERALIST NO. 77 (emphasis added), *at* https://avalon.law.yale.edu/18th_century/fed77.asp. In each passage, therefore, Hamilton makes clear that prosecution of the President could occur only "after," "afterwards," and "subsequent" to Senate conviction.

Other historical sources agree. In *Marbury v. Madison*, Charles Lee—Attorney General of the United States under Presidents Washington and John Adams—"declare[d] it to be my opinion, grounded on a comprehensive view of the subject, that the President is not amenable to any court of judicature for the exercise of his high functions, but is responsible only in the mode pointed out in the constitution," *i.e.*, impeachment by the House and trial by the Senate. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 149 (1803). Chief Justice Marshall agreed: "By the constitution of the United States, the President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country *in his political character*, and to his own conscience." *Marbury*, 5 U.S. (1 Cranch) at 165-66 (emphasis added).

The historical sources on which the prosecution relies, Doc. 139 at 51-52, do not undermine this consensus. Unlike Hamilton's and Madison's arguments in The Federalist, none of these sources were in wide circulation at the time the Constitution was adopted, so they are far less likely to reflect the objective public meaning and national understanding of the Clause at the time of its adoption. James Wilson's brief comment at the North Carolina ratifying convention referred to the potential prosecution of U.S. Senators, not Presidents, so it is inapposite here and is governed by a separate constitutional provision, the Speech and Debate Clause. *See* Doc. 139 at 51 (quoting 2 *The Documentary History of the Ratification of the Constitution* 492 (Merrill Jensen et al., eds. 1976)). As noted above, James Wilson's views on the specific question at issue here—*i.e.*, the impeachment or prosecution of the *President*—appear a few pages earlier in the same book, as

13

quoted by the Supreme Court in *Clinton v. Jones*: "[F]ar from being above the laws, [the President] is amenable to them in his private character as a citizen, and *in his public character by impeachment*." *Clinton*, 520 U.S. at 696 (quoting 2 J. Elliot, Debates on the Federal Constitution 480 (2d ed. 1863)) (emphasis added).

Edmund Pendleton's views (cited at Doc. 139 at 51) were expressed in a private letter to James Madison, and thus can be viewed as the opinions of but one man. Pendleton expresses his view in the context of criticizing the very concept of impeachment by Congress as inappropriate and more fitting for the judicial branch—"I do not see any material reason for having taken this trial [*i.e.*, impeachment proceedings] out of the judiciary course," and "[t]he mode of prosecution [*i.e.*, impeachment] as generally practiced, is not a favorite with me." *See Letter of Edmund Pendleton to James Madison* (1787), *at* https://www.digitalhistory.uh.edu/disp_textbook.cfm?smtID=3&psid=178. So it is no surprise that he adopts the minority, counter-textual view that the judicial branch retains the authority over criminal prosecutions, since his whole point in the letter is to suggest that even impeachments should have been lodged in the judicial branch in the first place. *See id.*

Representative Dana's comments in 1798, *see* Doc. 139 at 51-52, likewise reflect the views of a single Representative over a decade after the Constitution was ratified, and they were addressing an entirely different topic—*i.e.*, whether the underlying offense for the impeachment proceeding must itself be a crime. *See* 5 Annals of Congress 2475 (Dec. 1798), *at* https://memory.loc.gov/ammem/amlaw/lwaclink.html#anchor5.

Finally, the prosecution misreads Justice Story's comments by, once again, selectively quoting them. Justice Story commented that, because the direct consequences of impeachment include only removal from office and disqualification, it was necessary for the Constitution to

contain a "provision … that the common tribunals of justice should be at liberty to entertain jurisdiction of the offence." 2 Joseph Story, *Commentaries on the Constitution of the United States* § 782 (1833). "Otherwise, it might be a matter of extreme doubt whether … a second trial for the same offence could be had, either after an acquittal or a conviction, in the court of impeachments." *Id.* In sum, Justice Story stated that it made sense for the Constitution to contain a provision specifying the consequences of conviction after impeachment for future criminal prosecution to avoid the "extreme doubt" about whether criminal prosecution could follow. *Id.* The Constitution does so, of course, by specifying in the Impeachment Judgment Clause that the "Party *convicted*" may be impeached. As Justice Story's own logic indicates, *see id.*, its failure to authorize prosecution for the "Party *acquitted*" raises, at the very least, "extreme doubt" that an acquitted party may be prosecuted. *Id.*

> **3.** **The Impeachment Judgment Clause embodies structural protections for the Presidency that are deliberately rooted in *political* processes.**

The prosecution invokes the Constitution's "structure," but it presents no argument actually relying on that structure. Instead, it makes *policy* arguments that do not cite any original sources, but are drawn entirely from the 2000 O.L.C. opinion on this topic, which was drafted 212 years after the Constitution's ratification. Doc. 139 at 52-54. In this argument, the prosecution contends that impeachment and criminal prosecution "serve entirely distinct goals," that a "Senate impeachment trial may reflect a technical or procedural determination rather than a factual conclusion," and that "partisan loyalties or popular sentiment might influence the Senate's decision to convict or acquit." *Id.* In each case, the prosecution argues, as a *policy* matter, that criminal prosecution should be treated as independent from impeachment and a Senate trial, because the Senate trial might not result in the acquittal of a President whose political enemies deem him guilty. *See id.*

15

This argument flips the Constitution's structure on its head. The Impeachment Judgment Clause, and all related Impeachment Clauses, provide the President with critical *structural protections* from attacks by his political enemies. *See* U.S. Const. art. I, § 3, cl. 7. The requirements of impeachment by the House and conviction by two-thirds of the Senate, *id.*, ensure that the President cannot be removed from office—and subsequently prosecuted and imprisoned—without a widespread *political consensus* in favor of that result. The fact that "partisan loyalties or popular sentiment might influence the Senate's decision," or that the Senate's decision might rest on "a technical or procedural determination rather than a factual conclusion," Doc. 138 at 53-54, is a *feature*, not a bug, of that system. The Impeachment Judgment Clause ensures that the momentous step of removing the Chief Executive from office and sending him to prison cannot be achieved unless a widespread political consensus—reflecting two-thirds of U.S. Senators from across the Nation—supports and explicitly authorizes that goal. That is a critical structural protection reflected in the Constitution's separation of powers. To allow federal prosecutors to circumvent this judgment by prosecuting an acquitted President would utterly defeat this critical structural protection. *See* U.S. CONST. art. I, § 3, cl. 7.

That is why the Supreme Court has repeatedly emphasized that the Constitutionally established *political* checks like impeachment and Senate trial, not criminal prosecution, provide the remedy for a President accused of criminal wrongdoing. As the Supreme Court stated in *Fitzgerald*, political checks like "the credible threat of impeachment" and "[v]igilant oversight by Congress" keep abuse of Presidential authority in check, not the threat of prosecution:

> A rule of absolute immunity for the President will not leave the Nation without sufficient protection against misconduct on the part of the Chief Executive. *There remains the constitutional remedy of impeachment*. In addition, there are formal and informal checks on Presidential action…. The President is subjected to constant scrutiny by the press. Vigilant oversight by Congress also may serve to deter Presidential abuses of office, as well as to make credible the threat of impeachment. Other incentives to avoid misconduct

16

> may include a desire to earn reelection, the need to maintain prestige as an element of
> Presidential influence, and a President's traditional concern for his historical stature.

*Nixon v. Fitzgerald*, 457 U.S. 731, 757 (1982). The structural protection of the Constitution

provides that a President "is amenable … in his public character by impeachment," and that "[w]ith

respect to acts taken in his 'public character'—that is, official acts—the President may be

disciplined principally by impeachment." *Clinton v. Jones*, 520 U.S. 681, 696 (1997) (quoting 2 J.

Elliot, Debates on the Federal Constitution 480 (2d ed. 1863)).

To support its "structural" argument, the prosecution twice cites Alexander Hamilton's

statements in Federalist No. 65. Doc. 139 at 52-53, 54. Hamilton's writing, however, directly

contradicts the prosecution's argument. In Federalist No. 65, Hamilton argued that, precisely

*because* the "prosecution" of a President "will seldom fail to agitate the passions of the whole

community, and to divide it into parties, more or less friendly or inimical, to the accused," it should

*not* be entrusted to a court, but should be assigned only to a "POLITICAL" body—the U.S. Senate:

> A well constituted court for the trial of impeachments, is an object not more to be desired
> than difficult to be obtained in a government wholly elective. The subjects of its jurisdiction
> are those offenses which proceed from the misconduct of public men, or in other words
> from the abuse or violation of some public trust. They are of a nature which may with
> peculiar propriety be denominated POLITICAL, as they relate chiefly to injuries done
> immediately to the society itself. *The prosecution of them, for this reason, will seldom fail
> to agitate the passions of the whole community, and to divide it into parties, more or less
> friendly or inimical, to the accused*. In many cases, it will connect itself with the pre-
> existing factions, and will inlist all their animosities, partialities, influence and interest on
> one side, or on the other; and in such cases there will always be the greatest danger, that
> the decision will be regulated more by the compar[a]tive strength of parties than by the real
> demonstrations of innocence or guilt.

THE FEDERALIST No. 65 (Hamilton) (emphasis added). Hamilton went on to argue that even the

Supreme Court should not handle the trial of a President: "The awful discretion, which a court of

impeachments must necessarily have, to doom to honor or to infamy the most confidential and the

most distinguished characters of the community, *forbids the commitment of the trust to a small*

17

591

*number of persons*. These considerations seem alone sufficient to authorise a conclusion, that the *Supreme Court would have been an improper substitute for the Senate*, as a court of impeachments." *Id.* (emphasis added).

Moreover, James Madison reinforced this structural concern in Federalist No. 47, where he cautioned against those "new fangled and artificial treasons," which "have been the great engines, by which violent factions, the natural offspring of free governments, have usually wreaked their alternate malignity on each other." THE FEDERALIST No. 47 (Madison). By requiring a widespread political consensus within the U.S. Senate—the historical "cooling saucer" of the Republic— before a President can be criminally prosecuted, the Impeachment Judgment Clause protects Presidents from being harassed by any of thousands of local prosecutors charging them with such "new fangled and artificial treasons." *Id.*

### B.    Principles of Double Jeopardy Yield the Same Conclusion.

In his motion to dismiss, President Trump argued that "President Trump's acquittal by the U.S. Senate bars criminal prosecution" on similar charges under the Impeachment Judgment Clause and "principles of double jeopardy." Doc. 113 at 18. The prosecution argues that "principles of double jeopardy" do not apply, because an impeachment proceeding does not impose criminal penalties, and because the *Blockburger* test is not satisfied. Doc. 139 at 58-62.

The prosecution's response on this point attacks a straw man. The preclusion of future prosecution rooted in the Impeachment Judgment Clause is not identical to the pure doctrine of double jeopardy embedded in the Double Jeopardy Clause. Thus, one would not expect double jeopardy doctrines to simply transplant wholesale into the context of the Impeachment Judgment Clause, and President Trump does not contend that they do. Instead, the Impeachment Judgment Clause presents a specific, closely analogous case to criminal double jeopardy, which draws on the

principles of the Double Jeopardy Clause but adopts them in the unique context of the impeachment, removal, and subsequent prosecution of public officers. *See* U.S. Const. art. I, § 3, cl. 7. That is why President Trump contends that "principles of Double Jeopardy"—which, though closely analogous, are not identical to those in ordinary criminal cases—foreclose the future prosecution of a President for conduct of which the U.S. Senate has acquitted him. Doc. 113 at 23-24. In fact, the prosecution *itself* argues that the Impeachment Judgment Clause addresses "the principle of double jeopardy." Doc. 139 at 55 (quoting *United States v. Claiborne*, 727 F.2d 842, 846 (9th Cir. 1984)).

When this argument is properly understood, the prosecution's objections to it are implausible. The question whether impeachment trials impose criminal penalties is beside the point, because the preclusive force of an impeachment acquittal arises from the text of the Impeachment Judgment Clause itself, not just from the Double Jeopardy Clause's prohibition against being "subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. Only the "Party convicted" in a Senate trial may be subject to criminal prosecution and punishment. That is true even if the Senate trial does not involve "jeopardy of life or limb." *Id.* amend. V. Likewise, the *Blockburger* test is an interpretation of the phrase "the same offence" in the Fifth Amendment—it does not elucidate the phrase "Party convicted" in the Impeachment Judgment Clause. The prosecution's objections, therefore, are beside the point.

Most fundamentally, the Impeachment Judgment Clause and the related principles of Double Jeopardy instruct that "the Executive Branch—including the prosecution—lacks authority to second-guess the determination of acquittal made by the United States Senate, the body to which the Constitution explicitly entrusts this authority." Doc. 113 at 23. Once the U.S. Senate has determined, through a politically accountable procedure, that the President's conduct does not

19

warrant the lesser penalties of removal and disqualification, the Executive Branch cannot then seek to impose the graver penalties of imprisonment or death for the same conduct. To do so violates the Impeachment Judgment Clause, the Double Jeopardy Clause, and the separation of powers, by allowing the Special Counsel to encroach on an area exclusively reserved for the Legislative Branch. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585-89 (1952). The prosecution has no answer to this fundamental point.

## III.    The Indictment Violates Due Process Principles of Fair Notice.

### A.    President Trump Did Not Have Fair Notice That Political Speech Is a Crime.

President Trump addresses the prosecution's argument (Doc. 139 at 37-40) about whether he had fair notice about the charges in Count 4 (18 U.S.C. § 241) in greater depth in his Reply in Support of the Motion to Dismiss on Statutory Grounds, which is incorporated by reference herein.

As argued in President Trump's Motion to Dismiss on Constitutional Grounds, these fair-notice problems afflict the entire indictment, and the Court should dismiss the indictment in its entirety. And the principal reason is on page one of the prosecution's brief: President Trump, the prosecution proclaims, "stands alone in American history for his alleged crimes." Doc. 139 at 1. That admits the novelty of the prosecution's criminal theories—and such unprecedented novelty is antithetical to constitutional requirements of fair notice.

The prosecution does not dispute that there have been many challenges to the counting of electoral votes, and zero federal prosecutions or even suggestions that such challenges are criminal. That the charged conduct is in the same category as those historical examples indicates that no one "reasonably underst[ood]" that 18 U.S.C. §§ 241, 371, or 1512 "proscribed" that conduct. *United States v. Harriss*, 347 U.S. 612, 617 (1954). Based on the historical evidence, application of those statutes to the alleged conduct would indeed be "an unforeseeable and retroactive judicial expansion of" them. *Bouie v. City of Columbia*, 378 U.S. 347, 352 (1964). *Contra* Doc. 139 at 36.

20

In short, President Trump is not asking for an "'extreme level of factual specificity.'" *Contra id.* 40 (quoting *United States v. Lanier*, 520 U.S. 259, 268 (1997)). He is asking for evidence that his conduct clearly violated federal law.

Instead, the prosecution flips the analysis on its head. The prosecution says (at 40) that "the absence of prior prosecutions is not equivalent to a line of judicial precedent treating the conduct at issue as non-criminal." But the test is not whether a court said President Trump's conduct was *not* criminal; the test is whether a court (or, to be sure, the statutes themselves) clearly said it was. *See Lanier*, 520 U.S. at 267. Furthermore, because fair notice standards track the clearly-established prong of qualified immunity, *see id.* at 271-72, it was the prosecution's "burden to show that," *Dukore v. District of Columbia*, 799 F.3d 1137, 1145 (D.C. Cir. 2015). That is, the prosecution needed to provide examples where similar conduct was found criminal, or at least fell clearly within the statutes' proscriptions. It has not done so. The most specific argument the prosecution offers is its discussion (at 37-40) of § 241. But as President Trump's Reply in Support of the Motion to Dismiss on Statutory Grounds shows, that argument is meritless. The prosecution is therefore correct in only one aspect: This case "stands alone." And that admission cuts to the heart of the Due Process Clause's fair-notice requirement.

To be clear, however, the prosecution's discussion (at 41-46) of historical Electoral College disputes misses the point: that disputes about the electoral vote happened repeatedly in American history, and that many people—including Supreme Court Justices—believed Congress had the final say in what electors were counted. *See* Doc. 113 at 30 (making this point, citing *Bush v. Gore*, 531 U.S. 98, 127 (2000) (Stevens, J., dissenting)). Indeed, the prosecution even admits that Congress *ignored* a state-court decision in awarding all twenty electoral votes to Rutherford B.

21

Hayes during the disputed 1876 election. *See* Doc. 139 at 43. Thus, the cases are not "dissimilar," *id.* at 41, in the ways that matter.

Indeed, the prosecution's attempts to distinguish the 2000, 2004, and 2016 contests likewise make President Trump's case. In each case, Democrats objected to the electoral count. *See* Doc. 139 at 44-46. If sustained, those objections would have switched votes. The prosecution argues that those objections ultimately did not affect the end result. *See id.* at 47 (noting the objections were "overruled" or were protest votes "without the hope or even the hint of overturning the victory of the President") (quotations omitted). But neither did any of the conduct alleged in the indictment. The prosecution also claims some type of good intention or good faith on the objectors' part. *See id.* at 47 (referencing the lack of "fraud and deceit" in those episodes). But, except for the 2004 contest, *see* Doc. 139 at 45-46, it has no evidence for that. To the contrary, the objectors meant "to prevent the electors votes from … being counted," claimed that the "electors were not lawfully certified," and attempted to convince electors not to vote for President Trump. Doc. 113 at 28-29 n.7 (quotations omitted). Regardless, the prosecution's undertheorized standard means the difference between a crime and an innocent protest depends on an unknown mix of culpability and degree of success. That cannot "provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits," and it "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000).

The prosecution also misses the relevance of the 2016 Electoral College contest. During that contest, three electors in Washington "pledged to support Hillary Clinton in the Electoral College." *Chiafolo v. Washington*, 140 S. Ct. 2316, 2322 (2020). But "they decided to cast their ballots for someone else" to "encourage other electors—particularly those from States Donald Trump had carried—to follow their example." *Id.* They were, as news sources indicated, part of a

22

cabal seeking to stop "Trump from taking the White House" despite his electoral victory. Kyle Cheney, *Lessig, Lawyers to Offer Support to Anti-Trump Electors*, Politico (Dec. 5, 2016);[2] *see also* Doc. 113 at 29 n.7 (discussing the conspiracy). That is indistinguishable from this case. Yet nothing indicates those electors, or anyone else, faced federal charges or that such charges were even contemplated.

The prosecution, to be sure, claims (at 37) that "applying the facts alleged in the indictment to the well-established statutory elements would not require any sort of novel judicial construction." That incorporates the prosecution's statutory arguments, *see* Doc. 139 at 37, which fail for the reasons set out in the Reply in Support of the Motion to Dismiss on Statutory Grounds. But the historical analysis President Trump provides bolsters his point. It provides "a regular course of practice [that] liquidate[s] [and] settle[s] the meaning of" the underlying statutes, *Chiafalo*, 591 U.S. at 2326 (quotations omitted), and settles it against reading them as covering the charged conduct—or, at the least, shows that the statutes do not plainly cover the conduct alleged in the indictment.

**CONCLUSION**

The indictment should be dismissed with prejudice.

---

[2] *Available at* https://www.politico.com/story/2016/12/larry-lessig-electors-trump-232231.

Dated: November 22, 2023

Respectfully submitted,

*/s/ John F. Lauro*

Todd Blanche, Esq. (PHV)
toddblanche@blanchelaw.com
Emil Bove, Esq. (PHV)
Emil.Bove@blanchelaw.com
BLANCHE LAW
99 Wall St., Suite 4460
New York, NY 10005
(212) 716-1250

John F. Lauro, Esq.
D.C. Bar No. 392830
jlauro@laurosinger.com
Gregory M. Singer, Esq. (PHV)
gsinger@laurosinger.com
Filzah I. Pavalon, Esq. (PHV)
fpavalon@laurosinger.com
LAURO & SINGER
400 N. Tampa St., 15th Floor
Tampa, FL 33602
(813) 222-8990

*Counsel for President Trump*

24

598

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA**,

v.

**DONALD J. TRUMP**,

Defendant.

Criminal Action No. 23-257 (TSC)

## MEMORANDUM OPINION

The United States has charged former President Donald J. Trump with four counts of criminal conduct that he allegedly committed during the waning days of his Presidency. *See* Indictment, ECF No. 1. He has moved to dismiss the charges against him based on Presidential immunity, ECF No. 74 ("Immunity Motion"), and on constitutional grounds, ECF No. 113 ("Constitutional Motion").[1] For the reasons set forth below, the court will DENY both motions.

## I.   BACKGROUND

At the motion to dismiss stage, the court assumes the truth of the Indictment's allegations. *See, e.g.*, *United States v. Weeks*, 636 F. Supp. 3d 117, 120 (D.D.C. 2022). Defendant contends that the charges in the Indictment are based on his "public statements and tweets about the federal election and certification," "communications with the U.S. Department of Justice about investigating elections crimes and possibly appointing a new Acting Attorney

---

[1] Defendant has also moved to dismiss based on statutory grounds, ECF No. 114, and for selective and vindictive prosecution, ECF No. 116. The court will address those motions separately. The Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (citations omitted). The court therefore rules first on the Immunity Motion and the Constitutional Motion—in which Defendant asserts "constitutional immunity from double jeopardy," *United States v. Scott*, 464 F.2d 832, 833 (D.C. Cir. 1972).

General," "communications with state officials about the federal election and the exercise of their official duties with respect to the election," "communications with the Vice President and Members of Congress about the exercise of their official duties in the election-certification proceedings," and "organizing slates of electors as part of the attempt to convince legislators not to certify the election against defendant."  Immunity Motion at 3–8 (formatting modified). Those generalized descriptions fail to properly portray the conduct with which he has been charged.  Accordingly, the court will briefly review the central allegations as set forth in the Indictment.

Defendant "was the forty-fifth President of the United States and a candidate for re-election in 2020."  Indictment ¶ 1.  "Despite having lost" that election, he "was determined to remain in power," so "for more than two months following election day on November 3, 2020, the Defendant spread lies that there had been outcome-determinative fraud in the election and that he had actually won."  *Id.* ¶ 2.  He "knew that [those claims] were false," but "repeatedly and widely disseminated them anyway—to make his knowingly false claims appear legitimate, create an intense national atmosphere of mistrust and anger, and erode public faith in the administration of the election."  *Id.*; *see id.* ¶ 12 (listing six such claims).  "In fact, the Defendant was notified repeatedly that his claims were untrue—often by the people on whom he relied for candid advice on important matters, and who were best positioned to know the facts and he deliberately disregarded the truth."  *Id.* ¶ 11.  Those people included the Vice President, "senior leaders of the Justice Department," the Director of National Intelligence, the Department of Homeland Security's Cybersecurity and Infrastructure Security Agency, "Senior White House attorneys," "Senior staffers on the Defendant's 2020 re-election campaign," state legislators and officials, and state and federal judges.  *Id.*

"Defendant also pursued unlawful means of discounting legitimate votes and subverting the election results." *Id.* ¶ 4.  Specifically, he "targeted a bedrock function of the United States federal government: the nation's process of collecting, counting, and certifying the results of the presidential election." *Id.*  The Indictment describes that process:

> The Constitution provided that individuals called electors select the president, and that each state determine for itself how to appoint the electors apportioned to it. Through state laws, each of the fifty states and the District of Columbia chose to select their electors based on the popular vote in the state.  After election day, the [Electoral Count Act ("ECA")] required each state to formally determine—or 'ascertain'—the electors who would represent the state's voters by casting electoral votes on behalf of the candidate who had won the popular vote, and required the executive of each state to certify to the federal government the identities of those electors.  Then, on a date set by the ECA, each state's ascertained electors were required to meet and collect the results of the presidential election—that is, to cast electoral votes based on their state's popular vote, and to send their electoral votes, along with the state executive's certification that they were the state's legitimate electors, to the United States Congress to be counted and certified in an official proceeding.  Finally, the Constitution and ECA required that on the sixth of January following election day, the Congress meet in a Joint Session for a certification proceeding, presided over by the Vice President as President of the Senate, to count the electoral votes, resolve any objections, and announce the result—thus certifying the winner of the presidential election as president-elect.

*Id.* ¶ 9.

Defendant, along with at least six co-conspirators, *id.* ¶ 8, undertook efforts "to impair, obstruct, and defeat [that process] through dishonesty, fraud, and deceit," *id.* ¶ 10.  Those efforts took five alleged forms:

*First*, they "used knowingly false claims of election fraud to get state legislators and election officials to subvert the legitimate election results and change electoral votes for the Defendant's opponent, Joseph R. Biden, Jr., to electoral votes for the Defendant."  *Id.* ¶ 10(a). "That is, on the pretext of baseless fraud claims, the Defendant pushed officials in certain states to ignore the popular vote; disenfranchise millions of voters; dismiss legitimate electors; and

ultimately, cause the ascertainment of and voting by illegitimate electors in favor of the Defendant." *Id.*; *see id.* ¶¶ 13–52.

*Second*, they "organized fraudulent slates of electors in seven targeted states (Arizona, Georgia, Michigan, Nevada, New Mexico, Pennsylvania, and Wisconsin), attempting to mimic the procedures that the legitimate electors were supposed to follow under the Constitution and other federal and state laws." *Id.* ¶ 10(b). "This included causing the fraudulent electors to meet on the day appointed by federal law on which legitimate electors were to gather and cast their votes; cast fraudulent votes for the Defendant; and sign certificates falsely representing that they were legitimate electors." *Id.*; *see id.* ¶¶ 53–69. They "then caused these fraudulent electors to transmit their false certificates to the Vice President and other government officials to be counted at the certification proceeding on January 6," 2021. *Id.* ¶ 10(b); *see id.* ¶¶ 53–69.

*Third*, they "attempted to use the power and authority of the Justice Department to conduct sham election crime investigations and to send a letter to the targeted states that falsely claimed that the Justice Department had identified significant concerns that may have impacted the election outcome; that sought to advance the Defendant's fraudulent elector plan by using the Justice Department's authority to falsely present the fraudulent electors as a valid alternative to the legitimate electors; and that urged, on behalf of the Justice Department, the targeted states' legislatures to convene to create the opportunity to choose the fraudulent electors over the legitimate electors." *Id.* ¶ 10(c); *see id.* ¶¶ 70–85.

*Fourth*, "using knowingly false claims of election fraud," they "attempted to convince the Vice President to use the Defendant's fraudulent electors, reject legitimate electoral votes, or send legitimate electoral votes to state legislatures for review rather than counting them." *Id.* ¶ 10(d). "When that failed, on the morning of January 6," they "repeated knowingly false claims

of election fraud to gathered supporters, falsely told them that the Vice President had the authority to and might alter the election results, and directed them to the Capitol to obstruct the certification proceeding and exert pressure on the Vice President to take the fraudulent actions he had previously refused." *Id.*; *see id.* ¶¶ 86–105.

*Fifth*, "on the afternoon of January 6," once "a large and angry crowd—including many individuals whom the Defendant had deceived into believing the Vice President could and might change the election results—violently attacked the Capitol and halted the proceeding," they "exploited the disruption by redoubling efforts to levy false claims of election fraud and convince members of Congress to further delay the certification based on those claims." *Id.* ¶ 10(e); *see id.* ¶¶ 106–124.

Based on this conduct, the Indictment charges Defendant with four counts: Conspiracy to Defraud the United States, in violation of 18 U.S.C. § 371, *id.* ¶ 6; Conspiracy to Obstruct an Official Proceeding, in violation of 18 U.S.C. § 1512(k), *id.* ¶ 126; Obstruction of, and Attempt to Obstruct, an Official Proceeding, in violation of 18 U.S.C. §§ 1512(c)(2), 2, *id.* ¶ 128; and Conspiracy Against Rights, in violation of 18 U.S.C. § 241, *id.* ¶ 130.

## II.    LEGAL STANDARD

A criminal defendant may move to dismiss based on a "defect in the indictment," such as a "failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(v).  That motion may be based—as it is here—on constitutional challenges to the prosecution, including the assertion of immunity. *See, e.g.*, *United States v. Stone*, 394 F. Supp. 3d 1, 8 (D.D.C. 2019).  "Because a court's use of its supervisory power to dismiss an indictment directly encroaches upon the fundamental role of the grand jury, dismissal is granted only in unusual circumstances."  *United States v. Fischer*, 64 F.4th 329, 334–35 (D.C. Cir. 2023) (formatting modified).

### III.    EXECUTIVE IMMUNITY

Defendant contends that the Constitution grants him "absolute immunity from criminal prosecution for actions performed within the 'outer perimeter' of his official responsibility" while he served as President of the United States, so long as he was not both impeached and convicted for those actions.  Immunity Motion at 8, 11–13 (formatting modified).  The Constitution's text, structure, and history do not support that contention.  No court—or any other branch of government—has ever accepted it.  And this court will not so hold.  Whatever immunities a sitting President may enjoy, the United States has only one Chief Executive at a time, and that position does not confer a lifelong "get-out-of-jail-free" pass.  Former Presidents enjoy no special conditions on their federal criminal liability.  Defendant may be subject to federal investigation, indictment, prosecution, conviction, and punishment for any criminal acts undertaken while in office.

### A.  <u>Text</u>

In interpreting the Constitution, courts ordinarily "begin with its text," *City of Boerne v. Flores*, 521 U.S. 507, 519 (1997), but there is no provision in the Constitution conferring the immunity that Defendant claims.  The Supreme Court has already noted "the absence of explicit constitutional . . . guidance" on whether a President possesses any immunity.  *Nixon v. Fitzgerald*, 457 U.S. 731, 747 (1982) ("*Fitzgerald*"); *see also United States v. Nixon*, 418 U.S. 683, 705–06 n.16 (1974) ("*Nixon*") (observing "the silence of the Constitution" regarding a President's immunity from criminal subpoenas).  The Executive Branch has likewise recognized that "the Constitution provides no explicit immunity from criminal sanctions for any civil officer," including the current President.  *A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 U.S. Op. Off. Legal Counsel 222, 2000 WL 33711291, at *9 (2000) ("OLC Immunity Memo") (quoting Memorandum for the United States Concerning the Vice

President's Claim of Constitutional Immunity at 4 (filed Oct. 5, 1973), *In re Proceedings of the Grand Jury Impaneled December 5, 1972: Application of Spiro T. Agnew, Vice President of the United States* (D. Md. 1973) (No. 73-965) ("1973 SG Memo"), *available at* 27 Hofstra L. Rev. 677, 775–97 (Appendix)) (alterations adopted).  There is no "Presidential Immunity" Clause.

The lack of constitutional text is no accident; the Framers explicitly created immunity for other officials.  The Constitution's Speech and Debate Clause provides that "Senators and Representatives . . . shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest during their Attendance at the Session of their respective Houses, and in going to and returning from the same; and for any Speech or Debate in either House, they shall not be questioned in any other Place."  U.S. Const. art. I, § 6, cl. 1.  And some Founding-Era state constitutions, like those of Virginia and Delaware, unequivocally protected their Governor from certain penal sanctions, at least until "he [was] out of office."  Saikrishna Bangalore Prakash, *Prosecuting and Punishing Our Presidents*, 100 Tex. L. Rev. 55, 69 (2021) (quoting Va. Const. of 1776, art. XVI); *accord id.* at 69–70 (quoting Del. Const. of 1776, art. XXIII).  The U.S. Constitution contains no equivalent protections for the President.

Nor is the Constitution silent on the question because its drafters and ratifiers assumed the President would enjoy the immunity Defendant claims.  To the contrary, America's founding generation envisioned a Chief Executive wholly different from the unaccountable, almost omnipotent rulers of other nations at that time.  In Federalist No. 69—titled "The Real Character of the Executive"—Alexander Hamilton emphasized the "total dissimilitude between [the President] and the king of Great Britain," the latter being "sacred and inviolable" in that "there is no constitutional tribunal to which he is amenable; no punishment to which he can be subjected." *The Federalist Papers by Alexander Hamilton, James Madison and John Jay* 348–49 (Garry

Wills ed. 1982).[2]  Hamilton's contemporary commentators universally affirmed the crucial

distinction that the President would at some point be subject to criminal process.  *See* Prakash,

100 Tex. L. Rev. at 71–75 (collecting commentary); Response, Brian C. Kalt, *Criminal Immunity*

*and Schrödinger's President: A Response to* Prosecuting and Punishing Our Presidents, 100 Tex.

L. Rev. Online 79, 83–85 (2021) (acknowledging Founding-Era consensus that Presidents would

lack absolute criminal immunity, but noting that most commentary was ambiguous about

whether prosecution could occur during Presidency, or only after).  That widely acknowledged

contrast between the President and a king is even more compelling for a former President.  The

Constitution's silence on former Presidents' criminal immunity thus does not reflect an

understanding that such immunity existed.

Lacking an express constitutional provision, Defendant hangs his textual argument for

immunity on the Impeachment Judgment Clause, but it cannot bear the weight he places on it.

The Clause provides:

> Judgment in Cases of Impeachment shall not extend further than to removal from
> Office, and disqualification to hold and enjoy any Office of honor, Trust or Profit
> under the United States: but the Party convicted shall nevertheless be liable and
> subject to Indictment, Trial, Judgment and Punishment, according to Law.

U.S. Const. art. I, § 3, cl. 7.  From this language, Defendant concludes "that the President may be

charged by indictment only in cases where the President has been impeached and convicted by

trial in the Senate."  Immunity Motion at 11.  But Defendant is not President, and reading the

Clause to grant absolute criminal immunity to former Presidents would contravene its plain

meaning, original understanding, and common sense.

---

[2] All subsequent citations to the Federalist Papers refer to this edition, and the Papers are also
available online at https://avalon.law.yale.edu/subject_menus/fed.asp.

The Clause has two parts.  The first limits the penalties of impeachment to removal and disqualification from office.  That limit marked a deliberate departure from the prevailing British tradition, in which an impeachment conviction "might result in a wide array of criminal penalties, including fines, imprisonment, and even execution."  *Whether A Former President May Be Indicted and Tried for the Same Offenses for Which He Was Impeached by the House and Acquitted by the Senate*, 24 U.S. Op. Off. Legal Counsel 110, 2000 WL 33711290, at *7 (2000) ("OLC Double Jeopardy Memo") (citing 2 Joseph Story, *Commentaries on the Constitution of the United States* 251–2 (1833; reprint 1994) ("*Story's Commentaries*"); 2 Richard Wooddeson, *A Systematical View of the Laws of England* 611–14 (1792); Raoul Berger, *Impeachment: The Constitutional Problems* 67 (1974)).  The second part of the Clause provides, however, that impeachment's limits do not preclude "the Party convicted" from later criminal prosecution in the courts—*i.e.*, that "further punishment[] . . . would still be available but simply not to the legislature."  *Id.* at *10.

Both parts of the Clause undercut Defendant's interpretation of it.  The first begins by defining the Clause's scope: "Judgment in Cases of Impeachment," indicating that the Clause is aimed primarily at identifying the permissible penalties associated with impeachment itself.  The Clause's second part confirms that purview.  Rather than stating that "the Party convicted shall *only then* be liable" to criminal prosecution, the Clause states that "the Party convicted shall *nevertheless* be liable."  U.S. Const. art. I, § 3, cl. 7 (emphasis added).  At the Founding, as now, "nevertheless" meant "notwithstanding that," and "notwithstanding that" meant "[w]ithout hindrance or obstruction from."  *Neverthele'ss*, Samuel Johnson, *A Dictionary Of The English Language* (1978) (4th ed. 1773), *available at* https://perma.cc/ST8E-RCMB; *id.*, *Notwithsta'nding*, *available at* https://perma.cc/A9ML-QK4Y.  In the Impeachment Judgment

Clause, the word "nevertheless" in the second part thus signifies that the first part—constraining impeachment's penalties—does not bear on whether the Party would also be subject to criminal prosecution.  *See* OLC Immunity Memo at *2 (citing *Amenability of the President, Vice President and other Civil Officers to Federal Criminal Prosecution while in Office* (1973) ("1973 OLC Memo"), *available at* https://perma.cc/DM28-LHT9).  As discussed at greater length below, the Clause's manifest purpose—and originally understood effect—was therefore "to permit criminal prosecution in spite of the prior adjudication by the Senate, *i.e.*, to forestall a double jeopardy argument."  *Id.* (citation omitted); *see infra* Section V.B.  That is quite different from establishing impeachment and conviction as a prerequisite to a former President's criminal prosecution.

The historical sources that Defendant cites do not move the needle.  First, he quotes Alexander Hamilton's twin statements in *The Federalist* that the "President of the United States would be liable to be impeached, tried, and, upon conviction of treason, bribery, or other high crimes or misdemeanors, removed from office; and would afterwards be liable to prosecution and punishment in the ordinary course of law," Federalist No. 69 at 348, and that the President would be "at all times liable to impeachment, trial, dismission from office, incapacity to serve in any other, and to forfeiture of life and estate by subsequent prosecution in the common course of law,"  Federalist No. 77 at 392.  Immunity Motion at 12.  But those statements merely echo the Clause's clarification that prosecution *may* follow impeachment; they do not say that those events *must* happen in that order.  Second, Defendant cites Founding Father James Wilson's remark during the ratification debates that the President "is amenable to [the laws] in his private character as a citizen, and in his public character by impeachment."  J. Elliot, *Debates on The Federal Constitution* 480 (2d ed. 1863).  But Wilson was describing a President in office, *see id.*,

and that description is entirely consistent with a former President—having returned to life "as a citizen"—being subject to criminal prosecution.  There is no evidence that any of the Constitution's drafters or ratifiers intended or understood former Presidents to be criminally immune unless they had been impeached and convicted, much less a widespread consensus that the Impeachment Judgment Clause would have that effect.

In addition to lacking textual or historical support, Defendant's interpretation of the Clause collapses under the application of common sense.  For one, his reasoning is based on the logical fallacy of "denying the antecedent."  *See, e.g.*, *New LifeCare Hosps. of N.C. LLC v. Azar*, 466 F. Supp. 3d 124, 136 n.7 (D.D.C. 2020).  From the statement "if the animal is a cat, it can be a pet," it does not follow that "if the animal is not a cat, it cannot be a pet."  Yet Defendant argues that because a President who is impeached and convicted may be subject to criminal prosecution, "a President who is *not* convicted may *not* be subject to criminal prosecution."  Immunity Motion at 11.  Even assuming that negative implication finds some traction when applied to sitting Presidents, *see, e.g.*, *Trump v. Vance*, 140 S. Ct. 2412, 2444–45 (2020) (Alito, J., dissenting) (discussing that implication); *but see* OLC Immunity Memo at *2–3 (restating the 1973 OLC Memo's rejection of the implication); *see also infra* Section V.B (discussing the implication for double jeopardy purposes), the logic certainly does not hold for former Presidents.  That is because there is another way, besides impeachment and conviction, for a President to be removed from office and thus subjected to "the ordinary course of law," Federalist No. 69 at 348:  As in Defendant's case, he may be voted out.  The President "shall hold his Office during the Term of four Years."  U.S. Const. art. II, § 1, cl. 1.  Without reelection, the expiration of that term ends a Presidency as surely as impeachment and conviction.  *See United States v. Burr*, 25 F. Cas. 30, 34 (C.C.D. Va. 1807) (Marshall, Circuit

Justice) ("[T]he president is elected from the mass of the people, and, on the expiration of the time for which he is elected, returns to the mass of the people again.").  Nothing in the Impeachment Judgment Clause prevents criminal prosecution thereafter.

Defendant's reading of the Impeachment Judgment Clause also proves too much.  If the Clause required impeachment and conviction to precede criminal prosecution, then that requirement would apply not only to the President, but also to the "Vice President and all civil Officers of the United States"—who may likewise be impeached.  U.S. Const. art. II, § 4.  "The constitutional practice since the Founding, however, has been to prosecute and even imprison civil officers other than the President . . . prior to their impeachment."  OLC Immunity Memo at *2 (citing 1973 OLC Memo at 4–7 (collecting sources)).  For instance, then-Vice President Aaron Burr was indicted without being impeached, *see* 1973 SG Memo at 12, and the same fate might have befallen Vice President Spiro Agnew had he not resigned and entered a *nolo contendere* plea, *see United States v. Agnew*, 428 F. Supp. 1293, 1293 (D. Md. 1977).  Not only would Defendant's interpretation contradict that long-settled practice, it would also introduce significant "complications into criminal proceedings" for all current and former federal officials, including "threshold constitutional questions" of "whether the suspect is or was an officer of the United States," and "whether the offense is one for which he could be impeached."  OLC Immunity Memo at *3 (citing 1973 OLC Memo at 7).  The clash with historical practice and difficulties in application that would flow from Defendant's interpretation further confirm that it cannot be the correct reading of the Clause.

Finally, Defendant's interpretation of the Impeachment Judgment Clause would produce implausibly perverse results.  The Constitution permits impeachment and conviction for a limited category of offenses: "Treason, Bribery, or other high Crimes and Misdemeanors."  U.S. Const.

art. II, § 4.  Under Defendant's reading, if a President commits a crime that does not fall within that limited category, and so could not be impeached and convicted, the President could never be prosecuted for that crime.  Alternatively, if Congress does not have the opportunity to impeach or convict a sitting President—perhaps because the crime occurred near the end of their term, or is covered up until after the President has left office—the former President similarly could not be prosecuted.  Defendant seems to suggest that this scenario, in which the former President would be utterly unaccountable for their crimes, is simply the price we pay for the separation of powers. *See* Reply in Support of Immunity Motion, ECF No. 122, at 6 (quoting *Morrison v. Olson*, 487 U.S. 654, 710 (1988) (Scalia, J., dissenting) ("While the separation of powers may prevent us from righting every wrong, it does so in order to ensure that we do not lose liberty.")).[3]  That cannot be the Clause's meaning.  The constitutional limits on impeachment's penalties do not license a President's criminal impunity.

In sum, nothing in the Constitution's text supplies the immunity that Defendant claims.  To be sure, "a specific textual basis has not been considered a prerequisite to the recognition of immunity," and so the inquiry is not confined to the express terms of our founding charter. *Fitzgerald*, 457 U.S. at 750 n.31.  But the lack of supporting constitutional text does mean that a former President's federal criminal immunity, if it exists, must arise entirely from "concerns of public policy, especially as illuminated by our history and the structure of our government." *Id.* at 747–48.  Defendant's resort to those principles fares no better.

---

[3] Even assuming that former as well as sitting Presidents may be impeached, this hypothetical would still produce problematic results.  Congress could enable a former President's criminal prosecution by impeaching them after they have left office.  But it would raise serious separation of powers concerns to restrain the core executive act of prosecuting a private citizen—as a former President would then be—until Congress chose to do so. *See infra* Section III.B.2.

B. **Structure**

The Supreme Court has cautioned against forms of Presidential liability that "rise to the level of constitutionally forbidden impairment of the Executive's ability to perform its constitutionally mandated functions." *Clinton v. Jones*, 520 U.S. 681, 702 (1997). But the prospect of federal criminal liability for a former President does not violate that structural principle, either by imposing unacceptable risks of vexatious litigation or by otherwise chilling the Executive's decision-making process. Indeed, it is likely that a President who knows that their actions may one day be held to criminal account will be motivated to take greater care that the laws are faithfully executed. More fundamentally, federal criminal liability is essential to the public's interest in our "historic commitment to the rule of law . . . nowhere more profoundly manifest than in our view that 'the twofold aim of criminal justice is that guilt shall not escape or innocence suffer.'" *Nixon*, 418 U.S. at 708–09 (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)) (formatting modified). The Presidency's unique responsibilities do not exempt its former occupants from that commitment.

In *Fitzgerald*, the Supreme Court explained the structural analysis for Presidential immunity. In that case, civil plaintiff A. Ernest Fitzgerald claimed that President Richard Nixon had been involved in unlawfully firing him from his government job and sought money damages against the former President. 457 U.S. at 733–41. The five-Justice majority noted it was "settled law that the separation-of-powers doctrine does not bar every exercise of jurisdiction over the President of the United States." *Id.* at 753–54 (citations omitted). But it instructed that "a court, before exercising jurisdiction, must balance the constitutional weight of the interest to be served against the dangers of intrusion on the authority and functions of the Executive Branch." *Id.* at 754 (citations omitted). "When judicial action is needed to serve broad public interests—as when the Court acts, not in derogation of the separation of powers, but to maintain their proper

balance, or to vindicate the public interest in an ongoing criminal prosecution—the exercise of jurisdiction has been held warranted." *Id.* (first citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), then citing *Nixon*, 418 U.S. 731). Ultimately, the Court found that a "merely private suit for damages based on a President's official acts" did not serve those interests, and held that a former President could remain immune from such suits. *Id.* For a federal criminal prosecution, however, the analysis comes out the other way.

1. Burdens on the Presidency

At the outset, it bears noting that it is far less intrusive on the functions of the Executive Branch to prosecute a former President than a sitting one. The Supreme Court has accepted at least "the initial premise" that the President "occupies a unique office with powers and responsibilities so vast and important that the public interest demands that he devote his undivided time and attention to his public duties." *Clinton*, 520 U.S. at 697–98. And the Office of Legal Counsel has identified three burdens of criminal prosecution that could impede the performance of that constitutional role:

> (a) the actual imposition of a criminal sentence of incarceration, which would make it physically impossible for the President to carry out his duties; (b) the public stigma and opprobrium occasioned by the initiation of criminal proceedings, which could compromise the President's ability to fulfill his constitutionally contemplated leadership role with respect to foreign and domestic affairs; and (c) the mental and physical burdens of assisting in the preparation of a defense for the various stages of the criminal proceedings, which might severely hamper the President's performance of his official duties.

OLC Immunity Memo at *19. But none of those burdens would result from the criminal prosecution of a former President, who is no longer performing official duties. Accordingly, the separation-of-powers concerns are significantly diminished in this context.

*Fitzgerald* nonetheless suggested that the prospect of post-Presidency civil liability might "distract a President from his public duties, to the detriment of not only the President and his

office but also the Nation that the Presidency was designed to serve."  457 U.S. at 753.  The

Supreme Court highlighted two concerns: (1) the public interest in providing the President "the

maximum ability to deal fearlessly and impartially with the duties of his office," and (2) the fact

that given the "visibility of his office and the effect of his actions on countless people, the

President would be an easily identifiable target for suits for civil damages."  *Id.* at 752–53

(quotation omitted).  Defendant correspondingly focuses his arguments for immunity on (1) "the

chilling effect personal liability would have on the President's decision-making," and (2) the

"potential criminal prosecutions" former Presidents could face from "local, state, or subsequent

federal officials."  Immunity Motion at 9–10.  He contends that "[c]ognizance of this personal

vulnerability frequently could distract a President from his public duties, to the detriment of not

only the President and his office but also the Nation that the Presidency was designed to serve."

*Id.* at 10 (quoting *Fitzgerald*, 457 U.S. at 753).

Those concerns do not carry the same weight in the context of a former President's

federal criminal prosecution.  First, the Supreme Court has largely rejected similar claims of a

"chilling effect" from the possibility of future criminal proceedings.  During the Watergate

prosecution, President Nixon argued that if recordings of his conversations were subject to

criminal subpoena, the Presidential decision-making process would be compromised because his

staff would be less candid.  *Nixon*, 418 U.S. at 705–06.  The Court disagreed, stating that it

"cannot conclude that advisers will be moved to temper the candor of their remarks by the

infrequent occasions of disclosure because of the possibility that such conversations will be

called for in the context of a criminal prosecution."  *Id.* at 712.  The Court quoted Justice

Cardozo's unanimous opinion finding that a jury's decision-making process would not be

meaningfully chilled if jurors' conduct were later subject to criminal prosecution:

> A juror of integrity and reasonable firmness will not fear to speak his mind if the confidences of debate are barred to the ears of mere impertinence of malice. He will not expect to be shielded against the disclosure of his conduct in the event that there is evidence reflecting upon his honor. The chance that now and then there may be found some timid soul who will take counsel of his fears and give way to their repressive power is too remote and shadowy to shape the course of justice.

*Id.* n.20 (quoting *Clark v. United States*, 289 U.S. 1, 16 (1933)).

The same reasoning applies here. There is no doubt that "a President must concern himself with matters likely to arouse the most intense feelings." *Fitzgerald*, 457 U.S. at 752 (internal quotation marks omitted). But "[c]riminal conduct is not part of the necessary functions performed by public officials." *United States v. Isaacs*, 493 F.2d 1124, 1144 (7th Cir. 1974). By definition, the President's duty to "take Care that the Laws be faithfully executed" does not grant special latitude to violate them. U.S. Const., art. II, § 3. That is especially true when the violations require criminal intent, as is the case here, *see* Opp'n to Immunity Motion, ECF No. 109, at 31–32 (reviewing *mens rea* requirements for the Indictment's four counts); *cf. Imbler v. Pachtman*, 424 U.S. 409, 429 (1976) (noting that even public officials "cloaked with absolute civil immunity . . . could be punished criminally" for their "willful acts"). Like his fellow citizens serving on juries, then, a President "of integrity and reasonable firmness" will not fear to carry out his lawful decision-making duties—even on hot-button political issues—and "will not expect to be shielded against the disclosure of his conduct in the event that there is evidence reflecting upon his honor." *Clark*, 289 U.S. at 16. The rationale for immunizing a President's controversial decisions from civil liability does not extend to sheltering his criminality.

Indeed, the possibility of future criminal liability might encourage the kind of sober reflection that would reinforce rather than defeat important constitutional values. If the specter of subsequent prosecution encourages a sitting President to reconsider before deciding to act with criminal intent, that is a benefit, not a defect. "Where an official could be expected to know

that certain conduct would violate statutory or constitutional rights, he should be made to hesitate." *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982). Consequently, to the extent that there are any cognizable "chilling effects" on Presidential decision-making from the prospect of criminal liability, they raise far lesser concerns than those discussed in the civil context of *Fitzgerald*. Every President will face difficult decisions; whether to intentionally commit a federal crime should not be one of them.

Second, the possibility of vexatious post-Presidency litigation is much reduced in the criminal context. Defendant protests that denying him immunity would subject future Presidents to "prosecution in countless federal, state, and local jurisdictions across the country," Immunity Motion at 10, but that is incorrect. To begin, Defendant is only charged with federal crimes in this case, so any ruling here will be limited to that context and would not extend to state or local prosecutions—which in any event might run afoul of the Supremacy Clause, *see Vance*, 140 S. Ct. at 2428 ("The Supremacy Clause prohibits state judges and prosecutors from interfering with a President's official duties. . . . Any effort to manipulate a President's policy decisions or to 'retaliat[e]' against a President for official acts . . . would thus be an unconstitutional attempt to 'influence' a superior sovereign 'exempt' from such obstacles." (citations omitted)). And as Defendant well knows, *see infra* Section V.A, a person cannot "be subject for the same offence to be twice put in jeopardy of life or limb," U.S. Const., amend. V. Consequently, denying Defendant immunity here means only that a former President may face one federal prosecution, in one jurisdiction, for each criminal offense allegedly committed while in office. That consequence stands in contrast to the civil context, where "the effect of [the President's] actions on countless people" could result in untold numbers of private plaintiffs suing for damages based on any number of Presidential acts. *Fitzgerald*, 457 U.S. at 753.

Defendant also warns that if he is not given immunity here, criminal prosecutions will "bedevil[] every future Presidential administration and usher[] in a new era of political recrimination and division." Immunity Motion at 11. But, as the Supreme Court noted when faced with a similar argument in *Clinton*, that "predictive judgment finds little support in either history or the relatively narrow compass of the issues raised in this particular case." 520 U.S. at 702. As Defendant acknowledges, he is the only former President in United States history to face criminal charges for acts committed while in office. *See* Immunity Motion at 15. "If the past is any indicator, it seems unlikely that a deluge of such litigation will ever engulf the Presidency." *Clinton*, 520 U.S. at 702. Despite Defendant's doomsaying, he points to no evidence that his criminal liability in this case will open the gates to a waiting flood of future federal prosecutions.

The robust procedural safeguards attendant to federal criminal prosecutions further reduce the likelihood that former Presidents will be unjustly harassed. Prosecutors themselves are constitutionally bound to not abuse their office, which is why "courts presume that they have properly discharged their official duties." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting *United States v. Chem. Found., Inc.,* 272 U.S. 1, 14–15 (1926)). And a federal indictment is issued by a grand jury, which is similarly "prohibited from engaging in 'arbitrary fishing expeditions' and initiating investigations 'out of malice or an intent to harass.'" *Vance*, 140 S. Ct. at 2428 (quoting *United States v. R. Enters., Inc.*, 498 U.S. 292, 299 (1991)). Even after indictment, "in the event of such harassment, a [former] President would be entitled to the protection of federal courts," which "have the tools to deter and, where necessary, dismiss" vexatious prosecutions. *Id*. For instance, if a prosecution is politically motivated, as Defendant has argued in this case, that alone may warrant dismissal. *See* Motion to Dismiss Case for

Selective and Vindictive Prosecution, ECF No. 116.  And if a meritless prosecution somehow

reached trial, a former President would still have the opportunity to put the government's proof

to the test.  *See* U.S. Const., art. III, § 2, cl. 3.

In short, the concerns discussed in the civil context of *Fitzgerald* find no meaningful

purchase here.  A former President accused of committing a crime while in office will be subject

to only one federal prosecution for that offense, which in turn will only result in conviction if the

grand jury finds probable cause and the prosecutor, judge, and all twelve petit jurors agree that

the charges are legitimate and have been proven beyond a reasonable doubt.  Throughout that

process, a former President "may avail himself of the same protections available to every other

citizen."  *Vance*, 140 S. Ct. at 2430.  In the rare case when a former President must do so, the

Constitution does not proffer the sledgehammer of absolute immunity where the scalpel of

procedural protections will suffice.  *See Burr*, 25 F. Cas. at 34 ("The guard, furnished to this high

officer [the President], to protect him from being harassed by vexatious and unnecessary

subpoenas, is to be looked for in the conduct of a court after those subpoenas have issued; not in

any circumstance which is to [] precede their being issued.").  The possibility of future harassing

federal criminal prosecution will not cast so "serious" a shadow on the Presidency that its current

occupant cannot fulfill its duties.  *Clinton*, 520 U.S. at 708.

2.  Public interest

On the other of side of the scale, the public interest in the prosecution of this case carries

grave weight.  The Supreme Court has repeatedly underscored its judgment that "the public

interest in fair and accurate judicial proceedings is at its height in the criminal setting."  *Vance*,

140 S. Ct. at 2424.  It has correspondingly refused to permit other concerns, including those

asserted by Presidents, to "prevail over the fundamental demands of due process of law in the

fair administration of criminal justice."  *Nixon*, 418 U.S. at 713; *see United States v. Gillock*, 445

U.S. 360, 373 (1980) (concluding that "principles of comity" must yield "where important federal interests are at stake, as in the enforcement of federal criminal statutes").  Despite their other vehement disagreements in *Fitzgerald*, all nine Justices unanimously endorsed that judgment with respect to former Presidents.  Justice Powell's majority opinion specifically contrasted the "lesser public interest in actions for civil damages than . . . in criminal prosecutions."  457 at 754 n.37.  Chief Justice Burger's concurrence made the same distinction.  *Id.* at 759–60 (distinguishing immunity "limited to civil damages claims" from "a *criminal* prosecution," as in *Burr* or *Nixon* (emphasis in original)).  And Justice White's four-member dissent stressed that no party had argued "that the President is immune from criminal prosecution in the courts[,] . . . [n]or would such a claim be credible."  *Id.* at 780.  *Fitzgerald* was thus undivided in contemplating that the public interest could require a former President's criminal liability.

Defendant resists that consensus in *Fitzgerald* by pointing to a single passage in the majority opinion where, in listing the "formal and informal checks" that could replace civil liability as a deterrent for Presidential misconduct, the Court did not specifically list criminal liability.  *Id.* at 757.  From that omission, Defendant infers that the Court intended to suggest that criminal liability would not be available either.  Immunity Motion at 13.  But the Court's unanimous emphasis that it was not immunizing former Presidents from federal criminal liability squarely refutes that inference.  If anything, the omission underscores that civil and criminal liability are so fundamentally distinct that they cannot be understood as substitutes for one another.  Accordingly, in the parallel context of cases "which have recognized an immunity from civil suit for state officials," the Supreme Court has explicitly "presumed the existence of federal

criminal liability as a restraining factor on the conduct of state officials." *Gillock*, 445 U.S. at 372.

It is no surprise that the Supreme Court has long recognized the special public interest in criminal law because of its distinctly communal character; that character is reflected in both the Constitution itself and the legal tradition from which it arose.  Unlike defendants in a civil matter, for example, federal criminal defendants are constitutionally guaranteed "a speedy and public trial" before a jury drawn from their community.  U.S. Const., amend VI; *id.*, art. III, § 2, cl. 3.  And the preeminent 18th-century legal commentator William Blackstone explained the reason for the community's special involvement in criminal cases:  Whereas civil injuries "are an infringement or privation of the civil rights which belong to individuals, considered merely as individuals," crimes "are a breach and violation of the public rights and duties due to the whole community, considered as a community."  4 William Blackstone, *Commentaries* *5.  The fundamentally public interest in a criminal prosecution explains why it "may proceed without the consent of the victim and why it is brought in the name of the sovereign rather than the person immediately injured by the wrong."  OLC Immunity Memo at *22.  Put differently, the very name of this case confirms the public's particular stake in its adjudication: it is the *United States of America v. Donald J. Trump*.

Congress has also affirmed the special public interests in enforcing the criminal law.  In the Sentencing Reform Act of 1984, it required every federal court to consider certain factors in imposing sentence, and declared "the need for the sentence imposed":

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2); *see* Pub. L. 98-473, title II, § 212(a)(2) (1984). The public has an undisputed interest in promoting respect for the law, deterring crime, protecting itself, and rehabilitating offenders. All of those interests would be thwarted by granting former Presidents absolute criminal immunity.

The fact that Congress has spoken by criminalizing the conduct with which Defendant is charged also highlights the separation of powers principles that counsel in favor of the court retaining jurisdiction over this case. "When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb." *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring). Congress could have penalized the conduct alleged in this case— if it chose to penalize it at all—with mere civil liability, perhaps allowing for monetary damages should a private plaintiff choose to bring suit. Instead, it expressed a far stronger condemnation by subjecting that conduct to the severe consequences of the criminal law. "Whatever may be the case with respect to civil liability" for former Presidents, then, "the judicially fashioned doctrine of official immunity does not reach 'so far as to immunize criminal conduct proscribed by an Act of Congress.'" *O'Shea v. Littleton*, 414 U.S. 488, 503 (1974) (quoting *Gravel v. United States*, 408 U.S. 606, 627 (1972)). Indeed, stretching the doctrine so far would also "imped[e] . . . the primary constitutional duty of the Judicial Branch to do justice in criminal prosecutions," *Nixon*, 418 U.S. at 707, not to mention the current President's duty to enforce the criminal law, *see* U.S. Const., art. II, § 3. Holding a former President absolutely immune would thus impinge on the functions of all three branches with respect to the criminal law: Congress's province to make it, the Executive's prerogative to enforce it, and the Judiciary's charge to apply it.

Most importantly, a former President's exposure to federal criminal liability is essential to fulfilling our constitutional promise of equal justice under the law. "The government of the United States has been emphatically termed a government of laws, and not of men." *Marbury v. Madison*, 5 U.S. 137, 163 (1803). As the Supreme Court has stated, that principle must govern citizens and officials alike:

> No officer of the law may set that law at defiance with impunity. All the officers of the government, from the highest to the lowest, are creatures of the law, and are bound to obey it. It is the only supreme power in our system of government, and every man who by accepting office participates in its functions is only the more strongly bound to submit to that supremacy, and to observe the limitations which it imposes upon the exercise of the authority which it gives.

*United States v. Lee*, 106 U.S. 196, 220 (1882).

Perhaps no one understood the compelling public interest in the rule of law better than our first former President, George Washington. His decision to voluntarily leave office after two terms marked an extraordinary divergence from nearly every world leader who had preceded him, ushering in the sacred American tradition of peacefully transitioning Presidential power—a tradition that stood unbroken until January 6, 2021. In announcing that decision, however, Washington counseled that the newfound American independence carried with it a responsibility. "The very idea of the power and the right of the people to establish government presupposes the duty of every individual to obey the established government." Washington's Farewell Address, S. Doc. No. 106-21, at 13 (2d Sess. 2000), *available at* https://perma.cc/E5CZ-7NNP. He issued a sober warning: "All obstructions to the execution of the laws," including group arrangements to "counteract" the "regular deliberation and action of the constituted authorities, are destructive of this fundamental principle." *Id.* at 14. In Washington's view, such obstructions would prove "fatal" to the Republic, as "cunning, ambitious, and unprincipled men will be enabled to subvert

the power of the people and to usurp for themselves the reins of government, destroying afterwards the very engines which have lifted them to unjust dominion."  *Id.*

In this case, Defendant is charged with attempting to usurp the reins of government as Washington forewarned:  The Government alleges that, with the help of political associates, he "spread lies that there had been outcome-determinative fraud in the election and that he had actually won," and "pursued unlawful means of discounting legitimate votes and subverting the election results," all because he "was determined to remain in power."  Indictment ¶¶ 2, 4.  In asserting absolute executive immunity, Defendant asks not for an opportunity to disprove those allegations, but for a categorical exemption from criminal liability because, in his view, "the indictment is based solely on President Trump's official acts."  Immunity Motion at 27–28.  That obstruction to the execution of the laws would betray the public interest.  "If one man can be allowed to determine for himself what is law, every man can.  That means first chaos, then tyranny."  *United States v. United Mine Workers of Am.*, 330 U.S. 258, 312 (1947) (Frankfurter, J., concurring in the judgment).

For all these reasons, the constitutional consequences of federal criminal liability differ sharply from those of the civil liability at issue in *Fitzgerald*.  Federal criminal liability will not impermissibly chill the decision-making of a dutiful Chief Executive or subject them to endless post-Presidency litigation.  It will, however, uphold the vital constitutional values that *Fitzgerald* identified as warranting the exercise of jurisdiction: maintaining the separation of powers and vindicating "the public interest in an ongoing criminal prosecution."  457 U.S. at 753–54.  Exempting former Presidents from the ordinary operation of the criminal justice system, on the other hand, would undermine the foundation of the rule of law that our first former President described: "Respect for its authority, compliance with its laws, [and] acquiescence in its

measures"—"duties enjoined by the fundamental maxims of true liberty."  Washington's

Farewell Address at 13.  Consequently, the constitutional structure of our government does not

require absolute federal criminal immunity for former Presidents.

## C.  History

Nothing in American history justifies the absolute immunity Defendant seeks.  As

discussed above, *supra* Section III.A, there is no evidence that the Founders understood the

Constitution to grant it, and since that time the Supreme Court "has never suggested that the

policy considerations which compel civil immunity for certain governmental officials also place

them beyond the reach of the criminal law."  *Imbler*, 424 U.S. at 429.  Moreover, the notion that

former Presidents cannot face federal criminal charges for acts they took in office is refuted by

the "presuppositions of our political history."  *Fitzgerald*, 457 U.S. at 745 (quoting *Tenney v.*

*Brandhove*, 341 U.S. 367, 376 (1951)).

Start with the Executive Branch itself.  "In the performance of assigned constitutional

duties each branch of the Government must initially interpret the Constitution, and the

interpretation of its powers by any branch is due great respect from the others."  *Nixon*, 418 U.S.

at 703.  The Executive's legal representatives—the Solicitor General and Office of Legal

Counsel—have expressly and repeatedly concluded that a former President may "be subject to

criminal process . . . after he leaves office or is removed therefrom through the impeachment

process."  OLC Immunity Memo at *12 (citing 1973 OLC Memo and 1973 SG Memo).

Naturally, the Special Counsel's decision to bring this case also reflects that judgment,

distinguishing the Department of Justice's position that former Presidents retain civil immunity.

*See* Brief for the United States as Amicus Curiae at 3 n.1 (filed Mar. 2, 2023), *Blassingame v.*

*Trump*, Nos. 22-5069, 22-7030, 22-7031 (D.C. Cir.).  Even on its own, the Executive's

longstanding and unwavering position on this issue weighs against this court unilaterally

blocking a considered prosecution by conferring absolute immunity.[4]

      Historical practice also indicates that a President's actions may later be criminally

prosecuted.  In the aftermath of Watergate, for example, President Ford granted former President

Nixon "full, free, and absolute pardon . . . for all offenses against the United States which he,

Richard Nixon, has committed or may have committed or taken part in during" while in office.

Gerald Ford, Presidential Statement at 7–8 (Sept. 8, 1974), *available at* https://perma.cc/2GNZ-

QQ3D.  In so doing, President Ford specifically noted the "serious allegations" that, without a

pardon, would "hang like a sword over our former President's head" until he could "obtain a fair

trial by jury."  *Id.* at 3; *see id. at* 4–5 (expressing concern about Nixon's rights to a presumption

of innocence and a speedy trial).  And former President Nixon formally accepted that "full and

absolute pardon for any charges which might be brought against me for actions taken during the

time I was President of the United States," calling the pardon a "compassionate act."  Richard

Nixon, Statement by Former President Richard Nixon at 1 (Sept. 8, 1974), *available at*

https://perma.cc/WV43-6E69.  Both Ford's pardon and Nixon's acceptance arose from the desire

to prevent the former President's potential criminal prosecution, and both specifically refer to

that possibility—without which the pardon would have been largely unnecessary.  Defendant's

view of his own immunity thus stands at odds with that of his predecessors in the Oval Office.

---

[4] Congress, the other political branch, has not spoken directly to this issue.  But it has not
exempted actions taken during the Presidency from the criminal law, and "[u]nder the authority
of Art. II, § 2," it "has vested in the Attorney General the power to conduct the criminal
litigation of the United States Government" and "to appoint subordinate officers to assist him,"
which he has done "in th[is] particular matter[]" by appointing "a Special Prosecutor."  *Nixon*,
418 U.S. at 694.  The Government also notes the statements of individual members of
Congress—including some who voted to acquit Defendant during his impeachment trial—
anticipating that Defendant could later be criminally prosecuted for the conduct at issue.  *See*
Opp'n to Immunity Motion at 14–15.

Granting the immunity Defendant seeks would also break with longstanding legal precedent that all government officials—even those immune from civil claims—may be held to criminal account.  In *Fitzgerald*, for instance, the Supreme Court analogized former President Nixon's civil immunity to the similar protections provided to judges and prosecutors.  457 U.S. at 745–48.  Unlike most government officials, who only receive "qualified" civil immunity, prosecutors and judges have absolute civil immunity due to "the especially sensitive duties" of their office and the public interest in their "liberty to exercise their functions with independence and without fear of consequences."  *Id.* at 745–46 (quotation omitted); *see, e.g.*, *Imbler*, 424 U.S. at 431 (state prosecutors possess absolute civil immunity for prosecutions); *Stump v. Sparkman*, 435 U.S. 349, 359–60 (1978) (state judges possess absolute civil immunity for judicial acts).  But notwithstanding their absolute civil immunity, prosecutors and judges are "subject to criminal prosecutions as are other citizens."  *Dennis v. Sparks*, 449 U.S. 24, 31 (1980); *see Imbler*, 424 U.S. at 429.  Thus, while in *Fitzgerald* the "careful analogy to the common law absolute immunity of judges and prosecutors" demonstrated history's support for the former President's civil immunity, *Vance*, 140 S. Ct. at 2426, here that same history compels the denial of a former President's criminal immunity.

Against the weight of that history, Defendant argues in essence that because no other former Presidents have been criminally prosecuted, it would be unconstitutional to start now.  Immunity Motion at 15–16.  But while a former President's prosecution is unprecedented, so too are the allegations that a President committed the crimes with which Defendant is charged.  *See infra* Section VI.B.  The Supreme Court has never immunized Presidents—much less former Presidents—from judicial process merely because it was the first time that process had been

necessary.  *See, e.g.*, *Vance*, 140 S. Ct. at 2424–25; *Clinton*, 520 U.S. at 692; *Nixon*, 418 U.S. at

703; *Burr*, 25 F. Cas. at 32.  The court will not do so here.

In any event, Defendant's reasoning turns the relevant historical analysis on its head.  In

*Clinton*, the President likewise argued that the relative dearth of cases in which "sitting

Presidents ha[d] been defendants in civil litigation involving their actions prior to taking office"

meant that the Constitution afforded him temporary immunity for such claims.  520 U.S. at 692;

*see* Brief for the Petitioner, 1996 WL 448096, at *17–18, *Clinton v. Jones*, No. 95-1853 (U.S.).

The Court found instead that the dearth of similar cases meant that there was no "basis of

precedent" for the immunity that President Clinton sought—and in fact showed that there was

little risk of such litigation impeding the Presidency going forward.  *Clinton*, 520 U.S. at 692,

702.  In other words, a defendant cannot claim that history supports their immunity by pointing

to the fact that their immunity has never been asserted.  Here, as in *Clinton*, that absence of

precedent negates rather than validates Defendant's argument that history establishes his

immunity from criminal prosecution.

\*     \*     \*

For these reasons, the court cannot conclude that our Constitution cloaks former

Presidents with absolute immunity for any federal crimes they committed while in office.  Our

nation's "historic commitment to the rule of law" is "nowhere more profoundly manifest than in

our view that 'the twofold aim of criminal justice is that guilt shall not escape or innocence

suffer.'"  *Nixon*, 418 U.S. at 708–09 (quoting *Berger*, 295 U.S. at 88) (formatting modified).

Nothing in the Constitution's text or allocation of government powers requires exempting former

Presidents from that solemn process.  And neither the People who adopted the Constitution nor

those who have safeguarded it across generations have ever understood it to do so.  Defendant's

four-year service as Commander in Chief did not bestow on him the divine right of kings to evade the criminal accountability that governs his fellow citizens. "No man in this country," not even the former President, "is so high that he is above the law." *Lee*, 106 U.S. at 220.

Consistent with its duty to not "decide questions of a constitutional nature unless absolutely necessary to a decision," *Clinton*, 520 U.S. at 690 & n.11 (quoting *Burton v. United States*, 196 U.S. 283, 295 (1905)), the court emphasizes the limits of its holding here. It does not decide whether former Presidents retain absolute criminal immunity from non-federal prosecutions, or whether sitting Presidents are entitled to greater immunity than former ones. Similarly, the court expresses no opinion on the additional constitutional questions attendant to Defendant's assertion that former Presidents retain absolute criminal immunity for acts "within the outer perimeter of the President's official" responsibility. Immunity Motion at 21 (formatting modified). Even if the court were to accept that assertion, it could not grant Defendant immunity here without resolving several separate and disputed constitutional questions of first impression, including: whether the President's duty to "take Care that the Laws be faithfully executed" includes within its "outer perimeter" at least five different forms of indicted conduct;[5] whether inquiring into the President's purpose for undertaking each form of that allegedly criminal conduct is constitutionally permissible in an immunity analysis, and whether any Presidential conduct "intertwined" with otherwise constitutionally immune actions

---

[5] As another court in this district observed in a decision regarding Defendant's civil immunity, "[t]his is not an easy issue. It is one that implicates fundamental norms of separation of powers and calls on the court to assess the limits of a President's functions. And, historical examples to serve as guideposts are few." *Thompson v. Trump*, 590 F. Supp. 3d 46, 74 (D.D.C. 2022); *see id*. at 81–84 (performing that constitutional analysis). The D.C. Circuit recently affirmed that district court's decision with an extensive analysis of just one form of conduct—"speech on matters of public concern." *Blassingame v. Trump*, Nos. 22-5069, 22-7030, 22-7031, slip op. at 23–42 (D.C. Cir. Dec. 1, 2023).

also receives criminal immunity.  *See id.* at 21–45.  Because it concludes that former Presidents do not possess absolute federal criminal immunity for any acts committed while in office, however, the court need not reach those additional constitutional issues, and it expresses no opinion on them.

## IV.    FIRST AMENDMENT

In his Constitutional Motion, Defendant first argues that the Indictment should be dismissed because it criminalizes his speech and therefore violates the First Amendment.  But it is well established that the First Amendment does not protect speech that is used as an instrument of a crime, and consequently the Indictment—which charges Defendant with, among other things, making statements in furtherance of a crime—does not violate Defendant's First Amendment rights.

### A.  The First Amendment and criminal prosecutions

The First Amendment provides, in relevant part, that "Congress shall make no law . . . abridging the freedom of speech."  U.S. Const. amend. I.  Generally, "the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."  *United States v. Stevens*, 559 U.S. 460, 468 (2010) (quoting *Ashcroft v. Am. Civ. Liberties Union*, 535 U.S. 564, 573 (2002)).  In restricting the government's power to control speech, the First Amendment "embodies 'our profound national commitment to the free exchange of ideas.'"  *Ashcroft*, 535 U.S. at 573 (citation omitted).

The right to freedom of speech is "not absolute," however.  *Id.*  It is fundamental First Amendment jurisprudence that prohibiting and punishing speech "integral to criminal conduct" does not "raise any Constitutional problem."  *Stevens*, 559 U.S. at 468–69 (citation omitted); *accord Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498–502 (1949).  "Many long established" criminal laws permissibly "criminalize speech . . . that is intended to induce or

commence illegal activities," *United States v. Williams*, 553 U.S. 285, 298 (2008), such as fraud, bribery, perjury, extortion, threats, incitement, solicitation, and blackmail, *see, e.g.*, *Stevens*, 559 U.S. at 468–69 (fraud); *Williams*, 553 U.S. at 298 (incitement, solicitation); *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 356 (2010) (bribery); *Rice v. Paladin Enters., Inc.*, 128 F.3d 233, 244 (4th Cir. 1997) (extortion, threats, blackmail, perjury). Prosecutions for conspiring, directing, and aiding and abetting do not run afoul of the Constitution when those offenses are "carried out through speech." *Nat'l Org. for Women v. Operation Rescue*, 37 F.3d 646, 655–56 (D.C. Cir. 1994) (directing and aiding and abetting); *see Williams*, 553 U.S. at 298 (conspiring).

**B.  The Indictment does not violate the First Amendment**

The Indictment alleges that Defendant used specific statements as instruments of the criminal offenses with which he is charged: conspiring to fraudulently obstruct the federal function for collecting, counting, and certifying the results of the Presidential election, in violation of 18 U.S.C. § 371 (Count I); corruptly obstructing and conspiring to obstruct Congress's certification of the election results, in violation of 18 U.S.C. §§ 1512(c)(2) and (k) (Counts II and III); and conspiring to deprive citizens of their constitutional right to have their votes counted, in violation of 18 U.S.C § 241 (Count IV). *See* Indictment ¶¶ 5–130.

That Defendant's alleged criminal conduct involved speech does not render the Indictment unconstitutional. The Indictment notes that "Defendant had a right, like every American, to speak publicly about the election and even to claim, falsely, that there had been outcome-determinative fraud during the election and that he had won." *Id.* ¶ 3. And it enumerates Defendant's specific statements only to support the allegations that Defendant joined conspiracies and attempted to obstruct the election certification, such as the allegations that Defendant knowingly made false claims about the election results, *id.* ¶¶ 11–12, and deceived

state officials to subvert the election results, *id.* ¶¶ 13–52. *See, e.g.*, *id.* ¶¶ 12, 19, 22, 31–35, 37, 41, 46, 50, 52 (referencing Defendant's statements).  The Indictment therefore properly alleges Defendant's statements were made in furtherance of a criminal scheme.

Defendant argues that the Indictment violates the First Amendment for three primary reasons: (1) the government may not prohibit Defendant's core political speech on matters of public concern, Constitutional Motion at 4–11; (2) "First Amendment protection . . . extends to statements advocating the government to act," *id.* at 12–14 (formatting modified); and (3) Defendant reasonably believed that the 2020 Presidential Election was stolen, *id.* at 15–17.

1. Core political speech on matters of public concern

Defendant first claims that his statements disputing the outcome of the 2020 election is "core political speech" that addresses a "matter[] of public concern." *Id.* at 8–10.  Even assuming that is true, "core political speech" addressing "matters of public concern" is not "immunized from prosecution" if it is used to further criminal activity.  *United States v. Rahman*, 189 F.3d 88, 117 (2d Cir. 1999); *see Stevens*, 559 U.S. at 468–69.  That is the case even though Defendant was the President at the time.  *See Blassingame v. Trump*, Nos. 22-5069, 22-7030, 22-7031, slip op. at 50 (D.C. Cir. Dec. 1, 2023) (Defendant is not entitled to immunity when he "engages in speech" that "removes him[] from the First Amendment's protections.").  As the D.C. Circuit has recognized, "an immunity for all presidential speech on matters of public concern …. is 'unsupported by precedent.'"  *Id.* at 27 (quoting *Clinton*, 520 U.S. at 695).

In support of his argument, Defendant first invokes various Justices' opinions in *United States v. Alvarez*, 567 U.S. 709 (2012).  Constitutional Motion at 4–7.  There was no majority opinion in *Alvarez*; a majority of the Justices agreed only that the Stolen Valor Act, which prohibits an individual from falsely representing that they have received "any decoration or medal authorized by Congress for the Armed Forces of the United States," violated the First

Amendment.  567 U.S. at 716, 729–30 (plurality opinion) (Kennedy, J., joined by Roberts. C.J.,

Ginsburg, J., and Sotomayor, J.); *id.* at 730 (Breyer, J. concurring in the judgment, joined by

Kagan, J.).  One theme common to both the plurality and concurring opinions, however, was the

concern that the Stolen Valor Act prohibited only false statements and *only because of their*

*falsity*. *See id.* at 717–22 (plurality opinion); *id.* at 732 (Breyer, J. concurring).  Indeed, each

opinion reiterated that laws "implicat[ing] fraud or speech integral to criminal conduct" are

constitutional.  *Id.* at 721 (plurality opinion); *accord id.* at 734–36 (Breyer, J., concurring in the

judgment); *id.* at 747 (Alito, J., dissenting).  Because it confirmed that speech involved in the

commission of a crime was not protected by the First Amendment, *Alvarez* did not undermine

settled precedent allowing the prosecution of speech in furtherance of criminal activity.

Second, Defendant contends that "attempts to prohibit or criminalize claims on political

disputes" constitute viewpoint discrimination.  Constitutional Motion at 9–10.  But Defendant is

not being prosecuted for his "view" on a political dispute; he is being prosecuted for acts

constituting criminal conspiracy and obstruction of the electoral process. *Supra* Section I.  And

any political motives Defendant may have had in doing so do not insulate his conduct from

prosecution. *E.g.*, *Rahman*, 189 F.3d at 116–17 (mixed motives do not insulate speech from

prosecution); *see* Gov.'s Omnibus Opp'n to Def.'s Motions to Dismiss the Indictment on

Statutory and Constitutional Grounds, ECF No. 139 at 33 (Opp'n to Constitutional Motion)

(collecting other Circuit cases).  The Indictment does not unconstitutionally discriminate against

Defendant based on viewpoint.

Third, Defendant argues that even if a higher level of scrutiny does not apply to the

Indictment, it nonetheless is invalid "under any level of scrutiny" because it is "tailored to violate

free-speech rights."  Constitutional Motion at 11.  Here, however, there is no level of scrutiny

that applies, because speech in furtherance of criminal conduct does not receive *any* First Amendment protection. *E.g.*, *Stevens*, 559 U.S. at 468–69. Moreover, Defendant cites no support for his argument that the Indictment is "tailored to *violate* free-speech rights," nor does he explain how the Indictment is so tailored. *See* Constitutional Motion at 11 (emphasis added).

Finally, Defendant argues that the Indictment violates the First Amendment because "*all* the charged conduct constitutes First Amendment protected speech." Def.'s Reply in Support of Motion to Dismiss Based on Constitutional Grounds, ECF No. 162 at 7–8 ("Constitutional Reply") (emphasis in original). He contends that to qualify as speech in furtherance of criminal conduct, "the speech in question must 'be integral to' some criminal 'conduct' that *is not itself a form of First Amendment-protected speech or expression*." *Id.* (emphasis added). But again, the Indictment does not need to list other kinds of criminal conduct in addition to speech to comply with the First Amendment; the crimes Defendant is charged with violating may be carried out through speech alone. *See Nat'l Org. for Women*, 37 F.3d at 656; *supra* Section IV.A.

2. Statements advocating government action

Defendant next claims the First Amendment protects "statements advocating the government to act." Constitutional Motion at 12–14 (formatting modified). He first contends the Petition Clause of the First Amendment provides an absolute right to make statements encouraging the government to act in a public forum, citing *McDonald v. Smith*, 472 U.S. 479 (1985). Constitutional Motion at 12–13. The Petition Clause provides that "Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. amend. I. The Clause protects individuals' ability to "'communicate their will' through direct petitions to the legislature and government officials." *McDonald*, 472 U.S. at 482 (quoting 1 *Annals of Congress* 738 (1789) (James Madison)). In *McDonald*, however, the Supreme Court concluded that the Petition Clause did *not* immunize a

person from a libel suit based on letters the individual had sent to the President.  *Id.* at 480–81; *see also* Opp'n to Constitutional Motion at 34.  The Court explained that the Petition Clause does not have "special First Amendment status," so "there is no sound basis for granting greater constitutional protection" under the Petition Clause "than other First Amendment expressions." *McDonald*, 472 U.S. at 484–85.  Defendant's reliance on the Clause and its interpretation in *McDonald* is therefore unavailing, as the Petition Clause does not prohibit prosecuting Defendant's speech any more than the Speech Clause does.  The Petition Clause does not insulate speech from prosecution merely because that speech also petitions the government.

Defendant also invokes *McDonnell v. United States*, 579 U.S. 550 (2016), to argue that allowing this prosecution would risk criminalizing statements once thought to be false that turned out to be true, such as statements made early in the COVID-19 pandemic that masks do not stop the transmission of the virus.  Constitutional Motion at 13–14.  Not so.  First, *McDonnell* did not involve the First Amendment but rather the proper interpretation of "official act" under the federal bribery statute, 18 U.S.C. § 201(b)(2).  *McDonell*, 579 U.S. at 566; *see* Opp'n to Constitutional Motion at 34 n.14.  And neither the Indictment nor the federal statutes under which Defendant is charged involve an "official act."  Second, Defendant is not being prosecuted simply for making false statements, *see supra* at 33–34, but rather for knowingly making false statements in furtherance of a criminal conspiracy and obstructing the electoral process.  Consequently, there is no danger of a slippery slope in which inadvertent false statements alone are alleged to be the basis for criminal prosecution.

In his Reply brief, Defendant also raises overbreadth, arguing that under the Government's interpretation, the underlying statutes charged in the Indictment are unconstitutional because they "criminalize a wide range of perfectly ordinary acts of public

speech and petitioning the government." Constitutional Reply at 9–10.  Assuming Defendant's

overbreadth challenge was properly raised for the first time in his Reply brief, the statutes are not

overbroad under the Government's view.  As an initial matter, Defendant's actions are not

entitled to First Amendment protection as "perfectly ordinary acts of public speech and

petitioning the government."  *Supra* Section IV.B.1–2; *infra* Section IV.B.3.  Moreover,

Defendant fails to identify any protected acts or speech that the statutes might render

impermissible under the Government's interpretation.  *See, e.g.*, *United States v. Hansen*, 599

U.S. 762, 769–70 (2023) (A litigant must "demonstrate[] that the statute 'prohibits a substantial

amount of protected speech' relative to its 'plainly legitimate sweep'" to succeed in overbreadth

challenge (citation omitted)).

3.   Defendant's statements on the 2020 Presidential Election

Finally, Defendant claims the First Amendment does not permit the government to

prosecute him for his reasonable belief that the 2020 Presidential Election was stolen.

Constitutional Motion at 15–17.  He argues that the truth or falsity of his belief is not "easily

verifiable" and there is "abundant public evidence providing a reasonable basis" for his view.  *Id.*

at 15–16.  He contends that he is "entitled to mistrust the word of . . . establishment-based

government officials and draw [his] own inferences from the facts."  *Id.* at 17.  At this stage,

however, the court must take the allegations in the Indictment as true, *supra* Section II, and the

Indictment alleges that Defendant made statements that he knew were false, *e.g.*, Indictment

¶¶ 11–12; *see also* Opp'n to Constitutional Motion at 26–27.  While Defendant challenges that

allegation in his Motion, and may do so at trial, his claim that his belief was reasonable does not

implicate the First Amendment.  If the Government cannot prove beyond a reasonable doubt at

trial that Defendant knowingly made false statements, he will not be convicted; that would not

mean the Indictment violated the First Amendment.

## V.    DOUBLE JEOPARDY

Defendant's Constitutional Motion next posits that the prosecution violates double jeopardy because Defendant was tried—and acquitted—in earlier impeachment proceedings arising out of the same course of conduct.  Constitutional Motion at 18–24.  But neither traditional double jeopardy principles nor the Impeachment Judgment Clause provide that a prosecution following impeachment acquittal violates double jeopardy.

### A.  **Double Jeopardy Clause**

The Fifth Amendment provides that "[n]o person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb."  U.S. Const. amend. V.  To "be twice put in jeopardy of life or limb" means to face the possibility of "multiple *criminal* punishments for the same offense."  *Hudson v. United States*, 522 U.S. 93, 99 (citation omitted) (emphasis in original).  A purportedly civil penalty only counts in the double jeopardy context if "the statutory scheme was so punitive in either purpose or effect . . . as to 'transform'" it into a criminal penalty.  *Id.* (citation omitted).

As long as separate prosecutions charge an individual with violating different laws, the prosecutions are considered separate "offenses" under the Double Jeopardy Clause and the second prosecution passes constitutional muster.  *Denezpi v. United States*, 596 U.S. 591, 597–98 (2022).  When the same "act or transaction" violates two distinct provisions of the same statute, there are distinct offenses only if "each provision requires proof of a fact which the other does not."  *Blockburger v. United States*, 284 U.S. 299, 304 (1932).  In contexts involving different sovereigns—such as the federal government and a state government—a person may be tried for violating laws that "have identical elements and could not be separately prosecuted if enacted by a single sovereign."  *Denezpi*, 596 U.S. at 597–98.

The Indictment here does not violate double jeopardy principles. First, impeachment threatens only "removal from Office, and disqualification to hold and enjoy any Office of honor, Trust or Profit under the United States," U.S. Const. art. I, § 3, cl. 7, neither of which is a criminal penalty. *See supra* at 9. Nor does Defendant argue that they are civil penalties that should be construed as criminal penalties. *See* Constitutional Motion at 23–24. Second, the impeachment proceedings charged Defendant with "Incitement of Insurrection," which is not charged in the Indictment. *See* Opp'n to Constitutional Motion at 60–62 (citing H.R. Res. 24, 117th Cong. (Jan. 11, 2021)). Although there are few decisions interpreting the analogous federal statute that prohibits inciting "any . . . insurrection against the authority of the United States or the laws thereof," 18 U.S.C. § 2383, it is well-established that "incitement" typically means "advocacy . . . directed to inciting or producing imminent lawless action" that is "likely to incite or produce such action," *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969). None of the statutes under which Defendant is charged require the Government to prove incitement. *See* 18 U.S.C. § 371; *id.* §§ 1512(c)(2), (k); *id.* § 241; *accord* Indictment ¶¶ 6, 126, 128, 130. The impeachment proceedings and this prosecution therefore did not "twice put" Defendant "in jeopardy of life or limb" for the "same offense."

Defendant also contends his prosecution violates double jeopardy principles because the distinct branches of government are part of one single sovereign. Constitutional Motion at 24. But even assuming that is true, Defendant does not argue that impeachment carries a criminal sanction or that the impeachment proceedings were based on the same offense as charged in the Indictment. *See id.* at 23–24. Instead, he argues that different double jeopardy principles would apply to prosecutions following impeachments, referencing only the Impeachment Judgment Clause for support. Constitutional Reply at 18–20. But, as discussed below, the Impeachment

Judgment Clause provides only that prosecutions following convictions at impeachment are

constitutionally permissible; it does not create special double jeopardy principles. *See* U.S.

Const. art. I, § 3, cl. 7; *infra* Section V.B. Consequently, the Indictment does not violate the

Double Jeopardy Clause.

**B.  Impeachment Judgment Clause**

The Impeachment Judgment Clause provides that "Judgment in Cases of Impeachment

shall not extend further than to removal from Office, and disqualification to hold and enjoy any

Office of honor, Trust or Profit under the United States: but the Party convicted shall

nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to

Law." U.S. Const. art. I, § 3, cl. 7. As explained above, the first part of the Clause limits the

remedies available in impeachment, and the second part provides that even if a person is

convicted in impeachment proceedings, they may still be subject to criminal prosecution. *See*

*supra* at 8–10. As the Office of Legal Counsel noted, the "second part makes clear that the

restriction on sanctions in the first part was not a prohibition on further punishments; rather,

those punishments would still be available but simply not to the legislature." OLC Double

Jeopardy Memo at *10.

Defendant contends the Impeachment Judgment Clause contains a negative implication:

if a person is *not* convicted in impeachment proceedings, they may *not* be prosecuted.

Constitutional Motion at 18–23; Constitutional Reply at 10–11. In statutory interpretation, the

*expressio unius* canon, which provides that "expressing one item of an associated group or series

excludes another left unmentioned," does not apply unless "circumstances support a sensible

inference that the term left out must have been meant to be excluded." *NLRB v. SW General,*

*Inc.*, 580 U.S. 288, 302 (2017) (citations omitted). Because Defendant's reading is not supported

by the structure of the Constitution, the historical context of the impeachment clauses, or prior

constitutional precedents, *expressio unius* does not apply. *Accord Thompson v. Trump*, 590 F. Supp. 3d 46, 86–87 (D.D.C. 2022). The Impeachment Judgment Clause does not provide that acquittal by the Senate during impeachment proceedings shields a President from criminal prosecution after he leaves office.

1. Structure

Structural considerations support reading the Impeachment Judgment Clause as the plain language suggests. First, as the Government notes, impeachment and prosecution serve distinct goals within the separation of powers. *See* Opp'n to Constitutional Motion at 52–53. Impeachment "is designed to enable Congress to protect the nation against officers who have demonstrated that they are unfit to carry out important public responsibilities," whereas prosecution is designed to "penalize individuals for their criminal misdeeds." OLC Double Jeopardy Memo at *13. Impeachment proceedings provide far fewer procedural safeguards than do prosecutions, *see id.*, and accordingly, Congress may not dispense criminal penalties in impeachment proceedings, *supra* Section V.A. Impeachment is not a substitute for prosecution.

Second, the Senate may acquit in impeachment proceedings even when it finds that an official committed the acts alleged. For example, the Senate may acquit because it believes the acts committed do not amount to "high Crimes and Misdemeanors," U.S. Const. art. II, § 4; because the Senate believes it lacks authority to try the official; or for partisan reasons. OLC Double Jeopardy Memo at *14–15. Indeed, the Framers anticipated that impeachments might spark partisan division. *See* The Federalist No. 65, at 330–31 (Alexander Hamilton); Letter from Edmund Pendleton to James Madison, Oct. 8, 1787, 10 *The Documentary History of the Ratification of the Constitution* 1773 (1976); 10 *The Papers of James Madison* 223 (Rutland et al. ed., 1977); *accord* OLC Double Jeopardy Memo at *15. Acquittal on impeachment does not establish the defendant's innocence.

Defendant contends that impeachment serves to protect officials from political attacks by their enemies, and allowing prosecution following impeachment acquittal would undermine that protection. Constitutional Reply at 15–18. But politics are likely to play even larger a role in impeachments than in prosecutions, given that impeachments are conducted by elected officials politically accountable to their constituents, whereas prosecutions are conducted by appointed officials, most of whom may not be removed without cause, *see Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 492–93 (2010) (explaining for-cause removal). And former officials like Defendant, rather than current officials, are also less likely to be politically attacked, because they no longer hold the power and authority of political office.

2.   Historical context

Defendant claims that his interpretation of the Impeachment Judgment Clause reflects the original public meaning of the impeachment clauses. Constitutional Motion at 20–21; Constitutional Reply at 12–15. Considerable historical research undermines that contention. *See* OLC Double Jeopardy Memo at *7–12 ("We are unaware of any evidence suggesting that the framers and ratifiers of the Constitution chose the phrase 'the party convicted' with a negative implication in mind."); *accord Thompson*, 590 F. Supp. 3d at 87. Most notably, the Founders repeatedly acknowledged that impeachment acquittals would not bar subsequent prosecutions. For example, James Wilson, who participated in the Constitutional Convention, observed that officials who "may not be convicted on impeachment . . . may be tried by their country." 2 *The Documentary History of the Ratification of the Constitution* 492. Edward Pendleton, who was President of the Virginia Ratifying Convention, similarly observed that "an Acquital would not bar," a "resort to the Courts of Justice," Letter from Edmund Pendleton to James Madison, Oct. 8, 1787, 10 *The Documentary History of the Ratification of the Constitution* 1773, a conclusion that James Madison called "extremely well founded," 10 *The Papers of James Madison* 223.

Justice Story too described that, following impeachment, "a second trial for the same offence could be had, either after an acquittal, or a conviction in the court of impeachments." 2 *Story's Commentaries* § 780.

Founding-era officials similarly acknowledged that an acquittal at impeachment proceedings would not bar a subsequent prosecution. For example, during the first federal impeachment trial, Representative Samuel Dana contrasted impeachment proceedings with criminal trials, stating that impeachment had "no conne[ct]ion with punishment or crime, as, whether a person tried under an impeachment be found guilty or acquitted, he is still liable to a prosecution at common law." 9 *Annals of Congress* 2475 (1798). None of the sources Defendant cites refute that conclusion. *See* Constitutional Motion at 20–21.

3. Prior precedent

Defendant's additional arguments invoking past constitutional precedents are similarly unavailing. He first cites Justice Alito's dissent in *Vance*. Constitutional Motion at 19–20. In *Vance*, the Supreme Court held that a sitting President is not immune from state criminal subpoenas, nor does a heightened standard apply to such requests. 140 S. Ct. at 2431. In so holding, the majority opinion reiterated that "no citizen, not even the President, is categorically above the common duty to produce evidence when called upon in a criminal proceeding." *Id.* Justice Alito's dissent, moreover, noted that under the Impeachment Judgement Clause, "criminal prosecution, like removal from the Presidency and disqualification from other offices, is a consequence that can come about only after the Senate's judgment, not during or prior to the Senate trial." *Id.* at 2444 (Alito, J., dissenting); *see* Constitutional Motion at 19. All Justice Alito's dissent observed is that, temporally, any prosecution must follow the judgment on impeachment; no official shall be subject to simultaneous impeachment proceedings and

criminal prosecution.  The dissent does not support the view that if impeachment proceedings end in acquittal, subsequent prosecution violates double jeopardy.

Defendant also cites *Fitzgerald* for the proposition that the threat of impeachment alone is the proper remedy against a President for any "official misfeasance."  Constitutional Motion at 22.  But as already explained, *Fitzgerald* is meaningfully distinguishable; it addressed immunity from civil suit, and all nine Justices took care to emphasize that their reasoning did not extend to the criminal context.  *See supra* Section III.B.1.

In sum, neither the Double Jeopardy Clause nor the Impeachment Judgment Clause prevent Defendant, who while President was acquitted in impeachment proceedings for incitement, from being prosecuted after leaving office for different offenses.

## VI.    DUE PROCESS

Finally, Defendant contends that the Indictment violates the Due Process Clause because he lacked fair notice that his conduct was unlawful.  Constitutional Motion at 25–31.

### A.  Due process principles

The Due Process Clause of the Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  To comply with due process, a law must give "fair warning" of the prohibited conduct.  *United States v. Lanier*, 520 U.S. 259, 265 (1997) (citation omitted).  A law fails to give fair warning if the text of a statute is so unclear that it requires the Judicial and Executive Branches to "define what conduct is sanctionable and what is not," *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018); *see Lanier*, 520 U.S. at 266 (citation omitted), or a judge construes the statute in a manner that is "clearly at variance with the statutory language," *Bouie v. City of Columbia*, 378 U.S. 347, 356 (1964); *see Rogers v. Tennessee*, 532 U.S. 451, 457 (2001); *see also Lanier*, 520 U.S. at 266.

For instance, in 2015, the Supreme Court concluded that the residual clause of the Armed Career Criminal Act violated due process because it was so vague—and difficult to administer— that defendants lacked notice of how it would be applied in any given case. *Johnson v. United States*, 576 U.S. 591, 597 (2015). The Court explained that the residual clause required judges to imagine an "ordinary case" involving the crime with which the defendant was charged, and compare the defendant's actions to that "ordinary case." *Id.* at 597, 599. It further emphasized that its "repeated attempts and repeated failures to craft a principled and objective standard out of the residual clause confirm[ed] its hopeless indeterminacy," *id.* at 598, noting that the clause had caused "numerous splits among the lower federal courts," *id.* at 601 (citation omitted).

A statute does not fail to give fair warning just "because it 'does not mean the same thing to all people, all the time, everywhere.'" *United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017) (citation omitted). "Since words, by their nature, are imprecise instruments," laws "may have gray areas at the margins" without violating due process. *United States v. Barnes*, 295 F.3d 1354, 1366 (D.C. Cir. 2002). Indeed, statutes are rarely found unconstitutional because their text fails to give fair warning. *See, e.g.*, *Bronstein*, 849 F.3d at 1107 (statute upheld); *Barnes*, 259 F.3d at 1366 (same); *Woodhull Freedom Found. v. United States*, 72 F.4th 1286, 1303–05 (D.C. Cir. 2023) (same); *Kincaid v. Gov't of D.C.*, 854 F.3d 721, 728–30 (D.C. Cir. 2017) (same); *Agnew v. Gov't of D.C.*, 920 F.3d 49, 55–61 (D.C. Cir. 2019) (same).

Applying a novel judicial construction of a statute may also fail to give fair warning if it "unexpectedly broadens" the statute's reach and applies that expanded reach "retroactively." *Bouie*, 378 U.S. at 353–57; *see Rogers*, 532 U.S. at 457; *Reed v. Goertz*, 143 S. Ct. 955, 960–61 (2023). In *Bouie*, for example, defendants were convicted of violating a state law prohibiting "entry upon the lands of another . . . after notice from the other . . . prohibiting such entry" after

they remained on premises after being asked to leave, even though they did not re-enter the premises.  378 U.S. at 355.  The Supreme Court held that the state supreme court's construction of the statute failed to give the defendants fair notice because it was "clearly at variance with the statutory language" and had "not the slightest support in prior [state] decisions."  *Id.* at 356.

### B.  **The Indictment does not violate due process**

Defendant had fair notice that his conduct might be unlawful.  None of the criminal laws he is accused of violating—18 U.S.C. § 371; *id.* § 1512(k); *id.* § 1512(c)(2); and *id.* § 241—require the Executive or Judicial Branch to "guess" at the prohibited conduct, *Lanier*, 520 U.S. at 266.  Nor does finding that the Indictment complies with due process require the court to create a novel judicial construction of any statute.

Defendant notes that the "principle of fair notice has special force" in the First Amendment Context.  Constitutional Motion at 26–27.  While that may be true, even "special force" does not place Defendant's alleged conduct "outside the plain language of the charged statutes" as he alleges.  *See id.* at 27.  First, his argument does not contrast the allegations in the Indictment with the plain language of the statutes, but instead attempts to recast the factual allegations in the Indictment itself as no more than routine efforts to challenge an election.  *See id.* at 31 (claiming that "post-election challenges" like Defendant's "had been performed in 1800, 1824, 1876, and 1960 . . . without any suggestion [it was] criminal").  But again, at this stage, the court must take the allegations in the Indictment as true.  *Supra* Section II, IV.B.3.  The fact that Defendant disputes the allegations in the Indictment do not render them unconstitutional.  Second, the meaning of statutory terms "need not be immediately obvious to an average person; indeed, 'even trained lawyers may find it necessary to consult legal dictionaries, treatises, and judicial opinions before they may say with any certainty what some statutes may compel or forbid.'"  *Agnew*, 920 F.3d at 57 (citation omitted).  And due process does not entitle Defendant

to advance warning that his precise conduct is unlawful, so long as the law plainly forbids it.  *See Lanier*, 520 U.S. at 271; *cf. United States v. Int'l Mins. & Chem. Corp.*, 402 U.S. 558, 563 (1971) ("ignorance of the law is no defense").

Defendant also claims he lacked fair notice because there is a "long history" of government officials "publicly claiming that election results were tainted by fraud" or questioning election results, yet he is "the first person to face criminal charges for such core political behavior."  Constitutional Motion at 25; *see id.* at 27–30.  But there is also a long history of prosecutions for interfering with the outcome of elections; that history provided Defendant with notice that his conduct could be prosecuted.  *See* Opp'n to Constitutional Motion at 39–40 (citing six examples of 18 U.S.C. § 241 prosecutions).  Indeed, the Supreme Court has addressed more than one case in which officials were prosecuted for interfering with or discarding election ballots.  *United States v. Mosley*, 238 U.S. 383, 385 (1915); *United States v. Saylor*, 322 U.S. 385, 386 (1944).

In addition, none of the contested elections Defendant invokes is analogous to this case.  *See* Opp'n to Constitutional Motion at 40–47 (detailing the history of each election).  As noted above, Defendant is not being prosecuted for publicly contesting the results of the election; he is being prosecuted for knowingly making false statements in furtherance of a criminal conspiracy and for obstruction of election certification proceedings.  And in none of these earlier circumstances was there any allegation that any official engaged in criminal conduct to obstruct the electoral process.  For instance, following the 2004 Presidential election, Representative Stephanie Tubbs Jones raised an objection to Ohio's electoral votes at the joint session; Senator Boxer signed the objection.  151 Cong. Rec. 199 (Jan. 6, 2005).  As Representative Jones explained in a separate session, that objection was to allow "a necessary, timely, and appropriate

opportunity to review and remedy . . . the right to vote." *Id.* Ohio's electoral votes were then counted for President Bush. Defendant points to no allegation that Representative Jones' objection was in furtherance of a criminal conspiracy or designed to obstruct the electoral process.

Moreover, even if there were an analogous circumstance in which an official had escaped prosecution, the mere absence of prior prosecution in a similar circumstance would not necessarily mean that Defendant's conduct was lawful or that his prosecution lacks due process. The "exclusive authority and absolute discretion to decide whether to prosecute a case"—within bounds, *supra* at 19–20—is a cornerstone of the Executive Branch. *Nixon*, 418 U.S. at 693 (citation omitted).

Finally, Defendant argues that, for the Indictment to comply with due process, the prosecution bears the burden to "provide examples where similar conduct was found criminal." Constitutional Reply at 21. Under that theory, novel criminal acts would never be prosecuted. The Constitution does not so constrain the Executive Branch.

## VII.   CONCLUSION

For the foregoing reasons, the court will DENY Defendant's Motion to Dismiss Indictment Based on Presidential Immunity, ECF No. 74, and Motion to Dismiss the Indictment Based on Constitutional Grounds, ECF No. 113. A corresponding Order will accompany this Memorandum Opinion.

Date: December 1, 2023

*Tanya S. Chutkan*

TANYA S. CHUTKAN
United States District Judge

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **UNITED STATES OF AMERICA**, <br><br> v. <br><br> **DONALD J. TRUMP**, <br><br> Defendant. | Criminal Action No. 23-257 (TSC) |

## <u>ORDER</u>

For the reasons set forth in the accompanying Memorandum Opinion, ECF No. 171, Defendant's Motion to Dismiss Based on Presidential Immunity, ECF No. 74, is hereby DENIED; and Defendant's Motion to Dismiss Based on Constitutional Grounds, ECF No. 113, is hereby DENIED.

Date: December 1, 2023

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

   v.

DONALD J. TRUMP,

       *Defendant*.

Case No. 1:23-cr-00257-TSC

### NOTICE OF APPEAL

Defendant President Donald J. Trump hereby provides notice that he appeals to the U.S. Court of Appeals for the District of Columbia Circuit from the Memorandum Opinion and Order of the District Court dated December 1, 2023, Docs. 171, 172.

Dated: December 7, 2023

Respectfully submitted,

Todd Blanche, Esq. (PHV)
ToddBlanche@blanchelaw.com
Emil Bove, Esq. (PHV)
Emil.Bove@blanchelaw.com
BLANCHE LAW PLLC
99 Wall St., Suite 4460
New York, NY 10005
(212) 716-1250

*/s/John F. Lauro*
John F. Lauro, Esq.
D.C. Bar No. 392830
jlauro@laurosinger.com
Gregory M. Singer, Esq. (PHV)
gsinger@laurosinger.com
Filzah I. Pavalon, Esq. (PHV)
fpavalon@laurosinger.com
Lauro & Singer
400 N. Tampa St., 15th Floor
Tampa, FL 33602
(813) 222-8990
*Counsel for President Trump*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA**,

v.

**DONALD J. TRUMP**,

Defendant.

Criminal Action No. 23-257 (TSC)

## OPINION AND ORDER

On December 4, 2023, the court issued a Memorandum Opinion and Order denying Defendant's motions to dismiss based on Presidential immunity and constitutional grounds. ECF Nos. 171, 172. Defendant has appealed that decision, ECF No. 177, and filed a Motion to Stay Proceedings Pending Appeal, ECF No. 178 ("Motion"). For the reasons set forth below, the court will GRANT in part and DENY in part Defendant's Motion.

"The filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982). In *Coinbase, Inc. v. Bielski*, 599 U.S. 736, 739–44 (2023), the Supreme Court applied the *Griggs* principle to an interlocutory appeal of the denial of a motion to compel arbitration, holding that any further proceedings before the district court must automatically be stayed. The Court reasoned that because "whether the litigation may go forward in the district court is precisely what the court of appeals must decide[,] . . . it makes no sense for trial to go forward while the court of appeals cogitates on whether there should be one." *Id.* at 741 (quotations omitted). And the Court analogized its holding to similar decisions in the context of appeals involving immunity and double jeopardy. *Id.* at 742.

As the D.C. Circuit recently made clear, a former President's absolute immunity would constitute "an entitlement not to stand trial or face the other burdens of litigation," such as discovery obligations. *Blassingame v. Trump*, No. 22-5069, 2023 WL 8291481, at *22 (D.C. Cir. Dec. 1, 2023) (citation omitted). Thus, because Defendant has appealed this court's denial of that immunity, "whether the litigation may go forward in the district court is precisely what the court of appeals must decide." *Coinbase*, 599 U.S. at 741 (quotation omitted). Consequently, the court agrees with both parties that Defendant's appeal automatically stays any further proceedings that would move this case towards trial or impose additional burdens of litigation on Defendant. Motion at 1; Gvt.'s Opp'n to Def.'s Mot. to Stay Proceedings Pending Appeal at 3, ECF No. 182. Accordingly, and for clarity, the court hereby STAYS the deadlines and proceedings scheduled by its Pretrial Order, as amended. *See* ECF No. 39; *see also* Def.'s Reply in Supp. of Mot. to Stay Proceedings Pending Appeal at 3, ECF No. 185 ("Reply").

The court emphasizes two limits on that stay. First, as Defendant notes, the stayed deadlines and proceedings are "held in abeyance," Motion at 1, rather than permanently vacated. If jurisdiction is returned to this court, it will—consistent with its duty to ensure both a speedy trial and fairness for all parties—consider at that time whether to retain or continue the dates of any still-future deadlines and proceedings, including the trial scheduled for March 4, 2024.

Second, the court does not understand the required stay of further proceedings to divest it of jurisdiction to enforce the measures it has already imposed to safeguard the integrity of these proceedings, including: Defendant's conditions of release, ECF No. 13; the protective orders governing discovery materials, ECF No. 28, 37; the restrictions on extrajudicial statements, ECF No. 105, as modified by the D.C. Circuit's decision in *United States v. Trump*, No. 23-3190, 2023 WL 8517991, at *28 (D.C. Cir. Dec. 8, 2023); and protective jury procedures, ECF No.

130.  Unlike, for example, requiring additional discovery or briefing, maintaining those measures does not advance the case towards trial or impose burdens of litigation on Defendant beyond those he already carries.  And if a criminal defendant could bypass those critical safeguards merely by asserting immunity and then appealing its denial, then during the appeal's pendency, the defendant could irreparably harm any future proceedings and their participants.

That said, there is little precedent guiding the application of *Griggs* to such protective measures.  The Ninth Circuit, at least, has transferred a "motion to enforce" a "protective order" back to the district court, even though the Circuit had taken "jurisdiction over the merits of the decision below, including the judgment," reasoning that "the district court has not been divested of its jurisdiction over ancillary matters, such as protective orders."  *Perry v. City & Cnty. of S.F.*, No. 10-16696, 2011 WL 2419868, at *1 (9th Cir. Apr. 27, 2011) (citing, among others, *Griggs*, 459 U.S. at 58).  But the parties have not identified—and the court is not aware of—any guiding precedent in this Circuit on that issue, much less instructive cases in the context of an interlocutory immunity appeal.  In addition, Defendant does not appear to argue that the protective measures are themselves stayed.  *See* Reply at 3.  Nonetheless, if he asks the court reviewing his immunity appeal to also take temporary jurisdiction over the enforcement of those measures, and that court agrees to do so, this court of course will be bound by that decision.

Date: December 13, 2023

*Tanya S. Chutkan*

TANYA S. CHUTKAN
United States District Judge

Dated: December 23, 2023

LAURO & SINGER
John F. Lauro
400 N. Tampa St., 15th Floor
Tampa, FL 33602
(813) 222-8990
jlauro@laurosinger.com

BLANCHE LAW
Todd Blanche
Emil Bove
99 Wall St., Suite 4460
New York, NY 10005
(212) 716-1250
toddblanche@blanchelaw.com

Respectfully Submitted,

JAMES OTIS LAW GROUP, LLC

*/s/ D. John Sauer*
D. John Sauer
William O. Scharf
Michael E. Talent
13321 N. Outer Forty Road, Suite 300
St. Louis, Missouri 63017
(314) 562-0031
John.Sauer@james-otis.com

*Attorneys for President Donald J. Trump*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on December 23, 2023, I caused a true and correct copy of the foregoing to be filed by the Court's electronic filing system, to be served by operation of the Court's electronic filing system on counsel for all parties who have entered in the case.

*/s/ D. John Sauer*