ORAL ARGUMENT SCHEDULED FOR JANUARY 9, 2024

No. 23-3228

In the
# United States Court of Appeals
for the District of Columbia Circuit

———————————

UNITED STATES OF AMERICA

v.

DONALD J. TRUMP,
Defendant

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
District Court No. 23-cr-257 (Chutkan, J.)

———————

## ANSWERING BRIEF FOR THE UNITED STATES

———————

J.P. COONEY
Deputy Special Counsel

MICHAEL R. DREEBEN
RAYMOND N. HULSER
Counselors to the Special Counsel

JOHN M. PELLETTIERI
CECIL W. VANDEVENDER
Assistant Special Counsels

JACK SMITH
Special Counsel

MOLLY GASTON
THOMAS P. WINDOM
Senior Assistant Special Counsels

JAMES I. PEARCE
Assistant Special Counsel
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Rm. B-206
Washington, D.C. 20530

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Cir. R. 28(a)(1), the undersigned certifies that:

## A.    Parties and Amici

The parties that appeared in the district court and that are now before this Court are the United States (appellee) and Donald J. Trump (defendant-appellant). Amicus briefs have been filed in this Court by the following entities: American Oversight; Former Government Officials and Constitutional Lawyers; and Former Officials in Five Republican Administrations.

## B.    Rulings Under Review

The defendant seeks review of the order of the district court (Chutkan, J.) denying his motions to dismiss based on Presidential immunity and principles of double jeopardy. JA.599-641, 649-51.

## C.    Related Cases

The same parties litigated a different issue arising out of the same district court case in *United States v. Trump*, No. 23-3190 (D.C. Cir. Dec. 8, 2023).

/s/ James I. Pearce
JAMES I. PEARCE
Assistant Special Counsel
U.S. Department of Justice

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED
CASES ...........................................................................................i

TABLE OF AUTHORITIES...............................................................iv

GLOSSARY OF ABBREVIATIONS .....................................................xiii

INTRODUCTION................................................................................1

JURISDICTIONAL STATEMENT ......................................................2

STATEMENT OF THE ISSUES.........................................................3

STATEMENT OF THE CASE .............................................................3

    I.    Factual and Procedural Background ......................................3

    II.    The District Court's Order ......................................................6

SUMMARY OF ARGUMENT ...............................................................7

STANDARD OF REVIEW....................................................................10

ARGUMENT ........................................................................................10

    I.    The Defendant Has No Immunity from Federal
        Criminal Prosecution. .........................................................11

        A.    Separation-of-powers analysis provides no support
            for immunizing a former President from federal
            criminal prosecution. ...................................................12

        B.    Constitutional text, historical practice, and other
            immunity doctrines do not support the defendant's
            contrary claim. ...........................................................29

        C.    Even if separation-of-powers principles limited the
            federal prosecution of a former President in some

unusual circumstances, those principles would not require dismissal here..................................................45

D.  Even if a former President were entitled to immunity from criminal prosecution comparable to his immunity from civil liability, dismissal is not warranted here.............................................................49

II.  The Defendant's Acquittal at an Impeachment Trial Does Not Bar This Prosecution.............................................53

CONCLUSION ......................................................................65

CERTIFICATE OF COMPLIANCE........................................67

# TABLE OF AUTHORITIES

## Cases

*Abney v. United States*,
431 U.S. 651 (1977)......................................................................2

*Anderson v. United States*,
417 U.S. 211 (1974).....................................................................25

*Berger v. United States*,
295 U.S. 78 (1935).......................................................................27

*Blassingame v. Trump*,
87 F.4th 1 (D.C. Cir. 2023) ................................................29, 48, 50-51

*Blockburger v. United States*,
284 U.S. 299 (1932).....................................................................64

*Brandenburg v. Ohio*,
395 U.S. 444 (1969).....................................................................65

*Burdick v. United States*,
236 U.S. 79 (1915).......................................................................39

*Butz v. Economou*,
438 U.S. 478 (1978).....................................................................47

*Cheney v. U.S. Dist. Court for Dist. of Columbia*,
542 U.S. 367 (2004).....................................................................27

*Clinton v. Jones*,
520 U.S. 681 (1997).......................................................16, 18, 32-33

*Coffin v. Coffin*,
4 Mass. 1 (1808) .........................................................................40

*Dames & Moore v. Regan*,
453 U.S. 654 (1981).....................................................................17

*Dennis v. Sparks,*
    449 U.S. 24 (1980) .......................................................................... 42

*Ex Parte Commonwealth of Virginia,*
    100 U.S. 339 (1879) ........................................................................ 43

*Forrester v. White,*
    484 U.S. 219 (1988) ........................................................................ 47

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) ........................................................................ 17

*Georgia v. Meadows,*
    No. 23-12958, 2023 WL 8714992 (11th Cir. Dec. 18, 2023) .............. 48

*Gravel v. United States,*
    408 U.S. 606 (1972) ................................................................ 40, 43

*Hammerschmidt v. United States,*
    265 U.S. 182 (1924) ........................................................................ 25

*Harlow v. Fitzgerald,*
    457 U.S. 800 (1982) ................................................................ 21, 42

*Hastings v. United States Senate,*
    716 F. Supp. 38 (D.D.C. 1989) ................................... 35-36, 57-58

*Hudson v. United States,*
    522 U.S. 93 (1997) ............................................................ 61-62, 64

*Imbler v. Pachtman,*
    424 U.S. 409 (1976) .................................................................. 42-43

*In re al-Nashiri,*
    791 F.3d 71 (D.C. Cir. 2015) .......................................................... 47

*In re Sealed Case,*
    121 F.3d 729 (D.C. Cir. 1997) ........................................................ 25

*Johnson v. Quander*,
    440 F.3d 489 (D.C. Cir. 2006) ............................................................ 62

*Kendall v. United States*,
    37 U.S. 524 (1838) ............................................................................ 16

*Kennedy v. Mendoza-Martinez*,
    372 U.S. 144 (1965) ......................................................................... 62

*Lash v. Lemke*,
    786 F.3d 1 (D.C. Cir. 2015) ............................................................. 10

*Little v. Barreme*,
    6 U.S. (2 Cranch) 170 (1804) .......................................................... 16

*Marbury v. Madison*,
    5 U.S. (1 Cranch) 137 (1803) .................................................... 13, 15

*Martin v. Mott*,
    25 U.S. 19 (1827) ............................................................................. 18

*Medellin v. Texas*,
    552 U.S. 491 (2008) ......................................................................... 17

*Mireles v. Waco*,
    502 U.S. 9 (1991) ............................................................................. 42

*Mississippi v. Johnson*,
    71 U.S. 475 (1866) ........................................................................... 18

*Missouri v. Hunter*,
    459 U.S. 359 (1983) ......................................................................... 63

*NAACP v. Claiborne Hardware Co.*,
    458 U.S. 886 (1982) ......................................................................... 65

*Nixon v. Adm'r of Gen. Servs.*,
    433 U.S. 425 (1977) ..................................................................... 9, 13

*Nixon v. Fitzgerald,*
457 U.S. 731 (1982)............................ 2, 7, 13, 19-20, 22, 26, 39, 47, 50

*Nixon v. Sirica,*
487 F.2d 700 (D.C. Cir. 1973) (en banc) ............................................ 17

*Nixon v. United States,*
506 U.S. 224 (1993) ................................................................................ 35

*O'Shea v. Littleton,*
414 U.S. 488 (1974) ................................................................................ 43

*Screws v. United States,*
325 U.S. 91 (1945) .................................................................................. 25

*Seila Law LLC v. CFPB,*
140 S. Ct. 2183 (2020) ........................................................................... 13

*Spalding v. Vilas,*
161 U.S. 483 (1896) ................................................................................ 44

*Thompson v. Trump,*
590 F. Supp. 3d 46 (D.D.C. 2022) ....................................................... 60

*Trump v. Hawaii,*
138 S. Ct. 2392 (2018) ........................................................................... 17

*Trump v. Mazars USA, LLP,*
140 S. Ct. 2019 (2020) ........................................................................... 13

*Trump v. Thompson,*
20 F.4th 10 (D.C. Cir. 2021) ................................................................... 3

*Trump v. Vance,*
140 S. Ct. 2412 (2020) ........................ 17, 23-24, 26, 30, 33, 37, 39, 42

*United States v. Aguilar,*
515 U.S. 593 (1995) ................................................................................ 45

*United States v. Armstrong*,
   517 U.S. 456 (1996)...................................................................22

*United States v. Ballestas*,
   795 F.3d 138 (D.C. Cir. 2015) ..........................................10

*United States v. Brewster*,
   408 U.S. 501 (1972)...................................................................41

*United States v. Burr*,
   25 F. Cas. 30 (C.C.D. Va. 1807) ...................................12, 17

*United States v. Chaplin*,
   54 F. Supp. 926 (S.D. Cal. 1944).....................................44

*United States v. Chemical Foundation, Inc.*,
   272 U.S. 1 (1926)......................................................................22

*United States v. Cisneros*,
   169 F.3d 763 (D.C. Cir. 1999) ..........................................46

*United States v. Claiborne*,
   727 F.2d 842 (9th Cir. 1984)............................................44

*United States v. Collins*,
   972 F.2d 1385 (5th Cir. 1992)..........................................45

*United States v. Dixon*,
   509 U.S. 688 (1996).............................................................64-65

*United States v. Donner*,
   497 F.2d 184 (7th Cir. 1974)............................................52

*United States v. Gaudin*,
   515 U.S. 506 (1995)................................................................24

*United States v. Gillock*,
   445 U.S. 360 (1980).......................................................41, 43

*United States v. Haldeman*,
   559 F.2d 31 (D.C. Cir. 1976) (en banc) .............................................. 38

*United States v. Hastings*,
   681 F.2d 706 (11th Cir. 1982) ...................................................... 23, 44

*United States v. Isaacs*,
   493 F.2d 1124 (7th Cir. 1974) ...................................................... 44-45

*United States v. Johnson*,
   383 U.S. 169 (1966) ...................................................................... 41

*United States v. Lee*,
   106 U.S. 196 (1882) ...................................................................... 26

*United States v. Manton*,
   107 F.2d 834 (2d Cir. 1939) ............................................................ 45

*United States v. McCallum*,
   721 F.3d 706 (D.C. Cir. 2013) ......................................................... 10

*United States v. Nixon*,
   418 U.S. 683 (1974) ........................................ 17, 24-25, 27, 30, 38, 47

*United States v. R. Enterprises, Inc.*,
   498 U.S. 292 (1991) ...................................................................... 23

*United States v. Rayburn House Off. Bldg.*,
   497 F.3d 654 (D.C. Cir. 2007) ..................................................... 26, 40

*United States v. Rhodes*,
   610 F. Supp. 3d 29 (D.D.C. 2022) ..................................................... 48

*United States v. Robertson*,
   86 F.4th 355 (D.C. Cir. 2023)........................................................... 25

*United States v. Rostenkowski*,
   59 F.3d 1291 (D.C. Cir. 1995) .......................................................... 46

*United States v. Ward*,
448 U.S. 242 (1980) ....................................................................... 61

*Williamson v. United States*,
207 U.S. 425 (1908) ....................................................................... 26

*Wisconsin v. Mitchell*,
508 U.S. 476 (1993) ....................................................................... 52

*Yates v. Lansing*,
5 Johns. 282 (N.Y. Sup. Ct. 1810), *aff'd*, 9 Johns. 395 (N.Y. 1811) ... 44

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) ................................................................. 16, 46

*Zivotofsky v. Kerry*,
576 U.S. 1 (2015) ........................................................................... 46

## Statutes, Rules, and Constitutional Provisions

U.S. Const. amend. V ........................................................................ 22

U.S. Const. art. I ............................................................................... 13

U.S. Const. art. I, § 3, cl. 6 ............................................................ 4, 34

U.S. Const. art. I, § 3, cl. 7 .................................................. 20, 31, 53, 54

U.S. Const. art. I, § 6, cl. 1 ........................................................ 8, 30, 39

U.S. Const. art. II, § 1 ................................................................. 13, 49

U.S. Const. art. II, § 3 ...................................................................... 13

U.S. Const. art. II, § 4 ............................................................. 20, 32, 34

U.S. Const. art. VI, cl. 2 .................................................................... 11

18 U.S.C. § 241 ............................................................................... 65

18 U.S.C. § 371 ........................................................................... 4, 65

18 U.S.C. § 1512 .......................................................................5, 65

18 U.S.C. § 2383 ...........................................................................64

28 U.S.C. § 364 .............................................................................43

28 U.S.C. § 1291 .............................................................................2

D.C. Cir. R. 28 ................................................................................i

## Other Authorities

167 Cong. Rec. S607 (daily ed. Feb. 9, 2021) .........................................24

167 Cong. Rec. S733 (daily ed. Feb. 13, 2021) .........................................4

167 Cong. Rec. S736 (daily ed. Feb. 13, 2021) .......................................58

2 J. Elliot, *Debates on the Federal Constitution* (2d ed. 1863) ..............33

2 J. Story, *Commentaries on the Constitution of the United States* (1833) .........................................................................32, 56-57

2 *Records of the Federal Convention of 1787* (M. Farrand ed. 1911)......................................................................................14

2 *The Documentary History of the Ratification of the Constitution* (Merrill Jensen et al., eds. 1976) .................................55

3 J. Story, *Commentaries on the Constitution of the United States* (1833) ....................................................................18

4 *Debates on the Constitution* (J. Elliot ed. 1891) .................................37

9 Annals of Congress (1798)................................................................56

Brett M. Kavanaugh*, The President and the Independent Counsel*, 86 Geo. L.J. 2133 (1998) .......................................................34

David J. Barron, Office of Legal Counsel, *Applicability of Federal Criminal Laws and the Constitution to Contemplated Lethal*

*Operations Against Shaykh Anwar al-Aulaqi* (July 16, 2010).................................................................................46

Gerald Ford, Presidential Statement (Sept. 8, 1974)............................38

H.R. Res. 24, 117th Cong. (Jan. 11, 2021) ..........................................4, 64

*In re Impeachment of Former President Donald J. Trump*, Trial Memorandum of Donald J. Trump, S. Doc. 117-2 (Feb. 8, 2021).................................................................................4

Randolph D. Moss, *A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. 222 (Oct. 16, 2000) .........................................................21, 23, 34

Randolph D. Moss, *Whether a Former President May Be Indicted and Tried for the Same Offenses for Which He was Impeached by the House and Acquitted by the Senate*, 24 Op. O.L.C. 110 (Aug. 18, 2000) ...................................36, 54, 57-59, 63

Richard Nixon, Statement by Former President Richard Nixon (Sept. 8, 1974) ......................................................................38

Robert G. Dixon, Jr., *Amenability of the President, Vice President and other Civil Officers to Federal Criminal Prosecution while in Office* (Sept. 24, 1973) ..........................21, 34-35

Saikrishna Bangalore Prakash, *Prosecuting and Punishing Our Presidents*, 100 Tex. L. Rev. 55 (2021) ........................................30, 37

*The Federalist Papers* (Clinton Rossiter ed., 1999)..............................................32, 35-36, 54, 57, 60-61

Walter Dellinger, *Application of 28 U.S.C. § 458 to Presidential Appointments of Federal Judges*, 19 Op. O.L.C. 350 (Dec. 18, 1995).................................................................................49

## GLOSSARY OF ABBREVIATIONS

Br.                     Opening brief filed by the defendant

ECF No.                 Docket number citation in the district court

JA                      Joint Appendix

## INTRODUCTION

For the first time in our Nation's history, a grand jury has charged a former President with committing crimes while in office to overturn an election that he lost. In response, the defendant claims that to protect the institution of the Presidency, he must be cloaked with absolute immunity from criminal prosecution unless the House impeached and the Senate convicted him for the same conduct. He is wrong. Separation-of-powers principles, constitutional text, history, and precedent all make clear that a former President may be prosecuted for criminal acts he committed while in office—including, most critically here, illegal acts to remain in power despite losing an election.

The Presidency plays a vital role in our constitutional system, but so does the principle of accountability for criminal acts—particularly those that strike at the heart of the democratic process. Rather than vindicating our constitutional framework, the defendant's sweeping immunity claim threatens to license Presidents to commit crimes to remain in office. The Founders did not intend and would never have countenanced such a result. And multiple safeguards—ultimately

enforced by the Article III courts—protect against any potential burdens on the Presidency that the defendant claims to fear.

The defendant asserts (Br.1) that this prosecution "threatens . . . to shatter the very bedrock of our Republic." To the contrary: it is the defendant's claim that he cannot be held to answer for the charges that he engaged in an unprecedented effort to retain power through criminal means, despite having lost the election, that threatens the democratic and constitutional foundation of our Republic. This Court should affirm and issue the mandate expeditiously to further the public's—and the defendant's—compelling interest in a prompt resolution of this case.

## JURISDICTIONAL STATEMENT

The district court entered its order on December 1, 2023, and the defendant filed a timely notice of appeal on December 7, 2023. JA.647-48. This Court has jurisdiction under 28 U.S.C. § 1291 and the collateral-order doctrine for the defendant's claims that he is immune from prosecution, *Nixon v. Fitzgerald*, 457 U.S. 731, 742-43 (1982), and that double-jeopardy principles prevent his criminal prosecution, *Abney v. United States*, 431 U.S. 651, 662-63 (1977).

2

## STATEMENT OF THE ISSUES

I.      Whether the defendant is immune from federal prosecution for crimes committed while he served as President of the United States.

II.      Whether the defendant's impeachment in the House followed by acquittal in the Senate precludes his criminal prosecution.

## STATEMENT OF THE CASE

## I.      Factual and Procedural Background

The defendant lost the 2020 presidential election.  Nonetheless, according to a later grand jury indictment, in the weeks following the election, he conspired to use knowingly false claims of election fraud with the goal of overturning the legitimate results of that election and disenfranchising millions of voters.  The conspiracies culminated in an attack on the United States Capitol on January 6, 2021, when both Houses of Congress met to certify the Presidential election results, in accordance with procedures set out in the Constitution and federal law. A violent mob forced past police officers and into the Capitol building, causing Members of Congress and the Vice President to flee, delaying the certification, and leaving "multiple people dead, injur[ing] more than 140 people, and inflict[ing] millions of dollars in damage to the Capitol." *Trump v. Thompson*, 20 F.4th 10, 15 (D.C. Cir. 2021).

3

Five days later, the United States House of Representatives adopted a single-article resolution to impeach the defendant for high crimes and misdemeanors for violating his "constitutional oath faithfully to execute the office of President of the United States . . . by inciting violence against the Government of the United States."  H.R. Res. 24, 117th Cong. (Jan. 11, 2021).  The House impeached the defendant, and after the defendant's term in office ended, a trial was held in the Senate, where the defendant contended that the Senate lacked jurisdiction to try him.  *See In re Impeachment of Former President Donald J. Trump*, Trial Memorandum of Donald J. Trump, S. Doc. 117-2 at 122-39 (Feb. 8, 2021).  On February 13, 2021, 57 Senators voted to convict, and 43 Senators voted to acquit, 167 Cong. Rec. S733 (daily ed. Feb. 13, 2021), resulting in an acquittal, *see* U.S. Const. art. I, § 3, cl. 6 (two-thirds majority required for impeachment conviction).

On August 1, 2023, a grand jury charged the defendant in a four-count indictment.  JA.24-68.  Count One, which charges a conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, alleges that the defendant, then a candidate seeking re-election to the Presidency, conspired with, among others, several individuals outside the Executive

Branch to "overturn the legitimate results of the 2020 presidential election by using knowingly false claims of election fraud to obstruct the federal government function by which those results are collected, counted, and certified." JA.24-26. The indictment further alleges that the defendant aimed at accomplishing the conspiracy's objectives in five ways: using deceit toward state officials to subvert the legitimate election results in their respective states, *id.* at 32-44; using deceit to organize fraudulent slates of electors in seven targeted states, and cause them to send false certificates to Congress, *id.* at 44-50; leveraging the Department of Justice to use deceit to get state officials to replace the legitimate electoral slates with electors who would cast their votes for the defendant, *id.* at 50-54; attempting to enlist the Vice President to fraudulently alter the election results during the certification proceeding on January 6, 2021, and directing supporters to the Capitol to obstruct the proceeding, *id.* at 55-62; and exploiting the violence and chaos that transpired at the United States Capitol on January 6, 2021, *id.* at 62-65. Counts Two and Three, which incorporate allegations from Count One, charge conspiracy and substantive violations of 18 U.S.C. § 1512(c)(2) for corruptly obstructing the certification of the Presidential election results

on January 6, 2021. *Id.* at 66-67. Count Four, which likewise incorporates the allegations from Count One, alleges that the defendant conspired to violate one or more person's constitutional right to vote and have one's vote counted. *Id.* at 68.

The district court scheduled the trial to begin on March 4, 2024. JA.324.

## II. The District Court's Order

As relevant here, the defendant filed two pretrial motions to dismiss the indictment. In one, he argued that he was immune for acts within the "'outer perimeter'" of his official Presidential responsibilities and that the indictment's allegations all fell within that outer perimeter. JA.331-82. In another, he contended that the Impeachment Judgment Clause and the Double Jeopardy Clause precluded his prosecution. JA.437-67.

The district court denied the defendant's Presidential-immunity and double-jeopardy motions. JA.599-646. The court explained that the Constitution's text, structure, and history supported the conclusion that the defendant "may be subject to federal investigation, indictment, prosecution, conviction, and punishment for any criminal acts

6

undertaken while in office." JA.604-24. The court "expresse[d] no opinion" on whether any of the acts alleged in the indictment fell within the "'outer perimeter'" of the defendant's Presidential responsibilities. *Id.* at 628-29. The district court also rejected the defendant's claims that principles of double jeopardy or the Impeachment Judgment Clause precluded his prosecution based on his acquittal at the Senate impeachment proceeding. *Id.* at 636-42.

## SUMMARY OF ARGUMENT

I. The defendant, a former President, does not enjoy immunity from federal prosecution for the offenses charged in this case. Under separation-of-powers analysis, the President's unique constitutional status provides immunity from *civil* liability for official conduct, *see Nixon v. Fitzgerald*, 457 U.S. 731 (1982), but it does not render a former President immune from *criminal* liability when charged with violations of generally applicable federal criminal statutes. Any burdens of post-Presidency criminal liability have minimal impact on the functions of an incumbent and are outweighed by the paramount public interest in upholding the rule of law through federal prosecution. Constitutional text, historical practice, and other immunity doctrines confirm that

conclusion.    The Impeachment Judgment Clause limits Congress's remedies to removal and disqualification from office and thereby prevents the Senate from imposing criminal punishment.  But it does not make conviction at a Senate trial a condition precedent to criminal prosecution, which serves a function distinct from impeachment and removal.    No historical materials support the defendant's broad immunity claim, and the post-Presidency pardon that President Nixon accepted reflects the consensus view that a former President is subject to prosecution after leaving office.   Nor can Presidential immunity be derived by analogy to the Speech or Debate Clause, U.S. Const. art. I, § 6, cl. 1; that textually explicit provision is defined and limited by its unique history.  More apt is the immunity for judges and prosecutors, who are immune from civil liability for official conduct, but not from federal prosecution.

The defendant does not advance a position short of absolute immunity for conduct that he describes, at a high level of generality, as official acts.   But even assuming the Court wished to reserve the possibility of some narrower constitutional protection for former Presidents from prosecution for conduct essential to their

"constitutionally assigned functions," *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 443 (1977), such a doctrine would have no application to the defendant, who is alleged to have conspired with private individuals and government officials to use fraudulent means to thwart the transfer of power and remain in office.  And even if a former President could claim immunity from criminal prosecution commensurate with his immunity from civil damages liability for official conduct, dismissal would be unwarranted because the indictment contains substantial allegations of a plot to overturn the election results that fall well outside the outer perimeter of official Presidential responsibilities.

II.  The defendant's acquittal at an impeachment trial does not bar this prosecution under either the Impeachment Judgment Clause or principles of double jeopardy.  The Impeachment Judgment Clause limits congressional sanctions for impeachment to removal and disqualification from office; it does not create a double-jeopardy prohibition that protects an impeached but not convicted officer from criminal prosecution. Structural considerations—including the special function of impeachment within the constitutional separation of powers and the many distinctions between impeachment and criminal verdicts—

reinforce the conclusion that the Impeachment Judgment Clause permits prosecution of a former President impeached by the House but acquitted by the Senate.  Nor is the prosecution here barred by double-jeopardy principles.  Because the only remedies available in the impeachment proceedings were removal and disqualification, the defendant was never previously placed in jeopardy.  But even if he were, the indictment charges different offenses than were at issue in his impeachment.

## STANDARD OF REVIEW

The defendant's Presidential-immunity and double-jeopardy claims are legal claims that this Court reviews *de novo*.  *See Lash v. Lemke*, 786 F.3d 1, 5 (D.C. Cir. 2015) (immunity); *United States v. McCallum*, 721 F.3d 706, 709 (D.C. Cir. 2013) (double jeopardy).  In reviewing those claims, the Court "assumes the truth" of the "factual allegations" in the indictment.  *United States v. Ballestas*, 795 F.3d 138, 149 (D.C. Cir. 2015).

## ARGUMENT

The defendant argues that Presidential immunity and principles of double jeopardy warrant dismissal of the indictment.  Those arguments lack support in the separation of powers, constitutional text, history, or precedent.  Both arguments also threaten to undermine democracy.  The

defendant's immunity claim implies that a President may use any means necessary to remain in power and evade federal criminal liability for his conduct unless first impeached and convicted. And his invocation of double-jeopardy principles implies that a Senate acquittal of a former President because he is no longer in office forever insulates him from criminal accountability. Those claims draw no support from our constitutional heritage and, if accepted, would damage bedrock principles of equality before the law. The Court should affirm.

## I.   The Defendant Has No Immunity from Federal Criminal Prosecution.

An individual who has served as President but is no longer in office may face investigation, indictment, trial, and, if convicted, punishment for conduct committed during the Presidency. The President stands alone in the constitutional firmament, but legal principles and historical evidence establish that, once out of office, a former President may face federal criminal prosecution like any other citizen.[1] *See United States v. Burr*, 25 F. Cas. 30, 34 (C.C.D. Va. 1807) ("[T]he President is elected from

---

[1] This brief addresses only a *federal* criminal prosecution. Prosecution by a state or local entity would raise separate questions under the Constitution's Supremacy Clause, U.S. Const. art. VI, cl. 2. *See* JA.616.

the mass of the people, and, on the expiration of the time for which he is elected, returns to the mass of the people again."). Neither the separation of powers, constitutional text, historical practice, nor other immunity doctrines support a contrary rule, and its acceptance would violate the fundamental principle that no one in this country, not even the President, is above the law.

A. **Separation-of-powers analysis provides no support for immunizing a former President from federal criminal prosecution.**

Although the Supreme Court has not squarely addressed an incumbent or former President's amenability to criminal prosecution, it has consistently rejected claims that a President is immune from criminal process, even while recognizing some immunity from civil liability. *See infra* at 17, 19. In this line of cases, the governing separation-of-powers analysis considers (1) whether a congressionally imposed limitation on Presidential action "prevents the Executive Branch from accomplishing its constitutionally assigned functions," and (2), if the "potential for disruption is present[,] . . . whether that impact is justified by an overriding need to promote objectives within the constitutional authority of Congress." *Nixon v. Adm'r of Gen. Servs.*, 433

12

U.S. 425, 443 (1977).  Contrary to the defendant's contentions (Br.9-12, 21-25), that analysis does not support immunity of a former President from federal criminal prosecution.

1.  The President of the United States "occupies a unique position in the constitutional scheme." *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982).  The Constitution vests the "executive Power" in the President, *id.* (quoting U.S. Const. art. II, § 1), and entrusts him with commander-in-chief, foreign-affairs, supervisory, and policy duties "of utmost discretion and sensitivity." *Id.* at 750.  The President is "the only person who alone composes a branch of government." *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2034 (2020); *see also Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2203 (2020).  The President's duties, however, do not operate in a realm without law.  They exist within a scheme of separated powers in which Congress makes laws, U.S. Const. art. I; the President "shall take Care that the Laws be faithfully executed," *id.*, art. II, § 3; and the Article III courts exercise the judicial power to "say what the law is," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

The Founders were keenly aware that vesting executive power in a single person carried with it unique risks of abuse.  As James Madison

13

explained, Congress's composition as a multi-member body made it implausible to "presume[] that all or even a majority of the members . . . would either lose their capacity for discharging, or be bribed to betray, their trust," given the "difficulty of acting in concert for purposes of corruption." 2 *Records of the Federal Convention of 1787*, at 66 (M. Farrand ed. 1911). By contrast, because "the Executive Magistracy . . . was to be administered by a single man, loss of capacity or corruption was more within the compass of probable events, and either of them might be fatal to the Republic." *Id.*; *see id.* at 67 (Edmund Randolph noting that "[t]he Executive will have great opportunitys [sic] of abusing his power"). George Mason agreed that no man should "be above Justice," least of all he "who can commit the most extensive injustice." *Id.* at 65.

The defendant nevertheless advances the broad argument (Br.9-12) that the separation of powers mandates immunity from *any* judicial review of a President's official acts. For that proposition, the defendant invokes *Marbury* itself, wresting from context Chief Justice Marshall's statement that "[t]he acts of such an officer, as an officer, *can never be examinable by the courts*." Br.10 (quoting 5 U.S. (1 Cranch) at 166). But the defendant's reading of that language is at odds with *Marbury* itself,

14

with subsequent decisions reviewing Presidential acts, and with the defendant's own argument.

The defendant misconstrues *Marbury* as placing all Presidential acts beyond judicial cognizance. In fact, the relevant passage of *Marbury* addressed the reviewability of acts by Executive Branch officers in general, not the President in particular, and Chief Justice Marshall distinguished between "a mere political act, belonging to the executive department alone, for the performance of which[] entire confidence is placed by our constitution in the supreme executive," 5 U.S. (1 Cranch) at 164, and duties that the legislature imposes on an Executive Branch officer, which "he is directed peremptorily to perform," in which case "he is so far the officer of the law; is amenable to the laws for his conduct; and cannot at his discretion sport away the vested rights of others," *id.* at 166. *Marbury* stated that courts have "no power to control [executive] *discretion*," *id.* at 164 (emphasis added), but it reaffirmed that courts unquestionably have power to review adherence to the law by Executive Branch officers, *id.* at 168-71, which includes the President himself.

Precedent from the founding era forward confirms that courts can review Presidential acts. For example, in *Little v. Barreme*, 6 U.S. (2

15

Cranch) 170 (1804) (Marshall, C.J.), the Supreme Court held that an order by President Adams to seize certain vessels violated the Nonintercourse Act and therefore was invalid.  In *Kendall v. United States*, 37 U.S. 524 (1838), the Court held that President Jackson's order forbidding a postmaster from paying a government contractor violated a statutory requirement to pay the bill, explaining that "clothing the President with a power entirely to control the legislation of congress" would "paralyze the administration of justice." *Id.* at 613.  And in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), the Court reviewed "whether the President was acting within his constitutional power when he issued an order directing the Secretary of Commerce to take possession of and operate most of the Nation's steel mills." *Id.* at 582; *see Clinton v. Jones*, 520 U.S. 681, 703 (1997) (citing *Youngstown* for the observation that the Supreme Court has "long held that when the President takes official action, the Court has the authority to determine whether he has acted within the law").  Judicial review of Presidential compliance with the law continues to the present. *See*, *e.g.*, *Trump v. Hawaii*, 138 S. Ct. 2392 (2018); *Medellin v. Texas*, 552 U.S. 491 (2008); *Dames & Moore v. Regan*, 453 U.S. 654 (1981).  And significantly here,

courts have conclusively rejected Presidential claims of unreviewable power to resist criminal process. *See Trump v. Vance*, 140 S. Ct. 2412, 2431 (2020); *United States v. Nixon*, 418 U.S. 683, 713 (1974); *Nixon v. Sirica*, 487 F.2d 700, 709 (D.C. Cir. 1973) (en banc) (per curiam); *Burr*, 25 F. Cas. at 33-34.

The defendant's remaining authorities do not establish otherwise. The defendant relies (Br.11-12, 30, 38) on a separate opinion in *Franklin v. Massachusetts*, 505 U.S. 788 (1992), stating that "no court has authority to direct the President to take an official act" but that judicial review of Presidential action can nevertheless "be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive." *Id.* at 826-29 (Scalia, J., concurring in part and concurring in the judgment). Nothing in Justice Scalia's analysis supports the defendant's claim that a *former* President's official acts are categorically unreviewable—let alone that he is immune from federal criminal prosecution. Nor does the defendant's citation (Br.11) to Story's *Commentaries on the Constitution of the United States*, ch. 37, § 1563 (1833), assist him; the Supreme Court has explained that Story "did not specify the dimensions of the necessary immunity," and it declined to

17

treat Story's statement as controlling or informative on the immunity question before it. *Clinton*, 520 U.S. at 695 & n.23; *see also* JA.410-11 (explaining limited relevance of the passage in Story). *Martin v. Mott*, 25 U.S. 19, 32-33 (1827), dealt with the discretionary act of the President to call forth the militia to repel an invasion—a far cry from the violations of criminal law alleged here. And the ruling in *Mississippi v. Johnson*, 71 U.S. 475, 499 (1866), that the Court would not enjoin "the exercise of Executive discretion" to enforce the Reconstruction Acts provides no precedent for the assertion that courts are powerless to consider allegations that a former President violated federal criminal laws while in office.

Finally, the defendant's blanket claim that courts cannot review Presidential acts is contradicted by his own position (Br.31) that "a President may be prosecuted, but only if he is first impeached, tried, and convicted by the U.S. Senate." That concession is fundamentally inconsistent with his argument that criminal immunity is a functionally mandated incident of the separation of powers. If courts can hear such criminal cases, Presidential acts are plainly not beyond the reach of the judiciary. And nothing in the text or history of the Impeachment

Judgment Clause gives a former President any immunity—let alone one that vanishes only if he was impeached by the House and convicted by the Senate. *See infra* at 30-36.

2. The defendant's invocation (Br.21-25) of "[p]olicy rooted in the separation of powers" fares no better. In *Fitzgerald*, the Supreme Court held that Presidential immunity from civil damages liability is a "functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers." 457 U.S. at 749. The Court reasoned that separation of powers requires the balancing of "the constitutional weight of the interest to be served against the dangers of intrusion on the authority and functions of the Executive Branch." *Id.* at 754. Contrary to the defendant's claim, such balancing does not support the conclusion that a former President who was not impeached and convicted enjoys immunity from criminal prosecution for any acts that fall within the outer perimeter of his official duties.

a. The defendant identifies (Br.21-24) several burdens that he claims criminal liability would place on the Presidency. Each of those burdens is overstated, and they do not, individually or collectively,

outweigh the deeply rooted public interest in enforcing federal criminal law.

i. The defendant's suggestion (Br.22-23) that an incumbent President would be inhibited by the prospect of future federal criminal prosecution lacks any historical or empirical support. Since the founding, every President has discharged the office's demanding duties with the knowledge that he could be impeached and separately "subject to Indictment, Trial, Judgment and Punishment, according to Law." U.S. Const. art. II, § 4; *id.* at art. I, § 3, cl. 7. Even under the defendant's view, the prospect of impeachment and prosecution has existed throughout our Nation's history, and it has never been thought to deter the sort of "bold and unhesitating action," *Fitzgerald*, 457 U.S. at 745, that the Presidency requires. Indeed, the Executive Branch and multiple Presidents, including the defendant, have consistently acknowledged that any criminal immunity ends once a President leaves office. *See United States v. Nixon*, Nos. 73-1766, 73-1834, Br. of Respondent, 1974 WL 174855, at *98 (June 21, 1974) (President may "be indicted after he leaves office at the end of his term or after being 'convicted' by the Senate in an impeachment proceeding"); *Trump v. Vance*, No. 19-635, Br. of

Petitioner, 2020 WL 528038, at *16, *33 (Jan. 27, 2020) (emphasizing that the temporary immunity the defendant here sought in that case "would expire when the President leaves office" and therefore would not "place the President 'above the law'"); *see also* Randolph D. Moss, *A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. 222, 255 (Oct. 16, 2000) (a President may be prosecuted "once [his] term is over or he is otherwise removed from office by resignation or impeachment"); Robert G. Dixon, Jr., *Amenability of the President, Vice President and other Civil Officers to Federal Criminal Prosecution while in Office*, at 4-5 (Sept. 24, 1973) ("*Amenability of the President*") (rejecting as "unreasonable" the claim that "an offending federal officer acquires a lifetime immunity against indictment unless the Congress takes time to impeach him").  And to the extent that any concern about chilling the President is implicated, the prospect of future criminal prosecution for knowingly criminal acts can have a salutary, not a chilling, effect.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982) ("Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate.").

21

ii.  The concern that a former President subject to civil suit could become "an easily identifiable target" for "highly intrusive" private lawsuits from "countless people," *Fitzgerald*, 457 U.S. at 753, 756, or "vexatious" civil actions (Br.23-24) does not translate to the criminal context.  *Cf. Trump v. Vance*, No. 19-635, Reply Br. of Petitioner, 2020 WL 1643779, at *14 (Mar. 27, 2020) ("The concern about an avalanche of criminal subpoenas targeting the President is not present in federal court.").  The Supreme Court has long applied a strong presumption of prosecutorial regularity because prosecutors exercise a "special province" of executive power derived from authority stemming from Article II.  *See United States v. Armstrong*, 517 U.S. 456, 464 (1996) (absent "clear evidence to the contrary, courts presume that [prosecutors] have properly discharged their official duties.") (quoting *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14-15 (1926)).  Unlike a civil lawsuit, a federal felony prosecution of a former President requires an indictment by a grand jury, U.S. Const. amend. V, which is "prohibited from engaging in 'arbitrary fishing expeditions' and initiating investigations 'out of malice or an intent to harass,'" *Vance*, 140 S. Ct. at 2428 (quoting *United States v. R. Enterprises, Inc.*, 498 U.S. 292, 299 (1991)); *see A*

22

*Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. at 250 (noting that a criminal indictment "is a public rather than private allegation of wrongdoing reflecting the official judgment of a grand jury acting under the general supervision of the District Court").[2]

Article III courts, moreover, can address any legally defective prosecutions. Former Presidents "enjoy the same protection as do all citizens from vindictive [or selective] prosecution,"[3] *United States v. Hastings*, 681 F.2d 706, 711 (11th Cir. 1982), and courts could be expected to review a former President's claims—as have been made here (ECF No. 116)—"meticulous[ly]," *Vance*, 140 S. Ct. 2430 (quoting *Nixon*,

---

[2] That the Department of Justice and others (*see* Br.29, 34-35) have concluded that prosecuting a *sitting* President would constitute an "'unavoidably political' task" (citation omitted) reflects the view that prosecution would seriously interfere with a President's ability "to carry out his constitutional functions," and thus would be tantamount to removal from office. *A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. at 246, 258. But that consideration is inapplicable to a former President, as the defendant acknowledges. *See* Br.29 (certain "burdens" on a sitting President "naturally . . . do not apply to a *former* President").

[3] As the defendant has noted, the specter of a politically motivated prosecution "is diminished at the federal level" and is unlikely to "deter[]" a President "from vigorously fulfilling the responsibilities of his office." *Trump v. Vance*, No. 19-635, Reply Br. of Petitioner, 2020 WL 1643779, at *14 (Mar. 27, 2020).

418 U.S. at 702).  Similarly, to the extent the defendant believes (Br.32-33) that the charged offenses reflect "novel" and unsound interpretations of the relevant statutes or the improper criminalization of "core political speech and advocacy," he can challenge the indictment on that basis—as he has, JA.437-67.

Complementing those protections are the rigorous standards to prove criminal offenses and evidentiary limitations that would come into play with respect to any prosecution of a former President.  *See* 167 Cong. Rec. S607 (daily ed. Feb. 9, 2021) (the defendant arguing at his impeachment trial that criminal investigation and prosecution would be more "appropriate" than impeachment, because trial in the Senate "does not and cannot offer the safeguards of the judicial system").  Unlike in private civil actions, the government in a federal prosecution must prove the defendant's guilt beyond a reasonable doubt to a unanimous jury.  *United States v. Gaudin*, 515 U.S. 506, 510 (1995).  Proving a former President's criminal guilt will often require satisfying that standard with respect to demanding *mens rea* elements.  Here, for example, the Government must prove that the defendant conspired to obstruct a lawful government function through deceitful and dishonest means,

24

*Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924); conspired to corruptly obstruct and corruptly obstructed a congressional proceeding, *United States v. Robertson*, 86 F.4th 355, 366-68 (D.C. Cir. 2023); and conspired to "act in open defiance or in reckless disregard of a constitutional requirement which has been made specific and definite," *Screws v. United States*, 325 U.S. 91, 105 (1945) (plurality opinion), with the "specific intent to interfere with the federal rights in question," *Anderson v. United States*, 417 U.S. 211, 223 (1974). And to obtain certain evidence to establish whether a former President had a culpable *mens rea*, the Government must—as it already has in this case—seek relief from the court to overcome any claim of executive privilege. *See Nixon*, 418 U.S. at 713; *In re Sealed Case*, 121 F.3d 729, 754 (D.C. Cir. 1997). These formidable safeguards counsel strongly against the need to extend a former President's civil immunity to the criminal context.

b. The overriding interest at stake in this case, as in any federal prosecution, is upholding the rule of law, and the immunity the defendant advocates would undermine that critical interest.

i. As the district court correctly concluded, JA.618-24, permitting this case to proceed would "vindicate the public interest in an ongoing

criminal prosecution." *Fitzgerald*, 457 U.S. at 754; *see* JA.619 (explaining that *Fitzgerald* was "undivided in contemplating that the public interest could require a former President's criminal liability"). Most fundamentally, the broad immunity the defendant advocates would undermine the principle that "[n]o man in this country is so high that he is above the law." *United States v. Lee*, 106 U.S. 196, 220 (1882). That principle extends to "[a]ll the officers of the government, from the highest to the lowest," and requires that "every man who by accepting office participates in its functions is only the more strongly bound to submit to that supremacy." *Id.*; *see United States v. Rayburn House Off. Bldg.*, 497 F.3d 654, 672-73 (D.C. Cir. 2007) (Henderson, J., concurring in the judgment) ("[T]he laws of this country allow no place or employment as a sanctuary for crime.") (citing *Williamson v. United States*, 207 U.S. 425, 439 (1908)). And the principle that no one is above the law "applies, of course, to a President." *Vance*, 140 S. Ct. at 2432 (Kavanaugh, J., concurring).

The greater public interest in criminal rather than civil matters "is not just a matter of formalism." *Cheney v. U.S. Dist. Court for Dist. of Columbia*, 542 U.S. 367, 384 (2004). Although the interests at stake in

civil litigation are "far from negligible," *id.*, the courts' "primary constitutional duty" is "to do justice in criminal prosecutions," *Nixon*, 418 U.S. at 707. The Supreme Court in *Nixon* emphasized that "our historic[al] commitment to the rule of law . . . is nowhere more profoundly manifest than in our view that 'the twofold aim (of criminal justice) is that guilt shall not escape or innocence suffer.'" *Id.* at 708-09 (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)). Extending immunity recognized for a former President in civil cases to the "much weightier" criminal context, *Cheney*, 542 U.S. at 384, would undermine that bedrock commitment to the rule of law.

ii. Bestowing far-reaching immunity from criminal prosecution on a former President would also expose the Nation to dangerous risks. Under the defendant's view, unless a former President had been first impeached and convicted, he would be wholly immune from criminal prosecution for acts ostensibly within the outer perimeter of his official duties even when those acts are crimes that benefit him, endanger the Republic, or both. A former President could thus bank on the practical obstacles to impeachment (a remedy designed to remove, not hold criminally accountable, a corrupt officer) to provide a safe harbor

27

insulating him from prosecution once he has left office.  *See infra* at 30-36 (explaining why such a view misinterprets the constitutional impeachment system).  Immunity from criminal prosecution would be particularly dangerous where, as here, the former President is alleged to have engaged in criminal conduct aimed at overturning the results of a Presidential election to remain in office beyond the allotted term.  A President who unlawfully seeks to retain power through criminal means unchecked by potential criminal prosecution could jeopardize both the Presidency itself and the very foundations of our democratic system of governance.

The implications of the defendant's broad immunity theory are sobering.  In his view, a court should treat a President's criminal conduct as immune from prosecution as long as it takes the form of correspondence with a state official about a matter in which there is a federal interest, a meeting with a member of the Executive Branch, or a statement on a matter of public concern.  That approach would grant immunity from criminal prosecution to a President who accepts a bribe in exchange for directing a lucrative government contract to the payer; a President who instructs the FBI Director to plant incriminating evidence

on a political enemy; a President who orders the National Guard to murder his most prominent critics; or a President who sells nuclear secrets to a foreign adversary, because in each of these scenarios, the President could assert that he was simply executing the laws; or communicating with the Department of Justice; or discharging his powers as Commander-in-Chief; or engaging in foreign diplomacy. Under the defendant's framework, the Nation would have no recourse to deter a President from inciting his supporters during a State of the Union address to kill opposing lawmakers—thereby hamstringing any impeachment proceeding—to ensure that he remains in office unlawfully. *See Blassingame v. Trump*, 87 F.4th 1, 21 (D.C. Cir. 2023) (President's delivery of the State of the Union address is an official act). Such a result would severely undermine the compelling public interest in the rule of law and criminal accountability.

### B.   Constitutional text, historical practice, and other immunity doctrines do not support the defendant's contrary claim.

The defendant contends (Br.12-21) that constitutional text, historical practice, and other immunity doctrines support his broad claim of post-Presidential immunity. None does.

29

1. Unlike the explicit textual immunity granted to legislators under the Speech or Debate Clause, U.S. Const. art. I, § 6, cl. 1, which provides that "for any Speech or Debate in either House," members of Congress "shall not be questioned in any other Place," the Constitution does not expressly provide such protection for the President or any executive branch officials. *See Vance*, 140 S. Ct. at 2434 (Thomas, J., dissenting) ("The text of the Constitution explicitly addresses the privileges of some federal officials, but it does not afford the President absolute immunity."); JA.604-06. By contrast, state constitutions at the time of the founding in Virginia and Delaware did grant express criminal immunity to the state's chief executive officer. JA.605 (citing Saikrishna Bangalore Prakash, *Prosecuting and Punishing Our Presidents*, 100 Tex. L. Rev. 55, 69 (2021)). To be sure, the federal Constitution's "silence . . . on this score is not dispositive," *Nixon*, 418 U.S. at 705 n.16, but that silence is telling when placed against the Constitution's Impeachment Judgment Clause, which presupposes and expressly preserves the availability of criminal prosecution following impeachment and conviction. *See* U.S. Const. art. I, § 3, cl. 7. Where a President—or any federal officer—has been impeached by the House and convicted at an impeachment trial in the

30

Senate, the Impeachment Judgment Clause provides that the punishment for such impeachment and conviction "shall not extend further than to removal from Office, and disqualification to hold and enjoy any Office of honor, Trust or Profit under the United States: but the Party convicted shall nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law." *Id.* Nothing in that Clause conditions prosecution on prior impeachment. *See infra* at 33-35. And it would be incongruous to conclude that the Constitution contains any implicit form of immunity from criminal prosecution for a former President when the Constitution expressly states that a former President may be subject to criminal prosecution after impeachment by the House and conviction by the Senate.

The constitutional impeachment system explains why no such implicit immunity exists. Under the Constitution, a President is subject to impeachment and Senate conviction for, among other things, "high crimes and misdemeanors." U.S. Const. art. II, § 4 (capitalization altered). The phrase "high crimes and misdemeanors" was aimed at the "misconduct of public men," including the "abuse or violation of some public trust." *Federalist* No. 65, at 364 (Alexander Hamilton) (Clinton

Rossiter ed., 1999). In that respect, "high crimes and misdemeanors" were principally offenses that "may with peculiar propriety be denominated POLITICAL, as they relate chiefly to injuries done immediately to the society itself." *Id.*; *accord* 2 Joseph Story, *Commentaries on the Constitution of the United States* § 783 (1833) (noting that the "offences, to which the remedy of impeachment has been, and will continue to be principally applied, are of a political nature"). The conduct that impeachment targets includes "acts taken in [the President's] 'public character'—that is, official acts[.]" *Clinton*, 520 U.S. at 696. Thus, the Constitution explicitly permits the impeachment and conviction of a President for official conduct taken in his public role and likewise explicitly provides for an impeached and convicted President's criminal prosecution for the same conduct. Given that, the Constitution cannot be understood simultaneously (and implicitly) to immunize a former President from criminal prosecution for official acts; rather, the Constitution envisions Presidential accountability in his *political* capacity through impeachment and in his *personal* capacity through prosecution. *See Clinton*, 520 U.S. at 696 ("[F]ar from being above the laws, [the President] is amenable to them in his private character as a

citizen, and in his public character by impeachment.") (quoting 2 J. Elliot, *Debates on the Federal Constitution* 480 (2d ed. 1863) (James Wilson)).

The defendant's contention (Br.12-13) that impeachment followed by conviction is a condition precedent to criminal prosecution misreads both Hamilton and Justice Alito's dissenting opinion in *Vance*, *supra*. Each made the undisputed point that a President must leave office before any prosecution may commence. *See Vance*, 140 S. Ct. 2412, 2444-45 (Alito, J., dissenting) (citing Hamilton's essays in *Federalist* Nos. 69 and 77 in support of the proposition that "[b]oth the structure of the Government established by the Constitution and the Constitution's provisions on the impeachment and removal of a President make it clear that the prosecution of a sitting President is out of the question"). Thus, if Congress declines to "impeach and remove" a sitting President, he cannot face criminal prosecution "until his term in office expires." Brett M. Kavanaugh, *The President and the Independent Counsel*, 86 Geo. L.J. 2133, 2161 (1998); *accord A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. at 255.

If, by contrast, the defendant's condition-precedent theory were correct, criminal investigations and prosecutions of any federal official—

not just a former President[4]—would give rise to complex preliminary questions such as whether the suspect was an "officer" subject to impeachment, whether the conduct in question amounted to "Treason, Bribery, or other high Crimes and Misdemeanors," U.S. Const. art. II, § 4, and whether Congress had jurisdiction over someone who had left office. It would also require Congress to expend significant resources to impeach and convict *all* officers—even those who had left office—before criminal proceedings could commence. An approach that "injects such complications into criminal proceedings," *Amenability of the President*, at 7, and "pressure[s] Congress to conduct a large number of impeachment proceedings," *id.* at 17, could not be correct, as the history of prosecutions preceding impeachments demonstrates, *see Nixon v. United States*, 506 U.S. 224, 226-27 (1993) (defendant-judge criminally prosecuted and then impeached); *Hastings v. United States Senate*, 716 F. Supp. 38, 41 (D.D.C. 1989) (same); *see also Amenability of the*

---

[4] The Constitution's text undermines the defendant's suggestion (Br.52 n.6) that the Impeachment Judgment Clause operates differently for Presidents. The Framers provided in the preceding clause that at a President's impeachment trial (and only at such a trial), the Chief Justice presides, art. I, § 3, cl. 6, but provided no special Presidential dispensation in the Impeachment Judgment Clause.

*President*, at 4 (observing that, as of 1973, although only 12 impeachments had occurred, "scores, if not hundreds, of officers of the United States have been subject to criminal proceedings for offenses for which they could have been impeached").

The defendant's argument (Br.13-14; *see also id.* at 29-30) that impeachment is the "principal check" for Presidential "malfeasance" is also incorrect. Hamilton's description of the impeachment process supports the constitutional difference between the *political* means of removing an official from office and the *legal* means of holding an official accountable for violations of law. *See Federalist* No. 65. As Hamilton recognized, impeachment proceedings may "agitate the passions of the whole community" and "divide it into parties more or less friendly or inimical." *Id.* at 364. Because the Framers recognized that "partisanship and transitory political passions" could induce the Senate to convict or to acquit, *see* Randolph D. Moss, *Whether a Former President May Be Indicted and Tried for the Same Offenses for Which He was Impeached by the House and Acquitted by the Senate*, 24 Op. O.L.C. 110, 134 (Aug. 18, 2000), they decoupled the judgment at an impeachment trial from criminal prosecution. Understood in that context, the Impeachment

Judgment Clause reflects the "separate and different roles for the executive's power of prosecution and the legislature's impeachment powers." *Hastings*, 716 F. Supp. at 42. Moreover, conditioning the Executive Branch's exclusive authority to prosecute a former President—or any federal officer—on congressional impeachment and removal would "raise serious separation of powers concerns." JA.611 n.3.

2. Historical evidence from the time of the founding likewise confirms that a President was subject to prosecution when no longer in office. *See* JA.624-27. Hamilton explained that an impeachment would not "terminate the chastisement of the offender" because "[a]fter having been sentenced to a perpetual ostracism from the esteem and confidence, and honors and emoluments of his country, he will still be liable to prosecution and punishment in the ordinary course of law." *Federalist* No. 65, at 367; *see id.* at No. 69, at 384 (Hamilton); *id.* at No. 77 (Hamilton), at 432 (noting that the President is "at all times liable to impeachment, trial, [and] dismission from office" as well as "forfeiture of life and estate by subsequent prosecution in the common course of law"). Speaking at the North Carolina ratifying convention, James Iredell—who later became a Supreme Court Justice—noted that "[i]f [the

President] commits any crime, he is punishable by the laws of his country." 4 *Debates on the Constitution* 109 (J. Elliot ed. 1891); *see Vance*, 140 S. Ct. at 2435 (Thomas, J., dissenting) (discussing Iredell).

The defendant advances two unpersuasive contentions that historical practice in fact supports a rule of Presidential immunity from criminal prosecution. First, in adverting to (Br.14-15) "[e]arly authorities," the defendant repeats his flawed claim (*id.* at 9-12) that decisions and other writings from Chief Justice Marshall and Justice Story expounded a rule of unreviewable Presidential authority. As explained, that sweeping claim is unfounded. *See supra* at 13-18. Second, he notes that no former President has been criminally prosecuted (*see* Br.17-18), but that reflects not a tradition of criminal immunity but instead the fact that "most presidents have done nothing criminal, making it difficult to draw inferences from the absence of arrests or prosecutions." Prakash, *supra*, at 82. In any event, the history is not as uniform as the defendant suggests. President Ford's pardon of former President Nixon covering acts during the latter's Presidency rested on the assumption that no post-Presidency immunity from criminal prosecution existed. *See* Gerald Ford, Presidential Statement at 7-8

(Sept. 8, 1974) (granting former President Nixon a "full, free, and absolute pardon . . . for all offenses against the United States which he, Richard Nixon, has committed or may have committed or taken part in during" his Presidency)[5]; Richard Nixon, Statement by Former President Richard Nixon at 1 (Sept. 8, 1974) (former President accepting "full and absolute pardon for any charges which might be brought against me for actions taken during the time I was President of the United States").[6] That President Nixon was named as an unindicted coconspirator in a plot to defraud the United States and obstruct justice, *Nixon*, 418 U.S. at 687, entirely refutes the defendant's efforts (Br.27-28, 41) to distinguish that case as involving private conduct. *See United States v. Haldeman*, 559 F.2d 31, 121-22 (D.C. Cir. 1976) (en banc) (per curiam) (explaining that the offense conduct included efforts "to get the CIA to interfere with the Watergate investigation being conducted by the FBI" and "to obtain information concerning the investigation from the FBI and the Department of Justice") (internal quotation marks omitted). And

---

[5]     https://www.fordlibrarymuseum.gov/library/document/0067/1563096.pdf.

[6]     https://www.fordlibrarymuseum.gov/library/document/0019/4520706.pdf.

President Nixon's acceptance of the pardon represents a "confession of guilt." *Burdick v. United States*, 236 U.S. 79, 90-91 (1915).

3.  The defendant also relies on legislative, judicial, and common-law[7] immunities, but these other immunity doctrines lend no support to the defendant's Presidential-immunity claim.

i.  The defendant suggests (Br.16-17, 18-19) that common-law principles of legislative immunity embodied in the Speech or Debate Clause, U.S. Const. art. I, § 6, cl. 1, inform the immunity analysis here, but that suggestion lacks support in constitutional text, history, or purpose.  The Framers omitted any comparable text protecting executive officials, *see Vance*, 140 S. Ct. at 2434 (Thomas, J., dissenting), and no reason exists to look to the Speech or Debate Clause as a model for the defendant's immunity claim.

In contrast to the defendant's sweeping claim of immunity for all Presidential acts within the outer perimeter of his duties, the Speech or

---

[7] The defendant separately discusses the common law (Br.16) and legislative (*id.* at 18-19) immunities, but his discussion of the former relies entirely on the latter.  Any separate argument predicated on the common law alone would fail because "the Presidency did not exist through most of the development of common law." *Fitzgerald*, 457 U.S. at 748.

Debate Clause's scope is specific: it is limited to conduct "within the 'sphere of legitimate legislative activity.'" *Gravel v. United States*, 408 U.S. 606, 624 (1972). "Legislative acts are not all-encompassing," and exclude a vast range of "acts in [a Member's] official capacity," such as outreaches to the Executive Branch. *Id.* Beyond that limitation, the Clause "does not purport to confer a general exemption . . . from liability . . . in criminal cases." *Id.* at 626. Nor does it "privilege [Members or aides] to violate an otherwise valid criminal law in preparing for or implementing legislative acts." *Id.* Courts have therefore recognized for more than 200 years that a Representative "not acting as a member of the house" is "not entitled to any privileges above his fellow-citizens" but instead "is placed on the same ground, on which his constituents stand." *Coffin v. Coffin*, 4 Mass. 1, 28-29 (1808); *see Rayburn House Off. Bldg.*, 497 F.3d at 670 (Henderson, J., concurring in the judgment) (observing that "it is well settled that a Member is subject to criminal prosecution and process"). The Speech or Debate Clause does not "make Members of Congress super-citizens, immune from criminal responsibility." *United States v. Brewster*, 408 U.S. 501, 516 (1972). The defendant's immunity

claim, however, would do just that, absent prior impeachment and conviction.

The Speech or Debate Clause's historical origins likewise reveal its inapplicability in the Presidential context. The Clause arose in response to successive British kings' use of "the criminal and civil law to suppress and intimidate critical legislators." *United States v. Johnson*, 383 U.S. 169, 178 (1966); *see United States v. Gillock*, 445 U.S. 360, 368-69 (1980) (noting that the English parliamentary privilege arose from "England's experience with monarchs exerting pressure on members of Parliament" in order "to make them more responsive to their wishes"). In one instance, the King "imprison[ed] members of Commons on charges of seditious libel and conspiracy to detain the Speaker in the chair to prevent adjournment," and the judiciary afforded no relief because "the judges were often lackeys of the Stuart monarchs." *Johnson*, 383 U.S. at 181. That history has no parallel here: the defendant can point to no record of abuses of the criminal law against former Presidents, and the Article III judiciary provides a bulwark against any such abuses.

ii. The defendant's reliance (Br.19-20) on judicial immunity in fact undermines his broad claim. Both in *Fitzgerald*, 457 U.S. at 746-48, 751-

41

52, 758, and when subsequently describing *Fitzgerald*, *see Vance*, 140 S. Ct. at 2426, the Supreme Court has repeatedly recognized the parallel between Presidential immunity from civil damages liability and comparable immunity for prosecutors and judges. That parallel is instructive because the Supreme Court has reasoned that, notwithstanding their absolute immunity from civil liability, prosecutors and judges are "subject to criminal prosecutions as are other citizens." *Dennis v. Sparks*, 449 U.S. 24, 31 (1980) (discussing judges); *see Imbler v. Pachtman*, 424 U.S. 409, 429 (1976) (observing, in a case holding that prosecutors are absolutely immune from civil damages liability, that the Supreme Court had "never suggested that the policy considerations which compel civil immunity for certain governmental officials also place them beyond the reach of the criminal law"); *Mireles v. Waco*, 502 U.S. 9, 9, 10 n.1 (1991) (per curiam) ("[A] judge is not absolutely immune from criminal liability."); *Ex Parte Commonwealth of Virginia*, 100 U.S. 339, 348 (1879); *see also* 28 U.S.C. § 364 (statute addressing the effect of a federal judge's felony conviction).

Indeed, courts recognizing immunity from civil liability for certain officials, such as judges and prosecutors, have operated from the premise

42

that civil immunity did not erect an absolute shield for misconduct precisely because those officials were subject to criminal prosecution. *See Imbler*, 424 U.S. at 428-29 ("We emphasize that the immunity of prosecutors from liability in suits under § 1983 does not leave the public powerless to deter misconduct or to punish that which occurs."); *Gillock*, 445 U.S. at 372-73 ("[T]he cases in this Court which have recognized an immunity from civil suit for state officials have presumed the existence of federal criminal liability as a restraining factor on the conduct of state officials."). The Supreme Court accordingly has "never held that the performance of the duties of judicial, legislative, or executive officers, requires or contemplates the immunization of otherwise criminal deprivation of constitutional rights." *O'Shea v. Littleton*, 414 U.S. 488, 503 (1974). "On the contrary, the judicially fashioned doctrine of official immunity does not reach 'so far as to immunize criminal conduct proscribed by an Act of Congress.'" *Id.* (quoting *Gravel*, 408 U.S. at 627).

The defendant's counterarguments lack merit. He suggests (Br.19) that *Spalding v. Vilas*, 161 U.S. 483 (1896), recognized judicial immunity from criminal prosecution, but the language in *Spalding*, a civil case, was dicta relying on a state case from 1810, *see id.* at 494 (discussing *Yates*

43

*v. Lansing*, 5 Johns. 282 (N.Y. Sup. Ct. 1810), *aff'd,* 9 Johns. 395 (N.Y. 1811)), and is inconsistent with the Supreme Court's more recent pronouncements.  Citing *United States v. Chaplin*, 54 F. Supp. 926 (S.D. Cal. 1944), the defendant contends (Br.20-21) that criminal prosecutions for judicial acts are "exceedingly rare" and limited to bribery cases.  But *Chaplin*—an out-of-circuit district court decision from nearly 80 years ago that recognized "where a judge violates a criminal statute, he is held to the same responsibility as any citizen," 54 F. Supp. at 933—is apparently the sole case that conferred immunity on a judge facing criminal prosecution.  *See* 54 F. Supp. at 934-35; *see United States v. Claiborne*, 727 F.2d 842, 845 (9th Cir. 1984) (per curiam) (rejecting claim of immunity from criminal prosecution by defendant-judge); *Hastings*, 681 F.2d at 710-11 (same); *United States v. Isaacs*, 493 F.2d 1124, 1143-44 (7th Cir. 1974) (per curiam) (same).  And contrary to the defendant's assertion, judges have long been criminally prosecuted for non-bribery offenses. *See, e.g., United States v. Aguilar*, 515 U.S. 593, 602-06 (1995) (upholding defendant-judge's conviction for disclosure of wiretap information); *United States v. Collins*, 972 F.2d 1385, 1392-94, 1415 (5th Cir. 1992) (upholding defendant-judge's convictions for, *inter alia*,

44

obstruction of justice and conspiracy to defraud the United States); *United States v. Manton*, 107 F.2d 834, 850 (2d Cir. 1939) (upholding defendant-judge's convictions for conspiracy to obstruct the administration of justice and to defraud the United States). Those cases establish the proposition, equally applicable to the defendant's case, that "[c]riminal conduct is not"—and can never be—"part of the necessary functions performed by public officials." *Isaacs*, 493 F.2d at 1144.

**C.** **Even if separation-of-powers principles limited the federal prosecution of a former President in some unusual circumstances, those principles would not require dismissal here.**

Because a former President does not have the sort of sweeping immunity the defendant advocates, the denial of his motion to dismiss should be affirmed, and this case should proceed to trial. That straightforward conclusion would not, however, foreclose the possibility that a future prosecution could raise difficult questions implicating cognizable separation-of-powers concerns—if, for example, a prosecution were to encroach on a President's foreign-affairs or commander-in-chief powers, or involve areas where the President's powers are "both 'exclusive' and 'conclusive' on the issue." *Zivotofsky v. Kerry*, 576 U.S. 1,

10 (2015) (citing *Youngstown Sheet & Tube*, 343 U.S. at 637-38 (Jackson, J., concurring)).

If those concerns arise, courts can and should address them in the same manner as other constitutional issues that arise in federal criminal prosecutions. Like any other criminal defendant, a former President could assert a constitutional challenge in the district court and could couple that claim with any relevant President-specific objections to liability.[8] Any rulings could be reviewed on appeal from a final judgment. *Cf. United States v. Rostenkowski*, 59 F.3d 1291, 1300 (D.C. Cir. 1995) (where an indictment is "untainted" by "Speech or Debate material," a defendant can object "at such point(s) in the trial" that the government seeks admission of any "protected material into evidence"); *United States v. Cisneros*, 169 F.3d 763, 771 (D.C. Cir. 1999) ("[T]here will be time enough in an appeal from the final judgment to vindicate the separation of powers."); *accord In re al-Nashiri*, 791 F.3d 71, 80 (D.C. Cir. 2015).

---

[8] *Cf.* David J. Barron, Office of Legal Counsel, *Applicability of Federal Criminal Laws and the Constitution to Contemplated Lethal Operations Against Shaykh Anwar al-Aulaqi* (July 16, 2010) (addressing lawfulness of conduct where the President was acting pursuant to his commander-in-chief powers).

In a truly "exceptional situation[]," a court could consider recognizing a novel form of criminal immunity, if a defendant could demonstrate that doing so would be "essential for the conduct of the public business." *Butz v. Economou*, 438 U.S. 478, 507 (1978); *see Forrester v. White*, 484 U.S. 219, 224 (1988). By necessity, however, any such novel immunity would have to be narrower than the civil immunity recognized in *Fitzgerald*, since it would need to "vindicate the public interest in an ongoing criminal prosecution," *Fitzgerald*, 457 U.S. at 754, and reflect courts' "primary constitutional duty . . . to do justice in criminal prosecutions," *Nixon*, 418 U.S. at 707, as opposed to the "lesser public interest" at issue in a "merely private suit for damages," *Fitzgerald*, 457 U.S. at 754 & n.37.

The Court need not address those issues here, however. The indictment alleges a conspiracy to overturn the presidential election results, JA.26, through targeting state officials, *id.* at 32-44; creating fraudulent slates of electors in seven states, *id.* at 44-50; leveraging the Department of Justice in the effort to target state officials through deceit and to substitute the fraudulent elector slates supporting his personal candidacy for the legitimate ones, *id.* at 50-54; attempting to enlist the

47

Vice President to fraudulently alter the election results during the certification proceeding on January 6, 2021, and directing supporters to the Capitol to obstruct the proceeding, *id.* at 55-62; and exploiting the violence and chaos that transpired at the United States Capitol on January 6, 2021, *id.* at 62-65. The indictment thus alleges conspiracies to advance the defendant's prospects as a candidate for elective office in concert with private persons as well as government officials, *cf. Blassingame*, 87 F.4th at 4 (the President's conduct falls beyond the outer perimeter of his official duties if it can only be understood as having been undertaken in his capacity as a candidate for re-election), and the defendant offers no plausible argument that the federal government function and official proceeding that he is charged with obstructing establish a role—much less an exclusive and conclusive role—for the President, *see Georgia v. Meadows*, No. 23-12958, 2023 WL 8714992, at *11 (11th Cir. Dec. 18, 2023); *United States v. Rhodes*, 610 F. Supp. 3d 29, 41 (D.D.C. 2022) (Congress and the Vice President in his role as President of the Senate carry out the "laws governing the transfer of power") (internal quotation marks omitted). Just as the Constitution "confers no power in the President to receive bribes," Walter Dellinger,

*Application of 28 U.S.C. § 458 to Presidential Appointments of Federal Judges*, 19 Op. O.L.C. 350, 357 n.11 (Dec. 18, 1995), so too it does not afford a President an unreviewable authority or license to conspire to obstruct a federal governmental function through fraud and dishonesty, conspire and attempt to obstruct a congressional proceeding, and conspire to violate the constitutional rights of others.

Accordingly, the prosecution here raises no separation-of-powers concerns. To the contrary, a scheme to thwart the peaceful transfer of power contradicts the most basic constitutional check on executive abuses: A President comes to power by winning an election, not by subverting the results of the vote. *See* U.S. Const. art. II, § 1, cls. 1, 2 (President "shall hold his office during the Term of four years" based on an election carried out under the procedures set forth in the Constitution). Whatever hypothetical concerns might arise in a future case do not affect the outcome here.

**D.  Even if a former President were entitled to immunity from criminal prosecution comparable to his immunity from civil liability, dismissal is not warranted here.**

Dismissal is at a minimum unwarranted because the defendant has no remotely viable claim that *all* of the indictment's allegations involve

49

acts "within the 'outer perimeter' of his official responsibility." *Fitzgerald*, 457 U.S. at 756. Rather, the indictment alleges substantial conduct as a part of the charged conspiracies that goes well beyond any plausible claim of official acts. This Court has held that a "sitting President running for a second term . . . is not carrying out the official duties of the presidency" and thus "cannot qualify for *official*-act immunity" when he acts "as [an] office-*seeker*, not office-*holder*." *Blassingame*, 87 F.4th at 4-5. A former President therefore is not entitled to even civil immunity for acts done while in office that "viewed objectively and in context may reasonably be understood only as re-election campaign activity." *Id.* at 21-22. Here, the defendant is alleged to have conspired with and directed individuals outside the government to facilitate his effort, as a candidate, to subvert the election results, *see* JA.434, thus placing that conduct beyond the outer perimeter of Presidential responsibilities. The same is true for the allegations describing the conspirators' efforts to organize fraudulent electoral slates and cause them to transmit false certificates to Congress in anticipation of the certification proceeding on January 6, 2021. *See* JA.44-50. Again, those alleged acts were carried out by and on behalf of the defendant in

his capacity as a candidate, and the extensive involvement of private attorneys and campaign staff in procuring the fraudulent slates as alleged in the indictment underscores that those activities were not within the outer perimeter of the office of the Presidency. *Cf. Blassingame*, 87 F.4th at 17 ("[A] sitting President, just like the candidates he runs against, is subject to civil damages liability for his actions constituting re-election campaign activity."). Because the indictment's allegations substantially fall outside the outer perimeter of the president's powers even under the broadest understanding of that term, the remedy of dismissal is inappropriate.

The defendant's counterarguments rest entirely on mischaracterization of the indictment. For example, the defendant identifies (Br.42) one of the "five types of conduct" as his "public statements and tweets about alleged fraud and irregularity in the federal election." That description glosses over the specific allegations about how the defendant as a candidate used false statements to undermine the election's integrity, *see supra* at 5, and ignores that even if certain statements were otherwise protected in isolation, "constitutionally protected speech may nevertheless be an overt act in a conspiracy

51

charge." *United States v. Donner*, 497 F.2d 184, 192 (7th Cir. 1974); *see also Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993) ("[A] defendant's previous declarations or statements [are] commonly admitted in criminal trials subject to evidentiary rules dealing with relevancy, reliability, and the like.").

Similarly, the defendant's conclusory assertions that the allegations involve his "official duties" rely on his recasting of what the indictment in fact alleges. In his view, for example, the indictment encompasses mere "communications with state officials," Br.44, when the actual allegations detail "knowingly false claims of election fraud aimed at interfering with the ascertainment of and voting by" electors made by the defendant and his coconspirators in several targeted states as part of his campaign to retain the Presidency. *See* JA.24-26. The defendant's further claim to have been carrying out his "official duties" entirely ignores that, as a "candidate for re-election," *id.* at 24, he is alleged to have conspired to "overturn the legitimate results of" a "presidential election," *id.* at 26, and to have done so with at least five others who had absolutely no role in the federal government, including private attorneys and a political consultant, *id.* at 26-27. While the defendant is presumed

52

innocent and the Government will have to carry its burden to prove the indictment's allegations at trial, the defendant cannot reframe the allegations into a version that more conveniently supports his legal arguments.

## II.   The Defendant's Acquittal at an Impeachment Trial Does Not Bar This Prosecution.

The defendant contends (Br.46-55) that the Impeachment Judgment Clause and principles of double jeopardy supply an additional barrier to his prosecution.  That contention is incorrect.

1. a.   As noted above, *see supra* at 30-36, the Impeachment Judgment Clause's two parts reflect its related objectives.  The first clause—which limits "Judgment in Cases of Impeachment" to removal and disqualification, U.S. Const. art. I, § 3, cl. 7—empowers Congress to impose a political sanction for removal without enabling the Legislative Branch to exact criminal punishment.  Ensuring that Congress could not exact criminal penalties following impeachment distinguished the American approach from Britain, where Parliament could impose "a wide array of criminal penalties, including fines, imprisonment, and even execution."  Randolph D. Moss, *Whether a Former President May Be Indicted and Tried for the Same Offenses for Which He Was Impeached*

53

*by the House and Acquitted by the Senate*, 24 Op. O.L.C. 110, 120 (Aug. 18, 2000). The second clause—which "nevertheless" subjects the officer in question to "Indictment, Trial, Judgment and Punishment, according to Law," U.S. Const. art. I, § 3, cl. 7—clarifies that, although Congress may not impose criminal punishment, the officer in question, including a former President, is "liable to prosecution and punishment in the ordinary course of law." *Federalist* No. 69, at 384 (Hamilton). Read together, those two clauses constrain the range of potential sanctions available to Congress following impeachment but place no corresponding limits beyond those prescribed "according to Law" on post-impeachment criminal prosecution. The clauses therefore preclude an impeached officer from invoking his Senate conviction to bar his subsequent criminal prosecution but do not suggest that the *absence* of a conviction provides the officer with any sort of shield.

That straightforward textual reading of the Impeachment Judgment Clause finds ample historical support. For example, James Wilson, a participant at the Constitutional convention and later a Supreme Court Justice, responded in the 1787 Pennsylvania ratification convention to the argument that the Senate would be unlikely to impeach

and remove through Senate conviction fellow Senators by observing that, "Though they may not be convicted on impeachment before the Senate, they may be tried by their country; and if their criminality is established, the law will punish."[9]  2 *The Documentary History of the Ratification of the Constitution* 492 (Merrill Jensen et al., eds. 1976).  Similarly, Edward Pendleton, who served as President of the Virginia Supreme Court and the Virginia ratifying convention, observed in a letter to James Madison that the impeachment power "is in the hands of the House of Representatives, who will not use it in the case Supposed, or if they do, and meet the obstruction, may yet resort to the courts of Justice, as an Acquital [sic] would not bar that remedy."  *See id.* at 1773 (Letter from Edmund Pendleton to James Madison, Oct. 8, 1787).  And that view was likewise shared by Representative Samuel Dana, a participant in the first federal impeachment trial—of Senator William Blount of Tennessee in 1798—who observed that an impeachment conviction "has no

---

[9] The defendant's citation (Br.51) to Wilson's statement that a President is "amenable" to the laws in "his private character as a citizen" supports the conclusion that a former President enjoys no immunity from criminal prosecution in his personal capacity and is entirely consistent with Wilson's view at the Pennsylvania ratification convention and not inconsistent with Hamilton's views.  *See infra* at 60-61.

connexion [sic] with punishment or crime, as, whether a person tried under an impeachment be found guilty or acquitted, he is still liable to a prosecution at common law." 9 Annals of Congress 2475 (1798).

The defendant's dismissal (Br.48-49) of Justice Joseph Story's view as "baseless" is unmerited. Story explained that the Constitution separated an impeachment trial (with its exclusive remedies of removal and disqualification) from a trial "in the common tribunals of justice" to ensure that "a second trial for the same offence could be had, either after an acquittal, or a conviction in the court of impeachments." 2 Joseph Story, *Commentaries on the Constitution of the United States* §§ 780-81 (1833). Otherwise, "if no such second trial could be had, then the grossest official offenders might escape without any substantial punishment, even for crimes, which would subject their fellow citizens to capital punishment." *Id.* at § 780. That observation remains true—and unrebutted—today.

b. Two structural considerations bolster the textual and historical evidence demonstrating that the Impeachment Judgment Clause does not bar the criminal prosecution of a former president acquitted at a Senate trial.

56

First, "[i]mpeachment and criminal prosecution serve entirely distinct goals." *Indicted and Tried for the Same Offenses*, 24 Op. O.L.C. at 130; *see Hastings*, 716 F. Supp. at 42. Impeachment provides Congress with a political check on the Executive Branch to address through removal the "misconduct of public men" for "injuries done immediately to the society itself." *Federalist* No. 65, at 364. The Constitution's limitation of Congress's sanction to removal and disqualification reflects the view that "the national legislature is not to be trusted with dispensing criminal punishments, sanctions aimed not at protecting the integrity of the government's operations but at penalizing individuals by taking away their life, liberty, or property." *Indicted and Tried for the Same Offenses*, 24 Op. O.L.C. at 130. By contrast, the Executive Branch is constitutionally entrusted with the "power of prosecution," *Hastings*, 716 F. Supp. at 42, to enforce the violation of congressionally passed penal statutes. Neither branch's independent action, however, can "effectively prevent," *id.*, the other branch from acting.

Second, acquittal in a Senate impeachment trial may reflect a technical or procedural determination rather than a factual conclusion

that the official in question did not commit the alleged acts.  *Indicted and Tried for the Same Offenses*, 24 Op. O.L.C. at 131.  That is true of the defendant's impeachment proceedings.  *See* JA.407-08 (explaining that at least 31 of the 43 Senators who voted to acquit the defendant explained that their decision to do so rested in whole or in part on their agreement with the defendant's argument that the Senate lacked jurisdiction to try him because he was no longer in office).  Several Senators who voted against conviction on jurisdictional grounds emphasized the defendant's criminal responsibility for the events of January 6.  *See, e.g.*, 167 Cong. Rec. S736 (daily ed. Feb. 13, 2021) (Sen. McConnell) (explaining that his vote was based on the view that the Senate lacked jurisdiction and stating that the defendant "is still liable for everything he did while he was in office, "as an ordinary citizen"; and noting that "[w]e have a criminal justice system in this country").  Those votes and statements make clear that, to the extent those considerations played a role, Senators were not adjudicating the defendant's factual guilt, but rather were relying on a legal judgment about the scope of the Senate's jurisdiction, a "political judgment" about what constitutes "high crimes and misdemeanors," and a practical judgment on whether removal and

disqualification best serve the country "at a particular moment in our nation's history." *Indicted and Tried for the Same Offenses*, 24 Op. O.L.C. at 132-33.

c.  The defendant's counterarguments fail.  First, the defendant's reliance (Br.46-48) on an asserted negative implication—that the phrase "Party convicted" in the Impeachment Judgment Clause requires that an officer be both impeached and convicted before that officer may face criminal prosecution—is misplaced.  The prior portion of the Clause limits the permissible consequences that the Senate may impose upon conviction.  The portion of the Clause on which the defendant relies then makes clear that such a party is subject to criminal prosecution, but it does not speak to acquittal at all.  In any event, the asserted negative implication could not overcome the historical evidence and structural considerations indicating that the Impeachment Judgment Clause was intended to limit congressional sanctions for impeachment to removal and disqualification from office, not to preclude the prosecution of an impeached but not convicted officer. *See Thompson v. Trump*, 590 F. Supp. 3d 46, 86-87 (D.D.C. 2022).

Second, the defendant repeatedly contends (Br.6, 13, 14-15, 26, 50-51) that Hamilton's writings support his position. Hamilton's essays stressed the function of impeachment as a safeguard against the abuse of power by an incumbent President—who would also be liable to criminal punishment after removal or departure from office. But nothing in his writings addressed what the defendant seeks to establish: that acquittal by the Senate would forestall the criminal prosecution of a former President. Instead, Hamilton explained why the Supreme Court was not the proper body to serve as an impeachment court, *Federalist* No. 65, how a President differed from the British monarch, *Federalist* No. 69, and that, despite the President's formidable powers, strong constitutional safeguards existed to protect the Nation, *Federalist* No. 77. Hamilton's inventory of constitutional protections did not suggest that a former President could not be prosecuted if he was impeached but not convicted. Rather, the strong current that runs through all three of Hamilton's essays is that a former President, unlike a king, is amenable to "the common course of law." *Federalist* No. 77, at 432.

2.    The defendant suggests (Br.46) that "[p]rinciples of Double Jeopardy" underpin his claim that his acquittal in the Senate forecloses

any future prosecution. But that vague invocation of double-jeopardy principles falters for at least two reasons.

First, the penalty following impeachment—removal and disqualification from office—is not criminal and thus does not implicate double-jeopardy principles. The Double Jeopardy Clause does not preclude the imposition of any penalty "that could, in common parlance, be described as punishment"; instead, it guards only against "imposition of multiple *criminal* punishments for the same offense." *Hudson v. United States*, 522 U.S. 93, 99 (1997) (internal quotation marks omitted). To determine whether a penalty is criminal or civil proceeds in two steps. Courts first assess whether the legislature, "in establishing the penalizing mechanism, indicated either expressly or impliedly a preference" for labelling the penalty as civil or criminal. *United States v. Ward*, 448 U.S. 242, 248 (1980); *cf. Johnson v. Quander*, 440 F.3d 489, 501 (D.C. Cir. 2006). Second, even where the legislature intended to enact a civil penalty, courts must determine whether that penalty is nonetheless "so punitive either in purpose or effect . . . as to transform what was clearly intended as a civil remedy into a criminal penalty." *Hudson*, 522 U.S. at 99 (brackets and internal quotation marks omitted).

The Supreme Court in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1965), set out several factors as "useful guideposts," *Hudson*, 522 U.S. at 99, to determine whether a nominally civil penalty is criminal. 372 U.S. at 168-69; *see Johnson*, 440 F.3d at 502-03 (applying *Mendoza-Martinez* factors and concluding that statute requiring DNA collection was punitive in "neither purpose nor effect").

Rather than try to establish that removal and disqualification from office is a criminal penalty, the defendant simply assumes (Br.47) the "criminal nature of the impeachment process." That assumption is misguided. The historical evidence above showing that the Framers intended that Congress could not impose the type of criminal sanctions following impeachment that the British Parliament could exact, *see supra* at 53-54, indicates that the Framers did not intend to create a criminal sanction. Indeed, the Framers initially considered adopting language in the Constitution that provided that "No person shall be subject, except in cases of impeachment, to more than one punishment or one trial for the same offence." *See Indicted and Tried for the Same Offenses*, 24 Op. O.L.C. at 134. But the Framers deleted the reference to impeachment when they added the phrase "life or limb" to denote

criminal punishment, making the exception for impeachment superfluous because that remedy clearly did not risk criminal punishment. *See id.* at 134-35. That history underscores the common-sense intuition that being terminated from, or prevented from obtaining, a job is qualitatively different than facing a prison term or execution. But even if that were not so, the *Mendoza-Martinez* factors overwhelmingly support a finding that removal and disqualification from office does not constitute a criminal penalty. *See Indicted and Tried for the Same Offenses*, 24 Op. O.L.C. at 139-48 (applying *Mendoza-Martinez* factors to removal and disqualification following impeachment).

Second, even if the Double Jeopardy Clause (or analogous principles derived from it, Br.54 n.7) applied, it would not bar the defendant's prosecution. The Clause protects against multiple punishments for the same offense. *See Missouri v. Hunter*, 459 U.S. 359, 365-66 (1983). But the Double Jeopardy Clause "is not implicated simply because a criminal charge involves 'essentially the same conduct' for which a defendant has previously been punished." *Hudson*, 522 U.S. at 107 (Stevens, J., concurring) (citing *United States v. Dixon*, 509 U.S. 688, 696, 704 (1996)). Instead, whether two offenses are the same for double-jeopardy purposes

requires ascertaining whether each requires proof of an element that the other does not. *See Blockburger v. United States*, 284 U.S. 299, 304 (1932). It is not enough that there may be some overlap between the conduct charged in each case.

Any double-jeopardy claim here would founder in light of these principles. Without support, the defendant asserts that his Senate acquittal and the indictment in this case involve "the same or closely related conduct." Br.52. Not so. The single article of impeachment alleged a violation of "Incitement of Insurrection," H.R. Res. 24, 117th Cong. at 2 (Jan. 11, 2021) (capitalization altered), and charged that the defendant had "incit[ed] violence against the Government of the United States," *id.* at 3. The most analogous federal statute is 18 U.S.C. § 2383, which prohibits "incit[ing] . . . any rebellion or insurrection against the authority of the United States or the laws thereof." A violation of Section 2383 would therefore require proof that the violence at the Capitol on January 6, 2021, constituted an "insurrection against the authority of the United States or the laws thereof" and that the defendant incited that insurrection. Incitement, in turn, requires proof that the speaker's words were both directed to "producing imminent lawless action" and "likely to

64

incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (per curiam); *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 927-28 (1982). None of the offenses charged here—18 U.S.C. § 371, 18 U.S.C. § 1512(c)(2) and (k), and 18 U.S.C. § 241—has as an element any of the required elements for an incitement offense. And the elements of the charged offenses—*e.g.*, conspiring to defeat a federal governmental function through deceit under Section 371, obstruct an "official proceeding" under Section 1512, and deprive persons of rights under Section 241—are nowhere to be found in the elements of a violation of Section 2383 or any other potential incitement offense. The mere fact that some of the conduct on which the impeachment resolution relied is related to conduct alleged in the indictment does not implicate the Double Jeopardy Clause or its principles. *See Dixon*, 509 U.S. at 696.

## CONCLUSION

For the foregoing reasons, the Court should affirm the district court's order denying the defendant's motions to dismiss on Presidential-immunity and double-jeopardy grounds. For the reasons given in the Government's motion to expedite appellate review, including the imperative public importance of a prompt resolution of this case, the

Government respectfully requests the Court to issue the mandate five days after the entry of judgment.  Such an approach would appropriately require any party seeking further review to do so promptly.

Respectfully submitted,

J.P. COONEY
Deputy Special Counsel

JACK SMITH
Special Counsel

MICHAEL R. DREEBEN
RAYMOND N. HULSER
Counselors to the Special Counsel

MOLLY GASTON
THOMAS P. WINDOM
Senior Assistant Special Counsels

JOHN M. PELLETTIERI
CECIL W. VANDEVENDER
Assistant Special Counsels

/S/ JAMES I. PEARCE
Assistant Special Counsel
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Rm. B-206
Washington, D.C. 20530

## CERTIFICATE OF SERVICE

In accordance with Fed. R. App. P. 25(d), the undersigned counsel of record certifies that the foregoing Answering Brief for the United States was this day served upon counsel for appellant, by notice of electronic filing with the District of Columbia Circuit CM/ECF system.

DATED: DECEMBER 30, 2023

S/ JAMES I. PEARCE
Assistant Special Counsel
U.S. Department of Justice

67

# CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND LENGTH LIMITATIONS

1. This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 12,997 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in Century 14-point font in text and Century 14-point font in footnotes.

3. This brief complies with the privacy redaction requirement of Fed R. App. 25(a)(5) because it contains no personal data identifiers.

4. The digital version electronically filed with the Court on this day is an exact copy of the written document to be sent to the Clerk; and

5. This brief has been scanned for viruses with the most recent version of McAfee Endpoint Security, version 10.7, which is continuously updated, and according to that program is free of viruses.

/S/ JAMES I. PEARCE
Assistant Special Counsel
U.S. Department of Justice