**ORAL ARGUMENT SET FOR JANUARY 9, 2024**
**No. 23-3228**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

UNITED STATES OF AMERICA,

*Appellee*,

v.

DONALD J. TRUMP,

*Defendant-Appellant*.

_____

On Appeal from the United States District Court
for the District of Columbia

**REPLY BRIEF OF DEFENDANT-APPELLANT**
**PRESIDENT DONALD J. TRUMP**

LAURO & SINGER
John F. Lauro
Gregory M. Singer
400 N. Tampa St., 15th Floor
Tampa, FL 33602
(813) 222-8990
jlauro@laurosinger.com

BLANCHE LAW
Todd Blanche
Emil Bove
99 Wall St., Suite 4460
New York, NY 10005
(212) 716-1250
toddblanche@blanchelaw.com

JAMES OTIS LAW GROUP, LLC
D. John Sauer
William O. Scharf
Michael E. Talent
13321 N. Outer Forty Road, Suite 300
St. Louis, Missouri 63017
(314) 562-0031
John.Sauer@james-otis.com

*Attorneys for President Donald J. Trump*

## SUPPLEMENTAL CERTIFICATE AS TO
## PARTIES, RULINGS, AND RELATED CASES

**A.    PARTIES AND *AMICI CURIAE***

The parties in the district court include the United States of America and President Donald J. Trump.  The same parties are now before this Court.

The district court denied leave to file to proposed *amici curiae*.  Except for *amici* Former Attorney General Edwin Meese III and Law Professors Steven G. Calabresi and Gary S. Lawson, *amici curiae* appearing before this Court are listed in the Brief for Appellee United States of America.

**B.    RULINGS UNDER REVIEW**

References to the rulings at issue appear in the Brief for Appellant President Donald J. Trump.

**C.    RELATED CASES**

References to related cases appear in the Brief for Appellant President Donald J. Trump.

*/s/ D. John Sauer*

# **TABLE OF CONTENTS**

SUPPLEMENTAL CERTIFICATE AS TO PARTIES, RULINGS,
    AND RELATED CASES.........................................................................i

TABLE OF CONTENTS ......................................................................... ii

TABLE OF AUTHORITIES....................................................................iii

GLOSSARY ...........................................................................................ix

SUPPLEMENTAL JURISDICTIONAL STATEMENT ...........................1

SUMMARY OF ARGUMENT................................................................2

ARGUMENT ..........................................................................................3

   I.  The Government's Statement of Facts Is Legally and Factually Incorrect......3

  II. President Trump Has Immunity from Prosecution for His Official Acts. .......5

      A.  The Separation of Powers Mandates Presidential Immunity....................5

      B.  Policy Considerations Favor Criminal Immunity. ....................................9

      C.  Constitutional Text and History Support Presidential Immunity.............14

      D.  Analogous Immunity Doctrines Support Presidential Immunity. ...........19

  III. The Indictment Violates Presidential Immunity. ..........................................21

      A.  The "Outer Perimeter" Test Provides the Scope of Immunity.................21

      B.  The Alleged Acts Fall Within the Outer Perimeter. .................................23

  IV. The Impeachment Judgment Clause Forecloses the Prosecution. ................24

CONCLUSION.......................................................................................29

CERTIFICATE OF SERVICE ...............................................................30

CERTIFICATE OF COMPLIANCE .......................................................31

## TABLE OF AUTHORITIES

**Cases**

*Abney v. United States*,
   431 U.S. 651 (1977)............................................................................2

*Alden v. Maine*,
   527 U.S. 706 (1999)..........................................................................24

*Ashe v. Swenson*,
   397 U.S. 436 (1970)..........................................................................28

*Barker v. Wingo*,
   407 U.S. 514 (1972)..........................................................................28

*Barr v. Matteo*,
   360 U.S. 564 (1959)..................................................................... 22-23

*Blassingame v. Trump*,
   87 F.4th 1 (D.C. Cir. 2023) ........................................................21, 23

*Bradley v. Fisher*,
   80 U.S. 335 (1871)...................................................................... 22-23

*Butz v. Economou*,
   438 U.S. 478 (1978)..........................................................................12

*Cummings v. Missouri*,
   71 U.S. 277 (1866)............................................................................26

*Ex parte Virginia*,
   100 U.S. 339 (1879)..........................................................................20

*Franchise Tax Bd. of Cal. v. Hyatt*,
   139 S. Ct. 1485 (2019)......................................................................24

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992)............................................................................7

*Gravel v. United States*,
    408 U.S. 606 (1972)..........................................................................19

*Gregoire v. Biddle*,
    177 F.2d 579 (2d Cir. 1949) ..................................................... 22-23

*Harlow v. Fitzgerald*,
    457 U.S. 800 (1982).................................................................8, 10, 14

*Helvering v. Mitchell*,
    303 U.S. 391 (1938)..........................................................................28

*Hunter v. Bryant*,
    502 U.S. 224 (1991)..........................................................................22

*In re Sealed Case*,
    121 F.3d 729 (D.C. Cir. 1997) .........................................................22

*Kendall v. United States*,
    37 U.S. 524 (1838)........................................................................7, 8

*Kennedy v. Mendoza-Martinez*,
    372 U.S. 144 (1963)..........................................................................27

*Little v. Barreme*,
    6 U.S. (2 Cranch) 170 (1804) .........................................................7, 8

*Marbury v. Madison*,
    5 U.S. (1 Cranch) 137 (1803) .........................................................2, 6

*Martin v. Mott*,
    25 U.S. 19 (1827)...............................................................................7

*Midland Asphalt Corp. v. United States*,
    489 U.S. 794 (1989)............................................................................1

*Mississippi v. Johnson*,
    71 U.S. 475 (1866)........................................................................7, 8

iv

*Mireles v. Waco*,
    502 U.S. 9 (1991)...............................................................................20

*Morrison v. Olson*,
    487 U.S. 654 (1988).........................................................................13

*Newdow v. Roberts*,
    603 F.3d 1002 (D.C. Cir. 2010) ............................................................7

*Nixon v. Fitzgerald*,
    457 U.S. 731 (1982).........................................1, 3-4, 8, 10, 14, 19, 21-23

*Pearson v. Callahan*,
    555 U.S. 223 (2009).........................................................................22

*Perrin v. United States*,
    444 U.S. 37 (1979)...........................................................................20

*Pierson v. Ray*,
    386 U.S. 547 (1967).........................................................................22

*Robinson v. Shell Oil Co.*,
    519 U.S. 337 (1997)...........................................................................2

*Seila Law LLC v. CFPB*,
    140 S. Ct. 2183 (2020).....................................................................18

*Spalding v. Vilas*,
    161 U.S. 483 (1896)..................................................................... 21-23

*Springer v. Gov't of Philippine Islands*,
    277 U.S. 189 (1928).........................................................................27

*Stump v. Sparkman*,
    435 U.S. 349 (1978)...........................................................................4

*Swan v. Clinton*,
    100 F.3d 973 (D.C. Cir. 1996) .........................................................7, 8

*Trump v. Vance*,
  140 S. Ct. 2412 (2020) ...................................................................10, 12

*United States v. Aguilar*,
  515 U.S. 593 (1995) ................................................................................20

*United States v. Cisneros*,
  169 F.3d 763 (D.C. Cir. 1999) .................................................................1

*United States v. Claiborne*,
  727 F.2d 842 (9th Cir. 1984) .................................................................20

*United States v. Classic*,
  313 U.S. 299 (1941) ................................................................................28

*United States v. Collins*,
  972 F.2d 1385 (5th Cir. 1992) ...............................................................20

*United States v. Hastings*,
  681 F.2d 706 (11th Cir. 1982) ...............................................................20

*United States v. Hudson*,
  11 U.S. (7 Cranch.) 32 (1812) ...............................................................27

*United States v. Isaacs*,
  493 F.2d 1124 (7th Cir. 1974) ...............................................................20

*United States v. Johnson*,
  383 U.S. 169 (1966) ................................................................................19

*United States v. Lee*,
  106 U.S. 196 (1882) ................................................................................12

*United States v. Manton*,
  107 F.2d 834 (2d Cir. 1939) ...................................................................21

*United States v. Nixon*,
  418 U.S. 683 (1974) ..............................................................................2, 8

*United States v. Rose*,
   28 F.3d 181 (D.C. Cir. 1994) ...............................................................1

*United States v. Ward*,
   448 U.S. 242 (1980)...........................................................................27

*Zivotofsky v. Kerry*,
   576 U.S. 1 (2015)...............................................................................22

**U.S. Constitution**

U.S. CONST. art. I, § 3, cl. 7 .............................................................2, 12
U.S. CONST. art. I, § 9, cl. 7 .................................................................27
U.S. CONST. art. II, § 1 ..........................................................................2
U.S. CONST. art. II, § 2, cl. 1 ...............................................................27
U.S. CONST. art. II, § 4...........................................................................14
U.S. CONST. art. III, § 2, cl. 3 ..............................................................27

**Statutes**

18 U.S.C. § 3282 ...................................................................................28

**Other Authorities**

2 RECORDS OF THE FEDERAL CONVENTION OF 1787 (M. Farrand ed. 1911) ..............8

2 William Blackstone, *Commentaries on the Laws of England* (1753)...................26

3 J. STORY, COMMENTARIES ON THE CONSTITUTION OF THE
UNITED STATES (1833).........................................................................6, 25

4 DEBATES ON THE CONSTITUTION 109 (J. Elliot ed. 1891) ....................................17

*A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 U.S.
Op. O.L.C. 222, 2000 WL 33711291 (2000).........................................9, 11, 13, 16

Andrew C. McCarthy, *The Wages of Prosecuting Presidents for their Official Acts*,
National Review (Dec. 9, 2023), *at* https://www.nationalreview.com/2023/12/the-
wages-of-prosecuting-presidents-over-their-official-acts/......................................17

ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS (2012) .....................................................................24

Brett Kavanaugh, *Separation of Powers During the Forty-Fourth Presidency and Beyond*, 93 MINN. L. REV. 1454 (2009).............................................9, 11

FEDERALIST NO. 47 ...........................................................................10

FEDERALIST NO. 65 ............................................................ 14-16, 26, 28

FEDERALIST NO. 69 ......................................................................15, 26

FEDERALIST NO. 77 ......................................................................16, 26

Statement of President Ford (Sept. 8, 1974), https://www.fordlibrarymuseum.gov/library/document/0067/1563096.pdf............18

The Editors, *Iran-Contra Scandal Begins with Shredded Documents*, History (Nov. 13, 2009), *at* https://www.history.com/this-day-in-history/oliver-north-starts-feeding-documents-into-the-shredding-machine ....................................................17

*The Proceedings Relative to Calling the Conventions of 1776 and 1790* (1825) ...25

Tim Arango, *Ex-Prosecutor's Book Accuses Bush of Murder*, NEW YORK TIMES (July 7, 2008), https://www.nytimes.com/2008/07/07/business/media/07bugliosi.html..17

U.S. Dep't of Justice Memorandum, Doc. 28 *in Missouri v. Biden*, No. 4:21-cv-00287-AGF (E.D. Mo. Filed June 4, 2021) ............................................................7

*Whether a Former President May Be Indicted and Tried for the Same Offenses for Which He Was Impeached by the House and Acquitted by the Senate*, 24 Op. O.L.C. 110 (2000) ........................................................................ 24-26

## **GLOSSARY**

App.Br…………………………………..Opening Brief of Defendant-Appellant
President Donald J. Trump

criminal immunity……………………absolute Presidential immunity from
criminal prosecution for official acts

Double Jeopardy Memo………………*Whether a Former President May Be
Indicted and Tried for the Same Offenses for
Which He Was Impeached by the House and
Acquitted by the Senate*, 24 Op. O.L.C. 110,
130 (2000)

J.A.__ ..................................................Joint Appendix (page number)

OLC Memo…………………………..*A Sitting President's Amenability to
Indictment and Criminal Prosecution*, 24
U.S. Op. O.L.C. 222, 2000 WL 33711291
(2000)

President Trump………………………Defendant-Appellant President Donald J.
Trump

the government………………………..Appellee Department of Justice

Resp.Br…....…………………………Answering Brief for the United States

Presidential immunity and the Impeachment Judgment Clause foreclose the criminal prosecution of President Trump for his official acts. The government's argument contradicts the text of the U.S. Constitution, Supreme Court precedent, separation of powers, and historical evidence from the Founding to the present day.

## SUPPLEMENTAL JURISDICTIONAL STATEMENT

The government concedes that this Court has appellate jurisdiction. Resp.Br.2. *Amicus* American Oversight, however, contends (at 4) that there is supposedly not "an explicit … constitutional guarantee that trial will not occur." *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 801 (1989). This is incorrect. The President's "unique position in the constitutional scheme," set forth in the Executive Vesting Clause, guarantees him immunity from trial. *Nixon v. Fitzgerald*, 457 U.S. 731, 749-50 (1982). That is unlike the generic separation-of-powers claim in *United States v. Cisneros*, 169 F.3d 763 (D.C. Cir. 1999). In fact, *Cisneros* acknowledged that "a trial court's order denying a President's claim of separation-of-powers immunity from civil actions during his term of office falls within the collateral order doctrine: the right asserted would be irretrievably lost if there could be no immediate appeal." *Id.* at 769. Circuit precedent permits interlocutory appeals of "separation of powers claim[s]" like this one. *United States v. Rose*, 28 F.3d 181, 185 (D.C. Cir. 1994); *see also Cisneros*, 169 F.3d at 770. Likewise, denials of

presidential privilege in the criminal context are immediately appealable. *United States v. Nixon*, 418 U.S. 683, 690-91 (1974).

In addition, the Impeachment Judgment Clause explicitly shields a President from "Indictment, Trial, Judgment and Punishment" unless he is the "Party convicted" in trial before the Senate. U.S. CONST. art. I, § 3, cl.7. Interpretive tools, context, and history establish the Clause's plain meaning and explicit protection from "Trial." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). An acquittal by the Senate strips away "the very authority of the Government to" prosecute, and appellate jurisdiction is present. *Abney v. United States*, 431 U.S. 651, 659 (1977).

## SUMMARY OF ARGUMENT

President Trump has immunity from prosecution for his official acts. Under our system of separated powers, the Executive Power is exclusively vested in the President. U.S. CONST. art. II, § 1. A President's official acts "can never be examinable by the courts." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 166 (1803). The Judicial Branch cannot issue equitable relief directly against the President's official acts, including his power under the Take Care Clause. So also, it cannot sit in criminal judgment over them.

The Constitution's text, history, and policy support this conclusion. The Impeachment Judgment Clause presupposes the existence of Presidential criminal immunity. Early commentators including Alexander Hamilton, James Madison,

2

Chief Justice Marshall, and Justice Story support it.  The 234-year unbroken tradition of not prosecuting Presidents for official acts, despite vociferous calls to do so from across the political spectrum, provides powerful evidence of it.  Analogous immunity doctrines rooted in the separation of powers demonstrate the basis and existence of criminal immunity for Presidents.  The likelihood of mushrooming politically motivated prosecutions, and future cycles of recrimination, are far more menacing and crippling to the Presidency than the threat of civil liability.

Therefore, the scope of criminal immunity has to be at least as broad as for civil immunity, *i.e.*, the "outer perimeter" of the President's official responsibilities. *Fitzgerald*, 457 U.S. at 756.  All five classes of conduct charged in the indictment fall within that broad scope.

The Impeachment Judgment Clause and principles of double jeopardy independently bar this prosecution.  The plain text of the Clause, ordinary principles of interpretation, and the decisive weight of historical evidence confirm that a President who was impeached and acquitted is not subject to subsequent prosecution on the same conduct.

## **ARGUMENT**

### I.     **The Government's Statement of Facts Is Legally and Factually Incorrect.**

The government's Statement of the Case, Resp.Br.3-6, is legally and factually incorrect.  The government attempts to emphasize the allegedly unlawful manner

and purpose of acts alleged in the indictment.  Resp.Br.4-5.  However, in assessing whether immunity applies, courts must look to the "nature of the act itself."  *Stump v. Sparkman*, 435 U.S. 349, 362 (1978).  The allegedly improper manner or purpose of the alleged acts is not relevant.  *Fitzgerald*, 457 U.S. at 756.

Even worse, the government relies on facts outside the indictment to wrongfully suggest that President Trump is responsible for the events at the Capitol on January 6, 2021.  Resp.Br.3.  This is improper.  The indictment does not charge President Trump with responsibility for the events at the Capitol on January 6, J.A.24, and no evidence supports the allegations.  The government's account, Resp.Br.3, selectively omits key facts—such as that, in his speech at the Ellipse, President Trump encouraged the crowd to "peacefully and patriotically make your voices heard," and "cheer on our brave senators and congressmen and women." *Transcript of Trump's Speech at Rally Before US Capitol Riot*, AP (Jan. 13, 2021).[1] President Trump denounced the destruction of monuments and other symbols of American democracy.  *Id.*  He never encouraged anyone to enter the Capitol.  *Id.*  He stated on social media that protestors should "remain peaceful"[2] and "[s]tay

---

[1]    https://apnews.com/article/election-2020-joe-biden-donald-trump-capitol-siege-media-e79eb5164613d6718e9f4502eb471f27.

[2]    Donald J. Trump (@realDonaldTrump), X (Jan. 6, 2021, 2:13 PM), https://twitter.com/realDonaldTrump/status/1346912780700577792?lang=en.

peaceful,"[3] and released a video from the Rose Garden telling protestors "to go home now."[4]  The government's brief (at 3) omits the vigorous disputes and questions about the actual outcome of the 2020 Presidential election—disputes that date back to November 2020, continue to this day in our nation's political discourse, and are based on extensive information about widespread fraud and irregularities in the 2020 election.  *See, e.g.,* Donald J. Trump (@realDonaldTrump), Truth Social (Jan. 2, 2024),       https://truthsocial.com/@realDonaldTrump/posts/111687076142669367 (sharing the report *Summary of Election Fraud in the 2020 Presidential Election in the Swing States*,   https://cdn.nucleusfiles.com/e0/e04e630c-63ff-4bdb-9652-e0be3598b5d4/summary20of20election20fraud20in20the20swing20states.pdf); *see also id.* at 4 (published analysis reporting that "investigations across the country have uncovered an avalanche of irregularities, unlawful activity, manipulation of election records, destruction of evidence, and fraud" in the 2020 election).

## II.    President Trump Has Immunity from Prosecution for His Official Acts.

### A.    The Separation of Powers Mandates Presidential Immunity.

Article II, § 1 vests the Executive Power exclusively in the President of the United States.  No prosecutor, judge, or jury may sit in judgment over the President's

---

[3]  Donald J. Trump (@realDonaldTrump), X (Jan. 6, 2021, 1:38 PM), https://twitter.com/realDonaldTrump/status/1346904110969315332?lang=en.

[4]  Pres. Donald J. Trump, Video Telling Protestors at Capitol Building to Go Home: Transcript (Jan. 6, 2021), https://www.rev.com/blog/transcripts/trump-video-telling-protesters-at-capitol-building-to-go-home-transcript.

official acts. A President's official acts "can never be examinable by the courts." *Marbury*, 5 U.S. at 166.

The government argues that *Marbury* "addressed the reviewability of acts of Executive Branch officers in general, not the President in particular." Resp.Br.15. Not so. *Marbury* distinguished an executive officer's ministerial duties from the *President's* official acts:

> By the constitution of the United States, the President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character…. [T]here exists, and can exist, no power to control that discretion…. [B]eing entrusted to the executive, the decision of the executive is conclusive…. [A subordinate] officer … is to conform precisely to the will of the President…. The acts of such an officer, as an officer, can never be examinable by the courts.

5 U.S. at 165-66. Thus, the official acts of the *President* can "never be examinable by the courts," precisely because the Executive power is "vested" with him "[b]y the Constitution of the United States." *Id.* Chief Justice Marshall emphasized this point throughout *Marbury*. *See id.* at 164, 166, 170. "[N]othing can be more perfectly clear than that" the President's "acts are only politically examinable." *Id.* at 166.

Likewise, Justice Story wrote that the President, in his official acts, "is accountable only to his country, and to his own conscience. His decision, in relation to these powers, is subject to no control; and his discretion, when exercised, is conclusive." 3 J. STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES ch. 37, § 1563 (1833). He reinforced this point in *Martin v. Mott*: "It is no

6

answer that such a power may be abused, for there is no power which is not susceptible of abuse. The remedy for this … is to be found in the constitution itself," *i.e.*, impeachment and Senate trial. 25 U.S. 19, 32 (1827). Justice Story rejected the notion that "the legality of the orders of the President would depend, not on his own judgment of the facts, but upon the finding of those facts upon the proofs submitted to a jury." *Id.* at 33.

Accordingly, *Mississippi v. Johnson* held that the courts may not issue an injunction against the President's official acts. 71 U.S. 475, 499 (1866). The separation of powers "forbid[s] judicial interference with the exercise of Executive discretion" by the President. *Id.* In *Franklin v. Massachusetts*, 505 U.S. 788 (1992), "a majority of the Justices … subscribed to this position." *Swan v. Clinton*, 100 F.3d 973, 977 (D.C. Cir. 1996). "With regard to the President, courts do not have jurisdiction to enjoin him, and have never submitted the President to declaratory relief." *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010); *Swan*, 100 F.3d at 976 n.1; *see also* U.S. Dep't of Justice Memorandum, Doc. 28 *in Missouri v. Biden*, No. 4:21-cv-00287-AGF (E.D. Mo. Filed June 4, 2021). *A fortiori*, the courts cannot enter a criminal judgment against the President based on his official acts.

The government (at 15-16) cites *Little v. Barreme*, 6 U.S. (2 Cranch) 170 (1804), and *Kendall v. United States*, 37 U.S. 524 (1838). *Little* is inapplicable; it held that a private ship's captain could be held liable for damages arising from a

7

seizure that was illegal under an Act of Congress but allegedly authorized by the Executive.  6 U.S. at 179.  *Kendall* involved the issuance of mandamus against the Postmaster General, a subordinate official *below* the President, for "the performance of a mere ministerial act" over which the President had no control.  37 U.S. at 610; *see also Mississippi*, 71 U.S. at 499 (discussing *Kendall*).  Both cases are consistent with the longstanding rule that Article III courts may issue injunctions to prevent unlawful conduct by *subordinate* officers—but not directly against the President. *See Harlow v. Fitzgerald*, 457 U.S. 800, 811 n.17 (1982); *Swan*, 100 F.3d at 978-79.

The government cites the President's amenability to criminal subpoenas for *evidence*.  Resp.Br.17 (citing *Nixon*, 418 U.S. at 713).  But *Fitzgerald* distinguished a request for information relating to a criminal prosecution from a far more intrusive rule imposing personal liability on the President himself.  457 U.S. at 754, 759.

Convention statements of James Madison, Edmund Randolph, and George Mason, Resp.Br.13-14, were made in support of a motion to make the President *impeachable* for offenses in office.  *See* 2 RECORDS OF THE FEDERAL CONVENTION OF 1787, at 64 (M. Farrand ed. 1911) (discussing "the necessity of making the Executive *impeachable* whilst in office"); *id.* at 65 (George Mason arguing that "*impeachment*" would prevent the President from being "above Justice"); *id.* at 65-66 (James Madison arguing for impeachment to guard against "negligence or perfidy of the chief Magistrate"); *id.* at 67 (Edmund Randolph arguing for "the propriety of

8

*impeachments*" because "the Executive will have great opportunitys [*sic*] of abusing his power") (emphases added).  Impeachment, not criminal prosecution, provides the principal check against alleged Presidential misfeasance.  App.Br.12-14.

### B.    Policy Considerations Favor Criminal Immunity.

Contrary to the government, Resp.Br.20-28, the threat of future prosecution—with its more severe stigma and penalties—is far more menacing and disruptive to the Presidency than civil lawsuits.  *See* OLC Memo, 2000 WL 33711291, at *28 ("The stigma and opprobrium attached to indictment … far exceed that faced by the civil litigant defending a claim."); Brett Kavanaugh, *Separation of Powers During the Forty-Fourth Presidency and Beyond*, 93 MINN. L. REV. 1454, 1461 (2009) ("[A] President who is concerned about an ongoing criminal investigation is almost inevitably going to do a worse job as President").

The government argues that the President already faces this concern because the Impeachment Judgment Clause authorizes prosecution after impeachment and Senate conviction.  Resp.Br.20.  On the contrary, impeachment and conviction—which requires a broad consensus of Senators and Representatives across the country—provide a powerful structural check against *politically motivated* prosecutions.  In American history, three Presidents have been impeached and none convicted.  Stripping away this check would radically diminish the President's independence and protection from "new fangled and artificial treasons… by which

violent factions, the natural offspring of free governments, have usually wreaked their alternate malignity on each other." FEDERALIST NO. 47 (Madison).

The government (at 20-21) cites the OLC Memos and briefs from *Nixon* and *Vance*, but these statements refer to future prosecution for *private conduct*, not official acts, while defending the *sitting* President's immunity. App.Br.27-29 (discussing OLC Memos). *Vance* addressed a subpoena for information relating to the President's *personal* conduct. *Trump v. Vance*, 140 S. Ct. 2412, 2420 (2020). So also, President Nixon faced potential prosecution for a range of private conduct. App.Br.27-28 n.4.

The government argues that "the prospect of future criminal prosecution for knowingly criminal acts can have a salutary, not a chilling, effect." *Id.* at 21 (citing *Harlow*, 457 U.S. at 819). *Harlow* made this comment with respect to *subordinate* officers, 457 U.S. at 819; on the same day, the Supreme Court drew the opposing conclusion with respect to the President himself, *Fitzgerald*, 457 U.S. at 756. Moreover, *Harlow* held in the very next sentence that executive officials must be allowed to act "with independence and without fear of consequences." *Harlow*, 457 U.S. at 819.

The government, ironically, relies on the "presumption of prosecutorial regularity" and criminal procedural protections. Resp.Br.22-25. But, as the OLC Memo emphasizes, the prosecution of a President is "necessarily" and "unavoidably

10

political." 2000 WL 33711291, at *7. The OLC Memo also emphasizes "the stigma arising both from the initiation of a criminal prosecution and … from the need to respond to such charges from the judicial process" as formidable burdens, *id.* at *22—all of which are imposed regardless of procedural protections. Further, the OLC Memo correctly highlights how "incongruous" it is for a "jury of twelve" to "undertake the 'unavoidably political' task of rendering judgment in a criminal proceeding against the President." *Id.* at *7. The notion that the prosecution of a former President is politically neutral is indefensible. "Criminal investigations targeted at or revolving around a President are inevitably politicized by both their supporters and critics." Kavanaugh, *supra*, at 1461.

The government also argues that "Article III courts … can address any legally defective prosecutions." Resp.Br.23. This logic is circular. Under the separation of powers, Article III courts cannot sit in judgment on the legality of the President's official acts. *See supra*, Part I.A. The government cannot cure the unconstitutionality of its position by invoking the aspect of it that is most offensive to the separation of powers.

The government emphasizes the public interest in federal criminal prosecutions. Resp.Br.25. But, again, the government overlooks the great deterrence and disruption to the President's functions from the threat of such prosecutions, which more than outweighs the government's asserted interest here, if

any exists.  *See supra*.  On this point, the government contends that criminal immunity would contradict "the rule of law" and would place the President "above the law."  Resp.Br.25-26 (quoting *United States v. Lee*, 106 U.S. 196, 220 (1882)).  Not so.  In *Butz v. Economou*, the Supreme Court explained that immunity does *not* entail that the official is "above the law," especially where, as here "absolute immunity is essential for the conduct of the public business."  438 U.S. 478, 506 (1978).  The Constitution, which mandates immunity here, is the most fundamental law.  U.S. CONST. art. I, § 3, cl. 7.

The government (at 26) cites Justice Kavanaugh's statement in *Vance* that the President is not "above the law."  *Vance*, 140 S. Ct. at 2432 (Kavanaugh, J., concurring in the judgment).  But Justice Kavanaugh went on to state: "At the same time, in light of Article II of the Constitution, this Court has repeatedly declared … that a court may not proceed against a President as it would against an ordinary litigant."  *Id.*  That principle governs here.

The government argues that criminal immunity is "sobering" and would "expose the Nation to dangerous risks."  Resp.Br.27-28.  On the contrary, allowing a single prosecutor to sit in judgment over the President's official acts poses "dangerous risks."  *Id.*  The U.S. Senate, not the Special Counsel, has the constitutional authority, political accountability, and institutional competence to determine whether the public interest justifies prosecuting a President for official

acts: "Congress is structurally designed to consider and reflect the interests of the entire nation, and individual Members of Congress must ultimately account for their decisions to their constituencies."  OLC Memo, 2000 WL 33711291 at *27.  "By contrast, the most important decisions in the process of criminal prosecution would lie in the hands of unaccountable grand and petit jurors, deliberating in secret, perhaps influenced by regional or other concerns not shared by the general polity, guided by a prosecutor who is only indirectly accountable to the public." *Id.*

As for the government's parade of hypotheticals, Resp.Br.28-29, the OLC Memo explains that such concerns are addressed by "the availability of a politically accountable process of impeachment and removal from office for a President who has engaged in serious criminal misconduct."  2000 WL 33711291, at *21.  The Senate is very likely to convict in such extreme cases: "[A] President suspected of the most serious criminal wrongdoing might well face impeachment and removal from office before his term expired, permitting criminal prosecution at that point." *Id.* at *26.  The government's concern that the "practical obstacles to impeachment" might prevent the prosecution of a President in some marginal cases, Resp.Br.27, misapprehends the doctrine of the separation of powers.  All structural checks against government overreach create similar risks of under-enforcement, but they do so "to ensure that we do not lose liberty." *Morrison v. Olson*, 487 U.S. 654, 710 (1988) (Scalia, J., dissenting).

13

**C.    Constitutional Text and History Support Presidential Immunity.**

The government argues that "the Constitution does not expressly provide for" executive immunity.    Resp.Br.30-31.    But the Supreme Court has recognized absolute immunity for the President and qualified immunity for other "executive branch officials," *id.*, neither of which is expressly provided in the Constitution. *Fitzgerald*, 457 U.S. at 756; *Harlow*, 457 U.S. at 819.    Moreover, the text of the Constitution *does* explicitly acknowledge the President's criminal immunity in the Impeachment Judgment Clause.    *See infra*, Part III.

Next, the government notes that impeachment applies only to "high crimes and misdemeanors."  U.S. CONST. art. II, § 4.  But "high crimes and misdemeanors" encompass official acts of the President that the Senate deems sufficiently serious to warrant removal from office and exposure to prosecution—*i.e.*, "those offenses which proceed from the misconduct of public men, or, in other words, from the abuse or violation of some public trust. They are of a nature which may with peculiar propriety be denominated POLITICAL, as they relate chiefly to injuries done immediately to the society itself."  FEDERALIST NO. 65.  For this reason, trial for such offenses is assigned first to the Senate: "The prosecution of them, for this reason, will seldom fail to agitate the passions of the whole community, and to divide it into parties more or less friendly or inimical to the accused. In many cases it will connect itself with the pre-existing factions, and will enlist all their animosities, partialities,

14

influence, and interest on one side or on the other; and in such cases there will always be the greatest danger that the decision will be regulated more by the comparative strength of parties, than by the real demonstrations of innocence or guilt." *Id.* Thus, the Constitutional "convention … thought the Senate the most fit depositary of this important trust," *id.*, and rejected "the Supreme Court" as an appropriate venue for such trials. *Id.*

The government argues that Alexander Hamilton only asserted "that a President must leave office before any prosecution may commence." Resp.Br.33. On the contrary, Hamilton states that prosecution must occur only after *impeachment and conviction*, not after leaving office upon the expiration of his term. FEDERALIST NO. 69 ("The President of the United States would be liable to be impeached, tried, and, upon conviction of treason, bribery, or other high crimes or misdemeanors, removed from office; and would *afterwards* be liable to prosecution and punishment in the ordinary course of law.") (emphasis added). Hamilton was well aware that the President could also leave office upon the expiration of his term, since Hamilton emphasized that point multiple times in the immediately preceding sentences, but he did not say the President would be subject to prosecution for official acts after completing his term. *See id.* Likewise, in Federalist No. 77, Hamilton's statement that the President would "be[] at all times liable to impeachment, trial, dismissal from office, incapacity to serve in any other, and to forfeiture of life and estate by

15

*subsequent* prosecution in the common course of law," immediately followed his *separate* statement that the President is elected to a limited four-year term. FEDERALIST NO. 77 (emphasis added).

The government (at 36) cites Federalist No. 65, but that passage explicitly reinforces that prosecution must *follow* impeachment and conviction: "*After* having been sentenced to a perpetual ostracism from the esteem and confidence, and honors and emoluments of his country, he will still be liable to prosecution and punishment in the ordinary course of law."  FEDERALIST NO. 65 (emphasis added).

The government argues that historical practice has allowed for the prosecution prior to impeachment of *subordinate* officers below the President.  Resp.Br.33-34. But "the discussion of the Impeachment Judgment Clause in the [Constitutional] convention focused almost exclusively on the Office of the President, and the Framers did not debate the question whether impeachment generally must precede indictment" for subordinate officers.  OLC Memo, 2000 WL 33711291 at *9 (quotation marks omitted).  "To the extent that the convention did debate the timing of impeachment relative to indictment, … the convention records 'show that the Framers contemplated that *this sequence should be mandatory only as to the President.*'"  *Id.* at *10 (emphasis added) (citation omitted).  These records thus support the historic practice of prosecuting subordinate officers prior to impeachment, but not the President.

16

The government cites James Iredell's comments at the North Carolina ratifying convention. Resp.Br.36. Like Hamilton, Iredell's comments strongly imply that criminal prosecution would *follow* conviction after impeachment by reciting them in that order: "If [the President] commits any misdemeanor in office, he is impeachable, removable from office, and incapacitated to hold any office of honor, trust, or profit. If he commits any crime, he is punishable by the laws of this country…." 4 DEBATES ON THE CONSTITUTION 109 (J. Elliot ed. 1891).

The government argues that the absence of any prior criminal prosecution of a President in American history merely "reflects … the fact that most presidents have done nothing criminal." Resp.Br.37 (citation omitted). This claim is untenable. App.Br.17 (citing examples of Presidents accused of crimes in official acts, from John Quincy Adams to Barack Obama). American history contains many such examples—President Reagan's alleged involvement in Iran-Contra, President Clinton's pardon of Marc Rich, President Bush's claims of "weapons of mass destruction," President Nixon's firing of Archibald Cox, etc.[5] None of the above

---

[5] Tim Arango, *Ex-Prosecutor's Book Accuses Bush of Murder*, N.Y. TIMES (July 7, 2008), https://www.nytimes.com/2008/07/07/business/media/07bugliosi.html; Andrew C. McCarthy, *The Wages of Prosecuting Presidents for their Official Acts*, NAT'L REVIEW (Dec. 9, 2023), https://www.nationalreview.com/2023/12/the-wages-of-prosecuting-presidents-over-their-official-acts/; The Editors, *Iran-Contra Scandal Begins with Shredded Documents*, HISTORY (Nov. 13, 2009), *at* https://www.history.com/this-day-in-history/oliver-north-starts-feeding-documents-into-the-shredding-machine.

conduct was prosecuted. "Perhaps the most telling indication of a severe constitutional problem" with this prosecution "is a lack of historical precedent to support it." *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2201 (2020) (cleaned up).

The government relies on President Ford's pardon of President Nixon, Resp.Br.37-39, but that pardon applied to private conduct. *See* App.Br.27-28 & n.4. In any event, like the Founders, President Ford emphasized the divisive nature of a prosecution of the former President. *See* Statement of President Ford (Sept. 8, 1974), https://www.fordlibrarymuseum.gov/library/document/0067/1563096.pdf.     He stated that, "[a]fter years of bitter controversy and divisive national debate, … many months and perhaps more years will have to pass before Richard Nixon could hope to obtain a fair trial by jury in any jurisdiction of the United States." *Id.* at 4. President Ford determined that "ugly passions would again be aroused, our people would again be polarized in their opinions, and the credibility of our free institutions of government would again be challenged." *Id.* at 5. He concluded that the criminal prosecution of the President would "prolong the bad dreams that continue to reopen a chapter that is closed." *Id.* at 6. President Ford thus made the same judgment that the Founders made: The criminal prosecution of a former President should not, and could not fairly, proceed in Article III courts.

18

**D.      Analogous Immunity Doctrines Support Presidential Immunity.**

The government argues that legislative immunity is limited to *legislative* acts, *i.e.*, those "within the sphere of legitimate legislative activity."   Resp.Br.39-40 (quoting *Gravel v. United States*, 408 U.S. 606, 624 (1972)).   But this parallels the scope of immunity claimed by President Trump—he claims criminal immunity for *Presidential* acts, *i.e.*, those within the "outer perimeter of the President's official responsibilities."  *Fitzgerald*, 457 U.S. at 756.

The government argues that legislative immunity "arose in response to successive British kings' use of 'the criminal and civil law to suppress and intimidate critical legislators.'"   Resp.Br.41 (quoting *United States v. Johnson*, 383 U.S. 169, 178 (1966)).   This point also supports President Trump.   "In the American governmental structure," official immunity "reinforc[es] the separation of powers so deliberately established by the Founders."  *Johnson*, 383 U.S. at 178.   Preventing politically motivated prosecutions is fundamental to preserving the independence of the coordinate Branches: "[P]rotecting against possible prosecution by an unfriendly executive and conviction by a hostile judiciary, is one manifestation of the 'practical security' for ensuring the independence" of each Branch.  *Id.* at 179.   Separation of powers shields the President, no less than members of Congress, from scrutiny and "conviction" before a potentially "hostile judiciary" for official acts.  *Id.*

Regarding judicial immunity, the government argues that "a judge is not absolutely immune from criminal liability." Resp.Br.42 (quoting *Mireles v. Waco*, 502 U.S. 9, 10 n.1 (1991) (per curiam)). But the government fails to cite cases where a judge was criminally prosecuted for *judicial* acts. *Ex parte Virginia*, 100 U.S. 339 (1879), which *Mireles* cited, illustrates this point. In that case, the Supreme Court assumed that "Congress cannot punish a State judge for his official acts," and took pains to clarify that the conduct charged was *not* "a judicial act," but one that "might as well have been committed to a private person as one holding the office of a judge." 100 U.S. at 348. The Court then held that "[i]t is idle … to say that the act of Congress is unconstitutional because it inflicts penalties upon State judges for their judicial action. It does no such thing." *Id.* at 348-49.

The government (at 44) cites a series of cases involving bribery and bribe-solicitation. *United States v. Claiborne*, 727 F.2d 842, 843 (9th Cir. 1984); *United States v. Hastings*, 681 F.2d 706, 707 (11th Cir. 1982); *United States v. Isaacs*, 493 F.2d 1124, 1131 (7th Cir. 1974). Judicial bribe-taking was treated as a non-judicial act prosecutable at common law. App.Br.21 (citing *Perrin v. United States*, 444 U.S. 37, 39 (1979)). The government claims that "judges have long been criminally prosecuted for non-bribery offenses," Resp.Br.44, but the cases it cites all either involve bribery, or do not involve *judicial* acts at all. *See United States v. Aguilar*, 515 U.S. 593, 595-96 (1995) (leaking information about a wiretap to the target in a

case in which he was not presiding, and lying to federal agents about his involvement); *United States v. Collins*, 972 F.2d 1385, 1388-95 (5th Cir. 1992) (taking bribes and lying to federal agents about financial dealings with the bribe-giver); *United States v. Manton*, 107 F.2d 834, 836 (2d Cir. 1939) (soliciting bribes of "sums of money as gifts, loans and purported loans"). Thus, "a judge [is] exempt from … *indictment* for any act done or omitted to be done by him, *sitting as judge*…" *Spalding v. Vilas*, 161 U.S. 483, 494 (1896) (emphases added). So is the President.

## III.    The Indictment Violates Presidential Immunity.

### A.    The "Outer Perimeter" Test Provides the Scope of Immunity.

"[A]bsolute Presidential immunity" extends to "acts within the 'outer perimeter' of his official responsibility." *Fitzgerald*, 457 U.S. at 756; *Blassingame v. Trump*, 87 F.4th 1, 12-13 (D.C. Cir. 2023); J.A.357-59. The government argues for a case-by-case, functional approach instead. Resp.Br.45-49. This is meritless.

First, the government suggests that immunity might depend on the *function* that the President is performing. Resp.Br.45-46. The Supreme Court rejected this approach in *Fitzgerald*. 457 U.S. at 756. Among other problems, "it would be difficult to determine which of the President's innumerable 'functions' encompassed a particular action," and "an inquiry into the President's motives could not be avoided under the kind of 'functional' theory asserted" by the government. *Id.*

Second, the government suggests that immunity turns on the allegedly criminal *manner* or *purpose* for which the President supposedly committed the alleged acts. Resp.Br.48-49. But many cases hold that the purpose and manner of the alleged acts are irrelevant to the immunity determination. *Fitzgerald*, 457 U.S. at 756; *Bradley v. Fisher*, 80 U.S. 335, 354 (1871); *Spalding*, 161 U.S. at 494, 498; *Pierson v. Ray*, 386 U.S. 547, 554 (1967); *Barr v. Matteo*, 360 U.S. 564, 575 (1959); *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949) (Hand, J.).

Third, the prosecution suggests that, under a case-by-case approach to immunity, "any rulings could be reviewed on appeal from a final judgment." Resp.Br.46. On the contrary, the Supreme Court has "repeatedly … stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991). Because official immunity is "an immunity from suit rather than a mere defense to liability ... it is effectively lost if a case is erroneously permitted to go to trial." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

Finally, the government suggests immunity should "involve areas where the President's powers are 'both "exclusive" and "conclusive" on the issue.'" Resp.Br.45 (quoting *Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015)). But the indictment in *this* case charges President Trump with, *inter alia*, using his appointment and removal power over the Attorney General, which is a "quintessential and

22

nondelegable Presidential power." *In re Sealed Case*, 121 F.3d 729, 752–53 (D.C. Cir. 1997). The same logic applies to the President's power under the Take Care Clause.

**B.    The Alleged Acts Fall Within the Outer Perimeter.**

If the Court does not remand to the district court to apply immunity in the first instance, *see Blassingame*, 87 F.4th at 29, the Court should hold that all five types of conduct alleged in the indictment are immune. App.Br.41-46.

The government's arguments to the contrary (at 49-53) are unconvincing. Though the government concedes that the applicability of immunity requires an "objective[]" test, Resp.Br.50 (quoting *Blassingame*, 87 F.4th at 21-22), its analysis actually focuses on the allegedly improper *purpose* of President Trump's actions. Resp.Br.50-51. Supreme Court precedent squarely forecloses this approach. *Fitzgerald*, 457 U.S. at 756; *Bradley*, 80 U.S. at 354; *Spalding*, 161 U.S. at 498; *Barr*, 360 U.S. at 575.

Next, the government argues that President Trump's public statements and communications were supposedly "knowingly false." Resp.Br.51-52. The government's empty assertion is utterly false. President Trump was carrying out his duties as Chief Executive to investigate the overwhelming reports of widespread election fraud. *See supra*, Part I (citing *Summary of Election Fraud*). Nevertheless, absolute immunity would apply even if the challenged statements were allegedly

23

false and "actuated by malice on the part of the [speaker]," which they are not in this case. *Barr*, 360 U.S. at 568; *id.* at 569; *see also Fitzgerald*, 457 U.S. at 756; *Gregoire*, 177 F.2d at 581.

The government argues that the indictment alleges participation of private actors. Resp.Br.52 (citing J.A.26-27). On the contrary, the indictment alleges the overwhelming involvement of *official* staff and public officials, with private actors playing only a very minor role. *See* J.A. 28-29, 30-32, 33-34, 35-39, 40-42, 42-43, 43-44, 50-52, 54, 55-59, 63-65.

## IV.    The Impeachment Judgment Clause Forecloses the Prosecution.

The government's textual analysis (at 53-54) commits the "type of 'ahistorical literalism'" that is inappropriate for constitutional analysis. *Franchise Tax Bd. of Cal. v. Hyatt*, 139 S. Ct. 1485, 1498-99 (2019) (quoting *Alden v. Maine*, 527 U.S. 706, 730 (1999)). The negative inference is thus proper; when the Clause says "the Party convicted shall nevertheless be liable and subject to" criminal prosecution, it means the Party *acquitted* shall not be. *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 107 (2012).

That the Clause "does not speak to acquittal at all," Resp.Br.59, is irrelevant. The *expressio unius* canon is "often ... wielded to support the conclusion that when a statute identifies specific exceptions to a general rule," as the Impeachment

24

Judgment Clause does, "it by implication prohibits other exceptions."  Double Jeopardy Memo, 24 Op. O.L.C. at 130.

The government cites "historical evidence and structural considerations." Resp.Br. 59.  Its historical evidence is weak.  Even the Double Jeopardy Memo so concedes, opining that "[t]ext and history ultimately leave the question unresolved." 24 Op. O.L.C. at 130.  That's wrong, too.  App.Br.47-52.  The government points (at 54-56) to statements from James Wilson, Edward Pendleton, and Representative Dana, which President Trump has already addressed.  App.Br.50 n.5, 52 n.6. Wilson's more relevant statements support President Trump, *see id.* at 51-52, as do his actions.  When Pennsylvania drafted a new constitution, Wilson moved to change language subjecting "the party convicted" to prosecution to "the party, whether convicted or acquitted."  *The Proceedings Relative to Calling the Conventions of 1776 and 1790*, at 254 (1825).  That would be unnecessary if the former language permitted prosecutions after acquittals.

Next, the government points (at 56) to §§ 780 and 781 of Justice Story's *Commentaries*.  Section 780 describes two sets of punishments an impeachment court could impose: It could "pronounce a full and complete sentence of punishment" or it could "confine its sentence to the removal from office and other disabilities."  Double jeopardy principles apply to the former.  *See id.*  But Story noted they apply to the latter too.  Thus, "provision should be made … for the

25

purpose of inflicting the common punishment applicable to unofficial offenders. Otherwise, it might be a matter of extreme doubt whether, consistently with [double jeopardy] … a second trial for the same offense could be had … after an acquittal." *Id.* The Impeachment Judgement Clause lacks such provision.

The government's minimal historical evidence contrasts with the extensive evidence President Trump cites. App.Br.49-52. The government ignores much of it. What the government does address (at 60)—Hamilton's statements—it misapprehends. In his description of impeachment, Hamilton thrice indicated that prosecution follows Senate *conviction*. *See* FEDERALIST NOS. 65, 69, 77. So, per Hamilton, an *acquittal* means that prosecution cannot proceed.

The government's double-jeopardy analysis (at 60-63) is similarly deficient. President Trump did not assume that the impeachment penalties and process are criminal in nature, *contra* Resp.Br.62; he showed it, App.Br.47-54. Impeachment was adapted from the English process, which was criminal and included removal and disqualification along with imprisonment and death as punishments. *See* Double Jeopardy Memo, at 126. That suggests removal and disqualification are criminal punishments. Blackstone thought so. *See* 2 William Blackstone, *Commentaries on the Laws of England*, at *121, *141 (1753). So did Hamilton. He grouped them and "prosecution and punishment" together as the "chastisement of the offender." FEDERALIST NO. 65. Likewise, the Supreme Court has said "[d]isqualification from

office may be punishment, as in cases of conviction upon impeachment." *Cummings v. Missouri*, 71 U.S. 277, 320 (1866).

The government cites (at 62-63) the Senate's unexplained deletion of the phrase "except in cases of impeachment" in the House draft of the Double Jeopardy Clause. That, the government speculates, was because "the phrase 'life or limb'" made "the exception … superfluous … ." *Id.* at 63. Speculation cannot overcome countervailing evidence—especially since the Constitution elsewhere assumes impeachment is a criminal process. *See* U.S. CONST. art. II, § 2, cl. 1; *id.* art. III, § 2, cl. 3. Principles of double jeopardy thus apply to impeachment, even under Fifth Amendment tests. *See United States v. Ward*, 448 U.S. 242, 248 (1980) (looking at intent); *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 169-84 (1963) (looking at history).

The government's two "structural considerations" are unconvincing. Resp.Br.56-59. That impeachment and criminal prosecution serve distinct goals, *see id.* at 57, is beside the point; the Constitution mandates that acquittal bars further prosecutions. Nor is there an issue with a Senate acquittal, by the Legislative Branch, barring future Executive Branch prosecutions. *Contra id.* The Constitution does not divide "the branches into watertight compartments." *Springer v. Gov't of Philippine Islands*, 277 U.S. 189, 211 (1928) (Holmes, J., dissenting). And congressional action is frequently a prerequisite to prosecution. For example,

Congress must pass penal laws, *see United States v. Hudson*, 11 U.S. (7 Cranch.) 32, 34 (1812), and fund prosecutions, *see* U.S. CONST. art. I, § 9, cl. 7.

The government also notes (at 57-59) that an acquittal may reflect considerations other than guilt. Again, that's beside the point; what the Constitution mandates controls. Regardless, technical or procedural bars to conviction are common. *See*, *e.g.*, 18 U.S.C. § 3282 (statute of limitations); *Barker v. Wingo*, 407 U.S. 514, 522 (1972) (speedy trial); *Ashe v. Swenson*, 397 U.S. 436, 445 (1970) (collateral estoppel/double jeopardy). Indeed, the beyond-reasonable-doubt standard means an acquittal does not "determine" that a person "had not" committed the crime. *Helvering v. Mitchell*, 303 U.S. 391, 397 (1938). And punishment of a President always involves political considerations going beyond guilt or innocence. The Framers recognized that, and they delegated to Congress the power to weigh those political considerations in the first instance. *See* FEDERALIST NO. 65. To allow prosecution after acquittal usurps that role and undermines the mechanism the Framers used to temper political passions: impeachment in the House and trial in the Senate. *See id.*

That also answers the government's attempt to apply (at 63-65) the Fifth Amendment "same offense" test. Here, the double jeopardy protections emanate from the Impeachment Judgment Clause. While double-jeopardy principles are relevant, the key is what "will effectuate the Constitutional purpose" of the Clause.

28

*United States v. Classic*, 313 U.S. 299, 316 (1941). That requires dismissing the

prosecution, which undermines the Senate's judgment.

## **CONCLUSION**

The district court's Opinion and Order, J.A.599, 647, should be reversed.

Dated: January 2, 2024                Respectfully Submitted,

LAURO & SINGER                        JAMES OTIS LAW GROUP, LLC

John F. Lauro                         */s/ D. John Sauer*
Gregory M. Singer                     D. John Sauer
400 N. Tampa St., 15th Floor          William O. Scharf
Tampa, FL 33602                       Michael E. Talent
(813) 222-8990                        13321 N. Outer Forty Road, Suite 300
jlauro@laurosinger.com                St. Louis, Missouri 63017
                                      (314) 562-0031
BLANCHE LAW                           John.Sauer@james-otis.com

Todd Blanche                          *Attorneys for President Donald J. Trump*
Emil Bove
99 Wall St., Suite 4460
New York, NY 10005
(212) 716-1250
toddblanche@blanchelaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on January 2, 2024, I caused a true and correct copy of the foregoing to be filed by the Court's electronic filing system, to be served by operation of the Court's electronic filing system on counsel for all parties who have entered in the case.

<em><u>/s/ D. John Sauer</u></em>

## <u>CERTIFICATE OF COMPLIANCE</u>

This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,459 words, excluding those portions pursuant to Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1), according to Microsoft Word.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it was prepared in a proportionally spaced typeface in Microsoft Word utilizing 14-point Times New Roman font.

*/s/ D. John Sauer*
D. John Sauer