# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 9, 2024          Decided February 6, 2024

No. 23-3228

UNITED STATES OF AMERICA,
APPELLEE

v.

DONALD J. TRUMP,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:23-cr-00257-1)

———

*D. John Sauer* argued the cause for appellant. With him on the briefs were *John F. Lauro*, *Gregory M. Singer*, *Emil Bove*, *William O. Scharf*, and *Michael E. Talent*.

*Paul M. Dorsey*, pro se, was on the brief for *amicus curiae* Paul M. Dorsey in support of appellant.

*Victor Williams*, pro se, was on the brief for *amicus curiae* Law Professor Victor Williams in support of appellant.

*James I. Pearce*, Assistant Special Counsel, U.S. Department of Justice, argued the cause for appellee. With him on the brief were *J. P. Cooney*, Deputy Special Counsel,

2

*Michael R. Dreeben* and *Raymond N. Hulser*, Counselors to the Special Counsel, *John M. Pellettieri* and *Cecil W. VanDevender*, Assistant Special Counsels, and *Molly Gaston* and *Thomas P. Windom*, Senior Assistant Special Counsels.

    *Richard D. Bernstein* was on the brief for *amici curiae* Former Officials in Five Republican Administrations, et al. in support of appellee.

    *Fred Wertheimer*, *Matthew A. Seligman*, *Seth P. Waxman*, *Colleen M. Campbell*, *Nathaniel W. Reisinger*, *David M. Levine*, and *Kyle T. Edwards* were on the brief for *amici curiae* Former Government Officials and Constitutional Lawyers in support of appellee.

    *R. Stanton Jones* and *Andrew T. Tutt* were on the brief for *amicus curiae* American Oversight in support of dismissal for lack of jurisdiction.

    *Gene C. Schaerr* and *Justin A. Miller* were on the brief for *amici curiae* Former Attorney General Edwin Meese III and Law Professors Steven G. Calabresi and Gary S. Lawson in support of neither party.

    Before: HENDERSON, CHILDS and PAN, *Circuit Judges*.

    Opinion for the Court filed PER CURIAM.

    PER CURIAM:  Donald J. Trump was elected the 45th President of the United States on November 8, 2016.  He was sworn into office at noon on January 20, 2017, and served until his term expired at noon on January 20, 2021.  At that moment, President Trump became former President Trump and his successor, Joseph R. Biden, became President and began his own four-year term.  U.S. CONST. art. II, § 1.  Although this

3

sequence is set by the Constitution, *id.* amend. XX, it did not proceed peacefully.  Indeed, from election day 2020 forward, the government alleges that President Trump denied that he had lost his bid for a second term and challenged the election results through litigation, pressure on state and federal officers, the organization of an alternate slate of electors and other means. His alleged interference in the constitutionally prescribed sequence culminated with a Washington, D.C., rally held on January 6, 2021, the day set by the Electoral Count Act, 3 U.S.C. § 15(a), for the Congress to meet in joint session to certify the election results.  The rally headlined by President Trump resulted in a march of thousands to the Capitol and the violent breach of the Capitol Building.  The breach delayed the congressional proceedings for several hours and it was not until the early morning of January 7th that the 2020 presidential election results were certified, naming Joseph R. Biden as the soon-to-be 46th President.

Since then, hundreds of people who breached the Capitol on January 6, 2021, have been prosecuted and imprisoned. And on August 1, 2023, in Washington, D.C., former President Trump was charged in a four-count Indictment as a result of his actions challenging the election results and interfering with the sequence set forth in the Constitution for the transfer of power from one President to the next.  Former President Trump moved to dismiss the Indictment and the district court denied his motion.  Today, we affirm the denial.  For the purpose of this criminal case, former President Trump has become citizen Trump, with all of the defenses of any other criminal defendant. But any executive immunity that may have protected him while he served as President no longer protects him against this prosecution.

4

# I. BACKGROUND

Former President Trump did not concede the 2020 election and, in the ensuing months, he and his supporters made numerous attempts to challenge the results. Many of their attempts were allegedly criminal.[1] A District of Columbia federal grand jury indicted former President Trump on four criminal counts arising from the steps he allegedly took to change the outcome of the election: (1) conspiracy to defraud the United States by overturning the election results, in violation of 18 U.S.C. § 371; (2) conspiracy to obstruct an official proceeding — *i.e.*, the Congress's certification of the electoral vote — in violation of 18 U.S.C. § 1512(k); (3) obstruction of, and attempt to obstruct, the certification of the electoral vote, in violation of 18 U.S.C. §§ 1512(c)(2), 2; and (4) conspiracy against the rights of one or more persons to vote and to have their votes counted, in violation of 18 U.S.C. § 241. At this stage of the prosecution, we assume that the allegations set forth in the Indictment are true. *United States v. Ballestas*, 795 F.3d 138, 149 (D.C. Cir. 2015). We emphasize that whether the Indictment's allegations are supported by evidence sufficient to sustain convictions must be determined at a later stage of the prosecution.

The Indictment alleges that former President Trump understood that he had lost the election and that the election results were legitimate but that he nevertheless was "determined to remain in power." Indictment ¶ 2. He then conspired with others to cast doubt on the election's outcome and contrived to have himself declared the winner. The

---

[1] Former President Trump's campaign and his supporters also unsuccessfully challenged the election results in several state and federal courts.

5

Indictment charges that he and his co-conspirators allegedly advanced their goal through five primary means:

First, they "used knowingly false claims of election fraud" to attempt to persuade state legislators and election officials to change each state's electoral votes in former President Trump's favor. Indictment ¶ 10(a). For example, he and his allies falsely declared "that more than ten thousand dead voters had voted in Georgia"; "that there had been 205,000 more votes than voters in Pennsylvania"; "that more than 30,000 non-citizens had voted in Arizona"; and "that voting machines . . . had switched votes from [Trump] to Biden." *Id.* at ¶ 12.

Second, then-President Trump and his co-conspirators "organized fraudulent slates of electors in seven targeted states . . . attempting to mimic the procedures that the legitimate electors were supposed to follow." Indictment ¶ 10(b). They "then caused these fraudulent electors to transmit their false certificates to the Vice President and other government officials to be counted at the certification proceeding on January 6." *Id.*

Third, then-President Trump and his co-conspirators pressed officials at the Department of Justice "to conduct sham election crime investigations and to send a letter to the targeted states that falsely claimed that the Justice Department had identified significant concerns that may have impacted the election outcome." Indictment ¶ 10(c).

Fourth, then-President Trump and his co-conspirators attempted to convince then-Vice President Mike Pence to "use his ceremonial role at the January 6 certification proceeding to fraudulently alter the election results." Indictment ¶ 10(d). When the Vice President rebuffed them, he stirred his base of supporters to increase pressure on the Vice President. *See id.* at ¶¶ 10(d), 96, 100. Ultimately, on the morning of

6

January 6, 2021, he held a rally in Washington D.C. where he "repeated knowingly false claims of election fraud to gathered supporters" and "directed them to the Capitol to obstruct the certification proceeding and exert pressure on the Vice President to take the fraudulent actions he had previously refused." *Id.* at ¶¶ 10(d), 90(c).

Fifth, and finally, from the January 6 rally, thousands of his supporters — "including individuals who had traveled to Washington and to the Capitol at [his] direction" — swarmed the United States Capitol, causing "violence and chaos" that required the Congress to temporarily halt the election-certification proceeding. Indictment ¶¶ 107, 119, 121. At that point, he and his co-conspirators "exploited the disruption by redoubling efforts to levy false claims of election fraud and convince Members of Congress to further delay the certification." *Id.* at ¶ 10(e).

Then-President Trump's efforts to overturn the election results were unsuccessful and the Congress certified the Electoral College vote in favor of President-Elect Biden. Indictment ¶ 123. On January 11, 2021, nine days before President-Elect Biden's inauguration, the House of Representatives adopted an impeachment resolution charging then-President Trump with "Incitement of Insurrection." H.R. Res. 24, 117th Cong. (2021). The single article of impeachment alleged that he had violated "his constitutional oath faithfully to execute the office of President of the United States . . . [and] his constitutional duty to take care that the laws be faithfully executed . . . by inciting violence against the Government of the United States." *Id.* at 2. The impeachment resolution asserted that "President Trump repeatedly issued false statements asserting that the Presidential election results were the product of widespread fraud and should not be accepted by the American people or certified by State or

7

Federal officials," *id.* at 2–3; that his statements on the morning of January 6 "encouraged — and foreseeably resulted in — lawless action at the Capitol," *id.* at 3; and that he attempted to "subvert and obstruct the certification of the results of the 2020 Presidential election" by other means, including by threatening a Georgia state official into manipulating the results, *id.* at 3–4.

Importantly, by the time the United States Senate conducted a trial on the article of impeachment, he had become former President Trump. At the close of the trial, on February 13, 2021, fifty-seven Senators voted to convict him and forty-three voted to acquit him. *See* 167 CONG. REC. S733 (daily ed. Feb. 13, 2021). Because two-thirds of the Senate did not vote for conviction, he was acquitted on the article of impeachment. *See id.*; U.S. CONST. art. I, § 3, cl. 6.

On November 18, 2022, the U.S. Attorney General appointed John L. Smith as Special Counsel to investigate "efforts to interfere with the lawful transition of power following the 2020 presidential election or the certification of the Electoral College vote."[2] A Washington, D.C., grand jury returned the instant four-count Indictment against former President Trump on August 1, 2023, and on August 28, 2023, the district court set a trial date of March 4, 2024.

Former President Trump filed four motions to dismiss the Indictment, relying on: (1) presidential immunity; (2) constitutional provisions, including the Impeachment Judgment Clause and principles stemming from the Double

---

[2] Off. of the Att'y Gen., "Appointment of John L. Smith as Special Counsel," Order No. 5559-2022 (Nov. 18, 2022).

8

Jeopardy Clause; (3) statutory grounds; and (4) allegations of
selective and vindictive prosecution.

On December 1, 2023, the district court issued a written
opinion denying the two motions that are based on presidential
immunity and the two constitutional provisions. In relevant
part, the district court rejected Trump's claim of executive
immunity from criminal prosecution, holding that "[f]ormer
Presidents enjoy no special conditions on their federal criminal
liability." *United States v. Trump*, --- F. Supp. 3d ---, 2023 WL
8359833, at *3 (D.D.C. Dec. 1, 2023). It concluded that "[t]he
Constitution's text, structure, and history do not support" the
existence of such an immunity, *id.*, and that it "would betray
the public interest" to grant a former President "a categorical
exemption from criminal liability" for allegedly "attempting to
usurp the reins of government." *Id.* at *12. It also held that
"neither traditional double jeopardy principles nor the
Impeachment Judgment Clause provide that a prosecution
following impeachment acquittal violates double jeopardy."
*Id.* at *18.[3]

Former President Trump filed an interlocutory appeal of
the district court's presidential immunity and double-jeopardy
holdings. On December 13, 2023, we granted the

---

[3] Former President Trump does not challenge the district court's
other holdings at this stage: (1) that "the First Amendment does not
protect speech that is used as an instrument of a crime, and
consequently the indictment — which charges [Trump] with, among
other things, making statements in furtherance of a crime — does not
violate [Trump]'s First Amendment rights," *Trump*, --- F. Supp. 3d
---, 2023 WL 8359833, at *15, and (2) that the Indictment does not
violate Due Process because Trump "had fair notice that his conduct
might be unlawful," *id.* at *22.

9

government's motion to expedite the appeal, and oral argument was held on January 9, 2024.

## II. JURISDICTION

Although both parties agree that the Court has jurisdiction over former President Trump's appeal, *amicus curiae* American Oversight raises a threshold question about our collateral-order jurisdiction. In every case, "we must assure ourselves of our jurisdiction." *In re Brewer*, 863 F.3d 861, 868 (D.C. Cir. 2017). Under 28 U.S.C. § 1291, which grants us jurisdiction over "final decisions of the district courts," *id.*, "we ordinarily do not have jurisdiction to hear a defendant's appeal in a criminal case prior to conviction and sentencing," *United States v. Andrews*, 146 F.3d 933, 936 (D.C. Cir. 1998). The collateral-order doctrine, however, treats as final and thus allows us to exercise appellate jurisdiction over "a small class of [interlocutory] decisions that conclusively determine the disputed question, resolve an important issue completely separate from the merits of the action, and are effectively unreviewable on appeal from a final judgment." *Citizens for Resp. & Ethics in Wash. v. Dep't of Homeland Sec.*, 532 F.3d 860, 864 (D.C. Cir. 2008) (cleaned up). The district court's denial of former President Trump's immunity defense unquestionably satisfies the first two requirements and thus we focus our analysis on the third: whether the denial of immunity is effectively unreviewable on appeal from a final judgment.

District court orders rejecting claims of *civil* immunity are quintessential examples of collateral orders. *See, e.g.*, *Nixon v. Fitzgerald*, 457 U.S. 731, 741–43 (1982) (executive immunity from civil liability); *Blassingame v. Trump*, 87 F.4th 1, 12 (D.C. Cir. 2023) (same). But in *Midland Asphalt Corp. v. United States*, the Supreme Court counseled that the collateral-

10

order doctrine is interpreted "with the utmost strictness in criminal cases." 489 U.S. 794, 799 (1989) (cleaned up).

The *Midland Asphalt* Court emphasized that criminal collateral orders that are based on "[a] right not to be tried" must "rest[] upon an *explicit* statutory or constitutional guarantee that trial will not occur" — singling out the Double Jeopardy Clause and the Speech or Debate Clause. 489 U.S. at 801 (emphasis added). Former President Trump does not raise a straightforward claim under the Double Jeopardy Clause but instead relies on the Impeachment Judgment Clause and what he calls "double jeopardy principles." Appellant's Br. 54 n.7. The double-jeopardy "principle[]" he relies on is a negative implication drawn from the Impeachment Judgment Clause. *See id.* at 8, 12, 46–47. Thus, he does not invoke our jurisdiction based on the explicit grant of immunity found in the Double Jeopardy Clause.

Nevertheless, we can exercise jurisdiction for two reasons. First, *Midland Asphalt* is distinguishable and does not *require* immunity to derive from an explicit textual source. Second, the theories of immunity former President Trump asserts are sufficient to satisfy *Midland Asphalt* under Circuit precedent.

## A. DISTINGUISHING *MIDLAND ASPHALT*

*Midland Asphalt* dealt with the third prong of the collateral-order test in the context of criminal defendants who argued they were entitled to immediately appeal the denial of their motion to dismiss an indictment because the government had violated Federal Rule of Criminal Procedure 6(e)(2)'s requirement of grand jury secrecy. 489 U.S. at 796. The Supreme Court held that an order is "effectively unreviewable" on appeal "only where the order at issue involves 'an asserted right the legal and practical value of which would be destroyed if it were not vindicated before trial.'" *Id.* at 799 (quoting

11

*United States v. MacDonald*, 435 U.S. 850, 860 (1978)).  The Court rejected the defendants' argument that the denial of the motion satisfied the third prong.  It explained that "[i]t is true that deprivation of the right not to be tried satisfies the *Coopers & Lybrand* requirement of being 'effectively unreviewable on appeal from a final judgment,'" but held that the defendants had not asserted a right against trial in "the sense relevant for purposes of the exception to the final judgment rule."  *Id.* at 801–02 (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468 (1978) ("To come within the [collateral-order doctrine], the order must conclusively determine the disputed question, resolve an important issue completely separate from the merits of the action, and be effectively unreviewable on appeal from a final judgment.")).

The reason the defendants' argument failed, the *Midland Asphalt* Court held, was that it overlooked the "crucial distinction between a right not to be tried and a right whose remedy requires the dismissal of charges."  489 U.S. at 801 (quotation omitted).  "A right not to be tried in the sense relevant to the [collateral-order doctrine] rests upon an explicit statutory or constitutional guarantee that trial will not occur — as in the Double Jeopardy Clause . . . or the Speech or Debate Clause."  *Id.*  By contrast, Rule 6(e)(2) did not "give[] rise to a right not to stand trial" but instead merely created a right to secret grand jury proceedings, the violation of which could be remedied through the indictment's dismissal.  *Id.* at 802.

American Oversight's argument hinges on the Court's use of the adjective "explicit" — a word that appears only once in the *Midland Asphalt* opinion.  The Court has repeatedly (and recently) cautioned against "read[ing] too much into too little," reminding us that "'[t]he language of an opinion is not always to be parsed as though we were dealing with language of a statute.'"  *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356,

12

373 (2023) (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979)). Instead, opinions "must be read with a careful eye to context" and the "particular work" that quoted language performs within an opinion. *Id.* at 374; *see also Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1968 (2021) (Gorsuch, J., concurring in part) ("[T]his Court [has] often said it is a mistake to parse terms in a judicial opinion with the kind of punctilious exactitude due statutory language.").

The Supreme Court itself has hinted, although not squarely held, that *Midland Asphalt*'s language should not be read literally. In *Digital Equipment*, the Court quoted the relevant sentence from *Midland Asphalt* and characterized it as a "suggest[ion]." *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 874 (1994) ("Only such an 'explicit statutory or constitutional guarantee that trial will not occur,' we suggested, could be grounds for an immediate appeal of right under § 1291." (internal citation to *Midland Asphalt*, 489 U.S. at 801, omitted)). The Court then weighed the argument that *Midland Asphalt*'s comment is dictum because the Court allows interlocutory review of other implied immunities, including qualified immunity. *Id.* at 875 (citing *Mitchell v. Forsyth*, 472 U.S. 511 (1985)). The Court did not concede the point, however, as it pointed out that *Midland Asphalt* is a criminal case and *Mitchell* is a civil case, but it allowed that "even if *Mitchell* could not be squared fully with the literal words of the *Midland Asphalt* sentence . . . that would be only because the qualified immunity right is inexplicit, not because it lacks a good pedigree in public law." *Id.* It then noted "the insight that explicitness may not be needed for jurisdiction consistent

13

with § 1291."[4]  *Id.*  The Court ultimately chose to reject the petitioner's argument on a different basis, *see id.* at 877, so it did not squarely resolve how to interpret *Midland Asphalt*.  But a fair reading contemplates that there are exceptions to *Midland Asphalt*'s broad statement. *See id.* at 875.  Other courts have held to that effect. *See Al Shimari v. CACI Int'l, Inc.*, 679 F.3d 205, 217 n.9 (4th Cir. 2012) (en banc) (reading *Digital Equipment* to hold that qualified immunity's "good pedigree in public law . . . more than makes up for its implicitness" (cleaned up)); *McClendon v. City of Albuquerque*, 630 F.3d 1288, 1296 n.2 (10th Cir. 2011) (interpreting *Digital Equipment*'s "good pedigree in public law" comment as a "binding" reconciliation of *Midland Asphalt* with the immediate appealability of some implicit immunities).

There is good reason not to read *Midland Asphalt* literally here.  Read in context, the Court's use of "explicit" was simply to contrast a right against trial and a right that entitles the defendant to the dismissal of charges.  The latter can be vindicated through appeal after a final judgment, but the former cannot.  The Court was not addressing an issue as to which it was necessary to distinguish between explicit and implied rights against trial; instead, it addressed the defendants' assertion that the violation of the Federal Rules of Criminal Procedure entitled them to immediate review. *See Midland Asphalt*, 489 U.S. at 802 (Rule 6(e) contained "no hint" of a right against trial).  Thus, "explicit" did not perform any "particular work" within the opinion, *see Nat'l Pork Producers*, 598 U.S. at 374, meaning it would be a mistake to make a doctrinal mountain out of a verbal molehill. *See Al*

---

[4] Elsewhere, *Digital Equipment* refers to rights "originating in the Constitution or statutes."  511 U.S. at 879.  Its broader formulation comfortably encompasses implicit as well as explicit immunities.

14

*Shimari*, 679 F.3d at 246 (Wilkinson, J., dissenting) (calling *Midland Asphalt*'s sentence "dictum" and a "lonely line").

Nor was the question presented in *Midland Asphalt* anything like the one before us. Procedural rules are worlds different from a former President's asserted immunity from federal criminal liability. The Supreme Court has repeatedly emphasized that the President is *sui generis*. In the civil context, the Court has held that the denial of the President's assertion of absolute immunity is immediately appealable "[i]n light of the special solicitude due to claims alleging a threatened breach of essential Presidential prerogatives under the separation of powers." *Fitzgerald*, 457 U.S. at 743. And in *United States v. Nixon*, the Court waived the typical requirement that the President risk contempt before appealing because it would be "unseemly" to require the President to do so "merely to trigger the procedural mechanism for review of the ruling." 418 U.S. 683, 691–92 (1974). It would be equally "unseemly" for us to require that former President Trump first be tried in order to secure review of his immunity claim after final judgment. When the Court instructs us to read its opinions "with a careful eye to context," *see Nat'l Pork Producers*, 598 U.S. at 374, it authorizes us to consider the "special solicitude" due a former President, *Fitzgerald*, 457 U.S. at 743.

One final reason not to overread a single adjective in *Midland Asphalt* is that there is no apparent reason to treat an *implicit* constitutional immunity from trial differently from an *explicit* one for interlocutory review.[5]  *Midland Asphalt*

---

[5]  By contrast, the Supreme Court has explained why a right against trial must ordinarily be "statutory or constitutional" in nature to fall within the collateral-order doctrine. *Midland Asphalt*, 489 U.S. at 801. Whether a right can be effectively reviewed after final judgment "simply cannot be answered without a judgment about the

15

certainly did not provide one. The ultimate source of our appellate jurisdiction is 28 U.S.C. § 1291, which extends to the "final decision[]" of the district court. There is no basis in the statutory text to treat the denial of an explicit immunity as final but the denial of an implicit immunity as non-final. In both cases, the "deprivation of the right not to be tried" would be "effectively unreviewable on appeal from a final judgment." *Midland Asphalt*, 489 U.S. at 800–01 (quotation omitted). Whether explicit or implicit in the Constitution, the right not to stand trial must be "vindicated before trial" or not at all. *Id.* at 799 (quotation omitted).

## B.  CIRCUIT PRECEDENT

Our Circuit precedent has taken a broad view of *Midland Asphalt*, consistently holding that the denial of a right not to stand trial is immediately appealable if the right is similar or analogous to one provided in the Constitution. Both of former President Trump's asserted sources of immunity — separation of powers and double jeopardy principles — fit within this window of appealability. *See* Appellant's Br. 2–3 (listing "Statement of the Issues").

Our caselaw includes *United States v. Rose*, a civil case in which we held that Congressman Rose's standalone separation of powers immunity was reviewable under § 1291 because it served the same function as a claim of Speech or Debate Clause immunity. 28 F.3d 181 (D.C. Cir. 1994). Congressman Rose

---

value of the interests that would be lost through rigorous application of a final judgment requirement." *Digital Equip.*, 511 U.S. at 878–79. But there is no need for courts to make that judgment call "[w]hen a policy is embodied in a constitutional or statutory provision," thus leaving "little room for the judiciary to gainsay its importance." *Id.* at 879 (cleaned up).

16

argued that he had immunity from the DOJ's suit against him because "the action was barred by the Speech or Debate Clause" and, separately, because "the separation of powers doctrine barred the DOJ from suing him" when a congressional committee had already investigated him. *Id.* at 185. We held that the latter claim falls within the collateral-order doctrine, "recogniz[ing] claims of immunity based on the separation of powers doctrine as an additional exception to the general rule against interlocutory appeals." *Id.* Granted, we acknowledged that the separation of powers doctrine "does not provide as precise a protection as the Speech or Debate Clause," but we focused on the "equivalent reasons for vindicating in advance of trial whatever protection it affords." *Id.* at 186 (quotation omitted).

We confirmed *Rose*'s applicability in the criminal context in *United States v. Durenberger*, 48 F.3d 1239 (D.C. Cir. 1995). There, former Senator Durenberger sought to dismiss an indictment, arguing based on separation of powers that the district court was powerless to decide whether he had violated the Senate's rules, a prerequisite of its assessment of the criminal charges against him. *See id.* at 1241; U.S. CONST. art. I, § 5, cl. 2 ("Each House may determine the Rules of its Proceedings . . . ."). He thus "claim[ed] that, as a former member of the Senate, he cannot be held to answer criminal charges when his liability depends on judicial usurpation of the Senate's exclusive right to formulate its internal rules." *Durenberger*, 48 F.3d at 1242. We held that this "colorable" argument was sufficient to confer appellate jurisdiction under *Rose*. *Id.* Notably, the constitutional text invoked in *Durenberger* can hardly be said to create an "explicit" right not to stand trial. As we explained in a subsequent case, both *Rose* and *Durenberger* rest on the rationale that the "separation-of-powers doctrine conferred . . . an analogous and comparable

17

privilege" to the Speech or Debate Clause. *United States v. Cisneros*, 169 F.3d 763, 770 (D.C. Cir. 1999).

Following the Supreme Court's lead, *see Abney v. United States*, 431 U.S. 651, 662 (1977) (denial of motion to dismiss indictment on double jeopardy grounds is immediately appealable), we have also allowed interlocutory review by analogizing to the explicit constitutional immunity in the Double Jeopardy Clause. In *United States v. Trabelsi*, we exercised interlocutory appellate jurisdiction of the defendant's invocation of a treaty's *non bis in idem* provision, which "mirror[ed] the Constitution's prohibition of double jeopardy." 28 F.4th 1291, 1298 (D.C. Cir. 2022), *cert. denied*, 143 S. Ct. 345 (2022). The treaty provision's similarity to the constitutional guarantee, we held, was enough to bring the appeal within the scope of *Abney*.

Former President Trump's two arguments can be analogized to explicit constitutional immunities, which is all that *Durenberger* and *Trabelsi* require. His separation of powers argument does not explicitly draw on the Speech or Debate Clause but neither did the argument in *Durenberger*. The immunity for official acts former President Trump asserts is "closely akin to a claim of Speech or Debate Clause immunity," *Cisneros*, 169 F.3d at 770, making it immediately appealable because "there are equivalent reasons for vindicating [it] in advance of trial," *Rose*, 28 F.3d at 186 (quotation omitted). Likewise, the defense argues that the Impeachment Judgment Clause "incorporates a Double Jeopardy principle." Appellant's Br. 46. We found a similar line of reasoning convincing in *Trabelsi*. If a treaty provision that "mirrors" the Double Jeopardy Clause falls within the collateral-order doctrine, so does a constitutional clause that (purportedly) attaches jeopardy to a Senate's impeachment acquittal. Both of former President Trump's arguments are at

18

least analogous enough to the Speech or Debate Clause or the Double Jeopardy Clause to fit within our precedent.

Nor will exercising jurisdiction here put us in conflict with other circuits, as American Oversight suggests. *See* Am. Oversight Br. 9. The chief cases on which American Oversight relies are readily distinguishable because in each the asserted right against trial was not grounded solely in either the Constitution or a statute. *See United States v. Joseph*, 26 F.4th 528, 534 (1st Cir. 2022) (a state judge's immunity depended "solely on the common law"); *United States v. Macchia*, 41 F.3d 35, 38 (2d Cir. 1994) (addressing "an alleged agreement with the United States Attorney" to provide the defendant with immunity); *United States v. Wampler*, 624 F.3d 1330, 1337 & n.3 (10th Cir. 2010) (involving "an executory plea agreement between a company and the government" that excluded the defendants).

Accordingly, we conclude that we have jurisdiction to reach the merits of former President Trump's appeal.

## III. EXECUTIVE IMMUNITY

For all immunity doctrines, "the burden is on the official claiming immunity to demonstrate his entitlement." *Dennis v. Sparks*, 449 U.S. 24, 29 (1980). Former President Trump claims absolute immunity from criminal prosecution for all "official acts" undertaken as President, a category, he contends, that includes all of the conduct alleged in the Indictment.

The question of whether a former President enjoys absolute immunity from federal criminal liability is one of first impression. *See Blassingame*, 87 F.4th at 5 (noting the unresolved question of "whether or when a President might be immune from criminal prosecution"). The Supreme Court has consistently held that even a sitting President is not immune

19

from responding to criminal subpoenas issued by state and federal prosecutors. *See Trump v. Vance*, 140 S. Ct. 2412, 2431 (2020); *Nixon*, 418 U.S. at 706; *United States v. Burr*, 25 F. Cas. 30, 33–34 (C.C. Va. 1807) (Marshall, C.J.). In the civil context, the Supreme Court has explained that a former President is absolutely immune from civil liability for his official acts, defined to include any conduct falling within the "'outer perimeter' of his official responsibility." *Fitzgerald*, 457 U.S. at 756. Both sitting and former Presidents remain civilly liable for private conduct. *Clinton v. Jones*, 520 U.S. 681, 686, 694–95 (1997); *Blassingame*, 87 F.4th at 12–14. When considering the issue of Presidential immunity, the Supreme Court has been careful to note that its holdings on civil liability do not carry over to criminal prosecutions. *See Fitzgerald*, 457 U.S. at 754 n.37 (explaining the "lesser public interest in actions for civil damages than, for example, in criminal prosecutions"); *cf. Clinton*, 520 U.S. at 704 n.39 (noting special considerations at issue in criminal cases).

Former President Trump's claimed immunity would have us extend the framework for Presidential civil immunity to criminal cases and decide for the first time that a former President is categorically immune from federal criminal prosecution for any act conceivably within the outer perimeter of his executive responsibility. He advances three grounds for establishing this expansive immunity for former Presidents: (1) Article III courts lack the power to review the President's official acts under the separation of powers doctrine; (2) functional policy considerations rooted in the separation of powers require immunity to avoid intruding on Executive Branch functions; and (3) the Impeachment Judgment Clause does not permit the criminal prosecution of a former President in the absence of the Congress impeaching and convicting him.

20

Our analysis is "guided by the Constitution, federal statutes, and history," as well as "concerns of public policy." *Fitzgerald*, 457 U.S. at 747. Relying on these sources, we reject all three potential bases for immunity both as a categorical defense to federal criminal prosecutions of former Presidents and as applied to this case in particular.

## A. SEPARATION OF POWERS DOCTRINE

The President of the United States "occupies a unique position in the constitutional scheme." *Fitzgerald*, 457 U.S. at 749; *see Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2034 (2020) ("The President is the only person who alone composes a branch of government."). Under the separation of powers established in the Constitution, the President is vested with "executive Power," U.S. CONST. art. II, § 1, cl.1, which entails the duty to "take Care that the Laws be faithfully executed," *id.* § 3, and "supervisory and policy responsibilities of utmost discretion and sensitivity," *Fitzgerald*, 457 U.S. at 750. The President's constitutional role exists alongside the Congress's duty to make the laws, U.S. CONST. art. I, § 1, and the Judiciary's duty to "say what the law is," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

"It is settled law that the separation-of-powers doctrine does not bar every exercise of jurisdiction over the President of the United States." *Fitzgerald*, 457 U.S. at 753–54; *see also Nixon*, 418 U.S. at 706 (separation of powers doctrine cannot "sustain an absolute, unqualified Presidential privilege of immunity from judicial process under all circumstances"). Nevertheless, former President Trump argues that the constitutional structure of separated powers means that "neither a federal nor a state prosecutor, nor a state or federal court, may sit in judgment over a President's official acts, which are vested in the Presidency alone." Appellant's Br. 10.

21

He relies on *Marbury*'s oft-quoted statement that a President's official acts "can never be examinable by the courts." *Id.* (quoting *Marbury*, 5 U.S. (1 Cranch) at 166); *see also* Reply Br. 6.

Former President Trump misreads *Marbury* and its progeny. Properly understood, the separation of powers doctrine may immunize lawful discretionary acts but does not bar the federal criminal prosecution of a former President for *every* official act.

*Marbury* distinguished between two kinds of official acts: discretionary and ministerial. As to the first category, Chief Justice Marshall recognized that "the President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character, and to his own conscience." *Marbury*, 5 U.S. (1 Cranch) at 165–66. When the President or his appointed officers exercise discretionary authority, "[t]he subjects are political" and "the decision of the executive is conclusive." *Id.* at 166. Their discretionary acts, therefore, "can never be examinable by the courts." *Id.* "But," Chief Justice Marshall continued, "when the legislature proceeds to impose on that officer other duties; when he is directed peremptorily to perform certain acts; when the rights of individuals are dependent on the performance of those acts; he is so far the officer *of the law*; is *amenable to the laws for his conduct*; and cannot at his discretion sport away the vested rights of others." *Id.* (emphases added). Under these circumstances, an executive officer acts as a "ministerial officer . . . compellable to do his duty, and if he refuses, is liable to indictment." *Id.* at 150; *see id.* at 149–50 ("It is not consistent with the policy of our political institutions, or the manners of the citizens of the United States, that any ministerial officer having public duties to perform, should be

22

above the compulsion of law in the exercise of those duties."). Based on these principles, Chief Justice Marshall concluded that, although discretionary acts are "only politically examinable," the judiciary has the power to hear cases "where a specific duty is assigned by law." *Id.* at 166. *Marbury* thus makes clear that Article III courts may review certain kinds of official acts — including those that are legal in nature.

The cases following *Marbury* confirm that we may review the President's actions when he is bound by law, including by federal criminal statutes. In *Little v. Barreme*, the Supreme Court concluded that the President's order to a subordinate officer to seize American ships traveling to or from French ports violated the Nonintercourse Act precisely because the Congress had acted to constrain the Executive's discretion. 6 U.S. (2 Cranch) 170, 177–79 (1804). Chief Justice Marshall observed that the President may have had the discretionary authority to order the seizure absent legislation but had no discretion to violate the Act. *Id.* at 177–78. Similarly, in *Kendall v. United States ex rel. Stokes*, the Supreme Court reviewed the official acts of the postmaster general, the President's subordinate officer who derived his authority from the Executive Branch, because the civil case involved the violation of a statutory requirement. 37 U.S. 524, 612–13 (1838). To find a statutory violation unreviewable, the Court held, "would be clothing the President with a power entirely to control the legislation of congress, and paralyze the administration of justice." *Id.* at 613.

Then, in *Mississippi v. Johnson*, the Supreme Court considered whether the State of Mississippi could sue President Andrew Johnson to enjoin him from enforcing the Reconstruction Acts, which the State alleged were unconstitutional. 71 U.S. 475, 497–98 (1866). The Court concluded that it lacked jurisdiction to issue an injunction,

23

relying on *Marbury*, *Kendall* and the distinction between "mere ministerial dut[ies]" in which "nothing was left to discretion" and "purely executive and political" duties involving the President's discretion. *Id.* at 498–99; *see also Martin v. Mott*, 25 U.S. 19, 31–32 (1827) (no judicial power to review President exercising his "discretionary power" conferred by statute). In holding that it could not enjoin the President from using his discretion, the Court nevertheless affirmed the role of the Judiciary in checking the other two branches of government: "The Congress is the legislative department of the government; the President is the executive department. Neither can be restrained in its action by the judicial department; though the acts of both, when performed, are, in proper cases, subject to its cognizance." *Mississippi*, 71 U.S. at 500.

The Supreme Court exercised its cognizance over Presidential action to dramatic effect in 1952, when it held that President Harry Truman's executive order seizing control of most of the country's steel mills exceeded his constitutional and statutory authority and was therefore invalid. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587–89 (1952). The Congress had not legislated to authorize President Truman's seizure and in fact had "refused to adopt th[e seizure] method of settling labor disputes." *Id.* at 586. President Truman could lawfully act only to execute the Congress's laws or to carry out his constitutional duties as the Executive; and he lacked authority from either source to seize the steel mills. *Id.* at 587–89. As Justice Jackson explained, the Court's holding invalidating the executive order was proper because "[w]hen the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb." *Id.* at 637 (Jackson, J., concurring). Based on *Youngstown* and *Marbury*, the Supreme Court in *Clinton* easily concluded that "when the President takes official action, the Court has the

24

authority to determine whether he has acted within the law." *Clinton*, 520 U.S. at 703.

Objection may be made that *Marbury* and its progeny exercised jurisdiction only over subordinate officers, not the President himself. The writ in *Marbury* was brought against the Secretary of State; in *Little* against a commander of a ship of war; in *Kendall* against the postmaster general; in *Youngstown* against the Secretary of Commerce. But as the Supreme Court has unequivocally explained:

> No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All the officers of the government, from the highest to the lowest, are creatures of the law and are bound to obey it. It is the only supreme power in our system of government, and every man who by accepting office participates in its functions is only the more strongly bound to submit to that supremacy, and to observe the limitations which it imposes upon the exercise of the authority which it gives.

*United States v. Lee*, 106 U.S. 196, 220 (1882). "That principle applies, of course, to a President." *Vance*, 140 S. Ct. at 2432 (Kavanaugh, J., concurring).

Further, the Supreme Court has repeatedly affirmed the judiciary's power to "direct appropriate process to the President himself." *Clinton*, 520 U.S. at 705. The President does not enjoy absolute immunity from criminal subpoenas issued by state and federal prosecutors and may be compelled by the courts to respond. *Burr*, 25 F. Cas. at 33–34; *Nixon*, 418 U.S. at 713–14; *Vance*, 140 S. Ct. at 2431. We have "200 years of precedent establishing that Presidents, and their official

25

communications, are subject to judicial process, even when the President is under investigation." *Vance*, 140 S. Ct. at 2427 (citations omitted); *see also Clinton*, 520 U.S. at 703–05 (recounting history of sitting Presidents complying with court orders to provide testimony and other evidence).

The separation of powers doctrine, as expounded in *Marbury* and its progeny, necessarily permits the Judiciary to oversee the federal criminal prosecution of a former President for his official acts because the fact of the prosecution means that the former President has allegedly acted in defiance of the Congress's laws. Although certain discretionary actions may be insulated from judicial review, the structure of the Constitution mandates that the President is "amenable to the laws for his conduct" and "cannot at his discretion" violate them. *Marbury*, 5 U.S. (1 Cranch) at 166. Here, former President Trump's actions allegedly violated generally applicable criminal laws, meaning those acts were not properly within the scope of his lawful discretion; accordingly, *Marbury* and its progeny provide him no structural immunity from the charges in the Indictment.

Our conclusion that the separation of powers doctrine does not immunize former Presidents from federal criminal liability is reinforced by the analogous immunity doctrines for legislators and judges. Legislators and judges are absolutely immune from civil suits for any official conduct, and legislators have an explicit constitutional immunity from criminal prosecution arising from the Speech or Debate Clause. Nevertheless, legislators and judges can be criminally prosecuted under generally applicable laws for their official acts consistent with the separation of powers doctrine.

Legislators have explicit constitutional immunity from criminal or civil liability "for what they do or say in legislative

26

proceedings" under the Speech or Debate Clause. *Tenney v. Brandhove*, 341 U.S. 367, 372 (1951); *see* U.S. CONST. art. I, § 6, cl. 1. But outside of constitutionally protected legislative conduct, members of the Congress perform a wide range of "acts in their official capacity" that are not "legislative in nature" and so can subject them to criminal liability. *Gravel v. United States*, 408 U.S. 606, 625 (1972); *see id.* at 626 (Speech or Debate Clause "does not privilege either Senator or aide to violate an otherwise valid criminal law in preparing for or implementing legislative acts"). In *United States v. Johnson*, a Congressman was criminally charged with conspiring to pressure the Department of Justice to dismiss pending indictments of a loan company and its officers on mail fraud charges. 383 U.S. 169, 171 (1966). The Supreme Court held that the prosecution could not include evidence related to a speech made by Johnson on the House floor because of his constitutional immunity but, the Court made clear, Johnson could be retried on the same count "wholly purged of elements offensive to the Speech or Debate Clause." *Id.* at 185. Although his unprotected conduct constituted an official act under *Fitzgerald* (communicating with the Executive Branch), *see id.* at 172, it was constrained by and subject to "criminal statute[s] of general application." *Id.* at 185.

Judges are similarly liable to the criminal laws for their official acts. A notable example is *Ex parte Commonwealth of Virginia*, in which the Supreme Court applied *Marbury*'s discretionary/ministerial distinction to affirm the criminal indictment of a judge based on an official act. 100 U.S. 339 (1879). A county judge was indicted in federal court for violating a federal statute that prohibited discriminating on the basis of race in jury selection. *Id.* at 340, 344. The Supreme Court began by observing the principle that officers are bound to follow the law: "We do not perceive how holding an office under a State, and claiming to act for the State, can relieve the

27

holder from obligation to obey the Constitution of the United
States, or take away the power of Congress to punish his
disobedience." *Id.* at 348.  The Court then addressed the
judge's argument that the Court lacked the authority to punish
a state judge for "his official acts." *Id.*  Its response was
twofold.  First, the Court described juror selection as "merely
a ministerial act, as much so as the act of a sheriff holding an
execution, in determining upon what piece of property he will
make a levy, or the act of a roadmaster in selecting laborers to
work upon the roads." *Id.*  The Court then explained that even
if juror selection is considered a "judicial act," the judge had a
legal duty to obey the criminal laws:

> But if the selection of jurors could be considered
> in any case a judicial act, can the act charged
> against the petitioner be considered such when
> he acted outside of his authority and in direct
> violation of the spirit of the State statute?  That
> statute gave him no authority, when selecting
> jurors, from whom a panel might be drawn for
> a circuit court, to exclude all colored men
> merely because they were colored.  *Such an
> exclusion was not left within the limits of his
> discretion.*  It is idle, therefore, to say that the
> act of Congress is unconstitutional because it
> inflicts penalties upon State judges for their
> judicial action.  It does no such thing.

*Id.* at 348–49 (emphasis added).[6]

---

[6] The Court's reference to "the State statute" is to the Virginia
law charging the county judge with the duty to select jurors in the
circuit and county courts.  *Ex parte Virginia*, 100 U.S. at 340.

28

More recent case law on the judicial immunity doctrine affirms that judges are not immune from criminal liability for their official acts. *O'Shea v. Littleton* confirmed the holding of *Ex parte Virginia* in dismissing a civil rights action for equitable relief brought against a county magistrate and associate judge of a county circuit. 414 U.S. 488, 490–91, 503 (1974). The Supreme Court concluded that the requested injunction was not the only available remedy because both judges remained answerable to the federal criminal laws:

> [W]e have never held that the performance of the duties of judicial, legislative, or executive officers, requires or contemplates the immunization of otherwise criminal deprivation of constitutional rights. On the contrary, the judicially fashioned doctrine of official immunity does not reach 'so far as to immunize criminal conduct proscribed by an Act of Congress . . . .'

*Id.* at 503 (citation to *Ex parte Virginia*, 100 U.S. 339, omitted; quoting *Gravel*, 408 U.S. at 627). Similarly, in *Dennis v. Sparks*, the Court affirmed judicial immunity from civil money damages in the context of bribery allegations but explained that judges "are subject to criminal prosecutions as are other citizens." 449 U.S. at 31. Crucially, the judge in *Dennis* retained civil immunity because "the challenged conduct" — allegedly issuing an injunction corruptly after accepting bribes as part of a conspiracy — was "an official judicial act within his statutory jurisdiction, broadly construed." *Id.* at 29. The scope of civil judicial immunity thus aligns with civil Presidential immunity under *Fitzgerald*, but a judge has no criminal immunity for the same "official act." *See also Imbler v. Pachtman*, 424 U.S. 409, 429 (1976) ("Even judges, cloaked with absolute civil immunity for centuries, could be punished

29

criminally for willful deprivations of constitutional rights . . . ."); *United States v. Gillock*, 445 U.S. 360, 372 (1980) ("[T]he cases in this Court which have recognized an immunity from civil suit for state officials have presumed the existence of federal criminal liability as a restraining factor on the conduct of state officials.").[7]

When considering the criminal prosecutions of judges, other circuits have repeatedly rejected judicial criminal immunity for official acts, largely in the context of bribery prosecutions. *See United States v. Claiborne*, 727 F.2d 842, 845 (9th Cir.) (per curiam), *cert. denied*, 469 U.S. 829 (1984); *United States v. Hastings*, 681 F.2d 706, 709–11 (11th Cir. 1982), *cert. denied*, 459 U.S. 1203 (1983); *United States v. Isaacs*, 493 F.2d 1124, 1143–44 (7th Cir.) (per curiam), *cert. denied*, 417 U.S. 976 (1974), *overruled on other grounds by United States v. Gimbel*, 830 F.2d 621 (7th Cir. 1987). Former President Trump argues that bribery allegations were not considered "judicial acts" at common law, Appellant's Br. 21, but his sources do not support his conclusion. He is correct that

---

[7]    In his brief, former President Trump contends otherwise, primarily relying on two words in a single line of dictum from *Spalding v. Vilas* to urge that judges are immune from criminal prosecution for their official acts. Appellant's Br. 19. *Spalding* was a civil case in which the Supreme Court quoted an opinion of the Supreme Court of New York: "The doctrine which holds a judge exempt from a civil suit *or indictment* for any act done or omitted to be done by him, sitting as judge, has a deep root in the common law." *Spalding v. Vilas*, 161 U.S. 483, 494 (1896) (quoting *Yates v. Lansing*, 5 Johns. 282, 291 (N.Y. Sup. Ct. 1810)) (emphasis added). The Supreme Court did not analyze the scope of judicial criminal immunity itself and the quoted New York language is flatly incompatible with the Supreme Court case law addressed *supra*. We do not consider *Spalding*'s dictum binding on the question of judicial criminal immunity.

30

Blackstone and other early common law sources expressly contemplated the criminal prosecution of judges on bribery charges. *See* 4 WILLIAM BLACKSTONE, COMMENTARIES *139; *Perrin v. United States*, 444 U.S. 37, 43 (1979). But this shows only that judicial immunity did not stretch to shield judges from generally applicable criminal laws, not that bribery was ever considered a nonofficial act. And as explained *supra*, the Supreme Court emphasized the official nature of the bribery allegations in *Dennis* while reinforcing the judge's criminal liability.

We therefore conclude that Article III courts may hear the charges alleged in the Indictment under the separation of powers doctrine, as explained in *Marbury* and its progeny and applied in the analogous contexts of legislative and judicial immunity. The Indictment charges that former President Trump violated criminal laws of general applicability. Acting against laws enacted by the Congress, he exercised power that was at its "lowest ebb." *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring). Former President Trump lacked any lawful discretionary authority to defy federal criminal law and he is answerable in court for his conduct.

## B. FUNCTIONAL POLICY CONSIDERATIONS

Even though it is proper under *Marbury* and its progeny for an Article III court to hear criminal charges brought against a former President, we "necessarily" must "weigh[] concerns of public policy, especially as illuminated by our history and the structure of our government," including our "constitutional heritage and structure." *Fitzgerald*, 457 U.S. at 747–48; *see id.* at 748 (our historical analysis merges with public policy analysis "[b]ecause the Presidency did not exist through most of the development of common law"); *Clinton*, 520 U.S. at 694 (courts apply "a functional approach" in determining the scope

31

of official immunity). "This inquiry involves policies and principles that may be considered implicit in the nature of the President's office in a system structured to achieve effective government under a constitutionally mandated separation of powers." *Fitzgerald*, 457 U.S. at 748. Our analysis entails "balanc[ing] the constitutional weight of the interest to be served against the dangers of intrusion on the authority and functions of the Executive Branch." *Id.* at 754.

We note at the outset that our analysis is specific to the case before us, in which a former President has been indicted on federal criminal charges arising from his alleged conspiracy to overturn federal election results and unlawfully overstay his Presidential term.[8] We consider the policy concerns at issue in this case in two respects. First, we assess possible intrusions on the authority and functions of the Executive Branch and the countervailing interests to be served as those concerns apply to former President Trump's claim that former Presidents are categorically immune from federal prosecution. We conclude that the interest in criminal accountability, held by both the public and the Executive Branch, outweighs the potential risks of chilling Presidential action and permitting vexatious litigation. Second, we examine the additional interests raised by the nature of the charges in the Indictment: The Executive Branch's interest in upholding Presidential elections and vesting power in a new President under the Constitution and the voters' interest in democratically selecting their President. We find these interests compel the conclusion that former President Trump is not immune from prosecution under the Indictment.

---

[8] We do not address policy considerations implicated in the prosecution of a sitting President or in a state prosecution of a President, sitting or former.

32

## 1. CATEGORICAL IMMUNITY DEFENSE

Former President Trump argues that criminal liability for former Presidents risks chilling Presidential action while in office and opening the floodgates to meritless and harassing prosecution. These risks do not overcome "the public interest in fair and accurate judicial proceedings," which "is at its height in the criminal setting." *Vance*, 140 S. Ct. at 2424.

Former President Trump first asserts that the prospect of potential post-Presidency criminal liability would inhibit a sitting President's ability to act "fearlessly and impartially," citing the "especially sensitive duties" of the President and the need for "bold and unhesitating action." Appellant's Br. 21–22 (quoting *Fitzgerald*, 457 U.S. at 745–46). But "[t]he chance that now and then there may be found some timid soul who will take counsel of his fears and give way to their repressive power is too remote and shadowy to shape the course of justice." *Clark v. United States*, 289 U.S. 1, 16 (1933). In *Clark*, the Supreme Court dismissed the threat of a chilling effect, holding that jurors could be subject to criminal prosecution for conduct during their jury service and explaining that a "juror of integrity and reasonable firmness will not fear to speak his mind if the confidences of debate are barred to the ears of mere impertinence or malice." *Id.* Rather, the Court observed, "[h]e will not expect to be shielded against the disclosure of his conduct in the event that there is evidence reflecting upon his honor." *Id.* The Court reinforced the point in *United States v. Nixon*, holding that it could not "conclude that [Presidential] advisers will be moved to temper the candor of their remarks by the infrequent occasions of disclosure because of the possibility that such conversations will be called for in the context of a criminal prosecution." 418 U.S. at 712. So too here. We cannot presume that a President will be unduly cowed by the prospect of post-Presidency criminal liability any

33

more than a juror would be influenced by the prospect of post-deliberation criminal liability, or an executive aide would be quieted by the prospect of the disclosure of communications in a criminal prosecution.

Moreover, past Presidents have understood themselves to be subject to impeachment and criminal liability, at least under certain circumstances, so the possibility of chilling executive action is already in effect. Even former President Trump concedes that criminal prosecution of a former President is expressly authorized by the Impeachment Judgment Clause after impeachment and conviction. *E.g.*, Oral Arg. Tr. 13:25–14:9. We presume that every President is aware of the Impeachment Judgment Clause and knows that he is "liable and subject to Indictment, Trial, Judgment and Punishment, according to Law," at least after impeachment and conviction. U.S. CONST. art. I, § 3, cl. 7.

Additionally, recent historical evidence suggests that former Presidents, including President Trump, have not believed themselves to be wholly immune from criminal liability for official acts during their Presidency. President Gerald Ford issued a full pardon to former President Richard Nixon, which both former Presidents evidently believed was necessary to avoid Nixon's post-resignation indictment. *See, e.g.*, *President Gerald R. Ford's Proclamation 4311, Granting a Pardon to Richard Nixon*, Ford Presidential Library (Sept. 8, 1974); *Statement by Former President Richard Nixon* 1, Ford Presidential Library (Sept. 8, 1974). Before leaving office, President Bill Clinton agreed to a five-year suspension of his law license and a $25,000 fine in exchange for Independent Counsel Robert Ray's agreement not to file criminal charges against him. *See* John F. Harris & Bill Miller, *In a Deal, Clinton Avoids Indictment*, WASH. POST (Jan. 20, 2001), https://perma.cc/MMR9-GDTL. And during President

34

Trump's 2021 impeachment proceedings for incitement of insurrection, his counsel argued that instead of post-Presidency impeachment, the appropriate vehicle for "investigation, prosecution, and punishment" is "the article III courts," as "[w]e have a judicial process" and "an investigative process . . . to which no former officeholder is immune." 167 CONG. REC. S607 (daily ed. Feb. 9, 2021); *see also id.* at S693 (daily ed. Feb. 12, 2021) ("[T]he text of the Constitution . . . makes very clear that a former President is subject to criminal sanction after his Presidency for any illegal acts he commits."). In light of the express mention of "Indictment" in the Impeachment Judgment Clause and recent historical evidence of former Presidents acting on the apparent understanding that they are subject to prosecution even in the absence of conviction by the Senate, the risk of criminal liability chilling Presidential action appears to be low.

Instead of inhibiting the President's lawful discretionary action, the prospect of federal criminal liability might serve as a structural benefit to deter possible abuses of power and criminal behavior. "Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate . . . ." *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982). As the district court observed: "Every President will face difficult decisions; whether to intentionally commit a federal crime should not be one of them." *Trump*, --- F. Supp. 3d ---, 2023 WL 8359833, at *9.

Former President Trump next urges that a lack of criminal immunity will subject future Presidents to politically motivated prosecutions as soon as they leave office. In the civil context, the Supreme Court found official-act Presidential immunity necessary in part to avoid "subject[ing] the President to trial on virtually every allegation that an action was unlawful, or was

35

taken for a forbidden purpose." *Fitzgerald*, 457 U.S. at 756; *see id.* at 753 ("In view of the visibility of his office and the effect of his actions on countless people, the President would be an easily identifiable target for suits for civil damages."). But the decision to initiate a federal prosecution is committed to the prosecutorial discretion of the Executive Branch. Prosecutors have ethical obligations not to initiate unfounded prosecutions and "courts presume that they . . . properly discharge[] their official duties." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14–15 (1926)). There are additional safeguards in place to prevent baseless indictments, including the right to be charged by a grand jury upon a finding of probable cause. U.S. CONST. amend. V; *Kaley v. United States*, 571 U.S. 320, 328 (2014). "[G]rand juries are prohibited from engaging in 'arbitrary fishing expeditions' and initiating investigations 'out of malice or an intent to harass.'" *Vance*, 140 S. Ct. at 2428 (quoting *United States v. R. Enters., Inc.*, 498 U.S. 292, 299 (1991)). Additionally, former President Trump's "predictive judgment" of a torrent of politically motivated prosecutions "finds little support in either history or the relatively narrow compass of the issues raised in this particular case," *see Clinton*, 520 U.S. at 702, as former President Trump acknowledges that this is the first time since the Founding that a former President has been federally indicted. Weighing these factors, we conclude that the risk that former Presidents will be unduly harassed by meritless federal criminal prosecutions appears slight.

On the other side of the scale, we must consider "the constitutional weight of the interest to be served" by allowing the prosecution of a former President to proceed. *Fitzgerald*, 457 U.S. at 754. The public has a fundamental interest in the enforcement of criminal laws. *Vance*, 140 S. Ct. at 2424. "[O]ur historic commitment to the rule of law . . . is nowhere

36

more profoundly manifest than in our view that 'the twofold aim (of criminal justice) is that guilt shall not escape or innocence suffer.'" *Nixon*, 418 U.S. at 708–09 (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)).  As the *Nixon* Court explained, wholly immunizing the President from the criminal justice process would disturb "the primary constitutional duty of the Judicial Branch to do justice in criminal prosecutions" to such an extent that it would undermine the separation of powers by "plainly conflict[ing] with the function of the courts under Art. III."  *Nixon*, 418 U.S. at 707.

There is also a profound Article II interest in the enforcement of federal criminal laws.  The President has a constitutionally mandated duty to "take Care that the Laws be faithfully executed."  U.S. CONST. art. II, § 3.  As part of this duty, the President is responsible for investigating and prosecuting criminal violations.  *See Morrison v. Olson*, 487 U.S. 654, 706 (1988) (Scalia, J., dissenting) ("Governmental investigation and prosecution of crimes is a quintessentially executive function."); *see also In re Lindsey*, 158 F.3d 1263, 1272 (D.C. Cir. 1998) ("Investigation and prosecution of federal crimes is one of the most important and essential functions within [the President's] constitutional responsibility."); *Cmty. For Creative Non-Violence v. Pierce*, 786 F.2d 1199, 1201 (D.C. Cir. 1986) ("The power to decide when to investigate, and when to prosecute, lies at the core of the Executive's duty to see to the faithful execution of the laws . . . .").  Beyond simply making explicit that a President must enforce the law, the Take Care Clause plays a central role in "signify[ing] . . . the principle that ours is a government of laws, not of men, and that we submit ourselves to rulers only if under rules."  *Youngstown*, 343 U.S. at 646 (Jackson, J., concurring).  It would be a striking paradox if the President, who alone is vested with the constitutional duty to "take Care

37

that the Laws be faithfully executed," were the sole officer capable of defying those laws with impunity.

The federal prosecution of a former President fits the case "[w]hen judicial action is needed to serve broad public interests" in order to "vindicate the public interest in an ongoing criminal prosecution." *Fitzgerald*, 457 U.S. at 754. The risks of chilling Presidential action or permitting meritless, harassing prosecutions are unlikely, unsupported by history and "too remote and shadowy to shape the course of justice." *See Clark*, 289 U.S. at 16. We therefore conclude that functional policy considerations rooted in the structure of our government do not immunize former Presidents from federal criminal prosecution.

## 2. IMMUNITY FROM THE INDICTMENT'S CHARGES

In addition to the generally applicable concerns discussed *supra*, the allegations of the Indictment implicate the Article II interests in vesting authority in a new President and the citizenry's interest in democratically selecting its President.

The Indictment alleges that the assertedly "official" actions at issue here were undertaken by former President Trump in furtherance of a conspiracy to unlawfully overstay his term as President and to displace his duly elected successor. *See* Indictment ¶¶ 2, 10. That alleged conduct violated the constitutionally established design for determining the results of the Presidential election as well as the Electoral Count Act of 1887, neither of which establishes a role for the President in counting and certifying the Electoral College votes. U.S. CONST. art. II, § 1, cl. 3; *id.* amend. XII; 3 U.S.C. § 15, *amended by* 136 Stat. 4459, 5238 (2022); *see* Indictment ¶¶ 9–10. The alleged conduct also violated Article II's mandate that a President "hold his Office during the Term of four Years."

38

U.S. CONST. art. II, § 1, cl. 1.  The Twentieth Amendment reinforces the discrete nature of a presidential term, explicitly providing that "[t]he terms of the President and Vice President shall end at noon on the 20th day of January . . .; and the terms of their successors shall then begin."  U.S. CONST. amend. XX, § 1.  Upon "the expiration of the time for which he is elected," a former president "returns to the mass of the people again" and the power of the Executive Branch vests in the newly elected President.  *Burr*, 25 F. Cas. at 34; U.S. CONST. art. II, § 1, cl. 1 ("The executive Power shall be vested in *a* President of the United States of America.") (emphasis added).

The President, of course, also has a duty under the Take Care Clause to faithfully enforce the laws.  This duty encompasses following the legal procedures for determining election results and ensuring that executive power vests in the new President at the constitutionally appointed time.  To the extent former President Trump maintains that the post-2020 election litigation that his campaign and supporters unsuccessfully pursued implemented his Take Care duty, he is in error.  *See infra* n.14.  Former President Trump's alleged conduct conflicts with his constitutional mandate to enforce the laws governing the process of electing the new President.

The public has a strong interest in the foundational principle of our government that the will of the people, as expressed in the Electoral College vote, determines who will serve as President.  *See* U.S. CONST. amend. XII ("The Electors shall meet in their respective states, and vote by ballot for President and Vice-President. . . .  The person having the greatest number of votes for President, shall be the President."); *Chiafalo v. Washington*, 140 S. Ct. 2316, 2328 (2020) ("Early in our history, States decided to tie electors to the presidential choices of [citizens].").  The Supreme Court recently noted that "the Framers made the President the most

39

democratic and politically accountable official in Government," the only one who (along with the Vice President) is "elected by the entire Nation." *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2203 (2020). "To justify and check" the President's "unique [authority] in our constitutional structure," Article II "render[s] the President directly accountable to the people through regular elections." *Id.* As James Madison put it, "[a] dependence on the people is, no doubt, the primary control on the government." The Federalist No. 51, at 253 (James Madison) (Coventry House Publishing, 2015)[9]; *see also Morrison*, 487 U.S. at 731 (Scalia, J., dissenting) ("[T]he Founders . . . established a single Chief Executive accountable to the people" so that "the blame [could] be assigned to someone who can be punished."). Thus, the quadrennial Presidential election is a crucial check on executive power because a President who adopts unpopular policies or violates the law can be voted out of office.

Former President Trump's alleged efforts to remain in power despite losing the 2020 election were, if proven, an unprecedented assault on the structure of our government. He allegedly injected himself into a process in which the President has no role — the counting and certifying of the Electoral College votes — thereby undermining constitutionally established procedures and the will of the Congress. To immunize former President Trump's actions would "further . . . aggrandize the presidential office, already so potent and so relatively immune from judicial review, at the expense of Congress." *Youngstown*, 343 U.S. at 654 (Jackson, J., concurring) (footnote omitted). As Justice Jackson warned:

---

[9] Federalist No. 51 is "generally attributed to Madison" but is "sometimes attributed to 'Hamilton or Madison.'" *INS v. Chadha*, 462 U.S. 919, 950 (1983).

40

> Executive power has the advantage of
> concentration in a single head in whose choice
> the whole Nation has a part, making him the
> focus of public hopes and expectations. In
> drama, magnitude and finality his decisions so
> far overshadow any others that almost alone he
> fills the public eye and ear. No other personality
> in public life can begin to compete with him in
> access to the public mind through modern
> methods of communications. By his prestige as
> head of state and his influence upon public
> opinion he exerts a leverage upon those who are
> supposed to check and balance his power which
> often cancels their effectiveness.

*Id.* at 653–54 (Jackson, J., concurring).

We cannot accept former President Trump's claim that a
President has unbounded authority to commit crimes that
would neutralize the most fundamental check on executive
power — the recognition and implementation of election
results. Nor can we sanction his apparent contention that the
Executive has carte blanche to violate the rights of individual
citizens to vote and to have their votes count.

\*   \*   \*

At bottom, former President Trump's stance would
collapse our system of separated powers by placing the
President beyond the reach of all three Branches. Presidential
immunity against federal indictment would mean that, as to the
President, the Congress could not legislate, the Executive could
not prosecute and the Judiciary could not review. We cannot
accept that the office of the Presidency places its former
occupants above the law for all time thereafter. Careful
evaluation of these concerns leads us to conclude that there is

41

no functional justification for immunizing former Presidents from federal prosecution in general or for immunizing former President Trump from the specific charges in the Indictment. In so holding, we act, "not in derogation of the separation of powers, but to maintain their proper balance." *See Fitzgerald*, 457 U.S. at 754.

## C.  THE IMPEACHMENT JUDGMENT CLAUSE

The strongest evidence against former President Trump's claim of immunity is found in the words of the Constitution. The Impeachment Judgment Clause provides that "[j]udgment in Cases of Impeachment shall not extend further than to removal from Office, and disqualification to hold and enjoy any Office of honor, Trust or Profit under the United States: but the Party convicted shall nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law." U.S. CONST. art. I, § 3, cl. 7. That language limits the consequences of impeachment to removal and disqualification from office, but explicitly preserves the option of criminal prosecution of an impeached official "according to Law."

Former President Trump agrees that the Impeachment Judgment Clause contemplates and permits the prosecution of a former President on criminal charges — he argues only that such a former President first must be impeached by the House and "convicted" by the Senate. Appellant's Br. 12–14, 31. In other words, he asserts that, under the Clause, a former President enjoys immunity for any criminal acts committed while in office *unless* he is first impeached and convicted by the Congress. Under that theory, he claims that he is immune from prosecution because he was impeached and *acquitted*. By taking that position, former President Trump potentially narrows the parties' dispute to whether he may face criminal charges in this case consistent with the Impeachment Judgment

42

Clause: If the Clause requires an impeachment conviction first, he may not be prosecuted; but if it contains no such requirement, the Clause presents no impediment to his prosecution.

Former President Trump also implicitly concedes that there is no absolute bar to prosecuting assertedly "official" actions. He argues elsewhere in his brief that his impeachment on the charge of inciting insurrection was based on conduct that was the "same and closely related" to the "official acts" charged in the Indictment. Appellant's Br. 46 ("President Trump was impeached and acquitted by the Senate for the same and closely related conduct to that alleged in the indictment." (emphasis omitted)); *id.* at 42 ("[A]ll five types of conduct alleged in the indictment constitute official acts."). And he agrees that if he had been convicted by the Senate in that impeachment trial, he would not be immune from prosecution for the "official acts" at issue here. *See id.* at 31. Thus, he concedes that a President can be prosecuted for broadly defined "official acts," such as the ones alleged in the Indictment, under some circumstances, *i.e.*, following an impeachment conviction.

The Impeachment Judgment Clause is focused solely on those who are convicted by the Senate following impeachment by the House. The first part of the Clause limits the penalties that can be imposed based on an impeachment conviction: "Judgment in Cases of Impeachment shall not extend further than to removal from Office, and disqualification to hold and enjoy any Office of honor, Trust or Profit under the United States." U.S. Const. art. I, § 3, cl. 7. The second part makes clear that the limited consequences of impeachment do not immunize convicted officers from criminal prosecution: "[T]he Party convicted shall nevertheless be liable and subject

43

to Indictment, Trial, Judgment and Punishment, according to Law." *Id.*

In former President Trump's view, however, the word "convicted" in the second phrase implicitly bestows immunity on Presidents who are *not* convicted, based on a negative implication. He asserts that the Impeachment Judgment Clause "presupposes" that a President is not criminally liable absent a conviction in the Senate. Appellant's Br. 12. Other courts have rejected this "tortured" interpretation of the Impeachment Judgment Clause, which previously has been advanced to support claims of judicial immunity. *See Claiborne*, 727 F.2d at 846 ("According to Claiborne, this language means that a federal judge cannot be indicted and tried in an Article III court unless he has been removed from office by the impeachment process. Both *Isaacs* and *Hastings* rejected this tortured interpretation . . . ." (cleaned up)); *Hastings*, 681 F.2d at 710; *Isaacs*, 493 F.2d at 1142 (The Impeachment Judgment Clause "does not mean that a judge may not be indicted and tried without impeachment first."). Moreover, former President Trump's interpretation runs counter to the text, structure and purpose of the Impeachment Judgment Clause. *See N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 302 (2017) ("The force of any negative implication . . . depends on context," and "applies only when circumstances support a sensible inference that the term left out must have been meant to be excluded." (cleaned up)); *Mercy Hosp., Inc. v. Azar*, 891 F.3d 1062, 1069 (D.C. Cir. 2018) ("Finding the negative implication of a statute is a context-specific exercise.").

To begin, former President Trump's reliance on a negative implication is an immediate red flag: The Framers knew how to explicitly grant criminal immunity in the Constitution, as they did to legislators in the Speech or Debate Clause. *See* U.S. CONST. art. I, § 6, cl. 1. Yet they chose not to include a similar

44

provision granting immunity to the President.  *See Vance*, 140
S. Ct. at 2434 (Thomas, J., dissenting) ("The text of the
Constitution explicitly addresses the privileges of some federal
officials, but it does not afford the President absolute
immunity.").    The Impeachment Judgment Clause merely
states that "the Party convicted" shall nevertheless be subject
to criminal prosecution.   The text says nothing about non-
convicted officials.  Former President Trump's reading rests on
a logical fallacy:  Stating that "if the President is convicted, he
can be prosecuted," does not necessarily mean that "if the
President is *not* convicted, he *cannot* be prosecuted."  *See, e.g.*,
*N.L.R.B. v. Noel Canning*, 573 U.S. 513, 589 (2014) (Scalia, J.,
concurring) (explaining "the fallacy of the inverse (otherwise
known as denying the antecedent):  the incorrect assumption
that if P implies Q, then not-P implies not-Q").

Another important clue is the Clause's use of the word
"nevertheless," as in "the Party convicted shall *nevertheless* be
liable."  U.S. CONST. art. I, § 3, cl. 7 (emphasis added).  The
meaning of "neverthele'ss," according to a contemporaneous
18th century dictionary, is "[n]otwithsta'nding that," which in
turn means "[w]ithout hindrance or obstruction from."   2
Samuel Johnson, A Dictionary of the English Language 200,
216 (1773).  The Impeachment Judgment Clause contains no
words that limit criminal liability — and, to the contrary, it uses
"nevertheless" to ensure that liability will *not* be limited (*i.e.*,
"hindered or obstructed"), even after an official is impeached,
convicted and removed from office.

The text of the Impeachment Judgment Clause reflects its
purpose:  To allocate responsibility between the Legislative
and Executive branches for holding impeached officers
accountable for misconduct.  In 18th-century Great Britain,
impeachment could result in "capital punishment . . . fine and
ransom[,] or imprisonment."  2 Joseph Story, *Commentaries on*

45

the Constitution of the United States § 782; *see also Whether a Former President May Be Indicted and Tried for the Same Offenses for Which He was Impeached by the House and Acquitted by the Senate*, 24 Op. O.L.C. 110, 120 (2000) (hereinafter, "OLC Double Jeopardy Memo") (noting that impeachment in Britain could have resulted "in a wide array of criminal penalties, including fines, imprisonment, and even execution"). The Framers chose to withhold such broad power from the Senate, specifying instead that the Senate could impose "only political, not ordinary criminal, punishments." OLC Double Jeopardy Memo at 124; *see also* Tench Coxe, An American Citizen, *Independent Gazetteer* (Philadelphia), Sept. 28, 1787 (The Senate "can only, by conviction on impeachment, *remove and incapacitate a dangerous officer* . . . ." (emphasis in original)). That approach naturally "raise[d] the question whether the other punishments the founding generation was accustomed to seeing" in British impeachment proceedings "could be imposed at all under the new American government." OLC Double Jeopardy Memo at 126. The Framers wished to make clear that a President would "still be liable to prosecution and punishment in the ordinary course of law." The Federalist No. 65, at 321 (Alexander Hamilton) (Coventry House Publishing, 2015); Coxe, *An American Citizen* ("[T]he punishment of [a dangerous officer] as a criminal *remains within the province of the courts of law to be conducted under all the ordinary forms and precautions* . . . ." (emphasis in original)). They therefore added the provision that "the Party convicted shall nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law." U.S. CONST. art. I, § 3, cl. 7. As the Office of Legal Counsel noted, that "second part makes clear that the restriction on sanctions in the first part was not a prohibition on further punishments; rather, those punishments would still be available but simply not to the [Senate]." OLC Double Jeopardy Memo at 126–27. In short, then, the Framers

46

intended impeached officials to face criminal liability "according to Law." U.S. CONST. art. I, § 3, cl. 7.

To counter the historical evidence that explains the purpose of the Impeachment Judgment Clause, former President Trump turns to one sentence written by Alexander Hamilton in the Federalist 69: "The President of the United States would be liable to be impeached, tried, and, upon conviction of treason, bribery, or other high crimes or misdemeanors, removed from office; and would afterwards be liable to prosecution and punishment in the ordinary course of law." The Federalist No. 69, at 337 (Alexander Hamilton) (Coventry House Publishing, 2015). He focuses on the word "afterwards" and suggests that a President is not "liable to prosecution and punishment" until "after[]" he has been impeached and convicted by the Senate. *See* Appellant's Br. 14–15. But we think the more significant word in Hamilton's statement is "liable," which means "subject to." *Liable*, 1 John Ash, New and Complete Dictionary of the English Language (1795). Hamilton specifies that a President would be *subject to* impeachment, trial, conviction and removal from office; and "afterwards" would be *subject to* prosecution and punishment, without regard to the verdict in the impeachment proceeding.[10] Moreover, in the very next sentence of the same essay, Hamilton stresses that the President must be unlike the "king of Great Britain," who was "sacred and inviolable." The

---

[10] Former President Trump also cites to Hamilton's statement in Federalist 77 that the President is "at all times *liable* to impeachment, trial, dismission from office, incapacity to serve in any other, and to forfeiture of life and estate by *subsequent* prosecution in the common course of law." The Federalist No. 77, at 378–79 (Alexander Hamilton) (Coventry House Publishing, 2015) (emphasis added). This argument is similarly unavailing based on Federalist 77's analogous use of "liable."

47

Federalist No. 69, at 337–38. It strains credulity that Hamilton
would have endorsed a reading of the Impeachment Judgment
Clause that shields Presidents from all criminal accountability
unless they are first impeached and convicted by the Congress.

Other historical evidence further supports our conclusion.
For example, many founding-era sources state that an
impeached-and-acquitted official may face criminal indictment
and trial. Edmund Pendleton, President of the Virginia
Ratifying Convention, noted that Senate "obstruction" of an
impeachment charge would not allow an official to escape
accountability because the people "may yet resort to the Courts
of Justice, as an Acquital [sic] would not bar that remedy." 10
*The Documentary History of the Ratification of the
Constitution* 1773 (Merrill Jensen et al, eds. 1976) (Letter from
Edmund Pendleton to James Madison, Oct. 8, 1787).
Similarly, James Wilson — a member of the Constitutional
Convention committee that drafted the Impeachment Judgment
Clause — argued as follows: "Though [Senators] may not be
convicted on impeachment before the Senate, they may be tried
by their country; and if their criminality is established, the law
will punish. A grand jury may present, a petit jury may convict,
and the judges will pronounce the punishment." *See* 2 *The
Documentary History of the Ratification of the Constitution*
492 (Merrill Jensen et al, eds. 1976); *see also* 9 Annals of Cong.
2475 (1798) (statement of Rep. Dana) ("[W]hether a person
tried under an impeachment be found guilty or acquitted, he is
still liable to a prosecution at common law.").

In drafting the Impeachment Judgment Clause, to the
extent that the Framers contemplated whether impeachment
would have a preclusive effect on future criminal charges, the
available evidence suggests that their intent was to ensure that
a subsequent prosecution would *not* be barred. *See* OLC
Double Jeopardy Memo at 122 (noting limited scope of

48

discussion at the Constitutional Convention and ratifying
conventions regarding the Impeachment Judgment Clause).
Joseph Story explained that the Impeachment Judgment Clause
removed doubt that "a second trial for the same offence could
be had, either after an acquittal, or a conviction in the court of
impeachments." 2 Story, *Commentaries* § 780; *id.* § 781
(noting the Constitution "has wisely subjected the party to trial
in the common criminal tribunals, for the purpose of receiving
such punishment, as ordinarily belongs to the offence"). Story
explained that without a criminal trial "the grossest official
offenders might escape without any substantial punishment,
even for crimes, which would subject their fellow citizens to
capital punishment." *Id.* § 780.[11]

Finally, the practical consequences of former President
Trump's interpretation demonstrate its implausibility. The
Impeachment Judgment Clause applies not just to Presidents
but also to the "Vice President and all civil Officers of the
United States." U.S. CONST. art. II, § 4. Thus, his reading
would prohibit the Executive Branch from prosecuting current
and former civil officers for crimes committed while in office,

---

[11] Former President Trump points to some historical evidence
that he considers countervailing. He notes that some state
constitutions explicitly provided for the criminal prosecution of a
party acquitted on impeachment charges, arguing that silence on that
point therefore should be inferred as precluding prosecution. But
some early state constitutions also expressly granted criminal
immunity to the state's chief executive, so interpreting silence is not
so simple. *See* Saikrishna Bangalore Prakash, *Prosecuting and
Punishing Our Presidents*, 100 Tex. L. Rev. 55, 69–70 (2021) (citing
1776 Virginia and Delaware constitutions). Any limited, indirect
historical clues must be weighed against the compelling textual,
structural and historical evidence that the Founders did not intend the
Impeachment Judgment Clause to bar the criminal prosecution of an
official who was impeached and acquitted (or not impeached at all).

49

unless the Congress first impeached and convicted them.  No court has previously imposed such an irrational "impeachment first" constraint on the criminal prosecution of federal officials.  *See*, *e.g.*, *Isaacs*, 493 F.2d at 1144 ("[W]e are convinced that a federal judge is subject to indictment and trial before impeachment . . . .").[12]  Even if there is an atextual basis for treating Presidents differently from subordinate government officials, as former President Trump suggests, his proposed interpretation still would leave a President free to commit all manner of crimes with impunity, so long as he is not impeached and convicted.  Former President Trump's interpretation also would permit the commission of crimes not readily categorized as impeachable (*i.e.*, as "Treason, Bribery, or other high Crimes and Misdemeanors") and, if thirty Senators are correct, crimes not discovered until after a President leaves office.  *See* U.S. CONST. art. II, § 4; *see also*, *e.g.*, 167 CONG. REC. S736 (daily ed. Feb. 13, 2021) (statement of Senate Minority Leader McConnell) ("We have no power to convict and disqualify a former office holder who is now a private citizen.").[13]  All of

---

[12]  Indeed, history reveals examples of prosecutions preceding impeachments.  *See Nixon v. United States*, 506 U.S. 224, 226–27 (1993) (defendant judge criminally prosecuted and then impeached); *Hastings v. United States Senate*, 716 F. Supp. 38, 41 (D.D.C. 1989) (same); *Amenability of the President, Vice President and other Civil Officers to Federal Criminal Prosecution While in Office*, Op. O.L.C. 4 (1973) (observing that, as of 1973, only 12 impeachments had occurred, but "presumably scores, if not hundreds, of officers of the United States have been subject to criminal proceedings for offenses for which they could have been impeached").

[13]  *See also* statements of Senators Barrasso, Blunt, Braun, Capito, Cornyn, Cramer, Crapo, Daines, Ernst, Fischer, Grassley, Hoeven, Hyde-Smith, Inhofe, Kennedy, Lankford, Lee, Lummis, Moran, Portman, Risch, Rounds, Rubio, Shelby, Sullivan, Thune, Tillis, Tuberville and Wicker.

50

this leads us to conclude that, under the best reading of the Impeachment Judgment Clause, a former President may be criminally prosecuted in federal court, without any requirement that he first be impeached and convicted for the same conduct.[14]

## IV.  DOUBLE JEOPARDY PRINCIPLES

Former President Trump alternatively argues that the Impeachment Judgment Clause and "principles of double jeopardy" bar his prosecution because he was impeached by the

---

[14]  Because we conclude that former President Trump is not entitled to categorical immunity from criminal liability for assertedly "official" acts, it is unnecessary to explore whether executive immunity, if it applied here, would encompass his expansive definition of "official acts."  Nevertheless, we observe that his position appears to conflict with our recent decision in *Blassingame*, 87 F.4th at 1.  According to the former President, any actions he took in his role as President should be considered "official," including all the conduct alleged in the Indictment.  Appellant's Br. 41–42.  But in *Blassingame*, taking the plaintiff's allegations as true, we held that a President's "actions constituting re-election campaign activity" are not "official" and can form the basis for civil liability.  87 F.4th at 17.  In other words, if a President who is running for re-election acts "as office-*seeker*, not office-*holder*," he is not immune even from *civil* suits.  *Id*. at 4 (emphasis in original).  Because the President has no official role in the certification of the Electoral College vote, much of the misconduct alleged in the Indictment reasonably can be viewed as that of an office-*seeker* — including allegedly organizing alternative slates of electors and attempting to pressure the Vice President and Members of the Congress to accept those electors in the certification proceeding.  It is thus doubtful that "all five types of conduct alleged in the indictment constitute official acts." Appellant's Br. 42.

51

House of Representatives for the same or closely related conduct but acquitted by the Senate. We disagree.

As we have discussed, *supra* Part III.C, the Impeachment Judgment Clause addresses only *convicted* parties; it does not address the consequences of a Senate acquittal. For the reasons already stated, the Clause's provision that "the Party convicted shall nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law" does not bar the prosecution of an official who, like former President Trump, was acquitted rather than "convicted" in an impeachment proceeding; nor does it bar the prosecution of an official who was never impeached in the first place. U.S. CONST. art. I, § 3, cl. 7. The Clause simply does not speak to such matters. But the weight of historical authority indicates that the Framers intended for public officials to face ordinary criminal prosecution as well as impeachment. *Supra* Part III.C.

To the extent former President Trump relies on "double jeopardy principles" beyond the text of the Impeachment Judgment Clause, those principles cut against him. The Double Jeopardy Clause provides: "No person shall . . . be subject for the same offence to be twice put in jeopardy of life or limb." U.S. CONST. amend. V. It has been interpreted to prohibit "imposition of multiple criminal punishments for the same offense." *Hudson v. United States*, 522 U.S. 93, 99 (1997) (citation omitted). Under precedent interpreting the Double Jeopardy Clause, former President Trump's impeachment acquittal does not bar his subsequent criminal prosecution for two reasons: (1) An impeachment does not result in *criminal* punishments; and (2) the Indictment does not charge the same offense as the single count in the Impeachment Resolution.

52

## A.  IMPEACHMENT IS NOT "CRIMINAL"

Under the Double Jeopardy Clause, a defendant is not "put in jeopardy of life or limb," U.S. CONST. amend. V, when faced with any penalty "that could, in common parlance, be described as punishment"; instead, double jeopardy guards only against "imposition of multiple criminal punishments for the same offense."  *Hudson*, 522 U.S. at 99 (cleaned up).  Although double jeopardy applies only to *criminal* punishments, impeachment imposes *political* punishments.

Impeachment is a political process that is instigated and overseen by the Congress.  *See* 2 Story, *Commentaries* § 784 ("There is wisdom, and sound policy, and intrinsic justice in this separation of the offence, at least so far, as the jurisdiction and trial are concerned, into its proper elements, bringing *the political part* under the power of the political department of the government . . . ." (emphasis added)); 9 Annals of Cong. 2475 (1798) (statement of Rep. Dana) ("The process in cases of impeachment, in this country, is distinct from either civil or criminal — it is a political process, having in view the preservation of the Government of the Union.").  It is a tool entrusted to elected officials and "designed to enable Congress to protect the nation against officers who have demonstrated that they are unfit to carry out important public responsibilities."  OLC Double Jeopardy Memo at 130; *see* The Federalist No. 66, at 324 (Alexander Hamilton) (Coventry House Publishing, 2015) ("[T]he powers relating to impeachments are, as before intimated, an essential check in the hands of [Congress] upon the encroachments of the executive."); *Mazars USA, LLP*, 140 S. Ct. at 2046 (Thomas, J., dissenting) ("The founding generation understood impeachment as a check on Presidential abuses.").  The consequences imposed by an impeachment conviction — removal from office and disqualification from future service,

53

U.S. CONST. art. I, § 3, cl. 7. — are intended to hold officials *politically* accountable, while leaving *criminal* accountability to the Judicial Branch.

As a result of the political nature of impeachment proceedings, impeachment acquittals are often unrelated to factual innocence.  *See* The Federalist No. 65, at 319 (In an impeachment proceeding, "there will always be the greatest danger that the decision will be regulated more by the comparative strength of parties, than by the real demonstrations of innocence or guilt.").  Former President Trump's acquittal in his impeachment trial on the charge of inciting insurrection makes this point.  The forty-three Senators who voted to acquit him relied on a variety of concerns, many of which had nothing to do with whether he committed the charged offense.  Those Senators cited jurisdictional reasons, *see, e.g.*, 167 CONG. REC. S736 (daily ed. Feb. 13, 2021) (statement of Senate Minority Leader McConnell) ("We have no power to convict and disqualify a former office holder who is now a private citizen."); process-based reasons, *see, e.g.*, Press Release, Sen. Todd Young, Senator Young Statement on Impeachment Trial (Feb. 13, 2021), https://perma.cc/26Z8-XYTT ("Simply put, the U.S. House of Representatives conducted a rushed and incomplete process for this snap impeachment."); and political reasons, *see, e.g.*, Press Release, Sen. Ron Johnson, Johnson Statement on Impeachment Trial of Former President Trump (Feb. 13, 2021), https://perma.cc/L4EZ-7C77 ("The Democrats' vindictive and divisive political impeachment is over.  While there are still many questions that remain unanswered, I do know neither the Capitol breach nor this trial should have ever occurred.  Hopefully, true healing can now begin.").  Indeed, at least thirty Senators who voted to acquit relied at least in part on a belief that the Senate lacked the power to convict a *former* President.  *See supra* n.13.

54

Criminal prosecutions, by contrast, are aimed at "penaliz[ing] individuals for their criminal misdeeds . . . by taking away their life, liberty, or property." OLC Double Jeopardy Memo at 130; *see also Kansas v. Hendricks*, 521 U.S. 346, 361–62 (1997) (identifying "retribution [and] deterrence" as "the two primary objectives of criminal punishment"). The consequences of a criminal conviction are predicated on a finding of guilt beyond a reasonable doubt, *United States v. Gaudin*, 515 U.S. 506, 510 (1995); and such consequences can be severe, including asset forfeiture, incarceration and even death, *see, e.g.*, 18 U.S.C. §§ 982, 3581, 3591. Criminal prosecutions are overseen by the judiciary, which enforces stringent procedural protections that reflect the gravity of the potential ramifications for the defendant. *See Nixon*, 418 U.S. at 707 (describing "the primary constitutional duty of the Judicial Branch to do justice in criminal prosecutions"). The Double Jeopardy Clause is one such procedural protection, ensuring that a criminal defendant is not forced to face prosecution twice for the same offense.

In light of the very different procedures and purposes associated with impeachment proceedings as compared to criminal proceedings, former President Trump's reliance on the Double Jeopardy Clause is misplaced. Impeachment is not a criminal process and cannot result in criminal punishment.[15]

---

[15] When determining whether a punishment labeled "civil" by the Congress is criminal for double-jeopardy purposes, courts apply a multi-factored test. *See Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69 (1963). Because former President Trump does not contend impeachment threatens criminal punishment, and because we think the political nature of impeachment makes that clear, we need not address those factors. *Cf.* OLC Double Jeopardy Memo at 139–48 (concluding, under the *Mendoza-Martinez* test, that removal

55

He does not seriously contend otherwise; and he does not explain why he believes that impeachment can implicate "double jeopardy principles" when it does not involve criminal punishment.

## B. *BLOCKBURGER* TEST

Even if we assume that an impeachment trial is criminal under the Double Jeopardy Clause, the crimes alleged in the Indictment differ from the offense for which President Trump was impeached. In determining whether two charges are the "same" for double-jeopardy purposes, courts apply "the same-elements test" (also known as the "*Blockburger* test"): If "each offense contains an element not contained in the other," the offenses are different. *United States v. Dixon*, 509 U.S. 688, 696 (1993) (citing *Blockburger v. United States*, 284 U.S. 299, 304 (1932)) (cleaned up). If the charges at issue are not the "same offense" under that test, double jeopardy does not bar prosecution. *Id.* at 696–97.

Under the *Blockburger* test, none of the four offenses alleged in the Indictment is the same as the sole offense charged in the article of impeachment. The indicted criminal counts include conspiracy to defraud the United States under 18 U.S.C. § 371; conspiracy to obstruct and obstructing an official proceeding under 18 U.S.C. §§ 1512(c)(2), (k); and conspiracy to deprive one or more individuals of the right to vote under 18 U.S.C. § 241. *See* Indictment ¶¶ 6, 126, 128, 130. By contrast, the article of impeachment charged former President Trump with incitement of insurrection. *See* H.R. Res. 24, 117th Cong. (2021). Each of the indicted charges requires proof of an element other than those required for incitement. And the

_____

and disqualification are not criminal punishments implicating double jeopardy).

56

offense of incitement of insurrection requires proof of incitement — an element that is distinct from those associated with each of the crimes of indictment. In other words, the charges are not the same under a straightforward application of the *Blockburger* test.

Former President Trump does not dispute this analysis and instead contends that, rather than applying the *Blockburger* test, a subsequent criminal prosecution cannot be based on "the same or closely related conduct" as an unsuccessful impeachment. Appellant's Br. 52. But that argument is foreclosed by case law: "The 'same-conduct' rule . . . is wholly inconsistent with . . . Supreme Court precedent and with the clear common-law understanding of double jeopardy." *Dixon*, 509 U.S. at 704; *see also Hudson*, 522 U.S. at 107 (Stevens, J., concurring in the judgment) ("[T]he Double Jeopardy Clause is not implicated simply because a criminal charge involves essentially the same conduct for which a defendant has previously been punished." (cleaned up)).

Thus, well-established law interpreting the Double Jeopardy Clause undermines rather than supports former President Trump's argument that he may not be prosecuted. Perhaps recognizing that normal double-jeopardy rules disfavor his position, he claims that the Impeachment Judgment Clause incorporates "double jeopardy principles" that are distinct from the Double Jeopardy Clause. *See* Appellant's Br. 54 n.7. But if the "double jeopardy principles" he invokes are unmoored from the Double Jeopardy Clause, we are unable to discern what the principles are or how to apply them. He thus fails to establish that his Senate acquittal bars his criminal prosecution.

\*     \*     \*

57

We have balanced former President Trump's asserted interests in executive immunity against the vital public interests that favor allowing this prosecution to proceed. We conclude that "[c]oncerns of public policy, especially as illuminated by our history and the structure of our government" compel the rejection of his claim of immunity in this case. *See Fitzgerald*, 457 U.S. at 747–48. We also have considered his contention that he is entitled to categorical immunity from criminal liability for any assertedly "official" action that he took as President — a contention that is unsupported by precedent, history or the text and structure of the Constitution. Finally, we are unpersuaded by his argument that this prosecution is barred by "double jeopardy principles." Accordingly, the order of the district court is AFFIRMED.[16]

*So ordered*.

---

[16] *Amici* former Attorney General Edwin Meese III and others argue that the appointment of Special Counsel Smith is invalid because (1) no statute authorizes the position Smith occupies and (2) the Special Counsel is a principal officer who must be nominated by the President and confirmed by the Senate. *See* U.S. CONST. art. II, § 2, cl. 2 (Appointments Clause). On appeal from a collateral order, we generally lack jurisdiction to consider issues that do not independently satisfy the collateral order doctrine unless we can exercise pendent jurisdiction over the issue. *See Abney*, 431 U.S. at 663; *Azima v. RAK Inv. Auth.*, 926 F.3d 870, 874 (D.C. Cir. 2019). Because the Appointments Clause issue was neither presented to nor decided by the district court, there is no order on the issue that could even arguably constitute a collateral order for us to review. Additionally, the exercise of pendent jurisdiction would be improper here, assuming without deciding that pendent jurisdiction is *ever* available in criminal appeals. *See Abney*, 431 U.S. at 663; *Gilda Marx, Inc. v. Wildwood Exercise, Inc.*, 85 F.3d 675, 679 (D.C. Cir. 1996).