No. _____

# In the Supreme Court of the United States

PRESIDENT DONALD J. TRUMP,
*Applicant*,

v.

UNITED STATES OF AMERICA,
*Respondent*.

On Application for Stay of the Mandate To Be Issued by the
United States Court of Appeals for the District of Columbia Circuit

## APPLICATION FOR A STAY OF THE D.C. CIRCUIT'S MANDATE PENDING THE FILING OF A PETITION FOR WRIT OF CERTIORARI

LAURO & SINGER
John F. Lauro
Gregory M. Singer
400 N. Tampa St., 15th Fl.
Tampa, FL 33602
(813) 222-8990
jlauro@laurosinger.com

BLANCHE LAW
Todd Blanche
Emil Bove
99 Wall St., Suite 4460
New York, NY 10005
(212) 716-1250
toddblanche@blanchelaw.com

JAMES OTIS LAW GROUP, LLC
D. John Sauer
 *Counsel of Record*
William O. Scharf
Michael E. Talent
Kenneth C. Capps
13321 N. Outer Forty Rd.
Suite 300
St. Louis, Missouri 63017
(314) 562-0031
John.Sauer@james-otis.com

## QUESTIONS PRESENTED

The questions presented are:

I.      Whether the doctrine of absolute presidential immunity includes immunity from criminal prosecution for a President's official acts, *i.e.*, those performed within the "'outer perimeter' of his official responsibility." *Nixon* v. *Fitzgerald*, 457 U.S. 731, 756 (1982) (quoting *Barr* v. *Matteo*, 360 U.S. 564, 575 (1959)).

II. Whether the Impeachment Judgment Clause, U.S. CONST. art. I, § 3, cl. 7, and principles of double jeopardy foreclose the criminal prosecution of a President who has been impeached and acquitted by the U.S. Senate for the same and/or closely related conduct that underlies the criminal charges.

**PARTIES TO THE PROCEEDING**

The applicant is President Donald J. Trump ("President Trump").

The respondent is the United States of America ("Special Counsel" or "government").

## RELATED PROCEEDINGS

United States District Court (D.D.C.):

- *United States* v. *Trump*, No. 23-cr-257 (Dec. 1, 2023)

United States Court of Appeals (D.C. Cir.):

- *United States* v. *Trump*, No. 23-3190 (opinion issued Dec. 8, 2023)
- *United States* v. *Trump*, No. 23-3228 (opinion issued Feb. 6, 2024)

## TABLE OF CONTENTS

QUESTIONS PRESENTED ................................................................................ i

PARTIES TO THE PROCEEDING ....................................................................... ii

RELATED PROCEEDINGS ............................................................................... iii

TABLE OF CONTENTS .................................................................................... iv

TABLE OF AUTHORITIES ................................................................................ v

INTRODUCTION ............................................................................................ 1

STATEMENT ................................................................................................. 4

   I.  President Trump Was Indicted for His Official Acts as President. ............................ 4

   II.  The Lower Courts Incorrectly Deny President Trump's Immunity Claims. ................ 6

ARGUMENT .................................................................................................. 8

   I.  There Is a Reasonable Probability That This Court Will Grant Certiorari ................. 9

      A.  The Case Raises Important Questions of Federal Law. ........................................ 9

      B.  The D.C. Circuit's Opinion Conflicts With Decisions of This Court. ................... 11

   II.  There Is a Significant Possibility of Reversal. ............................................... 11

      A.  The Executive Vesting Clause and *Marbury* v. *Madison*. ................................ 12

      B.  "The Presuppositions of Our Political History." ............................................ 21

      C.  The Likelihood of Chilling Presidential Action. ........................................... 26

   III. There Is a Likelihood of Irreparable Harm Absent the Stay. .............................. 31

      A.  Absent a Stay, President Trump Will Immediately Be Required to Bear the Burdens of Prosecution and Trial. ............................................................ 32

      B.  Conducting the Criminal Trial of President Trump Will Inflict Grave First Amendment Injuries on Millions of American Voters. ................................... 33

   IV. The Balancing of Equities Strongly Favors a Stay. ....................................... 35

CONCLUSION ............................................................................................... 39

APPENDIX

# TABLE OF AUTHORITIES

**Cases**                                                                    **Pages(s)**

*Abney* v. *United States*,
    431 U.S. 651 (1977) ................................................................................................32

*Ashcroft* v. *Iqbal*,
    556 U.S. 662 (2009) ................................................................................................32

*Barr* v. *Matteo*,
    360 U.S. 564 (1959) ................................................................................................. i

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26* v. *Pico*,
    457 U.S. 853 (1982) ................................................................................................35

*Behrens* v. *Pelletier*,
    516 U.S. 299 (1996) ................................................................................................32

*Belk* v. *Charlotte-Mecklenburg Bd. of Educ.*,
    211 F.3d 853 (4th Cir. 2000) ..................................................................................39

*Blassingame* v. *Trump*,
    87 F.4th 1 (D.C. Cir. 2023) ...................................................................................6-7

*Butz* v. *Economou*,
    438 U.S. 478 (1978) ................................................................................................21

*Certain Named and Unnamed Non-Citizen Children and Their Parents* v. *Texas*,
    448 U.S. 1327 (1980) ..........................................................................................9, 12

*Chi. & S. Air Lines* v. *Waterman S.S. Corp.*,
    333 U.S. 103 (1948) ................................................................................................13

*Clark* v. *United States*,
    289 U.S. 1 (1933) ....................................................................................................27

*Clinton* v. *Jones*,
    520 U.S. 681 (1997) ................................................................................................15

*Dep't of Com.* v. *New York*,
    139 S. Ct. 2551 (2019) ............................................................................................37

*Digital Equip. Corp.* v. *Desktop Direct, Inc.*,
    511 U.S. 863 (1994) ................................................................................................32

*Elrod* v. *Burns*,
    427 U.S. 347 (1976) ................................................................................................34

*Ferri* v. *Ackerman*,
    444 U.S. 193 (1979) ................................................................................. 26

*Franklin* v. *Massachusetts*,
    505 U.S. 788 (1992) .............................................................. 13-15, 17, 28

*Free Enter. Fund* v. *Pub. Co. Accounting Oversight Bd.*,
    561 U.S. 477 (2010) ................................................................................. 21

*Harlow* v. *Fitzgerald*,
    457 U.S. 800 (1982) ................................................................................. 32

*Helstoski* v. *Meanor*,
    442 U.S. 500 (1979) ................................................................................. 32

*In re Trump*,
    958 F.3d 274 (4th Cir. 2020) ............................................... 14-15, 18, 21

*Karcher* v. *Daggett*,
    455 U.S. 1303 (1982) ............................................................ 8-9, 11, 31, 35

*Kendall* v. *United States ex rel. Stokes*,
    37 U.S. 524 (1838) ................................................................................... 19

*Kusay* v. *United States*,
    62 F.3d 192 (7th Cir. 1995) .................................................................... 38

*Landis* v. *N. Am. Co.*,
    299 U.S. 248 (1936) ................................................................................. 36

*Little* v. *Barreme*,
    6 U.S. (2 Cranch) 170 (1804) ................................................................. 19

*Marbury* v. *Madison*,
    5 U.S. (1 Cranch) 137 (1803) ................................................. 3, 11-13, 16-22, 29

*Martin* v. *Mott*,
    25 U.S. (12 Wheat.) 19 (1827) .......................................................... 16, 29

*McCulloch* v. *Maryland*,
    17 U.S. 316 (1819) ................................................................................... 22

*McIntyre* v. *Ohio Elec. Comm'n*,
    514 U.S. 334 (1995) ................................................................................. 34

*McLeod* v. *Gen. Elec. Co.*,
    87 S. Ct. 5 (1966) ................................................................................. 9, 12

*Meyer* v. *Grant*,
486 U.S. 414 (1988) .................................................................................... 34

*Midland Asphalt Corp.* v. *United States*,
489 U.S. 794 (1989) .................................................................................... 33

*Mississippi* v. *Johnson*,
71 U.S. 475 (1866) .............................................. 11, 13-15, 17-18, 20

*Mistretta* v. *United States*,
488 U.S. 361 (1989) .................................................................................... 22

*Mitchell* v. *Forsyth*,
472 U.S. 511 (1985) .................................................................................... 32

*Monitor Patriot Co.* v. *Roy*,
401 U.S. 265 (1971) .................................................................................... 34

*Morrison* v. *Olson*,
487 U.S. 654 (1988) ............................................................... 11, 25, 31

*Newdow* v. *Roberts*,
603 F.3d 1002 (D.C. Cir. 2010) ............................................ 14, 16, 20

*NFIB* v. *OSHA*,
595 U.S. 109 (2022) .................................................................................... 21

*Nixon* v. *Fitzgerald*,
457 U.S. 731 (1982) ......................... i, 1-2, 6, 11, 15, 20, 22, 26-28

*Nixon* v. *Sirica*,
487 F.2d 700 (D.C. Cir. 1973) ............................................................... 38

*N.L.R.B.* v. *Noel Canning*,
573 U.S. 513 (2014) .................................................................................... 22

*Packingham* v. *North Carolina*,
582 U.S. 98 (2017) ...................................................................................... 35

*Pearson* v. *Callahan*,
555 U.S. 223 (2009) .................................................................................... 32

*P.R. Aqueduct & Sewer Auth.* v. *Metcalf & Eddy, Inc.*,
506 U.S. 139 (1993) .................................................................................... 32

*Printz* v. *United States*,
521 U.S. 898 (1997) .................................................................................... 22

*Public Citizen* v. *U.S. Dep't of Justice*,
   491 U.S. 440 (1989) .................................................................................17

*Red Lion Broad. Co.* v. *F.C.C.*,
   395 U.S. 367 (1969) .................................................................................35

*Republican Party of Minnesota* v. *White*,
   536 U.S. 765 (2002) .................................................................................35

*Seila Law, LLC* v. *CFPB*,
   140 S. Ct. 2183 (2020) ............................................................................21

*Shiffman* v. *Selective Serv. Bd. No.5*,
   88 S. Ct. 1831 (1968) ................................................................................9

*Snyder* v. *Phelps*,
   562 U.S. 443 (2011) .................................................................................34

*Susan B. Anthony List* v. *Driehaus*,
   573 U.S. 149 (2014) .................................................................................34

*Swan* v. *Clinton*,
   100 F.3d 973 (D.C. Cir. 1996) ..................................................14, 19-20

*Times-Picayune Publ'g Corp.* v. *Schulingkamp*,
   419 U.S. 1301 (1974) ..............................................................................8, 12

*Trump* v. *Vance*,
   140 S. Ct. 2412 (2020) ............................................................................30

*United States* v. *Burr*,
   25 F. Cas. 30 (C.C.D.Va. 1807) .............................................................21

*United States* v. *Johnson*,
   383 U.S. 169 (1966) .................................................................................21

*United States* v. *Lee*,
   106 U.S. 196 (1882) .................................................................................20

*United States* v. *Nixon*,
   418 U.S. 683 (1974) ............................................................10, 28, 33, 38

*United States* v. *Philip Morris, Inc.*,
   314 F.3d 612 (D.C. Cir. 2003) ................................................................36

*Va. State Bd. of Pharm.* v. *Va. Citizens Consumer Council, Inc.*,
   425 U.S. 748 (1976) .................................................................................35

*Whalen* v. *Roe*,
    423 U.S. 1313 (1975) ..................................................................8

*White* v. *Florida*,
    458 U.S. 1301 (1982) ...............................................................8, 11

*Youngstown Sheet & Tube Co.* v. *Sawyer*,
    343 U.S. 579 (1952) ..............................................................14, 19

**U.S. Constitution, Statutes, Rules**

18 U.S.C. § 1512(c)(2) ...............................................................4, 18

28 U.S.C. § 1291 ...........................................................................33

D.C. Cir. R. 41(a)(1) .......................................................................8

H. Res.24, 117th Cong. (2021) .......................................................4

Sup. Ct. R. 10(c) .....................................................................2, 9-11

U.S. CONST. art. I, § 3, cl. 7 .........................................i, 16, 20, 28-29

U.S. CONST. art. II, § 1, cl. 1 .......................................................12

**Other Authorities**

3 J. STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES, ch. 37, § 1563
    (1833), https://lonang.com/library/reference/story-commentaries-us-constitution/sto-337/
    ......................................................................................13

Andrew C. McCarthy, *The Wages of Prosecuting Presidents for their Official Acts*, Nat'l
    Review (Dec. 9, 2023), https://www.nationalreview.com/2023/12/the-wages-of-
    prosecuting-presidents-over-their-official-acts/ ..........................23

Andrew McCarthy, *Thoughts on Biden's Funding of Terror-Sponsoring UNRWA and D.C.
    Circuit's Delay on Trump Immunity*, Nat'l Review (Jan. 31, 2024),
    https://www.nationalreview.com/corner/thoughts-on-bidens-funding-of-terror-
    sponsoring-unrwa-and-d-c-circuits-delay-on-trump-immunity/ .......23

Byron York (@ByronYork), X (Dec. 11, 2023),
    https://twitter.com/ByronYork/status/1734305076582244850?s=20 ...............37

Editorial Board, *Jack Smith and the Supreme Court*, Wall St. J. (Dec. 16, 2023) ...............37

Elie Honig, *Why Jack Smith Will Never Say the 'E' Word*, CNN (Dec. 16, 2023), https://www.cnn.com/videos/politics/2023/12/16/smr-honig-on-smith-vs-election-calendar.cnn ................................................................................................37

Francis X. Clines and Steven Lee Myers, *Attack on Iraq; The Overview; Impeachment Vote in House Delayed As Clinton Launches Iraq Air Strike, Citing Military Need to Move Swiftly*, N.Y. Times (Dec. 17, 1998), https://www.nytimes.com/1998/12/17/world/attack-iraq-overview-impeachment-vote-house-delayed-clinton-launches-iraq-air.html ..........23

Gary L. Gregg II, *George W. Bush: Foreign Affairs*, UVA Miller Center, https://millercenter.org/president/-gwbush/foreign-affairs ...............................................22

Jason Willick, *Politics Are Now Clearly Shaping Jack Smith's Trump Prosecution*, Wash. Post (Dec. 12, 2023), https://www.washingtonpost.com/opinions/2023/12/12/special-counsel-jack-smith-politicized-prosecution/ .....................................................................37

Jason Willick, *The Eyebrow-Raising Line in the Trump Immunity Opinion*, Wash. Post (Feb. 7, 2024), https://www.washingtonpost.com/opinions/2024/02/07/trump-immunity-decision-disclaimer/ ...................................................................................................23

Jessie Kratz, *The 1824 Presidential Election and the "Corrupt Bargain"*, National Archives (Oct. 22, 2020), https://prologue.blogs.archives.gov/2020/10/22/the-1824-presidential-election-and-the-corrupt-bargain/ ...................................................................................22

Spencer Ackerman, *US Cited Controversial Law in Decision to Kill American Citizen by Drone*, The Guardian (June 23, 2014), https://www.theguardian.com/world/2014/jun/23/us-justification-drone-killing-american-citizen-awlaki .....................................................................................................................23

The Editors, *Alien and Sedition Acts*, History (June 21, 2023), https://www.history.com/topics/early-us/alien-and-sedition-acts ......................................24

The Editors, *Hamas Was Right Under Unrwa's Nose*, Wall St. J. (Feb. 11, 2024), https://www.wsj.com/articles/hamas-was-right-under-unrwas-nose-tunnels-gaza-israel-war-f715d219?mod=opinion_lead_pos2 ...........................................................................24

The Editors, *Indian Treaties and the Removal Act of 1830*, Office of the Historian, U.S. Department of State, https://history.state.gov/milestones/1830-1860/indian-treaties ....24

The Editors, *Iran-Contra Scandal Begins with Shredded Documents*, History (Nov. 13, 2009), https://www.history.com/this-day-in-history/oliver-north-starts-feeding-documents-into-the-shredding-machine...........................................................................23

The Editors, *Mexican-American War*, Encyclopaedia Britannica (Jan. 2, 2024), https://www.britannica.com/event/Mexican-American-War/Invasion-and-war ...............24

THE FEDERALIST NO. 47 .........................................................................................................29

THE FEDERALIST NO. 65 ...................................................................................30

THE FEDERALIST NO. 69 ...................................................................................30

THE FEDERALIST NO. 77 ...................................................................................30

Tim Arango, *Ex-Prosecutor's Book Accuses Bush of Murder*, N.Y. Times (July 7, 2008),
    https://www.nytimes.com/2008/07/07/business/media/07bugliosi.html ...........................22

U.S. Dep't of Justice, Justice Manual § 9-27.260 (2018) ........................................37

U.S. Dep't of Justice, Justice Manual § 9-85.500 (2018) ........................................37

U.S. Dep't of Justice Memorandum, Doc. 28 in *Missouri* v. *Biden*, No. 4:21-cv-00287-AGF
    (E.D. Mo. filed June 4, 2021) ................................................................14

U.S. Dep't of Justice, Reply Brief for Pet'r, *In re Trump*, No. 18-2486 (4th Cir. filed Feb. 21,
    2019)....................................................................................14, 18

*World Media Troubled by Clinton's Timing in Airstrikes*, CNN (Dec. 18, 1998),
    http://edition.cnn.com/WORLD/meast/9812/18/iraq.press/...............................23

*Yogi Berra Museum & Learning Center*, "Yogi-isms," https://yogiberramuseum.org/about-
    yogi/yogisms/ ...............................................................................1

## INTRODUCTION

This application is "déjà vu all over again." *Yogi Berra Museum & Learning Center*, "Yogi-isms," https://yogiberramuseum.org/about-yogi/yogisms/.  Two months ago, after the district court denied President Trump's claim of Presidential immunity in this criminal case, the Special Counsel filed a petition for certiorari before judgment asking this Court to undertake an extraordinary departure from ordinary appellate procedures and decide the vital and historic question of Presidential immunity on a hyper-accelerated basis.  This Court correctly chose to follow standard judicial process and declined to do so.  Now, at the Special Counsel's urging, a panel of the D.C. Circuit has, in an extraordinarily fast manner, issued a decision on President Trump's claim of immunity and ordered the mandate returned to the district court to proceed with President Trump's criminal trial in four business days, unless this Court intervenes (as it should).  App'x 58A.  This Court should stay the D.C. Circuit's mandate to forestall, once again, an unprecedented and unacceptable departure from ordinary appellate procedures and allow President Trump's claim of immunity to be decided in the ordinary course of justice.

The reasons to do so are compelling.  President Trump's claim that Presidents have absolute immunity from criminal prosecution for their official acts presents a novel, complex, and momentous question that warrants careful consideration on appeal.  The panel opinion below, like the district court, concludes that Presidential immunity from prosecution for official acts does not exist *at all*.  This is a stunning breach of precedent and historical norms.  In 234 years of American history, no President was ever prosecuted for his official acts.  Nor should they be.  Presidents "must make the most sensitive and far-reaching decisions entrusted to any official under our constitutional system." *Fitzgerald*, 457 U.S. at 752.  Their decisions are the most politically controversial of any official, and they draw the most national attention and political ire, making "the President … an easily identifiable target"

1

for politically motivated prosecution. *Id.* at 753. If the prosecution of a President is upheld, such prosecutions will recur and become increasingly common, ushering in destructive cycles of recrimination. Criminal prosecution, with its greater stigma and more severe penalties, imposes a far greater "personal vulnerability" on the President than any civil penalty. *Id.* The threat of future criminal prosecution by a politically opposed Administration will overshadow every future President's official acts—especially the most politically controversial decisions. The President's political opponents will seek to influence and control his or her decisions via effective extortion or blackmail with the threat, explicit or implicit, of indictment by a future, hostile Administration, for acts that do not warrant any such prosecution. This threat will hang like a millstone around every future President's neck, distorting Presidential decisionmaking, undermining the President's independence, and clouding the President's ability "'to deal fearlessly and impartially with' the duties of his office." *Id.* at 752. Without immunity from criminal prosecution, the Presidency as we know it will cease to exist.

President Trump's application easily satisfies this Court's traditional factors for granting a stay of the mandate pending en banc review and review on certiorari by this Court.

*First*, the likelihood that this Court will grant certiorari in the future is extremely strong. As the Special Counsel emphatically stated in December, "[i]t is of imperative public importance that [President Trump's] claims of immunity be resolved by this Court," and "only this Court can definitively resolve them." Pet. for Cert. Before Judgment, *United States* v. *Trump*, No. 23-624 (U.S. filed Dec. 11, 2023), at 2, 3 ("Pet. in No. 23-624"). President Trump's claim presents "a quintessential example of 'an important question of federal law that has not been, but should be, settled by this Court.'" *Id.* at 12 (quoting Sup. Ct. R. 10(c)).

*Second*, there is far more than a "fair prospect" that this Court will reverse the decision below. The panel opinion misapprehends and contradicts the original understanding of the Executive Vesting Clause and the separation of powers, as interpreted in an unbroken line of legal and historical precedent going back to *Marbury* v. *Madison*, 5 U.S. (1 Cranch) 137 (1803). Chief Justice Marshall thought it self-evident that Article III courts cannot sit in judgment directly over the President's official acts, which "can never be examinable by the courts." *Id.* at 166. Because "the courts" cannot "examin[e]," *id.*, the President's official acts, they cannot enter a criminal judgment against him and imprison him on the basis of those official acts. Yet the D.C. Circuit's judgment seemingly authorizes the district court to conduct a criminal trial of President Trump based on his official acts before this Court concludes its review of this momentous question—thus subjecting the Presidency to the most intrusive possible "examin[ation] by the courts," *id.*, and inflicting one of the gravest wounds to the separation of powers in our Nation's history.

*Third*, absent a stay from this Court, irreparable injury to President Trump is inevitable. It is axiomatic that President Trump's claim of immunity is an entitlement *not to stand trial at all*, and to avoid the burdens of litigation pending review of his claim. Yet the D.C. Circuit's judgment appears to authorize the district court to resume criminal proceedings *immediately*, and to conduct President Trump's criminal trial while his claim is pending before this Court—and there is strong indication that the district court will do so. In addition, President Trump is the leading candidate for President in the 2024 election. Conducting a months-long criminal trial of President Trump at the height of election season will radically disrupt President Trump's ability to campaign against President Biden—which appears to be the whole point of the Special Counsel's persistent demands for expedition. The D.C. Circuit's order thus threatens immediate irreparable injury to the First Amendment

interests of President Trump and tens of millions of American voters, who are entitled to hear President Trump's campaign message as they decide how to cast their ballots in November.

This Court should stay the D.C. Circuit's mandate pending resolution of President Trump's petition for certiorari in this Court and subsequent proceedings on the merits. As additional relief, President Trump also requests that this Court stay the D.C. Circuit's mandate pending the resolution of a petition for en banc consideration in that court, before the filing (if necessary) of his petition for certiorari in this Court.

**STATEMENT**

## I.    President Trump Was Indicted for His Official Acts as President.

On August 1, 2023, President Trump was indicted on four counts—including two counts alleging violations of 18 U.S.C. § 1512(c)(2)[1]—for his alleged conduct following the outcome of the 2020 Presidential election. D. Ct. Doc. 1. All the conduct alleged in the indictment occurred between November 2020 and early January 2021, while President Trump was still President. D. Ct. Doc. 1. President Trump was impeached for much of the same conduct charged in the indictment on January 11, 2021, and acquitted by the U.S. Senate on February 13, 2021. *See* H. Res.24, 117th Cong. (2021). The indictment charges President Trump with five types of conduct, all constituting official acts of the President.

First, it alleges that President Trump, using official channels of communication, made a series of tweets and other public statements on matters of paramount federal concern, contending that the 2020 federal election was tainted by fraud and irregularities that should be addressed by government officials. D. Ct. Doc. 1, ¶¶ 2, 11-12, 19, 32-34, 37, 41-42, 46, 52,

---

[1] This is the same statutory section whose interpretation is at issue in *Fischer* v. *United States*, No. 23-5572 (cert. granted Dec. 13, 2023), which is pending before this Court and may bear directly upon the validity of those charges against President Trump.

99, 102, 104 (alleging public statements regarding the federal election and state and federal officials' exercise of their official responsibilities with respect to the election); *id.* ¶¶ 22, 28, 44, 50, 87-88, 90(c), 96(a)-(c), 100(a)-(b), 111, 114 (alleging tweets about the same topics).

Second, the indictment alleges that President Trump communicated with the Acting Attorney General and officials at the U.S. Department of Justice—which he oversaw as an integral part of his official duties as chief executive—about investigating suspected election crimes and irregularities, and possibly appointing a new Acting Attorney General. *Id.* ¶¶ 10(c), 27, 29, 36, 45, 51, 70-85. These include allegations of a series of communications urging the Acting Attorney General and Acting Deputy Attorney General to investigate widespread reports of election fraud, *id.* ¶¶ 29, 36, 45, 51; and allegations of deliberations during Oval Office meetings about whether to replace the Acting Attorney General, a Cabinet-level officer constitutionally appointed by the President, *id.* ¶¶ 74, 77, 84.

Third, the indictment alleges that President Trump communicated with state officials about the administration of the federal election and urged them to exercise their official responsibilities in accordance with the conclusion that the 2020 presidential election was tainted by fraud and irregularities. *Id.* ¶¶ 10(a), 15-18, 21, 24, 26, 31, 35, 38-39, 43.

Fourth, the indictment alleges that President Trump communicated with the Vice President in his capacity as President of the Senate, the Vice President's official staff, and other members of Congress to urge them to exercise their official duties in the election certification process in accordance with President Trump's contention that the election was tainted by fraud and irregularities. *Id.* ¶¶ 10(d), 86-95, 97, 101, 122 (Vice President and his official staff); *id.* ¶¶ 115, 119(b)-(c) (attempts to communicate with Members of Congress).

Fifth, the indictment alleges that other individuals organized slates of alternate electors from seven States to ensure that the Vice President would be authorized to exercise

his official duties in the manner urged by President Trump.  *Id.* ¶¶ 53-69.  According to the indictment, these alternate slates of electors were designed to validate the Vice President's authority to conduct his official duties as President Trump urged.  *Id.* ¶¶ 10(b), 53.

## II.    The Lower Courts Incorrectly Deny President Trump's Immunity Claims.

President Trump filed motions to dismiss the indictment on multiple grounds.  As relevant here, President Trump contended that (1) the indictment must be dismissed because it brings criminal charges against him based on his official acts as President, and is thus barred by absolute Presidential immunity from criminal prosecution for official acts, D. Ct. Doc. 74; and (2) the indictment must be dismissed under the Impeachment Judgment Clause and principles of double jeopardy because it charges President Trump with conduct for which he was impeached and acquitted by the U.S. Senate, D. Ct. Doc. 113.

On December 7, 2023, the district court ruled against President Trump's claims.  Pet. App'x in No. 23-624, at 1a-59a.  The district court held that Presidential immunity from criminal prosecution for official acts does not exist in any circumstance.  *Id.* at 7a.  It held that a federal prosecutor may bring criminal charges against a former President based on conduct for which he was acquitted during an impeachment proceeding.  *Id.* at 46a.

The district court did not assess whether President Trump's alleged actions fell within the "outer perimeter of his official responsibility," *Fitzgerald*, 457 U.S. at 755 (quotation marks omitted), or were official acts on any basis. D. Ct. Doc. 171, at 30.  Instead, the district court held that Presidential immunity from prosecution for official acts does not exist at all. *Id*.  For the same reason, the district court did not conduct factfinding on this subject or give President Trump an opportunity to present facts regarding the official nature of his conduct prior to a potential trial.  *See Blassingame* v. *Trump*, 87 F.4th 1, 5 (D.C. Cir. 2023).

President Trump timely appealed the district court's judgment to the D.C. Circuit. The district court stayed proceedings in the district court pending the outcome of the appeal. D. Ct. Doc. 186, at 2 (quoting *Blassingame*, 87 F.4th at 29).

On December 11, 2023, the Special Counsel filed a petition for certiorari before judgment and a motion to expedite in this Court, seeking this Court's immediate review of President Trump's claims on an extraordinarily expedited basis. Pet. in No. 23-624, at 2. On December 22, 2023, this Court denied the request. Dec. 22, 2023, Order in No. 23-624.

The Special Counsel was, however, able to convince a panel of the D.C. Circuit to hear President Trump's claims on an extremely accelerated basis, giving President Trump just ten days to draft and file his opening brief, only three days to file his reply brief, and setting the case for oral argument one week later, on January 9, 2024. C.A. Doc. 2031419, 2032082. In his brief to the D.C. Circuit, President Trump requested, "[i]f the Court affirms the district court in any respect, … that the Court stay the issuance of its mandate pending further review, including possible en banc proceedings and/or Supreme Court review." C.A. App. Br. 55. The Special Counsel, by contrast, "request[ed] the Court to issue the mandate five days after the entry of judgment," citing (as it had done to this Court) the supposed, but nonexistent, "imperative public importance of a prompt resolution of this case." C.A. Resp. Br. 65-66.

On February 6, 2024, the D.C. Circuit panel issued a per curiam opinion ruling against President Trump's immunity claims, providing an analysis that overlooks and mischaracterizes many of President Trump's major arguments. App'x 1A-57A. On the same day, the D.C. Circuit entered a judgment directing the clerk to issue the mandate to the district court in four business days if President Trump did not file an application in this Court to stay the mandate in that time. *Id.* at 58A. The D.C. Circuit's judgment directs the Clerk to issue the mandate after February 12, 2024, unless President Trump "notifies the Clerk in

writing that he has filed an application with the Supreme Court for a stay of the mandate pending the filing of a petition for a writ of certiorari," in which case "the Clerk is directed to withhold issuance of the mandate pending the Supreme Court's final disposition of the application." *Id.* The D.C. Circuit further directed that "[t]he filing of a petition for rehearing or rehearing en banc will not result in any withholding of the mandate." *Id.*

This order departs from the D.C. Circuit's ordinary procedures, which provide, consistent with Federal Rule of Appellate Procedure 41(b), that "the court ordinarily will include as part of its disposition an instruction that the clerk withhold issuance of the mandate until 7 days after the expiration of the time for filing a petition for rehearing or a petition for rehearing en banc and, if such petition is timely filed, until 7 days after disposition thereof." D.C. Cir. R. 41(a)(1).

On February 12, 2024, as required by the D.C. Circuit's judgment, President Trump filed this application to stay the D.C. Circuit's mandate pending disposition of his petition for certiorari. President Trump also asks this Court to stay the D.C. Circuit's mandate pending resolution of his planned petition for en banc consideration in that court.

## ARGUMENT

"The standards for granting a stay of mandate pending disposition of a petition for certiorari are well established." *White* v. *Florida*, 458 U.S. 1301, 1302 (1982) (Powell, J., in chambers). "[1] There must be a reasonable probability that four members of the Court would consider the underlying issue sufficiently meritorious for the grant of certiorari or the notation of probable jurisdiction; [2] there must be a significant possibility of reversal of the lower court's decision; and [3] there must be a likelihood that irreparable harm will result if that decision is not stayed." *Id.* (quoting *Times-Picayune Publ'g Corp.* v. *Schulingkamp*, 419 U.S. 1301, 1305 (1974) (Powell, J., in chambers)); *accord Karcher* v. *Daggett*, 455 U.S. 1303 (1982) (Brennan, J., in chambers); *Whalen* v. *Roe*, 423 U.S. 1313, 1316-17 (1975) (Marshall,

8

J., in chambers). In addition, "in a close case it may be appropriate to 'balance the equities'—to explore the relative harms to applicant and respondent, as well as the interests of the public at large." *Karcher*, 455 U.S. at 1305–06.

Further, a stay is more likely warranted where, as here, "[t]he underlying issue in th[e] case … has not heretofore been passed upon by this Court and is of continuing importance." *McLeod* v. *Gen. Elec. Co.*, 87 S. Ct. 5, 6 (1966) (Harlan, J.). Thus, "the existence of an important question not previously passed on by this Court" is a factor that weighs in favor of a stay. *Shiffman* v. *Selective Serv. Bd. No.5*, 88 S. Ct. 1831, 1832 n.3 (1968) (Douglas, J., dissenting); *Certain Named and Unnamed Non-Citizen Children and Their Parents* v. *Texas*, 448 U.S. 1327, 1332 (1980) (Powell, J., in chambers) (holding that a case that "presents novel and important issues" warrants a stay). Where the appeal "raises a difficult question of constitutional significance" that "also involves a pressing national problem," a stay is warranted. *Texas*, 448 U.S. at 1331.

Here, each of these traditional factors counsels in favor of granting the stay.

## I.    There Is a Reasonable Probability That This Court Will Grant Certiorari.

The appeal addresses two issues: whether the President possesses absolute immunity from criminal prosecution for his official acts, and whether the impeachment and acquittal of a President forecloses a subsequent criminal prosecution of the President for the same and/or closely related conduct. The Court is likely to grant a petition for certiorari to review these questions. Certiorari is warranted when "a United States court of appeals has decided an important question of federal law that has not been, but should be, settled by this Court, or has decided an important federal question in a way that conflicts with relevant decisions of this Court." Sup. Ct. R. 10(c). Both criteria are satisfied here.

### A.    The Case Raises Important Questions of Federal Law.

First, this case involves "important question[s] of federal law that ha[ve] not been, but should be, settled by this Court." *Id.* As the Special Counsel advised this Court on December 11, 2023, "[t]his case presents a fundamental question at the heart of our democracy: whether a former President is absolutely immune from federal prosecution" for his official acts. Pet. for Cert. Before Judgment, *United States* v. *Trump*, No. 23-624 (U.S. filed Dec. 11, 2023), at 2 ("Pet. in No. 23-624"). "This case involves a paradigmatic issue of imperative public importance: the amenability to criminal prosecution of a former President of the United States for [official] conduct undertaken during his presidency." *Id.* at 10. President Trump's claim of absolute immunity from criminal prosecution for a President's official acts "is a quintessential example of 'an important question of federal law that has not been, but should be, settled by this Court.'" *Id.* at 12 (quoting Sup. Ct. R. 10(c)).

As the Special Counsel urged, "[i]t is of imperative public importance that [President Trump's] claims of immunity be resolved by this Court," *id.* at 2, and "only this Court can definitively resolve them," *id.* at 3. "[T]his Court" should "grant review" and "resolve the important immunity question presented here." *Id.* at 10. "It requires no extended discussion to confirm that this case … is at the apex of public importance." *Id.* at 10. "The public importance of the issues presented" in this case "merit this Court's intervention." *Id.* at 12 (quoting *United States* v. *Nixon*, 418 U.S. 683, 687 (1974)).

On this point, the parties agree. "An erroneous denial of a claim of presidential immunity from criminal prosecution unquestionably warrants this Court's review." Br. in Opposition in No. 23-624 (U.S. filed Dec. 20, 2023), at 3 ("BIO in No. 23-624").

The public importance of Presidential immunity cannot be overstated. As stated above, an absence of criminal immunity for official acts threatens the very ability of the President to function properly. Any decision by the President on a politically controversial

10

question would face the threat of indictment by the opposing party after a change in administrations. All presidential decisions would be exposed to undue, wrongful pressure from opposing political forces, under a threat of indictment after the President has left office. The D.C. Circuit's denial of immunity thus threatens every future President with both attempts of *de facto* extortion and blackmail while in office, and years of post-office trauma at the hands of his or her political opponents. The threat of prosecution will become a political cudgel used to influence the most sensitive and important Presidential decisions with the menace of personal vulnerability after leaving office. The D.C. Circuit's categorical denial of immunity would forever undermine the independence, authority, and decisiveness of the Presidency. The more consequential the decision, the more likely that political opponents will use the threat of wrongful criminal prosecution to bully and extort the President, gravely weakening the independence of the Presidency, and thus our country as a whole. Cycles of recrimination are inevitable, thrusting the most sensitive and vital Presidential decisions in the Nation's future into a "context" that will be "acrid with the smell of threatened" criminal prosecution. *Morrison* v. *Olson*, 487 U.S. 654, 702 (1988) (Scalia, J., dissenting). All this directly contradicts the Founders' careful design, as discussed below.

### B.    The D.C. Circuit's Opinion Conflicts With Decisions of This Court.

The D.C. Circuit's decision also warrants review because it decided important federal questions "in a way that conflicts with relevant decisions of this Court." Sup. Ct. R. 10(c). As discussed below, *infra* Part II, the D.C. Circuit's decision conflicts with *Marbury* v. *Madison*, *Mississippi* v. *Johnson*, *Nixon* v. *Fitzgerald*, and a host of other decisions of this Court.

### II.    There Is a Significant Possibility of Reversal.

The second factor considers whether there is "a significant possibility of reversal of the lower court's decision." *White*, 458 U.S. at 1302. A "fair prospect of reversal" suffices. *Karcher*, 455 U.S. at 1306. The factor is satisfied when "[t]he issues underlying this case are

important and difficult," and it does not require "anticipating [the Court's] views on the merits." *Times-Picayune Publ'g*, 419 U.S. at 1309. A stay is appropriate if "petitioner's position … cannot be deemed insubstantial," *McLeod*, 87 S. Ct. at 6, and the Court need not "think it more probable than not that" reversal will occur, *Texas*, 448 U.S. at 1332.

Here, the D.C. Circuit's opinion mischaracterizes this Court's case law and commits a series of fundamental errors. A full accounting of these errors must await merits briefing, but President Trump highlights a series of independently sufficient bases for reversal here.

### A. The Executive Vesting Clause and *Marbury* v. *Madison*.

First, the panel opinion's analysis of the Executive Vesting Clause and *Marbury* v. *Madison*, 5 U.S. (1 Cranch) 137 (1803), is profoundly wrong.

The Executive Vesting Clause provides that "[t]he executive Power shall be vested in a President of the United States of America." U.S. CONST. art. II, § 1, cl. 1. For another branch to arrogate the "executive Power" to itself, or to purport to dictate how the President must exercise that authority, is a core violation of the separation of powers. As a direct corollary, the Clause provides that the Judicial Branch cannot sit in judgment directly over the President's official acts, and that any attempt to do so violates the separation of powers.

In *Marbury* v. *Madison*, Chief Justice Marshall described this doctrine as foundational and self-evident. "By the constitution of the United States, the President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character, and to his own conscience." 5 U.S. at 165–66. When it comes to the President's official acts, "whatever opinion may be entertained of the manner in which executive discretion may be used, still there exists, and can exist, no power to control that discretion." *Id.* at 166. "[N]othing can be more perfectly clear than that" the President's discretionary "acts are only politically examinable." *Id.*

"Questions … which are, by the constitution and laws, submitted to the executive, can never be made in this court." *Id.* at 170.  The President's official acts, therefore, "*can never be examinable by the courts*." *Id.* at 166 (emphasis added).

Consistent with this opinion, an unbroken tradition from *Marbury* to the present holds that Article III courts lack authority to sit in judgment directly over a President's official acts.  In 1833, citing *Marbury*, Justice Story wrote that "[i]n the exercise of his political powers [the President] is to use his own discretion, and is accountable only to his country, and to his own conscience.  His decision, in relation to these powers, is subject to no control; and his discretion, when exercised, is conclusive."  3 J. STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES, ch. 37, § 1563 (1833), https://lonang.com/library/reference/story-commentaries-us-constitution/sto-337/.

In *Mississippi* v. *Johnson*, this Court, citing *Marbury*, held that Article III courts lack jurisdiction to enter an injunction directly against the President in the exercise of his official duties.  71 U.S. 475, 499 (1866).  "An attempt on the part of the judicial department of the government to enforce the performance of such duties by the President might be justly characterized, in the language of Chief Justice Marshall, as 'an absurd and excessive extravagance.'"  *Id.* (quoting *Marbury*, 5 U.S. at 170).  "[T]his court has no jurisdiction of a bill to enjoin the President in the performance of his official duties."  *Id.* at 501.

In 1948, this Court wrote that "whatever of this order emanates from the President is not susceptible of review by the Judicial Department."  *Chi. & S. Air Lines* v. *Waterman S.S. Corp.*, 333 U.S. 103, 112 (1948).  The Judicial Branch cannot "require [the President] to exercise the 'executive Power' in a judicially prescribed fashion."  *Franklin* v. *Massachusetts*, 505 U.S. 788, 826 (1992) (Scalia, J., concurring in part and concurring in the judgment).  "It

13

is incompatible with his constitutional position that [the President] be compelled personally to defend his executive actions before a court." *Id.* at 827.

Thus, Article III courts lack jurisdiction to enter an injunction directly against the President in the exercise of his official responsibility, and no court has ever entered a declaratory judgment against the President in his official acts. The D.C. Circuit observed that "in *Franklin*, … [t]he plurality opinion of the Court concluded that 'in general, this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties,' and a majority of the Justices in fact subscribed to this position." *Swan* v. *Clinton*, 100 F.3d 973, 977 (D.C. Cir. 1996) (quoting *Franklin*, 505 U.S. at 802-03). "With regard to the President, courts do not have jurisdiction to enjoin him, and have never submitted the President to declaratory relief." *Newdow* v. *Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010). This is also the consistent litigation position of the U.S. Department of Justice, which oversees the Special Counsel. *See, e.g.,* U.S. Dep't of Justice, Reply Brief for Pet'r, *In re Trump*, No. 18-2486 (4th Cir. filed Feb. 21, 2019), at 4-6 (invoking "the separation-of-powers principle that 'courts have no jurisdiction of a bill to enjoin the President in the performance of his official duties'") (quoting *Mississippi*, 71 U.S. at 501) (cleaned up); U.S. Dep't of Justice Memorandum, Doc. 28 in *Missouri* v. *Biden*, No. 4:21-cv-00287-AGF (E.D. Mo. filed June 4, 2021) (same).

"Since *Mississippi*, the federal courts have continued this practice *without exception* and have not sustained a single injunction against the President in his official capacity." *In re Trump*, 958 F.3d 274, 297–98 (4th Cir. 2020), *cert. granted, judgment vacated sub nom. Trump* v. *D.C.*, 141 S. Ct. 1262 (2021) (Wilkinson, J., dissenting) (italics in original).

To be sure, Article III courts sometimes review the validity of the official acts of *subordinate* executive officials below the President, *see, e.g., Youngstown Sheet & Tube Co.* v.

*Sawyer*, 343 U.S. 579 (1952), and such review may reflect *indirectly* on the lawfulness of the President's own acts or directives. But the authority of judicial review of the official acts of subordinate officers has never been held to extend to the official acts of the *President himself*. Rather, there is an "'unbroken historical tradition ... implicit in the separation of powers' that a President may not be ordered by the Judiciary to perform particular Executive acts." *Clinton* v. *Jones*, 520 U.S. 681, 719 (1997) (Breyer, J., concurring) (quoting *Franklin*, 505 U.S. at 827 (Scalia, J., concurring in part and concurring in the judgment)).

These two lines of precedent—that courts may not sit in judgment over a President's official acts, but they may review the validity of the acts of, and enjoin, *subordinate* executive officials—both originate in the decisions of Chief Justice Marshall and have coexisted in harmony for over two centuries. The distinction they reflect is not one of mere formalism. "*Youngstown* … underscores the constitutional necessity of the judiciary separating the President, as chief executive, from his subordinate officers within the executive branch." *In re Trump*, 958 F.3d at 301 (Wilkinson, J., dissenting). "This distinction, in fact, makes all the difference…. First, more formally, when a federal court enjoins the conduct of a subordinate executive officer, it may frustrate the President's will in a specific instance, but it does not seize the very reins of the executive branch by exercising control over 'the executive department' itself." *Id.* (quoting *Mississippi*, 71 U.S. at 500). "Second, more functionally, the President is 'entrusted with supervisory and policy responsibilities of utmost discretion and sensitivity,' and how he decides to allocate his energies and attentions in an official capacity is itself owed constitutional protection." *Id.* (quoting *Fitzgerald*, 457 U.S. at 750). "By contrast, when the judiciary enjoins subordinate executive officers, … the level of intrusion into the executive branch's fluid operation is far less severe." *Id.*

15

Accordingly, the Executive Vesting Clause and the separation of powers prevent Article III courts from sitting in judgment directly over the President's official acts. Under this principle, no Article III court has jurisdiction to enter an injunction against the President, and no court has even ventured to enter a *declaratory judgment* against the President opining on the validity of his official acts. *Newdow*, 603 F.3d at 1013. *A fortiori*, the authority asserted by the lower courts here—to put a President on trial, enter a criminal judgment against him, and punish him with imprisonment or other criminal penalties, all for his *official acts*—constitutes a core violation of the separation of powers. *Cf. Martin* v. *Mott*, 25 U.S. (12 Wheat.) 19, 32-33 (1827) (Story, J.) (holding that, "[w]hen the President exercises an authority confided to him by law," his official conduct cannot "be passed upon by a jury" or "upon the proofs submitted to a jury"). Accordingly, the Impeachment Judgment Clause explicitly presupposes that, absent impeachment and conviction by the U.S. Senate, a President cannot be prosecuted for his official acts. U.S. CONST. art. I, § 3, cl.7.

The D.C. Circuit's opinion offers a series of arguments to distinguish *Marbury* and the subsequent line of authority. None is convincing.

First, the opinion notes that "*Marbury* distinguished between two kinds of official acts: discretionary and ministerial." App'x 21A. It admits that the President's "discretionary acts … 'can never be examinable by the courts.'" *Id.* (quoting *Marbury*, 5 U.S. at 166). But it likens the President's alleged duty to comply with each and every federal criminal law—a duty that no court has ever upheld—to a "ministerial" duty of a subordinate official that admits of no discretion. *Id.* at 22A (holding that "*Marbury* thus makes clear that Article III courts may review certain kinds of official acts — including those that are legal in nature");

16

*see also id.* at 25A (holding that "actions" that "allegedly violated generally applicable criminal laws[2] … were not properly within the scope of his lawful discretion").

This characterization of a "ministerial" duty under *Marbury* as any duty that is "legal in nature," *id.*, cannot be squared with *Marbury* itself. What renders a duty "ministerial" is not whether it is "legal in nature," *id.*, but whether it admits of any *discretion* (which is why "ministerial" duties are distinguished from "discretionary" acts, *id.*). A "ministerial act" is one—like the delivery of an already-signed commission—where there is "a precise course accurately marked out by law, [which] is to be strictly pursued." *Marbury*, 5 U.S. at 158. A ministerial duty arises when the legislature "direct[s]" an official "peremptorily to perform certain acts." *Id.* at 166. By contrast, in any case "in which the executive possesses a constitutional or legal discretion," *id.*, the official act is not ministerial. As the Court held in *Mississippi*, "[a] ministerial duty" is "a simple, definite duty" in "which nothing is left to discretion." 71 U.S. at 498. If there is any "exercise of judgment" involved, the duty is not ministerial. *Id.* at 499. Even the panel opinion admits that a "ministerial" duty is one "in which 'nothing [i]s left to discretion.'" App'x 23A (quoting *Mississippi*, 71 U.S. at 498).

---

[2] The D.C. Circuit's unsupported assumption that all "generally applicable criminal laws" apply to the President in his official acts cannot be squared with *Franklin*, which held that "[w]e would require an express statement by Congress before assuming it intended to subject the President's performance of his statutory duties to be reviewed for abuse of discretion." *Franklin*, 505 U.S. at 801; *see also Public Citizen* v. *U.S. Dep't of Justice*, 491 U.S. 440, 466 (1989) ("[W]e are loath to conclude that Congress intended to press ahead into dangerous constitutional thickets in the absence of firm evidence that it courted those perils."). This Court requires an "express statement" before it will construe even a *civil* statute to grant judicial review over the President's official acts, yet the D.C. Circuit assumes that *every* "generally applicable" federal criminal statute must be construed to cover the President in the exercise of his official responsibilities. Contrary to this assumption, statutes providing for judicial review of a President's official acts present, at very least, "dangerous constitutional thickets" and grave "perils," requiring an extremely clear statement of Congress's intent to cover the President. *Public Citizen*, 491 U.S. at 466.

Here, even a moment's reflection demonstrates that avoiding violations of federal criminal law involves the "exercise of judgment," *Mississippi*, 71 U.S. at 499, and of "executive discretion." *Marbury*, 5 U.S. at 166. A statute that imposes a "ministerial" duty is one that commands a specific, *affirmative* course of conduct that admits of no discretion in its execution. Criminal statutes do not command specific, affirmative courses of action; rather, they *prohibit* certain specified conduct, leaving those covered with a wide range of discretion in how to conduct themselves in compliance with such prohibitions. Given a prohibition in a criminal statute, a covered individual has a virtually infinite array of options on structuring his or her conduct to avoid violating the statute—thus rendering compliance "discretionary" within the meaning of *Marbury* and its progeny.

In fact, the government itself has contended that complying with a constitutional prohibition, the Emoluments Clause, is obviously not ministerial because it "requires ample 'exercise of judgment'." *In re Trump*, Reply Brief, at 5. This point is indisputable:

> [O]nce an official responsibility involves the 'exercise of judgment,' it is a non-ministerial official duty. That describes compliance with the Emoluments Clauses…. [C]ompliance in practice is not a "simple, definite" endeavor; rather, it involves seemingly innumerable judgment calls about how a President must organize his financial interests, sequester his real assets, or restructure his holdings. To put a finer point on it, compare these sorts of choices with what was required in the quintessential example of a ministerial duty: the delivery of the commission in *Marbury* v. *Madison*. There, *Marbury*'s commission had been signed and sealed, but not delivered. The Secretary of State was required by law to just hand over the parchment, a function that required no judgment and where nothing was left to discretion. Such a rote errand is different in kind from the sort of discretionary conduct at issue here.

*In re Trump*, 958 F.3d at 299–300 (Wilkinson, J., dissenting). Likewise, "compliance in practice" with federal criminal statutes "is not a 'simple, definite' endeavor," *id.*—especially the vague, broadly phrased statutes charged in the indictment here, such as 18 U.S.C. § 1512(c)(2).

Moreover, the government contends that these statutes purport to impose duties on the President as he exercises his official responsibilities in overseeing the affairs of the Department of Justice, deliberating about Cabinet-level appointments, communicating with members of Congress and state officials about matters of enormous federal concern, communicating with the public on matters of public concern through official government channels, etc.—all of which are obviously *discretionary*, not "ministerial," responsibilities, for which the President possesses discretion on how to carry out those duties and responsibilities. Indeed, virtually all the President's official responsibilities involve the exercise of discretion, which is perhaps why the federal courts "have … never attempted to exercise power to order the President to perform a ministerial duty." *Swan*, 100 F.3d at 978.

Second, the panel opinion reasons that "[t]he cases following *Marbury* confirm that we may review the President's actions when he is bound by law, including by federal criminal statutes." App'x 22A. But all the cases cited in the opinion do not involve review of "the President's actions," *id.*, but review of the actions of *subordinate* federal officials or others implementing federal programs, not the President himself. *Id.* at 22A-23A. As the opinion admits, *Little* v. *Barreme*, 6 U.S. (2 Cranch) 170, 177-79 (1804), reviewed the acts of a private ship's captain, not the President, App'x 22A; *Kendall* v. *United States ex rel. Stokes*, 37 U.S. 524, 612-13 (1838), "reviewed the official acts of the Postmaster General, not the President," App'x 22A; and *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U.S. 579 (1952), reviewed the acts of the Secretary of Commerce, not the President, App'x 23A. None of these cases provides any authority for Article III courts to sit in judgment directly over the *President*'s official acts; and none contradicts the still-binding holding of *Marbury* that such acts "can never be examinable by the courts." 5 U.S. at 166.

19

In fact, the opinion concedes that "*Marbury* and its progeny exercised jurisdiction only over subordinate officers, not the President himself," App'x 24A, and that "[t]he writ in *Marbury* was brought against the Secretary of State; in *Little* against a commander of a ship of war; in *Kendall* against the postmaster general; in *Youngstown* against the Secretary of Commerce." *Id.* But the opinion then pivots—in a dizzying *non sequitur*—to assert that "the Supreme Court has unequivocally explained" that "[n]o man in this country is so high that he is above the law." *Id.* (quoting *United States* v. *Lee*, 106 U.S. 196, 220 (1882)).

The D.C. Circuit's reliance on the highly generalized maxim that "no man … is above the law," *id.*, fails to provide a plausible basis for it to disregard *Marbury*, *Mississippi*, or its own precedents in *Swan* and *Newdow*. Those cases, and the separation of powers reflected in Article II, are part of "the law" that binds the courts. In *Fitzgerald*, this Court held that the contention that recognizing absolute Presidential immunity "places the President 'above the law'" is "rhetorically chilling but wholly unjustified." 457 U.S. at 758 n.41. As the panel opinion overlooks, "[t]he remedy of impeachment demonstrates that the President remains accountable under law for his misdeeds in office." *Id.* This is especially true here, where the Impeachment Judgment Clause specifically *authorizes* the criminal prosecution of a President, but only after the crucial structural check of impeachment and conviction. U.S. CONST. art. I, § 3, cl. 7. "It is simply error to characterize an official as 'above the law' because a particular remedy is not available against him." *Fitzgerald*, 457 U.S. at 758 n.41. Indeed, the Constitution—including the Executive Vesting Clause—is the most fundamental "law," and it dictates that Article III courts lack authority to sit in judgment over a President's official acts. *Marbury*, 5 U.S. at 166. "[T]he federal judiciary, no less than the President, is subject to the law. And here the federal judiciary has sorely overstepped its proper bounds."

20

*In re Trump*, 958 F.3d at 291 (Wilkinson, J., dissenting); *see also, e.g., Butz* v. *Economou*, 438 U.S. 478, 506 (1978).

Next, the panel opinion notes that "[t]he President does not enjoy absolute immunity from criminal subpoenas issued by state and federal prosecutors and may be compelled by the courts to respond." App'x 24A (citing *United States* v. *Burr*, 25 F. Cas. 30, 33-34 (C.C.D.Va. 1807)). But compelling the President to provide *information* in response to a criminal subpoena is a far cry from putting him on trial, entering judgment against him, and potentially subjecting him to imprisonment for his official acts. Thus, Chief Justice Marshall, the author of *Burr*, 25 F. Cas. 33-34, wrote just a few years earlier that the President's official acts "can never be examinable by the courts." *Marbury*, 5 U.S. at 166.[3]

## B.    "The Presuppositions of Our Political History."

Below, President Trump argued that "'[p]erhaps the most telling indication of a severe constitutional problem' with this 'wholly unprecedented' prosecution 'is a lack of historical precedent to support it.'" C.A. App.Br. 7 (quoting *Seila Law, LLC* v. *CFPB*, 140 S. Ct. 2183, 2201 (2020)); *see also id.* at 17-18. "The unbroken tradition of not exercising the supposed formidable power of criminally prosecuting a President for official acts—despite ample motive and opportunity to do so, over centuries—implies that the power does not exist." *Id.* at 18 (citing, *inter alia*, *NFIB* v. *OSHA*, 595 U.S. 109, 119 (2022) (per curiam); *Free Enter. Fund* v. *Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 505 (2010)). "[T]he longstanding

---

[3] The panel opinion's discussion of legislative and judicial immunity, App'x 25A-30A, misapprehends this Court's case law, but also overlooks a fundamental point. At common law, immunity from criminal prosecution was more fundamental to the doctrine of official immunity than immunity from civil liability. As this Court has recognized, "the privilege" of legislative immunity "was not born primarily of a desire to avoid private suits …, but rather to prevent intimidation by the executive and accountability before a possibly hostile judiciary." *United States* v. *Johnson*, 383 U.S. 169, 180–81 (1966). Preventing "the instigation of *criminal charges* against critical or disfavored legislators" was the "chief fear" that led to the recognition of legislative immunity. *Id.* at 182 (emphasis added).

'practice of the government,' can inform our determination of 'what the law is.'" *N.L.R.B.* v. *Noel Canning*, 573 U.S. 513, 525 (2014) (quoting *McCulloch* v. *Maryland*, 17 U.S. 316, 401 (1819), and *Marbury*, 5 U.S. at 177). "That principle is neither new nor controversial," and this Court's "cases have continually confirmed [this] view." *Id.* (citing *Mistretta* v. *United States*, 488 U.S. 361, 401 (1989), and eight other cases from 1803 to 1981). Consulting "the presuppositions of our political history," C.A. App.Br. 17 (quoting *Fitzgerald*, 457 U.S. at 749), President Trump argued that this 234-year-long, unbroken "constitutional practice ... tends to negate the existence of the … power asserted here." *Id.* at 18 (quoting *Printz* v. *United States*, 521 U.S. 898, 918 (1997)).

The opinion below overlooks this argument. It cites *Seila Law* only for the proposition that the President is "elected by the entire Nation," App'x 39A, and it does not cite or discuss *NFIB*, *Free Enterprise Fund*, *Printz*, or similar cases. It also declines to grapple with President Trump's long series of real-world, historical examples of former Presidents accused of criminal behavior through their official acts—none of whom, in 234 years, ever faced prosecution, despite ample political motive and practical opportunity to charge them.

"American history abounds with examples of Presidents who were accused by political opponents of committing crimes through their official acts." C.A. App.Br. 17. "These include, among many others, John Quincy Adams' alleged 'corrupt bargain' in appointing Henry Clay as Secretary of State;[4] President George W. Bush's allegedly false claim to Congress that Saddam Hussein possessed stockpiles of 'weapons of mass destruction,' which led to war in which thousands were killed;[5] and President Obama's alleged authorization of a drone strike

---

[4] *See, e.g.,* Jessie Kratz, *The 1824 Presidential Election and the "Corrupt Bargain"*, National Archives (Oct. 22, 2020), https://prologue.blogs.archives.gov/2020/10/22/the-1824-presidential-election-and-the-corrupt-bargain/.

[5] See, e.g., Gary L. Gregg II, *George W. Bush: Foreign Affairs*, UVA Miller Center, https://millercenter.org/president/-gwbush/foreign-affairs; Tim Arango, *Ex-Prosecutor's Book*

that targeted and killed a U.S. citizen abroad (and his teenage son, also a U.S. citizen).[6]" *Id.* They also include, among many other examples, President Reagan's alleged involvement in the Iran-Contra scandal,[7] President Clinton's last-minute pardon of fugitive financier Marc Rich,[8] President Clinton's repeated use of airstrikes in the Middle East in August and November 1998 in an alleged attempt to distract attention from the Monica Lewinsky scandal,[9] President Biden's egregious mismanagement of the United States' border security, and President Biden's alleged "material support for terrorism" through the funding of the UNRWA despite its documented history of direct support for terrorism.[10] From the earliest

---

*Accuses    Bush    of    Murder*,    N.Y.    Times    (July    7,    2008), https://www.nytimes.com/2008/07/07/business/media/07bugliosi.html.

[6] *See, e.g.*, Spencer Ackerman, *US Cited Controversial Law in Decision to Kill American Citizen    by    Drone*,    The    Guardian    (June    23,    2014), https://www.theguardian.com/world/2014/jun/23/us-justification-drone-killing-american-citizen-awlaki.

[7] The Editors, *Iran-Contra Scandal Begins with Shredded Documents*, History (Nov. 13, 2009),    https://www.history.com/this-day-in-history/oliver-north-starts-feeding-documents-into-the-shredding-machine.

[8] Andrew C. McCarthy, *The Wages of Prosecuting Presidents for their Official Acts*, Nat'l Review (Dec. 9, 2023), https://www.nationalreview.com/2023/12/the-wages-of-prosecuting-presidents-over-their-official-acts/ (reporting first-hand that "[i]n 2001 … the Justice Department considered criminal charges against former president Clinton, and even a theory that Hillary Clinton may have conspired with him, in connection with his final-day corrupt pardons," by which federal prosecutors were "righteously appalled," but "the Bush Justice Department would not cross that Rubicon").

[9] *See, e.g., World Media Troubled by Clinton's Timing in Airstrikes*, CNN (Dec. 18, 1998), http://edition.cnn.com/WORLD/meast/9812/18/iraq.press/; Francis X. Clines and Steven Lee Myers, *Attack on Iraq; The Overview; Impeachment Vote in House Delayed As Clinton Launches Iraq Air Strike, Citing Military Need to Move Swiftly*, N.Y. Times (Dec. 17, 1998), https://www.nytimes.com/1998/12/17/world/attack-iraq-overview-impeachment-vote-house-delayed-clinton-launches-iraq-air.html.

[10] *See, e.g., Jason Willick, The Eyebrow-Raising Line in the Trump Immunity Opinion*, Wash. Post (Feb. 7, 2024), https://www.washingtonpost.com/opinions/2024/02/07/trump-immunity-decision-disclaimer/; Andrew McCarthy, *Thoughts on Biden's Funding of Terror-Sponsoring UNRWA and D.C. Circuit's Delay on Trump Immunity*, Nat'l Review (Jan. 31, 2024), https://www.nationalreview.com/corner/thoughts-on-bidens-funding-of-terror-sponsoring-unrwa-and-d-c-circuits-delay-on-trump-immunity/ ("When President Biden insisted on restarting funding for UNRWA, to the tune of over $1 billion since 2021, there was abundant, well-known evidence, going back decades, that UNRWA provides material support to terrorism.  It was not just a hypothetical possibility that Biden's funding might end up

days of the Republic until today, American history is littered with examples of allegedly "criminal" behavior by Presidents in their official acts, behavior that was never prosecuted.[11]

The panel opinion ignores the long history of real-world examples of Presidents engaging in actual behavior that political opponents viewed as egregious and "criminal." Instead, keying on the Special Counsel's arguments, the panel fretted about lurid hypotheticals that have never occurred in 234 years of history, almost certainly never will occur, and would virtually certainly result in impeachment and Senate conviction (thus authorizing criminal prosecution) if they *did* occur—such as a hypothetical President corruptly ordering the assassination of political rivals through "SEAL Team Six." D.C. Cir. Oral Arg Tr. 10:19-21. Such hypotheticals provide fodder for histrionic media coverage, but they are a poor substitute for legal and historical analysis. Confronted with *real-world* hypotheticals—such as President Obama's killing of U.S. citizens by drone strike—the Special Counsel conceded below that Presidential immunity from criminal prosecution for official acts likely exists and would apply, directly contradicting the "categorical," App'x 20A, holdings to the contrary of both the appellate panel and the trial court. D.C. Cir. Oral Arg.

---

facilitating Hamas's operations. There were notorious cases over the years of UNRWA terror support."); The Editors, *Hamas Was Right Under Unrwa's Nose*, Wall St. J. (Feb. 11, 2024), https://www.wsj.com/articles/hamas-was-right-under-unrwas-nose-tunnels-gaza-israel-war-f715d219?mod=opinion_lead_pos2 ("Israel has provided evidence that 12 Unrwa employees took part in the Oct. 7 massacre, and that 1,200 are affiliated with or members of Hamas and Islamic Jihad.").

[11] Similar examples pervade American history—consider, for example, President Adams' jailing of political opponents under the Alien and Sedition Acts, *see* The Editors, *Alien and Sedition Acts*, History (June 21, 2023), https://www.history.com/topics/early-us/alien-and-sedition-acts; President Jackson's treatment of the Cherokee and other tribes in defiance of this Court's rulings, *see* The Editors, *Indian Treaties and the Removal Act of 1830*, Office of the Historian, U.S. Department of State, https://history.state.gov/milestones/1830-1860/indian-treaties; and President Polk's allegedly false statement to Congress that Mexico had "invaded our territory and shed American blood on American soil" at the outbreak of Mexican-American War, which then-Congressman Abraham Lincoln challenged through the famous "Spot Resolutions," The Editors, *Mexican-American War*, Encyclopaedia Britannica (Jan. 2, 2024), https://www.britannica.com/event/Mexican-American-War/Invasion-and-war.

Tr. 49:18-22 (Special Counsel admitting that a "drone strike" where "civilians were killed ... might be the kind of place in which the Court would properly recognize some kind of immunity"). Further, the logical presupposition of such speculative hypotheticals—*i.e.*, that the Founders supposedly *must have* intended that no alleged Presidential misdeed could ever escape prosecution—is plainly incorrect and contradicts the basic premises of a system of separated powers. "While the separation of powers may prevent us from righting every wrong, it does so in order to ensure that we do not lose liberty." *Morrison*, 487 U.S. at 710 (Scalia, J., dissenting).

Thus, when the panel *did* get around to addressing actual history, App'x 35A-37A, it drew precisely the wrong conclusions. The panel somehow proposed that there is no reason to fear "a torrent of politically motivated prosecutions" in the future, because "this is the first time since the Founding that a former President has been federally indicted," and so the prosecution of President Trump is sure to be a historical one-off. App'x 35A. This reasoning is unpersuasive to followers of recent American political history. For example, "[i]n the 209 years from 1789 to 1998, there was one impeachment of a President—Andrew Johnson in 1868." BIO in No. 23-624, at 33. "In the last 25 years, there have been three, with a fourth currently under consideration by the U.S. House of Representatives." *Id.* "Presidential impeachment is changing from virtually unthinkable to a fixture of interbranch politics." *Id.* Moreover, "impeachment faces formidable structural checks—it must be voted by a majority of the House, with a supermajority of the Senate required to convict. Criminal prosecution, by contrast, requires only the action of a single enterprising prosecutor and a compliant grand jury." *Id.*

For all these reasons, the "presuppositions of our political history" decisively favor the recognition of Presidential immunity from criminal prosecution for acts within the "outer perimeter of the President's official responsibilities." *Fitzgerald*, 457 U.S. at 745, 756.

## C.    The Likelihood of Chilling Presidential Action.

In *Fitzgerald*, this Court held that the threat of future *civil* liability for official acts—including years after the President left office—could deter the President from the "bold and unhesitating action" required for his official responsibilities. 457 U.S. at 745. In so holding, "[t]his Court … weighed concerns of public policy, especially as illuminated by our history and the structure of our government." *Id.* at 747–48. The Court emphasized that "[t]he President occupies a unique position in the constitutional scheme," *id.* at 749, and is "entrusted with supervisory and policy responsibilities of utmost discretion and sensitivity," *id.* at 750. "Because of the singular importance of the President's duties, diversion of his energies by concern with private lawsuits would raise unique risks to the effective functioning of government." *Id.* at 751. "[T]here exists the greatest public interest in providing" the President with "'the maximum ability to deal fearlessly and impartially with' the duties of his office." *Id.* at 752 (quoting *Ferri* v. *Ackerman*, 444 U.S. 193, 203 (1979)). "This concern is compelling where" the President "must make the most sensitive and far-reaching decisions entrusted to any official under our constitutional system." *Id.* "Nor can the sheer prominence of the President's office be ignored." *Id.* at 752–53. "[T]he President would be an easily identifiable target" for politically motivated litigation. *Id.* at 753. "Cognizance of this personal vulnerability frequently could distract a President from his public duties, to the detriment of not only the President and his office but also the Nation that the Presidency was designed to serve." *Id.*

All the same concerns apply to the threat of *criminal prosecution* of a President for his official acts—in fact, those concerns are dramatically enhanced. The President's "personal vulnerability," *id.*, to criminal prosecution, with its greater stigma and far more severe penalties, provides a much graver deterrent to "bold and unhesitating action" in making "the most sensitive and far-reaching decisions entrusted to any official under our constitutional system." *Id.* at 745, 752. The panel opinion disagrees, dismissing such concerns as unfounded. App'x 32A-35A. Its analysis is unpersuasive.

First, the panel opinion begins by drawing a comparison between the exercise of the President's "unique" responsibilities and the deliberations of ordinary citizens called to serve as federal jurors. *Id.* (citing *Clark* v. *United States*, 289 U.S. 1, 16 (1933)). The opinion reasons that "[w]e cannot presume that a President will be unduly cowed by the prospect of post-Presidency criminal liability any more than a juror would be influenced by the prospect of post-deliberation criminal liability…." App'x 32A-33A. This analogy falls short. Though undoubtedly exercising an important function, a juror in a federal case does not "occup[y]" anything like the President's "unique position in the constitutional scheme," *Fitzgerald*, 457 U.S. at 749, and is not "entrusted with supervisory and policy responsibilities of utmost discretion and sensitivity" on a scale anything like the Presidency, *id.* at 750. "The singular importance of [a federal juror's] duties" does not entail that "diversion of his energies by concern with [personal liability] would raise unique risks to the effective functioning of government." *Id.* at 751. A federal juror does not "make the most sensitive and far-reaching decisions entrusted to any official under our constitutional system." *Id.* at 752. "Nor" does a federal juror sit in a position whose "sheer prominence" cannot "be ignored." *Id.* at 752–53. A federal juror would not "be an easily identifiable target" for politically motivated prosecution. *Id.* at 753. "Cognizance of this personal vulnerability" is unlikely to "distract a

[federal juror] from his public duties, to the detriment of not only the [juror] and his office but also the Nation that the [juror] was designed to serve." *Id.*

The per curiam opinion also relies on an analogy with the executive staffers in *United States* v. *Nixon*, 418 U.S. 683 (1974). App'x 32A-33A. That reasoning is likewise unconvincing, for at least two reasons. First, *Nixon* addressed the potential deterrence to candid advice from the requirement of providing *information* in response to a criminal subpoena, *see* App'x 32A-33A, not the far more chilling threat of "personal vulnerability" to prosecution, conviction, and imprisonment. Second, *Fitzgerald* and other cases correctly reject the analogy between the President, who occupies "a unique position in the constitutional scheme," 457 U.S. at 749, and lower-level executive officials such as aides, staff, and even Cabinet officers. "The President's unique status under the Constitution distinguishes him from other executive officials." *Id.* at 750. The Court has thus "long recognized" that "the scope of Presidential immunity from judicial process differs significantly from that of Cabinet or inferior officers." *Franklin*, 505 U.S. at 826 (Scalia, J., concurring in part and concurring in judgment).

Next, the D.C. Circuit's opinion reasons that "past Presidents have understood themselves to be subject to impeachment and criminal liability, at least under certain circumstances, so the possibility of chilling executive action is already in effect," because "criminal prosecution of a former President is expressly authorized by the Impeachment Judgment Clause after impeachment and conviction." App'x 33A. This argument ignores the enormous significance of the structural check that the Constitution places between a President and criminal prosecution for his official acts—*i.e.*, the requirement of impeachment and conviction by the U.S. Senate. U.S. CONST. art. I, § 3, cl.7.

The Founders were steeped in classical history and understood that politically motivated prosecutions had corroded democratic and republican governments in ancient Athens and Rome. They were thus explicitly concerned about the destructive effect on the new Republic of such politically motivated prosecutions—*i.e.*, what James Madison described as the "new fangled and artificial treasons, [which] have been the great engines, by which violent factions, the natural offspring of free governments, have usually wreaked their alternate malignity on each other." THE FEDERALIST NO. 47 (Madison). Accordingly, the Founders exercised care when they consciously departed from the British common-law practice of treating the Chief Executive as absolutely immune in all circumstances. They crafted a carefully balanced approach that authorizes the criminal prosecution of a President, but only *after* both Houses of Congress—reflecting the widespread political consensus required for a two-thirds majority vote of the Senate—support the President's removal from office for high crimes and misdemeanors. U.S. CONST. art. I, § 3, cl.7.

Contrary to the lower court's ahistorical analysis, this was the common understanding of the Founders—that criminal prosecution of a President could only occur if the President was impeached and *convicted* by the U.S. Senate. *Id.* This understanding matches the views of both Chief Justice Marshall and Attorney General Charles Lee (Attorney General under Presidents George Washington and John Adams), as expressed in *Marbury* v. *Madison*, 5 U.S. at 149, 165-66, and the understanding of Justice Story reflected both in his Commentaries and in his opinion in *Martin*, 25 U.S. at 32-33.

This was also the clear and unambiguous understanding of Alexander Hamilton. The per curiam opinion states that "President Trump turns to one sentence written by Alexander Hamilton in the Federalist 69," App'x 46A, but its math is off. Hamilton wrote, not once, but three times in three different essays, that the President may be subject to criminal prosecution only *after* he is impeached and convicted by the Senate, and as a "*consequence*"

of that conviction. "The President of the United States would be liable to be impeached, tried, and, upon conviction of treason, bribery, or other high crimes or misdemeanors, removed from office; and would *afterwards* be liable to prosecution and punishment in the ordinary course of law." THE FEDERALIST NO. 69 (Hamilton). "The punishment which may be *the consequence* of conviction upon impeachment, is not to terminate the chastisement of the offender. *After* having been sentenced to a perpetual ostracism from the esteem and confidence, and honors and emoluments of his country, he will still be liable to prosecution and punishment in the ordinary course of law." THE FEDERALIST NO. 65 (Hamilton). The President is "at all times liable to impeachment, trial, dismission from office, incapacity to serve in any other, and to forfeiture of life and estate by *subsequent* prosecution in the common course of law." THE FEDERALIST NO. 77 (Hamilton) (all emphases added). As Hamilton explains, criminal prosecution of a President can arise only "after," "subsequent" to, "afterwards," and as a "*consequence*" of "conviction upon impeachment." *Id.* (emphasis added). "The plain implication" of this Clause "is that criminal prosecution, like removal from the Presidency and disqualification from other offices, is a consequence that can come about only after the Senate's judgment, not during or prior to the Senate trial." *Trump* v. *Vance*, 140 S. Ct. 2412, 2444 (2020) (Alito, J., dissenting). "This was how Hamilton explained the impeachment provisions in the Federalist Papers. He wrote that a President may 'be impeached, tried, and, upon conviction ... would afterwards be liable to prosecution and punishment in the ordinary course of law.'" *Id.* (quoting THE FEDERALIST NO. 69).

The opinion below errs by disregarding this formidable, carefully crafted structural check against the criminal prosecution of Presidents for their official acts. Conviction upon impeachment requires both a majority vote of the House to impeach, and two-thirds majority vote of the U.S. Senate to convict—which together require a widespread political consensus of elected representatives across the political spectrum and across the Nation's geographic

regions. Criminal prosecution, by contrast, requires only a single enterprising prosecutor and a compliant grand jury drawn from a tiny slice of America, which may be—and, if the prosecutor is clever enough, probably will be—located in an enclave of deep political hostility to the President. Therefore, criminal prosecution which can only occur after impeachment and conviction plainly does not present the same "chilling effect," App'x 33A, as prosecution unhindered by any structural check—as in this case, where President Trump was acquitted by the Senate but then wrongfully prosecuted by his political opponent for the same conduct.

Finally, for the reasons discussed above, the D.C. Circuit's overall assessment that "the risk of criminal liability chilling Presidential action appears to be low," App'x 34A, cannot be squared with our recent political history. Impeachment of Presidents, once virtually unheard-of, is becoming a routine feature of interbranch conflict. Once the political Rubicon is crossed, criminal prosecution of Presidents by their political opponents will become common, and the *threat* of such prosecution will become ubiquitous, hanging over every President like a sword of Damocles. Instead of acting fearlessly, every President will be forced to ponder, before taking any official act—especially the most politically controversial decisions—whether the decision may lead to his or her prosecution, conviction, and imprisonment once the administration changes. Enterprising political opponents, aware of this, will wield the threat of prosecution as a powerful and menacing tool to influence Presidents' official actions. The judgment below thus "deeply wounds the President" by forever undermining his or her independence. *Morrison*, 487 U.S. at 713 (Scalia, J., dissenting).

## III.    There Is a Likelihood of Irreparable Harm Absent the Stay.

The third factor considers whether the applicant "would … suffer irreparable harm were the stay not granted." *Karcher*, 455 U.S. at 1306. Here, the threat of irreparable injury if the D.C. Circuit's mandate is not stayed is clear and manifest.

31

### A.    Absent a Stay, President Trump Will Immediately Be Required to Bear the Burdens of Prosecution and Trial.

Absolute immunity is "an entitlement not to stand trial or face the other burdens of litigation…. The entitlement is an immunity from suit rather than a mere defense to liability; and like an absolute immunity, *it is effectively lost if a case is erroneously permitted to go to trial*." *Mitchell* v. *Forsyth*, 472 U.S. 511, 526 (1985) (emphasis added). Absolute immunity's protection is "not limited to liability for money damages," but "also include[s] 'the general costs of subjecting officials to the risks of trial—distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service.'" *Id.* (quoting *Harlow* v. *Fitzgerald*, 457 U.S. 800, 816 (1982)). Under absolute immunity, "even such pretrial matters as discovery are to be avoided if possible, as '[i]nquiries of this kind can be peculiarly disruptive of effective government.'" *Id.* (quoting *Harlow*, 457 U.S. at 817); *see also Pearson* v. *Callahan*, 555 U.S. 223, 231-32 (2009) (reaffirming that official immunity is "an immunity from suit rather than a mere defense to liability" that "is effectively lost if a case is erroneously permitted to go to trial"); *Ashcroft* v. *Iqbal*, 556 U.S. 662, 672 (2009); *Behrens* v. *Pelletier*, 516 U.S. 299, 308 (1996); *P.R. Aqueduct & Sewer Auth.* v. *Metcalf & Eddy, Inc.*, 506 U.S. 139, 143-44 (1993).

The same is true of President Trump's claim based on principles of double jeopardy under the Impeachment Judgment Clause. *See, e.g., Helstoski* v. *Meanor*, 442 U.S. 500, 507-08 (1979) (double jeopardy protects defendants "not only from the consequences of litigation's results but also from the burden of defending themselves") (quotation omitted); *Abney* v. *United States*, 431 U.S. 651, 661 (1977) (double jeopardy "assures an individual that, among other things, he will not be forced, with certain exceptions, to endure the personal strain, public embarrassment, and expense of a [second] criminal trial"); *accord Digital Equip. Corp.* v. *Desktop Direct, Inc.*, 511 U.S. 863, 869-71 (1994) (summarizing cases holding that double-

jeopardy and immunity defenses involve an "entitlement not to stand trial or face the other burdens of litigation").

In fact, the opinion below strongly endorses this conclusion. In holding that there is appellate jurisdiction over this interlocutory appeal under 28 U.S.C. § 1291, the opinion emphasizes that "[i]t would be … 'unseemly' for us to require that former President Trump first be tried in order to secure review of his immunity claim after final judgment." App'x 14A (quoting *Nixon*, 418 U.S. at 691-92). "[T]he 'deprivation of the right not to be tried' would be 'effectively unreviewable on appeal from a final judgment.'" *Id.* at 15 (quoting *Midland Asphalt Corp.* v. *United States*, 489 U.S. 794, 800–01 (1989)). "[T]he right not to stand trial must be 'vindicated before trial' or not at all." *Id.* These statements cannot be squared with the panel's decision to dramatically *accelerate* its issuance of the mandate—thus immediately launching criminal proceedings and trial in the district court—before the completion of ordinary appellate review, especially this Court's review. App'x 58A.

**B.    Conducting the Criminal Trial of President Trump Will Inflict Grave First Amendment Injuries on American Voters.**

The D.C. Circuit's extraordinary decision to return the mandate to the district court to proceed to trial imposes another grave species of irreparable injury—the threat to the First Amendment rights of President Trump, his supporters and volunteers, and all American voters, who are entitled to hear from the leading candidate for President at the height of the Presidential campaign. The Special Counsel seeks urgently to force President Trump into a months-long criminal trial at the height of campaign season, effectively sidelining him and preventing him from campaigning against the current President to whom the Special Counsel ultimately reports, President Biden. This would impose grave First Amendment injuries on President Trump and all American voters, whether they support him or not, and threatens to tarnish the federal courts with the appearance of partisanship.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod* v. *Burns*, 427 U.S. 347, 373 (1976). Here, President Trump is the leading candidate for President of the United States and the greatest electoral threat to President Biden, whose administration is prosecuting him. Conducting a months-long criminal trial of the leading opponent of the current regime in the middle of a Presidential campaign will inevitably disrupt President Trump's ability to campaign against President Biden, stifling his voice and preventing American voters from hearing from the leading candidate.

The speech of a Presidential candidate campaigning for President stands at the pinnacle of First Amendment protection. "Speech on matters of public concern is at the heart of the First Amendment's protection. That is because speech concerning public affairs is more than self-expression; it is the essence of self-government." *Snyder* v. *Phelps*, 562 U.S. 443, 451-52 (2011) (cleaned up) (citing numerous cases). "No form of speech is entitled to greater constitutional protection" than "[c]ore political speech." *McIntyre* v. *Ohio Elec. Comm'n*, 514 U.S. 334, 347 (1995). Likewise, the First Amendment's "constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Susan B. Anthony List* v. *Driehaus*, 573 U.S. 149, 162 (2014) (quoting *Monitor Patriot Co.* v. *Roy*, 401 U.S. 265, 272 (1971)). Campaign speech lies "at the core of our electoral process of the First Amendment freedoms—an area … where protection of robust discussion is at its zenith." *Meyer* v. *Grant*, 486 U.S. 414, 425 (1988) (citations and quotations omitted).

This First Amendment protection extends, first and foremost, to the American voters who would hear and consider President Trump's campaign speech as they reflect on how to cast their ballots in November. The First Amendment's "protection afforded is to the

communication, to its source and to its recipients both." *Va. State Bd. of Pharm.* v. *Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976) (citing many cases); *see also Packingham* v. *North Carolina*, 582 U.S. 98, 104 (2017) (recognizing the right to "speak and listen, and then … speak and listen once more," as a "fundamental principle of the First Amendment"); *Red Lion Broad. Co.* v. *F.C.C.*, 395 U.S. 367, 390 (1969). "[T]he right to receive ideas follows ineluctably from the sender's First Amendment right to send them." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26* v. *Pico*, 457 U.S. 853, 867 (1982). A *de facto* restriction on President Trump's campaign speech—such as that caused by a months-long criminal trial at the height of campaign season—inflicts a "reciprocal" injury on the hundreds of millions of Americans who listen to him. *Va. State Bd. of Pharm.*, 425 U.S. at 757.

This Court has "never allowed the government to prohibit candidates from communicating relevant information to voters during an election." *Republican Party of Minnesota* v. *White*, 536 U.S. 765, 781-82 (2002). Permitting the Biden administration to put its leading political opponent on trial in the middle of the campaign for President would do just that—effectively stifling President Trump's campaign speech for months on end with the election date less than nine months away.

## IV. The Balancing of Equities Strongly Favors a Stay.

Since this is not a "close case," the Court need not "balance the equities." *Karcher*, 455 U.S. at 1305-06. But if it does, the equities strongly favor a stay of the mandate. As detailed above, the considerations counseling in favor of a stay are overwhelming. They include preserving this Court's jurisdiction to hear this appeal in an orderly fashion, protecting the 234-year tradition against prosecuting Presidents for their official acts, preventing all Presidents from being effectively blackmailed and extorted by their political opponents with threat of wrongful prosecution for their official acts, preventing the manifest

irreparable injury of forcing President Trump to undergo criminal trial before his claim of immunity is adjudicated, and violating the First Amendment rights of all American voters to hear from the leading candidate at the height of a Presidential campaign.

Against these compelling interests, in the court below, the Special Counsel cited only one consideration supposedly justifying the immediate return of the mandate to the district court: "the imperative public importance of a prompt resolution of this case."  C.A. Resp.Br. at 65.  The Special Counsel cited the same vaguely defined interest in "prompt resolution" of this case in its Petition for Certiorari Before Judgment, which this Court denied.  As noted in President Trump's Brief in Opposition, the Special Counsel conflates the supposed "public" interest, *id.*, with the manifestly *partisan* interest of the Special Counsel's ultimate boss, President Biden, in conducting President Trump's criminal trial while he is campaigning against President Biden himself.

In the Court of Appeals, as here, the Special Counsel never explains *why* it is so "imperative" that this case proceed to trial immediately, forestalling ordinary en banc review and even this Court's review procedures.  The prospect that an interlocutory appeal of an immunity question might affect a pending trial date is commonplace and routine. "Especially in cases of extraordinary public moment, the individual may be required to submit to delay not immoderate in extent and not oppressive in its consequences if the public welfare or convenience will thereby be promoted."  *Landis* v. *N. Am. Co.*, 299 U.S. 248, 256 (1936).  "A mere assertion of delay does not constitute substantial harm.  Some delay would be occasioned by almost all interlocutory appeals."  *United States* v. *Philip Morris, Inc.*, 314 F.3d 612, 622 (D.C. Cir. 2003), *jurisdictional ruling overruled by Mohawk Indus., Inc.* v. *Carpenter*, 558 U.S. 100 (2009).

"The Special Counsel's request, therefore, cannot avoid the appearance of partisanship."  BIO in No. 23-624, at 22.  "This Court is 'not required to exhibit a naiveté

from which ordinary citizens are free.'" *Id.* (quoting *Dep't of Com.* v. *New York*, 139 S. Ct. 2551, 2575 (2019)). The Special Counsel's prior request to circumvent ordinary appellate review caused "commentators from across the political spectrum [to] observe[] that its evident motivation is to schedule the trial before the 2024 presidential election—a nakedly political motive." *Id.* (citing Elie Honig, *Why Jack Smith Will Never Say the 'E' Word*, CNN (Dec. 16, 2023), https://www.cnn.com/videos/politics/2023/12/16/smr-honig-on-smith-vs-election-calendar.cnn; Editorial Board, *Jack Smith and the Supreme Court*, Wall St. J. (Dec. 16, 2023); Jason Willick, *Politics Are Now Clearly Shaping Jack Smith's Trump Prosecution*, Wash. Post (Dec. 12, 2023), https://www.washingtonpost.com/opinions/2023/12/12/special-counsel-jack-smith-politicized-prosecution/; and Byron York (@ByronYork), X (Dec. 11, 2023), https://twitter.com/ByronYork/status/1734305076582244850?s=20).

"The Special Counsel thus confuses the public interest with a partisan interest of his superior, President Biden." *Id.* at 22. "The Special Counsel's politicization of the trial schedule" also "departs from the best traditions of the U.S. Department of Justice," which "call for prosecutors to *avoid* the appearance of election interference in the prosecution of political candidates." *Id.* at 23 (citing U.S. Dep't of Justice, Justice Manual §§ 9-27.260, 9-85.500 (2018); https://www.justice.gov/jm/jm-9-27000-principles-federal-prosecution#9-27.260). "The Special Counsel's extraordinary petition creates a strong appearance of a significant departure from those rules and aspirations." *Id.* at 24.

"Even worse, the Special Counsel's request threatens to tarnish" the Court of Appeals' "procedures with the same appearance of partisanship." *Id.* at 24 (citing Editorial Board, *Jack Smith and the Supreme Court*, Wall St. J. (Dec. 16, 2023)). "The Special Counsel urge[d]" the lower court "to jettison venerable principles of prudence, leapfrog the ordinary process of appellate review, and rush headlong to decide one of the most novel, complex, and

momentous legal issues in American history." *Id.* at 25. "In doing so, the Special Counsel seeks to embroil" both the Court of Appeals and "this Court in a partisan rush to judgment on some of the most historic and sensitive questions that the Court may ever decide." *Id.* The Court should issue a stay of the D.C. Circuit's mandate to put an end to these ill-conceived efforts to circumvent the ordinary processes of appellate review.

* * *

"'Haste makes waste' is an old adage. It has survived because it is right so often." *Kusay* v. *United States*, 62 F.3d 192, 195 (7th Cir. 1995). The Court should stay the D.C. Circuit's mandate pending resolution of a petition for certiorari, and if review is granted, resolution of this case on the merits by this Court.

As additional relief, in issuing its stay, President Trump requests that this Court direct that the D.C. Circuit's mandate is stayed pending the resolution, not just of proceedings in this Court, but also of President Trump's planned petition for en banc consideration in the D.C. Circuit, which he intends to file in the D.C. Circuit in the ordinary course before seeking (if necessary) this Court's review, if given the opportunity to do so. As noted in President Trump's Brief in Opposition in No. 23-624, en banc consideration by the lower courts provides an important part of the percolation that this Court ordinarily prefers before reviewing petitions for certiorari. For example, in *United States* v. *Nixon*, this Court had the benefit of the multiple thoughtful opinions produced by the D.C. Circuit's en banc consideration of *Nixon* v. *Sirica*, which addressed the same executive privilege asserted against a grand-jury subpoena the year before. 487 F.2d 700, 700-22 (D.C. Cir. 1973) (en banc) (cited in *Nixon*, 418 U.S. at 689, 708 & n.17); *id.* at 729 (MacKinnon, J., concurring in part and dissenting in part); *id.* at 762 (Wilkey, J., dissenting). Allowing President Trump to pursue en banc review in the D.C. Circuit will provide an opportunity for similar thoughtful consideration in the lower court before this Court addresses the novel, complex,

and momentous issues at stake in this appeal. *See Belk* v. *Charlotte-Mecklenburg Bd. of Educ.*, 211 F.3d 853, 854-55 (4th Cir. 2000) (Wilkinson, C.J., concurring in the denial of initial hearing en banc).

## CONCLUSION

This Court should stay the D.C. Circuit's mandate pending resolution of President Trump's petition for certiorari in this Court. As additional relief, President Trump requests that this Court stay the D.C. Circuit's mandate pending the resolution of a petition for en banc consideration in that court, before the filing (if necessary) of his petition for certiorari in this Court.

February 12, 2024

LAURO & SINGER
John F. Lauro
Gregory M. Singer
400 N. Tampa St., 15th Fl.
Tampa, FL 33602
(813) 222-8990
jlauro@laurosinger.com

BLANCHE LAW
Todd Blanche
Emil Bove
99 Wall St., Suite 4460
New York, NY 10005
(212) 716-1250
toddblanche@blanchelaw.com

Respectfully submitted,

JAMES OTIS LAW GROUP, LLC

*/s/ D. John Sauer*
D. John Sauer
  *Counsel of Record*
William O. Scharf
Michael E. Talent
Kenneth C. Capps
13321 N. Outer Forty Rd., Suite 300
St. Louis, Missouri 63017
(314) 562-0031
John.Sauer@james-otis.com

*Attorneys for President Donald J. Trump*

## APPENDIX

Per Curiam Opinion of the United States Court of Appeals for the District of Columbia
Circuit (February 6, 2024) ................................................................................ 1A

Per Curiam Judgment and Order of the United States Court of Appeals for the District of
Columbia Circuit (February 6, 2024) ............................................................. 58A

1A

# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 9, 2024      Decided February 6, 2024

No. 23-3228

UNITED STATES OF AMERICA,
APPELLEE

v.

DONALD J. TRUMP,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:23-cr-00257-1)

———

*D. John Sauer* argued the cause for appellant.  With him on the briefs were *John F. Lauro*, *Gregory M. Singer*, *Emil Bove*, *William O. Scharf*, and *Michael E. Talent*.

*Paul M. Dorsey*, pro se, was on the brief for *amicus curiae* Paul M. Dorsey in support of appellant.

*Victor Williams*, pro se, was on the brief for *amicus curiae* Law Professor Victor Williams in support of appellant.

*James I. Pearce*, Assistant Special Counsel, U.S. Department of Justice, argued the cause for appellee.  With him on the brief were *J. P. Cooney*, Deputy Special Counsel,

2

*Michael R. Dreeben* and *Raymond N. Hulser*, Counselors to the Special Counsel, *John M. Pellettieri* and *Cecil W. VanDevender*, Assistant Special Counsels, and *Molly Gaston* and *Thomas P. Windom*, Senior Assistant Special Counsels.

*Richard D. Bernstein* was on the brief for *amici curiae* Former Officials in Five Republican Administrations, et al. in support of appellee.

*Fred Wertheimer*, *Matthew A. Seligman*, *Seth P. Waxman*, *Colleen M. Campbell*, *Nathaniel W. Reisinger*, *David M. Levine*, and *Kyle T. Edwards* were on the brief for *amici curiae* Former Government Officials and Constitutional Lawyers in support of appellee.

*R. Stanton Jones* and *Andrew T. Tutt* were on the brief for *amicus curiae* American Oversight in support of dismissal for lack of jurisdiction.

*Gene C. Schaerr* and *Justin A. Miller* were on the brief for *amici curiae* Former Attorney General Edwin Meese III and Law Professors Steven G. Calabresi and Gary S. Lawson in support of neither party.

Before: HENDERSON, CHILDS and PAN, *Circuit Judges*.

Opinion for the Court filed PER CURIAM.

PER CURIAM:  Donald J. Trump was elected the 45th President of the United States on November 8, 2016.  He was sworn into office at noon on January 20, 2017, and served until his term expired at noon on January 20, 2021.  At that moment, President Trump became former President Trump and his successor, Joseph R. Biden, became President and began his own four-year term.  U.S. CONST. art. II, § 1.  Although this

3

sequence is set by the Constitution, *id.* amend. XX, it did not proceed peacefully. Indeed, from election day 2020 forward, the government alleges that President Trump denied that he had lost his bid for a second term and challenged the election results through litigation, pressure on state and federal officers, the organization of an alternate slate of electors and other means. His alleged interference in the constitutionally prescribed sequence culminated with a Washington, D.C., rally held on January 6, 2021, the day set by the Electoral Count Act, 3 U.S.C. § 15(a), for the Congress to meet in joint session to certify the election results. The rally headlined by President Trump resulted in a march of thousands to the Capitol and the violent breach of the Capitol Building. The breach delayed the congressional proceedings for several hours and it was not until the early morning of January 7th that the 2020 presidential election results were certified, naming Joseph R. Biden as the soon-to-be 46th President.

Since then, hundreds of people who breached the Capitol on January 6, 2021, have been prosecuted and imprisoned. And on August 1, 2023, in Washington, D.C., former President Trump was charged in a four-count Indictment as a result of his actions challenging the election results and interfering with the sequence set forth in the Constitution for the transfer of power from one President to the next. Former President Trump moved to dismiss the Indictment and the district court denied his motion. Today, we affirm the denial. For the purpose of this criminal case, former President Trump has become citizen Trump, with all of the defenses of any other criminal defendant. But any executive immunity that may have protected him while he served as President no longer protects him against this prosecution.

4

## I. BACKGROUND

Former President Trump did not concede the 2020 election and, in the ensuing months, he and his supporters made numerous attempts to challenge the results. Many of their attempts were allegedly criminal.[1] A District of Columbia federal grand jury indicted former President Trump on four criminal counts arising from the steps he allegedly took to change the outcome of the election: (1) conspiracy to defraud the United States by overturning the election results, in violation of 18 U.S.C. § 371; (2) conspiracy to obstruct an official proceeding — *i.e.*, the Congress's certification of the electoral vote — in violation of 18 U.S.C. § 1512(k); (3) obstruction of, and attempt to obstruct, the certification of the electoral vote, in violation of 18 U.S.C. §§ 1512(c)(2), 2; and (4) conspiracy against the rights of one or more persons to vote and to have their votes counted, in violation of 18 U.S.C. § 241. At this stage of the prosecution, we assume that the allegations set forth in the Indictment are true. *United States v. Ballestas*, 795 F.3d 138, 149 (D.C. Cir. 2015). We emphasize that whether the Indictment's allegations are supported by evidence sufficient to sustain convictions must be determined at a later stage of the prosecution.

The Indictment alleges that former President Trump understood that he had lost the election and that the election results were legitimate but that he nevertheless was "determined to remain in power." Indictment ¶ 2. He then conspired with others to cast doubt on the election's outcome and contrived to have himself declared the winner. The

---

[1] Former President Trump's campaign and his supporters also unsuccessfully challenged the election results in several state and federal courts.

5

Indictment charges that he and his co-conspirators allegedly advanced their goal through five primary means:

First, they "used knowingly false claims of election fraud" to attempt to persuade state legislators and election officials to change each state's electoral votes in former President Trump's favor. Indictment ¶ 10(a). For example, he and his allies falsely declared "that more than ten thousand dead voters had voted in Georgia"; "that there had been 205,000 more votes than voters in Pennsylvania"; "that more than 30,000 non-citizens had voted in Arizona"; and "that voting machines . . . had switched votes from [Trump] to Biden." *Id.* at ¶ 12.

Second, then-President Trump and his co-conspirators "organized fraudulent slates of electors in seven targeted states . . . attempting to mimic the procedures that the legitimate electors were supposed to follow." Indictment ¶ 10(b). They "then caused these fraudulent electors to transmit their false certificates to the Vice President and other government officials to be counted at the certification proceeding on January 6." *Id.*

Third, then-President Trump and his co-conspirators pressed officials at the Department of Justice "to conduct sham election crime investigations and to send a letter to the targeted states that falsely claimed that the Justice Department had identified significant concerns that may have impacted the election outcome." Indictment ¶ 10(c).

Fourth, then-President Trump and his co-conspirators attempted to convince then-Vice President Mike Pence to "use his ceremonial role at the January 6 certification proceeding to fraudulently alter the election results." Indictment ¶ 10(d). When the Vice President rebuffed them, he stirred his base of supporters to increase pressure on the Vice President. *See id.* at ¶¶ 10(d), 96, 100. Ultimately, on the morning of

January 6, 2021, he held a rally in Washington D.C. where he "repeated knowingly false claims of election fraud to gathered supporters" and "directed them to the Capitol to obstruct the certification proceeding and exert pressure on the Vice President to take the fraudulent actions he had previously refused." *Id.* at ¶¶ 10(d), 90(c).

Fifth, and finally, from the January 6 rally, thousands of his supporters — "including individuals who had traveled to Washington and to the Capitol at [his] direction" — swarmed the United States Capitol, causing "violence and chaos" that required the Congress to temporarily halt the election-certification proceeding. Indictment ¶¶ 107, 119, 121. At that point, he and his co-conspirators "exploited the disruption by redoubling efforts to levy false claims of election fraud and convince Members of Congress to further delay the certification." *Id.* at ¶ 10(e).

Then-President Trump's efforts to overturn the election results were unsuccessful and the Congress certified the Electoral College vote in favor of President-Elect Biden. Indictment ¶ 123. On January 11, 2021, nine days before President-Elect Biden's inauguration, the House of Representatives adopted an impeachment resolution charging then-President Trump with "Incitement of Insurrection." H.R. Res. 24, 117th Cong. (2021). The single article of impeachment alleged that he had violated "his constitutional oath faithfully to execute the office of President of the United States . . . [and] his constitutional duty to take care that the laws be faithfully executed . . . by inciting violence against the Government of the United States." *Id.* at 2. The impeachment resolution asserted that "President Trump repeatedly issued false statements asserting that the Presidential election results were the product of widespread fraud and should not be accepted by the American people or certified by State or

7

Federal officials," *id.* at 2–3; that his statements on the morning of January 6 "encouraged — and foreseeably resulted in — lawless action at the Capitol," *id.* at 3; and that he attempted to "subvert and obstruct the certification of the results of the 2020 Presidential election" by other means, including by threatening a Georgia state official into manipulating the results, *id.* at 3–4.

Importantly, by the time the United States Senate conducted a trial on the article of impeachment, he had become former President Trump. At the close of the trial, on February 13, 2021, fifty-seven Senators voted to convict him and forty-three voted to acquit him. *See* 167 CONG. REC. S733 (daily ed. Feb. 13, 2021). Because two-thirds of the Senate did not vote for conviction, he was acquitted on the article of impeachment. *See id.*; U.S. CONST. art. I, § 3, cl. 6.

On November 18, 2022, the U.S. Attorney General appointed John L. Smith as Special Counsel to investigate "efforts to interfere with the lawful transition of power following the 2020 presidential election or the certification of the Electoral College vote."[2] A Washington, D.C., grand jury returned the instant four-count Indictment against former President Trump on August 1, 2023, and on August 28, 2023, the district court set a trial date of March 4, 2024.

Former President Trump filed four motions to dismiss the Indictment, relying on: (1) presidential immunity; (2) constitutional provisions, including the Impeachment Judgment Clause and principles stemming from the Double

---

[2]  Off. of the Att'y Gen., "Appointment of John L. Smith as Special Counsel," Order No. 5559-2022 (Nov. 18, 2022).

8

Jeopardy Clause; (3) statutory grounds; and (4) allegations of selective and vindictive prosecution.

On December 1, 2023, the district court issued a written opinion denying the two motions that are based on presidential immunity and the two constitutional provisions. In relevant part, the district court rejected Trump's claim of executive immunity from criminal prosecution, holding that "[f]ormer Presidents enjoy no special conditions on their federal criminal liability." *United States v. Trump*, --- F. Supp. 3d ---, 2023 WL 8359833, at *3 (D.D.C. Dec. 1, 2023). It concluded that "[t]he Constitution's text, structure, and history do not support" the existence of such an immunity, *id.*, and that it "would betray the public interest" to grant a former President "a categorical exemption from criminal liability" for allegedly "attempting to usurp the reins of government." *Id.* at *12. It also held that "neither traditional double jeopardy principles nor the Impeachment Judgment Clause provide that a prosecution following impeachment acquittal violates double jeopardy." *Id.* at *18.[3]

Former President Trump filed an interlocutory appeal of the district court's presidential immunity and double-jeopardy holdings. On December 13, 2023, we granted the

---

[3] Former President Trump does not challenge the district court's other holdings at this stage: (1) that "the First Amendment does not protect speech that is used as an instrument of a crime, and consequently the indictment — which charges [Trump] with, among other things, making statements in furtherance of a crime — does not violate [Trump]'s First Amendment rights," *Trump*, --- F. Supp. 3d ---, 2023 WL 8359833, at *15, and (2) that the Indictment does not violate Due Process because Trump "had fair notice that his conduct might be unlawful," *id.* at *22.

9A

9

government's motion to expedite the appeal, and oral argument was held on January 9, 2024.

## II. JURISDICTION

Although both parties agree that the Court has jurisdiction over former President Trump's appeal, *amicus curiae* American Oversight raises a threshold question about our collateral-order jurisdiction. In every case, "we must assure ourselves of our jurisdiction." *In re Brewer*, 863 F.3d 861, 868 (D.C. Cir. 2017). Under 28 U.S.C. § 1291, which grants us jurisdiction over "final decisions of the district courts," *id.*, "we ordinarily do not have jurisdiction to hear a defendant's appeal in a criminal case prior to conviction and sentencing," *United States v. Andrews*, 146 F.3d 933, 936 (D.C. Cir. 1998). The collateral-order doctrine, however, treats as final and thus allows us to exercise appellate jurisdiction over "a small class of [interlocutory] decisions that conclusively determine the disputed question, resolve an important issue completely separate from the merits of the action, and are effectively unreviewable on appeal from a final judgment." *Citizens for Resp. & Ethics in Wash. v. Dep't of Homeland Sec.*, 532 F.3d 860, 864 (D.C. Cir. 2008) (cleaned up). The district court's denial of former President Trump's immunity defense unquestionably satisfies the first two requirements and thus we focus our analysis on the third: whether the denial of immunity is effectively unreviewable on appeal from a final judgment.

District court orders rejecting claims of *civil* immunity are quintessential examples of collateral orders. *See, e.g.*, *Nixon v. Fitzgerald*, 457 U.S. 731, 741–43 (1982) (executive immunity from civil liability); *Blassingame v. Trump*, 87 F.4th 1, 12 (D.C. Cir. 2023) (same). But in *Midland Asphalt Corp. v. United States*, the Supreme Court counseled that the collateral-

10

order doctrine is interpreted "with the utmost strictness in criminal cases." 489 U.S. 794, 799 (1989) (cleaned up).

The *Midland Asphalt* Court emphasized that criminal collateral orders that are based on "[a] right not to be tried" must "rest[] upon an *explicit* statutory or constitutional guarantee that trial will not occur" — singling out the Double Jeopardy Clause and the Speech or Debate Clause. 489 U.S. at 801 (emphasis added). Former President Trump does not raise a straightforward claim under the Double Jeopardy Clause but instead relies on the Impeachment Judgment Clause and what he calls "double jeopardy principles." Appellant's Br. 54 n.7. The double-jeopardy "principle[]" he relies on is a negative implication drawn from the Impeachment Judgment Clause. *See id.* at 8, 12, 46–47. Thus, he does not invoke our jurisdiction based on the explicit grant of immunity found in the Double Jeopardy Clause.

Nevertheless, we can exercise jurisdiction for two reasons. First, *Midland Asphalt* is distinguishable and does not *require* immunity to derive from an explicit textual source. Second, the theories of immunity former President Trump asserts are sufficient to satisfy *Midland Asphalt* under Circuit precedent.

## A. DISTINGUISHING *MIDLAND ASPHALT*

*Midland Asphalt* dealt with the third prong of the collateral-order test in the context of criminal defendants who argued they were entitled to immediately appeal the denial of their motion to dismiss an indictment because the government had violated Federal Rule of Criminal Procedure 6(e)(2)'s requirement of grand jury secrecy. 489 U.S. at 796. The Supreme Court held that an order is "effectively unreviewable" on appeal "only where the order at issue involves 'an asserted right the legal and practical value of which would be destroyed if it were not vindicated before trial.'" *Id.* at 799 (quoting

11A

11

*United States v. MacDonald*, 435 U.S. 850, 860 (1978)).  The Court rejected the defendants' argument that the denial of the motion satisfied the third prong.  It explained that "[i]t is true that deprivation of the right not to be tried satisfies the *Coopers & Lybrand* requirement of being 'effectively unreviewable on appeal from a final judgment,'" but held that the defendants had not asserted a right against trial in "the sense relevant for purposes of the exception to the final judgment rule."  *Id.* at 801–02 (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468 (1978) ("To come within the [collateral-order doctrine], the order must conclusively determine the disputed question, resolve an important issue completely separate from the merits of the action, and be effectively unreviewable on appeal from a final judgment.")).

The reason the defendants' argument failed, the *Midland Asphalt* Court held, was that it overlooked the "crucial distinction between a right not to be tried and a right whose remedy requires the dismissal of charges."  489 U.S. at 801 (quotation omitted).   "A right not to be tried in the sense relevant to the [collateral-order doctrine] rests upon an explicit statutory or constitutional guarantee that trial will not occur — as in the Double Jeopardy Clause . . . or the Speech or Debate Clause."  *Id.*  By contrast, Rule 6(e)(2) did not "give[] rise to a right not to stand trial" but instead merely created a right to secret grand jury proceedings, the violation of which could be remedied through the indictment's dismissal.  *Id.* at 802.

American Oversight's argument hinges on the Court's use of the adjective "explicit" — a word that appears only once in the *Midland Asphalt* opinion.  The Court has repeatedly (and recently) cautioned against "read[ing] too much into too little," reminding us that "'[t]he language of an opinion is not always to be parsed as though we were dealing with language of a statute.'"  *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356,

12

373 (2023) (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979)). Instead, opinions "must be read with a careful eye to context" and the "particular language" that quoted language performs within an opinion. *Id.* at 374; *see also Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1968 (2021) (Gorsuch, J., concurring in part) ("[T]his Court [has] often said it is a mistake to parse terms in a judicial opinion with the kind of punctilious exactitude due statutory language.").

The Supreme Court itself has hinted, although not squarely held, that *Midland Asphalt*'s language should not be read literally. In *Digital Equipment*, the Court quoted the relevant sentence from *Midland Asphalt* and characterized it as a "suggest[ion]." *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 874 (1994) ("Only such an 'explicit statutory or constitutional guarantee that trial will not occur,' we suggested, could be grounds for an immediate appeal of right under § 1291." (internal citation to *Midland Asphalt*, 489 U.S. at 801, omitted)). The Court then weighed the argument that *Midland Asphalt*'s comment is dictum because the Court allows interlocutory review of other implied immunities, including qualified immunity. *Id.* at 875 (citing *Mitchell v. Forsyth*, 472 U.S. 511 (1985)). The Court did not concede the point, however, as it pointed out that *Midland Asphalt* is a criminal case and *Mitchell* is a civil case, but it allowed that "even if *Mitchell* could not be squared fully with the literal words of the *Midland Asphalt* sentence . . . that would be only because the qualified immunity right is inexplicit, not because it lacks a good pedigree in public law." *Id.* It then noted "the insight that explicitness may not be needed for jurisdiction consistent

13

with § 1291."[4]  *Id.*  The Court ultimately chose to reject the petitioner's argument on a different basis, *see id.* at 877, so it did not squarely resolve how to interpret *Midland Asphalt*.  But a fair reading contemplates that there are exceptions to *Midland Asphalt*'s broad statement. *See id.* at 875.  Other courts have held to that effect.  *See Al Shimari v. CACI Int'l, Inc.*, 679 F.3d 205, 217 n.9 (4th Cir. 2012) (en banc) (reading *Digital Equipment* to hold that qualified immunity's "good pedigree in public law . . . more than makes up for its implicitness" (cleaned up)); *McClendon v. City of Albuquerque*, 630 F.3d 1288, 1296 n.2 (10th Cir. 2011) (interpreting *Digital Equipment*'s "good pedigree in public law" comment as a "binding" reconciliation of *Midland Asphalt* with the immediate appealability of some implicit immunities).

There is good reason not to read *Midland Asphalt* literally here.  Read in context, the Court's use of "explicit" was simply to contrast a right against trial and a right that entitles the defendant to the dismissal of charges.  The latter can be vindicated through appeal after a final judgment, but the former cannot.  The Court was not addressing an issue as to which it was necessary to distinguish between explicit and implied rights against trial; instead, it addressed the defendants' assertion that the violation of the Federal Rules of Criminal Procedure entitled them to immediate review.  *See Midland Asphalt*, 489 U.S. at 802 (Rule 6(e) contained "no hint" of a right against trial).  Thus, "explicit" did not perform any "particular work" within the opinion, *see Nat'l Pork Producers*, 598 U.S. at 374, meaning it would be a mistake to make a doctrinal mountain out of a verbal molehill.  *See Al*

---

[4]  Elsewhere, *Digital Equipment* refers to rights "originating in the Constitution or statutes."  511 U.S. at 879.  Its broader formulation comfortably encompasses implicit as well as explicit immunities.

14

*Shimari*, 679 F.3d at 246 (Wilkinson, J., dissenting) (calling *Midland Asphalt*'s sentence "dictum" and a "lonely line").

Nor was the question presented in *Midland Asphalt* anything like the one before us. Procedural rules are worlds different from a former President's asserted immunity from federal criminal liability. The Supreme Court has repeatedly emphasized that the President is *sui generis*. In the civil context, the Court has held that the denial of the President's assertion of absolute immunity is immediately appealable "[i]n light of the special solicitude due to claims alleging a threatened breach of essential Presidential prerogatives under the separation of powers." *Fitzgerald*, 457 U.S. at 743. And in *United States v. Nixon*, the Court waived the typical requirement that the President risk contempt before appealing because it would be "unseemly" to require the President to do so "merely to trigger the procedural mechanism for review of the ruling." 418 U.S. 683, 691–92 (1974). It would be equally "unseemly" for us to require that former President Trump first be tried in order to secure review of his immunity claim after final judgment. When the Court instructs us to read its opinions "with a careful eye to context," *see Nat'l Pork Producers*, 598 U.S. at 374, it authorizes us to consider the "special solicitude" due a former President, *Fitzgerald*, 457 U.S. at 743.

One final reason not to overread a single adjective in *Midland Asphalt* is that there is no apparent reason to treat an *implicit* constitutional immunity from trial differently from an *explicit* one for interlocutory review.[5] *Midland Asphalt*

---

[5] By contrast, the Supreme Court has explained why a right against trial must ordinarily be "statutory or constitutional" in nature to fall within the collateral-order doctrine. *Midland Asphalt*, 489 U.S. at 801. Whether a right can be effectively reviewed after final judgment "simply cannot be answered without a judgment about the

15

certainly did not provide one. The ultimate source of our appellate jurisdiction is 28 U.S.C. § 1291, which extends to the "final decision[]" of the district court. There is no basis in the statutory text to treat the denial of an explicit immunity as final but the denial of an implicit immunity as non-final. In both cases, the "deprivation of the right not to be tried" would be "effectively unreviewable on appeal from a final judgment." *Midland Asphalt*, 489 U.S. at 800–01 (quotation omitted). Whether explicit or implicit in the Constitution, the right not to stand trial must be "vindicated before trial" or not at all. *Id.* at 799 (quotation omitted).

## B. CIRCUIT PRECEDENT

Our Circuit precedent has taken a broad view of *Midland Asphalt*, consistently holding that the denial of a right not to stand trial is immediately appealable if the right is similar or analogous to one provided in the Constitution. Both of former President Trump's asserted sources of immunity — separation of powers and double jeopardy principles — fit within this window of appealability. *See* Appellant's Br. 2–3 (listing "Statement of the Issues").

Our caselaw includes *United States v. Rose*, a civil case in which we held that Congressman Rose's standalone separation of powers immunity was reviewable under § 1291 because it served the same function as a claim of Speech or Debate Clause immunity. 28 F.3d 181 (D.C. Cir. 1994). Congressman Rose

---

value of the interests that would be lost through rigorous application of a final judgment requirement." *Digital Equip.*, 511 U.S. at 878–79. But there is no need for courts to make that judgment call "[w]hen a policy is embodied in a constitutional or statutory provision," thus leaving "little room for the judiciary to gainsay its importance." *Id.* at 879 (cleaned up).

16

argued that he had immunity from the DOJ's suit against him because "the action was barred by the Speech or Debate Clause" and, separately, because "the separation of powers doctrine barred the DOJ from suing him" when a congressional committee had already investigated him. *Id.* at 185. We held that the latter claim falls within the collateral-order doctrine, "recogniz[ing] claims of immunity based on the separation of powers doctrine as an additional exception to the general rule against interlocutory appeals." *Id.* Granted, we acknowledged that the separation of powers doctrine "does not provide as precise a protection as the Speech or Debate Clause," but we focused on the "equivalent reasons for vindicating in advance of trial whatever protection it affords." *Id.* at 186 (quotation omitted).

We confirmed *Rose*'s applicability in the criminal context in *United States v. Durenberger*, 48 F.3d 1239 (D.C. Cir. 1995). There, former Senator Durenberger sought to dismiss an indictment, arguing based on separation of powers that the district court was powerless to decide whether he had violated the Senate's rules, a prerequisite of its assessment of the criminal charges against him. *See id.* at 1241; U.S. CONST. art. I, § 5, cl. 2 ("Each House may determine the Rules of its Proceedings . . . ."). He thus "claim[ed] that, as a former member of the Senate, he cannot be held to answer criminal charges when his liability depends on judicial usurpation of the Senate's exclusive right to formulate its internal rules." *Durenberger*, 48 F.3d at 1242. We held that this "colorable" argument was sufficient to confer appellate jurisdiction under *Rose*. *Id.* Notably, the constitutional text invoked in *Durenberger* can hardly be said to create an "explicit" right not to stand trial. As we explained in a subsequent case, both *Rose* and *Durenberger* rest on the rationale that the "separation-of-powers doctrine conferred . . . an analogous and comparable

17

privilege" to the Speech or Debate Clause. *United States v. Cisneros*, 169 F.3d 763, 770 (D.C. Cir. 1999).

Following the Supreme Court's lead, *see Abney v. United States*, 431 U.S. 651, 662 (1977) (denial of motion to dismiss indictment on double jeopardy grounds is immediately appealable), we have also allowed interlocutory review by analogizing to the explicit constitutional immunity in the Double Jeopardy Clause. In *United States v. Trabelsi*, we exercised interlocutory appellate jurisdiction of the defendant's invocation of a treaty's *non bis in idem* provision, which "mirror[ed] the Constitution's prohibition of double jeopardy." 28 F.4th 1291, 1298 (D.C. Cir. 2022), *cert. denied*, 143 S. Ct. 345 (2022). The treaty provision's similarity to the constitutional guarantee, we held, was enough to bring the appeal within the scope of *Abney*.

Former President Trump's two arguments can be analogized to explicit constitutional immunities, which is all that *Durenberger* and *Trabelsi* require. His separation of powers argument does not explicitly draw on the Speech or Debate Clause but neither did the argument in *Durenberger*. The immunity for official acts former President Trump asserts is "closely akin to a claim of Speech or Debate Clause immunity," *Cisneros*, 169 F.3d at 770, making it immediately appealable because "there are equivalent reasons for vindicating [it] in advance of trial," *Rose*, 28 F.3d at 186 (quotation omitted). Likewise, the defense argues that the Impeachment Judgment Clause "incorporates a Double Jeopardy principle." Appellant's Br. 46. We found a similar line of reasoning convincing in *Trabelsi*. If a treaty provision that "mirrors" the Double Jeopardy Clause falls within the collateral-order doctrine, so does a constitutional clause that (purportedly) attaches jeopardy to a Senate's impeachment acquittal. Both of former President Trump's arguments are at

18

least analogous enough to the Speech or Debate Clause or the Double Jeopardy Clause to fit within our precedent.

Nor will exercising jurisdiction here put us in conflict with other circuits, as American Oversight suggests. *See* Am. Oversight Br. 9. The chief cases on which American Oversight relies are readily distinguishable because in each the asserted right against trial was not grounded solely in either the Constitution or a statute. *See United States v. Joseph*, 26 F.4th 528, 534 (1st Cir. 2022) (a state judge's immunity depended "solely on the common law"); *United States v. Macchia*, 41 F.3d 35, 38 (2d Cir. 1994) (addressing "an alleged agreement with the United States Attorney" to provide the defendant with immunity); *United States v. Wampler*, 624 F.3d 1330, 1337 & n.3 (10th Cir. 2010) (involving "an executory plea agreement between a company and the government" that excluded the defendants).

Accordingly, we conclude that we have jurisdiction to reach the merits of former President Trump's appeal.

## III.  EXECUTIVE IMMUNITY

For all immunity doctrines, "the burden is on the official claiming immunity to demonstrate his entitlement." *Dennis v. Sparks*, 449 U.S. 24, 29 (1980). Former President Trump claims absolute immunity from criminal prosecution for all "official acts" undertaken as President, a category, he contends, that includes all of the conduct alleged in the Indictment.

The question of whether a former President enjoys absolute immunity from federal criminal liability is one of first impression. *See Blassingame*, 87 F.4th at 5 (noting the unresolved question of "whether or when a President might be immune from criminal prosecution"). The Supreme Court has consistently held that even a sitting President is not immune

19

from responding to criminal subpoenas issued by state and federal prosecutors. *See Trump v. Vance*, 140 S. Ct. 2412, 2431 (2020); *Nixon*, 418 U.S. at 706; *United States v. Burr*, 25 F. Cas. 30, 33–34 (C.C. Va. 1807) (Marshall, C.J.). In the civil context, the Supreme Court has explained that a former President is absolutely immune from civil liability for his official acts, defined to include any conduct falling within the "'outer perimeter' of his official responsibility." *Fitzgerald*, 457 U.S. at 756. Both sitting and former Presidents remain civilly liable for private conduct. *Clinton v. Jones*, 520 U.S. 681, 686, 694–95 (1997); *Blassingame*, 87 F.4th at 12–14. When considering the issue of Presidential immunity, the Supreme Court has been careful to note that its holdings on civil liability do not carry over to criminal prosecutions. *See Fitzgerald*, 457 U.S. at 754 n.37 (explaining the "lesser public interest in actions for civil damages than, for example, in criminal prosecutions"); *cf. Clinton*, 520 U.S. at 704 n.39 (noting special considerations at issue in criminal cases).

Former President Trump's claimed immunity would have us extend the framework for Presidential civil immunity to criminal cases and decide for the first time that a former President is categorically immune from federal criminal prosecution for any act conceivably within the outer perimeter of his executive responsibility. He advances three grounds for establishing this expansive immunity for former Presidents: (1) Article III courts lack the power to review the President's official acts under the separation of powers doctrine; (2) functional policy considerations rooted in the separation of powers require immunity to avoid intruding on Executive Branch functions; and (3) the Impeachment Judgment Clause does not permit the criminal prosecution of a former President in the absence of the Congress impeaching and convicting him.

20

Our analysis is "guided by the Constitution, federal statutes, and history," as well as "concerns of public policy." *Fitzgerald*, 457 U.S. at 747. Relying on these sources, we reject all three potential bases for immunity both as a categorical defense to federal criminal prosecutions of former Presidents and as applied to this case in particular.

## A.  SEPARATION OF POWERS DOCTRINE

The President of the United States "occupies a unique position in the constitutional scheme." *Fitzgerald*, 457 U.S. at 749; *see Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2034 (2020) ("The President is the only person who alone composes a branch of government."). Under the separation of powers established in the Constitution, the President is vested with "executive Power," U.S. CONST. art. II, § 1, cl.1, which entails the duty to "take Care that the Laws be faithfully executed," *id.* § 3, and "supervisory and policy responsibilities of utmost discretion and sensitivity," *Fitzgerald*, 457 U.S. at 750. The President's constitutional role exists alongside the Congress's duty to make the laws, U.S. CONST. art. I, § 1, and the Judiciary's duty to "say what the law is," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

"It is settled law that the separation-of-powers doctrine does not bar every exercise of jurisdiction over the President of the United States." *Fitzgerald*, 457 U.S. at 753–54; *see also Nixon*, 418 U.S. at 706 (separation of powers doctrine cannot "sustain an absolute, unqualified Presidential privilege of immunity from judicial process under all circumstances"). Nevertheless, former President Trump argues that the constitutional structure of separated powers means that "neither a federal nor a state prosecutor, nor a state or federal court, may sit in judgment over a President's official acts, which are vested in the Presidency alone." Appellant's Br. 10.

21

He relies on *Marbury*'s oft-quoted statement that a President's official acts "can never be examinable by the courts." *Id.* (quoting *Marbury*, 5 U.S. (1 Cranch) at 166); *see also* Reply Br. 6.

Former President Trump misreads *Marbury* and its progeny. Properly understood, the separation of powers doctrine may immunize lawful discretionary acts but does not bar the federal criminal prosecution of a former President for *every* official act.

*Marbury* distinguished between two kinds of official acts: discretionary and ministerial. As to the first category, Chief Justice Marshall recognized that "the President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character, and to his own conscience." *Marbury*, 5 U.S. (1 Cranch) at 165–66. When the President or his appointed officers exercise discretionary authority, "[t]he subjects are political" and "the decision of the executive is conclusive." *Id.* at 166. Their discretionary acts, therefore, "can never be examinable by the courts." *Id.* "But," Chief Justice Marshall continued, "when the legislature proceeds to impose on that officer other duties; when he is directed peremptorily to perform certain acts; when the rights of individuals are dependent on the performance of those acts; he is so far the officer *of the law*; is *amenable to the laws for his conduct*; and cannot at his discretion sport away the vested rights of others." *Id.* (emphases added). Under these circumstances, an executive officer acts as a "ministerial officer . . . compellable to do his duty, and if he refuses, is liable to indictment." *Id.* at 150; *see id.* at 149–50 ("It is not consistent with the policy of our political institutions, or the manners of the citizens of the United States, that any ministerial officer having public duties to perform, should be

22

above the compulsion of law in the exercise of those duties.").
Based on these principles, Chief Justice Marshall concluded
that, although discretionary acts are "only politically
examinable," the judiciary has the power to hear cases "where
a specific duty is assigned by law." *Id.* at 166. *Marbury* thus
makes clear that Article III courts may review certain kinds of
official acts — including those that are legal in nature.

The cases following *Marbury* confirm that we may review
the President's actions when he is bound by law, including by
federal criminal statutes. In *Little v. Barreme*, the Supreme
Court concluded that the President's order to a subordinate
officer to seize American ships traveling to or from French
ports violated the Nonintercourse Act precisely because the
Congress had acted to constrain the Executive's discretion. 6
U.S. (2 Cranch) 170, 177–79 (1804). Chief Justice Marshall
observed that the President may have had the discretionary
authority to order the seizure absent legislation but had no
discretion to violate the Act. *Id.* at 177–78. Similarly, in
*Kendall v. United States ex rel. Stokes*, the Supreme Court
reviewed the official acts of the postmaster general, the
President's subordinate officer who derived his authority from
the Executive Branch, because the civil case involved the
violation of a statutory requirement. 37 U.S. 524, 612–13
(1838). To find a statutory violation unreviewable, the Court
held, "would be clothing the President with a power entirely to
control the legislation of congress, and paralyze the
administration of justice." *Id.* at 613.

Then, in *Mississippi v. Johnson*, the Supreme Court
considered whether the State of Mississippi could sue President
Andrew Johnson to enjoin him from enforcing the
Reconstruction Acts, which the State alleged were
unconstitutional. 71 U.S. 475, 497–98 (1866). The Court
concluded that it lacked jurisdiction to issue an injunction,

23

relying on *Marbury*, *Kendall* and the distinction between "mere ministerial dut[ies]" in which "nothing was left to discretion" and "purely executive and political" duties involving the President's discretion. *Id.* at 498–99; *see also Martin v. Mott*, 25 U.S. 19, 31–32 (1827) (no judicial power to review President exercising his "discretionary power" conferred by statute). In holding that it could not enjoin the President from using his discretion, the Court nevertheless affirmed the role of the Judiciary in checking the other two branches of government: "The Congress is the legislative department of the government; the President is the executive department. Neither can be restrained in its action by the judicial department; though the acts of both, when performed, are, in proper cases, subject to its cognizance." *Mississippi*, 71 U.S. at 500.

The Supreme Court exercised its cognizance over Presidential action to dramatic effect in 1952, when it held that President Harry Truman's executive order seizing control of most of the country's steel mills exceeded his constitutional and statutory authority and was therefore invalid. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587–89 (1952). The Congress had not legislated to authorize President Truman's seizure and in fact had "refused to adopt th[e seizure] method of settling labor disputes." *Id.* at 586. President Truman could lawfully act only to execute the Congress's laws or to carry out his constitutional duties as the Executive; and he lacked authority from either source to seize the steel mills. *Id.* at 587–89. As Justice Jackson explained, the Court's holding invalidating the executive order was proper because "[w]hen the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb." *Id.* at 637 (Jackson, J., concurring). Based on *Youngstown* and *Marbury*, the Supreme Court in *Clinton* easily concluded that "when the President takes official action, the Court has the

24

authority to determine whether he has acted within the law." *Clinton*, 520 U.S. at 703.

Objection may be made that *Marbury* and its progeny exercised jurisdiction only over subordinate officers, not the President himself. The writ in *Marbury* was brought against the Secretary of State; in *Little* against a commander of a ship of war; in *Kendall* against the postmaster general; in *Youngstown* against the Secretary of Commerce. But as the Supreme Court has unequivocally explained:

> No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All the officers of the government, from the highest to the lowest, are creatures of the law and are bound to obey it. It is the only supreme power in our system of government, and every man who by accepting office participates in its functions is only the more strongly bound to submit to that supremacy, and to observe the limitations which it imposes upon the exercise of the authority which it gives.

*United States v. Lee*, 106 U.S. 196, 220 (1882). "That principle applies, of course, to a President." *Vance*, 140 S. Ct. at 2432 (Kavanaugh, J., concurring).

Further, the Supreme Court has repeatedly affirmed the judiciary's power to "direct appropriate process to the President himself." *Clinton*, 520 U.S. at 705. The President does not enjoy absolute immunity from criminal subpoenas issued by state and federal prosecutors and may be compelled by the courts to respond. *Burr*, 25 F. Cas. at 33–34; *Nixon*, 418 U.S. at 713–14; *Vance*, 140 S. Ct. at 2431. We have "200 years of precedent establishing that Presidents, and their official

25

communications, are subject to judicial process, even when the President is under investigation." *Vance*, 140 S. Ct. at 2427 (citations omitted); *see also Clinton*, 520 U.S. at 703–05 (recounting history of sitting Presidents complying with court orders to provide testimony and other evidence).

The separation of powers doctrine, as expounded in *Marbury* and its progeny, necessarily permits the Judiciary to oversee the federal criminal prosecution of a former President for his official acts because the fact of the prosecution means that the former President has allegedly acted in defiance of the Congress's laws. Although certain discretionary actions may be insulated from judicial review, the structure of the Constitution mandates that the President is "amenable to the laws for his conduct" and "cannot at his discretion" violate them. *Marbury*, 5 U.S. (1 Cranch) at 166. Here, former President Trump's actions allegedly violated generally applicable criminal laws, meaning those acts were not properly within the scope of his lawful discretion; accordingly, *Marbury* and its progeny provide him no structural immunity from the charges in the Indictment.

Our conclusion that the separation of powers doctrine does not immunize former Presidents from federal criminal liability is reinforced by the analogous immunity doctrines for legislators and judges. Legislators and judges are absolutely immune from civil suits for any official conduct, and legislators have an explicit constitutional immunity from criminal prosecution arising from the Speech or Debate Clause. Nevertheless, legislators and judges can be criminally prosecuted under generally applicable laws for their official acts consistent with the separation of powers doctrine.

Legislators have explicit constitutional immunity from criminal or civil liability "for what they do or say in legislative

proceedings" under the Speech or Debate Clause. *Tenney v. Brandhove*, 341 U.S. 367, 372 (1951); *see* U.S. CONST. art. I, § 6, cl. 1. But outside of constitutionally protected legislative conduct, members of the Congress perform a wide range of "acts in their official capacity" that are not "legislative in nature" and so can subject them to criminal liability. *Gravel v. United States*, 408 U.S. 606, 625 (1972); *see id.* at 626 (Speech or Debate Clause "does not privilege either Senator or aide to violate an otherwise valid criminal law in preparing for or implementing legislative acts"). In *United States v. Johnson*, a Congressman was criminally charged with conspiring to pressure the Department of Justice to dismiss pending indictments of a loan company and its officers on mail fraud charges. 383 U.S. 169, 171 (1966). The Supreme Court held that the prosecution could not include evidence related to a speech made by Johnson on the House floor because of his constitutional immunity but, the Court made clear, Johnson could be retried on the same count "wholly purged of elements offensive to the Speech or Debate Clause." *Id.* at 185. Although his unprotected conduct constituted an official act under *Fitzgerald* (communicating with the Executive Branch), *see id.* at 172, it was constrained by and subject to "criminal statute[s] of general application." *Id.* at 185.

Judges are similarly liable to the criminal laws for their official acts. A notable example is *Ex parte Commonwealth of Virginia*, in which the Supreme Court applied *Marbury*'s discretionary/ministerial distinction to affirm the criminal indictment of a judge based on an official act. 100 U.S. 339 (1879). A county judge was indicted in federal court for violating a federal statute that prohibited discriminating on the basis of race in jury selection. *Id.* at 340, 344. The Supreme Court began by observing the principle that officers are bound to follow the law: "We do not perceive how holding an office under a State, and claiming to act for the State, can relieve the

27

holder from obligation to obey the Constitution of the United States, or take away the power of Congress to punish his disobedience." *Id.* at 348. The Court then addressed the judge's argument that the Court lacked the authority to punish a state judge for "his official acts." *Id.* Its response was twofold. First, the Court described juror selection as "merely a ministerial act, as much so as the act of a sheriff holding an execution, in determining upon what piece of property he will make a levy, or the act of a roadmaster in selecting laborers to work upon the roads." *Id.* The Court then explained that even if juror selection is considered a "judicial act," the judge had a legal duty to obey the criminal laws:

> But if the selection of jurors could be considered in any case a judicial act, can the act charged against the petitioner be considered such when he acted outside of his authority and in direct violation of the spirit of the State statute? That statute gave him no authority, when selecting jurors, from whom a panel might be drawn for a circuit court, to exclude all colored men merely because they were colored. *Such an exclusion was not left within the limits of his discretion.* It is idle, therefore, to say that the act of Congress is unconstitutional because it inflicts penalties upon State judges for their judicial action. It does no such thing.

*Id.* at 348–49 (emphasis added).[6]

---

[6] The Court's reference to "the State statute" is to the Virginia law charging the county judge with the duty to select jurors in the circuit and county courts. *Ex parte Virginia*, 100 U.S. at 340.

28

More recent case law on the judicial immunity doctrine affirms that judges are not immune from criminal liability for their official acts. *O'Shea v. Littleton* confirmed the holding of *Ex parte Virginia* in dismissing a civil rights action for equitable relief brought against a county magistrate and associate judge of a county circuit. 414 U.S. 488, 490–91, 503 (1974). The Supreme Court concluded that the requested injunction was not the only available remedy because both judges remained answerable to the federal criminal laws:

> [W]e have never held that the performance of the duties of judicial, legislative, or executive officers, requires or contemplates the immunization of otherwise criminal deprivation of constitutional rights. On the contrary, the judicially fashioned doctrine of official immunity does not reach 'so far as to immunize criminal conduct proscribed by an Act of Congress . . . .'

*Id.* at 503 (citation to *Ex parte Virginia*, 100 U.S. 339, omitted; quoting *Gravel*, 408 U.S. at 627). Similarly, in *Dennis v. Sparks*, the Court affirmed judicial immunity from civil money damages in the context of bribery allegations but explained that judges "are subject to criminal prosecutions as are other citizens." 449 U.S. at 31. Crucially, the judge in *Dennis* retained civil immunity because "the challenged conduct" — allegedly issuing an injunction corruptly after accepting bribes as part of a conspiracy — was "an official judicial act within his statutory jurisdiction, broadly construed." *Id.* at 29. The scope of civil judicial immunity thus aligns with civil Presidential immunity under *Fitzgerald*, but a judge has no criminal immunity for the same "official act." *See also Imbler v. Pachtman*, 424 U.S. 409, 429 (1976) ("Even judges, cloaked with absolute civil immunity for centuries, could be punished

29

criminally for willful deprivations of constitutional rights . . . ."); *United States v. Gillock*, 445 U.S. 360, 372 (1980) ("[T]he cases in this Court which have recognized an immunity from civil suit for state officials have presumed the existence of federal criminal liability as a restraining factor on the conduct of state officials.").[7]

When considering the criminal prosecutions of judges, other circuits have repeatedly rejected judicial criminal immunity for official acts, largely in the context of bribery prosecutions. *See United States v. Claiborne*, 727 F.2d 842, 845 (9th Cir.) (per curiam), *cert. denied*, 469 U.S. 829 (1984); *United States v. Hastings*, 681 F.2d 706, 709–11 (11th Cir. 1982), *cert. denied*, 459 U.S. 1203 (1983); *United States v. Isaacs*, 493 F.2d 1124, 1143–44 (7th Cir.) (per curiam), *cert. denied*, 417 U.S. 976 (1974), *overruled on other grounds by United States v. Gimbel*, 830 F.2d 621 (7th Cir. 1987). Former President Trump argues that bribery allegations were not considered "judicial acts" at common law, Appellant's Br. 21, but his sources do not support his conclusion. He is correct that

---

[7]    In his brief, former President Trump contends otherwise, primarily relying on two words in a single line of dictum from *Spalding v. Vilas* to urge that judges are immune from criminal prosecution for their official acts. Appellant's Br. 19. *Spalding* was a civil case in which the Supreme Court quoted an opinion of the Supreme Court of New York: "The doctrine which holds a judge exempt from a civil suit *or indictment* for any act done or omitted to be done by him, sitting as judge, has a deep root in the common law." *Spalding v. Vilas*, 161 U.S. 483, 494 (1896) (quoting *Yates v. Lansing*, 5 Johns. 282, 291 (N.Y. Sup. Ct. 1810)) (emphasis added). The Supreme Court did not analyze the scope of judicial criminal immunity itself and the quoted New York language is flatly incompatible with the Supreme Court case law addressed *supra*. We do not consider *Spalding*'s dictum binding on the question of judicial criminal immunity.

30

Blackstone and other early common law sources expressly contemplated the criminal prosecution of judges on bribery charges. *See* 4 WILLIAM BLACKSTONE, COMMENTARIES *139; *Perrin v. United States*, 444 U.S. 37, 43 (1979). But this shows only that judicial immunity did not stretch to shield judges from generally applicable criminal laws, not that bribery was ever considered a nonofficial act. And as explained *supra*, the Supreme Court emphasized the official nature of the bribery allegations in *Dennis* while reinforcing the judge's criminal liability.

We therefore conclude that Article III courts may hear the charges alleged in the Indictment under the separation of powers doctrine, as explained in *Marbury* and its progeny and applied in the analogous contexts of legislative and judicial immunity. The Indictment charges that former President Trump violated criminal laws of general applicability. Acting against laws enacted by the Congress, he exercised power that was at its "lowest ebb." *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring). Former President Trump lacked any lawful discretionary authority to defy federal criminal law and he is answerable in court for his conduct.

## B. FUNCTIONAL POLICY CONSIDERATIONS

Even though it is proper under *Marbury* and its progeny for an Article III court to hear criminal charges brought against a former President, we "necessarily" must "weigh[] concerns of public policy, especially as illuminated by our history and the structure of our government," including our "constitutional heritage and structure." *Fitzgerald*, 457 U.S. at 747–48; *see id.* at 748 (our historical analysis merges with public policy analysis "[b]ecause the Presidency did not exist through most of the development of common law"); *Clinton*, 520 U.S. at 694 (courts apply "a functional approach" in determining the scope

31

of official immunity). "This inquiry involves policies and principles that may be considered implicit in the nature of the President's office in a system structured to achieve effective government under a constitutionally mandated separation of powers." *Fitzgerald*, 457 U.S. at 748. Our analysis entails "balanc[ing] the constitutional weight of the interest to be served against the dangers of intrusion on the authority and functions of the Executive Branch." *Id.* at 754.

We note at the outset that our analysis is specific to the case before us, in which a former President has been indicted on federal criminal charges arising from his alleged conspiracy to overturn federal election results and unlawfully overstay his Presidential term.[8] We consider the policy concerns at issue in this case in two respects. First, we assess possible intrusions on the authority and functions of the Executive Branch and the countervailing interests to be served as those concerns apply to former President Trump's claim that former Presidents are categorically immune from federal prosecution. We conclude that the interest in criminal accountability, held by both the public and the Executive Branch, outweighs the potential risks of chilling Presidential action and permitting vexatious litigation. Second, we examine the additional interests raised by the nature of the charges in the Indictment: The Executive Branch's interest in upholding Presidential elections and vesting power in a new President under the Constitution and the voters' interest in democratically selecting their President. We find these interests compel the conclusion that former President Trump is not immune from prosecution under the Indictment.

---

[8] We do not address policy considerations implicated in the prosecution of a sitting President or in a state prosecution of a President, sitting or former.

32

## 1.  CATEGORICAL IMMUNITY DEFENSE

Former President Trump argues that criminal liability for former Presidents risks chilling Presidential action while in office and opening the floodgates to meritless and harassing prosecution.  These risks do not overcome "the public interest in fair and accurate judicial proceedings," which "is at its height in the criminal setting."  *Vance*, 140 S. Ct. at 2424.

Former President Trump first asserts that the prospect of potential post-Presidency criminal liability would inhibit a sitting President's ability to act "fearlessly and impartially," citing the "especially sensitive duties" of the President and the need for "bold and unhesitating action."  Appellant's Br. 21–22 (quoting *Fitzgerald*, 457 U.S. at 745–46).  But "[t]he chance that now and then there may be found some timid soul who will take counsel of his fears and give way to their repressive power is too remote and shadowy to shape the course of justice." *Clark v. United States*, 289 U.S. 1, 16 (1933).  In *Clark*, the Supreme Court dismissed the threat of a chilling effect, holding that jurors could be subject to criminal prosecution for conduct during their jury service and explaining that a "juror of integrity and reasonable firmness will not fear to speak his mind if the confidences of debate are barred to the ears of mere impertinence or malice." *Id.*  Rather, the Court observed, "[h]e will not expect to be shielded against the disclosure of his conduct in the event that there is evidence reflecting upon his honor." *Id.*  The Court reinforced the point in *United States v. Nixon*, holding that it could not "conclude that [Presidential] advisers will be moved to temper the candor of their remarks by the infrequent occasions of disclosure because of the possibility that such conversations will be called for in the context of a criminal prosecution."  418 U.S. at 712.  So too here.  We cannot presume that a President will be unduly cowed by the prospect of post-Presidency criminal liability any

33

more than a juror would be influenced by the prospect of post-deliberation criminal liability, or an executive aide would be quieted by the prospect of the disclosure of communications in a criminal prosecution.

Moreover, past Presidents have understood themselves to be subject to impeachment and criminal liability, at least under certain circumstances, so the possibility of chilling executive action is already in effect. Even former President Trump concedes that criminal prosecution of a former President is expressly authorized by the Impeachment Judgment Clause after impeachment and conviction. *E.g.*, Oral Arg. Tr. 13:25–14:9. We presume that every President is aware of the Impeachment Judgment Clause and knows that he is "liable and subject to Indictment, Trial, Judgment and Punishment, according to Law," at least after impeachment and conviction. U.S. CONST. art. I, § 3, cl. 7.

Additionally, recent historical evidence suggests that former Presidents, including President Trump, have not believed themselves to be wholly immune from criminal liability for official acts during their Presidency. President Gerald Ford issued a full pardon to former President Richard Nixon, which both former Presidents evidently believed was necessary to avoid Nixon's post-resignation indictment. *See, e.g.*, *President Gerald R. Ford's Proclamation 4311, Granting a Pardon to Richard Nixon*, Ford Presidential Library (Sept. 8, 1974); *Statement by Former President Richard Nixon* 1, Ford Presidential Library (Sept. 8, 1974). Before leaving office, President Bill Clinton agreed to a five-year suspension of his law license and a $25,000 fine in exchange for Independent Counsel Robert Ray's agreement not to file criminal charges against him. *See* John F. Harris & Bill Miller, *In a Deal, Clinton Avoids Indictment*, WASH. POST (Jan. 20, 2001), https://perma.cc/MMR9-GDTL. And during President

34

Trump's 2021 impeachment proceedings for incitement of insurrection, his counsel argued that instead of post-Presidency impeachment, the appropriate vehicle for "investigation, prosecution, and punishment" is "the article III courts," as "[w]e have a judicial process" and "an investigative process . . . to which no former officeholder is immune." 167 CONG. REC. S607 (daily ed. Feb. 9, 2021); *see also id.* at S693 (daily ed. Feb. 12, 2021) ("[T]he text of the Constitution . . . makes very clear that a former President is subject to criminal sanction after his Presidency for any illegal acts he commits."). In light of the express mention of "Indictment" in the Impeachment Judgment Clause and recent historical evidence of former Presidents acting on the apparent understanding that they are subject to prosecution even in the absence of conviction by the Senate, the risk of criminal liability chilling Presidential action appears to be low.

Instead of inhibiting the President's lawful discretionary action, the prospect of federal criminal liability might serve as a structural benefit to deter possible abuses of power and criminal behavior. "Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate . . . ." *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982). As the district court observed: "Every President will face difficult decisions; whether to intentionally commit a federal crime should not be one of them." *Trump*, --- F. Supp. 3d ---, 2023 WL 8359833, at *9.

Former President Trump next urges that a lack of criminal immunity will subject future Presidents to politically motivated prosecutions as soon as they leave office. In the civil context, the Supreme Court found official-act Presidential immunity necessary in part to avoid "subject[ing] the President to trial on virtually every allegation that an action was unlawful, or was

35

taken for a forbidden purpose." *Fitzgerald*, 457 U.S. at 756; *see id.* at 753 ("In view of the visibility of his office and the effect of his actions on countless people, the President would be an easily identifiable target for suits for civil damages."). But the decision to initiate a federal prosecution is committed to the prosecutorial discretion of the Executive Branch. Prosecutors have ethical obligations not to initiate unfounded prosecutions and "courts presume that they . . . properly discharge[] their official duties." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14–15 (1926)). There are additional safeguards in place to prevent baseless indictments, including the right to be charged by a grand jury upon a finding of probable cause. U.S. CONST. amend. V; *Kaley v. United States*, 571 U.S. 320, 328 (2014). "[G]rand juries are prohibited from engaging in 'arbitrary fishing expeditions' and initiating investigations 'out of malice or an intent to harass.'" *Vance*, 140 S. Ct. at 2428 (quoting *United States v. R. Enters., Inc.*, 498 U.S. 292, 299 (1991)). Additionally, former President Trump's "predictive judgment" of a torrent of politically motivated prosecutions "finds little support in either history or the relatively narrow compass of the issues raised in this particular case," *see Clinton*, 520 U.S. at 702, as former President Trump acknowledges that this is the first time since the Founding that a former President has been federally indicted. Weighing these factors, we conclude that the risk that former Presidents will be unduly harassed by meritless federal criminal prosecutions appears slight.

On the other side of the scale, we must consider "the constitutional weight of the interest to be served" by allowing the prosecution of a former President to proceed. *Fitzgerald*, 457 U.S. at 754. The public has a fundamental interest in the enforcement of criminal laws. *Vance*, 140 S. Ct. at 2424. "[O]ur historic commitment to the rule of law . . . is nowhere

36

more profoundly manifest than in our view that 'the twofold aim (of criminal justice) is that guilt shall not escape or innocence suffer.'" *Nixon*, 418 U.S. at 708–09 (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)). As the *Nixon* Court explained, wholly immunizing the President from the criminal justice process would disturb "the primary constitutional duty of the Judicial Branch to do justice in criminal prosecutions" to such an extent that it would undermine the separation of powers by "plainly conflict[ing] with the function of the courts under Art. III." *Nixon*, 418 U.S. at 707.

There is also a profound Article II interest in the enforcement of federal criminal laws. The President has a constitutionally mandated duty to "take Care that the Laws be faithfully executed." U.S. CONST. art. II, § 3. As part of this duty, the President is responsible for investigating and prosecuting criminal violations. *See Morrison v. Olson*, 487 U.S. 654, 706 (1988) (Scalia, J., dissenting) ("Governmental investigation and prosecution of crimes is a quintessentially executive function."); *see also In re Lindsey*, 158 F.3d 1263, 1272 (D.C. Cir. 1998) ("Investigation and prosecution of federal crimes is one of the most important and essential functions within [the President's] constitutional responsibility."); *Cmty. For Creative Non-Violence v. Pierce*, 786 F.2d 1199, 1201 (D.C. Cir. 1986) ("The power to decide when to investigate, and when to prosecute, lies at the core of the Executive's duty to see to the faithful execution of the laws . . . ."). Beyond simply making explicit that a President must enforce the law, the Take Care Clause plays a central role in "signify[ing] . . . the principle that ours is a government of laws, not of men, and that we submit ourselves to rulers only if under rules." *Youngstown*, 343 U.S. at 646 (Jackson, J., concurring). It would be a striking paradox if the President, who alone is vested with the constitutional duty to "take Care

that the Laws be faithfully executed," were the sole officer capable of defying those laws with impunity.

The federal prosecution of a former President fits the case "[w]hen judicial action is needed to serve broad public interests" in order to "vindicate the public interest in an ongoing criminal prosecution." *Fitzgerald*, 457 U.S. at 754. The risks of chilling Presidential action or permitting meritless, harassing prosecutions are unlikely, unsupported by history and "too remote and shadowy to shape the course of justice." *See Clark*, 289 U.S. at 16. We therefore conclude that functional policy considerations rooted in the structure of our government do not immunize former Presidents from federal criminal prosecution.

## 2. IMMUNITY FROM THE INDICTMENT'S CHARGES

In addition to the generally applicable concerns discussed *supra*, the allegations of the Indictment implicate the Article II interests in vesting authority in a new President and the citizenry's interest in democratically selecting its President.

The Indictment alleges that the assertedly "official" actions at issue here were undertaken by former President Trump in furtherance of a conspiracy to unlawfully overstay his term as President and to displace his duly elected successor. *See* Indictment ¶¶ 2, 10. That alleged conduct violated the constitutionally established design for determining the results of the Presidential election as well as the Electoral Count Act of 1887, neither of which establishes a role for the President in counting and certifying the Electoral College votes. U.S. CONST. art. II, § 1, cl. 3; *id.* amend. XII; 3 U.S.C. § 15, *amended by* 136 Stat. 4459, 5238 (2022); *see* Indictment ¶¶ 9–10. The alleged conduct also violated Article II's mandate that a President "hold his Office during the Term of four Years."

38

U.S. CONST. art. II, § 1, cl. 1. The Twentieth Amendment reinforces the discrete nature of a presidential term, explicitly providing that "[t]he terms of the President and Vice President shall end at noon on the 20th day of January . . .; and the terms of their successors shall then begin." U.S. CONST. amend. XX, § 1. Upon "the expiration of the time for which he is elected," a former president "returns to the mass of the people again" and the power of the Executive Branch vests in the newly elected President. *Burr*, 25 F. Cas. at 34; U.S. CONST. art. II, § 1, cl. 1 ("The executive Power shall be vested in *a* President of the United States of America.") (emphasis added).

The President, of course, also has a duty under the Take Care Clause to faithfully enforce the laws. This duty encompasses following the legal procedures for determining election results and ensuring that executive power vests in the new President at the constitutionally appointed time. To the extent former President Trump maintains that the post-2020 election litigation that his campaign and supporters unsuccessfully pursued implemented his Take Care duty, he is in error. *See infra* n.14. Former President Trump's alleged conduct conflicts with his constitutional mandate to enforce the laws governing the process of electing the new President.

The public has a strong interest in the foundational principle of our government that the will of the people, as expressed in the Electoral College vote, determines who will serve as President. *See* U.S. CONST. amend. XII ("The Electors shall meet in their respective states, and vote by ballot for President and Vice-President. . . . The person having the greatest number of votes for President, shall be the President."); *Chiafalo v. Washington*, 140 S. Ct. 2316, 2328 (2020) ("Early in our history, States decided to tie electors to the presidential choices of [citizens]."). The Supreme Court recently noted that "the Framers made the President the most

39

democratic and politically accountable official in Government," the only one who (along with the Vice President) is "elected by the entire Nation." *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2203 (2020). "To justify and check" the President's "unique [authority] in our constitutional structure," Article II "render[s] the President directly accountable to the people through regular elections." *Id*. As James Madison put it, "[a] dependence on the people is, no doubt, the primary control on the government." The Federalist No. 51, at 253 (James Madison) (Coventry House Publishing, 2015)[9]; *see also Morrison*, 487 U.S. at 731 (Scalia, J., dissenting) ("[T]he Founders . . . established a single Chief Executive accountable to the people" so that "the blame [could] be assigned to someone who can be punished."). Thus, the quadrennial Presidential election is a crucial check on executive power because a President who adopts unpopular policies or violates the law can be voted out of office.

Former President Trump's alleged efforts to remain in power despite losing the 2020 election were, if proven, an unprecedented assault on the structure of our government. He allegedly injected himself into a process in which the President has no role — the counting and certifying of the Electoral College votes — thereby undermining constitutionally established procedures and the will of the Congress. To immunize former President Trump's actions would "further . . . aggrandize the presidential office, already so potent and so relatively immune from judicial review, at the expense of Congress." *Youngstown*, 343 U.S. at 654 (Jackson, J., concurring) (footnote omitted). As Justice Jackson warned:

---

[9]  Federalist No. 51 is "generally attributed to Madison" but is "sometimes attributed to 'Hamilton or Madison.'" *INS v. Chadha*, 462 U.S. 919, 950 (1983).

40

> Executive power has the advantage of concentration in a single head in whose choice the whole Nation has a part, making him the focus of public hopes and expectations. In drama, magnitude and finality his decisions so far overshadow any others that almost alone he fills the public eye and ear. No other personality in public life can begin to compete with him in access to the public mind through modern methods of communications. By his prestige as head of state and his influence upon public opinion he exerts a leverage upon those who are supposed to check and balance his power which often cancels their effectiveness.

*Id.* at 653–54 (Jackson, J., concurring).

We cannot accept former President Trump's claim that a President has unbounded authority to commit crimes that would neutralize the most fundamental check on executive power — the recognition and implementation of election results. Nor can we sanction his apparent contention that the Executive has carte blanche to violate the rights of individual citizens to vote and to have their votes count.

\*   \*   \*

At bottom, former President Trump's stance would collapse our system of separated powers by placing the President beyond the reach of all three Branches. Presidential immunity against federal indictment would mean that, as to the President, the Congress could not legislate, the Executive could not prosecute and the Judiciary could not review. We cannot accept that the office of the Presidency places its former occupants above the law for all time thereafter. Careful evaluation of these concerns leads us to conclude that there is

41A

41

no functional justification for immunizing former Presidents from federal prosecution in general or for immunizing former President Trump from the specific charges in the Indictment. In so holding, we act, "not in derogation of the separation of powers, but to maintain their proper balance." *See Fitzgerald*, 457 U.S. at 754.

## C. THE IMPEACHMENT JUDGMENT CLAUSE

The strongest evidence against former President Trump's claim of immunity is found in the words of the Constitution. The Impeachment Judgment Clause provides that "[j]udgment in Cases of Impeachment shall not extend further than to removal from Office, and disqualification to hold and enjoy any Office of honor, Trust or Profit under the United States: but the Party convicted shall nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law." U.S. CONST. art. I, § 3, cl. 7. That language limits the consequences of impeachment to removal and disqualification from office, but explicitly preserves the option of criminal prosecution of an impeached official "according to Law."

Former President Trump agrees that the Impeachment Judgment Clause contemplates and permits the prosecution of a former President on criminal charges — he argues only that such a former President first must be impeached by the House and "convicted" by the Senate. Appellant's Br. 12–14, 31. In other words, he asserts that, under the Clause, a former President enjoys immunity for any criminal acts committed while in office *unless* he is first impeached and convicted by the Congress. Under that theory, he claims that he is immune from prosecution because he was impeached and *acquitted*. By taking that position, former President Trump potentially narrows the parties' dispute to whether he may face criminal charges in this case consistent with the Impeachment Judgment

42

Clause: If the Clause requires an impeachment conviction first, he may not be prosecuted; but if it contains no such requirement, the Clause presents no impediment to his prosecution.

Former President Trump also implicitly concedes that there is no absolute bar to prosecuting assertedly "official" actions. He argues elsewhere in his brief that his impeachment on the charge of inciting insurrection was based on conduct that was the "same and closely related" to the "official acts" charged in the Indictment. Appellant's Br. 46 ("President Trump was impeached and acquitted by the Senate for the same and closely related conduct to that alleged in the indictment." (emphasis omitted)); *id.* at 42 ("[A]ll five types of conduct alleged in the indictment constitute official acts."). And he agrees that if he had been convicted by the Senate in that impeachment trial, he would not be immune from prosecution for the "official acts" at issue here. *See id.* at 31. Thus, he concedes that a President can be prosecuted for broadly defined "official acts," such as the ones alleged in the Indictment, under some circumstances, *i.e.*, following an impeachment conviction.

The Impeachment Judgment Clause is focused solely on those who are convicted by the Senate following impeachment by the House. The first part of the Clause limits the penalties that can be imposed based on an impeachment conviction: "Judgment in Cases of Impeachment shall not extend further than to removal from Office, and disqualification to hold and enjoy any Office of honor, Trust or Profit under the United States." U.S. CONST. art. I, § 3, cl. 7. The second part makes clear that the limited consequences of impeachment do not immunize convicted officers from criminal prosecution: "[T]he Party convicted shall nevertheless be liable and subject

43

to Indictment, Trial, Judgment and Punishment, according to Law." *Id.*

In former President Trump's view, however, the word "convicted" in the second phrase implicitly bestows immunity on Presidents who are *not* convicted, based on a negative implication. He asserts that the Impeachment Judgment Clause "presupposes" that a President is not criminally liable absent a conviction in the Senate. Appellant's Br. 12. Other courts have rejected this "tortured" interpretation of the Impeachment Judgment Clause, which previously has been advanced to support claims of judicial immunity. *See Claiborne*, 727 F.2d at 846 ("According to Claiborne, this language means that a federal judge cannot be indicted and tried in an Article III court unless he has been removed from office by the impeachment process. Both *Isaacs* and *Hastings* rejected this tortured interpretation . . . ." (cleaned up)); *Hastings*, 681 F.2d at 710; *Isaacs*, 493 F.2d at 1142 (The Impeachment Judgment Clause "does not mean that a judge may not be indicted and tried without impeachment first."). Moreover, former President Trump's interpretation runs counter to the text, structure and purpose of the Impeachment Judgment Clause. *See N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 302 (2017) ("The force of any negative implication . . . depends on context," and "applies only when circumstances support a sensible inference that the term left out must have been meant to be excluded." (cleaned up)); *Mercy Hosp., Inc. v. Azar*, 891 F.3d 1062, 1069 (D.C. Cir. 2018) ("Finding the negative implication of a statute is a context-specific exercise.").

To begin, former President Trump's reliance on a negative implication is an immediate red flag: The Framers knew how to explicitly grant criminal immunity in the Constitution, as they did to legislators in the Speech or Debate Clause. *See* U.S. CONST. art. I, § 6, cl. 1. Yet they chose not to include a similar

44

provision granting immunity to the President. *See Vance*, 140 S. Ct. at 2434 (Thomas, J., dissenting) ("The text of the Constitution explicitly addresses the privileges of some federal officials, but it does not afford the President absolute immunity."). The Impeachment Judgment Clause merely states that "the Party convicted" shall nevertheless be subject to criminal prosecution. The text says nothing about non-convicted officials. Former President Trump's reading rests on a logical fallacy: Stating that "if the President is convicted, he can be prosecuted," does not necessarily mean that "if the President is *not* convicted, he *cannot* be prosecuted." *See, e.g.*, *N.L.R.B. v. Noel Canning*, 573 U.S. 513, 589 (2014) (Scalia, J., concurring) (explaining "the fallacy of the inverse (otherwise known as denying the antecedent): the incorrect assumption that if P implies Q, then not-P implies not-Q").

Another important clue is the Clause's use of the word "nevertheless," as in "the Party convicted shall *nevertheless* be liable." U.S. CONST. art. I, § 3, cl. 7 (emphasis added). The meaning of "neverthele'ss," according to a contemporaneous 18th century dictionary, is "[n]otwithsta'nding that," which in turn means "[w]ithout hindrance or obstruction from." 2 Samuel Johnson, A Dictionary of the English Language 200, 216 (1773). The Impeachment Judgment Clause contains no words that limit criminal liability — and, to the contrary, it uses "nevertheless" to ensure that liability will *not* be limited (*i.e.*, "hindered or obstructed"), even after an official is impeached, convicted and removed from office.

The text of the Impeachment Judgment Clause reflects its purpose: To allocate responsibility between the Legislative and Executive branches for holding impeached officers accountable for misconduct. In 18th-century Great Britain, impeachment could result in "capital punishment . . . fine and ransom[,] or imprisonment." 2 Joseph Story, *Commentaries on*

45A

45

*the Constitution of the United States* § 782; *see also Whether a Former President May Be Indicted and Tried for the Same Offenses for Which He was Impeached by the House and Acquitted by the Senate*, 24 Op. O.L.C. 110, 120 (2000) (hereinafter, "OLC Double Jeopardy Memo") (noting that impeachment in Britain could have resulted "in a wide array of criminal penalties, including fines, imprisonment, and even execution"). The Framers chose to withhold such broad power from the Senate, specifying instead that the Senate could impose "only political, not ordinary criminal, punishments." OLC Double Jeopardy Memo at 124; *see also* Tench Coxe, An American Citizen, *Independent Gazetteer* (Philadelphia), Sept. 28, 1787 (The Senate "can only, by conviction on impeachment, *remove and incapacitate a dangerous officer* . . . ." (emphasis in original)). That approach naturally "raise[d] the question whether the other punishments the founding generation was accustomed to seeing" in British impeachment proceedings "could be imposed at all under the new American government." OLC Double Jeopardy Memo at 126. The Framers wished to make clear that a President would "still be liable to prosecution and punishment in the ordinary course of law." The Federalist No. 65, at 321 (Alexander Hamilton) (Coventry House Publishing, 2015); Coxe, *An American Citizen* ("[T]he punishment of [a dangerous officer] as a criminal *remains within the province of the courts of law to be conducted under all the ordinary forms and precautions* . . . ." (emphasis in original)). They therefore added the provision that "the Party convicted shall nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law." U.S. CONST. art. I, § 3, cl. 7. As the Office of Legal Counsel noted, that "second part makes clear that the restriction on sanctions in the first part was not a prohibition on further punishments; rather, those punishments would still be available but simply not to the [Senate]." OLC Double Jeopardy Memo at 126–27. In short, then, the Framers

46

intended impeached officials to face criminal liability "according to Law." U.S. CONST. art. I, § 3, cl. 7.

To counter the historical evidence that explains the purpose of the Impeachment Judgment Clause, former President Trump turns to one sentence written by Alexander Hamilton in the Federalist 69: "The President of the United States would be liable to be impeached, tried, and, upon conviction of treason, bribery, or other high crimes or misdemeanors, removed from office; and would afterwards be liable to prosecution and punishment in the ordinary course of law." The Federalist No. 69, at 337 (Alexander Hamilton) (Coventry House Publishing, 2015). He focuses on the word "afterwards" and suggests that a President is not "liable to prosecution and punishment" until "after[]" he has been impeached and convicted by the Senate. *See* Appellant's Br. 14–15. But we think the more significant word in Hamilton's statement is "liable," which means "subject to." *Liable*, 1 John Ash, New and Complete Dictionary of the English Language (1795). Hamilton specifies that a President would be *subject to* impeachment, trial, conviction and removal from office; and "afterwards" would be *subject to* prosecution and punishment, without regard to the verdict in the impeachment proceeding.[10] Moreover, in the very next sentence of the same essay, Hamilton stresses that the President must be unlike the "king of Great Britain," who was "sacred and inviolable." The

---

[10] Former President Trump also cites to Hamilton's statement in Federalist 77 that the President is "at all times *liable* to impeachment, trial, dismission from office, incapacity to serve in any other, and to forfeiture of life and estate by *subsequent* prosecution in the common course of law." The Federalist No. 77, at 378–79 (Alexander Hamilton) (Coventry House Publishing, 2015) (emphasis added). This argument is similarly unavailing based on Federalist 77's analogous use of "liable."

Federalist No. 69, at 337–38.  It strains credulity that Hamilton would have endorsed a reading of the Impeachment Judgment Clause that shields Presidents from all criminal accountability unless they are first impeached and convicted by the Congress.

Other historical evidence further supports our conclusion.  For example, many founding-era sources state that an impeached-and-acquitted official may face criminal indictment and trial.  Edmund Pendleton, President of the Virginia Ratifying Convention, noted that Senate "obstruction" of an impeachment charge would not allow an official to escape accountability because the people "may yet resort to the Courts of Justice, as an Acquital [sic] would not bar that remedy."  10 *The Documentary History of the Ratification of the Constitution* 1773 (Merrill Jensen et al, eds. 1976) (Letter from Edmund Pendleton to James Madison, Oct. 8, 1787).  Similarly, James Wilson — a member of the Constitutional Convention committee that drafted the Impeachment Judgment Clause — argued as follows:  "Though [Senators] may not be convicted on impeachment before the Senate, they may be tried by their country; and if their criminality is established, the law will punish.  A grand jury may present, a petit jury may convict, and the judges will pronounce the punishment."  *See* 2 *The Documentary History of the Ratification of the Constitution* 492 (Merrill Jensen et al, eds. 1976); *see also* 9 Annals of Cong. 2475 (1798) (statement of Rep. Dana) ("[W]hether a person tried under an impeachment be found guilty or acquitted, he is still liable to a prosecution at common law.").

In drafting the Impeachment Judgment Clause, to the extent that the Framers contemplated whether impeachment would have a preclusive effect on future criminal charges, the available evidence suggests that their intent was to ensure that a subsequent prosecution would *not* be barred.  *See* OLC Double Jeopardy Memo at 122 (noting limited scope of

48

discussion at the Constitutional Convention and ratifying conventions regarding the Impeachment Judgment Clause). Joseph Story explained that the Impeachment Judgment Clause removed doubt that "a second trial for the same offence could be had, either after an acquittal, or a conviction in the court of impeachments."  2 Story, *Commentaries* § 780; *id.* § 781 (noting the Constitution "has wisely subjected the party to trial in the common criminal tribunals, for the purpose of receiving such punishment, as ordinarily belongs to the offence").  Story explained that without a criminal trial "the grossest official offenders might escape without any substantial punishment, even for crimes, which would subject their fellow citizens to capital punishment."  *Id.* § 780.[11]

Finally, the practical consequences of former President Trump's interpretation demonstrate its implausibility.  The Impeachment Judgment Clause applies not just to Presidents but also to the "Vice President and all civil Officers of the United States."  U.S. CONST. art. II, § 4.  Thus, his reading would prohibit the Executive Branch from prosecuting current and former civil officers for crimes committed while in office,

---

[11] Former President Trump points to some historical evidence that he considers countervailing.  He notes that some state constitutions explicitly provided for the criminal prosecution of a party acquitted on impeachment charges, arguing that silence on that point therefore should be inferred as precluding prosecution.  But some early state constitutions also expressly granted criminal immunity to the state's chief executive, so interpreting silence is not so simple.  *See* Saikrishna Bangalore Prakash, *Prosecuting and Punishing Our Presidents*, 100 Tex. L. Rev. 55, 69–70 (2021) (citing 1776 Virginia and Delaware constitutions).  Any limited, indirect historical clues must be weighed against the compelling textual, structural and historical evidence that the Founders did not intend the Impeachment Judgment Clause to bar the criminal prosecution of an official who was impeached and acquitted (or not impeached at all).

49

unless the Congress first impeached and convicted them.  No court has previously imposed such an irrational "impeachment first" constraint on the criminal prosecution of federal officials.  *See*, *e.g.*, *Isaacs*, 493 F.2d at 1144 ("[W]e are convinced that a federal judge is subject to indictment and trial before impeachment . . . .").[12]  Even if there is an atextual basis for treating Presidents differently from subordinate government officials, as former President Trump suggests, his proposed interpretation still would leave a President free to commit all manner of crimes with impunity, so long as he is not impeached and convicted.  Former President Trump's interpretation also would permit the commission of crimes not readily categorized as impeachable (*i.e.*, as "Treason, Bribery, or other high Crimes and Misdemeanors") and, if thirty Senators are correct, crimes not discovered until after a President leaves office.  *See* U.S. CONST. art. II, § 4; *see also*, *e.g.*, 167 CONG. REC. S736 (daily ed. Feb. 13, 2021) (statement of Senate Minority Leader McConnell) ("We have no power to convict and disqualify a former office holder who is now a private citizen.").[13]  All of

---

[12]  Indeed, history reveals examples of prosecutions preceding impeachments.  *See Nixon v. United States*, 506 U.S. 224, 226–27 (1993) (defendant judge criminally prosecuted and then impeached); *Hastings v. United States Senate*, 716 F. Supp. 38, 41 (D.D.C. 1989) (same); *Amenability of the President, Vice President and other Civil Officers to Federal Criminal Prosecution While in Office*, Op. O.L.C. 4 (1973) (observing that, as of 1973, only 12 impeachments had occurred, but "presumably scores, if not hundreds, of officers of the United States have been subject to criminal proceedings for offenses for which they could have been impeached").

[13]  *See also* statements of Senators Barrasso, Blunt, Braun, Capito, Cornyn, Cramer, Crapo, Daines, Ernst, Fischer, Grassley, Hoeven, Hyde-Smith, Inhofe, Kennedy, Lankford, Lee, Lummis, Moran, Portman, Risch, Rounds, Rubio, Shelby, Sullivan, Thune, Tillis, Tuberville and Wicker.

50

this leads us to conclude that, under the best reading of the Impeachment Judgment Clause, a former President may be criminally prosecuted in federal court, without any requirement that he first be impeached and convicted for the same conduct.[14]

## IV. DOUBLE JEOPARDY PRINCIPLES

Former President Trump alternatively argues that the Impeachment Judgment Clause and "principles of double jeopardy" bar his prosecution because he was impeached by the

---

[14] Because we conclude that former President Trump is not entitled to categorical immunity from criminal liability for assertedly "official" acts, it is unnecessary to explore whether executive immunity, if it applied here, would encompass his expansive definition of "official acts." Nevertheless, we observe that his position appears to conflict with our recent decision in *Blassingame*, 87 F.4th at 1. According to the former President, any actions he took in his role as President should be considered "official," including all the conduct alleged in the Indictment. Appellant's Br. 41–42. But in *Blassingame*, taking the plaintiff's allegations as true, we held that a President's "actions constituting re-election campaign activity" are not "official" and can form the basis for civil liability. 87 F.4th at 17. In other words, if a President who is running for re-election acts "as office-*seeker*, not office-*holder*," he is not immune even from *civil* suits. *Id*. at 4 (emphasis in original). Because the President has no official role in the certification of the Electoral College vote, much of the misconduct alleged in the Indictment reasonably can be viewed as that of an office-*seeker* — including allegedly organizing alternative slates of electors and attempting to pressure the Vice President and Members of the Congress to accept those electors in the certification proceeding. It is thus doubtful that "all five types of conduct alleged in the indictment constitute official acts." Appellant's Br. 42.

51

House of Representatives for the same or closely related conduct but acquitted by the Senate. We disagree.

As we have discussed, *supra* Part III.C, the Impeachment Judgment Clause addresses only *convicted* parties; it does not address the consequences of a Senate acquittal. For the reasons already stated, the Clause's provision that "the Party convicted shall nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law" does not bar the prosecution of an official who, like former President Trump, was acquitted rather than "convicted" in an impeachment proceeding; nor does it bar the prosecution of an official who was never impeached in the first place. U.S. CONST. art. I, § 3, cl. 7. The Clause simply does not speak to such matters. But the weight of historical authority indicates that the Framers intended for public officials to face ordinary criminal prosecution as well as impeachment. *Supra* Part III.C.

To the extent former President Trump relies on "double jeopardy principles" beyond the text of the Impeachment Judgment Clause, those principles cut against him. The Double Jeopardy Clause provides: "No person shall . . . be subject for the same offence to be twice put in jeopardy of life or limb." U.S. CONST. amend. V. It has been interpreted to prohibit "imposition of multiple criminal punishments for the same offense." *Hudson v. United States*, 522 U.S. 93, 99 (1997) (citation omitted). Under precedent interpreting the Double Jeopardy Clause, former President Trump's impeachment acquittal does not bar his subsequent criminal prosecution for two reasons: (1) An impeachment does not result in *criminal* punishments; and (2) the Indictment does not charge the same offense as the single count in the Impeachment Resolution.

52

## A.  IMPEACHMENT IS NOT "CRIMINAL"

Under the Double Jeopardy Clause, a defendant is not "put in jeopardy of life or limb," U.S. CONST. amend. V, when faced with any penalty "that could, in common parlance, be described as punishment"; instead, double jeopardy guards only against "imposition of multiple criminal punishments for the same offense."  *Hudson*, 522 U.S. at 99 (cleaned up).  Although double jeopardy applies only to *criminal* punishments, impeachment imposes *political* punishments.

Impeachment is a political process that is instigated and overseen by the Congress.  *See* 2 Story, *Commentaries* § 784 ("There is wisdom, and sound policy, and intrinsic justice in this separation of the offence, at least so far, as the jurisdiction and trial are concerned, into its proper elements, bringing *the political part* under the power of the political department of the government . . . ." (emphasis added)); 9 Annals of Cong. 2475 (1798) (statement of Rep. Dana) ("The process in cases of impeachment, in this country, is distinct from either civil or criminal — it is a political process, having in view the preservation of the Government of the Union.").  It is a tool entrusted to elected officials and "designed to enable Congress to protect the nation against officers who have demonstrated that they are unfit to carry out important public responsibilities."  OLC Double Jeopardy Memo at 130; *see* The Federalist No. 66, at 324 (Alexander Hamilton) (Coventry House Publishing, 2015) ("[T]he powers relating to impeachments are, as before intimated, an essential check in the hands of [Congress] upon the encroachments of the executive."); *Mazars USA, LLP*, 140 S. Ct. at 2046 (Thomas, J., dissenting) ("The founding generation understood impeachment as a check on Presidential abuses.").  The consequences imposed by an impeachment conviction — removal from office and disqualification from future service,

53

U.S. CONST. art. I, § 3, cl. 7. — are intended to hold officials *politically* accountable, while leaving *criminal* accountability to the Judicial Branch.

As a result of the political nature of impeachment proceedings, impeachment acquittals are often unrelated to factual innocence.  *See* The Federalist No. 65, at 319 (In an impeachment proceeding, "there will always be the greatest danger that the decision will be regulated more by the comparative strength of parties, than by the real demonstrations of innocence or guilt.").  Former President Trump's acquittal in his impeachment trial on the charge of inciting insurrection makes this point.  The forty-three Senators who voted to acquit him relied on a variety of concerns, many of which had nothing to do with whether he committed the charged offense.  Those Senators cited jurisdictional reasons, *see, e.g.*, 167 CONG. REC. S736 (daily ed. Feb. 13, 2021) (statement of Senate Minority Leader McConnell) ("We have no power to convict and disqualify a former office holder who is now a private citizen."); process-based reasons, *see, e.g.*, Press Release, Sen. Todd Young, Senator Young Statement on Impeachment Trial (Feb. 13, 2021), https://perma.cc/26Z8-XYTT ("Simply put, the U.S. House of Representatives conducted a rushed and incomplete process for this snap impeachment."); and political reasons, *see, e.g.*, Press Release, Sen. Ron Johnson, Johnson Statement on Impeachment Trial of Former President Trump (Feb. 13, 2021), https://perma.cc/L4EZ-7C77 ("The Democrats' vindictive and divisive political impeachment is over.  While there are still many questions that remain unanswered, I do know neither the Capitol breach nor this trial should have ever occurred.  Hopefully, true healing can now begin.").  Indeed, at least thirty Senators who voted to acquit relied at least in part on a belief that the Senate lacked the power to convict a *former* President.  *See supra* n.13.

54

Criminal prosecutions, by contrast, are aimed at "penaliz[ing] individuals for their criminal misdeeds . . . by taking away their life, liberty, or property." OLC Double Jeopardy Memo at 130; *see also Kansas v. Hendricks*, 521 U.S. 346, 361–62 (1997) (identifying "retribution [and] deterrence" as "the two primary objectives of criminal punishment"). The consequences of a criminal conviction are predicated on a finding of guilt beyond a reasonable doubt, *United States v. Gaudin*, 515 U.S. 506, 510 (1995); and such consequences can be severe, including asset forfeiture, incarceration and even death, *see, e.g.*, 18 U.S.C. §§ 982, 3581, 3591. Criminal prosecutions are overseen by the judiciary, which enforces stringent procedural protections that reflect the gravity of the potential ramifications for the defendant. *See Nixon*, 418 U.S. at 707 (describing "the primary constitutional duty of the Judicial Branch to do justice in criminal prosecutions"). The Double Jeopardy Clause is one such procedural protection, ensuring that a criminal defendant is not forced to face prosecution twice for the same offense.

In light of the very different procedures and purposes associated with impeachment proceedings as compared to criminal proceedings, former President Trump's reliance on the Double Jeopardy Clause is misplaced. Impeachment is not a criminal process and cannot result in criminal punishment.[15]

---

[15] When determining whether a punishment labeled "civil" by the Congress is criminal for double-jeopardy purposes, courts apply a multi-factored test. *See Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69 (1963). Because former President Trump does not contend impeachment threatens criminal punishment, and because we think the political nature of impeachment makes that clear, we need not address those factors. *Cf.* OLC Double Jeopardy Memo at 139–48 (concluding, under the *Mendoza-Martinez* test, that removal

55

He does not seriously contend otherwise; and he does not explain why he believes that impeachment can implicate "double jeopardy principles" when it does not involve criminal punishment.

## B. *BLOCKBURGER* TEST

Even if we assume that an impeachment trial is criminal under the Double Jeopardy Clause, the crimes alleged in the Indictment differ from the offense for which President Trump was impeached. In determining whether two charges are the "same" for double-jeopardy purposes, courts apply "the same-elements test" (also known as the "*Blockburger* test"): If "each offense contains an element not contained in the other," the offenses are different. *United States v. Dixon*, 509 U.S. 688, 696 (1993) (citing *Blockburger v. United States*, 284 U.S. 299, 304 (1932)) (cleaned up). If the charges at issue are not the "same offense" under that test, double jeopardy does not bar prosecution. *Id.* at 696–97.

Under the *Blockburger* test, none of the four offenses alleged in the Indictment is the same as the sole offense charged in the article of impeachment. The indicted criminal counts include conspiracy to defraud the United States under 18 U.S.C. § 371; conspiracy to obstruct and obstructing an official proceeding under 18 U.S.C. §§ 1512(c)(2), (k); and conspiracy to deprive one or more individuals of the right to vote under 18 U.S.C. § 241. *See* Indictment ¶¶ 6, 126, 128, 130. By contrast, the article of impeachment charged former President Trump with incitement of insurrection. *See* H.R. Res. 24, 117th Cong. (2021). Each of the indicted charges requires proof of an element other than those required for incitement. And the

———————————

and disqualification are not criminal punishments implicating double jeopardy).

56

offense of incitement of insurrection requires proof of incitement — an element that is distinct from those associated with each of the crimes of indictment. In other words, the charges are not the same under a straightforward application of the *Blockburger* test.

Former President Trump does not dispute this analysis and instead contends that, rather than applying the *Blockburger* test, a subsequent criminal prosecution cannot be based on "the same or closely related conduct" as an unsuccessful impeachment. Appellant's Br. 52. But that argument is foreclosed by case law: "The 'same-conduct' rule . . . is wholly inconsistent with . . . Supreme Court precedent and with the clear common-law understanding of double jeopardy." *Dixon*, 509 U.S. at 704; *see also Hudson*, 522 U.S. at 107 (Stevens, J., concurring in the judgment) ("[T]he Double Jeopardy Clause is not implicated simply because a criminal charge involves essentially the same conduct for which a defendant has previously been punished." (cleaned up)).

Thus, well-established law interpreting the Double Jeopardy Clause undermines rather than supports former President Trump's argument that he may not be prosecuted. Perhaps recognizing that normal double-jeopardy rules disfavor his position, he claims that the Impeachment Judgment Clause incorporates "double jeopardy principles" that are distinct from the Double Jeopardy Clause. *See* Appellant's Br. 54 n.7. But if the "double jeopardy principles" he invokes are unmoored from the Double Jeopardy Clause, we are unable to discern what the principles are or how to apply them. He thus fails to establish that his Senate acquittal bars his criminal prosecution.

\*    \*    \*

57

We have balanced former President Trump's asserted interests in executive immunity against the vital public interests that favor allowing this prosecution to proceed. We conclude that "[c]oncerns of public policy, especially as illuminated by our history and the structure of our government" compel the rejection of his claim of immunity in this case. *See Fitzgerald*, 457 U.S. at 747–48. We also have considered his contention that he is entitled to categorical immunity from criminal liability for any assertedly "official" action that he took as President — a contention that is unsupported by precedent, history or the text and structure of the Constitution. Finally, we are unpersuaded by his argument that this prosecution is barred by "double jeopardy principles." Accordingly, the order of the district court is AFFIRMED.[16]

*So ordered.*

---

[16] *Amici* former Attorney General Edwin Meese III and others argue that the appointment of Special Counsel Smith is invalid because (1) no statute authorizes the position Smith occupies and (2) the Special Counsel is a principal officer who must be nominated by the President and confirmed by the Senate. *See* U.S. CONST. art. II, § 2, cl. 2 (Appointments Clause). On appeal from a collateral order, we generally lack jurisdiction to consider issues that do not independently satisfy the collateral order doctrine unless we can exercise pendent jurisdiction over the issue. *See Abney*, 431 U.S. at 663; *Azima v. RAK Inv. Auth.*, 926 F.3d 870, 874 (D.C. Cir. 2019). Because the Appointments Clause issue was neither presented to nor decided by the district court, there is no order on the issue that could even arguably constitute a collateral order for us to review. Additionally, the exercise of pendent jurisdiction would be improper here, assuming without deciding that pendent jurisdiction is *ever* available in criminal appeals. *See Abney*, 431 U.S. at 663; *Gilda Marx, Inc. v. Wildwood Exercise, Inc.*, 85 F.3d 675, 679 (D.C. Cir. 1996).

58A

# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

**No. 23-3228**

**September Term, 2023**
FILED ON: FEBRUARY 6, 2024

UNITED STATES OF AMERICA,
    APPELLEE

v.

DONALD J. TRUMP,
    APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:23-cr-00257-1)

———

Before: HENDERSON, CHILDS and PAN, *Circuit Judges*

## J U D G M E N T

This cause came on to be heard on the record on appeal from the United States District Court for the District of Columbia and was argued by counsel. On consideration thereof, it is

**ORDERED** and **ADJUDGED** that the order of the District Court appealed from in this cause be affirmed, in accordance with the opinion of the court filed herein this date.

The Clerk is directed to withhold issuance of the mandate through February 12, 2024. If, within that period, Appellant notifies the Clerk in writing that he has filed an application with the Supreme Court for a stay of the mandate pending the filing of a petition for a writ of certiorari, the Clerk is directed to withhold issuance of the mandate pending the Supreme Court's final disposition of the application. The filing of a petition for rehearing or rehearing en banc will not result in any withholding of the mandate, although the grant of rehearing or rehearing en banc would result in a recall of the mandate if the mandate has already issued. *See* D.C. Cir. R. 41(a)(4).

### Per Curiam

**FOR THE COURT:**
Mark J. Langer, Clerk

BY:    /s/

Daniel J. Reidy
Deputy Clerk

Date: February 6, 2024

Opinion Per Curiam