Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## TRUMP *v.* UNITED STATES

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 23–939.   Argued April 25, 2024—Decided July 1, 2024

A federal grand jury indicted former President Donald J. Trump on four counts for conduct that occurred during his Presidency following the November 2020 election.  The indictment alleged that after losing that election, Trump conspired to overturn it by spreading knowingly false claims of election fraud to obstruct the collecting, counting, and certifying of the election results.  Trump moved to dismiss the indictment based on Presidential immunity, arguing that a President has absolute immunity from criminal prosecution for actions performed within the outer perimeter of his official responsibilities, and that the indictment's allegations fell within the core of his official duties.  The District Court denied Trump's motion to dismiss, holding that former Presidents do not possess federal criminal immunity for any acts.  The D. C. Circuit affirmed.  Both the District Court and the D. C. Circuit declined to decide whether the indicted conduct involved official acts.

*Held*: Under our constitutional structure of separated powers, the nature of Presidential power entitles a former President to absolute immunity from criminal prosecution for actions within his conclusive and preclusive constitutional authority.  And he is entitled to at least presumptive immunity from prosecution for all his official acts.  There is no immunity for unofficial acts.  Pp. 5–43.

   (a) This case is the first criminal prosecution in our Nation's history of a former President for actions taken during his Presidency.  Determining whether and under what circumstances such a prosecution may proceed requires careful assessment of the scope of Presidential power under the Constitution.  The nature of that power requires that a former President have some immunity from criminal prosecution for official acts during his tenure in office.  At least with respect to the

President's exercise of his core constitutional powers, this immunity must be absolute. As for his remaining official actions, he is entitled to at least presumptive immunity. Pp. 5–15.

(1) Article II of the Constitution vests "executive Power" in "a President of the United States of America." §1, cl. 1. The President has duties of "unrivaled gravity and breadth." *Trump* v. *Vance*, 591 U. S. 786, 800. His authority to act necessarily "stem[s] either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 585. In the latter case, the President's authority is sometimes "conclusive and preclusive." *Id.*, at 638 (Jackson, J., concurring). When the President exercises such authority, Congress cannot act on, and courts cannot examine, the President's actions. It follows that an Act of Congress—either a specific one targeted at the President or a generally applicable one—may not criminalize the President's actions within his exclusive constitutional power. Neither may the courts adjudicate a criminal prosecution that examines such Presidential actions. The Court thus concludes that the President is absolutely immune from criminal prosecution for conduct within his exclusive sphere of constitutional authority. Pp. 6–9.

(2) Not all of the President's official acts fall within his "conclusive and preclusive" authority. The reasons that justify the President's absolute immunity from criminal prosecution for acts within the scope of his exclusive constitutional authority do not extend to conduct in areas where his authority is shared with Congress. To determine the President's immunity in this context, the Court looks primarily to the Framers' design of the Presidency within the separation of powers, precedent on Presidential immunity in the civil context, and criminal cases where a President resisted prosecutorial demands for documents. P. 9.

(i) The Framers designed the Presidency to provide for a "vigorous" and "energetic" Executive. The Federalist No. 70, pp. 471–472 (J. Cooke ed. 1961) (A. Hamilton). They vested the President with "supervisory and policy responsibilities of utmost discretion and sensitivity." *Nixon* v. *Fitzgerald*, 457 U. S. 731, 750. Appreciating the "unique risks" that arise when the President's energies are diverted by proceedings that might render him "unduly cautious in the discharge of his official duties," the Court has recognized Presidential immunities and privileges "rooted in the constitutional tradition of the separation of powers and supported by our history." *Id.*, at 749, 751, 752, n. 32. In *Fitzgerald*, for instance, the Court concluded that a former President is entitled to absolute immunity from "damages liability for acts within the 'outer perimeter' of his official responsibility." *Id.*, at 756. The Court's "dominant concern" was to avoid "diversion of the President's attention during the decisionmaking process caused by needless

worry as to the possibility of damages actions stemming from any particular official decision." *Clinton* v. *Jones*, 520 U. S. 681, 694, n. 19.

By contrast, when prosecutors have sought evidence from the President, the Court has consistently rejected Presidential claims of absolute immunity. During the treason trial of former Vice President Aaron Burr, for instance, Chief Justice Marshall rejected President Thomas Jefferson's claim that the President could not be subjected to a subpoena. Marshall simultaneously recognized, however, the existence of a "privilege" to withhold certain "official paper[s]." *United States* v. *Burr*, 25 F. Cas. 187, 192 (No. 14,694) (CC Va.). And when a subpoena issued to President Richard Nixon, the Court rejected his claim of "absolute privilege." *United States* v. *Nixon*, 418 U. S. 683, 703. But recognizing "the public interest in candid, objective, and even blunt or harsh opinions in Presidential decisionmaking," it held that a "presumptive privilege" protects Presidential communications. *Id.*, at 708. Because that privilege "relates to the effective discharge of a President's powers," *id.*, at 711, the Court deemed it "fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." *Id.*, at 708. Pp. 9–12.

(ii) Criminally prosecuting a President for official conduct undoubtedly poses a far greater threat of intrusion on the authority and functions of the Executive Branch than simply seeking evidence in his possession. The danger is greater than what led the Court to recognize absolute Presidential immunity from civil damages liability—that the President would be chilled from taking the "bold and unhesitating action" required of an independent Executive. *Fitzgerald*, 457 U. S., at 745. Although the President might be exposed to fewer criminal prosecutions than civil damages suits, the threat of trial, judgment, and imprisonment is a far greater deterrent and plainly more likely to distort Presidential decisionmaking than the potential payment of civil damages. The hesitation to execute the duties of his office fearlessly and fairly that might result when a President is making decisions under "a pall of potential prosecution," *McDonnell* v. *United States*, 579 U. S. 550, 575, raises "unique risks to the effective functioning of government," *Fitzgerald*, 457 U. S., at 751. But there is also a compelling "public interest in fair and effective law enforcement." *Vance*, 591 U. S., at 808.

Taking into account these competing considerations, the Court concludes that the separation of powers principles explicated in the Court's precedent necessitate at least a *presumptive* immunity from criminal prosecution for a President's acts within the outer perimeter of his official responsibility. Such an immunity is required to safeguard the independence and effective functioning of the Executive

Branch, and to enable the President to carry out his constitutional duties without undue caution. At a minimum, the President must be immune from prosecution for an official act unless the Government can show that applying a criminal prohibition to that act would pose no "dangers of intrusion on the authority and functions of the Executive Branch." *Fitzgerald*, 457 U. S., at 754. Pp. 12–15.

(3) As for a President's unofficial acts, there is no immunity. Although Presidential immunity is required for *official* actions to ensure that the President's decisionmaking is not distorted by the threat of future litigation stemming from those actions, that concern does not support immunity for *unofficial* conduct. *Clinton*, 520 U. S., at 694, and n. 19. The separation of powers does not bar a prosecution predicated on the President's unofficial acts. P. 15.

(b) The first step in deciding whether a former President is entitled to immunity from a particular prosecution is to distinguish his official from unofficial actions. In this case, no court thus far has drawn that distinction, in general or with respect to the conduct alleged in particular. It is therefore incumbent upon the Court to be mindful that it is "a court of final review and not first view." *Zivotofsky* v. *Clinton*, 566 U. S. 189, 201. Critical threshold issues in this case are how to differentiate between a President's official and unofficial actions, and how to do so with respect to the indictment's extensive and detailed allegations covering a broad range of conduct. The Court offers guidance on those issues. Pp. 16–32.

(1) When the President acts pursuant to "constitutional and statutory authority," he takes official action to perform the functions of his office. *Fitzgerald*, 456 U. S., at 757. Determining whether an action is covered by immunity thus begins with assessing the President's authority to take that action. But the breadth of the President's "discretionary responsibilities" under the Constitution and laws of the United States frequently makes it "difficult to determine which of [his] innumerable 'functions' encompassed a particular action." *Id.*, at 756. The immunity the Court has recognized therefore extends to the "outer perimeter" of the President's official responsibilities, covering actions so long as they are "not manifestly or palpably beyond [his] authority." *Blassingame* v. *Trump*, 87 F. 4th 1, 13 (CADC).

In dividing official from unofficial conduct, courts may not inquire into the President's motives. Such a "highly intrusive" inquiry would risk exposing even the most obvious instances of official conduct to judicial examination on the mere allegation of improper purpose. *Fitzgerald*, 457 U. S., at 756. Nor may courts deem an action unofficial merely because it allegedly violates a generally applicable law. Otherwise, Presidents would be subject to trial on "every allegation that an action was unlawful," depriving immunity of its intended effect.

*Ibid.* Pp. 17–19.

    (2) With the above principles in mind, the Court turns to the conduct alleged in the indictment. Certain allegations—such as those involving Trump's discussions with the Acting Attorney General—are readily categorized in light of the nature of the President's official relationship to the office held by that individual. Other allegations—such as those involving Trump's interactions with the Vice President, state officials, and certain private parties, and his comments to the general public—present more difficult questions. Pp. 19–30.

        (i) The indictment alleges that as part of their conspiracy to overturn the legitimate results of the 2020 presidential election, Trump and his co-conspirators attempted to leverage the Justice Department's power and authority to convince certain States to replace their legitimate electors with Trump's fraudulent slates of electors. According to the indictment, Trump met with the Acting Attorney General and other senior Justice Department and White House officials to discuss investigating purported election fraud and sending a letter from the Department to those States regarding such fraud. The indictment further alleges that after the Acting Attorney General resisted Trump's requests, Trump repeatedly threatened to replace him.

    The Government does not dispute that the indictment's allegations regarding the Justice Department involve Trump's use of official power. The allegations in fact plainly implicate Trump's "conclusive and preclusive" authority. The Executive Branch has "exclusive authority and absolute discretion" to decide which crimes to investigate and prosecute, including with respect to allegations of election crime. *Nixon*, 418 U. S., at 693. And the President's "management of the Executive Branch" requires him to have "unrestricted power to remove the most important of his subordinates"—such as the Attorney General—"in their most important duties." *Fitzgerald*, 457 U. S., at 750. The indictment's allegations that the requested investigations were shams or proposed for an improper purpose do not divest the President of exclusive authority over the investigative and prosecutorial functions of the Justice Department and its officials. Because the President cannot be prosecuted for conduct within his exclusive constitutional authority, Trump is absolutely immune from prosecution for the alleged conduct involving his discussions with Justice Department officials. Pp. 19–21.

        (ii) The indictment next alleges that Trump and his co-conspirators "attempted to enlist the Vice President to use his ceremonial role at the January 6 certification proceeding to fraudulently alter the election results." App. 187, Indictment ¶10(d). In particular, the indictment alleges several conversations in which Trump pressured the Vice President to reject States' legitimate electoral votes or send them back

to state legislatures for review.

Whenever the President and Vice President discuss their official responsibilities, they engage in official conduct. Presiding over the January 6 certification proceeding at which Members of Congress count the electoral votes is a constitutional and statutory duty of the Vice President. Art. II, §1, cl. 3; Amdt. 12; 3 U. S. C. §15. The indictment's allegations that Trump attempted to pressure the Vice President to take particular acts in connection with his role at the certification proceeding thus involve official conduct, and Trump is at least presumptively immune from prosecution for such conduct.

The question then becomes whether that presumption of immunity is rebutted under the circumstances. It is the Government's burden to rebut the presumption of immunity. The Court therefore remands to the District Court to assess in the first instance whether a prosecution involving Trump's alleged attempts to influence the Vice President's oversight of the certification proceeding would pose any dangers of intrusion on the authority and functions of the Executive Branch. Pp. 21–24.

(iii) The indictment's remaining allegations involve Trump's interactions with persons outside the Executive Branch: state officials, private parties, and the general public. In particular, the indictment alleges that Trump and his co-conspirators attempted to convince certain state officials that election fraud had tainted the popular vote count in their States, and thus electoral votes for Trump's opponent needed to be changed to electoral votes for Trump. After Trump failed to convince those officials to alter their state processes, he and his co-conspirators allegedly developed and effectuated a plan to submit fraudulent slates of Presidential electors to obstruct the certification proceeding. On Trump's view, the alleged conduct qualifies as official because it was undertaken to ensure the integrity and proper administration of the federal election. As the Government sees it, however, Trump can point to no plausible source of authority enabling the President to take such actions. Determining whose characterization may be correct, and with respect to which conduct, requires a fact-specific analysis of the indictment's extensive and interrelated allegations. The Court accordingly remands to the District Court to determine in the first instance whether Trump's conduct in this area qualifies as official or unofficial. Pp. 24–28.

(iv) The indictment also contains various allegations regarding Trump's conduct in connection with the events of January 6 itself. The alleged conduct largely consists of Trump's communications in the form of Tweets and a public address. The President possesses "extraordinary power to speak to his fellow citizens and on their behalf." *Trump* v. *Hawaii*, 585 U. S. 667, 701. So most of a President's public

communications are likely to fall comfortably within the outer perimeter of his official responsibilities.  There may, however, be contexts in which the President speaks in an unofficial capacity—perhaps as a candidate for office or party leader.  To the extent that may be the case, objective analysis of "content, form, and context" will necessarily inform the inquiry.  *Snyder* v. *Phelps*, 562 U. S. 443, 453.  Whether the communications alleged in the indictment involve official conduct may depend on the content and context of each.  This necessarily factbound analysis is best performed initially by the District Court.  The Court therefore remands to the District Court to determine in the first instance whether this alleged conduct is official or unofficial.  Pp. 28–30.

(3) Presidents cannot be indicted based on conduct for which they are immune from prosecution.  On remand, the District Court must carefully analyze the indictment's remaining allegations to determine whether they too involve conduct for which a President must be immune from prosecution.  And the parties and the District Court must ensure that sufficient allegations support the indictment's charges without such conduct.  Testimony or private records of the President or his advisers probing such conduct may not be admitted as evidence at trial.  Pp. 30–32.

(c) Trump asserts a far broader immunity than the limited one the Court recognizes, contending that the indictment must be dismissed because the Impeachment Judgment Clause requires that impeachment and Senate conviction precede a President's criminal prosecution.  But the text of the Clause does not address whether and on what conduct a President may be prosecuted if he was never impeached and convicted.  See Art. I, §3, cl. 7.  Historical evidence likewise lends little support to Trump's position.  The Federalist Papers on which Trump relies concerned the checks available against a *sitting* President; they did not endorse or even consider whether the Impeachment Judgment Clause immunizes a *former* President from prosecution.  Transforming the political process of impeachment into a necessary step in the enforcement of criminal law finds little support in the text of the Constitution or the structure of the Nation's Government.  Pp. 32–34.

(d) The Government takes a similarly broad view, contending that the President enjoys no immunity from criminal prosecution for any action.  On its view, as-applied challenges in the course of the trial suffice to protect Article II interests, and review of a district court's decisions on such challenges should be deferred until after trial.  But questions about whether the President may be held liable for particular actions, consistent with the separation of powers, must be addressed at the outset of a proceeding.  Even if the President were ultimately not found liable for certain official actions, the possibility of an extended proceeding alone may render him "unduly cautious in the

discharge of his official duties." *Fitzgerald*, 457 U. S., at 752, n. 32. The Constitution does not tolerate such impediments to "the effective functioning of government." *Id.*, at 751.  Pp. 34–37.

(e) This case poses a question of lasting significance: When may a former President be prosecuted for official acts taken during his Presidency?  In answering that question, unlike the political branches and the public at large, the Court cannot afford to fixate exclusively, or even primarily, on present exigencies.  Enduring separation of powers principles guide our decision in this case.  The President enjoys no immunity for his unofficial acts, and not everything the President does is official.  The President is not above the law.  But under our system of separated powers, the President may not be prosecuted for exercising his core constitutional powers, and he is entitled to at least presumptive immunity from prosecution for his official acts.  That immunity applies equally to all occupants of the Oval Office.  Pp. 41–43.

91 F. 4th 1173, vacated and remanded.

ROBERTS, C. J., delivered the opinion of the Court, in which THOMAS, ALITO, GORSUCH, and KAVANAUGH, JJ., joined in full, and in which BARRETT, J., joined except as to Part III–C.  THOMAS, J., filed a concurring opinion.  BARRETT, J., filed an opinion concurring in part.  SOTOMAYOR, J., filed a dissenting opinion, in which KAGAN and JACKSON, JJ., joined. JACKSON, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the
United States Reports. Readers are requested to notify the Reporter of
Decisions, Supreme Court of the United States, Washington, D. C. 20543,
pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

_____

No. 23–939

_____

## DONALD J. TRUMP, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[July 1, 2024]

CHIEF JUSTICE ROBERTS delivered the opinion of the
Court.

This case concerns the federal indictment of a former
President of the United States for conduct alleged to involve
official acts during his tenure in office. We consider the
scope of a President's immunity from criminal prosecution.

I

From January 2017 until January 2021, Donald J.
Trump served as President of the United States. On Au-
gust 1, 2023, a federal grand jury indicted him on four
counts for conduct that occurred during his Presidency fol-
lowing the November 2020 election. The indictment alleged
that after losing that election, Trump conspired to overturn
it by spreading knowingly false claims of election fraud to
obstruct the collecting, counting, and certifying of the elec-
tion results.

According to the indictment, Trump advanced his goal
through five primary means. First, he and his co-conspirators
"used knowingly false claims of election fraud to get state
legislators and election officials to . . . change electoral

votes for [Trump's] opponent, Joseph R. Biden, Jr., to electoral votes for [Trump]." App. 185, Indictment ¶10(a). Second, Trump and his co-conspirators "organized fraudulent slates of electors in seven targeted states" and "caused these fraudulent electors to transmit their false certificates to the Vice President and other government officials to be counted at the certification proceeding on January 6." *Id.*, at 186, ¶10(b). Third, Trump and his co-conspirators attempted to use the Justice Department "to conduct sham election crime investigations and to send a letter to the targeted states that falsely claimed that the Justice Department had identified significant concerns that may have impacted the election outcome." *Id.*, at 186–187, ¶10(c). Fourth, Trump and his co-conspirators attempted to persuade "the Vice President to use his ceremonial role at the January 6 certification proceeding to fraudulently alter the election results." *Id.*, at 187, ¶10(d). And when that failed, on the morning of January 6, they "repeated knowingly false claims of election fraud to gathered supporters, falsely told them that the Vice President had the authority to and might alter the election results, and directed them to the Capitol to obstruct the certification proceeding." *Ibid.* Fifth, when "a large and angry crowd . . . violently attacked the Capitol and halted the proceeding," Trump and his co-conspirators "exploited the disruption by redoubling efforts to levy false claims of election fraud and convince Members of Congress to further delay the certification." *Id.*, at 187–188, ¶10(e).

Based on this alleged conduct, the indictment charged Trump with (1) conspiracy to defraud the United States in violation of 18 U. S. C. §371, (2) conspiracy to obstruct an official proceeding in violation of §1512(k), (3) obstruction of and attempt to obstruct an official proceeding in violation

of §1512(c)(2), §2, and (4) conspiracy against rights in violation of §241.[1]

Trump moved to dismiss the indictment based on Presidential immunity. In his view, the conduct alleged in the indictment, properly characterized, was that while he was President he (1) "made public statements about the administration of the federal election"; (2) communicated with senior Justice Department officials "about investigating election fraud and about choosing the leadership" of the Department; (3) "communicated with state officials about the administration of the federal election and their exercise of official duties with respect to it"; (4) "communicated with the Vice President" and with "Members of Congress about the exercise of their official duties regarding the election certification"; and (5) "authorized or directed others to organize contingent slates of electors in furtherance of his attempts to convince the Vice President to exercise his official authority in a manner advocated for by President Trump." Motion To Dismiss Indictment Based on Presidential Immunity in No. 1:23–cr–00257 (DC), ECF Doc. 74, p. 9. Trump argued that all of the indictment's allegations fell within the core of his official duties. *Id.*, at 27. And he contended that a President has absolute immunity from criminal prosecution for actions performed within the outer perimeter of his official responsibilities, to ensure that he can undertake the especially sensitive duties of his office with bold and unhesitating action. *Id.*, at 14, 24.

The District Court denied the motion to dismiss, holding

_____

[1] Trump contends that the indictment stretches Section 1512(c)(2) "far beyond its natural meaning." Brief for Petitioner 39, n. 4. As we explained in *Fischer* v. *United States*, Section 1512(c)(2) covers acts that impair "the availability or integrity for use in an official proceeding of records, documents, objects, or . . . other things used in the proceeding." 603 U. S. ___, ___ (2024) (slip op., at 16). If necessary, the District Court should determine in the first instance whether the Section 1512(c)(2) charges may proceed in light of our decision in *Fischer*.

that "former Presidents do not possess absolute federal criminal immunity for any acts committed while in office." 2023 WL 8359833, \*15 (DC, Dec. 1, 2023). The District Court recognized that the President is immune from damages liability in civil cases, to protect against the chilling effect such exposure might have on the carrying out of his responsibilities. See *Nixon* v. *Fitzgerald*, 457 U. S. 731, 749–756 (1982). But it reasoned that "the possibility of vexatious post-Presidency litigation is much reduced in the criminal context" in light of "[t]he robust procedural safeguards attendant to federal criminal prosecutions." 2023 WL 8359833, \*9–\*10. The District Court declined to decide whether the indicted conduct involved official acts. See *id.*, at \*15.

The D. C. Circuit affirmed. 91 F. 4th 1173 (2024) (*per curiam*). Citing *Marbury* v. *Madison*, 1 Cranch 137 (1803), the court distinguished between two kinds of official acts: discretionary and ministerial. 91 F. 4th, at 1189–1190. It observed that "although discretionary acts are 'only politically examinable,' the judiciary has the power to hear cases" involving ministerial acts that an officer is directed to perform by the legislature. *Ibid.* (quoting *Marbury*, 1 Cranch, at 166). From this distinction, the D. C. Circuit concluded that the "separation of powers doctrine, as expounded in *Marbury* and its progeny, necessarily permits the Judiciary to oversee the federal criminal prosecution of a former President for his official acts because the fact of the prosecution means that the former President has allegedly acted in defiance of the Congress's laws." 91 F. 4th, at 1191. In the court's view, the fact that Trump's actions "allegedly violated generally applicable criminal laws" meant that those actions "were not properly within the scope of his lawful discretion." *Id.*, at 1192. The D. C. Circuit thus concluded that Trump had "no structural immunity from the charges in the Indictment." *Ibid.* Like the District Court, the D. C.

Circuit declined to analyze the actions described in the indictment to determine whether they involved official acts. See *id.*, at 1205, n. 14.

We granted certiorari to consider the following question: "Whether and if so to what extent does a former President enjoy presidential immunity from criminal prosecution for conduct alleged to involve official acts during his tenure in office." 601 U. S. ___ (2024).

## II

This case is the first criminal prosecution in our Nation's history of a former President for actions taken during his Presidency. We are called upon to consider whether and under what circumstances such a prosecution may proceed. Doing so requires careful assessment of the scope of Presidential power under the Constitution. We undertake that responsibility conscious that we must not confuse "the issue of a power's validity with the cause it is invoked to promote," but must instead focus on the "enduring consequences upon the balanced power structure of our Republic." *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 634 (1952) (Jackson, J., concurring).

The parties before us do not dispute that a former President can be subject to criminal prosecution for unofficial acts committed while in office. See Tr. of Oral Arg. 28. They also agree that some of the conduct described in the indictment includes actions taken by Trump in his unofficial capacity. See *id.*, at 28–30, 36–37, 124.

They disagree, however, about whether a former President can be prosecuted for his official actions. Trump contends that just as a President is absolutely immune from civil damages liability for acts within the outer perimeter of his official responsibilities, *Fitzgerald*, 457 U. S., at 756, he must be absolutely immune from criminal prosecution for such acts. Brief for Petitioner 10. And Trump argues that the bulk of the indictment's allegations involve conduct in

his official capacity as President. See Tr. of Oral Arg. 30–32. Although the Government agrees that some official actions are included in the indictment's allegations, see *id.*, at 125, it maintains that a former President does not enjoy immunity from criminal prosecution for any actions, regardless of how they are characterized. See Brief for United States 9.

We conclude that under our constitutional structure of separated powers, the nature of Presidential power requires that a former President have some immunity from criminal prosecution for official acts during his tenure in office. At least with respect to the President's exercise of his core constitutional powers, this immunity must be absolute. As for his remaining official actions, he is also entitled to immunity. At the current stage of proceedings in this case, however, we need not and do not decide whether that immunity must be absolute, or instead whether a presumptive immunity is sufficient.

## A

Article II of the Constitution provides that "[t]he executive Power shall be vested in a President of the United States of America." §1, cl. 1. The President's duties are of "unrivaled gravity and breadth." *Trump* v. *Vance*, 591 U. S. 786, 800 (2020). They include, for instance, commanding the Armed Forces of the United States; granting reprieves and pardons for offenses against the United States; and appointing public ministers and consuls, the Justices of this Court, and Officers of the United States. See §2. He also has important foreign relations responsibilities: making treaties, appointing ambassadors, recognizing foreign governments, meeting foreign leaders, overseeing international diplomacy and intelligence gathering, and managing matters related to terrorism, trade, and immigration. See §§2, 3. Domestically, he must "take Care that the Laws be faithfully executed," §3, and he bears responsibility for the

actions of the many departments and agencies within the Executive Branch. He also plays a role in lawmaking by recommending to Congress the measures he thinks wise and signing or vetoing the bills Congress passes. See Art. I, §7, cl. 2; Art. II, §3.

No matter the context, the President's authority to act necessarily "stem[s] either from an act of Congress or from the Constitution itself." *Youngstown*, 343 U. S., at 585. In the latter case, the President's authority is sometimes "conclusive and preclusive." *Id.*, at 638 (Jackson, J., concurring). When the President exercises such authority, he may act even when the measures he takes are "incompatible with the expressed or implied will of Congress." *Id.*, at 637. The exclusive constitutional authority of the President "disabl[es] the Congress from acting upon the subject." *Id.*, at 637–638. And the courts have "no power to control [the President's] discretion" when he acts pursuant to the powers invested exclusively in him by the Constitution. *Marbury*, 1 Cranch, at 166.

If the President claims authority to act but in fact exercises mere "individual will" and "authority without law," the courts may say so. *Youngstown*, 343 U. S., at 655 (Jackson, J., concurring). In *Youngstown*, for instance, we held that President Truman exceeded his constitutional authority when he seized most of the Nation's steel mills. See *id.*, at 582–589 (majority opinion). But once it is determined that the President acted within the scope of his exclusive authority, his discretion in exercising such authority cannot be subject to further judicial examination.

The Constitution, for example, vests the "Power to Grant Reprieves and Pardons for Offences against the United States" in the President. Art. II, §2, cl. 1. During and after the Civil War, President Lincoln offered a full pardon, with restoration of property rights, to anyone who had "engaged in the rebellion" but agreed to take an oath of allegiance to the Union. *United States* v. *Klein*, 13 Wall. 128, 139–141

(1872). But in 1870, Congress enacted a provision that prohibited using the President's pardon as evidence of restoration of property rights. *Id.*, at 143–144. Chief Justice Chase held the provision unconstitutional because it "impair[ed] the effect of a pardon, and thus infring[ed] the constitutional power of the Executive." *Id.*, at 147. "To the executive alone is intrusted the power of pardon," and the "legislature cannot change the effect of such a pardon any more than the executive can change a law." *Id.*, at 147–148. The President's authority to pardon, in other words, is "conclusive and preclusive," "disabling the Congress from acting upon the subject." *Youngstown*, 343 U. S., at 637–638 (Jackson, J., concurring).

Some of the President's other constitutional powers also fit that description. "The President's power to remove—and thus supervise—those who wield executive power on his behalf," for instance, "follows from the text of Article II." *Seila Law LLC* v. *Consumer Financial Protection Bureau*, 591 U. S. 197, 204 (2020). We have thus held that Congress lacks authority to control the President's "unrestricted power of removal" with respect to "executive officers of the United States whom he has appointed." *Myers* v. *United States*, 272 U. S. 52, 106, 176 (1926); see *Youngstown*, 343 U. S., at 638, n. 4 (Jackson, J., concurring) (citing the President's "exclusive power of removal in executive agencies" as an example of "conclusive and preclusive" constitutional authority); cf. *Seila Law*, 591 U. S., at 215 (noting only "two exceptions to the President's unrestricted removal power"). The power "to control recognition determinations" of foreign countries is likewise an "exclusive power of the President." *Zivotofsky* v. *Kerry*, 576 U. S. 1, 32 (2015). Congressional commands contrary to the President's recognition determinations are thus invalid. *Ibid.*

Congress cannot act on, and courts cannot examine, the President's actions on subjects within his "conclusive and preclusive" constitutional authority. It follows that an Act

of Congress—either a specific one targeted at the President or a generally applicable one—may not criminalize the President's actions within his exclusive constitutional power. Neither may the courts adjudicate a criminal prosecution that examines such Presidential actions. We thus conclude that the President is absolutely immune from criminal prosecution for conduct within his exclusive sphere of constitutional authority.

### B

But of course not all of the President's official acts fall within his "conclusive and preclusive" authority. As Justice Robert Jackson recognized in *Youngstown*, the President sometimes "acts pursuant to an express or implied authorization of Congress," or in a "zone of twilight" where "he and Congress may have concurrent authority." 343 U. S., at 635, 637 (concurring opinion). The reasons that justify the President's absolute immunity from criminal prosecution for acts within the scope of his exclusive authority therefore do not extend to conduct in areas where his authority is shared with Congress.

We recognize that only a limited number of our prior decisions guide determination of the President's immunity in this context. That is because proceedings directly involving a President have been uncommon in our Nation, and "decisions of the Court in this area" have accordingly been "rare" and "episodic." *Dames & Moore* v. *Regan*, 453 U. S. 654, 661 (1981). To resolve the matter, therefore, we look primarily to the Framers' design of the Presidency within the separation of powers, our precedent on Presidential immunity in the civil context, and our criminal cases where a President resisted prosecutorial demands for documents.

### 1

The President "occupies a unique position in the constitutional scheme," *Fitzgerald*, 457 U. S., at 749, as "the only

person who alone composes a branch of government,"
*Trump* v. *Mazars USA, LLP*, 591 U. S. 848, 868 (2020). The
Framers "sought to encourage energetic, vigorous, decisive,
and speedy execution of the laws by placing in the hands of
a single, constitutionally indispensable, individual the ulti-
mate authority that, in respect to the other branches, the
Constitution divides among many." *Clinton* v. *Jones*, 520
U. S. 681, 712 (1997) (Breyer, J., concurring in judgment).
They "deemed an energetic executive essential to 'the pro-
tection of the community against foreign attacks,' 'the
steady administration of the laws,' 'the protection of prop-
erty,' and 'the security of liberty.'" *Seila Law*, 591 U. S., at
223–224 (quoting The Federalist No. 70, p. 471 (J. Cooke
ed. 1961) (A. Hamilton)). The purpose of a "vigorous" and
"energetic" Executive, they thought, was to ensure "good
government," for a "feeble executive implies a feeble execu-
tion of the government." *Id.*, at 471–472.

The Framers accordingly vested the President with "su-
pervisory and policy responsibilities of utmost discretion
and sensitivity." *Fitzgerald*, 457 U. S., at 750. He must
make "the most sensitive and far-reaching decisions en-
trusted to any official under our constitutional system." *Id.*,
at 752. There accordingly "exists the greatest public inter-
est" in providing the President with "'the maximum ability
to deal fearlessly and impartially with' the duties of his of-
fice." *Ibid.* (quoting *Ferri* v. *Ackerman*, 444 U. S. 193, 203
(1979)). Appreciating the "unique risks to the effective
functioning of government" that arise when the President's
energies are diverted by proceedings that might render him
"unduly cautious in the discharge of his official duties," we
have recognized Presidential immunities and privileges
"rooted in the constitutional tradition of the separation of
powers and supported by our history." *Fitzgerald*, 457
U. S., at 749, 751, 752, n. 32.

In *Nixon* v. *Fitzgerald*, for instance, we recognized that
as "a functionally mandated incident of [his] unique office,"

a former President "is entitled to absolute immunity from damages liability predicated on his official acts." *Id.*, at 749. That case involved a terminated Air Force employee who sued former President Richard Nixon for damages, alleging that Nixon approved an Air Force reorganization that wrongfully led to his firing. In holding that Nixon was immune from that suit, "our dominant concern" was to avoid "diversion of the President's attention during the decisionmaking process caused by needless worry as to the possibility of damages actions stemming from any particular official decision." *Clinton*, 520 U. S., at 694, n. 19. "[T]he singular importance of the President's duties" implicating "matters likely to 'arouse the most intense feelings,'" coupled with "the sheer prominence of [his] office," heightens the prospect of private damages suits that would threaten such diversion. *Fitzgerald*, 457 U. S., at 751–753 (quoting *Pierson* v. *Ray*, 386 U. S. 547, 554 (1967)). We therefore concluded that the President must be absolutely immune from "damages liability for acts within the 'outer perimeter' of his official responsibility." *Fitzgerald*, 457 U. S., at 756.

By contrast, when prosecutors have sought evidence from the President, we have consistently rejected Presidential claims of absolute immunity. For instance, during the treason trial of former Vice President Aaron Burr, Chief Justice Marshall rejected President Thomas Jefferson's claim that the President could not be subjected to a subpoena. Marshall reasoned that "the law does not discriminate between the president and a private citizen." *United States* v. *Burr*, 25 F. Cas. 30, 34 (No. 14,692d) (CC Va. 1807) (*Burr I*). Because a President does not "stand exempt from the general provisions of the constitution," including the Sixth Amendment's guarantee that those accused shall have compulsory process for obtaining witnesses for their defense, a subpoena could issue. *Id.*, at 33–34.

Marshall acknowledged, however, the existence of a

"privilege" to withhold certain "official paper[s]" that "ought not on light ground to be forced into public view." *United States* v. *Burr*, 25 F. Cas. 187, 192 (No. 14,694) (CC Va. 1807) (*Burr II*); see also *Burr I*, 25 F. Cas., at 37 (stating that nothing before the court showed that the document in question "contain[ed] any matter the disclosure of which would endanger the public safety"). And he noted that a court may not "be required to proceed against the president as against an ordinary individual." *Burr II*, 25 F. Cas., at 192.

Similarly, when a subpoena issued to President Nixon to produce certain tape recordings and documents relating to his conversations with aides and advisers, this Court rejected his claim of "absolute privilege," given the "constitutional duty of the Judicial Branch to do justice in criminal prosecutions." *United States* v. *Nixon*, 418 U. S. 683, 703, 707 (1974). But we simultaneously recognized "the public interest in candid, objective, and even blunt or harsh opinions in Presidential decisionmaking," as well as the need to protect "communications between high Government officials and those who advise and assist them in the performance of their manifold duties." *Id.*, at 705, 708. Because the President's "need for complete candor and objectivity from advisers calls for great deference from the courts," we held that a "presumptive privilege" protects Presidential communications. *Id.*, at 706, 708. That privilege, we explained, "relates to the effective discharge of a President's powers." *Id.*, at 711. We thus deemed it "fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." *Id.*, at 708.

### 2

Criminally prosecuting a President for official conduct undoubtedly poses a far greater threat of intrusion on the authority and functions of the Executive Branch than simply seeking evidence in his possession, as in *Burr* and

*Nixon.* The danger is akin to, indeed greater than, what led us to recognize absolute Presidential immunity from civil damages liability—that the President would be chilled from taking the "bold and unhesitating action" required of an independent Executive. *Fitzgerald*, 457 U. S., at 745. Although the President might be exposed to fewer criminal prosecutions than the range of civil damages suits that might be brought by various plaintiffs, the threat of trial, judgment, and imprisonment is a far greater deterrent. Potential criminal liability, and the peculiar public opprobrium that attaches to criminal proceedings, are plainly more likely to distort Presidential decisionmaking than the potential payment of civil damages.

The hesitation to execute the duties of his office fearlessly and fairly that might result when a President is making decisions under "a pall of potential prosecution," *McDonnell* v. *United States*, 579 U. S. 550, 575 (2016), raises "unique risks to the effective functioning of government," *Fitzgerald*, 457 U. S., at 751. A President inclined to take one course of action based on the public interest may instead opt for another, apprehensive that criminal penalties may befall him upon his departure from office. And if a former President's official acts are routinely subjected to scrutiny in criminal prosecutions, "the independence of the Executive Branch" may be significantly undermined. *Vance*, 591 U. S., at 800. The Framers' design of the Presidency did not envision such counterproductive burdens on the "vigor[]" and "energy" of the Executive. The Federalist No. 70, at 471–472.

We must, however, "recognize[] the countervailing interests at stake." *Vance*, 591 U. S., at 799. Federal criminal laws seek to redress "a wrong to the public" as a whole, not just "a wrong to the individual." *Huntington* v. *Attrill*, 146 U. S. 657, 668 (1892). There is therefore a compelling "public interest in fair and effective law enforcement." *Vance*, 591 U. S., at 808. The President, charged with enforcing

federal criminal laws, is not above them.

Chief Justice Marshall's decisions in *Burr* and our decision in *Nixon* recognized the distinct interests present in criminal prosecutions. Although *Burr* acknowledged that the President's official papers may be privileged and publicly unavailable, it did not grant him an absolute exemption from responding to subpoenas. See *Burr II*, 25 F. Cas., at 192; *Burr I*, 25 F. Cas., at 33–34. *Nixon* likewise recognized a strong protection for the President's confidential communications—a "presumptive privilege"—but it did not entirely exempt him from providing evidence in criminal proceedings. 418 U. S., at 708.

Taking into account these competing considerations, we conclude that the separation of powers principles explicated in our precedent necessitate at least a *presumptive* immunity from criminal prosecution for a President's acts within the outer perimeter of his official responsibility. Such an immunity is required to safeguard the independence and effective functioning of the Executive Branch, and to enable the President to carry out his constitutional duties without undue caution. Indeed, if presumptive protection for the President is necessary to enable the "effective discharge" of his powers when a prosecutor merely seeks evidence of his official papers and communications, *id.*, at 711, it is certainly necessary when the prosecutor seeks to charge, try, and imprison the President himself for his official actions. At a minimum, the President must therefore be immune from prosecution for an official act unless the Government can show that applying a criminal prohibition to that act would pose no "dangers of intrusion on the authority and functions of the Executive Branch." *Fitzgerald*, 457 U. S., at 754.

But as we explain below, the current stage of the proceedings in this case does not require us to decide whether this immunity is presumptive or absolute. See Part III–B, *infra*. Because we need not decide that question today, we do not

decide it. "[O]ne case" in more than "two centuries does not afford enough experience" to definitively and comprehensively determine the President's scope of immunity from criminal prosecution. *Mazars*, 591 U. S., at 871.

## C

As for a President's unofficial acts, there is no immunity. The principles we set out in *Clinton* v. *Jones* confirm as much. When Paula Jones brought a civil lawsuit against then-President Bill Clinton for acts he allegedly committed prior to his Presidency, we rejected his argument that he enjoyed temporary immunity from the lawsuit while serving as President. 520 U. S., at 684. Although Presidential immunity is required for *official* actions to ensure that the President's decisionmaking is not distorted by the threat of future litigation stemming from those actions, that concern does not support immunity for *unofficial* conduct. *Id.*, at 694, and n. 19. The "'justifying purposes'" of the immunity we recognized in *Fitzgerald*, and the one we recognize today, are not that the President must be immune because he is the President; rather, they are to ensure that the President can undertake his constitutionally designated functions effectively, free from undue pressures or distortions. 520 U. S., at 694, and n. 19 (quoting *Fitzgerald*, 457 U. S., at 755). "[I]t [is] the nature of the function performed, not the identity of the actor who perform[s] it, that inform[s] our immunity analysis." *Forrester* v. *White*, 484 U. S. 219, 229 (1988). The separation of powers does not bar a prosecution predicated on the President's unofficial acts.[2]

——————
[2] Our decision in *Clinton* permitted claims alleging unofficial acts to proceed against the sitting President. See 520 U. S., at 684. In the criminal context, however, the Justice Department "has long recognized" that "the separation of powers precludes the criminal prosecution of a sitting President." Brief for United States 9 (citing A Sitting President's Amenability to Indictment and Criminal Prosecution, 24 Op. OLC 222 (2000); emphasis deleted); see Tr. for Oral Arg. 78.

### III

Determining whether a former President is entitled to immunity from a particular prosecution requires applying the principles we have laid out to his conduct at issue. The first step is to distinguish his official from unofficial actions. In this case, however, no court has thus far considered how to draw that distinction, in general or with respect to the conduct alleged in particular.

Despite the unprecedented nature of this case, and the very significant constitutional questions that it raises, the lower courts rendered their decisions on a highly expedited basis. Because those courts categorically rejected *any* form of Presidential immunity, they did not analyze the conduct alleged in the indictment to decide which of it should be categorized as official and which unofficial. Neither party has briefed that issue before us (though they discussed it at oral argument in response to questions). And like the underlying immunity question, that categorization raises multiple unprecedented and momentous questions about the powers of the President and the limits of his authority under the Constitution. As we have noted, there is little pertinent precedent on those subjects to guide our review of this case—a case that we too are deciding on an expedited basis, less than five months after we granted the Government's request to construe Trump's emergency application for a stay as a petition for certiorari, grant that petition, and answer the consequential immunity question. See 601 U. S., at ___. Given all these circumstances, it is particularly incumbent upon us to be mindful of our frequent admonition that "[o]urs is a court of final review and not first view." *Zivotofsky* v. *Clinton*, 566 U. S. 189, 201 (2012) (internal quotation marks omitted).

Critical threshold issues in this case are how to differentiate between a President's official and unofficial actions, and how to do so with respect to the indictment's extensive and detailed allegations covering a broad range of conduct.

We offer guidance on those issues below. Certain allegations—such as those involving Trump's discussions with the Acting Attorney General—are readily categorized in light of the nature of the President's official relationship to the office held by that individual. Other allegations—such as those involving Trump's interactions with the Vice President, state officials, and certain private parties, and his comments to the general public—present more difficult questions. Although we identify several considerations pertinent to classifying those allegations and determining whether they are subject to immunity, that analysis ultimately is best left to the lower courts to perform in the first instance.

A

Distinguishing the President's official actions from his unofficial ones can be difficult. When the President acts pursuant to "constitutional and statutory authority," he takes official action to perform the functions of his office. *Fitzgerald*, 457 U. S., at 757. Determining whether an action is covered by immunity thus begins with assessing the President's authority to take that action.

But the breadth of the President's "discretionary responsibilities" under the Constitution and laws of the United States "in a broad variety of areas, many of them highly sensitive," frequently makes it "difficult to determine which of [his] innumerable 'functions' encompassed a particular action." *Id.*, at 756. And some Presidential conduct—for example, speaking to and on behalf of the American people, see *Trump* v. *Hawaii*, 585 U. S. 667, 701 (2018)—certainly can qualify as official even when not obviously connected to a particular constitutional or statutory provision. For those reasons, the immunity we have recognized extends to the "outer perimeter" of the President's official responsibilities, covering actions so long as they are "not manifestly or palpably beyond [his] authority." *Blassingame* v. *Trump*, 87

F. 4th 1, 13 (CADC 2023) (internal quotation marks omitted); see *Fitzgerald*, 457 U. S., at 755–756 (noting that we have "refused to draw functional lines finer than history and reason would support").

In dividing official from unofficial conduct, courts may not inquire into the President's motives. Such an inquiry would risk exposing even the most obvious instances of official conduct to judicial examination on the mere allegation of improper purpose, thereby intruding on the Article II interests that immunity seeks to protect. Indeed, "[i]t would seriously cripple the proper and effective administration of public affairs as entrusted to the executive branch of the government" if "[i]n exercising the functions of his office," the President was "under an apprehension that the motives that control his official conduct may, at any time, become the subject of inquiry." *Fitzgerald*, 457 U. S., at 745 (quoting *Spalding* v. *Vilas*, 161 U. S. 483, 498 (1896)). We thus rejected such inquiries in *Fitzgerald*. The plaintiff there contended that he was dismissed from the Air Force for retaliatory reasons. See 457 U. S., at 733–741, 756. The Air Force responded that the reorganization that led to Fitzgerald's dismissal was undertaken to promote efficiency. *Ibid.* Because under Fitzgerald's theory "an inquiry into the President's motives could not be avoided," we rejected the theory, observing that "[i]nquiries of this kind could be highly intrusive." *Id.*, at 756. "[B]are allegations of malice should not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery." *Harlow* v. *Fitzgerald*, 457 U. S. 800, 817–818 (1982).

Nor may courts deem an action unofficial merely because it allegedly violates a generally applicable law. For instance, when Fitzgerald contended that his dismissal violated various congressional statutes and thus rendered his discharge "outside the outer perimeter of [Nixon's] duties," we rejected that contention. 457 U. S., at 756. Otherwise, Presidents would be subject to trial on "every allegation

that an action was unlawful," depriving immunity of its intended effect. *Ibid.*

## B

With these principles in mind, we turn to the conduct alleged in the indictment.

### 1

The indictment broadly alleges that Trump and his coconspirators sought to "overturn the legitimate results of the 2020 presidential election." App. 183, Indictment ¶7. It charges that they conspired to obstruct the January 6 congressional proceeding at which electoral votes are counted and certified, and the winner of the election is certified as President-elect. *Id.*, at 181–185, ¶¶4, 7, 9. As part of this conspiracy, Trump and his co-conspirators allegedly attempted to leverage the Justice Department's power and authority to convince certain States to replace their legitimate electors with Trump's fraudulent slates of electors. See *id.*, at 215–220, ¶¶70–85. According to the indictment, Trump met with the Acting Attorney General and other senior Justice Department and White House officials to discuss investigating purported election fraud and sending a letter from the Department to those States regarding such fraud. See, *e.g.*, *id.*, at 217, 219–220, ¶¶77, 84. The indictment further alleges that after the Acting Attorney General resisted Trump's requests, Trump repeatedly threatened to replace him. See, *e.g.*, *id.*, at 216–217, ¶¶74, 77.

The Government does not dispute that the indictment's allegations regarding the Justice Department involve Trump's "use of official power." Brief for United States 46; see *id.*, at 10–11; Tr. of Oral Arg. 125. The allegations in fact plainly implicate Trump's "conclusive and preclusive" authority. "[I]nvestigation and prosecution of crimes is a quintessentially executive function." Brief for United States 19 (quoting *Morrison* v. *Olson*, 487 U. S. 654, 706

(1988) (Scalia, J., dissenting)). And the Executive Branch has "exclusive authority and absolute discretion" to decide which crimes to investigate and prosecute, including with respect to allegations of election crime. *Nixon*, 418 U. S., at 693; see *United States* v. *Texas*, 599 U. S. 670, 678–679 (2023) ("Under Article II, the Executive Branch possesses authority to decide 'how to prioritize and how aggressively to pursue legal actions against defendants who violate the law.'" (quoting *TransUnion LLC* v. *Ramirez*, 594 U. S. 413, 429 (2021))). The President may discuss potential investigations and prosecutions with his Attorney General and other Justice Department officials to carry out his constitutional duty to "take Care that the Laws be faithfully executed." Art. II, §3. And the Attorney General, as head of the Justice Department, acts as the President's "chief law enforcement officer" who "provides vital assistance to [him] in the performance of [his] constitutional duty to 'preserve, protect, and defend the Constitution.'" *Mitchell* v. *Forsyth*, 472 U. S. 511, 520 (1985) (quoting Art. II, §1, cl. 8).

Investigative and prosecutorial decisionmaking is "the special province of the Executive Branch," *Heckler* v. *Chaney*, 470 U. S. 821, 832 (1985), and the Constitution vests the entirety of the executive power in the President, Art. II, §1. For that reason, Trump's threatened removal of the Acting Attorney General likewise implicates "conclusive and preclusive" Presidential authority. As we have explained, the President's power to remove "executive officers of the United States whom he has appointed" may not be regulated by Congress or reviewed by the courts. *Myers*, 272 U. S., at 106, 176; see *supra*, at 8. The President's "management of the Executive Branch" requires him to have "unrestricted power to remove the most important of his subordinates"—such as the Attorney General—"in their most important duties." *Fitzgerald*, 457 U. S., at 750 (internal quotation marks and alteration omitted).

The indictment's allegations that the requested investigations were "sham[s]" or proposed for an improper purpose do not divest the President of exclusive authority over the investigative and prosecutorial functions of the Justice Department and its officials. App. 186–187, Indictment ¶10(c). And the President cannot be prosecuted for conduct within his exclusive constitutional authority. Trump is therefore absolutely immune from prosecution for the alleged conduct involving his discussions with Justice Department officials.

### 2

The indictment next alleges that Trump and his co-conspirators "attempted to enlist the Vice President to use his ceremonial role at the January 6 certification proceeding to fraudulently alter the election results." *Id.*, at 187, ¶10(d). In particular, the indictment alleges several conversations in which Trump pressured the Vice President to reject States' legitimate electoral votes or send them back to state legislatures for review. See, *e.g.*, *id.*, at 222–224, 226, ¶¶90, 92–93, 97.

The Government explained at oral argument that although it "has not yet had to come to grips with how [it] would analyze" Trump's interactions with the Vice President, there is "support" to characterize that conduct as official. Tr. of Oral Arg. 128. Indeed, our constitutional system anticipates that the President and Vice President will remain in close contact regarding their official duties over the course of the President's term in office. These two officials are the only ones "elected by the entire Nation." *Seila Law*, 591 U. S., at 224; see Art. II, §1. The Constitution provides that "the Vice President shall become President" in the case of "the removal of the President from office or of his death or resignation." Amdt. 25, §1. It also "empowers the Vice President, together with a majority of the 'principal officers

of the executive departments,' to declare the President 'unable to discharge the powers and duties of his office.'" *Freytag* v. *Commissioner*, 501 U. S. 868, 886–887 (1991) (quoting Amdt. 25, §4). And Article I of course names the Vice President as President of the Senate and gives him a tie-breaking vote. §3, cl. 4. It is thus important for the President to discuss official matters with the Vice President to ensure continuity within the Executive Branch and to advance the President's agenda in Congress and beyond.

The Vice President may in practice also serve as one of the President's closest advisers. The Office of Legal Counsel has explained that within the Executive Branch, the Vice President's "sole function [is] advising and assisting the President." Whether the Office of the Vice President Is an 'Agency' for Purposes of the Freedom of Information Act, 18 Op. OLC 10 (1994). Indeed, the "Twelfth Amendment was brought about" to avoid the "manifestly intolerable" situation that occurred "[d]uring the John Adams administration," when "we had a President and Vice-President of different parties." *Ray* v. *Blair*, 343 U. S. 214, 224, n. 11 (1952). The President and Vice President together "are the senior officials of the Executive Branch of government" and therefore "must formulate, explain, advocate, and defend policies" of the President's administration. Payment of Expenses Associated With Travel by the President and Vice President, 6 Op. OLC 214, 215 (1982).

As the President's second in command, the Vice President has historically performed important functions "at the will and as the representative of the President." Participation of the Vice President in the Affairs of the Executive Branch, 1 Supp. Op. OLC 214, 220 (1961). President Woodrow Wilson's Vice President, for instance, "presided over a few cabinet meetings while Wilson was in France negotiating" the Treaty of Versailles after World War I. H. Relyea, The Law: The Executive Office of the Vice President: Constitutional and Legal Considerations, 40 Presidential Studies Q. 327,

328 (2010). During President Franklin Roosevelt's admin-
istration, the Vice President "became a regular participant
in cabinet deliberations—a practice that was continued by
each succeeding president." *Ibid.* And when President
Dwight Eisenhower "suffered three major illnesses while in
office . . . Vice President Richard Nixon consulted with the
Cabinet and developed a procedure for relaying important
matters to the President." Presidential Succession and Del-
egation in Case of Disability, 5 Op. OLC 91, 102 (1981). At
the President's discretion, "the Vice President may engage
in activities ranging into the highest levels of diplomacy
and negotiation and may do so anywhere in the world." 1
Supp. Op. OLC, at 220. Domestically, he may act as the
President's delegate to perform any duties "co-extensive
with the scope of the President's power of delegation." *Ibid.*

Whenever the President and Vice President discuss their
official responsibilities, they engage in official conduct. Pre-
siding over the January 6 certification proceeding at which
Members of Congress count the electoral votes is a consti-
tutional and statutory duty of the Vice President. Art. II,
§1, cl. 3; Amdt. 12; 3 U. S. C. §15. The indictment's allega-
tions that Trump attempted to pressure the Vice President
to take particular acts in connection with his role at the cer-
tification proceeding thus involve official conduct, and
Trump is at least presumptively immune from prosecution
for such conduct.

The question then becomes whether that presumption of
immunity is rebutted under the circumstances. When the
Vice President presides over the January 6 certification
proceeding, he does so in his capacity as President of the
Senate. *Ibid.* Despite the Vice President's expansive role
of advising and assisting the President within the Execu-
tive Branch, the Vice President's Article I responsibility of
"presiding over the Senate" is "not an 'executive branch'
function." Memorandum from L. Silberman, Deputy Atty.
Gen., to R. Burress, Office of the President, Re: Conflict of

Interest Problems Arising Out of the President's Nomina-
tion of Nelson A. Rockefeller To Be Vice President Under
the Twenty-Fifth Amendment to the Constitution 2 (Aug.
28, 1974). With respect to the certification proceeding in
particular, Congress has legislated extensively to define the
Vice President's role in the counting of the electoral votes,
see, *e.g.*, 3 U. S. C. §15, and the President plays no direct
constitutional or statutory role in that process. So the Gov-
ernment may argue that consideration of the President's
communications with the Vice President concerning the
certification proceeding does not pose "dangers of intrusion
on the authority and functions of the Executive Branch."
*Fitzgerald*, 457 U. S., at 754; see *supra*, at 14.

At the same time, however, the President may frequently
rely on the Vice President in his capacity as President of the
Senate to advance the President's agenda in Congress.
When the Senate is closely divided, for instance, the Vice
President's tiebreaking vote may be crucial for confirming
the President's nominees and passing laws that align with
the President's policies. Applying a criminal prohibition to
the President's conversations discussing such matters with
the Vice President—even though they concern his role as
President of the Senate—may well hinder the President's
ability to perform his constitutional functions.

It is ultimately the Government's burden to rebut the
presumption of immunity. We therefore remand to the Dis-
trict Court to assess in the first instance, with appropriate
input from the parties, whether a prosecution involving
Trump's alleged attempts to influence the Vice President's
oversight of the certification proceeding in his capacity as
President of the Senate would pose any dangers of intrusion
on the authority and functions of the Executive Branch.

3

The indictment's remaining allegations cover a broad
range of conduct. Unlike the allegations describing

Trump's communications with the Justice Department and the Vice President, these remaining allegations involve Trump's interactions with persons outside the Executive Branch: state officials, private parties, and the general public. Many of the remaining allegations, for instance, cover at great length events arising out of communications that Trump and his co-conspirators initiated with state legislators and election officials in Arizona, Georgia, Michigan, Pennsylvania, and Wisconsin regarding those States' certification of electors. See App. 192–207, Indictment ¶¶13–52.

Specifically, the indictment alleges that Trump and his co-conspirators attempted to convince those officials that election fraud had tainted the popular vote count in their States, and thus electoral votes for Trump's opponent needed to be changed to electoral votes for Trump. See *id*., at 185–186, ¶10(a). After Trump failed to convince those officials to alter their state processes, he and his co-conspirators allegedly developed a plan "to marshal individuals who would have served as [Trump's] electors, had he won the popular vote" in Arizona, Georgia, Michigan, Nevada, New Mexico, Pennsylvania, and Wisconsin, "and cause those individuals to make and send to the Vice President and Congress false certifications that they were legitimate electors." *Id*., at 208, ¶53. If the plan worked, "the submission of these fraudulent slates" would position the Vice President to "open and count the fraudulent votes" at the certification proceeding and set up "a fake controversy that would derail the proper certification of Biden as president-elect." *Id*., at 208–209, ¶¶53, 54(b). According to the indictment, Trump used his campaign staff to effectuate the plan. See, *e.g.*, *id*., at 210, 212–213, ¶¶55, 63. On the same day that the legitimate electors met in their respective jurisdictions to cast their votes, the indictment alleges that Trump's "fraudulent electors convened sham proceedings in the seven tar-

geted states to cast fraudulent electoral ballots" in his fa-
vor. *Id.*, at 214, ¶66. Those ballots "were mailed to the
President of the Senate, the Archivist of the United States,
and others." *Ibid.*, ¶67.

At oral argument, Trump appeared to concede that at
least some of these acts—those involving "private actors"
who "helped implement a plan to submit fraudulent slates
of presidential electors to obstruct the certification proceed-
ing" at the direction of Trump and a co-conspirator—entail
"private" conduct. Tr. of Oral Arg. 29–30. He later as-
serted, however, that asking "the chairwoman of the Repub-
lican National Committee . . . to gather electors" qualifies
as official conduct because "the organization of alternate
slates of electors is based on, for example, the historical ex-
ample of President Grant as something that was done pur-
suant to and ancillary and preparatory to the exercise of" a
core Presidential power. *Id.*, at 37; see also *id.*, at 25 (dis-
cussing the "historical precedent . . . of President Grant
sending federal troops to Louisiana and Mississippi in 1876
to make sure that the Republican electors got certified in
those two cases, which delivered the election to Rutherford
B. Hayes"). He also argued that it is "[a]bsolutely an official
act for the president to communicate with state officials on
. . . the integrity of a federal election." *Id.*, at 38. The Gov-
ernment disagreed, contending that this alleged conduct
does not qualify as "official conduct" but as "campaign con-
duct." *Id.*, at 124–125.

On Trump's view, the alleged conduct qualifies as official
because it was undertaken to ensure the integrity and
proper administration of the federal election. Of course, the
President's duty to "take Care that the Laws be faithfully
executed" plainly encompasses enforcement of federal elec-
tion laws passed by Congress. Art. II, §3. And the Presi-
dent's broad power to speak on matters of public concern
does not exclude his public communications regarding the
fairness and integrity of federal elections simply because he

is running for re-election. Cf. *Hawaii*, 585 U. S., at 701. Similarly, the President may speak on and discuss such matters with state officials—even when no specific federal responsibility requires his communication—to encourage them to act in a manner that promotes the President's view of the public good.

As the Government sees it, however, these allegations encompass nothing more than Trump's "private scheme with private actors." Brief for United States 44. In its view, Trump can point to no plausible source of authority enabling the President to not only organize alternate slates of electors but also cause those electors—unapproved by any state official—to transmit votes to the President of the Senate for counting at the certification proceeding, thus interfering with the votes of States' properly appointed electors. Indeed, the Constitution commits to the States the power to "appoint" Presidential electors "in such Manner as the Legislature thereof may direct." Art. II, §1, cl. 2; see *Burroughs* v. *United States*, 290 U. S. 534, 544 (1934). "Article II, §1's appointments power," we have said, "gives the States far-reaching authority over presidential electors, absent some other constitutional constraint." *Chiafalo* v. *Washington*, 591 U. S. 578, 588–589 (2020). By contrast, the Federal Government's role in appointing electors is limited. Congress may prescribe when the state-appointed electors shall meet, and it counts and certifies their votes. Art. II, §1, cls. 3, 4. The President, meanwhile, plays no direct role in the process, nor does he have authority to control the state officials who do. And the Framers, wary of "cabal, intrigue and corruption," specifically excluded from service as electors "all those who from situation might be suspected of too great devotion to the president in office." The Federalist No. 68, at 459 (A. Hamilton); see Art. II, §1, cl. 2.

Determining whose characterization may be correct, and with respect to which conduct, requires a close analysis of

the indictment's extensive and interrelated allegations.
See App. 192–215, Indictment ¶¶13–69. Unlike Trump's
alleged interactions with the Justice Department, this al-
leged conduct cannot be neatly categorized as falling within
a particular Presidential function. The necessary analysis
is instead fact specific, requiring assessment of numerous
alleged interactions with a wide variety of state officials
and private persons. And the parties' brief comments at
oral argument indicate that they starkly disagree on the
characterization of these allegations. The concerns we
noted at the outset—the expedition of this case, the lack of
factual analysis by the lower courts, and the absence of per-
tinent briefing by the parties—thus become more promi-
nent. We accordingly remand to the District Court to de-
termine in the first instance—with the benefit of briefing
we lack—whether Trump's conduct in this area qualifies as
official or unofficial.

### 4

Finally, the indictment contains various allegations re-
garding Trump's conduct in connection with the events of
January 6 itself. It alleges that leading up to the January
6 certification proceeding, Trump issued a series of Tweets
(to his nearly 89 million followers) encouraging his support-
ers to travel to Washington, D. C., on that day. See, *e.g.*,
App. 221, 225–227, Indictment ¶¶87–88, 96, 100. Trump
and his co-conspirators addressed the gathered public that
morning, asserting that certain States wanted to recertify
their electoral votes and that the Vice President had the
power to send those States' ballots back for recertification.
*Id.*, at 228–230, ¶¶103–104. Trump then allegedly "di-
rected the crowd in front of him to go to the Capitol" to pres-
sure the Vice President to do so at the certification proceed-
ing. *Id.*, at 228–230, ¶104. When it became public that the
Vice President would not use his role at the certification
proceeding to determine which electoral votes should be

counted, the crowd gathered at the Capitol "broke through barriers cordoning off the Capitol grounds" and eventually "broke into the building." *Id*., at 230–231, ¶¶107, 109.

The alleged conduct largely consists of Trump's communications in the form of Tweets and a public address. The President possesses "extraordinary power to speak to his fellow citizens and on their behalf." *Hawaii*, 585 U. S., at 701; cf. *Lindke* v. *Freed*, 601 U. S. 187, 191 (2024). As the sole person charged by the Constitution with executing the laws of the United States, the President oversees—and thus will frequently speak publicly about—a vast array of activities that touch on nearly every aspect of American life. Indeed, a long-recognized aspect of Presidential power is using the office's "bully pulpit" to persuade Americans, including by speaking forcefully or critically, in ways that the President believes would advance the public interest. He is even expected to comment on those matters of public concern that may not directly implicate the activities of the Federal Government—for instance, to comfort the Nation in the wake of an emergency or tragedy. For these reasons, most of a President's public communications are likely to fall comfortably within the outer perimeter of his official responsibilities.

There may, however, be contexts in which the President, notwithstanding the prominence of his position, speaks in an unofficial capacity—perhaps as a candidate for office or party leader. To the extent that may be the case, objective analysis of "content, form, and context" will necessarily inform the inquiry. *Snyder* v. *Phelps*, 562 U. S. 443, 453 (2011) (internal quotation marks omitted). But "there is not always a clear line between [the President's] personal and official affairs." *Mazars*, 591 U. S., at 868. The analysis therefore must be fact specific and may prove to be challenging.

The indictment reflects these challenges. It includes only

select Tweets and brief snippets of the speech Trump delivered on the morning of January 6, omitting its full text or context. See App. 228–230, Indictment ¶104. Whether the Tweets, that speech, and Trump's other communications on January 6 involve official conduct may depend on the content and context of each. Knowing, for instance, what else was said contemporaneous to the excerpted communications, or who was involved in transmitting the electronic communications and in organizing the rally, could be relevant to the classification of each communication. This necessarily factbound analysis is best performed initially by the District Court. We therefore remand to the District Court to determine in the first instance whether this alleged conduct is official or unofficial.

## C

The essence of immunity "is its possessor's entitlement not to have to answer for his conduct" in court. *Mitchell*, 472 U. S., at 525. Presidents therefore cannot be indicted based on conduct for which they are immune from prosecution. As we have explained, the indictment here alleges at least some such conduct. See Part III–B–1, *supra*. On remand, the District Court must carefully analyze the indictment's remaining allegations to determine whether they too involve conduct for which a President must be immune from prosecution. And the parties and the District Court must ensure that sufficient allegations support the indictment's charges without such conduct.

The Government does not dispute that if Trump is entitled to immunity for certain official acts, he may not "be held criminally liable" based on those acts. Brief for United States 46. But it nevertheless contends that a jury could "consider" evidence concerning the President's official acts "for limited and specified purposes," and that such evidence would "be admissible to prove, for example, [Trump's] knowledge or notice of the falsity of his election-fraud

claims." *Id.*, at 46, 48. That proposal threatens to eviscerate the immunity we have recognized. It would permit a prosecutor to do indirectly what he cannot do directly—invite the jury to examine acts for which a President is immune from prosecution to nonetheless prove his liability on any charge. But "[t]he Constitution deals with substance, not shadows." *Cummings* v. *Missouri*, 4 Wall. 277, 325 (1867). And the Government's position is untenable in light of the separation of powers principles we have outlined.

If official conduct for which the President is immune may be scrutinized to help secure his conviction, even on charges that purport to be based only on his unofficial conduct, the "intended effect" of immunity would be defeated. *Fitzgerald*, 457 U. S., at 756. The President's immune conduct would be subject to examination by a jury on the basis of generally applicable criminal laws. Use of evidence about such conduct, even when an indictment alleges only unofficial conduct, would thereby heighten the prospect that the President's official decisionmaking will be distorted. See *Clinton*, 520 U. S., at 694, n. 19.

The Government asserts that these weighty concerns can be managed by the District Court through the use of "evidentiary rulings" and "jury instructions." Brief for United States 46. But such tools are unlikely to protect adequately the President's constitutional prerogatives. Presidential acts frequently deal with "matters likely to 'arouse the most intense feelings.'" *Fitzgerald*, 457 U. S., at 752 (quoting *Pierson*, 386 U. S., at 554). Allowing prosecutors to ask or suggest that the jury probe official acts for which the President is immune would thus raise a unique risk that the jurors' deliberations will be prejudiced by their views of the President's policies and performance while in office. The prosaic tools on which the Government would have courts rely are an inadequate safeguard against the peculiar constitutional concerns implicated in the prosecution of a former President. Cf. *Nixon*, 418 U. S., at 706. Although such

tools may suffice to protect the constitutional rights of individual criminal defendants, the interests that underlie Presidential immunity seek to protect not the President himself, but the institution of the Presidency.[3]

### IV
### A

Trump asserts a far broader immunity than the limited one we have recognized. He contends that the indictment must be dismissed because the Impeachment Judgment Clause requires that impeachment and Senate conviction precede a President's criminal prosecution. Brief for Petitioner 16.

The text of the Clause provides little support for such an absolute immunity. It states that an impeachment judgment "shall not extend further than to removal from Office, and disqualification to hold and enjoy any Office of honor, Trust or Profit under the United States." Art. I, §3, cl. 7. It then specifies that "the Party convicted shall *nevertheless* be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law." *Ibid.* (emphasis added).

---

[3] JUSTICE BARRETT disagrees, arguing that in a bribery prosecution, for instance, excluding "any mention" of the official act associated with the bribe "would hamstring the prosecution." *Post*, at 6 (opinion concurring in part); cf. *post*, at 25–27 (opinion of SOTOMAYOR, J.). But of course the prosecutor may point to the public record to show the fact that the President performed the official act. And the prosecutor may admit evidence of what the President allegedly demanded, received, accepted, or agreed to receive or accept in return for being influenced in the performance of the act. See 18 U. S. C. §201(b)(2). What the prosecutor may not do, however, is admit testimony or private records of the President or his advisers probing the official act itself. Allowing that sort of evidence would invite the jury to inspect the President's motivations for his official actions and to second-guess their propriety. As we have explained, such inspection would be "highly intrusive" and would "'seriously cripple'" the President's exercise of his official duties. *Fitzgerald*, 457 U. S., at 745, 756 (quoting *Spalding* v. *Vilas*, 161 U. S. 483, 498 (1896)); see *supra,* at 18. And such second-guessing would "threaten the independence or effectiveness of the Executive." *Trump* v. *Vance*, 591 U. S. 786, 805 (2020).

The Clause both limits the consequences of an impeachment judgment and clarifies that notwithstanding such judgment, subsequent prosecution may proceed. By its own terms, the Clause does not address whether and on what conduct a President may be prosecuted if he was never impeached and convicted.

Historical evidence likewise lends little support to Trump's position. For example, Justice Story reasoned that without the Clause's clarification that "Indictment, Trial, Judgment and Punishment" may nevertheless follow Senate conviction, "it might be matter of extreme doubt, whether . . . a second trial for the same offence could be had, either after an acquittal, or a conviction in the court of impeachments." 2 J. Story, Commentaries on the Constitution of the United States §780, p. 251 (1833). James Wilson, who served on the Committee that drafted the Clause and later as a Justice of this Court, similarly concluded that acquittal of impeachment charges posed no bar to subsequent prosecution. See 2 Documentary History of the Ratification of the Constitution 492 (M. Jensen ed. 1979). And contrary to Trump's contention, Alexander Hamilton did not disagree. The Federalist Papers on which Trump relies, see Brief for Petitioner 17–18, concerned the checks available against a *sitting* President. Hamilton noted that unlike "the King of Great-Britain," the President "would be liable to be impeached" and "removed from office," and "would afterwards be liable to prosecution and punishment." The Federalist No. 69, at 463; see also *id.*, No. 77, at 520 (explaining that the President is "at all times liable to impeachment, trial, dismission from office . . . and to the forfeiture of life and estate by subsequent prosecution"). Hamilton did not endorse or even consider whether the Impeachment Judgment Clause immunizes a *former* President from prosecution.

The implication of Trump's theory is that a President who evades impeachment for one reason or another during his

term in office can never be held accountable for his criminal acts in the ordinary course of law. So if a President manages to conceal certain crimes throughout his Presidency, or if Congress is unable to muster the political will to impeach the President for his crimes, then they must forever remain impervious to prosecution.

Impeachment is a political process by which Congress can remove a President who has committed "Treason, Bribery, or other high Crimes and Misdemeanors." Art. II, §4. Transforming that political process into a necessary step in the enforcement of criminal law finds little support in the text of the Constitution or the structure of our Government.

### B

The Government for its part takes a similarly broad view, contending that the President enjoys no immunity from criminal prosecution for any action. It maintains this view despite agreeing with much of our analysis.

For instance, the Government does not dispute that Congress may not criminalize Presidential conduct within the President's "conclusive and preclusive" constitutional authority. See Tr. of Oral Arg. 133 ("[C]ore powers . . . can't be regulated at all, like the pardon power and veto."); see also *id.*, at 84–85. And it too accords protection to Presidential conduct if subjecting that conduct to generally applicable laws would "raise serious constitutional questions regarding the President's authority" or cause a "possible conflict with the President's constitutional prerogatives." Application of 28 U. S. C. §458 to Presidential Appointments of Federal Judges, 19 Op. OLC 350, 351–352 (1995); see Brief for United States 26–29; Tr. of Oral Arg. 78. Indeed, the Executive Branch has long held that view. The Office of Legal Counsel has recognized, for instance, that a federal statute generally prohibiting appointments to "'any office or duty in any court'" of persons within certain degrees of consanguinity to the judges of such courts would, if

applied to the President, infringe his power to appoint federal judges, thereby raising a serious constitutional question. 19 Op. OLC, at 350 (quoting 28 U. S. C. §458); see *id.*, at 350–352. So it viewed such a statute as not applying to the President. Likewise, it has narrowly construed a criminal prohibition on grassroots lobbying to avoid the constitutional issues that would otherwise arise, reasoning that the statute should not "be construed to prohibit the President or executive branch agencies from engaging in a general open dialogue with the public on the Administration's programs and policies." Constraints Imposed by 18 U. S. C. §1913 on Lobbying Efforts, 13 Op. OLC 300, 304 (1989); see *id.*, at 304–306.

The Government thus broadly agrees that the President's official acts are entitled to some degree of constitutional protection. And with respect to the allegations in the indictment before us, the Government agrees that at least some of the alleged conduct involves official acts. See Tr. of Oral Arg. 125; cf. *id.*, at 128.

Yet the Government contends that the President should not be considered immune from prosecution for those official acts. See Brief for United States 9. On the Government's view, as-applied challenges in the course of the trial suffice to protect Article II interests, and review of a district court's decisions on such challenges should be deferred until after trial. See Tr. of Oral Arg. 69, 79–80, 154–158. If the President is instead immune from prosecution, a district court's denial of immunity would be appealable before trial. See *Mitchell*, 472 U. S., at 524–530 (explaining that questions of immunity are reviewable before trial because the essence of immunity is the entitlement not to be subject to suit).

The Government asserts that the "[r]obust safeguards" available in typical criminal proceedings alleviate the need for pretrial review. Brief for United States 20 (boldface and

emphasis omitted).  First, it points to the Justice Depart-
ment's "longstanding commitment to the impartial enforce-
ment of the law," *id.*, at 21, as well as the criminal justice
system's further protections: grand juries, a defendant's
procedural rights during trial, and the requirement that the
Government prove its case beyond a reasonable doubt, *id.*,
at 22.  Next, it contends that "existing principles of statu-
tory construction and as-applied constitutional challenges"
adequately address the separation of powers concerns in-
volved in applying generally applicable criminal laws to a
President.  *Id.*, at 29.  Finally, the Government cites certain
defenses that would be available to the President in a par-
ticular prosecution, such as the public-authority defense or
the advice of the Attorney General.  *Id.*, at 29–30; see *Nar-
done* v. *United States*, 302 U. S. 379, 384 (1937); Tr. of Oral
Arg. 107–108.

These safeguards, though important, do not alleviate the
need for pretrial review.  They fail to address the fact that
under our system of separated powers, criminal prohibi-
tions cannot apply to certain Presidential conduct to begin
with.  As we have explained, when the President acts pur-
suant to his exclusive constitutional powers, Congress can-
not—as a structural matter—regulate such actions, and
courts cannot review them.  See Part II–A, *supra*.  And he
is at least presumptively immune from prosecution for his
other official actions.  See Part II–B, *supra*.

Questions about whether the President may be held lia-
ble for particular actions, consistent with the separation of
powers, must be addressed at the outset of a proceeding.
Even if the President were ultimately not found liable for
certain official actions, the possibility of an extended pro-
ceeding alone may render him "unduly cautious in the dis-
charge of his official duties." *Fitzgerald*, 457 U. S., at 752,
n. 32.  Vulnerability "'to the burden of a trial and to the
inevitable danger of its outcome, would dampen the ardor
of all but the most resolute.'" *Id.*, at 752–753, n. 32 (quoting

*Gregoire* v. *Biddle*, 177 F. 2d 579, 581 (CA2 1949) (Hand, L., C. J.)).  The Constitution does not tolerate such impediments to "the effective functioning of government." *Fitzgerald*, 457 U. S., at 751.

As for the Government's assurances that prosecutors and grand juries will not permit political or baseless prosecutions from advancing in the first place, those assurances are available to every criminal defendant and fail to account for the President's "unique position in the constitutional scheme." *Id.*, at 749.  We do not ordinarily decline to decide significant constitutional questions based on the Government's promises of good faith.  See *United States* v. *Stevens*, 559 U. S. 460, 480 (2010) ("We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly.").  Nor do we do so today.

C

As for the dissents, they strike a tone of chilling doom that is wholly disproportionate to what the Court actually does today—conclude that immunity extends to official discussions between the President and his Attorney General, and then remand to the lower courts to determine "in the first instance" whether and to what extent Trump's remaining alleged conduct is entitled to immunity.  *Supra*, at 24, 28, 30.

The principal dissent's starting premise—that unlike Speech and Debate Clause immunity, no constitutional text supports Presidential immunity, see *post*, at 4–6 (opinion of SOTOMAYOR, J.)—is one that the Court rejected decades ago as "unpersuasive." *Fitzgerald*, 457 U. S., at 750, n. 31; see also *Nixon*, 418 U. S., at 705–706, n. 16 (rejecting unanimously a similar argument in the analogous executive privilege context).  "[A] specific textual basis has not been considered a prerequisite to the recognition of immunity." *Fitzgerald*, 457 U. S., at 750, n. 31.  Nor is that premise correct.  True, there is no "Presidential immunity clause" in

the Constitution. But there is no "'separation of powers clause'" either. *Seila Law*, 591 U. S., at 227. Yet that doctrine is undoubtedly carved into the Constitution's text by its three articles separating powers and vesting the Executive power solely in the President. See *ibid.* And the Court's prior decisions, such as *Nixon* and *Fitzgerald*, have long recognized that doctrine as mandating certain Presidential privileges and immunities, even though the Constitution contains no explicit "provision for immunity." *Post*, at 4; see Part II–B–1, *supra*. Neither the dissents nor the Government disavow any of those prior decisions. See Tr. of Oral Arg. 76–77.

The principal dissent then cites the Impeachment Judgment Clause, arguing that it "clearly contemplates that a former President may be subject to criminal prosecution." *Post*, at 6. But that Clause does not indicate whether a former President may, consistent with the separation of powers, be prosecuted for his *official* conduct in particular. See *supra*, at 32–33. And the assortment of historical sources the principal dissent cites are unhelpful for the same reason. See *post*, at 6–8. As the Court has previously noted, relevant historical evidence on the question of Presidential immunity is of a "fragmentary character." *Fitzgerald*, 457 U. S., at 752, n. 31; see also *Clinton*, 520 U. S., at 696–697; cf. *Youngstown*, 343 U. S., at 634 (Jackson, J., concurring) (noting "the poverty of really useful and unambiguous authority applicable to concrete problems of executive power"). "[T]he most compelling arguments," therefore, "arise from the Constitution's separation of powers and the Judiciary's historic understanding of that doctrine." *Fitzgerald*, 457 U. S., at 752, n. 31.

The Court's prior admonition is evident in the principal dissent's citations. Some of its cherry-picked sources do not even discuss the President in particular. See, *e.g.*, *post*, at 7–8 (citing 2 Debates on the Constitution 177 (J. Elliot ed. 1836); 2 J. Story, Commentaries on the Constitution of the

United States §780, pp. 250–251 (1833)). And none of them indicate whether he may be prosecuted for his official conduct. See, *e.g.*, *post*, at 6, 7, n. 2 (citing The Federalist No. 69; 4 Debates on the Constitution, at 109). The principal dissent's most compelling piece of evidence consists of excerpted statements of Charles Pinckney from an 1800 Senate debate. See *post*, at 7. But those statements reflect only the now-discredited argument that any immunity not expressly mentioned in the Constitution must not exist. See 3 Records of the Federal Convention of 1787, pp. 384–385 (M. Farrand ed. 1911). And Pinckney is not exactly a reliable authority on the separation of powers: He went on to state on the same day that "it was wrong to give the nomination of Judges to the President"—an opinion expressly rejected by the Framers. *Id.*, at 385. Given the Framers' desire for an energetic and vigorous President, the principal dissent's view that the Constitution they designed allows all his actions to be subject to prosecution—even the exercise of powers it grants exclusively to him—defies credulity.

Unable to muster any meaningful textual or historical support, the principal dissent suggests that there is an "established understanding" that "former Presidents are answerable to the criminal law for their official acts." *Post*, at 9. Conspicuously absent is mention of the fact that since the founding, no President has ever faced criminal charges—let alone for his conduct in office. And accordingly no court has ever been faced with the question of a President's immunity from prosecution. All that our Nation's practice establishes on the subject is silence.

Coming up short on reasoning, the dissents repeatedly level variations of the accusation that the Court has rendered the President "above the law." See, *e.g.*, *post*, at 1, 3, 11, 12, 21, 30 (opinion of SOTOMAYOR, J.); *post*, at 9, 10, 11, 12, 13, 19 (opinion of JACKSON, J.). As before, that "rhetorically chilling" contention is "wholly unjustified." *Fitzger-*

*ald*, 457 U. S., at 758, n. 41. Like everyone else, the President is subject to prosecution in his unofficial capacity. But unlike anyone else, the President is a branch of government, and the Constitution vests in him sweeping powers and duties. Accounting for that reality—and ensuring that the President may exercise those powers forcefully, as the Framers anticipated he would—does not place him above the law; it preserves the basic structure of the Constitution from which that law derives.

The dissents' positions in the end boil down to ignoring the Constitution's separation of powers and the Court's precedent and instead fear mongering on the basis of extreme hypotheticals about a future where the President "feels empowered to violate federal criminal law." *Post*, at 18 (opinion of SOTOMAYOR, J.); see *post*, at 26, 29–30; *post*, at 8–9, 10, 12, 16, 20–21 (opinion of JACKSON, J.). The dissents overlook the more likely prospect of an Executive Branch that cannibalizes itself, with each successive President free to prosecute his predecessors, yet unable to boldly and fearlessly carry out his duties for fear that he may be next. For instance, Section 371—which has been charged in this case—is a broadly worded criminal statute that can cover "'any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of Government.'" *United States* v. *Johnson*, 383 U. S. 169, 172 (1966) (quoting *Haas* v. *Henkel*, 216 U. S. 462, 479 (1910)). Virtually every President is criticized for insufficiently enforcing some aspect of federal law (such as drug, gun, immigration, or environmental laws). An enterprising prosecutor in a new administration may assert that a previous President violated that broad statute. Without immunity, such types of prosecutions of ex-Presidents could quickly become routine. The enfeebling of the Presidency and our Government that would result from such a cycle of factional strife is exactly what the Framers intended to

avoid. Ignoring those risks, the dissents are instead content to leave the preservation of our system of separated powers up to the good faith of prosecutors.

Finally, the principal dissent finds it "troubling" that the Court does not "designate any course of conduct alleged in the indictment as private." *Post*, at 27. Despite the unprecedented nature of this case, the significant constitutional questions that it raises, its expedited treatment in the lower courts and in this Court, the lack of factual analysis in the lower courts, and the lack of briefing on how to categorize the conduct alleged, the principal dissent would go ahead and declare all of it unofficial. The other dissent, meanwhile, analyzes the case under comprehensive models and paradigms of its own concoction and accuses the Court of providing "no meaningful guidance about how to apply [the] new paradigm or how to categorize a President's conduct." *Post*, at 13 (opinion of JACKSON, J.). It would have us exhaustively define every application of Presidential immunity. See *post*, at 13–14. Our dissenting colleagues exude an impressive infallibility. While their confidence may be inspiring, the Court adheres to time-tested practices instead—deciding what is required to dispose of this case and remanding after "revers[ing] on a threshold question," *Zivotofsky*, 566 U. S., at 201, to obtain "guidance from the litigants [and] the court below," *Vidal* v. *Elster*, 602 U. S. 286, 328 (2024) (SOTOMAYOR, J., concurring in judgment).

## V

This case poses a question of lasting significance: When may a former President be prosecuted for official acts taken during his Presidency? Our Nation has never before needed an answer. But in addressing that question today, unlike the political branches and the public at large, we cannot afford to fixate exclusively, or even primarily, on present exigencies. In a case like this one, focusing on "transient results" may have profound consequences for the separation

of powers and for the future of our Republic. *Youngstown*, 343 U. S., at 634 (Jackson, J., concurring). Our perspective must be more farsighted, for "[t]he peculiar circumstances of the moment may render a measure more or less wise, but cannot render it more or less constitutional." Chief Justice John Marshall, A Friend of the Constitution No. V, Alexandria Gazette, July 5, 1819, in John Marshall's Defense of *McCulloch v. Maryland* 190–191 (G. Gunther ed. 1969).

Our first President had such a perspective. In his Farewell Address, George Washington reminded the Nation that "a Government of as much vigour as is consistent with the perfect security of Liberty is indispensable." 35 Writings of George Washington 226 (J. Fitzpatrick ed. 1940). A government "too feeble to withstand the enterprises of faction," he warned, could lead to the "frightful despotism" of "alternate domination of one faction over another, sharpened by the spirit of revenge." *Id.*, at 226–227. And the way to avoid that cycle, he explained, was to ensure that government powers remained "properly distributed and adjusted." *Id.*, at 226.

It is these enduring principles that guide our decision in this case. The President enjoys no immunity for his unofficial acts, and not everything the President does is official. The President is not above the law. But Congress may not criminalize the President's conduct in carrying out the responsibilities of the Executive Branch under the Constitution. And the system of separated powers designed by the Framers has always demanded an energetic, independent Executive. The President therefore may not be prosecuted for exercising his core constitutional powers, and he is entitled, at a minimum, to a presumptive immunity from prosecution for all his official acts. That immunity applies equally to all occupants of the Oval Office, regardless of politics, policy, or party.

The judgment of the Court of Appeals for the D. C. Circuit is vacated, and the case is remanded for further proceedings

consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 23–939

_____

## DONALD J. TRUMP, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[July 1, 2024]

JUSTICE THOMAS, concurring.

Few things would threaten our constitutional order more than criminally prosecuting a former President for his official acts. Fortunately, the Constitution does not permit us to chart such a dangerous course. As the Court forcefully explains, the Framers "deemed an energetic executive essential to . . . the security of liberty," and our "system of separated powers" accordingly insulates the President from prosecution for his official acts. *Ante*, at 10, 42 (internal quotation marks omitted). To conclude otherwise would hamstring the vigorous Executive that our Constitution envisions. "While the separation of powers may prevent us from righting every wrong, it does so in order to ensure that we do not lose liberty." *Morrison* v. *Olson*, 487 U. S. 654, 710–711 (1988) (Scalia, J., dissenting).

I write separately to highlight another way in which this prosecution may violate our constitutional structure. In this case, the Attorney General purported to appoint a private citizen as Special Counsel to prosecute a former President on behalf of the United States. But, I am not sure that any office for the Special Counsel has been "established by Law," as the Constitution requires. Art. II, §2, cl. 2. By requiring that Congress create federal offices "by Law," the Constitution imposes an important check against the President—he cannot create offices at his pleasure. If there is

no law establishing the office that the Special Counsel oc-
cupies, then he cannot proceed with this prosecution. A pri-
vate citizen cannot criminally prosecute anyone, let alone a
former President.

No former President has faced criminal prosecution for
his acts while in office in the more than 200 years since the
founding of our country. And, that is so despite numerous
past Presidents taking actions that many would argue con-
stitute crimes. If this unprecedented prosecution is to pro-
ceed, it must be conducted by someone duly authorized to
do so by the American people. The lower courts should thus
answer these essential questions concerning the Special
Counsel's appointment before proceeding.

## I

The Constitution sets forth how an office may be created
and how it may be filled. The Appointments Clause pro-
vides:

> "[The President] shall nominate, and by and with the
> Advice and Consent of the Senate, shall appoint Am-
> bassadors, other public Ministers and Consuls, Judges
> of the supreme Court, and all other Officers of the
> United States, whose Appointments are not herein oth-
> erwise provided for, and which shall be established by
> Law: but the Congress may by Law vest the Appoint-
> ment of such inferior Officers, as they think proper, in
> the President alone, in the Courts of Law, or in the
> Heads of Department." Art. II, §2, cl. 2.

The constitutional process for filling an office is plain
from this text. The default manner for appointing "Officers
of the United States" is nomination by the President and
confirmation by the Senate. *Ibid.* "But the Clause provides
a limited exception for the appointment of inferior officers:
Congress may 'by Law' authorize" one of three specified ac-

tors "to appoint inferior officers without the advice and con-
sent of the Senate." *NLRB* v. *SW General, Inc.*, 580 U. S.
288, 312 (2017) (THOMAS, J., concurring). As relevant here,
a "Hea[d] of Department"—such as the Attorney General—
is one such actor that Congress may authorize "by Law" to
appoint inferior officers without senatorial confirmation.
Art. II, §2, cl. 2.

Before the President or a Department Head can appoint
any officer, however, the Constitution requires that the un-
derlying office be "established by Law."[1] The Constitution
itself creates some offices, most obviously that of the Presi-
dent and Vice President. See §1. Although the Constitution
contemplates that there will be "other Officers of the United
States, whose Appointments are not herein otherwise pro-
vided for," it clearly requires that those offices "shall be es-
tablished by Law." §2, cl. 2. And, "established by law" re-
fers to an office that Congress creates "by statute." *Lucia*
v. *SEC*, 585 U. S. 237, 254 (2018) (THOMAS, J., concurring);
see also *United States* v. *Maurice*, 26 F. Cas. 1211, 1213
(No. 15,747) (CC Va. 1823) (Marshall, C. J.).

The limitation on the President's power to create offices
grew out of the Founders' experience with the English mon-
archy. The King could wield significant power by both cre-
ating and filling offices as he saw fit. He was "emphatically
and truly styled the fountain of honor. He not only ap-
point[ed] to all offices, but [could] create offices." The Fed-
eralist No. 69, p. 421 (C. Rossiter ed. 1961); see also 1 W.
Blackstone, Commentaries on the Laws of England 271 (T.

──────────

[1] Although a Government official may also be a "nonofficer employe[e],"
I set aside that category because it is difficult to see how an official exer-
cising the Department of Justice's duties to enforce the criminal law by
leading a prosecution could be anything but an officer. *Lucia* v. *SEC*,
585 U. S. 237, 253, n. 1 (2018) (THOMAS, J., concurring); see *SW General*,
580 U. S., at 314 (opinion of THOMAS, J.). If the Special Counsel were a
nonofficer employee, the constitutional problems with this prosecution
would only be more serious. For now, I assume without deciding that the
Special Counsel is an officer.

Cooley ed. 1871) ("[A]s the king may create new titles, so may he create new offices"). That ability to create offices raised many "concerns about the King's ability to amass too much power"; the King could both create a multitude of offices and then fill them with his supporters. J. Mascott, Who Are "Officers of the United States"? 70 Stan. L. Rev. 443, 492 (2018) (Mascott); see also G. Wood, The Creation of the American Republic 1776–1787, p. 143 (1969) (describing "the power of appointment to offices" as "the most insidious and powerful weapon of eighteenth-century despotism"); T. Paine, Common Sense (1776), reprinted in The Great Works of Thomas Paine 11 (1877) (explaining that "the crown . . . derives its whole consequence merely from being the giver of places and pensions"). In fact, one of the grievances raised by the American colonists in declaring their independence was that the King "ha[d] erected a multitude of New Offices, and sent hither swarms of Officers to harass our people and eat out their substance." Declaration of Independence ¶12. The Founders thus drafted the Constitution with "evidently a great inferiority in the power of the President, in this particular, to that of the British king." The Federalist No. 69, at 421.

The Founders broke from the monarchial model by giving the President the power to *fill* offices (with the Senate's approval), but not the power to *create* offices. They did so by "imposing the constitutional requirement that new officer positions be 'established by Law' rather than through a King-like custom of the head magistrate unilaterally creating new offices." Mascott 492–493 (footnote omitted); see also 1 Annals of Cong. 581–582 (1789) ("The powers relative to offices are partly Legislative and partly Executive. The Legislature creates the office, defines the powers, limits its duration, and annexes a compensation"); see also *ibid.* (describing the power to "designat[e] the man to fill the office" as "of an Executive nature"). The Constitution thus "giv[es]

Congress broad authority to establish and organize the Executive Branch." *Seila Law LLC* v. *Consumer Financial Protection Bureau*, 591 U. S. 197, 266 (2020) (KAGAN, J., concurring in judgment in part and dissenting in part). By keeping the ability to create offices out of the President's hands, the Founders ensured that no President could unilaterally create an army of officer positions to then fill with his supporters. Instead, our Constitution leaves it in the hands of the people's elected representatives to determine whether new executive offices should exist.

Longstanding practice from the founding to today comports with this original understanding that Congress must create offices by law. The First Congress, for instance, routinely and explicitly created offices by statute. See, *e.g.*, §35, 1 Stat. 92–93 (creating the offices of Attorney General and U. S. Attorney for each district); see also §§1–2, *id.*, at 50 (creating offices of Secretary of War and his Chief Clerk); ch. 12, §1, *id.*, at 65 (creating offices within the Department of Treasury for Secretary of the Treasury, a Comptroller, Auditor, Treasurer, Register, and Assistant to the Secretary). Still today, Congress creates the offices that the Executive Branch may fill. For example, Congress has created several offices within the Department of Justice, including the offices of the Attorney General, Deputy Attorney General, Associate Attorney General, Solicitor General, and Assistant Attorneys General. See 28 U. S. C. §§503–506. For some agencies, Congress has also granted the agency head the power to "appoint such officers and employees . . . as are necessary to execute the functions vested in him." 7 U. S. C. §610(a) (Department of Agriculture); see also, *e.g.*, 20 U. S. C. §3461 (Department of Education); 42 U. S. C. §913 (Department of Health and Human Services).

In the past, Congress has at times expressly created offices similar to the position now occupied by the Special Counsel. Congress created an office for a "special counsel"

to investigate the Teapot Dome Scandal and pursue prosecutions. See ch. 16, 43 Stat. 6. And, a statute provided for "the appointment of an independent counsel" that we addressed in *Morrison* v. *Olson.* See 28 U. S. C. §592. That statute lapsed, and Congress has not since reauthorized the appointment of an independent counsel. See §599.[2]

We cannot ignore the importance that the Constitution places on *who* creates a federal office. To guard against tyranny, the Founders required that a federal office be "established by Law." As James Madison cautioned, "[i]f there is any point in which the separation of the Legislative and Executive powers ought to be maintained with greater caution, it is that which relates to officers and offices." 1 Annals of Cong. 581. If Congress has not reached a consensus that a particular office should exist, the Executive lacks the power to create and fill an office of his own accord.

## II

It is difficult to see how the Special Counsel has an office "established by Law," as required by the Constitution. When the Attorney General appointed the Special Counsel, he did not identify any statute that clearly creates such an office. See Dept. of Justice Order No. 5559–2022 (Nov. 18, 2022). Nor did he rely on a statute granting him the authority to appoint officers as he deems fit, as the heads of some other agencies have.[3] See *supra*, at 5. Instead, the Attorney General relied upon several statutes of a general nature. See Order No. 5559–2022 (citing 28 U. S. C. §§509, 510, 515, 533).

---

[2]To be sure, a few Presidents have appointed "special prosecutors" without pointing to any express statutory authorization. See generally T. Eastland, Ethics, Politics and the Independent Counsel 8–9 (1989) (describing past uses of special prosecutors). But, this Court had no occasion to review the constitutionality of those prosecutors' authority.

[3]In fact, Congress gave the Attorney General the power to appoint "additional officers . . . as he deems necessary"—but, only for the Bureau of Prisons. 18 U. S. C. §4041.

None of the statutes cited by the Attorney General appears to create an office for the Special Counsel, and especially not with the clarity typical of past statutes used for that purpose. See, *e.g.*, 43 Stat. 6 ("[T]he President is further authorized and directed to appoint . . . special counsel who shall have charge and control of the prosecution of such litigation"). Sections 509 and 510 are generic provisions concerning the functions of the Attorney General and his ability to delegate authority to "any other officer, employee, or agency." Section 515 contemplates an "attorney specially appointed by the Attorney General *under law*," thereby suggesting that such an attorney's office must have already been created by some other law. (Emphasis added.) As for §533, it provides that "[t]he Attorney General may appoint *officials* . . . to detect and prosecute crimes against the United States." (Emphasis added.) It is unclear whether an "official" is equivalent to an "officer" as used by the Constitution. See *Lucia*, 585 U. S., at 254–255 (opinion of THOMAS, J.) (considering the meaning of "officer"). Regardless, this provision would be a curious place for Congress to hide the creation of an office for a Special Counsel. It is placed in a chapter concerning the Federal Bureau of Investigation (§§531–540d), not the separate chapters concerning U. S. Attorneys (§§541–550) or the now-lapsed Independent Counsel (§§591–599).[4]

To be sure, the Court gave passing reference to the cited statutes as supporting the appointment of the Special Prosecutor in *United States* v. *Nixon*, 418 U. S. 683, 694 (1974), but it provided no analysis of those provisions' text. Perhaps there is an answer for why these statutes create an office for the Special Counsel. But, before this consequen-

--------

[4] Regulations remain on the books that contemplate an "outside" Special Counsel, 28 CFR §600.1 (2023), but I doubt a regulation can create a federal office without underlying statutory authority to do so.

tial prosecution proceeds, we should at least provide a fulsome explanation of why that is so.

Even if the Special Counsel has a valid office, questions remain as to whether the Attorney General filled that office in compliance with the Appointments Clause. For example, it must be determined whether the Special Counsel is a principal or inferior officer. If the former, his appointment is invalid because the Special Counsel was not nominated by the President and confirmed by the Senate, as principal officers must be. Art. II, §2, cl. 2. Even if he is an inferior officer, the Attorney General could appoint him without Presidential nomination and senatorial confirmation only if "Congress . . . by law vest[ed] the Appointment" in the Attorney General as a "Hea[d] of Department." *Ibid.* So, the Special Counsel's appointment is invalid unless a statute created the Special Counsel's office *and* gave the Attorney General the power to fill it "by Law."

Whether the Special Counsel's office was "established by Law" is not a trifling technicality. If Congress has not reached a consensus that a particular office should exist, the Executive lacks the power to unilaterally create and then fill that office. Given that the Special Counsel purports to wield the Executive Branch's power to prosecute, the consequences are weighty. Our Constitution's separation of powers, including its separation of the powers to create and fill offices, is "the absolutely central guarantee of a just Government" and the liberty that it secures for us all. *Morrison*, 487 U. S., at 697 (Scalia, J., dissenting). There is no prosecution that can justify imperiling it.

*      *      *

In this case, there has been much discussion about ensuring that a President "is not above the law." But, as the Court explains, the President's immunity from prosecution for his official acts *is* the law. The Constitution provides for

"an energetic executive," because such an Executive is "essential to . . . the security of liberty." *Ante*, at 10 (internal quotation marks omitted). Respecting the protections that the Constitution provides for the Office of the Presidency secures liberty. In that same vein, the Constitution also secures liberty by separating the powers to create and fill offices. And, there are serious questions whether the Attorney General has violated that structure by creating an office of the Special Counsel that has not been established by law. Those questions must be answered before this prosecution can proceed. We must respect the Constitution's separation of powers in all its forms, else we risk rendering its protection of liberty a parchment guarantee.

# SUPREME COURT OF THE UNITED STATES

_____

No. 23–939

_____

## DONALD J. TRUMP, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[July 1, 2024]

JUSTICE BARRETT, concurring in part.

For reasons I explain below, I do not join Part III–C of the Court's opinion. The remainder of the opinion is consistent with my view that the Constitution prohibits Congress from criminalizing a President's exercise of core Article II powers and closely related conduct. That said, I would have framed the underlying legal issues differently. The Court describes the President's constitutional protection from certain prosecutions as an "immunity." As I see it, that term is shorthand for two propositions: The President can challenge the constitutionality of a criminal statute as applied to official acts alleged in the indictment, and he can obtain interlocutory review of the trial court's ruling.

There appears to be substantial agreement on the first point. Like the Court, the dissenting Justices and the Special Counsel all accept that some prosecutions of a President's official conduct may be unconstitutional. See *post*, at 16 (opinion of SOTOMAYOR, J.); Brief for United States 24–30. As for interlocutory review, our precedent recognizes that resolving certain legal issues before trial is necessary to safeguard important constitutional interests—here, Executive Branch independence on matters that Article II assigns to the President's discretion.

Properly conceived, the President's constitutional protection from prosecution is narrow. The Court leaves open the

possibility that the Constitution forbids prosecuting the President for *any* official conduct, instructing the lower courts to address that question in the first instance. See *ante*, at 14. I would have answered it now. Though I agree that a President cannot be held criminally liable for conduct within his "conclusive and preclusive" authority and closely related acts, *ante*, at 8–9, the Constitution does not vest every exercise of executive power in the President's sole discretion, *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 637 (1952) (Jackson, J., concurring).[1] Congress has concurrent authority over many Government functions, and it may sometimes use that authority to regulate the President's official conduct, including by criminal statute. Article II poses no barrier to prosecution in such cases.

I would thus assess the validity of criminal charges predicated on most official acts—*i.e.*, those falling outside of the President's core executive power—in two steps. The first question is whether the relevant criminal statute reaches the President's official conduct. Not every broadly worded statute does. For example, §956 covers conspiracy to murder in a foreign country and does not expressly exclude the President's decision to, say, order a hostage rescue mission abroad. 18 U. S. C. §956(a). The underlying murder statute, however, covers only "unlawful" killings. §1111. The Office of Legal Counsel has interpreted that phrase to reflect a public-authority exception for official acts involving the military and law enforcement. Memorandum from D. Barron, Acting Assistant Atty. Gen., to E. Holder, Atty.

---

[1] Consistent with our separation of powers precedent, I agree with the Court that the supervision and removal of appointed, high ranking Justice Department officials falls within the President's core executive power. See *Seila Law LLC* v. *Consumer Financial Protection Bureau*, 591 U. S. 197, 213–215 (2020); *ante*, at 19–21. I do not understand the Court to hold that all exercises of the Take Care power fall within the core executive power. Cf. *post*, at 24 (SOTOMAYOR, J., dissenting). I agree with the dissent that the Constitution does not justify such an expansive view. *Ibid.*

Gen., Re: Applicability of Federal Criminal Laws and the Constitution to Contemplated Lethal Operations Against Shaykh Anwar al-Aulaqi 12–19 (July 16, 2010); see also Brief for United States 29–30; *post*, at 16, and n. 3 (SOTOMAYOR, J., dissenting).  I express no view about the merits of that interpretation, but it shows that the threshold question of statutory interpretation is a nontrivial step.

If the statute covers the alleged official conduct, the prosecution may proceed only if applying it in the circumstances poses no "'dange[r] of intrusion on the authority and functions of the Executive Branch.'"  *Ante*, at 14 (quoting *Nixon* v. *Fitzgerald*, 457 U. S. 731, 754 (1982)).  On remand, the lower courts will have to apply that standard to various allegations involving the President's official conduct.[2]  Some of those allegations raise unsettled questions about the scope of Article II power, see *ante*, at 21–28, but others do not.  For example, the indictment alleges that the President "asked the Arizona House Speaker to call the legislature into session to hold a hearing" about election fraud claims.  App. 193.  The President has no authority over state legislatures or their leadership, so it is hard to see how prose-

_____

[2] This analysis is unnecessary for allegations involving the President's private conduct because the Constitution offers no protection from prosecution of acts taken in a private capacity.  *Ante*, at 15.  Sorting private from official conduct sometimes will be difficult—but not always.  Take the President's alleged attempt to organize alternative slates of electors.  See, *e.g.*, App. 208.  In my view, that conduct is private and therefore not entitled to protection.  See *post*, at 27–28 (SOTOMAYOR, J., dissenting).  The Constitution vests power to appoint Presidential electors in the States.  Art. II, §1, cl. 2; see also *Chiafalo* v. *Washington*, 591 U. S. 578, 588–589 (2020).  And while Congress has a limited role in that process, see Art. II, §1, cls. 3–4, the President has none.  In short, a President has no legal authority—and thus no official capacity—to influence how the States appoint their electors.  I see no plausible argument for barring prosecution of that alleged conduct.

cuting him for crimes committed when dealing with the Arizona House Speaker would unconstitutionally intrude on executive power.

This two-step analysis—considering first whether the statute applies and then whether its application to the particular facts is constitutional—is similar to the approach that the Special Counsel presses in this Court. Brief for United States 24–30. It is also our usual approach to considering the validity of statutes in situations raising a constitutional question. See, *e.g.*, *Seila Law LLC* v. *Consumer Financial Protection Bureau*, 591 U. S. 197, 213, 229 (2020).[3] An important difference in this context is that the President is entitled to an interlocutory appeal of the trial court's ruling. See *ante*, at 36. A criminal defendant in federal court normally must wait until after trial to seek review of the trial court's refusal to dismiss charges. See *United States* v. *MacDonald*, 435 U. S. 850, 853–854 (1978); see also 18 U. S. C. §3731. But where trial itself threatens certain constitutional interests, we have treated the trial court's resolution of the issue as a "final decision" for purposes of appellate jurisdiction. *MacDonald*, 435 U. S., at 854–856; see 28 U. S. C. §1291; see also §1257.

_____

[3] The Court has sometimes applied an avoidance canon when interpreting a statute that would interfere with the President's prerogatives. See, *e.g.*, *Franklin* v. *Massachusetts*, 505 U. S. 788, 800–801 (1992); *Public Citizen* v. *Dept. of Justice*, 491 U. S. 440, 465–467 (1989); see also *Sale* v. *Haitian Centers Council, Inc.*, 509 U. S. 155, 188 (1993). The Office of Legal Counsel has advocated for a clear-statement rule if applying a statute would "raise serious constitutional questions relating to the President's constitutional authority." See Application of 28 U. S. C. §458 to Presidential Appointments of Federal Judges, 19 Op. OLC 350, 350–357 (1995). In my view, neither canon applies in this circumstance. Courts should instead determine the statute's ordinary meaning and, if it covers the alleged official acts, assess whether prosecution would intrude on the President's constitutional authority. See *Public Citizen*, 491 U. S., at 481–482 (Kennedy, J., concurring in judgment) (declining to apply the avoidance canon and concluding that the Federal Advisory Committee Act is unconstitutional as applied).

The present circumstances fall squarely within our precedent authorizing interlocutory review. When a President moves to dismiss an indictment on Article II grounds, he "makes no challenge whatsoever to the merits of the charge against him." *Abney* v. *United States*, 431 U. S. 651, 659 (1977) (allowing interlocutory appeal of rejection of double jeopardy defense). He instead contests whether the Constitution allows Congress to criminalize the alleged conduct, a question that is "collateral to, and separable from" his guilt or innocence. *Ibid.* Moreover, the President's Executive Branch authority "would be significantly undermined if appellate review" of the constitutional challenge "were postponed until after conviction and sentence." *Id.*, at 660; see also *Helstoski* v. *Meanor*, 442 U. S. 500, 507 (1979) (allowing interlocutory appeal of refusal to dismiss an indictment on Speech or Debate Clause grounds). The prospect of a trial court erroneously allowing the prosecution to proceed poses a unique danger to the "independence of the Executive Branch." *Trump* v. *Vance*, 591 U. S. 786, 800 (2020). As the Court explains, the possibility that the President will be made to defend his official conduct before a jury after he leaves office could distort his decisions while in office. *Ante*, at 13–14, 36. These Article II concerns do not insulate the President from prosecution. But they do justify interlocutory review of the trial court's final decision on the President's as-applied constitutional challenge. See *Helstoski*, 442 U. S., at 507–508; *Abney*, 431 U. S., at 659–661; see also Reply Brief for United States in No. 23–624, p. 5 (agreeing that the President "has a right to an interlocutory appeal from the district court's rejection of his immunity defense").

I understand most of the Court's opinion to be consistent with these views. I do not join Part III–C, however, which holds that the Constitution limits the introduction of protected conduct as *evidence* in a criminal prosecution of a President, beyond the limits afforded by executive privilege. See *ante*, at 30–32. I disagree with that holding; on this

score, I agree with the dissent. See *post*, at 25–27
(SOTOMAYOR, J., dissenting). The Constitution does not re-
quire blinding juries to the circumstances surrounding con-
duct for which Presidents *can* be held liable. Consider a
bribery prosecution—a charge not at issue here but one that
provides a useful example. The federal bribery statute for-
bids any public official to seek or accept a thing of value "for
or because of any official act." 18 U. S. C. §201(c). The Con-
stitution, of course, does not authorize a President to seek
or accept bribes, so the Government may prosecute him if
he does so. See Art. II, §4 (listing "Bribery" as an impeach-
able offense); see also Memorandum from L. Silberman,
Deputy Atty. Gen., to R. Burress, Office of the President,
Re: Conflict of Interest Problems Arising Out of the Presi-
dent's Nomination of Nelson A. Rockefeller To Be Vice Pres-
ident Under the Twenty-Fifth Amendment to the Constitu-
tion 5 (Aug. 28, 1974) (suggesting that the federal bribery
statute applies to the President). Yet excluding from trial
any mention of the official act connected to the bribe would
hamstring the prosecution. To make sense of charges alleg-
ing a *quid pro quo*, the jury must be allowed to hear about
both the *quid* and the *quo*, even if the *quo*, standing alone,
could not be a basis for the President's criminal liability.

I appreciate the Court's concern that allowing into evi-
dence official acts for which the President cannot be held
criminally liable may prejudice the jury. *Ante*, at 31. But
the rules of evidence are equipped to handle that concern
on a case-by-case basis. Most importantly, a trial court can
exclude evidence of the President's protected conduct "if its
probative value is substantially outweighed by a danger of
. . . unfair prejudice" or "confusing the issues." Fed. Rule
Evid. 403; see also Rule 105 (requiring the court to "restrict
the evidence to its proper scope and instruct the jury ac-
cordingly"). The balance is more likely to favor admitting
evidence of an official act in a bribery prosecution, for in-
stance, than one in which the protected conduct has little

connection to the charged offense.  And if the evidence comes in, the trial court can instruct the jury to consider it only for lawful purposes.  See *Richardson* v. *Marsh*, 481 U. S. 200, 206–207 (1987).  I see no need to depart from that familiar and time-tested procedure here.

\*    \*    \*

The Constitution does not insulate Presidents from criminal liability for official acts.  But *any* statute regulating the exercise of executive power is subject to a constitutional challenge.  See, *e.g.*, *Collins* v. *Yellen*, 594 U. S. 220, 235–236 (2021); *Zivotofsky* v. *Clinton*, 566 U. S. 189, 192–194 (2012); *Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.*, 561 U. S. 477, 487–488 (2010).  A criminal statute is no exception.  Thus, a President facing prosecution may challenge the constitutionality of a criminal statute as applied to official acts alleged in the indictment.  If that challenge fails, however, he must stand trial.

# SUPREME COURT OF THE UNITED STATES

————————

No. 23–939

————————

## DONALD J. TRUMP, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[July 1, 2024]

JUSTICE SOTOMAYOR, with whom JUSTICE KAGAN and JUSTICE JACKSON join, dissenting.

Today's decision to grant former Presidents criminal immunity reshapes the institution of the Presidency. It makes a mockery of the principle, foundational to our Constitution and system of Government, that no man is above the law. Relying on little more than its own misguided wisdom about the need for "bold and unhesitating action" by the President, *ante,* at 3, 13, the Court gives former President Trump all the immunity he asked for and more. Because our Constitution does not shield a former President from answering for criminal and treasonous acts, I dissent.

I

The indictment paints a stark portrait of a President desperate to stay in power.

In the weeks leading up to January 6, 2021, then-President Trump allegedly "spread lies that there had been outcome-determinative fraud in the election and that he had actually won," App. 181, Indictment ¶2, despite being "notified repeatedly" by his closest advisers "that his claims were untrue," *id.,* at 188, ¶11.

When dozens of courts swiftly rejected these claims, Trump allegedly "pushed officials in certain states to ignore the popular vote; disenfranchise millions of voters; dismiss

legitimate electors; and ultimately, cause the ascertain-
ment of and voting by illegitimate electors" in his favor. *Id.*,
at 185–186, ¶10(a). It is alleged that he went so far as to
threaten one state election official with criminal prosecu-
tion if the official did not "'find' 11,780 votes" Trump needed
to change the election result in that state. *Id.*, at 202,
¶31(f). When state officials repeatedly declined to act out-
side their legal authority and alter their state election pro-
cesses, Trump and his co-conspirators purportedly devel-
oped a plan to disrupt and displace the legitimate election
certification process by organizing fraudulent slates of elec-
tors. See *id.*, at 208–209, ¶¶53–54.

As the date of the certification proceeding neared, Trump
allegedly also sought to "use the power and authority of the
Justice Department" to bolster his knowingly false claims
of election fraud by initiating "sham election crime investi-
gations" and sending official letters "falsely claim[ing] that
the Justice Department had identified significant concerns
that may have impacted the election outcome" while
"falsely present[ing] the fraudulent electors as a valid alter-
native to the legitimate electors." *Id.*, at 186–187, ¶10(c).
When the Department refused to do as he asked, Trump
turned to the Vice President. Initially, he sought to per-
suade the Vice President "to use his ceremonial role at the
January 6 certification proceeding to fraudulently alter the
election results." *Id.*, at 187, ¶10(d). When persuasion
failed, he purportedly "attempted to use a crowd of support-
ers that he had gathered in Washington, D. C., to pressure
the Vice President to fraudulently alter the election re-
sults." *Id.*, at 221, ¶86.

Speaking to that crowd on January 6, Trump "falsely
claimed that, based on fraud, the Vice President could alter
the outcome of the election results." *Id.*, at 229, ¶104(a).
When this crowd then "violently attacked the Capitol and
halted the proceeding," *id.*, at 188, ¶10(e), Trump allegedly

delayed in taking any step to rein in the chaos he had un-
leashed. Instead, in a last desperate ploy to hold onto
power, he allegedly "attempted to exploit the violence and
chaos at the Capitol" by pressuring lawmakers to delay the
certification of the election and ultimately declare him the
winner. *Id.*, at 233, ¶119. That is the backdrop against
which this case comes to the Court.

## II

The Court now confronts a question it has never had to
answer in the Nation's history: Whether a former President
enjoys immunity from federal criminal prosecution. The
majority thinks he should, and so it invents an atextual,
ahistorical, and unjustifiable immunity that puts the Pres-
ident above the law.

The majority makes three moves that, in effect, com-
pletely insulate Presidents from criminal liability. First,
the majority creates absolute immunity for the President's
exercise of "core constitutional powers." *Ante,* at 6. This
holding is unnecessary on the facts of the indictment, and
the majority's attempt to apply it to the facts expands the
concept of core powers beyond any recognizable bounds. In
any event, it is quickly eclipsed by the second move, which
is to create expansive immunity for all "official act[s]."
*Ante,* at 14. Whether described as presumptive or absolute,
under the majority's rule, a President's use of any official
power for any purpose, even the most corrupt, is immune
from prosecution. That is just as bad as it sounds, and it is
baseless. Finally, the majority declares that evidence con-
cerning acts for which the President is immune can play no
role in any criminal prosecution against him. See *ante,* at
30–32. That holding, which will prevent the Government
from using a President's official acts to prove knowledge or
intent in prosecuting private offenses, is nonsensical.

Argument by argument, the majority invents immunity

through brute force. Under scrutiny, its arguments crumble. To start, the majority's broad "official acts" immunity is inconsistent with text, history, and established understandings of the President's role. See Part III, *infra.* Moreover, it is deeply wrong, even on its own functionalist terms. See Part IV, *infra.* Next, the majority's "core" immunity is both unnecessary and misguided. See Part V, *infra.* Furthermore, the majority's illogical evidentiary holding is unprecedented. See Part VI, *infra.* Finally, this majority's project will have disastrous consequences for the Presidency and for our democracy. See Part VII, *infra.*

## III

The main takeaway of today's decision is that all of a President's official acts, defined without regard to motive or intent, are entitled to immunity that is "at least . . . *presumptive,*" and quite possibly "absolute." *Ante,* at 14. Whenever the President wields the enormous power of his office, the majority says, the criminal law (at least presumptively) cannot touch him. This official-acts immunity has "no firm grounding in constitutional text, history, or precedent." *Dobbs* v. *Jackson Women's Health Organization*, 597 U. S. 215, 280 (2022). Indeed, those "standard grounds for constitutional decisionmaking," *id.*, at 279, all point in the opposite direction. No matter how you look at it, the majority's official-acts immunity is utterly indefensible.

## A

The majority calls for a "careful assessment of the scope of Presidential power under the Constitution." *Ante,* at 5. For the majority, that "careful assessment" does not involve the Constitution's text. I would start there.

The Constitution's text contains no provision for immunity from criminal prosecution for former Presidents. Of course, "the silence of the Constitution on this score is not

dispositive." *United States* v. *Nixon*, 418 U. S. 683, 706,
n. 16 (1974). Insofar as the majority rails against the no-
tion that a "'specific textual basis'" is required, *ante,* at 37
(quoting *Nixon* v. *Fitzgerald*, 457 U. S. 731, 750, n. 31
(1982)), it is attacking an argument that has not been made
here. The omission in the text of the Constitution is worth
noting, however, for at least three reasons.

First, the Framers clearly knew how to provide for im-
munity from prosecution. They did provide a narrow im-
munity for legislators in the Speech or Debate Clause. See
Art. I, §6, cl. 1 ("Senators and Representatives . . . shall in
all Cases, except Treason, Felony and Breach of the Peace,
be privileged from Arrest during their Attendance at the
Session of their respective Houses, and in going to and re-
turning from the same; and for any Speech or Debate in ei-
ther House, they shall not be questioned in any other
Place"). They did not extend the same or similar immunity
to Presidents.

Second, "some state constitutions at the time of the Fram-
ing specifically provided 'express criminal immunities' to
sitting governors." Brief for Scholars of Constitutional Law
as *Amici Curiae* 4 (quoting S. Prakash, Prosecuting and
Punishing Our Presidents, 100 Tex. L. Rev. 55, 69 (2021)).
The Framers chose not to include similar language in the
Constitution to immunize the President. If the Framers
"had wanted to create some constitutional privilege to
shield the President . . . from criminal indictment," they
could have done so. Memorandum from R. Rotunda to K.
Starr re: Indictability of the President 18 (May 13, 1998).
They did not.

Third, insofar as the Constitution does speak to this ques-
tion, it actually contemplates some form of criminal liability
for former Presidents. The majority correctly rejects
Trump's argument that a former President cannot be pros-
ecuted unless he has been impeached by the House and con-
victed by the Senate for the same conduct. See *ante,* at 32–

34; Part IV–C, *infra*.  The majority ignores, however, that
the Impeachment Judgment Clause cuts against its own po-
sition.  That Clause presumes the availability of criminal
process as a backstop by establishing that an official im-
peached and convicted by the Senate "shall *nevertheless* be
liable and subject to Indictment, Trial, Judgment and Pun-
ishment, according to Law."  Art. I, §3, cl. 7 (emphasis
added).  That Clause clearly contemplates that a former
President may be subject to criminal prosecution for the
same conduct that resulted (or could have resulted) in an
impeachment judgment—including conduct such as "Brib-
ery," Art. II, §4, which implicates official acts almost by def-
inition.[1]

## B

Aware of its lack of textual support, the majority points
out that this Court has "recognized Presidential immunities
and privileges 'rooted in the constitutional tradition of the
separation of powers and supported by our history.'"  *Ante*,
at 10 (quoting *Fitzgerald*, 457 U. S., at 749).  That is true,
as far as it goes.  Nothing in our history, however, supports
the majority's entirely novel immunity from criminal pros-
ecution for official acts.

The historical evidence that exists on Presidential im-
munity from criminal prosecution cuts decisively against it.
For instance, Alexander Hamilton wrote that former Presi-
dents would be "liable to prosecution and punishment in the
ordinary course of law."  The Federalist No. 69, p. 452 (J.
Harv. Lib. ed. 2009).  For Hamilton, that was an important
distinction between "the king of Great Britain," who was
"sacred and inviolable," and the "President of the United
States," who "would be amenable to personal punishment

---

[1] Article II, §4, provides: "The President, Vice President and all Civil
Officers of the United States, shall be removed from Office on Impeach-
ment for and Conviction of, Treason, Bribery, or other high Crimes and
Misdemeanors."

and disgrace." *Id.*, at 458. In contrast to the king, the President should be subject to "personal responsibility" for his actions, "stand[ing] upon no better ground than a governor of New York, and upon worse ground than the governors of Maryland and Delaware," whose State Constitutions gave them some immunity. *Id.*, at 452.

At the Constitutional Convention, James Madison, who was aware that some state constitutions provided governors immunity, proposed that the Convention "conside[r] what privileges ought to be allowed to the Executive." 2 Records of the Federal Convention of 1787, p. 503 (M. Farrand ed. 1911). There is no record of any such discussion. *Ibid.* Delegate Charles Pinckney later explained that "[t]he Convention which formed the Constitution well knew" that "no subject had been more abused than privilege," and so it "determined to . . . limi[t] privilege to what was necessary, and no more." 3 *id.*, at 385. "No privilege . . . was intended for [the] Executive." *Ibid.*[2]

Other commentators around the time of the Founding observed that federal officials had no immunity from prosecution, drawing no exception for the President. James Wilson recognized that federal officers who use their official powers to commit crimes "may be tried by their country; and if their criminality is established, the law will punish. A grand jury may present, a petty jury may convict, and the judges will pronounce the punishment." 2 Debates on the Constitution 177 (J. Elliot ed. 1836). A few decades later, Justice Story evinced the same understanding. He explained that, when

————————

[2]To note, as the majority does, see *ante*, at 39, that this Court has recognized civil immunities arguably inconsistent with this view is not to say that Pinckney was wrong about what the Framers had "intended." Indeed, Pinckney's contemporaries shared the same view during the ratification debates. See, *e.g.*, 4 Debates on the Constitution 109 (J. Elliot ed. 1836) (J. Iredell) ("If the President does a single act by which the people are prejudiced, he is punishable himself. . . . If he commits any crime, he is punishable by the laws of his country").

a federal official commits a crime in office, "it is indispensa-
ble, that provision should be made, that the common tribu-
nals of justice should be at liberty to entertain jurisdiction
of the offence, for the purpose of inflicting, the common pun-
ishment applicable to unofficial offenders." 2 Commen-
taries on the Constitution of the United States §780,
pp. 250–251 (1833). Without a criminal trial, he explained,
"the grossest official offenders might escape without any
substantial punishment, even for crimes, which would sub-
ject their fellow citizens to capital punishment." *Id.*, at 251.

This historical evidence reinforces that, from the very be-
ginning, the presumption in this Nation has always been
that no man is free to flout the criminal law. The majority
fails to recognize or grapple with the lack of historical evi-
dence for its new immunity. With nothing on its side of the
ledger, the most the majority can do is claim that the his-
torical evidence is a wash. See *ante,* at 38–39. It claims
that the Court previously has described the "relevant his-
torical evidence on the question of Presidential immunity"
as "'fragmentary'" and not worthy of consideration. *Ante,*
at 38 (quoting *Fitzgerald*, 457 U. S., at 752, n. 31). Yet the
Court has described only the evidence regarding "the Pres-
ident's immunity *from damages liability*" as "fragmentary."
*Fitzgerald*, 457 U. S., at 751–752, n. 31 (emphasis added).
Moreover, far from dismissing that evidence as irrelevant,
the *Fitzgerald* Court was careful to note that "[t]he best his-
torical evidence clearly support[ed]" the immunity from
damages liability that it recognized, and it relied in part on
that historical evidence to overcome the lack of any textual
basis for its immunity. *Id.*, at 152, n. 31. The majority ig-
nores this reliance. It seems history matters to this Court
only when it is convenient. See, *e.g., New York State Rifle
& Pistol Assn., Inc.* v. *Bruen*, 597 U. S. 1 (2022); *Dobbs*, 597
U. S. 215.

### C

Our country's history also points to an established understanding, shared by both Presidents and the Justice Department, that former Presidents are answerable to the criminal law for their official acts. Cf. *Chiafalo* v. *Washington*, 591 U. S. 578, 592–593 (2020) ("'Long settled and established practice' may have 'great weight in a proper interpretation of constitutional provisions'" (quoting *The Pocket Veto Case*, 279 U. S. 655, 689 (1929))). Consider Watergate, for example. After the Watergate tapes revealed President Nixon's misuse of official power to obstruct the Federal Bureau of Investigation's investigation of the Watergate burglary, President Ford pardoned Nixon. Both Ford's pardon and Nixon's acceptance of the pardon necessarily "rested on the understanding that the former President faced potential criminal liability." Brief for United States 15; see also Public Papers of the Presidents, Gerald R. Ford, Vol. 1, Sept. 8, 1974, p. 103 (1975) (granting former President Nixon a "full, free, and absolute pardon . . . for all offenses against the United States which he . . . has committed or may have committed or taken part in during" his Presidency); R. Nixon, Statement by Former President Richard Nixon to P. Buchen, Counsel to President Ford, p. 1 (Sept. 8, 1974) (accepting "full and absolute pardon for any charges which might be brought against me for actions taken during the time I was President of the United States").

Subsequent special counsel and independent counsel investigations have also operated on the assumption that the Government can criminally prosecute former Presidents for their official acts, where they violate the criminal law. See, *e.g.*, 1 L. Walsh, Final Report of the Independent Counsel for Iran/Contra Matters: Investigations and Prosecutions 445 (1993) ("[B]ecause a President, and certainly a past President, is subject to prosecution . . . the conduct of Pres-

ident Reagan in the Iran/contra matter was reviewed by In-
dependent Counsel against the applicable statutes. It was
concluded that [his] conduct fell well short of criminality
which could be successfully prosecuted").

Indeed, Trump's own lawyers during his second impeach-
ment trial assured Senators that declining to impeach
Trump for his conduct related to January 6 would not leave
him "in any way above the law." 2 Proceedings of the U. S.
Senate in the Impeachment Trial of Donald John Trump, S.
Doc. 117–2, p. 144 (2021). They insisted that a former Pres-
ident "is like any other citizen and can be tried in a court of
law." *Ibid.*; see also 1 *id.*, S. Doc. 117–3, at 339 (Trump's
impeachment counsel stating that "no former officeholder
is immune" from the judicial process "for investigation,
prosecution, and punishment"); *id.*, at 322–323 (Trump's
impeachment counsel stating: "If my colleagues on this side
of the Chamber actually think that President Trump com-
mitted a criminal offense . . . [a]fter he is out of office, you
go and arrest him"). Now that Trump is facing criminal
charges for those acts, though, the tune has changed. Being
treated "like any other citizen" no longer seems so appeal-
ing.

In sum, the majority today endorses an expansive vision
of Presidential immunity that was never recognized by the
Founders, any sitting President, the Executive Branch, or
even President Trump's lawyers, until now. Settled under-
standings of the Constitution are of little use to the majority
in this case, and so it ignores them.

## IV
### A

Setting aside this evidence, the majority announces that
former Presidents are "absolute[ly]," or "at least . . . pre-
sumptive[ly]," immune from criminal prosecution for all of
their official acts. *Ante,* at 14 (emphasis omitted). The ma-
jority purports to keep us in suspense as to whether this

immunity is absolute or presumptive, but it quickly gives up the game. It explains that, "[a]t a minimum, the President must . . . be immune from prosecution for an official act unless the Government can show that applying a criminal prohibition to that act would pose *no 'dangers of intrusion* on the authority and functions of the Executive Branch.'" *Ibid.* (emphasis added). No dangers, none at all. It is hard to imagine a criminal prosecution for a President's official acts that would pose no dangers of intrusion on Presidential authority in the majority's eyes. Nor should that be the standard. Surely some intrusions on the Executive may be "justified by an overriding need to promote objectives within the constitutional authority of Congress." *Nixon* v. *Administrator of General Services*, 433 U. S. 425, 443 (1977). Other intrusions may be justified by the "primary constitutional duty of the Judicial Branch to do justice in criminal prosecutions." *United States* v. *Nixon*, 418 U. S. 683, 707 (1974). According to the majority, however, any incursion on Executive power is too much. When presumptive immunity is this conclusive, the majority's indecision as to "whether [official-acts] immunity must be absolute" or whether, instead, "presumptive immunity is sufficient," *ante,* at 6, hardly matters.

Maybe some future opinion of this Court will decide that presumptive immunity is "sufficient," *ibid.*, and replace the majority's ironclad presumption with one that makes the difference between presumptive and absolute immunity meaningful. Today's Court, however, has replaced a presumption of equality before the law with a presumption that the President is above the law for all of his official acts.

Quick on the heels of announcing this astonishingly broad official-acts immunity, the majority assures us that a former President can still be prosecuted for "unofficial acts." *Ante,* at 15. Of course he can. No one has questioned the ability to prosecute a former President for unofficial (other-

wise known as private) acts.  Even Trump did not claim im-
munity for such acts and, as the majority acknowledges,
such an immunity would be impossible to square with *Clin-
ton* v. *Jones*, 520 U. S. 681 (1997).  See *ante,* at 15.  This
unremarkable proposition is no real limit on today's deci-
sion.  It does not hide the majority's embrace of the most
far-reaching view of Presidential immunity on offer.

In fact, the majority's dividing line between "official" and
"unofficial" conduct narrows the conduct considered "unof-
ficial" almost to a nullity.  It says that whenever the Presi-
dent acts in a way that is "'not manifestly or palpably be-
yond [his] authority,'" he is taking official action.  *Ante,* at
17 (quoting *Blassingame* v. *Trump*, 87 F. 4th 1, 13 (CADC
2023)).  It then goes a step further: "In dividing official from
unofficial conduct, courts may not inquire into the Presi-
dent's motives."  *Ante,* at 18.  It is one thing to say that mo-
tive is irrelevant to questions regarding the scope of civil
liability, but it is quite another to make it irrelevant to
questions regarding criminal liability.  Under that rule, any
use of official power for any purpose, even the most corrupt
purpose indicated by objective evidence of the most corrupt
motives and intent, remains official and immune.  Under
the majority's test, if it can be called a test, the category of
Presidential action that can be deemed "unofficial" is des-
tined to be vanishingly small.

Ultimately, the majority pays lip service to the idea that
"[t]he President, charged with enforcing federal criminal
laws, is not above them," *ante,* at 13–14, but it then pro-
ceeds to place former Presidents beyond the reach of the
federal criminal laws for any abuse of official power.

## B

So how does the majority get to its rule?  With text, his-
tory, and established understanding all weighing against it,
the majority claims just one arrow in its quiver: the balanc-
ing test in *Nixon* v. *Fitzgerald*, 457 U. S. 731 (1983).  Yet

even that test cuts against it. The majority concludes that official-acts immunity "is required to safeguard the independence and effective functioning of the Executive Branch," *ante,* at 14, by rejecting that Branch's own protestations that such immunity is not at all required and would in fact be harmful, see Brief for United States 18–24, 29–30. In doing so, it decontextualizes *Fitzgerald*'s language, ignores important qualifications, and reaches a result that the *Fitzgerald* Court never would have countenanced.

In *Fitzgerald*, plaintiff A. Ernest Fitzgerald sued then-former President Nixon for money damages. He claimed that, while in office, Nixon had been involved in unlawfully firing him from his government job. See 457 U. S., at 733–741. The question for the Court was whether a former President had immunity from such a civil suit. The Court explained that it was "settled law that the separation-of-powers doctrine does not bar every exercise of jurisdiction over the President of the United States." *Id.,* at 753–754. To determine whether a particular type of suit against a President (or former President) could be heard, a court "must balance the constitutional weight of the interest to be served against the dangers of intrusion on the authority and functions of the Executive Branch." *Id.,* at 754. The Court explained that, "[w]hen judicial action is needed to serve broad public interests—as when the Court acts, not in derogation of the separation of powers, but to maintain their proper balance, or to vindicate the public interest in an ongoing criminal prosecution—the exercise of jurisdiction has been held warranted." *Ibid.* (citations omitted).

On the facts before it, the Court concluded that a "merely private suit for damages based on a President's official acts" did not serve those interests. *Ibid.* The Court reasoned that the "visibility of [the President's] office and the effect of his actions on countless people" made him an easy target for civil suits that "frequently could distract [him] from his

public duties." *Id.*, at 753. The public interest in such private civil suits, the Court concluded, was comparatively weak. See *id.*, at 754, n. 37 ("[T]here is a lesser public interest in actions for civil damages than, for example, in criminal prosecutions"). Therefore, the Court held that a former President was immune from such suits. *Ibid.*

In the context of a federal criminal prosecution of a former President, however, the danger to the functioning of the Executive Branch is much reduced. Further, as every member of the *Fitzgerald* Court acknowledged, see Part IV–B–2, *infra*, the public interest in a criminal prosecution is far weightier. Applying the *Fitzgerald* balancing here should yield the opposite result. Instead, the majority elides any difference between civil and criminal immunity, granting Trump the same immunity from criminal prosecution that Nixon enjoyed from an unlawful termination suit. That is plainly wrong.

1

The majority relies almost entirely on its view of the danger of intrusion on the Executive Branch, to the exclusion of the other side of the balancing test. Its analysis rests on a questionable conception of the President as incapable of navigating the difficult decisions his job requires while staying within the bounds of the law. It also ignores the fact that he receives robust legal advice on the lawfulness of his actions.

The majority says that the danger "of intrusion on the authority and functions of the Executive Branch" posed by criminally prosecuting a former President for official conduct "is akin to, indeed greater than, what led us to recognize absolute Presidential immunity from civil damages liability—that the President would be chilled from taking the 'bold and unhesitating action' required of an independent Executive." *Ante,* at 13 (quoting *Fitzgerald*, 457 U. S., at 745). It is of course important that the President be able to

"'"deal fearlessly and impartially with" the duties of his of-
fice.'" *Ante*, at 10 (quoting *Fitzgerald*, 457 U. S., at 752). If
every action the President takes exposes him personally to
vexatious private litigation, the possibility of hamstringing
Presidential decisionmaking is very real. Yet there are
many facets of criminal liability, which the majority dis-
counts, that make it less likely to chill Presidential action
than the threat of civil litigation.

First, in terms of probability, the threat of criminal lia-
bility is much smaller. In *Fitzgerald*, the threat of vexa-
tious civil litigation loomed large. The Court observed that,
given the "visibility of his office and the effect of his actions
on countless people, the President would be an easily iden-
tifiable target for suits for civil damages." *Id*., at 753. Alt-
hough "'the effect of [the President's] actions on countless
people' could result in untold numbers of private plaintiffs
suing for damages based on any number of Presidential
acts" in the civil context, the risk in the criminal context is
"only that a former President may face one federal prosecu-
tion, in one jurisdiction, for each criminal offense allegedly
committed while in office." 2023 WL 8359833, *9 (DC, Dec.
1, 2023) (quoting *Fitzgerald*, 457 U. S., at 753). The major-
ity's bare assertion that the burden of exposure to federal
criminal prosecution is more limiting to a President than
the burden of exposure to civil suits does not make it true,
and it is not persuasive.

Second, federal criminal prosecutions require "robust
procedural safeguards" not found in civil suits. 2023 WL
8359833, *10. The criminal justice system has layers of pro-
tections that "filter out insubstantial legal claims," whereas
civil litigation lacks "analogous checks." *Cheney* v. *United
States Dist. Court for D. C.*, 542 U. S. 367, 386 (2004). To
start, Justice Department policy requires scrupulous and
impartial prosecution, founded on both the facts and the
law. See generally Dept. of Justice, Justice Manual §9–
27.000 (Principles of Federal Prosecution) (June 2023). The

grand jury provides an additional check on felony prosecutions, acting as a "buffer or referee between the Government and the people," to ensure that the charges are well-founded. *United States* v. *Williams*, 504 U. S. 36, 47 (1992); see also *Harlow* v. *Fitzgerald*, 457 U. S. 800, 826, n. 6 (1982) (Burger, C. J., dissenting) ("[A] criminal prosecution cannot be commenced absent careful consideration by a grand jury at the request of a prosecutor; the same check is not present with respect to the commencement of civil suits in which advocates are subject to no realistic accountability").

If the prosecution makes it past the grand jury, then the former President still has all the protections our system provides to criminal defendants. If the former President has an argument that a particular statute is unconstitutional as applied to him, then he can move to dismiss the charges on that ground. Indeed, a former President is likely to have legal arguments that would be unavailable to the average criminal defendant. For example, he may be able to rely on a public-authority exception from particular criminal laws,[3] or an advice-of-the-Attorney-General defense, see Tr. of Oral Arg. 107–108.[4]

───────────

[3] See *Nardone* v. *United States*, 302 U. S. 379, 384 (1937) (explaining that public officers may be "impliedly excluded from [statutory] language embracing all persons" if reading the statute to include such officers "would work obvious absurdity as, for example, the application of a speed law to a policeman pursuing a criminal or the driver of a fire engine responding to an alarm"); see also Memorandum from D. Barron, Acting Assistant Atty. Gen., Office of Legal Counsel, to E. Holder, Atty. Gen., Re: Applicability of Federal Criminal Laws and the Constitution to Contemplated Lethal Operations Against Shaykh Anwar al-Aulaqi 12 (July 16, 2010) (interpreting criminal statute prohibiting unlawful killings "to incorporate the public authority justification, which can render lethal action carried out by a government official lawful in some circumstances").

[4] Trump did not raise those defenses in this case, and the immunity that the majority has created likely will obviate the need to raise them in future cases. Yet those defenses would have protected former Presidents from unwarranted criminal prosecutions much more precisely than the blanket immunity the majority creates today.

If the case nonetheless makes it to trial, the Government will bear the burden of proving every element of the alleged crime beyond a reasonable doubt to a unanimous jury of the former President's fellow citizens. See *United States* v. *Gaudin*, 515 U. S. 506, 510 (1995). If the Government manages to overcome even that significant hurdle, then the former President can appeal his conviction, and the appellate review of his claims will be "'particularly meticulous.'" *Trump* v. *Vance*, 591 U. S. 786, 809 (2020) (quoting *Nixon*, 418 U. S., at 702). He can ultimately seek this Court's review, and if past practice (including in this case) is any indication, he will receive it.

In light of these considerable protections, the majority's fear that "'bare allegations of malice,'" *ante,* at 18 (alteration omitted), would expose former Presidents to trial and conviction is unfounded. Bare allegations of malice would not make it out of the starting gate. Although a private civil action may be brought based on little more than "'intense feelings,'" *ante,* at 11 (quoting *Fitzgerald*, 457 U. S., at 752), a federal criminal prosecution is made of firmer stuff. Certainly there has been, on occasion, great feelings of animosity between incoming and outgoing Presidents over the course of our country's history. Yet it took allegations as grave as those at the center of this case to have the first federal criminal prosecution of a former President. That restraint is telling.

Third, because of longstanding interpretations by the Executive Branch, every sitting President has so far believed himself under the threat of criminal liability after his term in office and nevertheless boldly fulfilled the duties of his office. The majority insists that the threat of criminal sanctions is "more likely to distort Presidential decisionmaking than the potential payment of civil damages." *Ante,* at 13. If that is right, then that distortion has been shaping Presidential decisionmaking since the earliest days of the Republic. Although it makes sense to avoid "diversion of the

President's attention during the decisionmaking process" with "needless worry," *Clinton*, 520 U. S., at 694, n. 19, one wonders why requiring some small amount of his attention (or his legal advisers' attention) to go towards complying with federal criminal law is such a great burden. If the President follows the law that he must "take Care" to execute, Art. II, §3, he has not been rendered "'unduly cautious,'" *ante*, at 10 (quoting *Fitzgerald*, 457 U. S., at 752, n. 32). Some amount of caution is necessary, after all. It is a far greater danger if the President feels empowered to violate federal criminal law, buoyed by the knowledge of future immunity. I am deeply troubled by the idea, inherent in the majority's opinion, that our Nation loses something valuable when the President is forced to operate within the confines of federal criminal law.

So what exactly is the majority worried about deterring when it expresses great concern for the "deterrent" effect that "the threat of trial, judgment, and imprisonment" would pose? *Ante,* at 13. It cannot possibly be the deterrence of acts that are truly criminal. Nor does it make sense for the majority to wring its hands over the possibility that Presidents might stop and think carefully before taking action that borders on criminal. Instead, the majority's main concern could be that Presidents will be deterred from taking necessary and lawful action by the fear that their successors might pin them with a baseless criminal prosecution—a prosecution that would almost certainly be doomed to fail, if it even made it out of the starting gate. See *ante,* at 40. The Court should not have so little faith in this Nation's Presidents. As this Court has said before in the context of criminal proceedings, "'[t]he chance that now and then there may be found some timid soul who will take counsel of his fears and give way to their repressive power is too remote and shadowy to shape the course of justice.'" *Nixon*, 418 U. S., at 712, n. 20 (quoting *Clark* v. *United States*, 289 U. S. 1, 16 (1933)). The concern that countless

(and baseless) civil suits would hamper the Executive may have been justified in *Fitzgerald*, but a well-founded federal criminal prosecution poses no comparable danger to the functioning of the Executive Branch.

2

At the same time, the public interest in a federal criminal prosecution of a former President is vastly greater than the public interest in a private individual's civil suit. All nine Justices in *Fitzgerald* explicitly recognized that distinction. The five-Justice majority noted that there was a greater public interest "in criminal prosecutions" than in "actions for civil damages." 457 U. S., at 754, n. 37. Chief Justice Burger's concurrence accordingly emphasized that the majority's immunity was "limited to civil damages claims," rather than "*criminal* prosecution." *Id.*, at 759–760. The four dissenting Justices agreed that a "contention that the President is immune from criminal prosecution in the courts," if ever made, would not "be credible." *Id.*, at 780 (White, J., dissenting). At the very least, the *Fitzgerald* Court did not expect that its balancing test would lead to the same outcome in the criminal context.

The public's interest in prosecution is transparent: a federal prosecutor herself acts on behalf of the United States. Even the majority acknowledges that the "[f]ederal criminal laws seek to redress 'a wrong to the public' as a whole, not just 'a wrong to the individual,'" *ante,* at 13 (quoting *Huntington* v. *Attrill*, 146 U. S. 657, 668 (1892)), such that there is "a compelling 'public interest in fair and effective law enforcement,'" *ante,* at 13 (quoting *Vance*, 591 U. S., at 808). Indeed, "our historic commitment to the rule of law" is "nowhere more profoundly manifest than in our view that . . . 'guilt shall not escape or innocence suffer.'" *Nixon*, 418 U. S., at 708–709 (quoting *Berger* v. *United States*, 295 U. S. 78, 88 (1935)).

The public interest in criminal prosecution is particularly

strong with regard to officials who are granted some degree of civil immunity because of their duties. It is in those cases where the public can see that officials exercising power under public trust remain on equal footing with their fellow citizens under the criminal law. See, *e.g.*, *O'Shea* v. *Littleton*, 414 U. S. 488, 503 (1974) ("[W]e have never held that the performance of the duties of judicial, legislative, or executive officers, requires or contemplates the immunization of otherwise criminal deprivations of constitutional rights"); *Dennis* v. *Sparks*, 449 U. S. 24, 31 (1980) ("[J]udicial immunity was not designed to insulate the judiciary from all aspects of public accountability. Judges are immune from §1983 damages actions, but they are subject to criminal prosecutions as are other citizens"); *Imbler* v. *Pachtman*, 424 U. S. 409, 428–429 (1976) ("We emphasize that the [civil] immunity of prosecutors . . . does not leave the public powerless to deter misconduct or to punish that which occurs. This Court has never suggested that the policy considerations which compel civil immunity for certain governmental officials also place them beyond the reach of the criminal law. Even judges, cloaked with absolute civil immunity for centuries, could be punished criminally").

The public interest in the federal criminal prosecution of a former President alleged to have used the powers of his office to commit crimes may be greater still. "[T]he President . . . represent[s] all the voters in the Nation," and his powers are given by the people under our Constitution. *Anderson* v. *Celebrezze*, 460 U. S. 780, 795 (1983). When Presidents use the powers of their office for personal gain or as part of a criminal scheme, every person in the country has an interest in that criminal prosecution. The majority overlooks that paramount interest entirely.

Finally, the question of federal criminal immunity for a former President "involves a countervailing Article II consideration absent in *Fitzgerald*": recognizing such an im-

munity "would frustrate the Executive Branch's enforcement of the criminal law." Brief for United States 19. The President is, of course, entrusted with "'supervisory and policy responsibilities of utmost discretion and sensitivity.'" *Ante* at 10 (quoting *Fitzgerald*, 457 U. S., at 750). One of the most important is "enforcement of federal law," as "it is the President who is charged constitutionally to 'take Care that the Laws be faithfully executed.'" *Id.*, at 750 (quoting Art. II, §3). The majority seems to think that allowing former Presidents to escape accountability for breaking the law while disabling the current Executive from prosecuting such violations somehow respects the independence of the Executive. It does not. Rather, it diminishes that independence, exalting occupants of the office over the office itself. There is a twisted irony in saying, as the majority does, that the person charged with "tak[ing] Care that the Laws be faithfully executed" can break them with impunity.

In the case before us, the public interest and countervailing Article II interest are particularly stark. The public interest in this criminal prosecution implicates both "[t]he Executive Branch's interest in upholding Presidential elections and vesting power in a new President under the Constitution" as well as "the voters' interest in democratically selecting their President." 91 F. 4th 1173, 1195 (CADC 2024) (*per curiam*). It also, of course, implicates Congress's own interest in regulating conduct through the criminal law. Cf. *Fitzgerald*, 457 U. S., at 749, n. 27 (noting that the case did not involve "affirmative action by Congress"). Yet the majority believes that a President's anxiety over prosecution overrides the public's interest in accountability and negates the interests of the other branches in carrying out their constitutionally assigned functions. It is, in fact, the majority's position that "boil[s] down to ignoring the Constitution's separation of powers." *Ante,* at 40.

### C

Finally, in an attempt to put some distance between its official-acts immunity and Trump's requested immunity, the majority insists that "Trump asserts a far broader immunity than the limited one [the majority has] recognized." *Ante*, at 32. If anything, the opposite is true. The only part of Trump's immunity argument that the majority rejects is the idea that "the Impeachment Judgment Clause requires that impeachment and Senate conviction precede a President's criminal prosecution." *Ibid.* That argument is obviously wrong. See *ante*, at 32–34. Rejecting it, however, does not make the majority's immunity narrower than Trump's. Inherent in Trump's Impeachment Judgment Clause argument is the idea that a former President who was impeached in the House and convicted in the Senate for crimes involving his official acts could then be prosecuted in court for those acts. See Brief for Petitioner 22 ("The Founders thus adopted a carefully balanced approach that permits the criminal prosecution of a former President for his official acts, but only if that President is first impeached by the House and convicted by the Senate"). By extinguishing that path to overcoming immunity, however nonsensical it might be, the majority arrives at an official-acts immunity even more expansive than the one Trump argued for. On the majority's view (but not Trump's), a former President whose abuse of power was so egregious and so offensive even to members of his own party that he was impeached in the House and convicted in the Senate still would be entitled to "at least presumptive" criminal immunity for those acts.

### V

Separate from its official-acts immunity, the majority recognizes absolute immunity for "conduct within [the President's] exclusive sphere of constitutional authority." *Ante,* at 9. Feel free to skip over those pages of the majority's

opinion. With broad official-acts immunity covering the field, this ostensibly narrower immunity serves little purpose. In any event, this case simply does not turn on conduct within the President's "exclusive sphere of constitutional authority," and the majority's attempt to apply a core immunity of its own making expands the concept of "core constitutional powers," *ante,* at 6, beyond any recognizable bounds.

The idea of a narrow core immunity might have some intuitive appeal, in a case that actually presented the issue. If the President's power is "conclusive and preclusive" on a given subject, then Congress should not be able to "ac[t] upon the subject." *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 638 (1952) (Jackson, J., concurring). In his *Youngstown* concurrence, Justice Robert Jackson posited that the President's "power of removal in executive agencies" seemed to fall within this narrow category. *Ibid.,* n. 4. Other decisions of this Court indicate that the pardon power also falls in this category, see *United States* v. *Klein*, 13 Wall. 128, 147 (1872) ("To the executive alone is intrusted the power of pardon; and it is granted without limit"), as does the power to recognize foreign countries, see *Zivotofsky* v. *Kerry*, 576 U. S. 1, 32 (2015) (holding that the President has "exclusive power . . . to control recognition determinations").

In this case, however, the question whether a former President enjoys a narrow immunity for the "exercise of his core constitutional powers," *ante,* at 6, has never been at issue, and for good reason: Trump was not criminally indicted for taking actions that the Constitution places in the unassailable core of Executive power. He was not charged, for example, with illegally wielding the Presidency's pardon power or veto power or appointment power or even removal power. Instead, Trump was charged with a conspiracy to commit fraud to subvert the Presidential election. It is true that the detailed indictment in this case alleges that Trump

threatened to remove an Acting Attorney General who would not carry out his scheme. See, *e.g.*, App. 216–217, Indictment ¶¶74, 77. Yet it is equally clear that the Government does not seek to "impose criminal liability on the [P]resident for exercising or talking about exercising the appointment and removal power." Tr. of Oral Arg. 127. If that were the majority's concern, it could simply have said that the Government cannot charge a President's threatened use of the removal power as an overt act in the conspiracy. It says much more.

The core immunity that the majority creates will insulate a considerably larger sphere of conduct than the narrow core of "conclusive and preclusive" powers that the Court previously has recognized. The first indication comes when the majority includes the President's broad duty to "'take Care that the Laws be faithfully executed'" among the core functions for which a former President supposedly enjoys absolute immunity. *Ante,* at 20 (quoting Art. II, §3). That expansive view of core power will effectively insulate all sorts of noncore conduct from criminal prosecution. Were there any question, consider how the majority applies its newly minted core immunity to the allegations in this case. It concludes that "Trump is . . . absolutely immune from prosecution for" any "conduct involving his discussions with Justice Department officials." *Ante,* at 21. That conception of core immunity expands the "conclusive and preclusive" category beyond recognition, foreclosing the possibility of prosecution for broad swaths of conduct. Under that view of core powers, even fabricating evidence and insisting the Department use it in a criminal case could be covered. The majority's conception of "core" immunity sweeps far more broadly than its logic, borrowed from *Youngstown*, should allow.

The majority tries to assuage any concerns about its made-up core immunity by suggesting that the Government

agrees with it. See *ante,* at 34. That suggestion will surprise the Government. To say, as the Government did, that a "small core of exclusive official acts" such as "the pardon power, the power to recognize foreign nations, the power to veto legislation, [and] the power to make appointments" cannot be regulated by Congress, see Tr. of Oral Arg. 85–87, does not suggest that the Government agrees with immunizing any and all conduct conceivably related to the majority's broad array of supposedly "core" powers. The Government in fact advised this Court to "leav[e] potentially more difficult questions" about the scope of any immunity "that might arise on different facts for decision if they are ever presented." Brief for United States 45. That would have made sense. The indictment here does not pose any threat of impermissibly criminalizing acts within the President's "conclusive and preclusive" authority. Perhaps for this reason, even Trump discouraged consideration of "a narrower scope of immunity," claiming that such an immunity "would be nearly impossible to fashion, and would certainly involve impractical line-drawing problems in every application." Brief for Petitioner 43–44.

When forced to wade into thorny separation-of-powers disputes, this Court's usual practice is to "confine the opinion only to the very questions necessary to decision of the case." *Dames & Moore* v. *Regan,* 453 U. S. 654, 661 (1981). There is plenty of peril and little value in crafting a core immunity doctrine that Trump did not seek and that rightly has no application to this case.

## VI

Not content simply to invent an expansive criminal immunity for former Presidents, the majority goes a dramatic and unprecedented step further. It says that acts for which the President is immune must be redacted from the narrative of even wholly private crimes committed while in office. They must play no role in proceedings regarding private

criminal acts. See *ante,* at 30–32.

Even though the majority's immunity analysis purports to leave unofficial acts open to prosecution, its draconian approach to official-acts evidence deprives these prosecutions of any teeth. If the former President cannot be held criminally liable for his official acts, those acts should still be admissible to prove knowledge or intent in criminal prosecutions of unofficial acts. For instance, the majority struggles with classifying whether a President's speech is in his capacity as President (official act) or as a candidate (unofficial act). Imagine a President states in an official speech that he intends to stop a political rival from passing legislation that he opposes, no matter what it takes to do so (official act). He then hires a private hitman to murder that political rival (unofficial act). Under the majority's rule, the murder indictment could include no allegation of the President's public admission of premeditated intent to support the *mens rea* of murder. That is a strange result, to say the least.[5]

The majority's extraordinary rule has no basis in law. Consider the First Amendment context. Although the First Amendment prohibits criminalizing most speech, it "does not prohibit the evidentiary use of speech," including its use "to prove motive or intent." *Wisconsin* v. *Mitchell*, 508 U. S. 476, 489 (1993). Evidentiary rulings and limiting instructions can ensure that evidence concerning official acts is "considered only for the proper purpose for which it was admitted." *Huddleston* v. *United States*, 485 U. S. 681, 691–692 (1988). The majority has no coherent explanation as to

---

[5] The majority suggests, in a footnote, that a "prosecutor may point to the public record to show the fact that the President performed the official act," so long as the prosecutor does not "invite the jury to inspect" the act in any way. *Ante,* at 32, n. 3. Whatever that suggestion is supposed to accomplish, it does not salvage the majority's nonsensical evidentiary rule.

why these protections that are sufficient in every other context would be insufficient here. It simply asserts that it would be "untenable" and would deprive immunity of its "'intended effect.'" *Ante,* at 31 (quoting *Fitzgerald*, 457 U. S., at 756). The majority hazards an explanation that the use of official-acts evidence will "raise a unique risk that the jurors' deliberations will be prejudiced by their views of the President's policies and performance while in office." *Ante,* at 31. That "unique risk," however, is not a product of introducing official-acts evidence. It is simply the risk involved in any suit against a former President, including the private-acts prosecutions the majority says it would allow.

## VII

Today's decision to grant former Presidents immunity for their official acts is deeply wrong. As troubling as this criminal immunity doctrine is in theory, the majority's application of the doctrine to the indictment in this case is perhaps even more troubling. In the hands of the majority, this new official-acts immunity operates as a one-way ratchet.

First, the majority declares all of the conduct involving the Justice Department and the Vice President to be official conduct, see *ante,* at 19–24, yet it refuses to designate any course of conduct alleged in the indictment as private, despite concessions from Trump's counsel.[6] Trump's counsel conceded, for example, that the allegation that Trump

––––––––

[6]The majority protests that it is "adher[ing] to time-tested practices" by "deciding what is required to dispose of this case and remanding" to lower courts to sort out the details. *Ante,* at 41. Yet it implicitly acknowledges that it reaches far beyond what any lower court considered or any party briefed by designating certain conduct official in the first instance. See *ibid.* (noting "the lack of factual analysis in the lower courts, and the lack of briefing on how to categorize the conduct alleged"). In reaching out to shield some conduct as official while refusing to recognize any conduct as unofficial, the majority engages in judicial activism, not judicial restraint.

"turned to a private attorney who was willing to spread knowingly false claims of election fraud to spearhead his challenges to the election results" "sounds private." Tr. of Oral Arg. 29. He likewise conceded that the allegation that Trump "conspired with another private attorney who caused the filing in court of a verification signed by [Trump] that contained false allegations to support a challenge" "sounds private." *Ibid.*; see also *id.*, at 36–37 (Trump's counsel explaining that it is not "disputed" that such conduct is "unofficial"). Again, when asked about allegations that "[t]hree private actors . . . helped implement a plan to submit fraudulent slates of presidential electors to obstruct the certification proceeding, and [Trump] and a co-conspirator attorney directed that effort," Trump's counsel conceded the alleged conduct was "private." *Id.*, at 29–30. Only the majority thinks that organizing fraudulent slates of electors might qualify as an official act of the President, see *ante,* at 24–28, or at least an act so "interrelated" with other allegedly official acts that it might warrant protection, *ante,* at 28. If the majority's sweeping conception of "official acts" has any real limits, the majority is unwilling to reveal them in today's decision.

Second, the majority designates certain conduct immune while refusing to recognize anything as prosecutable. It shields large swaths of conduct involving the Justice Department with immunity, see *ante,* at 19–21; see also Part V, *supra,* but it does not give an inch in the other direction. The majority admits that the Vice President's responsibility "'presiding over the Senate'" is "'not an "executive branch" function,'" and it further admits that the President "plays no direct constitutional or statutory role" in the counting of electoral votes. *Ante,* at 23–24. Yet the majority refuses to conclude that Trump lacks immunity for his alleged attempts to "enlist the Vice President to use his ceremonial role at the January 6 certification proceeding to fraudulently alter the election results." App. 187, Indictment

¶10(d). Instead, it worries that a prosecution for this conduct might make it harder for the President to use the Vice President "to advance [his] agenda in Congress." *Ante,* at 24. Such a prosecution, according to the majority, "may well hinder the President's ability to perform his constitutional functions." *Ibid.* Whether a prosecution for this conduct warrants immunity should have been an easy question, but the majority turns it into a debatable one. Remarkably, the majority goes further and declines to deny immunity even for the allegations that Trump organized fraudulent elector slates, pressured States to subvert the legitimate election results, and exploited violence at the Capitol to influence the certification proceedings. It is not conceivable that a prosecution for these alleged efforts to overturn a Presidential election, whether labeled official or unofficial under the majority's test, would pose any "'dangers of intrusion on the authority and functions of the Executive Branch,'" *ante,* at 14, and the majority could have said as much. Instead, it perseverates on a threshold question that should be immaterial.

Looking beyond the fate of this particular prosecution, the long-term consequences of today's decision are stark. The Court effectively creates a law-free zone around the President, upsetting the status quo that has existed since the Founding. This new official-acts immunity now "lies about like a loaded weapon" for any President that wishes to place his own interests, his own political survival, or his own financial gain, above the interests of the Nation. *Korematsu* v. *United States*, 323 U. S. 214, 246 (1944) (Jackson, J., dissenting). The President of the United States is the most powerful person in the country, and possibly the world. When he uses his official powers in any way, under the majority's reasoning, he now will be insulated from criminal prosecution. Orders the Navy's Seal Team 6 to assassinate a political rival? Immune. Organizes a military

coup to hold onto power?  Immune.  Takes a bribe in ex-
change for a pardon? Immune.  Immune, immune, immune.

Let the President violate the law, let him exploit the trap-
pings of his office for personal gain, let him use his official
power for evil ends.  Because if he knew that he may one
day face liability for breaking the law, he might not be as
bold and fearless as we would like him to be.  That is the
majority's message today.

Even if these nightmare scenarios never play out, and I
pray they never do, the damage has been done.  The rela-
tionship between the President and the people he serves
has shifted irrevocably.  In every use of official power, the
President is now a king above the law.

*          *          *

The majority's single-minded fixation on the President's
need for boldness and dispatch ignores the countervailing
need for accountability and restraint.  The Framers were
not so single-minded.  In the Federalist Papers, after "en-
deavor[ing] to show" that the Executive designed by the
Constitution "combines . . . all the requisites to energy," Al-
exander Hamilton asked a separate, equally important
question: "Does it also combine the requisites to safety, in a
republican sense, a due dependence on the people, a due re-
sponsibility?"  The Federalist No. 77, p. 507 (J. Harvard Li-
brary ed. 2009).  The answer then was yes, based in part
upon the President's vulnerability to "prosecution in the
common course of law."  *Ibid.*  The answer after today is no.

Never in the history of our Republic has a President had
reason to believe that he would be immune from criminal
prosecution if he used the trappings of his office to violate
the criminal law.  Moving forward, however, all former
Presidents will be cloaked in such immunity.  If the occu-
pant of that office misuses official power for personal gain,
the criminal law that the rest of us must abide will not pro-
vide a backstop.

With fear for our democracy, I dissent.

# SUPREME COURT OF THE UNITED STATES

_____

No. 23–939

_____

## DONALD J. TRUMP, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[July 1, 2024]

JUSTICE JACKSON, dissenting.

JUSTICE SOTOMAYOR has thoroughly addressed the
Court's flawed reasoning and conclusion as a matter of history, tradition, law, and logic.  I agree with every word of
her powerful dissent.  I write separately to explain, as succinctly as I can, the theoretical nuts and bolts of what, exactly, the majority has done today to alter the paradigm of
accountability for Presidents of the United States.  I also
address what that paradigm shift means for our Nation
moving forward.

I

To fully appreciate the profound change the majority has
wrought, one must first acknowledge what it means to have
immunity from criminal prosecution.  Put simply, immunity is "exemption" from the duties and liabilities imposed by
law.  Black's Law Dictionary 898 (11th ed. 2019); see *Hopkins* v. *Clemson*, 221 U. S. 636, 643 (1911) (explaining that
immunity is "exemption from legal process").  In its purest
form, the concept of immunity boils down to a maxim—
"'[t]he King can do no wrong'"—a notion that was firmly
"rejected at the birth of [our] Republic."  *Clinton* v. *Jones*,
520 U. S. 681, 697, n. 24 (1997) (quoting 1 W. Blackstone,
Commentaries *246 (Blackstone)); see *United States* v.
*Burr*, 25 F. Cas. 30, 34 (No. 14,692d) (CC Va. 1807).  To say

that someone is immune from criminal prosecution is to say
that, like a King, he "is not under the coercive power of the
law," which "will not suppose him capable of committing a
folly, much less a crime."  4 Blackstone *33.  Thus, being
immune is not like having a defense *under* the law.  Rather,
it means that the law does not apply to the immunized per-
son in the first place.  Conferring immunity therefore "cre-
ate[s] a privileged class free from liability for wrongs in-
flicted or injuries threatened."  *Hopkins*, 221 U. S., at 643.

It is indisputable that immunity from liability for wrong-
doing is the exception rather than the rule in the American
criminal justice system.  That is entirely unsurprising, for
the very idea of immunity stands in tension with founda-
tional principles of our system of Government.  It is a core
tenet of our democracy that the People are the sovereign,
and the Rule of Law is our first and final security.  "[F]rom
their own experience and their deep reading in history, the
Founders knew that Law alone saves a society from being
rent by internecine strife or ruled by mere brute power how-
ever disguised."  *United States* v. *Mine Workers*, 330 U. S.
258, 308 (1947) (Frankfurter, J., concurring in judgment).

A corollary to that principle sets the terms for this case:
"No man in this country is so high that he is above the law.
No officer of the law may set that law at defiance with im-
punity.  All the officers of the government, from the highest
to the lowest, are creatures of the law, and are bound to
obey it."  *United States* v. *Lee*, 106 U. S. 196, 220 (1882).  We
have long lived with the collective understanding that
"[d]ecency, security and liberty alike demand that govern-
ment officials shall be subjected to the same rules of con-
duct that are commands to the citizen," for "[i]n a govern-
ment of laws, existence of the government will be imperilled
if it fails to observe the law scrupulously."  *Olmstead* v.
*United States*, 277 U. S. 438, 485 (1928) (Brandeis, J., dis-
senting).

## II

## A

These foundational presuppositions are reflected in a procedural paradigm of rules and accountability that operates in the realm of criminal law—what I would call an individual accountability model.

The basic contours of that model are familiar, because they manifest in every criminal case. Criminal law starts with an act of the legislature, which holds the power "to define a crime, and ordain its punishment." *United States* v. *Wiltberger*, 5 Wheat. 76, 95 (1820); accord, *Ohio* v. *Johnson*, 467 U. S. 493, 499 (1984). Criminal statutes are laws of general applicability that express "the assent of the people's representatives" that certain conduct is off limits in our society. *Wooden* v. *United States*, 595 U. S. 360, 391 (2022) (GORSUCH, J., concurring in judgment).

When the Federal Government believes that someone has run afoul of a criminal statute and decides to exercise its prosecutorial discretion to pursue punishment for that violation, it persuades a grand jury that there is probable cause to indict. U. S. Const., Amdt. 5. Then, the Government marshals evidence to prove beyond a reasonable doubt that the defendant engaged in the prohibited conduct and possessed the requisite state of mind. See *United States* v. *Bailey*, 444 U. S. 394, 402 (1980) (observing that, to hold a person criminally liable, "the concurrence of . . . 'an evil-meaning mind [and] an evil-doing hand'" must be proved (quoting *Morissette* v. *United States*, 342 U. S. 246, 251 (1952))).

For his part, the defendant "stands accused but is presumed innocent until conviction upon trial or guilty plea." *Betterman* v. *Montana*, 578 U. S. 437, 441 (2016). Notably, criminal defendants have various constitutionally protected rights during the criminal-liability process, including the rights to a speedy and public trial, the right to have a jury decide guilt or innocence, the right to the assistance

of counsel, and the right to confront the witnesses against
him. Amdt. 6. The defendant also has at his disposal many
means to defend himself against the criminal charge. He
can, of course, seek to hold the Government to its burden of
proof at trial. And even before trial, in a motion to dismiss
the indictment, he might make any number of legal argu-
ments; he can assert, for example, that the Government's
charging document does not give adequate notice of the
charge against him or that the law he has been accused of
violating is unconstitutionally vague. See *Hamling* v.
*United States*, 418 U. S. 87, 117 (1974); *United States* v. *Da-
vis*, 588 U. S. 445, 451 (2019). He might further claim that
the law is unconstitutional as applied to his particular con-
duct. See *United States* v. *O'Brien*, 391 U. S. 367, 376
(1968). And he might maintain that his conduct, even if
proved, does not violate the law at issue. See, *e.g.*, *Fischer*
v. *United States*, 603 U. S. ___, ___ (2024) (slip op., at 2).

The defendant may also raise, and attempt to prove, af-
firmative defenses that "excuse conduct that would other-
wise be punishable." *Dixon* v. *United States*, 548 U. S. 1, 6
(2006). Generally speaking, affirmative defenses are deter-
minations (often adopted by legislation) that certain con-
duct otherwise punishable by law is justified. This might
be the case, for example, when the Legislature determines
that, under specified circumstances, the societal harm par-
ticular conduct causes "is outweighed by the need to avoid
an even greater harm." 1 P. Robinson, Criminal Law De-
fenses §24(a) (1984) (Robinson).

Importantly, a defense is *not* an immunity, even though
a defense can likewise result in a person charged with a
crime avoiding liability for his criminal conduct. Consistent
with our foundational norms, the individual accountability
model adheres to the presumption that the law applies to
all and that everyone must follow it; yet, the model makes
allowances for recognized defenses. One such defense is the

JACKSON, J., dissenting

special privilege that Government officials sometimes invoke when carrying out their official duties.[1]

All of this is to say that our Government has long functioned under an accountability paradigm in which no one is above the law; an accused person is innocent until proven guilty; and criminal defendants may raise defenses, both legal and factual, tailored to their particular circumstances, whether they be Government officials or ordinary citizens. For over two centuries, our Nation has survived with these principles intact.

## B

With that understanding of how our system of accountability for criminal acts ordinarily functions, it becomes much easier to see that the majority's ruling in this case breaks new and dangerous ground. Departing from the traditional model of individual accountability, the majority has concocted something entirely different: a Presidential accountability model that creates immunity—an exemption from criminal law—applicable only to the most powerful official in our Government.

### 1

So, how does this new Presidential accountability model work? An initial problem is the lack of clarity regarding what this new model entails. The majority announces only its most basic contours. See *ante,* at 6 (asserting that "the

——————

[1] See R. Perkins & R. Boyce, Criminal Law 1093 (3d ed. 1982) ("Deeds which otherwise would be criminal, such as taking or destroying property, taking hold of a person by force and against his will, placing him in confinement, or even taking his life, are not crimes if done with proper public authority"); see also 2 Robinson §141(a) (describing the public-authority defense, under which a defendant may escape liability if he "has been specifically authorized to engage in the conduct constituting the offense in order to protect or further a public interest"); Brief for United States 29–30, n. 11; *ante,* at 16, n. 3 (SOTOMAYOR, J., dissenting) (citing *Nardone* v. *United States*, 302 U. S. 379, 384 (1937)).

nature of Presidential power requires that a former President have some immunity from criminal prosecution for official acts during his tenure in office"). Instead of no immunity (the individual accountability model) or an unqualified grant of absolute immunity for "*all* official acts," Brief for Petitioner 44 (emphasis added), the majority purports to adopt something of a hybrid.[2] It holds that a former President may or may not be immune from criminal prosecution for conduct undertaken while in office, to be determined on a case-by-case basis. According to the majority, whether a former President is immune depends on how his criminal conduct is classified, as among three possible categories.

First, with respect to any criminal conduct relating to a President's "core constitutional powers"—those subjects "within his 'conclusive and preclusive' constitutional authority"—the President is entitled to absolute immunity from criminal prosecution. See *ante*, at 6, 8. Second, expanding outward from this "core," regarding all other "acts within the outer perimeter of [the President's] official responsibility," the President is entitled to "at least a *presumptive* immunity from criminal prosecution." *Ante*, at 14.

---

[2] Its feigned judicial humility notwithstanding, see *ante*, at 41, the majority's holding goes further—*much* further—than necessary to resolve this case. Petitioner's argument in both the lower courts and this one was that a former President is categorically immune from federal criminal prosecution for "all" acts within the outer perimeter of his official duties. See Opening Brief for Defendant-Appellant in No. 23–3228 (CADC, Dec. 23, 2023), p. 23; 91 F. 4th 1173, 1188–1189, 1195, 1208 (CADC 2024) (*per curiam*); Brief for Petitioner 41–47 (arguing for absolute immunity for "all actions within the 'outer perimeter'" of a President's responsibilities, and imploring the Court not to adopt a "'function-based' approach"). Thus, it would have been enough for the Court simply to reject petitioner's categorical claim and leave it at that. But the majority *sua sponte* rephrased the question presented, and it now takes full advantage of this opportunity to devise from whole cloth an entirely new legal framework for judicial evaluation of potential criminal immunity for former Presidents.

Third, if the criminal conduct at issue comprises "unofficial acts, there is no immunity." *Ante*, at 15.[3]

Applying the majority's new Presidential accountability model thus seems to involve bearing down on the indictment's allegations and making a series of determinations about the nature of the conduct at issue. From the structure of the paradigm, it appears that the first decision point is whether the alleged criminal conduct involves one of the President's "core" powers. If so (and apparently regardless of the degree to which the conduct implicates that core power), the President is absolutely immune from criminal liability for engaging in that criminal conduct. If not, then one must proceed to consider whether the conduct qualifies as an "official" act or "unofficial" act of that President. If the crime is an official act, the President is presumptively immune from criminal prosecution and punishment. But even then, immunity still hinges on whether there is any legal or factual basis for concluding that the presumption of immunity has been rebutted. Alternatively, if the charged conduct is an unofficial act (a determination that, inci-

—————

[3] It is important to note that the majority reframes the immunity question presented here as a separation of powers concern that is compelled by Article II—as if what is being asked is whether Congress can criminalize executive prerogatives. See, *e.g.*, *ante*, at 6–7; see also *ante*, at 1–2 (BARRETT, J., concurring in part). But that is not anywhere close to what is happening in this case. No one maintains that Congress has passed a law that specifically criminalizes the President's use of any power that the Constitution vests exclusively in the Executive, much less that the Judiciary is being conscripted to adjudicate the propriety of such a statute. To the contrary, the indictment here invokes criminal statutes of general applicability that everyone is supposed to follow, both on and off the job. So, the real question is: Can the President, too, be held accountable for committing crimes while he is undertaking his official duties? The nature of his authority under Article II (whether conclusive and preclusive, or shared with Congress, or otherwise) is entirely beside the point.

dentally, courts must make without considering the President's motivations, *ante,* at 18), the President is not immune.[4]

2

The majority's multilayered, multifaceted threshold parsing of the character of a President's criminal conduct differs from the individual accountability model in several crucial respects. For one thing, it makes it next to impossible to know *ex ante* when and under what circumstances a President will be subject to accountability for his criminal acts. For every allegation, courts must run this gauntlet first—no matter how well documented or heinous the criminal act might be.

Thus, even a hypothetical President who admits to having ordered the assassinations of his political rivals or critics, see, *e.g.,* Tr. of Oral Arg. 9, or one who indisputably instigates an unsuccessful coup, *id.*, at 41–43, has a fair shot at getting immunity under the majority's new Presidential accountability model. That is because whether a President's conduct will subject him to criminal liability turns on the court's evaluation of a variety of factors related to the character of that particular act—specifically, those characteristics that imbue an act with the status of "official" or "unofficial" conduct (minus motive). In the end, then, under the majority's new paradigm, whether the President will be exempt from legal liability for murder, assault, theft, fraud,

——————

[4] JUSTICE BARRETT's version of the Presidential accountability paradigm works slightly differently; she would have us ask, first, "whether the relevant criminal statute reaches the President's official conduct." *Ante,* at 2. But, again, what is at issue here are statutes of general applicability—they only "reach" the President's conduct to the extent that he chooses to engage in the prohibited behavior. See n. 3, *supra.* JUSTICE BARRETT's framing, thus, sidesteps the fact that, when immunity is being considered, what is actually at issue is whether the President is exempt from punishment if he opts to exercise his official duties using means that violate criminal law.

or any other reprehensible and outlawed criminal act will turn on whether he committed that act in his official capacity, such that the answer to the immunity question will always and inevitably be: It depends.

Under the individual accountability paradigm, the accountability analysis is markedly less convoluted, and leads to a more certain outcome. None of the same complications or consequences arise, because, as I have explained, there are no exemptions from the criminal law for any person, but every defendant can assert whatever legal arguments and defenses might be applicable under governing law. Since no one is above the law, everyone can focus on what the law demands and permits, and on what the defendant did or did not do; no one has to worry about characterizing any criminal conduct as official or unofficial in order to assess the applicability of an immunity at the outset.

The majority's new Presidential accountability model is also distinct insofar as it accepts as a basic starting premise that generally applicable criminal laws do *not* apply to everyone in our society. In the majority's view, while all other citizens of the United States must do their jobs and live their lives within the confines of criminal prohibitions, the President cannot be made to do so; he must sometimes be exempt from the law's dictates depending on the character of his conduct. Indeed, the majority holds that the President, unlike anyone else in our country, is comparatively free to engage in criminal acts in furtherance of his official duties.

That point bears emphasizing. Immunity can issue for Presidents under the majority's model even for unquestionably and intentionally egregious criminal behavior. Regardless of the nature or the impact of the President's criminal conduct, so long as he is committing crimes "pursuant to the powers invested exclusively in him by the Constitution," *ante,* at 7, or as needed "to carry out his constitutional duties without undue caution," *ante,* at 14, he is likely to be

deemed immune from prosecution.[5]

Ultimately, the majority's model simply sets the criminal law to one side when it comes to crimes allegedly committed by the President. Before accountability can be sought or rendered, the Judiciary serves as a newfound special gate-keeper, charged not merely with interpreting the law but with policing whether it applies to the President *at all*. Also, under the new Presidential accountability model, the starting presumption is that the criminal law does *not* apply to Presidents, no matter how obviously illegal, harmful, or unacceptable a President's official behavior might be. Regardless of all that, courts must now ensure that a former President is *not* held accountable for any criminal conduct he engages in while he is on duty, unless his conduct consists primarily (and perhaps solely) of unofficial acts.

3

The structure and function of the two accountability paradigms are not the only differences—the models also assign different roles to participants in the criminal justice system, and they ultimately generate different relationships between the Presidency and the Rule of Law.

Under the individual accountability model, duty-bound prosecutorial officers initially exercise their discretion to decide whether to seek punishment for alleged violations of

––––––––

[5]To fully appreciate the oddity of making the criminal immunity determination turn on the character of the President's responsibilities, consider what the majority says is one of the President's "conclusive and preclusive" prerogatives: "'[t]he President's power to remove . . . those who wield executive power on his behalf.'" *Ante,* at 8 (quoting *Seila Law LLC* v. *Consumer Financial Protection Bureau,* 591 U. S. 197, 204 (2020)). While the President may have the authority to decide to remove the Attorney General, for example, the question here is whether the President has the option to remove the Attorney General by, say, poisoning him to death. Put another way, the issue here is not whether the President has exclusive removal power, but whether a generally applicable criminal law prohibiting murder can restrict *how* the President exercises that authority.

criminal law (a determination that is made based on numerous factors). And even if prosecutors decide to bring a charge, a jury of the criminal defendant's peers ultimately determines whether that defendant (including a former President) will actually be held to account for having engaged in unlawful conduct, after the court has resolved any legal challenges and has instructed the jury as to the requirements of the law.

By contrast, under the majority's new Presidential accountability paradigm, what a prosecutor or jury does may not even matter, since the courts take center stage once charges are brought against a former President, marshaling their resources to conduct a complex and amorphous threshold immunity evaluation. Whether a former President will be entirely exempted from the dictates of the law (such that the roles of other participants in the criminal justice process become irrelevant) requires a judicial assessment, in the first instance, of his criminal conduct and the circumstances under which he acted.

Finally, and most importantly, recall that under the individual accountability model, an indicted former President can raise an affirmative defense just like any other criminal defendant. This means that the President remains answerable to the law, insofar as he must show that he was justified in committing a criminal act while in office under the given circumstances. In other words, while the President might indeed be privileged to commit a crime in the course of his official duties, any such privilege exists only when the People (acting either through their elected representatives or as members of a jury) determine that the former President's conduct was in fact justified, notwithstanding the general criminal prohibition.

Under the majority's immunity regime, by contrast, the President can commit crimes in the course of his job even under circumstances *in which no one thinks he has any ex-*

*cuse*; the law simply does not apply to him. Unlike a defendant who invokes an affirmative defense and relies on a legal determination that there was a good reason for his otherwise unlawful conduct, a former President invoking immunity relies on the premise that he can do whatever he wants, however he wants, so long as he uses his "'official power'" in doing so. *Ante,* at 19. In the former paradigm, the President remains subject to law; in the latter, he is above it.

## III

JUSTICE SOTOMAYOR has already warned of the dire consequences that are likely to follow from the majority's decision in this case. *Ante,* at 29–30 (dissenting opinion). I have thus far endeavored merely to explain what today's ruling amounts to on a theoretical level: the Court's abandonment of the individual accountability model as applied to Presidents, and its introduction of a new Presidential accountability model that authorizes the Judiciary to exempt Presidents from punishment under law, depending on the official or unofficial character of the criminal conduct at issue.

Here, I will highlight just two observations about the results that follow from this paradigm shift. First, by changing the accountability paradigm in this fashion, the Court has unilaterally altered the balance of power between the three coordinate branches of our Government as it relates to the Rule of Law, aggrandizing power in the Judiciary and the Executive, to the detriment of Congress. Second, the majority's new Presidential accountability model undermines the constraints of the law as a deterrent for future Presidents who might otherwise abuse their power, to the detriment of us all.

## A

Consider the structural implications of today's decision from the standpoint of the separation of powers. Until now,

Congress's laws, passed by the representatives of the People, bound the People and their elected officials just the same. Law, we have explained, "is the only supreme power in our system of government, and every man who by accepting office participates in its functions is only the more strongly bound to submit to that supremacy, and to observe the limitations which it imposes upon the exercise of the authority which it gives." *Lee*, 106 U. S., at 220. With its adoption of a paradigm that sometimes exempts the President from the dictates of the law (when the Court says so), this Court has effectively snatched from the Legislature the authority to bind the President (or not) to Congress's mandates, and it has also thereby substantially augmented the power of both the Office of the Presidency and itself.

As to the former, it should go without saying that the Office of the Presidency, the apex of the Executive Branch, is made significantly more powerful when the constraints of the criminal law are lifted with respect to the exercise of a President's official duties. After today's ruling, the President must still "take Care that the Laws be faithfully executed," Art. II, §3; yet, when acting in his official capacity, he has no obligation to follow those same laws himself.

But whatever additional power the majority's new Presidential accountability model gives to the Presidency, it gives doubly to the Court itself, for the majority provides no meaningful guidance about how to apply this new paradigm or how to categorize a President's conduct. For instance, its opinion lists some examples of the "core" constitutional powers with respect to which the President is now entitled to absolute immunity—a list that apparently includes the removal power, the power to recognize foreign nations, and the pardon power. *Ante,* at 6–9. However, the majority does not—and likely cannot—supply any useful or administrable definition of the scope of that "core." For what it's worth, the Constitution's text is no help either; Article II

does not contain a Core Powers Clause.[6]  So the actual
metes and bounds of the "core" Presidential powers are re-
ally anyone's guess.

Nor does the majority explain how to consistently distin-
guish between official and unofficial acts.  Quite the oppo-
site, in fact.  While acknowledging that this is a critical line
that courts must draw in order for its new accountability
model to work properly, the majority simultaneously cau-
tions that making this distinction "can be difficult"—likely
a gross understatement given the recognized "breadth of
the President's 'discretionary responsibilities' under the
Constitution and laws of the United States." *Ante,* at 17.
The majority likewise provides no guidance as to when,
how, or why the President's "presumptive" immunity for
noncore official acts might be rebutted, saying only that ap-
plying the criminal law to a President's acts must pose "no
'dangers of intrusion on the authority and functions of the
Executive Branch.'" *Ante,* at 14 (quoting *Nixon* v. *Fitzger-
ald,* 457 U. S. 731, 754 (1982)).

At most, to distinguish official from unofficial conduct,
the majority advises asking whether the former President's
conduct was "'manifestly or palpably beyond [his] author-
ity.'" *Ante,* at 17 (quoting *Blassingame* v. *Trump,* 87 F. 4th
1, 13 (CADC 2023)).  But that test can be illusory, as is ev-
idenced by the facts alleged in this very case.  With respect
to the indictment's allegations concerning petitioner's at-
tempt to assemble false slates of electors in conjunction

––––––––––––

[6]Some of the powers the majority designates as "core" powers are, at
best, implied from indefinite constitutional language.  See, *e.g.*, *Seila
Law*, 591 U. S., at 268–269 (KAGAN, J., concurring in judgment with re-
spect to severability and dissenting in part) ("Nowhere does the text say
anything about the President's power to remove subordinate officials at
will"); *Zivotofsky* v. *Kerry*, 576 U. S. 1, 11 (2015) ("[T]he Constitution does
not use the term 'recognition,' either in Article II or elsewhere"); *id.*, at
63 (ROBERTS, C. J., dissenting) (calling the "asserted textual bases" for
an exclusive Presidential recognition power "tenuous").

with the events of January 6, 2021, for example, the major-
ity admits that the "alleged conduct cannot be neatly cate-
gorized," and that "[t]he analysis therefore . . . may prove to
be challenging." *Ante,* at 28–29. With that, at least, I could
not agree more.

This much is clear: Before today, none of these kinds of
inquiries was necessary for criminal liability to be fairly as-
sessed with respect to persons accused of having engaged in
criminal conduct. And, frankly, none is needed now—ex-
cept as relates to the President under the new paradigm the
majority has crafted.

Perhaps even more troubling, while Congress (the branch
of our Government most accountable to the People) is the
entity our Constitution tasks with deciding, as a general
matter, what conduct is on or off limits, the Court has now
arrogated that power unto itself when that question per-
tains to the President. In essence, the Court has now im-
posed its own preclearance requirement on the application
of Congress's laws to a former President alleged to have
committed crimes while in office. Who will be responsible
for drawing the crucial "'line between [the President's] per-
sonal and official affairs'"? *Ante,* at 29. To ask the question
is to know the answer. A majority of this Court, applying
an indeterminate test, will pick and choose which laws ap-
ply to which Presidents, by labeling his various allegedly
criminal acts as "core," "official," or "manifestly or palpably"
beyond the President's authority.

Ironically, then, while purportedly seeking to transcend
politics, see *ante,* at 41–42, the Court today displaces the
independent judgments of the political branches about the
circumstances under which the criminal law should apply.
Effectively, the Court elbows out of the way both Congress
and prosecutorial authorities within the Executive Branch,
making itself the indispensable player in all future at-
tempts to hold former Presidents accountable to generally
applicable criminal laws. "The Framers, however, did not

make the judiciary the overseer of our government."
*Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 594
(1952) (Frankfurter, J., concurring). To be sure, this Court
may sometimes "have to intervene in determining where
authority lies as between the democratic forces in our
scheme of government." *Id.*, at 597. But it has long been
understood that "we should be wary and humble" when do-
ing so. *Ibid.*

The majority displays no such caution or humility now.
Instead, the Court today transfers from the political
branches to itself the power to decide when the President
can be held accountable. What is left in its wake is a greatly
weakened Congress, which must stand idly by as the Pres-
ident disregards its criminal prohibitions and uses the pow-
ers of his office to push the envelope, while choosing to fol-
low (or not) existing laws, as he sees fit. We also now have
a greatly empowered Court, which can opt to allow Con-
gress's policy judgments criminalizing conduct to stand (or
not) with respect to a former President, as a matter of its
own prerogative.

### B

If the structural consequences of today's paradigm shift
mark a step in the wrong direction, then the practical con-
sequences are a five-alarm fire that threatens to consume
democratic self-governance and the normal operations of
our Government. The majority shoos away this possibility.
*Ante,* at 37 (accusing the dissents of "strik[ing] a tone of
chilling doom that is wholly disproportionate to what the
Court actually does today"). But JUSTICE SOTOMAYOR
makes this point plain, see *ante,* at 29–30, and I will not
belabor it.

Here, I will merely observe that, from a theoretical per-
spective, philosophers have long considered deterrence to
be a key justification for adopting and maintaining systems

that ensure accountability for criminal conduct.[7]  For that same reason, some commentators also maintain that decreasing the certainty of accountability for wrongful acts at least arguably reduces incentives to follow the law.[8]

Under the individual accountability model, because everyone is subject to the law, the potential of criminal liability operates as a constraint on the actions and decisions of everyone, including the President.  After today, that reality is no more. Consequently, our Nation has lost a substantial check on Presidents who would use their official powers to commit crimes with impunity while in office.

So, one might ask, what remains of accountability for Presidents under law?  With today's paradigm shift, the majority leaves in place only the chance that this Court might someday determine that the criminal conduct in question was an "unofficial" act, or that the Government will somehow rebut the presumption of immunity that applies to a President's official acts, such that criminal consequences might attach.  But with the parameters of official and unofficial conduct unknown, I think it highly unlikely that a sitting President would feel constrained by these remote possibilities.

—————

[7] See, *e.g.*, Plato, Laws 274 (B. Jowett transl. 2000) ("Not that he is punished because he did wrong, for that which is done can never be undone, but in order that in future times, he, and those who see him corrected, may utterly hate injustice, or at any rate abate much of their evildoing"); see also J. Bentham, The Rationale of Punishment 20 (1830) ("General prevention ought to be the chief end of punishment, as it is its real justification"); A. von Hirsch, Doing Justice: The Choice of Punishments 44 (1976) ("The threat and imposition of punishment is called for in order to secure compliance—not full compliance, but more compliance than there might be were there no legal penalties at all").

[8] See, *e.g.*, M. Ryan, Taking Another Look at Second-Look Sentencing, 81 Brooklyn L. Rev. 149, 156, and n. 37 (2015) ("[U]ndermining the . . . certainty of punishment . . . could undermine the deterrence value of punishment").

All of this leads me to ponder why, exactly, has the majority concluded that an indeterminate "core"-versus-"official"-versus-"unofficial" line-drawing exercise is the better way to address potential criminal acts of a President? Could it be that the majority believes the obviously grave dangers of shifting from the individual accountability model to the Presidential accountability model might nevertheless be offset by the great benefits of doing so? Cf. J. Bentham, A Fragment on Government and an Introduction to the Principles of Morals and Legislation 3 (W. Harrison ed. 1948) (arguing that acts can be justified by the maxim that "it is the greatest happiness of the greatest number that is the measure of right and wrong" (emphasis deleted)).

Some of the majority's analysis suggests as much. As far as I can tell, the majority is mostly concerned that, without immunity, Presidents might "be chilled from taking the 'bold and unhesitating action' required of an independent Executive." *Ante,* at 13. The Court's opinion candidly laments that application of the law to Presidents might not be evenhanded, and that, as a result, Presidents might be less "'vigorous' and 'energetic'" as executive officers. *Ante,* at 10; accord, *ante,* at 39. But that concern ignores (or rejects) the foundational principles upon which the traditional individual accountability paradigm is based. Worse still, promoting more vigor from Presidents in exercising their official duties—and, presumably, less deliberation—invites breathtaking risks in terms of harm to the American people that, in my view, far outweigh the benefits.

This is not to say that the majority is wrong when it perceives that it can be cumbersome for a President to have to follow the law while carrying out his duty to enforce it. It is certainly true that "[a] scheme of government like ours no doubt at times feels the lack of power to act with complete, all-embracing, swiftly moving authority." *Youngstown*, 343 U. S., at 613 (Frankfurter, J., concurring). But

any American who has studied history knows that "our government was *designed* to have such restrictions." *Ibid.* (emphasis added).  Our Constitution's "separation of powers was adopted by the Convention of 1787, not to promote efficiency but to preclude the exercise of arbitrary power.  The purpose was, not to avoid friction, but . . . to save the people from autocracy." *Myers* v. *United States*, 272 U. S. 52, 293 (1926) (Brandeis, J., dissenting).

Having now cast the shadow of doubt over when—if ever—a former President will be subject to criminal liability for any criminal conduct he engages in while on duty, the majority incentivizes all future Presidents to cross the line of criminality while in office, knowing that unless they act "manifestly or palpably beyond [their] authority," *ante,* at 17, they will be presumed above prosecution and punishment alike.

But the majority also tells us not to worry, because "[l]ike everyone else, the President is subject to prosecution in his *unofficial* capacity." *Ante,* at 40 (emphasis added).  This attempted reassurance is cold comfort, even setting aside the fact that the Court has neglected to lay out a standard that reliably distinguishes between a President's official and unofficial conduct.  Why?  Because there is *still* manifest inequity: Presidents alone are now free to commit crimes when they are on the job, while all other Americans must follow the law in all aspects of their lives, whether personal or professional. The official-versus-unofficial act distinction also seems both arbitrary and irrational, for it suggests that the unofficial criminal acts of a President are the only ones worthy of prosecution.  Quite to the contrary, it is when the President commits crimes using his unparalleled official powers that the risks of abuse and autocracy will be most dire.  So, the fact that, "unlike anyone else, the President is" vested with "sweeping powers and duties," *ibid.,* actually underscores, rather than undermines, the grim stakes of setting the criminal law to the side when the President

flexes those very powers.

The vision John Adams enshrined in the Massachusetts Declaration of Rights—"'a government of laws and not of men'"—speaks directly to this concept. *Mine Workers*, 330 U. S., at 307 (Frankfurter, J., concurring in judgment). Adams characterized that document as an homage to the Rule of Law; it reflected both a flat "rejection in positive terms of rule by fiat" and a solemn promise that "[e]very act of government may be challenged by an appeal to law." *Id.*, at 308. Thanks to the majority, that vision and promise are likely to be fleeting in the future. From this day forward, Presidents of tomorrow will be free to exercise the Commander-in-Chief powers, the foreign-affairs powers, and all the vast law enforcement powers enshrined in Article II however they please—including in ways that Congress has deemed criminal and that have potentially grave consequences for the rights and liberties of Americans.

## IV

To the extent that the majority's new accountability paradigm allows Presidents to evade punishment for their criminal acts while in office, the seeds of absolute power for Presidents have been planted. And, without a doubt, absolute power corrupts absolutely. "If one man can be allowed to determine for himself what is law, every man can. That means first chaos, then tyranny." *Id.*, at 312. Likewise, "[i]f the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy." *Olmstead*, 277 U. S., at 485 (Brandeis, J., dissenting). I worry that, after today's ruling, our Nation will reap what this Court has sown.

Stated simply: The Court has now declared for the first time in history that the most powerful official in the United States can (under circumstances yet to be fully determined) become a law unto himself. As we enter this uncharted territory, the People, in their wisdom, will need to remain ever

attentive, consistently fulfilling their established role in our constitutional democracy, and thus collectively serving as the ultimate safeguard against any chaos spawned by this Court's decision. For, like our democracy, our Constitution is "the creature of their will, and lives only by their will." *Cohens* v. *Virginia*, 6 Wheat. 264, 389 (1821).

For my part, I simply cannot abide the majority's senseless discarding of a model of accountability for criminal acts that treats every citizen of this country as being equally subject to the law—as the Rule of Law requires. That core principle has long prevented our Nation from devolving into despotism. Yet the Court now opts to let down the guardrails of the law for one extremely powerful category of citizen: any future President who has the will to flout Congress's established boundaries.

In short, America has traditionally relied on the law to keep its Presidents in line. Starting today, however, Americans must rely on the courts to determine when (if at all) the criminal laws that their representatives have enacted to promote individual and collective security will operate as speedbumps to Presidential action or reaction. Once self-regulating, the Rule of Law now becomes the rule of judges, with courts pronouncing which crimes committed by a President have to be let go and which can be redressed as impermissible. So, ultimately, this Court itself will decide whether the law will be any barrier to whatever course of criminality emanates from the Oval Office in the future. The potential for great harm to American institutions and Americans themselves is obvious.

\*      \*      \*

The majority of my colleagues seems to have put their trust in our Court's ability to prevent Presidents from becoming Kings through case-by-case application of the indeterminate standards of their new Presidential accountability paradigm. I fear that they are wrong. But, for all our

sakes, I hope that they are right.

   In the meantime, because the risks (and power) the Court has now assumed are intolerable, unwarranted, and plainly antithetical to bedrock constitutional norms, I dissent.